**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BRAD AMOS,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **vs.** | ] | **Case No:** |
| | ] | |
| **THE LAMPO GROUP, LLC, d/b/a** | ] | |
| **RAMSEY SOLUTIONS; DAVE** | ] | |
| **RAMSEY** | ] | **JURY DEMAND** |
| | ] | |
| **Defendants.** | ] | |

## COMPLAINT

Comes now the Plaintiff, Brad Amos, by and through counsel and for cause of action will respectfully show to the Court as follows:

### JURISDICTION and VENUE

1.      This action involves the application of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*.

2.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

3.      Dave Ramsey is hereinafter referred to as "Mr. Ramsey" or "Ramsey" in this Complaint.

4.      The Defendants are collectively referred to as "Defendants" in this Complaint.

5.      Plaintiff was an employee as defined under all laws relevant to this lawsuit.

6.      Lampo was an employer as defined under all laws relevant to this lawsuit.

1

## ADMINISTRATIVE PREREQUISITE

7.     Plaintiff has fulfilled all conditions precedent to the institution of this action under 42 U.S.C.A. § 2000e. A Notice of Right to Sue was issued on September 10, 2020, and was received by Plaintiff on September 14, 2020. A true and correct copy of which is attached hereto as Exhibit A. Further, Defendant is a corporation that employs more than fifteen employees.

## PARTIES

8.     Brad Amos is a resident of Williamson County, College Grove, Tennessee.

9.     Defendant The Lampo Group, LLC, d/b/a Ramsey Solutions (hereinafter "Lampo") is a Tennessee LLC doing business and headquartered in Williamson County, Tennessee. Registered Agent for service of process is Mark Floyd, 1011 Reams Fleming Boulevard, Franklin, Tennessee 37064.

## FACTUAL ALLEGATIONS

10.     From 2006 until 2019, Plaintiff worked in Los Angeles as a motion picture trailer editor for BLT Communications.

11.     Plaintiff was raised in a Christian home and continues to practice his Christian beliefs.

12.     Plaintiff's Christian beliefs included caring for family and doing unto others as you would have them do unto you.

13.     Prior to working with Defendant, Plaintiff was earning an annual salary of over $240,000.00 with benefits.

14.     In May 2019, Plaintiff was contacted by Kimberly Rudolph, a recruiter for Lampo.

15.     Rudolph sought to hire Plaintiff as "Senior Video Editor".

16.     Ms. Rudolph held several phone interviews with Plaintiff over the following weeks.

2

17.     These interviews covered Plaintiff's work history, salary, and included questions about Plaintiff's wife, children, and home life as well.

18.     Eventually, Plaintiff had online interviews with the Head of Post Production for Lampo, David DiCicco.

19.     Mr. DiCicco stated his intention was Plaintiff to take a lead editing role at Ramsey.

20.     Mr. DiCicco specifically highlighted a substantial role in the production of an upcoming documentary regarding student debt.

21.     Mr. DiCicco made it clear this would be Plaintiff's primary role if he accepted the position.

22.     In a 60-day interview process Lampo required over a dozen phone, Skype, and in person interviews with members of Lampo leadership.

23.     The interview process also required two spousal video interviews, a spousal dinner, personality testing, and Plaintiff turning in a monthly budget detailing personal finances.

24.     These interviews included Head of Production, Larry Anderson; Video Department Supervisor, Lara Johnson; and Head of Creative and Board Member, Luke LeFevre.

25.     Eventually, Plaintiff engaged in multiple on-site interviews with Lampo's leadership.

26.     At one of the interviews, Plaintiff expressed concerns with Mr. DiCicco and Larry Anderson regarding rumors that Ramsey Solutions was "cult-like".

27.     Plaintiff also expressed concern about rumors that Defendants did not support a family friendly atmosphere.

28.     Plaintiff indicated the importance of being able to spend unimpeded time with his family.

3

29.     Plaintiff expressed the importance of his work not interfering with his family life.

30.     Plaintiff has personal Christian religious religious beliefs which he regularly practices and values.

31.     Among those values, Plaintiff possesses a religious devotion to maintaining the health, safety, and wellbeing to his children and wife.

32.     Additionally, Plaintiff's religious beliefs reflect a respectful treatment for the safety of others and his community.

33.     Plaintiff has continuously held and actively practiced these values throughout his life.

34.     Plaintiff, knowing that Mr. Ramsey publicly identifies as a Christian and advocates for Christian beliefs, expressed his religious devotion to these values during the interview process.

35.     Given Mr. Ramsey's representations and public support of these, Plaintiff felt that Ramsey Solutions would be a great fit for himself, and more importantly his family.

36.     However, Plaintiff through his own interview research had also found certain reviews and local commentary indicating that Ramsey Solutions was more "cult-like" than Christian.

37.     After sharing his religious beliefs with Mr. DiCicco and Mr. Anderson, Plaintiff inquired to the validity of these rumors as sharing these values was an important part of his employment.

38.     In response, Mr. DiCicco and Mr. Anderson specifically stated the working environment at Lampo and with Mr. Ramsey was not "cult-like."

4

39.     Mr. DiCicco and Mr. Anderson assured Plaintiff that the working environment at Lampo and with Mr. Ramsey was indeed "family friendly" and would not interfere with his family life.

40.     Mr. Anderson, Ms. Johnson, and Mr. LeFevre also ensured Plaintiff his desire for unimpeded family time would be respected and accommodated.

41.     All interviewers guaranteed Lampo was a non-traditional work environment because of their strong commitment to family time for employees.

42.     Lampo constantly informed Plaintiff people who work for Lampo and Mr. Ramsey love the work environment.

43.     Defendants constantly informed Plaintiff this was evidenced by the fact they were voted a "best employer" by their employees in several publications.

