EXHIBIT 10

 Positive

As of: February 12, 2022 5:09 AM Z

# Chapman v. S. Natural Gas Co.

United States District Court for the Eastern District of Tennessee

March 11, 2011, Filed

No. 3:09-CV-224

**Reporter**

2011 U.S. Dist. LEXIS 25129 *; 2011 WL 883918

FRANK CHAPMAN, Plaintiff, v. S. NATURAL GAS CO., Defendant.

**Subsequent History:** Affirmed by *Chapman v. Southern Natural Gas Co., 2012 U.S. App. LEXIS 7599 (6th Cir.) (6th Cir. Tenn., 2012)*

## Core Terms

promise, promissory estoppel, summary judgment, Contractors, at-will, benefits, court of appeals, genuine issue of material fact, hire, undisputed material fact, present case, enforceable promise, conversation, branch manager, furloughed, employment relationship, definite promise, activated, projects, reasonable reliance, moving party, electrical, admits, argues, phone, reasonably rely, file a claim, ten years, replacement, non-moving

## Case Summary

### Overview

Where plaintiff did not allege that defendant promised to hire him for a project but rather alleged that defendant promised that he would be used at the project, he failed to raise a genuine issue of material fact regarding whether defendant made a definite and enforceable promise and thus, his claim for promissory estoppel was dismissed.

### Outcome

Motion for summary judgment granted. Case dismissed with prejudice.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

### *HN1*[ ] Entitlement as Matter of Law, Genuine Disputes

Under *Fed. R. Civ. P. 56*, summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

**HN2**[ ] **Entitlement as Matter of Law, Appropriateness**

A court must construe the facts and draw all inferences therefrom in the light most favorable to the party opposing the motion a motion for summary judgment.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

**HN3**[ ] **Entitlement as Matter of Law, Genuine Disputes**

On a motion for summary judgment, a genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Civil Procedure > ... > Summary Judgment > Evidentiary Considerations > Absence of Essential Element

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

**HN4**[ ] **Evidentiary Considerations, Absence of Essential Element**

On a motion for summary judgment, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. With regard to issues where the moving party will not bear the ultimate burden of proof at trial, the burden on the moving party may be discharged by showing that there is an absence of evidence to support the nonmoving party's case. The burden then shifts to the non-moving party to demonstrate the existence of genuine issues of material fact. If the non-moving party fails to meet this burden, the moving party is entitled to summary judgment.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

Civil Procedure > ... > Jurisdiction > Diversity Jurisdiction > General Overview

**HN5**[ ] **Federal & State Interrelationships, Erie Doctrine**

Under the Erie doctrine, federal courts sitting in diversity under *28 U.S.C.S. § 1332* apply the substantive law of the forum state and federal procedural law.

Business & Corporate Compliance > ... > Contract Formation > Consideration > Promissory Estoppel

**HN6**[ ] **Consideration, Promissory Estoppel**

To succeed on a promissory estoppel claim (also known as detrimental reliance) under Tennessee law, a plaintiff must establish (1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that the plaintiff reasonably relied upon

the promise to the plaintiff's detriment. This doctrine has also been described as a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. As the definition suggests, promissory estoppel is an equitable doctrine, and its limits are defined by equity and reason. This doctrine, however, is not without limits.

Business & Corporate Compliance > ... > Contract Formation > Consideration > Promissory Estoppel

HN7[ ] Consideration, Promissory Estoppel

Detrimental action or forbearance by the promisee in reliance on a gratuitous promise, within limits constitutes a substitute for consideration, or a sufficient reason for enforcement of the promise without consideration. This doctrine is known as promissory estoppel. A promisor who induces substantial change of position by the promisee in reliance on the promise is estopped to deny its enforceability as lacking consideration. The reason for the doctrine is to avoid an unjust result, and its reason defines its limits. No injustice results in refusal to enforce a gratuitous promise where the loss suffered in reliance is negligible, nor where the promisee's action in reliance was unreasonable or unjustified by the promise. The limits of promissory estoppel are: (1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted reasonably in justifiable reliance on the promise as made.

Business & Corporate Compliance > ... > Contract Formation > Consideration > Promissory Estoppel

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

HN8[ ] Consideration, Promissory Estoppel

Tennessee courts have recognized that it is very difficult to establish a claim for promissory estoppel in the context of an at-will employment relationship.

Evidence > Inferences & Presumptions > Presumptions

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Evidence > Inferences & Presumptions > Presumptions > Rebuttal of Presumptions

HN9[ ] Inferences & Presumptions, Presumptions

In Tennessee, there is a presumption that employees are hired on an at-will basis. Under this doctrine, an at-will employee may be terminated for good cause, bad cause, or no cause. This presumption may be overcome only by specific language guaranteeing a definite term of employment.

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

HN10[ ] Employment Relationships, At Will Employment

Tennessee has long adhered to the employment-at-will doctrine in employment relationships not established or formalized for a definite term. Under this employment at

will doctrine, both the employer and the employee are generally permitted, with certain exceptions, to terminate the employment relationship at any time for good cause, bad cause, or no cause. This relationship recognizes (1) that employers should be free to make their own business judgments without undue court interference, and (2) that employees may refuse to work for a person or company and may exercise their rights in the same way, to the same extent, for the same cause or want of cause as to the employer.

Business & Corporate Compliance > ... > Contract Formation > Consideration > Promissory Estoppel

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

HN11[ ] Consideration, Promissory Estoppel

Under Tennessee law, while a plaintiff may file a claim for promissory estoppel that is based upon an at-will employment relationship, the plaintiff will only prevail under exceptional circumstances. In particular, the nature of the employment relationship makes it very difficult to establish "reasonable reliance" in this context.

Business & Corporate Compliance > ... > Contract Formation > Consideration > Promissory Estoppel

HN12[ ] Consideration, Promissory Estoppel

As Tennessee courts recognize, the key element in finding promissory estoppel is, of course, the promise. It is the key because the court must know what induced a plaintiff's action or forbearance; only then would the court be able to prevent the injustice resulting from a failure to keep the promise. Ultimately, the plaintiff must establish that the resulting promise must be unambiguous and not unenforceably vague.

