2021 WL 3269955
Only the Westlaw citation is currently available.
United States District Court, M.D.
Tennessee, Nashville Division.

Rachel GRIZZARD, Plaintiffs,

v.

NASHVILLE HOSPITALITY
CAPITAL, LLC, et al., Defendants.

No. 3:18-cv-00034
|
Signed 07/30/2021

**Attorneys and Law Firms**

Brian C. Winfrey, Morgan & Morgan, Nashville, TN, for Plaintiffs.

Anthony M. Noel, James W. Fuller, IV, Kaley Pennington-Bell, Leitner, Williams, Dooley, and Napolitan, Jennifer G. Cook, Martha L. Boyd, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Nashville, TN, Jessica Roe, Roe Law Group, PLLC, Minneapolis, MN, for Defendants.

**MEMORANDUM OPINION**

ELI RICHARDSON, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court are two motions. Defendant Nashville Hospitality Capital, LLC ("NHC") has filed a motion for summary judgment (Doc. No. 50, "Defendant NHC's Motion"), and a memorandum in support thereof. (Doc. No. 51). Defendant Wischermann Partners, Inc. has filed its own motion for summary judgment (Doc. No. 47, "Defendant Wischermann's Motion"), and a memorandum in support thereof. (Doc. No. 48). Plaintiff opted to file a single Response in opposition to both Motions. (Doc. No. 54).[1] Each Defendant has filed a Reply. (Doc. No. 59, "Defendant NHC's Reply"); and (Doc. No. 58, "Defendant Wischermann's Reply"). Both Motions (collectively, "Motions") are ripe for review.

For the reasons discussed herein, Defendant Wischermann's Motion will be granted. Defendant NHC's Motion will be granted in part and denied in part.

**BACKGROUND**[2]

A. Factual Background

**\*2** Plaintiff began working at The Westin Nashville Hotel ("The Westin")[3] in November/December 2016 and reported to Executive Steward Jamy Mathis. (Doc. No. 57 at ¶¶ 8, 10). As Mathis worked day shifts, Plaintiff reported to, and received direction and supervision on her day-to-day activities from, either the Executive Chef or Antonio Johnson (a cook) when working overnight. (Id. at ¶ 12). On December 31, 2016, Mathis extended Plaintiff an offer of permanent employment as an overnight cleaner at The Westin, telling Plaintiff that her permanent employment status would become official after she completed 520 hours or 90 days of work. (Id. at ¶ 13).

**\*3** On January 9, 2017, Plaintiff worked an overnight shift at The Westin. (Id. at ¶ 16). On her lunch break, Plaintiff went to the kitchen area to place an order with the overnight cook, Johnson. (Id.). When she arrived at the kitchen, Plaintiff found Johnson and another employee, Jevon Wiggins, discussing paying women for sexual favors. (Id.). Johnson then told Plaintiff that he liked the way her lips looked and asked Plaintiff whether she knew anyone who would perform oral sex on him in exchange for $30 or $50. (Id.). Plaintiff said that she "does not talk to or hang with people like that." (Id.). Johnson then asked Plaintiff how much she would charge to perform oral sex on him.[4] (Id.). Plaintiff rejected this request and took her food to the second-floor cafeteria to eat her lunch alone. (Id.). Johnson thereafter came to the second-floor cafeteria, sat directly across from Plaintiff, and again asked Plaintiff to perform oral sex in exchange for money by asking her to "suck his dick for $30." (Id. at ¶ 18). Plaintiff rejected this request and left the cafeteria. (Id.).

After this interaction, an elevator malfunction left Plaintiff stuck in the dark on an elevator for an hour or two, causing Plaintiff to have panic and anxiety attacks. (Id. at ¶¶ 19-21). As a result of this and her interactions with Johnson, Plaintiff went to the second-floor break room to lie down on the floor.[5] (Id.). After she returned to work, Johnson treated her in a hostile manner. (Id. at ¶ 22).

Plaintiff later spoke about Johnson's actions with another individual, Demarco Ridley, and he advised Plaintiff to report the incidents to Mathis. (Id. at ¶ 23). Plaintiff thereafter reported Johnson's statements and two solicitations for sex to

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 1

Mathis on the morning of January 10, 2017 (the day after the incidents). (*Id.* at ¶ 24). Mathis told Plaintiff that she would convey Plaintiff's complaint to Human Resources and later informed Plaintiff that she had done so. (*Id.* at ¶ 26).

**\*4** Mikea Brown is The Westin's Director of Human Resources. (*Id.* at ¶ 27). Brown testified that on January 17, 2017, The Westin suspended Johnson pending completion of its investigation. (*Id.* at ¶ 37). The investigative file included a written statement from Ridley which stated that he received a call from Plaintiff, who was very upset because Johnson had requested that she perform oral sex on him (Johnson) in exchange for $30. (*Id.* at ¶ 31).[6] Additionally, the investigative file included a written statement by Plaintiff detailing the incident in the kitchen and Johnson's subsequent request in the cafeteria for oral sex.[7] (*Id.* at ¶¶ 33, 34). On January 23, 2017, Johnson was issued a written warning for engaging in "inappropriate conversations in the workplace" and was allowed to return to work. (*Id.* at ¶ 40).

Plaintiff's last day working at The Westin was on January 23, 2017. (*Id.* at ¶ 43). The following day, Mathis called Plaintiff and asked her to come to The Westin for a conversation. (*Id.* at ¶ 44). During this conversation, Mathis told Plaintiff: "I don't want you to think you done nothing wrong. Everything's all right, but we're going to have – [Brown] said we're going to have to let you go. That's because you're a liability." (*Id.*). Mathis explained what was meant by calling Plaintiff a "liability" and linked Plaintiff's termination to her harassment complaint. (*Id.*). Plaintiff testified that after receiving this news she went to speak with Brown. (*Id.* at ¶ 45). Brown told Plaintiff that she was fired not because of the incident with Johnson, but rather because security footage showed Plaintiff sleeping on the floor. (*Id.* at ¶ 46). On the same day, The Westin informed PeopleReady that it had decided to end Plaintiff's employment because it was seeking to hire its own staff. (*Id.* at ¶¶ 51-55).

### B. Procedural History

**\*5** Plaintiff filed the present lawsuit against Defendant NHC and PeopleReady (the temp agency Plaintiff worked for) on January 9, 2018. (*Id.* at ¶ 56; Doc. No. 1). Plaintiff thereafter filed a First Amended Complaint on February 5, 2018, removing PeopleReady as a defendant. (Doc. No. 57 at ¶ 57; Doc. No. 7). Defendant NHC filed its Answer to the First Amended Complaint on February 22, 2018. (Doc. No. 57 at ¶ 57; Doc. No. 8). On October 16, 2018, the Court entered an Order granting Defendant NHC permission to file an Amended Answer. (Doc. No. 57 at ¶ 58; Doc. No. 13). In its Amended Answer, Defendant NHC asserted that it was not the employer of the individual who allegedly harassed Plaintiff and that "Plaintiff was employed or controlled by People Ready [sic] and/or [Defendant] Wischermann." (Doc. No. 54-2 at ¶ 11; Doc. No. 14).

On January 13, 2019, Plaintiff petitioned the Court to amend her First Amended Complaint to add Defendant Wischermann. (Doc. No. 57 at ¶ 59; Doc. No. 21). Plaintiff provided a summons for service and informed the Court that if her request were granted promptly, "Defendant Wishermann Partners [sic] will be served in person at its Registered Agent on Monday, January 14, 2019." (Doc. No. 57 at ¶ 59; Doc. No. 21). The Court granted Plaintiff permission to amend on January 30, 2019. (Doc. No. 57 at ¶ 59; Doc. No. 23). Plaintiff issued service to Defendant Wischermann on January 31, 2019, and service was executed on February 4, 2019. (Doc. No. 57 at ¶ 59; Doc. No. 25). Defendant Wischermann accepted service, then filed an Answer on March 1, 2019. (Doc. No. 57 at ¶ 59; Doc. No. 32).

The Second Amended Complaint asserts counts for i) sexual harassment in violation of the Tennessee Human Rights Act ("THRA"), ii) sex discrimination in violation of the THRA, iii) retaliation in violation of the THRA, and iv) violations of the Tennessee Public Protection Act ("TPPA").[8] (Doc. No. 24).

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]' " *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248.

A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

**\*6** On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at \*5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

## DISCUSSION

Each Defendant moves for summary judgment as to all claims against it. As Defendant Wischermann's Motion (but not Defendant NHC's Motion) contains arguments regarding the timeliness of the claims against it, the Court will discuss Defendant Wischermann's Motion first. The Court will then discuss Defendant NHC's arguments that several relevant statements constitute inadmissible hearsay. The Court will then discuss each claim brought in the Second Amended Complaint in turn.

A. Timeliness of claims against Defendant Wischermann[9]
Defendant Wischermann argues that the claims brought against it are untimely. Under Tennessee limitations law, claims brought under the THRA and TPPA are subject to a one-year limitations period. *See* Tenn. Code Ann. § 4-21-311(d) ("A civil cause of action under this section [the THRA] shall be filed in chancery court or circuit court within one (1) year after the alleged discriminatory practice ceases[.]"); *Conley v. Yellow Freight Sys., Inc.*, 521 F. Supp. 2d 713, 719 (E.D. Tenn. 2007) ("Claims under the TPPA and common law claims for retaliatory discharge in violation of public policy must be filed within one year from the date of the discriminatory act." (citing *Stewart v. Memphis Housing Authority*, 287 F.Supp.2d 853, 858 (W.D. Tenn. 2003)). The limitations period for harassment claims begins to run when the last harassing act occurs. *See Mosby v. State Farm Mut. Auto. Ins. Co.*, No. 3:04-0275, 2005 WL 2600420, at \*8 (M.D. Tenn. Oct. 13, 2005). Regarding claims based on the plaintiff's termination of employment, the limitations period generally begins to run when a plaintiff learns of their discharge (and Plaintiff has indicated no basis for an exception to this general rule in the present action). *See Weber v. Moses*, 938 S.W.2d 387, 392-93 (Tenn. 1996).

**\*7** In the instant case, Plaintiff's interaction with Johnson occurred on January 9, 2017, and her assignment at The Westin was terminated on January 24, 2017. (Doc. No. 57 at ¶¶ 16, 18, 44). Therefore, Plaintiff had until January 24, 2018, at the latest to bring her claims under the THRA and TPPA.

Regarding the THRA claims in particular, Defendant Wischermann argues:

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    3

The first time that Plaintiff filed a complaint naming Defendant Wischermann as a defendant was 736 days after Plaintiff's termination. The summons for Defendant Wischermann was issued 737 days after Plaintiff's termination. Defendant Wischermann was served with the Second Amended Complaint 741 days after Plaintiff's termination. Based on this, it is clear that Defendant Wischermann was not sued within the one-year statute of limitations applicable to claims under the THRA.

Because Plaintiff's claims for discrimination, harassment, and retaliation were filed outside the THRA's one-year statute of limitations, her claims as to Defendant Wischermann must be dismissed as a matter of law.

(Doc. No. 48 at 7-8). Regarding Plaintiff's TPPA claim, Defendant Wischermann asserts: "Plaintiff did not timely file suit against Defendant Wischermann because she did not file suit within one year of her termination of employment .... Plaintiff's Second Amended Complaint adding Defendant Wischermann was filed on January 30, 2019, over two years after the termination of her employment .... As a result, Plaintiff's TPPA claim should be dismissed as a matter of law." (*Id.* at 8).

In her Response, Plaintiff briefly addresses Defendant Wischermann's limitations argument, addressing Defendant Wischermann's entire Memorandum in support of its Motion in two paragraphs:

The Westin is owned by [Defendant] NHC and [Defendant Wischermann] served as its exclusive agent for hotel operations and management. Plaintiff has contended from the outset of this case that employer liability for this action should be attributed to the owner of The Westin, [Defendant] NHC – who, pursuant to its Management Agreement with [Defendant Wischermann], accepts all liabilities for the actions of its exclusive agent. *Virgo v. Riviera Beach, Ltd.*, 30 F.3d 1350, 1359-61 (11th Cir. 1994) (finding owner of hotel and management company to be joint employers). [Defendant Wischermann] was only added as a Defendant after [Defendant] NHC, not Plaintiff, raised an inapplicable claim [sic] comparative fault defense as it relates to [Defendant Wischermann], inter alia, in a late filed Amended Answer.

Candidly, Plaintiff believes [Defendant] Wischermann is correct in its claim that [Defendant] NHC's tort-based affirmative defense of comparative fault is "legally deficient" and dreadfully misplaced in this employment action. In fact, because [Defendant] NHC did not seek summary judgment or dismissal regarding its status as an employer in this case status as a liable employer are effectively conceded. Thus, to the extent that [Defendant] NHC makes any claim of comparative fault on liability, Plaintiff believes that [Defendant] NHC is liable as an employer. Regarding the timeliness of the claims against [Defendant Wischermann], Plaintiff clearly moved to include and issue summons on [Defendant Wischermann] within the 90 days. However, the Court did not grant leave to Amend the Complaint to include [Defendant Wischermann] until January 31, 2019 – at which time Plaintiff promptly served [Defendant Wischermann]. [Defendant Wischermann] did not move to dismiss, participated in discovery and litigation process, and accepted service of the Complaint. Under these circumstances, principles of equity and discretion of the Court permit the claims against [Defendant Wischermann] to proceed – regardless of whether it was served within 90 days of the grant of [Defendant] NHC's Amended Answer alleging comparative fault.

