EXHIBIT 14

 Cited

As of: March 16, 2022 11:00 AM Z

# Shipp v. Ditch Witch Equip. of Tenn., Inc.

Court of Appeals of Tennessee, At Nashville

November 14, 2006, Session ; March 7, 2007, Filed

No. M2005-02354-COA-R3-CV

**Reporter**
2007 Tenn. App. LEXIS 123 *; 2007 WL 700979

FRANK SHIPP v. DITCH WITCH EQUIPMENT OF TENNESSEE, INC.

**Prior History:** [*1] *Tenn. R. App. P. 3* Appeal as of Right; Judgment of the Chancery Court is Affirmed in Part, Reversed in Part, and Modified. An Appeal from the Chancery Court for Rutherford County. No. 03-7133CV. Royce Taylor, Judge.

**Disposition:** Judgment of the Chancery Court is Affirmed in Part, Reversed in Part, and Modified.

## Core Terms

lease, commissions, salesman, trial court, sales, monthly, piece of equipment, territory, hired, attorney's fees, lease agreement, rental, Transmitter, salesperson, customer, locating, lease payment, negotiations, electronics, advances, argues, verbal, quit, preponderance of evidence, employment agreement, branch manager, pricing

## Case Summary

### Procedural Posture

Plaintiff, the employee, sought review of the decision of the Chancery Court for Rutherford County (Tennessee), which found in favor of defendant, the employer, in the employee's breach of contract action seeking commissions. The trial court found that the employee was entitled to commissions on the lease, but only with respect to one of three pieces of equipment.

### Overview

The employee, a salesman, actively marketed equipment to a customer in his sales territory, and the customer ultimately signed a lease for several pieces of equipment. After the lease was executed, the employee quit working for the employer and sought his commissions due on the lease. The employer refused to pay the commissions and the employee filed a breach of contract action seeking the commissions. The trial court found that the employee was entitled to commissions on the lease, but only with respect to one of the pieces of leased equipment. The appellate court reversed, finding that the employee was entitled to commissions for all three pieces of equipment. The evidence showed that the three pieces of equipment were leased to the customer at the same time, in the same manner. The evidence did not support the trial court's parsing of the lease or its finding that the employee was the salesman for one unit, but not the other two. Considering the trial court's determinations on the witnesses' credibility, if it found the employee to have been the "salesman of record" for one unit, it necessarily followed that the employee was also the "salesman of record" for the other two units.

**Outcome**

The appellate court reversed the judgment, holding that the evidence preponderated in favor of a finding that the employee was entitled to commissions for all three pieces of equipment. Costs of the appeal were assessed to the employer.

## LexisNexis® Headnotes

Civil Procedure > Trials > Bench Trials

Evidence > Burdens of Proof > Preponderance of Evidence

Civil Procedure > Appeals > Record on Appeal

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1*[ ] **Trials, Bench Trials**

When cases are tried by the trial court without a jury, appellate courts review the trial court's findings of fact de novo on the record, presuming those findings to be correct unless the evidence preponderates otherwise, Tenn. R. App. P. 13(d). Appellate courts review conclusions of law de novo, without such a presumption of correctness, R. 13(d).

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > American Rule

*HN2*[ ] **Basis of Recovery, American Rule**

In Tennessee, the award of attorney's fees is governed by the well-established American rule, which provides that attorney's fees may not be awarded to the prevailing party absent statutory authorization or an agreement between the parties so providing.

**Counsel:** Frank Shipp, appellant, Pro se.

Aaron S. Guin, Nashville, Tennessee, for the appellee, Ditch Witch Equipment of Tennessee, Inc. [1]

**Judges:** HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and FRANK G. CLEMENT, JR., J., joined.

**Opinion by:** HOLLY M. KIRBY

## Opinion

This is a breach of contract case. The defendant equipment company sells and leases underground construction equipment. The plaintiff worked for the defendant company as an outside salesman with a sales territory. The plaintiff salesman operated under a verbal employment agreement and was paid a minimum weekly salary plus commissions. During his employment, the plaintiff actively marketed equipment to a customer in his sales territory, and the customer ultimately signed a lease [*2] for several pieces of equipment. Soon after the lease was executed, the plaintiff quit working for the defendant. Subsequently, he sought his commissions due on the lease. The defendant equipment company refused to pay the commissions, claiming that the plaintiff salesman was not due any commissions on the lease because he quit work before the customer made any payments on the lease. The plaintiff filed the instant lawsuit for the commissions. After a bench trial, the trial court held that the plaintiff was entitled to commissions on the lease,

---

[1] Appellate counsel for Ditch Witch is not the same attorney who represented the company at trial.

but only with respect to one of the pieces of leased equipment. The plaintiff now appeals, arguing that he is entitled to commissions on two other pieces of equipment. We reverse, finding that the evidence preponderates in favor of a finding that the plaintiff was entitled to commissions for all three pieces of equipment.

