2020 WL 6130918
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee,
AT KNOXVILLE.

Ezra MAIZE
v.
FRIENDSHIP COMMUNITY CHURCH, INC., et al.

No. E2019-00183-COA-R3-CV
|
July 21, 2020 Session
|
Filed 10/19/2020

Appeal from the Circuit Court for Hamilton County, No. 15C540, Kyle E. Hedrick[1], Judge

**Attorneys and Law Firms**

Joshua Phillip Weiss and Samuel T. Quattrochi, Chattanooga, Tennessee, for the appellant, Ezra Maize.

Amy Victoria Peters, Brentwood, Tennessee, for the appellee, Friendship Community Church, Inc.

Thomas Kenan Smith, Knoxville, Tennessee, for the appellees, Robert Alanda Blake, James R. Hutchins, Arthur Lee Foster, and Albert C. Russell, Vincent Boozer[2].

Arnold B. Goldin, J., delivered the opinion of the Court, in which Kenny Armstrong and Carma Dennis McGee, JJ., joined

## OPINION

Arnold B. Goldin, J.

*1 Plaintiff, a former pastor at a church in Chattanooga, brought suit against the church, church elders, and another pastor at the church, alleging that various torts were committed against him. Following a series of motions by the defendants that sought the dismissal of plaintiff's claims, the trial court ultimately dismissed all legal theories that were asserted in the case. Among other bases for the dismissal, the trial court held that a number of plaintiff's claims were barred by the ecclesiastical abstention doctrine. Discerning no error in the trial court's decision to dismiss plaintiff's claims, we affirm its judgment.

## BACKGROUND AND PROCEDURAL HISTORY

The Plaintiff/Appellant in this matter, Ezra Maize ("Mr. Maize"), is a former pastor at Friendship Community Church, Inc. ("the Church"),[3] a congregation which is located in Chattanooga, Tennessee. The Defendants/Appellees in this litigation consist of the Church, certain of its elders, and another pastor at the Church who has since deceased.[4] Rather than extensively chronicle the byzantine nature of this case's procedural history and get mired in the minutiae of the voluminous record transmitted to us,[5] we will initially, for the sake of clarity, attempt to distill the facts of this case into a logical narrative.

The genesis of the controversy among the parties is traceable to the Church's efforts to remove Mr. Maize from his pastoral post in the wake of alleged misconduct on his part.[6] An initial meeting involving Church elders occurred on October 27, 2014, following which Mr. Maize's resignation was requested. According to Mr. Maize, slanderous allegations were made against him during the meeting. In response to the Church elders' request, Mr. Maize refused to tender his resignation, and subsequently, he received a termination letter which he refused to abide by. As a result, a second termination letter was delivered to him on November 1, 2014.

According to deposition testimony in the record, at a meeting with the elders on November 1, 2014 concerning his termination, Mr. Maize refused to accept the termination, and it was suggested that it had to be done through a church vote in order to be effective. When Mr. Maize refused to accept his termination, the Church warned the congregation of his recalcitrance in an email sent by the Church's administrative assistance that very same day. The email forewarned of Mr. Maize's likely efforts to continue to hold church services and also provided information as to future Church meetings on the matter. As to this latter point, the email informed the congregation that an emergency Church conference was scheduled by the ruling elders for November 4.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.      1

As anticipated, Mr. **Maize** continued to defy the elders' efforts to remove him from his position, and on Sunday, November 2, 2014, he returned to the Church to hold services and took up a collection which was not turned over to the Church.[7] Two days later, on November 4, 2014, the Church initiated a lawsuit against Mr. **Maize** in the Hamilton County Chancery Court, asserting, among other things, that Mr. **Maize** had converted Church funds collected at the unauthorized November 2 service. Soon thereafter, however, on November 11, 2014, the chancery court lawsuit was dismissed by the Church.

**\*2** The power struggle between the parties eventually became the subject of an article by an online press publication, and the following year, on April 20, 2015, Mr. **Maize** commenced the present litigation by filing a complaint against the Defendants in the Hamilton County Circuit Court. Mr. **Maize's** complaint raised several grievances and specifically asserted the following legal claims stemming from the events surrounding his termination: libel, slander, malicious prosecution, abuse of process, civil conspiracy, false light invasion of privacy, intentional infliction of emotional distress, and negligent infliction of emotional distress.[8] It is his general contention in this litigation that his reputation was tarnished by the Defendants as a result of various defamations and other actions against him and that he had to move out of state as a result.

After the Defendants filed several summary judgment motions and the case was transferred among different judges for various reasons, all claims were eventually dismissed. As to some of Mr. **Maize's** claims, the trial court held that relief was not available pursuant to the bar posed by the ecclesiastical abstention doctrine.

On one occasion, Mr. **Maize** tried to assert additional instances of alleged defamations, even filing a motion to amend his complaint in November 2018, but the trial court denied his request in a December 2018 order. After final judgment was entered on January 18, 2019, Mr. **Maize** timely appealed to this Court. In his briefing before us, he generally submits that the trial court erred in dismissing his legal claims for relief.[9]

**STANDARD OF REVIEW**

Primarily at issue in this appeal is the trial court's decision to dismiss Mr. **Maize's** asserted claims at summary judgment. In outlining the standard of review applicable to such a decision, we previously stated as follows:

> A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "The moving party has the ultimate burden of persuading the court that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Martin v. Norfolk S. Ry.,* 271 S.W.3d 76, 83 (Tenn. 2008) (citation omitted). When the moving party does not bear the burden of proof at trial, "the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye v. Women's Care Ctr. of Memphis, MPLLC,* 477 S.W.3d 235, 264 (Tenn. 2015). Because resolving a motion for summary judgment is a question of law, we review the trial court's disposition on the issue *de novo* without a presumption of correctness. *Martin,* 271 S.W.3d at 84 (citation omitted). Indeed, we must make a fresh determination that the requirements of Rule 56 have been satisfied in each case. *Green v. Green,* 293 S.W.3d 493, 514 (Tenn. 2009) (citations omitted). In assessing the propriety of the motion, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Martin,* 271 S.W.3d at 84 (citation omitted).

