🟡 KeyCite Yellow Flag - Negative Treatment
Distinguished by Brown v. Tethys Bioscience, Inc., S.D.W.Va., October 1, 2012

2009 WL 3518211
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee.

Mary Beth VANCLEAVE,

v.

REELFOOT BANK.

No. W2008-01559-COA-R3-CV.
|
April 23, 2009 Session.
|
Oct. 30, 2009.

West KeySummary

1   **Labor and Employment** 🔑 Protected Activities

A former employee's statement that she refused to open a bank account in the manner a customer requested that was contrary to applicable statutes and regulations in order to protect her employer was not fatal to her claim of retaliatory discharge. The employee was not required to show that in refusing to participate in the alleged illegal activity, she was motivated by an intent to protect the public as opposed to protecting herself or her employer. The employer cited no case in which an employee was required to demonstrate such a subjective intent. It was sufficient that the employee show that the alleged illegal activity implicated important public policy concerns.

Appeal from the Circuit Court for Weakley County, No. 3943; W. Michael Maloan, Chancellor.

**Attorneys and Law Firms**

Ann Buntin Steiner, Nashville, Tennessee, for the Plaintiff/Appellant Mary Beth VanCleave.

David W. White, Kansas City, Missouri, and James M. Glasgow, Jr., Union City, Tennessee, for Defendant/Appellee Reelfoot Bank.

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

**OPINION**

HOLLY M. KIRBY, J.

*1 This is a retaliatory discharge case. The plaintiff was employed by the defendant bank. The plaintiff was asked by a customer to open an account in a manner that the plaintiff believed was illegal. The plaintiff refused to do so, and shortly afterward was terminated by the bank. The plaintiff employee filed suit against the bank, asserting claims of common law and statutory retaliatory discharge. After discovery, the bank filed a motion for summary judgment. The trial court granted summary judgment in favor of the bank, finding that the plaintiff failed to state a claim under either theory because the purported violation of the various statutes and regulations cited by the plaintiff employee did not implicate an important public policy or an illegal activity affecting the public health, safety or welfare. The trial court also found the plaintiff employee, in refusing to open the requested account, had no intent to further the public good, but sought only to protect the bank. The plaintiff employee appeals. We reverse, finding that some of the statutory provisions at issue implicate important public policy and can constitute the basis for a retaliatory discharge claim, and that intent to further the public good is not a required element.

**Facts and Proceedings Below**

Plaintiff/Appellant Mary Beth VanCleave ("VanCleave") was employed for some fourteen years by the Defendant/Appellee Reelfoot Bank ("Bank") in Weakley County, Tennessee.[1] She was an Assistant Vice President at the Bank, and her responsibilities included opening accounts for customers. In late October 2002, VanCleave was promoted to personal

banker; in this new position, she retained responsibilities for opening new customer accounts.

On Friday November 1, 2002, a longtime customer of the Bank, James Lynch ("Lynch"), approached VanCleave about opening another account with the Bank. VanCleave was aware that Lynch had overdue loans from the Bank and on earlier occasions, executions had been issued against his prior accounts at the Bank. VanCleave did not personally know Lynch, but had a perception that he was untrustworthy. At Lynch's meeting with VanCleave, Lynch had a check for over $31,000 payable to his employer, Stan Gammons ("Gammons"). Lynch told VanCleave that the check was his (Lynch's) money, not Gammons'. Lynch wanted the check deposited into a new account opened in Gammons' name with Gammons' social security number. However, Lynch wanted no checks written on the account to be payable without his (Lynch's) signature. From several training seminars VanCleave had attended, she believed that opening an account in the manner described by Lynch would violate various banking laws and regulations.

Consequently, VanCleave told Lynch that she could only open the account for him if he (Lynch) would sign an account signature card and also provide the Bank his driver's license number. Lynch refused, emphasizing that he did not want his name on the account. Lynch indicated to VanCleave that her immediate supervisor, Bank Vice President Larry Elgin ("Elgin"), had already told him that the account could be set up in the manner he requested. VanCleave responded by telling Lynch that Elgin may not be clear on Bank deposit policy. She refused to open the account for Lynch under these conditions. Apparently unhappy with VanCleave's refusal, Lynch left the Bank.

