

**U.S. Equal Employment Opportunity Commission**

# What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws

## INTRODUCTION

*Technical Assistance Questions and Answers - Updated on March 14, 2022.*

- *All EEOC materials related to COVID-19 are collected at* **www.eeoc.gov/coronavirus (https://www.eeoc.gov/coronavirus)** .

- The EEOC enforces workplace anti-discrimination laws, including the Americans with Disabilities Act (ADA) and the Rehabilitation Act (which include the requirement for reasonable accommodation and non-discrimination based on disability, and rules about employer medical examinations and inquiries), Title VII of the Civil Rights Act (which prohibits discrimination based on race, color, national origin, religion, and sex, including pregnancy), the Age Discrimination in Employment Act (which prohibits discrimination based on age, 40 or older), and the Genetic Information Nondiscrimination Act. Note: Other federal laws, as well as

state or local laws, may provide employees with additional protections.

- Title I of the ADA applies to private employers with 15 or more employees. It also applies to state and local government employers, employment agencies, and labor unions. All nondiscrimination standards under Title I of the ADA also apply to federal agencies under Section 501 of the Rehabilitation Act. Basic background information about the ADA and the Rehabilitation Act is available on EEOC's **disability page (https://www.eeoc.gov/disability-discrimination)** .

- The EEO laws, including the ADA and Rehabilitation Act, continue to apply during the time of the COVID-19 pandemic, but they do not interfere with or prevent employers from following the **guidelines and suggestions made by the CDC or state/local public health authorities (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html)** about steps employers should take regarding COVID-19. **Employers should remember that guidance from public health authorities is likely to change as the COVID-19 pandemic evolves. Therefore, employers should continue to follow the most current information on maintaining workplace safety.** This includes evolving guidance found in the CDC publication, "**Interim Public Health Recommendations for Fully Vaccinated People (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html)** ." Many common workplace inquiries about the COVID-19 pandemic are addressed in the CDC publication "**General Business Frequently Asked Questions (https://www.cdc.gov/coronavirus/2019-ncov/community/general-business-faq.html)** ."

- The EEOC has provided guidance (a publication entitled **Pandemic Preparedness in the Workplace and the Americans With Disabilities Act (https://www.eeoc.gov/laws/guidance/pandemic-preparedness-workplace-and-americans-disabilities-act)** [**PDF version (https://www.eeoc.gov/sites/default/files/2020-04/pandemic_flu.pdf)** ]) ("Pandemic Preparedness"), consistent with these workplace protections

and rules, that can help employers implement strategies to navigate the impact of COVID-19 in the workplace. This pandemic publication, which was written during the prior H1N1 outbreak, is still relevant today and identifies established ADA and Rehabilitation Act principles to answer questions frequently asked about the workplace during a pandemic. It has been updated as of March 19, 2020 to address examples and information regarding COVID-19; **the new 2020 information appears in bold and is marked with an asterisk**.

- On March 27, 2020 the EEOC provided a webinar ("3/27/20 Webinar") which was recorded and transcribed and is available at **www.eeoc.gov/coronavirus (https://www.eeoc.gov/coronavirus)** . The World Health Organization (WHO) has declared COVID-19 to be an international pandemic. The EEOC pandemic publication includes a **separate section (https://www.eeoc.gov/laws/guidance/pandemic-preparedness-workplace-and-americans-disabilities-act#secB)** that answers common employer questions about what to do after a pandemic has been declared. Applying these principles to the COVID-19 pandemic, the following may be useful:

# A. Disability-Related Inquiries and Medical Exams

*The ADA has restrictions on when and how much medical information an employer may obtain from any applicant or employee. Prior to making a conditional job offer to an applicant, disability-related inquiries and medical exams are generally prohibited. They are permitted between the time of the offer and when the applicant begins work, provided they are required for everyone in the same job category.  For more information on the timing of disability-related inquiries and medical examinations for applicants, see **Section C.** Once an employee begins work, any disability-related inquiries or medical exams must be job related and consistent with business necessity. For information on disability-related questions and COVID-19 vaccinations, see **K.7.**- **K.9.***

### A.1. How much information may an employer request from an employee who calls in sick, in order to protect the rest of its workforce during the COVID-19 pandemic? *(3/17/20)*

During a pandemic, ADA-covered employers may ask such employees if they are experiencing symptoms of the pandemic virus. For COVID-19, these include symptoms such as fever, chills, cough, shortness of breath, or sore throat. Employers must maintain all information about employee illness as a confidential medical record in compliance with the ADA.

### A.2. When screening employees entering the workplace during this time, may an employer only ask employees about the COVID-19 symptoms EEOC has identified as examples (https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q1) , or may it ask about any symptoms identified by public health authorities as associated with COVID-19? *(4/9/20)*

As public health authorities and doctors learn more about COVID-19, they may expand the list of associated symptoms. Employers should rely on the CDC, other public health authorities, and reputable medical sources for guidance on emerging symptoms associated with the disease. These sources may guide employers when choosing questions to ask employees to determine whether they would pose a direct threat to health in the workplace. For example, additional symptoms beyond fever or cough may include new loss of smell or taste as well as gastrointestinal problems, such as nausea, diarrhea, and vomiting.

### A.3. When may an ADA-covered employer take the body temperature of employees during the COVID-19 pandemic? *(3/17/20)*

Generally, measuring an employee's body temperature is a medical examination. Because the CDC and state/local health authorities have acknowledged community spread of COVID-19 and issued attendant precautions, employers may measure employees' body temperature. However, employers should be aware that some people with COVID-19 do not have a fever.

### A.4. Does the ADA allow employers to require employees to stay home if they have symptoms of the COVID-19? *(3/17/20)*

Yes. The CDC states that employees who become ill with symptoms of COVID-19 should leave the workplace. The ADA does not interfere with employers following this advice.

### A.5. When employees return to work, does the ADA allow employers to require a doctor's note certifying fitness for duty? *(3/17/20)*

Yes. Such inquiries are permitted under the ADA either because they would not be disability-related or, if the pandemic were truly severe, they would be justified under the ADA standards for disability-related inquiries of employees. As a practical matter, however, doctors and other health care professionals may be too busy during and immediately after a pandemic outbreak to provide fitness-for-duty documentation. Therefore, new approaches may be necessary, such as reliance on local clinics to provide a form, a stamp, or an e-mail to certify that an individual does not have the pandemic virus.

### A.6. May an employer administer a COVID-19 test (a test to detect the presence of the COVID-19 virus) when evaluating an employee's initial or continued presence in the workplace? *(4/23/20; updated 9/8/20 to address stakeholder questions about updates to CDC guidance)*

The ADA requires that any mandatory medical test of employees be "job related and consistent with business necessity." Applying this standard to the current circumstances of the COVID-19 pandemic, employers may take screening steps to determine if **employees entering the workplace have COVID-19 (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#A.2)** because **an individual with the virus will pose a direct threat (https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q1)** to the health of others. Therefore an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace and/or periodically to determine if their presence in the workplace

poses a direct threat to others. The ADA does not interfere with employers following **recommendations by the CDC (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/testing-non-healthcare-workplaces.html)** or other public health authorities regarding whether, when, and for whom testing or other screening is appropriate. Testing administered by employers consistent with current CDC guidance will meet the ADA's "business necessity" standard.

Consistent with the ADA standard, employers should ensure that the tests are considered accurate and reliable. For example, employers may review **information (https://www.fda.gov/medical-devices/emergency-situations-medical-devices/faqs-diagnostic-testing-sars-cov-2)** from the U.S. Food and Drug Administration about what may or may not be considered safe and accurate testing, as well as guidance from CDC or other public health authorities. Because the CDC and FDA may revise their recommendations based on new information, it may be helpful to check these agency websites for updates. Employers may wish to consider the incidence of false-positives or false-negatives associated with a particular test. Note that a positive test result reveals that an individual most likely has a current infection and may be able to transmit the virus to others. A negative test result means that the individual did not have detectable COVID-19 at the time of testing.

A negative test does not mean the employee will not acquire the virus later. Based on guidance from medical and public health authorities, employers should still require–to the greatest extent possible–that employees observe infection control practices (such as social distancing, regular handwashing, and other measures) in the workplace to prevent transmission of COVID-19.

*Note: Question A.6 and A.8 address screening of employees generally. See Question A.9 regarding decisions to screen individual employees.*

**A.7. CDC said in its Interim Guidelines (https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antibody-tests-guidelines.html) that antibody test results "should not be used to**

**make decisions about returning persons to the workplace." In light of this CDC guidance, under the ADA may an employer require antibody testing before permitting employees to re-enter the workplace?** *(6/17/20)*

No. An antibody test constitutes a medical examination under the ADA. In light of CDC's **Interim Guidelines (https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antibody-tests-guidelines.html)** that antibody test results "should not be used to make decisions about returning persons to the workplace," an antibody test at this time does not meet the ADA's "job related and consistent with business necessity" standard for medical examinations or inquiries for current employees. Therefore, requiring antibody testing before allowing employees to re-enter the workplace is not allowed under the ADA. Please note that an antibody test is different from a test to determine if someone has an active case of COVID-19 (i.e., a viral test). The EEOC has already stated that COVID-19 viral tests are **permissible under the ADA (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#A.6)** .

The EEOC will continue to closely monitor CDC's recommendations, and could update this discussion in response to changes in CDC's recommendations.

**A.8. May employers ask all employees physically entering the workplace if they have been diagnosed with or tested for COVID-19?** *(9/8/20; adapted from 3/27/20 Webinar Question 1)*

Yes. Employers may ask all employees who will be physically entering the workplace if they have COVID-19 or symptoms associated with COVID-19, and ask if they have been tested for COVID-19. Symptoms associated with COVID-19 include, for example, fever, chills, cough, and shortness of breath. The CDC has identified a **current list of symptoms (https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html)** .

An employer may exclude those with COVID-19, or symptoms associated with COVID-19, from the workplace because, as EEOC has stated, their presence

would pose a direct threat to the health or safety of others. However, for those employees who are teleworking and are not physically interacting with coworkers or others (for example, customers), the employer would generally not be permitted to ask these questions.

**A.9. May a manager ask only one employee—as opposed to asking all employees—questions designed to determine if the employee has COVID-19, or require that this employee alone have a temperature reading or undergo other screening or testing?** *(9/8/20; adapted from 3/27/20 Webinar Question 3)*

If an employer wishes to ask only a particular employee to answer such questions, or to have a temperature reading or undergo other screening or testing, the ADA requires the employer to have a reasonable belief based on objective evidence that this person might have the disease. So, it is important for the employer to consider why it wishes to take these actions regarding this particular employee, such as a display of COVID-19 symptoms. In addition, the ADA does not interfere with employers following **recommendations by the CDC (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/testing-non-healthcare-workplaces.html)** or other public health authorities regarding whether, when, and for whom testing or other screening is appropriate.

**A.10. May an employer ask an employee who is physically coming into the workplace whether they have family members who have COVID-19 or symptoms associated with COVID-19?** *(9/8/20; adapted from 3/27/20 Webinar Question 4)*

No. The Genetic Information Nondiscrimination Act (GINA) prohibits employers from asking employees medical questions about family members. GINA, however, does not prohibit an employer from asking employees whether they have had contact with anyone diagnosed with COVID-19 or who may have symptoms associated with the disease. Moreover, from a public health perspective, only asking about an employee's contact with family members would unnecessarily limit the information obtained about an employee's

potential exposure to COVID-19.

**A.11. What may an employer do under the ADA if an employee refuses to permit the employer to take the employee's temperature or refuses to answer questions about whether the employee has COVID-19, has symptoms associated with COVID-19, or has been tested for COVID-19?** *(9/8/20; adapted from 3/27/20 Webinar Question 2)*

Under the circumstances existing currently, the ADA allows an employer to bar an employee from physical presence in the workplace if the employee refuses to have a temperature reading taken or refuses to answer questions about whether the employee has COVID-19, has symptoms associated with COVID-19, or has been tested for COVID-19. To gain the cooperation of employees, however, employers may wish to ask the reasons for the employee's refusal. The employer may be able to provide information or reassurance that they are taking these steps to ensure the safety of everyone in the workplace, and that these steps are consistent with health screening recommendations from CDC. Sometimes, employees are reluctant to provide medical information because they fear an employer may widely spread such personal medical information throughout the workplace. The ADA prohibits such broad disclosures. Alternatively, if an employee requests reasonable accommodation with respect to screening, the usual accommodation process should be followed; this is discussed in Question G.7.

**A.12. During the COVID-19 pandemic, may an employer request information from employees who work on-site, whether regularly or occasionally, who report feeling ill or who call in sick?** *(9/8/20; adapted from Pandemic Preparedness Question 6)*

Due to the COVID-19 pandemic, at this time employers may ask employees who work on-site, whether regularly or occasionally, and report feeling ill or who call in sick, questions about their symptoms as part of workplace screening for COVID-19.

**A.13. May an employer ask an employee why the employee has been**

**absent from work?** *(9/8/20; adapted from Pandemic Preparedness Question 15)*

Yes. Asking why an individual did not report to work is not a disability-related inquiry. An employer is always entitled to know why an employee has not reported for work.

**A.14. When an employee returns from travel during a pandemic, must an employer wait until the employee develops COVID-19 symptoms to ask questions about where the person has traveled?** *(9/8/20; adapted from Pandemic Preparedness Question 8)*

No. Questions about where a person traveled would not be disability-related inquiries. If the CDC or state or local public health officials recommend that people who visit specified locations remain at home for a certain period of time, an employer may ask whether employees are returning from these locations, even if the travel was personal.

# B. Confidentiality of Medical Information

*With limited exceptions, the ADA requires employers to keep confidential any medical information they learn about any applicant or employee. Medical information includes not only a diagnosis or treatments, but also the fact that an individual has requested or is receiving a reasonable accommodation.*

**B.1. May an employer store in existing medical files information it obtains related to COVID-19, including the results of taking an employee's temperature or the employee's self-identification as having this disease, or must the employer create a new medical file system solely for this information?** *(4/9/20)*

The ADA requires that all medical information about a particular employee be stored separately from the employee's personnel file, thus limiting access to this **confidential information (https://www.eeoc.gov/transcript-march-27-**

**2020-outreach-webinar#q9)** . An employer may store all medical information related to COVID-19 in existing medical files. This includes an employee's statement that the employee has the disease or suspects so, or the employer's notes or other documentation from questioning an employee about symptoms. For information on confidentiality and COVID-19 vaccinations, see **K.4.**

### B.2. If an employer requires all employees to have a daily temperature check before entering the workplace, may the employer maintain a log of the results? *(4/9/20)*

Yes. The employer needs to maintain the confidentiality of this information.

### B.3. May an employer disclose the name of an employee to a public health agency when it learns that the employee has COVID-19? *(4/9/20)*

**Yes (https://www.cdc.gov/coronavirus/2019-ncov/community/contact-tracing-nonhealthcare-workplaces.html)** .

### B.4. May a temporary staffing agency or a contractor that places an employee in an employer's workplace notify the employer if it learns the employee has COVID-19? *(4/9/20)*

Yes. The staffing agency or contractor may notify the employer and disclose the name of the employee, because the employer may need to determine if this employee had contact with anyone in the workplace.

