## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

DANNY JACKSON and )
ANNETTE JACKSON, )
)
    Plaintiff, )
)
v. )      No. 11-2093-STA
)
LONGISTICS TRANSPORTATION, INC, )
)
    Defendant. )

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Longistics Transportation, Inc.'s Motion for Summary Judgment (D.E. # 26, 27) filed on January 27, 2012. Plaintiffs Danny Jackson and Annette Jackson have filed a response in opposition, and Defendant has filed a reply brief. For the reasons set forth below, Defendant's Motion is **DENIED**.

## BACKGROUND

The following facts are not in dispute for purposes of this Motion unless otherwise noted. Defendant Longistics Transportation, Inc. is a trucking company headquartered in Raleigh, North Carolina, with one other location in Memphis, Tennessee. (Def.'s Statement of Undisputed Facts ¶ 1.) Defendant has approximately 135 to 140 employees. (*Id.*) The only two shareholders of the company are Duane and Pat Long. (*Id.*)

Plaintiffs Danny Jackson and Annette Jackson, who are married, worked as team drivers for Defendant from 2004 to 2007 and returned to the company in July 2008. (*Id.* ¶ 2.) According to

1

Annette Jackson, she joined a church known as Hungry Hearts in January 2007 and her husband joined in October or November 2007. (*Id.* ¶ 6.)[1] Plaintiffs' church is a Christian congregation that adheres to the Jewish Torah, meaning members observe the Sabbath day and Jewish feast days. (Pls.' Statement of Add'l Facts ¶ 1.) By the fall of 2007, Plaintiffs had decided to follow their church's Sabbath mandate, which required Plaintiffs to refrain from work from sundown on Friday to sundown on Saturday. (Def.'s Statement of Undisputed Facts ¶ 7.)[2]

Accordingly, when Plaintiffs returned to work for Defendant, they attended employee

---

[1] Hungry Hearts Church has locations in Jackson, Tennessee, and Corinth, Mississippi. (Def.'s Statement of Undisputed Facts ¶ 5.) Defendant points out that Plaintiffs' separate deposition testimony differed on when Danny Jackson actually joined the church as well as over whether the church is properly considered a Jewish religious institution. However, these facts are not relevant to the issues presented in the Motion for Summary Judgment, largely because Defendant does not contest the sincerity of Plaintiffs' religious beliefs.

[2] Defendant has asserted a number of other facts related to Plaintiffs' beliefs about refraining from work on the Sabbath. For example, Defendant cites Annette Jackson's testimony that Hungry Hearts does not restrict its members' Sabbath activities and that the church does not "have Sabbath police telling us what we can or can't do." (Def.'s Statement of Undisputed Facts ¶ 8.) Defendant also cites Danny Jackson's testimony that while it is permissible for him to drive his own car on the Sabbath, he cannot operate his 18-wheeler. (*Id.* ¶ 9.) Similarly, Defendant cites Danny Jackson's testimony that while employed by Defendant, he and his wife on occasion did not return to Defendant's terminal until after sundown on Friday. (*Id.* ¶ 20.) For their part, Plaintiffs' pastor submitted letters to Defendant explaining the church's Sabbath observances in 2008 and again in 2010. (Pls.' Statement of Add'l Facts ¶ 11.)

The Court finds that these asserted facts are largely not relevant to the legal issue presented in Defendant's Motion for Summary Judgment. Defendant concedes for purposes of its Motion "the sincerity of Plaintiffs' religious belief that they cannot work on their Sabbath or that their conviction not to work from sundown on Friday to sundown on Saturday conflicts with Longistics' unpaid-leave policy when they are scheduled to work on those days." Def.'s Mem. in Support 7. The only legal question raised in Defendant's Rule 56 Motion is whether Plaintiffs were disciplined or discharged for failing to comply with a requirement that conflicted with their sincerely held religious beliefs. *Id.* at 8. Because Defendant does not actually challenge the sincerity of Plaintiffs' beliefs about refraining from work on the Sabbath, evidence about what Plaintiffs' beliefs will or will not permit is not relevant. Therefore, the Court declines to consider this evidence here.

orientation on July 14, 2008, and mentioned their Sabbath practices to the orientation leader, specifically stating that they observed the Sabbath on Saturdays. (*Id.* ¶ 12.) Plaintiffs requested only that they be off from sundown Friday through sundown Saturday. (Pls.' Statement of Add'l Facts ¶ 2.) Plaintiffs were willing to and offered to take runs the rest of the weekend, even coming in at sundown Saturday or on Sundays and traditional Christian holidays such as Christmas and Easter. (*Id.*) In response, the orientation leader explained Defendant's scheduling procedure and stated that most loads went out on Sundays. (Def.'s Statement of Undisputed Facts ¶ 13.)[3]

Under its company policy, Defendant considers it insubordination for a team to refuse a dispatch to carry a load. (*Id.* ¶ 23.) If a team refuses a load, "[a] final written warning will be issued." (*Id.*) The policy further states that two refusals within a twelve (12) month period will result in termination of employment. (*Id.*) Approximately two weeks after orientation, Plaintiffs refused to take a load that was assigned to them. (*Id.* ¶ 24.) When Plaintiffs refused the load, Defendant's human resources director Randall Bain ("Bain") explained to Plaintiffs that they needed to fill out time-off requests in order to take off for their Sabbath. (*Id.* ¶ 25, 44.) Otherwise, Plaintiffs' religious beliefs did not conflict with their employment in 2008 and 2009, because they filled out time-off requests for every date that they needed to have off. (*Id.* ¶ 43.)

