# AMOS

## vs

# THE LAMPO GROUP, LLC.

---

# ARMANDO LOPEZ

# October 25, 2022

---



## Nicole M. DeBartolo, CSR, RPR, LCR

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

1    IN THE CHANCERY COURT FOR WILLIAMSON COUNTY,
                        TENNESSEE
2    _____

3    BRAD AMOS,

4              Plaintiff,

5    vs.                           Case No.
                                   21CV-50339M
6    THE LAMPO GROUP, LLC,
     d/b/a RAMSEY SOLUTIONS;
7    DAVE RAMSEY,

8              Defendants.
     _____

9

10

11

12

13

14            Video Deposition of:

15            ARMANDO LOPEZ

16            Taken on behalf of the Plaintiff
              October 25, 2022

17            Commencing at 9:50 a.m.

18

19

20

21
     _____
22

23          Elite-Brentwood Reporting Services
               www.elitereportingservices.com
24     Nicole Marie DeBartolo, TN LCR, RPR, IL CSR
               Nashville, Tennessee  37229
25                  (615)595-0073

```
 1        A P P E A R A N C E S
 2
 3
 4    For the Plaintiff:
 5          MR. JONATHAN STREET
           MS. LAUREN IRWIN
 6         Attorneys at Law
           Employment and Consumer Law Group
 7         1720 West End Avenue
           Suite 402
 8         Nashville, Tennessee 37203
           (615) 850.0632
 9         street@eclaw.com
           lauren@eclaw.com
10
11    For the Defendants:
12
           MS. LESLIE GOFF SANDERS
13         Attorney at Law
           Jackson Lewis P.C.
14         611 Commerce Street
           Suite 3102
15         Nashville, Tennessee 37203
           (615) 565-1661
16         leslie.sanders@jacksonlewis.com
17
           MR. DANIEL E. CORTEZ
18         Attorney at Law
           The Lampo Group
19         1011 Reams Fleming Boulevard
           Franklin, Tennessee  37064
20         (615) 371-8881
21
22    ALSO PRESENT:
23    MS. SOPHIA GORDON - Videographer
24
25
```

```
 1            I N D E X
 2                                          Page
 3    Examination                             6
      By Mr. Street
 4
 5         E X H I B I T S
 6                                          Page
 7    Exhibit 1                               8
         Notice of deposition
 8
      Exhibit 2                              10
 9       Amended notice of deposition
10    Exhibit 3                              13
         Brad Amos Jobvite evaluations
11
      Exhibit 4                              49
12       E-mails associated with Brad Amos
13    Exhibit 5                             209
         Lampo's Responses to Plaintiff's
14       First Set of Interrogatories
15
16
17
18
19
20
21
22
23
24
25
```

```
 1        S T I P U L A T I O N S
 2
 3
 4
 5        The video deposition of ARMANDO LOPEZ was
 6    taken by counsel for the plaintiff, by Notice,
 7    at the offices of Jackson Lewis, P.C.,
 8    611 Commerce Street, Suite 3102, Nashville,
 9    Tennessee, on October 25, 2022, for all
10    purposes under the Tennessee Rules of Civil
11    Procedure.
12        All formalities as to caption, notice,
13    statement of appearance, et cetera, are waived.
14    All objections, except as to the form of the
15    question, are reserved for the hearing, and
16    that said deposition may be read and used in
17    evidence in said cause of action in any trial
18    thereon or any proceeding herein.
19        It is agreed that Nicole Marie DeBartolo,
20    TN LCR, RPR, IL CSR, and Court Reporter for the
21    State of Tennessee, may swear the witness, and
22    that the reading and signing of the completed
23    deposition by the witness are not waived.
24
25
```

```
 1                *   *   *
 2        THE VIDEOGRAPHER:  We are now on the
 3    record.  Today is Tuesday, the 25th of October,
 4    2022, and the time indicated on the video
 5    screen is 10:17 a.m.
 6        This is the 30(b)(6) video deposition of
 7    Armando Lopez, a representative of The Lampo
 8    Group, LLC, in the matter of Amos versus The
 9    Lampo Group, LLC, et al.,
10    Case No. 3:21-cv-00923, filed in the United
11    States District Court for the Middle District
12    of Tennessee, Nashville Division.
13        This deposition is being held today at
14    611 Commerce Street, Nashville, Tennessee,
15    37203.
16        My name is Sofia Gordan, the
17    videographer; the court reporter is Nicole
18    DeBartolo; both in association with Elite
19    Brentwood Reporting Services.
20        Will counsel please introduce yourselves
21    and state whom you represent.
22        MR. STREET:  Jonathan Street.  I'm
23    here for the plaintiff, Brad Amos.
24        MS. IRWIN:  Lauren Irwin for the
25    plaintiff, Brad Amos.
```

**2..5**

1       MS. SANDERS:  Leslie Sanders for
2  defendant, The Lampo Group.
3       MR. CORTEZ:  Daniel Cortez for
4  defendant, The Lampo Group.
5       THE VIDEOGRAPHER:  Would the court
6  reporter please swear in the witness.
7       (Witness sworn.)
8            *   *   *
9
10            ARMANDO LOPEZ,
11  was called as a witness, and after having been
12  first duly sworn, testified as follows:
13
14            EXAMINATION
15  QUESTIONS BY MR. STREET:
16  Q.    Would you state your name for the record,
17  please.
18  **A.    Sure.  Armando Lopez.**
19  Q.    Mr. Lopez, have you been in a deposition
20  before?
21  **A.    I have.**
22  Q.    Okay.  And what was that regarding?
23  **A.    I've been in several, actually, just as**
24  **the head of human resources, both with Ramsey**
25  **as well as with my previous employments.**

1  Q.    Okay.  Well, the ones with Ramsey, what
2  were those about?
3  **A.    One was a charge of discrimination.**
4  Q.    Do you remember the name of the case?
5  **A.    That would be Caitlin O'Connor.  And**
6  **actually with Ramsey, that is the only one.**
7  Q.    Okay.  But before that, you've been in
8  depositions with your previous employer?
9  **A.    Correct.**
10  Q.    Which was who?
11  **A.    That's American Blue Ribbon Holdings.**
12  Q.    Okay.  Are they a local town --
13  **A.    They have.**
14  Q.    Local company, excuse me.
15       Okay.  And have you ever testified as a
16  30(b)(6) witness before?
17  **A.    I have.**
18  Q.    Okay.  So you kind of know how it works?
19  **A.    A little bit, yes.**
20  Q.    Okay.
21  **A.    I'm not expert, but yes.**
22  Q.    Well, that's good you're no expert.  That
23  means you'd be a lawyer, and nobody likes us.
24       So a 30(b)(6) deposition means you're
25  here today to testify on behalf of the

1  corporation, not on behalf of yourself.  So if
2  I ask questions today, the questions are
3  directed to the corporation.  This is not your
4  personal deposition.  This is just for the
5  corporation.
6  **A.    Yes, sir.**
7  Q.    So if you'll take a look --
8       MR. STREET:  If we'll go ahead and
9  mark this notice as Exhibit 1.
10       (WHEREUPON, a document was marked as
11  Exhibit 1.)
12       MS. SANDERS:  John, if you'll give me
13  just a minute.  I thought I had it pulled up,
14  and I don't, so --
15       MR. STREET:  That's okay.
16       MS. SANDERS:  If you'll give me just
17  a minute.
18       MR. STREET:  Just let me know when
19  you're ready.
20       MS. SANDERS:  Okay.  We're good.
21  We've got a copy.
22  BY MR. STREET:
23  Q.    Okay.  If you'll take a second,
24  Mr. Lopez, and look through that.  And do you
25  see where it lists the topics?  It starts on

1  the first page, the first topic being "The
2  factual basis for Defendant -- Defendant's
3  affirmative defenses."
4       Do you see that, No. 1?
5  **A.    Yes, sir.**
6  Q.    And then it goes on for a few more pages.
7  **A.    Ending with No. 28?**
8  Q.    No. 28.  Okay.
9       If you'll read those topics for me and
10  tell me if there are any of those topics that
11  you are not prepared to testify to today --
12  **A.    Sure.**
13  Q.    -- on behalf of the corporation.
14       MR. STREET:  Is that me?
15       MS. IRWIN:  No.  I already turned you
16  down.
17       MS. SANDERS:  It was me.
18       MS. IRWIN:  It's almost always John.
19       MS. SANDERS:  While -- while he's
20  reviewing that, is that the amended notice, or
21  was there an amended notice?
22       MS. IRWIN:  The amended notice just
23  had the correct date.  The topics are the same.
24       MS. SANDERS:  Okay.  Because we're
25  looking at the original.

*6..9*

1    MS. IRWIN:  Yeah.
2         MS. SANDERS:  So I just wanted to
3    make sure we're --
4         MS. IRWIN:  Topics are the same; just
5    has the date and address corrected.
6         MS. SANDERS:  All right.
7         MR. STREET:  That's a good point.
8         **THE WITNESS:  Yes, sir, I reviewed**
9    **it.**
10        MR. STREET:  And as your lawyer
11   pointed out in a little break here, this
12   isn't -- there's been an amended notice to the
13   deposition, but the topics remained the same
14   for the notice.  And if it's okay, we'll get a
15   late-filed exhibit --
16        MS. SANDERS:  That's fine.
17        MR. STREET:  -- to -- this will be
18   the amended notice.
19        (WHEREUPON, a document was designated to
20   be marked as Late-Filed Exhibit 2, when
21   provided.)
22        MS. SANDERS:  No objection.
23   BY MR. STREET:
24   Q.   But you're prepared to testify to all
25   those topics today?

1    **A.   Some of them are pretty broad, but I**
2    **believe I'm prepared to testify to all of them.**
3    Q.   And the reason I ask this, I want to make
4    sure you understand -- you know your answers
5    are binding on the corporation today.
6    **A.   Correct.**
7    Q.   You know, normally, you may not have that
8    power, but today, you do.
9         So all right.  We're going to jump around
10   a little bit today.
11        Tell me about how -- and just so you
12   know, I know you've been in a deposition
13   before, I'm not going to waste a whole bunch of
14   time asking about your 40 years of education
15   and your work history and all that.
16   **A.   Okay.**
17   Q.   Especially not for today when it's not
18   even your deposition.
19        Tell me about how Brad Amos first came
20   into contact with The Lampo Group.
21   **A.   Brad Amos would have applied for a**
22   **position, and that's how he came in contact**
23   **with The Lampo Group.**
24   Q.   Okay.  Do you know when he applied?
25   **A.   Yes.  However, we -- I don't have the**

1    dates memorized, but I know he applied for four
2    positions.  I believe the first one was in
3    2017.
4    Q.   Okay.  And there would be documentation
5    provided by Lampo that provide the exact date
6    if we wanted to know?
7    **A.   That's exactly right.**
8    Q.   All right.  What was the -- you say "the
9    first one."  He applied for positions.
10   What were the four positions?
11   **A.   I would have to reference the documents**
12   **to be able to tell you all four.**
13   Q.   Okay.  But one you said was -- I'm sorry.
14   I didn't write it down.
15   **A.   So he applied for one in 2017, then the**
16   **next three were all 2019, and I believe that**
17   **those were closer in dates.**
18   Q.   Okay.  I want to hand you what's -- is
19   marked --
20        MR. STREET:  Is the stuff that came
21   in yesterday?
22        MS. IRWIN:  It is.
23        MR. STREET:  Okay.  You got a copy
24   for Leslie?
25        MS. IRWIN:  Yes.

1         MS. SANDERS:  Can we go off the
2    record for just a minute?  I don't mind if it's
3    on the record, but let's go off, and then you
4    tell me if you want it on.
5         THE VIDEOGRAPHER:  We are -- we are
6    going off the record.  The time on the video
7    screen is 10:24 a.m.
8         (Short break.)
9         THE VIDEOGRAPHER:  We are back on the
10   record.  The time on the video monitor is
11   10:25 a.m.
12        MR. STREET:  All right.  Can we mark
13   this as Exhibit No. 3, please?
14        (WHEREUPON, a document was marked as
15   Exhibit 3.)
16   BY MR. STREET:
17   Q.   All right.  Mr. Lopez, do you recognize
18   these documents I've handed you there?
19   **A.   Yes, sir.  They come out of our Jobvite**
20   **system.**
21   Q.   Okay.  What is the Jobvite system?
22   **A.   It's an applicant tracking software.  It**
23   **would be where candidates would apply for**
24   **positions, be scheduled for interviews.  Notes**
25   **on those interviews would be kept in that**

**10..13**

system as well as evaluations of how well they did.
Q. Okay. And you said you're in HR?
A. Correct.
Q. And this is -- I'm sorry. This is a personal question.
So you're familiar with these personally?
A. Yes.
Q. Okay. Back -- back to your corporate hat on again.
A. Yup.
Q. If you'll flip through these, does this help you kind of refresh your memory as to what the positions were and when Mr. Amos applied for them?
A. Yes.
So on the upper right-hand corner, it looks like the first -- on Exhibit 1, page --
Q. Or Exhibit No. 3, you mean?
A. Exhibit No. 3. I'm sorry.
Q. That's okay.
A. That is titled LAMPO_0509.
Q. Okay.
A. So at the very top right-hand corner, it will say this is for position senior video



editor, and the 11675 is a requisition number for us. It looks like this was applied on May 8, 2019, at 9:34 is when Brad would have applied for that role.
Q. Okay.
A. So that's one of the roles.
The second role -- that's actually -- 511 is the exact same role, as is 512.
Beginning on page listed LAMPO_0517, the second position is video producer. It's req number 11721.
Q. Okay.
A. On Page 0 -- LAMPO_0519, associate creative director is the next position. It's req number 11360.
Q. Okay.
A. And video producer would be the fourth one, and that is req number 10455 as shown on page Lampo_0519.
Q. Okay. And I'm looking on 0_ -- or Lampo 519 --
A. Yes.
Q. -- video producer. It looks like that this was -- this document was created on 3/8/17?



A. I'm sorry. Where do you see that?
Q. It's on the top underneath the job title.
A. Yes.
Q. Posting date, created 3/8/2017?
A. Yeah. The posting was created on that date. That is the not the date he would have applied for. The date that he applied is actually not listed here --
Q. Okay.
A. -- on this screenshot.
Q. It says updated 6/21/2019. What does that mean when it says updated?
A. That means that a recruiter would have gone in to that req and either updated it, closed it, copied it to create another posting. They would have opened that requisition for some reason.
Q. Okay. But as you look here, you can't tell. There was one for senior video editor, video producer, associate creative director, and video producer, correct?
A. That is correct.
Q. Those are the four positions?
A. Yeah, that's correct.
Q. And those appear on 516 to 519, LAMPO_516



to 519?
A. That's correct.
Q. But look at these documents. You can't tell what day they were submitted on.
A. No. There was different documents turned over in discovery that actually showed the date that he -- that Mr. Amos would have applied for these roles and the disposition of those applications.
Q. Okay. All right. Well, let's flip back to LAMPO_509, which is the first page in Exhibit No. 3.
Now, this -- can you look at this document and tell me when this was filled out?
A. Yeah. That would be on May 16th, 2019, is the evaluation by Kimberly Rudolph, who would have been the recruiter working that requisition. And these would be her notes on the -- what we would call an HR screen -- HR Zoom Screen.
Q. Okay. And would these documents, this HR Zoom Screen, would they be -- would you have these same documents for each of the four jobs he applied for?
A. If an HR Zoom Screen was -- took place,



Case 3:21-cv-00923 Document 59-1 Filed 01/18/23 Page 6 of 90 PageID #: 1526

1  yes. Sometimes they didn't take place. Some
2  of his dispositions he was turned down before
3  an HR Zoom Screen happened.
4  Q.  Okay. Why would you be turned down
5  before a Zoom Screen happened?
6  A.  Multitude of reasons. One of them could
7  be the amount that he was asking for was not --
8  didn't line up with the position we had, the
9  experience didn't line up with what we needed
10 for that requisition, the background and
11 experience. It could have been all kinds of
12 different reasons.
13 Q.  Okay. Do you know why when Mr. Amos
14 applied for the job of video producer, why he
15 did not get that job?
16 A.  Without looking at the dispositions, I
17 can't tell you for sure.
18 Q.  Okay. And is that the same for the
19 associate creative director position as well?
20 A.  That would be correct.
21 Q.  And the same for video producer, the
22 first time he applied for video producer, it
23 looks like? Or second time.
24 A.  Yeah. So to give you accurate
25 information, yes, I would have to look at

1  the -- the disposition reasons --
2  Q.  Okay.
3  A.  -- for each one of these reqs.
4  Q.  Okay. But he was hired eventually as a
5  senior video editor?
6  A.  That is correct.
7  Q.  Do you see on Page 509, the first
8  page, do you see this line says, "We discussed
9  his position would [sic] be a leadership
10 position, but I can see him building great
11 partnerships with the team and his clients."
12     Do you see that?
13 A.  Can you read that again, please?
14 Q.  Sure. It's towards the bottom of the
15 page.
16 A.  Uh-huh.
17 Q.  "We discussed that this position wouldn't
18 be a leadership position, but I can see him
19 building great partnerships with the team and
20 his clients."
21 A.  Yes, sir, I see that.
22 Q.  Okay. Who would have put that into the
23 system?
24 A.  All of the notes listed on this page are
25 from Kimberly Rudolph.

1  Q.  Okay. So Kimberly Rudolph initially
2  said, when she first met Mr. Amos, said, "He's
3  our guy," I guess smiley face.
4     Do you see that at the top of Page 509?
5  A.  I do.
6  Q.  Okay. It says, "He" -- do you see the
7  next paragraph? "He's all set to move here
8  from Cal with the family. This is home for
9  him, and everything aligns. I think he would
10 be the right person to help guide the team."
11     And next thing you say, "He is a
12 culture?"
13     What does that mean, "He is a culture"?
14 A.  Speaking on behalf of the company, I
15 cannot answer that question. I don't know how
16 Kimberly would have interpreted that.
17 Q.  Okay. Could it mean he's a cultural fit
18 for the job?
19 A.  That would be my guess, but it would be a
20 guess.
21 Q.  Okay. Does Ramsey require candidates to
22 be a cultural fit in order to be employed?
23 A.  Yes and no. So cultural means they align
24 with the team, they follow our principles of
25 money handling.

1  Q.  Okay.
2  A.  And so my guess is that's what she meant
3  with that. Because the following, if you read
4  through it, "He is a culture and debt free with
5  the exception of his home."
6  Q.  Okay. And then she says, "He is humble."
7     What do you mean when you say, "He is
8  humble"?
9  A.  We interview following Ideal Team Player
10 by Patrick Lencioni. It's a book.
11 Q.  I'm sorry. What is that? Ideal Team --
12 A.  Team Player. It's a book by Patrick
13 Lencioni.
14 Q.  Can you spell that last name?
15 A.  L-E-N-C-C-I-O-N-I [sic].
16 Q.  Okay.
17 A.  And in that book, Mr. Lencioni speaks
18 about an ideal team player is someone who is
19 humble, hungry, and smart, and he goes on to
20 identify those three characteristics.
21 Q.  Okay. When you say "humble," what is --
22 what does -- what is an employee that makes him
23 humble in Lampo's views?
24 A.  Somebody willing to be a team player and
25 not take all the credit for themselves, be

**18..21**

1 willing to give credit to others.  Even though
2 they're -- they may be a subject matter expert,
3 hold things openhandedly and take advice from
4 others.
5 Q.    Follow orders?
6 A.    Follow orders would fall under humble,
7 yes.
8 Q.    All right.  What else would fall under
9 humble besides what you told me today?
10 A.    I think one of the best definitions that
11 I've heard for humility is not thinking too
12 much of yourself.
13 Q.    And okay.  Like in a work aspect, like
14 working at Lampo, what would be considered an
15 employee thinking too much about themselves?
16 What kind of activities would indicate
17 that would -- that would be an issue?
18 A.    It would be someone who would walk in to,
19 say, a collaborative meeting but felt like
20 their answer was the only correct answer and
21 would not be willing to take constructive
22 criticism, take advice from others, think of a
23 possible alternative way to resolve a problem
24 or an issue.
25 Q.    Okay.  Anything -- another example you

1 can think of?
2 A.    Not that I can think of.
3 Q.    Is this book, The Ideal Team Player, is
4 that required reading by anyone who does hiring
5 at Lampo?
6 A.    It is.  It's required reading for all
7 team members including those who hire.
8 Q.    It's required for all team -- I'm sorry.
9 What did you call them?
10 A.    All team members.
11 Q.    All team members.
12 A.    So anyone that works at Ramsey would be
13 required to read that book.
14 Q.    While we're here, what are all the
15 required readings of a -- for a Lampo team
16 member?  Ideal Team Player is one, you told me.
17 A.    Yes.
18        MS. SANDERS:  Objection.  Objection,
19 it's outside the scope of the notice, but he
20 may answer if he knows.
21        THE WITNESS:  So there are seven
22 required readings.  Ideal Team Player is one of
23 them; Total Money Makeover is another one;
24 EntreLeadership is a third one.
25

1 BY MR. STREET:
2 Q.    Entre?
3 A.    EntreLeadership; Who Moved My Cheese.
4 Q.    Okay.
5 A.    The Monk and the Merchant; The Go-Getter.
6 Q.    Okay.
7 A.    How many is that?
8 Q.    That was six.  I can read them off for
9 you, if you want.
10 A.    The Go-Giver is the seventh one.
11 Q.    The Go-Getter and The Go-Giver?
12 A.    Correct.
13 Q.    All right.  Who wrote Total Money
14 Makeover?
15 A.    That would be Dave Ramsey.
16 Q.    Okay.  What with about EntreLeadership?
17 A.    Dave Ramsey.
18 Q.    Okay.  Who Moved My Cheese?
19 A.    I don't know the author.  It's not Dave
20 Ramsey.
21 Q.    All right.  What is that book about?
22 A.    It's about dealing with change.  It's
23 about the ability to cope and understand that
24 change is a necessary part of life.
25 Q.    Okay.  The Monk and the -- I'm sorry.  I

1 can't read my own handwriting.
2 A.    The Monk and the Merchant.
3 Q.    The Monk and the Merchant.  Thank you.
4 Who wrote that?
5 A.    I'm not sure who the author is.
6 Q.    What's it about?
7 A.    It is about the relationship between
8 businesses and supporting faith.  So you don't
9 have to be necessarily at church to be in
10 ministry.  You could support it by being in
11 business and giving to ministry.
12 Q.    Okay.  Is it a Christian book?
13 A.    No, not to my knowledge.
14 Q.    Okay.  Is it written for Christians?  Is
15 it --
16 A.    No, not to my knowledge.  It's not a
17 Christian book or written for Christians.  It's
18 about the relationship between businesses and
19 faith.
20 Q.    Okay.  The Go-Getter?
21 A.    About perseverance and tenacity.
22 Q.    Who wrote that?
23 A.    I'm not sure.
24 Q.    And The Go-Giver?
25 A.    That ties a little bit to The Monk and

1  the Merchant.  It's about the spirit of
2  generosity, the spirit of giving.
3  Q.   Okay.  And is this something you tell
4  employees when they first come on; "We expect
5  you to read these seven books"?
6  A.   Correct.
7  Q.   Okay.  Do you test them on it or
8  anything?
9  A.   No.
10 Q.   The salary, looking at 509, looks like
11 Mr. Amos was asking -- or the salary was going
12 to be $80,000?
13 A.   Correct.
14 Q.   Okay.  And is that what Mr. Amos ended up
15 making when he first started with --
16 A.   No.  He made 90,000.
17 Q.   Okay.
18 A.   He was hired for 90,000.
19 Q.   Okay.
20 A.   The salary on that line on 509 would have
21 been what Mr. Amos said to Kimberly on salary
22 requested.
23 Q.   Okay.  And if we go on to Page 511, the
24 question -- again, this is -- this looks like
25 maybe David DiCicco.  Am I saying that name

1  right?
2  A.   Correct.
3  Q.   Is he the one who's inputting this data
4  here?
5  A.   He would be.  This is his evaluation --
6  Q.   Okay.
7  A.   -- of Mr. Amos.
8  Q.   And you -- and Mr. DiCicco says that Brad
9  is "definitely an ideal team player."
10     Do you see that?
11 A.   Yes.
12 Q.   Okay.  What did he mean when he said he
13 is an "ideal team player"?
14 A.   Goes back to that book from Patrick
15 Lencioni.
16 Q.   Okay.
17 A.   So he would have been comparing him to
18 that book and saying that, in his opinion,
19 Mr. Amos would have been an "ideal team
20 player."
21 Q.   Okay.  What does the book say makes an
22 "ideal team player"?
23 A.   Somebody who is humble, hungry, and
24 smart.
25 Q.   All right.  We talked a little bit about

1  humble.  When it says "hungry," what does it
2  mean in the book when it says "hungry"?
3  A.   Hungry would be drive and energy; someone
4  who possesses drive and energy.
5  Q.   Can you give me specific examples of what
6  it might be talking about?
7  A.   This is off Patrick Lencioni's book.  As
8  he describes it, it is not someone who only
9  speaks about getting things done; it is someone
10 who has a proven track record of getting things
11 done; someone who still has a passion and a
12 hunger for moving things ahead, moving his --
13 his or her career ahead.
14 Q.   Is there anything else that -- or from
15 the book that talks about being hungry?
16 A.   That's the gist of what hungry means.
17 Q.   Okay.  And I just want to make sure, I
18 don't want to keep harping on it, but as far as
19 the book talks about being humble, have we
20 talked about everything the book says about
21 being humble?
22 A.   I believe we have.  I think we've talked
23 about being collaborative, I think we've talked
24 about being open to other people's ideas,
25 not -- even if you're a subject matter expert,

1  being willing to listen to other ways of doing
2  things.
3  Q.   Okay.
4  A.   Not thinking too much of yourself.
5  Q.   Okay.  And what about smart means smart?
6  A.   It actually does not mean --
7  Q.   Okay.  Good.  I'm glad I asked it.  What
8  does it mean in the book?
9  A.   It's not IQ.  It's people smart,
10 relational smarts.  It is the ability to have
11 self-awareness of how you're coming across and
12 how you're leaving or entering a room with
13 other people present.
14 Q.   Okay.  All right.  And then going on this
15 page, 511, Mr. DiCicco, he also goes on and
16 says "He is passionate about our mission."
17     What mission is he talking about?
18 A.   That would be our Ramsey Solutions
19 mission statement.
20 Q.   All right.  I'm sure we have that here
21 somewhere, but can you tell me in your own
22 words what that says?
23 A.   Sure.  We exist to provide biblically
24 based education and empowerment that provide
25 hope to everyone in every walk of life.

1 Q.    Okay.  And to be a team player, would a
2 person need to follow the Ramsey mission
3 statement?
4 A.    Yes.  To be hired, someone would follow
5 our mission statement and be passionate for it.
6 That's not in Patrick Lencioni's book.  So it's
7 not to be an ideal team player, but to be a
8 team member, someone would need to be
9 passionate about what we do.
10 Q.    Okay.  It says, "He offers a lot more
11 than just the editor role."
12       What more did he offer besides the editor
13 role?
14 A.    I don't have the answer to that.  This
15 was Mr. DiCicco's notes.  My guess would be
16 that there's something in his background
17 experience.
18 Q.    Okay.  It looks like Mr. DiCicco after --
19 did he make these notes after speaking with
20 Mr. Amos?
21 A.    That's our normal process, yes.
22 Q.    Okay.  And he thought that Mr. Amos was
23 absolutely a candidate fit for Ramsey Solutions
24 according to this document?
25 A.    Yes, that's how he answered this

1 question.
2 Q.    All right.  And let's look at 512, that
3 also -- let's make sure -- this also appears to
4 be from Mr. DiCicco?
5 A.    Yes.  They're different interviews.
6 So -- but, yes, that's also noted by
7 Mr. DiCicco.
8 Q.    They're different interviews?
9 A.    Yes.  So at the top on Page 511, it says
10 "Evaluation for Leader Interview 2."  This
11 would have been the second interview for the
12 hiring leader.  And then it says "DISC,"
13 meaning that by that point, we would have had
14 the DISC profile on the person.
15       And then on 512, if you look at the top,
16 it's Evaluation for Compensation Discussion.
17 So this would have been the discussion that
18 covered the compensation and benefits with
19 Mr. Amos.
20 Q.    Okay.  But these interviews would have
21 been with Mr. Amos himself?
22 A.    Correct.
23 Q.    All right.  And the first -- and let's go
24 back, and I'm going -- thanks for telling me
25 that.

1       The first one, being on Page 509, it says
2 "Evaluations for HR Zoom Screen."  What is
3 that?  What is the HR Zoom Screen?
4 A.    That's the first interview that a
5 recruiter would have with a candidate.
6 Q.    Okay.  And then -- so after he
7 interviewed with Ms. Rudolph at his HR Zoom
8 Screen, he's then passed on to Mr. DiCicco for
9 a leader interview?
10 A.    That's correct.
11 Q.    That's the second step?
12 A.    Correct.
13 Q.    All right.  And the third step is a third
14 interview, correct?  It's a completely separate
15 interview?
16 A.    Uh-huh, yes.
17 Q.    And I'm sorry.
18 A.    That's okay.
19 Q.    Okay.  When you say -- she's trying to
20 write down "yes" and "no" --
21 A.    Yes.
22 Q.    -- so "uh-huhs" and "uh-uhs" get
23 confused.  They mean fairly different things,
24 so -- and I'm -- I'm not fussing because I do
25 it all the time, too.

1       So, anyway, this is the third separate
2 interview, Brad Amos for compensation?
3 A.    Yes.
4 Q.    Okay.  Is the wife involved?  Would a
5 person's wife be involved in this third
6 interview?
7 A.    No.
8 Q.    Okay.  I'm confused by his comment.  He
9 says, "Let's get him in here!  His wife is
10 confused about the opportunity and being back
11 in Tennessee as well."
12 A.    That would have been a comment probably
13 by Mr. Amos to Mr. DiCicco.
14 Q.    Okay.  And, again, Mr. DiCicco feels that
15 Mr. Amos is definitely a candidate for Ramsey
16 Solutions?
17 A.    Correct.  That's how he answered the
18 question.
19 Q.    Okay.  And then the next page, 513, this
20 is an "Evaluation for Final On-Site Interview &
21 Spousal."  Is this another interview?
22 A.    Yes.
23 Q.    Okay.  And this -- what is a -- what is a
24 Final On-Site Interview & Spousal?
25 A.    The final on-site is the last set of

1  interviews that happen at our facility.  So
2  that would be when the candidate comes on-site.
3        Spousal is that night they'll go have
4  dinner together, and so this is the evaluations
5  for those two things.
6  Q.    Okay.  And these were -- looks like
7  these -- these comments were typed in by -- the
8  first comments on top were typed in by Luke
9  LeFevre.
10 A.    LeFevre.
11 Q.    LeFevre.
12      And Mr. LeFevre says, "Is the candidate a
13 fit for Ramsey Solutions?"
14      He says he "needs to get some corporate
15 off of him, but he will be good."
16      What does he mean when he says he "needs
17 to get some corporate off of him"?
18 A.    Not -- not sure what Luke LeFevre meant
19 by that comment, so --
20 Q.    Okay.  And I'm looking on, for the
21 record, on Page 513, LAMPO_513.  In the second
22 paragraph, you see where it's -- it looks like
23 this was created by Mr. Rick Perry; is that
24 correct?
25 A.    That is correct.

1  Q.    If you look at the second sentence there,
2  it says, "An extremely talented candidate that
3  will need to be on a fast track re:
4  contributing."
5        What does that mean, "fast track re:
6  contributing"?
7  A.    The comment there by Rick would mean that
8  he felt he was very talented, but he would need
9  to be contributing quickly.  He follows that up
10 regarding contributing, i.e., his "key results
11 area needs to challenge his strengths quickly
12 and often."
13      So I believe what he meant by that is
14 saying that this individual is going to be
15 bored if we don't challenge him and give him
16 something where he can contribute.
17 Q.    Okay.  What is the -- what is KR -- key
18 results area I think you called it?
19 A.    Yes.
20 Q.    What does that mean?
21 A.    That would be his job description, if you
22 will, what's expected of him.
23 Q.    Okay.  So a KRA is a job description?
24 A.    Yes.  It's a little more elaborate, but
25 yes.

1  Q.    In what way is it more elaborate?
2  A.    It defines kind of what winning would
3  look like in that role.
4  Q.    Okay.  And was there an actual KRA
5  written up for Mr. Amos?
6  A.    There was.
7  Q.    And the last sentence says, "Ok to
8  proceed if team/leader chemistry is a fit and
9  conversation with his spouse re: the move" --
10 "re: the move and comp align."
11      So what does he mean when he says that?
12 A.    So what he's meaning is okay to proceed
13 if the team/leader chemistry is a fit.  So he
14 may be feeling like there may be something
15 there that rubbed Rick the wrong way perhaps.
16 It might be that, Hey, we probably need to make
17 sure that that chemistry with the team is okay.
18 He might have felt there's something there that
19 might not make him an ideal team player.
20      And then going on, he says in the
21 conversation with his spouse regarding the move
22 and comp alignment, again, it's Rick trying to
23 say, "Hey, let's make sure everything lines
24 up."
25 Q.    Okay.  And did everything line up in the

1  case of Mr. Amos?
2  A.    The offer was extended, so obviously
3  somebody felt that it did to extend him that
4  offer.
5  Q.    Who made the ultimate decision to extend
6  Mr. Amos that offer?
7  A.    That would have been David DiCicco.
8  Q.    Okay.  If you look on Page 514, these
9  look just like some messages back and forth
10 from Katie Price and Mark Mozingo?
11 A.    Yes.
12 Q.    Who are Katie Price and Mark Mozingo?
13 A.    So Katie Price at that time was our
14 recruiting coordinator that coordinated all of
15 the flights, car rentals, hotels for any
16 candidate that was coming in from out of town.
17 Q.    Okay.  And Mark Mozingo?
18 A.    And Mark Mozingo is our compliance
19 specialist.  So he runs all of our background
20 checks.  So he would have initiated the
21 background check for Mr. Amos.
22 Q.    Okay.  So we kind of went through the
23 pages there, but I want to speak to actually in
24 the case of Mr. Amos, what was it about him
25 particularly that made you feel like he was

**34..37**

1 well-suited for this position, you being Lampo?
2 A.    Right.
3        It would have been a combination of his
4 background, experience, and the interview
5 process.
6 Q.    Okay.  And you felt like he did well on
7 both, fit both?
8 A.    He had background experience and did well
9 enough through the interview process.
10 Q.    Was there anything in the interview
11 process with Mr. Amos that gave you pause?
12 A.    There was.  In our notes, there was some
13 concern about his ability to have enough
14 humility.
15 Q.    What was it about him that gave you that
16 concern?
17 A.    He was overly talkative, and he did a lot
18 of name-dropping, which caused us to think that
19 there might have been something there.  It
20 required an additional interview that was had
21 with him to clarify that.
22 Q.    What name-dropping?  What was he doing?
23 A.    There's a difference in talking about
24 people you've worked with, and the way the
25 interviewer took it is that he was dropping

1 names, not necessarily people he's worked with
2 or projects he's worked on, but dropping names
3 to elevate himself, and we were trying to make
4 sure that that it wasn't a lack of humility, if
5 you will.
6 Q.    Okay.  Was there anything else besides
7 the fact he was overly talkative and
8 name-dropping that made you feel like he may
9 not have the humility to work at Lampo?
10 A.    From a humility standpoint, at that time
11 through the interview process, no.
12 Q.    Okay.  Was there any other reason besides
13 the humility standpoint that you thought he
14 might not be a good fit?
15 A.    The only other thing is something that we
16 were struggling with or dealing with at that
17 time, and that is that hiring people from out
18 West was not very successful for us.  People
19 that moved that far away from their family were
20 usually -- we took extra precaution to make
21 sure that the spouse was on board, signed up,
22 and ready to make that kind of move.
23 Q.    So you said you had bad luck with people
24 out West -- hiring people out West before?
25 A.    Yes.  We had -- we had hired a series of

1 people from, whether it be Phoenix or
2 Washington or California, where in a short time
3 of being with us, they got homesick and wanted
4 to move back out West.  So we were trying to
5 make sure that that was not the case.
6 Q.    Okay.  So the -- besides the humility
7 concerns, which you mentioned, and the concern
8 about him being from -- moving from out West,
9 was there anything else that gave you pause
10 prior to hiring Mr. Amos?
11 A.    Not from what was documented or from what
12 I could see.
13 Q.    When you say he was name-dropping, do you
14 remember the names he was dropping?  I mean,
15 just --
16 A.    No.  And they're not listed.  It was a
17 comment made by someone in the discovery
18 documents that said he appeared to be
19 name-dropping.  So they didn't list the names.
20 Q.    Okay.  Was it an interviewer who said
21 that?
22 A.    Yes.
23 Q.    What about Mr. Amos's experience did
24 Lampo like prior to hiring him?
25 A.    Specifically?

1 Q.    Yes.
2 A.    My guess would be his video editing
3 skills because that's the position he was being
4 hired for.
5 Q.    Okay.  And the experience he had in that
6 area?
7 A.    Yes.
8 Q.    The reason I'm asking is because you
9 said that it was -- what made him a good fit,
10 you had mentioned his experience?
11 A.    Right.
12 Q.    And I'm not putting words in your mouth,
13 so correct me if I'm wrong.  I think you said
14 that it was his experience and --
15 A.    Background and experience.
16 Q.    Okay.
17 A.    And obviously how he did in the
18 interviews.
19 Q.    Okay.  So you said his experience as a
20 video editor, and you said his background.
21 What about his background made him an ideal fit
22 in Lampo's view?
23 A.    That would have been -- it ties together.
24 So the background and experience is what he's
25 done before and how fast or slow that he has

*38..41*

1   elevated what he shows or demonstrates his
2   passions are in that area, and then how much
3   time he spent in that area, the experience, the
4   types of projects he's worked on, et cetera.
5   Q.   Okay.  But the background wouldn't be
6   dealing with these things from the book you
7   were telling me; the humble-hungry-smart?
8   A.   Correct.
9   Q.   Okay.  What investigations, if any, did
10  Lampo do prior -- into Mr. Amos prior to hiring
11  him?
12  A.   We don't do an investigation prior to
13  hiring somebody.
14  Q.   You do a background check?
15  A.   Yes.
16  Q.   Okay.  And when I say "investigation," I
17  mean -- that's what I'm talking about, any kind
18  of a check, something like that.
19  A.   We would have done a background check and
20  reference checks.
21  Q.   Okay.  And that's it?
22  A.   Correct.
23  Q.   And there was nothing in his background
24  check or checking his reference that made you
25  think he would not be a good candidate?

1   A.   Correct.
2   Q.   As a senior video editor, what were
3   Mr. Amos's job duties?
4   A.   Specifically, to edit video.  So
5   different video, different types of video that
6   we produce, whether that be for a conference or
7   internal videos that are being utilized for a
8   staff meeting.
9   Q.   Okay.  Do you remember the particular
10  videos Mr. Amos was brought on to work on?
11  A.   There's a series.  We don't necessarily
12  hire someone with one particular editing video
13  in mind.  So we would have brought him on to
14  edit video.  And I know at that time when he
15  came on we were contemplating a documentary,
16  but we were not there yet.
17  Q.   What was going to be the subject of the
18  documentary?
19  A.   The subject would have been loans --
20  college loans.
21  Q.   School debt?
22  A.   Uh-huh.
23  Q.   So when Mr. Amos -- you say his job was
24  to -- as a video editor was to edit video.  Did
25  you have the software there for him to use --

1   A.   Yes.
2   Q.   -- at the office and a computer for him
3   to use?
4   A.   Yes, sir.
5   Q.   Is it possible he could have done this
6   job at his house?
7   A.   The video files are so large that they
8   really sit on our servers at the office.
9   Q.   Okay.  Could he access them online, the
10  video files?
11  A.   I do not believe so.  I don't believe --
12  he could access them, yes; I don't believe that
13  he could do his job of editing remotely.  I
14  believe to manage the files and change the
15  files, I believe you have to be on the server.
16  Q.   Okay.  But that's not something he could
17  log in to the server from another location to
18  perform?
19  A.   Not to my knowledge.
20  Q.   Is the server connected to his computer
21  directly at the office, the server with the
22  large video files?
23  A.   He would connect directly to it, yes.
24  It's not a cloud-based server, if that's your
25  question.

1   Q.   Yes, I guess it was.  Thank you.
2        Who did Mr. Amos answer to while working
3   at Lampo Group?
4   A.   In his time there, he answered to two
5   different people.  I believe he started with
6   David DiCicco.
7   Q.   What's Mr. DiCicco's job title?  Or was
8   his job title.
9   A.   I don't know without looking at it.
10  Q.   Is Mr. DiCicco still with --
11  A.   Yes, he is.
12  Q.   Okay.  You said there was two.  One was
13  David DiCicco?
14  A.   Right.  And the second one was Lara
15  Johnson.
16  Q.   And is Ms. Johnson still with Ramsey?
17  A.   Yes, she is.
18  Q.   Or she's with Lampo.
19       And what was her job title at the time?
20  A.   She was over the video team.  She might
21  have been a director or senior director.
22  Q.   Now, plaintiff -- do you remember the day
23  plaintiff started for Lampo?
24  A.   No, sir.
25  Q.   Okay.  And when he started, were there

**42..45**

1  any issues with his work right off the bat?
2  A.    Not to my knowledge.
3  Q.    Okay.  Were there ever any issues with
4  plaintiff's work as a video director --
5  A.    There were --
6  Q.    -- video editor?
7  A.    -- yes.
8  Q.    What were those issues?
9  A.    Those issues were outlined in an e-mail
10  by Mr. David DiCicco to Mr. Brad Amos where it
11  was a combination of missing deadlines and a
12  lack of communication back to Mr. DiCicco
13  stating that they were going to miss those
14  deadlines.
15  Q.    Okay.  And are those the only two issues?
16  A.    There were more that transpired after
17  that.  That was the first one.  And then
18  there's additional e-mails where Lara Johnson
19  brought up some performance issues with him and
20  his ability to do work quickly.
21  Q.    Okay.  And there was an issue -- you said
22  he was late with Lara Johnson and a performance
23  issue.  Was this before or after the e-mail was
24  between -- you said it was DiCicco, I think?
25  A.    It was after.

1  Q.    So DiCicco e-mail was first, then Lara
2  Johnson e-mail was second?
3  A.    Correct.
4  Q.    And DiCicco's e-mail was about missing a
5  deadline?
6  A.    That is correct.
7  Q.    Okay.  And lack of communications.  And
8  then Lara Johnson's was about ability to do
9  work quickly?
10  A.    It was about getting something done in
11  time.  I don't remember the specifics of that
12  e-mail.
13  Q.    Okay.  And did these -- were there any
14  other issues with his particular work?
15  A.    Yes.  There was, in the e-mail -- there
16  was an e-mail as well by Luke LeFevre that
17  outlined and summarized some of the issues that
18  were going to be discussed with Mr. Amos.
19  Q.    Do you remember what they were?
20  A.    Not off the top.
21  Q.    Give me a second here.  We'll see if we
22  can't find it for you.
23  A.    Sure.
24  Q.    I'm not trying to trick you.  Like I
25  said --

1  A.    Yeah.
2  Q.    -- we just need to figure where it is in
3  the stack of documents lawyers carry around
4  everywhere they go.
5      MR. STREET:  Let's take about five or ten
6  while we flip through here.
7      MS. SANDERS:  Sure.
8      MR. STREET:  Won't keep everybody.
9      MS. SANDERS:  Do you want to -- do
10  you want us to stay in here?  Do you want us to
11  leave?  We can leave.
12      MR. STREET:  Yeah, if y'all don't
13  mind, just for a second.
14      MS. SANDERS:  Yeah.  Sure.
15      MR. STREET:  It being easier than us
16  having to haul all this stuff.
17      THE VIDEOGRAPHER:  We are going off
18  the record.  The time on the video monitor is
19  11:12 a.m.
20      (Short break.)
21      THE VIDEOGRAPHER:  We are back on the
22  record.  The time is 11:26 a.m.
23      MR. STREET:  All right.  Let's mark
24  these as Exhibit No. 4.
25      MS. SANDERS:  Can I just see them

1  before?
2      MR. STREET:  Sure.
3      MS. SANDERS:  So I can try to match
4  them up.
5
6      (WHEREUPON, a document was marked as
7  Exhibit 4.)
8      MS. SANDERS:  Okay.  If you'll just
9  give me the date of the e-mail as you're going,
10  I'll try to match it up.
11      MR. STREET:  Okay.  Sure.
12  BY MR. STREET:
13  Q.    All right.  If you'll look at those, do
14  you recognize these documents I've handed you?
15  A.    Yes, sir.
16  Q.    And what are those documents?
17  A.    These are e-mail exchanges between -- I'm
18  only looking at the first page, and that one is
19  a conversation between David DiCicco and Luke
20  LeFevre.
21  Q.    They're e-mail exchanges between
22  employees of Lampo?
23  A.    That would be correct.
24  Q.    All right.  Well, let's look at the first
25  page.  And this is an e-mail dated Tuesday,

**46..49**

1  April 7, 2020.  And this appears to be an
2  e-mail from DiCicco to Luke LeFevre.  Am I
3  saying it -- LeFevre?
4  **A.     Yes.**
5  Q.     Okay.  It looks like Mr. DiCicco is
6  talking about something he wanted to
7  communicate to Brad.  Do you see that?
8  **A.     I see that.**
9  Q.     Why would Mr. DiCicco have sent this to
10  Mr. LeFevre instead of just talking to Brad
11  himself?
12  **A.     David DiCicco reported to Luke LeFevre.**
13  **What this appears to be is, "Hey, I need your**
14  **advice.  I need your help.  I'm about to have**
15  **this conversation.  Can you guide me, lead me,**
16  **provide your advice?"**
17  Q.     Okay.  And if you'll look at the second
18  paragraph, it says, "I hope you understood my
19  frustration back on March 6th when we talked
20  about missing the 'Cards and Quotes' assembly
21  edit screener deadline."
22       What is the "Cards and Quotes" assembly
23  edit screener?
24  **A.     That is a great question.  I'm guessing**
25  **it's some kind of video thing that we did, but**

1  I am not sure which one it is.
2  Q.     Okay.  And this is apparently -- it looks
3  this e-mail that he has -- do you see where
4  it's in bold?  It says, "This is what I want to
5  communicate with Brad."
6  **A.     Yes, sir.**
7  Q.     And the following paragraphs look like
8  what he is suggesting, correct me if I'm wrong,
9  that DiCicco was telling LeFevre, "This is the
10  e-mail I'm going to send to Brad"?
11  **A.     That's right.  That's what it reads like.**
12  Q.     He's not saying it to LeFevre; he's
13  saying this is what I would like to send to
14  Brad Amos?
15  **A.     This is what I would like to communicate**
16  **to Brad Amos.  Can you provide your input or**
17  **insight or...**
18  Q.     Okay.
19  **A.     There is an actual other e-mail where he**
20  **did communicate this to Brad via e-mail.**
21  Q.     Okay.  And it's this exact same e-mail?
22  **A.     It's similar.  I don't know if it's exact**
23  **word for word.**
24  Q.     Okay.
25  **A.     But I do recall seeing it in the**

1  documents we produced.
2  Q.     I'm sure we'll pull it up again today at
3  some point.
4  **A.     Okay.**
5  Q.     But this is the one where -- did
6  Mr. DiCicco or Mr. LeFevre discuss this before
7  he sent this e-mail about issues they were
8  having with Brad?
9  **A.     I don't know that.  It doesn't state that**
10  **in this.**
11  Q.     Okay.  You don't know what led
12  Mr. DiCicco to send this e-mail?
13  **A.     I do not.  My guess is that in a**
14  **conversation with Luke LeFevre, he would have**
15  **said, "Hey, I'm having issues."  Luke would**
16  **have advised him to say "Hey, document that,**
17  **and let's go ahead and send him" -- "tell him**
18  **what you're thinking," right?  And then David**
19  **would have sent this back to Luke saying, "This**
20  **is what I would like to communicate."**
21  Q.     And was this the first e-mail that you're
22  aware of that Mr. DiCicco would have sent to
23  Brad expressing a little bit of angst about his
24  work?
25  **A.     To my knowledge, yes.**

1  Q.     All right.  If you look at the next set
2  of e-mails, it looks like it starts a 3/21/20
3  on the top of the page, and it's a -- it's an
4  e-mail string from before that.  Do you see
5  that?
6  **A.     Yes, I see that.**
7  Q.     The first one we're looking at backward
8  appears to be from Lara Johnson to Luke LeFevre
9  and Jen Sievertsen?
10  **A.     Sievertsen, yeah.**
11  **And that's -- so the first one at the top**
12  **appears to be from Luke LeFevre to Lara Johnson**
13  **and Jen Sievertsen.**
14  Q.     Right, right.  But I'm looking backwards
15  because we're going by dates.  You know how --
16  **A.     Got it.  Okay.**
17  Q.     -- in a reply e-mail, the older ones come
18  at the bottom?
19  **A.     So you're at the bottom?**
20  Q.     Right.
21       All right.  So I'm looking -- I'm asking
22  about this one that was sent on Friday,
23  March 20th, at 4:26.  Do you see that?
24  **A.     Yes, I see that.**
25  Q.     And it was sent to Luke LeFevre and

**50..53**

1    Jen Sievertsen.  Did I say that right?
2    **A.     Yes.**
3    Q.    And who is Jen Sievertsen?
4    **A.     She is a board member.  That would be who**
5    **Luke LeFevre reported to.**
6    Q.    Okay.  And is being a board member there
7    a full-time job at Lampo?
8    **A.     Yes, it's a full-time job, but there's**
9    **also -- she's our chief marketing officer as**
10   **well.  So a board member is not a position, per**
11   **se.**
12   Q.    Okay.
13   **A.     She's the chief marketing officer, who**
14   **also is a board member.**
15   Q.    Okay.  Who else is on the board?
16          MS. SANDERS:  Object, outside the
17   scope.  He can answer it.
18          THE WITNESS:  So Brendan Wovchko,
19   he's the chief technology officer; Michael
20   Finney, he's the chief operating officer; Susan
21   Simms, she is over our business channels; Dave
22   Ramsey; his son, Daniel Ramsey over
23   EntreLeadership.
24          There's 14 of them.
25          Herb Jenkins.  I don't have all 14

1    memorized.
2          God bless you.
3          But I can pull that up if you like.
4    BY MR. STREET:
5    Q.    That's okay.  I just wondered.
6          But looking at her e-mail from
7    March 20th -- and March 20th, 2020, fair to
8    say, this is about the same time COVID was just
9    getting started up --
10   **A.     Uh-huh.**
11   Q.    -- correct?
12   **A.     That's correct.**
13   Q.    All right.  So we're looking at this from
14   Lara Johnson, and it says, "It is difficult for
15   our team to work from home since so much of it
16   is hands-on activity."
17          Do you see that?
18   **A.     Yes.**
19   Q.    And it says, "We think we can keep the
20   team moving forward on projects and production
21   if we can make things" -- "these things happen
22   with a small crew here in the building for
23   limited times."
24   **A.     I see that.**
25   Q.    And was that -- the entire time during

1    the COVID pandemic, did Mr. Ramsey keep
2    a small -- or did Lampo, excuse me, keep a
3    small team there at the -- at the actual
4    office?
5    **A.     There was a group of essential workers**
6    **that stayed on to do the Dave Ramsey show.**
7    Q.    Okay.  And how did you interpret
8    essential to determine they would be working
9    there at the office?
10   **A.     We followed Governor Lee's mandate for**
11   **agencies that broadcast radio stations,**
12   **et cetera.**
13   Q.    Okay.  And was there something particular
14   about this group of people's job duties that
15   made them essential?
16   **A.     Yes.  They would have been essential to**
17   **being able to broadcast the radio show or**
18   **YouTube channel or any of the other media**
19   **outlets that we would serve.**
20   Q.    Okay.  What size crew did you have in the
21   building for the video editors?
22   **A.     I don't remember the size.  It was a**
23   **small group.  It was a skeleton crew of team**
24   **members.  I don't remember the exact number.**
25   Q.    Now, next paragraph says, "We are getting

1    hard drives together for the editors to take
2    home.  These will be ready starting Monday, and
3    we will release them as loaded.  We will
4    schedule these pick-ups next week and have
5    their computers & hard drives ready from them
6    to drive up and grab."
7          Do you see that?
8    **A.     I see that.**
9    Q.    All right.  So the files -- the video
10   files, you were giving them to editors to take
11   home to work on them?
12   **A.     The hard drives did not hold all of the**
13   **video files.  They just held portions of them.**
14   **So we were trying to give them enough to do**
15   **while we were working from home.**
16   Q.    Okay.  So you gave them hard drives with
17   material they needed to do their jobs from
18   home?
19   **A.     Correct.**
20   Q.    How did you determine who would be
21   working at the office and who would be able to
22   work from home during this time period?
23   **A.     We asked for volunteers, and so we said,**
24   **"Hey, if you're okay coming in, this is what**
25   **we're going to be doing."  And, again, this**

1 were people that were directly involved with
2 the radio show, YouTube channel, things where
3 we would be broadcasting for the radio show
4 mostly. And so we asked for volunteers to --
5 that would be comfortable coming in during that
6 time period.
7 Q. Okay. Mr. Amos was not one of these
8 volunteers?
9 A. Mr. Amos was one of them. I believe
10 somewhere in this stack is an e-mail from David
11 DiCicco confirming that he is, in fact, okay
12 coming in, and that if he's not, that that
13 would be okay with us.
14 Q. Okay. How many of the video producers
15 chose to work from home?
16 A. I don't know the answer to that question.
17 Q. Who would know that?
18 A. I don't know that anyone would. We
19 didn't keep attendance during that time. And
20 as you may recall in 2020 during that time,
21 there were a lot of things up in the air with
22 the pandemic.
23 Q. When you said that -- when Lara Johnson
24 says here that, "It is difficult for our team
25 to work from home since so much of it is

1 hands-on activity," what is the hands-on
2 activity required for the video editors?
3 A. I'm sorry. Where are you at?
4 Q. In the first sentence in this e-mail from
5 Lara Johnson.
6 A. "Wanted to run some thoughts by you."
7 Q. Right.
8 A. Okay. "...with the video team
9 essentially shut down. It is difficult for our
10 team" -- second sentence. Got it.
11 That goes back to what we were talking
12 about. So much is on our servers, that from an
13 editing standpoint -- it's not cloud-based, so
14 you're having to grab things from different
15 places on the server in order to be able to
16 edit, and then you must have certain software
17 if you want to edit the sound as well, the
18 audio, not just the video.
19 Q. Okay. Well, what was on these hard
20 drives you were passing out -- passing out?
21 A. Small portions of that.
22 Q. And then she says in the next page, if
23 you look at the next page, this older e-mail,
24 that you're going to have a few shoots
25 scheduled in the next two weeks. "We wanted to

1 know if we continue moving forward with these
2 if we had a small crew to make them happen."
3 Ramsey Education, is that a video, Ramsey
4 Education?
5 A. That's a department.
6 Q. Okay. All right. Who is George and
7 Hogan?
8 A. The George referenced here would be
9 George Kamel. Hogan would be Chris Hogan. And
10 so it's listed "George, Hogan in the
11 personalities room - March 25th." My guess is
12 that's where they would do the video shoot.
13 Q. Okay. And then the section is "PU Quick
14 Pivot Ideas."
15 A. Yeah. It's cut off with the hole punch.
16 It should actually say FPU.
17 Q. Okay.
18 A. And so that would be Financial Piece
19 University, Quick Pivot Ideas. "Dan Ram is
20 working with Dave on these. To be shot in
21 TDRS"; is The Dave Ramsey Show studio.
22 Q. Who is Dan Ram?
23 A. That would be Daniel Ramsey.
24 Q. Okay. Is he related to Dave?
25 A. He is.

1 Q. How?
2 A. It's his son.
3 Q. Entre Core Teaching, what is that?
4 A. EntreLeadership is a department. It's --
5 also happens to be a book, but it's a
6 department, and during that time -- well, let
7 me back up.
8 We teach small businesses how to run
9 their businesses the way that Dave ran his
10 company when it started. And so there were a
11 lot of small businesses, including -- we were
12 not a small business but including us,
13 wondering how do we -- how do we deal with a
14 pandemic, how do we deal with -- mostly it was
15 communication. So we were filming and putting
16 something out for our clients on the core
17 principles and -- and how to deal with
18 uncertainty.
19 Q. Those would be videos that you sold?
20 A. Yes and no. So if you were part of an
21 Entre All Access, you had access to them. So
22 we weren't selling them individually. You were
23 already a part of the Entre tribe, thus, you
24 got this --
25 Q. Subscription based?

1   A.    -- content for free.
2         Correct.
3   Q.    Okay.  So people who subscribe could
4   watch these videos?
5   A.    Yes.
6   Q.    What is SmartDollar?
7   A.    It's a business unit.  So SmartDollar is
8   where we teach small businesses how to get
9   their employees out of debt.
10  Q.    Okay.  And "AO - Product addiction" --
11  "addition"?  Excuse me.
12  A.    So AO stands for Anthony O'Neill, and so
13  this was an Anthony O'Neill product addition
14  that was being filmed.  They're recommending on
15  April 8th.
16  Q.    Who is Anthony?
17  A.    Anthony O'Neill was a personality with
18  Ramsey Solutions.
19  Q.    And he would sell things?
20  A.    I'm sorry?
21  Q.    He would sell things, trinkets,
22  souvenirs?
23  A.    No.
24  Q.    What would he sell?
25  A.    He would sell -- basically, he would have

1   content that talked to people about either, A,
2   getting out of debt; B, think -- think
3   interviews that he would do that would have an
4   appeal to the public to hear what people have
5   to say; motivational speaker.
6   Q.    Right.  So --
7   A.    There -- there was no merchandising,
8   there was no trinket, there wasn't a T-shirt or
9   a cup or a glass.
10  Q.    Then she goes on and says, "Skeleton
11  Crew, Daily, that there will be two people
12  required in the building every day from the
13  video production"?
14  A.    Yes.  So this was part of that e-mail
15  that we started with on the previous page.  And
16  so this is what Lara is saying her
17  recommendation for the video shoots and then
18  the skeleton crew that would be needed in order
19  to make this work that she just finished
20  listing happen.  So she's saying daily, we
21  would need the -- two individuals in order to
22  be able to do this, and she outlines why each
23  one is needed.
24        And then if we did the productions that
25  are scheduled, then we would need the following

1   people to do that -- that type of production.
2   And she lists four names there.  And then the
3   documentary, we would need the following.  She
4   said we would love to keep it on schedule, and
5   that's where David DiCicco and Brad Amos would
6   be in Bluebird viewing room to continue to work
7   through the edits.
8   Q.    Okay.  What's the Bluebird viewing room?
9   A.    Bluebird is just the name of a screening
10  room.  It's an edit room where team members
11  would go in to do their edits there.  It's a
12  bigger screen.  It's, again, access to servers,
13  et cetera.
14  Q.    Okay.  So these projects listed, the only
15  one that you mentioned Mr. Amos working on was
16  the documentary?
17  A.    That's correct.
18  Q.    Okay.  If you flip back to the page
19  before, in an e-mail from Friday, March 20th,
20  2020, from Jennifer Sievertsen, she says this
21  plan -- she's okay with this plan, and they're
22  doing a deep clean?
23  A.    Yeah.  So "I'm good with this plan
24  assuming the team is good to come in.  You can
25  let them know we're already deep cleaning,

1   again, the offices this weekend."  So we were
2   on a schedule of deep cleaning at this time.
3         And so she's stating to Lara, "Hey, I'm
4   good with this plan assuming that the team is
5   good to come in, and let them know we're
6   already deep cleaning again," meaning we would
7   have already done it once at least, and that
8   was scheduled to happen that weekend.
9   Q.    Okay.  And then it looks like the next --
10  next message in the string was sent from Luke
11  LeFevre and included David DiCicco as copied as
12  well, and this is, "Copying David.  I am fine
13  with most of this.  I think we need to pause
14  the doc for a week."
15        Do you see that?
16  A.    I see that.  But is that the next one or
17  is the next one the one from Lara Johnson?
18  Q.    Oh, I guess you're right.  There is one
19  between there.
20  A.    Right.
21  Q.    So Lara Johnson --
22  A.    So Lara is replying to Jen Sievertsen
23  saying that sounds good, yes, this is
24  contingent on them, meaning the team, being
25  okay.

1 Q. And that was on March 20th -- Friday
2 March 20th. So on Saturday, March 21st, that's
3 when Mr. LeFevre sent this mail saying he needs
4 to put the pause -- need to pause the doc for a
5 week?
6 **A. He's asking the question. So it looks**
7 **like -- so if I read the whole thing, it says,**
8 **"Copying David," that would be David DiCicco.**
9 **"I'm fine with most of this. I think we need**
10 **to pause the doc for a week. I am nervous**
11 **about Brad Amos's wife doing something dumb if**
12 **he comes in." And then he asks the question,**
13 **"Can we pause for a week and see where we**
14 **stand? Then check in with him?"**
15 Q. Check in with him being Brad Amos?
16 **A. That would be my guess.**
17 Q. Okay. Well, he says, "I am nervous about
18 Brad Amos's wife doing something dumb if he
19 comes in."
20 What were they worried about Brad Amos's
21 wife doing?
22 **A. I'm not sure. I am not sure what he's**
23 **thinking about, but in further e-mails, we can**
24 **see where Brad Amos's wife would not let him**
25 **come into the house because he was at work and**

1 **was having him change clothes in the garage.**
2 Q. Okay. And is that what they considered
3 dumb?
4 **A. I don't know that dumb is the right word,**
5 **but that would be something that Luke was**
6 **afraid of, where now a family can't be**
7 **together. And the fact that they can't be**
8 **together as husband and wife would be what's**
9 **dumb, not the fact that -- he's not calling her**
10 **dumb.**
11 Q. He's just calling what she's doing dumb?
12 **A. We don't know what she's doing. It says**
13 **she might do something.**
14 Q. But you have no idea what she -- what
15 they thought she might do?
16 MS. SANDERS: Object, asked and
17 answered.
18 BY MR. STREET:
19 Q. Is that fair to say?
20 **A. That's fair to say.**
21 Q. Okay. I'm just asking because it's the
22 only chance I get to ask the corporation.
23 All right. If you'll flip over to the
24 next page, I think. This is an e-mail, looks
25 dated 4/14/2020?

1 **A. Yes, sir.**
2 Q. This says, you know, "Luke and I talked
3 and wanted to bring you up to speed on what we
4 discussed. I want to start digging in with
5 Brad and see if I can get some of that
6 corporate thinking out of him."
7 What does that mean, the "corporate
8 thinking out of him"?
9 **A. I'm not sure what Lara meant by that.**
10 Q. So "I'm going to start meeting with him
11 1:1."
12 Do you see that?
13 **A. Yes, I see that. So I'm going to start**
14 **meeting with him one-on-one. So we do**
15 **one-on-ones with team members on a weekly**
16 **basis. My guess is she's saying I'm going to**
17 **start having one-on-ones with him weekly.**
18 Q. Because she didn't like the way he was
19 thinking?
20 **A. Perhaps. Again, I'm not sure what she**
21 **meant by "corporate thinking." There must have**
22 **been something that she said or done that**
23 **caused her to think, "Hey, let's figure out**
24 **exactly what's going on."**
25 Q. Well, what other situations would be bad

1 thinking on the part of an employee that would
2 require a one-on-one meeting?
3 MS. SANDERS: Object, outside the
4 scope.
5 THE WITNESS: Other type of
6 situations that would require a one-on-one
7 meeting, is that the question?
8 BY MR. STREET:
9 Q. Yes.
10 **A. Okay.**
11 Q. For thinking. What thoughts were not
12 allowed over there?
13 **A. It would be policy, procedure driven. It**
14 **would be, "Hey, I want to make sure that I**
15 **follow hierarchy." We're very collaborative as**
16 **a team. So it wouldn't be a -- I need to make**
17 **sure that I get to my leader before I act on**
18 **anything, and then that leader's leader, and**
19 **then that leader's leader. Like, it wouldn't**
20 **be that type. It would be more collaborative.**
21 **If you have something to say, you can say it.**
22 Q. Okay. And she says to DiCicco, "You are
23 more than welcome to continue to meet with
24 him."
25 Was DiCicco meeting with Mr. Amos at this

1  time about something?
2  A.   Yes.  So, again, my guess is that at this
3  point, he was in transition -- Mr. Amos was in
4  transition of reporting to Lara versus
5  reporting to David.  So David would have been
6  his leader doing one-on-ones with him prior to
7  that.
8  Q.   Okay.  And would these one-on-ones also
9  be about his thinking?
10 A.   One-on-ones are a normal part of doing
11 business.  They have nothing to do with your
12 thinking.  I do one-on-ones with every one of
13 my direct reports, as does every leader at
14 Ramsey.
15 Q.   Right.  But this e-mail says this
16 one-on-one is to get "some of that corporate
17 think out of him."
18 A.   This is why she's requesting to have
19 one-on-ones with him, but the one-on-one
20 concept applies to every leader at Ramsey to
21 meet with their team members on a weekly basis.
22 Q.   Okay.  Why would she want to give
23 Mr. Amos more attention than she already was?
24         MS. SANDERS:  Object, outside the
25 scope.

1         MR. STREET:  It's not, but go ahead.
2         THE WITNESS:  So my guess, again --
3  "so I am going to start meeting with him
4  one-on-one.  You are more than welcome to
5  continue to meet with him.  I just want to give
6  him more attention.  I could not help but feel
7  like I failed both of you by not digging in
8  sooner.  We are going to go ahead and give Brad
9  some other work so he feels like he's
10 contributing.  I will start talking with him
11 through that then just to continue to help get
12 a gauge on how deep his attitude goes.  Luke
13 and I are also going to meet with HR Committee
14 just to give them a heads-up so all this
15 doesn't come out of left field.  I'll keep you
16 updated and let you know if I have questions."
17        So in reading it in full context, my
18 guess is that Brad had said something about the
19 fact that he's, A, not getting enough work or,
20 B, is starting to have maybe a negative
21 attitude toward the work that he is doing.
22        And so Lara is saying to David, "I'd like
23 to start meeting with him to find out what's
24 going on, and in those meetings I will assign
25 him more work, and I'm coming in to human

1  resources committee to give them a heads-up so
2  this doesn't come out of left field."  Meaning
3  if this continues to go bad, she wanted
4  HR Committee to be aware that we were having
5  some issues.
6  BY MR. STREET:
7  Q.   Okay.  Well, I appreciate that, but
8  his -- her words are that she's going to
9  "continue to help, get a gauge on how deep his
10 attitude goes."  What was problematic about
11 Mr. Amos's attitude?
12 A.   Again, I'm reading it in full context,
13 not out of context.  In full context, "so he
14 feels like he's contributing," tells me that he
15 would feel like he's not contributing.
16 Q.   So "the attitude" talks about his
17 attitude that he feels like he's not
18 contributing?
19 A.   Correct.  And my thoughts there, again,
20 in full context, would be that he -- it wasn't
21 a positive attitude.  My guess is she's not
22 pulling him in to talk about what a great
23 attitude he has.
24 Q.   Right.  But you said that the -- I guess
25 I'm just confused because he feels like --

1  you're saying the attitude was that Mr. Amos
2  felt like he wasn't contributing, and that was
3  the bad attitude?
4  A.   Like he wasn't contributing or wasn't
5  doing the work that he felt like he was
6  contributing.
7  Q.   Okay.  And because he didn't feel like he
8  was contributing enough, they were going to
9  meet with the HR Committee about that?
10 A.   Yes.  So our -- our process would that be
11 if there was a team member that a leader was
12 having concerns with or issues with, before
13 that leader would take action on someone, they
14 would bring that into human resources
15 committee.
16 Q.   Who was the -- who was on the
17 HR Committee she's talking about here in this
18 e-mail?
19 A.   That would be different board members and
20 includes myself and the human resources
21 committee.
22 Q.   And is that the same committee every
23 time?
24 A.   It changes.  I would have to go back to
25 pull who was there in April of 2020.

1  Q.   Okay.  But as you sit here today, can you
2  tell me who was on the committee best you can
3  from your memory?
4  A.   Yeah.  Best I can from my memory would be
5  Jack Galloway, Mark Floyd, Jen Sievertsen.
6  Q.   Okay.
7  A.   Myself.
8  Q.   Okay.
9  A.   I believe that's it in 2020.
10 Q.   And the HR Committee, did they meet about
11 Brad Amos with Lara Johnson?
12 A.   We did not.  There was an e-mail that was
13 sent.  HR Committee did not meet on the week
14 that they requested to be part of it.
15 Q.   She said she wants to get with the
16 HR Committee to "give them a heads-up so all
17 this."  I guess I'm just confused by "all
18 this."  Does the "all this" just mean
19 Mr. Amos's perception that he wasn't helping
20 out as much as he should have?
21 A.   My guess is that "all this" is
22 reference -- in reference to his attitude, not
23 to the fact that he wasn't contributing.
24 Q.   Okay.  And that's what I'm trying to get
25 at.  What about his attitude was the issue?

1  A.   I have the e-mail to go by that you have
2  to go by.  So we would have to ask Lara Johnson
3  exactly what it meant.
4  Q.   Right.  But as far as the corporation is
5  here today to ask questions --
6  A.   Uh-huh.
7  Q.   -- you can't tell me one thing that
8  Mr. Amos had a bad attitude about?
9  A.   I can tell you from the e-mails that
10 they've written what eventually came out, but
11 on this date given the paper that I have in
12 front of me, I cannot.
13 Q.   Okay.
14 A.   I can tell what you it led to with the
15 information I now have --
16 Q.   Okay.
17 A.   -- and the e-mail that Luke LeFevre sent.
18 Q.   Okay.  Why don't you do that.
19 A.   Okay.  Can we pull the e-mail that Luke
20 LeFevre sent to HR Committee?
21 Q.   If it's in this group we can; if not,
22 we'll find it.
23 A.   It's not included in this group.  The one
24 that is included in this group is an e-mail
25 from Lara Johnson dated Monday, July 27th,

1  2020, at 3:22 p.m. --
2  Q.   Yes.
3  A.   -- from Lara Johnson to HR Committee,
4  where she is asking "I am needing to come and
5  talk with HR Committee about the future of Brad
6  Amos.  We talked about him back in March, and I
7  have been meeting with him weekly."
8  Q.   Okay.  Well, let's -- let's stop right
9  there a second.
10      Now, did Ms. Johnson actually come in and
11 meet with the HR Committee about Mr. Amos?
12 A.   I don't remember that.
13 Q.   So is it fair to say that Mr. Amos was
14 terminated without an HR Committee meeting
15 taking place?
16 A.   Correct.
17 Q.   Okay.  So it didn't matter what the
18 HR Committee thought, he was fired anyway; fair
19 to say?
20 A.   Luke LeFevre sent an e-mail to
21 HR Committee asking for moneys to present to
22 Brad Amos, and then in that meeting, he was
23 terminated.
24 Q.   Okay.  But I mean when -- he was asking
25 for money for a separation agreement, wasn't

1  he?
2  A.   That's correct.
3  Q.   Okay.  So he already had been determined
4  he was going to be fired?
5  A.   The way the e-mail was written by Luke
6  LeFevre, he was going to be given an option to
7  go on a performance improvement plan or take a
8  separation amount.
9  Q.   Right.
10 A.   He was asking approval ahead of time for
11 that amount.
12 Q.   And was that what was done?
13 A.   Correct.
14 Q.   Let me go back to this e-mail you were
15 just reading from on July 27, 2020, 3:23.
16 You're saying the HR Committee never met but
17 that Luke LeFevre sent an e-mail one time about
18 it?
19 A.   Yeah.
20 Q.   Okay.  But in this e-mail, she says, "We
21 talked about him back in March, and I've been
22 meeting with him weekly."
23      Is this, the e-mails we just read from,
24 where she said she was going to start having
25 the one-to-ones?

74..77

Page 78

1  A.    Yes.
2  Q.    Was there any other talk from Ms. Johnson
3  to the committee other than those e-mails?
4  A.    I don't know the answer to that question.
5  Q.    Okay.  She says, "Not much has changed."
6  What was -- you know, because I want to look
7  back -- I'm sorry.  If we go back to this
8  e-mail from before, maybe I just don't see it,
9  but I thought Lara Johnson had just sent that
10 e-mail before about Brad Amos to David DiCicco
11 only.  I think you might have it right there.
12 It's dated 4/14.
13 A.    Yeah, 4/14/2020, 1:16 p.m.
14 Q.    She did communicate with the -- so
15 there's an e-mail to
16 HRCommittee@daveramsey.com, right?
17 A.    Yes, from -- from Luke LeFevre, not from
18 Lara Johnson, if I'm not mistaken.
19 Q.    Well, this one I'm looking at is from
20 Lara Johnson to HR Committee.  We were just
21 reading from it.
22 A.    Yes, Monday July 27th, 2020.
23 Q.    So she could have sent an e-mail, maybe
24 she did send one, to the HR Committee about
25 Brad Amos prior to this one.  Is that what

Page 79

1  happened?
2  A.    That could be.
3  Q.    Okay.  And if you look through there, are
4  they in those e-mails there?  Maybe I'm just
5  not seeing it.  And I'd be talking about an
6  e-mail that would be dated prior to July 27th,
7  2020.
8         MS. SANDERS:  For the record, what's
9  this exhibit number?
10        MS. IRWIN:  It's 4.
11        MS. SANDERS:  Okay.
12        MS. IRWIN:  It's collective.
13        THE WITNESS:  There was an additional
14 e-mail that's not listed here where Lara is
15 asking to be on HR Committee back in March.
16        MR. STREET:  Okay.  Can we get that
17 one?
18        MS. IRWIN:  I'm looking.
19 BY MR. STREET:
20 Q.    And when she says, "Not much has
21 changed," she's referencing that e-mail you
22 just told me about?
23 A.    Correct.
24 Q.    The one that's not in this group, not
25 part of Exhibit 4?

Page 80

1  A.    That's correct.
2  Q.    And it also says that Mr. Amos apparently
3  told her, "There are things I wish I knew
4  before I took this job."
5         Do you see that?
6  A.    I see that.
7  Q.    What were those things he said he wished
8  he knew before he took the job?
9  A.    She doesn't spell it out, so I don't
10 recall them.
11 Q.    Did you ever know them?
12 A.    I -- I do know them now given what Brad
13 said.
14 Q.    Okay.  What were they?
15 A.    That he would not be working on the
16 documentary, that he would not be quickly
17 promoted, that this was not a come in, make a
18 big splash, and get promoted quickly.
19 Q.    That's what he thought was going to
20 happen?
21 A.    That's what he said.
22 Q.    Okay.  And those are the things that he
23 said he wish he knew before he took the job?
24 A.    That is my guess of what he's referencing
25 given that line by Lara.

Page 81

1  Q.    Okay.  I don't want you to guess.  If you
2  don't know, say, "I don't know."  That's fine.
3         Fair to say?
4  A.    That's fair to say.
5  Q.    So it sounds like we just don't know
6  what she -- as you sit here today, you can't
7  tell me what he told her to make her say that
8  in this e-mail?
9  A.    Correct.
10        Given that e-mail, I would have known
11 at that time what it was.
12 Q.    Okay.  And it says, "I want to see if it
13 is time to do an emotional firing."
14        What is an emotional firing?
15 A.    This would be where we give someone the
16 option to either go on a performance
17 improvement plan or given an amount of money to
18 opt out.
19 Q.    Okay.  Why would you call that an
20 emotional firing?
21 A.    It's -- it's really an emotional time for
22 that person.  So imagine if you were sitting
23 there being told, "Hey, your performance is
24 such that you can either go on this performance
25 improvement plan or you can take this money and

78..81

Case 3:21-cv-00923   Document 59-1   Filed 01/18/23   Page 22 of 90 PageID #: 1542

1  leave."  The term "emotional firing" is the
2  term that is used at Ramsey for that
3  conversation because it almost feels like a
4  firing.  It's not, but it feels that way.
5  Q.  Okay.  And then she says, "I don't
6  believe this is going to get better, and I
7  don't believe he will take the money.  Instead,
8  he will want to make it work."
9     Do you see that?
10  A.  Yeah, I see that.
11  Q.  All right.  And is that indeed what
12  Mr. Amos wanted to do?
13  A.  No.
14  Q.  Okay.
15  A.  It never got to that point of being
16  presented with the two options.
17  Q.  Okay.  All right.  If you look at the --
18  above that, Jack Galloway, the executive vice
19  president?
20  A.  Yes.
21  Q.  This e-mail, it looks like it was sent on
22  Tuesday, July 28th, at 8:11 p.m.
23     MS. SANDERS:  Let me find that
24  e-mail.  I don't have that e-mail in front of
25  me.

1     MR. STREET:  It's the same page as we
2  were just reading form.  It's this e-mail right
3  above it.
4     THE WITNESS:  There's two e-mails
5  from Lara.  So one is Luke replied, and then
6  the second one -- there's two identical ones.
7     MS. SANDERS:  Yeah, that's not the
8  one I had in front of me.
9     MR. STREET:  Okay.
10     MS. SANDERS:  There's not -- there's
11  not a number -- a Bates number on that one?
12     MS. IRWIN:  No.  I can get it for you
13  in a second, though, I think.
14     MS. SANDERS:  What's the -- what's
15  the date again?
16     MR. STREET:  July 28th, 2020,
17  8:21 p.m.
18     Did you find it?
19     MS. SANDERS:  No.  Do you have any
20  idea where -- where it is in the production?  I
21  can just find -- I mean, there's like 600 --
22  500 documents I'm scrolling through.
23     MS. IRWIN:  Yeah.  Well, I mean, you
24  get to like 350, you get past all the other
25  calendar invites, it's probably on the other

1  side of that, if I were to guess.
2     MS. SANDERS:  Yeah, I'm still not
3  seeing it.
4     MS. IRWIN:  It is 359.
5     MS. SANDERS:  Okay.
6     MS. IRWIN:  It's Page 245 of the PDF,
7  if that's helpful.
8     MS. SANDERS:  Yes.  I'm almost there.
9     Okay.  I'm referring to LAMPO_0359.
10     MS. IRWIN:  That's the one.
11     MS. SANDERS:  Okay.
12  BY MR. STREET:
13  Q.  All right.  And do you see the e-mail I'm
14  talking from Jack Galloway dated July 28, 2020,
15  at 8:21 p.m.?
16  A.  I do.
17  Q.  All right.  And he says in this e-mail,
18  "HRC doesn't meet this week.  We are having
19  exec comm stratop"?
20     Did I say that right?
21  A.  Stratop.
22  Q.  Stratop.
23     What is exec comm stratop?
24  A.  Executive committee is what exec comm is
25  referencing.  Stratop is strategic operations.

1  And so they were basically going to meet to
2  have a planning section for the coming year.
3  Q.  Okay.  And he says, "If you like, I can
4  add you to next week's agenda to come in and
5  discuss it."
6     Do you know if this matter was added to
7  the agenda for the HR Committee?
8  A.  It was not.
9  Q.  Okay.  Why was it not?
10  A.  Luke LeFevre sent an e-mail kind of
11  summarizing and reiterating what Lara had said
12  about asking for the money and outlining that
13  he was ready to have that conversation that we
14  called an emotional firing earlier --
15  Q.  Right.
16  A.  -- and asked for permission to have that
17  conversation on that Monday.
18  Q.  Okay.  It sounds like -- he says, "But it
19  sounds to me like you feel like he needs to
20  leave."
21     I keep going back to this, but I'm just
22  not clear.  What was it about Mr. Amos that
23  Mr. Amos was doing or his attitude that made it
24  sound like he needed to leave?
25  A.  I think it's probably a combination of

Page 86
1  things, but I am inferring by what Lara Johnson
2  said:  So "It sounds to me like you feel he
3  needs to leave."  She's saying that things,
4  and she's saying, "I don't believe that things
5  are going to get better, and I don't believe he
6  will take the money."
7  Q.    Right.  And I guess I keep coming back
8  to, what are the things that are not going to
9  get better?  What are the things that indicated
10 he needed to leave?
11 A.    Yeah.
12 Q.    What are those things?
13 A.    So knowing what I know today, it would be
14 the combination of his lack of being able to do
15 the work we hired him to do, the lack of his
16 ability to collaborate with others.
17 Q.    Okay.  Hold on a second.
18    Lack of ability to do the work?
19 A.    Yeah.  So it's all the things that Luke
20 LeFevre outlined in that e-mail that we had --
21 Q.    The lack of -- I'm sorry.  What was the
22 second thing you said?  You said it's the lack
23 of ability to do the work?
24 A.    Or collaborate with others.
25 Q.    Lack of -- lack of collaboration.

Page 87
1     Anything else?
2  A.    Again, there's more listed in that
3  e-mail --
4  Q.    Okay.
5  A.    -- that's not included in this group
6  of -- this exhibit that was handed to me.
7  Q.    What indicated that Mr. Amos had a lack
8  of ability to do the work he was hired to do?
9  A.    It was his missed deadlines that was
10 outlined in the David DiCicco e-mail where he
11 says, "I would like to have the following
12 conversation with Brad Amos."
13    It was his lack of being transparent to
14 Mr. DiCicco about the fact that those deadlines
15 were not being met.
16 Q.    Okay.  Anything else besides the
17 deadlines?
18 A.    The communication and the deadline miss,
19 yes.
20 Q.    I think -- didn't we look at one of these
21 e-mails today from where -- or maybe it was the
22 one he was going to send Brad.  Do you see that
23 was on the first page, Exhibit No. 4?  Is this
24 the e-mail you were talking about where
25 Mr. LeFevre [sic] breaks down --

Page 88
1  A.    This is where Mr. DiCicco breaks down.
2  Q.    Mr. DiCicco.
3  A.    You have some of the frustrations and
4  issues he's having with Mr. Amos.
5  Q.    Okay.  And is this the e-mail that you
6  were just saying that the -- when I asked
7  you how he didn't -- how he wasn't able to
8  do -- to do the job you hired him to do, you
9  said there was an e-mail that set -- set that
10 out.  Is this the e-mail you're talking about?
11 A.    Yeah, this is the e-mail that I
12 reference.  There's also a secondary e-mail by
13 Luke LeFevre to HR Committee outlining all
14 the issues that they've had with Brad Amos and
15 why he's recommending the moneys and emotional
16 firing conversation that we talked about
17 earlier.
18 Q.    Okay.  All right.  And then on the second
19 page of this exhibit in this same e-mail dated
20 April 7th, 2020, at 12:17, it says, "You agreed
21 to be here as part of a team -- be here --
22 Excuse me.  Let me read -- Strike that.
23    "You agreed to be here to be part of a
24 team, not edit a documentary."
25    What did he mean when he said that?

Page 89
1  A.    That he took the job to be part of a
2  team, not to be a solo person editing a
3  documentary.  He wasn't a contract team member
4  hired to edit a documentary and only that.
5  Q.    Okay.  Was Mr. Amos actually doing that,
6  acting like he was the lone wolf, so to stay?
7  A.    We would have to read the whole thing in
8  context, but yes.
9  Q.    Go ahead and read it and answer me, then.
10 A.    Sure.  So if we start at the top where it
11 says:  "This is what I want to communicate,"
12 right, "I have to have an honest conversation
13 with you.  Been wrestling with a few things.
14 Want to talk through those, so just listen."
15 This is his suggesting this to Luke LeFevre as
16 the conversation he's go to have with Brad
17 Amos.
18    "I hope you understand my frustration
19 back on March 6 when we talked about missing
20 the 'Cards and Quotes' assembly edit screener
21 deadline.  I want to reiterate why.
22    On January 14th, we sat down, I told you
23 I can easily slip in to micromanaging a project
24 like this, but I didn't have the bandwidth, and
25 I also wanted to give you the space to create

86..89

1  and do your thing. We had a rough paper edit
2  and a narrow" -- "and a narrative structure we
3  had all worked through. This was the starting
4  point to build a story out of. You had eight
5  weeks to work through the assembly edit."
6      That would be the assembly edit that he
7  missed.
8      "I traveled a few weeks during that time,
9  but when I would do check-ins asking how the
10 work was coming, help answer any questions we
11 needed to talk through, you kept saying things
12 were fine. I believed you. But then on
13 March 5th, the day before we're supposed to
14 screen a rough assembly of the film, I find out
15 we aren't anywhere close to having an assembly
16 edit done.
17     So this is what that does to me. I was
18 really frustrated because we didn't hit the
19 agreed deadline; ZERO communication that it was
20 behind; it wasn't until asked last minute that
21 you mentioned that you didn't have it where we
22 wanted it to me. BIG MISS," in bold letters.
23 Q.    I'm not asking you to read everything,
24 but what I am asking you to do is tell me is --
25 did Mr. Amos, you said in this -- the second

1  part of this e-mail, that he agreed to be here,
2  a part of a team, not edit a documentary. Was
3  Mr. Amos working on it as just it was his
4  project and his alone?
5  A.    Yes.
6  Q.    Okay.
7  A.    He was acting like it was his project and
8  his alone, but, also, he was saying -- so if I
9  can come back to this?
10 Q.    Sure.
11 A.    I just want to continue.
12     So "Even after we had the first
13 conversation about missing the deadline, you
14 confidently told me the first half of the film
15 would be cut by the following Friday.
16 Thursday, when I checked in, you needed an
17 extra day. I had to follow up with you on the
18 progress. Trust was broken during this."
19     So where -- where this is going is that
20 not only did he miss the deadline on the
21 project that he was assigned, he basically
22 said, "Hey, I'm not doing anything else except
23 editing the documentary."
24 Q.    Okay.
25 A.    The last line of that sentence is where

1  Brad was taken off this project during that
2  conversation with Mr. DiCicco. "Dennis is
3  running point as we wrestle the story over the
4  next few weeks." So he was taken off running
5  point on this story.
6  Q.    Mr. Amos was?
7  A.    Correct.
8  Q.    Excuse me.
9      Now, Dennis, did he work from home during
10 the pandemic, or did he actually come in the
11 office?
12 A.    I don't know that.
13 Q.    Who is Dennis?
14 A.    Dennis would have been another video
15 editor -- another senior video editor.
16 Q.    What was his last name?
17 A.    I don't recall that. I can get it for
18 you, but I don't recall that.
19 Q.    Okay. Thank you.
20     All right. I think the next page that
21 you may look at here in your stack is an e-mail
22 dated 4/13/2020 from Lara Johnson to Luke
23 LeFevre and David DiCicco.
24     There you go.
25 A.    Okay.

1  Q.    This -- the first e-mail on top of the
2  page, the one dated 4/13/2020, 1:22:29 p.m., it
3  says, "Yes, I saw this this morning and made a
4  note," Lara Johnson. And the first e-mail
5  looks like it was -- it might have been cut
6  off. Do you see the one I'm talking about?
7  A.    Yeah. At the bottom?
8  Q.    Yeah.
9  A.    The one from Luke LeFevre to David
10 DiCicco and Lara Johnson dated Monday,
11 April 13th, at 8:21 a.m.?
12 Q.    Okay. What are these little smiley,
13 happy faces things here? What is -- what are
14 those?
15 A.    They're in reference. We do a weekly
16 report, every team member does one, that
17 basically informs their leader how their --
18 their week was, anything special going on in
19 their lives. This is one portion of the report
20 that has the smiley faces.
21     And so it looks like this is off of Brad
22 Amos's weekly report for that week or the week
23 that just ended. So this would have been the
24 week prior to April 13th. Looks like Brad
25 listed his morale as low or mediocre. As with

90..93

1  everyone, lots of them started doing the
2  mandatory quarantine, stress, he listed, as
3  well as not doing well.  It says, "No work,
4  little feedback, bit of a limbo, makes things a
5  bit stressful, as I'm sure it does with
6  everyone."  Workload he listed the same way.
7  Q.    What's a QNAP, Q-N-A-P?
8  A.    Don't have a clue.
9          And then you can see that the next
10 section of that report is what's on the bottom
11 where it lists weekly high, weekly low, or
12 anything else.  And he didn't -- it doesn't
13 appear he put anything in those boxes.
14 Q.    But this is something they did every
15 week, correct?
16 A.    That's correct.
17 Q.    So they didn't just do it on April 13th,
18 2020.  But on the next page, September 30th,
19 2019, there was a bunch between those two as
20 well?
21 A.    Correct.
22 Q.    Okay.  These are the ones we have.
23        All right.  Now, these -- what would you
24 call these actual reports that these employees
25 would do?

1  A.    We call them weekly reports.
2  Q.    Weekly reports?
3  A.    Yes, sir.
4  Q.    And would it be about work, or would it
5  be about the person's personal life?
6  A.    It's work, but it's everything.  So
7  morale could be -- somebody could be listing
8  I've got family drama going on or lost a pet at
9  home or something like that.  Stress is usually
10 work related but not always.  Workload is
11 obviously workload related to work.  And then
12 the weekly high, weekly low are anything else.
13 It's open to whatever someone wants to
14 communicate.
15 Q.    Okay.  Well, were employees encouraged to
16 share personal things about them outside of the
17 work in these reports?
18 A.    They're encouraged to tell us what's
19 going on with their lives so that we could be
20 aware of that.
21 Q.    Okay.  So the -- Ramsey wants to be aware
22 of what's going on in work but also in their
23 personal lives as well?
24 A.    Only as it affects their work.  So if I
25 know that you're -- I'm going to exaggerate,

1  but if you're going through a divorce, and I
2  know that, it helps me be more cognizant as to
3  how to lead you.
4  Q.    And would marital problems be the kind of
5  thing you talk about in these weekly reports?
6  A.    It's up to the team member on what they
7  write down.  So -- and there's no guide that
8  says, "You must tell us this."  It's up to each
9  individual what they're comfortable
10 communicating up to their leaders.
11 Q.    What guidance is provided to these
12 employees as to what to include in these
13 reports?
14 A.    It's really what you see.  There's
15 nothing more.  So it's, Hey, we want to hear
16 from you on how you're doing, how your morale
17 is doing.  We want to hear from you on your
18 stress and the amount of stress you're feeling.
19 We want to know your workload and whether we
20 need to address that.  And then there's a high,
21 what was your high for the week, what was
22 the -- something that happened that was
23 extraordinary, what was the low, and then is
24 there anything else that we should know.
25 Q.    Okay.

1  A.    That's the guidance that is provided to
2  our team.
3  Q.    All right.  Is it a form that they fill
4  out?  Is it a website?
5  A.    It's electronic.
6  Q.    Electronic form?
7  A.    No.  It's an app, so it's not a form.
8  Q.    What's the app called?
9  A.    It's our own.  It's part of
10 EntreLeadership, so we created it.
11 Q.    All right.  So it looks like that
12 Mr. LeFevre forwarded this report from Mr. Amos
13 to David DiCicco and Lara Johnson?
14 A.    Uh-huh.
15 Q.    Is that yes?
16 A.    That's correct.
17 Q.    Is there something unusual or spectacular
18 about this report that would require him to
19 forward it to his supervisors?
20 A.    The -- what would be unusual, as a leader
21 if I'm reading this, I would say there -- the
22 fact that there's "no work, little feedback, a
23 bit of limbo makes things a bit stressful.  I'm
24 sure it does with everyone," so this would
25 be -- the way that this application works is

94..97

1  whoever the team member is, their leader can
2  see that team leader, and that leader's leader
3  can also see that, hence, why Luke LeFevre was
4  able to see this report. And then he would say
5  why is he not getting feedback? Why he is in
6  limbo? So he would send it to Laura and Dave
7  DiCicco, which is what he did on that 4/13/2020
8  at 1:22, right? He -- so he -- he sends it and
9  then Lara replies saying, "Hey, I saw it and
10  made a note to talk to you about it," is my
11  guess, because on the subject line it says,
12  "Let's talk about it at 9:30 as well."
13  Q.    Okay. All right. Let's look at the --
14  keep on flipping back through those e-mails.
15  There's one dated 7/10/2020. That might have
16  been it you just flipped over.
17  A.    That's dated 9/30/2019.
18  Q.    Oh, okay. Keep going.
19         The next one should be --
20  A.    Let's see. April 8th.
21  Q.    I think you may be missing that one. The
22  one that's April 3rd, 2019, 3:07, which you
23  said you had, it said "Missing the fam"?
24  A.    Yeah.
25  Q.    And then the next page is the one I was

1  talking about, which you may not have. We'll
2  come back to that one.
3  A.    Okay.
4  Q.    The next one you have, is it dated
5  7/29/20, 2:58:09 p.m.?
6  A.    7/29/2020, 2:58:09?
7  Q.    Yes.
8         All right. So it looks like in this
9  e-mail string, there is some e-mails from Luke
10  LeFevre on 7/29/2020 at 7:25 a.m. to
11  Jack Galloway, Lara Johnson, and the
12  HR Committee, and it says, "Let's get together
13  today or tomorrow and talk through this."
14         Do you see this?
15  A.    Yes.
16  Q.    What --
17         MS. SANDERS: I don't see that.
18  Maybe it be easier if I just make a copy of
19  what he's looking at.
20         MR. STREET: That's fine.
21         MS. SANDERS: Why don't we do that.
22  Why don't we take a break and make a copy of
23  that, so that -- I'm sorry -- so that I can
24  follow along.
25         MR. STREET: That's okay. Can you

1  make copies of all four?
2         MS. SANDERS: Okay.
3         THE VIDEOGRAPHER: We are going off
4  the record. The time is 12:30 p.m.
5         (Lunch break.)
6         THE VIDEOGRAPHER: We are back on the
7  record. The time on the video monitor is
8  1:43 p.m.
9  BY MR. STREET:
10  Q.    All right. Mr. Lopez, before we left --
11  broke for lunch, we were talking about these
12  e-mails which are sitting in front of you.
13         I think if you go back to I believe it's
14  the seventh page in your packet, it's an
15  e-mail -- we're talking about it was the top of
16  the page is from Luke LeFevre 7/29/2020?
17  A.    Yes, sir.
18  Q.    All right. Do you see the one I'm
19  talking about?
20  A.    Yes.
21  Q.    Okay. Now, I want to go back to if you
22  look at the bottom of the page, it looks like
23  the first -- one of the e-mails in the string
24  was sent at July 29, 2020, at 7:25 a.m., and
25  it's sent from Luke LeFevre to Jack Galloway,

1  Lara Johnson, and Committee - HR. Now, if --
2  if these e-mails are sent to Committee - HR, do
3  you receive those as well?
4  A.    Yes, I do.
5  Q.    Okay. Well, when he says -- I think it
6  should say, "Lara, let's get together today" --
7  "today or tomorrow and talk this through."
8  What was he talking about? What did he want to
9  talk through? It's on the bottom of this page.
10  A.    Yeah, I was trying to see if there was
11  another e-mail that was further down this
12  thread, but I don't see it. I am not sure what
13  he's referring to there.
14  Q.    Okay. And it looks like you respond.
15  You say, "has been under here one year" --
16  "under one year and makes 90K. We would
17  normally offer 5K."
18  A.    Correct.
19  Q.    So at some point, did Mr. LeFevre ask you
20  about preparing a severance agreement?
21  A.    This is why I felt there was something
22  missing. So I think there's the -- he's
23  probably saying there's an emotional
24  conversation happening, and I would like to
25  offer X amount.

1        Do you mind if I look back through some
2  of the e-mails ahead?
3  Q.    No, go ahead.
4  A.    So I believe these do connect.
5  Q.    Okay.
6  A.    I believe it starts with the following
7  page from the one you were on.
8  Q.    The one --
9  A.    An e-mail from Lara Johnson sent Monday
10 July 27th at 3:23 p.m.
11 Q.    Okay.
12 A.    And this is where Lara's asking or
13 stating needing to come speak with the
14 HR Committee about the future of Brad Amos; we
15 talked to him back in March; there's some
16 things I wish I knew before I took the job, and
17 in that, she's basically saying 20K or so
18 amount to leave that she'd like to offer. Jack
19 weighs in, then I believe Luke weighs in. The
20 subject line on all of these e-mails is
21 identical --
22 Q.    Okay.
23 A.    -- which is what makes me think it's one
24 thread.
25 Q.    All right. Well, you're here to testify

1  to this today, so this is how we'll find out.
2  A.    Correct.
3  Q.    So I just need you tell me what you know.
4  A.    Right.
5  Q.    And what you know is what Ram- -- or what
6  Lampo knows?
7  A.    Correct.
8  Q.    If you tell me you don't know, you're
9  telling me Lampo doesn't know.
10 A.    Correct.
11 Q.    Okay.
12 A.    In the reviewing these documents, they
13 appear to be one thread.
14 Q.    Okay.
15 A.    So I would treat them as one thread,
16 hence, my reply is Brad has been here under one
17 year, makes 90K, we would normally offer 5K.
18 Q.    Okay. Did someone ask you about how much
19 that you needed to offer Brad to get him out of
20 there?
21 A.    No, they did not, but it is in the
22 e-mail.
23 Q.    You just volunteered in the amount?
24 A.    It's in the e-mail that starts on that
25 Monday, July 27th. This is one thread.

1  Q.    I get it.
2  A.    Hence, I replied with that.
3  Q.    Right. But I'm asking you did anyone in
4  particular ask you, hey, how much can we give
5  this guy to get rid of him?
6  A.    No.
7  Q.    Okay. And what did you base that on, one
8  year makes 90K, we normally offer 5K? Is that
9  something they do a lot at Ramsey?
10 A.    We have a guideline that we would
11 utilize --
12 Q.    Okay.
13 A.    -- when we offer severance. Basically,
14 we look at how long they've been with the
15 company and how much they're earning to
16 determine the severance amount.
17 Q.    The severance amount they'll be offered?
18 A.    Correct.
19 Q.    All right. Well, looking back at the
20 e-mail you said before, the one from
21 Jack Galloway dated July 28th, 2020, at
22 8:21 p.m. --
23 A.    Yes, sir --
24 Q.    -- do you see that one?
25 A.    -- I do.

1  Q.    It sounds like in the second paragraph,
2  it says, "It sounds to me like you feel like he
3  needs to leave."
4        And he's telling that to Lara Johnson,
5  correct?
6  A.    That is correct.
7  Q.    Lara -- I'm sorry.
8        Lara Johnson was not Mr. Amos's direct
9  supervisor?
10 A.    She would have been at that point.
11 Q.    She was his direct supervisor?
12 A.    Correct.
13 Q.    Okay. I apologize. I thought it was
14 Mr. LeFevre was her -- was his direct
15 supervisor?
16 A.    I'm sorry. Can you repeat your question?
17 Q.    Sure.
18        Mr. Amos's direct supervisor was
19 Mr. LeFevre or --
20 A.    No. It was never -- Luke LeFevre was
21 never Brad Amos's direct supervisor.
22 Q.    Okay. Lara Johnson was?
23 A.    Correct.
24 Q.    Okay. Was there any other direct
25 supervisor he had when he was there?

1  A.    David DiCicco when he was hired.
2  Q.    Okay.  I'm getting LeFevre and DiCicco
3  confused.
4       DiCicco, is he still with the company?
5  A.    Yes.
6  Q.    Is LeFevre still with the company?
7  A.    No.
8  Q.    Where is he now?
9  A.    He's retired.  He's in Nashville.  I
10  don't know what he's doing.
11  Q.    Okay.  Why did he leave?
12       MS. SANDERS:  Outside the scope
13  objection.
14  BY MR. STREET:
15  Q.    You can answer.
16  A.    He left to go do his own thing; be an
17  author, speaker, write a book.
18  Q.    Is he what you would call a Ramsey
19  personality, Luke LeFevre?
20  A.    No.
21  Q.    Well, going back to what Mr. Galloway
22  says here, this says, from the sounds of it, "I
23  would suggest a one-time final write-up instead
24  of a 90-day plan."
25       What -- did they -- what would be in this

1  final write-up that he was proposing?
2  A.    The write-up would be based on his
3  performance, lack of delivering on time.
4  Q.    So his humility?
5  A.    Lack of teamwork.
6  Q.    It would just be the one-time write-up
7  about his -- about this deadline and --
8  A.    Missing deadlines, not collaborating, not
9  being a team player.
10  Q.    Let's stop there a second.  Tell me
11  everything that Lampo claims evidenced that
12  Mr. Amos was not a team player.
13  A.    So he was not a team player in how he
14  collaborated with others.
15  Q.    Okay.  Wait.  Let's start one at a time.
16  One, in how he collaborated with others, what
17  did he do that indicated he was not a team
18  player based on his collaboration with others?
19  A.    Now, he was not communicating properly or
20  being open to suggestions from others.
21  Q.    Like who?
22  A.    Like the other video editors and
23  videographers.
24  Q.    Did they complain?
25  A.    They did not, however -- well, let me

1  back up.
2       In the e-mail from David DiCicco, he is
3  stating that he was not doing those things.
4  Q.    Right.  But what I'm asking is you said
5  that his no communication was with his fellow
6  video editors, unless -- or did I misunderstand
7  you?
8  A.    Yes, the communication that he was not
9  having was with David DiCicco, his immediate
10  leader.
11  Q.    So it wasn't with his fellow video
12  editors?
13  A.    In that note he's also stating -- David
14  DiCicco is also stating that he is not
15  collaborating with --
16  Q.    Right.
17  A.    -- with the other --
18  Q.    But I want to make sure you understand,
19  I'm not asking what a note says, I'm asking you
20  as Lampo.  How was Mr. Amos -- because this is
21  what you fired him for, Lampo?
22  A.    Uh-huh.
23  Q.    You know, this is what -- so we need to
24  know -- tell me every single way that Mr. Amos
25  failed to corroborate -- is that what you said,

1  corroborated with others?
2  A.    Yes.  So ultimately --
3  Q.    And then we go back, and then you said
4  he's not communicating with other video
5  editors, the first thing you said.  Is that
6  still true, is that he wasn't communicating
7  with other video editors?
8  A.    So if I can go back to clarify?
9  Q.    Sure.
10  A.    So, ultimately, his termination was for
11  insubordination with Luke LeFevre.
12  Q.    But what I'm asking about is how did he
13  not collaborate, Lampo, tell, please, Company,
14  how Mr. Amos did not collaborate with others
15  while he was working there?  And I don't -- I
16  don't want you to just point me to an e-mail.
17  I want you to just tell me because that's who
18  you're here to testify for.
19  A.    That's true.  But I'm here to testify
20  what is -- what we did, which is written in
21  that e-mail.
22  Q.    All right.  Well, then, tell me what it
23  is, everything he did, whether it's written or
24  that you just know.
25  A.    Okay.

106..109

1    MS. SANDERS:  Object to the form.  He
2  may answer.
3  BY MR. STREET:
4    Q.    That's fine.  You can answer.
5    A.    Yeah.
6    Q.    That he didn't corroborate with others.
7    A.    SO there was zero communication that
8  would have included the team of people that he
9  is working with.
10   Q.    Okay.  What team members -- what team
11 members that Mr. Amos was working with
12 complained about his communications?
13   A.    If I said "complained," I did not mean
14 complained because I don't believe that I
15 said --
16   Q.    Okay.
17   A.    It wasn't other people complaining about
18 him.  It was the fact that he was not
19 complaining with other team members.  Had he
20 been communicating, he wouldn't have been
21 called out for zero communication.
22   Q.    Right.  But no team member -- let's make
23 sure I understand.  No team member complained
24 about his lack of communication?
25   A.    To my knowledge, no.

1    Q.    And you're saying this lack of
2  communication was amongst the team members?
3    A.    Yes; but also with his leader.
4    Q.    Okay.  So, then, all right.  That's one
5  issue, was the lack of communication with team
6  members that no one complained about.
7          Two being lack of communication with
8  his leader; is that right?
9    A.    That's correct.
10   Q.    And who was his leader that you're
11 talking about?
12   A.    David DiCicco.
13   Q.    Okay.  So David DiCicco complained about
14 him not communicating well?
15   A.    Correct.
16   Q.    How did he not communicate well with
17 Mr. DiCicco?
18   A.    He did not let him know of the progress
19 of the project he was working or how far along
20 or deadlines that were about to be missed.
21   Q.    Okay.  And is that it?
22   A.    Those are three specific points, yes.
23   Q.    Those two, okay.  I'm unsure.  All right.
24 You said not -- not letting him know about the
25 progress and then not letting him know about

1  what?
2    A.    About the deadline that was about to be
3  missed.
4    Q.    Okay.  That's two.
5    A.    Or obstacles that he was faced with.
6    Q.    You're saying he didn't let Mr. DiCicco
7  know of obstacles Mr. Amos was faced with?
8    A.    Yes.
9    Q.    What were those obstacles?
10         MS. SANDERS:  Object.  He can answer.
11         THE WITNESS:  It's not spelled out.
12 So in here what it says is that he broke trust
13 by not communicating or anticipating the fact
14 that he was not going to hit a deadline.  So
15 when David DiCicco was checking in with Brad
16 Amos, Brad Amos was letting him believe that
17 the project was on time.  The project was, in
18 fact, not on time, and the date prior to the
19 video screen, that project was not ready.
20 BY MR. STREET:
21   Q.    Okay.  So you're saying his failure to
22 communicate involved not knowing the progress,
23 not letting Mr. LeFevre know about the deadline
24 that was going to be missed.  And was there
25 anything else besides those things that

1  Mr. Amos did not -- he was -- failed to
2  corroborate?
3    A.    It was Mr. DiCicco, and, yes, he did not
4  keep him informed of obstacles or progress or
5  lack thereof.
6    Q.    Right.  And that's what I'm asking:  What
7  specific obstacles are you talking about?
8    A.    It's whatever the obstacles were that
9  were faced by Mr. Amos for --
10   Q.    What were they?
11   A.    -- not being able to complete the
12 project.
13         MS. SANDERS:  Let him finish the
14 question [sic], please.
15         MR. STREET:  That's okay.
16 BY MR. STREET:
17   Q.    But what were those obstacles?
18         MS. SANDERS:  Objection.  He may
19 answer, if he knows.
20         THE WITNESS:  I don't know the answer
21 to that question.
22 BY MR. STREET:
23   Q.    Okay.  You just assume there are some?
24   A.    I would assume that there would have to
25 be some obstacles in order for Mr. Amos not to

110..113

1  do his work.
2  Q.   Okay.  And does -- the only evidence I've
3  heard today of Mr. Amos not doing this work is
4  this deadline he missed?
5  A.   That is correct.  That is part of it, but
6  yes.
7      (Simultaneous crosstalk.)
8  Q.   Okay.  What are the other parts?  What
9  else did he fail to do?
10  A.   The other parts are where Lara Johnson
11  has taken over.
12  Q.   Where what?
13  A.   The one-on-ones; where Lara Johnson says
14  I'm taking over one-on-ones now so that we can
15  try to get the corporate thinking out of him so
16  that we can move things forward.
17  Q.   But, again, I mean, I have to keep coming
18  back.  This is something that you considered
19  that you're telling me that you used to
20  terminate him is that he couldn't get this
21  corporate think out of his head?
22      MS. SANDERS:  Objection.
23  BY MR. STREET:
24  Q.   Is that correct?
25  A.   That's one of the things that's listed in

1  Lara --
2  Q.   But you can't --
3  A.   -- for one-on-ones.
4  Q.   Right.  But you can't tell me what the
5  corporate thinking was.
6  A.   It's the bureaucratic process --
7  Q.   You can't tell me.
8  A.   -- versus the relationship.
9  Q.   Explain that to me.
10  A.   So Ramsey is a very relational company,
11  right.  Part of humble-hungry-smart is we talk
12  through that.  So the corporate think that
13  Lara's talking about is the red tape,
14  bureaucratic, dot Is, cross Ts, do things on
15  your own versus work collaboratively with other
16  people.
17  Q.   What bureaucratically was Mr. Amos doing
18  that was frowned upon by Lampo?
19      MS. SANDERS:  Object, outside the
20  scope.  He can answer.
21      THE WITNESS:  Yeah, I don't know the
22  answer to that because it's not listed in here.
23      MR. STREET:  He testified -- I mean,
24  I mean, he was noticed to testify to every
25  single fact considered by Lampo when they

1  terminated my client.  So if they're not here
2  today to tell me any of these facts, then it's
3  probably not coming into evidence.
4  BY MR. STREET:
5  Q.   So it's important that you remember as
6  best as you can.
7      MS. SANDERS:  Objection, you can
8  answer, if that was a question.
9      THE WITNESS:  I didn't catch the
10  question.
11  BY MR. STREET:
12  Q.   It's not a question.  It's just that
13  some -- explaining to the importance of
14  remembering specific facts because the
15  corporation is bound by your testimony today,
16  correct?
17      MS. SANDERS:  He understands that.
18  Please continue with your question.
19  BY MR. STREET:
20  Q.   And the notice said -- the notice said,
21  if you'll look at the notice, it says, all
22  facts considered by Lampo when terminating our
23  client.
24  A.   That's correct.
25  Q.   Okay.  So if you can't remember something

1  today, I'm going to assume it doesn't exist,
2  okay?
3  A.   That's okay.
4  Q.   Okay.  And what about this last sentence
5  in this e-mail from Jack Galloway, "The only
6  reason I'm not just suggesting to fire him now
7  is that he'd be surprised by the firing," what
8  does that mean?
9      MS. SANDERS:  Objection, he can
10  answer, if he knows.
11      MR. STREET:  That's on the topic
12  sheet.
13      THE WITNESS:  Yeah, I'm not sure why
14  Jack would have written that, but my guess is
15  he felt that Mr. Amos would be surprised.
16  BY MR. STREET:
17  Q.   Okay.  Well, he didn't want Mr. Amos to
18  be surprised?
19  A.   That's correct.  We don't want anyone to
20  be surprised when they lose their job.
21  Q.   Okay.  All right.  Let's look at the
22  e-mail below from Lara Johnson.  She says, "I
23  need to come in and talk with the HR Committee
24  about the future of Brad Amos."  Do you see
25  that?

1  A.    I see that.
2  Q.    It's an e-mail dated Monday, July 27th,
3  3:23 p.m.
4  A.    Yes, sir.
5  Q.    "We had talked about him back in March."
6        Okay.  What did you talk about in March
7  with Ms. Johnson?  Who -- first of all, who is
8  Ms. Johnson talking about?  Who talked about
9  him in March?
10 A.    The e-mail is addressed to HR Committee.
11 Q.    Okay.
12 A.    So she's referencing HR Committee talked
13 about him back in March.
14 Q.    So the HR Committee did meet on Mr. Amos
15 in March?
16 A.    That's what she's stating there.
17 Q.    Did they?
18 A.    I don't recall that.
19 Q.    Okay.  What was said in this meeting in
20 March about Mr. Amos?
21        MS. SANDERS:  Objection.  He's
22 already answered that.
23 BY MR. STREET:
24 Q.    What was said in this meeting in March
25 about Mr. Amos?

1  A.    I don't recall that meeting.
2  Q.    So we don't know what she means when she
3  says that.
4        We don't -- when she says, "not much has
5  changed," can you tell me what she was
6  expecting to change?
7  A.    I would imagine that his behavior would
8  have changed --
9  Q.    No, just tell me what you know --
10 A.    -- not his performance.
11 Q.    -- not what you're guessing, you're
12 imagining, you're guessing.  What do you know?
13 A.    The answer to your question is I don't
14 recall what was discussed in March; hence, I
15 can't make an assumption as to what didn't
16 change.
17 Q.    Okay.  And it says, "Mr." -- "Mr. Amos
18 feels disappointed in several areas."
19        What areas did Mr. Amos feel disappointed
20 in?
21        MS. SANDERS:  Objection, asked and
22 answered.
23        THE WITNESS:  They're not stated in
24 the e-mail, so I'm not sure.
25

1  BY MR. STREET:
2  Q.    So you don't know?
3  A.    Correct.
4  Q.    And, again, I want to make sure I
5  understand, too, when he says, "there are
6  things I wish I knew before I took the job."
7  Do you know what things he's referencing?
8  A.    I do not.
9  Q.    All right.  Flip to the next page.  We've
10 got an e-mail from Luke LeFevre, and this looks
11 like it was sent on 7/27 prior to
12 Mr. Galloway's e-mail but also in response to
13 Ms. Johnson's e-mail.  Do you see where I'm
14 talking about?
15 A.    Yes, I do.
16 Q.    All right.  And Mr. LeFevre says, "I
17 would like to come in and talk this through
18 with you-all."  Did Mr. LeFevre have everyone
19 come in and talk this through with him?
20 A.    Did not.
21 Q.    He did not do that?
22 A.    No.
23 Q.    Why not?
24 A.    I'm not sure.
25 Q.    Now --

1  A.    Actually, if you go back to that, so Lara
2  Johnson sends an e-mail 3:22 p.m. on July 27th,
3  2020.  Same day, 7/27/2020 at 8:23 p.m., Luke
4  LeFevre sends, "I would like to" -- "I'd like
5  us to come in and talk this through with
6  you-all."  Addressing to HR Committee.
7  Q.    Right.  This is from Mr. LeFevre sent
8  8:23 p.m. --
9  A.    Yeah.  And on 8:21 p.m., a few minutes
10 prior to Luke LeFevre sending it --
11 Q.    I don't see where you're reading from.
12 A.    It's the e-mail from Jack Galloway --
13 Q.    Okay.
14 A.    -- to Lara.
15 Q.    All right.
16 A.    So that is at 8:21 on the 28th, so the
17 next day, correct?
18 Q.    Yes.
19 A.    Okay.  So that is where Jack is
20 responding now to Lara and Luke saying HRC does
21 not meet.  So you asked the question about did
22 they come in --
23 Q.    I see.
24 A.    -- the answer is, no, they didn't come
25 in.

1  Q.   I see what you're saying.
2     But it says, "Can you add it to the next
3  week's agenda to come in and discuss it"?
4  **A.   Right.**
5  Q.   And was it added to the next week's
6  agenda?
7  **A.   I believe that Luke spoke to Mr. Amos**
8  **prior to next week's agenda to the next week's**
9  **HR Committee.**
10  Q.   So was it put on the next week's agenda?
11  **A.   I believe it was.  If Jack says, "I'm**
12  **adding it," then yes.**
13  Q.   Where he says, "If you like, I can add
14  you to next week's agenda;" he doesn't say he
15  is adding it.
16  **A.   Yeah, my guess is it was added.**
17  Q.   So the committee did meet about Mr. Amos?
18  **A.   I don't believe they met because by that**
19  **point --**
20  Q.   Again, I'm not asking what you think or
21  guess.  If you don't know, say you don't know.
22     MS. SANDERS:  Let him finish his
23  answer, please.
24     MR. STREET:  Well, if his first thing
25  is "I'm guessing," I want to stop him because

1  there's no point in guessing.
2     MS. SANDERS:  So you don't want --
3  you don't want the company's guess, is that
4  what you're saying?
5     MR. STREET:  I want to know what this
6  man knows.  I don't want to know what he
7  guesses.
8     MS. SANDERS:  Okay.  Fair enough.
9  **     THE WITNESS:  Then the answer is I**
10  **don't know.**
11  BY MR. STREET:
12  Q.   Okay.  Would there be records if they
13  actually met?  Would there be notes from a
14  meeting, minutes typed up, anything like that?
15  **A.   There would be a calendar invite.**
16  Q.   And would there be notes or minutes or
17  anything typed up after the event?
18  **A.   Not typically.**
19  Q.   So you don't keep records of what happens
20  at these meetings?
21  **A.   We do, but they're not a formal type --**
22  **they're minutes.  There might be notes just**
23  **saying, "Here's the agenda, the topics that**
24  **were covered."**
25  Q.   Okay.  Was that something you normally

1  do, is notes, agenda?
2  **A.   There would be an agenda.**
3  Q.   Okay.  And the agenda would be e-mailed
4  out to everybody?
5  **A.   It would be.**
6  Q.   And if there wasn't an agenda that we
7  received in discovery, is it fair to say that
8  they didn't discuss it in one of these
9  meetings?
10  **A.   That's correct.**
11  Q.   All right.  Let's flip back to one of the
12  e-mails on the back pages.  And this one is
13  from Luke LeFevre, 3/17.  This is prior to
14  these other e-mails, right?  Yes.  On
15  March 17th, 2020.
16     What -- first of all, let me ask this:
17  What is this link to this Vimeo link?
18  **A.   Down at the bottom?**
19  Q.   Yes.
20  **A.   From Jonna Covert?**
21  Q.   Yes.
22  **A.   The link is to a video that was being**
23  **worked on by different people, but I don't know**
24  **who it is.**
25  Q.   Okay.  Okay.  And do you see the top

1  e-mail there on this page from Luke LeFevre at
2  11:06 p.m., and it says, "Shit.  Hmmmm.  I'm
3  worried about Brad Amos.  I think his wife is
4  crazy.  Let's leave it for tonight."
5     Okay.  Let's break this down.  Why did
6  Mr. LeFevre think that Brad's wife was crazy?
7  **A.   You would have no idea.**
8     MS. SANDERS:  Objection.
9  BY MR. STREET:
10  Q.   The company had no opinion on whether
11  Mrs. Amos was crazy or not?
12  **A.   I did not, and I don't want to speculate**
13  **as to why Mr. LeFevre felt that way.**
14  Q.   Okay.  Was there anyone else, whoever
15  mentioned it, that they thought his wife was
16  crazy?
17  **A.   Not to my knowledge.**
18  Q.   Okay.  Did you ever hear of anyone else?
19  Did anyone ever complain to anyone at Lampo
20  that Mrs. Amos was disruptive, acting crazy as
21  they said?  Anything like that?
22  **A.   Not to my knowledge.**
23  Q.   So as far as you know, this is the only
24  complaint that there was about Mr. Amos's wife
25  is this e-mail?

1  A.    To my knowledge, yes.

2  Q.    Okay.  All right.  Let's put those up for

3  just a second.

4       All right.  Lampo terminated Mr. Amos,

5  did they not?

6  A.    Yes.

7  Q.    Okay.  And Topic No. 4 on here asks Lampo

8  to "discuss all facts considered by Lampo when

9  making this decision to terminate plaintiff."

10  So why don't you tell me -- every single

11  fact -- that Lampo considered when they

12  terminated Mr. Amos?

13  A.    So the facts that were considered for a

14  conversation with him --

15  Q.    No, no.  That's not my question.

16  A.    Okay.

17  Q.    My question was every single -- let me

18  know if you need me to repeat it, but the

19  question is not something about conversations,

20  it's not something about goals, it's something

21  about this:  What facts, every single fact, was

22  considered by Lampo when they made the decision

23  to terminate Mr. Amos?

24  A.    His termination was due to the

25  insubordination by him --

1  Q.    Insubordination?

2  A.    -- to Mr. Luke LeFevre.

3  Q.    And that was it?

4  A.    That's correct.

5  Q.    Okay.  What facts -- what actually

6  happened to show that it was insubordination?

7  A.    Mr. LeFevre and Ms. Johnson had a

8  conversation with him.

9  Q.    Okay.

10  A.    They were speaking to him about his

11  performance.

12  Q.    What day was this conversation?

13  A.    I would need to reference some documents.

14  Q.    Well, who was present at this?

15  A.    It was Mr. Amos's last day with the

16  company, and present was Lara Johnson, Luke

17  LeFevre, and Brad Amos.

18  Q.    Okay.  And what did Mr. Amos do that was

19  insubordinate?

20  A.    He was insubordinate to Luke LeFevre when

21  he was trying to have a corrective conversation

22  about his behavior --

23  Q.    How --

24  A.    -- and his humility.

25  Q.    How was he insubordinate?

1  A.    He basically said to Mr. LeFevre you're

2  the last person to speak to me about humility,

3  you lack humility, you're arrogant, you come

4  across this way.

5  Q.    Okay.  So that was why he got fired,

6  because he talked to Mr. LeFevre that way?

7  A.    Yes.

8  Q.    And that was the only reason he was

9  fired?

10  A.    The conversation leading up to that was

11  his performance --

12  Q.    Okay.  I'm asking about every single

13  fact, okay, not just -- let me finish, please.

14       MS. SANDERS:  Let him finish.

15  BY MR. STREET:

16  Q.    Every single fact and then not just the

17  end, okay?  Do you understand what I'm saying?

18  A.    I understand what you're saying, but

19  that's not what --

20  Q.    Right.

21  A.    -- you said earlier.

22  Q.    Well, I want to know every single fact

23  they considered.

24  A.    Cool.

25  Q.    It is what I said several times.

1       MS. SANDERS:  Objection, you've asked

2  him, he answered it.

3       THE WITNESS:  So --

4  BY MR. STREET:

5  Q.    So there's no more facts than what you

6  just told me that was considered, and that's

7  the only things they considered when they fired

8  him?

9  A.    That's correct.

10  Q.    Was this, that he talked back to

11  Mr. LeFevre?

12  A.    Yes.  He was insubordinate.

13  Q.    And that was it; he was fired; nothing

14  else to do?

15  A.    Correct.

16  Q.    Okay.  He wasn't fired because of his job

17  performance?

18  A.    That's what led to the conversation.

19  Q.    But he wasn't fired because of his job

20  performance?

21  A.    Ultimately, no.  He would have been given

22  an option to go on a performance improvement

23  plan or take a severance.  It would have still

24  been Mr. Amos's choice at that point.

25  Q.    Okay.

1  A.   The fact that he was insubordinate --
2  Q.   Right.
3  A.   -- led to his termination.
4  Q.   But you didn't consider his work
5  performance at all when you decided to make the
6  termination?
7  A.   Those things led to the conversation to
8  be put on either a performance improvement
9  plan --
10  Q.   I know you keep saying that, but I'm
11  asking you was his work performance considered
12  at all in making -- in determining to fire
13  Mr. Amos?
14  A.   The conversation would not have been
15  had --
16  Q.   No.
17  A.   -- had he not --
18         MS. SANDERS:  Objection.  He's
19  answering, maybe not the way you want him to,
20  but he's answering the question.
21         MR. STREET:  No, he's not.
22  BY MR. STREET:
23  Q.   Listen to what I am saying.  I'm asking
24  you what was considered.  I'm not asking you
25  about any kind of conversation, I'm not asking

1  about any conversation, so don't start your
2  answer with "This conversation."
3         MS. SANDERS:  Objection.
4  BY MR. STREET:
5  Q.   I'm asking you what facts were considered
6  by Lampo when they terminated Mr. Amos.  And
7  I'm asking you if one of those facts was his
8  work performance.  Because you just told me the
9  only thing considered was his insubordination
10  when he smarted off to Mr. LeFevre, that his
11  work performance wasn't part of why he was
12  terminated; am I correct?
13  A.   The piece you're missing, and maybe I'm
14  not being clear, is that that -- they would not
15  have been having -- Mr. LeFevre, Lara Johnson,
16  and Brad Amos would not have been in that room
17  were it not for his performance --
18  Q.   When Lampo --
19  A.   -- or lack thereof.
20  Q.   -- made the decision to terminate
21  Mr. Amos, did they consider his work
22  performance?
23  A.   Yes.
24         MS. SANDERS:  Objection.
25

1  BY MR. STREET:
2  Q.   Okay.  What aspect of his work
3  performance was considered?
4  A.   All of the aspects of his work
5  performance including his teamwork, lack of
6  collaboration, and missing deadlines.  All of
7  those things were what led to that day with
8  Mr. Amos and Luke LeFevre being in the same
9  room --
10  Q.   Okay.
11  A.   -- including Lara Johnson.
12  Q.   All right.  So now we've got the facts
13  you considered before when making the decision
14  to terminate him was his -- he smarted off to
15  Luke LeFevre in a meeting, his lack of
16  collaboration was -- we'll get into some actual
17  facts there on this in a second, and third
18  thing you said was missing deadlines?
19  A.   Correct.
20  Q.   Okay.  And is there any other facts
21  considered -- anything -- about Lampo that went
22  into the determination to fire Mr. Amos?
23  A.   There was not.
24  Q.   Okay.  So his lack of collaboration --
25  and I think I established -- we established

1  earlier there was no coworkers who complained
2  about Mr. Amos's lack of collaboration; fair to
3  say?
4         MS. SANDERS:  Objection.
5         MR. STREET:  You can answer.
6         THE WITNESS:  To my knowledge, that's
7  correct.
8  BY MR. STREET:
9  Q.   And as Lampo sits here today, you can't
10  tell me of any.  Who was the lack of collaboration
11  with, then?  Was it just Mr. LeFevre?
12  A.   It was Mr. DiCicco.
13  Q.   Mr. DiCicco.
14         And was the lack of collaboration because
15  he -- because Mr. DiCicco indicated that the
16  deadline -- that there was some -- some
17  misleading information provided on the
18  deadline?
19         A.   There was not only missing information,
20  there was a sense that things were okay when
21  they were not.
22  Q.   Okay.
23  A.   And in the position that Mr. Amos held,
24  it wasn't acting by himself, he was leading a

130..133

1  group of people to do that; hence, the lack of
2  collaboration with the other team.  They didn't
3  complain about him.
4  Q.    What other team?
5  A.    So he was leading other editors and
6  working -- he wasn't working by himself.
7  Q.    Who were the other editors he were -- was
8  leading?
9  A.    I'd have to go back and look at my notes,
10 but I'm not -- he was working with other
11 editors to provide a product.
12 Q.    But you can't tell me their names?
13 A.    I know one of them would have probably
14 been Dennis.
15 Q.    Dennis who?
16 A.    That would be Dennis that was listed
17 prior.  His last name is Warren; Dennis Warren.
18 Q.    And this would have been, I guess,
19 Mr. Amos being a senior video producer;
20 Mr. Warren would have been just a video
21 producer?
22        MS. SANDERS:  Objection.
23        THE WITNESS:  At that time, yes.
24 BY MR. STREET:
25 Q.    Okay.  Who else besides Dennis Warren was

1  Mr. Amos supervising on these projects?
2        MS. SANDERS:  Objection.
3        THE WITNESS:  Not that I can
4  remember.
5  BY MR. STREET:
6  Q.    No one that you can tell me?
7  A.    Correct.
8  Q.    Okay.  So what else -- what other facts
9  indicated that Mr. Amos had a lack of
10 collaboration that you haven't told me about
11 today?
12 A.    None that we haven't discussed.
13 Q.    Okay.  What specifically did Mr. Amos say
14 to Mr. LeFevre when he was insubordinate?
15        MS. SANDERS:  Objection, he may
16 answer.
17        THE WITNESS:  I wasn't in the room,
18 so I do not know specifically what he said.
19 BY MR. STREET:
20 Q.    But you fired him over it?
21 A.    But I do know --
22        That's correct.
23 Q.    So you didn't take the time to find out?
24 A.    He was terminated by Luke LeFevre on the
25 spot --

1  Q.    Okay.
2  A.    -- for being insubordinate.
3  Q.    But Mr. LeFevre never informed anyone
4  else what was said to him?
5  A.    He did inform us what was said, but I
6  don't recall it verbatim.
7  Q.    Okay.  So this -- whatever he said to
8  Mr. LeFevre that upset Mr. LeFevre and his lack
9  of collaboration, that's the reasons he was
10 fired, that's it?
11 A.    Including missing deadlines, yes.
12 Q.    Including missing deadlines.
13        What deadline did he miss?
14 A.    So we talked about the one that he
15 missed, but according to Lara Johnson, he
16 missed other things.
17 Q.    Okay.  What does -- what other things did
18 he miss?
19 A.    There were other video projects that he
20 was not quick to produce.
21 Q.    Like what?
22 A.    I don't have the specifics for you.
23 Q.    Do you know what they were about?  Do you
24 know anything about them?
25 A.    There were video edit projects, which is

1  what he was hired to do.
2  Q.    Okay.  But as you sit here today, does --
3  they -- talk about all facts considered when
4  you terminated him, you can't tell me a single
5  one he missed other than this documentary?
6  A.    Yeah, so all facts considered when he was
7  terminated is a very broad term.
8  Q.    It is.
9  A.    And the facts that led to LeFevre and
10 Lara sitting down to speak with him would have
11 not led to the term- -- they would have led to
12 a performance improvement or a separation.
13 Q.    Was there a performance improvement plan
14 offered to Mr. Amos?
15 A.    It did not get to that point.
16 Q.    Because you fired him before that?
17 A.    Correct.
18 Q.    Okay.  So -- so, again, I guess I'm just
19 confused.  If you're -- just keep saying, Well,
20 these video deadlines weren't the reason we
21 fired him -- am I saying that right?  Or they
22 were the reason you fired him?
23 A.    So you're -- you're correct and you're
24 not because they're the reason that the
25 conversation was had.  The reason he was

1  terminated was because of insubordination in
2  that conversation.  So it was a performance
3  conversation that became a termination based on
4  Mr. Amos's response.
5  Q.   Okay.  And what was said in this
6  conversation?
7  A.   Again, I was not in the room.
8  Q.   All right.  But the topic -- again, I
9  want to read a topic here for you:  "All
10 communications between employees of defendant
11 occurring between May 2019 and August 2020
12 related to its decision to terminate
13 plaintiff."
14         MS. SANDERS:  And I restate the
15 objection that I've already provided in
16 writing.
17 BY MR. STREET:
18 Q.   And you heard that, right?  You heard
19 what I just head?
20 A.   Yes.
21 Q.   So as a corporation, you can't sit here
22 and tell me what was said in this meeting
23 between Mr. LeFevre, Brad Amos -- and who was
24 the third person?  I forget the name.
25 A.   Lara Johnson.

1  Q.   -- Lara Johnson, you can't tell me what
2  was said in that meeting?
3  A.   We provided in discovery -- written
4  discovery --
5  Q.   No, no.  I'm asking you today can you
6  tell me what was said in that meeting?
7  A.   We've provided it to you.
8  Q.   Can you tell me as you sit here today
9  what was said in that meeting?
10 A.   Not verbatim, no.
11 Q.   Can you tell me at all, not verbatim,
12 just tell me what they discussed?
13 A.   I can tell you that he was insubordinate
14 when they were discussing his performance or
15 lack thereof, and that led to his termination.
16 Q.   But, again, you can't tell me what
17 specifically he said that was insubordinate;
18 fair to say?
19         MS. SANDERS:  Objection, asked and
20 answered.
21         THE WITNESS:  Fair to say.
22 BY MR. STREET:
23 Q.   Okay.  Who was the authority at Lampo to
24 make termination decisions?
25 A.   So HR Committee and leaders.  Leaders

1  have the right to make recommendations, usually
2  reviewed by HR Committee, but a board member
3  would also have that authority.
4  Q.   Okay.  Well, in this particular case, did
5  Mr. LeFevre fire Mr. Amos on the spot?
6  A.   Yes.
7  Q.   Okay.  So he didn't have to go to
8  committee or anything?
9  A.   That's correct.
10 Q.   Okay.  So he has the authority to just
11 fire people as well?
12 A.   Yes.  He's a board member.
13 Q.   Okay.  He is a board member?
14 A.   Yes.
15 Q.   Okay.  What's his title on the board?
16 A.   He was the chief creative officer.
17 Q.   So, again, just looking at our topic
18 here, when you said "All persons making either
19 recommendation or decision that the plaintiff
20 be terminated," the only person who made this
21 determination was Luke LeFevre?
22 A.   That's correct.
23 Q.   No one else had any input?
24 A.   Input came from David DiCicco and Lara
25 Johnson.

1  Q.   Okay.
2  A.   But the decision was made by Luke
3  LeFevre.
4  Q.   Okay.  And it was made on the spot in
5  this meeting?
6  A.   Correct.
7  Q.   Now, did anyone ever look into any
8  complaints Mr. Amos had about the workplace?
9  A.   I'm not aware of any complaints that
10 Mr. Amos made about the workplace.
11 Q.   Okay.  So no -- not that you know of?
12 A.   I'm not aware of any complaints made by
13 Mr. Amos.
14 Q.   Were there any kind of investigations
15 conducted by Lampo at all based on anything
16 Mr. Amos claimed while working there?
17         MS. SANDERS:  Objection to the extent
18 it calls for attorney-client information.
19 BY MR. STREET:
20 Q.   We can just ask [sic] them if they have
21 them, you don't have to tell me what was said.
22 A.   I'm not aware that he made any
23 allegations or claims.
24 Q.   Okay.  Did he complain about COVID at
25 all?

1  A.    He did not.
2  Q.    Okay.  What did you review before
3  testifying here today?
4        MS. SANDERS:  Objection to the extent
5  it calls for attorney-client privileged
6  information.
7  BY MR. STREET:
8  Q.    What documents did you review before you
9  testified?
10 A.    Everything we turned in to you, all the
11 written discoveries.
12 Q.    And what else?
13 A.    To my knowledge, that was it.
14 Q.    Okay.  Did you speak to anyone about your
15 testimony today besides your attorney?
16 A.    Did not.
17 Q.    And by attorney, I mean Leslie; not an
18 attorney, this attorney.
19 A.    We have two attorneys.  We have Leslie,
20 and we have Daniel Cortez.  That is the company
21 attorney.
22 Q.    Right.  Mr. Cortez on this case, or is he
23 only in-house counsel?
24        MS. SANDERS:  Objection, outside the
25 scope.

1        THE WITNESS:  They're both attorneys.
2  BY MR. STREET:
3  Q.    Okay.  Do the attorneys at Lampo
4  investigate a lot of termination?  Do the
5  in-house attorneys do they perform the
6  investigations at Lampo?
7  A.    We have not had investigations at Lampo
8  over -- that have been investigated.
9  Q.    What about -- what about the O'Connor
10 case, who investigated that?
11       MS. SANDERS:  Objection, outside the
12 scope.
13 BY MR. STREET:
14 Q.    Who investigated that?
15 A.    The O'Connor case was investigated by --
16 by myself and my team, the HR team, at the
17 request of legal counsel.
18 Q.    And is that the way all these
19 investigations are handled by legal -- is legal
20 involved in all of the investigations at Lampo
21 when it comes to employment-related matters?
22       MS. SANDERS:  Objection.  He can
23 answer if he knows.
24       THE WITNESS:  Can you clarify your
25 question?

1  BY MR. STREET:
2  Q.    Sure.
3        Say someone complains, like the O'Connor
4  case, of Title VII violation or in this case
5  Title VII violation, who leads up the
6  investigation into what happened?
7  A.    That would be a combination of HR with
8  legal.
9  Q.    Okay.  But it goes automatically to legal
10 when someone -- when they do any investigation?
11 A.    It would be both, yes.
12 Q.    Okay.  And that's what I'm getting at.
13 Is that Lampo's policy?  It's not, hey, let's
14 try to figure it out first; let's get the
15 lawyers involved first?
16 A.    It's not a policy.  It's more of a
17 practice because we have very few complaints.
18 So if someone is making a Title 7 complaint,
19 that is so few and far between --
20 Q.    Right.
21 A.    -- that we would go to our attorney.
22 Q.    Okay.  Well, what do you call a policy or
23 practice -- that is the practice of Lampo when
24 you get a complaint is to hand it off to legal
25 immediately and not do any kind of

1  investigation through HR?
2        MS. SANDERS:  Objection.
3        THE WITNESS:  It would be to do both,
4  so they happen at the same time.
5  BY MR. STREET:
6  Q.    So the legal is involved the entire time?
7  A.    Correct.
8  Q.    Now, other than this meeting when
9  Mr. Amos allegedly smarted off to Mr. LeFevre,
10 you can't sit and tell me any other facts
11 considered by Lampo to terminate other than
12 that?
13 A.    Other than what was in discovery, no.
14 Q.    No, I'm asking what were the other facts
15 besides that, tell me right now.
16       MS. SANDERS:  Objection, asked and
17 answered.
18       THE WITNESS:  The other facts were in
19 the discovery.
20 BY MR. STREET:
21 Q.    No, but as you sit here today what were
22 those other facts?
23 A.    It was his performance that led to that
24 conversation.  So his lack of performance led
25 to a conversation with Luke LeFevre and Lara

1  Johnson.  Those were the facts.
2  Q.    Okay.  Does Ramsey have any sort of a
3  policy or procedure, like a verbal warning?
4  You know, different companies have different
5  things they go through, verbal warning, written
6  warning.
7  A.    Not formally, no.
8  Q.    There's no discipline policy at Lampo?
9  A.    There is not.
10  Q.   So they can fire who they want for what
11  they want; fair to say?
12  A.    So long as it doesn't fall under
13  discriminatory practices, yes.  We're an
14  employment-at-will state.
15  Q.    How many people -- Strike that.
16        Was there any investigation performed by
17  Lampo as a result of any complaints lodged by
18  Mr. Amos regarding his employment at Lampo?
19        MS. SANDERS:  Objection to the extent
20  it calls for attorney-client privileged
21  information.
22        THE WITNESS:  Prior to his filing or
23  after his filing?
24  BY MR. STREET:
25  Q.    Either.

1  A.    After his filing.
2  Q.    His filing where?
3  A.    His filing through you, lawsuit.
4  Q.    To the EEOC?
5  A.    That came after you.
6  Q.    Okay.  What happened -- I mean -- tell
7  me -- don't tell me necessarily what you did,
8  but tell me how that investigation came to be.
9  A.    We received your notice of a lawsuit, we
10  contact -- I believe that came to me, I brought
11  our attorney in the fold, and then we began the
12  investigation.
13  Q.    Okay.  While we're there, let me ask you
14  something, too.  When you got it, you said --
15  did you get a copy of the lawsuit and that's
16  what started it, or was it a letter?
17  A.    I believe it was a copy of the lawsuit.
18  Q.    Okay.  What did you do after that to tell
19  employees to make sure they held on to
20  potential evidence?  Did you send an e-mail out
21  to everybody and say, "Hey, don't throw
22  anything away"?
23  A.    That is correct.
24  Q.    Okay.
25  A.    And it actually came from our general

1  counsel, not from me.
2  Q.    Okay.  So you have a copy of that?
3  A.    Yes.
4        MR. STREET:  Okay.  We'd like to see
5  that.
6        MS. SANDERS:  Objection, privileged,
7  but we can take that up after.
8        MR. STREET:  Well, that's pretty
9  custom -- customary allegedly to give us those.
10  BY MR. STREET:
11  Q.    When was that sent, your e-mail?  I guess
12  it was not from you, it was from the legal
13  counsel?
14  A.    Correct.
15  Q.    In-house counsel?
16  A.    Yes.
17  Q.    And what did it say?
18        MS. SANDERS:  Objection.  He can't
19  answer that.  We're taking the position it's
20  privileged.
21        MR. STREET:  A letter -- a holding
22  letter is privileged?
23        MS. SANDERS:  From the general
24  counsel.  We can take that up, and if -- if you
25  convince me it's not privileged, you can see

1  it.
2        MR. STREET:  It's not privileged.  I
3  get it in every lawsuit.  And, I know, the
4  rules don't apply to Lampo --
5        MS. SANDERS:  I can't speak to those
6  lawsuits.
7        MR. STREET:  -- so I forgot.
8  BY MR. STREET:
9  Q.    Ask let's get back and say what was
10  Lampo's policy when COVID-19 first hit?  What
11  did they do as a result of COVID-19?
12  A.    We shut down and sent everybody home same
13  as everybody else.
14  Q.    Did you shut down immediately?
15  A.    We shut down when we had the first case.
16  Q.    The first case at the office?
17  A.    Correct.
18  Q.    All right.  When was that?
19  A.    That was sometime in March.  I can't
20  recall the exact date, but it was sometime in
21  March.
22  Q.    And prior to that, did you take any kind
23  of precautions at all?
24  A.    We had taken the CDC precautions.  We had
25  started cleaning the building, providing hand

1  sanitizers.
2  Q.   Okay.  When did they do that?
3  **A.   It would have been sometime in March as**
4  **well.**
5  Q.   What other -- you said there's hand
6  sanitizer.  What other steps did you take?
7  **A.   We followed the guidelines provided by**
8  **the CDC.**
9  Q.   Okay.  What were they?
10  **A.   I don't recall them off the top of my**
11  **head, and they changed drastically sometimes**
12  **week by week, sometimes hour by hour.**
13  Q.   Okay.  But as you sit here today, you
14  can't tell me what the first precautions Ramsey
15  took other than hand sanitizer?
16  **A.   Hand sanitizer, 6 feet of distance, no**
17  **collective gathering.  There was a lot of**
18  **things, but all of those things that I'm**
19  **mentioning, I don't recall the order that they**
20  **happened in.**
21  Q.   Who made the determination at Ramsey
22  whether an employee was an essential worker or
23  not?
24  **A.   The determination was actually made by**
25  **Governor Lee that said these are the jobs that**

1  he would consider essential jobs and not.
2  Broadcast and radio were essential jobs.
3  Q.   Okay.
4  **A.   And so those were the people that we**
5  **allowed to come back in.  And, again, that was**
6  **a voluntary measure.**
7  Q.   Right.  Well, was that just people who
8  worked in the video department?
9  **A.   People that worked in video or broadcast,**
10  **YouTube channel, IT, technology; some certain**
11  **number of people to be able to broadcast a**
12  **radio show.**
13  Q.   So how many people were -- were
14  considered essential employees at Lampo?
15       MS. SANDERS:  Objection, outside the
16  scope.  He can answer if he knows.
17       THE WITNESS:  I don't know an exact
18  number.
19  BY MR. STREET:
20  Q.   Okay.  Again, one of the topics we expect
21  you to testify here today is defendant's
22  COVID-19 response.
23       MS. SANDERS:  And we provided you the
24  information --
25       MR. STREET:  And, again, I'm asking

1  your client questions.
2       MS. SANDERS:  Well, I get to state my
3  objection.  That's --
4       MR. STREET:  Are you -- there's an
5  objection or is there --
6       MS. SANDERS:  There's an objection.
7  I objected to the previous --
8       MR. STREET:  Okay.  Well, then, let's
9  start with objection and tell me what you're
10  objecting to.
11       MS. SANDERS:  I would appreciate if
12  you'd let me finish because I'm definitely
13  letting you finish.
14       MR. STREET:  That's fine if you'd
15  like to finish, but I don't want you telling
16  him what to answer.
17       MS. SANDERS:  I'm not telling him
18  what to answer.  I'm restating my objection,
19  which I stated earlier to you in writing, and
20  I'm restating it today, for the record.
21       Defendant's COVID-19 response is broad.
22  I asked you to narrow it.  You refused.  He's
23  here the best he can to answer your questions.
24  BY MR. STREET:
25  Q.   So as you sit here today to testify as to

1  Lampo's COVID response, you can't tell me how
2  many employees were considered exempt
3  employees?
4  **A.   Correct.**
5  Q.   Was everyone considered an exempt
6  employee just the fact they worked at Lampo?
7  **A.   No.**
8  Q.   Okay.  Who was not considered an exempt
9  employee?  What type of employee would not be
10  considered?
11  **A.   HR.**
12  Q.   Okay.  So the mere fact that your company
13  has a -- I guess it's a YouTube show?  Radio
14  show?
15  **A.   It's both.**
16  Q.   Okay.  So the fact that your company has
17  a YouTube show or radio show or both, it
18  doesn't mean everyone that works there is
19  exempt, correct?
20  **A.   Exempt?**
21  Q.   Exempt?  Is that the correct word?  I
22  forgot how long it is.  Essential.  Excuse me.
23  **A.   No, not everybody is essential, that's**
24  **correct.**
25  Q.   Okay.  And I'm asking you where the line

150..153

1 is drawn as to when someone is essential there
2 and when someone is not.
3 **A.    Asked/answered earlier.  I don't have the**
4 **number, but the essential workers are the ones**
5 **needed to broadcast the radio show, the YouTube**
6 **channel, XM; those were the essential workers.**
7 Q.    Right.  But the -- like, for example, HR,
8 I mean, you might be needed there at Lampo, but
9 they weren't considered essential?
10 **A.    That's correct.  Nor were salespeople,**
11 **for example.**
12 Q.    Okay.  That's what I'm saying.  How
13 closely related to the TV show was an employee
14 to be considered essential?
15 **A.    It would have to be pretty closely**
16 **related.**
17 Q.    Like a video editor?
18 **A.    Correct.**
19 Q.    And did you consider at all the
20 individual job duties of these folks, or did
21 you just say, hey, we can get away with this,
22 and we'll -- we'll have them come in the
23 office?
24        MS. SANDERS:  Objection to the form.
25        THE WITNESS:  We considered the

1 **individual job duties.**
2 BY MR. STREET:
3 Q.    Okay.  Since Mr. Amos left, what
4 specifically have you done to investigate any
5 of his claims in this lawsuit?
6        MS. SANDERS:  Objection, work
7 product.
8 **       THE WITNESS:  We were instructed by**
9 **our counsel --**
10        MS. SANDERS:  And you don't have to
11 answer what you were instructed to do by your
12 counsel.
13 **       THE WITNESS:  Right.**
14 BY MR. STREET:
15 Q.    But what did you do?
16        MS. SANDERS:  Objection.
17 **       THE WITNESS:  Whatever -- whatever**
18 **was instructed by our counsel.**
19 BY MR. STREET:
20 Q.    Well, what did you do?
21        MS. SANDERS:  Objection.  That's
22 protected by attorney- --
23        MR. STREET:  I'm not asking him what
24 anyone said; I'm asking what he did.
25        MS. SANDERS:  I directed it, so

1 that's protected by the work product doctrine.
2 BY MR. STREET:
3 Q.    Did you preserve documents?
4 **A.    We were all instructed to preserve**
5 **documents, yes.**
6 Q.    Okay.  What documents did you preserve?
7 **A.    Anything and any -- everything related to**
8 **Brad Amos.**
9 Q.    And from what date did you
10 preserve these documents?
11 **A.    I don't have that in front of me, but it**
12 **was for the entire employment period, so from**
13 **the time that he first applied for the position**
14 **through the -- past the date of termination.**
15 Q.    Okay.  Did employees at Lampo express
16 concern with Lampo's response to the COVID-19
17 pandemic?
18 **A.    Some did.**
19 Q.    Who were those folks?
20 **A.    There's a whole series of people.**
21 Q.    A lot?
22 **A.    I wouldn't say a lot, but there were**
23 **people express concern.  There were a lot of**
24 **things that were unknown when COVID hit.**
25 Q.    Right.  But I'm asking you who actually

1 expressed concern.
2 **A.    There was a whole series of people.  It**
3 **wasn't one person.  I had --**
4 Q.    I'm asking --
5 **A.    I had people on my team that expressed**
6 **concern to me.**
7 Q.    Okay.  And were they concerned about
8 Lampo's response or just to COVID itself?
9 **A.    COVID itself.**
10 Q.    All right.  I'm asking you who was
11 concerned about Lampo's response to COVID.
12 **A.    I don't know any particular names.  I can**
13 **think of several people who either were**
14 **concerned about how -- what we were doing or**
15 **not doing, concerned about returning to the**
16 **office, concerned about anything related to**
17 **COVID.  There was a lot of fear during that**
18 **time, so there were a lot of people that were**
19 **expressing concerns with -- the only**
20 **appropriate response would have been you don't**
21 **have to come to work basically.**
22 Q.    Okay.  And was that your response to
23 several employees, did they -- when they
24 expressed concern, you don't have to come in?
25 **A.    No.  We made exceptions for people for**

154..157

1  periods of time, so we did make a lot of
2  exceptions to people depending on their
3  personal situation, what was going on at home,
4  their health or immediate family's help.  So
5  there were a lot of exceptions made during that
6  time.
7  Q.   Were there records kept of these
8  individuals that were -- that you would excuse
9  from coming into the office?
10  A.   There was so much going on at the
11  beginning of this that, no, there were no
12  records kept at the very beginning of this when
13  all these exceptions were taking place.
14  Q.   Okay.  Did you lay anyone off as a result
15  of COVID-19?
16  A.   We didn't lay anyone off.  There were
17  some people that resigned of their own
18  volition.  There were people that -- a lot of
19  people that moved back home.  We relocated
20  about 50 percent of our team members.  So there
21  were some people who decided they wanted to
22  move back and be closer to family.
23  Q.   There were people that resigned as a
24  result of -- of COVID?
25  A.   As a result of wanting to be closer to

1  family.
2  Q.   Who were those people?
3  A.   I don't have any particular names to give
4  you.
5  Q.   Are you aware of anyone -- other employee
6  at Lampo complaining about their response to
7  COVID-19?
8  A.   Complaining about Lampo's response?
9  Q.   Yes.
10  A.   I'm aware of several, yes.
11  Q.   Who were they?
12  A.   So one that comes to mind is someone that
13  worked on my team, and that's Karla Lundell.
14  Q.   Okay.  Is she still with the company?
15  A.   She is not.  She moved to Wisconsin.
16  Q.   What was her concern with the response?
17  A.   Her concern was trying to alter or
18  stagger days so that everybody wasn't in the
19  office at the same time.
20  Q.   She -- that was her suggestion?
21  A.   That was her suggestion, yes.
22  Q.   And you said you can't do that?
23  A.   Correct.
24  Q.   Was there a reason you couldn't do that?
25  A.   The role that she held and what she did

1  with benefits, it would be too hard to say you
2  can only speak to someone on this date.
3  Q.   I see.  But she couldn't perform her job
4  at home?
5  A.   She could not.
6  Q.   Okay.  What was it about her job that
7  made had essential?
8  A.   She wasn't essential.
9       MS. SANDERS:  Object to form.
10  BY MR. STREET:
11  Q.   I'm sorry.  What did you say?
12  A.   She wasn't essential.  She wasn't there
13  when we closed down the office.  This was after
14  we decided to return to work.
15  Q.   Okay.  So Karla Lundell is one who
16  complained.  What am I -- I want to make sure
17  you understand what I'm asking you.  I'm asking
18  you about any employee who complained about
19  Lampo's response to COVID-19.  And does that
20  include Ms. Lundell?
21  A.   Yeah.  I don't know if --
22  Q.   So that's one person?
23  A.   Yeah.  And there's nobody else that comes
24  to mind per se.  There were people that had
25  suggestions, and Karla would be more in the,

1  hey, I'm suggesting this --
2  Q.   Right.
3  A.   -- more than I'm complaining about what
4  we're doing.
5  Q.   I'm asking you -- I thought I
6  misunderstood you because when I asked you that
7  a minute ago, you said there several, and now
8  you're saying there's just one?
9  A.   Yeah, because most of them were
10  suggestions, not I'm complaining.
11  Q.   Yeah, let me explain my question.  Then
12  what about -- what employees offered
13  suggestions?
14  A.   Karla would have been one.
15  Q.   Okay.  Who else?
16  A.   I don't have a list off the top of my
17  head.
18  Q.   Do you know how many there were?
19  A.   I'm going to say there were a handful
20  five, six; there wasn't 20.
21  Q.   Okay.  And if they did -- if employees
22  did have complaints about Lampo's response to
23  COVID, where would they direct those
24  complaints?
25  A.   They were -- they were told to come speak

1  with me, speak to HR.
2  Q.   Okay.  And it's your testimony that there
3  was only five or six people that complained
4  about Ramsey's -- or excuse me -- COVID's
5  response total in the whole company?
6  A.   Yeah.  And I didn't -- and I didn't use
7  the word "complaint."  So there were people who
8  had suggestions and said "Hey" --
9  Q.   Sure.
10  A.   -- "why can't we do this?"  Or "Have we
11  thought about doing that?"
12  Q.   Fair enough.
13       So you're saying there's five or six
14  people who had suggestions and/or complaints?
15  A.   Yes.  The people that would have
16  complained, to use your word, many of them we
17  didn't -- they didn't speak with their mouth,
18  they spoke with their feet.  They resigned.
19  They went somewhere else.
20  Q.   No one ever complained about the specific
21  manner in which Lampo responded to the
22  pandemic?
23  A.   To me directly in saying I disagree with
24  this?
25  Q.   I'm saying did anyone complain -- you're

1  here on behalf of the company today.  Did
2  anyone complain to the company about Lampo's
3  response to COVID?
4  A.   Yeah.  There was a lot of suggestions.
5  There was a lot of unknowns.  This is a crazy
6  time, unprecedented time in the country's
7  history.  There were a lot of things going on,
8  so there were a lot of people voicing concern,
9  a lot of people voicing suggestions.  There was
10  not someone that specifically said, "Hey, I --
11  that one thing right there, I disagree with."
12  Q.   All right.  I'm just asking, you're
13  saying all these -- there was a lot of people
14  making suggestions, but as you've sat here
15  today, you've only been able to tell me one
16  person, and that's Karla Lundell.
17  A.   That's right, because she was on my team.
18  I do not recall -- you may have -- I'm sure
19  you're aware of what was going on during that
20  period of time.  The world was crazy.  For me
21  to sit here and go, oh, yeah, it was So-and-So
22  and So-and-So -- there's no one else that
23  stands out in my head.  The only reason Karla
24  stands out is because she was on my team.
25  Q.   Okay.  So when these folks would make

1  suggestions or complained or complaints about
2  Lampo's response, what would you do as -- as a
3  result?  Would you follow up on them?  Would
4  you take them into consideration?
5  A.   Yeah --
6  Q.   Okay.
7  A.   -- both.
8  Q.   Did you change any policy -- or did Lampo
9  change any policy based on any kind of
10  suggestion or complaint from an employee?
11  A.   We did.
12  Q.   What was that?
13  A.   So, for example, we added soap stations
14  to every kitchen sink with antibacterial soap.
15  We moved to doing video meetings for a period
16  of time so our staff meetings were held with
17  video.
18  Q.   How long did that go on?
19  A.   I'm going to guess probably five,
20  six weeks.
21  Q.   Total?
22  A.   Total time, yes, from the time we started
23  it to the time we ended it.
24  Q.   And then you went back to in-person?
25  A.   And then we went back to voluntary

1  in-person and then eventually to where that
2  became part of the work.
3  Q.   Okay.  How long was it voluntary
4  in-person?
5  A.   Probably another couple of weeks after
6  that.
7  Q.   Okay.  And then Lampo at times has
8  all-employee meetings, do they not?
9  A.   We do.
10  Q.   How often do they have those?
11  A.   We do a staff meeting every Monday
12  morning, and we do a secondary, we call them
13  devotional, on Wednesdays.
14  Q.   Okay.  And that's -- all employees attend
15  both those events?
16  A.   Yes.
17  Q.   Okay.  How long did Lampo suspend those
18  events after COVID?  I think -- and I don't
19  want to put words in your mouth, but I want to
20  understand, you said five or six weeks?
21  A.   So we were five to six weeks work from
22  home.  So those meetings were suspended for
23  that period of time.  Then there was an
24  additional period of time where it was
25  voluntary, and that was probably three to

1   four weeks, and then we went back to in-person.
2   Q.    Okay.  So five or six weeks at home,
3   three to four weeks was video, and then it was
4   required for people to be back there again?
5   A.    Correct.
6   Q.    And this was for Monday staff meetings
7   and Wednesday you call it devotional?
8   A.    Correct.
9   Q.    What is a devotional?
10  A.    We bring in different speakers from, you
11  know, around the country or around the area.
12  So during that time, like, we had people like
13  Henry Cloud.
14  Q.    Who is Henry Cloud?
15  A.    Henry Cloud is known psychologist, wrote
16  different books, Boundaries being one of the
17  more famous ones.  He was one that came in and
18  spoke to the team.  They're meant to motivate
19  the team, uplift the team, and teach the team.
20  Q.    All right.  And I ask that because the
21  word "devotional" at times has a religious
22  context to it.
23  A.    It does.
24  Q.    Were they religious meetings at all?
25  A.    There -- some of them are pastors.  So

1   about 85 percent of the people that speak are
2   pastors from either local or national churches,
3   and the other 15 percent are motivational
4   speakers.
5   Q.    Okay.  These 85 percent that are pastors,
6   did you -- are you aware of any imam that came
7   in and spoke?
8         MS. SANDERS:  Objection, because it's
9   outside the scope.
10        BY MR. STREET:
11  Q.    You can answer.
12  A.    Yeah, I'm not.
13  Q.    Are you aware of any Jewish religious
14  leader?  I don't know want you call it.
15  A.    I am.
16  Q.    Okay.  Who was that?
17  A.    Lapin, Rabbi Lapin.
18  Q.    Rabbi Lapin.  Rabbi.  Thank you.
19  Rabbi Lapin?
20  A.    Uh-huh.
21  Q.    Were there any others?
22  A.    Any other Jewish?
23  Q.    Yes.
24  A.    So it's hard to answer that question
25  because I don't ask them what they are before

1   they speak.  But to my knowledge, no.  He's one
2   that I know because he's stated it.
3   Q.    Any leaders from the Buddhist church in
4   town?
5         MS. SANDERS:  Just so I don't have to
6   keep objecting -- objecting, these questions
7   are outside the scope, but, of course, he can
8   answer.
9         THE WITNESS:  No, not to my
10  knowledge.
11  BY MR. STREET:
12  Q.    Any other religion representing these
13  85 pastors besides Christianity except this
14  one, Rabbi Lapin?
15  A.    I'm sure there were others.  Again, I --
16  we never ask someone, "Hey, what denomination
17  are you?  What -- what's your religious
18  background before you speak to the team?"  So
19  we don't ask that question.
20  Q.    Do they not introduce themselves or what
21  church they were with?
22  A.    Not always.  Not everybody is with a
23  church.  Again, Henry Cloud is not with a
24  church; Christine King is not with a church.
25  Q.    The 85 percent you said were pastors,

1   they're with a church; fair to say?
2   A.    Yes.
3   Q.    Okay.  Them saying -- the 85 percent of
4   the speakers, did they not identify, say, "Hey
5   we're with such-and-such church" before they
6   spoke?
7   A.    Yeah.  But some of the churches have
8   different meanings.  Like, it doesn't say what
9   denomination it is.
10  Q.    Right.
11  A.    "I'm with Three Rivers Church," I don't
12  know what denomination that would be.
13  Q.    Right.  And I'm not asking about
14  particular denominations, more so, you know,
15  whether it be Methodist, Presbyterians,
16  Catholics, and then your Christian leaders
17  other than Jewish, Muslim, Buddhist.
18  A.    Correct.
19  Q.    Do you see the distinction I'm making?
20  A.    I see the distinction.  The point I'm
21  making is a Buddhist or a Jewish or other areas
22  that you are speaking of would still come in
23  and say, "I'm with Three Rivers."  They don't
24  say, "I'm with Three Rivers Buddhist Church."
25  Q.    All right.  But as far as you just told

1  me, there was only one Jewish --
2  **A.    One that I'm aware of.**
3  Q.    One that you're aware.
4       How long you been there?
5  **A.    Because -- because he stated it.**
6  **Eight years.**
7  Q.    Okay.  Are you aware at all about any
8  communications that Mr. Amos had with anyone at
9  Lampo regarding his concerns regarding Lampo's
10  COVID-19 response?
11  **A.    I am not.**
12  Q.    Are you aware of any accommodation he
13  requested during his employment there?
14  **A.    No.  He would have been directed to -- to**
15  **me, and I'm not aware.**
16  Q.    Okay.  So if he had asked to work from
17  home, that would have gone to you?
18  **A.    Correct.**
19  Q.    And you don't think you ever saw
20  Mr. Amos -- you're saying Mr. Amos never
21  considered to work from home?
22  **A.    That is correct.  That's what I'm saying.**
23  Q.    Okay.  Before termination of Mr. Amos,
24  did Lampo issue any corrective action toward
25  him for any reason?

1  **A.    The e-mail from Mr. DiCicco would have**
2  **been deemed as corrective action.**
3  Q.    Okay.  And let's look through -- which
4  one are you talking about there?
5  **A.    So the e-mail dated Tuesday, April 7th,**
6  **2020, where he is having the communication with**
7  **Luke LeFevre saying this is what I want to**
8  **communicate with Brad.**
9  Q.    Which one again?  Let me see.
10  **A.    Oh, I see.**
11  Q.    Okay.  This e-mail that you're -- that we
12  have a copy of him -- Mr. DiCicco sent to Luke
13  LeFevre --
14  **A.    Yeah.**
15  Q.    -- and it said, "This is what you should
16  say to" --
17  **A.    "This is what I would like to say."**
18  Q.    Okay.  But correct me if I'm wrong, do we
19  have a copy of the actual e-mail sent to Brad
20  with this in it?
21  **A.    I believe we do, but I have not seen that**
22  **in this stack of documents.**
23  Q.    Okay.
24       MS. SANDERS:  For the record,
25  Exhibit 4, is that what you mean by "this

1  stack"?
2       **THE WITNESS:  Exhibit 4.**
3  BY MR. STREET:
4  Q.    So if you do -- if it exists, you have
5  given it to us in discovery?
6  **A.    That's correct.**
7  Q.    Okay.  And if it doesn't in discovery,
8  we'll just assume it doesn't exist; is that
9  fair to say?
10  **A.    Fair to say.**
11  Q.    Okay.  We touched briefly on this, but I
12  want to talk more about it.  Did I hear you
13  say -- and, again, correct me if I'm wrong, I'm
14  not putting words in your mouth -- but did you
15  say Lampo doesn't have a discipline or
16  corrective action policy?
17  **A.    We do not.**
18  Q.    Okay.  So how is discipline or corrective
19  action handled at Lampo if there is no policy?
20  **A.    The leaders would handle it with the team**
21  **member, and before it would rise to the level**
22  **of termination, it would come into**
23  **HR Committee.**
24  Q.    Okay.  So the HR Committee was the
25  policy?

1  **A.    Governing body, yes.**
2  Q.    Okay.
3       MS. IRWIN:  Can we take a ten-minute
4  break, restroom break?
5       MR. STREET:  Sure.
6       Ten-minute restroom break.
7       THE VIDEOGRAPHER:  We are going off
8  the record.  The time on the monitor is
9  2:54 p.m.
10       (Short break.)
11       THE VIDEOGRAPHER:  We are back on the
12  record.  The time on the monitor is 3:03 p.m.
13  BY MR. STREET:
14  Q.    Now, was anyone from Lampo terminated for
15  refusing to come back in the office during
16  COVID?
17  **A.    Yes.**
18  Q.    Who?
19  **A.    I don't have the names specifically.**
20  Q.    How many people?
21  **A.    I'd say probably between six and ten,**
22  **somewhere in that neighborhood.**
23  **When you say "terminated," it was a**
24  **separation.**
25  Q.    You say it was a separation.  What's the

1  difference between that and a termination?
2  A.   I guess in this instance, there wouldn't
3  be one.
4  Q.   Do you remember what the specific
5  complaints they had about coming in the office
6  were?
7  A.   There weren't complaints.  It was -- it
8  was health reasons.  So the -- trying to think
9  of a particular person to be able to give you a
10 specific on that.
11 Q.   You're not saying you fired them for
12 health reasons?
13 A.   No.   They -- so the person that I'm
14 thinking about was single, living alone, was
15 perfectly healthy but felt that COVID was so
16 scary to her, she couldn't bring herself to
17 come back into work, even given the
18 accommodation of do you want to be on a
19 different floor, do you want to have a desk
20 that's more than 6 feet away from anyone.  She
21 just could not pass her anxiety of being able
22 to come in and perform her job.
23 Q.   And that's one person of the six to ten
24 you remember?
25 A.   Yeah.

1      I can think of other people who basically
2  said, "Hey, I'm moving."  I can think of one
3  lady who said her -- she was going to visit her
4  mom, she couldn't put herself to be in the
5  office and go visit her mom and didn't know how
6  frequently she was going to go visit her mom.
7  She wanted to keep that option open and coming
8  into the office every day felt like was going
9  to expose her mom to COVID.
10 Q.   What was her job?
11 A.   She was on the personalities team.
12 Q.   What is that?
13 A.   That is the -- earlier, we were speaking
14 about George Kamel and Anthony O'Neill and some
15 of these different people that have shows,
16 radio shows or YouTube shows.  So they are
17 the -- the face of Ramsey, if you will.
18 They're out there speaker -- public speakers.
19 Q.   Who was this person on the personality
20 team?
21 A.   I don't remember her name.  I'd have to
22 go back and look for it.
23 Q.   Did she have her own show?
24 A.   No.  This is not a personality.  She
25 worked on the personalities team.

1  Q.   I see.
2      When did Ramsey make the determination to
3  bring everyone back into the office?
4  A.   It was -- it was five weeks.  There was
5  five weeks where we made the determination to
6  come back in after not being in the office, and
7  then we had that two week where -- voluntary
8  where you can come in or not come in, your
9  call, and then we moved to if you need an
10 accommodation, you must go see HR to get an
11 accommodation.
12 Q.   All right.  And how many accommodations
13 did you issue during this time period?
14 A.   We issued quite a few.  In fact, at
15 first, there was a very easy accommodation, and
16 then as we -- we -- we're not a work-from-home
17 workplace.  So as we started saying, "Hey, we
18 are not a work-from-home workplace.  We believe
19 that the best work is done when you're here and
20 you're able to collaborate and see people in
21 the hallway," as we moved further -- further
22 away from -- from that, we began to rein in the
23 accommodations.
24 Q.   Okay.  Who made the determination that
25 you wouldn't be a work-from-home workplace?

1  A.   That would have been leadership back when
2  the company was first started.
3  Q.   Okay.  Was there -- was there a written
4  policy about that?
5  A.   I don't know that there's a written
6  policy, but I know that's even how we even
7  advertise our jobs.  It's part of every
8  recruiter speaks to people about.  We're a
9  work-from-work place.  So we don't hire
10 developers, for example, it's a hard position
11 to hire, and we don't do remote workers.
12 Q.   Okay.  But there's nothing in writing
13 that says that?
14 A.   To my knowledge, no, but it is our
15 practice.  While it may not be in writing, it
16 is what we do.
17 Q.   Okay.  So I'm not sure I understand
18 because we are talking about defendant's
19 response.  At some point, Lampo thought it was
20 more important to have people in the office
21 than maybe follow every COVID guideline; is
22 that fair to say?
23 A.   That's not fair to say because we were
24 following the CDC guidelines.
25 Q.   Okay.

174..177

1  A.    And at that point, we put those
2  precautions in place and followed everything,
3  whether it was the CDC or the State of
4  Tennessee guideline.  That's not a
5  recommendation, not a best practice, but a
6  guideline that said you must do this.  We
7  followed them.
8  Q.    Right.  And I'm saying it's a guideline.
9  And then you said it yourself, it's not a
10 requirement.  And I'm saying did -- did Ramsey
11 look at it that way, this is just a guideline
12 or it's a suggestion rather than a rule?
13 A.    We looked at things that were suggestions
14 as suggestions.  We looked at things that were
15 either the law or mandate as a mandate or a
16 law.
17       I'm not sure if that answers your
18 question.
19 Q.    Sort of.
20       You're saying if it was possible to have
21 some -- have these folks back in the office,
22 you were going to do what it took to get them
23 back in the office?
24 A.    Yes.  We were going to be a
25 work-from-work place.  So where -- where it was

1  allowed by the state law or where it was
2  allowed by CDC, we were going to move in that
3  direction.
4  Q.    Are you familiar with any kind of policy
5  at Lampo regarding fear of the virus is not
6  going to be tolerated, something along those
7  lines?
8  A.    We don't have any such policy that I'm
9  aware of.
10 Q.    Okay.  Are you aware if Mr. Ramsey said
11 that on his TV -- on his, excuse me, his
12 YouTube show?
13 A.    I don't listen to every one of them, so,
14 no, I'm not aware of that.
15 Q.    Okay.  What's Mr. Ramsey's role in the
16 day-to-day operations of the company?
17       MS. SANDERS:  Objection, outside the
18 scope.  He can answer.
19       THE WITNESS:  By Mr. Ramsey, I'm
20 assuming you mean Dave Ramsey, right?
21 BY MR. STREET:
22 Q.    Yes.
23 A.    Okay.  Thank you.
24       So he is the CEO.  He is also a
25 personality, a speaker, so he speaks on behalf

1  of the company.
2  Q.    Okay.  Does he -- these policies -- these
3  unwritten policies, like the one we just talked
4  about, are these from Mr. Ramsey himself?
5  A.    No.
6  Q.    If there's nothing in writing that says
7  we are a work-from-work place, I think that was
8  your term you used, work-from-work --
9  A.    Yes.  So there's no policy, right.  So,
10 yes, we haven't written down our recruiters say
11 it to every candidate.
12 Q.    Where is it -- okay.  That's fine.
13       Where is it written down?
14 A.    So it would be written down in HR Zoom
15 Screen interviews, for example, to -- to make
16 sure you let people know that we're not a
17 remote workplace.  It's written in our ad copy
18 when we post jobs.  It's written in our website
19 when people apply for a position to say that
20 we're not a -- we're not a remote workplace.
21 We are a work from workplace.
22 Q.    And it said this even prior to COVID?
23 A.    Yes.
24 Q.    Okay.  So the website --
25 A.    Yes.

1  Q.    -- said that prior to COVID?
2  A.    Yes.
3  Q.    And you said you had ad copy for jobs
4  that said this specifically?
5  A.    Yes.
6  Q.    Where would those ad copy be provided to?
7  A.    So wherever we advertised for jobs, which
8  is really everywhere.  And I don't --
9  Q.    Right.  But this is specifically where?
10 A.    So LinkedIn is an example.
11 Q.    Okay.  Where else?
12 A.    So we use an aggregator, and so to --
13 earlier we talked about Jobvite, which is how
14 Mr. Amos applied.  It's an applicant tracking
15 software.  That software also pushes our ads to
16 150 different job boards across the United
17 States in every one of those.
18 Q.    Okay.  It's the same ad copy in -- as
19 would appear in LinkedIn or Indeed or something
20 like that would be the same on everything?
21 A.    It pushes it to all of them; that's
22 correct.
23 Q.    And you're saying that the job
24 advertisements all say in them, "We're a work
25 from work --

1   A.    Not every job advertisement.  Like I
2   said, it's not a policy, but where we know, for
3   example, developers are very accustomed to
4   working from home, we would make sure that
5   those ads would say work from work because we
6   want to make -- we don't want to their waste
7   time or our time applying for a position.
8   Q.    So this ad copy that you're talking about
9   would say this would just be for developers?
10  A.    Not necessarily.  Again, I'm using that
11  as an example because that is a position that
12  is known for work -- remote work.  But we -- we
13  post it on other jobs as well.
14  Q.    Like what other jobs?
15  A.    Like any other jobs.  Like creative jobs,
16  like design jobs, marketing jobs.  It is also a
17  question that recruiters ask every candidate
18  regardless of a job.  So it doesn't matter if
19  the posting had it or didn't have it.  As part
20  of the HR screen, they make sure that the
21  person on the other end understands that this
22  job is in Franklin, Tennessee.
23  Q.    And there will be a script that these
24  folks read?
25  A.    No, there wasn't a script at that time.

1   There is one now, but there was not one there.
2   It's just part of the training that we train
3   every recruiter on.
4   Q.    And you trained the recruiters in HR when
5   they're interviewing to tell everyone?
6   A.    That's correct.  Because it leads to a
7   lot of people -- you end up spending a lot of
8   their time and our time, and then it doesn't
9   work out.
10  Q.    Okay.  So there's training materials that
11  you have that would say here's what we expect
12  you to do and expect you to tell --
13  A.    So it's -- most of our training is done
14  hands-on.  So you come on as a recruiter, you
15  sit next to another recruiter, and you learn as
16  you go.
17  Q.    So, no, it's not in writing anywhere?
18  A.    Correct.
19  Q.    Is there an employee handbook at -- for
20  Lampo?
21  A.    There's eight pages that constitute our
22  policies and procedures.
23  Q.    Okay.
24  A.    Not an employee handbook, no.
25  Q.    All right.  What are on those eight

1   pages?
2   A.    It's a whole combination of things, and I
3   believe that was part of the discovery turned
4   in.  So policies and procedures are, for
5   example, we're a non-smoking campus, so that
6   would be on there; EEO policy would be on
7   there.
8   Q.    Okay.  Is there something called a "Good
9   Living Policy" or something like that?
10  A.    No, not to my knowledge.
11  Q.    Okay.  And I'm probably using the -- the
12  name wrong.
13  A.    I can't think of something that's "Good
14  Living."
15  Q.    What was Ms. O'Connor fired for?  What
16  violation was she fired for?
17        MS. SANDERS:  Objection.
18  BY MR. STREET:
19  Q.    You can answer.
20        MS. SANDERS:  You can answer.
21        THE WITNESS:  Okay.  Now I get what
22  you're saying.  It's Righteous Living.
23  BY MR. STREET:
24  Q.    Righteous Living.  Righteous Living.
25  Okay.

1         What's in the Righteous Living Policy?
2   A.    It just basically says that we are an
3   organization that believes that character
4   matters, and it matters all the time.
5   Q.    That's basically -- what specifically
6   does it say?
7   A.    That is specifically what it says.
8   Q.    Is that -- say that again for me.
9   A.    Character -- character matters, and it
10  matters all the time.
11  Q.    That's all it says?
12  A.    Who you are -- who you are here Monday
13  through Friday is who you should be on Friday
14  night and Saturday night and outside of here.
15  So your character and what you do and how do
16  you it is representative of you and
17  representative of the organization.
18  Q.    Are there anything -- is it more specific
19  than that with any kind of -- in regards to any
20  kind of what's allowed, what's not allowed?
21  A.    There's other interpretations, yes.
22  Q.    Like what?
23  A.    So there's, for example, sex outside
24  marriage is not allowed.
25  Q.    Okay.  What else?

1    A.    Honesty, so telling the truth.  Lies are
2    not allowed under Righteous Living.
3    Q.    Okay.  What else?
4    A.    Theft is not allowed under Righteous
5    Living.
6    Q.    Okay.  What else?
7    A.    That's the gist of it.
8    Q.    So no lying, no stealing, no sex outside
9    of marriage?
10    A.    (Nodding.)
11    Q.    And that's what's covered by the
12    Righteous Living Policy, and that's it?
13    A.    For the most part, those are the -- those
14    are the high-level points, yes.
15    Q.    Okay.  Are those specific things listed
16    in the policy itself?
17    A.    Those are discussed usually in the
18    interview process, again in on-boarding, again
19    in staff meeting.
20    Q.    Again, just to be sure, Mr. Amos was not
21    terminated for any, I guess, unrighteous
22    living?
23    A.    That's correct.
24    Q.    He was terminated because he was
25    insubordinate in that meeting with Mr. LeFevre?

1    A.    That's correct.
2    Q.    Were there any performance reviews of
3    Mr. Amos prior to his termination?
4    A.    No.  His performance review would have
5    been at his annual, and he was not there at
6    that time.
7    Q.    Who would have done that performance
8    review?
9    A.    It would have been Lara Johnson.
10    Q.    Ms. Johnson is still with the company,
11    right?  I probably asked you that before.
12    A.    (Nodding.)
13    Q.    Yes, she is?  Thank you.
14    A.    That is correct.
15    Q.    All right.  I want to talk to you about
16    Topic No. 5.  In that one we asked for "The
17    identity of all persons making either
18    recommendation or decision that plaintiff be
19    terminated."
20         And if I understood you correctly, the
21    only person who made that recommendation or
22    decision was Luke LeFevre?
23    A.    The decision, yes.  The recommendation,
24    as we read in that e-mail from Lara, would have
25    been made by Lara Johnson and then David

1    DiCicco where she copied him.
2    Q.    Okay.  So Lara and David were involved
3    when it was recommended he should be
4    terminated?
5    A.    With termination, yes.
6    Q.    Okay.  Lara Johnson and David DiCicco.
7    A.    And then the decision was ultimately made
8    by Luke LeFevre.
9    Q.    Okay.  Without telling me what you said,
10    were you interviewed with -- by anyone
11    regarding Mr. Amos's termination?
12    A.    Interviewed?
13    Q.    Yes.
14    A.    No.
15    Q.    No one asked you about what led to it, no
16    one asked you what -- they asked you -- no one
17    even asked you about it?
18    A.    I was asked about it --
19    Q.    Okay.
20    A.    -- as to my knowledge about it.
21    Q.    When was that?
22         MS. SANDERS:  Objection.  That's
23    privileged.
24         MR. STREET:  No.  Hold on.
25

1    BY MR. STREET:
2    Q.    When was that?
3         MS. SANDERS:  Objection.  It's
4    privileged.
5    BY MR. STREET:
6    Q.    Who was that?
7    A.    That would have been our general counsel
8    and our outside attorney.
9    Q.    Okay.  With regard to defendant's COVID
10    response, did anyone beside Mr. Amos complain
11    about Lampo's COVID response?
12         MS. SANDERS:  Object to the form.  He
13    can answer.
14         THE WITNESS:  I'm not aware of a
15    complaint by Mr. Amos.
16    BY MR. STREET:
17    Q.    Are you aware did anyone including
18    Mr. Amos complain about defendant's COVID
19    response, any employee of Lampo?
20    A.    No.
21         MS. SANDERS:  Objection, asked and
22    answered.
23         THE WITNESS:  So as stated earlier,
24    we had a lot of people making suggestions.  We
25    didn't have anybody raising a complaint.

*186..189*

BY MR. STREET:

Q.    No one -- not one person complained; is
that what your testimony is?

A.    That is correct.

Q.    Okay.  So when you said that six to ten
people were terminated because they didn't come
back into the office when Lampo thought it was
time, they were fine with that?  There was no
complaint from these folks?

A.    They did not raise a complaint.  So the
answer -- so the way those conversations went
is, "We're ready to have a date for you to
return to the office, so let's talk about
putting something in writing, so when is a date
you can be back."  Some people just said, "I
don't see me ever being able to return."

Q.    Okay.  Did all the people say that?

A.    No.  Some of them we said -- and some of
them actually did come back where we said,
"Hey, on this date, I can return to the
office."  And we said, "Okay.  That's a
reasonable time frame, so on that date, we
expect you back."

       Some of those ten people I mentioned
were -- as it got closer to that date, they

came forward and said, "I'm not -- I'm not
comfortable.  I thought I would be, but I'm
not.  And I know this means I can't maintain my
employment with Lampo, and so how do we move
forward?"

Q.    And it was that congenial --

A.    Yeah.

Q.    -- with everyone?

       Okay.  And can you give me the names of
those people, the six to ten people that you're
talking about?

A.    I don't have them in front of me, so, no,
I cannot.

Q.    Could you get them for me and get them to
us later?

A.    I can.

       MR. STREET:  Okay.  All right.  That
was a request.  I'll also get their last known
addresses and things like that.

       Also, Leslie, did you guys give us a copy
of this eight-to-ten-page employee manual?

       MS. SANDERS:  Yes.  It's in the
initial disclosures.

       MR. STREET:  Okay.  Pull that out.

BY MR. STREET:

Q.    Besides Mr. Amos, what other lawsuits or
complaints were brought against Lampo from
current or former employees regarding violation
of Title 7 in 2019-2020?

A.    That would be -- Caitlin O'Connor would
be the only one in that time period.

Q.    Okay.  And I believe Mr. Amos, wasn't he
there in the same time period?

A.    Yes, but you had stated besides Mr. Amos.

Q.    You're right, you did -- I did.

       All right.  We know with Mr. Amos.
Ms. O'Connor, what investigation was made as a
result of Mr. [sic] O'Connor's complaints?  You
can answer.

       MR. STREET:  You're -- he's here for
a deposition.

       MS. SANDERS:  You can answer.

       THE WITNESS:  Okay.

       MS. SANDERS:  But just caution the
witness don't divulge any attorney-client
privileged contents of that investigation.

       THE WITNESS:  So we did a full and
thorough investigation of all her claims at our
attorneys' discretion and followed every lead

as we were instructed to do so.

BY MR. STREET:

Q.    Okay.  I must have misunderstood.  Did
you do that for Mr. Amos as well?

A.    So we did -- after the fact, we did do
something similar.  Same discretion -- same
direction of our attorneys.

Q.    Okay.  What did you do in one and not the
other?  How are they different?

A.    They're not much different in -- in
following every lead or uncovering what was --
what took place.

Q.    Did -- the actual investigation work, did
the attorneys do that or did people in HR do
that?

A.    The attorneys instructed HR to do some
and conducted some on their own.

Q.    Did you write a report?

A.    Wrote summary statements to our
attorneys.

Q.    Okay.  And that was as a result of Mr. --
investigating Mr. Amos's claim as well?

A.    Which one are you speaking of?

Q.    Mr. Amos's claims.

A.    There were responses, yes, to inquiries

1 made by our attorneys.
2 Q.    Okay.  What people did you speak to in
3 performing this investigation?
4         MS. SANDERS:  Objection, privileged.
5 BY MR. STREET:
6 Q.    What people did you speak to?
7         MS. SANDERS:  Objection, that's
8 privileged.
9         MR. STREET:  It's not a document I'm
10 asking for; it's not what you said to him.
11         MS. SANDERS:  You're asking him to
12 tell you who I told him to speak to.
13         MR. STREET:  I just asked him who he
14 spoke to; I didn't ask him who told him what.
15         MS. SANDERS:  Okay.  Well, so I'll
16 instruct the witness you may answer that unless
17 I told you who to talk to.
18 BY MR. STREET:
19 Q.    I'm asking you who did you actually go
20 speak to.
21 A.    The people I spoke with were the ones
22 instructed to by our attorney.
23 Q.    Which was who?
24         MS. SANDERS:  Objection.  That's
25 asking --

1         MR. STREET:  It's not -- it's not --
2         MS. SANDERS:  That's -- that's my
3 investigation.
4         MR. STREET:  Do you want to come back
5 again on this, or can we just find out the name
6 of the people?
7         MS. SANDERS:  That privileged.
8         MR. STREET:  It's not.  The privilege
9 is not -- how is it privileged?
10         MS. SANDERS:  And the entire
11 investigation is privileged.  I directed him.
12 If he tells you who he talked to --
13         MR. STREET:  Work product is
14 documentary.  And I'm not asking about any of
15 the documents.  I'm asking about the names of
16 these people he talked to.
17         MS. SANDERS:  I'm talking about my
18 investigation.  He helped me with my
19 investigation.
20         MR. STREET:  And you -- you're going
21 to hide witnesses by not telling us who they
22 are?
23         MS. SANDERS:  I haven't hidden a
24 single witness.  You have every single thing
25 you asked for.

1         MR. STREET:  Well, then teach him --
2 let him tell me.
3         MS. SANDERS:  No, absolutely not;
4 objection.
5         MR. STREET:  We'll we're going to
6 come back on this one, unfortunately --
7         MS. SANDERS:  That's fine.
8         MR. STREET:  -- because this is
9 important.
10         MS. SANDERS:  Yeah.  And I've given
11 you every single witness.  You don't need to
12 know who I told him who to speak to to know who
13 the witnesses are.
14         MR. STREET:  I don't care who you
15 told him to speak to.
16         MS. SANDERS:  That's what you're
17 asking him.
18         MR. STREET:  No.  I asked him who did
19 he speak to.  Maybe he took your advice, maybe
20 he didn't, but --
21         MS. SANDERS:  You can ask him --
22         MR. STREET:  -- regardless, it's who
23 he spoke to.
24         MS. SANDERS:  No, it's privileged.
25         MR. STREET:  No, it's not, Leslie.

1 You know it's not.
2         MS. SANDERS:  I know --
3         MR. STREET:  I really don't want to
4 come back.
5         MS. SANDERS:  Okay.  We'll come back.
6         MR. STREET:  Good grief.
7         MS. SANDERS:  That will be fine.
8         MR. STREET:  Expected.
9 BY MR. STREET:
10 Q.    So you're refusing to answer that
11 question, sir?
12         MS. SANDERS:  I'm instructing him not
13 to answer that question.
14 BY MR. STREET:
15 Q.    So your attorney -- on your attorney's
16 instructions, you're refusing to answer that
17 question?
18 A.    I'm following my attorney's advice.
19 Q.    Okay.  What documents did you create as a
20 result?  I'm not asking what they said; I'm
21 asking what they were.
22 A.    Responses to the inquiries by our
23 attorneys so that those were the documents
24 created.  I responded to their questions.
25 Q.    You responded to the questions from the

194..197

1  attorney?
2  **A.    Correct.**
3  Q.    Okay.  And they were based on statements
4  you took from other folks?
5  **A.    Some, yes.**
6  Q.    Okay.  The folks you won't tell me who
7  they are; is it those folks?
8  **A.    The folks I was instructed not to tell**
9  **you, yes.**
10  Q.    Okay.  So you spoke to these people or
11  some people, whoever they might be, and you
12  wrote up their statements in response to
13  specific questions from your outside counsel
14  and in-house counsel?
15  **A.    At this point, it would have been outside**
16  **counsel, yes.**
17  Q.    Okay.  When does it go to outside counsel
18  at Ramsey?  What's the policy there?
19  **A.    We don't have a policy, so you would have**
20  **to speak to our general counsel to learn the**
21  **answer to that.**
22  Q.    Okay.  Did you talk to anyone who told
23  you that things that Mr. Amos said were not
24  true in his complaint?
25       MS. SANDERS:  You can answer that.

1       **THE WITNESS:  Yes.**
2  BY MR. STREET:
3  Q.    Who?
4       MS. SANDERS:  Objection.
5  BY MR. STREET:
6  Q.    So there's witnesses who dispute what my
7  client says, but you're not going to tell me
8  who they are; is that what I'm hearing?
9       MS. SANDERS:  You have a list of
10  every witness we know of with relevant
11  information.
12       MR. STREET:  I'm asking your witness
13  a question.
14  BY MR. STREET:
15  Q.    Is that what your testimony is today?
16       MS. SANDERS:  You asked -- objection,
17  it's privileged.
18       You're asking him the people that I asked
19  him to speak to --
20       MR. STREET:  I asked him who did he
21  speak to.
22       MS. SANDERS:  You may ask him -- you
23  may ask him --
24       MR. STREET:  I asked him who did he
25  speak to.

1       MS. SANDERS:  You may ask him if --
2  everybody he knows -- that's --
3       MR. STREET:  What's going to make you
4  happy?  That's what I -- what's going to make
5  you happy?
6       MS. SANDERS:  I just told you.
7  Unfortunately, you were talking over me, so you
8  didn't hear me.
9       MR. STREET:  Well, that's -- that
10  seems to be going around.  But anyway --
11       MS. SANDERS:  Not from my end.
12       MR. STREET:  Yes, Leslie, you never
13  do anything wrong.
14  BY MR. STREET:
15  Q.    So, anyway, please, come again --
16       MS. SANDERS:  You're wrong.
17       MR. STREET:  No, I'm not.
18       MS. SANDERS:  You may ask him --
19       MR. STREET:  I'm not --
20       MS. SANDERS:  -- everybody -- every
21  witness he believes has relevant information,
22  you can ask him that.
23       MR. STREET:  Okay.
24       MS. SANDERS:  That's fine.  Ask him.
25       MR. STREET:  And then I'll ask him

1  what it is.
2       MS. SANDERS:  That's fine.  It's all
3  in the written documents.  He can absolutely
4  testify to that.
5       MR. STREET:  Then, let's do it that
6  way that makes your attorney happy.
7  BY MR. STREET:
8  Q.    Tell me every single witness you're aware
9  of that has relevant information to this
10  lawsuit.
11  **A.    Luke LeFevre, David DiCicco, Lara**
12  **Johnson.**
13  Q.    Okay.  Anyone else?
14  **A.    No.**
15  Q.    Okay.  So no one dealt with Mr. Amos's
16  complaints other than Luke LeFevre, DiCicco,
17  and Lara Johnson?
18  **A.    That is correct.**
19  Q.    And did you speak with each of these
20  individuals in investigating these claims?
21       MS. SANDERS:  Objection.
22  BY MR. STREET:
23  Q.    Did you speak with them?  I'm not asking
24  you what they said; I'm asking did you speak
25  with them.

198..201

1    MS. SANDERS: You can answer that.
2        THE WITNESS: Yes.
3  BY MR. STREET:
4    Q.  Okay.  And was that the extent of your
5  investigation?
6        MS. SANDERS:  Objection, privileged.
7  He may answer if he doesn't reveal any
8  attorney-client privileged information.
9        THE WITNESS:  Those were the people
10 with relevant information towards the case.
11 BY MR. STREET:
12   Q.  So did you speak to anyone besides these
13 three people?  I'm not asking what they said;
14 I'm just saying did you speak with anyone else?
15       MS. SANDERS:  You can answer.
16       THE WITNESS:  No, those are the three
17 people that I spoke with.
18 BY MR. STREET:
19   Q.  How much -- do you know what I mean when
20 I say ESI?
21   A.  Can you tell me?
22   Q.  It means electronically stored
23 information, something lawyers say to shorten
24 that up.
25   A.  Uh-huh.

1    Q.  Yes?
2    A.  Yes, I know what it means.
3    Q.  What electric -- what electronically
4  stored information was collected to review for
5  this lawsuit for -- to answer these complaints?
6    A.  So that would have been, pretty much
7  during that time period that was given, it
8  would have been anything that had --
9    Q.  What time period are we talking about?
10   A.  It's the time period stated in the
11 discovery.  And so it would have been all
12 electronic information that we had related to
13 Brad Amos.
14   Q.  And so is it fair to say that the time
15 period would have been the time period Mr. Amos
16 was -- was applying to --
17   A.  I believe it started a little before that
18 and --
19   Q.  Okay.
20   A.  -- ended a little after.
21   Q.  Okay.
22   A.  And so it was anything we had related
23 to -- that had the name "Brad" or "Amos" or
24 "COVID" related to "Brad Amos," "accommodation
25 related to Brad Amos."  There was a series of

1  search strings that were ran to find out what
2  was in there.
3    Q.  Okay.
4    A.  I want to say it's over 6,000 documents
5  that were reviewed.
6    Q.  Well, I'm interested in what the strings
7  themselves were.  Do you remember what they
8  were?
9    A.  So, no, I'm not in IT, so I'm not sure
10 the strings.  I know "Brad" and "Amos," and
11 "COVID," "accommodation."  I know some of those
12 things were used as search strings.
13   Q.  How did you come up with these --
14 these -- what to look for?  What terms did you
15 look for?
16   A.  I did not come up with them.  That was at
17 the instruction of our attorneys.
18   Q.  And you -- by you, again, I mean --
19   A.  Lampo.
20   Q.  Yes.  All right.  Because I'm looking at
21 the topic where -- Topic 25 -- we asked
22 "methods used to cull relevant ESI prior to
23 review," which it would include the search
24 criteria for inclusion or exclusion in review.
25 And I'm asking you how was the search criteria

1  developed in this case?
2    A.  That's correct.  And so I stated anything
3  that had the name Brad, just Brad by itself,
4  Brad Amos combined --
5    Q.  Right.  Let me ask you again.  Listen to
6  my question.  I'm not asking what they were at
7  this time, I'm asking you how they -- how you
8  came up with these terms?
9        MS. SANDERS:  Objection, asked and
10 answered.  He can answer again.
11       THE WITNESS:  Because we were looking
12 for anything related to Brad Amos.
13 BY MR. STREET:
14   Q.  Who came up with the search terms?
15   A.  I want to say that was done collectively.
16   Q.  Collectively between --
17   A.  It wasn't one person.  Collectively
18 between our attorneys, myself.
19   Q.  Okay.  And you're saying the terms
20 included "Brad" or "Amos" or "COVID"?
21   A.  Or Brad Amos combined.
22   Q.  Or Brad --
23   A.  Or "COVID."
24   Q.  What else?
25   A.  Or "accommodation" or "work from home."

```
1   Q.    Okay.  What else?
2   A.    I don't recall all them, but I want to
3   say that was the bulk of them.
4   Q.    As you sit here today -- that's all the
5   ones you can tell me as you sit here today?
6   A.    Yeah.
7   Q.    All right.  And you said there was about
8   6,000 documents that you caught on these terms?
9   A.    Yes.
10  Q.    And then what happened once you collected
11  these 6,000 documents?  What happened to them
12  then?
13  A.    We turned those in to our attorneys and
14  reviewed them, but -- you didn't ask me this,
15  but I was surprised how little there was, how
16  little communication regarding Brad Amos.
17  Q.    Okay.  And do you know what criteria was
18  used to determine whether you want to give
19  it -- the documents to turn over or not?
20  A.    Anything that was related to Brad Amos
21  was turned in in discovery.
22  Q.    Okay.  So every e-mail from Brad Amos, to
23  Brad Amos should have been turned over?
24  A.    Yes.
25        MS. SANDERS:  Object to the form.  He
```

```
1   can answer.
2         THE WITNESS:  Yes, that's correct.
3         MR. STREET:  Okay.
4         THE WITNESS:  There are other Brads
5   that work in the company.
6   BY MR. STREET:
7   Q.    All right.  I get it.
8         But I'm saying every e-mail to or from
9   Brad Amos, my client, is something that would
10  have been turned over in discovery?
11        MS. SANDERS:  Object to the form.
12        THE WITNESS:  Related to the case,
13  yes.
14  BY MR. STREET:
15  Q.    Okay.
16  A.    So if there was an e-mail about, "Hey, we
17  are having a meeting next week," and it's a
18  meeting invite, calendar invite, then no, we
19  wouldn't have turned that in.
20  Q.    Okay.  But I'm asking you who made the
21  determination whether it was relevant to the
22  case or not.  Is it something you gave to
23  attorneys like that, or did you give it all to
24  your attorneys and they decided?
25  A.    We gave it all to our attorneys.
```

```
1   Q.    Okay.  Who from Lampo participated in the
2   EEOC investigation in this matter?
3   A.    So we turned that -- at that point, we
4   had outside counsel, so we turned it over to
5   outside counsel.  I know that it involved Lara
6   Johnson, Luke LeFevre, myself, and I believe
7   that was it.
8   Q.    And DiCicco?
9   A.    Probably.
10  Q.    Besides the O'Connor lawsuit we talked
11  about and the Amos lawsuit, were there any
12  other complaints by employees of Lampo in
13  2019-2020 for discrimination, harassment?
14  A.    Complaints made to -- outside of Lampo?
15  Inside of Lampo?
16  Q.    Complaints made by Lampo employees to
17  Lampo.
18  A.    No.
19  Q.    Those are the only two people that
20  complained?
21  A.    During that time period?
22  Q.    During those two years.
23  A.    That is correct.
24  Q.    And you reviewed today to make sure
25  that's the correct answer?
```

```
1   A.    That is correct.
2         MR. STREET:  All right.  You want to
3   pull up those interrogatories?
4         MS. IRWIN:  You have a copy.
5         MR. STREET:  Leslie, you have a copy
6   of your interrogatory responses?
7         MS. SANDERS:  I do.
8         THE WITNESS:  I think these are
9   yours.
10        MR. STREET:  They might be.  I've
11  walked off with them before, so...
12        MS. IRWIN:  Oh, yeah, those are
13  yours.  She's got the stamped one.
14        MR. STREET:  Let's make this Exhibit
15  No. --
16        MS. IRWIN:  5.
17        MR. STREET:  5.
18        (WHEREUPON, a document was marked as
19  Exhibit 5.)
20        THE WITNESS:  Okay.
21  BY MR. STREET:
22  Q.    If you'll take a second and look through
23  those and tell me if you recognize those.
24  A.    Yes, I am familiar with them.
25  Q.    Okay.  And what -- what are those as your
```

1  understanding?
2  A.     Responses to questions that you
3  submitted.
4  Q.    Okay.  And were you involved in putting
5  these together?
6  A.     I was.
7  Q.    And these are the responses for Lampo who
8  you are here testifying for today?
9  A.     That is correct.
10 Q.    Okay.  And, again, I just want to make
11 sure, I know I keep harping this, but this is
12 not your deposition, okay, this is just for the
13 company, all right?
14 A.     Got it.
15 Q.    All right.  So looking at Interrogatory
16 No. 1, it looks like the information submitted
17 here was provided by Lara Johnson, David
18 DiCicco, Armando Lopez, and that's it?
19 A.     Yes, that's correct.
20 Q.    Okay.  All right.  The next one we asked
21 was to identify every person by name, address,
22 and telephone number who has knowledge of the
23 facts regarding this particular litigation.  We
24 have a few names:  David DiCicco, Armando
25 Lopez, J.B. Waggoner.

1         MS. SANDERS:  For the record, his
2  name is misspelled, Paul.  I just noticed that.
3  There's only one E on J.B. Waggoner.
4         MR. STREET:  I knew who you meant.
5  BY MR. STREET:
6  Q.    Okay.  Now, those are the only three
7  people that Lampo has identified as to having
8  any knowledge about this lawsuit?
9         MS. SANDERS:  Objection, that's not
10 what it says.
11 BY MR. STREET:
12 Q.    Okay.  That's the only three names I see.
13 Read through there and see if you see another
14 one for me.
15 A.     I think the -- the names listed are to
16 the specific question No. 2.
17 Q.    Right.
18        MS. SANDERS:  I'm just distracted by
19 the storm.  Apologies.
20        THE WITNESS:  Yeah, so the question,
21 "Identify each person by name, address, and
22 telephone number, who has knowledge of relevant
23 facts relating to the subject matter of this
24 litigation," and then state in detail.
25

1  BY MR. STREET:
2  Q.    Right.
3  A.     Then it goes on to say the "Request is
4  broader than defendant's initial disclosure as
5  it requests names and information regardless of
6  whether defendant may use the individual to
7  support claims or defenses."
8  Q.    Yeah, I mean, we don't -- we don't need
9  you to read.  It will be in the record.  But
10 I'm asking you about these three people.
11 There's only three people identified in the
12 response?
13 A.     Yes.
14        MS. SANDERS:  That's -- objection,
15 that's not correct.
16        MR. STREET:  Okay.  Your witness can
17 look and see if there is another name I'm not
18 seeing.
19 BY MR. STREET:
20 Q.    Is there a fourth?
21        MS. SANDERS:  Now, but there's -- it
22 says, "In addition to those identified in the
23 initial disclosures."
24        MR. STREET:  Oh, okay.
25        MS. SANDERS:  And he doesn't have the

1  initial disclosures in front of him.
2         MR. STREET:  Do you want hand him
3  those, too, then?
4  BY MR. STREET:
5  Q.    And I will say, we don't -- apparently,
6  we don't have a copy of it, but the only person
7  who was actually that is listed in the Rule 26
8  disclosures not identified here is Lara
9  Johnson.  I will take it back, also, and Luke
10 LeFevre.
11 A.     Yeah, that completes the set then.
12 Q.    So it's this three people and those two
13 was well?
14 A.     Correct.
15 Q.    What does J.B. Waggoner have knowledge of
16 in this lawsuit?
17 A.     So he was the floor supervisor.  We
18 break -- we break into packs or pods, different
19 groups of people to kind of work together.
20 J.B. Waggoner would have been the floor
21 supervisor over the pack that Brad Amos was a
22 part of.
23 Q.    Okay.  And correct me if I'm wrong, and I
24 may get his name wrong, wasn't he one of the
25 people on the board included on these e-mails?

**210..213**

1  A.    He was not.
2  Q.    I'm thinking of somebody else's name,
3  then.  Yes, I'm thinking of Jack Galloway.
4        Okay.  And is Mr. Waggoner still with
5  Lampo?
6  A.    Yes.
7  Q.    Okay.  So he said -- you're saying he was
8  a floor supervisor, but what specifically would
9  he know about this lawsuit?
10 A.    They work collaboratively as teams.
11 Q.    Okay.
12 A.    And so Brad Amos, Mr. Amos, would have
13 been a part of that group that Mr. Waggoner
14 would have been over as of -- kind of as a
15 floor supervisor.
16 Q.    Okay.
17 A.    It's not a direct leader; he's just the
18 floor leader.  He's the direct leader when
19 they're on the floor when they're actually
20 doing editing, doing -- working together on a
21 specific project or topic.
22 Q.    All right.  I guess I want to ask you
23 this.  I mean, I could save it if we depose you
24 individually, but since it's here in discovery,
25 what do you know about Lampo's designation as a

1  best place to work?
2  A.    I know that we won ten years that
3  designation.
4  Q.    What company was that from -- through?
5  A.    We've won it through two.  One of them is
6  a local Nashville-only best places to work.
7  The second one is a national best places to
8  work.  I don't remember the national -- I don't
9  remember the specific companies.
10 Q.    Was it an I-N-C, Inc.?
11 A.    Inc. Magazine, that's right.  That's --
12 Q.    That's the national one?
13 A.    That's the national one.  And we've only
14 won that once, and then we've won nine other
15 times in Nashville.
16 Q.    What was the one in Nashville?
17 A.    It was the best places to work.
18 Q.    Right.  But what was the publication?
19 A.    It's Pinnacle Bank who kind of puts it
20 on, but it's an independent third party that
21 does the study.
22 Q.    But you don't know who it is?
23 A.    There's a company behind the best places
24 to work, but they do it all across the country.
25 So it's an independent third party that does

1  this for every site.  So the award itself is a
2  Nashville best places to work.  It's not like
3  Inc. Magazine's best places to work.  This is
4  more like each city hires this company to do
5  that independent study and then get awarded the
6  Nashville best places to work or Seattle or
7  wherever it happens to be.
8  Q.    All right.  But you can't tell me the
9  name of the company?
10 A.    I cannot, no, not off the top of my head.
11 Q.    All right.  Do you know how it's
12 determined who will win this award?
13 A.    Can you clarify your question?
14 Q.    Yeah.
15        How do they clarify who is the best
16 employer, best place to work?
17 A.    So there's anonymous surveys that get
18 submitted.  So team members get e-mailed the
19 survey that complete; those go to that
20 third party; the third party then tabulates all
21 the results; and using that criteria, award a
22 best place to work.  That's the same for
23 Inc. Magazine, by the way.
24 Q.    Did Inc. Magazine come back and take you
25 off the best places to work list, though?

1  A.    They did come back and take it off when
2  the O'Connor lawsuit came to light.  She went
3  to the -- the answer is yes.
4  Q.    Okay.  Why?
5  A.    Ms. O'Connor went on a media publicity,
6  and even though the case is not resolved, they
7  opted to remove us.
8  Q.    Did you speak with anyone or did anyone
9  from Lampo speak to anyone at Inc. Magazine to
10 dispute it?
11 A.    Nope.  They sent an e-mail, and even
12 though they understood it was pending
13 litigation, they chose to take that action.
14 Q.    And no one at Lampo spoke with them after
15 that about it?
16 A.    No.  That would have been me, and we did
17 not.
18        MS. SANDERS:  For the record, all
19 Mr. Lopez's testimony is in the individual
20 capacity of Mr. Lopez, not the company.
21        MR. STREET:  This Mr. Lopez?
22        MS. SANDERS:  Yes.
23        MR. STREET:  Well, he's here today
24 talking about the company.
25        MS. SANDERS:  I know, but that wasn't

*214..217*

1  a topic. You said it. You said it at the
2  beginning.
3       MR. STREET: No. I mean, I did ask
4  him about something he knew, but it's also on
5  the topic list. So I just want to make sure
6  we're clear, this is all testimony about the
7  corporation.
8       MS. SANDERS: Well, where is it on
9  the topic list? Because I thought you just
10 said "I know this isn't on the list."
11      MR. STREET: It's something like the
12 all discovery or somebody in this matter.
13      MS. SANDERS: Okay. Well, objection,
14 outside the scope to all of the information
15 about the best place to work.
16      MR. STREET: No. 28, "Any response
17 provided in discovery in this matter."
18      MS. SANDERS: And objection, that's
19 broad.
20      MR. STREET: There's no protective
21 order.
22      MS. SANDERS: As I stated -- as I
23 stated in my written objections.
24 BY MR. STREET:
25 Q.   I just want to make sure I'm clear. I'm

1  expecting your answers to be on behalf of the
2  corporation. If we need you personally, we'll
3  call you back.
4       Who is Julie Anne Stamps?
5       MS. SANDERS: Objection, outside the
6  scope. He may answer.
7       **THE WITNESS: She is an ex-team**
8  **member.**
9  BY MR. STREET:
10 Q.   Okay. And she filed a lawsuit against
11 The Lampo Group?
12 A.   **She did.**
13 Q.   What was that lawsuit about?
14 A.   **It was alleging discrimination based on**
15 **lesbian status.**
16 Q.   Okay. Tell me more what happened that
17 led to this lawsuit.
18 A.   **She filed a lawsuit alleging**
19 **discrimination based on lesbian status. She**
20 **had resigned her position voluntarily.**
21 Q.   Okay. But she says she was terminated.
22 A.   **She alleges to be terminated; she was**
23 **not.**
24 Q.   Okay. Well, what was the -- the result
25 of that lawsuit?

1       MS. SANDERS: Object to the --
2  outside the scope.
3  BY MR. STREET:
4  Q.   Still pending?
5  A.   **No, I believe that settled.**
6  Q.   Do you remember who her attorney was?
7  A.   **Heather. I cannot think of Heather's**
8  **last name.**
9  Q.   Was Heather the attorney for Ms. Stamps
10 and Ms. O'Connor, same attorney?
11 A.   **I believe so.**
12 Q.   Okay. All right. Who is Kristoffer
13 Sketch?
14 A.   **He was a --**
15      MS. SANDERS: Objection, outside the
16 scope. You can answer if you know.
17      **THE WITNESS: Yeah, he's a candidate**
18 **that applied for a position at Lampo.**
19 BY MR. STREET:
20 Q.   Okay. And but he ended up filing with
21 the Tennessee Human Rights Commission?
22 A.   **Yes, he filed an EEOC complaint.**
23 Q.   Okay. What did he say in his complaint
24 was the problem?
25 A.   **Discrimination based on, I want to say, a**

1  **medical condition, but I'm not 100 percent**
2  **sure. He filed a complaint with the EEOC.**
3  Q.   Okay. And were there more lawsuits filed
4  against Lampo under Title VII or the Tennessee
5  Human Rights Act prior to these three lawsuits?
6  A.   **In what time period? Since the inception**
7  **of the company?**
8  Q.   Yes, since you -- yes.
9  A.   **I believe there's one more aside from**
10 **those three.**
11 Q.   And who is the plaintiff in that?
12      MS. SANDERS: Objection, outside the
13 scope. You can answer.
14      **THE WITNESS: I don't recall the**
15 **name.**
16 BY MR. STREET:
17 Q.   Do you recall when it was?
18 A.   **It was before I got there, so it would**
19 **have been at least ten years old, probably longer.**
20 Q.   What about subsequent to Mr. Amos's
21 lawsuit, has anybody else filed under Title VII
22 or under Tennessee Human Rights violation?
23      MS. SANDERS: Object, outside the
24 scope. He can answer.
25      **THE WITNESS: No.**

218..221

1  BY MR. STREET:
2  Q.    All right.  If you'll look at
3  Interrogatory No. 4, and this, again, is
4  talking about the facts/information considered
5  by defendant in making a decision to terminate
6  plaintiff's employees.  And I won't re-read it
7  because it will be in the record, so we'll have
8  it there.
9        But the people -- again -- again, these
10 facts you mentioned were that Luke LeFevre,
11 Lara Johnson, plaintiff met on July 31st, 2020,
12 to discuss plaintiff's work performance, and
13 to work on a plan to improve his performance, and
14 determine if plaintiff was willing to improve
15 his performance?
16       If I understood you correctly, the
17 only -- none of that had anything to do with
18 why you fired him.  It wasn't his work
19 performance, it was his disrespect to
20 Mr. LeFevre.
21 **A.    Correct.  They met to discuss the work**
22 **performance; he was terminated in that meeting**
23 **because of insubordination.**
24 Q.    Okay.  Mr. LeFevre says discussed areas
25 where plaintiff was not performing well.  Were

1  there e-mails between Mr. LeFevre and plaintiff
2  where this kind of thing was discussed?
3  **A.    It is not stated here.**
4  Q.    I'm asking you were there; do you know?
5  **A.    I'm not aware of any.**
6  Q.    Okay.  "Mr. LeFevre pointed out
7  plaintiff's attitude of trying to portray
8  himself as better than his team members."
9        What did plaintiff do that made you think
10 he was portraying himself better than his team
11 members -- team members?
12 **A.    It's not stated here.**
13 Q.    Right.
14 **A.    It would be speculation on my part.**
15 Q.    Well, you're here for the company, and
16 these are the company's responses.  And I just
17 want to know what does the company say that
18 Mr. Amos did, what actions did he take to
19 portray himself as better than his team
20 members?
21 **A.    It's not stated here, so it would be**
22 **speculative on my part.**
23 Q.    So you can't name one as you sit here?
24 **A.    I can speculate as to what he did.**
25 Q.    No, I only want to know what you know.

1  As you sit here today, you don't know one thing
2  he did to portray himself better than his
3  coworkers.
4  **A.    I know that's what's stated by**
5  **Mr. LeFevre, so I'm certain that he has more**
6  **specific facts about that.**
7  Q.    "His lack of interest in the job," and it
8  says, "As evidenced by missing deadlines."  Are
9  there any other facts that indicate that
10 Mr. Amos had a lack of interest in his job
11 other than this alleged missed deadline?
12 **A.    That is stated here.  So if there**
13 **was more, then I would imagine that that would**
14 **be in here.**
15 Q.    Well, I mean, if there was more, you
16 would have answered truthfully, correct?
17 **A.    Yes.**
18 Q.    And if there was more, you would have put
19 it in there, correct?
20 **A.    That's correct.**
21       MS. SANDERS:  Object to the form.
22 BY MR. STREET:
23 Q.    And his failure to follow instructions.
24 What did plaintiff do to -- how did he not
25 follow instructions?

1  **A.    Mr. LeFevre could respond to that.**
2  Q.    But the company can't tell me?
3  **A.    It's not stated in here.**
4  Q.    It says plaintiff was very least
5  resistant to making any changes.  What changes
6  were suggested to plaintiff that he make that
7  he refused to do?
8  **A.    Which sentence are you on?**
9  Q.    I'm on the next-to-the-last one of his
10 response to paragraph -- to Question No. 4.
11 **A.    The one that begins with "Plaintiff**
12 **laughed at the suggestion.  Mr. LeFevre**
13 **determined that plaintiff was unwilling to or**
14 **at the very least resistant to making any**
15 **changes"?**
16 Q.    Yes.  I'm asking you what changes did you
17 suggest plaintiff make that he refused to do?
18 **A.    Those would be the -- that would be in**
19 **the testimony of Mr. LeFevre.  It is not**
20 **written here.**
21 Q.    Well, what is it?  What were the changes?
22 **A.    It's not written here.**
23 Q.    Okay.  So as you -- the company sits
24 here, they can't tell me the changes?
25 **A.    No.  There were some recommendations for**

*222..225*

1  improvement on performance that would have been
2  included as part of the performance improvement
3  plan, but the specifics are not included here.
4  Q.   Okay.  But I'm not asking you what they
5  are, I'm asking what's written here.  I'm
6  asking you what they are.  What specifics were
7  in there?
8         MS. SANDERS:  Object, asked and
9  answered, but he can answer.
10        THE WITNESS:  My answer is
11 Mr. LeFevre would know the specifics.
12 BY MR. STREET:
13 Q.   Okay.  But you can't tell me today as the
14 company?
15 A.   That's right.
16 Q.   Okay.  Okay.  Will you look at No. 7 for
17 me, please?  I just want to make sure I
18 understand this response correctly.
19      We ask you to identify and describe all
20 statements including but not limited to
21 correspondence, verbal statements or
22 conversations, memoranda, voice mail messages,
23 recording, and electronic communications
24 regarding plaintiff's termination, concerns
25 about his job performance, concerns about his

1  personal life.  And if I understand this
2  correctly, your response says that any of these
3  conversations would be reflected in the e-mails
4  that were provided.  I could be wrong.
5         MS. SANDERS:  Objection to the form.
6  He can answer.
7         THE WITNESS:  So, yeah, it does state
8  what you said.  It also states that we can't
9  possibly have everything documented regarding
10 his personal life or every single piece of
11 communication that took place, but it does also
12 state that everything that was relevant was
13 turned in.
14 BY MR. STREET:
15 Q.   And who determined what was relevant to
16 this request?
17 A.   Again, we searched under the criteria we
18 spoke about earlier.
19 Q.   But you only gave me a fraction of those
20 documents you found, correct?
21 A.   Correct.  So all of the documents that
22 were surfaced under those search parameters
23 went to our attorneys, who then found relevant
24 documents to turn in.
25 Q.   Did they find documents that they did not

1  provide to us?
2         MS. SANDERS:  Objection.  That's
3  privileged.
4         THE WITNESS:  I was going to say our
5  attorney would know what they turned in or
6  didn't turn in.
7  BY MR. STREET:
8  Q.   Like, for example, if you remember
9  earlier, we can go back and find it, but do you
10 remember the e-mail we looked at where I think
11 it was Mr. DiCicco or was it LeFevre who
12 claimed Mr. Amos's wife was crazy?  Do you
13 remember this?
14 A.   Uh-huh.
15 Q.   Yes?
16 A.   I do remember that.
17 Q.   Okay.  And this request asks for
18 statements regarding his personal life,
19 including his relationship with the family.
20 That's the only one we have.  Is that the only
21 time they talked about his wife?
22        MS. SANDERS:  Objection to the form.
23 You can answer, if you know.
24        THE WITNESS:  So I don't know how
25 many times they talked about his wife.  That is

1  the only thing that came out in the discovery
2  that had anything to do --
3  BY MR. STREET:
4  Q.   Right.  You're saying as the corporation
5  here answering my questions on this discovery
6  today, that it could have been a thousand, it
7  could have been one, you don't know?
8  A.   I know that we surrendered everything
9  that we found to our attorney who then --
10 Q.   Right.  That's not what I'm asking you.
11      I'm asking as you sit here today on
12 behalf of the face of the corporation, I'm
13 asking you if there was just one statement ever
14 made over there by Ramsey employees regarding
15 my client's wife, and you're saying I don't
16 know; is that fair to say?
17 A.   That's fair to say.
18 Q.   Okay.
19 A.   If you're asking me do I know how many --
20 was there any conversation related to his wife
21 by any team member of Ramsey Solutions at any
22 point in time of his employment?
23 Q.   Are there any e-mails?
24 A.   No, they would have been turned in to
25 you.

226..229

1  Q.   Okay.  If you determined they were
2  relevant?
3  **A.   Well, they all went to our attorney, and**
4  **it's part of this case, so I have no reason to**
5  **believe they wouldn't have turned in something.**
6  Q.   Okay.  So as I said, as Lampo, you don't
7  object if they did say something, but they give
8  them to us now?
9       MS. SANDERS:  Objection to the form.
10      **THE WITNESS:  So we've surrendered**
11 **everything that we have.**
12      MR. STREET:  Okay.  Let's take about
13 a ten-minute break, and we'll come back, and
14 we'll finish up as quickly as we can after
15 that.
16      THE VIDEOGRAPHER:  We are going off
17 the record.  The time is 4:02 p.m.
18      (Short break.)
19      THE VIDEOGRAPHER:  We are back on the
20 record.  The time on the monitor is 4:14 p.m.
21 BY MR. STREET:
22 Q.   Mr. Lopez, I did want to talk about on
23 the notice we had a topic:  "All communications
24 between employees of defendant occurring
25 between May 2019 and August 2020 related to its

1  decision to terminate Mr. Amos."
2  **A.   Yes, sir.**
3  Q.   Okay.  And -- and we talked -- we looked
4  at several e-mails throughout the day --
5  **A.   Correct.**
6  Q.   -- regarding this, right?
7  **A.   Yes.**
8  Q.   Now, are you aware of any other
9  communications between employees of defendant
10 regarding the termination of Mr. Amos other
11 than the e-mails we talked about today?
12 **A.   I am not aware of any other than what was**
13 **instructed under attorney-client confidential**
14 **as part of the investigation.**
15 Q.   Do you -- okay.  But you saw the e-mails,
16 right?
17 **A.   Correct.**
18 Q.   And you're saying the only other
19 statements were made to your attorneys?
20 **A.   Correct.**
21 Q.   And besides the ones you made to your
22 attorneys after the lawsuit was filed, were
23 there any other statements not included in
24 that -- those statements you made to your
25 attorney after the lawsuit was filed that

1  weren't in these e-mails?
2  **A.   Not to my knowledge, no.**
3  Q.   Okay.
4       MS. SANDERS:  I'm sorry, John.  Which
5  one was that?
6       MR. STREET:  Topic 7.
7       MS. SANDERS:  7.  Okay.
8       MR. STREET:  Object to the breadth
9  but certainly fine for him to answer.
10 BY MR. STREET:
11 Q.   Now, if you look at the last page of
12 Exhibit 1 --
13 **A.   I need Exhibit 1, again.  Thank you.**
14 Q.   And you see the very last part of it with
15 the documents requested, one page before that,
16 there you go, do you see where it says,
17 "Documents requested duces tecum"?
18 **A.   Yes.**
19 Q.   All right.  And just to confirm, you did
20 not bring any documents with you today to the
21 deposition, did you?
22 **A.   I did not.**
23 Q.   Did you look for any documents before you
24 came today?
25 **A.   I did not.**

1  Q.   Now, Mr. Amos did work on some projects
2  while he was there at Lampo?
3  **A.   Yes.**
4  Q.   And were those projects he did work on
5  received well?
6  **A.   To my knowledge, some of them were and**
7  **some of them were not.**
8  Q.   Okay.  Some of them were not?
9  **A.   Correct.**
10 Q.   Like which ones were not?
11 **A.   So the earlier conversation we were**
12 **having, the conversation they were about to**
13 **have with him involved some of the things that**
14 **he had not been doing well.**
15 Q.   And what were those things?
16 **A.   Again, it's in -- listed in**
17 **Mr. LeFevre's -- they were going to talk about**
18 **the performance issues.  You asked what were**
19 **those specific things.  I said you would have**
20 **to ask Mr. LeFevre about the specifics.**
21 Q.   Because sitting here today, you just
22 can't tell me?
23 **A.   That is correct.  Because he is the one**
24 **that has the material knowledge.  He is the one**
25 **that sat down to have that conversation with**

*230..233*

1  him.
2  Q.    Okay.  So other than what you're telling
3  Mr. LeFevre would know, can you tell me
4  anything else about Mr. Amos's work being
5  subpar in any way?
6  A.    I know from the e-mail that David DiCicco
7  wrote to Mr. LeFevre that he missed deadlines
8  and didn't communicate on the -- that March
9  e-mail.
10  Q.    Did anyone else review Mr. Amos's work
11  besides Mr. DiCicco?
12  A.    I'm sure there were other people.  They
13  do a peer review as well as a team review of
14  edited work.
15  Q.    Mr. Ramsey ever comment on a video made
16  by Mr. Amos?
17  A.    Not that I'm aware of.
18  Q.    So besides this deadline -- and, again,
19  the deadline he missed, what was that for?
20  A.    That deadline that he missed according to
21  that document -- so if you'll bear with me?
22  Q.    Yeah, take your time.
23        MS. IRWIN:  Exhibit 4, for the
24  record.
25        THE WITNESS:  Exhibit 4, yes.

1        So it looks like there is a couple of
2  things.  One was that "Cards and Quotes" that
3  you asked me about.  And then --
4  BY MR. STREET:
5  Q.    I want to make sure, you -- you didn't
6  know what that was?
7  A.    That's correct.
8  Q.    Okay.  Go ahead.
9  A.    And then the second one is where he's
10  noticing that after we had the first
11  conversation about missing the deadline, then
12  there was a secondary missed deadline --
13  Q.    Right.
14  A.    -- that involved that video slash -- he
15  called it something specific, so bear with me,
16  and I'll tell you exactly what he called it.
17  Q.    Sure.
18  A.    He called it a story line.  So that was
19  the second missed deadline.
20  Q.    The deadline was for a story line?
21  A.    Yeah.  So it says that was "The starting
22  point to build the story out of."  So that
23  narrative structure.
24  Q.    Okay.  But you said that was the second
25  missed deadline.  Did I understood you

1  correctly?
2  A.    Correct.  That's what I'm taking it by as
3  I'm reading it.
4  Q.    Okay.  And the first missed deadline was?
5  A.    The first missed deadline was that "Cards
6  and Quotes" that we were discussing earlier.
7  Q.    And is this -- what's the date of that
8  e-mail you're reading just to make sure I'm on
9  the same page here?
10  A.    This is David DiCicco to Luke LeFevre
11  dated Tuesday, April 7th, 2020, at 12:17 p.m.
12  Q.    All right.  Who set these deadlines?
13  A.    This would have been set collaboratively,
14  but it would have been a group of people that
15  would have set them.  There's --
16  Q.    Who was in the group?
17  A.    So this would have probably been David
18  DiCicco with the editors saying, "Here's when
19  we have to deliver a product."
20  Q.    The editor being Mr. Amos?
21  A.    Correct.
22  Q.    So these deadlines were set by
23  Mr. DiCicco and Mr. Amos?
24  A.    Correct.
25  Q.    Okay.  And the second deadline was the --

1  it says, "Even after we had the first
2  conversation about missing the deadline, you
3  confidently told me the first half of the film
4  would be cut by the following Friday."  Do you
5  see that?
6  A.    Yes.  Down towards the bottom of that --
7  Q.    Is that the second -- yes, I'm sorry.
8  A.    That's what I'm considering to be the
9  second.
10  Q.    Okay.  Were these deadlines in writing
11  somewhere?
12  A.    I don't know the answer to that question.
13  My guess is when you go down to the video
14  editing room, there's a big white board with
15  projects that are going to be delivered, and
16  every deliverable has a date and a name
17  underneath that, who is responsible for
18  delivering it and on what date.
19  Q.    Okay.
20  A.    So there might be a video shoot, for
21  example, and the cinematographer that's
22  responsible for that shoot's name's there with
23  a date when that's due.  That's one piece of a
24  completed project.  And then there is a date at
25  the end of who is going to do the editing and

*234..237*

1  who is going to deliver the finished product.
2  Q.   Okay.  But if -- if you didn't provide us
3  an e-mail with a deadline set out in it in
4  discovery, can I assume there was not an e-mail
5  sent to Mr. Amos with these deadlines?
6  A.   That's correct.  What I've seen in that
7  area is a white board where they plan out all
8  their projects and outlined who is going to do
9  what.
10 Q.   Okay.  But you don't e-mail them and tell
11 them these are your deadlines?
12 A.   They're in the room when it's created.
13 Q.   What would Mr. DiCicco e-mail Mr. Amos
14 about if not about work?
15 A.   Obviously, things like what we've read in
16 these e-mails.
17 Q.   Right.  But I haven't -- I mean, again,
18 looking through these, there's not a lot from
19 Mr. Amos here from Mr. Amos, there's a lot
20 about Mr. Amos starting about -- about the time
21 COVID started, but essentially before COVID
22 started, there weren't e-mails discussing
23 Mr. Amos's work?
24 A.   No.
25 Q.   Because you would have provided them?

1  A.   That's right.
2  Q.   Okay.  And if there were something in
3  writing about this -- deadlines that you're
4  claiming that he missed, that would have been
5  provided as well?
6  A.   That's correct.
7  Q.   So if it's not provided, I'm assuming
8  they don't exist?
9  A.   They existed in a format that would have
10 been erased like a white board.
11 Q.   Okay.  Did anybody take a picture of that
12 white board before --
13 A.   No, not to my knowledge.
14 Q.   -- it was erased?
15 A.   If we had it, we would have surrendered
16 that.
17 Q.   Would the deadline have still been up
18 there on the day Mr. Amos was fired on the
19 white board?
20 A.   I doubt it.  This was -- this e-mail was
21 dated back April 7th.
22 Q.   Are these one-on-one meetings that
23 Mr. Amos was having with Ms. Johnson, were they
24 recorded in any way?
25 A.   No.

1  Q.   Are there notes Ms. Johnson takes?
2  A.   That would be a question for Ms. Johnson.
3  We don't instruct our leaders to take notes
4  during one-on-ones.
5  Q.   Okay.  Why would you not want them to
6  take notes?
7  A.   We don't instruct them not to, but we
8  don't instruct them to.
9  Q.   Okay.  What do you instruct these folks
10 that the purpose of these one-on-one meetings
11 is?
12 A.   It's to check in on each other,
13 priorities, what do you need from me, what are
14 the roadblocks that you're hitting, what do you
15 need from me to get that project finished,
16 et cetera.
17 Q.   I'm sorry.  You done?  I didn't mean to
18 interrupt you.
19 A.   That's fine.
20 Q.   How long do these meetings usually take?
21 A.   Anywhere between 30 minutes and an hour.
22 Each leader decides how much time is needed
23 with that individual.
24 Q.   Is there guidance you provide to their --
25 the leaders to tell them?

1  A.   Yeah.  So the guidance is you want to
2  check in on the team member to see how they're
3  doing --
4  Q.   Okay.
5  A.   -- so, first, individually; secondly,
6  priorities, what are you working on; thirdly,
7  how can I help, what do you need from me.
8  Q.   So your guidance doesn't tell them to ask
9  about personal family lives, things like that?
10 A.   No.  In fact, our guidance is available
11 to everyone because it's part of that
12 EntreLeadership book.
13 Q.   Okay.  But your guidance that you give
14 these folks doesn't say, "Hey, you should find
15 out about their personal lives, family," things
16 like that?
17 A.   It does not.  But if I'm asking you how
18 you are doing and you want to tell me how
19 things are going at home, that is your
20 decision.
21 Q.   Okay.  But your testified that the
22 company does not require folks to provide
23 information about their personal lives?
24 A.   We do not require it, no.
25 Q.   Okay.  But on the other hand, the company

238..241

1  does fire people for being lesbians; fair to
2  say?
3        MS. SANDERS:  Objection to the form.
4        THE WITNESS:  Incorrect; not fair to
5  say.
6  BY MR. STREET:
7  Q.   Well, they fired Ms. O'Connor for having
8  a baby outside of marriage; fair to say?
9        MS. SANDERS:  Object to the form.
10       THE WITNESS:  That's open litigation,
11  and she wasn't fired for having a baby.
12  BY MR. STREET:
13  Q.   What was she fired for?
14  A.   She was fired for having sex violating
15  Righteous Living Policy.
16  Q.   Okay.  So their lives -- personal lives
17  are discussed in these meetings?
18  A.   No.  That was not discussed in any
19  one-on-one.
20  Q.   Okay.  Well, how would they find out
21  about this if they weren't discussed in these
22  one-on-ones?
23  A.   Are are asking me to tell you about
24  Ms. O'Connor specifically?
25  Q.   No.  I'm asking you -- is it the

1  personal -- what did you call it -- the
2  Righteous Living Policy?
3  A.   Uh-huh.
4  Q.   Is that something that's discussed in
5  these one-on-one meetings?
6  A.   No.
7  Q.   Never?
8  A.   Unless it gets brought up by someone.  We
9  don't say during that specific one-on-one,
10  "Hey, ask -- ask about Righteous Living."
11  Q.   No, I get that.
12  A.   The only time Righteous Living surfaces
13  is when someone else has brought it up to
14  leadership, when someone else has brought it up
15  to HR, and then it's investigated.
16  Q.   And when you investigate these righteous
17  living -- I mean, who does those
18  investigations?
19  A.   That would be myself and/or general
20  counsel.
21  Q.   Is there a -- are there documents you
22  give to these leaders to tell them how to do
23  these one-on-one meetings?
24  A.   Yes.  As I said, it's in the book
25  EntreLeadership.  It's the three questions that

1  I just asked you.
2  Q.   Okay.  So it's this book.  There's
3  nothing by Ramsey.  It's just a book.
4  A.   There's a book available to anyone that
5  wants to purchase it, but we use the same --
6  that's how we run the company.  So we would --
7  one-on-one says how are you doing, right --
8  Q.   Uh-huh.
9  A.   -- what are you working on, what's your
10  priorities, how can I help.
11  Q.   Okay.  But there -- I just want to make
12  sure I understand.  These one-on-ones, do the
13  leaders who conduct these one-on-ones ever have
14  to report what is said to them to anyone else?
15  A.   No.
16  Q.   Are the weekly staff meetings, are they
17  videotaped?
18  A.   No.
19  Q.   They're not put online somewhere for
20  people to watch later?
21  A.   No.
22  Q.   Okay.  What about the devotional
23  meetings?
24  A.   No.
25  Q.   There's no evidence -- there's no

1  recording of any of those things?
2        MS. SANDERS:  Object to the form.
3        THE WITNESS:  No, not to my
4  knowledge.  We may do some special something
5  that we want to preserve for later that we
6  might record, but, typically, no.
7  BY MR. STREET:
8  Q.   And are the devotionals every week?
9  A.   Yes.
10  Q.   Every Wednesday, how long do those last?
11  A.   One hour.
12  Q.   And what time of day are they?
13  A.   8:30 to 9:30.
14  Q.   Okay.  And then Monday, what time is that
15  staff meeting?
16  A.   Same time frame, 8:30 to 9:30, just on
17  Mondays.
18  Q.   Okay.  Is there any follow-up after these
19  staff meetings, any kind of a, "Hey, here's
20  what we talked about"?
21  A.   Sometimes.  It depends what was
22  discussed.  This Monday, as an example, we
23  talked about open enrollment for health care,
24  and so that meeting was followed with an e-mail
25  to -- instructions and next steps and how to --

*242..245*

1  how to sign up for open enrollment.
2  Q.   Okay.  Were there ever staff meetings
3  done during the pandemic on Zoom?
4  A.   There were.
5  Q.   Were those recorded?
6  A.   No.
7  Q.   Who set those up, those staff meetings
8  up?
9  A.   Can you clarify your question?
10  Q.   Yes.  Who actually set the Zoom up for
11  everyone to log into?  Who coordinated, I guess
12  is the word?
13  A.    I don't know the answer to that question.
14        MR. STREET:  All right.  I think
15  that's all I have.
16        MS. SANDERS:  The only thing I have
17  is there were a few personnel matters discussed
18  that would fit into the confidentiality order.
19  So until we have had such time to review the
20  transcript and designate those sections, the
21  deposition will be deemed confidential until
22  we're able to get the transcript.
23        MR. STREET:  Our order says you can
24  do that, but we have to say okay, and we're not
25  saying okay.  We're not saying okay until we

1  get a transcript.  I'm not going to put it out
2  anywhere, but it's in the transcript.
3        MS. SANDERS:  Okay.  That's all --
4  that's all I'm saying.
5        MR. STREET:  I'm not going to say
6  it's automatically confidential either.
7        MS. SANDERS:  My point is I want an
8  opportunity to designate the portions that
9  are --
10        MR. STREET:  Sure, that's fine.
11        MS. SANDERS:  -- confidential under
12  the confidentiality order.
13        MR. STREET:  Well, you get 14 days
14  once we get the transcript.
15        MS. SANDERS:  That's exactly right.
16        MR. STREET:  All right.
17        THE VIDEOGRAPHER:  This marks the end
18  of this deposition.  We are going off the
19  record.  The time is 4:32 p.m.
20        (WHEREUPON, the following discussion was
21  had off the video record.)
22        THE REPORTER:  Are you ordering?
23        MR. STREET:  Yes; just the transcript
24  right now.
25        MS. IRWIN:  Electronic only.

1        MS. SANDERS:  Same for me.
2        FURTHER DEPONENT SAITH NOT
3  (Proceedings concluded at 4:32 p.m.)

1              C E R T I F I C A T E
2        I, ARMANDO LOPEZ, having read the
   foregoing deposition, Pages 1 through 248, do
3  hereby certify said testimony is a true and
   accurate transcript, with the following changes
   (if any):
4
5  PAGE   LINE           SHOULD HAVE BEEN
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18
19
20              _____
                       ARMANDO LOPEZ
21
22  _____
    Notary Public
23
    My Commission Expires: _____
24
25

```
 1              REPORTER'S CERTIFICATE
 2    STATE OF TENNESSEE
      COUNTY OF WILLIAMSON
 3
 4         I, Nicole Marie DeBartolo, court
 5    reporter, with offices in Brentwood, Tennessee,
 6    hereby certify that I reported the foregoing
 7    deposition of ARMANDO LOPEZ by machine
 8    shorthand to the best of my skills and
 9    abilities, and thereafter the same was reduced
10    to typewritten form by me.  I am not related to
11    any of the parties named herein, nor related to
12    their counsel, and have no interest, financial
13    or otherwise, in the outcome of the
14    proceedings.
15         I further certify that in order for this
      document to be considered a true and correct
16    copy, it must bear my original signature and
      that any unauthorized reproduction in whole or
17    in part and/or transfer of this document is not
      authorized, will not be considered authentic,
18    and will be in violation of Tennessee Code
      Annotated 3-914-104, Theft of Services.
19
20
21    _____
      Nicole Marie DeBartolo, TN LCR, RPR, IL CSR
22    Tennessee Licensed Court Reporter
      Registered Professional Reporter
23    Illinois Certified Shorthand Reporter, and
      Certified Court Reporter.
24
      TN LCR #915 -        Expires:  6/30/2024
25    IL CSR #084-004127 - Expires:  5/31/2023
```

*250*

## Exhibits

**Ex 01 -**
 **Armando Lopez** 3:7
 8:9,11 9:4 14:18 210:16
 232:12,13

**Ex 02 -**
 **Armando Lopez** 3:8
 10:20 211:16

**Ex 03 -**
 **Armando Lopez**
 3:10 5:10 13:13,15
 14:19,20 17:12

**Ex 04 -**
 **Armando Lopez**
 3:11 48:24 49:7 79:25
 87:23 126:7 171:25
 172:2 222:3 225:10
 234:23,25

**Ex 05 -**
 **Armando Lopez**
 3:13 187:16 209:19

---

## $

**$80,000** 26:12

---

## 0

**0** 15:13,20

---

## 1

**1** 8:9,11 9:4 14:18
 210:16 232:12,13

**100** 221:1

**10455** 15:18

**10:17** 5:5

**10:24** 13:7

**10:25** 13:11

**11360** 15:15

**11675** 15:1

**11721** 15:11

**11:06** 125:2

**11:12** 48:19

**11:26** 48:22

**12:17** 88:20 236:11

**12:30** 100:4

**13th** 93:11,24 94:17

**14** 54:24,25 247:13

**14th** 89:22

**15** 167:3

**150** 181:16

**16th** 17:15

**17th** 124:15

**1:1** 68:11

**1:16** 78:13

**1:22** 98:8

**1:22:29** 93:2

**1:43** 100:8

---

## 2

**2** 10:20 31:10 211:16

**20** 161:20

**2017** 12:3,15

**2019** 12:16 15:3 17:15
 94:19 98:22 138:11
 230:25

**2019-2020** 192:5
 208:13

**2020** 50:1 55:7 58:20
 64:20 73:25 74:9 76:1
 77:15 78:22 79:7 83:16
 84:14 88:20 94:18
 100:24 104:21 121:3
 124:15 138:11 171:6
 222:11 230:25 236:11

**2022** 5:4

**20K** 102:17

**20th** 53:23 55:7 64:19
 66:1,2

**21st** 66:2

**245** 84:6

**25** 204:21

**25th** 5:3 60:11

**26** 213:7

**27** 77:15

**27th** 75:25 78:22 79:6
 102:10 103:25 118:2
 121:2

**28** 9:7,8 84:14 218:16

**28th** 82:22 83:16
 104:21 121:16

**29** 100:24

**2:54** 173:9

**2:58:09** 99:5,6

---

## 3

**3** 13:13,15 14:19,20
 17:12

**3/17** 124:13

**3/21/20** 53:2

**3/8/17** 15:25

**3/8/2017** 16:4

**30** 240:21

**30(b)(6)** 5:6 7:16,24

**30th** 94:18

**31st** 222:11

**350** 83:24

**359** 84:4

**37203** 5:15

**3:03** 173:12

**3:07** 98:22

**3:21-cv-00923** 5:10

**3:22** 76:1 121:2

**3:23** 77:15 102:10
 118:3

**3rd** 98:22

---

## 4

**4** 48:24 49:7 79:10,25
 87:23 126:7 171:25
 172:2 222:3 225:10
 234:23,25

**4/13/2020** 92:22 93:2
 98:7

**4/14** 78:12

**4/14/2020** 67:25 78:13

**40** 11:14

**4:02** 230:17

**4:14** 230:20

**4:26** 53:23

**4:32** 247:19 248:3

---

## 5

**5** 187:16 209:16,17,19

**50** 158:20

**500** 83:22

**509** 19:7 20:4 26:10,20
 32:1

**511** 15:7 26:23 29:15
 31:9

**512** 15:8 31:2,15

**513** 33:19 34:21

**514** 37:8

**516** 16:25

**519** 15:21 16:25 17:1

**5K** 101:17 103:17 104:8

**5th** 90:13

---

## 6

**6** 89:19 150:16 174:20

**6,000** 204:4 206:8,11

**6/21/2019** 16:11

**600** 83:21

**611** 5:14

**6th** 50:19

---

**7**

**7** 50:1 144:18 192:5
226:16 232:6,7

**7/10/2020** 98:15

**7/27** 120:11

**7/27/2020** 121:3

**7/29/20** 99:5

**7/29/2020** 99:6,10
100:16

**7:25** 99:10 100:24

**7th** 88:20 171:5 236:11
239:21

---

**8**

**8** 15:3

**85** 167:1,5 168:13,25
169:3

**8:11** 82:22

**8:21** 83:17 84:15 93:11
104:22 121:9,16

**8:23** 121:3,8

**8:30** 245:13,16

**8th** 62:15 98:20

---

**9**

**9/30/2019** 98:17

**90,000** 26:16,18

**90-day** 106:24

**90K** 101:16 103:17
104:8

**9:30** 98:12 245:13,16

**9:34** 15:3

---

**A**

**a.m.** 5:5 13:7,11 48:19,
22 93:11 99:10 100:24

**ability** 24:23 29:10
38:13 46:20 47:8 86:16,
18,23 87:8

**absolutely** 30:23 196:3
201:3

**access** 44:9,12 61:21
64:12

**accommodation**
170:12 174:18 176:10,
11,15 203:24 204:11
205:25

**accommodations**
176:12,23

**accurate** 18:24

**accustomed** 182:3

**act** 69:17 221:5

**acting** 89:6 91:7 125:20
133:25

**action** 73:13 170:24
171:2 172:16,19 217:13

**actions** 223:18

**activities** 22:16

**activity** 55:16 59:1,2

**actual** 36:4 51:19 56:3
94:24 132:16 171:19
193:13

**ad** 180:17 181:3,6,18
182:8

**add** 85:4 122:2,13

**added** 85:6 122:5,6
164:13

**addiction** 62:10

**adding** 122:12,15

**addition** 62:11,13
212:22

**additional** 38:20 46:18
79:13 165:24

**address** 10:5 96:20
210:21 211:21

**addressed** 118:10

**addresses** 191:19

**Addressing** 121:6

**ads** 181:15 182:5

**advertise** 177:7

**advertised** 181:7

**advertisement** 182:1

**advertisements**
181:24

**advice** 22:3,22 50:14,
16 196:19 197:18

**advised** 52:16

**affects** 95:24

**affirmative** 9:3

**afraid** 67:6

**agencies** 56:11

**agenda** 85:4,7 122:3,6,
8,10,14 123:23 124:1,2,
3,6

**aggregator** 181:12

**agreed** 88:20,23 90:19
91:1

**agreement** 76:25
101:20

**ahead** 8:8 28:12,13
52:17 71:1,8 77:10 89:9
102:3 235:8

**air** 58:21

**align** 20:23 36:10

**alignment** 36:22

**aligns** 20:9

**all-employee** 165:8

**allegations** 141:23

**alleged** 224:11

**allegedly** 145:9 148:9

**alleges** 219:22

**alleging** 219:14,18

**allowed** 69:12 151:5
179:1,2 185:20,24
186:2,4

**alter** 159:17

**alternative** 22:23

**amended** 9:20,21,22
10:12,18

**American** 7:11

**Amos** 5:8,23,25 11:19,
21 14:14 17:7 18:13
20:2 26:11,14,21 27:7,
19 30:20,22 31:19,21
33:2,13,15 36:5 37:1,6,
21,24 38:11 40:10
42:10 43:10,23 45:2
46:10 47:18 51:14,16
58:7,9 64:5,15 66:15
69:25 70:3,23 73:1
74:11 75:8 76:6,11,13,
22 78:10,25 80:2 82:12
85:22,23 87:7,12 88:4,
14 89:5,17 90:25 91:3
92:6 97:12 102:14
107:12 108:20,24
109:14 110:11 112:7,16
113:1,9,25 114:3
115:17 117:15,17,24
118:14,20,25 119:17,19
122:7,17 125:3,11,20
126:4,12,23 127:17,18
130:13 131:6,16,21
132:8,22 133:24 134:19
135:1,9,13 137:14
138:23 140:5 141:8,10,
13,16 145:9 146:18
155:3 156:8 170:8,20,
23 181:14 186:20 187:3
189:10,15,18 192:2,8,
10,12 193:4 198:23
203:13,15,23,24,25
204:10 205:4,12,20,21
206:16,20,22,23 207:9
208:11 213:21 214:12
223:18 224:10 231:1,10
233:1 234:16 236:20,23
238:5,13,19,20 239:18,
23

**Amos's** 40:23 43:3
66:11,18,20,24 72:11

---

74:19 93:22 105:8,18, 21 125:24 127:15 129:24 133:2 138:4 188:11 193:22,24 201:15 221:20 228:12 234:4,10 238:23

**amount** 18:7 77:8,11 81:17 96:18 101:25 102:18 103:23 104:16, 17

**and/or** 162:14 243:19

**angst** 52:23

**Anne** 219:4

**annual** 187:5

**anonymous** 216:17

**answering** 130:19,20 229:5

**answers** 11:4 178:17 219:1

**Anthony** 62:12,13,16, 17 175:14

**antibacterial** 164:14

**anticipating** 112:13

**anxiety** 174:21

**AO** 62:10,12

**Apologies** 211:19

**apologize** 105:13

**app** 97:7,8

**apparently** 51:2 80:2 213:5

**appeal** 63:4

**appeared** 40:18

**appears** 31:3 50:1,13 53:8,12

**applicant** 13:22 181:14

**application** 97:25

**applications** 17:9

**applied** 11:21,24 12:1, 9,15 14:14 15:2,4 16:7 17:7,24 18:14,22 156:13 181:14 220:18

**applies** 70:20

**apply** 13:23 149:4 180:19

**applying** 182:7 203:16

**approval** 77:10

**April** 50:1 62:15 73:25 88:20 93:11,24 94:17 98:20,22 171:5 236:11 239:21

**area** 35:11,18 41:6 42:2,3 166:11 238:7

**areas** 119:18,19 169:21 222:24

**Armando** 5:7 6:10,18 210:18,24

**arrogant** 128:3

**Asked/answered** 154:3

**asks** 66:12 126:7 228:17

**aspect** 22:13 132:2

**aspects** 132:4

**assembly** 50:20,22 89:20 90:5,6,14,15

**assign** 71:24

**assigned** 91:21

**associate** 15:13 16:20 18:19

**association** 5:18

**assume** 113:23,24 117:1 172:8 238:4

**assuming** 64:24 65:4 179:20 239:7

**assumption** 119:15

**attend** 165:14

**attendance** 58:19

**attention** 70:23 71:6

**attitude** 71:12,21 72:10,11,16,17,21,23 73:1,3 74:22,25 75:8 85:23 223:7

**attorney** 142:15,17,18, 21 144:21 147:11 189:8 194:22 197:15 198:1 201:6 220:6,9,10 228:5 229:9 230:3 231:25

**attorney's** 197:15,18

**attorney-** 155:22

**attorney-client** 141:18 142:5 146:20 192:21 202:8 231:13

**attorneys** 142:19 143:1,3,5 193:7,14,16, 20 194:1 197:23 204:17 205:18 206:13 207:23, 24,25 227:23 231:19,22

**attorneys'** 192:25

**audio** 59:18

**August** 138:11 230:25

**author** 24:19 25:5 106:17

**authority** 139:23 140:3,10

**automatically** 144:9 247:6

**award** 216:1,12,21

**awarded** 216:5

**aware** 52:22 72:4 95:20,21 141:9,12,22 159:5,10 163:19 167:6, 13 170:2,3,7,12,15 179:9,10,14 189:14,17 201:8 223:5 231:8,12 234:17

---

**B**

**baby** 242:8,11

**back** 13:9 14:9 17:10 27:14 31:24 33:10 37:9 40:4 46:12 48:21 50:19 52:19 59:11 61:7 64:18 73:24 76:6 77:14,21 78:7 79:15 85:21 86:7 89:19 91:9 98:14 99:2 100:6,13,21 102:1,15 104:19 106:21 108:1

109:3,8 114:18 118:5, 13 121:1 124:11,12 129:10 134:9 149:9 151:5 158:19,22 164:24,25 166:1,4 173:11,15 174:17 175:22 176:3,6 177:1 178:21,23 190:7,15,19, 23 195:4 196:6 197:4,5 213:9 216:24 217:1 219:3 228:9 230:13,19 239:21

**background** 18:10 30:16 37:19,21 38:4,8 41:15,20,21,24 42:5,14, 19,23 168:18

**backward** 53:7

**backwards** 53:14

**bad** 39:23 68:25 72:3 73:3 75:8

**bandwidth** 89:24

**Bank** 215:19

**base** 104:7

**based** 29:24 61:25 107:2,18 138:3 141:15 164:9 198:3 219:14,19 220:25

**basically** 62:25 85:1 91:21 93:17 102:17 104:13 128:1 157:21 175:1 185:2,5

**basis** 9:2 68:16 70:21

**bat** 46:1

**Bates** 83:11

**bear** 234:21 235:15

**began** 147:11 176:22

**beginning** 15:9 158:11,12 218:2

**begins** 225:11

**behalf** 7:25 8:1 9:13 20:14 163:1 179:25 219:1 229:12

**behavior** 119:7 127:22

**believed** 90:12

believes 185:3 200:21

benefits 31:18 160:1

biblically 29:23

big 80:18 90:22 237:14

bigger 64:12

binding 11:5

bit 7:19 11:10 25:25
27:25 52:23 94:4,5
97:23

bless 55:2

Blue 7:11

Bluebird 64:6,8,9

board 39:21 54:4,6,10,
14,15 73:19 140:2,12,
13,15 213:25 237:14
238:7 239:10,12,19

boards 181:16

body 173:1

bold 51:4 90:22

book 21:10,12,17 23:3,
13 24:21 25:12,17
27:14,18,21 28:2,7,15,
19,20 29:8 30:6 42:6
61:5 106:17 241:12
243:24 244:2,3,4

books 26:5 166:16

bored 35:15

bottom 19:14 53:18,19
93:7 94:10 100:22
101:9 124:18 237:6

bound 116:15

Boundaries 166:16

boxes 94:13

Brad 5:23,25 11:19,21
15:3 27:8 33:2 46:10
50:7,10 51:5,10,14,16,
20 52:8,23 64:5 66:11,
15,18,20,24 68:5 71:8,
18 74:11 76:5,22 78:10,
25 80:12 87:12,22
88:14 89:16 92:1 93:21,
24 102:14 103:16,19
105:21 112:15,16

117:24 125:3 127:17
131:16 138:23 156:8
171:8,19 203:13,23,24,
25 204:10 205:3,4,12,
20,21,22 206:16,20,22,
23 207:9 213:21 214:12

Brad's 125:6

Brads 207:4

breadth 232:8

break 10:11 13:8 48:20
99:22 100:5 125:5
173:4,6,10 213:18
230:13,18

breaks 87:25 88:1

Brendan 54:18

Brentwood 5:19

briefly 172:11

bring 68:3 73:14
166:10 174:16 176:3
232:20

broad 11:1 137:7
152:21 218:19

broadcast 56:11,17
151:2,9,11 154:5

broadcasting 58:3

broader 212:4

broke 100:11 112:12

broken 91:18

brought 43:10,13
46:19 147:10 192:3
243:8,13,14

Buddhist 168:3
169:17,21,24

build 90:4 235:22

building 19:10,19
55:22 56:21 63:12
149:25

bulk 206:3

bunch 11:13 94:19

bureaucratic 115:6,14

bureaucratically
115:17

business 25:11 54:21
61:12 62:7 70:11

businesses 25:8,18
61:8,9,11 62:8

---

## C

Caitlin 7:5 192:6

Cal 20:8

calendar 83:25 123:15
207:18

California 40:2

call 17:19 23:9 81:19
94:24 95:1 106:18
144:22 165:12 166:7
167:14 176:9 219:3
243:1

called 6:11 35:18 85:14
97:8 110:21 184:8
235:15,16,18

calling 67:9,11

calls 141:18 142:5
146:20

campus 184:5

candidate 30:23 32:5
33:15 34:2,12 35:2
37:16 42:25 180:11
182:17 220:17

candidates 13:23
20:21

capacity 217:20

car 37:15

Cards 50:20,22 89:20
235:2 236:5

care 196:14 245:23

career 28:13

carry 48:3

case 5:10 7:4 37:1,24
40:5 140:4 142:22
143:10,15 144:4
149:15,16 202:10 205:1
207:12,22 217:6 230:4

catch 116:9

Catholics 169:16

caught 206:8

caused 38:18 68:23

caution 192:20

CDC 149:24 150:8
177:24 178:3 179:2

CEO 179:24

cetera 42:4 56:12 64:13
240:16

challenge 35:11,15

chance 67:22

change 24:22,24 44:14
67:1 119:6,16 164:8,9

changed 78:5 79:21
119:5,8 150:11

channel 56:18 58:2
151:10 154:6

channels 54:21

character 185:3,9,15

characteristics 21:20

charge 7:3

check 37:21 42:14,18,
19,24 66:14,15 240:12
241:2

check-ins 90:9

checked 91:16

checking 42:24 112:15

checks 37:20 42:20

Cheese 24:3,18

chemistry 36:8,13,17

chief 54:9,13,19,20
140:16

choice 129:24

chose 58:15 217:13

Chris 60:9

Christian 25:12,17
169:16

Christianity 168:13

**Christians** 25:14,17

**Christine** 168:24

**church** 25:9 168:3,21, 23,24 169:1,5,11,24

**churches** 167:2 169:7

**cinematographer** 237:21

**city** 216:4

**claim** 193:22

**claimed** 141:16 228:12

**claiming** 239:4

**claims** 107:11 141:23 155:5 192:24 193:24 201:20 212:7

**clarify** 38:21 109:8 143:24 216:13,15 246:9

**clean** 64:22

**cleaning** 64:25 65:2,6 149:25

**clear** 85:22 131:14 218:6,25

**client** 116:1,23 152:1 199:7 207:9

**client's** 229:15

**clients** 19:11,20 61:16

**close** 90:15

**closed** 16:15 160:13

**closely** 154:13,15

**closer** 12:17 158:22,25 190:25

**clothes** 67:1

**Cloud** 166:13,14,15 168:23

**cloud-based** 44:24 59:13

**clue** 94:8

**cognizant** 96:2

**collaborate** 86:16,24 109:13,14 176:20

**collaborated** 107:14,

16

**collaborating** 107:8 108:15

**collaboration** 86:25 107:18 132:6,16,24 133:2,11,15 134:2 135:10 136:9

**collaborative** 22:19 28:23 69:15,20

**collaboratively** 115:15 214:10 236:13

**collected** 203:4 206:10

**collective** 79:12 150:17

**collectively** 205:15,16, 17

**college** 43:20

**combination** 38:3 46:11 85:25 86:14 144:7 184:2

**combined** 205:4,21

**comfortable** 58:5 96:9 191:2

**comm** 84:19,23,24

**comment** 33:8,12 34:19 35:7 40:17 234:15

**comments** 34:7,8

**Commerce** 5:14

**Commission** 220:21

**committee** 71:13 72:1, 4 73:9,15,17,21,22 74:2,10,13,16 75:20 76:3,5,11,14,18,21 77:16 78:3,20,24 79:15 84:24 85:7 88:13 99:12 101:1,2 102:14 117:23 118:10,12,14 121:6 122:9,17 139:25 140:2, 8 172:23,24

**communicate** 50:7 51:5,15,20 52:20 78:14 89:11 95:14 111:16 112:22 171:8 234:8

**communicating** 96:10 107:19 109:4,6 110:20 111:14 112:13

**communication** 46:12 61:15 87:18 90:19 108:5,8 110:7,21,24 111:2,5,7 171:6 206:16 227:11

**communications** 47:7 110:12 138:10 170:8 226:23 230:23 231:9

**comp** 36:10,22

**companies** 146:4 215:9

**company** 7:14 20:14 61:10 104:15 106:4,6 109:13 115:10 125:10 127:16 142:20 153:12, 16 159:14 162:5 163:1, 2 177:2 179:16 180:1 187:10 207:5 210:13 215:4,23 216:4,9 217:20,24 221:7 223:15,17 225:2,23 226:14 241:22,25 244:6

**company's** 123:3 223:16

**comparing** 27:17

**compensation** 31:16, 18 33:2

**complain** 107:24 125:19 134:3 141:24 162:25 163:2 189:10,18

**complained** 110:12, 13,14,23 111:6,13 133:1 160:16,18 162:3, 16,20 164:1 190:2 208:20

**complaining** 110:17, 19 159:6,8 161:3,10

**complains** 144:3

**complaint** 125:24 144:18,24 162:7 164:10 189:15,25 190:9,10 198:24 220:22,23 221:2

**complaints** 141:8,9,12 144:17 146:17 161:22,

24 162:14 164:1 174:5, 7 192:3,14 201:16 203:5 208:12,14,16

**complete** 113:11 216:19

**completed** 237:24

**completely** 32:14

**completes** 213:11

**compliance** 37:18

**computer** 44:2,20

**computers** 57:5

**concept** 70:20

**concern** 38:13,16 40:7 156:16,23 157:1,6,24 159:16,17 163:8

**concerned** 157:7,11, 14,15,16

**concerns** 40:7 73:12 157:19 170:9 226:24,25

**concluded** 248:3

**condition** 221:1

**conduct** 244:13

**conducted** 141:15 193:17

**conference** 43:6

**confidential** 231:13 246:21 247:6,11

**confidentiality** 246:18 247:12

**confidently** 91:14 237:3

**confirm** 232:19

**confirming** 58:11

**confused** 32:23 33:8, 10 72:25 74:17 106:3 137:19

**congenial** 191:6

**connect** 44:23 102:4

**connected** 44:20

**consideration** 164:4

**considered** 22:14 67:2
114:18 115:25 116:22
126:8,11,13,22 128:23
129:6,7 130:11,24
131:5,9 132:3,13,21
137:3,6 145:11 151:14
153:2,5,8,10 154:9,14,
25 170:21 222:4

**constitute** 183:21

**constructive** 22:21

**contact** 11:20,22
147:10

**contemplating** 43:15

**content** 62:1 63:1

**contents** 192:22

**context** 71:17 72:12,
13,20 89:8 166:22

**contingent** 65:24

**continue** 60:1 64:6
69:23 71:5,11 72:9
91:11 116:18

**continues** 72:3

**contract** 89:3

**contribute** 35:16

**contributing** 35:4,6,9,
10 71:10 72:14,15,18
73:2,4,6,8 74:23

**conversation** 36:9,21
49:19 50:15 52:14 82:3
85:13,17 87:12 88:16
89:12,16 91:13 92:2
101:24 126:14 127:8,
12,21 128:10 129:18
130:7,14,25 131:1,2
137:25 138:2,3,6
145:24,25 229:20
233:11,12,25 235:11
237:2

**conversations** 126:19
190:11 226:22 227:3

**convince** 148:25

**Cool** 128:24

**coordinated** 37:14
246:11

**coordinator** 37:14

**cope** 24:23

**copied** 16:15 65:11
188:1

**copies** 100:1

**copy** 8:21 12:23 99:18,
22 147:15,17 148:2
171:12,19 180:17
181:3,6,18 182:8
191:20 209:4,5 213:6

**Copying** 65:12 66:8

**core** 61:3,16

**corner** 14:17,24

**corporate** 14:9 34:14,
17 68:6,7,21 70:16
114:15,21 115:5,12

**corporation** 8:1,3,5
9:13 11:5 67:22 75:4
116:15 138:21 218:7
219:2 229:4,12

**correct** 7:9 9:23 11:6
14:4 16:21,22,24 17:2
18:20 19:6 22:20 24:12
26:6,13 27:2 31:22
32:10,12,14 33:17
34:24,25 41:13 42:8,22
43:1 47:3,6 49:23 51:8
55:11,12 57:19 62:2
64:17 72:19 76:16 77:2,
13 79:23 80:1 81:9 92:7
94:15,16,21 97:16
101:18 103:2,7,10
104:18 105:5,6,12,23
111:9,15 114:5,24
116:16,24 117:19 120:3
121:17 124:10 127:4
129:9,15 131:12 132:19
133:7 135:7,22 137:17,
23 140:9,22 141:6
145:7 147:23 148:14
149:17 153:4,19,21,24
154:10,18 159:23
166:5,8 169:18 170:18,
22 171:18 172:6,13
181:22 183:6,18 186:23
187:1,14 190:4 198:2
201:18 205:2 207:2
208:23,25 209:1 210:9,
19 212:15 213:14,23

222:21 224:16,19,20
227:20,21 231:5,17,20
233:9,23 235:7 236:2,
21,24 238:6 239:6

**corrected** 10:5

**corrective** 127:21
170:24 171:2 172:16,18

**correctly** 187:20
222:16 226:18 227:2
236:1

**correspondence**
226:21

**corroborate** 108:25
110:6 113:2

**corroborated** 109:1

**Cortez** 6:3 142:20,22

**counsel** 5:20 142:23
143:17 148:1,13,15,24
155:9,12,18 189:7
198:13,14,16,17,20
208:4,5 243:20

**country** 166:11 215:24

**country's** 163:6

**couple** 165:5 235:1

**court** 5:11,17 6:5

**covered** 31:18 123:24
186:11

**Covert** 124:20

**COVID** 55:8 56:1
141:24 153:1 156:24
157:8,9,11,17 158:24
161:23 163:3 165:18
173:16 174:15 175:9
177:21 180:22 181:1
189:9,11,18 203:24
204:11 205:20,23
238:21

**COVID's** 162:4

**COVID-19** 149:10,11
151:22 152:21 156:16
158:15 159:7 160:19
170:10

**coworkers** 133:1
224:3

**crazy** 125:4,6,11,16,20
163:5,20 228:12

**create** 16:15 89:25
197:19

**created** 15:24 16:4,5
34:23 97:10 197:24
238:12

**creative** 15:14 16:20
18:19 140:16 182:15

**credit** 21:25 22:1

**crew** 55:22 56:20,23
60:2 63:11,18

**criteria** 204:24,25
206:17 216:21 227:17

**criticism** 22:22

**cross** 115:14

**crosstalk** 114:7

**cull** 204:22

**cultural** 20:17,22,23

**culture** 20:12,13 21:4

**cup** 63:9

**current** 192:4

**custom** 148:9

**customary** 148:9

**cut** 60:15 91:15 93:5
237:4

---

## D

**daily** 63:11,20

**Dan** 60:19,22

**Daniel** 6:3 54:22 60:23
142:20

**data** 27:3

**date** 9:23 10:5 12:5
16:4,6,7 17:6 49:9
75:11 83:15 112:18
149:20 156:9,14 160:2
190:12,14,20,22,25
236:7 237:16,18,23,24

**dated** 49:25 67:25
75:25 78:12 79:6 84:14

88:19 92:22 93:2,10
98:15,17 99:4 104:21
118:2 171:5 236:11
239:21

**dates** 12:1,17 53:15

**Dave** 24:15,17,19 54:21
56:6 60:20,21,24 61:9
98:6 179:20

**David** 26:25 37:7 45:6,
13 46:10 49:19 50:12
52:18 58:10 64:5 65:11,
12 66:8 70:5 71:22
78:10 87:10 92:23 93:9
97:13 106:1 108:2,9,13
111:12,13 112:15
140:24 187:25 188:2,6
201:11 210:17,24 234:6
236:10,17

**day** 17:4 45:22 63:12
90:13 91:17 121:3,17
127:12,15 132:7 175:8
231:4 239:18 245:12

**day-to-day** 179:16

**days** 159:18 247:13

**deadline** 47:5 50:21
87:18 89:21 90:19
91:13,20 107:7 112:2,
14,23 114:4 133:17,19
136:13 224:11 234:18,
19,20 235:11,12,19,20,
25 236:4,5,25 237:2
238:3 239:17

**deadlines** 46:11,14
87:9,14,17 107:8
111:20 132:6,18
136:11,12 137:20 224:8
234:7 236:12,22 237:10
238:5,11 239:3

**deal** 61:13,14,17

**dealing** 24:22 39:16
42:6

**dealt** 201:15

**Debartolo** 5:18

**debt** 21:4 43:21 62:9
63:2

**decided** 130:5 158:21
160:14 207:24

**decides** 240:22

**decision** 37:5 126:9,22
131:20 132:13 138:12
140:19 141:2 187:18,
22,23 188:7 222:5
231:1 241:20

**decisions** 139:24

**deemed** 171:2 246:21

**deep** 64:22,25 65:2,6
71:12 72:9

**defendant** 6:2,4 9:2
138:10 212:6 222:5
230:24 231:9

**defendant's** 9:2
151:21 152:21 177:18
189:9,18 212:4

**defenses** 9:3 212:7

**defines** 36:2

**definitions** 22:10

**deliver** 236:19 238:1

**deliverable** 237:16

**delivered** 237:15

**delivering** 107:3
237:18

**demonstrates** 42:1

**Dennis** 92:2,9,13,14
134:14,15,16,17,25

**denomination** 168:16
169:9,12

**denominations**
169:14

**department** 60:5 61:4,
6 151:8

**depending** 158:2

**depends** 245:21

**DEPONENT** 248:2

**depose** 214:23

**deposition** 5:6,13 6:19
7:24 8:4 10:13 11:12,18
192:17 210:12 232:21
246:21 247:18

**depositions** 7:8

**describe** 226:19

**describes** 28:8

**description** 35:21,23

**design** 182:16

**designate** 246:20
247:8

**designated** 10:19

**designation** 214:25
215:3

**desk** 174:19

**detail** 211:24

**determination** 132:22
140:21 150:21,24
176:2,5,24 207:21

**determine** 56:8 57:20
104:16 206:18 222:14

**determined** 77:3
216:12 225:13 227:15
230:1

**determining** 130:12

**developed** 205:1

**developers** 177:10
182:3,9

**devotional** 165:13
166:7,9,21 244:22

**devotionals** 245:8

**Dicicco** 26:25 27:8
29:15 30:18 31:4,7 32:8
33:13,14 37:7 45:6,10,
13 46:10,12,24 47:1
49:19 50:2,5,9,12 51:9
52:6,12,22 58:11 64:5
65:11 66:8 69:22,25
78:10 87:10,14 88:1,2
92:2,23 93:10 97:13
98:7 106:1,2,4 108:2,9,
14 111:12,13,17 112:6,
15 113:3 133:13,14,16
140:24 171:1,12 188:1,
6 201:11,16 208:8
210:18,24 228:11
234:6,11 236:10,18,23
238:13

**Dicicco's** 30:15 45:7
47:4

**difference** 38:23 174:1

**difficult** 55:14 58:24
59:9

**digging** 68:4 71:7

**dinner** 34:4

**direct** 70:13 105:8,11,
14,18,21,24 161:23
214:17,18

**directed** 8:3 155:25
170:14 195:11

**direction** 179:3 193:7

**directly** 44:21,23 58:1
162:23

**director** 15:14 16:20
18:19 45:21 46:4

**disagree** 162:23
163:11

**disappointed** 119:18,
19

**DISC** 31:12,14

**discipline** 146:8
172:15,18

**disclosure** 212:4

**disclosures** 191:23
212:23 213:1,8

**discoveries** 142:11

**discovery** 17:6 40:17
124:7 139:3,4 145:13,
19 172:5,7 184:3
203:11 206:21 207:10
214:24 218:12,17
229:1,5 238:4

**discretion** 192:25
193:6

**discrimination** 7:3
208:13 219:14,19
220:25

**discriminatory** 146:13

**discuss** 52:6 85:5
122:3 124:8 126:8
222:12,21

**discussed** 19:8,17 47:18 68:4 119:14 135:12 139:12 186:17 222:24 223:2 242:17, 18,21 243:4 245:22 246:17

**discussing** 139:14 236:6 238:22

**discussion** 31:16,17 247:20

**disposition** 17:8 19:1

**dispositions** 18:2,16

**dispute** 199:6 217:10

**disrespect** 222:19

**disruptive** 125:20

**distance** 150:16

**distinction** 169:19,20

**distracted** 211:18

**District** 5:11

**Division** 5:12

**divorce** 96:1

**divulge** 192:21

**doc** 65:14 66:4,10

**doctrine** 156:1

**document** 8:10 10:19 13:14 15:24 17:14 30:24 49:6 52:16 194:9 209:18 234:21

**documentary** 43:15, 18 64:3,16 80:16 88:24 89:3,4 91:2,23 137:5 195:14

**documentation** 12:4

**documented** 40:11 227:9

**documents** 12:11 13:18 17:3,5,21,23 40:18 48:3 49:14,16 52:1 83:22 103:12 127:13 142:8 156:3,5,6, 10 171:22 195:15 197:19,23 201:3 204:4 206:8,11,19 227:20,21,

24,25 232:15,17,20,23 243:21

**dot** 115:14

**doubt** 239:20

**drama** 95:8

**drastically** 150:11

**drawn** 154:1

**drive** 28:3,4 57:6

**driven** 69:13

**drives** 57:1,5,12,16 59:20

**dropping** 38:25 39:2 40:14

**duces** 232:17

**due** 126:24 237:23

**duly** 6:12

**dumb** 66:11,18 67:3,4, 9,10,11

**duties** 43:3 56:14 154:20 155:1

---

**E**

**e-mail** 46:9,23 47:1,2,4, 12,15,16 49:9,17,21,25 50:2 51:3,10,19,20,21 52:7,12,21 53:4,17 55:6 58:10 59:4,23 63:14 64:19 67:24 70:15 73:18 74:12 75:1,17,19, 24 76:20 77:5,14,17,20 78:8,10,15,23 79:6,14, 21 81:8,10 82:21,24 83:2 84:13,17 85:10 86:20 87:3,10,24 88:5, 9,10,11,12,19 91:1 92:21 93:1,4 99:9 100:15 101:11 102:9 103:22,24 104:20 108:2 109:16,21 117:5,22 118:2,10 119:24 120:10,12,13 121:2,12 125:1,25 147:20 148:11 171:1,5,11,19 187:24 206:22 207:8,16 217:11 228:10 234:6,9 236:8

238:3,4,10,13 239:20 245:24

**e-mailed** 124:3 216:18

**e-mails** 46:18 53:2 66:23 75:9 77:23 78:3 79:4 83:4 87:21 98:14 99:9 100:12,23 101:2 102:2,20 124:12,14 213:25 223:1 227:3 229:23 231:4,11,15 232:1 238:16,22

**earlier** 85:14 88:17 128:21 133:1 152:19 154:3 175:13 181:13 189:23 227:18 228:9 233:11 236:6

**earning** 104:15

**easier** 48:15 99:18

**easily** 89:23

**easy** 176:15

**edit** 43:4,14,24 50:21, 23 59:16,17 64:10 88:24 89:4,20 90:1,5,6, 16 91:2 136:25

**edited** 234:14

**editing** 41:2 43:12 44:13 59:13 89:2 91:23 214:20 237:14,25

**editor** 15:1 16:19 19:5 30:11,12 41:20 43:2,24 46:6 92:15 154:17 236:20

**editors** 56:21 57:1,10 59:2 107:22 108:6,12 109:5,7 134:5,7,11 236:18

**edits** 64:7,11

**education** 11:14 29:24 60:3,4

**EEO** 184:6

**EEOC** 147:4 208:2 220:22 221:2

**eight-to-ten-page** 191:21

**elaborate** 35:24 36:1

**electric** 203:3

**electronic** 97:5,6 203:12 226:23 247:25

**electronically** 202:22 203:3

**elevate** 39:3

**elevated** 42:1

**Elite** 5:18

**else's** 214:2

**emotional** 81:13,14,20, 21 82:1 85:14 88:15 101:23

**employed** 20:22

**employee** 21:22 22:15 69:1 150:22 153:6,9 154:13 159:5 160:18 164:10 183:19,24 189:19 191:21

**employees** 26:4 49:22 62:9 94:24 95:15 96:12 138:10 147:19 151:14 153:2,3 156:15 157:23 161:12,21 165:14 192:4 208:12,16 222:6 229:14 230:24 231:9

**employer** 7:8 216:16

**employment** 146:18 156:12 170:13 191:4 229:22

**employment-at-will** 146:14

**employment-related** 143:21

**employments** 6:25

**empowerment** 29:24

**encouraged** 95:15,18

**end** 128:17 182:21 183:7 200:11 237:25 247:17

**ended** 26:14 93:23 164:23 203:20 220:20

**Ending** 9:7

energy 28:3,4

enrollment 245:23 246:1

entering 29:12

entire 55:25 145:6 156:12 195:10

Entre 24:2 61:3,21,23

Entreleadership 23:24 24:3,16 54:23 61:4 97:10 241:12 243:25

erased 239:10,14

ESI 202:20 204:22

essential 56:5,8,15,16 150:22 151:1,2,14 153:22,23 154:1,4,6,9, 14 160:7,8,12

essentially 59:9 238:21

established 132:25

et al 5:9

evaluation 17:16 27:5 31:10,16 33:20

evaluations 14:1 32:2 34:4

event 123:17

events 165:15,18

eventually 19:4 75:10 165:1

evidence 114:2 116:3 147:20 244:25

evidenced 107:11 224:8

ex-team 219:7

exact 12:5 15:8 51:21, 22 56:24 149:20 151:17

exaggerate 95:25

EXAMINATION 6:14

examples 28:5

exception 21:5

exceptions 157:25

158:2,5,13

exchanges 49:17,21

exclusion 204:24

excuse 7:14 56:2 62:11 88:22 92:8 153:22 158:8 162:4 179:11

exec 84:19,23,24

executive 82:18 84:24

exempt 153:2,5,8,19, 20,21

exhibit 8:9,11 10:15,20 13:13,15 14:18,19,20 17:12 48:24 49:7 79:9, 25 87:6,23 88:19 171:25 172:2 209:14,19 232:12,13 234:23,25

exist 29:23 117:1 172:8 239:8

existed 239:9

exists 172:4

expect 26:4 151:20 183:11,12 190:23

expected 35:22 197:8

expecting 119:6 219:1

experience 18:9,11 30:17 38:4,8 40:23 41:5,10,14,15,19,24 42:3

expert 7:21,22 22:2 28:25

explain 115:9 161:11

explaining 116:13

expose 175:9

express 156:15,23

expressed 157:1,5,24

expressing 52:23 157:19

extend 37:3,5

extended 37:2

extent 141:17 142:4 146:19 202:4

extra 39:20 91:17

extraordinary 96:23

extremely 35:2

F

face 20:3 175:17 229:12

faced 112:5,7 113:9

faces 93:13,20

facility 34:1

fact 39:7 58:11 67:7,9 71:19 74:23 87:14 97:22 110:18 112:13,18 115:25 126:11,21 128:13,16,22 130:1 153:6,12,16 176:14 193:5 241:10

facts 116:2,14,22 126:8,13,21 127:5 129:5 131:5,7 132:12, 17,20 135:8 137:3,6,9 145:10,14,18,22 146:1 210:23 211:23 222:10 224:6,9

facts/information 222:4

factual 9:2

fail 114:9

failed 71:7 108:25 113:1

failure 112:21 224:23

fair 55:7 67:19,20 76:13,18 81:3,4 123:8 124:7 133:2 139:18,21 146:11 162:12 169:1 172:9,10 177:22,23 203:14 229:16,17 242:1,4,8

fairly 32:23

faith 25:8,19

fall 22:6,8 146:12

fam 98:23

familiar 14:7 179:4 209:24

family 20:8 39:19 67:6 95:8 158:22 159:1 228:19 241:9,15

family's 158:4

famous 166:17

fast 35:3,5 41:25

fear 157:17 179:5

feedback 94:4 97:22 98:5

feel 37:25 39:8 71:6 72:15 73:7 85:19 86:2 105:2 119:19

feeling 36:14 96:18

feels 33:14 71:9 72:14, 17,25 82:3,4 119:18

feet 150:16 162:18 174:20

fellow 108:5,11

felt 22:19 35:8 36:18 37:3 38:6 73:2,5 101:21 117:15 125:13 174:15 175:8

field 71:15 72:2

figure 48:2 68:23 144:14

filed 5:10 219:10,18 220:22 221:2,3,21 231:22,25

files 44:7,10,14,15,22 57:9,10,13

filing 146:22,23 147:1, 2,3 220:20

fill 97:3

filled 17:14

film 90:14 91:14 237:3

filmed 62:14

filming 61:15

final 33:20,24,25 106:23 107:1

**Financial** 60:18

**find** 47:22 71:23 75:22
82:23 83:18,21 90:14
103:1 135:23 195:5
204:1 227:25 228:9
241:14 242:20

**fine** 10:16 65:12 66:9
81:2 90:12 99:20 110:4
152:14 180:12 190:8
196:7 197:7 200:24
201:2 232:9 240:19
247:10

**finish** 113:13 122:22
128:13,14 152:12,13,15
230:14

**finished** 63:19 238:1
240:15

**Finney** 54:20

**fire** 117:6 130:12
132:22 140:5,11 146:10
242:1

**fired** 76:18 77:4 108:21
128:5,9 129:7,13,16,19
135:20 136:10 137:16,
21,22 174:11 184:15,16
222:18 239:18 242:7,
11,13,14

**firing** 81:13,14,20 82:1,
4 85:14 88:16 117:7

**fit** 20:17,22 30:23 34:13
36:8,13 38:7 39:14
41:9,21 246:18

**flights** 37:15

**flip** 14:12 17:10 48:6
64:18 67:23 120:9
124:11

**flipped** 98:16

**flipping** 98:14

**floor** 174:19 213:17,20
214:8,15,18,19

**Floyd** 74:5

**fold** 147:11

**folks** 154:20 156:19
163:25 178:21 182:24
190:9 198:4,6,7,8 240:9

241:14,22

**follow** 20:24 22:5,6
30:2,4 69:15 91:17
99:24 164:3 177:21
224:23,25

**follow-up** 245:18

**forget** 138:24

**forgot** 149:7 153:22

**form** 83:2 97:3,6,7
110:1 154:24 160:9
189:12 206:25 207:11
224:21 227:5 228:22
230:9 242:3,9 245:2

**formal** 123:21

**formally** 146:7

**format** 239:9

**forward** 55:20 60:1
97:19 114:16 191:1,5

**forwarded** 97:12

**found** 227:20,23 229:9

**fourth** 15:17 212:20

**FPU** 60:16

**fraction** 227:19

**frame** 190:22 245:16

**Franklin** 182:22

**free** 21:4 62:1

**frequently** 175:6

**Friday** 53:22 64:19
66:1 91:15 185:13
237:4

**front** 75:12 82:24 83:8
100:12 156:11 191:12
213:1

**frowned** 115:18

**frustrated** 90:18

**frustration** 50:19
89:18

**frustrations** 88:3

**full** 71:17 72:12,13,20
192:23

**full-time** 54:7,8

**fussing** 32:24

**future** 76:5 102:14
117:24

---

**G**

**Galloway** 74:5 82:18
84:14 99:11 100:25
104:21 106:21 117:5
121:12 214:3

**Galloway's** 120:12

**garage** 67:1

**gathering** 150:17

**gauge** 71:12 72:9

**gave** 38:11,15 40:9
57:16 207:22,25 227:19

**general** 147:25 148:23
189:7 198:20 243:19

**generosity** 26:2

**George** 60:6,8,9,10
175:14

**gist** 28:16 186:7

**give** 8:12,16 18:24 22:1
28:5 35:15 47:21 49:9
57:14 70:22 71:5,8,14
72:1 74:16 81:15 89:25
104:4 148:9 159:3
174:9 191:9,20 206:18
207:23 230:7 241:13
243:22

**giving** 25:11 26:2 57:10

**glad** 29:7

**glass** 63:9

**Go-getter** 24:5,11
25:20

**Go-giver** 24:10,11
25:24

**goals** 126:20

**God** 55:2

**good** 7:22 8:20 10:7
29:7 34:15 39:14 41:9
42:25 64:23,24 65:4,5,

23 184:8,13 197:6

**Gordan** 5:16

**Governing** 173:1

**Governor** 56:10
150:25

**grab** 57:6 59:14

**great** 19:10,19 50:24
72:22

**grief** 197:6

**group** 5:8,9 6:2,4
11:20,23 45:3 56:5,14,
23 75:21,23,24 79:24
87:5 134:1 214:13
219:11 236:14,16

**groups** 213:19

**guess** 20:3,19,20 21:2
30:15 41:2 45:1 52:13
60:11 65:18 66:16
68:16 70:2 71:2,18
72:21,24 74:17,21
80:24 81:1 84:1 86:7
98:11 117:14 122:16,21
123:3 134:18 137:18
148:11 153:13 164:19
174:2 186:21 214:22
237:13 246:11

**guesses** 123:7

**guessing** 50:24
119:11,12 122:25 123:1

**guidance** 96:11 97:1
240:24 241:1,8,10,13

**guide** 20:10 50:15 96:7

**guideline** 104:10
177:21 178:4,6,8,11

**guidelines** 150:7
177:24

**guy** 20:3 104:5

**guys** 191:20

---

**H**

**half** 91:14 237:3

**hallway** 176:21

*i10*

**hand** 12:18 144:24 149:25 150:5,15,16 213:2 241:25

**handbook** 183:19,24

**handed** 13:18 49:14 87:6

**handful** 161:19

**handle** 172:20

**handled** 143:19 172:19

**handling** 20:25

**hands-on** 55:16 59:1 183:14

**handwriting** 25:1

**happen** 34:1 55:21 60:2 63:20 65:8 80:20 145:4

**happened** 18:3,5 79:1 96:22 127:6 144:6 147:6 150:20 206:10,11 219:16

**happening** 101:24

**happy** 93:13 200:4,5 201:6

**harassment** 208:13

**hard** 57:1,5,12,16 59:19 160:1 167:24 177:10

**harping** 28:18 210:11

**hat** 14:9

**haul** 48:16

**head** 6:24 114:21 138:19 150:11 161:17 163:23 216:10

**heads-up** 71:14 72:1 74:16

**health** 158:4 174:8,12 245:23

**healthy** 174:15

**hear** 63:4 88:3 96:15,17 125:18 172:12 200:8

**heard** 22:11 114:3 138:18

**hearing** 199:8

**Heather** 220:7,9

**Heather's** 220:7

**held** 5:13 57:13 133:24 147:19 159:25 164:16

**helped** 195:18

**helpful** 84:7

**helping** 74:19

**helps** 96:2

**Henry** 166:13,14,15 168:23

**Herb** 54:25

**hey** 36:16,23 50:13 52:15,16 57:24 65:3 68:23 69:14 81:23 91:22 96:15 98:9 104:4 144:13 147:21 154:21 161:1 162:8 163:10 168:16 169:4 175:2 176:17 190:20 207:16 241:14 243:10 245:19

**hidden** 195:23

**hide** 195:21

**hierarchy** 69:15

**high** 94:11 95:12 96:20, 21

**high-level** 186:14

**hire** 23:7 43:12 177:9, 11

**hired** 19:4 26:18 30:4 39:25 41:4 86:15 87:8 88:8 89:4 106:1 137:1

**hires** 216:4

**hiring** 23:4 31:12 39:17,24 40:10,24 42:10,13

**history** 11:15 163:7

**hit** 90:18 112:14 149:10 156:24

**hitting** 240:14

**Hmmmm** 125:2

**Hogan** 60:7,9,10

**hold** 22:3 57:12 86:17 188:24

**holding** 148:21

**Holdings** 7:11

**hole** 60:15

**home** 20:8 21:5 55:15 57:2,11,15,18,22 58:15, 25 92:9 95:9 149:12 158:3,19 160:4 165:22 166:2 170:17,21 182:4 205:25 241:19

**homesick** 40:3

**honest** 89:12

**Honesty** 186:1

**hope** 29:25 50:18 89:18

**hotels** 37:15

**hour** 150:12 240:21 245:11

**house** 44:6 66:25

**HR** 14:3 17:19,20,22,25 18:3 32:2,3,7 71:13 72:4 73:9,17 74:10,13, 16 75:20 76:3,5,11,14, 18,21 77:16 78:20,24 79:15 85:7 88:13 99:12 101:1,2 102:14 117:23 118:10,12,14 121:6 122:9 139:25 140:2 143:16 144:7 145:1 153:11 154:7 162:1 172:23,24 176:10 180:14 182:20 183:4 193:14,16 243:15

**HRC** 84:18 121:20

**HRCOMMITTEE@ DAVERAMSEY.COM** 78:16

**human** 6:24 71:25 73:14,20 220:21 221:5, 22

**humble** 21:6,8,19,21, 23 22:6,9 27:23 28:1, 19,21

**humble-hungry-smart** 42:7 115:11

**humility** 22:11 38:14 39:4,9,10,13 40:6 107:4 127:24 128:2,3

**hunger** 28:12

**hungry** 21:19 27:23 28:1,2,3,15,16

**husband** 67:8

---

**I**

**I-N-C** 215:10

**i.e.** 35:10

**idea** 67:14 83:20

**ideal** 21:9,11,18 23:3, 16,22 27:9,13,19,22 30:7 36:19 41:21

**ideas** 28:24 60:14,19

**identical** 83:6 102:21

**identified** 211:7 212:11,22 213:8

**identify** 21:20 169:4 210:21 211:21 226:19

**identity** 187:17

**imagine** 81:22 119:7 224:13

**imagining** 119:12

**imam** 167:6

**immediately** 144:25 149:14

**importance** 116:13

**important** 116:5 177:20 196:9

**improve** 222:13,14

**improvement** 77:7 81:17,25 129:22 130:8 137:12,13 226:1,2

**in-house** 142:23 143:5 148:15 198:14

**in-person** 164:24 165:1,4 166:1

**inception** 221:6

**include** 96:12 160:20 204:23

**included** 65:11 75:23, 24 87:5 110:8 205:20 213:25 226:2,3 231:23

**includes** 73:20

**including** 23:7 61:11, 12 132:5,11 136:11,12 189:17 226:20 228:19

**inclusion** 204:24

**Incorrect** 242:4

**independent** 215:20, 25 216:5

**individual** 35:14 96:9 154:20 155:1 212:6 217:19 240:23

**individually** 61:22 214:24 241:5

**individuals** 63:21 158:8 201:20

**inferring** 86:1

**inform** 136:5

**information** 18:25 75:15 133:18,20 141:18 142:6 146:21 151:24 199:11 200:21 201:9 202:8,10,23 203:4,12 210:16 212:5 218:14 241:23

**informed** 113:4 136:3

**informs** 93:17

**initial** 191:23 212:4,23 213:1

**initially** 20:1

**initiated** 37:20

**input** 51:16 140:23,24

**inputting** 27:3

**inquiries** 193:25 197:22

**Inside** 208:15

**insight** 51:17

**instance** 174:2

**instruct** 194:16 240:3, 7,8,9

**instructed** 155:8,11,18 156:4 193:1,16 194:22 198:8 231:13

**instructing** 197:12

**instruction** 204:17

**instructions** 197:16 224:23,25 245:25

**insubordinate** 127:19, 20,25 129:12 130:1 135:14 136:2 139:13,17 186:25

**insubordination** 109:11 126:25 127:1,6 131:9 138:1 222:23

**interest** 224:7,10

**interested** 204:6

**internal** 43:7

**interpret** 56:7

**interpretations** 185:21

**interpreted** 20:16

**interrogatories** 209:3

**interrogatory** 209:6 210:15 222:3

**interrupt** 240:18

**interview** 21:9 31:10, 11 32:4,9,14,15 33:2,6, 20,21,24 38:4,9,10,20 39:11 186:18

**interviewed** 32:7 188:10,12

**interviewer** 38:25 40:20

**interviewing** 183:5

**interviews** 13:24,25 31:5,8,20 34:1 41:18 63:3 180:15

**introduce** 5:20 168:20

**investigate** 143:4

155:4 243:16

**investigated** 143:8,10, 14,15 243:15

**investigating** 193:22 201:20

**investigation** 42:12,16 144:6,10 145:1 146:16 147:8,12 192:13,22,24 193:13 194:3 195:3,11, 18,19 202:5 208:2 231:14

**investigations** 42:9 141:14 143:6,7,19,20 243:18

**invite** 123:15 207:18

**invites** 83:25

**involved** 33:4,5 58:1 112:22 143:20 144:15 145:6 188:2 208:5 210:4 233:13 235:14

**IQ** 29:9

**Irwin** 5:24 9:15,18,22 10:1,4 12:22,25 79:10, 12,18 83:12,23 84:4,6, 10 173:3 209:4,12,16 234:23 247:25

**issue** 22:17,24 46:21, 23 74:25 111:5 170:24 176:13

**issued** 176:14

**issues** 46:1,3,8,9,15,19 47:14,17 52:7,15 72:5 73:12 88:4,14 233:18

---

**J**

---

**J.B.** 210:25 211:3 213:15,20

**Jack** 74:5 82:18 84:14 99:11 100:25 102:18 104:21 117:5,14 121:12,19 122:11 214:3

**January** 89:22

**Jen** 53:9,13 54:1,3 65:22 74:5

**Jenkins** 54:25

**Jennifer** 64:20

**Jewish** 167:13,22 169:17,21 170:1

**job** 16:2 18:14,15 20:18 35:21,23 43:3,23 44:6, 13 45:7,8,19 54:7,8 56:14 80:4,8,23 88:8 89:1 102:16 117:20 120:6 129:16,19 154:20 155:1 160:3,6 174:22 175:10 181:16,23 182:1,18,22 224:7,10 226:25

**jobs** 17:23 57:17 150:25 151:1,2 177:7 180:18 181:3,7 182:13, 14,15,16

**Jobvite** 13:19,21 181:13

**John** 8:12 9:18 232:4

**Johnson** 45:15,16 46:18,22 47:2 53:8,12 55:14 58:23 59:5 65:17, 21 74:11 75:2,25 76:3, 10 78:2,9,18,20 86:1 92:22 93:4,10 97:13 99:11 101:1 102:9 105:4,8,22 114:10,13 117:22 118:7,8 121:2 127:7,16 131:15 132:11 136:15 138:25 139:1 140:25 146:1 187:9,10, 25 188:6 201:12,17 208:6 210:17 213:9 222:11 239:23 240:1,2

**Johnson's** 47:8 120:13

**Jonathan** 5:22

**Jonna** 124:20

**Julie** 219:4

**July** 75:25 77:15 78:22 79:6 82:22 83:16 84:14 100:24 102:10 103:25 104:21 118:2 121:2 222:11

**jump** 11:9

## K

**Kamel** 60:9 175:14

**Karla** 159:13 160:15,25
161:14 163:16,23

**Katie** 37:10,12,13

**key** 35:10,17

**Kimberly** 17:16 19:25
20:1,16 26:21

**kind** 7:18 14:13 22:16
36:2 37:22 39:22 42:17
50:25 85:10 96:4
130:25 141:14 144:25
149:22 164:9 179:4
185:19,20 213:19
214:14 215:19 223:2
245:19

**kinds** 18:11

**King** 168:24

**kitchen** 164:14

**knew** 80:3,8,23 102:16
120:6 211:4 218:4

**knowing** 86:13 112:22

**knowledge** 25:13,16
44:19 46:2 52:25
110:25 125:17,22 126:1
133:6 142:13 168:1,10
177:14 184:10 188:20
210:22 211:8,22 213:15
232:2 233:6,24 239:13
245:4

**KR** 35:17

**KRA** 35:23 36:4

**Kristoffer** 220:12

## L

**L-E-N-C-C-I-O-N-I**
21:15

**lack** 39:4 46:12 47:7
86:14,15,18,21,22,25
87:7,13 107:3,5 110:24
111:1,5,7 113:5 128:3
131:19 132:5,15,24

133:2,11,15 134:1
135:9 136:8 139:15
145:24 224:7,10

**lady** 175:3

**Lampo** 5:7,9 6:2,4
11:20,23 12:5 15:21
22:14 23:5,15 38:1 39:9
40:24 42:10 45:3,18,23
49:22 54:7 56:2 103:6,9
107:11 108:20,21
109:13 115:18,25
116:22 125:19 126:4,7,
8,11,22 131:6,18
132:21 133:9 139:23
141:15 143:3,6,7,20
144:23 145:11 146:8,
17,18 149:4 151:14
153:6 154:8 156:15
159:6 162:21 164:8
165:7,17 170:9,24
172:15,19 173:14
177:19 179:5 183:20
189:19 190:7 191:4
192:3 204:19 208:1,12,
14,15,16,17 210:7
211:7 214:5 217:9,14
219:11 220:18 221:4
230:6 233:2

**Lampo's** 21:23 41:22
144:13 149:10 153:1
156:16 157:8,11 159:8
160:19 161:22 163:2
164:2 170:9 189:11
214:25

**LAMPO_0359** 84:9

**LAMPO_0509** 14:22

**LAMPO_0517** 15:9

**Lampo_0519** 15:13,19

**LAMPO_509** 17:11

**LAMPO_513** 34:21

**LAMPO_516** 16:25

**Lapin** 167:17,18,19
168:14

**Lara** 45:14 46:18,22
47:1,8 53:8,12 55:14
58:23 59:5 63:16 65:3,
17,21,22 68:9 70:4
71:22 74:11 75:2,25

76:3 78:9,18,20 79:14
80:25 83:5 85:11 86:1
92:22 93:4,10 97:13
98:9 99:11 101:1,6
102:9 105:4,7,8,22
114:10,13 115:1 117:22
121:1,14,20 127:16
131:15 132:11 136:15
137:10 138:25 139:1
140:24 145:25 187:9,
24,25 188:2,6 201:11,
17 208:5 210:17 213:8
222:11

**Lara's** 102:12 115:13

**large** 44:7,22

**late** 46:22

**late-filed** 10:15,20

**laughed** 225:12

**Laura** 98:6

**Lauren** 5:24

**law** 178:15,16 179:1

**lawsuit** 147:3,9,15,17
149:3 155:5 201:10
203:5 208:10,11 211:8
213:16 214:9 217:2
219:10,13,17,18,25
221:21 231:22,25

**lawsuits** 149:6 192:2
221:3,5

**lawyer** 7:23 10:10

**lawyers** 48:3 144:15
202:23

**lay** 158:14,16

**lead** 50:15 96:3 192:25
193:11

**leader** 31:10,12 32:9
69:17,18,19 70:6,13,20
73:11,13 93:17 97:20
98:1,2 108:10 111:3,8,
10 167:14 214:17,18
240:22

**leader's** 69:18,19 98:2

**leaders** 96:10 139:25
168:3 169:16 172:20
240:3,25 243:22 244:13

**leadership** 19:9,18
177:1 243:14

**leading** 128:10 133:25
134:5,8

**leads** 144:5 183:6

**learn** 183:15 198:20

**leave** 48:11 82:1 85:20,
24 86:3,10 102:18
105:3 106:11 125:4

**leaving** 29:12

**led** 52:11 75:14 129:18
130:3,7 132:7 137:9,11
139:15 145:23,24
188:15 219:17

**Lee** 150:25

**Lee's** 56:10

**Lefevre** 34:9,10,11,12,
18 47:16 49:20 50:2,3,
10,12 51:9,12 52:6,14
53:8,12,25 54:5 65:11
66:3 75:17,20 76:20
77:6,17 78:17 85:10
86:20 87:25 88:13
89:15 92:23 93:9 97:12
98:3 99:10 100:16,25
101:19 105:14,19,20
106:2,6,19 109:11
112:23 120:10,16,18
121:4,7,10 124:13
125:1,6,13 127:2,7,17,
20 128:1,6 129:11
131:10,15 132:8,15
133:12 135:14,24
136:3,8 137:9 138:23
140:5,21 141:3 145:9,
25 171:7,13 186:25
187:22 188:8 201:11,16
208:6 213:10 222:10,
20,24 223:1,6 224:5
225:1,12,19 226:11
228:11 233:20 234:3,7
236:10

**Lefevre's** 233:17

**left** 71:15 72:2 100:10
106:16 155:3

**legal** 143:17,19 144:8,
9,24 145:6 148:12

Case 3:21-cv-00923   Document 59-1   Filed 01/18/23   Page 78 of 90 PageID #: 1598

**Lencioni** 21:10,13,17 27:15

**Lencioni's** 28:7 30:6

**lesbian** 219:15,19

**lesbians** 242:1

**Leslie** 6:1 12:24 142:17,19 191:20 196:25 200:12 209:5

**letter** 147:16 148:21,22

**letters** 90:22

**letting** 111:24,25 112:16,23 152:13

**level** 172:21

**Lies** 186:1

**life** 24:24 29:25 95:5 227:1,10 228:18

**light** 217:2

**likes** 7:23

**limbo** 94:4 97:23 98:6

**limited** 55:23 226:20

**lines** 36:23 179:7

**link** 124:17,22

**Linkedin** 181:10,19

**list** 40:19 161:16 199:9 216:25 218:5,9,10

**listed** 15:9 16:8 19:24 40:16 60:10 64:14 79:14 87:2 93:25 94:2,6 114:25 115:22 134:16 186:15 211:15 213:7 233:16

**listen** 29:1 89:14 130:23 179:13 205:5

**listing** 63:20 95:7

**lists** 8:25 64:2 94:11

**litigation** 210:23 211:24 217:13 242:10

**lives** 93:19 95:19,23 241:9,15,23 242:16

**living** 174:14 184:9,14, 22,24 185:1 186:2,5,12,

22 242:15 243:2,10,12, 17

**LLC** 5:8,9

**loaded** 57:3

**loans** 43:19,20

**local** 7:12,14 167:2 215:6

**location** 44:17

**lodged** 146:17

**log** 44:17 246:11

**lone** 89:6

**long** 104:14 146:12 153:22 164:18 165:3,17 170:4 240:20 245:10

**longer** 221:19

**looked** 178:13,14 228:10 231:3

**Lopez** 5:7 6:10,18,19 8:24 13:17 100:10 210:18,25 217:20,21 230:22

**Lopez's** 217:19

**lose** 117:20

**lost** 95:8

**lot** 30:10 38:17 58:21 61:11 104:9 143:4 150:17 156:21,22,23 157:17,18 158:1,5,18 163:4,5,7,8,9,13 183:7 189:24 238:18,19

**lots** 94:1

**love** 64:4

**low** 93:25 94:11 95:12 96:23

**luck** 39:23

**Luke** 34:8,18 47:16 49:19 50:2,12 52:14,15, 19 53:8,12,25 54:5 65:10 67:5 68:2 71:12 75:17,19 76:20 77:5,17 78:17 83:5 85:10 86:19 88:13 89:15 92:22 93:9 98:3 99:9 100:16,25

102:19 105:20 106:19 109:11 120:10 121:3, 10,20 122:7 124:13 125:1 127:2,16,20 132:8,15 135:24 140:21 141:2 145:25 171:7,12 187:22 188:8 201:11,16 208:6 213:9 222:10 236:10

**lunch** 100:5,11

**Lundell** 159:13 160:15, 20 163:16

**lying** 186:8

**M**

**made** 26:16 37:5,25 39:8 40:17 41:9,21 42:24 56:15 85:23 93:3 98:10 126:22 131:20 140:20 141:2,4,10,12, 22 150:21,24 157:25 158:5 160:7 176:5,24 187:21,25 188:7 192:13 194:1 207:20 208:14,16 223:9 229:14 231:19, 21,24 234:15

**Magazine** 215:11 216:23,24 217:9

**Magazine's** 216:3

**mail** 66:3 226:22

**maintain** 191:3

**make** 10:3 11:3 28:17 30:19 31:3 36:16,19,23 39:3,20,22 40:5 55:21 60:2 63:19 69:14,16 80:17 81:7 82:8 99:18, 22 100:1 108:18 110:22 119:15 120:4 130:5 139:24 140:1 147:19 158:1 160:16 163:25 176:2 180:15 182:4,6, 20 200:3,4 208:24 209:14 210:10 218:5,25 225:6,17 226:17 235:5 236:8 244:11

**Makeover** 23:23 24:14

**makes** 21:22 27:21

94:4 97:23 101:16 102:23 103:17 104:8 201:6

**making** 26:15 126:9 130:12 132:13 140:18 144:18 163:14 169:19, 21 187:17 189:24 222:5 225:5,14

**man** 123:6

**manage** 44:14

**mandate** 56:10 178:15

**mandatory** 94:2

**manner** 162:21

**manual** 191:21

**March** 50:19 53:23 55:7 60:11 64:19 66:1,2 76:6 77:21 79:15 89:19 90:13 102:15 118:5,6,9, 13,15,20,24 119:14 124:15 149:19,21 150:3 234:8

**marital** 96:4

**mark** 8:9 13:12 37:10, 12,17,18 48:23 74:5

**marked** 8:10 10:20 12:19 13:14 49:6 209:18

**marketing** 54:9,13 182:16

**marks** 247:17

**marriage** 185:24 186:9 242:8

**match** 49:3,10

**material** 57:17 233:24

**materials** 183:10

**matter** 5:8 22:2 28:25 76:17 85:6 182:18 208:2 211:23 218:12,17

**matters** 143:21 185:4, 9,10 246:17

**meaning** 31:13 36:12 65:6,24 72:2

**meanings** 169:8

**means** 7:23,24 16:13 20:23 28:16 29:5 119:2 191:3 202:22 203:2

**meant** 21:2 34:18 35:13 68:9,21 75:3 166:18 211:4

**measure** 151:6

**media** 56:18 217:5

**medical** 221:1

**mediocre** 93:25

**meet** 69:23 70:21 71:5, 13 73:9 74:10,13 76:11 84:18 85:1 118:14 121:21 122:17

**meeting** 22:19 43:8 68:10,14 69:2,7,25 71:3,23 76:7,14,22 77:22 118:19,24 119:1 123:14 132:15 138:22 139:2,6,9 141:5 145:8 165:11 186:19,25 207:17,18 222:22 245:15,24

**meetings** 71:24 123:20 124:9 164:15,16 165:8, 22 166:6,24 239:22 240:10,20 242:17 243:5,23 244:16,23 245:19 246:2,7

**member** 23:16 30:8 54:4,6,10,14 73:11 89:3 93:16 96:6 98:1 110:22, 23 140:2,12,13 172:21 219:8 229:21 241:2

**members** 23:7,10,11 56:24 64:10 68:15 70:21 73:19 110:10,11, 19 111:2,6 158:20 216:18 223:8,11,20

**memoranda** 226:22

**memorized** 12:1 55:1

**memory** 14:13 74:3,4

**mentioned** 40:7 41:10 64:15 90:21 125:15 190:24 222:10

**mentioning** 150:19

**merchandising** 63:7

**Merchant** 24:5 25:2,3 26:1

**mere** 153:12

**message** 65:10

**messages** 37:9 226:22

**met** 20:2 77:16 87:15 122:18 123:13 222:11, 21

**Methodist** 169:15

**methods** 204:22

**Michael** 54:19

**micromanaging** 89:23

**Middle** 5:11

**mind** 13:2 43:13 48:13 102:1 159:12 160:24

**ministry** 25:10,11

**minute** 8:13,17 13:2 90:20 161:7

**minutes** 121:9 123:14, 16,22 240:21

**misleading** 133:18

**missed** 87:9 90:7 111:20 112:3,24 114:4 136:15,16 137:5 224:11 234:7,19,20 235:12,19, 25 236:4,5 239:4

**missing** 46:11 47:4 50:20 89:19 91:13 98:21,23 101:22 107:8 131:13 132:6,18 133:20 136:11,12 224:8 235:11 237:2

**mission** 29:16,17,19 30:2,5

**misspelled** 211:2

**mistaken** 78:18

**misunderstand** 108:6

**misunderstood** 161:6 193:3

**mom** 175:4,5,6,9

**Monday** 57:2 75:25 78:22 85:17 93:10 102:9 103:25 118:2 165:11 166:6 185:12 245:14,22

**Mondays** 245:17

**money** 20:25 23:23 24:13 76:25 81:17,25 82:7 85:12 86:3,6

**moneys** 76:21 88:15

**monitor** 13:10 48:18 100:7 173:8,12 230:20

**Monk** 24:5,25 25:2,3,25

**morale** 93:25 95:7 96:16

**morning** 93:3 165:12

**motivate** 166:18

**motivational** 63:5 167:3

**mouth** 41:12 162:17 165:19 172:14

**move** 20:7 36:9,10,21 39:22 40:4 114:16 158:22 179:2 191:4

**moved** 24:3,18 39:19 158:19 159:15 164:15 176:9,21

**moving** 28:12 40:8 55:20 60:1 175:2

**Mozingo** 37:10,12,17, 18

**Multitude** 18:6

**Muslim** 169:17

---

**N**

**name's** 237:22

**name-dropping** 38:18,22 39:8 40:13,19

**names** 39:1,2 40:14,19 64:2 134:12 157:12 159:3 173:19 191:9 195:15 210:24 211:12, 15 212:5

**narrative** 90:2 235:23

**narrow** 90:2 152:22

**Nashville** 5:12,14 106:9 215:15,16 216:2, 6

**Nashville-only** 215:6

**national** 167:2 215:7,8, 12,13

**necessarily** 25:9 39:1 43:11 147:7 182:10

**needed** 18:9 57:17 63:18,23 85:24 86:10 90:11 91:16 103:19 154:5,8 240:22

**needing** 76:4 102:13

**negative** 71:20

**neighborhood** 173:22

**nervous** 66:10,17

**next-to-the-last** 225:9

**Nicole** 5:17

**night** 34:3 185:14

**Nodding** 186:10 187:12

**non-smoking** 184:5

**normal** 30:21 70:10

**note** 93:4 98:10 108:13, 19

**noted** 31:6

**notes** 13:24 17:18 19:24 30:15,19 38:12 123:13,16,22 124:1 134:9 240:1,3,6

**notice** 8:9 9:20,21,22 10:12,14,18 23:19 116:20,21 147:9 230:23

**noticed** 115:24 211:2

**noticing** 235:10

**number** 15:1,11,15,18 56:24 79:9 83:11 151:11,18 154:4 210:22 211:22

**O**

**O'CONNOR** 7:5 143:9, 15 144:3 184:15 192:6, 13 208:10 217:2,5 220:10 242:7,24

**O'Connor's** 192:14

**O'NEILL** 62:12,13,17 175:14

**object** 54:16 67:16 69:3 70:24 110:1 112:10 115:19 160:9 189:12 206:25 207:11 220:1 221:23 224:21 226:8 230:7 232:8 242:9 245:2

**objected** 152:7

**objecting** 152:10 168:6

**objection** 10:22 23:18 106:13 113:18 114:22 116:7 117:9 118:21 119:21 125:8 129:1 130:18 131:3,24 133:4 134:22 135:2,15 138:15 139:19 141:17 142:4,24 143:11,22 145:2,16 146:19 148:6,18 151:15 152:3,5,6,9,18 154:24 155:6,16,21 167:8 179:17 184:17 188:22 189:3,21 194:4,7,24 196:4 199:4,16 201:21 202:6 205:9 211:9 212:14 218:13,18 219:5 220:15 221:12 227:5 228:2,22 230:9 242:3

**objections** 218:23

**obstacles** 112:5,7,9 113:4,7,8,17,25

**occurring** 138:11 230:24

**October** 5:3

**offer** 30:12 37:2,4,6 101:17,25 102:18 103:17,19 104:8,13

**offered** 104:17 137:14 161:12

**offers** 30:10

**office** 44:2,8,21 56:4,9 57:21 92:11 149:16 154:23 157:16 158:9 159:19 160:13 173:15 174:5 175:5,8 176:3,6 177:20 178:21,23 190:7,13,21

**officer** 54:9,13,19,20 140:16

**offices** 65:1

**older** 53:17 59:23

**on-boarding** 186:18

**on-site** 33:20,24,25 34:2

**one-on-one** 68:14 69:2,6 70:16,19 71:4 239:22 240:10 242:19 243:5,9,23 244:7

**one-on-ones** 68:15,17 70:6,8,10,12,19 114:13, 14 115:3 240:4 242:22 244:12,13

**one-time** 106:23 107:6

**one-to-ones** 77:25

**online** 44:9 244:19

**open** 28:24 95:13 107:20 175:7 242:10 245:23 246:1

**opened** 16:16

**openhandedly** 22:3

**operating** 54:20

**operations** 84:25 179:16

**opinion** 27:18 125:10

**opportunity** 33:10 247:8

**opt** 81:18

**opted** 217:7

**option** 77:6 81:16 129:22 175:7

**options** 82:16

**order** 20:22 59:15 63:18,21 113:25 150:19 218:21 246:18,23 247:12

**ordering** 247:22

**orders** 22:5,6

**organization** 185:3,17

**original** 9:25

**outlets** 56:19

**outlined** 46:9 47:17 86:20 87:10 238:8

**outlines** 63:22

**outlining** 85:12 88:13

**overly** 38:17 39:7

**P**

**p.m.** 76:1 78:13 82:22 83:17 84:15 93:2 99:5 100:4,8 102:10 104:22 118:3 121:2,3,8,9 125:2 173:9,12 230:17,20 236:11 247:19 248:3

**pack** 213:21

**packet** 100:14

**packs** 213:18

**pages** 9:6 37:23 124:12 183:21 184:1

**pandemic** 56:1 58:22 61:14 92:10 156:17 162:22 246:3

**paper** 75:11 90:1

**paragraph** 20:7 34:22 50:18 56:25 105:1 225:10

**paragraphs** 51:7

**parameters** 227:22

**part** 24:24 61:20,23 63:14 69:1 70:10 74:14 79:25 88:21,23 89:1 91:1,2 97:9 114:5 115:11 131:11 165:2 177:7 182:19 183:2

184:3 186:13 213:22 214:13 223:14,22 226:2 230:4 231:14 232:14 241:11

**participated** 208:1

**partnerships** 19:11,19

**parts** 114:8,10

**party** 215:20,25 216:20

**pass** 174:21

**passed** 32:8

**passing** 59:20

**passion** 28:11

**passionate** 29:16 30:5, 9

**passions** 42:2

**past** 83:24 156:14

**pastors** 166:25 167:2,5 168:13,25

**Patrick** 21:10,12 27:14 28:7 30:6

**Paul** 211:2

**pause** 38:11 40:9 65:13 66:4,10,13

**PDF** 84:6

**peer** 234:13

**pending** 217:12 220:4

**people** 29:9,13 38:24 39:1,17,18,23,24 40:1 45:5 58:1 62:3 63:1,4, 11 64:1 110:8,17 115:16 124:23 134:1 140:11 146:15 151:4,7, 9,11,13 156:20,23 157:2,5,13,18,25 158:2, 17,18,19,21,23 159:2 160:24 162:3,7,14,15 163:8,9,13 166:4,12 167:1 173:20 175:1,15 176:20 177:8,20 180:16,19 183:7 189:24 190:6,15,17,24 191:10 193:14 194:2,6,21 195:6,16 198:10,11 199:18 202:9,13,17

Case 3:21-cv-00923   Document 59-1   Filed 01/18/23   Page 81 of 90 PageID #: 1601

208:19 211:7 212:10,11 213:12,19,25 222:9 234:12 236:14 242:1 244:20

**people's** 28:24 56:14

**percent** 158:20 167:1, 3,5 168:25 169:3 221:1

**perception** 74:19

**perfectly** 174:15

**perform** 44:18 143:5 160:3 174:22

**performance** 46:19,22 77:7 81:16,23,24 107:3 119:10 127:11 128:11 129:17,20,22 130:5,8, 11 131:8,11,17,22 132:3,5 137:12,13 138:2 139:14 145:23,24 187:2,4,7 222:12,13,15, 19,22 226:1,2,25 233:18

**performed** 146:16

**performing** 194:3 222:25

**period** 57:22 58:6 156:12 163:20 164:15 165:23,24 176:13 192:7,9 203:7,9,10,15 208:21 221:6

**periods** 158:1

**permission** 85:16

**Perry** 34:23

**perseverance** 25:21

**person** 20:10 30:2 31:14 81:22 89:2 128:2 138:24 140:20 157:3 160:22 163:16 174:9, 13,23 175:19 182:21 187:21 190:2 205:17 210:21 211:21 213:6

**person's** 33:5 95:5

**personal** 8:4 14:6 95:5, 16,23 158:3 227:1,10 228:18 241:9,15,23 242:16 243:1

**personalities** 60:11 175:11,25

**personality** 62:17 106:19 175:19,24 179:25

**personally** 14:7 219:2

**personnel** 246:17

**persons** 140:18 187:17

**pet** 95:8

**Phoenix** 40:1

**pick-ups** 57:4

**picture** 239:11

**piece** 60:18 131:13 227:10 237:23

**Pinnacle** 215:19

**Pivot** 60:14,19

**place** 17:25 18:1 76:15 158:13 177:9 178:2,25 180:7 193:12 215:1 216:16,22 218:15 227:11

**places** 59:15 215:6,7, 17,23 216:2,3,6,25

**plaintiff** 5:23,25 45:22, 23 126:9 138:13 140:19 187:18 221:11 222:11, 14,25 223:1,9 224:24 225:4,6,11,13,17

**plaintiff's** 46:4 222:6, 12 223:7 226:24

**plan** 64:21,23 65:4 77:7 81:17,25 106:24 129:23 130:9 137:13 222:13 226:3 238:7

**planning** 85:2

**player** 21:9,12,18,24 23:3,16,22 27:9,13,20, 22 30:1,7 36:19 107:9, 12,13,18

**pods** 213:18

**point** 10:7 31:13 52:3 70:3 82:15 90:4 92:3,5 101:19 105:10 109:16 122:19 123:1 129:24

137:15 169:20 177:19 178:1 198:15 208:3 229:22 235:22 247:7

**pointed** 10:11 223:6

**points** 111:22 186:14

**policies** 180:2,3 183:22 184:4

**policy** 69:13 144:13,16, 22 146:3,8 149:10 164:8,9 172:16,19,25 177:4,6 179:4,8 180:9 182:2 184:6,9 185:1 186:12,16 198:18,19 242:15 243:2

**portion** 93:19

**portions** 57:13 59:21 247:8

**portray** 223:7,19 224:2

**portraying** 223:10

**position** 11:22 14:25 15:10,14 18:8,19 19:9, 10,17,18 38:1 41:3 54:10 133:24 148:19 156:13 177:10 180:19 182:7,11 219:20 220:18

**positions** 12:2,9,10 13:24 14:14 16:23

**positive** 72:21

**possesses** 28:4

**possibly** 227:9

**post** 180:18 182:13

**posting** 16:4,5,15 182:19

**potential** 147:20

**power** 11:8

**practice** 144:17,23 177:15 178:5

**practices** 146:13

**precaution** 39:20

**precautions** 149:23,24 150:14 178:2

**prepared** 9:11 10:24 11:2

**preparing** 101:20

**Presbyterians** 169:15

**present** 29:13 76:21 127:14,16

**presented** 82:16

**preserve** 156:3,4,6,10 245:5

**president** 82:19

**pretty** 11:1 148:8 154:15 203:6

**previous** 6:25 7:8 63:15 152:7

**Price** 37:10,12,13

**principles** 20:24 61:17

**prior** 40:10,24 42:10,12 70:6 78:25 79:6 93:24 112:18 120:11 121:10 122:8 124:13 134:17 146:22 149:22 180:22 181:1 187:3 204:22 221:5

**priorities** 240:13 241:6 244:10

**privilege** 195:8

**privileged** 142:5 146:20 148:6,20,22,25 149:2 188:23 189:4 192:22 194:4,8 195:7,9, 11 196:24 199:17 202:6,8 228:3

**problem** 22:23 220:24

**problematic** 72:10

**problems** 96:4

**procedure** 69:13 146:3

**procedures** 183:22 184:4

**proceed** 36:8,12

**proceedings** 248:3

**process** 30:21 38:5,9, 11 39:11 73:10 115:6 186:18

**produce** 43:6 136:20

**produced** 52:1

**producer** 15:10,17,23 16:20,21 18:14,21,22 134:19,21

**producers** 58:14

**product** 62:10,13 134:11 155:7 156:1 195:13 236:19 238:1

**production** 55:20 63:13 64:1 83:20

**productions** 63:24

**profile** 31:14

**progress** 91:18 111:18,25 112:22 113:4

**project** 89:23 91:4,7,21 92:1 111:19 112:17,19 113:12 214:21 237:24 240:15

**projects** 39:2 42:4 55:20 64:14 135:1 136:19,25 233:1,4 237:15 238:8

**promoted** 80:17,18

**properly** 107:19

**proposing** 107:1

**protected** 155:22 156:1

**protective** 218:20

**proven** 28:10

**provide** 12:5 29:23,24 50:16 51:16 134:11 228:1 238:2 240:24 241:22

**provided** 10:21 12:5 96:11 97:1 133:18 138:15 139:3,7 150:7 151:23 181:6 210:17 218:17 227:4 238:25 239:5,7

**providing** 149:25

**psychologist** 166:15

**PU** 60:13

**public** 63:4 175:18

**publication** 215:18

**publicity** 217:5

**pull** 52:2 55:3 73:25 75:19 191:24 209:3

**pulled** 8:13

**pulling** 72:22

**punch** 60:15

**purchase** 244:5

**purpose** 240:10

**pushes** 181:15,21

**put** 19:22 66:4 94:13 122:10 126:2 130:8 165:19 175:4 178:1 224:18 244:19 247:1

**puts** 215:19

**putting** 41:12 61:15 172:14 190:14 210:4

---

## Q

**Q-N-A-P** 94:7

**QNAP** 94:7

**quarantine** 94:2

**question** 14:6 20:15 26:24 31:1 33:18 44:25 50:24 58:16 66:6,12 69:7 78:4 105:16 113:14,21 116:8,10,12, 18 119:13 121:21 126:15,17,19 130:20 143:25 161:11 167:24 168:19 178:18 182:17 197:11,13,17 199:13 205:6 211:16,20 216:13 225:10 237:12 240:2 246:9,13

**questions** 6:15 8:2 71:16 75:5 90:10 152:1, 23 168:6 197:24,25 198:13 210:2 229:5 243:25

**quick** 60:13,19 136:20

**quickly** 35:9,11 46:20 47:9 80:16,18 230:14

**Quotes** 50:20,22 89:20 235:2 236:6

---

## R

**Rabbi** 167:17,18,19 168:14

**radio** 56:11,17 58:2,3 151:2,12 153:13,17 154:5 175:16

**raise** 190:10

**raising** 189:25

**Ram** 60:19,22

**Ram-** 103:5

**Ramsey** 6:24 7:1,6 20:21 23:12 24:15,17, 20 29:18 30:2,23 33:15 34:13 45:16 54:22 56:1, 6 60:3,21,23 62:18 70:14,20 82:2 95:21 104:9 106:18 115:10 146:2 150:14,21 175:17 176:2 178:10 179:10, 19,20 180:4 198:18 229:14,21 234:15 244:3

**Ramsey's** 162:4 179:15

**ran** 61:9 204:1

**re-read** 222:6

**read** 9:9 19:13 21:3 23:13 24:8 25:1 26:5 66:7 77:23 88:22 89:7,9 90:23 138:9 182:24 187:24 211:13 212:9 238:15

**reading** 23:4,6 71:17 72:12 77:15 78:21 83:2 97:21 121:11 236:3,8

**readings** 23:15,22

**reads** 51:11

**ready** 8:19 39:22 57:2,5 85:13 112:19 190:12

**reason** 11:3 16:17 39:12 41:8 117:6 128:8 137:20,22,24,25 159:24 163:23 170:25 230:4

**reasonable** 190:22

**reasons** 18:6,12 19:1 136:9 174:8,12

**recall** 51:25 58:20 80:10 92:17,18 118:18 119:1,14 136:6 149:20 150:10,19 163:18 206:2 221:14,17

**receive** 101:3

**received** 124:7 147:9 233:5

**recognize** 13:17 49:14 209:23

**recommendation** 63:17 140:19 178:5 187:18,21,23

**recommendations** 140:1 225:25

**recommended** 188:3

**recommending** 62:14 88:15

**record** 5:3 6:16 13:2,3, 6,10 28:10 34:21 48:18, 22 79:8 100:4,7 152:20 171:24 173:8,12 211:1 212:9 217:18 222:7 230:17,20 234:24 245:6 247:19,21

**recorded** 239:24 246:5

**recording** 226:23 245:1

**records** 123:12,19 158:7,12

**recruiter** 16:13 17:17 32:5 177:8 183:3,14,15

**recruiters** 180:10 182:17 183:4

**recruiting** 37:14

**red** 115:13

**reference** 12:11 42:20, 24 74:22 88:12 93:15 127:13

**referenced** 60:8

**referencing** 79:21
80:24 84:25 118:12
120:7

**referring** 84:9 101:13

**reflected** 227:3

**refresh** 14:13

**refused** 152:22 225:7,
17

**refusing** 173:15
197:10,16

**regard** 189:9

**rein** 176:22

**reiterate** 89:21

**reiterating** 85:11

**related** 60:24 95:10,11
138:12 154:13,16 156:7
157:16 203:12,22,24,25
205:12 206:20 207:12
229:20 230:25

**relating** 211:23

**relational** 29:10 115:10

**relationship** 25:7,18
115:8 228:19

**release** 57:3

**relevant** 199:10 200:21
201:9 202:10 204:22
207:21 211:22 227:12,
15,23 230:2

**religion** 168:12

**religious** 166:21,24
167:13 168:17

**relocated** 158:19

**remained** 10:13

**remember** 7:4 40:14
43:9 45:22 47:11,19
56:22,24 76:12 116:5,
25 135:4 174:4,24
175:21 204:7 215:8,9
220:6 228:8,10,13,16

**remembering** 116:14

**remote** 177:11 180:17,
20 182:12

**remotely** 44:13

**remove** 217:7

**rentals** 37:15

**repeat** 105:16 126:18

**replied** 83:5 104:2

**replies** 98:9

**reply** 53:17 103:16

**replying** 65:22

**report** 93:16,19,22
94:10 97:12,18 98:4
193:18 244:14

**reported** 50:12 54:5

**reporter** 5:17 6:6
247:22

**reporting** 5:19 70:4,5

**reports** 70:13 94:24
95:1,2,17 96:5,13

**represent** 5:21

**representative** 5:7
185:16,17

**representing** 168:12

**req** 15:10,15,18 16:14

**reqs** 19:3

**request** 143:17 191:18
212:3 227:16 228:17

**requested** 26:22 74:14
170:13 232:15,17

**requesting** 70:18

**requests** 212:5

**require** 20:21 69:2,6
97:18 241:22,24

**required** 23:4,6,8,13,
15,22 38:20 59:2 63:12
166:4

**requirement** 178:10

**requisition** 15:1 16:16
17:18 18:10

**resigned** 158:17,23
162:18 219:20

**resistant** 225:5,14

**resolve** 22:23

**resolved** 217:6

**resources** 6:24 72:1
73:14,20

**respond** 101:14 225:1

**responded** 162:21
197:24,25

**responding** 121:20

**response** 120:12 138:4
151:22 152:21 153:1
156:16 157:8,11,20,22
159:6,8,16 160:19
161:22 162:5 163:3
164:2 170:10 177:19
189:10,11,19 198:12
212:12 218:16 225:10
226:18 227:2

**responses** 193:25
197:22 209:6 210:2,7
223:16

**responsible** 237:17,22

**restate** 138:14

**restating** 152:18,20

**restroom** 173:4,6

**result** 146:17 149:11
158:14,24,25 164:3
192:14 193:21 197:20
219:24

**results** 35:10,18
216:21

**retired** 106:9

**return** 160:14 190:13,
16,20

**returning** 157:15

**reveal** 202:7

**review** 142:2,8 187:4,8
203:4 204:23,24
234:10,13 246:19

**reviewed** 10:8 140:2
204:5 206:14 208:24

**reviewing** 9:20 103:12

**reviews** 187:2

**Ribbon** 7:11

**Rick** 34:23 35:7 36:15,
22

**rid** 104:5

**right-hand** 14:17,24

**righteous** 184:22,24
185:1 186:2,4,12
242:15 243:2,10,12,16

**Rights** 220:21 221:5,22

**rise** 172:21

**Rivers** 169:11,23,24

**roadblocks** 240:14

**role** 15:4,7,8 30:11,13
36:3 159:25 179:15

**roles** 15:6 17:8

**room** 29:12 60:11 64:6,
8,10 131:16 132:9
135:17 138:7 237:14
238:12

**rough** 90:1,14

**rubbed** 36:15

**Rudolph** 17:16 19:25
20:1 32:7

**rule** 178:12 213:7

**rules** 149:4

**run** 59:6 61:8 244:6

**running** 92:3,4

**runs** 37:19

**S**

**SAITH** 248:2

**salary** 26:10,11,20,21

**salespeople** 154:10

**Sanders** 6:1 8:12,16,20
9:17,19,24 10:2,6,16,22
13:1 23:18 48:7,9,14,25
49:3,8 54:16 67:16 69:3
70:24 79:8,11 82:23
83:7,10,14,19 84:2,5,8,
11 99:17,21 100:2
106:12 110:1 112:10

113:13,18 114:22
115:19 116:7,17 117:9
118:21 119:21 122:22
123:2,8 125:8 128:14
129:1 130:18 131:3,24
133:4 134:22 135:2,15
138:14 139:19 141:17
142:4,24 143:11,22
145:2,16 146:19 148:6,
18,23 149:5 151:15,23
152:2,6,11,17 154:24
155:6,10,16,21,25
160:9 167:8 168:5
171:24 179:17 184:17,
20 188:22 189:3,12,21
191:22 192:18,20
194:4,7,11,15,24 195:2,
7,10,17,23 196:3,7,10,
16,21,24 197:2,5,7,12
198:25 199:4,9,16,22
200:1,6,11,16,18,20,24
201:2,21 202:1,6,15
205:9 206:25 207:11
209:7 211:1,9,18
212:14,21,25 217:18,
22,25 218:8,13,18,22
219:5 220:1,15 221:12,
23 224:21 226:8 227:5
228:2,22 230:9 232:4,7
242:3,9 245:2 246:16
247:3,7,11,15 248:1

**sanitizer** 150:6,15,16

**sanitizers** 150:1

**sat** 89:22 163:14 233:25

**Saturday** 66:2 185:14

**save** 214:23

**scary** 174:16

**schedule** 57:4 64:4
65:2

**scheduled** 13:24 59:25
63:25 65:8

**School** 43:21

**scope** 23:19 54:17 69:4
70:25 106:12 115:20
142:25 143:12 151:16
167:9 168:7 179:18
218:14 219:6 220:2,16
221:13,24

**screen** 5:5 13:7 17:19,
20,22,25 18:3,5 32:2,3,
8 64:12 90:14 112:19
180:15 182:20

**screener** 50:21,23
89:20

**screening** 64:9

**screenshot** 16:10

**script** 182:23,25

**scrolling** 83:22

**search** 204:1,12,23,25
205:14 227:22

**searched** 227:17

**Seattle** 216:6

**secondary** 88:12
165:12 235:12

**section** 60:13 85:2
94:10

**sections** 246:20

**self-awareness** 29:11

**sell** 62:19,21,24,25

**selling** 61:22

**send** 51:10,13 52:12,17
78:24 87:22 98:6
147:20

**sending** 121:10

**sends** 98:8 121:2,4

**senior** 14:25 16:19
19:5 43:2 45:21 92:15
134:19

**sense** 133:21

**sentence** 35:1 36:7
59:4,10 91:25 117:4
225:8

**separate** 32:14 33:1

**separation** 76:25 77:8
137:12 173:24,25

**September** 94:18

**series** 39:25 43:11
156:20 157:2 203:25

**serve** 56:19

**server** 44:15,17,20,21,
24 59:15

**servers** 44:8 59:12
64:12

**Services** 5:19

**set** 20:7 33:25 53:1 88:9
213:11 236:12,13,15,22
238:3 246:7,10

**settled** 220:5

**seventh** 24:10 100:14

**severance** 101:20
104:13,16,17 129:23

**sex** 185:23 186:8
242:14

**share** 95:16

**she'd** 102:18

**sheet** 117:12

**Shit** 125:2

**shoot** 60:12 237:20

**shoot's** 237:22

**shoots** 59:24 63:17

**short** 13:8 40:2 48:20
173:10 230:18

**shorten** 202:23

**shot** 60:20

**show** 56:6,17 58:2,3
60:21 127:6 151:12
153:13,14,17 154:5,13
175:23 179:12

**showed** 17:6

**shown** 15:18

**shows** 42:1 175:15,16

**shut** 59:9 149:12,14,15

**sic** 19:9 21:15 87:25
113:14 141:20 192:14

**side** 84:1

**Sievertsen** 53:9,10,13
54:1,3 64:20 65:22 74:5

**sign** 246:1

**signed** 39:21

**similar** 51:22 193:6

**Simms** 54:21

**simultaneous** 114:7

**single** 108:24 115:25
126:10,17,21 128:12,
16,22 137:4 174:14
195:24 196:11 201:8
227:10

**sink** 164:14

**sir** 8:6 9:5 10:8 13:19
19:21 44:4 45:24 49:15
51:6 68:1 95:3 100:17
104:23 118:4 197:11
231:2

**sit** 44:8 74:1 81:6 137:2
138:21 139:8 145:10,21
150:13 152:25 163:21
183:15 206:4,5 223:23
224:1 229:11

**site** 216:1

**sits** 133:9 225:23

**sitting** 81:22 100:12
137:10 233:21

**situation** 158:3

**situations** 68:25 69:6

**size** 56:20,22

**skeleton** 56:23 63:10,
18

**Sketch** 220:13

**skills** 41:3

**slash** 235:14

**slip** 89:23

**slow** 41:25

**small** 55:22 56:2,3,23
59:21 60:2 61:8,11,12
62:8

**smart** 21:19 27:24 29:5,
9

**Smartdollar** 62:6,7

**smarted** 131:10 132:14
145:9

**smarts** 29:10

**smiley** 20:3 93:12,20

**So-and-so** 163:21,22

**soap** 164:13,14

**Sofia** 5:16

**software** 13:22 43:25
59:16 181:15

**sold** 61:19

**solo** 89:2

**Solutions** 29:18 30:23
33:16 34:13 62:18
229:21

**son** 54:22 61:2

**sooner** 71:8

**sort** 146:2 178:19

**sound** 59:17 85:24

**sounds** 65:23 81:5
85:18,19 86:2 105:1,2
106:22

**souvenirs** 62:22

**space** 89:25

**speak** 37:23 102:13
128:2 137:10 142:14
149:5 160:2 161:25
162:1,17 167:1 168:1,
18 194:2,6,12,20
196:12,15,19 198:20
199:19,21,25 201:19,
23,24 202:12,14 217:8,
9

**speaker** 63:5 106:17
175:18 179:25

**speakers** 166:10 167:4
169:4 175:18

**speaking** 20:14 30:19
127:10 169:22 175:13
193:23

**speaks** 21:17 28:9
177:8 179:25

**special** 93:18 245:4

**specialist** 37:19

**specific** 28:5 111:22
113:7 116:14 162:20
174:4,10 185:18 186:15

198:13 211:16 214:21
215:9 224:6 233:19
235:15 243:9

**specifically** 40:25 43:4
135:13,18 139:17 155:4
163:10 173:19 181:4,9
185:5,7 214:8 242:24

**specifics** 47:11 136:22
226:3,6,11 233:20

**spectacular** 97:17

**speculate** 125:12
223:24

**speculation** 223:14

**speculative** 223:22

**speed** 68:3

**spell** 21:14 80:9

**spelled** 112:11

**spending** 183:7

**spent** 42:3

**spirit** 26:1,2

**splash** 80:18

**spoke** 122:7 162:18
166:18 167:7 169:6
194:14,21 196:23
198:10 202:17 217:14
227:18

**spot** 135:25 140:5
141:4

**Spousal** 33:21,24 34:3

**spouse** 36:9,21 39:21

**stack** 48:3 58:10 92:21
171:22 172:1

**staff** 43:8 164:16
165:11 166:6 186:19
244:16 245:15,19
246:2,7

**stagger** 159:18

**stamped** 209:13

**Stamps** 219:4 220:9

**stand** 66:14

**standpoint** 39:10,13
59:13

**stands** 62:12 163:23,24

**start** 68:4,10,13,17
71:3,10,23 77:24 89:10
107:15 131:1 152:9

**started** 26:15 45:5,23,
25 55:9 61:10 63:15
94:1 147:16 149:25
164:22 176:17 177:2
203:17 238:21,22

**starting** 57:2 71:20
90:3 235:21 238:20

**starts** 8:25 53:2 102:6
103:24

**state** 5:21 6:16 52:9
146:14 152:2 178:3
179:1 211:24 227:7,12

**stated** 119:23 152:19
168:2 170:5 189:23
192:10 203:10 205:2
218:22,23 223:3,12,21
224:4,12 225:3

**statement** 29:19 30:3,5
229:13

**statements** 193:19
198:3,12 226:20,21
228:18 231:19,23,24

**states** 5:11 181:17
227:8

**stating** 46:13 65:3
102:13 108:3,13,14
118:16

**stations** 56:11 164:13

**status** 219:15,19

**stay** 48:10 89:6

**stayed** 56:6

**stealing** 186:8

**step** 32:11,13

**steps** 150:6 245:25

**stop** 76:8 107:10
122:25

**stored** 202:22 203:4

**storm** 211:19

**story** 90:4 92:3,5

235:18,20,22

**strategic** 84:25

**stratop** 84:19,21,22,23,
25

**Street** 5:14,22 6:15 8:8,
15,18,22 9:14 10:7,10,
17,23 12:20,23 13:12,
16 24:1 48:5,8,12,15,23
49:2,11,12 55:4 67:18
69:8 71:1 72:6 79:16,19
83:1,9,16 84:12 99:20,
25 100:9 106:14 110:3
112:20 113:15,16,22
114:23 115:23 116:4,
11,19 117:11,16 118:23
120:1 122:24 123:5,11
125:9 128:15 129:4
130:21,22 131:4 132:1
133:5,8 134:24 135:5,
19 138:17 139:22
141:19 142:7 143:2,13
144:1 145:5,20 146:24
148:4,8,10,21 149:2,7,8
151:19,25 152:4,8,14,
24 155:2,14,19,23
156:2 160:10 167:10
168:11 172:3 173:5,13
179:21 184:18,23
188:24 189:1,5,16
190:1 191:17,24 192:1,
16 193:2 194:5,9,13,18
195:1,4,8,13,20 196:1,
5,8,14,18,22,25 197:3,
6,8,9,14 199:2,5,12,14,
20,24 200:3,9,12,14,17,
19,23,25 201:5,7,22
202:3,11,18 205:13
207:3,6,14 209:2,5,10,
14,17,21 211:4,5,11
212:1,16,19,24 213:2,4
217:21,23 218:3,11,16,
20,24 219:9 220:3,19
221:16 222:1 224:22
226:12 227:14 228:7
229:3 230:12,21 232:6,
8,10 235:4 242:6,12
245:7 246:14,23 247:5,
10,13,16,23

**strengths** 35:11

**stress** 94:2 95:9 96:18

**stressful** 94:5 97:23

**Strike** 88:22 146:15

**string** 53:4 65:10 99:9 100:23

**strings** 204:1,6,10,12

**structure** 90:2 235:23

**struggling** 39:16

**studio** 60:21

**study** 215:21 216:5

**stuff** 12:20 48:16

**subject** 22:2 28:25 43:17,19 98:11 102:20 211:23

**submitted** 17:4 210:3, 16 216:18

**subpar** 234:5

**subscribe** 62:3

**Subscription** 61:25

**subsequent** 221:20

**successful** 39:18

**such-and-such** 169:5

**suggest** 106:23 225:17

**suggested** 225:6

**suggesting** 51:8 89:15 117:6 161:1

**suggestion** 159:20,21 164:10 178:12 225:12

**suggestions** 107:20 160:25 161:10,13 162:8,14 163:4,9,14 164:1 178:13,14 189:24

**summarized** 47:17

**summarizing** 85:11

**summary** 193:19

**supervising** 135:1

**supervisor** 105:9,11, 15,18,21,25 213:17,21 214:8,15

**supervisors** 97:19

**support** 25:10 212:7

**supporting** 25:8

**supposed** 90:13

**surfaced** 227:22

**surfaces** 243:12

**surprised** 117:7,15,18, 20 206:15

**surrendered** 229:8 230:10 239:15

**survey** 216:19

**surveys** 216:17

**Susan** 54:20

**suspend** 165:17

**suspended** 165:22

**swear** 6:6

**sworn** 6:7,12

**system** 13:20,21 14:1 19:23

---

**T**

**T-SHIRT** 63:8

**tabulates** 216:20

**takes** 240:1

**taking** 76:15 114:14 148:19 158:13 236:2

**talented** 35:2,8

**talk** 72:22 76:5 78:2 89:14 90:11 96:5 98:10, 12 99:13 101:7,9 115:11 117:23 118:6 120:17,19 121:5 137:3 172:12 187:15 190:13 194:17 198:22 230:22 233:17

**talkative** 38:17 39:7

**talked** 27:25 28:20,22, 23 50:19 63:1 68:2 76:6 77:21 88:16 89:19 102:15 118:5,8,12 128:6 129:10 136:14 180:3 181:13 195:12,16 208:10 228:21,25 231:3,11 245:20,23

**talking** 28:6 29:17 38:23 42:17 50:6,10 59:11 71:10 73:17 79:5 84:14 87:24 88:10 93:6 99:1 100:11,15,19 101:8 111:11 113:7 115:13 118:8 120:14 171:4 177:18 182:8 191:11 195:17 200:7 203:9 217:24 222:4

**talks** 28:15,19 72:16

**tape** 115:13

**TDRS** 60:21

**teach** 61:8 62:8 166:19 196:1

**Teaching** 61:3

**team** 19:11,19 20:10,24 21:9,11,12,18,24 23:3, 7,8,10,11,15,16,22 27:9,13,19,22 30:1,7,8 36:17,19 45:20 55:15, 20 56:3,23 58:24 59:8, 10 64:10,24 65:4,24 68:15 69:16 70:21 73:11 88:21,24 89:2,3 91:2 93:16 96:6 97:2 98:1,2 107:9,12,13,17 110:8,10,19,22,23 111:2,5 134:2,4 143:16 157:5 158:20 159:13 163:17,24 166:18,19 168:18 172:20 175:11, 20,25 216:18 223:8,10, 11,19 229:21 234:13 241:2

**team/leader** 36:8,13

**teams** 214:10

**teamwork** 107:5 132:5

**technology** 54:19 151:10

**tecum** 232:17

**telephone** 210:22 211:22

**telling** 31:24 42:7 51:9 103:9 105:4 114:19 152:15,17 186:1 188:9 195:21 234:2

**tells** 72:14 195:12

**ten** 48:5 173:21 174:23 190:5,24 191:10 215:2 221:19

**ten-minute** 173:3,6 230:13

**tenacity** 25:21

**Tennessee** 5:12,14 33:11 178:4 182:22 220:21 221:4,22

**term** 82:1,2 137:7 180:8

**term-** 137:11

**terminate** 114:20 126:9,23 131:20 132:14 138:12 145:11 222:5 231:1

**terminated** 76:14,23 116:1 126:4,12 131:6, 12 135:24 137:4,7 138:1 140:20 173:14,23 186:21,24 187:19 188:4 190:6 219:21,22 222:22

**terminating** 116:22

**termination** 109:10 126:24 130:3,6 138:3 139:15,24 143:4 156:14 170:23 172:22 174:1 187:3 188:5,11 226:24 231:10

**terms** 204:14 205:8,14, 19 206:8

**test** 26:7

**testified** 6:12 7:15 115:23 142:9 241:21

**testify** 7:25 9:11 10:24 11:2 102:25 109:18,19 115:24 151:21 152:25 201:4

**testifying** 142:3 210:8

**testimony** 116:15 142:15 162:2 190:3 199:15 217:19 218:6 225:19

**Theft** 186:4

**thereof** 113:5 131:19 139:15

**thing** 20:11 39:15 50:25 66:7 75:7 86:22 89:7 90:1 96:5 106:16 109:5 122:24 131:9 132:18 163:11 195:24 223:2 224:1 229:1 246:16

**things** 22:3 28:9,10,12 29:2 32:23 34:5 42:6 55:21 58:2,21 59:14 62:19,21 80:3,7,22 86:1,4,8,9,12,19 89:13 90:11 93:13 94:4 95:16 97:23 102:16 108:3 112:25 114:16,25 115:14 120:6,7 129:7 130:7 132:7 133:21 136:16,17 146:5 150:18 156:24 163:7 178:13,14 184:2 186:15 191:19 198:23 204:12 233:13, 15,19 235:2 238:15 241:9,15,19 245:1

**thinking** 22:11,15 29:4 52:18 66:23 68:6,8,19, 21 69:1,11 70:9,12 114:15 115:5 174:14 214:2,3

**thirdly** 241:6

**thought** 8:13 30:22 39:13 67:15 76:18 78:9 80:19 105:13 125:15 161:5 162:11 177:19 190:7 191:2 218:9

**thoughts** 59:6 69:11 72:19

**thousand** 229:6

**thread** 101:12 102:24 103:13,15,25

**throw** 147:21

**Thursday** 91:16

**ties** 25:25 41:23

**time** 5:4 11:14 13:6,10 18:22,23 32:25 37:13 39:10,17 40:2 42:3 43:14 45:4,19 47:11 48:18,22 55:8,25 57:22

58:6,19,20 61:6 65:2 70:1 73:23 77:10,17 81:11,13,21 90:8 100:4, 7 107:3,15 112:17,18 134:23 135:23 145:4,6 156:13 157:18 158:1,6 159:19 163:6,20 164:16,22,23 165:23,24 166:12 173:8,12 176:13 182:7,25 183:8 185:4, 10 187:6 190:8,22 192:7,9 203:7,9,10,14, 15 205:7 208:21 221:6 228:21 229:22 230:17, 20 234:22 238:20 240:22 243:12 245:12, 14,16 246:19 247:19

**times** 55:23 128:25 165:7 166:21 215:15 228:25

**title** 16:2 45:7,8,19 140:15 144:4,5,18 192:5 221:4,21

**titled** 14:22

**today** 5:3,13 7:25 8:2 9:11 10:25 11:5,8,10,17 22:9 52:2 74:1 75:5 81:6 86:13 87:21 99:13 101:6,7 103:1 114:3 116:2,15 117:1 133:9 135:11 137:2 139:5,8 142:3,15 145:21 150:13 151:21 152:20,25 163:1,15 199:15 206:4, 5 208:24 210:8 217:23 224:1 226:13 229:6,11 231:11 232:20,24 233:21

**told** 22:9 23:16 79:22 80:3 81:7,23 89:22 91:14 129:6 131:8 135:10 161:25 169:25 194:12,14,17 196:12,15 198:22 200:6 237:3

**tolerated** 179:6

**tomorrow** 99:13 101:7

**tonight** 125:4

**top** 14:24 16:2 20:4 31:9,15 34:8 47:20

53:3,11 89:10 93:1 100:15 124:25 150:10 161:16 216:10

**topic** 9:1 117:11 126:7 138:8,9 140:17 187:16 204:21 214:21 218:1,5, 9 230:23 232:6

**topics** 8:25 9:9,10,23 10:4,13,25 123:23 151:20

**total** 23:23 24:13 162:5 164:21,22

**touched** 172:11

**town** 7:12 37:16 168:4

**track** 28:10 35:3,5

**tracking** 13:22 181:14

**train** 183:2

**trained** 183:4

**training** 183:2,10,13

**transcript** 246:20,22 247:1,2,14,23

**transition** 70:3,4

**transparent** 87:13

**transpired** 46:16

**traveled** 90:8

**treat** 103:15

**tribe** 61:23

**trick** 47:24

**trinket** 63:8

**trinkets** 62:21

**true** 109:6,19 198:24

**trust** 91:18 112:12

**truth** 186:1

**truthfully** 224:16

**Ts** 115:14

**Tuesday** 5:3 49:25 82:22 171:5 236:11

**turn** 206:19 227:24 228:6

**turned** 9:15 17:5 18:2,4 142:10 184:3 206:13, 21,23 207:10,19 208:3, 4 227:13 228:5 229:24 230:5

**TV** 154:13 179:11

**type** 64:1 69:5,20 123:21 153:9

**typed** 34:7,8 123:14,17

**types** 42:4 43:5

**typically** 123:18 245:6

---

**U**

**Uh-huh** 19:16 32:16 43:22 55:10 75:6 97:14 108:22 167:20 202:25 228:14 243:3 244:8

**uh-huhs** 32:22

**uh-uhs** 32:22

**ultimate** 37:5

**ultimately** 109:2,10 129:21 188:7

**uncertainty** 61:18

**uncovering** 193:11

**underneath** 16:2 237:17

**understand** 11:4 24:23 89:18 108:18 110:23 120:5 128:17,18 160:17 165:20 177:17 226:18 227:1 244:12

**understanding** 210:1

**understands** 116:17 182:21

**understood** 50:18 187:20 217:12 222:16 235:25

**unit** 62:7

**United** 5:10 181:16

**University** 60:19

**unknown** 156:24

123

unknowns 163:5

unprecedented 163:6

unrighteous 186:21

unsure 111:23

unusual 97:17,20

unwilling 225:13

unwritten 180:3

updated 16:11,12,14 71:16

uplift 166:19

upper 14:17

upset 136:8

utilize 104:11

utilized 43:7

---

**V**

verbal 146:3,5 226:21

verbatim 136:6 139:10, 11

versus 5:8 70:4 115:8, 15

vice 82:18

video 5:4,6 13:6,10 14:25 15:10,17,23 16:19,20,21 18:14,21, 22 19:5 41:2,20 43:2,4, 5,12,14,24 44:7,10,22 45:20 46:4,6 48:18 50:25 56:21 57:9,13 58:14 59:2,8,18 60:3,12 63:13,17 92:14,15 100:7 107:22 108:6,11 109:4,7 112:19 124:22 134:19,20 136:19,25 137:20 151:8,9 154:17 164:15,17 166:3 234:15 235:14 237:13,20 247:21

videographers 107:23

videos 43:7,10 61:19 62:4

view 41:22

---

viewing 64:6,8

views 21:23

VII 144:4,5 221:4,21

Vimeo 124:17

violating 242:14

violation 144:4,5 184:16 192:4 221:22

virus 179:5

visit 175:3,5,6

voice 226:22

voicing 163:8,9

volition 158:18

voluntarily 219:20

voluntary 151:6 164:25 165:3,25 176:7

volunteered 103:23

volunteers 57:23 58:4, 8

---

**W**

Waggoner 210:25 211:3 213:15,20 214:4, 13

Wait 107:15

walk 22:18 29:25

walked 209:11

wanted 10:2 12:6 40:3 50:6 59:6,25 68:3 72:3 82:12 89:25 90:22 158:21 175:7

wanting 158:25

warning 146:3,5,6

Warren 134:17,20,25

Washington 40:2

waste 11:13 182:6

watch 62:4 244:20

ways 29:1

website 97:4 180:18,24

---

Wednesday 166:7 245:10

Wednesdays 165:13

week 57:4 65:14 66:5, 10,13 74:13 84:18 93:18,22,24 94:15 96:21 150:12 176:7 207:17 245:8

week's 85:4 122:3,5,8, 10,14

weekend 65:1,8

weekly 68:15,17 70:21 76:7 77:22 93:15,22 94:11 95:1,2,12 96:5 244:16

weeks 59:25 90:5,8 92:4 164:20 165:5,20, 21 166:1,2,3 176:4,5

weighs 102:19

well-suited 38:1

West 39:18,24 40:4,8

white 237:14 238:7 239:10,12,19

wife 33:4,5,9 66:11,18, 21,24 67:8 125:3,6,15, 24 228:12,21,25 229:15,20

win 216:12

winning 36:2

Wisconsin 159:15

wished 80:7

witnesses 195:21 196:13 199:6

wolf 89:6

won 215:2,5,14

wondered 55:5

wondering 61:13

word 51:23 67:4 153:21 162:7,16 166:21 246:12

words 29:22 41:12 72:8 165:19 172:14

work 11:15 22:13 39:9

---

43:10 46:1,4,20 47:9,14 52:24 55:15 57:11,22 58:15,25 63:19 64:6 66:25 71:9,19,21,25 73:5 82:8 86:15,18,23 87:8 90:5,10 92:9 94:3 95:4,6,10,11,17,22,24 97:22 114:1,3 115:15 130:4,11 131:8,11,21 132:2,4 155:6 156:1 157:21 160:14 165:2,21 170:16,21 174:17 176:19 180:21 181:24, 25 182:5,12 183:9 193:13 195:13 205:25 207:5 213:19 214:10 215:1,6,8,17,24 216:2, 3,6,16,22,25 218:15 222:12,13,18,21 233:1, 4 234:4,10,14 238:14, 23

work-from-home 176:16,18,25

work-from-work 177:9 178:25 180:7,8

worked 38:24 39:1,2 42:4 90:3 124:23 151:8, 9 153:6 159:13 175:25

worker 150:22

workers 56:5 154:4,6 177:11

working 17:17 22:14 45:2 56:8 57:15,21 60:20 64:15 80:15 91:3 109:15 110:9,11 111:19 134:6,10 141:16 182:4 214:20 241:6 244:9

workload 94:6 95:10, 11 96:19

workplace 141:8,10 176:17,18,25 180:17, 20,21

works 7:18 23:12 97:25 153:18

world 163:20

worried 66:20 125:3

Wovchko 54:18

---

**wrestle** 92:3

**wrestling** 89:13

**write** 12:14 32:20 96:7
106:17 193:18

**write-up** 106:23 107:1,
2,6

**writing** 138:16 152:19
177:12,15 180:6 183:17
190:14 237:10 239:3

**written** 25:14,17 36:5
75:10 77:5 109:20,23
117:14 139:3 142:11
146:5 177:3,5 180:10,
13,14,17,18 201:3
218:23 225:20,22 226:5

**wrong** 36:15 41:13
51:8 171:18 172:13
184:12 200:13,16
213:23,24 227:4

**wrote** 24:13 25:4,22
166:15 193:19 198:12
234:7

---

**X**

---

**XM** 154:6

---

**Y**

---

**y'all** 48:12

**year** 85:2 101:15,16
103:17 104:8

**years** 11:14 170:6
208:22 215:2 221:19

**yesterday** 12:21

**you-all** 120:18 121:6

**Youtube** 56:18 58:2
151:10 153:13,17 154:5
175:16 179:12

**Yup** 14:11

---

**Z**

---

**Zoom** 17:20,22,25 18:3,
5 32:2,3,7 180:14

246:3,10

Case 3:21-cv-00923   Document 59-1   Filed 01/18/23   Page 90 of 90 PageID #: 1610