44.     The leadership in these "on-site" interviews emphasized:

   a)   Plaintiff would have many opportunities for "quick and significant" advancements and salary increases based on his work performance.

   b)   Plaintiff would edit features and help create their new film department.

   c)   Defendants were not "cult like" in the way they operated

   d)   Defendants operated a "drama free" workplace

   e)   Lampo had been voted "best place to work" for over 10 years in a row by their own employees without interference from management.

   f)   Defendants were family friendly and would allow Plaintiff to spend time with his family without interference or involvement from Defendants.

45.     Lampo made a final offer to Plaintiff for an annual salary of $90,000.00 with a $10,000.00 relocation bonus.

46.     Plaintiff relied on each of the specific assurances by the Defendats in accepting the job with such a reduced salary.

47.     Plaintiff's start date was in August 2019 but he still needed to sell his home in California, so he had to leave his family in California to begin work on Lampo's documentary.

48.     On Plaintiff's first three days as an employee of Lampo, he went through what was known as the "onboarding" process.

49.     During this "onboarding," Plaintiff was introduced to the company culture.

50.     The onboarding process did not include specific job training for Plaintiff's job.

51.     The "onboarding" consisted of 3 days of indoctrinating employees to constantly praise Mr. Ramsey and/or "The Ramsey Way".

52.     The "Ramsey Way" encourages expressing deeply personal connection with Mr. Ramsey and the Ramsey brand.

53.     The "Ramsey Way" encourages expressing praise for Mr. Ramsey constantly.

54.     The onboarding process included group discussions where people shared their "Dave Story,"

55.     "Dave Stories" were deeply personal moments where Mr. Ramsey or his program significantly changed a person's life.

56.     During the onboarding process, Plaintiff was introduced to Defendants' "14-Point Philosophy," which was a document outlining the company's culture and values, also known as Defendants' "Core Values."

57.     One point of this 14-Point Philosophy, titled "No Gossip," specifically outlines the Defendants' value against "backstabbing."

6

58.     However, the part of the onboarding process dealing with "gossip" only focused on the prohibition against any negative comments about Mr. Ramsey or his management decisions.

59.     The core value expressed during onboarding was not anti-gossip, but was a directive to constantly praise Mr. Ramsey in both private and public.

60.     Early in Plaintiff's employment, Lampo strongly encouraged Plaintiff to be Facebook friends with all of his co-workers and supervisors.

61.     Lampo encouraged Plaintiff's wife to join the "Lampo Ladies" Facebook group.

62.     The Lampo Ladies Facebook group is used to facilitate spousal friendships for employees of Lampo.

63.     Ramsey management monitored the board "Lampo Ladies" for opinions of wives of employees for "dissent" or for not being "onboard."

64.     Upon information and belief, the "Lampo Ladies" board is run by the wife of an Human Resources director for Lampo.

65.     Eventually, this included reporting to Defendants any views which may split with any religious view Defendants had on COVID.

66.     Plaintiff's wife joined the Lampo Ladies Facebook group.

67.     Soon after his start date, Plaintiff cut a trailer for Lampo's new major podcast, "Borrowed Future."

68.     Plaintiff's trailer was given glowing reviews by several of Plaintiff's co-workers and supervisors.

69.     Mr. Ramsey reviewed Plaintiff's trailer and personally stated to Plaintiff he "loved it."

7

70. At a screening of the trailer, Luke LeFevre stated "this is how we need to be cutting things at Ramsey Solutions. Truly awesome job."

71. Plaintiff's trailer is still routinely linked by Lampo.

72. The trailer has publicly received outstanding public reactions.

73. Soon after, Plaintiff helped edit and produce a major Lampo sales reel for Amazon Prime and Netflix.

74. Beyond Plaintiff's key responsibility areas, he also provided assistance to the video team.

75. Plaintiff performed a workflow analysis, identifying "bottlenecks" and offered solutions.

76. Plaintiff helped create a Standards and Practices guide for the editing team.

77. Plaintiff consistently came in early to work and aided other teams, including cinematographers, with their work.

78. Plaintiff consistently performed duties outside of his job description.

79. After Plaintiff's first 90 days of work, Mr. DiCicco and JB Waggoner reviewed his performance.

80. During this review Mr. DiCicco and Mr. Waggoner emphasized what a fantastic team member Plaintiff had been and reinforced their previous assurances that he would be given a leadership role with a pay increase.

81. Plaintiff participated in Lampo's mandatory extracurricular activities.

82. Lampo required its employees fill out weekly personal reports.

83. These personal reports required employees to scale their happiness with a green or red indicator regarding their personal victories and struggles for that week.

84.     Personal reports included both work-related and personal victories and struggles.

85.     These reports often asked for deeply personal information from their employees including but not limited to their marriages and relationships with their spouses.

86.     They required employees to identify very specific personal issues in their personal lives, including any issues with their marriages.

87.     When employees indicated they were unhappy with anything, professionally or personally, they were required to attend additional meetings.

88.     Lampo also required all its employees to participate in weekly "one-on-one" meetings.

89.     The meetings were designed in part to ensure Plaintiff adhere to Mr. Ramsey's personal religious beliefs both at the office and in his home life.

90.     These meetings were also designed for Defendants to garner very personal information on Mr. Amos' religious beliefs which would be used against him later.

91.     These meetings were thirty (30) minute meetings which involved discussion ranging from everyday work to deeply personal questions about home life, marriage, emotional well-being, and personal finances.

92.     Employees were given feedback on these reports and meetings.

93.     Plaintiff was told these reports were private.

94.     However, these reports were shared with upper management.

95.     In early March, during the beginning of his employment, Plaintiff expressed frustration in selling his California house in his personal reports and one-on-ones, but did not disclose this frustration publicly.