**Counsel:** [*1] For Frank Chapman, Plaintiff: Beecher A Bartlett, Jr, Edwin H Rayson, Jr, Kramer, Rayson LLP (Knox), Knoxville, TN.

For Southern Natural Gas Company, Defendant: Elizabeth S Washko, LEAD ATTORNEY, Ogletree, Deakins, Nash, Smoak & Stewart (Nashville), Nashville, TN; James W Seitz, PRO HAC VICE, El Paso Corporation, Houston, TX.

For Wilcrest Field Services, Inc, Defendant: W Tyler Chastain, LEAD ATTORNEY, Bernstein, Stair & McAdams, LLP, Knoxville, TN.

**Judges:** Thomas W. Phillips, United States District Judge.

**Opinion by:** Thomas W. Phillips

## Opinion

MEMORANDUM AND ORDER

This matter is before the Court on defendant Southern Natural Gas Company's ("SNG") Motion for Summary Judgment [Doc. 17]. Pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, SNG has moved for summary judgment on Plaintiff's claim for promissory estoppel. [Id.]. This is the only remaining claim in the lawsuit.[1]

---

[1] At one point, it was unclear whether Plaintiff also asserted claims for breach of contract and tortious interference with employment. [*See* SNG's Memorandum in Support of its Motion for Summary Judgment, Doc. 18]. In its Motion for Summary Judgment [Doc. 17], SNG moved to dismiss Plaintiff's claims for promissory estoppel, breach of contract, [*2] and tortious interference. When Plaintiff responded in opposition [Doc. 21], he only addressed his claim for promissory estoppel. Accordingly, the Court finds that Plaintiff

Based upon the following, the Court finds that SNG did not make an enforceable promise to Plaintiff. In addition, the Court finds that even if SNG made an enforceable promise, Plaintiff did not exercise reasonable reliance upon that promise. Accordingly, SNG's Motion for Summary Judgment [Doc. 17] is **GRANTED,** whereby this case is **DISMISSED WITH PREJUDICE.**

## I. BACKGROUND

For the most part, the facts of this case are not in dispute. Notably, Plaintiff agrees with almost all of the "undisputed material facts" listed by SNG. [Plaintiff's Response to SNG's Statement of Undisputed Material Facts, Doc. 22]. Most of these facts are based upon Plaintiff's declaration [Doc. 21-1] and deposition testimony [Doc. 21-3].

SNG is a pipeline company that builds and maintains natural gas pipelines throughout the southeastern United States. [Plaintiff's Response to SNG's Statement of Undisputed Material Facts, Doc. 22, at 1, ¶¶ 1-2]. Many of SNG's projects are [*3] staffed with individuals ("Workers") who are provided by outside contractors or subcontractors (collectively, the "Contractors"). [Id., at 3, ¶ 4]. SNG does not actually employ the Workers; they are hired by the Contractors. [Id., at 2, ¶ 6]. The Contractors pay the Workers' wages and provide benefits. [Id.]. In turn, SNG pays the Contractors for the Workers' services. [Id., at 2, ¶ 7].

Plaintiff is an electrician who has worked primarily in "construction management." [Id., at 4, ¶ 14]. During his career, Plaintiff has worked for over ten different Contractors on projects involving private construction and government contract work. [Id., at 4, ¶ 15]. As of August 2008, Plaintiff was working for Summit Industrial

---

has abandoned his claims for breach of contract and tortious interference.

Services ("Summit") as a Safety Electrical Foreman. [Id., at 6, ¶ 28]. Plaintiff earned $23.80 per hour, plus a per diem of $80.00 per day. [Id.]. Plaintiff was working on a project that involved the General Chemical Plant in Augusta, Georgia (hereafter referred to as the "Summit Project"). [Plaintiff's Complaint, Doc. 1, at 2, ¶ 5]. Plaintiff began working for Summit in September 2007, and the project was expected to last for one year. [Id., at 6, ¶¶ 29-30].

On August 22, 2008, [*4] Plaintiff was contacted by Dale Weaver ("Mr. Weaver"), an SNG employee. [Id., at 7, ¶ 33]. During this time, Mr. Weaver was employed as the Senior Construction Inspector for SNG. [Id., at 1, ¶ 3]. In this capacity, Mr. Weaver was responsible for coordinating the Workers assigned to work on SNG projects. [Id., at 1-2, ¶ 3]. During the phone conversation, Mr. Weaver stated that he was interested in having Plaintiff work on an SNG project in Muldon, Mississippi (hereafter referred to as the "Muldon Project"). [Id., at 7, ¶ 36]. According to Plaintiff, Mr. Weaver stated that he wanted Plaintiff to "get on board and come to work for [SNG]." [Id., at 8, ¶ 40]. Mr. Weaver stated that if Plaintiff worked on the Muldon Project, he would work as an electrical inspector. [Id., at 8, ¶ 41]. In addition, Mr. Weaver stated that the project would last five to six months. [Id.]. Mr. Weaver did not provide any other details about the project. [Id., at 9, ¶ 43].

From the very beginning, Plaintiff understood that he would not be employed by SNG. [Id., at 9, ¶¶ 47-48]. Rather, Mr. Weaver explained that if Plaintiff worked on the Muldon Project, he would be employed by a Contractor. [Id.]. When Plaintiff [*5] asked about insurance benefits, Mr. Weaver explained that the Contractors would provide benefits, not SNG. [Id.]. While Mr. Weaver explained that the work would pay in the range of $3,000 per week, he advised Plaintiff to contact the Contractors for additional information. [Id., at

10, ¶ 54].

When Plaintiff told Mr. Weaver that he would contact Wilcrest Field Services, Inc.[2] ("Wilcrest"), one of the Contractors used by SNG, Mr. Weaver responded by saying "that will be good." [Id., at 10, ¶ 53]. When Plaintiff told Mr. Weaver that he was currently employed by Summit, [Id., at 9, ¶ 44], Mr. Weaver suggested that Plaintiff could hire a replacement. [Id., at 9, ¶ 45]. Despite these statements, Plaintiff admits that Mr. Weaver did not make an offer of employment. [Id., at 11, ¶57]. In fact, Plaintiff recognizes that following this conversation, he still needed to "contact Wilcrest to get information about the pay and benefits to help him determine if he was interested in working for them." [Id.].