(Doc. No. 54 at 24-25).[10]

**\*8** Essentially, regarding the untimeliness of the claims against Defendant Wischermann, Plaintiff asserts, without citing any legal authority, that "principles of equity and discretion of the Court permit the claims against Wischermann Partners to proceed." (Doc. No. 54 at 25). It is unclear what principles of equity Plaintiff is referring to. Plaintiff has provided no argument or doctrine applicable to this case that shows that "equity" and "discretion" indicate that the Court should not dismiss Defendant Wischermann on the grounds that she added it to this action outside the limitations period.[11] It is undisputed that Plaintiff filed her Second Amended Complaint adding Defendant Wischermann as a Defendant 736 days after her assignment as The Westin was terminated, 371 days after the one-year limitations period had expired. (Doc. Nos. 24, 57).

**\*9** Based on the above, the Court finds that Defendant Wischermann has shown that there is no genuine dispute of material fact that the claims against it are untimely under the relevant limitations period, shifting the burden to Plaintiff on this issue. Plaintiff acknowledges that her claims fall outside of the limitations period (and does not point to any genuine dispute of material fact on this issue), and Plaintiff's argument regarding the applicability of "equity" and "discretion" is unsupported by any legal authority.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

The Court will therefore grant summary judgment to Defendant Wischermann on all claims against it.[12]

### B. Hearsay Issues

Hearsay is an out-of-court statement (excluding any statement described in Rule 801(d), which carves out from the definition of hearsay certain kinds of statements that otherwise would meet the definition of hearsay) offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). And under the so-called "hearsay rule," hearsay generally is inadmissible at trial. Fed. R. Evid. 802. Likewise, generally, "hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). So if a party seeking or opposing summary judgment relies on a sworn declaration or affidavit,[13] or deposition testimony, that refers to a statement that is hearsay (sometimes referred to as a "hearsay statement"), the statement is generally inadmissible. (Likewise, if a document contains a statement that is hearsay, that statement generally is hearsay). But of course, the hearsay rule is subject to various exceptions prescribed in Fed. R. Evid. 803 and 804.

Defendant NHC argues that several statements on which Plaintiff relies are hearsay: 1) statements (mentioned in deposition testimony) made by Mathis, such as those offering Plaintiff a job and explaining the reason for Plaintiff's subsequent termination, 2) statements made in conversations (mentioned in deposition testimony) between Plaintiff and Johnson regarding oral sex, 3) statements made in an unsworn written statement provided by another employee (Jevon Wiggins) who witnessed the conversation between Plaintiff and Johnson, and 4) statements (mentioned in deposition testimony) by Brown explaining why Plaintiff was terminated. (Doc. No. 57; Doc. No. 59). Besides citing one general case discussing the principle that a Court cannot consider hearsay evidence in ruling on a motion for summary judgment, *Hoover v. Walsh*, 682 F.3d 481, 491 (6th Cir. 2012), Defendant NHC makes little argument for why these statements constitute hearsay, and more specifically, why the statements (i) meet the general definition of hearsay and are not "carved out" of such definition under Rule 801(d); and (ii) do not fall within any of the exceptions to the hearsay rule.

### 1. *Johnson's statements*

**\*10** The statements made during the conversation between Plaintiff and Johnson are not offered for the truth of the matter

asserted in the statements, but rather to show merely that the statements were made. *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009) ("[Plaintiff] offers [the supervisor's] April 2001 statement for that fact that it was said, not to prove that [Plaintiff] was actually too old to work the Ford account. Accordingly, this statement is not hearsay because it is not being offered for the truth of the matter asserted."). For each of Johnson's statements at issue, Plaintiff has reason to show what Johnson said irrespective of whether Johnson made any assertion via what he said or whether any assertion that was made was actually true. And some of Johnson's statements do not even constitute or include any *assertion*, but rather only a question or a request (for sexual favors)—which are categorically not assertions. Therefore, the Court finds that these statements are not hearsay and thus not subject to the hearsay rule.

### 2. *Mathis and Brown's statements*

Statements made by supervisors (which, as will be discussed below, generally are relevant when determining the existence *vel non* of direct evidence of discrimination because they are supervisors' statements) fall under the opposing party-statement exception, which provides that a statement is not (as carved out of the definition of) hearsay when it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D); *see e.g.*, *Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003) ("Being a direct decision-maker, of course, constitutes strong proof that a statement was made within the scope of employment, but the 'scope of employment' criterion extends beyond direct decision-makers."); *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 456 (6th Cir. 2004) ("The statement was admissible under the hearsay exception for an admission by a party-opponent."). Mathis and Brown both appear to have been supervisors of Plaintiff acting within the scope of their employment when they made statements regarding her hiring and firing.[14] Therefore, the Court finds that these statements fall under the party-opponent carve-out and thus are not subject to the hearsay rule.

### 3. *Wiggins's statement*

**\*11** The statements in Wiggins's (handwritten) unsworn statement, confirming that the incident happened as Plaintiff

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

described, obviously are offered for the truth of the matter asserted (*i.e.*, that the incident happened as described by Wiggins). So those statements are hearsay unless carved out by Section 801(d). And the Court finds that the only conceivable carve-out (the one prescribed in *Fed. R. Evid. 801(d)(2)(D)*) is inapplicable because it does not appear from the record that Wiggins was a supervisor or otherwise acting in the scope of his employment in providing this unsworn statement. *See e.g.*, *N.L.R.B. v. Sherwood Trucking Co.*, 775 F.2d 744, 750 (6th Cir. 1985); *Quintanilla v. AK Tube LLC*, 477 F. Supp. 2d 828, 836 (N.D. Ohio 2007). And the Court is not aware of any possible exception to the hearsay rule.

In sum, the Court finds that it can consider the above-referenced statements made by Johnson, Mathis, and Brown when resolving the present Motions. To the extent that Defendant NHC has lodged a hearsay objection to an assertion contained in Wiggins's written statement, the Court will not consider the assertion.

### C. Sex Discrimination[15]

Both Defendants argue that Plaintiff cannot show her *prima facie* case for sex discrimination under the THRA. (Doc. No. 51 at 4; Doc. No. 48 at 13). Plaintiff does not respond to these arguments, and she does not mention her sex discrimination claim anywhere in her Response. Therefore, the Court finds that Plaintiff has abandoned her sex discrimination claim. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

**\*12** As a result, the Court will grant summary judgment on Plaintiff's sex discrimination claim under the THRA.

### D. Retaliation

Plaintiff brings her retaliation claims under the THRA. Such claims are subject to the same analysis as are retaliation claims under Title VII.[16] *Frazier v. Phillip's Masonry Grp., Inc.*, No. 1:09-0022, 2010 WL 1882123, at \*6 (M.D. Tenn. May 11, 2010); *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc.*, No. 3:14 C 02325, 2016 WL 2927983, at \*\*3, 8, 10 (M.D. Tenn. May 19, 2016). Thus, case law addressing such claims under Title VII is applicable here.

Title VII makes it unlawful to retaliate against employees for engaging in protected conduct. *42 U.S.C. § 2000e-3(a)*. Protected conduct includes opposing any practice made unlawful by Title VII, or making a charge or testifying, assisting or participating in any manner in an investigation, proceeding, or hearing under Title VII. 28 U.S.C. § 2000e-3(a). Reporting or complaining of discrimination to management also constitutes protected conduct. *Fite v. Comtide Nashville, LLC*, 686 F. Supp. 2d 735, 753 (M.D. Tenn. 2010); *Pendleton*, 2016 WL 2927983, at \*8. A plaintiff " 'may prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework.' " *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (quoting *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003)). This means that if there is no direct evidence of retaliation, a retaliation claim is subject to the below-discussed *McDonnell Douglas* burden-shifting framework. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

#### 1. Indirect Evidence

**\*13** The Sixth Circuit has summarized the applicability and workings of the *McDonnell Douglas* burden shifting framework as follows:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).

> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence .... Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted).

Therefore, if only indirect (and no direct) evidence is present, the plaintiff bears the burden under *McDonnell Douglas* of first showing its *prima facie* case of discrimination. In

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

this context, one must keep in mind a distinction between claims of *retaliation* under Title VII and *general* claims of discrimination under Title VII. A claim of retaliation is treated like a claim of discrimination in that it is subject to *McDonnell Douglas* to the extent it is pursued under an indirect-evidence theory. *E.g.*, *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) ("When a plaintiff presents only circumstantial evidence, we examine Title VII ... retaliation claims under the same *McDonnell Douglas/Burdine* evidentiary framework that is used to assess claims of discrimination."). And in this sense, courts' discussions about *McDonnell Douglas* are generally applicable to claims of retaliation even if framed in terms of discrimination; in the *McDonnell-Douglas* context, retaliation is treated essentially as a specific kind of discrimination. However, the elements to establish an indirect-evidence *prima facie* case are different for a Title VII retaliation claim than for a Title VII general discrimination claim.[17]

"In order to establish a prima facie case of retaliation under Title VII, an employee must establish that (1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). *Accord Taylor*, 703 F.3d at 336 ("[Plaintiff] does not present direct evidence of retaliation, and, therefore, she must demonstrate by a preponderance of the evidence four elements: (1) she engaged in a protected activity under Title VII, (2) the exercise of protected rights was known by [her supervisor], (3) [her supervisor] took [an] adverse employment action against [Plaintiff], and (4) there was a causal connection between the adverse employment action and the protected activity.").[18] The Sixth Circuit has noted that "the burden of establishing a *prima facie* case of retaliation is not onerous[.]" *Hatchett*, 186 F. App'x at 550 (internal quotation marks and citation omitted).

**\*14** If and when the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show some legitimate, non-discriminatory explanation for its action(s). *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

The Supreme Court has prudently cautioned, given the confusion sometimes discernible in this context, "[t]he nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens."

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). As the Sixth Circuit recently explained:

> Establishing a prima facie case is not difficult, and it creates a "presumption that the employer unlawfully discriminated against the employee." *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 169 (6th Cir. 1996) (quoting [*Burdine*, 450 U.S. at 254]). This presumption does not shift the burden of proof, but only the burden of producing some evidence of permissible motive. *See Burdine*, 450 U.S. at 256 n.8, 101 S. Ct. 1089.

*Harris v. City of Akron, Ohio*, 836 F. App'x 415, 419 (6th Cir. 2020).

Thus, as to the existence of legitimate and non-discriminatory reasons for its actions, the defendant bears only the burden of production and not the burden of persuasion. *Garren v. CVS Rx Servs., Inc.*, 482 F. Supp. 3d 705, 717 (E.D. Tenn. 2020) (citing *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003)).[19] To meet that burden of mere production, "the defendant need not persuade the court that it was actually motivated by the proffered reason[s]." *Burdine*, 450 U.S. at 254. Rather, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* To raise such genuine issue, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection, which must be legally sufficient to justify a judgment for the defendant." *Id.* at 255. "The defendant only has to present [evidence of] 'clear and reasonably specific' reasons that will 'frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.' " *Harris*, 836 F. App'x at 419 (quoting *Burdine*, 450 U.S. at 258).[20]

**\*15** If the defendant carries its burden to show a legitimate nondiscriminatory reason, then finally the burden shifts back to the plaintiff to show that the reason offered by the defendant is a pretext. *McDonnell Douglas*, 411 U.S. at 802-04 (1973); *Burdine*, 450 U.S. at 255. This resulting burden is one of persuasion, and this burden of persuasion (as to pretext) at this stage "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. In other words, once the burden has shifted back to the plaintiff, the plaintiff must show by a preponderance of the evidence[21] each of two components of pretext: that the defendant's reasons (i) were not its true reasons and (ii) were instead actually a pretext for discrimination. *Kirilenko-Ison v. Bd. of Educ. of*

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020). To defeat a summary judgment motion in such circumstances, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him. *Braithwaite v. Tinken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

An employee can show pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "Whichever method the plaintiff employs, he always bears the burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.' " *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)).

"The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?' " *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [or failed to rehire] her.' " *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). The plaintiff "must meet this evidentiary burden by a preponderance of the evidence." *Id.* (citation omitted). If the plaintiff can do so, he meets his burden of showing that the employer's stated reason for the allegedly discriminatory reason was not its true reason.