## OPINION

Defendant/Appellee Ditch Witch Equipment of Tennessee, Inc. ("Ditch Witch"), sells and leases underground construction equipment. In February 2001, the branch manager of Ditch Witch, Kent Northcutt ("Northcutt"), hired Plaintiff/Appellant Frank Shipp ("Shipp") as an outside salesman. Shipp was assigned to a [*3] sales territory in middle Tennessee. Shipp did not have a written employment contract with Ditch Witch; he operated pursuant to a verbal employment agreement. Under the parties' verbal agreement, Shipp received $ 150 per week as a base salary, commissions from sales and rentals of equipment, plus a $ 150 per week draw or advance against any commissions.

Before Shipp was hired, Greater Dickson Gas Authority ("Greater Dickson") had purchased some older Ditch Witch equipment. Greater Dickson was located in Shipp's sales territory, and Shipp regularly visited the Greater Dickson office to service its needs on behalf of Ditch Witch. Sometime in 2002, Greater Dickson indicated to Shipp that it wanted to replace some of its Ditch Witch equipment, and indicated as well that it was considering obtaining the new equipment from a different supplier. In an effort to keep Greater Dickson's business, Shipp took two representatives from Greater Dickson to tour Ditch Witch's home plant in Perry, Oklahoma, to demonstrate some of Ditch Witch's "latest and greatest" products. After this, negotiations between Greater Dickson and Ditch Witch ensued regarding the purchase or lease of new equipment.

As [*4] the negotiations progressed, they included participation by branch manager Northcutt and Ditch Witch's general manager, Leroy Hylton ("Hylton"). On approximately July 12, 2002, Shipp and Northcutt drafted the following quotes for Greater Dickson on six pieces of Ditch Witch equipment:

Go to table1

On the quotes, Shipp is listed as the "salesperson" for Unit D23 and for the three locator and transmitter items. On the quotes for equipment Units D21 and D22, branch manager Northcutt is listed as the "salesperson."

On August 1, 2002, Greater Dickson and Ditch Witch executed an Equipment Lease Agreement ("lease agreement"), with respect to the six items described above. Under the lease agreement, Greater Dickson agreed to lease the equipment for thirty-six months for $ 7,245 per month, for a total of $ 260,820 in lease payments.

Soon after the lease was executed, on approximately [*5] August 12, 2002, Shipp terminated his employment with Ditch Witch without notice. At the time Shipp quit, he had not been paid any commissions on the Greater Dickson lease. Greater Dickson's first lease payment on the equipment was received by Ditch Witch between August 8 and August 13, 2002.

Subsequently, Shipp sent a letter to Ditch Witch seeking payment of his 5% commission on the Greater Dickson lease. In response, the president of Ditch Witch, Aubrey Needham, Jr. ("Needham"), wrote Shipp a letter dated March 20, 2003, telling Shipp that he was not due any commissions for the lease under the terms of Ditch Witch's commission structure. In the letter, Needham explained his understanding of the commission structure as follows:

> [Ditch Witch] Salesmen are paid commission at 5% on equipment sales that are sold at or above the manufacturers suggested list price. Sales of equipment sold for less than MSLP have a commission rate of 2% of net sale. *All rentals and monthly leases have a commission rate of 5% of monthly rental payable to a salesman of record on date paid by customer.*

Needham took the position that, because Shipp had quit working at Ditch Witch [*6] as of the date that Greater Dickson made its first payment on the lease, Shipp was not the "salesman of record" on that date and was not entitled to any commissions. In addition, Needham demanded that Shipp pay Ditch Witch $ 758.95 in advances made to Shipp that were not offset by commissions earned.