**\*3** *Bobo v. City of Jackson,* 511 S.W.3d 14, 18-19 (Tenn. Ct. App. 2015). On appeal, this Court may affirm the trial court's summary judgment decision even when rendered on different grounds. *Hill v. Lamberth,* 73 S.W.3d 131, 136 (Tenn. Ct. App. 2001); *see also Wood v. Parker,* 901 S.W.2d 374, 378 (Tenn. Ct. App. 1995) (noting that this Court will, irrespective of the reasons stated, affirm the trial court's summary judgment if it finds that the trial court reached the correct result).

**DISCUSSION**

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.
2

Although Mr. Maize is not formally seeking to have the Court restore him to his former position through this litigation, the backdrop of his termination looms large in the issues before us. Indeed, when his claims are examined, it is clear that his grievances generally arise from the factual nexus surrounding his termination as pastor and the Church's concomitant efforts to regain control of the congregation. Whether his claims were properly dismissed by the trial court is the question we seek to explore in this appeal. As necessary, we will address the dismissal of each claim in turn.[10]

*Abuse of Process*

We begin our discussion by examining the trial court's dismissal of Mr. Maize's abuse of process claim. We do so, in part, because this claim was the focal point of Mr. Maize's articulated concerns at oral argument before this Court. In this respect, we observe that at the outset of his presentation, Mr. Maize's counsel remarked that "this case is simply about ... the ... Appellees abusing the process of the court to accomplish an ulterior, a malicious motive."

When the trial court dismissed the abuse of process claim, it held specifically as follows: "[T]here has been no showing that process has been abused, that is, misused in this case." In advocating for a reversal of the trial court's decision on this issue, Mr. Maize argues that process was abused in connection with the Church's initiation of the chancery court litigation against him. Specifically, he contends that the Church "had an ulterior and malicious motive" when it filed its chancery court complaint. For the reasons stated below, we agree with the Defendants that Mr. Maize's argument on this issue is without merit.

"To establish a claim for abuse of process in Tennessee, as in a majority of other jurisdictions, two elements must be alleged: '(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.' " *Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 555 (Tenn. 1999) (quoting *Priest v. Union Agency*, 125 S.W.2d 142, 143 (Tenn. 1939)). We have previously ruled that "the mere filing of a motion or document by a party is not automatically considered process within the context of a claim for abuse of process," *Blalock v. Preston Law Grp., P.C.*, No. M2011-00351-COA-R3-CV, 2012 WL 4503187, at *4 (Tenn. Ct. App. Sept. 28, 2012), and our Supreme Court has stated that a plaintiff must show *an additional abuse of process after the original processes of the court*. *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 403 (Tenn. 2002). It is this latter point that distinguishes this tort from the tort of malicious prosecution,[11] "which arises solely upon the filing of a complaint without probable cause." *Id.* Indeed, the "gist of the [abuse of process] tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish." *Bell ex rel. Snyder*, 986 S.W.2d at 555 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 121, at 897 (5th ed. 1984)); *see also Montpelier v. Moncier*, No. E2016-00246-COA-R3-CV, 2017 WL 2378301, at *5 (Tenn. Ct. App. June 1, 2017) (quoting *Batten v. Abrams*, 626 P.2d 984, 990-91 (Wash. Ct. App. 1981)) ("Abuse of process 'only deals with perversions of the tools of litigation occurring after a lawsuit has commenced.' "). As our Supreme Court has explained:

*4 Ordinarily, the lawful use of a court's process does not give rise to an abuse of process claim, and no claim of abuse will be heard if process is used for its lawful purpose, even though it is accompanied with an incidental spiteful motive or awareness that the use of process will result in increased burdens and expenses to the other party.

*Givens*, 75 S.W.3d at 401. Here, Mr. Maize simply argues on appeal that process was abused because the Church had an ulterior and malicious motive when it filed its complaint in chancery court. In view of the foregoing authorities, this alleged grievance does not give rise to a valid claim for abuse of process. We therefore refuse to disturb the trial court's dismissal of the claim.

*Defamation Claims*

We next turn our attention to the trial court's dismissal of Mr. Maize's libel and slander claims. On appeal, Mr. Maize asserts that these claims were erroneously dismissed on account of the ecclesiastical abstention doctrine.[12] To ascertain the validity of his challenge, we first briefly examine the contours of that doctrine.