**\*2** Shortly afterward, Lynch apparently contacted Elgin to complain about VanCleave's refusal to open the account. After talking to Lynch, Elgin went to see VanCleave and directed her to have Lynch and Gammons return to the Bank to open the requested account. VanCleave told Elgin that she would call Lynch and Gammons, but that the account would have to be opened in the proper manner and Lynch would have to sign a signature card and provide identification. Angered, Elgin walked out.

Subsequently, Gammons opened an account at the Bank, signing the signature card and providing all of the requisite information. Gammons deposited $26,000 of the $31,000 check into the new account. Immediately thereafter, Gammons wrote a $25,000 check to Lynch. Lynch took the check to another bank in a different city, opened a new account, and deposited the $25,000 into the new account.

On Monday November 4, 2002, VanCleave was summoned to the office of the Bank's branch manager, Carol Reed ("Reed"), to discuss the incident involving Lynch. Elgin attended the meeting. Referring to Lynch, Elgin said to VanCleave, "how in the hell do you expect me to get my hands on his money with you pulling sh-like that?" VanCleave told Elgin that Lynch's request was against policy, and said that she was just trying to protect the Bank. Elgin then stood up and left the meeting abruptly. At this point, Reed informed VanCleave that she had explained to Elgin that VanCleave was "just trying to protect him," to which VanCleave added "and the bank." VanCleave told Reed that she was just trying to do her job in the manner in which she had been trained.

On the morning of November 6, 2002, Elgin and Reed met with the president of the Bank, Mike Dickerson, to discuss VanCleave's conduct. At this meeting, it was decided that VanCleave's employment with the Bank would be terminated that day, due at least in part to the incident involving Lynch. Later that day, Elgin and Reed met with VanCleave and terminated her Bank employment.

On November 5, 2003, VanCleave filed the instant lawsuit against the Bank, alleging that she was wrongfully terminated by the Bank for refusing to do an illegal act. The Bank filed an answer, denying that the termination was wrongful and asserting that she was terminated for legitimate business reasons. Discovery ensued.

On February 29, 2008, the Bank filed a motion for summary judgment, arguing *inter alia* that VanCleave failed to show that the purported banking law violations implicated significant public policy interests on which to base a claim for retaliatory discharge under either the common law or Tennessee statutes. After a hearing on June 25, 2008, the trial court granted summary judgment in favor of the Bank. The trial court stated the issue as whether the "Bank's conduct ... violates a clear public policy or illegal activities which affect public health, safety, and welfare." It found that the statutory and regulatory violations alleged by VanCleave "do not rise to the required level of a clear public policy or illegal activity affecting public health, safety, and welfare." The trial court also noted that VanCleave stated in her complaint that her intent was to protect the Bank, not the public. From this order, VanCleave now appeals.

**Issues on Appeal and Standard of Review**

*\*3* On appeal, VanCleave raises the following issues for our review:

(1) Whether the trial court erred in finding that purported violation of the regulations promulgated under the Bank Secrecy Act, the Internal Revenue Code, the U.S.A. Patriot Act, the Privacy of Consumer Information Act, and purported violation of Tennessee Code Annotated section 66-3-101 do not rise to the level of a clear public policy or an illegal activity affecting public health, safety, and welfare, so as to sustain a retaliatory discharge action;

(2) Whether the trial court erred in finding that VanCleave was not seeking to further the public good by refusing to open the account as requested by Lynch;

(3) Whether the trial court erred in declining to rule on the other issues raised in the Bank's summary judgment motion.