### B.5. Suppose a manager learns that an employee has COVID-19, or has symptoms associated with the disease. The manager knows it must be reported but is worried about violating ADA confidentiality. What should the manager do? *(9/8/20; adapted from 3/27/20 Webinar Question 5)*

The ADA requires that an employer keep all medical information about employees confidential, even if that information is not about a disability. Clearly, the information that an employee has symptoms of, or a diagnosis of, COVID-19, is medical information. But the fact that this is medical information does not prevent the manager from reporting to appropriate employer officials

so that they can take actions consistent with guidance from the CDC and other public health authorities.

The question is really what information to report: is it the fact that an employee —unnamed—has symptoms of COVID-19 or a diagnosis, or is it the identity of that employee? Who in the organization needs to know the identity of the employee will depend on each workplace and why a specific official needs this information. Employers should make every effort to limit the number of people who get to know the name of the employee.

The ADA does not interfere with a designated representative of the employer interviewing the employee to get a list of people with whom the employee possibly had contact through the workplace, so that the employer can then take action to notify those who may have come into contact with the employee, without revealing the employee's identity. For example, using a generic descriptor, such as telling employees that "someone at this location" or "someone on the fourth floor" has COVID-19, provides notice and does not violate the ADA's prohibition of disclosure of confidential medical information. For small employers, coworkers might be able to figure out who the employee is, but employers in that situation are still prohibited from confirming or revealing the employee's identity. Also, all employer officials who are designated as needing to know the identity of an employee should be specifically instructed that they must maintain the confidentiality of this information. Employers may want to plan in advance what supervisors and managers should do if this situation arises and determine who will be responsible for receiving information and taking next steps.

**B.6. An employee who must report to the workplace knows that a coworker who reports to the same workplace has symptoms associated with COVID-19. Does ADA confidentiality prevent the first employee from disclosing the coworker's symptoms to a supervisor?** *(9/8/20; adapted from 3/27/20 Webinar Question 6)*

No. ADA confidentiality does not prevent this employee from communicating to the employee's supervisor about a coworker's symptoms. In other words, it is

not an ADA confidentiality violation for this employee to inform the supervisor about a coworker's symptoms. After learning about this situation, the supervisor should contact appropriate management officials to report this information and discuss next steps.

**B.7. An employer knows that an employee is teleworking because the person has COVID-19 or symptoms associated with the disease, and is in self-quarantine. May the employer tell staff that this particular employee is teleworking without saying why?** *(9/8/20; adapted from 3/27/20 Webinar Question 7)*

Yes. If staff need to know how to contact the employee, and that the employee is working even if not present in the workplace, then disclosure that the employee is teleworking without saying why is permissible. Also, if the employee was on leave rather than teleworking because the employee has COVID-19 or symptoms associated with the disease, or any other medical condition, then an employer cannot disclose the reason for the leave, just the fact that the fact that the individual is on leave.

**B.8. Many employees, including managers and supervisors, are now teleworking as a result of COVID-19. How are they supposed to keep medical information of employees confidential while working remotely?** *(9/8/20; adapted from 3/27/20 Webinar Question 9)*

The ADA requirement that medical information be kept confidential includes a requirement that it be stored separately from regular personnel files. If a manager or supervisor receives medical information involving COVID-19, or any other medical information, while teleworking, and is able to follow an employer's existing confidentiality protocols while working remotely, the supervisor has to do so. But to the extent that is not feasible, the supervisor still must safeguard this information to the greatest extent possible until the supervisor can properly store it. This means that paper notepads, laptops, or other devices should not be left where others can access the protected information.

Similarly, documentation must not be stored electronically where others would have access. A manager may even wish to use initials or another code to further ensure confidentiality of the name of an employee.

# C. Hiring and Onboarding

*Under the ADA, prior to making a conditional job offer to an applicant, disability-related inquiries and medical exams are generally prohibited. They are permitted between the time of the offer and when the applicant begins work, provided they are required for everyone in the same job category.*

**C.1. If an employer is hiring, may it screen applicants for symptoms of COVID-19?** *(3/18/20; updated 12/20/21)*

Yes. An employer may screen job applicants for symptoms of COVID-19 after making a conditional job offer, as long as it does so for all entering employees in the same type of job. This ADA rule applies whether or not the applicant has a disability. For information on the ADA rules governing such inquiries and examination, see **Section A**

**C.2. May an employer take an applicant's temperature as part of a post-offer, pre-employment medical exam?** *(3/18/20)*

Yes. Any medical exams are permitted after an employer has made a conditional offer of employment. However, employers should be aware that some people with COVID-19 do not have a fever.

**C.3. May an employer delay the start date of an applicant who has COVID-19 or symptoms associated with it?** *(3/18/20)*

Yes. According to CDC guidance, an individual who has COVID-19 or symptoms associated with it should not be in the workplace.

**C.4. May an employer withdraw a job offer when it needs the applicant to start immediately but the individual has COVID-19 or symptoms of it?**

*(3/18/20)*

Based on current CDC guidance, this individual cannot safely enter the workplace, and therefore the employer may withdraw the job offer.

**C.5. May an employer postpone the start date or withdraw a job offer because the individual is 65 years old or pregnant, both of which place them at higher risk from COVID-19?** *(4/9/20; updated 12/20/21)*

No. The fact that the CDC has identified those who are 65 or older, or pregnant women, as being at greater risk does not justify unilaterally postponing the start date or withdrawing a job offer. However, an employer may choose to allow telework or to discuss with these individuals if they would like to postpone the start date. For more information on potential issues regarding discrimination based on age or pregnancy, see Sections **H** and **J.**

# D. Reasonable Accommodation

*Under the ADA, reasonable accommodations are adjustments or modifications provided by an employer to enable people with disabilities to enjoy equal employment opportunities. If a reasonable accommodation is needed and requested by an individual with a disability to apply for a job, perform a job, or enjoy benefits and privileges of employment, the employer must provide it unless it would pose an undue hardship, meaning significant difficulty or expense. An employer has the discretion to choose among effective accommodations. Where a requested accommodation would result in undue hardship, the employer must offer an alternative accommodation if one is available absent undue hardship. In discussing accommodation requests, employers and employees may find it helpful to consult the Job Accommodation Network (JAN) website for types of accommodations,* **www.askjan.org (http://www.askjan.org/)** *. JAN's materials specific to COVID-19 are at* **https://askjan.org/topics/COVID-19.cfm (https://askjan.org/topics/COVID-19.cfm)** *.*

*For more information on reasonable accommodation issues that may arise*

*when employees return to the workplace, see **Section G**. For more information on reasonable accommodation and pregnancy-related disabilities, see **Section J**. For more information on reasonable accommodation and COVID-19 vaccinations, see **K.1.**, **K.2.**, **K.5.**, **K.6.**, and **K.11**.*

**D.1. If a job may only be performed at the workplace, are there reasonable accommodations (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#general) for individuals with disabilities, absent undue hardship (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#undue) , that could offer protection to an employee who, due to a preexisting disability, is at higher risk from COVID-19?** *(4/9/20)*

There may be reasonable accommodations that **could offer protection to an individual whose disability puts that person at greater risk from COVID-19 (https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q17)** and who therefore requests such actions to eliminate possible exposure. Even with the constraints imposed by a pandemic, some accommodations may meet an employee's needs on a temporary basis without causing undue hardship on the employer.

Low-cost solutions achieved with materials already on hand or easily obtained may be effective. If not already implemented for all employees, accommodations for those who request reduced contact with others due to a disability may include changes to the work environment such as designating one-way aisles; using plexiglass, tables, or other barriers to ensure minimum distances between customers and coworkers whenever feasible per **CDC guidance (https://www.cdc.gov/coronavirus/2019-ncov/community/index.html)** or other accommodations that reduce chances of exposure.

Flexibility by employers and employees is important in determining if some accommodation is possible in the circumstances. Temporary job restructuring of marginal job duties, temporary transfers to a different position, or modifying

a work schedule or shift assignment may also permit an individual with a disability to perform safely the essential functions of the job while reducing exposure to others in the workplace or while commuting.

**D.2. If an employee has a preexisting mental illness or disorder that has been exacerbated by the COVID-19 pandemic, may the employee now be entitled to a reasonable accommodation (absent undue hardship)?** *(4/9/20)*

Although many people feel significant stress due to the COVID-19 pandemic, employees with certain preexisting mental health conditions, for example, anxiety disorder, obsessive-compulsive disorder, or post-traumatic stress disorder, may have more difficulty handling the disruption to daily life that has accompanied the COVID-19 pandemic.

As with any accommodation request, employers may: ask questions to determine whether the condition is a disability; discuss with the employee how the requested accommodation would assist the employee and enable the employee to keep working; explore alternative accommodations that may effectively meet the employee's needs; and request medical documentation if if needed.

**D.3. In a workplace where all employees are required to telework during this time, should an employer postpone discussing a request from an employee with a disability for an accommodation that will not be needed until the employee returns to the workplace when mandatory telework ends?** *(4/9/20)*

Not necessarily. An employer may give higher priority to discussing requests for reasonable accommodations that are needed while teleworking, but the employer may begin discussing this request now. The employer may be able to acquire all the information it needs to make a decision. If a reasonable accommodation is granted, the employer also may be able to make some arrangements for the accommodation in advance.

**D.4. What if an employee was already receiving a reasonable accommodation prior to the COVID-19 pandemic and now requests an**

**additional or altered accommodation?** *(4/9/20)*

An employee who was already receiving a reasonable accommodation prior to the COVID-19 pandemic may be entitled to an additional or altered accommodation, absent undue hardship. For example, an employee who is teleworking because of the pandemic may need a different type of accommodation than what the employee **uses in the workplace (https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q20)**. The employer **may discuss (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#requesting)** with the employee whether the same or a different disability is the basis for this new request and why an additional or altered accommodation is needed.

**D.5. During the pandemic, if an employee requests an accommodation for a medical condition either at home or in the workplace, may an employer still request information to determine if the condition is a disability?** *(4/17/20)*

Yes, if it is not obvious or already known, an employer may ask questions or request medical documentation to determine whether the employee has a "disability" as defined by the ADA (a physical or mental impairment that substantially limits a major life activity, or a history of a substantially limiting impairment).

**D.6. During the pandemic, may an employer still engage in the interactive process and request information from an employee about why an accommodation is needed?** *(4/17/20)*

Yes, if it is not obvious or already known, an employer may ask questions or request **medical documentation (https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q17)** to determine whether the employee's disability necessitates an accommodation, either the one the employee requested or any other. **Possible questions (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-**

**accommodation-and-undue-hardship-under-ada#requesting)** for the employee may include: (1) how the disability creates a limitation, (2) how the requested accommodation will effectively address the limitation, (3) whether another form of accommodation could effectively address the issue, and (4) how a proposed accommodation will enable the employee to continue performing the "essential functions" of the employee's position (that is, the fundamental job duties).

### D.7. If there is some urgency to providing an accommodation, or the employer has limited time available to discuss the request during the pandemic, may an employer provide a temporary accommodation? *(4/17/20)*

Yes. Given the pandemic, some employers may choose to forgo or shorten the exchange of information between an employer and employee known as the "interactive process" (discussed in D.5 and D.6., above) and grant the request. In addition, when government restrictions change, or are partially or fully lifted, the need for accommodations may also change. This may result in more requests for short-term accommodations. Employers may wish to adapt the interactive process—and devise end dates for the accommodation—to suit changing circumstances based on public health directives.

Whatever the reason for shortening or adapting the interactive process, an employer may also choose to place an end date on the accommodation (for example, either a specific date such as May 30, or when the employee returns to the workplace part- or full-time due to changes in government restrictions limiting the number of people who may congregate). Employers may also opt to provide a requested accommodation on an interim or trial basis, with an end date, while awaiting receipt of medical documentation. Choosing one of these alternatives may be particularly helpful where the requested accommodation would provide protection that an employee may need because of a pre-existing disability that puts the employee at greater risk during this pandemic. This **could also apply (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.2)** to employees who have disabilities exacerbated by the pandemic.

Employees may request an extension that an employer must consider, particularly if current government restrictions are extended or new ones adopted.

### D.8. May an employer invite employees now to ask for reasonable accommodations they may need in the future when they are permitted to return to the workplace? *(4/17/20; updated 9/8/20 to address stakeholder questions)*

Yes. Employers may inform the workforce that employees with disabilities may request accommodations in advance that they believe they may need when the workplace re-opens. This is discussed in greater detail in Question G.6. If advance requests are received, employers may begin the "interactive process" – the discussion between the employer and employee focused on whether the impairment is a disability and the reasons that an accommodation is needed. If an employee chooses not to request accommodation in advance, and instead requests it at a later time, the employer must still consider the request at that time.

### D.9. Are the circumstances of the pandemic relevant to whether a requested accommodation can be denied because it poses an undue hardship? *(4/17/20)*

Yes. An employer does not have to provide a particular reasonable accommodation if it poses an "**undue hardship (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#undue)** ," which means "significant difficulty or expense." As described in the two questions that follow, in some instances, an accommodation that would not have posed an undue hardship prior to the pandemic may pose one now.

### D.10. What types of undue hardship considerations may be relevant to determine if a requested accommodation poses "significant difficulty" during the COVID-19 pandemic? *(4/17/20)*

An employer may consider whether current circumstances create "significant

difficulty" in acquiring or providing certain accommodations, considering the facts of the particular job and workplace. For example, it may be significantly more difficult in this pandemic to conduct a needs assessment or to acquire certain items, and delivery may be impacted, particularly for employees who may be teleworking. Or, it may be significantly more difficult to provide employees with temporary assignments, to remove marginal functions, or to readily hire temporary workers for specialized positions. If a particular accommodation poses an undue hardship, employers and employees should work together to determine if there may be an alternative that could be provided that does not pose such problems.

### D.11. What types of undue hardship considerations may be relevant to determine if a requested accommodation poses "significant expense" during the COVID-19 pandemic? *(4/17/20)*

Prior to the COVID-19 pandemic, most accommodations did not pose a significant expense when considered against an employer's overall budget and resources (always considering the budget/resources of the entire entity and not just its components). But, the sudden loss of some or all of an employer's income stream because of this pandemic is a relevant consideration. Also relevant is the amount of discretionary funds available at this time—when considering other expenses—and whether there is an expected date that current restrictions on an employer's operations will be lifted (or new restrictions will be added or substituted). These considerations do not mean that an employer can reject any accommodation that costs money; an employer must weigh the cost of an accommodation against its current budget while taking into account constraints created by this pandemic. For example, even under current circumstances, there may be many no-cost or very low-cost accommodations.