---

[3] Defendant has cited additional evidence that Annette Jackson believed that the orientation leaders's response amounted to a guarantee that Plaintiffs would not have to work on the Sabbath. (Def.'s Statement of Undisputed Facts ¶ 14.) In fact, Annette Jackson stated in her EEOC charge that she and her husband had an agreement with Defendant that they would not be required to work on the Sabbath. (*Id.* ¶ 17.) The Court finds that this evidence is not relevant to the sole legal issue raised in Defendant's Motion which is whether Plaintiffs were disciplined or discharged for failing to comply with a requirement that conflicted with their sincerely held religious beliefs. Defendant has conceded that Plaintiffs informed Defendant of the conflict between their work schedule and their Sabbath observance. Therefore, the Court finds no reason to consider evidence about whether the parties had an agreement that Plaintiffs would not work on the Sabbath.

Prior to January 8, 2010, Defendant's company policy permitted a driver who did not want to take a load to "mark off" the load from the schedule. (*Id.* ¶ 28.) When a driver marked off a scheduled load, Defendant would assign the load to the next driver on the list. (*Id.*) "Planners" or "dispatchers" were Defendant's employees who called drivers and offered them loads to haul. (*Id.* ¶ 4.)[4] After January 8, 2010, Defendant eliminated the mark-off policy, according to Bain, in order to free up time for its planners to do other things. (*Id.* ¶ 29.) Defendant also changed the policy because following a software upgrade, the mark-off procedure was not compatible with Defendant's new program. (*Id.*) There is also evidence that the planners regularly overrode the new program to change a load at a driver's request and that overriding the program took only a few minutes. (Pls.' Resp. to Def.'s Statement Undisputed Facts ¶ 29.) Planners continued to change load assignments frequently because loads were often being added, dropped, or modified. (Pls.'s Statement of Add'l Facts ¶ 22.) Bain testified that under the new system drivers could still have time off approximately every other weekend and that they still filled out paid and unpaid time-off requests. (Def.'s Statement of Undisputed Facts ¶ 31.)

Defendant made an additional change to its leave policy in March 2010. Prior to March 15, 2010, Defendant allowed drivers to put in unpaid time-off requests sixty (60) days in advance of the requested days off. (*Id.* ¶ 32.) According to Defendant, this policy was problematic because five or six teams of drivers, including Plaintiffs, requested their weekends off so far in advance that other drivers were unable to put in requests. (*Id.* ¶ 33.) Plaintiffs reiterate that they never requested to have off Sundays and were willing to accept assignments at any time over the weekend after

---

[4] During the relevant time, Demetrius "Dee" McFerren was Defendant's primary planner, and Tara Skeen was the secondary planner. (Def.'s Statement of Undisputed Facts ¶ 4.)

4

sundown Saturday.  (Pls.' Resp. to Def.'s Statement Undisputed Facts ¶ 33.)  Drivers who were not

getting the time off that they requested complained and demanded a change in the policy.  (Def.'s

Statement of Undisputed Facts ¶ 33.)  Plaintiffs add that only five drivers made these complaints

about the old system.  (Pls.' Statement of Add'l Facts ¶ 19.)  After March 15, 2010, Defendant

changed its time-off procedures to allow employees to request time-off only thirty (30) days in

advance and restricted the number of unpaid days off to six (6) within a ninety-day quarter.  (Def.'s

Statement of Undisputed Facts ¶ 34.)  After a driver used his or her six days of unpaid leave, the

driver still was free to use accumulated paid time off and vacation days.  (Id.)

Plaintiffs received notice of the new policy, which stated that the purpose of the change was

"to be fair and equitable to all OTR [over the road] drivers and their needs to take time off for

various personal reasons." (Id. ¶ 35.)  The policy changes were approved by Duane and Pat Long.

(Id. ¶ 36.)  Plaintiffs discussed the policy change with Lou Medlin who allegedly stated that

Plaintiffs were misusing the system and that it was not fair for Plaintiffs to be the only ones off every

weekend.  (Id. ¶ 37.)[5]  According to Danny Jackson, he told Bain on March 5, 2010, that he would

have to take the Sabbath off, no matter what, and Bain replied that he understood and respected

Jackson's religion.  (Id. ¶ 40.) Jackson also stated his concern that the new policy would not provide

Plaintiffs with a "guarantee" that they would never have to work on the Sabbath.  (Id. ¶ 41.)  At the

time of the March 2010 policy change, Plaintiffs still had time off available.  (Id. ¶ 42.)

_____

[5] It appears that Medlin was Defendant's director of driver relations and had
responsibility for employee orientation.  (Pls.' Statement of Add'l Facts ¶ 31.)  Her other job
duties are not clear.  Plaintiffs restate in response to this assertion that they did not request to
have an entire weekend off, only until Saturday at sundown.  Plaintiffs explained in their
depositions that loads set for Saturdays and Sundays were typically destined for the West Coast
and offered on a volunteer basis.  (Id. ¶¶ 5, 6.)

5

Danny Jackson testified that, until June 3, 2010, he was able to use the company's system to get the days off he needed to observe the Sabbath. (*Id.* ¶ 46; see also Pls.' Statement of Add'l Facts ¶¶ 12,13.) Then on June 3, 2010, Plaintiffs were scheduled to take a load and leave Memphis for Lakeland, Florida on Thursday and then continue on to Miramar, Florida before returning to Memphis. (Def.'s Statement of Undisputed Facts ¶ 47.) Danny Jackson admitted that a driver had to take the load because the cargo included prescription drugs, which had to be stored in refrigeration. (*Id.* ¶ 48.) When the dispatcher offered Plaintiffs this load, Plaintiffs asked to swap because they would not be able to return home before the Sabbath. (*Id.* ¶ 49.) The dispatcher agreed to attempt to swap Plaintiffs' assigned load for another load. (*Id.*) The dispatcher later informed Plaintiffs that she could not change the load because Plaintiffs were not scheduled for time off on those days, and as such swapping the load would violate company policy. (*Id.* ¶ 50.) Plaintiffs add that they could not schedule time off for these days because the leave policy allowed them to schedule only six days off during a 90-day period. (Pls.' Resp. to Def.'s Statement of Undisputed Facts ¶ 50.) At that point, Plaintiffs refused to take the load. (Def.'s Statement of Undisputed Facts ¶ 51.) After Plaintiffs refused the June 3, 2010 load, Bain issued both Plaintiffs written warnings, stating that "[a]nother refusal within a 12 month period will result in your termination of employment." (*Id.* ¶ 52.)