96. The reports and meetings were disclosed as Mr. LeFevre, unsolicited, provided a real estate agent from Lampo's Endorsed Local Provider (ELP) Unit to help sell Plaintiff's house.

97. These ELPs pay money to Defendants for the privilege of being an ELP.

98. In turn, Defendants promote these ELPs to their employees and on their shows.

99. Often Plaintiff's reports were returned to him with instructions to provide more detail because he did not include enough personal information about his family life.

100. Specifically, Plaintiff was asked to include more information about his relationship with his wife.

101. The information Lampo required from Plaintiff was extremely personal in nature; their reactions were always judgmental.

102. These reports and meetings would cause the Lampo to offer directives to its employees to do things Defendants thought required to solve what they considered to be "problems", both professionally and personal.

103. After his "onboarding" indoctrination, Plaintiff familiarized himself on his own with his key responsibility areas and began working.

104. In February 2020 prior to any COVID infection or order, Plaintiff was scheduling his family move and scheduled his move for the first week in early March.

105. After Plaintiff scheduled his move, Mr. DiCicco scheduled a documentary deadline during that time.

106. Concerned, Plaintiff offered to move a different week because of the deadline.

107. Mr. DiCicco informed him there was no need to reschedule his move in date.

108. Mr. DiCicco informed him the deadline for the screening was arbitrary so long as there was no theatrical release date.

10

109.    There was no theatrical release date set for the project at that point.

110.    Based on Mr. DiCicco's assurances, Plaintiff proceeded with his move as originally scheduled.

111.    Upon Plaintiff's return, Plaintiff worked early mornings and late nights in order to make up for the time taken off to move his family.

112.    Plaintiff was able to catch up to the deadline only being a few days behind schedule.

113.    Mr. DiCicco did not provide any negative feedback to Plaintiff about this deadline from the time Plaintiff notified him about his move to the time Plaintiff caught up with the work.

114.    Throughout early Spring of 2020, the spread of a coronavirus, COVID-19, became worldwide news and the concern of many American citizens.

115.    This news was specifically alarming for potential victims with preexisting conditions, known as "high-risk" individuals, who would have significantly greater medical consequences than others without preexisting conditions.

116.    Upon information and belief, Plaintiff's wife and son were "high-risk" potential victims of this virus.

117.    Plaintiff had a deep religious devotion to protect the health and safety of his family.

118.    As such, Plaintiff exercised extreme caution and made personal measures not to potentially infect his family with this virus.

119.    Plaintiff had a deep religious devotion to respect and care for the health and safety of others in his community, to follow the "golden rule" to do no harm to others.

120.    As such, Plaintiff exercised additional caution not to potentially spread the virus to his coworkers and friends outside of work.

121.     Despite the alarming spread of this highly infectious virus, Mr. Ramsey and other leadership at Ramsey Solutions spoke against other actors taking preventative COVID-19 measures.

122.     On his March 2, 2020 radio show, Mr. Ramsey said "We have people calling in, they are wanting to cancel stuff for a live event in May — let me tell you how much of your money I am going to give you back if you don't come for the coronavirus in May — ZERO. I am keeping your money. You are a wuss."

123.     On March 12, 2020, Governor Lee issued Executive Order #14 declaring a State of Emergency related to the COVID-19 Pandemic.

124.     Governor Lee guided individuals to work from home and stated, "we strongly discourage events of 250 people or more as an important step in limiting exposure to COVID-19."[1]

125.     On March 15, 2020, Dave Ramsey emailed all employees informing them that there has been a confirmed case of COVID-19 in the department where Plaintiff worked.

126.     The next day, approximately 900 Ramsey employees, including Plaintiff, were expected to attend an on-site all employee meeting despite Governor Lee's Executive Order #14 discouraging events of 250 people or more

127.     At this meeting, Mr. Ramsey announced that Ramsey Solutions employees would not be working from home.

128.     Despite the growing public concern for safety and need to exercise COVID-19 precautions, Mr. Ramsey and other leadership continued to express their belief that these measures were not aligned with the religious principles held by Ramsey Solutions.

---

[1] Attached hereto as Exhibit B – Governor Lee Guidance

12

129.     In fact, Mr. Ramsey and other Ramsey Solutions leadership actively denigrated any opposing religious beliefs that supported taking preventative measures.

130.     Specifically in this 900 person meeting, Mr. Ramsey stated that fear of working in the office because of COVID demonstrated "***weakness of spirit***".

131.     Ramsey believed taking preventative measures were against the will of God.

132.     Plaintiff did not share these beliefs.

133.     This reasoning was amplified on his radio show numerous times.

134.     Troubled by this news because of his Christian commitment to protecting the health of his family, Plaintiff confronted Mr. LeFevre that afternoon in front of the entire team about his concerns with Defendants' response to this virus.

135.     In this confrontation, Plaintiff mentioned other alternatives for safe working conditions during COVID, including working from home.

136.     Plaintiff told Mr. LeFevre he was concerned that Lampo's confirmed COVID-19 case was a mere fifteen (15) feet from his working area.

137.     Plaintiff expressed concern that Lampo had not taken any effort to implement any precautions against COVID-19 despite the proximity to an infected employee.

138.     Plaintiff reiterated his worries concerning his child with Coat's disease and his high-risk wife with a predisposition for pneumonia.

139.     Plaintiff's religious beliefs require him to protect his families health and safety.

140.     Mr. LeFevre dismissed Plaintiff's concerns, informing him that Lampo's current response was sufficient, and that Plaintiff needed to simply "***pray and keep moving forward***."

13

141. Lampo expected its employees to adopt the religious view of Mr. Ramsey that taking COVID-19 precautions demonstrated "weakness of spirit" and prayer was the proper way to avoid COVID-19 infection.