Following the phone call with Mr. Weaver, Plaintiff spoke with his boss on the Summit Project, [*6] Jimmy Parker ("Mr. Parker"). [Id., at 11, ¶ 58]. Plaintiff told Mr. Parker that he was very interested in the Muldon Project, and that "the goose just called with the golden egg." [Id.]. In response, Mr. Parker told Plaintiff, "[m]an, Frank, you only got a couple years left. If you don't go, I will kick your tail myself." [Id., at 11, ¶ 59].

On August 25, 2008, Plaintiff called Wilcrest to discuss working on the SNG project. [Id., at 12, ¶¶ 60-66]. A Wilcrest employee informed Plaintiff that if he was hired, he would be paid $50.00 per hour, for up to sixty hours per week, plus a per diem and other amounts. [Id., at 12-13, ¶ 67]. The Wilcrest employee also discussed health insurance benefits during the phone conversation. [Id., at 13, ¶¶ 70-71]. At the end of the conversation, the Wilcrest employee stated that he would send Plaintiff a "new hire" packet. [Id., at 13, ¶ 69]. Plaintiff received the "new hire" packet on August 26, 2008. [Id.].

---

[2] Wilcrest was dismissed from this lawsuit on December 16, 2010. [See Stipulation of Dismissal, Doc. 16].

Following the phone call with the Wilcrest employee, Plaintiff called Mr. Weaver again. [Id., at 13-14, ¶¶ 72-74]. Plaintiff did not speak with Mr. Weaver, but instead left a message. [Id.]. In that message, Plaintiff stated that "he had talked to [*7] Wilcrest; it looked good; and he was going to talk to Parker, his current project manager, to see what he could work out." [Id., at 14, ¶ 74]. On August 25, 2008, Plaintiff again spoke with Mr. Parker about the Muldon Project. [Id., at 14, ¶¶ 7580]. Plaintiff told Mr. Parker about the pay and benefits offered by Wilcrest, and explained that he would be leaving the Summit Project. [Id.]. At this point, Plaintiff decided to choose his replacement for the Summit Project. [Id.]. Plaintiff began training his replacement on August 27, 2008. [Id., at 15, ¶ 81].

On August 28, 2008, Plaintiff faxed the "new hire" application to Wilcrest. [Id., at 15, ¶ 86]. During that same day, Mr. Weaver called Plaintiff to discuss working on the SNG project. [Id., at 16-17, ¶¶ 87-97]. As Plaintiff recounts, "[Mr.] Weaver advised that he was calling . . . to make sure that Wilcrest would not 'freak out' when he called Wilcrest to give them a number to activate Plaintiff."[3] [Id., at 16, ¶ 88]. At the time of this conversation, Plaintiff had not been "activated." [Id.].

During the conversation on August 28th, Mr. Weaver provided additional details about the Muldon Project. [Id., at 16, ¶ 91]. In particular, Mr. Weaver provided directions to the SNG project in Muldon, Mississippi. [Id.]. In addition, Mr. Weaver stated that he wanted Plaintiff to be in Muldon by September 2, 2008. [Id., at 17, ¶ 92]. Finally, Plaintiff informed Mr. Weaver that he had chosen a replacement for his job on the Summit

---

[3] Before a Worker may be assigned to an SNG project, Mr. Weaver must "activate" or approve the Worker. [Plaintiff's Response to SNG's Statement [*8] of Undisputed Material Facts, Doc. 22, at 16, ¶ 88]. However, this does not mean that SNG actually employs the Worker. [Id.].

Project. [Id., at 17, ¶ 96].

On August 29, 2008, Plaintiff submitted his resignation papers for his job on the Summit Project [Id., at 6, ¶ 31]. Plaintiff admits that there was approximately one month of work left on the Summit Project. [Id.]. On September 5, 2008, Plaintiff called Mr. Weaver to discuss the Muldon Project. [Id., at 19, ¶¶ 109-11]. During this conversation, Mr. Weaver stated that Plaintiff was not going to work on the Muldon Project. [Id.]. In particular, Mr. Weaver told Plaintiff that "he was shutting the project down and that if Plaintiff had another opportunity he should take it." [Id., at 19, ¶ 110].

Plaintiff recognizes [*9] that there are many different reasons why a Worker may not be needed for a project. [Id., at 3, ¶ 9]. These reasons include the following:

• The Worker may decide to leave the project;

• SNG may be dissatisfied with the Worker;

• SNG determines that it does not need as many Workers as originally anticipated;

• SNG may decide not to move forward with a project;

• The project may take less time than anticipated; or

• The project may be shut down for a variety of reasons.

[Id.]. If SNG no longer needs or wants a Worker, SNG is free to end the assignment. [Id., at 3, ¶ 10]. Likewise, if a Worker no longer wants to work on an assignment, the Worker may leave. [Id., at 3, ¶ 11]. In other words, if Plaintiff worked on an SNG project, he would have been an at-will employee.[4] Once again, however, Plaintiff would have been employed by Wilcrest, not SNG. [Id., at 18, ¶ 100].

---

[4] In his Response to SNG's Statement of Undisputed Facts, Plaintiff denies this statement. [Doc. 22, at 18, ¶ 105].

On May 21, 2009, Plaintiff filed a claim for promissory estoppel against Wilcrest and SNG. [Plaintiff's Complaint, Doc. 1]. On December 16, 2010, Plaintiff dismissed his claim against Wilcrest. [Stipulation of Dismissal, [*10] Doc. 16]. On December 20, 2010, SNG filed a Motion for Summary Judgment on Plaintiff's promissory estoppel claim. [SNG's Motion for Summary Judgment, Doc. 17]. Notably, Plaintiff does not allege that SNG promised him employment. [Plaintiff's Response to SNG's Undisputed Material Facts, Doc. 22, at 17, ¶ 98]. Instead, Plaintiff alleges that SNG–acting through Mr. Weaver–promised that Plaintiff would "be *used* at the Muldon project." [Plaintiff's Response in Opposition to SNG's Motion for Summary Judgment, Doc. 21, at 9] [emphasis added]. In other words, Plaintiff alleges that "[t]he essence of the promise was an agreement on Weaver's part to *do what was necessary with Wilcrest* whereby, as a Wilcrest employee, Chapman would be employed at the Muldon project." [Id.] [emphasis added].