But something more is required of the plaintiff. That is, the plaintiff must address the second component of pretext, *i.e.*, that the actual reason was discriminatory. That is, as indicated above, "[t]o demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful."[22] *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993),[23] and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)).[24] In other words, if the burden has shifted back to the plaintiff, the plaintiff's trial burden would be to show by a preponderance of the

evidence that the defendant's reasons were not its true reasons and were instead actually a pretext for retaliation. *Kirilenko-Ison*, 974 F.3d at 661. "To avoid summary judgment, then, the [plaintiff] must present evidence from which a reasonable jury could find that poor performance was not the real reason that [the defendant] terminated [the plaintiff], and that unlawful retaliation in fact was." *Ford Motor Co.*, 782 F.3d at 767. In some cases, the evidence that the defendant's proffered reason was not the proffered reason will serve equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely because it suggests that (suspiciously) the proffered reason was not the real reason. But under Sixth Circuit law, the Court must be mindful to require evidence showing both things, even if it turns out to all be the same evidence.

**\*16** It is worth summarizing in some detail how all of these (variously shifting and conditional) requirements apply in the *summary judgment context* in particular, once the above-referenced principles of summary judgment are applied to the unique framework of indirect-evidence cases under *McDonnell Douglas*. The Sixth Circuit spoke very helpfully on this topic:

> [When a] discrimination plaintiff bases his case on indirect evidence (i.e., evidence requiring inferences to reach the conclusion that the defendant discriminated against the plaintiff), we apply the burden-shifting framework first set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 802–05, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *Rowan,* 360 F.3d at 547; *Town v. Mich. Bell Tel. Co.,* 455 Mich. 688, 568 N.W.2d 64, 67–68 (1997). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 661 (6th Cir.2000) (applying the *McDonnell Douglas* framework to a sex-discrimination claim). Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir.1996) (applying the *McDonnell Douglas* framework to a disability-discrimination claim). The defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant does so, the plaintiff must identify evidence from

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *Id.* Although the burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981).

*Blair*, 505 F.3d at 524.[25]

In the Court's view, what it boils down to, stated as concisely as possible (which, alas, is not particularly concisely), is set forth in the following paragraph.

To obtain summary judgment on Title VII or THRA claims grounded exclusively on the so-called "indirect-evidence" theory, the defendant must either (i) show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element); *or*, failing that, (ii) (a) make an evidentiary showing[26] that there was a legitimate, nondiscriminatory reason for its alleged actions and then (b) show that there is no genuine issue of material fact as to pretext (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of pretext). On the other hand, the plaintiff will avoid summary judgment if: (i) either (a) the defendant fails to meet its initial burden to show the lack of a genuine issue of material fact as to any one or more elements of the plaintiff's *prima facie* case, *or* (b) the plaintiff presents sufficient evidence to demonstrate a genuine issue of material fact as to any element(s) of such *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and (ii) either (a) the defendant cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or, if the defendant can make such a showing, (b) the plaintiff demonstrates that there is a genuine issue of material fact as to pretext.[27]

## 2. *Direct Evidence*

**\*17** As an alternative to indirect evidence, a plaintiff may seek to establish its case via direct evidence. "[D]irect evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor.' " *Bartlik v. U.S. Dep't of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). When there is direct evidence, "the existence of unlawful discrimination is 'patent.' " *Id.* "Whatever the strength of the evidence, it is not 'direct' evidence if [it] admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact." *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005) (quoting *Norbuta v. Loctite Corp.*, 1 Fed. Appx. 305, 313 (6th Cir. 2001)). If an inference is required to draw from the evidence the conclusion that an employer was animose against a protected class—for example, if an inference is required to reach the conclusion that a comment refers to a protected class or the plaintiff's membership in a protected class—then the evidence is not direct evidence. *Zivkovic v. Juniper Networks, Inc.*, 450 F. Supp. 2d 815, 825 (N.D. Ohio 2006). "[T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).

"Direct evidence of discrimination is rare because employers generally do not announce that they are acting on prohibited grounds." *Erwin v. Potter*, 79 F. App'x 893, 896–97 (6th Cir. 2003). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). "Direct evidence and circumstantial evidence claims run on parallel tracks, and therefore failure to sustain a claim under one framework does not undermine the other." *Erwin*, 79 F. App'x at 899.

Unlike in indirect evidence cases, which as noted always involve the *McDonnell-Douglas* framework, "[i]n direct evidence cases, once a plaintiff [via the submission of direct evidence] shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *see also Norbuta v. Loctite Corp.*, 1 F. App'x 305,

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

311–12 (6th Cir. 2001) ("If a plaintiff produces credible direct evidence of discrimination, discriminatory animus may be at least part of an employer's motive, and in the absence of [rebuttal evidence sufficient to remove any genuine issue (doubt) that the employer would have terminated the plaintiff even absent a discriminatory motive], there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court."); *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 382 (6th Cir. 2002) ("In contrast to purely circumstantial cases of retaliation, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."). "In particular, the burden of persuasion stays with the plaintiff throughout the *McDonnell Douglas* analysis; in contrast, the defendant in a direct evidence case has the burden to show that its stated reason for acting against the plaintiff was not pretextual." *Erwin*, 79 F. App'x at 899. In the summary judgment (as opposed to trial) context, the defendant-movant's burden is to remove all doubt about pretext, *i.e.*, remove any genuine issue of material fact as to whether it would have terminated the plaintiff even had it not been motivated (in part) by discriminatory animus. In commenting on the retaliation context, the Sixth Circuit has noted that "[i]n contrast to purely circumstantial cases of retaliation, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Weigel*, 302 F.3d at 382.

3. *Discussion of retaliation claim*

**\*18**  Defendant NHC focuses its argument solely on its assertion that Plaintiff has failed to raise a genuine issue as to causation as required by the fourth and final element of an indirect-evidence *prima facie* case for Title VII retaliation.[28] (Doc. No. 51 at 9-12). The Court declines to decide whether Defendant NHC has shifted the summary judgment burden to Plaintiff on an indirect-evidence theory (as Defendant NHC at least attempts to do), and the Court will instead focus its discussion on why direct evidence of discrimination is present in this case. In its Memorandum in support of its Motion, Defendant Wischermann appears not to address Plaintiff's THRA retaliation claim, but rather to address only retaliation

under the TPPA (discussed below). Plaintiff responds that she has shown direct evidence of retaliation. (Doc. No. 54 at 17).

Plaintiff has presented evidence that her supervisor, Mathis, informed her, while terminating her, that she was a "liability." When asked for clarification of what Mathis appeared to mean by "liability," Plaintiff testified that it connected back to her complaint against Johnson. That is, in response to two separate questions in her deposition regarding her conversation with Mathis, she testified as follows:

> When Jamey [Mathis] called me in and told me that I was a liability, that the investigation—that Ms. Mikia [Brown] couldn't decipher what was real, what was fake. Pretty much when she let me know everything wasn't my fault, you know, what's done in the dark shall come to light. They're having to let me go because I'm a temporary worker. That's what Mikia [ ] stated to Ms. Jamey: That I'm a temp worker, and that I can be replaced.
>
> January 24th, when I came in that morning and talked to Ms. Jamey [Mathis], her initial conversation—her entry to the conversation was, "I don't want you to think you done nothing wrong. Everything's all right, but we're going to have—Mikia [Brown] said we're going to have to let you go." And then, "That's because you're a liability." And she proceeded to tell me about the black and white and the gray area, and that Ms. Mikia [Brown] felt that there was too much gray to decide, to pick and choose. And it was just easier to let me go, especially with me operating on concerns of my own, as far as working night shift, and there was no other position available for me. Which was contradictive, because as soon as I got fired, four days later was a job fair.

(Doc. No. 54-10 at 25-26).

**\*19**  Then, when asked specifically about the use of the term "liability" in the conversation, Plaintiff confirmed that that exact term was used, and further stated that Mathis explained her use of the term as follows:

> That [the term liability] goes back to her — Ms. Jamey [Mathis] and Mikia [Brown]'s conversation about my complaint. I'm a temporary worker, and he's [Johnson's] a permanent worker, which—I am replaceable. So it was easier to let me go, and no harm done, than to push the envelope and open up the box.

(*Id.* at 25).

The Court finds that such evidence of Mathis' statement that Plaintiff was terminated because she was a "liability" due to her sexual harassment complaint is direct evidence of retaliation against Plaintiff. *See e.g.*, *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015) (finding direct evidence when supervisor specifically referenced protected statements as examples of the plaintiff's insubordination when terminating the plaintiff); *Inwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) (not finding direct evidence, but noting as an example of direct evidence of retaliation "an explicit statement from [the defendant] that it was firing [the plaintiff] in response to his discrimination claims"); *Lott v. Tradesmen Int'l, Inc.*, No. 5:09-CV-183-KKC, 2012 WL 2374238, at *4 (E.D. Ky. June 22, 2012) (finding direct evidence when the plaintiff had made a sex discrimination complaint to her employer and hired an attorney, and when she indicated in a conversation with her supervisor that she believed the reason for her termination was her lawsuit, her supervisor responded "pretty much").[29]

When a plaintiff shows direct evidence, the plaintiff has made out a *prima facie* case (but only a *prima facie* case) of discrimination. *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 830 (6th Cir. 2000) ("[D]irect evidence of discrimination merely suffices to establish a *prima facie* case, which shifts the burden of production to the employer to come forward with a non-pretextual reason for its decision[.]") (Norris, J., concurring). In other words, the notion of a "*prima facie* case" applies in the direct-evidence context as well as in indirect-evidence context, where the actual term itself is used more frequently.[30] The upshot of establishing a *prima facie* case in either context is that it shifts the burden to the defendant, but the burden thus shifted is different in the direct-evidence context than in the indirect-evidence context. *Diaz v. City of Inkster*, No. CIVA05-CV-70423-DT, 2006 WL 2192929, at *9 (E.D. Mich. Aug. 2, 2006) ("Plaintiff's presentation of direct evidence means that the burden-shifting paradigm (for indirect evidence) does not apply.").

**\*20**  Where a plaintiff has shown direct evidence of retaliation, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."[31] *Blair*, 505 F.3d at 523; *Weigel*, 302 F.3d at 382. In the summary judgment —as opposed to trial—context, the defendant-movant must show that *no reasonable jury* could fail to find by a preponderance that the defendant would have made the same

decision absent the impermissible (here, retaliatory) motive. Defendant NHC has made no argument of this nature.

Instead, Defendant NHC has focused the entirety of its argument regarding retaliation on Plaintiff's alleged lack of evidence of causation required to establish a *prima facie* case under the indirect-evidence framework.[32] But a challenge to the Plaintiff's ability to show causation as part of her *prima facie* case is simply inapplicable where there is direct evidence of retaliation—which, as indicated above, by itself suffices to establish a *prima facie* case (because, among other reasons, it necessarily raises a presumption of causation). True, the presumption can be rebutted by the defendant. Here, however, Defendant NHC has not even undertaken to show what is specifically required to rebut the presumptive showing of causation in a direct-evidence case: that Defendant NHC would have terminated Plaintiff even absent a discriminatory motive. And Defendant certainly has not met its burden to show that a reasonable jury would *have to find*, rather than merely *could* find, that Plaintiff would have been terminated even absent a discriminatory (*i.e.*, retaliatory) motive. Therefore, the Court finds that Plaintiff has shown direct evidence of retaliation sufficient to survive summary judgment on Plaintiff's retaliation claim, and it need not consider the indirect-evidence theory and the *McDonnell Douglas* burden shifting framework. *See e.g.*, *Wiegel*, 302 F.3d 367 at 381–82 ("It is well settled that if a plaintiff presents direct evidence of discrimination, she need not proceed under the *McDonnell Douglas* formula." (citation omitted)); *Hicks v. U.S. Off. of Pers. Mgmt.*, No. 2:05CV100, 2006 WL 8441765, at *2 (S.D. Ohio June 20, 2006) ("In a case alleging employment discrimination in violation of Title VII, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination *or* circumstantial evidence from which a jury may infer a discriminatory motive.") (emphasis added).

### E. Hostile work environment

Plaintiff brings her hostile work environment claim under the THRA and bases it on alleged sexual harassment. Hostile work environment claims that are based on sexual harassment are analyzed under the same framework whether brought under the THRA or brought under Title VII. *Theus v. GlaxoSmithKline*, 452 F. App'x 596, 600 (6th Cir. 2011); *Austin v. Alexander*, 439 F. Supp. 3d 1019, 1024 (M.D. Tenn. 2020); *Allen v. Cumberland Med. Ctr., Inc.*, No. 2:10-CV-0045, 2010 WL 3825667, at *3 (M.D. Tenn. Sept. 24,

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.  11

2010). Thus, case law addressing such claims under Title VII is applicable here.

**\*21** Plaintiff must establish five elements for a hostile work environment claim based on sexual harassment: "(1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability." *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008); *see also Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).[33] "When the workplace is permeated with discriminatory [meaning, in the context of sexual harassment, sexual or gender-based] intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).[34] "Whether conduct is severe or pervasive is 'quintessentially a question of fact.' " *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (*O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)). The fact-intensive nature typically makes "the severity and pervasiveness evaluation ... particularly unsuited for summary judgment." *O'Shea*, 185 F.3d at 1098.