On August 12, 2003, Shipp filed the instant lawsuit against Ditch Witch for the commissions he claimed were due under the Greater Dickson lease agreement. The complaint alleged theories of breach of contract, unjust enrichment, fraud, and violation of *Tennessee Code Annotated § 50-1-102* (fraudulent inducement). *See* Tenn. Code Ann. § 50-1-102 (2005). Ditch Witch filed an answer denying the allegations in the complaint, and also filed a counterclaim against Shipp, alleging that he owed Ditch Witch $ 758.95 in advances that were not covered by his commissions.

A bench trial was held on August 22, 2005. Shipp testified on his own behalf regarding his employment arrangement with Ditch Witch and his involvement in securing the Greater Dickson lease. Shipp testified that, under his verbal employment agreement with Ditch Witch, [*7] he received a base salary of $ 150 per week plus commissions on any sales or rentals of equipment. Shipp identified the parameters of his sales territory and stated that he was the only salesperson covering this territory. Consistent with Needham's March 2003 letter to Shipp, Shipp testified that his commission rate was 5%.

In his testimony, Shipp said that he had known the purchasing agent for Greater Dickson since 1989. Prior to Shipp's employment with Ditch Witch, Ditch Witch had sold equipment to Greater Dickson. When Shipp began working for Ditch Witch, he made service calls to Greater Dickson every month or two to check on the older Ditch Witch equipment. At one of those visits, Shipp said, employees of Greater Dickson told him that Greater Dickson was unhappy with its Ditch Witch equipment and dissatisfied with the Ditch Witch product line and service. They indicated to Shipp that Greater Dickson needed to purchase some new equipment and was considering buying the equipment from a Ditch Witch competitor. Shipp alerted Northcutt and Hylton about Greater Dickson's dissatisfaction. Upon the suggestion of Northcutt and Hylton, Shipp took two employees from Greater Dickson to tour [*8] the Ditch Witch home plant in Perry, Oklahoma, to show them some of Ditch Witch's new equipment. Shipp said that Greater Dickson decided to continue doing business with Ditch Witch because of his efforts to address their concerns and regain their trust. Ultimately, he said, this resulted in the lease of the equipment at issue.

Shipp described himself as the liaison between Greater Dickson and Ditch Witch. He stated that he played a direct role in causing Ditch Witch to enter into the lease at issue, although "higher-ups" at Ditch Witch drafted the paperwork. He stated that he was present when the Greater Dickson paperwork was negotiated and signed. When asked whether he was involved in the pricing and terms of the lease, Shipp acknowledged that the lease document "was already drawn up" and that others had arrived at the pricing. However, Shipp maintained that, with past customers, he had never done the actual pricing on the equipment and nevertheless was paid commissions. Shipp stated, "I was led to believe that

when the contract rolled, if it was in my area of responsibility, I got paid for those numbers." He said that, when he was hired by Ditch Witch, he was told that he would [*9] be paid for equipment that was bought or leased within his territory, except for BellSouth, which was a house account.

Shipp testified that, when he asked Northcutt about his commission on the Greater Dickson lease, Northcutt told him that he was sure that Ditch Witch would pay him "something." Contrary to Northcutt's assurance, Shipp later received the letter from Needham telling him that he was not entitled to any commissions on the Greater Dickson lease because he was not working for Ditch Witch when the first lease payment was received. Shipp disagreed with Needham's assertion, and recalled an instance in which a former sales employee received commissions, even though he no longer worked for Ditch Witch. Shipp said that, after he received Needham's letter, he was told that the reason he did not get paid any commissions on the Greater Dickson lease was because Greater Dickson was a house account, and commissions were not payable on house accounts. In his testimony, Shipp maintained that he should have received a 5% commission based on the total purchase price of the equipment leased to Greater Dickson.

Shipp did not dispute Ditch Witch's counterclaim against him for advances not [*10] covered by his commissions. He simply asked the trial court to offset his award by the amount of advances claimed.

The trial court also heard testimony from Jesse Davis ("Davis"), the director of operations at Greater Dickson. Davis said that he had worked for Greater Dickson for twenty-seven years. When asked about Shipp's role in procuring the lease at issue, Davis stated that Shipp "was the one that got the ball started on the lease program. . . . [H]e's the one that got us going." Davis stated that he spoke to Shipp directly on several occasions regarding the lease, and he described Shipp as the salesman or the "point man" on the deal. When asked about others at Ditch Witch who may have been involved, Davis said that Shipp was "the one who started talking to us first about it. . . . [Northcutt] come [sic] in later, after we started talking with [Shipp] on it." Davis said that although Shipp was not involved in determining the details of the lease, such as the specific pieces of equipment and the prices, Shipp had the "big idea." The details of the lease and the paperwork were handled by Northcutt and Hylton, along with Davis's boss, Mr. Durham.