"The ecclesiastical abstention doctrine, also commonly known as the 'church autonomy doctrine,' precludes civil courts in this country from adjudicating 'questions of discipline, or of faith, or ecclesiastical rule, custom, or law' or church polity, or the internal governance of religious organizations." *Church of God in Christ, Inc. v. L.M. Haley Ministries, Inc.*, 531 S.W.3d 146, 156 (Tenn. 2017) (citation omitted). This doctrine, which "is now clearly understood as

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 3

deriving from the Religion Clauses of the First Amendment to the United States Constitution," *id.*, "functions as a subject matter jurisdictional bar that precludes civil courts from adjudicating disputes" in cases where it applies. *Id.* at 159. Accordingly, it may be raised at any time in support of a party's request to dismiss an action. *Id.*

The concern undergirding the ecclesiastical abstention bar is that "[i]f secular courts were to become embroiled in ecclesiastical controversies within a religious body, those courts would be allowed, or required, to substitute their judgment for that of church governing bodies on issues of doctrine, belief, or practice." *Anderson v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, No. M2004-01066-COA-R9-CV, 2007 WL 161035, at *6 (Tenn. Ct. App. Jan. 19, 2007). Although the ecclesiastical abstention doctrine by no means immunizes religious organizations from suit, *id.*, its bar is not singularly limited to questions concerning who is a proper member of, or leader of, a church body, or related disciplinary issues. In fact, "[c]onduct that is inextricably tied to the disciplinary process of a religious organization is subject to the First Amendment's protection just as the disciplinary decision itself." *Id.* at *19. Accordingly, "[i]f the harm alleged is the direct result of a religious practice or decision that courts cannot examine, there is no remedy available in the courts for such harm." *Id.* at *20.

 *5  Regarding defamation claims specifically, "[a] number of courts have held that defamation claims arising out of minister employment or discipline disputes are outside the subject matter jurisdiction of the courts because all matters touching the relationship between pastor and church are of ecclesiastical concern and not subject to court review." *Id.* at *26. Ultimately, however, this Court has instructed that it is necessary to identify the precise nature of the interests at stake. *Id.* In a past decision, we held that "courts must look at whether the slanderous or libelous statements were made during the course of an ecclesiastical undertaking." *Ausley v. Shaw*, 193 S.W.3d 892, 895 (Tenn. Ct. App. 2005). Whereas no protection may be afforded under the First Amendment if done apart from an ecclesiastical undertaking, *id.*, if, on the other hand, "[the alleged defamatory remarks were] made during an ecclesiastical undertaking, such as the discipline or removal of a pastor, then such actions may be found 'too close to the peculiarly religious aspects of the transactions to be segregated and treated separately—as simple civil wrongs.' " *Id.* (quoting *Tidman v. Salvation Army*, No. 01-A-01-9708-CV00380, 1998 WL 391765, at *6 (Tenn. Ct. App. July 15, 1998) (citing *Higgins v. Maher*, 258 Cal. Rptr. 757 (Cal. Ct. App. 1989))). "Generally, disputes based on otherwise defamatory statements made in the context of a religious disciplinary proceeding are not resolvable by the courts." *Anderson*, 2007 WL 161035, at *26.

We have also noted that "[t]he protection afforded by the First Amendment to church disciplinary proceedings applies to statements made after the church's decision if the statements or actions are merely implementation of, still part of, inextricably related to, or a consequence of the decision." *Id.* at *28. "Within the concept of protected implementation are not only the religious disciplinary proceeding's merits and procedure but also its end product-the expulsion sanction." *Id.* (quoting *Hadnot v. Shaw*, 826 P.2d 978, 987-88 (Okla. 1992)). In the context of a party's expulsion from a church, for instance, "the church's communication of the fact and reason for excommunication are protected from judicial inquiry and review." *Id.* As we have noted, "[a]nnouncing an expulsion or disfellowshipping to the members of a church is part of the disciplinary proceedings, particularly where instruction to church members regarding the expelled party is part of the church's belief and practice." *Id.* Such an act "is as much within the rights protected by ecclesiastical abstention as is the church's right to take such actions, even though it may carry some kind of negative implication about the expelled member." *Id.* Although the bar posed by the ecclesiastical abstention doctrine is no doubt generally weakened with respect to statements made outside church membership, the ultimate issue is still whether the alleged defamations arise from or are inextricably linked to the protected religious decision. *Id.* at *28-29.

At issue in this appeal are two sets of alleged defamatory communications: the "Mason Communications" and the "Lewis Communications."[13] Whereas the trial court held that the claims based on these alleged instances of defamation should be dismissed because they were barred by the ecclesiastical abstention doctrine, among other reasons, Mr. Maize maintains that the trial court's decision should be reversed. For the reasons that follow, we respectfully disagree with Mr. Maize and hold that the trial court correctly concluded that the bar of the ecclesiastical abstention doctrine is applicable to these claims.

 *6  Significantly, as is evident from a review of the record on appeal, all of the communications at issue occurred in connection with Mr. Maize's termination and in the wake of his active resistance to the Church's efforts to divest him of his pastoral authority. Regarding the identified "Mason

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

4

Communications," at least as to those that occurred within the literal walls of the Church, we observe that, per the trial court's order, Mr. Maize even conceded during the summary judgment hearing that these communications related to his termination as pastor. The trial court therefore reasoned that all "Mason Communications," occurring both within and outside the Church would be barred, because the subject matter was the same. In relevant part, the court held as follows on this issue:

> As to the Mason communications occurring within the walls of the church, it was conceded by Plaintiff during the summary judgment hearings that any such communications would fall under the ecclesiastical abstention doctrine both because they happened on church property and, more importantly, because the accusations allegedly made against the Mason sisters and Plaintiff relate to his termination as senior pastor, which is undoubtedly an ecclesiastical undertaking. *See Ausley v. Shaw and Anderson v. Watchtower Bible.* In regards to the final communication which purportedly occurred in the church parking lot, it cannot be said that because the communication, which concerned the same subject matter as the other communications, is outside of the ecclesiastical abstention doctrine simply because the communication literally occurred outside of the church building. In fact, the statements were clearly made [as] part of a continued ecclesiastical undertaking.