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact and she is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04. "Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor." *Staples v. CBL & Assocs., Inc.,* 15 S.W.3d 83, 89 (Tenn.2000) (citing *Robinson v. Omer,* 952 S.W.2d 423, 426 (Tenn.1997); *Byrd v. Hall,* 847 S.W.2d 208, 210-11 (Tenn.1993)). A grant of summary judgment is reviewed on appeal *de novo* with no presumption of correctness. *Guy v. Mutual of Omaha Ins. Co.,* 79 S.W.3d 528, 534 (Tenn.2002) (citing *McClung v. Delta Square Ltd. P'ship,* 937 S.W.2d 891, 894 (Tenn.1996); *Carvell v. Bottoms,* 900 S.W.2d 23, 26 (Tenn.1995)).

**Analysis**

**Important Public Policy Concerns**

We first address VanCleave's argument that the trial court erred in determining that violation of the various regulations and statutes cited in her complaint is not a sufficient basis for a retaliatory discharge claim in that they do not indicate a clear public policy and violation of them does not affect the public health, safety or welfare.

In Tennessee, the doctrine of employment-at-will is a "bedrock" of the common law. *Franklin v. Swift Transp. Co., Inc.,* 210 S.W.3d 521, 527 (Tenn.Ct.App.2006). Under this doctrine, the employment of a person employed for an indefinite term may be terminated at any time, for good cause, bad cause, or no cause at all. *Id.* (citing *Guy,* 79 S.W.3d at 534-35).

Retaliatory discharge is "an important, but narrow, exception to the employment-at-will doctrine" applicable only in limited circumstances. *Franklin,* 210 S.W.3d at 530 (citing *Stein v. Davidson Hotel,* 945 S.W.2d 714, 717 (Tenn.1997); *Chism v. Mid-South Milling Co., Inc.,* 762 S.W.2d 552, 556 (Tenn.1988)). In this case, VanCleave asserts a claim for retaliatory discharge under both the common law and the Tennessee Public Protection Act, codified at Tennessee Code Annotated section 50-1-304. The elements required to establish both were summarized in *Franklin:*

> *\*4* To prevail under the Public Protection Act, the plaintiff must establish (1) his status as an employee of the defendant employer; (2) his refusal to participate in, or remain silent about, "illegal activities" as defined under the Act; (3) his termination; and (4) an exclusive causal relationship between his refusal to participate in or remain silent about illegal activities and his termination. The elements required in order to prove a common law retaliatory discharge claim are similar; the plaintiff must show (1) that an employment-at-will relationship existed; (2) that he was discharged; (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy.

*Franklin,* 210 S.W.3d at 528 (citations omitted). As in *Franklin,* VanCleave's appeal turns

on the final element, similar under the common law and the Public Protection Act. Under the Public Protection Act, it must be found that the violation by the employer constitutes an "illegal activity," defined as "activities that are in violation of the criminal or civil code of this state or the United States or [a] regulation intended to protect the public health, safety or welfare." T.C.A. § 51-1-304(c).

Under the common law, the motivating factor for the discharge must be the employee's compliance with "a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Crews,* 78 S.W.3d at 862.

*Franklin,* 210 S.W.3d at 528. As the trial court below correctly observed, "[u]nder both the Public Protection Act and the common law, the 'illegal activity' or violation by the employer must implicate important public policy concerns." *Id.* at 530. If the statutory or regulatory infraction relied upon by VanCleave does not implicate fundamental public policy concerns, then her claim of retaliatory discharge fails. *See id.* at 533.

We look, then, at the statutes and regulations that VanCleave asserts in her amended complaint would have been violated had the account been opened in the manner Lynch requested. These include verbatim:

(1) Financial Recordkeeping and Reporting Act of Currency and Foreign Transactions Act of 1970, 31 U.S.C. 1051 et seq. or 12 U.S.C .A.1951 et. seq. (The Bank Secrecy Act) and the implementing regulations of this Act specifically 31 CFR Part 103 (103.34(a)(1)(ii) and 37 Federal Register 13279 (1972))

(2) The Internal Revenue Code of 1986, 26 U.S.C. 6109 and the governing regulations (301.6109-1(b) and (c) and Section 6109 of the Internal Revenue Code of 1986 (26 U.S.C. 6109) and its implementing regulations-Reg. Sec. 301.6109-1(b)