### D.12. Do the ADA and the Rehabilitation Act apply to applicants or employees who are classified as "**critical infrastructure workers (https://www.cdc.gov/coronavirus/2019-ncov/downloads/Essential-Critical-Workers_Dos-and-Donts.pdf)** " or "**essential critical workers (https://www.cdc.gov/coronavirus/2019-ncov/community/critical-**

**workers/implementing-safety-practices.html)** ” by the CDC? *(4/23/20)*

Yes. These CDC designations, or any other designations of certain employees, do not eliminate coverage under the ADA or the Rehabilitation Act, or any other equal employment opportunity law. Therefore, employers receiving requests for reasonable accommodation under the ADA or the Rehabilitation Act from employees falling in these categories of jobs must accept and process the requests as they would for any other employee. Whether the request is granted will depend on whether the worker is an individual with a disability, and whether there is a reasonable accommodation that can be provided absent undue hardship.

**D.13. Is an employee entitled to an accommodation under the ADA in order to avoid exposing a family member who is at higher risk of severe illness from COVID-19 due to an underlying medical condition?** *(6/11/20)*

No. Although the ADA prohibits discrimination based on association with an individual with a disability, that protection is limited to disparate treatment or harassment. The ADA does not require that an employer accommodate an employee without a disability based on the disability-related needs of a family member or other person with whom the employee is associated.

**D.14. When an employer requires some or all of its employees to telework because of COVID-19 or government officials require employers to shut down their facilities and have workers telework, is the employer required to provide a teleworking employee with the same reasonable accommodations for disability under the ADA or the Rehabilitation Act that it provides to this individual in the workplace?** *(9/8/20; adapted from 3/27/20 Webinar Question 20)*

If such a request is made, the employer and employee should discuss what the employee needs and why, and whether the same or a different accommodation could suffice in the home setting. For example, an employee may already have certain things in their home to enable them to do their job so that they do not need to have all of the accommodations that are provided in the workplace.

Also, the undue hardship considerations might be different when evaluating a request for accommodation when teleworking rather than working in the workplace. A reasonable accommodation that is feasible and does not pose an undue hardship in the workplace might pose one when considering circumstances, such as the place where it is needed and the reason for telework. For example, the fact that the period of telework may be of a temporary or unknown duration may render certain accommodations either not feasible or an undue hardship. There may also be constraints on the normal availability of items or on the ability of an employer to conduct a necessary assessment.

As a practical matter, and in light of the circumstances that led to the need for telework, employers and employees should both be creative and flexible about what can be done when an employee needs a reasonable accommodation for telework at home. If possible, providing interim accommodations might be appropriate while an employer discusses a request with the employee or is waiting for additional information.

**D.15. Assume that an employer grants telework to employees for the purpose of slowing or stopping the spread of COVID-19. When an employer reopens the workplace and recalls employees to the worksite, does the employer automatically have to grant telework as a reasonable accommodation to every employee with a disability who requests to continue this arrangement as an ADA/Rehabilitation Act accommodation?** *(9/8/20; adapted from 3/27/20 Webinar Question 21)*

No. Any time an employee requests a reasonable accommodation, the employer is entitled to understand the disability-related limitation that necessitates an accommodation. If there is no disability-related limitation that requires teleworking, then the employer does not have to provide telework as an accommodation. Or, if there is a disability-related limitation but the employer can effectively address the need with another form of reasonable accommodation at the workplace, then the employer can choose that alternative to telework.

To the extent that an employer is permitting telework to employees because of COVID-19 and is choosing to excuse an employee from performing one or more essential functions, then a request—after the workplace reopens—to continue telework as a reasonable accommodation does not have to be granted if it requires continuing to excuse the employee from performing an essential function. The ADA never requires an employer to eliminate an essential function as an accommodation for an individual with a disability.

The fact that an employer temporarily excused performance of one or more essential functions when it closed the workplace and enabled employees to telework for the purpose of protecting their safety from COVID-19, or otherwise chose to permit telework, does not mean that the employer permanently changed a job's essential functions, that telework is always a feasible accommodation, or that it does not pose an undue hardship. These are fact-specific determinations. The employer has no obligation under the ADA to refrain from restoring all of an employee's essential duties at such time as it chooses to restore the prior work arrangement, and then evaluating any requests for continued or new accommodations under the usual ADA rules.

**D.16. Assume that prior to the emergence of the COVID-19 pandemic, an employee with a disability had requested telework as a reasonable accommodation. The employee had shown a disability-related need for this accommodation, but the employer denied it because of concerns that the employee would not be able to perform the essential functions remotely. In the past, the employee therefore continued to come to the workplace. However, after the COVID-19 crisis has subsided and temporary telework ends, the employee renews the request for telework as a reasonable accommodation. Can the employer again refuse the request?**
*(9/8/20; adapted from 3/27/20 Webinar Question 22)*

Assuming all the requirements for such a reasonable accommodation are satisfied, the temporary telework experience could be relevant to considering the renewed request. In this situation, for example, the period of providing telework because of the COVID-19 pandemic could serve as a trial period that showed whether or not this employee with a disability could satisfactorily

perform all essential functions while working remotely, and the employer should consider any new requests in light of this information. As with all accommodation requests, the employee and the employer should engage in a flexible, cooperative interactive process going forward if this issue does arise.

**D.17. Might the pandemic result in excusable delays during the interactive process?** *(9/8/20; adapted from 3/27/20 Webinar Question 19)*

Yes. The rapid spread of COVID-19 has disrupted normal work routines and may have resulted in unexpected or increased requests for reasonable accommodation. Although employers and employees should address these requests as soon as possible, the extraordinary circumstances of the COVID-19 pandemic may result in delay in discussing requests and in providing accommodation where warranted. Employers and employees are encouraged to use interim solutions to enable employees to keep working as much as possible.

**D.18. Federal agencies are required to have timelines in their written reasonable accommodation procedures governing how quickly they will process requests and provide reasonable accommodations. What happens if circumstances created by the pandemic prevent an agency from meeting this timeline?** *(9/8/20; adapted from 3/27/20 Webinar Question 19)*

Situations created by the current COVID-19 crisis may constitute an "extenuating circumstance"—something beyond a Federal agency's control—that may justify exceeding the normal timeline that an agency has adopted in its internal reasonable accommodation procedures.

# E. Pandemic-Related Harassment Due to National Origin, Race, or Other Protected Characteristics

**E.1. What practical tools are available to employers to reduce and address**

**workplace harassment that may arise as a result of the COVID-19 pandemic?** *(4/9/20)*

Employers can help reduce the chance of harassment by explicitly communicating to the workforce that fear of the COVID-19 pandemic should not be misdirected against individuals because of a protected characteristic, including their **national origin, race (https://www.eeoc.gov/wysk/message-eeoc-chair-janet-dhillon-national-origin-and-race-discrimination-during-covid-19)** , or other prohibited bases.

Practical anti-harassment tools provided by the EEOC for small businesses can be found here:

- Anti-harassment **policy tips (https://www.eeoc.gov/employers/small-business/harassment-policy-tips)** for small businesses

- Select Task Force on the Study of Harassment in the Workplace (includes detailed recommendations and tools to aid in designing effective anti-harassment policies; developing training curricula; implementing complaint, reporting, and investigation procedures; creating an organizational culture in which harassment is not tolerated):

  - **report (https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686319)** ;

  - **checklists (https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686319)** for employers who want to reduce and address harassment in the workplace; and

  - **chart (https://www.eeoc.gov/chart-risk-factors-harassment-and-responsive-strategies)** of risk factors that lead to harassment and appropriate responses.

**E.2. Are there steps an employer should take to address possible harassment and discrimination against coworkers when it re-opens the workplace?** *(4/17/20)*

Yes. An employer may remind all employees that it is against the federal EEO

laws to harass or otherwise discriminate against coworkers based on race, national origin, color, sex, religion, age (40 or over), disability, or genetic information. It may be particularly helpful for employers to advise supervisors and managers of their roles in watching for, stopping, and reporting any harassment or other discrimination. An employer may also make clear that it will immediately review any allegations of harassment or discrimination and take appropriate action.

### E.3. How may employers respond to pandemic-related harassment, in particular against employees who are or are perceived to be Asian? *(6/11/20)*

Managers should be alert to demeaning, derogatory, or hostile remarks directed to employees who are or are perceived to be of Chinese or other Asian national origin, including about the coronavirus or its origins.

All employers covered by Title VII should ensure that management understands in advance how to recognize such harassment. Harassment may occur using electronic communication tools—regardless of whether employees are in the workplace, teleworking, or on leave—and also in person between employees at the worksite. Harassment of employees at the worksite may also originate with contractors, customers or clients, or, for example, with patients or their family members at health care facilities, assisted living facilities, and nursing homes. Managers should know their legal obligations and be **instructed (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#E.2)** to quickly identify and resolve potential problems, before they rise to the level of unlawful discrimination.

Employers may choose to send a reminder to the entire workforce noting Title VII's prohibitions on harassment, reminding employees that harassment will not be tolerated, and inviting anyone who experiences or witnesses workplace harassment to report it to management. Employers may remind employees that harassment can result in disciplinary action up to and including termination.

**E.4. An employer learns that an employee who is teleworking due to the pandemic is sending harassing emails to another worker. What actions should the employer take?** *(6/11/20)*

The employer should take the same actions it would take if the employee was in the workplace. Employees may not harass other employees through, for example, emails, calls, or platforms for video or chat communication and collaboration.

# F. Furloughs and Layoffs

**F.1. Under the EEOC's laws, what waiver responsibilities apply when an employer is conducting layoffs?** *(4/9/20)*

Special rules apply when an employer is offering employees severance packages in exchange for a general release of all discrimination claims against the employer. More information is available in EEOC's **technical assistance document on severance agreements (https://www.eeoc.gov/laws/guidance/qa-understanding-waivers-discrimination-claims-employee-severance-agreements)** .

**F.2. What are additional EEO considerations in planning furloughs or layoffs?** *(9/8/20; adapted from 3/27/20 Webinar Question 13)*

The laws enforced by the EEOC prohibit covered employers from selecting people for furlough or layoff because of that individual's race, color, religion, national origin, sex, age, disability, protected genetic information, or in retaliation for protected EEO activity.

# G. Return to Work

**G.1. As government stay-at-home orders and other restrictions are modified or lifted in your area, how will employers know what steps they**

**can take consistent with the ADA to screen employees for COVID-19 when entering the workplace?** *(4/17/20; updated 12/20/21)*

The ADA permits employers to make disability-related inquiries and conduct medical exams  if job-related and consistent with business necessity.  (For more information on disability-related inquiries and medical exams, see **Section A**.)  Inquiries and reliable medical exams meet this standard if it is necessary to exclude employees with a medical condition that would pose a direct threat to health or safety.  For information on reasonable accommodation requests related to screening protocols, see **G.7**.

Direct threat is to be determined based on the best available objective medical evidence. The guidance from CDC or other public health authorities is such evidence. Therefore, employers will be acting consistent with the ADA as long as any screening implemented is consistent with advice from the CDC and public health authorities for that type of workplace at that time.

For example, this may include continuing to take temperatures and asking questions about symptoms (or require self-reporting) **of all those entering the workplace**. Similarly, the CDC recently posted **information (https://www.cdc.gov/coronavirus/2019-ncov/community/critical-workers/implementing-safety-practices.html)** on return by certain types of critical workers.

Employers should make sure not to engage in unlawful disparate treatment based on protected characteristics in decisions related to screening and exclusion.

**G.2. An employer requires returning workers to wear personal protective gear and engage in infection control practices. Some employees ask for accommodations due to a need for modified protective gear. Must an employer grant these requests?** *(4/17/20; updated 12/20/21)*

An employer may require employees to wear protective gear (for example, masks and gloves) and observe infection control practices (for example, regular hand washing and social distancing protocols).

However, where an employee with a disability needs a related reasonable accommodation under the ADA (e.g., non-latex gloves, modified face masks for interpreters or others who communicate with an employee who uses lip reading, or gowns designed for individuals who use wheelchairs), or a religious accommodation under Title VII (such as modified equipment due to religious garb), the employer should discuss the request and provide the modification or an alternative if feasible and not an undue hardship on the operation of the employer's business under the ADA or Title VII. For general information on reasonable accommodation under the ADA, see **Section D**.

**G.3. What does an employee need to do in order to request reasonable accommodation from an employer because the employee has one of the medical conditions (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html) that CDC says may put a person at higher risk for severe illness from COVID-19?** *(5/5/20)*

An employee—or a third party, such as an employee's doctor—must **let the employer know (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#requesting)** that the employee needs a change for a reason related to a medical condition (here, the underlying condition). Individuals may request accommodation in conversation or in writing. While the employee (or third party) does not need to use the term "reasonable accommodation" or reference the ADA, the employee may do so.

 The employee or the employee's representative should communicate that the employee has a medical condition that necessitates a change to meet a medical need. After receiving a request, the employer may **ask questions or seek medical documentation (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.6)** to help decide if the individual has a disability and if there is a reasonable accommodation, barring **undue hardship (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D)** , that can be provided. For

additional information on reasonable accommodation, see **Section D**.

**G.4. The CDC identifies a number of medical conditions that might place individuals at "higher risk for severe illness" (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html) if they get COVID-19. An employer knows that an employee has one of these conditions and is concerned that the employee's health will be jeopardized upon returning to the workplace, but the employee has not requested accommodation. How does the ADA apply to this situation?** *(5/7/20; updated 12/20/21)*

First, if the employee does not request a reasonable accommodation, the ADA does not mandate that the employer take action.

 If the employer is concerned about the employee's health being jeopardized upon returning to the workplace, the ADA does not allow the employer to exclude the employee—or take any other adverse action—solely because the employee has a disability that the CDC identifies as potentially placing the employee at "higher risk for severe illness" if the employee gets COVID-19. Under the ADA, such action is not allowed unless the employee's disability poses a "direct threat" to the employee's health that cannot be eliminated or reduced by reasonable accommodation.

 The ADA direct threat requirement is a high standard. As an affirmative defense, direct threat requires an employer to show that the individual has a disability that poses a "significant risk of substantial harm" to the employee's own health under **29 C.F.R. section 1630.2(r)** (regulation addressing direct threat to health or safety of self or others). A direct threat assessment cannot be based solely on the condition being on the CDC's list; the determination must be an individualized assessment based on a reasonable medical judgment about this employee's disability—not the disability in general—using the most current medical knowledge and/or on the best available objective evidence. The ADA regulation requires an employer to consider the duration of the risk, the nature and severity of the potential harm, the likelihood that the

potential harm will occur, and the imminence of the potential harm. Analysis of these factors will likely include considerations based on the severity of the pandemic in a particular area and the employee's own health (for example, is the employee's disability well-controlled), and the employee's particular job duties. A determination of direct threat also would include the likelihood that an individual will be exposed to the virus at the worksite. Measures that an employer may be taking in general to protect all workers, such as mandatory social distancing, also would be relevant.

 Even if an employer determines that an employee's disability poses a direct threat to the employee's own health, the employer still cannot exclude the employee from the workplace—or take any other adverse action—unless there is no way to provide a reasonable accommodation (absent undue hardship). The ADA regulations require an employer to consider whether there are reasonable accommodations that would eliminate or reduce the risk so that it would be safe for the employee to return to the workplace while still permitting performance of essential functions. This can involve an interactive process with the employee. If there are not accommodations that permit this, then an employer must consider accommodations such as telework, leave, or reassignment (perhaps to a different job in a place where it may be safer for the employee to work or that permits telework). An employer may only bar an employee from the workplace if, after going through all these steps, the facts support the conclusion that the employee poses a significant risk of substantial harm to themself that cannot be reduced or eliminated by reasonable accommodation. For general information on reasonable accommodation, see **Section D**.