The following week Plaintiffs were assigned another load from Memphis to Lakeland and Miramar, Florida, scheduled to leave on June 10, 2010. (*Id.* ¶ 53.)[6]  Plaintiffs also requested to swap the June 10 run with another team because they would not be able to return home in time for the

---

[6] Plaintiffs cite evidence that this load actually was for delivery to destinations in Alabama and Georgia.  In any event, it appears to be undisputed that Plaintiffs would not have been able to make either itinerary and return home before the start of the Sabbath.

Sabbath. (*Id.* ¶ 54.) Plaintiffs add that the dispatcher told them that they might be able to swap for a load destined for Birmingham, Alabama, a run which Plaintiffs could have completed before the start of the Sabbath. (Pls.' Resp. to Def.'s Statement of Undisputed Facts ¶ 55.) Later the dispatcher informed Plaintiffs that they could not swap the June 10 load because there was no time-off available. (Def.'s Statement of Undisputed Facts ¶ 55.) Plaintiffs refused the June 10 load, and following this second refusal to take a load, the dispatchers instructed Plaintiffs that they needed to meet with Bain before they could be assigned any more runs. (*Id.* ¶ 56.)

Sometime over the weekend after the June 10 incident, Plaintiffs cleaned out their truck. (*Id.* ¶ 57.) Bain learned that Plaintiffs had cleaned out their truck and later viewed this as a resignation. (*Id.*) Plaintiffs dispute that their act of cleaning out their truck amounted to their resignation. Plaintiffs assumed Defendant would dismiss them for their refusal to take the June 10 load and admit that they removed their linens from the truck on June 11, 2010. (Pls.' Statement of Add'l Facts ¶ 29.) Plaintiffs informed Bain that they had not in fact resigned. (Pls.' Resp. to Def.'s Statement of Undisputed Facts ¶ 57.)

Plaintiffs attempted to reach Bain by telephone to discuss their refusal to take the June 10 load and their future as Defendant's employees. (Def.'s Statement of Undisputed Facts ¶ 58.) During calls on Monday, June 14, and Tuesday, June 15, Bain informed Plaintiffs that a decision about their continued employment with Defendant had not yet been made. (Pls.' Statement of Add'l Facts ¶¶ 30, 32.) On Friday, June 18, 2010, Bain wrote to Duane Long, one of the owners of the company, "They have called me three times today. I do not know what to say. I need direction please." (*Id.* ¶ 33.) Long instructed Bain to offer Plaintiffs "a good reference." (*Id.*) In a phone call with Plaintiffs, on June 18, Bain told Plaintiffs that he was not going to fire them but that he would

7

accept their resignations. (Def.'s Statement of Undisputed Facts ¶ 58.) No one on behalf of Defendant ever told Plaintiffs that they were fired. (*Id.* ¶ 59.) Plaintiffs agree that Bain never actually stated that they were "fired." Danny Jackson testified in his deposition that he was not terminated and still had possession of his truck keys and employee identification badge. (Def.'s Statement of Undisputed Facts ¶ 60.) However, Plaintiffs contend that Bain told Plaintiffs that he would accept their resignations, would give both a good reference to any future employer, and would not oppose their attempt to draw unemployment benefits. (Pls.' Resp. to Def.'s Statement of Undisputed Facts ¶ 59.)[7]

On Monday, June 21, 2010, Annette Jackson telephoned Bain again to clarify Plaintiffs' status. (Pls.' Statement of Add'l Facts ¶ 35.) According to Plaintiffs, Bain told Annette Jackson that he "would very much like for you to get unemployment" and as such Plaintiffs should "just say you were laid off." (*Id.*) Annette Jackson told Bain that Plaintiffs had not resigned and that they had returned their laundered bedding to their truck ready for their next assignment. (*Id.*) Annette Jackson further told Bain that Plaintiffs did not understand how a resignation would affect their attempts to obtain unemployment benefits. (*Id.*) Bain admitted that as a result of his conversation with Annette Jackson on Monday, June 21, 2010, he understood that Plaintiffs did not believe they had resigned just because they had cleaned out their truck. (*Id.* ¶ 36.)

Defendant claims that no one on behalf of Defendant ever told Plaintiffs that Defendant was not going to accommodate their religious practices. (*Id.* ¶ 61.) Plaintiffs disagree and cite evidence

---

[7] The Court notes that Annette Jackson recorded a telephone conversation she had with Bain on June 21, 2010, in which Bain allegedly made these statements. According to Plaintiffs, this recording and others were produced in discovery. Furthermore, Bain admitted in his deposition that the voice on the recording was his. Defendant has objected that Plaintiffs have not properly authenticated the recording pursuant to Rule 901 of the Federal Rules of Evidence.