142. In contrast, Plaintiff's religious beliefs required him to heed the advice of science to protect his family from a deadly disease.

143. Initially, given Defendants' previous comments, Plaintiff continued to work from the office.

144. Plaintiff did not want to be unemployed in a town he just moved to.

145. Despite the CDC's COVID-19 precautions, the in person weekly meetings and devotionals at Lampo continued to take place.

146. Defendants declined to implement any of Governor Lee's or the Center for Disease Control's recommended COVID-19 precautions including limited gathering sizes, temperature checks, or social distancing.

147. On March 17, 2020, Tennessee announced a statewide mandated school closure.

148. On that same day, after a screening of a cut of the documentary, Mr. DiCicco reached out to Plaintiff about the possibility of working from home.

149. Plaintiff asked if that was an option and expressed his concerns about COVID since his son, wife, and mother were all considered "high risk."

150. Mr. DiCicco assured Plaintiff that his job would not be jeopardized by working from home and "family comes first."

151. Plaintiff decided that working from home would be safest for his family.

152. Plaintiff decided working with home was consistent with his religious beliefs considering Defendants' refusal to comply with COVID-19 precautions.

14

153.     Plaintiff elected to work from home for one week, and then evaluate whether or not he felt safe enough to return to the office based on the number of COVID-19 cases.

154.     On Friday, March 20, 2020, Mr. Ramsey had heard from his friends in politics that Governor Lee would be issuing an executive order requiring non-essential employees to stay at home and only allowing essential businesses to operate.

155.     As a result, Mr. Ramsey told the company that while he hated it, the entire company would be working from home until further notice due to federal and state regulations.

156.     After this, Plaintiff contacted Mr. DiCicco about Defendants' work from home plan and inquired about picking up some equipment from the office to resume his job duties at home.

157.     Mr. DiCicco told Plaintiff that the documentary team, which included Plaintiff, would continue working in the office in contradiction to what he told Plaintiff previously.

158.     Plaintiff brought up how Mr. DiCicco had previously stated Plaintiff could work from home but was informed by Mr. DiCicco that his position was essential.

159.     Mr. DiCicco also stated Lampo was considered an essential business.

160.     Mr. DiCicco responded he preferred to have Plaintiff in the office to work side-by-side with the video team though did not say why this was important.

161.     Plaintiff could perform all aspects of his job with a computer and Internet access.

162.     Mr. DiCicco told Plaintiff that Lampo would be exploiting a loophole in order to force the documentary team to work onsite.

163.     Mr. DiCicco and the Defendants were well aware Plaintiff had high-risk household members which made coming into the office very dangerous to Plaintiff's family.

164.     Plaintiff offered a solution of coming into the office and then quarantining from his family at home by moving into the garage.

165.    Mr. DiCicco would not allow Plaintiff to even take this precaution from COVID-19 because of the appearance.

166.    Mr. Ramsey continued to promote his religious beliefs by saying any COVID-19 precautions showed "weakness of the spirit" and encouraged employees to refrain from taking COVID-19 precautions but instead "pray and keep moving forward."

167.    Mr. DiCicco then told Plaintiff he could work from home but demoted him to Assistant Editor on the project because of Plaintiff's religious beliefs.

168.    Mr. DiCicco also stated that when Plaintiff was able to return to the office he would again be considered a "Senior Video Editor."

169.    On Sunday, March 22, 2020 Governor Lee issued Executive Order #17 directing Tennesseans to work from home whenever feasible.

170.    On March 22, 2020 Plaintiff's wife shared a post criticizing the Tennessee government's weak response to COVID-19, presumably seen by Lampo employees.[2]

171.    On March 24, Plaintiff went into the office of Lampo to pick up his personal items.

172.    Plaintiff found the building mostly empty except for the "edit bay" where Plaintiff worked.

173.    In the edit bay, five people were crammed into a small space with a "party like" attitude- snacks, drinks, and whiskey were there for employees in the bay.

174.    Other persons not associated with the documentary were present as well.

175.    Plaintiff's personal possessions were pushed to the side and were in a stack.

176.    At that time, Mr. DiCicco told Plaintiff to wait for his call to provide guidance as to what Plaintiff should be working on.

---

[2] Attached hereto as Exhibit C – Facebook Post

16

177. Plaintiff called, e-mailed, and text messaged Mr. DiCicco many times over the next few weeks to ask what he should be working on. These attempts to communicate went unanswered or the response was a simple "stand by."

178. Plaintiff spent this time period attending Zoom meetings, weekly devotionals online, checking e-mails, attempting to contact Mr. DiCicco, team meetings, and "one on one" meetings over Zoom.

179. From daily updates from Mr. LeFevre, Plaintiff discovered five more people at Lampo had become infected with COVID-19.

180. On March 30, 2020, Governor Lee issued Executive Order #22, requiring non-essential employees to stay at home and only allowing essential businesses to operate.

181. On April 9, 2020—after weeks of no contact—Plaintiff was contacted by Mr. DiCicco and he informed Plaintiff that he had missed a deadline, the same deadline Mr. DiCicco previously told Plaintiff was of no concern when Plaintiff was trying to move his family from California.

182. This phone call was the first time anyone at Ramsey had mentioned the missed deadline to Plaintiff since they told Plaintiff not to worry about missing the deadline over a month beforehand.

183. On the same phone call Mr. DiCicco stated Plaintiff was a great editor and doing a great job and was considered a valued member of the team.

184. Mr. DiCicco stated Lampo was not trying to fire Plaintiff or trying to get Plaintiff to quit through their recent actions.