In reviewing Plaintiff's claim for promissory estoppel, the Court finds the following facts particularly important. First, Plaintiff admits that SNG did not offer him a job. [Plaintiff's Response to SNG's Statement of Undisputed Material Facts, Doc. 22, at 17, ¶ 98]. In particular, Plaintiff admits that Mr. Weaver "never discussed with Plaintiff any terms of employment such as specific pay or benefits." [Id., at 18, [*11] ¶ 99]. In fact, Plaintiff admits that Mr. Weaver made it "very, very clear . . . that he was not going to become an employee of SNG but would have to go to one of five or six contractors." [Id., at 18, ¶ 100]. Second, Plaintiff never confirmed with Mr. Weaver whether he was "activated" to work on the Muldon Project. [Id., at 18, ¶ 102]. Third, Plaintiff did not talk to anyone at SNG other than Mr. Weaver about working on the Muldon Project. [Id., at 7, ¶ 35].

On January 11, 2011, Plaintiff responded in opposition to SNG's Motion for Summary Judgment. [Plaintiff's

Response in Opposition to SNG's Motion for Summary Judgment, Doc. 21]. On January 18, 2011, SNG filed a reply in support of its Motion for Summary Judgment [Doc. 24]. This matter is now ripe for adjudication.

## II. STANDARD OF REVIEW

HN1[↑] Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. HN2[↑] The court must construe the facts and draw all inferences therefrom in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). [*12] HN3[↑] A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

HN4[↑] The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also, e.g. Bridgeport Music, Inc. v. WB Music Corp., 508 F.3d 394, 397 (6th Cir. 2007) ("The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the non-moving party."). With regard to issues where the moving party will not bear the ultimate burden of proof at trial, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. The burden then shifts to the non-moving party to demonstrate the existence of genuine issues of material fact. Id. at 324. If the non-moving party fails to meet this burden, the moving party is entitled to summary judgment.

## III. ANALYSIS

### A. Introduction

As an initial matter, the Court recognizes that because [*13] it has jurisdiction pursuant to 28 U.S.C. § 1332, the law of the forum state–Tennessee–will govern the substantive issues in this case. See, e.g., Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 374 (6th Cir. 2009) (HN5[↑] "Under the Erie doctrine, federal courts sitting in diversity apply the substantive law of the forum state and federal procedural law.") (citing Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

The only issue remaining in this case is whether Plaintiff has raised a genuine issue of material fact regarding his promissory estoppel claim. HN6[↑] To succeed on a promissory estoppel claim (also known as "detrimental reliance"), Plaintiff must establish "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that they reasonably relied upon the promise to their detriment." Chavez v. Broadway Elec. Serv. Corp., 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007) (citations omitted). This doctrine has also been described as "a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can [*14] be avoided only by enforcement of the promise." Alden v. Presley, 637 S.W.2d 862, 864 (Tenn. 1982). As the definition suggests, "promissory estoppel is an equitable doctrine, and its limits are defined by equity and reason." Chavez, 245 S.W.3d at 404 (citations omitted).

This doctrine, however, is not without limits:

> HN7[↑] Detrimental action or forbearance by the promisee in reliance on a gratuitous promise, within limits constitutes a substitute for consideration, or a sufficient reason for enforcement of the promise without consideration. This doctrine is known as promissory estoppel. A promisor who induces substantial change of position by the promisee in reliance on the promise is estopped to deny its enforceability as lacking consideration. The reason for the doctrine is to avoid an unjust result, and its reason defines its limits. No injustice results in refusal to enforce a gratuitous promise where the loss suffered in reliance is negligible, nor where the promisee's action in reliance was unreasonable or unjustified by the promise. The limits of promissory estoppel are: (1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the [*15] promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted reasonably in justifiable reliance on the promise as made.

Alden, 637 S.W.2d at 864 (citation omitted).

HN8[↑] Tennessee courts have recognized that it is very difficult to establish a claim for promissory estoppel in the context of an at-will employment relationship. See, e.g., Shedd v. Gaylord Entm't Co., 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003)). Because courts have restricted promissory estoppel in this context, a quick review of Tennessee's at-will employment doctrine is worthwhile. HN9[↑] In Tennessee, there is a presumption that employees are hired on an at-will basis. See e, g., Davis v. Conn. Gen. Life Ins. Co., 743 F. Supp. 1273, 1280 (M.D. Tenn. 1990); McGee v. Best, 106 S.W.3d 48, 60 (Tenn. Ct. App. 2002). Under this doctrine, an at-will employee may be terminated for good cause, bad cause, or no cause. Stein v. Davidson Hotel Co., 945 S.W.2d 714, 716 (Tenn. 1997). This presumption may be overcome only "by specific language guaranteeing a definite term of employment." Davis, 743 F. Supp. at 1280. [*16] The Tennessee Supreme Court has explained the at will employment doctrine as follows:

> HN10[↑] Tennessee has long adhered to the employment-at-will doctrine in employment relationships not established or formalized for a definite term. Under this 'employment at will' doctrine, both the employer and the employee are generally permitted, with certain exceptions, to terminate the employment relationship at any time for good cause, bad cause, or no cause. This relationship recognizes (1) that employers should be free to make their own business judgments without undue court interference, and (2) that employees may refuse to work for a person or company and may exercise their rights in the same way, to the same extent, for the same cause or want of cause as to the employer. Indeed, this Court has noted that an employer's ability to make and act upon independent assessments of an employee's abilities and job performance as well as business needs is essential to the free-enterprise system.

Crews v. Buckman Labs. Int'l, 78 S.W.3d 852, 857-58 (Tenn. 2002) (citations omitted). Because the employment relationship between Plaintiff and SNG[5] was not established for a definite term, Tennessee's employment at-will [*17] doctrine applies.