The harassment must be both objectively and subjectively offensive to constitute a Title VII violation. *Id.* at 21-22. When looking at a hostile work environment claim, a court should employ a totality of the circumstances test. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (discussing *Harris*). "A court determines whether a hostile work environment has been created 'by looking at all the circumstances ... include[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Bradley v. Arwood*, 705 F. App'x 411, 422 (6th Cir. 2017) (quoting *Harris*, 510 U.S. at 23).

Each Defendant argues in its memorandums that Plaintiff cannot show that the working environment was sufficiently severe or pervasive to constitute a hostile work environment. (Doc. No. 51 at 9; Doc. No. 48 at 13). Defendants argue that the facts of this case are more akin to "teasing" or "offhand comments" instead of severe or pervasive conduct. (Doc. No. 51 at 9; Doc. No. 48 at 13). Thus, Defendants argue that, as a matter of law, the conduct Plaintiff complains of cannot

be "severe or pervasive." Plaintiff responds that the conduct in this case was sufficient to be "severe" for purposes of establishing a hostile work environment. (Doc. No. 54 at 12).

A district court in this circuit has explained that the Sixth Circuit declines to find isolated incidents sufficient to constitute a "severe" hostile work environment, unless those isolated incidents rise to the level of rape or assault:[35]

> It is well established that "acts of touching and unwelcome physical contact ... establish an element of physical invasion ... [that] is more severe than harassing comments alone." *Hawkins*, 517 F.3d at 333–35. And that these acts, on their own, can often form the basis for a hostile work environment claim. *Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) ("One instance of conduct that is sufficiently severe may be enough."). The Seventh Circuit has described the severity of sexual harassment as falling on a spectrum:

> > On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

> *Baskerville v. Culligan, Int'l*, 50 F.3d 428, 430 (7th Cir. 1995) (internal citations omitted).

The Sixth Circuit has declined to find isolated incidents severe enough to create a hostile work environment except for in cases of "extreme incidents such as rape or sexual assault." *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 474 (6th Cir. 2012); *Carter v. Youth Opportunity Invs., LLC*, No. 3:19-cv-0177, 2019 WL 1491739, at \*3 (M.D. Tenn. Apr. 4, 2019) ("In the Sixth Circuit, a single act of sexual assault may give rise to an actionable claim for the creation of a sex-based hostile work environment."). Here, Plaintiff's allegations as to Bob and Larry fall into the category of vulgar banter. As to Joe, she alleges two incidents that Joe masturbated while she was on the phone with him. Joe's alleged conduct does not parallel sexual assault. And even if the Court found that the acts complained of were similar in nature to instances of unwanted physical contact, the case law does not support a finding of hostile work environment based on only two such instances, even coupled with a few sexually suggestive comments from other individuals aimed at Plaintiff during the same

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

12

timeframe. *Compare Bowman*, 220 F.3d at 459, 464 (finding the claims insufficiently severe or pervasive where the plaintiff alleged that his supervisor had rubbed his shoulder once and "grabbed his buttocks" on another occasion, even considered in conjunction with a handful of sexually suggestive comments by the supervisor); *Burnett v. Tyco Corp.*, 203 F.3d 980, 981, 984–85 (6th Cir. 2000) (finding that the conduct alleged was not sufficiently severe or pervasive where the plaintiff alleged that her supervisor "placed a pack of cigarettes containing a lighter inside [the plaintiff's] tank top and brassiere strap," leaving her "stunned, shocked, and exposed"); *Moorer v. Summit Cty. Dep't of Job & Family Servs.*, No. 5:10CV457, 2011 WL 2746098, at *1, 6 (N.D. Ohio July 14, 2011) (dismissing hostile work environment claim on the basis that the alleged conduct was not sufficiently severe or pervasive even where the plaintiff's supervisor "smacked her on the rear end" and had "made comments and unwanted advances of a sexual nature toward Plaintiff for several months preceding this incident") *with Hawkins*, 517 F.3d at 334–35 (finding a *prima facie* case of hostile work environment where the male supervisor made continual requests for oral sex, regularly rubbed against the plaintiff with his private parts, and touched or grabbed her "every time" they worked together).

*Breeden v. Frank Brunckhorst Co., LLC*, No. 2:19-CV-5515, 2020 WL 3574685, at *5–6 (S.D. Ohio July 1, 2020), *appeal dismissed*, No. 20-3803, 2020 WL 8262176 (6th Cir. Oct. 30, 2020); *see also Fisher v. Fuyao Glass Am., Inc.*, No. 3:18-CV-405, 2020 WL 59632, at *4 (S.D. Ohio Jan. 6, 2020); *Bazemore v. Performance Food Grp., Inc.*, 478 S.W.3d 628, 636 (Tenn. Ct. App. 2015).

**\*22** In one particularly relevant Sixth Circuit case, an individual with supervisory authority over the plaintiff propositioned the plaintiff for sex, offering her a better performance review if she performed sexual favors (in addition to other inappropriate conduct). *Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784, 787 (6th Cir. 2000). In that case, the Sixth Circuit found that:

> We hold that, under these facts, [the plaintiff] cannot establish that she was subjected to a hostile working environment. The sum total of [the supervisor's] actions that can be considered "because of sex" are: (1) several dirty jokes he told in plaintiff's presence; (2) his alleged verbal sexual advance related to plaintiff's evaluation; (3) his one-time reference to plaintiff as "Hot Lips"; and (4) his isolated comments about plaintiff's state of dress. Although [the supervisor's] purported sexual advance was

truly offensive, it was the only advance that [the supervisor] allegedly made. Most of [the supervisor's] jokes were not aimed at the plaintiff, and that fact can be relied upon as part of a court's conclusion that a defendant's conduct was not severe enough to create an objectively hostile environment [The supervisor's] behavior seems to have consisted of the kind of simple teasing, offhand comments, and isolated incidents that *Faragher* made clear did not amount to discriminatory changes in the terms and conditions of a plaintiff's employment.

*Id.* at 790 (finding no sexual harassment, but finding genuine dispute of material fact as to retaliatory harassment) (citation omitted).

**\*23** Additionally, many cases outside this circuit have specifically found that requests for sex in one or a few instances are not "severe" for purposes of a hostile work environment claim.[36] *McCain v. CCA of Tennessee, Inc.*, 254 F. Supp. 2d 115, 121 (D.D.C. 2003) (two requests by supervisor for plaintiff to visit him at his hotel not sufficient for hostile work environment claim); *Russ v. Van Scoyoc Assocs., Inc.*, 122 F. Supp. 2d 29, 31 (D.D.C. 2000) (comments in single incident by vice president of a sexual nature, including that he wanted to have sex with female employee and perform oral sex on her, were not sufficient for hostile work environment claim); *Durkin v. City of Chicago*, 199 F. Supp. 2d 836, 850 (N.D. Ill. 2002), *aff'd*, 341 F.3d 606 (7th Cir. 2003) (finding conduct not severe when classmate at the police academy showed plaintiff his genitalia, urinated, and stated "suck this" in one incident); *Jones v. Clinton*, 990 F. Supp. 657, 675 (E.D. Ark.), *appeal dismissed and remanded*, 138 F.3d 758 (8th Cir. 1998) (finding conduct not severe when governor exposed his genitalia in a hotel room and asked the plaintiff to "kiss it").[37] This case law strongly appears to apply to Johnson's alleged conduct, since it involved only two solicitations for sex made over a very short time span. Therefore, the burden has shifted to Plaintiff to show that there actually is a genuine dispute of material fact regarding whether the conduct is "severe or pervasive."

**\*24** Plaintiff points the Court to a Seventh Circuit case, *Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899 (7th Cir. 2002), for the proposition that "[u]nder similar facts, federal courts have held that 'outright solicitations' for sex directly to a plaintiff are sufficiently severe to satisfy this element." (Doc. No. 54 at 14). In addition to not being binding on this Court, this case is distinguishable. *Quantock* involved a supervisor who asked the plaintiff for three different kinds of sex during a meeting, and the supervisor had previously (a few

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   13

years before) groped the plaintiff's breasts and forcibly kissed the plaintiff. *Quantock*, 312 F.3d at 902-03. The appellate court found that the plaintiff had satisfied her *prima facie* case for a hostile work environment based on sexual harassment, explaining that:

> In determining whether conduct is "severe or pervasive" enough to alter the conditions of employment, we look at "the totality of the circumstances, including ... the 'frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Murray v. Chicago Transit Authority*, 252 F.3d 880, 889 (7th Cir. 2001). Though infrequent, [the supervisor's] alleged outright solicitation of numerous sex acts from [Plaintiff] is considerably more "severe" than the type of "occasional vulgar banter, tinged with sexual innuendo" that has previously been deemed to fall short of the hostile workplace standard. *See, e.g., McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996) (finding that three "sexually suggestive" comments by a co-worker did not "unreasonably interfere [ ]" with the plaintiff's working environment). Given that [the supervisor] made his repeated requests for sex directly to [Plaintiff], *see Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir.2002) (sexual innuendo not "severe" because made out of the presence of the claimant), and in light of [Plaintiff's] significant position of authority at the company and the close working quarters within which he and [Plaintiff] worked, a reasonable jury could find the sexual propositions sufficiently "severe," as an objective matter, to alter the terms of [Plaintiff's] employment.

*Id.* at 904. *Quantock* has several distinguishing features from the case at hand. Unlike *Quantock*, Plaintiff in this case was not harassed by an individual with a "significant position of authority at the company." Johnson was a cook who occasionally gave instructions to Plaintiff, but there is no indication that he was her supervisor or that he held a "significant position of authority" over her. There is likewise no indication that Plaintiff and Johnson worked in "close working quarters." Finally, Plaintiff has not alleged any offensive or inappropriate touching by Johnson or harassment that occurred on multiple occasions over a sustained period of time. Therefore, the Court is not persuaded by Plaintiff's reliance on *Quantock*.

**\*25** Additionally, Plaintiff cites several cases for the proposition that "[o]vert verbal propositions for sex have consistently been held to be severe and far beyond off-color

jokes, innuendo, or merely offensive utterances." (Doc. No. 54 at 15). These cases are also distinguishable because they all involved instances of physical contact or repeated incidents of harassment. *Ellsworth v. Pot Luck Enterprises, Inc.*, 624 F. Supp. 2d 868, 879 (M.D. Tenn. 2009) (discussing a Sixth Circuit opinion where the court found fifteen incidents of sexual harassment— including the use of the word "slut," a sexual invitation, and physical contact—to be sufficient to create a genuine dispute of material fact regarding a hostile work environment claim, and denying summary judgment when the plaintiff had received between six and eight propositions for sex over a six-month period and been subject to speculation about his genitalia and sexual performance (discussing *Williams v. General Motors Corp.*, 187 F.3d 553, 559, 563 (6th Cir. 1999))); *Vanover v. White*, No. 3:07-CV-15, 2008 WL 2713711, at \*9 (E.D. Tenn. July 10, 2008) (denying summary judgment where, in addition to some less overt conduct, the defendant "(1) licked his lips at Plaintiff; (2) whistled at her; (3) grabbed himself; (4) asked to see Plaintiff's breasts; (5) made a gesture with his hands and tongue toward Plaintiff; (6) made repeated phone calls to her cell phone during work hours asking her to go out with him; (7) exposed his penis to Plaintiff; (8) sent a sexually suggestive note to the Plaintiff; and ([9]) made other sexually explicit comments."); *Deprey v. FedEx Freight, Inc.*, No. 3:18-CV-102-MPS, 2020 WL 1702335, at \*6 (D. Conn. Apr. 8, 2020) (finding repeated comments that were explicit and directed at the plaintiff, including threats, a slur, and questions about sucking male genitalia, to be severe).[38]

As discussed in more detail in the Factual Background section, in this case, on one occasion Plaintiff was asked by Johnson while in the kitchen how much she would charge to perform oral sex on him. Plaintiff then went to the cafeteria to eat her food, and Johnson again asked her to perform oral sex in exchange for money.[39] There is no evidence in the record indicating that Johnson exercised significant authority over Plaintiff,[40] that Johnson was actually authorized by his employer to exercise significant (or even any) authority over Plaintiff,[41] that they worked in close quarters, or that Johnson at any time touched or threatened Plaintiff. There is no evidence that Johnson propositioned Plaintiff on any occasion other than in the kitchen and in the cafeteria over the course of one evening. Therefore, the Court finds that Johnson's conduct does not constitute "severe" conduct for purposes of a hostile work environment claim based on sexual harassment.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   14

**\*26** To be clear, the Court does not deny that the conduct of which Plaintiff complained is not objectively offensive or in serious breach of prevailing standards of decency. But that does not mean it results in liability under the THRA. *See e.g., Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 402 (6th Cir. 1997) (finding no liability under Title VII even though "the conduct alleged ... was crude and offensive, and not to be tolerated in the workplace"); *Ford v. Chad Youth Enhancement Ctr.*, No. 3:08-CV-635, 2010 WL 1177334, at \*11 (M.D. Tenn. Mar. 24, 2010) ("Title VII does not extend to [mere] offensive conduct nor establish a code of civility for co-employees."). The Court's role is not to judge whether the alleged conduct at issue is reprehensible, but rather to determine whether Plaintiff has raised a genuine issue of material fact. The Court's role here is to determine whether Plaintiff has been able to raise a genuine issue as to whether it is "pervasive or severe." Because the Court finds that Plaintiff has not done so, the Court will grant summary judgment to Defendant NHC on Plaintiff's claim for hostile work environment due to sexual harassment.[42]

### F. TPPA claim

A claim under the TPPA contains four elements: "(1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in or remain silent about illegal activity; (3) the defendant employer discharged or terminated the plaintiff's employment; and (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity." *Id.* "[T]he plaintiff has indeed a formidable burden in establishing elements two and four of the cause of action." *Sanders v. Henry Cty.*, No. W200801832COAR3CV, 2009 WL 1065916, at \*6 (Tenn. Ct. App. Apr. 21, 2009) (quoting *Hill v. Perrigo of Tennessee*, No. M2000-02452-COA-R3CV, 2001 WL 694479, at \*5 (Tenn. Ct. App. June 21, 2001)).