A former sales representative [*11] for Ditch Witch, Mike Koby ("Koby"), also testified at trial. During the time in which the lease to Greater Dickson was being negotiated, Koby said, he worked in the electronics division of Ditch Witch selling electronic locating equipment. When an item in the Ditch Witch electronics division was sold, Koby received the commission. Koby's territory overlapped with the territory of the other salesmen, including Shipp. Koby said that he was consulted on the Greater Dickson lease, and he recommended the three pipeline locators and transmitters that were bundled into the lease with the other equipment. Koby said that, after Greater Dickson leased the equipment, he trained the Greater Dickson personnel on how to use it. In December 2002, four months after Shipp left, Koby was paid an 8% commission on the three pieces of locating equipment leased to Greater Dickson, a commission of approximately $ 122 each. Records were introduced into evidence confirming payment of Koby's commission on the Greater Dickson equipment.

The Ditch Witch general manager, Leroy Hylton, testified on behalf of Ditch Witch. Hylton said that he had worked for Ditch Witch for over twenty-nine years. Hylton did not [*12] know about Shipp's employment arrangement with Ditch Witch, because he was not

involved in Shipp's hiring. Hylton explained that Greater Dickson had been a longstanding client of Ditch Witch. He said that Shipp was not paid for servicing Greater Dickson from the beginning of his employment through August 2002 because the Greater Dickson account was "uniquely structured" to Ditch Witch. In fact, Hylton stated, no salesperson was ever paid for servicing the Greater Dickson account, although salespersons did receive commissions for equipment sales. Hylton said that Greater Dickson had never before leased equipment from Ditch Witch; rather, Ditch Witch had always purchased their equipment.

Hylton acknowledged that former Ditch Witch employee Koby had been paid commissions on the lease with respect to the three locators and transmitters and for the services he rendered to Greater Dickson on behalf of Ditch Witch. He said that Koby had a separate deal with Ditch Witch through the electronics division. Hylton then testified that Shipp did not receive a commission on the three primary pieces of equipment because, at the time Ditch Witch received the Greater Dickson lease payments, Shipp was [*13] no longer employed with Ditch Witch. Hylton said that, had Shipp remained employed with Ditch Witch and continued servicing the Greater Dickson account, "[h]e would have received the 2 percent commission on the equipment portion of the monthly rental payments . . . ." Hylton testified that, after Shipp quit, no salesman was paid any commissions on the Greater Dickson account.

On cross-examination, Hylton asserted that the Greater Dickson account was a house account. He defined "house account" as "one that is controlled and functioned by the house or by the management of our company. No salesman of record is the salesman of record for that account, regardless of where it is." [2]

Typically, he stated, salesmen do not get commissions on house accounts, though there have been exceptions. When asked about this topic in his deposition, Hylton testified that, "under a house account, we don't have to pay anybody if we don't want to." Hylton was asked how long the Greater Dickson account had been a house account, and he responded that it was designated a house account when the lease in question was signed in August 2002, but it had not previously been designated as a house account. Nevertheless, [*14] Hylton reiterated that, had Shipp continued to work at Ditch Witch, he probably would have been paid a commission on the monthly rental payments received by Ditch Witch on the Greater Dickson lease. Hylton admitted that Shipp had worked on the Greater Dickson lease, stating: "[Shipp] was sitting right there at the final. I don't deny that [Shipp worked on the account] at all, if that's the reference point you're trying to make. . . . I concede he was there."

Hylton was asked what commissions Shipp would have received, had he been paid his commissions on the Greater Dickson lease in a lump-sum payment. Hylton responded that Shipp would have been paid 5% of the amount of profit earned by Ditch Witch on the lease at the end of the thirty-six-month lease period. He calculated the profit to be $ 57,770, resulting in commissions of $ 2,885.

Kent Northcutt [*15] also testified on behalf of Ditch Witch. He said that he had worked for the company for approximately twenty-two years, and that when Shipp was hired, he was the branch manager. [3] Northcutt said that, when he hired Shipp, his employment agreement

---

[2] He also indicated that another account with Atmos Energy was a "house account," and that no salesmen earned commissions on equipment sold on that account.