Although counsel for Mr. Maize expressed concern in his rebuttal oral argument before this Court that the concession referenced by the trial court did not occur, his brief does not appear to raise any issue with the trial court's finding in this regard. In any event, we agree with the trial court that the communications are clearly barred by the ecclesiastical abstention doctrine.

The "Mason Communications" generally relate to communications made by a Church elder or elders to Brittany[14] Mason (a sound booth operator at the Church) and others[15] about an improper relationship between Mr. Maize and Ms. Mason.[16] Whereas Mr. Maize appears to argue that the communications about his alleged involvement in an inappropriate relationship with Ms. Mason have no connection to an ecclesiastical undertaking, we respectfully disagree. Ms. Mason's deposition testimony recounts the context of the alleged communications and underscores the conclusion that they were inextricably linked with the Church's efforts to terminate Mr. Maize and divest him of his pastoral authority. For instance, regarding an alleged communication made on Saturday, November 1, 2014, Ms. Mason testified as follows: "[S]o when they called a meeting for his resignation for termination, the accusations were made then, that Saturday." Ms. Mason specifically acknowledged she had been in the room where the elders were meeting with Mr. Maize.[17] Moreover, according to Ms. Mason, the alleged defamatory remarks about Mr. Maize were made again the following day, the date that he attempted to hold services at the Church. As Ms. Mason explained, "[T]hey told us that Maize was going to try to come in and have a service, and mentioned, you know, that his contract had ended with the church and that you didn't have to stay for service." Moreover, Ms. Mason's deposition testimony reveals that alleged defamatory communications also occurred amidst the backdrop of the scheduled emergency Church meeting referenced in the email the Church's administrative assistant had sent to the congregation on November 1, 2014. Of course, as we have already noted, although counsel now attempts to dispute the matter despite not mounting a challenge to it in Mr. Maize's appellate brief, the trial court's order states that Mr. Maize conceded in court that the content of the "Mason Communications" relates to his termination as pastor.[18]

**\*7** The "Lewis Communications" at issue concern emails/correspondence connected to the Church's administrative assistant, Sarita Lewis. First, Mr. Maize specifically complains of the email correspondence sent on November 1, 2014 that informed the congregation of his termination. The Church's elders authorized Ms. Lewis to send the November 1 email, which was transmitted to the Church's email distribution list. Although the trial court alternatively held that the November 1 email was not actionable as a matter of law because it could not be construed as holding Mr. Maize up to public hatred, contempt, or ridicule, the trial court primarily opined that the ecclesiastical abstention doctrine itself should pose a jurisdictional bar. The court reasoned that the email was merely meant to inform the congregation of the decisions the Church was making regarding Mr. Maize's termination as pastor. We agree with the trial court's analysis in this regard, for as we have noted already in this Opinion, an act of this ilk is properly considered to be in furtherance of an ecclesiastical undertaking. *See id*. at \*28. ("Announcing an expulsion ... is part of the disciplinary proceedings, particularly where instruction to church members regarding the expelled party is part of the church's belief and practice."). We observe that the November 1 email, in connection with its announcements about termination and the upcoming emergency Church meeting, specifically invoked

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.    5

two scriptural passages, asserting that the ruling elders were "bound by the Word of God to act under such conditions."[19]

Aside from the November 1 email, Mr. Maize takes issue with a so-called "pastoral summary" shared with Ms. Lewis by Bishop Sean Teal and subsequently sent by Ms. Lewis to two of the Church's elders at Bishop Teal's direction. The summary chronicled the elders' efforts to terminate Mr. Maize and outlined their rationale for removing him, including remarking that he did not possess "biblical character qualifications." In its order, the trial court found that the pastoral summary from Bishop Teal has "not been shown to have been shared via email or otherwise with anyone other than [Ms. Lewis and two elders]," a point Mr. Maize does not appear to challenge on appeal. The preparation of this document clearly was inextricably linked to the termination of Mr. Maize, and certainly the dissemination of that document to two elders, by way of Ms. Lewis, does not divorce the communication from its ecclesiastical context. Rather, we are of the opinion that it helps confirm such a conclusion.

Mr. Maize's principal criticism, it appears, is that the alleged defamations were somehow gratuitous—and therefore not properly deserving of any shield offered by the First Amendment—because they took place after October 27, 2014, the initial date there was an attempt to remove him. In this respect, he points favorably to our prior decision in *Ausley*, a case where certain alleged statements "made outside the confines of the church *after* Plaintiff had been terminated and were made in the presence of Church members, local law enforcement, and members of the surrounding community" were not found to be barred by the abstention doctrine. *Ausley*, 193 S.W.3d at 896.