(3) The U.S.A. Patriot Act and the implementing regulations specifically Title 31 Section 103.121 C.F.R. implementing section 32 of the U.S.A. Patriot Act and section 326 of the U.S.A. Patriot Act and the Anti-Money Laundering (AML) provisions-Section 352 of the U.S.A. Patriot Act;

**\*5** (4) The Privacy of Consumer Information, 12 CFR 216, Regulation P/Privacy of Consumer Financial Information; and

(5) Tenn.Code Ann. § 66-3-101 *et. seq.*

The Court ascertains public policy "from the constitution and the laws, and the course of administration and decision." *Stein v. Davidson Hotel Co.,* 945 S.W.2d 714, 717 (Tenn.1997) (quoting *Watson v. Cleveland Chair Co.,* 789 S.W.2d 538, 540 (Tenn.1989)). Thus, we examine the statutes and regulations cited in VanCleave's amended complaint to determine whether they evidence a clear expression of an important public policy.

We look first at 31 C.F.R. § 103.34, a federal regulation promulgated pursuant to 31 U.S.C. § 5318, a provision of the federal Bank Secrecy Act of 1970. 31 C.F.R. § 103.34 (2009) (authority); James E. Eldridge, *The Bank Secrecy Act; Privacy, Comity, and the Politics of Contraband,* 11 N.C.J. Int'l L. & Com. Reg. 667, 671 n. 23 (1986). Subsection (a)(1) of 31 C.F.R. § 103.34 mandates that "a bank shall ... secure and maintain a record of the taxpayer identification number of the customer involved." 31 C.F.R. § 103.34(a)(1) (2009). While making a reasonable effort to secure the identifying information and maintaining a list of persons from whom it could not secure such information was apparently sufficient to bring a bank into compliance with this requirement,[2] we must also consider subsection (b) of the same regulation. *Id.* Subsection (b) requires each bank to retain an original or copy of "[e]ach document granting signature authority ... including any notations, *if such are normally made,* of specific identifying information verifying the identity of the signer (such as a driver's license number or credit card number)." 31 C.F.R. § 103.34(b)(1) (2009) (emphasis added). The appellate record indicates that acquiring this information was the Bank's standard procedure. Thus, for purposes of summary judgment, a trier of fact could reasonably conclude that this regulation would have been violated had the account been opened in the manner Lynch requested.

Do these federal regulations evidence an important public policy? Prior to enacting the Bank Secrecy Act, Congress conducted extensive hearings on the relationship between criminal activity and secrecy in banks. Eldridge, *supra,* at 669-70. Testimony from several government agencies detailed the connection between secrecy and "crimes of tax evasion, federal securities fraud, and the laundering of 'dirty' (illegal) profits into 'clean' (legal) money." *Id.* at 670. The Bank Secrecy Act was enacted "[i]n response to the public outcry over this reported criminal activity and as a means of providing federal law investigators with an effective investigative tool." *Id.* at 672. This public policy was codified in 31 U.S.C. § 5311: "It is the purpose of this subchapter (except section 5315) to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311 (2006).

**\*6** We considered whether regulations evidenced important public policy in *Franklin v. Swift Transp. Co., Inc.,* 210

S.W.3d 521 (Tenn.Ct.App.2006). In *Franklin,* the truck driver plaintiff based his claim of retaliatory discharge on his refusal to drive his employer's truck with a photocopied "cab card" instead of the original cab card, pursuant to Tennessee Department of Transportation regulations that required that the original cab card be carried in the cab of the vehicle. *Franklin,* 210 S.W.3d at 532. We found that this was a "*de minimus* regulatory violation," and that the subject regulation was "one of the many regulations that impose 'requirements whose fulfillment does not implicate fundamental public policy concerns.' " *Id.* at 532-33 (quoting *DeSoto v. Yellow Freight Sys., Inc.,* 957 F.2d 655, 659 (9th Cir.1992)).