### G.5. What are examples of accommodation that, absent undue hardship, may eliminate (or reduce to an acceptable level) a direct threat to self?
*(5/5/20)*

**Accommodations (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.1)** may include additional or enhanced protective gowns, masks, gloves, or other gear

beyond what the employer may generally provide to employees returning to its workplace. Accommodations also may include additional or enhanced protective measures, for example, erecting a barrier that provides separation between an employee with a disability and coworkers/the public or increasing the space between an employee with a disability and others. Another possible reasonable accommodation may be elimination or substitution of particular "marginal" functions (less critical or incidental job duties as distinguished from the "essential" functions of a particular position). In addition, accommodations may include temporary modification of work schedules (if that decreases contact with coworkers and/or the public when on duty or commuting) or moving the location of where one performs work (for example, moving a person to the end of a production line rather than in the middle of it if that provides more social distancing).

These are only a few ideas. Identifying an effective accommodation depends, among other things, on an employee's job duties and the design of the workspace. An employer and employee should discuss possible ideas; the Job Accommodation Network (**www.askjan.org (http://www.askjan.org/)** ) also may be able to assist in helping identify possible accommodations. As with all discussions of reasonable accommodation during this pandemic, employers and employees are encouraged to be creative and flexible. For general information on reasonable accommodation, see **Section D**.

### G.6. As a best practice, and in advance of having some or all employees return to the workplace, are there ways for an employer to invite employees to request flexibility in work arrangements? *(6/11/20)*

Yes. The ADA and the Rehabilitation Act permit employers to make information available in advance to **all** employees about who to contact—if they wish—to request accommodation for a disability that they may need upon return to the workplace, even if no date has been announced for their return. If requests are received in advance, the employer may begin the **interactive process (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.8)** . An employer may choose to include in such a notice all the CDC-listed medical conditions that may place

people at higher risk of serious illness if they contract COVID-19, provide instructions about who to contact, and explain that the employer is willing to consider on a case-by-case basis any requests from employees who have these or other medical conditions.

An employer also may send a general notice to all employees who are designated for returning to the workplace, noting that the employer is willing to consider requests for accommodation or flexibilities on an individualized basis. The employer should specify if the contacts differ depending on the reason for the request – for example, if the office or person to contact is different for employees with disabilities or pregnant workers than for employees whose request is based on age or child-care responsibilities.

Either approach is consistent with the ADEA, the ADA, and the May 29, 2020 **CDC guidance (https://www.cdc.gov/coronavirus/2019-ncov/community/high-risk-workers.html?deliveryName=USCDC_2067-DM29601)** that emphasizes the importance of employers providing accommodations or flexibilities to employees who, due to age or certain medical conditions, are at higher risk for severe illness.

Regardless of the approach, however, employers should ensure that whoever receives inquiries knows how to handle them consistent with the different federal employment nondiscrimination laws that may apply, for instance, with respect to accommodations due to a medical condition, a religious belief, or pregnancy. For additional information on reasonable accommodation under the ADA/Rehabilitation Act, see **Section D**.

### G.7. What should an employer do if an employee entering the worksite requests an alternative method of screening due to a medical condition? *(6/11/20)*

This is a request for reasonable accommodation, and an employer should proceed as it would for any other request for accommodation under the ADA or the Rehabilitation Act. If the requested change is easy to provide and inexpensive, the employer might voluntarily choose to make it available to

anyone who asks, without going through an interactive process. Alternatively, if a disability is not obvious or already known, an employer may ask the employee for information to establish that the condition is a **disability (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#D.5)** and what specific limitations require an accommodation. If necessary, an employer also may request medical documentation to support the employee's request, and then determine if that accommodation or an alternative effective accommodation can be provided, absent undue hardship.

Similarly, if an employee requested an alternative method of screening as a religious accommodation, the employer should determine if accommodation is **available under Title VII (https://www.eeoc.gov/laws/guidance/questions-and-answers-religious-discrimination-workplace)** .

# H. Age

**H.1. The CDC has explained (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html) that individuals age 65 and over are at higher risk for a severe case of COVID-19 if they contract the virus and therefore has encouraged employers to offer maximum flexibilities to this group. Do employees age 65 and over have protections under the federal employment discrimination laws?** *(6/11/20; updated 12/20/21)*

The Age Discrimination in Employment Act (ADEA) prohibits employment discrimination against individuals age 40 and older. The ADEA would prohibit a covered employer from involuntarily excluding an individual from the workplace based on being 65 or older, even if the employer acted for benevolent reasons such as protecting the employee due to higher risk of severe illness from COVID-19. For more information on postponing a start date or withdrawing a job offer due to older age, see **C.5**.

**H.2. If an employer is choosing to offer flexibilities to other workers, may**

**older comparable workers be treated less favorably based on age?** *(9/8/20; adapted from 3/27/20 Webinar Question 12)*

No. If an employer is allowing other comparable workers to telework, it should make sure it is not treating older workers less favorably based on their age.

# I. Caregivers/Family Responsibilities

*For additional information about pandemic-related caregiver discrimination under the laws enforced by the EEOC, see the EEOC's technical assistance document,* **The COVID-19 Pandemic and Caregiver Discrimination Under Federal Employment Discrimination Laws. (https://www.eeoc.gov/laws/guidance/covid-19-pandemic-and-caregiver-discrimination-under-federal-employment)**

**I.1. If an employer provides telework, modified schedules, or other benefits to employees with school-age children due to school closures or distance learning during the pandemic, are there sex discrimination considerations?** *(3/14/22)*

Employers may provide any flexibilities as long as they are not treating employees differently based on sex or other EEO-protected characteristics. For example, under Title VII, female employees cannot be given more favorable treatment than male employees because of a gender-based assumption about who may have **caregiving responsibilities (https://www.eeoc.gov/laws/guidance/enforcement-guidance-unlawful-disparate-treatment-workers-caregiving-responsibilities)** for children.

**I.2. How might unlawful caregiver discrimination related to the COVID-19 pandemic arise under the laws enforced by the EEOC?** *(3/14/22)*

Caregiver discrimination violates the laws enforced by the EEOC if it is based on an applicant's or employee's sex (including pregnancy, sexual orientation, or

gender identity), race, national origin, disability, age (40 or older), or another **characteristic covered by federal employment discrimination laws (https://www.eeoc.gov/discrimination-type)** . Caregiver discrimination also is unlawful if it is based on the caregiver's association with an individual with a disability, or on the race, ethnicity, or other protected characteristic of the individual receiving care.

Caregiver discrimination related to the pandemic may arise in a variety of ways. For instance, under Title VII, employers may not discriminate against employees with pandemic-related caregiving responsibilities based on their sex, including gender stereotypes associated with caregiving responsibilities or roles. For example, employers may not decline to assign female employees with caregiving responsibilities demanding or high-profile projects that increase employees' advancement potential but require significant overtime or travel. Likewise, employers may not reassign such projects to other employees based on assumptions that female caregivers cannot, should not, or would not want to work extra hours or be away from their families if a family member is infected with or exposed to COVID-19. Employers also may not deny male employees permission to telework or to adjust their schedules to enable them to perform pandemic-related caregiving obligations, such as caring for young children or parents, while granting such requests when made by similarly situated female employees.

Title VII also prohibits employers from discriminating against employees with pandemic-related caregiving duties based on their race or national origin. For example, employers may not require more burdensome processes for employees of a certain race or national origin who are requesting schedule changes or leave related to COVID-19 caregiving. Employers also may not deny such requests more frequently, or penalize employees for requesting or receiving schedule changes or leave for caregiving purposes, based on employees' race or national origin.  Discrimination based on citizenship or immigration status against workers with caregiving responsibilities also can be unlawful under a law enforced by the **Department of Justice (https://www.justice.gov/crt/immigrant-and-employee-rights-section)** .

Under the ADA, employers may not discriminate against workers based on stereotypes or assumptions about workers' caregiving responsibilities for an individual with a disability, such as a child, spouse, or parent with a disability. For example, if an applicant is the primary caregiver of an individual with a disability who is at higher risk of complications from COVID-19, an employer may not refuse to hire the applicant out of fear that the care recipient will increase the employer's healthcare costs. If the applicant is hired, the employer may not refuse to allow the care recipient to be added as a dependent on the employer's health insurance because of that individual's disability. An employer also may not refuse to promote employees with caregiving responsibilities for an individual with a disability based on the assumption that they will take a significant amount of leave for caregiving purposes.

### I.3. Are these legal protections available only to workers caring for children, or are they also available to workers with other caregiving obligations? *(3/14/22)*

*This response includes hyperlinks to non-governmental sources.  The EEOC includes these resources solely for informational purposes.  The EEOC does not endorse these resources or the entities responsible for them, and it does not vouch for the accuracy of the information provided by referencing the non-governmental sources in this response.*

Employers may not discriminate against applicants or employees with caregiving responsibilities based on characteristics protected by the laws enforced by the EEOC, including caregivers' sex (including pregnancy, sexual orientation, or gender identity), race, color, religion, national origin, age (40 or older), disability, association with an individual with a disability, or genetic information (including family medical history). These protections are available to workers with any type of caregiving responsibilities, including care for children, spouses, partners, relatives, individuals with disabilities, or others.

State or local laws may provide additional protections for workers with caregiving responsibilities. Employees with caregiving responsibilities also may have rights under other laws, including the **Family and Medical Leave Act**

**(https://www.dol.gov/agencies/whd/fmla)** or similar **state (https://www.ncsl.org/research/labor-and-employment/state-family-and-medical-leave-laws.aspx)** or local laws.

### I.4. Should employers and employees be aware of any other pandemic-related caregiver discrimination issues? *(3/14/22)*

Yes. In this What You Should Know document, the EEOC addresses several different types of potential pandemic-related caregiver discrimination. For example:

- **A.10** addresses employer inquiries about family members with COVID-19 or related symptoms.

- **C.5** addresses employer-imposed start date postponements or offer withdrawals for pregnant applicants.

- **D.13** addresses whether employees are entitled to accommodations to avoid exposing family members at high risk of complications from COVID-19.

- **J.1** and **J.2** address excluding employees from the workplace based on pregnancy and accommodating pregnancy.

- **K.2** addresses pregnancy accommodation requests related to vaccination.

- **K.3** addresses employer encouragement of vaccination of family members.

- **K.13** addresses decisions not to be vaccinated due to pregnancy.

- **K.18** addresses GINA and incentives for non-employer-provided family member vaccinations or employer requests for documentation of family member vaccinations.

- **K.20** addresses GINA and incentives for employer-provided family member vaccinations.

- **K.21** addresses GINA and family member vaccinations without incentives.

For general information about caregiver discrimination and federal employment discrimination laws, see the EEOC's **policy guidance (https://www.eeoc.gov/laws/guidance/enforcement-guidance-unlawful-disparate-treatment-workers-caregiving-responsibilities)** , associated **fact sheet (https://www.eeoc.gov/questions-and-answers-about-eeocs-enforcement-guidance-unlawful-disparate-treatment-workers)** , and **best practices (https://www.eeoc.gov/laws/guidance/employer-best-practices-workers-caregiving-responsibilities)** document.

# J. Pregnancy

**J.1. Due to the pandemic, may an employer exclude an employee from the workplace involuntarily due to pregnancy (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/pregnancy-breastfeeding.html) ?** *(6/11/20)*

No. Sex discrimination under Title VII of the Civil Rights Act includes discrimination based on pregnancy. Even if motivated by benevolent concern, an employer is not permitted to single out workers on the basis of pregnancy for adverse employment actions, including involuntary leave, layoff, or furlough. For more information on postponing a start date or withdrawing a job offer due to pregnancy, see **C.5**.

**J.2. Is there a right to accommodation based on pregnancy during the pandemic?** *(6/11/20)*

There are two federal employment discrimination laws that may trigger **accommodation for employees based on pregnancy (https://www.eeoc.gov/laws/guidance/legal-rights-pregnant-workers-under-federal-law)** .

First, pregnancy-related medical conditions may themselves be disabilities under the ADA, even though pregnancy itself is not an ADA disability. If an employee makes a request for reasonable accommodation due to a pregnancy-

related medical condition, the employer must consider it under the usual ADA rules.

Second, Title VII as amended by the Pregnancy Discrimination Act specifically requires that women affected by pregnancy, childbirth, and related medical conditions be treated the same as others who are similar in their ability or inability to work. This means that a pregnant employee may be entitled to job modifications, including telework, changes to work schedules or assignments, and leave to the extent provided for other employees who are similar in their ability or inability to work. Employers should ensure that supervisors, managers, and human resources personnel know how to handle such requests to avoid disparate treatment in violation of Title VII. For information on pregnancy and COVID-19 vaccination, see **K.13**.

# K. Vaccinations – Overview, ADA, Title VII, and GINA

*The availability of COVID-19 vaccinations raises questions under the federal equal employment opportunity (EEO) laws, including the Americans with Disabilities Act (ADA), the Rehabilitation Act, the Genetic Information Nondiscrimination Act (GINA), and Title VII of the Civil Rights Act, as amended, inter alia, by the Pregnancy Discrimination Act (Title VII) (see also **Section J, EEO rights relating to pregnancy** and **Section L, Vaccinations – Title VII and Religious Objections to COVID-19 Vaccine Mandates**.)*

*This section was originally issued on December 16, 2020, and was updated on October 25, 2021. Note that the Centers for Disease Control and Prevention (CDC) has **issued guidance (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html)** for fully vaccinated individuals that addresses, among other things, when they need to wear a mask indoors.*

*The EEOC has received many inquiries from employers and employees about the type of authorization granted by the U.S. Department of Health and Human*

Services (HHS) Food and Drug Administration (FDA) for the administration of COVID-19 vaccines.  On August 23, 2021, the FDA approved the Biologics License Application for the Pfizer-BioNTech COVID-19 vaccine for use in individuals 16 years of age and older.  Previously, the FDA granted Emergency Use Authorizations (EUAs) for the two other vaccines—one made by Moderna and the other by Janssen/Johnson & Johnson—authorizing them for use in the United States for individuals 18 years of age and older.  The Pfizer-BioNTech vaccine is authorized under an EUA for individuals 12 years of age and older and for the administration of a **_third dose (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html)_** in certain immunocompromised individuals.  For the current status of vaccines authorized or approved by the FDA, please visit: **https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html (https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html)**

Also of note, on July 6, 2021, the U.S. Department of Justice's Office of Legal Counsel issued a Memorandum Opinion concluding that section 564 of the Federal Food, Drug, and Cosmetic Act does not prohibit public or private entities from imposing vaccination requirements for a vaccine that is subject to an EUA.