that Bain had issued a written warning to Plaintiffs about their refusal to take the June 3, 2010 load. (Pls.' Resp. to Def.'s Statement of Undisputed Facts ¶ 61.)  The written warning advised that a second refusal to accept a load would result in the termination of Plaintiffs' employment.  (*Id.*)  In a meeting Plaintiffs had with Bain to discuss the written warning, Plaintiffs explained that Defendant's new policy on time-off would inevitably force Plaintiffs to choose between their Sabbath observance and their job duties.  (*Id.*)  According to Plaintiffs, Bain responded by saying "You're right this is going to happen again, and when it does, what it says in that letter is going to happen."  (*Id.*)  Bain further stated that the new policy was adopted because Plaintiffs "were part of a group of drivers that monopolized every single weekend" by "working the system."  (*Id.*)

In its Motion for Summary Judgment, Defendant argues that Plaintiffs cannot establish their claim for failure to accommodate.[8]  Defendant's opening brief concedes that Plaintiffs can prove the first two elements of a failure to accommodate claim, namely that both Plaintiffs held a sincere religious belief that conflicted with an employment requirement and they informed Defendant about the conflict.  Defendant's sole, straightforward contention on summary judgment is that Plaintiffs cannot show that they were discharged or disciplined for failing to comply with the conflicting employment requirement.  According to Defendant, Plaintiffs refused the June 10, 2010 load because they would not be back home by sundown on Friday evening and then cleaned out their truck.

---

[8] Defendant has also argued that Plaintiffs cannot prove a claim for retaliation.  Plaintiffs have not responded to this specific argument in their brief.  Moreover, upon inspection of the Complaint, it is not clear to the Court that Plaintiffs have alleged such a claim against Defendant. The Complaint never uses the term "retaliation" though it does refer to "Termination of Employment for Requesting Religious Accommodation."  Under the circumstances, the Court holds that Plaintiffs have not stated a claim for retaliation, and to the extent that their pleadings could be construed to state such a claim, Plaintiffs have waived the issue by not addressing it in their summary judgment brief.

9

Defendant construed these actions to be consistent with resignation. Defendant maintains that it simply accepted Plaintiffs' resignations. As a result, Plaintiffs cannot prove that Defendant discharged them from their employment. Defendant contends, therefore, that it is entitled to summary judgment on Plaintiffs' failure to accommodate claim. Even if Plaintiffs could prove their claim, Defendant maintains that it attempted to offer Plaintiffs reasonable accommodations and that it did not provide an accommodation because it would have presented an undue hardship.

In response Plaintiffs argue that there is evidence that they suffered discipline and discharge in this instance. According to Plaintiffs, the evidence shows they were disciplined by means of a written warning for refusing to take the June 3, 2010 load. Plaintiffs contend that this evidence of discipline for failing to comply with a conflicting employment requirement satisfies this element of their prima facie case. Plaintiffs go on to argue that they did not resign and that the evidence supports the conclusion that they were constructively discharged. Under Defendant's attendance policy, Plaintiffs had already been warned that another refusal to take a load would result in termination. When Plaintiffs were scheduled for the June 10, 2010 load and later refused to accept the assignment, Plaintiffs' termination was inevitable based on company policy. Plaintiffs also dispute Defendant's contention that Plaintiffs simply resigned. Plaintiffs cite evidence that they removed linens from their truck to clean them and yet even after they had cleaned out the truck, Plaintiffs were told for several days that a decision about their status had not been reached. Plaintiffs continued to call Defendant to discuss the situation and even informed Bain that they had not resigned their jobs. With respect to proof of a reasonable accommodation, Plaintiffs argue that Defendant has no evidence of what reasonable accommodations it actually offered Plaintiffs. Nor has Defendant produced evidence that an accommodation for Plaintiffs would have resulted in an

10

undue hardship for Defendant.  Therefore, Plaintiffs ask the Court deny Defendant's Motion for Summary Judgment.

In its reply Defendant argues for the first time that Plaintiffs did not give proper notice of their request for an accommodation.  Defendant argues that the evidence shows that Plaintiffs "never made it clear to Longistics that their religious beliefs required *without exception* that they not work on the Sabbath."  Def.'s Reply 4 (D.E. # 34).  Defendant also argues for the first time that Plaintiffs cannot prove that Defendant required them to work on the Sabbath because working on the weekend was often voluntary for Defendants' driver teams.  According to Defendant, most drivers were scheduled only to work every other weekend.  Finally, Defendant reiterates its contention that Plaintiffs were never disciplined or discharged.  Therefore, Defendant maintains that Plaintiffs cannot make out their prima facie case.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving part "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[9]  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[10]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for

---

[9] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[10] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

trial."[11]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[12]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[13]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[14]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[15]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[16]  Finally, the "judge may not make credibility determinations or weigh the evidence."[17]

## ANALYSIS

Title VII makes it unlawful to discriminate against an employee on the basis of religion.[18] The Act broadly defines "religion" to mean "all aspects of religious observance and practice, as well

---

[11] *Celotex*, 477 U.S. at 324.

[12] *Matsushita*, 475 U.S. at 586.

[13] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[14] *Id*. at 251-52.

[15] *Celotex*, 477 U.S. at 322.

[16] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[17] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[18] 42 U.S.C. § 2000e-2(a).

12

as belief."[19]  "The analysis of any religious accommodation case begins with the question of whether the employee has established a prima facie case of religious discrimination."[20]  In order to establish a prima facie case, a plaintiff must show that (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement.[21]  Once an employee has established a prima facie case, the burden shifts to the employer "to show that it could not reasonably accommodate the employee without undue hardship."[22]  For purposes of a religious accommodation, "[t]o require an employer to bear more than a *de minimis* cost in order to accommodate an employee's religious beliefs is an undue hardship."[23]  Viewing the record evidence in a light most favorable to Plaintiffs, the Court holds that Plaintiffs can make out a prima facie case for their religious accommodation claim, and Defendant has not shown that an accommodation of Plaintiffs' beliefs would have imposed an undue hardship.  Therefore, Defendant's Motion must be denied.