185. However, on this call, Mr. DiCicco "officially" demoted Plaintiff to assistant editor on the project.

17

186.    Plaintiff asked what Lampo needed next from him and Mr. DiCicco stated he'd call back soon with this information.

187.    Later that day, Plaintiff had a zoom meeting placed on his schedule titled "documentary sync up" set for April 13, 2020.

188.    Plaintiff was told this was a meeting between him and Mr. DiCicco.

189.    However, when Plaintiff logged into the actual meeting, Mr. DiCicco, Ms. Johnson, and Mr. LeFevre were all present.

190.    The meeting began with Mr. LeFevre questioning Plaintiff regarding his tenure at Lampo, the other projects he had been involved with, and the status of the documentary.

191.    The meeting quickly turned hostile towards Plaintiff.

192.    In the meeting, Mr. LeFevre asked Plaintiff why the documentary was so behind.

193.    Plaintiff was surprised by the inquiry into the status of the documentary since he had not been kept up to date by anyone at Lampo since he started working from home.

194.    Plaintiff expressed surprise he had such sparse communication with Mr. DiCicco regarding the documentary considering it was the sole purpose for his employment.

195.    The meeting quickly devolved into a discussion about COVID-19 quarantine and Plaintiff's relationship with his wife.

196.    Plaintiff had discussed in what he thought were private "one on ones" that his wife was having some problems adjusting to life in Tennessee as she had moved 2000 miles away from her friends of over 20 years and had to leave her job. He also mentioned the pandemic was not helping with the situation at all.

197.    These conversations had been provided to upper management at Lampo despite their promise they would not be shared.

18

198.   Mr. LeFevre commented on Plaintiff's wife's problems with her "stress levels" and wanted to discuss how she felt about the move to Tennessee.

199.   Mr. LeFevre commented that Plaintiff needed to "talk with his wife to get her on the same page" referring to his wife's comments regarding shortcomings of Governor Lee in handling the coronavirus

200.   Mr. LeFevre then openly questioned Plaintiff about whether or not he wanted to work at Lampo.

201.   Plaintiff was astonished Mr. LeFevre asked this question and spoke of his sacrifices in moving his entire family based on Defendants' specific promises.

202.   Plaintiff's family issues were his own issues, not others.

203.   This also aligned with Plaintiff's deeply held religious beliefs.

204.   LeFevre suggested Plaintiff look for other work, and asked Plaintiff whether he would accept another job if he were to find one.

205.   Plaintiff replied "no" to this inquiry.

206.   Plaintiff was removed from the project.

207.   Plaintiff inquired what his next project would be since he was demoted and no longer working on his sole project, the student debt documentary.

208.   Mr. LeFevre responded only by saying Plaintiff needed to "check his humility."

209.   Mr. LeFevre meant Plaintiff should give up his personal beliefs in exchange for the beliefs of the company leader; specifically the way he chose to handle personal family issues and choosing to not put his family in danger because Ramsey believed taking COVID precautions demonstrated "weakness of spirit"

19

210.    After this meeting, Plaintiff was assigned the most demeaning work possible at Lampo.

211.    After this meeting, Plaintiff was mandated to attend a second, additional weekly one-on-one meeting with Lara Johnson.

212.    Plaintiff was informed that he had not been "onboarded" (indoctrinated) correctly and therefore he would need to go through an additional one on one with Ms. Johnson. Lampo said Plaintiff needed to be "re-onboarded" regarding the "Ramsey Way."

213.    These meetings were meant to monitor, "reeducate", punish, and/or find cause to dismiss Plaintiff.

214.    These meetings were designed to indoctrinate Plaintiff to the personal religious views of Dave Ramsey as a spiritual leader.

215.    Plaintiff attempted to focus these meetings on business-related topics.

216.    Ms. Johnson made the meetings about Plaintiff's relationship with his wife and any issues they may be having in their marriage.

217.    The meetings were designed to make Plaintiff uncomfortable and to make sure he and his wife could not spend time together without the interference of Defendants.

218.    In at least one of these meetings, Ms. Johnson actually stated discussing business related matters in these meetings was "getting off topic."

219.    Ms. Johnson consistently redirected these conversations to focus on Plaintiff' wife,marriage, family, and his spirituality.

220.    In these meetings, Plaintiff consistently expressed that he and his wife were happy and desired to continue building their life in Tennessee and at Lampo, but had faced challenges presented in moving his family from California.

221.    In response, Ms. Johnson insisted that Plaintiff was lying and was unhappy in his marriage and demanded information as to their marital issues.

222.    Ms. Johnson would repeatedly insist that Plaintiff talk with his wife about their commitment to Lampo.

223.    Despite these allegations, Plaintiff constantly emphasized he and his wife's marriage was healthy.

224.    Plaintiff expressed his desire to continue building their life in Tennessee and at Lampo as it was promised to him when he was hired

225.    Also, in these meetings, Plaintiff was asked for his opinions on recent controversies involving Defendants.

226.    One of the controversies brought up in Plaintiff's one-on-one included an unmarried female Lampo employee who was terminated due to her pregnancy occurring outside of marriage.

227.    Another controversy brought up in Plaintiff's one-on-one included an employee who was terminated after social media posts criticizing Lampo's COVID-19 response.

228.    Plaintiff knew that his personal information in prior one-on-one meetings had been shared with others without his consent.

229.    Consequently, he informed Ms. Johnson that he did not want to discuss these private matters in this additional series of one-on-one meetings.

230.    When Plaintiff inquired about the quality of his performance during these meetings, Ms. Johnson consistently noted that she had nothing but compliments about his performance and that he was a superior worker.

231.     Plaintiff was forced to attend these meetings of a "spiritual and personal nature" to force Plaintiff to completely submit to Defendants as an employer and also as a spiritual and religious leader.