---

[5] However, as the Court will soon explain, SNG did not make an enforceable promise to employ Plaintiff. See infra Part III.B. Accordingly, there was no employment relationship between Plaintiff and SNG. Id.

In light of this background, SNG argues that Plaintiff may not assert a claim for promissory estoppel. [SNG's Reply in Support of its Motion for Summary Judgment, Doc. 24, at 5]. In particular, SNG asserts that "promissory estoppel is inapplicable to cases involving individuals leaving at-will employment and/or claiming they were promised at-will employment." [Id.]. In support, SNG relies upon *Bryant v. MT Dev. Co., No. 3:06-CV-458, 2007 U.S. Dist. LEXIS 59203, 2007 WL 2343682 (M.D. Tenn. Aug. 13, 2007)*. The Court does not find, however, that such proposition is correct.

In Bryant, the plaintiff filed a claim for promissory estoppel under Tennessee law. Id. In addressing this claim, the court stated that "Tennessee law does not allow promissory estoppel claims for breach of at-will employment agreements because doing so would undermine the employment at-will doctrine." *2007 U.S. Dist. LEXIS 59203, [WL] at \*3* (citing *Chavez, 245 S.W.3d at 408*). That statement, however, is not entirely correct. Notably, the Chavez Court did [*18] not hold that the plaintiffs were barred–as a matter of law–from asserting promissory estoppel claims based upon at-will employment agreements. Rather, the Tennessee Court of Appeals in Chavez reviewed the facts of the case in great detail, and held that under those particular circumstances, the plaintiffs failed to establish a claim for promissory estoppel. *Chavez, 245 S.W.3d at 404-08*. If the plaintiffs were barred from asserting claims as a matter of law, then the Chavez Court did not have to analyze the facts supporting their claims. Id. Such analysis would have been unnecessary.

This leaves us with the following rule. *HN11*[ ] While a plaintiff may file claim for promissory estoppel that is based upon an at-will employment relationship, the plaintiff will only prevail under exceptional circumstances. In particular, the nature of the employment relationship makes it very difficult to establish "reasonable reliance" in this context. See, e.g., *Chavez, 245 S.W.3d at 407-08*.

### B. Plaintiff Failed to Raise a Genuine Issue of Material Fact Regarding Whether SNG Made an Unambiguous and Enforceable Promise

*HN12*[ ] As Tennessee courts recognize, "[t]he *key element in finding promissory estoppel is, of course,* [*19] *the promise*. It is the key because the court must know what induced the plaintiff's action or forbearance; only then would the court be able to prevent the injustice resulting from a failure to keep the promise." *Amacher v. Brown-Forman Corp., 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991)* (emphasis added). Ultimately, the plaintiff must establish that "the resulting promise must be unambiguous and not unenforceably vague." *Id.* (citations omitted).

The first question to ask is: what was the promise in this case? Plaintiff does not allege that SNG promised to hire him for the Muldon Project. [Plaintiff's Response to SNG's Undisputed Material Facts, Doc. 22, at 17, ¶ 98]. Rather, Plaintiff alleges that SNG promised that he would "be *used* at the Muldon project." [Plaintiff's Response in Opposition to SNG's Motion for Summary Judgment, Doc. 21, at 9] [emphasis added]. Plaintiff alleges that "[t]he essence of the promise was an agreement on Weaver's part *to do what was necessary with Wilcrest* whereby, as a Wilcrest employee, Chapman would be employed at the Muldon project." [Id.] [emphasis added]. In that short statement, Plaintiff has done two things. First, Plaintiff concedes that he was not [*20] going to be employed by SNG. Second, Plaintiff nonetheless attempts to hold SNG liable for not "activating" him.[6]

---

[6] Plaintiff summarizes the facts as follows: "In this matter, SNG acted through its agent, Dale Weaver. Weaver called Chapman, who was then employed by Summit Industry

There is absolutely nothing that suggests Mr. Weaver or other SNG employees promised to hire Plaintiff. In addition, there is nothing that suggests Mr. Weaver promised to "do what was necessary with Wilcrest" to have Plaintiff work on the Muldon Project. Notably, Mr. Weaver never "activated" Plaintiff to work on the Muldon Project. Nor was Mr. Weaver even required to do so. As SNG correctly states:

> At no time did Weaver make any promise to Plaintiff that SNG would do anything. [*21] He did not promise to employ Plaintiff, pay Plaintiff, or provide any benefits to Plaintiff. While he discussed with Plaintiff certain parameters of an SNG project, he did not promise to use Plaintiff on the project and did not make any promise that Plaintiff would be used for any particular period of time.

[SNG's Reply in Support of its Motion for summary Judgment, Doc. 24, at 7]. Realizing that SNG did not offer employment in any direct sense, Plaintiff has attempted to stretch the definition of "promise." The following facts–all of which Plaintiff admits–clearly demonstrates that SNG did not make a definite and enforceable promise:

• Mr. Weaver did not offer Plaintiff a job with SNG. [Plaintiff's Response to SNG's Statement of Undisputed Material Facts, Doc. 22, at 17, ¶ 98].

• Mr. Weaver "never discussed with Plaintiff any terms of employment such as specific pay or benefits." [Doc. 22, at 18, ¶ 99].

---

Services [] and induced him to leave that employment to work on an SNG project in Muldon, Mississippi as an employee of an SNG contractor, Wilcrest Field Services, Inc. []. Then after Weaver set a date for Chapman to report at Muldon and Chapman had quit his employment with Summit in reliance on what Weaver said, Weaver told Chapman he was not needed." [Plaintiff's Response in Opposition to SNG's Motion for Summary Judgment, Doc. 21, at 1].

• Mr. Weaver made it "very, very clear" that Plaintiff was not going to be employed by SNG, but would have to contact a Contractor about the Muldon Project. [Doc. 22, at 18, ¶ 100].

• Plaintiff did not speak with anyone else at SNG about employment. [Doc. 22, at 18, ¶ 101].