**\*27** The Tennessee Supreme Court has explained:

> While the TPPA is sometimes referred to as Tennessee's "Whistleblower Act," this informal name somewhat oversimplifies the Act, in that the TPPA "includes both (1) discharge in retaliation for refusing to remain silent about illegal activities, usually referred to as 'whistleblowing,' and (2) discharge in retaliation for refusing to participate in illegal activities. The claims are similar but distinct." *VanCleave*, 2009 WL 3518211, at \*7 & n.3. As explained in *VanCleave*:

> For both types of retaliatory discharge, the plaintiff must show that he was employed by the defendant and that he was discharged. In a whistleblowing claim, the plaintiff must show that he refused to remain silent about his employer's illegal activities, and the requisite causal relationship between his refusal to remain silent and his discharge. In a refusal-to-participate claim, the plaintiff must show that he refused to participate in illegal activities and the requisite causal relationship between his refusal to participate and his discharge.

*Id.* at \*8 (citation and footnotes omitted); *see Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 437–38 (Tenn. 2011); *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 27 (Tenn. 2011).
*Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015). Though unclear, Plaintiff appears to bring a whistleblower claim (instead of a refusal-to-participate claim). (Doc. No. 54 at 24 (referencing "Plaintiff's decision to speak out"); Doc. No. 24 at 8 (referencing Plaintiff "speaking out about illegal activity")). In any event, both types of TPPA claim require an illegal activity. Defendant Wischermann argues that this claim should fail because the underlying conduct of which Plaintiff complains does not constitute illegal activity. (Doc. No. 48 at 14).

Under the TPPA, "illegal activities" are defined as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304. "Thus, under the TPPA, illegal activity requires violation of a state or federal statute or regulation." *Davis v. Vanderbilt Univ. Med. Ctr.*, No. M201801860COAR3CV, 2020 WL 4516094, at \*3 (Tenn. Ct. App. Aug. 5, 2020), *appeal denied* (Nov. 12, 2020). "[T]he 'illegal activity' or violation by the employer must implicate important public policy concerns." *Williams v. Greater Chattanooga Pub. Television Corp.*, 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011).

Plaintiff asserts that Johnson's conduct violated two criminal statutes, Tenn. Code Ann. § 39-13-514[43] and Tenn. Code Ann. 39-13-515,[44] which prohibit patronizing prostitution and promoting prostitution, respectively. (Doc. No. 54 at 23). "Prostitution" is statutorily defined as "engaging in, or offering to engage in, sexual activity as a business or being an inmate in a house of prostitution or loitering in a public place for the purpose of being hired to engage in sexual activity." Tenn. Code Ann. § 39-13-512(6). Courts have interpreted

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   15

this definition to require a two-part inquiry, namely whether the activity at issue is: 1) "sexual activity" as defined by the statute,[45] and 2) conducted "as a business." *See State ex rel. Gibbons v. Jackson*, 16 S.W.3d 797, 800 (Tenn. Ct. App. 1999) (noting that whether activity constitutes "prostitution" is a two-part inquiry, involving a determination of whether sexual activity exists and if so is conducted "as a business," and that activity conducted at the defendants' adult cabaret was conducted "as a business" (discussing Tenn. Code Ann. § 29–3–101, Tennessee's nuisance statute, as well as Tenn. Code Ann. § 39-13-512)).

**\*28** The term "as a business" in not statutorily defined in this context, and its meaning is unclear from the text of the relevant statute, Tenn. Code Ann. § 39-13-512(6).[46] In determining whether Johnson engaged in conduct that was illegal for purposes of the TPPA elements because it violated statutes proscribing "prostitution"-related conduct, the Court discerns from Tennessee intermediate appellate courts that it should apply the definition of "business" as provided by the Tennessee Business Tax Act.[47] *State v. Royston*, No. W2010-02161-CCA-R3CD, 2011 WL 6349511, at \*4 (Tenn. Crim. App. Dec. 13, 2011) (ruling on different grounds but expressing support for the proposition that the definition of "business" provided by Tennessee's Business Tax Act is applicable to determining whether an individual has committed prostitution in violation of Tenn. Code Ann. § 39-13-513(b)(2)); *State v. Pulley*, No. M2000-02609-CCA-R3CD, 2001 WL 1597740, at \*3 (Tenn. Crim. App. Dec. 14, 2001) (explaining in the context of the Deceptive Business Practices Statute that "[a]lthough unrelated to the provisions of the criminal code, we adopt the definition of 'business' as provided by Tennessee Code Annotated § 67-4-702 which affords a fair import of the term 'business' and which gives proper effect to the legislative intent"); *see also State v. Cawood*, No. E2000-02478-CCA-R3CD, 2002 WL 264621, at \*5 (Tenn. Crim. App. Feb. 25, 2002), *vacated on other grounds*, 134 S.W.3d 159 (Tenn. 2004) (applying the Business Tax Act definition of "business" to conclude that the defendant could not be guilty of patronizing prostitution in violation of Tenn. Code Ann. § 39-13-514(b)(1)).

In the absence of clear case law on point from the Tennessee Supreme Court,[48] the Court assesses what the Tennessee Supreme Court would do if hypothetically it were presented with the issue.[49] Consistent with the opinions just cited, the Court projects that in assessing whether Tennessee statutes criminally proscribing "prostitution" apply to activity allegedly illegal for purposes of the TPPA, the Tennessee Supreme Court would apply the definition of "business" set forth in the Tennessee Business Tax Act.

**\*29** The Tennessee Business Tax Act defines "business" as: "any activity engaged in by any person, or caused to be engaged in by the person, with the object of gain, benefit, or advantage, either direct or indirect. 'Business' does not include occasional and isolated sales or transactions by a person not routinely engaged in business." Tenn. Code Ann. § 67-4-702(1). Therefore, it appears that in order to commit "prostitution" under the relevant statute in Tennessee, an individual must participate in more than occasional and isolated incidents in order to have conducted such activity "as a business."

Courts in other states with similar prostitution statutes have likewise found that an individual must participate in more than occasional or isolated acts to be criminally liable under the relevant prostitution statute.[50] *United States v. Curran*, 8 F.2d 355, 355 (2d Cir. 1925) ("We need not go so far, but do hold that the evidence was insufficient to warrant a holding that the woman was 'practicing prostitution.' In that common or ordinary parlance which legislative draftsmen are presumed to use, the phrase means to pursue as a business or occupation the sale of one's body for carnal intercourse. Cent. Dist. The proof is at best (or worst) of an isolated act, and there is no evidence at all of pursuing the habit as a vocation."); *People v. Draper*, 169 A.D. 479, 484, 154 N.Y.S. 1034, 1038 (App. Div. 1915) ("The legislation dealt with the systematizing of prostitution and concubinage upon a commercial basis; it sought to prevent prostitution and concubinage as a business, and had no connection whatever with any merely individual cases of sexual indulgence."); *Com. v. King*, 374 Mass. 5, 12, 372 N.E.2d 196, 202 (1977) ("[A] prostitute is one who permits common indiscriminate sexual activity for hire, in distinction from sexual activity confined exclusively to one person.").

Therefore, it appears to the Court that Johnson's conduct did not fall within the Tennessee statutes regarding promoting or patronizing prostitution, as he was making isolated requests for sex for money, without any indication he wanted Plaintiff to perform these services "as a business" or that Plaintiff did perform these services as a business. Thus, the Court finds that Tennessee's prostitution statute is not implicated by the facts in this case, and that as a matter of law Plaintiff cannot show that Johnson engaged in "illegal activity" as required for a TPPA claim.[51]

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**\*30** Therefore, the Court will grant summary judgment on Plaintiff's TPPA claim.[52]

## <u>CONCLUSION</u>

For the reasons discussed above, Defendant Wischermann's Motion will be granted, and summary judgment will be granted as to all counts against Defendant Wischermann.

Defendant NHC's Motion will be granted in part and denied in part. Defendant NHC's Motion will be granted regarding Plaintiff's sexual harassment/hostile work environment (Count I), sexual discrimination claim (Count II), and TPPA claim (Count IV). The Motion will be denied with respect to Plaintiff's claim for retaliation (Count III).

**\*31** An appropriate order will be entered.

**All Citations**

Slip Copy, 2021 WL 3269955

---

Footnotes

1   On November 23, 2020, Plaintiff filed a Motion for Leave to File Excess Pages, with an attached copy of her proposed Response, and she also separately filed her Response with various attached exhibits. (Doc. No. 53; Doc. No. 53-1; Doc. No. 54). The Court granted the Motion for Leave to File Excess Pages and directed the Clerk's Office to file the Response attached to the Motion for Leave to File Excess Pages, which was thereafter docketed at Docket Number 61. (Doc. No. 60). All three filings of the Response (Doc. No. 53-1; Doc. No. 54; Doc. No. 61) appear to be identical. For purposes of this opinion, the Court will refer to Docket Number 54, the version of the Response that was filed with corresponding exhibits. The Court also notes that although Plaintiff asked for additional pages in her Response, the Response actually complies with the general 25-page limit for a response. L.R. 7.01(a)(3).

2   The facts in this section are taken primarily from Plaintiff's Response to Defendant NHC's Statement of Facts (Doc. No. 54-1), Plaintiff's Response to Defendant Wischermann's Statement of Facts (Doc. No. 54-2), Defendant NHC's Response to Plaintiff's Statement of Undisputed Facts (Doc. No. 57), and Defendant Wischermann's Response to Plaintiff's Statement of Additional Undisputed Material Facts (Doc. No. 56). For purposes of this section, the Court will refer primarily to Defendant NHC's Response to Plaintiff's Statement of Additional Facts, (Doc. No. 57), which is substantively similar to Defendant Wischermann's Response, which therefore need not be cited additionally. The Court has reviewed the facts and objections contained in all of the statements of facts.

   Unless indicated otherwise (as for example when particular facts are identified as being merely asserted by a party or otherwise qualified in some manner), the facts set forth in this section are undisputed. Thus, the facts set forth herein are either undisputed or specifically identified as disputed. In stating the facts herein, the Court often uses the language used by the party that asserted the facts in the first instance; this helps the Court ensure that the facts as stated herein are undisputed, even if the language used is less precise or thorough than the Court would have used were it writing on a blank slate.

   The Court acknowledges that Defendants object to multiple paragraphs that contain more than one (asserted) fact. It is true that L.R. 56.01 requires that parties list each fact as a separate numbered paragraph. So Defendant certainly has a point, one that counsel should heed in the future. However, the parties do not seem to dispute the underlying (multiple) facts contained in any such paragraphs referred to herein, and so the Court will consider the (multiple) facts contained in these paragraphs to be undisputed for purposes of ruling on the Motions.

   The Court also notes that Plaintiff and Defendants dispute the precise location in the record of many of the facts included in the statement of facts. It appears that Plaintiff provided citations that incorrectly reflected the order that the exhibits were filed on the record. In light of this, the Court has examined the record and verified that all of the facts disputed on this basis contained in this section can be cited to a particular exhibit which provides evidence for the statement in the statement of facts. Where the Court has been able to so verify the facts asserted by Plaintiff, it treats those facts as undisputed if Defendants expressly disputed only the citation and not the fact itself. The Court has not included facts that it has determined to be unsupported by the record.

   Many of the facts are also disputed as being immaterial. The Court has not included herein any facts it deems immaterial, except to the extent helpful to provide context to the material facts.

   Additionally, in response to facts asserted in certain paragraphs of Plaintiff's s Statement of Additional Facts (included in Docket No. 54-1), Defendants have neither admitted nor denied the fact(s) itself but instead have admitted that Plaintiff

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*testified* to such fact(s). (The Court here is not referring to instances where Defendants have admitted that Plaintiff testified to the fact(s) asserted in a particular paragraph but nevertheless has disputed the asserted fact(s)). As Defendant has not denied such asserted facts, the Court will treat them as admitted. The Court also admonishes Defendants that their approach here (*i.e.*, making half-baked admissions) is not proper; they should either admit or deny the fact and support any denial with citation to the record. *See* L.R. 56.01(c).