[3] At the time of trial, Northcutt had become a sales representative, and he had taken over servicing Shipp's former territory.

was not in writing, and the two did not discuss the compensation for servicing existing accounts, such as Greater Dickson. Northcutt said that he did not tell Shipp that the Greater Dickson account was a house account, and he could not recall whether he explained to Shipp what a house account was. Northcutt testified that, other than his $ 150 per week base salary, Shipp was not compensated for servicing existing accounts.

Northcutt testified that Ditch Witch had a lease agreement similar to the Greater Dickson lease with only one other company, United Cities Gas/Atmos Energy. Northcutt apparently was considered the sales representative for [*16] the Atmos Energy account. For the Atmos Energy lease, Northcutt was paid a one-time commission at the beginning of the lease, but received no commission on a monthly basis. Northcutt maintained that, during his tenure with Ditch Witch, no salesperson had ever been paid commissions on a monthly basis for lease contracts.

Northcutt testified that he participated in the Greater Dickson lease negotiations, and that he was present when the lease was signed. After Shipp left, Northcutt said, he was assigned as the salesman in that territory and he had serviced the Greater Dickson account ever since. Northcutt was never paid a commission on that account.

At the conclusion of the trial, the trial court issued an oral ruling. The trial court noted that Shipp's employment contract was not reduced to writing, and that he had only a vague understanding of Ditch Witch's commission process. Nevertheless, the trial court stated, the evidence showed that Shipp's efforts helped Ditch Witch procure the Greater Dickson lease agreement. Relying on the written quotes submitted to Greater Dickson in July 2002, the trial court concluded that "the documentation indicates that [Shipp is] the salesman [*17] of record . . . for this Greater Dickson lease agreement . . . for . . . Unit D23." The trial court further determined that Shipp's interest in his commissions vested when he terminated his employment, and that his commissions were due monthly "as outlined in the letter from Mr. Needham, March 20 of 2003."[4] The trial court found that Unit D23 was 30.32% of the value of the total lease ($ 260,820), which was $ 79,604.96. Trial court determined that Shipp was entitled to 5% of this amount, or $ 3,980.25, less the undisputed $ 758.95 in advances that Shipp owed Ditch Witch, for a total award of $ 3,221.30. The trial court determined specifically that there was no fraud on the part of Ditch Witch in the manner in which Shipp was hired, and that this was simply a dispute over commissions. The trial court also awarded Shipp $ 500 in attorneys' fees in relation to a motion to compel discovery, where the documentation sought from Ditch Witch was untimely, but ultimately provided. On September 8, 2005, the trial court entered an order consistent with its oral ruling. From this order, Shipp now appeals, *pro se*.

[*18] On appeal, Shipp argues that the trial court erred in determining that he was entitled to commissions for Unit D23, but not for the other two primary pieces of equipment, Units D21 and D22. Shipp does not appeal the trial court's ruling that he was not due commissions on the three locator/transmitter pieces of equipment on the lease, conceding that "Koby was due commissions on all locating equipment within this contract." He asserts that the trial court erred in concluding that Ditch

---

[4] After the trial court made its oral ruling, counsel for Ditch Witch challenged the court's decision based on the statute of frauds because, under that doctrine, any contract not to be performed within one year requires a writing. The trial court rejected Ditch Witch's belated argument, stating that it "hadn't been raised, nor does it apply in this particular case . . . ." This decision was not challenged on appeal, and we do not address it in this Opinion.

Witch did not commit fraud in the manner in which he was hired. Ditch Witch argues that the trial court's decision should be affirmed, and it does not challenge the trial court's finding that Shipp was the "salesman of record" for Unit D23, or the 5% commission awarded on the lease for that unit.

HN1[⬆] Because this case was tried by the trial court without a jury, we review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **see** Carter v. Patrick, 163 S.W.3d 69, 74-75 (Tenn. Ct. App. 2004). We review conclusions of law *de novo*, without such a presumption of correctness. [*19] Tenn. R. App. P. 13(d); **see** Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn.1997).