*Ausley* is clearly distinguishable. First, notwithstanding the particular emphasis in *Ausley* about the date that the plaintiff in that case had been terminated, Mr. Maize's narrow focus on the date of the initial efforts to terminate him is misplaced. The implication of an ecclesiastical undertaking is not by any means strictly limited to the calendar date corresponding to the actual employment decision of a religious leader. In *Ausley*, we simply determined that, based on the record, the alleged statements were not shown to have been made during any ecclesiastical undertaking. *Id.* Such is not the case here. Indeed, as we have already outlined, the communication of a disciplinary action by a church "is as much within the rights protected by ecclesiastical abstention as is the church's right to take such actions, even though it may carry some kind of negative implication about the expelled member." *Anderson,* 2007 WL 161035, at *28. In the final calculus, "[c]onduct that is inextricably tied to the disciplinary process of a religious organization is subject to the First Amendment's protection just as the disciplinary decision itself." *Id.* at *19. Moreover, despite the Church's initial efforts at termination in this case, there was anything but a fixed resolution regarding Mr. Maize's termination on October 27, 2014. As the trial court observed in its order, Mr. Maize ignored the elders' letter of termination and continued to act as the pastor of the Church, fueling continued ecclesiastical conversations pertaining to his removal, including at the November 4, 2014 emergency Church conference. Mr. Maize's hypertechnical focus on the October 27, 2014 date is misguided. The alleged defamations here were inextricably linked to the termination process, and at oral argument, counsel for Mr. Maize, upon questioning by a member of the panel, acknowledged that they occurred during the period of time when his client's termination was occurring. Indeed, reviewing all of the asserted defamations in this case, they are, in our view, "too close to the peculiarly religious aspects of the transactions to be segregated and treated separately—as simple civil wrongs." *Ausley,* 193 S.W.3d at 895 (quoting *Tidman,* 1998 WL 391765, at *6 (citing *Higgins,* 258 Cal. Rptr. 757)). We, therefore, conclude that the trial court's reliance on the ecclesiastical abstention doctrine was not in error. Accordingly, we affirm its summary dismissal of Mr. Maize's libel and slander claims.

### NIED and IIED Claims

*8 Mr. Maize also asserted claims in this case for negligent infliction of emotional distress and intentional infliction of emotional distress. Regarding the latter claim, Mr. Maize's presented issue in his brief reads as follows: "Whether the Trial Court erred in finding that the claim for intentional infliction [of] emotional distress was precluded by Ecclesiastical Abstention Doctrine." Although, as discussed below, it stands to reason that the trial court should have dismissed the intentional infliction of emotional distress claim on this basis inasmuch as the claim is also based on the alleged acts of defamation by the Church and its elders,[20] the issue raised by Mr. Maize is not responsive to what occurred in the trial court. The trial court did not directly dismiss his intentional infliction of emotional distress claim specifically on the basis of the ecclesiastical abstention doctrine. Therefore, through the manner in which Mr. Maize delimits our inquiry by way of his defined issue, he somewhat confusingly fails to challenge what took actually place with respect to the intentional infliction of emotional distress claim. However, regardless of any technical basis

for waiver that could arguably exist as to this claim given the way Mr. Maize's issue was specifically drafted,[21] we conclude that dismissal of the claim should not be reversed. Indeed, as alluded to above, inasmuch as we understand the claim to be based on the alleged defamatory actions the Church and its elders took in this case,[22] it is clear that the harm claimed of is inextricably linked to the termination of Mr. Maize. See *Anderson*, 2007 WL 161035, at \*20 n.11 (determining that an intentional infliction of emotional distress claim was not subject to court determination because it was inextricably related to and a consequence of a church membership decision).

Regarding the negligent infliction of emotional distress claim, the trial court held that it should be dismissed on account of Mr. Maize's failure to show "either physical injury or severe emotional injury by medical proof." In challenging this holding on appeal, Mr. Maize argues that he does not need medical proof to support his claim because the claim is "parasitic" to other claims for relief in this matter. In response, the Church argues that this argument should be deemed waived because it allegedly was not made in the trial court; further, the Church appears to question the validity of the case law upon which Mr. Maize relies. We need not spill much ink on the subject. As an initial matter, the factual underpinning of Mr. Maize's apparent argument is vitiated given our disposition herein that there are no other surviving tort claims. Most importantly, however, as with the intentional infliction of emotional distress claim, we reason that the trial court should have also dismissed this claim on the basis of the ecclesiastical abstention doctrine. Again, Mr. Maize's grievances in this matter stem from the alleged defamatory actions taken by the Church and its elders in connection with his termination and active resistance of same. Therefore, we are of the opinion that the shield of the ecclesiastical abstention doctrine should apply.[23]

*Civil Conspiracy Claim*

 \*9 We turn next to the trial court's dismissal of the civil conspiracy claim. In his brief, Mr. Maize maintains that there are demonstrated facts that evidence a conspiracy to defame him, and accordingly, he challenges the trial court's dismissal of his civil conspiracy claim. When the trial court dismissed this claim, it offered two specific rationales. In addition to opining that Mr. Maize's conspiracy claim was barred by the ecclesiastical abstention doctrine, the trial court stated that it was "not aware of case authority to support a claim for conspiracy to defame." As explained below, although we agree with Mr. Maize that the trial court's specific ruling here is not beyond some minor criticism, this record presents us with no occasion to overturn the court's ultimate disposition on the issue.

Whereas the trial court dismissed Mr. Maize's conspiracy claim, in part, because it was "not aware" of any authority to support a conspiracy to defame, Mr. Maize correctly observes that there is authority acknowledging such a claim. *See, e.g.*, *Spivey v. King*, No. E2011-01114-COA-R3-CV, 2012 WL 344968, at \*18 (Tenn. Ct. App. Feb. 2, 2012) ("That part of the judgment dismissing the Plaintiff's claims for defamation and for wrongfully prosecuting him, as well as conspiracy to accomplish those wrongs, is vacated."); *Raiteri v. RKO Gen., Inc.*, 1989 WL 146743, at \*7 (Tenn. Ct. App. Dec. 6, 1989) ("Since we have found there was no libel or slander, there can be no conspiracy to libel or slander."). As it is, the elements of a civil conspiracy claim are as follows: "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006).