In this appeal, the Bank argues that the Bank Secrecy Act regulations at issue fall in the same category, providing "protection for the bank itself and not the public at large." The Bank likens the facts in this case to those in *Collins v. AmSouth Bank,* 241 S.W.3d 879 (Tenn.Ct.App.2007), cited by the trial court below. In *Collins,* the plaintiff bank employee refused her supervisor's directive to place cash into the night deposit drop box on Friday for use by the substitute bank teller on Saturday. *Id.* at 881-82. After an argument between the plaintiff and her supervisor, the plaintiff's employment was terminated by the defendant bank. The plaintiff sued the bank, claiming she was discharged in retaliation for her refusal to place the cash into the night deposit drop box. The plaintiff asserted that doing so would have violated federal banking regulations and bank policy. *Id.* at 882. The trial court granted summary judgment in favor of the bank, and the plaintiff appealed. *Id.* at 883.

The appellate court in *Collins* found that the plaintiff could not prove that she was discharged for refusing to participate in an illegal activity because she could not show that placing the cash in the night deposit drop box was illegal or violated bank policy. *Id.* at 885-86. Finding that the plaintiff's discharge resulted from a simpler dispute over "workplace procedures," the *Collins* court affirmed the grant of summary judgment in favor of the bank. *Id.*

In this appeal, the Bank argues that, like *Collins,* VanCleave's discharge involved only an argument over "workplace procedures." We must respectfully disagree. The Bank Secrecy Act and the regulations promulgated thereunder, including 31 C.F.R. § 103.34, were apparently intended by Congress to aid investigations of criminal, tax, and regulatory violations, including criminal acts such as money laundering and tax evasion. This involves weighty public concerns on the same order of gravity as protecting consumers from insurance fraud, *see Guy v. Mutual of Omaha Ins. Co.,* 79 S.W.3d 528, 537-38 (Tenn.2002), and preventing the unauthorized practice of law, *see Crews v. Buckman Labs. Int'l, Inc.,* 78 S.W.3d 852, 864-65 (Tenn.2002). Therefore, we must respectfully disagree with the trial court's conclusion that the Bank Secrecy Act regulations cited in VanCleave's amended complaint do not implicate "a clear public policy or illegal activity affecting public health, safety, and welfare." This holding makes it unnecessary for us to address the other statutes and regulations cited in VanCleave's amended complaint.

**Plaintiff's Subjective Intent**

\*7 In its order granting summary judgment in favor of the Bank, the trial court also notes that "VanCleave clearly states her intent was to protect the Bank and/or E[l]gin, not the public," in an apparent reference to VanCleave's conversation with Reed. It is unclear whether the trial court based its grant of summary judgment in part on VanCleave's subjective intent, in effect holding that she was required to show that her refusal to participate in alleged illegal activities was motivated by a desire to protect the public, as opposed to protecting Elgin, the Bank, or herself.

In the summary judgment order, the trial court quoted extensively from *Collins v. AmSouth Bank,* 241 S.W.3d 879 (Tenn.Ct.App.2007), including the statement in *Collins* that persons asserting either a statutory or common law whistleblowing claim "must prove that their efforts to bring to light an illegal or unsafe practice furthered an important public policy interest, rather than simply their personal interest." *Collins,* 241 S.W.3d at 885 (citations omitted). In support of this statement of the law, the *Collins* court cites *Guy v. Mutual of Omaha Ins. Co.,* 79 S.W.3d 528 (Tenn.2002), in which the Supreme Court stated the following:

> To be clear, under both the statute and the common law, the plaintiff must assert that his or her whistleblowing activity "serves a public purpose [that] should be protected. So long as employees' actions are not merely private or proprietary, but instead *seek to further the public good,* the decision to expose illegal or unsafe practices should be encouraged."