Other federal, state, and local laws and regulations govern COVID-19 vaccination of employees, including requirements for the federal government as an employer.  The federal government as an employer is subject to the EEO laws. Federal departments and agencies should consult the website of the **_Safer Federal Workforce Task Force_ (https://www.saferfederalworkforce.gov/)** for the latest guidance on federal agency operations during the COVID-19 pandemic.

This technical assistance on vaccinations was written to help employees and employers better understand how federal laws related to workplace discrimination apply during the COVID-19 pandemic. The EEOC questions and answers provided here set forth applicable EEO legal standards consistent with the federal civil rights laws enforced by the EEOC and with EEOC regulations, guidance, and technical assistance, unless another source is expressly cited.  In addition, whether an employer meets the EEO standards will depend on the

*application of these standards to particular factual situations.*

# COVID-19 Vaccinations:  EEO Overview

**K.1.  Under the ADA, Title VII, and other federal employment nondiscrimination laws, may an employer require all employees physically entering the workplace to be vaccinated against COVID-19?** *(Updated 10/13/21)*

The federal EEO laws do not prevent an employer from requiring all employees physically entering the workplace to be fully vaccinated against COVID-19, subject to the **reasonable accommodation provisions of Title VII and the ADA and other EEO considerations discussed below**. (See **Section L, Vaccinations – Title VII and Religious Objections to COVID-19 Vaccine Mandates**).

In some circumstances, Title VII and the ADA require an employer to provide reasonable accommodations for employees who, because of a disability or a sincerely held religious belief, practice, or observance, do not get vaccinated against COVID-19, unless providing an accommodation would pose an undue hardship on the operation of the employer's business.  The analysis for undue hardship depends on whether the accommodation is for a disability (including pregnancy-related conditions that constitute a disability) (see K.6) or for religion (see K.12).

As with any employment policy, employers that have a vaccination requirement may need to respond to allegations that the requirement has a disparate impact on—or disproportionately excludes—employees based on their race, color, religion, sex, or national origin under Title VII (or age under the Age Discrimination in Employment Act [40+]). Employers should keep in mind that because some individuals or demographic groups may face barriers to receiving a COVID-19 vaccination, some employees may be more likely to be negatively impacted by a vaccination requirement.

It would also be unlawful to apply a vaccination requirement to employees in a

way that treats employees differently based on disability, race, color, religion, sex (including pregnancy, sexual orientation, and gender identity), national origin, age, or genetic information, unless there is a legitimate non-discriminatory reason.

**K.2.  What are some examples of reasonable accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to disability; religious beliefs, practices, or observance; or pregnancy?** *(5/28/21)*

An employee who does not get vaccinated due to a disability (covered by the ADA) or a sincerely held religious belief, practice, or observance (covered by Title VII) may be entitled to a reasonable accommodation that does not pose an undue hardship on the operation of the employer's business.  For example, as a reasonable accommodation, an unvaccinated employee entering the workplace might wear a face mask, work at a social distance from coworkers or non-employees, work a modified shift, get periodic tests for COVID-19, be given the opportunity to telework, or finally, accept a reassignment.

Employees who are not vaccinated because of pregnancy may be entitled (under Title VII) to adjustments to keep working, if the employer makes modifications or exceptions for other employees.  These modifications may be the same as the accommodations made for an employee based on disability or religion.

**K.3.  How can employers encourage employees and their family members to be vaccinated against COVID-19 without violating the EEO laws, especially the ADA and GINA?** *(Updated 10/13/21)*

Employers may provide employees and their family members with information to educate them about COVID-19 vaccines, raise awareness about the benefits of vaccination, and address common questions and concerns. Employers also may work with local public health authorities, medical providers, or pharmacies to make vaccinations available for unvaccinated workers in the workplace.  Also, under certain circumstances employers may offer incentives

to employees who receive COVID-19 vaccinations, as discussed in K.16 - K.21. The federal government is providing COVID-19 vaccines at no cost to everyone 5 years of age and older.

There are many resources available to employees seeking more information about how to get vaccinated against COVID-19:

- The federal government's online **vaccines.gov (https://www.vaccines.gov/)** site can identify vaccination sites anywhere in the country (or **https://www.vacunas.gov (https://www.vacunas.gov)** for Spanish).  Individuals also can text their ZIP code to "GETVAX" (438829)– or "VACUNA" (822862) for Spanish–to find three vaccination locations near them.

- Employees with disabilities (or employees' family members with disabilities) may need extra support to obtain a vaccination, such as transportation or in-home vaccinations.  The HHS/Administration for Community Living has launched the Disability Information and Assistance Line (DIAL) to assist individuals with disabilities in obtaining such help. DIAL can be reached at: 888-677-1199 from 9 am to 8 pm (Eastern Standard Time) Mondays through Fridays or by emailing **DIAL@n4a.org**.

- CDC's website offers a link to a listing of **local health departments (https://www.cdc.gov/publichealthgateway/healthdirectories/index.html)** , which can provide more information about local vaccination efforts.

- In addition, CDC provides a complete communication "tool kit" for employers to use with their workforce to educate people about getting a COVID-19 vaccine.  Although originally written for essential workers and employers, it is useful for all workers and employers.  *See* **Workplace Vaccination Program | CDC (https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/essentialworker/workplace-vaccination-program.html)** .

- Some employees may not have reliable access to the internet to identify nearby vaccination locations or may speak no English or have limited

English proficiency and find it difficult to make an appointment for a vaccination over the phone. CDC operates a toll-free telephone line that can provide assistance in many languages for individuals seeking more information about vaccinations: 800-232-4636; TTY 888-232-6348.

- Some employees also may require assistance with transportation to vaccination sites. Employers may gather and disseminate information to their employees on low-cost and no-cost transportation resources serving vaccination sites available in their community and offer paid time-off for vaccination, particularly if transportation is not readily available outside regular work hours.

- Employers should provide the contact information of a management representative for employees who need to request a reasonable accommodation for a disability or religious belief, practice, or observance, or to ensure nondiscrimination for an employee who is pregnant.

## The ADA and COVID-19 Vaccinations

### K.4. Is information about an employee's COVID-19 vaccination confidential medical information under the ADA? *(Updated 10/13/21)*

Yes. The ADA requires an employer to maintain the confidentiality of employee medical information. Although the EEO laws do not prevent employers from requiring employees to provide documentation or other confirmation of vaccination, this information, like all medical information, must be kept confidential and stored separately from the employee's personnel files under the ADA.

*Mandatory Employer Vaccination Programs*

### K.5. Under the ADA, may an employer require a COVID-19 vaccination for all employees entering the workplace, even though it knows that some employees may not get a vaccine because of a disability? *(Updated 5/28/21)*

Yes, provided certain requirements are met. Under the ADA, an employer may

require an individual with a disability to meet a qualification standard applied to all employees, such as a safety-related standard requiring COVID-19 vaccination, if the standard is job-related and consistent with business necessity.  If a  particular employee cannot meet such a safety-related qualification standard because of a disability, the employer may not require compliance for that employee unless it can demonstrate that the individual would pose a "direct threat" to the health or safety of the employee or others in the workplace.  A "direct threat" is a "significant risk of substantial harm" that cannot be eliminated or reduced by reasonable accommodation.  **29 C.F.R. 1630.2(r) (https://www.govinfo.gov/content/pkg/CFR-2012-title29-vol4/xml/CFR-2012-title29-vol4-sec1630-2.xml)** .  This determination can be broken down into two steps: determining if there is a direct threat and, if there is, assessing whether a reasonable accommodation would reduce or eliminate the threat.

To determine if an employee who is not vaccinated due to a disability poses a "direct threat" in the workplace, an employer first must make an individualized assessment of the employee's present ability to safely perform the essential functions of the job.  The factors that make up this assessment are: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm.  The determination that a particular employee poses a direct threat should be based on a reasonable medical judgment that relies on the most current medical knowledge about COVID-19.  Such medical knowledge may include, for example, the level of community spread at the time of the assessment.   Statements from the CDC provide an important source of current medical knowledge about COVID-19, and the employee's health care provider, with the employee's consent, also may provide useful information about the employee.   Additionally, the assessment of direct threat should take account of the type of work environment, such as: whether the employee works alone or with others or works inside or outside; the available ventilation; the frequency and duration of direct interaction the employee typically will have with other employees and/or non-employees; the number of partially or fully vaccinated individuals already in the workplace; whether other employees are wearing

masks or undergoing routine screening testing; and the space available for social distancing.

If the assessment demonstrates that an employee with a disability who is not vaccinated would pose a direct threat to self or others, the employer must consider whether providing a reasonable accommodation, absent undue hardship, would reduce or eliminate that threat.  Potential reasonable accommodations could include requiring the employee to wear a mask, work a staggered shift, making changes in the work environment (such as improving ventilation systems or limiting contact with other employees and non-employees ), permitting telework if feasible, or reassigning the employee to a vacant position in a different workspace.

As a best practice, an employer introducing a COVID-19 vaccination policy and requiring documentation or other confirmation of vaccination should notify all employees that the employer will consider requests for reasonable accommodation based on disability on an individualized basis.  (See also **K.12** recommending the same best practice for religious accommodations.)

### K.6. Under the ADA, if an employer requires COVID-19 vaccinations for employees physically entering the workplace, how should an employee who does not get a COVID-19 vaccination because of a disability inform the employer, and what should the employer do? *(Updated 5/28/21)*

An employee with a disability who does not get vaccinated for COVID-19 because of a disability must let the employer know that the employee needs an exemption from the requirement or a change at work, known as a reasonable accommodation.  To request an accommodation, an individual does not need to mention the ADA or use the phrase "reasonable accommodation."

Managers and supervisors responsible for communicating with employees about compliance with the employer's vaccination requirement should know **how to recognize an accommodation request from an employee with a disability (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#requesting)**

and know to whom to refer the request for full consideration. As a best practice, before instituting a mandatory vaccination policy, employers should provide managers, supervisors, and those responsible for implementing the policy with clear information about how to handle accommodation requests related to the policy.

Employers and employees typically engage in a flexible, interactive process to identify workplace accommodation options that do not impose an undue hardship (significant difficulty or expense) on the employer.  This process may include determining whether it is necessary to obtain supporting medical documentation about the employee's disability.

In discussing accommodation requests, employers and employees may find it helpful to consult the **Job Accommodation Network (JAN) website (https://www.askjan.org)** as a resource for different types of accommodations.  JAN's materials about COVID-19 are available at **https://askjan.org/topics/COVID-19.cfm (https://askjan.org/topics/COVID-19.cfm)** .

 Employers also may consult applicable **Occupational Safety and Health Administration (OSHA) COVID-specific resources (https://www.osha.gov/SLTC/covid-19/)** .  Even if there is no reasonable accommodation that will allow the unvaccinated employee to be physically present to perform the employee's current job without posing a direct threat, the employer must consider if telework is an option for that particular job as an accommodation and, as a last resort, whether reassignment to another position is possible.

The ADA requires that employers offer an available accommodation if one exists that does not pose an undue hardship, meaning a significant difficulty or expense. See 29 C.F.R. 1630.2(p).  Employers are advised to consider all the options before denying an accommodation request.  The proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, who may be ineligible for a vaccination or whose vaccination status may be

unknown, can impact the ADA undue hardship consideration.  Employers may rely on **CDC recommendations (https://www.cdc.gov/coronavirus/2019-ncov/)** when deciding whether an effective accommodation is available that would not pose an undue hardship.

Under the ADA, it is unlawful for an employer **to disclose that an employee is receiving a reasonable accommodation (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#li42)** or **to retaliate against an employee for requesting an accommodation (https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada#li19)** .

**K.7.  If an employer requires employees to get a COVID-19 vaccination from the employer or its agent, do the ADA's restrictions on an employer making disability-related inquiries or medical examinations of its employees apply to any part of the vaccination process?** *(Updated 5/28/21)*

Yes. The ADA's restrictions apply to the screening questions that must be asked immediately prior to administering the vaccine if the vaccine is administered by the employer or its agent.  An **employer's agent (https://www.eeoc.gov/laws/guidance/section-2-threshold-issues#2-III-B-2)** is an individual or entity having the authority to act on behalf of, or at the direction of, the employer.

The ADA generally restricts when employers may require medical examinations (procedures or tests that seek information about an individual's physical or mental impairments or health) or make disability-related inquiries (questions that are likely to elicit information about an individual's disability).  The act of administering the vaccine is not a "medical examination" under the ADA because it does not seek information about the employee's physical or mental health.

However, because the pre-vaccination screening questions are likely to elicit information about a disability, the ADA requires that they must be "job related

and consistent with business necessity" when an employer or its agent administers the COVID-19 vaccine.  To meet this standard, an employer would need to have a reasonable belief, based on objective evidence, that an employee who does not answer the questions and, therefore, cannot be vaccinated, will pose a direct threat to the employee's own health or safety or to the health and safety of others in the workplace.  (See general discussion in **Question K.5**.)  Therefore, when an employer requires that employees be vaccinated by the employer or its agent, the employer should be aware that an employee may challenge the mandatory pre-vaccination inquiries, and an employer would have to justify them under the ADA.

The ADA also requires employers to keep any employee medical information obtained in the course of an employer vaccination program confidential.

### Voluntary Employer Vaccination Programs

**K.8.  Under the ADA, are there circumstances in which an employer or its agent may ask disability-related screening questions before administering a COVID-19 vaccine *without* needing to satisfy the "job-related and consistent with business necessity" standard?** *(Updated 5/28/21)*

Yes.  If the employer offers to vaccinate its employees on a voluntary basis, meaning that employees can choose whether or not to get the COVID-19 vaccine from the employer or its agent, the employer does not have to show that the pre-vaccination screening questions are job-related and consistent with business necessity.  However, the employee's decision to answer the questions must be voluntary.  (See also Questions **K.16 – 17**.)  The ADA prohibits taking an adverse action against an employee, including harassing the employee, for refusing to participate in a voluntary employer-administered vaccination program.  An employer also must keep any medical information it obtains from any voluntary vaccination program confidential.

**K.9.  Does the ADA prevent an employer from inquiring about or requesting documentation or other confirmation that an employee obtained a COVID-19 vaccination?** *(Updated 10/13/21)*

No.  When an employer asks employees whether they obtained a COVID-19 vaccination, the employer is not asking the employee a question that is likely to disclose the existence of a disability; there are many reasons an employee may not show documentation or other confirmation of vaccination besides having a disability.  Therefore, requesting documentation or other confirmation of vaccination is not a disability-related inquiry under the ADA, and the ADA's rules about making such inquiries do not apply.

However, documentation or other confirmation of vaccination provided by the employee to the employer is medical information about the employee and must be kept confidential, as discussed in K.4.

### K.10.  May an employer offer voluntary vaccinations only to certain groups of employees?  *(5/28/21)*

If an employer or its agent offers voluntary vaccinations to employees, the employer must comply with federal employment nondiscrimination laws.  For example, not offering voluntary vaccinations to certain employees based on national origin or another protected basis under the EEO laws would not be permissible.