## A.   *Plaintiffs' Sincere Religious Beliefs Conflicted With Their Job Requirements*

First, the Court concludes that for purposes of this Motion, Plaintiffs have shown that they hold a sincere religious belief that conflicted with an employment requirement.  The Sixth Circuit

---

[19] § 2000e-2(j).

[20] *Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1085 (6th Cir. 1987).

[21] *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007); *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618, 627–28 (6th Cir. 2000).

[22] *Tepper*, 505 F.3d at 514 (citations omitted).

[23] *Id*. (citations omitted).

has specifically held that "[r]eligious discrimination can arise out of an employer's failure to accommodate those employees who refuse to work on particular days of the week because of their religious beliefs."[24]  Defendant does not dispute that Plaintiffs hold a sincere religious belief that work cannot be performed from sundown on Friday until sundown on Saturday.[25]  The undisputed evidence shows that Plaintiffs were assigned a load to depart on Thursday, June 3, 2010, destined for Florida.  Plaintiffs determined that the run would not permit them to return home before the Sabbath began and consequently asked to swap the load.  Under Defendant's policy, however, Plaintiffs could not swap because they were not scheduled for time off on those days.  It is undisputed that Plaintiffs had already taken off the six days Defendant's leave policy allowed them to take within a 90-day period.  When Plaintiffs were assigned another load to leave on Thursday, June 10, 2010, they again believed that they could not return in time to observe the Sabbath and refused the run.  Viewing this undisputed evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that Plaintiffs' sincere religious beliefs conflicted with their job requirements.  Therefore, Plaintiffs can prove this first element of their failure to accommodate claim.

Although Defendant's opening brief conceded that Plaintiffs could establish this element,

_____

[24] *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 633 (6th Cir. 2003) (quoting *Smith*, 827 F.2d at 1085.

[25] The Court notes that Defendant refers to Plaintiffs' beliefs throughout its motion papers as a "religious preference."  The Court would emphasize that there is marked difference between a religious belief and a religious preference.  A sincerely held religious belief is entitled to accommodation; whereas, a preference is not.  *Creusere v. Bd. of Educ. of City School Dist. of City of Cincinnati*, 88 F. App'x 813, 819 (6th Cir. 2003) ("An employer only needs to make reasonable accommodations for an employee's religion. This principle does not require the employer to accommodate the employee in the way the employee finds to be the most desirable.").

14

Defendant appears to have reversed course in its reply brief without any explanation.   There
Defendant argues that Plaintiffs were not actually required to work every weekend and that weekend
runs were generally voluntary.   The Court finds it disconcerting that Defendant has taken one
position in its opening memorandum and then a contrary position in its reply.   Defendant has not
explained this vacillation.   For example, Defendant has not shown that new evidence was discovered
or an intervening change in legal authority required it to change its position.   Based on Defendant's
failure to justify its inconsistent positions alone, the Court would conclude that Plaintiffs have
established this element for purposes of summary judgment.

Additionally, the Court finds Defendant's reasoning in the reply brief unpersuasive.
Defendant asserts that Plaintiffs ran out of days off by requesting time off every weekend regardless
of whether they were actually scheduled to work, and in effect, by seeking a guarantee that they
would never be scheduled for assignments that would conflict with their Sabbath.   The Court finds
this line of argument unconvincing.   Rather than focusing on the specific events of June 2010,
Defendant emphasizes its general requirements for weekend work.   While evidence of general
practices is not irrelevant, it has little or no bearing on whether Plaintiffs' Sabbath observance
conflicted with Defendant's requirement that Plaintiffs' take loads on June 3, 2010 and June 10,
2010.   With respect to those specific job requirements, Defendant has adduced no evidence that
Plaintiffs were assigned the loads on June 3 and June 10 on a volunteer basis.   According to
Defendant's statement of undisputed facts, Plaintiffs were assigned the load on June 3 and then
issued written warnings for their refusal to take the load.   Based on the fact that Plaintiffs received
discipline for refusing the load, it cannot seriously be disputed that the assignment was not voluntary.
The same reasoning applies with even more force to the June 10 load where Defendant had already

15

warned Plaintiffs that a second refusal would result in termination. Defendant essentially argues that had Plaintiffs' been more judicious in using the six days they were permitted to take off in that quarter, they might have been able to avoid the conflicts on June 3 or June 10 without the need for an accommodation. However, Defendant has adduced no evidence to support such an assumption. The Court concludes that Defendant's arguments on this point are without merit. Therefore, Plaintiffs have satisfied their burden as to this element of their prima facie case.

## B.       *Plaintiffs Informed Defendant About the Conflicts*

The Court further holds that Plaintiffs can show that they informed Defendant about the conflict between their job assignments and their Sabbath observance. The undisputed evidence shows that since Plaintiffs had returned to work for Defendant in July 2008, they routinely and consistently requested time off from sundown Friday until sundown Saturday. Defendant was well aware that Plaintiffs asked for this time off because they held religious beliefs about refraining from work during their Sabbath observance. Plaintiffs' pastor addressed letters to Defendant in 2008 and 2010, explaining the church's teaching on the Sabbath and the propriety of work for believers. What is more, there is evidence that Defendant changed its leave policy in March 2010 in part because Plaintiffs signed up for time off during their Sabbath every week. Following the policy change, employees could only request time off thirty days in advance and then were allowed to request only six days off per quarter. At the time the new policy was announced, Defendant's director of driver relations told Plaintiffs that they were misusing the old system and that it was not fair for Plaintiffs to be the only drivers off every weekend. Based on this evidence, Plaintiffs can show that they informed Defendant about the conflict between their Sabbath requirements and working.