232.     Frequently, Plaintiff was questioned about his perception of Mr. Ramsey's comments during staff meetings regarding the company and also religious matters.

233.     He was also asked his thoughts whenever a negative article about Mr. Ramsey would circulate.

234.     To Plaintiff's understanding, Lampo employed a strict "No Gossip" policy regarding Mr. Ramsey that, if violated, would lead to termination.

235.     Plaintiff witnessed one producer, Shane Emerson, call a staff meeting for the sole purpose of apologizing for an alleged breach of this policy.

236.     In alignment with this policy, Plaintiff always expressed his sense of neutrality toward these controversial issues.

237.     Tennessee's Stay at Home Order expired on April 30, 2020 and starting April 27, 2020, Lampo employees were encouraged to begin working at the office again.

238.     Plaintiff returned to the office as all employees were required to do starting May 4, 2020.

239.     Lampo took adverse employment actions against all employees who requested to work from home.

240.     Following Plaintiff' return to the office, employee desks remained in contact with one another without any partitioning or additional protection.

241.     Zoom meetings were suspended and in person meetings were required.

242.     Religious and staff mass gatherings are mandatory.

243.    During this time, the CDC issued a set of guidelines aiming to better protect individuals from infection and prevent the spread of the virus.

244.    Specifically, the CDC urged the use of masks and social distancing as primary deterrents for the spread of COVID-19 infection.[3]

245.    Lampo implemented none of these policies as they felt the proper attitude was to simply "pray away the disease".

246.    During conference meetings, the use of masks and social distancing was frowned upon.

247.    Employees who wore masks to meetings were mocked and derided.

248.    Lampo continued to host meetings with more than 900 attendees, encouraging employees to attend in person despite being streamed.

249.    Masks and social distancing were not required at these meetings with 900 attendees.

250.    Within two weeks, these meetings were no longer streamed and employees were required to attend in person with no opportunity to social distance.

251.    Later in May 2020, an anonymous Lampo employee reported violations under OSHA and/or CDC guidelines.

252.    Mr. Ramsey addressed this report and specifically described the anonymous employee "cowardly" and "disloyal," asking that the employee should "do the right thing and quit."

253.    Mr. Ramsey openly mocked this employee's attempt to report a violation, stating that it would be useless due to Mr. Ramsey's "connections."

---

[3] See Exhibit D – CDC Guidance

23

254. Ms. Johnson personally asked Mr. Amos if he had any concerns about Mr. Ramsey's comments regarding this employee.

255. Out of fear of retaliation, Plaintiff responded that he did not.

256. Despite the struggles with COVID-19 measures at work, Mr. Amos continued to provide his best effort to any projects assigned to him.

257. Leo Gonzales specifically gave high praise to the new style and detail Mr. Amos was giving to the Lampo education material.

258. Shane Emerson commended Mr. Amos's promo video for "Summit," which also received a standing ovation at its event.

259. During this time, Mr. Ramsey was publicly taking an anti-mask position on his radio show.

260. "Summit," one of Lampo's largest conferences, was scheduled to take place at the Gaylord Hotel in Orlando.

261. The event was moved to the corporate office in Franklin purportedly because of Williamson County's lack of a mask mandate.

262. The event was moved to Franklin because the Gaylord Hotel in Orlando required all attendees at large events to adhere to COVID-19 regulations including wearing masks.

263. Orange County, Florida had issued a mask-mandate prior to the scheduled event.

264. The Gaylord Hotel, located in Orange County, adhered to the mask mandate.

265. Mr. Ramsey expressed his desire to only hold the event if masks would not have to be worn.

266. On July 8, 2020, the Nashville Scene published an internal email from Ramsey Solutions' executive vice president and company board member Daniel Tardy reading "Today we

were told by our host hotel, Marriott, that they have chosen to stop partnering with us and being solution oriented on delivering a great guest experience because of their myopic take on COVID stuff. I'll spare you the details but trust me when I say they are being immature, transactional and irrational."[4]

267.  Ms. Johnson was aware that wearing a mask was a precautionary measure that Plaintiff took at work.

268.  This "Summit" event was planned to host over seven hundred (700) attendees from all over the world in addition to vendors and approximately 900 employees.

269.  Internal Ramsey emails indicated that the mask mandate for Williamson county would not apply to this event.

270.  Employees taking video footage of the event were advised to ensure that no footage showed people wearing masks.

271.  Ms. Johnson urged Plaintiff to take off during the Summit.

272.  Ms. Johnson's made her suggestion with knowledge that Plaintiff wore masks at work and that Summit would be a mask-free event.

273.  Persuaded by Ms. Johnson's warning of conflict at Summit, Plaintiff took time off as suggested.

274.  Plaintiff's supervisors assured him that not attending the event would not adversely affect his employment.

275.  Upon return, Plaintiff heard many employees decry the crowded environment of Summit.

---

[4] Attached hereto as Exhibit E – Nashville Scene Article

276. On July 24, 2020, during a one-on-one meeting, Ms. Johnson asked Plaintiff about Mr. Ramsey's "rants."

277. In response, Plaintiff stated that he did not know much or whether they were true.

278. Plaintiff explained he had heard a rumor that Mr. Ramsey would compensate employees "with bounties" if they exposed other employees who provided damaging information to news outlets.

279. Plaintiff explained a Daily Beast article regarding Mr. Ramsey pulling a gun out at a staff meeting just to prove a point about Defendants' "no gossip" policy.

280. Ms. Johnson confirmed that this "bounty" rumor and the Daily Beast story were completely accurate.

281. Ms. Johnson added that one of the participants in this meeting had a breakdown because the gun triggered her Post-Traumatic Stress Disorder.

282. At the time of Plaintiff's hiring, Defendants specifically told Plaintiff that Defendants provided a "drama-free" workplace.