• Plaintiff never [*22] confirmed with Mr. Weaver whether he was "activated" to work on the Muldon Project. [Doc. 22, at 18, ¶ 102].

No reasonable juror would find that SNG promised to employ Plaintiff. First and foremost, Plaintiff recognizes that even if he worked on the Muldon Project, he would have been employed by a Contractor, not SNG. [Plaintiff's Response to SNG's Statement of Undisputed Material Facts, Doc. 22, at 18, ¶ 100]. While Mr. Weaver expressed interest in having Plaintiff work on the Muldon Project, he made it "very, very clear" that Plaintiff would not be employed by SNG. [Id.]. Having worked with numerous Contractors in the past, Plaintiff understood that he was not going to be employed by SNG. [Id., at 4, ¶ 15]. In fact, Plaintiff worked on an SNG project in 2006. [Id., at 4, ¶ 16].

Moreover, no reasonable juror would find that SNG promised "to do what was necessary with Wilcrest" to have Plaintiff work on the Muldon Project. Plaintiff argues that the following facts amount to an enforceable promise, but the Court disagrees:

> Weaver's representations, considered in their totality, were neither vague nor ambiguous. Weaver needed an electrical inspector for the Muldon job. He learned of Chapman. [*23] He called Chapman and asked him if he would accept such a job at Muldon. When Chapman told him he could not leave his work at Summit Weaver urged him to find a replacement- that he needed him. He told him he would not work as an employee of SNG but as an

employee of one of SNG's contractors. He told him that as an employee of a contractor health insurance would be available and the pay would be on the order of $3,000.00 a week. By then Chapman had clearly indicated an interest. And when Chapman said he knew of Wilcrest and that he would call Wilcrest to see what the compensation would be, Weaver agreed saying 'that is good.'

[Plaintiff's Response in Opposition to SNG's Motion for Summary Judgment, Doc. 21, at 8-9]. Indicating an interest is not the same thing as making an enforceable promise. During the phone conversation on August 22, 2008, Plaintiff asked Mr. Weaver about pay and benefits. [Plaintiff's Response to SNG's Statement of Undisputed Material Facts, Doc. 22, at 10, ¶ 54]. In response, Mr. Weaver explained that the Contractors would provide pay and benefits, not SNG. [Id.]. In addition, when Plaintiff stated that he would call Wilcrest about the Muldon Project, and Mr. Weaver [*24] responded by saying "that will be good," that did not amount to a promise. [Id., at 10, ¶ 53]. No reasonable juror would construe Mr. Weaver's comments as a promise "to do what was necessary with Wilcrest" to have Plaintiff work on the Muldon Project. Mr. Weaver was interested in having Plaintiff work on the Muldon Project, but he did not promise to make it happen. Notably, Mr. Weaver did not "activate" Plaintiff for the Muldon Project. Nor did he make such promise. In light of these facts, no reasonable juror would find that SNG promised to "do what was necessary with Wilcrest" to have Plaintiff work on the Muldon Project.

As a final argument, Plaintiff asserts that this case is governed by Richardson v. Goodall Rubber Co., an unreported decision by the Tennessee Court of Appeals. 1986 Tenn. App. LEXIS 3237, 1986 WL 9002 (Tenn. Ct. App. Aug. 19, 1986). Plaintiff's reliance upon Richardson is misplaced. The differences between the cases are substantial.

In Richardson, the plaintiff was employed for approximately seven years at the time she began discussing a new job opportunity with her branch manager. 1986 Tenn. App. LEXIS 3237, [WL] at *1. The branch manager promised the plaintiff a certain amount of money ($7 per hour), discussed benefits, [*25] and provided a start date for the new position. Id. In short, the branch manager discussed the material terms of the new job. Id. Based upon the branch manager's promise, the plaintiff resigned from her current position (with the same company). Id. However, before her new job was supposed to begin, the plaintiff was informed that the new job would not be available. Id. The plaintiff then sued her former employer for a claim of promissory estoppel. Id. In particular, the plaintiff argued that the branch manager made a definite promise of employment, and that she reasonably relied upon that promise. Id.

The trial court ruled in favor of the plaintiff, and the court of appeals affirmed. Id. In particular, the court of appeals found that the branch manager made a definite promise, and that the plaintiff reasonably relied upon the promise to her detriment. Id. The court held in favor of the plaintiff, even though the employment relationship would have been terminable at-will. 1986 Tenn. App. LEXIS 3237, [WL] at *2.

While Plaintiff admits that there are differences between Richardson and the present case, he attempts to downplay their significance:

> The difference in the Richardson case and the case at bar is that here [*26] there was no promise that Chapman would be employed by SNG. His promise was that he would place Chapman at Muldon as an employee of Wilcrest.

[Plaintiff's Response in Opposition to SNG's Motion for

Summary Judgment, Doc. 21, at 11]. Plaintiff argues that this fact–that SNG did not offer direct employment– is not important, and that "[t]he Richardson decision . . . cannot be distinguished on the basis of that difference." [Id.]. Contrary to Plaintiff's assertion, this is a significant difference between Richardson and the present case.

First, unlike the present case, the branch manager in Richardson made a definite promise of employment. *Richardson, 1986 Tenn. App. LEXIS 3237, 1986 WL 9002, at \*1*. The branch manager offered a job for a specific rate of pay, with specific benefits, and with a set start-date. Id. In the present case, Plaintiff's promissory estoppel claim is substantially weaker than in Richardson. Notably, Plaintiff's claim is not based upon an offer of employment. Rather, Plaintiff's claim is based upon an alleged promise by Mr. Weaver to "do what was necessary with Wilcrest" to have Plaintiff work on the Muldon Project. [Plaintiff's Response in Opposition to SNG's Motion for Summary Judgment, Doc. [*27] 21, at 9]. It is unclear what that even means. In any event, such promise "to do what was necessary" certainly does not carry the same weight as the branch manager's promise in Richardson, which was both direct and unambiguous.