Finally, Defendant NHC has also objected to several of the facts herein as containing inadmissible hearsay. The Court will discuss this in the legal analysis section of this opinion, and the Court has only included statements in this section that it will ultimately determine it can consider when ruling on the Motions. Though Defendant NHC disputed many of these statements that it regards as hearsay, the Court does not find that Defendant NHC disputes the underlying statements themselves. To the extent that Defendant NHC did intend to make such an objection, the Court would be unpersuaded because Defendant NHC does not cite to portions of the record showing the statements are disputed.

3   The parties agree that Defendant NHC owns The Westin Nashville Hotel. (Doc. No. 57 at ¶ 1). As revealed in paragraph 1 of Docket No. 57 (which reflects Plaintiff's additional numerated paragraphs of additionally allegedly undisputed facts set forth in Docket Number 54-1, and Defendant NHC's corresponding answers thereto), Plaintiff coined the term "The Westin" as a shorthand term for "The Nashville Westin Hotel." (*Id.*) One might think, then, that Plaintiff clearly meant for the term "The Westin" to reference (and only reference) the hotel (*i.e.*, the physical building). Regrettably, one would be wrong, as Plaintiff was very sloppy in her terminology, repeatedly using the term "The Westin" to refer to some kind of *entity*, capable of taking various actions (like contracting, indemnifying and investigating) that a physical structure simply cannot take. (*E.g.*, *id.* at 6, 7, 14, 29). In short, throughout Docket Number 54-1, Plaintiff refers to "The Westin" variously as an actor and as a place, presumably conflating the physical structure of the hotel with a legal entity. The Court can say that "The Westin" is not named a defendant to this action. What is identified, in the case caption and introduction of the Second Amended Complaint, as the *trade name* of NHC is "Westin Nashville." Of course, that is not the same as "The Westin." So to the extent that—contrary to Plaintiff's very first statement in Docket Number 54-1—The Westin refers to an entity rather than a building, the Court cannot say what the entity is and how it is related to Defendants. In its Reply, Defendant Wischermann understandably expresses concern that Plaintiff is attempting to conflate both Defendants into the single entity of "The Westin." (Doc. No. 58 at 1, 2). Having said that, the Court notes the following undisputed facts regarding what appears to be an entity referred to as The Westin.

Defendant NHC entered into a management agreement with Defendant Wischermann wherein Defendant Wischermann was appointed as Defendant NHC's "exclusive agent" for The Westin's operations and management. (*Id.* at ¶¶ 2, 3). Under this agreement, which was in effect during the period in which Plaintiff performed work at The Westin, all ordinary expenses, debts, and liabilities—including liability for this legal action—are chargeable to The Westin and are the responsibility of Defendant NHC. (*Id.* at ¶¶ 4, 5). The Westin and PeopleReady entered into an Agreement to Supply Temporary Staffing on October 26, 2016, whereby The Westin was responsible for the supervision, direction, and control of workers supplied by PeopleReady (the Court will discuss below the confusion regarding what entity is Plaintiff's employer). (*Id.* at ¶ 6). The Westin also agreed to indemnify and hold PeopleReady harmless against claims arising under its agreement relating to The Westin's supervision, direction, and control of assigned employees. (*Id.* at ¶ 7). Not knowing what "The Westin" even is, the Court could hardly ascribe much significance to these facts about "The Westin." The Court has provided the information in this paragraph as mere background information for what it is worth, and the Court does not view such information as material to resolving any of the claims discussed herein.

4   Defendant Wischermann indicates in its briefing that Plaintiff was not propositioned for oral sex in this first conversation, and instead was merely asked if she knew of anyone who would perform oral sex. (Doc. No. 48 at 12). However, in responding to Plaintiff's Additional Statement of Undisputed Facts, Defendant Wischermann did not object to Plaintiff's characterization of the events as asking her how much she would charge for oral sex. (Doc. No. 56 at 16). It is true that Plaintiff's recounting of the incident in her deposition is unclear, as she does not specifically reference being asked for oral sex in the kitchen, but then later refers to the request for oral sex in the cafeteria as Johnson's second request. (Doc. No. 54-10 at 19). The written statement of the incident by Plaintiff indicates that Johnson did ask for oral sex in exchange for $30 or $50 in the kitchen. (Doc. No. 54-9). Taking the facts in the light most favorable to Plaintiff, Plaintiff has put evidence into the record that Johnson solicited Plaintiff for sex twice (once in the kitchen and once in the cafeteria).

5   Plaintiff indicated in her deposition that she was not sleeping, but instead was in a calming and meditative state. (Doc. No. 57 at 21).

6   Defendant NHC asserts that factual assertions in several paragraphs of Plaintiff's Statement of Additional Facts "are based on hearsay." The Court presumes that in such places, Defendant NHC means that the deposition testimony (or written statement) cited in support of these respective paragraphs is based on an underlying hearsay statement of a

particular declarant. Defendant NHC does not argue, however, that this particular statement of Ridley is hearsay. "If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived ..." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994); *see e.g.*, *Moore v. City of Memphis*, 175 F. Supp. 3d 915, 929 (W.D. Tenn. 2016), *aff'd*, 853 F.3d 866 (6th Cir. 2017) (finding hearsay objection waived when no argument was provided); *Brady v. City of Westland*, 1 F. Supp. 3d 729, 732 n.3 (E.D. Mich. 2014) ("Indeed, Plaintiff not only failed to raise any hearsay concerns or other evidentiary objections with respect to the police reports, but she explicitly relied on the reports of the Westland officers as the basis for her counter-statement of facts in her responses to Defendants' motions. Accordingly, Plaintiff is in no position to complain about the Court's consideration of the police reports ..."); *Fish Farms P'ship v. Winston-Weaver Co. Inc.*, No. 2:09-CV-163, 2012 WL 5877967, at *4 (E.D. Tenn. Nov. 20, 2012), *aff'd*, 531 F. App'x 711 (6th Cir. 2013) ("It is again noted that plaintiff has made no effort to address the hearsay issue, and the issue is deemed waived."). The Court considers the hearsay issue waived as to those statements (including but not limited to this statement of Ridley) with respect to which Defendant did not raise the hearsay issue.

7   As with Ridley's statement, Defendant has not raised the hearsay issue as to Plaintiff's statement, and the Court therefore finds the objection waived.

8   The Second Amended Complaint is the operative Complaint in this matter. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000). The counts in the Second Amended Complaint were not enumerated, and so the Court has supplied numeration.

9   The undersigned will highlight a few important points regarding the terminology used herein, by reference to something he wrote years ago:

On the subject of limitations, courts often use language loosely, interchanging various terms for one another. For maximum clarity, terms must be defined so that important concepts are distinguishable from one another, then used consistently in accordance with those definitions. Herein, legal authorities will be paraphrased in terms of the following definitions to convey the concepts expressed therein, regardless of the terms used (or misused) by the authority being cited.

As used herein, a "statute of limitations" refers to a legislative enactment, or codification thereof, that sets forth a limitations period .... A "limitations period" refers to the length of time-the specific number of days, months, or years-in which a given claim can be commenced, as set forth in a statute of limitations. "Limitations" [refers] to the legal doctrine whereby a plaintiff is barred from bringing a claim based upon the lapse of the applicable limitations period. To say that limitations "applies" is to say that, under limitations law, a claim is time-barred. "Limitations law" refers to the entire body of rules, both statutory and judge-made, by which courts determine whether limitations applies in a given case.

Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1017– 19 (1997).

10  In addition to its (meritorious) argument that the claims against it are untimely, Defendant Wischermann also argues that the doctrine of comparative fault used to make it a party in this case is inapplicable to claims under the THRA or TPPA. (Doc. No. 48 at 8-9). As indicated in this quotation, Plaintiff seems to agree that the doctrine of comparative fault does not apply to the case at hand and was an inappropriate vehicle to bring Defendant Wischermann into the instant case. The Court agrees with the parties. The Court was unable to find any legal authority supporting the position that the doctrine of comparative fault applies to claims under the THRA or TPPA. Additionally, the Court finds that Defendant Wischermann has accurately described the lack of legal authority addressing the applicability of comparative fault in the related context of Title VII. (Doc. No. 48 at 9 (citing *Bell v. Am.'s Powersports, Inc.*, No. CIV-20-121-R, 2020 WL 2201421, at *3 (W.D. Okla. May 6, 2020) (citing *Scroggins v. State of Kans., Dept. of Human Resources*, 802 F.2d 1289, 1292 n.4 (10th Cir. 1986) (characterizing as "incredible" defendant's enumerated defenses, including contributory negligence, to Plaintiff's Title VII claim)); *Lofton v. FTS Int'l Mfg., LLC*, No. CIV-17-242, 2017 WL 3741982, at *6 (W.D. Okla. Aug. 30, 2017) ("[C]ontributory negligence does not apply to intentional acts of discrimination"); *Doe v. Oberweis Dairy*, 456 F.3d 704, 714 (7th Cir. 2006) ("[W]e cannot find a case under Title VII in which comparative fault was recognized as a complete or partial defense to liability.") (parentheticals taken from Defendant Wischermann's Memorandum in support of its Motion)).

11  It is unclear even what type of "equity" Plaintiff is referring to. One option would be equitable estoppel, which "tolls the running of the statute of limitations where the defendant has 'misled the plaintiff into failing to file [his] action within the statutory period of limitations.' " *Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 145 (Tenn. 2001) (citation omitted); *Barnes v. SRI Surgical Express, Inc.*, No. 1:09-CV-204, 2010 WL 11639654, at *7 (E.D. Tenn. Dec. 13, 2010). However, this doctrine is inapplicable in the instant case as Plaintiff has failed to show that Defendant Wischermann misled her in some way so as to prevent the timely filing of her complaint against it. Additionally, equitable tolling is not a recognized doctrine in Tennessee. *Norton v. Everhart*, 895 S.W.2d 317, 321 (Tenn. 1995); *Luciano v. Randstad HR Sols. of Delaware, LP*,

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.  19

No. 11-3095-STA, 2012 WL 601803, at *1 (W.D. Tenn. Feb. 22, 2012). Plaintiff has not argued that this doctrine should be used in this case, whether any of the five factors are met, or why this is the type of "rare[ ]" case where equitable tolling should apply. *Parks v. Fed. Exp. Corp.*, 1 F. App'x 273, 276 (6th Cir. 2001). Therefore, if Plaintiff was in fact referring to either of these types of "equity," the Court would find that they are inapplicable to this case.

12    As Plaintiff filed only one Response to both Motions, the Court will continue to refer to the various arguments contained in the Memorandum in support of Defendant Wischermann's Motion. Plaintiff responded to all of the arguments collectively in her Response, and the arguments from Defendant Wischermann's Memorandum are needed to identify the issues on which the burden shifted to Plaintiff as the party opposing summary judgment.

13    For summary judgment purposes, a sworn declaration or affidavit is treated like testimony given under oath from the witness stand in open court, and so its contents are not treated as hearsay except to the extent that its contents in turn refer to hearsay. By contrast, all contents of an *unsworn* written statement, like the one made by Jevon Wiggins (Doc. No. 54-10), are treated as hearsay (unless somehow carved out by Rule 801(d)).

14    As discussed in further detail in the Factual Background section, it appears undisputed from the record that both Mathis and Brown participated in the decision to terminate Plaintiff. Additionally, Mathis was apparently tasked with informing Plaintiff of her termination, and Mathis also originally informed Plaintiff that Defendant NHC would like to hire Plaintiff on a more permanent basis. Even if Mathis was not involved in the decision, the statement is still attributable to Defendant NHC because she used the word "we" and indicated she had personal knowledge of the reasons for firing Plaintiff. *See e.g.*, *Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 996 (6th Cir. 2009) ("Although the parties frame the dispositive issue as whether [the employee] was a 'decision maker,' and the district court found that he was not, [Plaintiff] need not rely on that inquiry to impute [the employee's] comments to [Defendant]. It is undisputed that [the employee] witnessed all or most aspects of the hiring process. Again considering the evidence in the light most favorable to [Plaintiff, the nonmovant], [the employee], as a witness with personal knowledge, directly implicated all members of the hiring committee, including ... the undisputed 'decision maker,' in alleged discriminatory conduct when he explained the hiring committee's decision to [Plaintiff] using the first-person plural 'we.' " ... Accordingly, we hold that the remarks are properly attributable to [Defendant] at the summary judgment stage of analysis."); *Lott v. Tradesmen Int'l, Inc.*, No. 5:09-CV-183-KKC, 2012 WL 2374238, at *5 (E.D. Ky. June 22, 2012) (discussing *Wharton* and finding statement attributable to employer because employee was "a witness with person knowledge of ... reasons for terminating [the plaintiff]" and the word "we" was used, and noting "[a]t the summary judgment stage of analysis, it is appropriate to hold [the] remarks attributable to [employer] as direct evidence of retaliation"). None of this is to say that Defendant NHC would not be permitted at trial to seek to convince the jury that Mathis's statement *ultimately* should not be attributed to Defendant NHC (even though there is a sufficient basis to make such attribution for purposes of *mere admissibility*).