We first address Shipp's argument that the evidence preponderates against the trial court's finding that he was not entitled to a commission for Units D21 and D22. He claims that the overwhelming evidence at trial showed that he was the salesman of record for the entire Greater Dickson lease, and that Northcutt was simply acting as branch manager in aiding him with the paperwork for the transaction, as was typical for all sales and leases. Shipp contends that the quotes for Units D21 and D22 indicated that Northcutt was the "salesman" only because those documents were generated from Northcutt's computer. Shipp argues that no evidence at trial showed that Northcutt was the salesman for Units D21 and D22 or that there was any differentiation among the lease of the three primary units. Therefore, Shipp claims, the trial court erred in relying on the written quotes in limiting his commission to Unit D23. In response, Ditch Witch asserts the trial court was correct in concluding that Northcutt was the salesman of record for Units D21 and D22. Ditch Witch argues that the [*20] notation on the quotes was probative evidence that Shipp was not the only salesman of record involved in the lease at issue, and that this evidence supports the trial court's assessment of damages.

Though Shipp's employment arrangement was verbal, the parties do not dispute the terms of that arrangement set out in Needham's March 20, 2003 letter to Shipp. The letter indicated that, for rentals and monthly leases, Shipp's commission would be "5% of monthly rental payable to a salesman of record on date paid by customer." Therefore, it is clear that, for transactions on which Shipp was the "salesman of record," he would be entitled to a commission equal to 5% of the monthly lease payments "on the date paid by the customer."

Thus, the question becomes whether Shipp was the "salesman of record" for Units D21 and D22 under the Greater Dickson lease. The trial court stated expressly that "[c]ertainly Mr. Shipp's efforts went toward production of this lease agreement," and that Shipp's interest in his commission vested when he quit working at Ditch Witch. In differentiating between Unit D23 on one hand and Units D21 and D22 on the other hand, the trial court relied solely on the computer-generated [*21] quotes which reflected that Northcutt was the "salesman" on Units D21 and D22. Based on this evidence alone, the trial court concluded that Northcutt, rather than Shipp, was the "salesman of record" for those two units.

From our review of the appellate record, the preponderance of the evidence does not support the trial court's conclusion in this regard. First and foremost, Ditch Witch never argued at trial that Units D21 and D22 should be treated differently from Unit D23. Indeed, Ditch Witch consistently argued that Shipp was entitled to no commission on any of the equipment leased to Greater Dickson, albeit for a variety of reasons. At no point did any Ditch Witch witness assert that Shipp was not entitled to commissions on Units D21 and D22

because of the notations on the quotes to Greater Dickson.

In finding that Shipp was entitled to commissions on the lease of Unit D23, the trial court implicitly discredited the variety of rationales proffered by Ditch Witch for its refusal to pay Shipp's commissions; namely, that (1) under their verbal agreement, Shipp was not due commissions on the lease because he quit the day before Ditch Witch received the first lease payment, or (2) [*22] Greater Dickson had been a house account during Shipp's entire tenure with Ditch Witch, for which no commissions were payable, or (3) Greater Dickson became a house account in August 2002 when it executed the contract to lease the equipment at issue, or (4) Northcutt and Shipp had no discussions about Shipp's compensation when Northcutt hired Shipp, or (5) since Greater Dickson leased the equipment rather than purchasing it, there would only have been a lump-sum commission payable at the beginning of the lease, rather than monthly commissions, or (6) former employee Koby was paid commissions on the leased electronic equipment only because he had an unspecified "separate deal" through Ditch Witch's electronics division, and Shipp had no such arrangement. Ditch Witch does not appeal the trial court's credibility determinations, and in fact the record fully supports its implicit finding that Ditch Witch's asserted reasons were not credible.

Moreover, the witnesses at trial, including the Ditch Witch witnesses, clearly corroborated Shipp's assertion that he was the procuring sales representative for the entire Greater Dickson lease. Shipp testified that it was he who convinced the principals [*23] at Greater Dickson to continue to do business with Ditch Witch by addressing their concerns and by taking Greater Dickson representatives to visit the Ditch Witch home plant in Pennsylvania. He described the time and effort he put forth, at the urging of Hylton and Northcutt, to keep Greater Dickson from sending its business to Ditch Witch's competitor. Jesse Davis, with Greater Dickson, confirmed that Shipp was the "point man" and was the salesperson who initiated the lease with Greater Dickson. Likewise, Hylton acknowledged Shipp's involvement in procuring the Greater Dickson lease, testifying that "[Shipp] was sitting right there at the final. I don't deny that [Shipp worked on the account] at all . . . . I concede he was there."