Nevertheless, as a basic matter of law and irrespective of any other consideration, Mr. Maize's conspiracy claim cannot survive in light of our determination herein that his defamation claims (as well as other tort claims) were properly dismissed. As alluded to in the presented quote from the *Raiteri* decision referenced above, a "[c]ivil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007). The trial court's dismissal of the civil conspiracy claim is therefore affirmed.

*Motion to Amend*

We conclude our discussion by turning to the last issue raised by Mr. Maize on appeal: whether the trial court erred in refusing him the opportunity to amend his complaint. As a preliminary consideration, we find it appropriate to briefly address a point of confusion that the record has generated for the Court. In his appellate brief, Mr. Maize argues that his motion to amend concerned two sets of communications: communications directed to Brittany Mason and communications directed to a pastor of another church. This is a point of confusion because, although the trial court denied Mr. Maize's motion to amend, its final order nonetheless engaged with the so-called "Mason

Communications," ostensibly regarding them as properly before the court but dismissing their viability as a foundation for a defamation claim due to the ecclesiastical abstention doctrine.[24]

All parties on appeal appear to embrace the notion that the "Mason Communications" are not properly considered to come under the ambit of Mr. Maize's original pleading. As noted, Mr. Maize's brief specifically states that his motion to amend sought to "add additional instances of defamation" and that it, among other things, concerned statements made to Brittany Mason. Moreover, although the individual elder Defendants emphasize in their brief that any alleged statements to Ms. Mason were barred by the ecclesiastical abstention doctrine, they also observe that "said statements were not specifically mentioned in Mr. Maize's complaint." The Church offers the same assessment in its appellate brief, arguing in relevant part as follows: "As to the statements allegedly made to or in the presence of Mason, said statements were not specifically mentioned in Maize's Complaint, but most importantly, any claim regarding said alleged statements was barred by the Ecclesiastical Abstention Doctrine."

*10 Given these representations, it is unclear to us why the "Mason Communications" were ultimately considered by the trial court as if those communications were a part of the pleadings, especially in light of the court's unqualified[25] denial of Mr. Maize's motion to amend. Out of an abundance of caution, we separately addressed the viability of the "Mason Communications" previously, but it bears noting that it appears that such communications were part of the subject matter of the motion to amend, which the court denied.

In specifically reviewing the propriety of the trial court's denial of Mr. Maize's motion to amend, we are guided by the following principles:

> We review a trial court's ruling on a motion to amend a pleading pursuant to Tenn. R. Civ. P. 15.01 under an abuse of discretion standard. State v. McCrary, No. W2005-02881-COA-R3-JV, 2006 WL 1864502, at * 6 (Tenn. Ct. App. July 6, 2006) (no Tenn. R. App. P 11 application filed); (citing Merriman v. Smith, 599 S.W.2d 548, 559 (Tenn. Ct. App. 1979)).
>
>> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.
>
> Eldridge v. Eldridge, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

"A plethora of cases illustrates the willingness of Tennessee courts to permit amendments under Rule 15.01." Freeman Indus., LLC v. Eastman Chem. Co., 227 S.W.3d 561, 566 (Tenn. Ct. App. 2006) (citing Branch v. Warren, 527 S.W.2d 89 (Tenn. 1975); Tennessee Dept. of Mental Health & Mental Retardation v. Hughes, 531 S.W.2d 299 (Tenn. 1975); Matus v. Metro. Gov't of Nashville, 128 S.W.3d 653 (Tenn. Ct. App. 2003); Coker v. Redick, No. 01-A-01-9410-CH-00500, 1995 WL 89706 (Tenn. Ct. App. March 3, 1995); HMF Trust v. Bankers Trust Co., 827 S.W.2d 296 (Tenn. Ct. App. 1991); Harris v. St. Mary's Med. Ctr., 726 S.W.2d 902 (Tenn. Ct. App. 1987); Garthright v. First Tennessee Bank of Memphis, 728 S.W.2d 7 (Tenn. Ct. App. 1986)).

The rule means precisely what it says, that "leave shall be freely given when justice so requires." Branch v. Warren, 527 S.W.2d 89, 92 (Tenn. 1975) (quoting Tenn. R. Civ. P. 15.01). The rule, however, does not state that "leave shall be given," it states that "leave shall be *freely* given." See Tenn. R. Civ. P. 15.01 (emphasis added). Moreover, once a responsive pleading has been filed, the party's entitlement to amend as a matter of right, without leave of the court or consent of the adverse party, is terminated. Keweenaw Bay Indian Cmty. v. State of Michigan, 11 F.3d 1341, 1348 (6th Cir. 1993). Accordingly, after a responsive pleading is filed, a party is only entitled to amend a pleading with leave of court, which may be granted or denied by the trial court in its discretion. Id.; Tenn. R. Civ. P. 15.