*Id.* at 537 n. 4 (quoting *Wagner v. City of Globe,* 150 Ariz. 82, 722 P.2d 250, 257 (Ariz.1986)) (emphasis added by *Guy* Court). Subsequent cases have cited these statements in *Guy* and *Collins,* but none have found the employee's subjective intent to be determinative. *See McDonough v.*

*Memphis Radiological Prof'l Corp.,* No. 04-2697-STA-tmp, 2009 WL 2179538, at *10-11 (W.D.Tenn. July 22, 2009); *Treadaway v. Big Red Powersports, LLC,* 611 F.Supp.2d 768, 783-84 (E.D.Tenn.2009); *Dishmon v. Wal-Mart Stores, Inc.,* No. 2:07-cv-0079, 2009 WL 396749, at *4-5, 9 (M.D.Tenn. Feb.17, 2009); *Moray v. Novartis Pharm. Corp.,* No. 3:07-cv-1223, 2009 WL 82471, at *9-10 (M.D.Tenn. Jan.9, 2009) *aff'd*, No. 09-5132, 2009 WL 2778086 (6th Cir. Sept.3, 2009); *Sanders v. Henry County,* No. W2008-01832-COA-R3-CV, 2009 WL 1065916, at *7-8 (Tenn.Ct.App. Apr.21, 2009), *perm. app. denied* Oct. 19, 2009; *Williams v. Columbia Hous. Auth.,* No. M2007-01379-COA-R3-CV, 2008 WL 4426880, at *4-6 (Tenn.Ct.App. Sept.30, 2008).

To the extent that the statement in *Guy,* paraphrased in *Collins,* may be interpreted as requiring a plaintiff in a retaliatory discharge case to show subjective intent to further the public good, some clarification is in order. As discussed in *Gossett v. Tractor Supply Co.,* No. M2007-02530-COA-R3-CV, 2009 WL 528924 (Tenn.Ct.App. Mar.2, 2009), *perm. app. granted* Aug. 17, 2009, the term "retaliatory discharge" includes both (1) discharge in retaliation for refusing to *remain silent* about illegal activities, usually referred to as "whistleblowing," and (2) discharge in retaliation for refusing to *participate in* illegal activities.[3] The claims are similar but distinct.[4]

**\*8** For both types of retaliatory discharge, the plaintiff must show that he was employed by the defendant and that he was discharged. *Franklin,* 210 S.W.3d at 528. In a whistleblowing claim, the plaintiff must show that he refused to remain silent about his employer's illegal activities, and the requisite causal relationship between his refusal to remain silent and his discharge.[5] *Id.* In a refusal-to-participate claim, the plaintiff must show that he refused to participate in illegal activities and the requisite causal relationship[6] between his refusal to participate and his discharge.[7] For both types of claims, the illegal activities must implicate important public policy concerns evidenced by an unambiguous constitutional, statutory, or regulatory provision. *Id.* at 528, 532 (citing *Crews,* 78 S.W.3d at 862; *Guy,* 79 S.W.3d at 538).

The Supreme Court's decision in *Guy* involved a whistleblowing claim, in which an insurance agent alleged that he was discharged for reporting illegal conduct to the Tennessee Department of Commerce and *Insurance. Guy,* 79 S.W.3d at 532-33. To the extent that the statement in *Guy,* relied on in *Collins,* can be read as requiring that the plaintiff's reporting of the illegal activity be motivated by a desire to further the public good, such a statement of the law would be limited to a whistleblowing claim.[8]

Likewise, the statement in *Collins* cited by the trial court below was made in the context of a discussion of the requirements of a whistleblowing claim.[9] *Collins,* 241 S.W.3d at 885 (referring to "[p]ersons asserting ... a ... whistleblowing claim."). Moreover, insofar as the statement in *Collins* can conceivably be read as indicating that a plaintiff must show that he had a subjective intent to further the public good,[10] such a statement is unnecessary to the holding in *Collins* and would be considered *dicta. Id.* at 885-86 (holding that the plaintiff failed to show a whistleblowing claim because she failed to present any proof that she reported or attempted to report the alleged illegal activity).