### K.11. What should an employer do if an employee who is fully vaccinated for COVID-19 requests accommodation for an underlying disability because of a continuing concern that the employee faces a heightened risk of severe illness from a COVID-19 infection, despite being vaccinated? *(5/28/21)*

Employers who receive a reasonable accommodation request from an employee should process the request in accordance with applicable ADA standards.

When an employee asks for a reasonable accommodation, whether the employee is fully vaccinated or not, the employer should engage in an interactive process to determine if there is a disability-related need for reasonable accommodation.  This process typically includes seeking information from the employee's health care provider with the employee's

consent explaining why an accommodation is needed.

For example, some individuals who are immunocompromised might still need reasonable accommodations because their conditions may mean that the vaccines may not offer them the same measure of protection as other vaccinated individuals.  If there is a disability-related need for accommodation, an employer must explore potential reasonable accommodations that may be provided absent undue hardship.

# Title VII and COVID-19 Vaccinations

**K.12.  Under Title VII, how should an employer respond to employees who communicate that they are unable to be vaccinated for COVID-19 (or provide documentation or other confirmation of vaccination) because of a sincerely held religious belief, practice, or observance?** (*Updated 5/28/21*)

Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting a COVID-19 vaccine, the employer must provide a reasonable accommodation unless it would pose an undue hardship.  Employers also may receive religious accommodation requests from individuals who wish to wait until an alternative version or specific brand of COVID-19 vaccine is available to the employee.  Such requests should be processed according to the same standards that apply to other accommodation requests. For more information on requests for religious accommodations related to COVID-19 vaccination requirements, see **Section L,  Vaccinations – Title VII and Religious Objections to COVID-19 Vaccine Mandates**.

EEOC guidance explains that the definition of religion is broad and protects beliefs, practices, and observances with which the employer may be unfamiliar.  Therefore, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance.  However, if an employee requests a religious accommodation, and an employer is aware of facts that provide an objective basis for questioning either the religious nature or the sincerity of a

particular belief, practice, or observance, the employer would be justified in requesting additional supporting information. See also 29 CFR 1605.

Under Title VII, an employer should thoroughly consider all possible reasonable accommodations, including telework and reassignment.  For suggestions about types of reasonable accommodation for unvaccinated employees, see **question and answer K.6.**, above.  In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances.

Under Title VII, courts define "undue hardship" as having more than minimal cost or burden on the employer.  This is an easier standard for employers to meet than the ADA's undue hardship standard, which applies to requests for accommodations due to a disability.  Considerations relevant to undue hardship can include, among other things, the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, whose vaccination status could be unknown or who may be ineligible for the vaccine.  Ultimately, if an employee cannot be accommodated, employers should determine if any other rights apply under the EEO laws or other federal, state, and local authorities before taking adverse employment action against an unvaccinated employee

### K.13.  Under Title VII, what should an employer do if an employee chooses not to receive a COVID-19 vaccination due to pregnancy? *(Updated 10/13/21)*

**CDC recommends (https://emergency.cdc.gov/han/2021/han00453.asp)** COVID-19 vaccinations for everyone aged 12 years and older, including people who are pregnant, breastfeeding, trying to get pregnant now, or planning to become pregnant in the future.  Despite these recommendations, some pregnant employees may seek job adjustments or may request exemption from a COVID-19 vaccination requirement.

If an employee seeks an exemption from a vaccination requirement due to pregnancy, the employer must ensure that the employee is not being

discriminated against compared to other employees similar in their ability or inability to work.  This means that a pregnant employee may be entitled to job modifications, including telework, changes to work schedules or assignments, and leave to the extent such modifications are provided for other employees who are similar in their ability or inability to work.  Employers should ensure that supervisors, managers, and human resources personnel know how to handle such requests to avoid **disparate treatment in violation of Title VII**.

# GINA And COVID-19 Vaccinations

*Title II of GINA prohibits covered employers from using the genetic information of employees to make employment decisions.  It also restricts employers from requesting, requiring, purchasing, or disclosing genetic information of employees.  Under Title II of GINA, genetic information includes information about the manifestation of disease or disorder in a family member (which is referred to as "family medical history") and information from genetic tests of the individual employee or a family member, among other things.*

**K.14.  Is Title II of GINA implicated if an employer requires an employee to receive a COVID-19 vaccine administered by the employer or its agent?** *(Updated 5/28/21)*

No.  Requiring an employee to receive a COVID-19 vaccination administered by the employer or its agent would not implicate Title II of GINA unless the pre-vaccination medical screening questions include questions about the employee's genetic information, such as asking about the employee's family medical history.  As of May 27, 2021, the pre-vaccination medical screening questions for the first three COVID-19 vaccines to receive Emergency Use Authorization (EUA) from the FDA do not seek family medical history or any other type of genetic information.  See **CDC's Pre-vaccination Checklist (https://www.cdc.gov/vaccines/covid-19/downloads/pre-vaccination-screening-form.pdf)** (last visited May 27, 2021).  Therefore, an employer or its agent may ask these questions without violating Title II of GINA.

The act of administering a COVID-19 vaccine does not involve the use of the

employee's genetic information to make employment decisions or the acquisition or disclosure of genetic information and, therefore, does not implicate Title II of GINA.

**K.15.  Is Title II of GINA implicated when an employer requires employees to provide documentation or other confirmation that they received a vaccination from a health care provider *that is not affiliated with their employer* (such as from the employee's personal physician or other health care provider, a pharmacy, or a public health department)?** *(Updated 10/13/21)*

No.  An employer requiring an employee to show documentation or other confirmation of vaccination from a health care provider unaffiliated with the employer, such as the employee's personal physician or other health care provider, a pharmacy, or a public health department, is not using, acquiring, or disclosing genetic information and, therefore, is not implicating Title II of GINA.  This is the case even if the medical screening questions that must be asked before vaccination include questions about genetic information, because documentation or other confirmation of vaccination would not reveal genetic information.  Title II of GINA does not prohibit an employee's *own* health care provider from asking questions about genetic information.  This GINA Title II prohibition only applies to the employer or its agent.

# Employer Incentives For COVID-19 Voluntary Vaccinations Under ADA and GINA

*ADA:  Employer Incentives for Voluntary COVID-19 Vaccinations*

**K.16.  Does the ADA limit the value of the incentive employers may offer to employees for voluntarily receiving a COVID-19 vaccination from a health care provider *that is not affiliated with their employer* (such as the employee's personal physician or other health care provider, a pharmacy, or a public health department)?**  *(Updated 10/13/21)*

No.  The ADA does not limit the incentives an employer may offer to encourage

employees to voluntarily receive a COVID-19 vaccination, or to provide confirmation of vaccination, if the health care provider administering a COVID-19 vaccine *is not the employer or its agent*.  By contrast, if an employer offers an incentive to employees to voluntarily receive a vaccination *administered by the employer or its agent*, the ADA's rules on disability-related inquiries apply and the value of the incentive may not be so substantial as to be coercive.  See K.17.

As noted in K 4., the employer is required to keep vaccination information confidential under the ADA.

### K.17.  Under the ADA, are there limits on the value of the incentive employers may offer to employees for voluntarily receiving a COVID-19 vaccination *administered by the employer or its agent*?  *(Updated 10/13/21)*

Yes.  When the employer or its agent administers a COVID-19 vaccine, the value of the incentive (which includes both rewards and penalties) may not be so substantial as to be coercive.  Because vaccinations require employees to answer pre-vaccination disability-related screening questions, a very large incentive could make employees feel pressured to disclose protected medical information to their employers or their agents. As explained in K.16., however, this incentive limit does not apply if an employer offers an incentive to encourage employees to be voluntarily vaccinated by a health care provider that is not their employer or an agent of their employer.

*GINA:  Employer Incentives for Voluntary COVID-19 Vaccinations*

### K.18.  Does GINA limit the value of the incentive employers may offer employees if employees or their family members get a COVID-19 vaccination from a health care provider *that is not affiliated with the employer* (such as the employee's personal physician or other health care provider, a pharmacy, or a public health department)?  *(Updated 10/13/21)*

No.  GINA does not limit the incentives an employer may offer to employees to encourage them or their family members to get a COVID-19 vaccine or provide confirmation of vaccination if the health care provider administering the

vaccine is not the employer or its agent.  If an employer asks an employee to show documentation or other confirmation that the employee or a family member has been vaccinated, it is not an unlawful request for genetic information under GINA because the fact that someone received a vaccination is not information about the manifestation of a disease or disorder in a family member (known as "family medical history" under GINA), nor is it any other form of genetic information. GINA's restrictions on employers acquiring genetic information (including those prohibiting incentives in exchange for genetic information), therefore, do not apply.

### K.19.  Under GINA, may an employer offer an incentive to employees in exchange for the employee getting vaccinated by the employer or its agent? *(5/28/21)*

Yes.  Under GINA, as long as an employer does not acquire genetic information while administering the vaccines, employers may offer incentives to employees for getting vaccinated.  Because the pre-vaccination medical screening questions for the three COVID-19 vaccines now available do not inquire about genetic information, employers may offer incentives to their employees for getting vaccinated.  See **K.14** for more about GINA and pre-vaccination medical screening questions.

### K.20. Under GINA, may an employer offer an incentive to an employee in return for an employee's *family member* getting vaccinated by the employer or its agent? *(5/28/21)*

No.  Under GINA's Title II health and genetic services provision, an employer may not offer any incentives to an employee in exchange for a family member's receipt of a vaccination from an employer or its agent.   Providing such an incentive to an employee because a family member was vaccinated by the employer or its agent would require the vaccinator to ask the family member the pre-vaccination medical screening questions, which include medical questions about the family member.  Asking these medical questions would lead to the employer's receipt of genetic information in the form of family medical history *of the employee*.  The regulations implementing Title II of GINA

prohibit employers from providing incentives in exchange for genetic information. Therefore, the employer may not offer incentives in exchange for the family member getting vaccinated. However, employers may still offer an employee's family member the opportunity to be vaccinated by the employer or its agent, if they take certain steps to ensure GINA compliance.

**K.21. Under GINA, may an employer offer an employee's family member an opportunity to be vaccinated *without* offering the employee an incentive?** *(5/28/21)*

Yes. GINA permits an employer to offer vaccinations to an employee's family members if it takes certain steps to comply with GINA. Employers must not require employees to have their family members get vaccinated and must not penalize employees if their family members decide not to get vaccinated. Employers must also ensure that all medical information obtained from family members during the screening process is only used for the purpose of providing the vaccination, is kept confidential, and is not provided to any managers, supervisors, or others who make employment decisions for the employees. In addition, employers need to ensure that they obtain prior, knowing, voluntary, and written authorization from the family member before the family member is asked any questions about the family member's medical conditions. If these requirements are met, GINA permits the collection of genetic information.

# L. Vaccinations – Title VII Religious Objections to COVID-19 Vaccine Requirements

The EEOC enforces Title VII of the Civil Rights Act of 1964 (Title VII), which prohibits employment discrimination based on religion. This includes a right for job applicants and employees to request an exception, called a religious or reasonable accommodation, from an employer requirement that conflicts with

their sincerely held religious beliefs, practices, or observances.  If an employer shows that it cannot reasonably accommodate an employee's religious beliefs, practices, or observances without undue hardship on its operations, the employer is not required to grant the accommodation.  *See generally* **Section 12: Religious Discrimination (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_718485799934051610749830452)** ; EEOC **Guidelines on Discrimination Because of Religion (https://www.govinfo.gov/content/pkg/CFR-2016-title29-vol4/xml/CFR-2016-title29-vol4-part1605.xml)** .  Although other laws, such as the Religious Freedom Restoration Act, also may protect religious freedom in some circumstances, this technical assistance only describes employment rights and obligations under Title VII.

### L.1. Do employees who have a religious objection to receiving a COVID-19 vaccination need to tell their employer?  If so, is there specific language that must be used under Title VII? *(3/1/22)*

Employees must tell their employer if they are requesting an exception to a COVID-19 vaccination requirement because of a conflict between that requirement and their sincerely held religious beliefs, practices, or observances.  Under Title VII, this is called a request for a "religious accommodation" or a "reasonable accommodation."

When making the request, employees do not need to use any "magic words," such as "religious accommodation" or "Title VII."  However, they need to explain the conflict and the religious basis for it.

The same principles apply if employees have a religious conflict with getting a particular vaccine and wish to wait until an alternative version or specific brand of COVID-19 vaccine is available to them.  *See* Introduction to Section K, above.

As a best practice, an employer should provide employees and applicants with information about whom to contact and the proper procedures for requesting a religious accommodation.

*As an example, here is how* **EEOC designed its own form for its own workplace (https://www.eeoc.gov/sites/default/files/2021-10/EEOC%20Religious%20Accommodation%20Request%20Form%20-%20for%20web.pdf)** *.  Although the EEOC's internal forms typically are not made public, it is included here given the extraordinary circumstances facing employers and employees due to the COVID-19 pandemic.  (Note:  Individuals not employed by the EEOC should not submit this form to the EEOC to request a religious accommodation.)*

### L.2. Does an employer have to accept an employee's assertion of a religious objection to a COVID-19 vaccination at face value?  May the employer ask for additional information? *(3/1/22)*

Generally, under Title VII, an employer should proceed on the assumption that a request for religious accommodation is based on sincerely held religious beliefs, practices, or observances.  However, if an employer has an objective basis for questioning either the religious nature or the sincerity of a particular belief, the employer would be justified in making a limited factual inquiry and seeking additional supporting information.  An employee who fails to cooperate with an employer's reasonable requests for verification of the sincerity or religious nature of a professed belief, practice, or observance risks losing any subsequent claim that the employer improperly denied an accommodation.  *See generally* **Section 12-IV.A.2: Religious Discrimination (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_790763467358216107498601135)** *.*

The **definition of "religion" (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_959368259682161074864706)** under Title VII protects both traditional and nontraditional religious beliefs, practices, or observances, including those that may be unfamiliar to employers.  While the employer should not assume that a request is invalid simply because it is based on unfamiliar religious beliefs, practices, or observances, employees may be asked to explain the religious nature of their belief, practice, or observance and should not assume that the employer already knows or understands it.

Title VII does not protect social, political, or economic views or personal preferences.  Thus, objections to a COVID-19 vaccination requirement that are purely based on social, political, or economic views or personal preferences, or any other nonreligious concerns (including about the possible effects of the vaccine), do not qualify as religious beliefs, practices, or observances under Title VII.  However, overlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system and is not simply an isolated teaching.  *See generally* **Section 12-I.A.1: Religious Discrimination (definition of religion) (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_ftnref18)** ; *see also* discussion of "sincerity" below.

The **sincerity (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_9546543277761610748655186)** of an employee's stated religious beliefs, practices, or observances is usually not in dispute.  The employee's sincerity in holding a religious belief is "largely a matter of individual credibility."  **Section 12-I.A.2: Religious Discrimination (credibility and sincerity) (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#_ftnref42)** .  Factors that—either alone or in combination— might undermine an employee's credibility include:  whether the employee has acted in a manner inconsistent with the professed belief (although employees need not be scrupulous in their observance); whether the accommodation sought is a particularly desirable benefit that is likely to be sought for nonreligious reasons; whether the timing of the request renders it suspect (for example, it follows an earlier request by the employee for the same benefit for secular reasons); and whether the employer otherwise has reason to believe the accommodation is not sought for religious reasons.