16

As for the specific dates when Plaintiffs refused loads in June 2010, there is evidence that Defendant was aware that the June 3, 2010 assignment conflicted with Plaintiffs' Sabbath. The June 3, 2010 load required Plaintiffs to leave Memphis, Tennessee for Lakeland, Florida on a Thursday and meant that Plaintiffs would not return home before the start of the Sabbath. Plaintiffs requested a swap because of the conflict, which was denied under Defendant's leave policy. After Plaintiffs refused to take the June 3 load, they received written warnings from Bain and met with him to discuss the situation. There is evidence that Plaintiffs informed Bain that they did not take the June 3 because they would not be able to complete the run and return home in time for the Sabbath. Plaintiffs also discussed their concerns about being assigned future loads that would conflict with their Sabbath observance as well as concerns that Defendant's new policy on taking leave would inevitably force them to choose between their religious practices and their jobs. According to Plaintiffs, Bain responded to these concerns by saying, "You're right this is going to happen again, and when it does, what it says in that letter [termination] is going to happen." Bain also told Plaintiffs that Defendant adopted the new leave policy because Plaintiffs "were part of a group of drivers that monopolized every single weekend" by "working the system." Based on this largely undisputed evidence, the Court holds that Plaintiffs could show that they informed Defendant of the conflict between their Sabbath observance and their duty to take the June 3, 2010 load.

Likewise, with respect to the June 10, 2010 load, Plaintiffs have adduced evidence that Defendant was aware of the conflict between the assignment and Plaintiffs' Sabbath observance. There is a question about whether the June 10 assignment required Plaintiffs to leave for Florida or Georgia and Alabama. In any event, it is undisputed that Plaintiffs would not have returned home before the start of the Sabbath at sundown on Friday. When Plaintiffs refused to take the load,

17

Defendant's planners notified Plaintiffs that they needed to talk to Bain before they were assigned any more loads. Plaintiffs were not able to discuss the matter with Bain until some time after June 10, and it is not clear that Plaintiffs directly addressed with Bain why the June 10 load would conflict with their Sabbath observance. Even so, a reasonable juror could find that under the circumstances Defendant was on notice of the conflict. During their meeting with Bain only days before they refused the June 10 load, Plaintiffs made clear to Bain their need for the ongoing accommodation. In response Bain acknowledged that "this is going to happen again" and warned Plaintiffs that termination would follow another refusal. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable juror could find that Defendant was informed about the conflict between Plaintiffs' June 10 assignment and their religious practice. Therefore, the Court holds that Plaintiffs have established this element of their prima facie case.

In its reply brief, Defendant argues that "Plaintiffs have been unclear about what they informed Defendant about their religious preferences."[26] Defendant contends that Plaintiffs never informed Defendant that they could never miss church services on Saturday or that they had to refrain from work from sundown on Friday until sundown on Saturday. Defendant admits that Plaintiffs "consistently requested time off for the entirety of the Sabbath and religious holidays" but complains that Plaintiffs "never made it clear to Longistics that their religious beliefs required" this accommodation and "never informed [Bain] of the extent of their need."[27] In addition to being a reversal of the position it took in its opening brief, the Court finds Defendant's argument to be without legal or factual support. Defendant has not cited any authority for the proposition that

---

[26] Def.'s Reply 3.

[27] *Id.* at 4.

18

Plaintiffs' duty to inform required anything more than their request to have the day off for a religious observance.    An employee need only notify his employer "of his need for a religious accommodation" in order to trigger the employer's obligation to reasonably accommodate an employee's religious practices.[28]  Another court has described the duty to inform in this way:

> While the law does not require that a[n] employer divine the existence of a conflict or discern whether an accommodation is desired, there is no magic incantation required to put an employer on notice either.  It would be contrary to the purpose of the statute to permit a[n] employer to close his eyes to that *which is obvious* in favor of a rule requiring particular verbiage to trigger constitutional protection.[29]

An employee fails to inform his employer where the employee never mentions his need for a religious accommodation to a supervisor at all.[30]  A reasonable juror could find that Plaintiffs have more than met this burden in this case.   Therefore, the Court concludes that Plaintiffs have shown that they adequately informed Defendant that their assigned loads in June 2010 would conflict with their observance of the Sabbath from sundown on Friday until sundown on Saturday.

**C.**    ***Plaintiffs Were Disciplined and/or Discharged For Failing to Comply with the Conflicting Employment Requirement***

The primary issue presented in Defendant's Motion for Summary Judgment is whether Plaintiffs were actually discharged for failing to comply with a conflicting employment requirement.

---

[28] 29 C.F.R. § 1605.2(c)(1).  *See also Averett v. Honda of Am. Mfg., Inc.* No. 07-cv-1167, 2010 WL 522826, at *10 (S.D. Ohio Feb. 9, 2010).

[29] *E.E.O.C. v. White Lodging Servs. Corp.*, No. 06-cv-353, 2010 WL 1416676, at *6 (W.D. Ky. Mar. 31, 2010) (emphasis added).

[30] *Getachew v. BP N. Am. Prods., Inc.*, No. 04-cv-107, 2006 WL 278982, at *9 (S.D. Ohio Feb. 2, 2006) (employee never informed supervisor that he had religious objections to paying for a lottery ticket).

19

Defendant cites evidence that Plaintiffs in fact resigned their jobs and argues that Plaintiffs have failed to show that they were constructively discharged. As such, Defendant contends that Plaintiffs cannot satisfy this element of their prima facie case.