283. Defendants consistently provided a dramatic workplace atmosphere where staff would consistently spread internal rumors, monitor and report irregularities and disloyalty in the social media accounts of fellow employees, and punish any employee who shared "gossip" outside of the workplace.

284. Ms. Johnson asked Plaintiff if these statements had changed the way that he felt about working for Defendants.

285. Ms. Johnson inquired if Plaintiff would like it better if Defendants provided him $15,000.00 and said "whoops I made a mistake."

286.     At this point, Plaintiff had already sacrificed much to move to Tennessee, including severe personal financial costs and salary reduction.

287.     Additionally, Plaintiff's family had struggled with the initial long distance and struggles moving to a new state.

288.     Given his previous demotion and unemployment concerns during a global pandemic, Plaintiff valued job security over all else.

289.     As a result of Plaintiff's desire for job security and in light of his sacrifices to obtain it, Plaintiff answered Ms. Johnson's inquiry with a "no."

290.     Plaintiff inquired if he would receive a raise due to his exceptional job performance since Lampo made the specific promise that Plaintiff would have many opportunities for "quick and significant advancements and salary increases based on his work performance."

291.     Plaintiff had not received any significant job advancement nor salary increase since he started working at Lampo.

292.     Ms. Johnson asked if Plaintiff would be upset if he did not receive any raise.

293.     Plaintiff responded that he would be very upset considering the promises made by Ramsey.

294.     Ms. Johnson replied that Plaintiff would not be receiving any salary increase near his one-year evaluation, not even a cost-of-living adjustment.

295.     Ms. Johnson indicated to Plaintiff that a salary increase or job promotion would never happen.

296.     At the time of Plaintiff's hiring, Lampo specifically told him he would "edit features and help create their new film department."

297. At the time of Plaintiff's hiring, Lampo specifically told Plaintiff that Defendants were not "cult-like" in the way they operated.

298. Defendants required complete and total submission to Mr. Ramsey and his views of the world in order to maintain employment.

299. Even following laws and government mandates which are not in line with Defendants' view of the world is reason for termination.

300. Defendants maintained a cult-like attitude regarding Mr. Ramsey the entire time of Plaintiff's employment.

301. During Plaintiff's employment, Defendant Ramsey Solutions would regularly and aggressively promote their own religious beliefs against COVID-19 precautions while also demeaning Plaintiff's religious beliefs supporting these measures to care for the wellbeing and safety of his family.

302. Defendant Ramsey Solutions also criticized Plaintiff's exercise of his religious beliefs such as social distancing and wearing a mask.

303. On July 31, 2020, Plaintiff had another one-on-one with Ms. Johnson and Mr. LeFevre.

304. In this meeting, Mr. LeFevre stated Plaintiff "was not a good fit" and was perceived to have a "lack of humility."

305. Additionally, Mr. LeFevre further explained the reasoning for this decision by demeaning Plaintiff's attempts to take preventative measures, stating that Plaintiff was not a good fit because he "would stand off to the side all of the time."

306. Upon Plaintiff's information and belief, he was also also terminated for his "lack of humility" as a result of his failure to submit to Defendant's religious beliefs throughout his employment and his one-on-one meetings.

307. Plaintiff was not given any other reason for his termination.

308. Since Plaintiff's termination, Defendants have been publicly criticized by many sources for their anti-mask position and their aversion to social distancing.

309. Defendants promised to Plaintiff that they were voted "best place to work for over 10 years" by their own employees without interference from management.

310. In actuality, Defendants forced their employees to participate in these polls and include only praise for the company and Mr. Ramsey himself. If they refused, they would face disciplinary actions or termination by the company.

311. Defendants told Plaintiff at the time of his hire that they were family friendly and would allow Plaintiff to spend time with his family without interference or involvement from Defendants.

312. After Plaintiff started working at Lampo; Defendants constantly harassed him about his home life and told him he needed to get his wife "on board" and he needed to "check his humility."

313. Defendants constantly harassed Plaintiff about his home life and consistently told him he needed to get his wife "on the same page."

## COUNT I – RETALIATORY DISCHARGE

### (Tennessee Public Protection Act, T.C.A. § 50-1-304, et seq.)

314. Plaintiff hereby re-alleges the foregoing paragraphs as though fully set forth herein.

315. Plaintiff was an employee of the Lampo as a Senior Video Editor.

29

316.     Plaintiff's refused to participate in and/or refused to remain silent about Lampo's requiring non-essential workers to be present in their office against state-mandated COVID-19 "stay at home", mask, and social distancing precautions was the sole factor in Lampo's decision to terminate Plaintiff.

317.     As a result, Plaintiff has suffered damages.

## COUNT II – RELIGIOUS DISCRIMINATION

**(** Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*)

318.     Plaintiff hereby re-alleges the foregoing paragraphs as though fully set forth herein.

319.     Plaintiff asserts Lampo retaliated against plaintiff and interfered with his rights in violation of the Title VII of the Civil Rights Act of 1964, 52 U.S.C. § 2000e, *et. seq.*

320.     Plaintiff was an employee of Lampo.

321.     Lampo violated the  Title VII of the Civil Rights Act of 1964, 52 U.S.C. § 2000e, *et. seq.* by wrongfully terminating Plaintiff for his inadherence to several of Lampo's particular religious convictions.

322.     Alternatively, Lampo violated the Title VII of the Civil Rights Act of 1964, 52 U.S.C. § 2000e, *et. seq.* by refusing to respect the Plaintiff's strongly held religious belief that "God helps those that help themselves"

323.     Lampo's religious convictions that individuals should "pray away the disease" rather than taking proper precautions and taking precautions against COVID demonstrated "weakness of spirit" were not followed by the Plaintiff.