Second, the plaintiff in Richardson was offered direct employment. Contrary to Richardson, Mr. Weaver did not promise to pay Plaintiff a certain amount of money or benefits. In fact, Mr. Weaver told Plaintiff the opposite. Plaintiff understood from the very beginning that if he worked on the Muldon Project, he was going to be employed by a Contractor, not SNG. In contrast, the branch manager in Richardson made a direct offer of employment to the plaintiff. *Richardson, 1986 Tenn. App. LEXIS 3237, 1986 WL 9002, at \*1*. In the present case, however, it was not reasonable for Plaintiff to expect employment from SNG. Nor was it reasonable for Plaintiff to expect that Mr. Weaver "would do what was necessary" to have Plaintiff work on the Muldon Project. Mr. Weaver wanted Plaintiff to work on the Muldon Project, but he did not offer him a job. Nor did Mr. Weaver promise that he would help Plaintiff secure a job with Wilcrest or another Contractor. Mr. Weaver simply provided information about the [*28] Contractors, and told Plaintiff to contact them for additional information. The fact that Plaintiff was not offered direct employment by SNG clearly distinguishes this case from Richardson.

When SNG filed their Motion for Summary Judgment [Doc. 17] and provided documents in support (Plaintiff's declaration, deposition testimony, and other documents), the burden shifted to Plaintiff to raise a genuine issue of material fact regarding his claim for promissory estoppel. *See Celotex, 477 U.S. at 324*. When construing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff failed to raise a genuine issue of material fact regarding whether SNG made a definite and enforceable promise. Accordingly, SNG's Motion for Summary Judgment [Doc. 17] is **GRANTED,** whereby Plaintiff's claim for promissory estoppel is **DISMISSED WITH PREJUDICE.**

## C. Even if SNG Made a Definite and Enforceable Promise, Plaintiff Failed to Raise a Genuine Issue of Material Fact Regarding Whether He Reasonably Relied Upon the Promise

Plaintiff frames the issue as whether Plaintiff had a "reasonable basis for believing he would be employed on the Muldon project." [Plaintiff's Response in Opposition to SNG's [*29] Motion for Summary Judgment, Doc. 21, at 2]. That is not the issue. The issue is whether Plaintiff had a reasonable belief *based upon SNG's actions* that he would work on the Muldon Project. As the following case makes clear, Plaintiff did not exercise reasonable reliance.

In Chavez v. Broadway Elec. Serv. Corp., the plaintiffs

filed suit against their former employer after they were laid-off. 245 S.W.3d at 399. The plaintiffs worked as electricians for Broadway Electric Service Corporation ("BESCO"), and were employed on an at-will basis. Id. After being furloughed, the plaintiffs filed claims for breach of contract, negligent misrepresentation, and promissory estoppel. Id. The chancery court entered judgment in favor of the plaintiffs on the promissory estoppel claim, and BESCO appealed. Id. When the case reached the Tennessee Court of Appeals, the court reversed the chancery court's ruling on the promissory estoppel claim. Id. In particular, the court of appeals held that BESCO did not make a definite promise of employment. Id. In addition, the court held that even if a promise was made, the plaintiffs failed to exercise reasonable reliance. Id.

In 2003, the plaintiffs worked as electricians [*30] at the United States Department of Energy's ("DOE") facility in Rocky Flats, Colorado. Id. In early 2003, the DOE ordered a permanent shutdown of the Rocky Flats facility, and began downsizing its workforce. Id. at 399-400. Despite the downsizing, the plaintiffs believed that they would continue working for another two or three years. Id.

Around this time, one of the plaintiffs, Mr. Lester Chavez ("Mr. Chavez") learned that a contracting firm, BESCO, was recruiting electricians to work at the DOE facilities in Oak Ridge, Tennessee. Id. at 400. Mr. Chavez contacted Travis Mayton ("Mr. Mayton"), a BESCO employee responsible for hiring workers. Id. According to Mr. Chavez, Mr. Mayton promised "work up to ten years, a dollar on top of the base salary for [his] clearance, per diem of $45 a day per day worked, overtime approximately 16 to 20 hours a week." Id. Following their phone conversation, Mr. Chavez traveled to Oak Ridge to meet with Mr. Mayton. Id. During this meeting, Mr. Mayton confirmed BESCO's offer, and said that "there was enough work for ten years and he wished there were–he had 40 more electricians like [Mr. Chavez] with Q clearances [a security clearance necessary to work [*31] at some of the DOE facilities in Oak Ridge] . . ." Id.

Before Mr. Chavez resigned from his job at Rocky Flats, Mr. Mayton confirmed that the BESCO job was still available. Id. According to Mr. Chavez, he moved his family to the Oak Ridge area because Mr. Mayton "kept assuring [him] that there was work for . . . ten years," and that there was work for his wife as well.[7] Id. at 400-01. In August of 2003, Mr. Chavez began working for BESCO as an electrician at a construction site in Oak Ridge. Id. at 401. Around this time, there was "a serious downturn in the amount of construction work available to BESCO under the DOE contracts." Id. Mr. Chavez worked for approximately eleven weeks before he was furloughed. Id.

Like Mr. Chavez, the other plaintiff in this case, Mr. Roger Davy ("Mr. Davy"), left the Rocky Flats facility to work as an electrician for BESCO. Id. Mr. Davy left his Rocky Flats job based upon a promise of employment by Mr. Mayton. Id. Once Mr. Davy moved to the Oak Ridge area, he only worked one week before he was furloughed. Id. at 402.

After being furloughed, the plaintiffs filed claims for breach of contract, negligent misrepresentation, and promissory estoppel. Id. The chancery court entered

---

[7] Mr. Chavez's wife, Judy Chavez ("Mrs. Chavez"), was also a plaintiff in this case. Chavez, 245 S.W.3d at 401. Mrs. Chavez claims that she spoke with Mr. Mayton about working for BESCO, and that he offered her a job working at a DOE facility in Oak Ridge "for $15 an hour with some overtime and $45 a day per diem for the first year." Id. However, when Mrs. Chavez moved to the Oak Ridge area and showed up for work in September 2003, she was told that she could not work because her [*32] security clearance had been terminated. Id.

judgment in favor of the plaintiffs on the promissory estoppel claim, and BESCO appealed. Id. When the case reached the Tennessee Court of Appeals, the court reversed the chancery court's ruling on the promissory estoppel claim. *Id. at 405*.