15    Though each Defendant notes that it did not (at least primarily) employ Plaintiff, neither Defendant argues in its memorandums in support of the motions that this fact dooms Plaintiff's claims against it. In fact, despite noting that it did not employ Plaintiff, Defendant Wischermann (but not Defendant NHC) states that "[f]or the sole purpose of its Motion for Summary Judgment, Defendant Wischermann will not contest that Plaintiff was its employee." (Doc. No. 48 at 15 n.3). It is unclear why Defendants noted that they were not employers, but then did not argue the legal implications of this fact. This is perhaps because, in the related Title VII context, an entity can be a joint employer of a plaintiff in some circumstances:

> The basis of the [joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

*Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.4 (6th Cir. 1997) (quoting *NLRB v. Browning–Ferris Ind. of Pennsylvania, Inc.*, 691 F.2d 1117, 1123 (3d Cir.1982)); *see also Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 215 (3d Cir. 2015) ("Two entities may be "co-employers" or "joint employers" of one employee for purposes of Title VII."); *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 313 (S.D.N.Y. 2014) ("[U]nder [the joint employer doctrine] 'an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer.' " (quoting *Arculeo v. On–Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir.2005))). In any event, Defendants have not shifted the burden on the employment issue to Plaintiff (the non-movant) regarding any of her claims for purposes of these Motions.

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    20

16    The THRA provides a state remedy for sex discrimination. The statute states "[i]t is a discriminatory practice for an employer to: (1) Fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin ..." Tenn. Code Ann. § 4-21-401(a)(1). Though this is a state discrimination law, courts apply, to claim brought thereunder, the same principles they would to a claim brought under Title VII or 42 U.S.C. § 1981. See e.g., Campbell v. Fla. Steel Corp., 919 S.W.2d 26, 31 (Tenn. 1996) ("The stated purpose and intent of the Tennessee Act is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws. Accordingly, our analysis of the issues in this appeal is the same under both the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act." (internal citations omitted)). It is true that the THRA is broader than Title VII in some respects, Walton v. Interstate Warehousing, Inc., No. 3:17-cv-1324, 2020 WL 1640440, at *5 (M.D. Tenn. Apr. 2, 2020), but not any that are relevant to the analysis in this case. Therefore, the Court will refer primarily herein to Title VII law.

17    In addition, at least one of the elements of each claim—an adverse employment action—is analyzed differently in connection with a Title VII retaliation claim than in connection with a Title VII general discrimination claim. See Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 720 (6th Cir. 2008) ("In contrast to Title VII's discrimination provision, the 'adverse employment action' requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace. The retaliation provision instead protects employees from conduct that would have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (citation and internal quotation marks omitted).

18    By contrast, the elements of an indirect-evidence prima facie case of general discrimination under Title VII (stated in the masculine) are: "1) [the plaintiff] is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class." Hughes v. Gen. Motors Corp., 212 F. App'x 497, 502 (6th Cir. 2007) (quoting Johnson v. Univ. of Cincinnati, 215 F.3d 561, 572–73 (6th Cir. 2000)). These elements would govern Plaintiff's claim of general sex discrimination to the extent pursued under an indirect-evidence theory, but these elements need not be analyzed because, as noted above, it is undisputed that Plaintiff could not establish such a claim in any event.

19    As suggested herein, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff at all times, throughout this burden shifting. Burdine, 450 U.S. at 253; Anthony, 339 F.3d at 515. The Court keeps this in mind, albeit with the caveat that on the instant Motions it does not sit as the trier of fact but instead concerns itself only with what a reasonable trier of fact could (or could not) find at a hypothetical trial based on the evidence presented on these Motions. Notably, in seeking to meet its burden, the plaintiff cannot rely purely on mere personal belief, conjecture and speculation, because they are insufficient to support an inference of discrimination. Garren, 482 F. Supp. 3d at 717.

20    The bracketed words added by the Court to this quote are significant; they denote the difference between a burden (a) merely to articulate some non-discriminatory reason(s) that supposedly motivated the employment decision, and (b) to provide some evidence that there was some non-discriminatory reason(s). It is true that some cases use language that seemingly suggests that the burden is the former. E.g., Redlin v. Grosse Pointe Pub. Sch. Sys., 921 F.3d at 607. But both Burdine and Harris (which, as noted was relying on Burdine) make clear that the employer meets its burden of production only if it presents not merely some statement of what the reason supposedly was, but rather evidence of what the reason actually was.

21    The "preponderance of the evidence" standard applicable here is the trial standard. At the summary judgment stage, as suggested above, the standard is modified, such that the question becomes whether a reasonable jury could make the required finding by a preponderance.

22    The required second component seems to coalesce with the required overall showing that the plaintiff must make to meet his or her overall burden of showing unlawful discrimination. Presumably, this is what the Supreme Court had in mind when it stated that the plaintiff's burden as to pretext "merges" with the plaintiff's overarching burden as to the discrimination claim as a whole. Burdine, 450 U.S. at 256.

23    One might reasonably ask whether St. Mary's, which as noted in Ford Motor Co. required the plaintiff to show both components, effectively overruled Burdine in one respect. Specifically, this aspect of St. Mary's seems in tension with Burdine's statement that the plaintiff may meet its burden of persuasion as to pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 256. The dissent in St. Mary's certainly saw the tension. But as far as the undersigned can tell, Burdine has never been considered to have been overruled in any respect, and certainly neither the

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   21

Supreme Court nor the Sixth Circuit has shown any compunction about citing *Burdine* (at least parts of *Burdine* other than the statement apparently displaced by *St. Mary's* as noted above) in the aftermath of *St. Mary's*. The Court is confident at the very least that the aspects of *Burdine* upon which the Court relies remain good law after *St. Mary's*.

24  One might ask why it is not enough to speak simply in terms of the requirement to show that the real reason was retaliation (the second component of pretext) without mentioning a separate requirement to show that the real reason was not the (non-retaliatory) reason proffered by Defendant (the first component of pretext). After all, the second seems necessarily subsumed in the first. But the Sixth Circuit has articulated these as separate requirements that each must be satisfied, and so the Court will proceed accordingly.

25  Although *Blair* states that "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination[,]" *505 F.3d at 524*, this is actually true only if the defendant-movant met its initial burden of showing the absence of sufficient evidence for a jury to reach such a conclusion. *See Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) ("The moving party must demonstrate the 'basis for its motion, and identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986))).

26  To be clear, as discussed herein, the requirement here is not merely to *articulate* a legitimate reason, but also to *present evidence* that the articulated legitimate reason was in fact the reason.

27  As indicated herein, a plaintiff's requirement to show "pretext" is actually a requirement to show not just pretext (*i.e.*, that the claimed, bogus reason was provided to conceal the real reason) but also to show that the real reason was of an unlawful, discriminatory nature.

28  The Court agrees with out-of-circuit decisions holding that, " '[t]o meet its burden on summary judgment, the defendant employer must show that the plaintiff will be unable to introduce either direct evidence of a purpose to discriminate, or indirect evidence of that purpose by showing that the proffered reason is subject to factual dispute.' " *Watkins v. Nabisco Biscuit Co.*, 224 F. Supp. 2d 852, 862 (D.N.J. 2002) (quoting *Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200, 203 (3d Cir. 1987)). This means that Defendant NHC bears an initial burden of showing preliminarily (subject to Plaintiff's rebuttal) that Plaintiff lacks direct evidence, failing which Plaintiff would not even be required to show that it has direct evidence.

Since Defendant NHC does not address whether Plaintiff has shown direct evidence of retaliation, one may wonder whether Defendant NHC ever shifted the summary-judgment burden to Plaintiff to show that she has direct evidence. Defendant NHC has raised (albeit with an exclusive focus on the indirect-evidence version of a *prima facie* case) Plaintiff's alleged inability to show a *prima facie* case, and one way that Plaintiff may establish a *prima facie* case is through presenting the Court with direct evidence. *See e.g.*, *Thompson v. Hendrickson USA, LLC*, No. 3:20-CV-00482, 2021 WL 848694, at *19 n.20 (M.D. Tenn. Mar. 5, 2021) ("Plaintiff might meet her *prima facie* case in various ways, including via direct evidence[.]") (Richardson, J.); *Conti v. Am. Axle & Mfg., Inc.*, 326 F. App'x 900, 911 (6th Cir. 2009) ("As in the direct evidence context, a plaintiff relying on indirect evidence still must make a *prima facie* showing of discrimination."). So the Court herein is content to construe Defendant NHC's argument as challenging Plaintiff's showing of a direct-evidence *prima facie* case as well as an indirect-evidence *prima facie* case. And the Court will assume *arguendo* that Defendant NHC shifted the burden to show the existence of direct evidence. But in any event, Plaintiff has shown the existence of evidence that Court deems properly classified as direct evidence.

29  As discussed in the Factual Background section, some additional and contradictory reasons for terminating Plaintiff also appear in the record (for sleeping on the floor and/or because The Westin wished to hire its own staff). The Court cannot resolve a factual issue on summary judgment and the Court must accept all facts in the light most favorable to Plaintiff.

30  Thus, the term "*prima facie* case" does not necessarily refer specifically to a *prima facie* case in support of an indirect-evidence theory under *McDonnell Douglas*, even though the Court herein, (and the opinions it quotes) sometimes uses the term with that specific connotation in mind. One way, among others, to distinguish a reference to a *prima facie* case under an indirect-evidence theory from a reference to a *prima facie* case under a direct-evidence theory is that only the former has *elements*; the whole idea of the latter is that when there is direct evidence of discrimination, satisfaction of various *elements* is unnecessary to raise a presumption of discrimination the way it is necessary when there is only circumstantial (indirect) evidence of discrimination.

31  This one-step, uni-directional burden-shifting is not the potentially two-step and bi-directional burden-shifting prescribed by *McDonnell Douglas*, but it is a kind of burden-shifting nonetheless.

32  Defendant does argue, in connection with its discussion of the TPPA claim, that Plaintiff was fired for sleeping on the floor during her shift. (Doc. No. 51 at 15). However, Defendant does not argue (or at all attempt to carry its burden) in

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.                    22

its retaliation section or otherwise explain how it would have made the same decision absent the apparent motivation that it found Plaintiff to be a "liability."

33    There is an affirmative defense available to a defendant when they have taken reasonable care to prevent and to correct harassment and the plaintiff did not avail themselves of the employer's procedures to address harassment. *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 452 (6th Cir. 2004). However, Defendant NHC in this case has not raised this affirmative defense. The Court therefore will not consider it.

34    The Court notes that, though at times the opinions cited herein refer to "severity *and* pervasiveness," a plaintiff is only required to show "severity *or* pervasiveness." *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 n.2 (6th Cir. 2012) (discussing the confusion in the case law and stating that "a disjunctive test, *i.e.*, 'severe or pervasive,' is proper"). Thus, conduct that is either severe or pervasive is sufficient to satisfy the relevant prong of Plaintiff's *prima facie* case. The parties seem to agree that the conduct, which occurred over the course of one evening, was not pervasive, and focus their analyses on whether the conduct was severe.

35    Additionally, "[t]hose cases in which the sexually harassing conduct consisted of a single minor incident of offensive touching have uniformly concluded that such an incident is not sufficiently severe to give rise to a hostile work environment." *Carter v. Youth Opportunity Invs., LLC*, No. 3:19-CV-0177, 2019 WL 1491739, at *3 (M.D. Tenn. Apr. 4, 2019) (collecting Sixth Circuit cases); *Stanley v. U.S. Enrichment Corp.*, No. 2:07-CV-656, 2009 WL 88623, at *3 (S.D. Ohio Jan. 12, 2009) ("Defendant correctly notes that Plaintiff's isolated incident of allegedly being sexually assaulted once does not rise to the level of objectively severe and pervasive harassment that affected the terms, conditions, or privileges of her employment."); *Mann v. Navicor Grp., LLC*, 488 F. App'x 994, 1000 (6th Cir. 2012) ("[Plaintiff] complains about four discrete and isolated incidents, only one of which involved any physical contact. This evidence is insufficient to establish [Plaintiff's] claim."); *Scarborough v. Brown Grp., Inc.*, 972 F. Supp. 1112, 1119 (W.D. Tenn. 1997) (granting summary judgment when plaintiff only pointed to one incident of her posterior being touched or grabbed).

36    It is true that, as the Seventh Circuit case quoted in *Breeden* notes, courts often state in dicta that "sexual solicitations" fall on the side of severe conduct. *See e.g.*, *Redd v. New York Div. of Parole*, 678 F.3d 166, 177 (2d Cir. 2012). However, Plaintiff has cited (and the Court is aware of) no authority indicating that one or two solicitations are sufficient to constitute severe conduct for purposes of a hostile work environment claim based on sexual harassment.

37    In a related context, courts have also found that one or a few instances of asking a plaintiff about rumors that they are a prostitute or participating in a prostitution ring were not severe. *Pryor v. United Airlines, Inc.*, 14 F. Supp. 3d 711, 720 (E.D. Va. 2014), *vacated and remanded sub nom. on other grounds Pryor v. United Air Lines, Inc.*, 791 F.3d 488 (4th Cir. 2015); *Johnson v. United Airlines, Inc.*, No. 1:13-CV-00113, 2013 WL 3990789, at *5 (E.D. Va. Aug. 2, 2013).