Moreover, at no time did any Ditch Witch witness assert that Northcutt was the "salesman of record" for Units D21 and D22 or in fact for any of the equipment that was subject to the Greater Dickson lease. Northcutt, who remained employed by Ditch Witch, was not paid a commission on any portion of the leased equipment as a "salesman of record." All of the testimony indicated that Northcutt functioned as a manager, and not as a "salesman of record, [*24] " in the negotiations with Greater Dickson. Ditch Witch did not refute Shipp's testimony that, throughout his employment with Ditch Witch, "higher-ups" such as Northcutt did the pricing on all of his sales and lease transactions, and he was nevertheless always paid full commissions.

Overall, the evidence at trial shows that the three main pieces of equipment, Units D21, D22 and D23, were all leased to Greater Dickson at the same time, in the same manner. It does not support the trial court's parsing of the lease or its finding that Shipp was the sales person for Unit D23 but not Units D21 and D22. Indeed, considering the trial court's implicit determinations on the witnesses' credibility, if it found Shipp to be the "salesman of record" for Unit D23, it necessarily follows that Shipp was also the "salesman of record" for Units D21 and D22. For these reasons, we hold that the evidence preponderates in favor of finding that Shipp, not Northcutt, was the "salesman of record" for all three primary pieces of equipment on the lease, including Units D21 and D22, and that he is entitled to

commissions for the lease of all three pieces of equipment.

Shipp next argues that the trial court erred [*25] in determining that Ditch Witch did not engage in fraud in the inducement of his employment in violation of Tennessee Code Annotated § 50-1-102(a)(1). Shipp does not identify any evidence submitted at trial showing that he was fraudulently induced into leaving his former employment to work for Ditch Witch. From our review of the record, we find no evidence to support a finding of fraud or fraud in the inducement. Therefore, we affirm the trial court's finding on this issue.

Finally, Shipp argues that he is entitled to more than $ 500 in attorney's fees for pursuing his lawsuit. [5] HN2[↑] In Tennessee, the award of attorney's fees is governed by "the well-established American rule, which provides that attorney's fees may not be awarded to the prevailing party absent statutory authorization or an agreement between the parties so providing." John Kohl & Co. P.C. v. Dearborn & Ewing, 977 S.W.2d 528, 534 (Tenn. 1998). Here, there is neither statutory authority nor a contractual provision obligating Ditch Witch to pay for Shipp's attorney's fees. Therefore, Shipp's request for additional attorney's fees must be declined. [6] For the same reason, [*26] to the extent that Shipp seeks attorney's fees for this appeal, his request must be denied. Archer v. Archer, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995).

Therefore, we reverse the trial court determination that Shipp was not the "salesman of record" for Units D21 and D22, and find that Shipp was entitled to a 5% commission on the value of the Greater Dickson lease with respect to Units D21, D22, and D23 in accordance with the parties' employment agreement. Therefore, we find that Shipp is entitled to a total commission of $ 13,041 (5% of $ 260,820), minus the undisputed $ 758.95 due to Ditch Witch for unearned advances, or $ 12,282.05. As the $ 500 attorney's fee award remains unchallenged by Ditch Witch, Shipp is also [*27] entitled to that amount, for a total award of $ 12,782.05. The remainder of the trial court's decision is affirmed. The cause is remanded to the trial court for consideration of any appropriate award of post-judgment interest on the modified award in favor of Shipp.

The decision of the trial court is reversed in part, affirmed in part, and modified as set forth above, and the cause is remanded for further proceedings not inconsistent with this Opinion. Costs on appeal are to be taxed to Appellee Ditch Witch Equipment of Tennessee, Inc., for which execution may issue, if necessary.

HOLLY M. KIRBY, JUDGE

---

[5] Shipp notes that he had a contingency fee arrangement with his attorneys at the trial court level.

[6] Ditch Witch does not challenge the trial court's award of $ 500 in attorney's fees as a sanction for failing to appropriately respond to Shipp's discovery request.

**Table1** (Return to related document text)

| ITEM | PURCHASE COST |
|---|---|
| Unit D21-DW Tracktor & Trailer | $ 107,329.50 |
| Unit D22-DW Tracktor & Trailer | 99,593.50 |
| Unit D23-DW Track & Trailer | 93,377.00 |
| Unit D21-Locator & Transmitter | 1,881.02 |
| Unit D22-Locator & Transmitter | 1,881.02 |
| Unit D23-Locator & Transmitter | 1,881.02 |
| Total Cost: | $ 305,943.06 |

**Table1** (Return to related document text)

End of Document