In considering a motion to amend, a trial court is to consider several factors. One of those factors is "undue delay in filing the amendment." Green v. Green, No. M2006-02119-COA-R3-CV, 2008 WL 624860, at *9 (Tenn. Ct. App. Mar. 5, 2008) (no Tenn. R. App. P. 11 application filed) (quoting Gardiner v. Word, 731 S.W.2d 889, 891-92 (Tenn. 1987)). Ordinarily, delay alone does not justify denial of leave to amend. Morse v. McWhorter, 290 F.3d 795, 800 (6th Cir. 2002); (citing Sec. Ins. Co. v. Kevin Tucker & Assocs., Inc., 64 F.3d 1001, 1009 (6th Cir. 1995); Tefft v. Seward, 689 F.2d 637, 639 n.2 (6th Cir. 1982)); however, at some

point "delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Id.* (citing *Adams v. Gould,* 739 F.2d 858, 863 (3d Cir. 1984)). When amendment is sought at a late stage in the litigation, there is an increased burden to show justification for failing to move earlier. *Wade v. Knoxville Utilities Bd.,* 259 F.3d 452, 459 (6th Cir. 2001) (citing *Duggins v. Steak 'N Shake, Inc.,* 195 F.3d 828, 834 (6th Cir. 1999)).

**\*11** *Waters v. Coker*, No. M2007-01867-COA-RM-CV, 2008 WL 4072104, at \*3-4 (Tenn. Ct. App. Aug. 28, 2008). A court should also consider the futility of the amendment when considering whether to grant a motion to amend. *Gardiner v. Word*, 731 S.W.2d 889, 891-92 (Tenn. 1987).

In this case, the trial court cited more than one consideration as justifying a denial of Mr. Maize's motion to amend, and we note that one of these considerations, prejudice, was not acknowledged by Mr. Maize on appeal. Indeed, whereas Mr. Maize states in his brief that the court "ultimately decided that there was not a question of prejudice or lack of justice," that is not precisely correct. The trial court specifically observed in its order that Mr. Maize's motion "was filed three weeks before the trial date, which is untimely, and that allowing such amendment would be potentially prejudicial to the Defendant."

In addition to criticizing the timeliness of Mr. Maize's efforts to amend, the trial court's principal objection to permitting an amendment appeared to rest on grounds of futility. In finding that an amendment would be futile, the trial court held that Mr. Maize was seeking to add new publications of defamation, that these allegations would not relate back under Rule 15.03 of the Tennessee Rules of Civil Procedure, and that the claims would therefore be barred by the applicable statutes of limitation.

We find no error concerning the trial court's holding on this issue. Regarding the statute of limitation issue specifically, Mr. Maize appears to, among other arguments, suggest that he should be allowed to amend his complaint because he did not previously know of all of the alleged defamatory actions, stating as follows in his brief as to this point: "Given the short statute of limitations on slander, Plaintiff had to file the Complaint before learning of all of the Defendants'

defamatory actions." To the extent that a discovery rule argument is advanced by Mr. Maize, it should be noted that the discovery rule does not apply to alleged slanders, which are the object of Mr. Maize's motion to amend. *See Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 822 (Tenn. 1994) ("[T]he discovery rule does not apply to Tennessee's slander statute of limitations[.]"). There is simply no benefit of a discovery rule, nor does Mr. Maize get the benefit of any relation back. Under Rule 15.03, an amendment relates back to the date of the original pleading when the claim in the amended pleading "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Tenn. R. Civ. P. 15.03. Here, Mr. Maize, by his own admission, sought to add additional instances of defamation through his motion to amend. These were additional claims implicating additional conduct, necessitating entirely different proof of separate alleged encounters and not the same "conduct, transaction, or occurrence" pled in the original complaint. *See Hawk v. Chattanooga Orthopaedic Grp., P.C.*, 45 S.W.3d 24, 31 (Tenn. Ct. App. 2000) (noting the proper inquiry as to whether amendments relate back is "whether the amendments arise out of the conduct, transaction, or occurrence in the original complaint").

**\*12** With no relation back available, the trial court's assessment about the statute of limitations was clearly correct. Indeed, given the six-month statute of limitations that applies to slander claims, *see* Tenn. Code Ann. § 28-3-103, all alleged communications[26] sought to be injected into the suit by way of an amended complaint were time-barred when Mr. Maize filed his motion to amend in 2018. The trial court's denial of Mr. Maize's motion to amend is therefore affirmed.

**CONCLUSION**

The trial court's judgment is affirmed, in its entirety, for the reasons stated herein.[27]

**All Citations**

Slip Copy, 2020 WL 6130918

Footnotes

1   A number of other judges were involved in this case at various stages. However, as a result of retirement, recusal, and transfer, Judge Hedrick entered the final judgment that concluded the proceedings in the trial court.

2   We note that Vincent Boozer was dismissed from this appeal pursuant to an April 2020 order from this Court after the Appellant filed a motion seeking to dismiss him as a party due to his death and the resulting abatement of the Appellant's action against him.

3   Per the complaint filed in this matter by Mr. Maize, the Church is also known as "Friendship Central Community Church" and the "Church Supernatural."

4   As noted in a previous footnote, Vincent Boozer, was dismissed from this appeal, due to his death, by order of this Court in April 2020 pursuant to a motion by Mr. Maize.

5   As Mr. Maize remarks in his brief to this Court, "[t]his matter has a torturous and tumultuous procedural posture."

6   Mr. Maize admitted in litigation, among other things, that he had inappropriate Facebook communications with a female member of the congregation. As with this fact and certain others, however, we note that Mr. Maize simply admitted them "for the purposes of [the summary judgment] motions[s]."