In the case at bar, VanCleave asserts no whistleblowing claims; rather, she asserts that she was discharged for refusing to open an account in a manner that was contrary to applicable statutes and regulations, *i.e.,* retaliatory discharge for refusal to participate in illegal activities. In such a case, it would be anomalous to hold that the plaintiff must show that, in refusing to *participate* in the alleged illegal activity, she was motivated by an intent to protect the public as opposed to protecting herself or her employer. The Bank has cited no case in which a plaintiff was required to demonstrate such a subjective intent. Indeed, retaliatory discharge claims involving refusal-to-participate often acknowledge that the plaintiff refused the employer's demand that he participate in the alleged illegal activity out of concern that the plaintiff himself could be penalized for doing so. *See, e.g., Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d 822, 824-25 (Tenn.1994) (noting that violation of regulations promulgated under the Tennessee Motor Carriers Act may expose employee drivers to criminal penalties); *Franklin,* 210 S.W.3d at 529-30 (operating defendant employer's truck with a photocopy of the cab card may expose plaintiff employee to fines, penalties and delay on the road); *Wilkerson v. Standard Knitting Mills, Inc.,* 1989 WL 120298, at *1, 7 (Tenn.Ct.App. Oct.11, 1989) *perm. app. granted* Feb. 26, 1990 (Sanders, P.J., dissenting) (following employer's instruction to avoid sending employees to outside medical treatment would result in criminal liability for violation of OSHA). It is sufficient that the plaintiff show that the alleged illegal activity implicates important public policy concerns; in a refusal-to-participate retaliatory discharge claim, she need not show a subjective intent to further the public good. Therefore, VanCleave's statement that she refused to open the bank account in the

manner Lynch requested in order to protect either Elgin or the Bank is not fatal to her claim of retaliatory discharge.

**Conclusion**

*9 We find that VanCleave has demonstrated that the Bank Secrecy Act and its attendant regulations, allegedly violated by opening an account as Lynch requested, evidence clear public policy and implicate important public policy interests.[11] It is not necessary for us to address the other statutes and regulations that VanCleave asserts would have been violated by opening the account as Lynch asked. We also hold that VanCleave need not show that her refusal to open the account as requested was motivated by a desire to further the public good, as opposed to protecting the Bank, Elgin or herself. Under these circumstances, we must hold that the trial court erred in granting the Bank's motion for summary judgment. This holding pretermits all other issues raised on appeal.

The decision of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion. The costs of this appeal are taxed to the Appellee Reelfoot Bank, for which execution may issue if necessary.