The employer **may ask for an explanation (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_79076346735821610749860135)** of how the employee's religious beliefs, practices, or observances conflict with the employer's COVID-19 vaccination requirement.  Although prior inconsistent conduct is relevant to the question of sincerity, an individual's beliefs—or degree of adherence—may

change over time and, therefore, an employee's newly adopted or inconsistently observed practices may nevertheless be sincerely held.  An employer should not assume that an employee is insincere simply because some of the employee's practices deviate from the commonly followed tenets of the employee's religion, or because the employee adheres to some common practices but not others.  No one factor or consideration is determinative, and employers should evaluate religious objections on an individual basis.

If an employee's objection to a COVID-19 vaccination requirement is not religious in nature, or is not sincerely held, Title VII does not require the employer to provide an exception to the vaccination requirement as a religious accommodation.

### L.3. How does an employer show that it would be an "undue hardship" to accommodate an employee's request for religious accommodation? *(3/1/22)*

Under Title VII, an employer should thoroughly consider all possible reasonable accommodations, including telework and reassignment.  For suggestions about types of reasonable accommodations for unvaccinated employees, *see* K.2, K.6, and K.12, above.  In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances without imposing an undue hardship.

If an employer demonstrates that it is unable to reasonably accommodate an employee's religious belief, practice, or observance without an "undue hardship" on its operations, then Title VII does not require the employer to provide the accommodation.  42 U.S.C. § 2000e(j).  The Supreme Court has held that requiring an employer to bear more than a "de minimis," or a minimal, cost to accommodate an employee's religious belief is an undue hardship. Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business—including, in this instance, the risk of the spread of COVID-19 to other employees or to the public.

Courts have found Title VII undue hardship where, for example, the religious accommodation would violate federal law, impair workplace safety, diminish efficiency in other jobs, or cause coworkers to carry the accommodated employee's share of potentially hazardous or burdensome work.  For a more detailed discussion, *see* **Section 12-IV.B: Religious Discrimination (discussing undue hardship) (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_12929403436951610749878556)** ..

An employer will need to assess undue hardship by considering the particular facts of each situation and will need to demonstrate how much cost or disruption the employee's proposed accommodation would involve.  An employer cannot rely on speculative or hypothetical hardship when faced with an employee's religious objection but, rather, should rely on objective information.  Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals).  Another relevant consideration is the number of employees who are seeking a similar accommodation, i.e., the cumulative cost or burden on the employer.  *See* K.12 for additional considerations relevant to the undue hardship analysis.

**L.4. If an employer grants some employees a religious accommodation from a COVID-19 vaccination requirement because of sincerely held religious beliefs, practices, or observances, does it have to grant all such requests?** *(3/1/22)*

No.  The determination of whether a particular proposed accommodation imposes an undue hardship on the conduct of the employer's business depends on its specific factual context.  When an employer is assessing whether exempting employees from getting a vaccination would impair workplace safety, it may consider, for example, the type of workplace, the nature of the employees' duties, the location in which the employees must or

can perform their duties, the number of employees who are fully vaccinated, how many employees and nonemployees physically enter the workplace, and the number of employees who will in fact need a particular accommodation. A mere assumption that many more employees might seek a religious accommodation—or the same accommodation—to the vaccination requirement in the future is not evidence of undue hardship, but the employer may consider the cumulative cost or burden of granting accommodations to other employees.

**L.5. Must an employer provide the religious accommodation preferred by an employee if there are other possible accommodations that also are effective in eliminating the religious conflict and do not cause an undue hardship under Title VII?** *(3/1/22)*

If there is more than one reasonable accommodation that would resolve the conflict between the vaccination requirement and the sincerely held religious belief, practice, or observance without causing an undue hardship under Title VII, the employer may choose which accommodation to offer. If more than one accommodation would be effective in eliminating the religious conflict, the employer should consider the employee's preference but is not obligated to provide the reasonable accommodation preferred by the employee. However, an employer's proposed accommodation will not be "reasonable" if the accommodation requires the employee to accept a reduction in pay or some other loss of a benefit or privilege of employment (for example, if unpaid leave is the employer's proposed accommodation) and there is a reasonable alternative accommodation that does not require that and would not impose undue hardship on the employer's business. *See* **Section 12-IV.A.3: Religious Discrimination (reasonable accommodation) (https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_25500674536391610749867844)**. If the employer denies the employee's proposed accommodation, the employer should explain to the employee why the preferred accommodation is not being granted.

An employer should consider all possible alternatives to determine whether exempting an employee from a vaccination requirement would impose an

undue hardship.  *See, e.g.*, K.2.  Employers may rely on **CDC recommendations (https://www.cdc.gov/coronavirus/2019-ncov/)** when deciding whether an effective accommodation is available that would not pose an undue hardship.

### L.6. If an employer grants a religious accommodation to an employee, can the employer later reconsider it? *(3/1/22)*

The obligation to provide religious accommodations absent undue hardship is a continuing obligation that allows for changing circumstances.  Employees' sincerely held religious beliefs, practices, or observances may evolve or change over time and may result in requests for additional or different religious accommodations.  Similarly, an employer has the right to discontinue a previously granted accommodation if it is no longer utilized for religious purposes, or if a provided accommodation subsequently poses an undue hardship on the employer's operations due to changed circumstances.  Employers must consider whether there are alternative accommodations that would not impose an undue hardship.  As a best practice, an employer should discuss with the employee any concerns it has about continuing a religious accommodation before revoking it.

# M. Retaliation and Interference

*The **anti-retaliation protections (https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-retaliation-and-related-issues)** discussed here only apply to the exercise of rights under the federal equal employment opportunity (EEO) laws. Information about similar protections under other federal workplace laws, such as the **Family and Medical Leave Act (https://www.dol.gov/agencies/whd/fmla)** or the **Occupational Safety and Health Act (https://www.osha.gov/workers)** , is available from the U.S. Department of Labor. Information about similar protections under the Immigration and Nationality Act's anti-discrimination provision, which prohibits some types of workplace discrimination based on citizenship status, immigration*

status, or national origin, and **_protects against retaliation for asserting those_**
**_rights (http://www.justice.gov/crt/types-discrimination)_** , is available from
the Civil Rights Division of the U.S. Department of Justice.

### M.1.  Do job applicants and employees (including former employees) have protections from retaliation for exercising equal employment opportunity (EEO) rights in connection with COVID-19? *(11/17/21)*

Yes.  Job applicants and current and former employees are protected from
retaliation by employers for asserting their rights under any of the federal **EEO**
**laws (https://www.eeoc.gov/statutes/laws-enforced-eeoc)** .  The EEO laws
prohibit workplace discrimination based on race, color, sex (including
pregnancy, sexual orientation, and gender identity), national origin, religion,
age (40 or over), disability, or genetic information.  Speaking out about or
exercising rights related to workplace discrimination is called "protected
activity."

Protected activity can take many forms.  For example, an employee
complaining to a supervisor about coworker harassment based on race or
national origin is protected activity.  Witnesses to discrimination who seek to
assist individuals affected by discrimination are also protected.  Engaging in
protected activity, however, does not shield an employee from discipline,
discharge, or other employer actions taken for reasons unrelated to the
protected activity.

### M.2. What are some examples of employee activities that are protected from employer retaliation? *(11/17/21)*

- **Filing a charge, complaint, or lawsuit, regardless of whether the**
  **underlying discrimination allegation is successful or timely**. For
  example, employers may not retaliate against employees who file charges
  with the EEOC alleging that their supervisor unlawfully disclosed
  confidential medical information (such as a COVID-19 diagnosis), even if the
  EEOC later decides there is no merit to the underlying charges.  Moreover, a
  supervisor may not give a false negative job reference to punish a former

employee for making an EEO complaint, or refuse to hire an applicant because of the applicant's EEO complaint against a prior employer.

- **Reporting alleged EEO violations to a supervisor or answering questions during an employer investigation of the alleged harassment**. For example, an Asian American employee who tells a manager or human resources official that a coworker made abusive comments accusing Asian people of spreading COVID-19 is protected from retaliation for reporting the harassment. Workplace discrimination laws also prohibit retaliation against employees for reporting harassing workplace comments about their religious reasons for not being vaccinated. Similarly, workplace discrimination laws prohibit retaliation against an employee for reporting sexually harassing comments made during a work video conference meeting.

- **Resisting harassment, intervening to protect coworkers from harassment, or refusing to follow orders that would result in discrimination**. For example, workplace discrimination laws protect a supervisor who refuses to carry out management's instruction not to hire certain applicants based on the sex-based presumption that they might use parental leave or have childcare needs, or to steer them to particular types of jobs.

- **Requesting accommodation of a disability (potentially including a pregnancy-related medical condition) or a religious belief, practice, or observance regardless of whether the request is granted or denied**. For example, the EEO laws prohibit an employer from retaliating against an employee for requesting continued telework as a disability accommodation after a workplace reopens.  Similarly, requesting religious accommodation, such as modified protective gear that can be worn with religious garb, is protected activity.  Requests for accommodation are protected activity even if the individual is not legally entitled to accommodation, such as where the employee's medical condition is not ultimately deemed a disability under the ADA, or where accommodation would pose an undue hardship.

### M.3. Who is protected from retaliation? *(11/17/21)*

Retaliation protections apply to current employees, whether they are full-time, part-time, probationary, seasonal, or temporary. Retaliation protections also apply to job applicants and to former employees (such as when an employer provides a job reference). In addition, these protections apply regardless of an applicant's or employee's citizenship or work authorization status.

## M.4. When do retaliation protections apply? *(11/17/21)*

Participating in an EEO complaint process is protected from retaliation under all circumstances.

Other acts by a current, prospective, or former employee to oppose discrimination are protected as long as the employee is acting on a reasonable good faith belief that something in the workplace may violate **EEO laws (https://www.eeoc.gov/statutes/laws-enforced-eeoc)** , and expresses those beliefs in a reasonable manner.  An employee is still protected from retaliation for making a complaint about workplace discrimination even if the employee does not use legal terminology to describe the situation.

## M.5. When is an employer action based on an employee's EEO activity serious enough to be unlawful retaliation? *(11/17/21)*

Retaliation includes any employer action in response to EEO activity that could deter a reasonable person from engaging in protected EEO activity.  Depending on the facts, this might include actions such as denial of promotion or job benefits, non-hire, suspension, discharge, work-related threats, warnings, negative or lowered evaluations, or transfers to less desirable work or work locations.  Retaliation could also include an action that has no tangible effect on employment, or even an action that takes place only outside of work, if it might deter a reasonable person from exercising EEO rights.  The fact that an individual is not actually deterred from opposing discrimination or participating in an EEO complaint-related process or activity does not preclude an employer's action from being considered retaliatory.

However, depending on the specific situation, retaliation likely would not include a petty slight, minor annoyance, or a trivial punishment.

### M.6.  Does this mean that an employer can never take action against someone who has engaged in EEO activity? *(11/17/21)*

No.  Engaging in protected EEO activity does not prevent discipline of an employee for legitimate reasons.  Employers are permitted to act based on *non-retaliatory and non-discriminatory* reasons that would otherwise result in discipline.  For example, if an employee performs poorly, has low productivity, or engages in misconduct, an employer may respond as it normally would, even if the employee has engaged in protected activity.  Similarly, an employer may take non-retaliatory, non-discriminatory action to enforce COVID-19 health and safety protocols, even if such actions follow EEO activity (e.g., an accommodation request).

### M.7.  Does the law provide any additional protections to safeguard ADA rights? *(11/17/21)*

Yes.  The ADA prohibits not only retaliation for protected EEO activity, but also "interference" with an individual's exercise of ADA rights.  Under the ADA, employers may not coerce, intimidate, threaten, or otherwise interfere with the exercise of ADA rights by job applicants or current or former employees.  For instance, it is unlawful for an employer to use threats to discourage someone from asking for a reasonable accommodation.  It is also unlawful for an employer to pressure an employee not to file a disability discrimination complaint.  The ADA also prohibits employers from interfering with employees helping others to exercise their ADA rights.

The employer's actions may still violate the ADA's interference provision even if an employer does not actually carry out a threat, and even if the employee is not deterred from exercising ADA rights.

# N. COVID-19 and the Definition of "Disability" Under the ADA/Rehabilitation Act

*Employees and employers alike have asked when COVID-19 is a "disability" under Title I of the ADA, which includes reasonable accommodation and nondiscrimination requirements in the employment context. These questions and answers clarify circumstances in which COVID-19 may or may not cause effects sufficient to meet the definition of "actual" or "record of" a disability for various purposes under Title I, as well as section 501 of the Rehabilitation Act, both of which are enforced by the EEOC. Other topics covered in this section include disabilities arising from conditions that were caused or worsened by COVID-19. This section also addresses the ADA's "regarded as" definition of disability with respect to COVID-19.*

*On July 26, 2021, the Department of Justice (DOJ) and the Department of Health and Human Services (HHS) issued **"Guidance on 'Long COVID' as a Disability Under the ADA, Section 504, and Section 1557" (https://www.ada.gov/long_covid_joint_guidance.pdf)** (DOJ/HHS Guidance). **The CDC uses the terms "long COVID (https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects/)** ," "post-COVID," "long-haul COVID," "post-acute COVID-19," "long-term effects of COVID," or "chronic COVID" to describe various post-COVID conditions, where individuals experience new, returning, or ongoing health problems four or more weeks after being infected with the virus that causes COVID-19. The DOJ/HHS Guidance focuses solely on long COVID in the context of Titles II and III of the ADA, Section 504 of the Rehabilitation Act of 1973, and Section 1557 of the Patient Protection and Affordable Care Act. These EEOC questions and answers focus more broadly on COVID-19 and do so in the context of Title I of the ADA and section 501 of the Rehabilitation Act, which cover employment. This discussion does not pertain to other contexts, such as eligibility determinations for federal benefit programs.*

### N.1. How does the ADA define disability, and how does the definition apply to COVID-19? *(12/14/21)*

The ADA's three-part definition of disability applies to COVID-19 in the same way it applies to any other medical condition. A person can be an individual with a "disability" for purposes of the ADA in one of three ways:

- <u>"Actual" Disability:</u> The person has a physical or mental impairment that substantially limits a major life activity (such as walking, talking, seeing, hearing, or learning, or operation of a major bodily function);

- <u>"Record of" a Disability:</u> The person has a history or "record of" an actual disability (such as cancer that is in remission); or

- <u>"Regarded as" an Individual with a Disability:</u> The person is subject to an adverse action because of an individual's impairment or an impairment the employer believes the individual has, whether or not the impairment limits or is perceived to limit a major life activity, unless the impairment is objectively both transitory (lasting or expected to last six months or less) and minor.

The definition of disability is construed broadly in favor of expansive coverage, to the maximum extent permitted by the law. Nonetheless, not every impairment will constitute a disability under the ADA. The ADA uses a case-by-case approach to determine if an applicant or employee meets any one of the three above definitions of "disability."