Viewing the evidence in the light most favorable to Plaintiffs, the Court holds that Plaintiffs can show that they were disciplined or discharged. It is undisputed that Defendant issued written reprimands to Plaintiffs for their refusal to accept the June 3, 2010 assignment. Bain's letter stated that it was a final warning and that "another refusal in a 12 month period will result in your termination of employment."[31]  Such a warning letter constitutes discipline for purposes of this element of Plaintiffs' religious accommodation claim.[32]  Therefore, Plaintiffs have met the burden to show that they were disciplined for failing to comply with a conflicting employment requirement.

---

[31] Bain Letter, June 3, 2010 (D.E. # 26-7).

[32] *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1379 (6th Cir. 1994) (holding that verbal warning and employee's accumulation of "absence points" amounted to discipline and satisfied this element of prima facie case).

Plaintiffs cite for additional support this Court's unreported decision in *Ayers-Jennings v. Fred's, Inc.*, No. 09-2593, 2010 WL 3810018 (W.D. Tenn. Sept. 21, 2010), *aff'd* no. 10-6228, 2012 WL 432273 (6th Cir. Feb. 13, 2012). The plaintiff in that case alleged discrimination on the basis of race and as such had the burden to show that she suffered "an adverse employment action." This Court in *Ayers-Jennings* stated, "While the parties differ over whether Plaintiff voluntarily resigned or was terminated, the Court finds that Plaintiff was effectively forced to resign her position with Defendant. It cannot be disputed then that Plaintiff suffered an adverse employment decision." *Id.* at *4.

The Court holds that the legal issue presented in the case at bar is distinguishable. Rather than showing an adverse employment action, Plaintiffs must establish that they were disciplined or discharged. The Sixth Circuit has never considered whether "any adverse employment action" without actual discipline or discharge could satisfy this element of a religious accommodation case. *Reed v. Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am.*, 569 F.3d 576, 580–81 (6th Cir. 2009). Because Bain's warning letter was a form of "discipline," the Court finds it unnecessary to reach that issue here.

20

For this reason, the Court need not consider whether Plaintiffs were actually or constructively discharged.[33]

Even if the warning letter could not be considered "discipline," Plaintiffs have adduced evidence to create at the very least a triable issue about whether they resigned their jobs. First, Defendant's characterization of the evidence to the contrary, a reasonable juror could find that Plaintiffs did not resign by cleaning out their truck. Rather, there is evidence that Plaintiffs were told they would not receive any more load assignments until Bain made a decision about their refusal to take the June 10 load. At that point Plaintiffs removed linens from their truck to launder them and then returned them to the truck while they awaited Bain's decision about their future with the company. It is undisputed that Danny Jackson never turned in his keys to the truck or his employee identification.[34] Over the following days, Plaintiffs made a series of phone calls to Bain in an attempt to get his answer about when they could return to work and were told no decision had been made. For his part Bain discussed with the owner of the company his uncertainty about what course to take and sought direction about how to handle the situation. As a result of those communications, management decided to view the removal of the items from Plaintiffs' truck as a resignation, which Defendant would agree to accept in return for a good reference and support for Plaintiffs' claim for unemployment. Even after Bain informed Plaintiffs of this decision, Plaintiffs insisted that they had not resigned. Viewing this evidence in the light most favorable to Plaintiffs, a reasonable juror could

---

[33] *Cooper*, 15 F.3d at 1379 n.1 ("We need not decide whether Cooper was constructively discharged for failing to comply with Oak's Saturday work requirement, because there is no dispute that she was disciplined. Cooper thus established all elements of her prima facie case.").

[34] Defendant cites these facts as evidence that Jackson was not fired. Viewed in a light most favorable to Plaintiffs, the Court holds that the evidence also shows that Jackson did not resign.

21

find that Plaintiffs did not resign by removing articles from their truck.

Second, questions of fact also exist about how Plaintiffs' employment with Defendant actually came to a conclusion. It is undisputed that Defendant did not actually discharge Plaintiffs but also that Plaintiffs are no longer employed by Defendant. In fact, there is evidence that Plaintiffs ultimately acquiesced to Defendant's suggestion that Plaintiffs "resign" in exchange for unemployment benefits and a good reference. The issue then is whether Defendant constructively discharged Plaintiffs. "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit."[35] The Sixth Circuit has held that even though employee resignations are presumptively voluntary, "an employee's resignation may constitute a constructive discharge when the employee reasonably believed his termination to be imminent."[36] Here Plaintiffs had received a disciplinary warning less than one week before that stated another refusal within the next 12 months would result in their termination. When Plaintiffs refused the second load on June 10, Bain waited a week to inform them of their status. A reasonable juror could find that even then Bain simply gave Plaintiffs the choice between resignation and termination, and as such Plaintiffs reasonably believed their termination to be imminent. Taken together with the evidence that Defendant changed its time off policy specifically because of the way

---

[35] *Tepper*, 505 F.3d at 513–15 (citation omitted).

[36] *Harris v. Butler Cnty., Ohio ex rel. its Sheriff's Dept.*, 344 F. App'x 195, 199 (6th Cir. 2009) (citing *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 555 (6th Cir. 2002)). *See also Goldmeier*, 337 F.3d at 636 ("However, Cooper resigned the day before her Sabbath absence would, cumulatively with the discipline for her earlier Sabbath absences, inevitably have led to her suspension under the employer's announced rule. . . . Thus, the threat of discharge had an immediacy . . . .") (citing *Cooper,* 15 F.3d at 1378, 1379 n.1)).

22

Plaintiffs requested time off for every Sabbath, the Court concludes that a reasonable juror could conclude that Defendant constructively discharged Plaintiffs. Therefore, Plaintiffs have adduced evidence to show that they were disciplined and/or discharged for failing to comply with a conflicting employment requirement.