324.     Lampo terminated Plaintiff for taking scientifically prescribed precautions, as required by his sincerely held religious beliefs, in the COVID pandemic rather than relying on prayer alone to protect himself.

30

325. This action was taken in violation of Plaintiff's Christian belief that the precautions suggested by the CDC, State of Tennessee, Medical Doctors and others were the proper way to avoid COVID.

326. Plaintiff was terminated for failing to follow Lampo's particular view that prayer was the exclusive way to prevent COVID infection.

327. Plaintiff was terminated for failing to follow Lampo's particular view that taking precautions other than prayer against COVID infection would make a person fall out of God's favor.

328. Plaintiff maintained his own religious beliefs in his efforts to avoid infection in addition to prayer, and as a result was terminated from his position.

329. Lampo terminated plaintiff solely because he refused to adhere to Lampo's particular religious views and abandon his own on COVID and therefore suffered religious discrimination.

330. Because Plaintiff did not adhere to Defendant's particular set of religious beliefs, he was terminated.

331. As a result, Plaintiff has suffered damages.

## COUNT III – FRAUD

332. Plaintiff hereby re-alleges the foregoing paragraphs as though fully set forth herein.

333. Defendants knowingly made false statements about Plaintiff's employment with Defendants including:

a) Plaintiff would edit features and help create their new film department;

b) Defendants was not "cult like" in the way they operated;

c) Defendants operated a "drama free" workplace;

d)  Defendants had been voted "best place to work" for over 10 years in a row by their own employees without interference from management;

e)  Defendants were family friendly and would allow Plaintiff to spend time with his family without interference from Defendants.

334.  When Defendants made each of these statements they were false.

335.  Plaintiff reasonably relied on these representations in accepting the position with Defendants.

336.  Further, Defendants knowingly made false statements about Plaintiff's ability to work from home without adverse employment action.

337.  When Defendants made this statement it was false.

338.  Plaintiff reasonably relied on this representation when deciding to work from home.

339.  Plaintiff would not have chosen to work from home if this statement had not been made.

340.  Defendants made each of these false statements knowingly, without belief in their truth, or recklessly.

341.  Each of these statements were in regard to material facts.

342.  Plaintiff has suffered injury as a result of the reliance on these statements.

## COUNT IV – NEGLIGENT MISREPRESENTATION

343.  Plaintiff hereby re-alleges the foregoing paragraphs as though fully set forth herein.

344.  Defendants made negligent misrepresentations to Plaintiff as identified in Count III.

345.  Defendants were acting in the course of his business, profession, employment, or in a transaction in which Defendants held a pecuniary interest.

32

346. Defendants supplied the information identified in Count III to guide Plaintiff in his decision to accept employment with Defendants.

347. When Defendants made these representations they were false.

348. The Defendants did not exercise reasonable care in obtaining or communicating the information.

349. Plaintiff justifiably relied on Defendants' negligent misrepresentations in accepting the position with Defendants.

350. Plaintiff would not have accepted the position with Defendants if these statements had not been made.

351. Plaintiff exchanged significant financial and personal resources in pursuit of this representation.

352. As a result, Plaintiff suffered damages.

## COUNT IV – PROMISORRY ESTOPPEL

353. Plaintiff hereby re-alleges the foregoing paragraphs as though fully set forth herein.

354. Defendants made promises to plaintiff regarding the conditions of his future employment including limited interference with Plaintiff's family time and a strict 40-hour work week.

355. Defendants made these promises clearly and unambiguously to Plaintiff.

356. As a result of Plaintiff's reliance on these promises, Plaintiff suffered substantial economic loss.

357. The economic loss that Plaintiff suffered as a result of relying on these promises was reasonably foreseeable by Defendants.

33

358.     Plaintiff acted reasonably in justifiable reliance on these promises as they were made.

## COUNT V – DECEPTIVE REPRESENTATIONS AND FALSE PRETENSES

## (T.C.A. § 50-1-102)

359.     Plaintiff hereby re-alleges the foregoing paragraphs as though fully set forth herein.

360.     Defendants induced Plaintiff to move from California to Tennessee to work for Defendants.

361.     Defendants made deceptive representations about the character of the work to be done.

362.     Defendants made deceptive representations about the quantity of work to be done.

363.     At the time these deceptive representations were made by Defendants, Defendants reasonably understood them to be false.

364.     At the time these deceptive representations were made by Defendants, Defendants had no intention on providing these representations was advertised.

365.     Plaintiff was reasonably persuaded to justifiably rely on these representations as advertised by Defendants.

366.     Plaintiff exchanged significant financial and personal resources in pursuit of this representation.

**WHEREFORE**, Plaintiff requests this court enter judgment in favor of the Plaintiff and against Defendants, for:

(1)     fall amounts of wages Plaintiff would have received but for Lampo's willful violation of his rights, front pay (or

reinstatement), liquidated damages, and all other relief allowed by the Tennessee

Public Protection Act;

(2)    compensatory damages pursuant to the Tennessee Public Protection Act;

(3)    all reasonable costs and attorney's fees pursuant to the Tennessee Public Protection

Act;

(4)    prejudgment and post judgment interest;

(5)    any such other legal relief as may be appropriate or to which Plaintiff may be

entitled under state law.

Respectfully Submitted,

**THE EMPLOYMENT AND CONSUMER LAW GROUP**

**/s/ JONATHAN A. STREET**
**JONATHAN A.  STREET, BPR No. 021712**
**BRANDON HALL, BPR No. 034027**
**CULLEN HAMELIN, BPR No. 037317**
**LAUREN IRWIN, BPR No. 038433**
1720 West End Ave., Ste 402
Nashville, TN 37203
(615) 850-0632

35