The court of appeals began its analysis by recognizing that the plaintiffs were terminable atwill. *Id. at 403*. As the court stated, the plaintiffs' claims needed to be "analyzed against the backdrop of the employment-at-will doctrine." *Id. at 404*. While the plaintiffs argued that they were hired for an enforceable ten-year period, the court of appeals rejected that argument. In particular, the court of appeals [*33] held that BESCO did not make a definite promise for ten years of employment. Id. Mr. Mayton's comments that "there was enough work for ten years" was not definite enough to qualify as an enforceable promise. Id. As the court explained:

> . . . we are of the opinion that these statements are not fairly characterized as 'promises' and more accurately described as general descriptions of the job market for electricians in Oak Ridge at the time they were made. We find that the 'promises' found by the trial court to have been made by BESCO to Mr. Chavez and Mr. Davy were too ambiguous, vague, and nonspecific to support Plaintiffs' claims for damages in the present case.

Id. In sum, the court recognized Mr. Mayton's comments as a description of the job market, not a definite promise of employment. Id.

The court of appeals also held that even if a definite promise was made, the plaintiffs failed to exercise reasonable reliance. *Id. at 406*. First, the court recognized the general volatility in the construction industry. Id. As the court explained, the plaintiffs were "aware of the potential for volatility in the construction business." Id. In fact, Mr. Chavez testified that "construction electrical [*34] work is more susceptible to layoffs and fluctuations than maintenance electrical work, and that the construction market on Oak Ridge ebbs and flows depending on the [DOE's] intentions and their actions." Id. (internal quotations omitted). In addition, Mr. Davy testified that he recognized that "layoffs are common in construction work." Id. In other words, the plaintiffs were aware that construction workers are frequently furloughed, that construction projects are often shut down prior to completion, and that there are other complications that make employment in the construction industry particularly volatile. Id.

Like the plaintiffs in Chavez, Plaintiff in the present case was also aware of this volatility. [Plaintiff's Response to SNG's Statement of Undisputed Material Facts, Doc. 22, at 4-6, ¶¶ 17-27]. In fact, Plaintiff has worked on numerous construction projects in which he was furloughed. [Id.]. For example, from 1998 until 2002, Plaintiff worked as a Supervisor for SW&B Construction. [Id., at 5, ¶¶ 22-23]. During the time he worked for SW&B Construction, "Plaintiff worked on multiple projects and, at the end of each project, was laid-off for a period of one week to one month [*35] at a time." [Id., at 5, ¶ 23]. Based upon Plaintiff's history of working in the construction industry, and the fact that he has been furloughed on numerous occasions, it is clear that Plaintiff was aware of the general volatility of this industry. Because Plaintiff was aware that he could be furloughed at any time while working on construction projects, his reliance on SNG's statements is particularly unreasonable.

Moreover, the facts of the present case are far less compelling than those in Chavez. In Chavez, the plaintiffs moved from Colorado to Tennessee for the BESCO job, and actually worked for BESCO (admittedly very short in the case of Mr. Davy). *245 S.W.3d at 407-08*. Despite moving hundreds of miles across the country, and actually working on an assignment, the

court of appeals denied the plaintiffs' claims for promissory estoppel. Id. In the present case, the facts supporting Plaintiff's claims are far less compelling. Unlike the plaintiffs in Chavez, Plaintiff did not actually work on the SNG assignment. Nor did Plaintiff move out of state for the assignment. Plaintiff simply quit his job, which only had a month of work left.[8] If the court of appeals in Chavez denied the promissory [*36] estoppel claims when the plaintiffs moved out of state for the BESCO jobs, and actually began working those jobs, then Plaintiff in the present case has clearly failed to establish reasonable reliance.

SNG argues that Plaintiff's claim fails for an additional reason: SNG did not engage in conduct "verging on actual fraud." [SNG's Memorandum of Law in Support of its Motion for Summary Judgment, Doc. 18, at 16-17]. In support, SNG argues that in order to establish a claim for promissory estoppel, Plaintiff must demonstrate that the defendant engaged in conduct "verg[ing] on actual [*37] fraud." Baliles v. Cities Serv., 578 S.W.2d 621, 624 (Tenn. 1979). In response, Plaintiff argues that this showing is only necessary in cases that involve the Statute of Frauds. [Plaintiff's Response in Opposition to SNG's Motion for Summary Judgment, Doc. 21, at 15]. While this appears to be an open question in Tennessee, the Court does not need to resolve it. Regardless of whether Plaintiff needed to show that SNG engaged in conduct "verg[ing] on actual fraud," he failed to establish the other elements for a claim of promissory estoppel.

When SNG filed their Motion for Summary Judgment [Doc. 17] and provided documents in support (Plaintiff's declaration, deposition testimony, and other documents), the burden shifted to Plaintiff to raise a genuine issue of material fact regarding his claim for promissory estoppel. See Celotex, 477 U.S. at 324. When construing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff failed to raise a genuine issue of material fact regarding whether he reasonably relied upon SNG's promise. Accordingly, SNG's Motion for Summary Judgment [Doc. 17] is **GRANTED** on this additional ground, whereby Plaintiff's claim for promissory [*38] estoppel is **DISMISSED WITH PREJUDICE**

### IV. CONCLUSION

Based upon the foregoing, SNG's Motion for Summary Judgment [Doc. 17] is **GRANTED,** whereby this case is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

**ENTER:**

/s/ Thomas W. Phillips

United States District Judge

---

End of Document

---

[8] Another possible reason for dismissing the promissory estoppel claim is that Plaintiff did not suffer detriment in a substantial economic sense. As the Tennessee Supreme Court has stated, "the detriment suffered in reliance must be substantial in an economic sense . . ." Alden, 637 S.W.2d at 864 (citation omitted). Plaintiff admits that he only had one month of work left on the Summit Project. Therefore, it is possible that when he resigned from his position on the Summit Project, he did not suffer detriment in a substantial economic sense. However, the Court notes that its opinion does not rest upon this ground.