38    Plaintiff's Response also argues that:

> Very frankly, Mr. Johnson's conduct was particularly insulting and humiliating because Plaintiff's dignity was impugned by being treated as if she was a cheap prostitute. Considering Antonio 'Big T' Johnson's large physical size and stature over plaintiff, his pseudo supervisory role on the overnight shift, and the close working quarters at the hotel, "a reasonable jury could find the sexual propositions sufficiently 'severe,' as an objective matter, to alter the terms of [Ms. Grizzard's] employment" as a matter of law.

(Doc. No. 54 at 15-16) (citation omitted)). Defendant NHC notes in its Reply that the statements regarding Johnson's physical size are unsupported by the record. The Court will therefore not consider Johnson's size when considering the statements, as they are unsupported by the record.

39    The parties quibble in briefing over Johnson's comments constituted technically two solicitations for sex, or essentially one conversation which contained two solicitations for sex. (Doc. No. 54 at 14). Regardless, the Court would not find the conduct sufficient to constitute "severe" harassment. Neither party has pointed the Court to any case law indicating that two solicitations for sex, as opposed to one, makes a difference under the law. As noted, the Court is aware of case law indicating that one or a few solicitations for sex is insufficient to constitute "severe" conduct. Taking the facts in the light most favorable to Plaintiff, the Court herein has phrased the events of the evening as two solicitations for sex, instead of one conversation. However, the Court notes that, even if one considers these to be two solicitations for sex, they all occurred in the same evening during the same shift.

40    Plaintiff occasionally took instructions from Johnson while working the nightshift. Even if one assumes that Johnson actually had the authority to give Plaintiff instructions on some occasions, that by itself does not reflect what the Court believes could be deemed "significant" authority, and there is no evidence that Johnson had any other authority over Plaintiff (significant or otherwise). Plaintiff does not seem to argue that Johnson was her supervisor, instead characterizing his role as "pseudo supervisory." (Doc. No. 54 at 15-16).

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.    23

41    Plaintiff also asserts that "it would be wrong to assess the totality of circumstances without considering the subsequent retaliatory acts targeted a [sic] Plaintiff as a direct result of reporting the harassment and solicitation." (Doc. No. 54 at 15). The first case cited for this proposition, *Navarro-Terran v. Embrace Aircraft Maintenance Services*, 184 F. Supp. 3d 612 (2016), contains no pinpoint cite and does not appear to be relevant to Plaintiff's proposition. Plaintiff is correct that the Sixth Circuit has said that "[i]n considering the totality of the circumstances, we are not to disaggregate the various retaliatory incidents that the plaintiff claims; this would inappropriately rob them of their cumulative effect." *Broska v. Henderson*, 70 F. App'x 262, 269 (6th Cir. 2003). Though this is an accurate quotation from the Sixth Circuit, the Sixth Circuit was explaining the standard for a case where the plaintiff brought a claim for retaliatory harassment. Plaintiff here has not brought such a claim and has instead brought a claim for sexual harassment. Additionally, the Court notes that in *Morris* (discussed at length above and relied on extensively in *Broska*), the Sixth Circuit did consider the facts that supported sexual harassment separately from the facts that supported retaliatory harassment. *Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784 (6th Cir. 2000). Even assuming that Plaintiff can rely on her termination as part of her sexual harassment claim (the Court is unsure why Plaintiff refers to multiple "retaliatory acts," when it seems she is only pointing to her termination), Plaintiff has not explained how this single additional event would make the conduct she faced severe or pervasive. Therefore, the Court is unpersuaded by this argument in Plaintiff's Response.

42    The Sixth Circuit has held that "[t]he *McDonnell Douglas* burden-shifting approach also applies to hostile-work-environment claims." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). This holding seems debatable insofar as *McDonnell-Douglas* burden-shifting is geared towards exploring an employer's reasons for making a particular *decision* (taking a particular adverse employment action), as opposed to the employer's reasons for merely *allowing* certain actions to occur. A claim of hostile work environment does not require (and often would not involve) any *decision by the employer* as such; the wrongful conduct underlying a claim of hostile work environment thus could be unrelated to the kind of employer *decision-making* that *McDonnell-Douglas* seems concerned with. For example, such a claim could be premised on alleged repeated and persistent inappropriate touching of the plaintiff by a co-employee which the employer knew about but failed to stop; in such a case, it seems strange to ask whether the employer had a legitimate and non-discriminatory reason for such failure, because the failure arguably did not involve any decision at all and, if it did, would quite obviously not be justified by some legitimate reason. So in some contexts, the Sixth Circuit rule may be difficult, and seem a touch non-sensical, to apply. But the undersigned of course recognizes this as binding precedent. In any event, in the instant case, burden-shifting never commences under *McDonnell- Douglas* because, as noted above, Plaintiff has failed to establish that a reasonable jury could find that she has met her *prima facie* case of hostile work environment.

43    The statute states, in relevant part:
       (a) A person commits an offense under this section:
          (1) Who patronizes prostitution; or
          (2) When a person patronizes prostitution where the subject of the offense is a law enforcement officer or a law enforcement officer eighteen (18) years of age or older posing as a minor.
       Tenn. Code Ann. § 39-13-514.

44    Plaintiff's briefing contains a typo (indicating that the prohibition against "promoting prostitution" is found at Tenn. Code Ann. § 39-13-512, which instead contains the definition of "prostitution"). The Court believes Plaintiff to be referencing Tenn. Code Ann. § 39-13-515, as it proscribes the promoting of prostitution. The statute states, in relevant part:
       (a) A person commits an offense under this section:
          (1) Who promotes prostitution; or
          (2) Who promotes prostitution where the subject of the offense is a law enforcement officer or is a law enforcement officer eighteen (18) years of age or older posing as a minor.
       Tenn. Code Ann. § 39-13-515.

45    Not surprisingly, oral sex appears to fall within "sexual activity" as defined by the statute, which defines "sexual activity" as "any sexual relations including homosexual relations." Tenn. Code Ann. § 39–13–512(7).

46    The Court briefly notes the important principles to keep in mind when interpreting a statute in Tennessee:
       Some of these tried and true principles are as follows: In construing a statute it is the duty of the court to give every word and phrase meaning. *United Canners, Inc. v. King*, 696 S.W.2d 525, 527 (Tenn.1985). Questions involving statutory construction must be answered in light of reason, having in mind the object of the statute and the mischief it aims at. *State v. Netto*, 486 S.W.2d 725, 728 (Tenn.1972). Furthermore, in construing a statute the intention of the legislature is to be gathered from words it has used and not from words it has chosen not to include. *Dwyer v. Progressive Bldg. & Loan Assoc.*, 20 Tenn. App. 16, 94 S.W.2d 725, 729 (1935). This statute, like all statutes, must be applied in its present

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.    24

form unless doing so would result in "manifest injustice." *Scarboro v. First American Bank*, 619 F.2d 621 (6th Cir.1980). And lastly, we must take the words of this statute in their natural and ordinary sense without forcing a construction upon them which would limit their meaning. *State v. Thomas*, 635 S.W.2d 114 (Tenn.1982).

*Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 345 (Tenn. Ct. App. 1997). The Court realizes that application of these principles naturally would vary from judge to judge, as judges can reasonably disagree about what constitutes, for example "manifest injustice" or "the natural and ordinary sense" of words used in a statute. It falls upon each judge to apply these principles as faithfully as he or she knows how, calling it like he or she sees it.

47    One case instead looked at *The American Heritage Dictionary of the English Language* definition and "common sense" definition to determine that "as a business" did not encompass a relationship where an attorney intended to trade credits to a client's account (instead of the fee that was due) in exchange for sexual favors. *Cawood v. Haggard*, 327 F. Supp. 2d 863, 873 (E.D. Tenn. 2004), *aff'd sub nom. Cawood v. Booth*, 125 F. App'x 700 (6th Cir. 2005) (quoting from a previous opinion in the case). The dictionary defined "business" as "[t]he occupation, work, or trade in which a person is engaged or a specific occupational pursuit." *Id.*

48    Neither party has pointed the Court to any relevant cases involving the TPPA and the Tennessee prostitution statute, and the Court is aware of none.

49    In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court. *See Prestige Cas. Co.*, 99 F.3d at 1348 (applying Michigan law). If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. *See id.* "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the Michigan Supreme Court would decide otherwise." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir.1995).

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001).

50    The Court is aware of other opinions that have found that plaintiffs on similar facts can bring claims under the relevant state whistleblowing statutes. However, in each of the cases of which the Court is aware, the plaintiff had the benefit of a prostitution statute that did not include the language of "as a business" and instead appeared to encompass occasional and isolated incidents. *E.g.*, *Harrison v. Edison Bros. Apparel Stores*, 924 F.2d 530, 534 (4th Cir. 1991) (statute defining prostitution as "the offering or receiving of the body for sexual intercourse for hire"); *Lucas v. Brown & Root, Inc.*, 736 F.2d 1202, 1205 (8th Cir. 1984) (statute defining prostitution as "[a] person commits prostitution if in return for, or in expectation of a fee, he engages in or agrees or offers to engage in sexual activity with any other person"). As noted above, neither party has pointed the Court to any relevant cases involving the TPPA and the Tennessee prostitution statute, and the Court is aware of none.

51    The Court notes that it is also possible to maintain a TPPA claim when the Plaintiff reasonably believes that the conduct is illegal. *E.g.*, *Williams v. Greater Chattanooga Pub. Television Corp.*, 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011). Plaintiff has made no argument or presented any evidence indicating that she reasonably believed that Johnson's conduct was illegal. Additionally, Courts have regularly found that summary judgment is appropriate on TPPA claims when conduct does not rise to the level of "illegal." *E.g.*, *Sacks v. Jones Printing Co.*, No. 1:05-CV-131, 2006 WL 686874, at *5 (E.D. Tenn. Mar. 16, 2006) (granting summary judgment on one of the plaintiff's TPPA theories because the allegedly improper ventilation system "does not come within the ambit of the whistleblower statute and does not constitute an 'illegal activity' "); *Konvalinka v. Fuller*, No. E201700493COAR3CV, 2019 WL 2323831, at *5 (Tenn. Ct. App. May 31, 2019) (finding that plaintiff did not identify a specific statutory or regulatory provision that was violated and granting summary judgment because that "one ground is dispositive ... [plaintiff] was required to demonstrate that his discharge violated a clear public policy for his common law claim or was based on his refusal to participate in or remain silent about an illegal activity as defined by the TPPA"); *Sanders v. Henry Cty.*, No. W200801832COAR3CV, 2009 WL 1065916, at *10 (Tenn. Ct. App. Apr. 21, 2009) (collecting cases); *Richmond v. Vanguard Healthcare Servs., LLC*, No. M201402461COAR3CV, 2016 WL 373279, at *8 (Tenn. Ct. App. Jan. 29, 2016) (finding no illegal activity and disregarding the plaintiff's arguments that he reasonably believed there was illegal activity when he could point to no applicable law); *see also Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 345 (Tenn. Ct. App. 1997) (finding that direct judgment should have been given when conduct involving insurance claims was not illegal).

52    Because the Court will grant summary judgment on this claim due to the absence of illegal activity for purposes of the TPPA, the Court does not need to address Defendants' additional arguments that 1) Plaintiff reporting the conduct was not in the public interest, but rather merely in her private interest, 2) preventing prostitution is not in the "public interest" as required by a TPPA claim, and 3) Plaintiff cannot show pretext.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   25

In its Reply, Defendant NHC also argues that the conduct at issue is attributable only to a specific employee (Johnson), and not to it as the employer, and therefore are not actionable. (Doc. No. 59 at 3). As Defendant NHC has only raised this argument in its Reply, and not in reply to an issue implicated for the first time in Plaintiff's response to the Motions, the Court considers it waived for purposes of summary judgment. *E.g.*, *Peake v. Nat'l City Bank of Michigan*, No. 05-72520, 2007 WL 951417, at *2-3 (E.D. Mich. Mar. 27, 2007) ("An argument raised for the first time in a reply brief is not to be considered by the court."); *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019) ("Generally speaking, arguments raised for the first time in reply briefs are waived, and this applies both on appeal and to summary judgment motions filed in the trial court." (internal citations omitted)); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived." (quotation omitted) (discussed in *Palazzo*)).

Despite the general rule against raising arguments for the first time in a reply brief, the Court realizes that *some* arguments are appropriately considered even if first raised in the movant's reply. Specifically, such an argument can (and should) be considered if it was raised in the non-movant's response to the motion, regarding an issue that the movant in all fairness should not have been expected to raise in its initial brief (since, after all, a movant is not required, and generally is not allowed sufficient briefing pages, to make a pre-emptive argument against every single point that might be made in the non-movant's response). But Defendants' argument about the attribution of Johnson's conduct at issue is not such an argument.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works. 26