7   According to his deposition testimony, on November 3, 2014, the day following the service, Mr. Maize opened a bank account on which he was a signatory and in which the collected funds were deposited.

8   Regarding the aforementioned online press publication, the trial court ultimately held that it "may not be the basis for a defamation claim" because it was not authorized by the Defendants. Mr. Maize does not challenge this particular holding on appeal.

9   As addressed *infra* herein, not every dismissed claim is a proper focus of our review.

10  Herein, we do not even broach a review of the trial court's dismissal of Mr. Maize's malicious prosecution claim because Mr. Maize specifically states in his brief that he "abandons his claim for malicious prosecution."

11  As already noted, although a claim for malicious prosecution was also asserted by Mr. Maize, it was abandoned by him on appeal.

12  Although the argument section of Mr. Maize's brief also criticizes the trial court's reliance on the ecclesiastical abstention doctrine for the dismissal of his false light invasion of privacy claim, the "Issues Presented" section of his brief simply raises the issue in reference to his defamation claims, not his false light claim. In relevant part, his presented issue as to this matter reads as follows: "Whether the Trial Court erred finding that the Ecclesiastical Abstention Doctrine bars Plaintiff's claims of defamation thereby depriving the Trial Court of subject-matter jurisdiction." As Mr. Maize himself acknowledges in his brief, "[a] False Light claim is not identical to that of a defamation claim." Inasmuch as Mr. Maize's presented issue is specifically in relation to his defamation claims, not his claim for false light invasion of privacy, the false light claim is subject to waiver, and we consider it waived on this basis. *See Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) ("We may consider an issue waived where it is argued in the brief but not designated as an issue.").

13  These are the alleged acts of defamation that the trial court dismissed on account of the ecclesiastical abstention doctrine. Mr. Maize also attempts to present a third set of communications as being at issue in this case, but the communications under that third set, which were directed to a pastor of another church, are a proper subject of our discussion of the trial court's ruling on Mr. Maize's motion to amend his complaint. As Mr. Maize notes in his brief, the trial court "refused to allow [him] to amend his Complaint to specifically allege these additional instances of defamation and relate-back." As discussed *infra*, based on the record presented, there is some confusion in our view as to whether the trial court's engagement with the "Mason Communications" should have been similarly limited.

14  We are aware of one place in the record where Ms. Mason's first name is spelled as "Brittney."

15  Although the communications were also alleged to be made to other individuals, including in one instance Brittany Mason's sister, the identities of others present varied among the particular communications and, in some instances, were unspecified.

16  Most of the alleged communications also implicated Ms. Mason's sister as having also had an inappropriate relationship with Mr. Maize.

17  Per her testimony, she was not asked to be at the meeting on November 1 with the elders concerning Mr. Maize's termination, but she had decided to go when she got wind of the fact that a meeting would be taking place.

18  Additionally, aside from the bar posed by the ecclesiastical abstention doctrine, it is not clear to us, as a preliminary consideration, why any defamation claims based on the "Mason Communications" should have been considered to have been properly before the trial court. See our discussion *infra* regarding the trial court's denial of Mr. Maize's motion to amend.

19  This fact strengthens the conclusion that the abstention doctrine should apply here. *See Anderson,* 2007 WL 161035, at \*26 n.17 ("The statements at issue in the case before us do contain references to religious beliefs and scripture, so there is no question that ecclesiastical matters are at issue.").

20  The individual elder Defendants allude to this point in their brief, stating as follows: "Plaintiff's claims of [libel], slander, civil conspiracy, false light, intentional infliction of emotional distress, and negligent infliction of emotional distress <u>are all impacted</u> by the Ecclesiastical Abstention Doctrine." (emphasis added)

21  Ostensibly, the manner in which the issue was drafted was inadvertent, and we recognize that Mr. Maize's briefing does offer argument responsive to holdings by the trial court on this claim. Under these circumstances, it is certainly not our desire to affirm dismissal of this claim solely due to the fact that counsel's attempt at specificity actually resulted in raising an issue about something that did not occur. Counsel in this case, for all of the parties, have proved to be zealous advocates for their clients, and we commend them for their respective efforts. We simply urge caution when issues are framed on appeal because we rely on parties' raised issues in our attempt to ascertain what we are to address. As it turns out, Mr. Maize's phrasing of the issue actually proved somewhat prescient here. As noted herein, given that his intentional infliction of emotional distress claim is based on the alleged acts of defamation we have examined, it likewise should have been dismissed due to the ecclesiastical abstention doctrine.

22  In his appellate brief, Mr. Maize points to the defamatory communications as foundational support for the claim.

23  In its appellate brief, the Church specifically advances this alternative reasoning in connection with the negligent infliction of emotional distress claim, stating, "Appellee was entitled to summary judgment on multiple grounds, including lack of subject matter jurisdiction based upon the Ecclesiastical Abstention Doctrine."

24  Through our prior analysis herein, we noted our agreement with the trial court's conclusion that the ecclesiastical abstention doctrine would pose a bar to claims based on such communications.

25  Pursuant to the terms of its order, the trial court did not grant any portion of Mr. Maize's motion to amend.

26  The proposed amended complaint details alleged slanders from 2014 and 2015.

27  As to several of Mr. Maize's claims, the trial court cited to more than one basis allegedly supporting dismissal. To the extent these alternative bases have not been the specific subject of our discussion herein, we pretermit consideration of them.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.