**All Citations**

Slip Copy, 2009 WL 3518211, 158 Lab.Cas. P 60,901, 29 IER Cases 1686

Footnotes

1   Because this is an appeal from an order for summary judgment, we review and here recite the facts as alleged by the non-moving party, VanCleave.
2   We note that acquiring and maintaining this identifying information became mandatory with the enactment of the Patriot Act, *see* 31 U.S.C. § 5318(l) (2006); however, the pertinent Patriot Act provisions did not become effective until October 1, 2003, almost a year after the termination of VanCleave's employment with the Bank. *See* Customer Identification Programs for Banks, Savings Associations, Credit Unions and Certain Non-Federally Regulated Banks, 68 Fed.Reg. 25090, 25092 (May 9, 2003). Therefore, the Patriot Act provisions will not be considered in connection with VanCleave's claim.
3   The Tennessee Public Protection Act is sometimes informally referred to as the "Whistleblower Act." *Collins,* 241 S.W.3d at 884. The language of the Act, however, explicitly encompasses both types of retaliatory discharge. *See* T.C.A. § 50-1-304(b) (2008). Claims for both types of retaliatory discharge are recognized under the common law as well. *See, e.g., Crews v. Buckman Labs. Int'l, Inc.,* 78 S.W.3d 852, 865 (Tenn.2002) (common law claim for whistleblowing); *Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d 822, 825 (Tenn.1994) (common law claim of retaliatory discharge for refusing to participate in illegal activities).
4   In *Gossett,* we held that reporting illegal activity is not an essential element of a claim of retaliatory discharge for refusal to participate. *Gossett,* 2009 WL 528924, at *6-14. We rejected *dicta* in *Collins v. AmSouth Bank,* 241 S.W.3d 879, 885 (Tenn.Ct.App.2007) to the extent that it could be interpreted to require reporting of the alleged illegal activity in a claim of retaliatory discharge for refusal to participate. *Gossett,* 2009 WL 528924, at *14.
5   Under the Tennessee Public Protection Act, the plaintiff must show an exclusive causal relationship. *Franklin,* 210 S.W.3d at 528. Under the common law, the plaintiff need only show that his refusal to remain silent was a substantial factor in the employer's decision to discharge him. *Id.* (citing *Crews,* 78 S.W.3d at 862).
6   Again, the Tennessee Public Protection Act requires an exclusive causal relationship while the common law requires only that the refusal to participate be a substantial factor in the decision to discharge. *Franklin,* 210 S.W.3d at 528.
7   The elements of a common law claim are stated more broadly, *i.e.,* the plaintiff "attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy," and that a substantial factor in the decision to discharge was the plaintiff's "exercise of protected rights or his compliance with clear public policy." *Franklin,* 210 S.W.3d at 528. Most common law retaliatory discharge claims break down into either a whistleblowing claim or a refusal-to-participate claim. However, common law retaliatory discharge claims can involve other public policy reasons, such as jury service, filing a worker's compensation claim, or rescuing someone from imminent death or serious harm. *See Anderson v. Standard Register Co.,* 857 S.W.2d 555 (Tenn.1993) (worker's compensation claim); *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896 (Tenn.1992) (jury service); *Little v. Eastgate of Jackson, LLC,* No. W2006-01846-COA-R9-CV, 2007 WL 1202431 (Tenn.Ct.App. Apr.24, 2007) (rescuing someone from physical assault).

8   Even in the context of a whistleblowing claim, this statement in a footnote in *Guy* was unnecessary to the Court's ultimate holding and thus must be considered *dicta.* Guy, 79 S.W.3d at 538 (holding that the lack of an explicit statutory duty to report the illegal activity was not fatal to the plaintiff's retaliatory discharge claim). Requiring that the plaintiff show subjective intent to further the public good, even for a whistleblowing claim, would appear to be problematic. A whistleblowing claim could arise from a plaintiff's *mandatory* duty to report illegal activity, where the plaintiff was motivated only by a desire to perform his mandated duty and thus keep himself out of trouble. *See, e.g.,* Crews v. Buckman Labs. Int'l, Inc., 78 S.W.3d 852 (Tenn.2002). *Crews* involved a permissive duty to report illegal conduct, but the Court referenced circumstances in which a plaintiff may have a mandatory duty to report illegal conduct. *Id.* at 865 n. 6.

9   *Collins* did not involve a whistleblowing claim; the plaintiff in *Collins* was a bank employee who was discharged after she refused to deposit cash into a night deposit box, and she alleged that doing so would have been a violation of federal banking regulations. Collins, 241 S.W.3d at 882. The *Collins* court discussed the requirements of a whistleblowing claim only to explain that the plaintiff failed to present proof of *either* a refusal-to-participate claim *or* a whistleblowing claim. *See id.* at 885-86. Unfortunately, the analysis in *Collins* discusses the two types of retaliatory discharge claims together and does not adequately distinguish between them.

10  It is more likely that the statement in *Collins* was intended to indicate that the *reporting* must further the public good, as opposed to furthering the plaintiff's private interest. For example, see Sanders v. Henry County, No. W2008-01832-COA-R3-CV, 2009 WL 1065916 (Tenn.Ct.App. Apr.21, 2009), in which the plaintiff reported the viewing of pornographic materials on the employer county's computer. The *Sanders* court held that the viewing of pornographic images on the employer's computer, while odious and offensive to the plaintiff, did not constitute "illegal activities." *Id.* at *6-8.

11  The trial court did not reach the issue of whether opening the account in the manner requested by Lynch would *actually* violate the regulations promulgated pursuant to the Bank Secrecy Act, and we likewise do not reach that issue.

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.