### COVID-19 and the ADA

***"Actual" Disability***

### N.2. When is COVID-19 an actual disability under the ADA? *(12/14/21)*

Applying the ADA rules stated in **N.1.** and depending on the specific facts involved in an individual employee's condition, a person with COVID-19 has an actual disability if the person's medical condition or any of its symptoms is a "physical or mental" impairment that "substantially limits one or more major life activities." An individualized assessment is necessary to determine whether the effects of a person's COVID-19 substantially limit a major life activity. This will always be a case-by-case determination that applies existing legal standards to the facts of a particular individual's circumstances. A person infected with the virus causing COVID-19 who is asymptomatic or a person whose COVID-19 results in mild symptoms similar to those of the common cold

or flu that resolve in a matter of weeks—with no other consequences—will not have an actual disability within the meaning of the ADA. However, depending on the specific facts involved in a particular employee's medical condition, an individual with COVID-19 might have an actual disability, as illustrated below.

Physical or Mental Impairment: Under the ADA, a physical impairment includes any physiological disorder or condition affecting one or more body systems. A mental impairment includes any mental or psychological disorder. COVID-19 is a physiological condition affecting one or more body systems. As a result, it is a "physical or mental impairment" under the ADA.

Major Life Activities: "Major life activities" include both major bodily functions, such as respiratory, lung, or heart function, and major activities in which someone engages, such as walking or concentrating. COVID-19 may affect major bodily functions, such as functions of the immune system, special sense organs (such as for smell and taste), digestive, neurological, brain, respiratory, circulatory, or cardiovascular functions, or the operation of an individual organ. In some instances, COVID-19 also may affect other major life activities, such as caring for oneself, eating, walking, breathing, concentrating, thinking, or interacting with others. An impairment need only substantially limit one major bodily function or other major life activity to be substantially limiting. However, limitations in more than one major life activity may combine to meet the standard.

Substantially Limiting: "Substantially limits" is construed broadly and should not demand extensive analysis. COVID-19 need not prevent, or significantly or severely restrict, a person from performing a major life activity to be considered substantially limiting under Title I of the ADA.

The limitations from COVID-19 do not necessarily have to last any particular length of time to be substantially limiting. They also need not be long-term. For example, in discussing a hypothetical physical impairment resulting in a 20-pound lifting restriction that lasts or is expected to last several months, the EEOC has said that such an impairment is substantially limiting. App. to 29 C.F.R. § 1630.2(j)(1)(ix). By contrast, "[i]mpairments that last only for a short

period of time are typically not covered, although they may be covered if sufficiently severe." Id.

Mitigating Measures: Whether COVID-19 substantially limits a major life activity is determined based on how limited the individual would have been without the benefit of any mitigating measures–i.e., any medical treatment received or other step used to lessen or prevent symptoms or other negative effects of an impairment. At the same time, in determining whether COVID-19 substantially limits a major life activity, any negative side effects of a mitigating measure are taken into account.

Some examples of mitigating measures for COVID-19 include medication or medical devices or treatments, such as antiviral drugs, supplemental oxygen, inhaled steroids and other asthma-related medicines, breathing exercises and respiratory therapy, physical or occupational therapy, or other steps to address complications of COVID-19.

Episodic Conditions: Even if the symptoms related to COVID-19 come and go, COVID-19 is an actual disability if it substantially limits a major life activity when active.

### N.3. Is COVID-19 always an actual disability under the ADA? *(12/14/21)*

No. Determining whether a specific employee's COVID-19 is an actual disability always requires an individualized assessment, and such assessments cannot be made categorically. See **29 C.F.R. § 1630.2 (https://www.law.cornell.edu/cfr/text/29/1630.2)** for further information on the ADA's requirements relating to individualized assessment.

### N.4. What are some examples of ways in which an individual with COVID-19 might or might not be substantially limited in a major life activity? *(12/14/21)*

As noted above, while COVID-19 may substantially limit a major life activity in some circumstances, someone infected with the virus causing COVID-19 who is asymptomatic or a person whose COVID-19 results in mild symptoms similar to

the common cold or flu that resolve in a matter of weeks—with no other consequences—will not be substantially limited in a major life activity for purposes of the ADA. Based on an individualized assessment in each instance, examples of fact patterns include:

*Examples of Individuals with an Impairment that Substantially Limits a Major Life Activity:*

- An individual diagnosed with COVID-19 who experiences ongoing but intermittent multiple-day headaches, dizziness, brain fog, and difficulty remembering or concentrating, which the employee's doctor attributes to the virus, is substantially limited in neurological and brain function, concentrating, and/or thinking, among other major life activities.

- An individual diagnosed with COVID-19 who initially receives supplemental oxygen for breathing difficulties and has shortness of breath, associated fatigue, and other virus-related effects that last, or are expected to last, for several months, is substantially limited in respiratory function, and possibly major life activities involving exertion, such as walking.

- An individual who has been diagnosed with COVID-19 experiences heart palpitations, chest pain, shortness of breath, and related effects due to the virus that last, or are expected to last, for several months. The individual is substantially limited in cardiovascular function and circulatory function, among others.

- An individual diagnosed with "**long COVID (https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects/index.html? CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Flong-term-effects.html)** ," who experiences COVID-19-related intestinal pain, vomiting, and nausea that linger for many months, even if intermittently, is substantially limited in gastrointestinal function, among other major life activities, and therefore has an actual disability under the ADA. For other examples of when "long COVID" can be a substantially limiting impairment, see the DOJ/HHS **Guidance**

**(https://www.ada.gov/long_covid_joint_guidance.pdf)** .

*Examples of Individuals with an Impairment that Does Not Substantially Limit a Major Life Activity:*

- An individual who is diagnosed with COVID-19 who experiences congestion, sore throat, fever, headaches, and/or gastrointestinal discomfort, which resolve within several weeks, but experiences no further symptoms or effects, is not substantially limited in a major bodily function or other major life activity, and therefore does not have an actual disability under the ADA. This is so even though this person is subject to CDC guidance for isolation during the period of infectiousness.

- An individual who is infected with the virus causing COVID-19 but is asymptomatic—that is, does not experience any symptoms or effects—is not substantially limited in a major bodily function or other major life activity, and therefore does not have an actual disability under the ADA. This is the case even though this person is still subject to CDC guidance for isolation during the period of infectiousness.

As noted above, even if the symptoms of COVID-19 occur intermittently, they will be deemed to substantially limit a major life activity if they are substantially limiting when active, based on an individualized assessment.

### *"Record of" Disability*

### N.5. Can a person who has or had COVID-19 be an individual with a "record of" a disability? *(12/14/21)*

Yes, depending on the facts. A person who has or had COVID-19 can be an individual with a "record of" a disability if the person has "a history of, or has been misclassified as having," **29 C.F.R. § 1630.2(k)(2) (https://www.law.cornell.edu/cfr/text/29/1630.2)** , an impairment that substantially limits one or more major life activities, based on an individualized assessment.

### *"Regarded As" Disability*

### N.6. Can a person be "regarded as" an individual with a disability if the person has COVID-19 or the person's employer mistakenly believes the person has COVID-19? *(12/14/21)*

Yes, depending on the facts. A person is "regarded as" an individual with a disability if the person is subjected to an adverse action (e.g., being fired, not hired, or harassed) because the person has an impairment, such as COVID-19, or the employer mistakenly believes the person has such an impairment, unless the actual or perceived impairment is objectively both transitory (lasting or expected to last six months or less) and minor. For this definition of disability, whether the actual or perceived impairment substantially limits or is perceived to substantially limit a major life activity is irrelevant.

### N.7. What are some examples of an employer regarding a person with COVID-19 as an individual with a disability? *(12/14/21)*

The situations in which an employer might "regard" an applicant or employee with COVID-19 as an individual with a disability are varied. Some examples include:

- An employer would regard an employee as having a disability if the employer fires the individual because the employee had symptoms of COVID-19, which, although minor, lasted or were expected to last more than six months. The employer could not show that the impairment was both transitory and minor.

- An employer would regard an employee as having a disability if the employer fires the individual for having COVID-19, and the COVID-19, although lasting or expected to last less than six months, caused non-minor symptoms. In these circumstances, the employer could not show that the impairment was both transitory and minor.

### N.8. If an employer regards a person as having a disability, for example by taking an adverse action because the person has COVID-19 that is not both transitory and minor, does that automatically mean the employer has discriminated for purposes of the ADA? *(12/14/21)*

No. It is possible that an employer may not have engaged in unlawful discrimination under the ADA even if the employer took an adverse action based on an impairment. For example, an individual still needs to be qualified for the job held or desired. Additionally, in some instances, an employer may have a defense to an action taken on the basis of the impairment. For example, the ADA's "direct threat" defense could permit an employer to require an employee with COVID-19 or its symptoms to refrain from physically entering the workplace during the CDC-recommended period of isolation, due to the significant risk of substantial harm to the health of others. See **WYSK Question A.8**. Of course, an employer risks violating the ADA if it relies on myths, fears, or stereotypes about a condition to disallow the employee's return to work once the employee is no longer infectious and, therefore, medically able to return without posing a direct threat to others.

*Other Conditions Caused or Worsened by COVID-19 and the ADA*

### N.9. Can a condition caused or worsened by COVID-19 be a disability under the ADA? *(12/14/21)*

Yes. In some cases, regardless of whether an individual's initial case of COVID-19 itself constitutes an actual disability, an individual's COVID-19 may end up causing impairments that are themselves disabilities under the ADA. For example:

- An individual who had COVID-19 develops heart inflammation. This inflammation itself may be an impairment that substantially limits a major bodily function, such as the circulatory function, or other major life activity, such as lifting.

- During the course of COVID-19, an individual suffers an acute ischemic stroke. Due to the stroke, the individual may be substantially limited in neurological and brain (or cerebrovascular) function.

- After an individual's COVID-19 resolves, the individual develops diabetes attributed to the COVID-19. This individual should easily be found to be substantially limited in the major life activity of endocrine function. See

**Diabetes in the Workplace and the ADA
(https://www.eeoc.gov/laws/guidance/diabetes-workplace-and-ada)**
for more information.

In some cases, an individual's COVID-19 may also worsen the individual's pre-
existing condition that was not previously substantially limiting, making that
impairment now substantially limiting. For example:

- An individual initially has a heart condition that is not substantially limiting.
  The individual is infected with COVID-19. The COVID-19 worsens the
  person's heart condition so that the condition now substantially limits the
  person's circulatory function.

### *Definition of Disability and Requests for Reasonable Accommodation*

**N.10. Does an individual have to establish coverage under a particular
definition of disability to be eligible for a reasonable accommodation?**
*(12/14/21)*

Yes. Individuals must meet either the "actual" or "record of" definitions of
disability to be eligible for a reasonable accommodation. Individuals who only
meet the "regarded as" definition are not entitled to receive reasonable
accommodation.

Of course, coverage under the "actual" or "record of" definitions does not,
alone, entitle a person to a reasonable accommodation. Individuals are not
entitled to an accommodation unless their disability requires it, and an
employer is not obligated to provide an accommodation that would pose an
undue hardship. See **WYSK Section D**, and **Enforcement Guidance on
Reasonable Accommodation and Undue Hardship under the ADA
(https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-
accommodation-and-undue-hardship-under-ada)** for more information.

**N.11. When an employee requests a reasonable accommodation related to
COVID-19 under the ADA, may the employer request supporting medical
documentation before granting the request?** *(12/14/21)*

Yes. As with employment accommodation requests under the ADA for any other potential disability, when the disability or need for accommodation is not obvious or already known, an employer may ask the employee to provide reasonable documentation about disability and/or need for reasonable accommodation. Often, the only information needed will be the individual's diagnosis and any restrictions or limitations. The employer also may ask about whether alternative accommodations would be effective in meeting the disability-related needs of the individual. See WYSK Questions D.5. and D.6. for more information.

The employer may either ask the employee to obtain the requested information or request that the employee sign a limited release allowing the employer to contact the employee's health care provider directly. If the employee does not cooperate in providing the requested reasonable supporting medical information, the employer can lawfully deny the accommodation request.

### N.12. May an employer voluntarily provide accommodations requested by an applicant or employee due to COVID-19, even if not required to do so under the ADA? *(12/14/21)*

Yes. Employers may choose to provide accommodations beyond what the ADA mandates. Of course, employers must provide a reasonable accommodation under the ADA, absent undue hardship, if the applicant or employee meets the definition of disability, requires an accommodation for the disability, and is qualified for the job with the accommodation. Accommodations might consist of schedule changes, physical modifications to the workplace, telework, or special or modified equipment. See, e.g., **WYSK Section D** or U.S. Department of Labor Blog, **Workers with Long COVID-19: You May Be Entitled to Workplace Accommodations (https://blog.dol.gov/2021/07/06/workers-with-long-covid-19-may-be-entitled-to-accommodations)** for more information.

### *Applicability of Definition of Disability*

### N.13. If an employer subjected an applicant or employee to an adverse action, and the applicant or employee is covered under any one of the three ADA definitions of disability, does that mean the employer violated the ADA? *(12/14/21)*

No. Having a disability, alone, does not mean an individual was subjected to an unlawful employment action under the ADA.

For example, the fact that an applicant or employee has a current disability, or a record of disability, does not mean that an employer violated the ADA by not providing an individual with a reasonable accommodation. As discussed in **Section D**., there are several considerations in making reasonable accommodation determinations, including the employee's need for the accommodation due to a disability and whether there is an accommodation that does not pose an undue hardship to the employer.

Similarly, the fact that an employer regarded an applicant or employee as an individual with a disability does not necessarily mean that the employer engaged in unlawful discrimination. For example, the ADA does not require an employer to hire anyone who is not qualified for the job. Moreover, in some instances, an employer may have a defense to an employment action taken based on an actual impairment, such as where the individual poses a **direct threat (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws)** to the health or safety of themselves or others in the workplace.

### N.14. Do any ADA protections apply to applicants or employees who do not meet an ADA definition of disability? *(12/14/21)*

Yes. The ADA's requirements about disability-related inquiries and medical exams, **medical confidentiality**, **retaliation, and interference** apply to all applicants and employees, regardless of whether they have an ADA disability. By contrast, an individual must have a "disability" to challenge employment decisions based on disability, denial of reasonable accommodation (see **N.10**), or disability-based harassment.

# Table of Contents

**Introduction**

**A. Disability-Related Inquiries and Medical Exams**

**B. Confidentiality of Medical Information**

**C. Hiring and Onboarding**

**D. Reasonable Accommodation**

**E. Pandemic-Related Harassment Due to National Origin, Race, or Other Protected Characteristics**

**F. Furloughs and Layoffs**

**G. Return to Work**

**H. Age**

**I. Caregivers/Family Responsibilities**

**J. Pregnancy**

**K. Vaccinations – Overview, ADA, Title VII, and GINA**

**L. Vaccinations – Title VII and Religious Objections to COVID-19 Vaccine Mandates**

**M. Retaliation and Interference**

**N. COVID-19 and the Definition of "Disability" Under the ADA/Rehabilitation Act (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#N)**