## D.    *Reasonable Accommodation v. Undue Hardship*

Once a plaintiff has established his prima facie case, the burden shifts to the defendant "to show that it could not reasonably accommodate the employee without undue hardship."[37] The "reasonableness" of an accommodation is determined on a case-by-case basis.[38] Indeed, the Sixth Circuit has noted that the question of reasonableness is best left to the trier of fact.[39] "What may be a reasonable accommodation for one employee may not be reasonable for another."[40] An undue hardship arises when an employer must "bear more than a *de minimis* cost in order to accommodate an employee's religious beliefs."[41] An employer need not actually undertake or attempt the accommodation to establish that the accommodation will be an undue hardship.[42] At the same time, an employer has an ongoing duty to reasonably accommodate an employee's religion even after an

---

[37] *Tepper*, 505 F.3d at 514 (citations omitted).

[38] *E.E.O.C. v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) (citation omitted).

[39] *Id*. (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 902-03 (7th Cir. 1978)).

[40] *Smith*, 827 F.2d at 1085 (citation omitted).

[41] *Tepper*, 505 F.3d at 514 (citations omitted).

[42] *Id*.

23

employer attempts to resolve the employee's religious conflict and fails.[43]  It is not enough for the employer to show that an "accommodation would be bothersome to administer or disruptive of the operating routine."[44]   Furthermore, an employer must present evidence to establish otherwise "speculative" or "hypothetical hardships" that could result from accommodations never attempted.[45] "To meet its burden on summary judgment, an employer must demonstrate that it at least considered possible options that would have accommodated an employee and that these options were rejected because they would have caused an undue hardship."[46]

Applying these principles to the facts of this case, the Court finds that Defendant has failed to offer evidence that it actually provided an accommodation or that Plaintiffs' requested accommodation would have resulted in an undue hardship.  As an initial matter, it is undisputed that Defendant had accommodated Plaintiffs' ongoing request not to work from Friday sundown until Saturday sundown since July 2008.  Then in March 2010, Defendant adopted a new leave policy, and management communicated to Plaintiffs that their request for accommodation was part of the reason for the new policy.  Nevertheless, Defendant argues that it attempted to offer Plaintiffs a reasonable accommodation.  Defendant's brief states, "Plaintiffs requested time off every weekend and religious holiday, even though they could have simply taken their loads to

---

[43] *Smith*, 827 F.2d at 1085 (citation omitted).

[44] *Id.*

[45] *Id.* at 1086.

[46] *E.E.O.C. v. Texas Hydraulics, Inc.*, 583 F. Supp. 2d 904, 911–12 (E.D. Tenn. 2008) (citing *Smith*, 827 F.2d at 1085).

24

their destinations and then stopped at sundown to rest for the Sabbath."[47]   However, Defendant has failed to show that it ever offered this accommodation to Plaintiffs, let alone that the accommodation could have avoided the conflict Plaintiffs faced with respect to the loads scheduled for June 3 or June 10, 2010.  The evidence shows only these two instances when Plaintiffs were confronted with an actual conflict between their religious practice and a work requirement.  Moreover, it is undisputed that the cargo for the June 3, 2010 load included medicine stored in refrigeration, circumstances which made time of the essence and which prohibited Plaintiffs from stopping until they had reached their destination.[48]  In the absence of some showing that Defendant offered Plaintiffs a reasonable accommodation to avoid the conflict over the June 2010 loads, the Court finds that Defendant has failed to carry its burden on this point.

Likewise, the Court holds that Defendant has not shown why a reasonable accommodation would have resulted in an undue hardship.  Defendant has not shown that management even considered possible options to accommodate Plaintiffs' requests not to take the June 2010 loads or steps to avoid a similar outcome in the future.  Defendant argues that its general business needs as a trucking firm prevented it from accommodating voluntary work preferences.  However, Defendant must show more than how an "accommodation would be

---

[47] Def.'s Mem. in Support 11.

[48] Def.'s Statement of Facts ¶¶ 47, 48; Pls.' Statement of Add'l Facts ¶ 10 ("It is a Longistics' rule that if a driver, or team of drivers, stops anywhere outside the gates of Longistics with medication, the driver/team are automatically terminated.").

bothersome to administer or disruptive of the operating routine."[49]  Defendant further asserts that it "could not cater only to the needs [of] the Plaintiffs and disregard the needs of its other employees, who were complaining about being denied requests for time off," an apparent reference to Defendant's leave policy as it existed prior to March 2010.  The Supreme Court has held that an employer need not "deny the shift and job preferences of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others[.]"[50]  The problem is that Defendant has not actually shown how accommodating Plaintiffs in June 2010 would have had such effects on Defendant's other employees.  For example, Defendant has not demonstrated why swapping Plaintiffs' assigned loads for other loads, as Plaintiffs requested, would have deprived other employees of their "contractual rights." There is no evidence that Defendant had to offer overtime compensation to another driver or hire a new driver to cover after Plaintiffs refused to take the loads, circumstances that would have resulted in more than *de minimis* costs to Defendant.  In short, Defendant has simply not come forward with proof that it offered Plaintiffs a reasonable accommodation or that accommodating Plaintiffs' beliefs would have resulted in undue hardship with respect to the June 2010 loads. For these reasons, Defendant has not met its burden on summary judgment.

## CONCLUSION

The Court holds that triable issues of fact remain in this case precluding judgment as a matter of law in favor of Defendant.  Therefore, Defendant's Motion for Summary Judgment is

---

[49] *Smith*, 827 F.2d at 1085.

[50] *Cooper*, 15 F.3d at 1380 (quoting *Trans World Airlines v. Hardison*, 432 U.S. 63, 81 (1977)).

26

**DENIED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**

S. THOMAS ANDERSON

UNITED STATES DISTRICT JUDGE

Date: April 13, 2012.

27