# In The Matter Of:

*Brad Amos v.*
*The Lampo Group, LLC, et al*

---

*Video Deposition of Brad Amos*
*September 26, 2022*

---

**nashvillecourtreporters**

Online Scheduling: **ncrdepo.com** | **615.885.5798**

*Original File 2022-09-26 Brad Amos.txt*
*Min-U-Script® with Word Index*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


BRAD AMOS,                    )
                              )
         Plaintiff,           )
                              ) Case No. 3:21-cv-00923
v.                            )
                              ) District Judge Richardson
THE LAMPO GROUP, LLC, et      )
al,                           ) Magistrate Judge Holmes
                              )
         Defendants.          )


-------------------------------------------------------

VIDEO DEPOSITION OF

BRAD AMOS

Monday, September 26, 2022

-------------------------------------------------------

2

APPEARANCES:

For the Plaintiff:        Mr. Jonathan A. Street
                          Ms. Lauren Irwin
                          The Employment & Consumer Law
                            Group
                          1720 West End Avenue
                          Suite 402
                          Nashville, TN  37203
                          615-850-0632
                          street@eclaw.com
                          lauren@eclaw.com

For the Defendants:       Ms. Leslie Goff Sanders
                          Jackson Lewis, P.C.
                          611 Commerce Street, Suite 3102
                          Nashville, TN 37203
                          615-565-1661
                          leslie.sanders@jacksonlewis.com

                          Mr. Daniel Cortez
                          General Counsel at Ramsey
                            Solutions
                          1011 Reams Fleming Boulevard
                          Franklin, TN  37064

The Videographer:         Ms. Cheryl Erwin
                          Erwin Video
                          1013 River Ridge Terrace
                          Nashville, TN  37221
                          615-646-1615
                          cerwinvideo@comcast.net

Reported By:
Jennifer B. Carollo, LCR, RPR, CCR

1           The video deposition of Brad Amos was taken

2    by counsel for the Defendants at the office of

3    Employment and Consumer Law Group, 1720 West End

4    Avenue, Suite 402, Nashville, Tennessee, on Monday,

5    September 26, 2022, beginning at 10:06 A.M., for all

6    purposes allowed under the Federal Rules of Civil

7    Procedure.

8           It is agreed that Jennifer B. Carollo,

9    Licensed Court Reporter, Registered Professional

10   Reporter, Certified Court Reporter, and Notary Public

11   for the State of Tennessee, may swear the witness, take

12   the deposition, and afterwards reduce same to

13   typewritten form, and that the reading and signing of

14   the completed deposition by the witness was not

15   discussed.

16          All formalities as to caption, certificate,

17   transmission, filing, etc., are waived.  All objections

18   except as to the form of the questions are reserved to

19   on or before the hearing.

20   -------------------------------------------------------

21                          INDEX

22   BRAD AMOS:                                    PAGE

23   Examination By Ms. Sanders .........................7

24

25

1                              EXHIBITS

2    NUMBER              DESCRIPTION                    PAGE

3    Exhibit 1    Notice of Unemployment Insurance     21
               Claim Filed, Bates-stamped Lampo
4                0106

5    Exhibit 2    Resume                               42

6    Exhibit 3    Brad Amos - Senior Video Editor -   114
               Schedule for 6/19/2019
7
     Exhibit 4    1/6/2019 Cover Letter to Mr. Willis 120
8                from Mr. Amos

9    Exhibit 5    5/8/2019 Cover Letter from Mr. Amos 122

10   Exhibit 6    Collection of Cover Letters,        154
               Bates-stamped Amos 0010 through Amos
11               0031

12   Exhibit 7    6/28/19 Offer of Employment         154

13   Exhibit 8    The Lampo Group, LLC, Employment    284
               Policies & Procedures, Bates-stamped
14               Lampo 0098 through Lampo 0105

15   Exhibit 9    3/20/2020 Email to Mr. Amos from    302
               Mr. DiCicco, Bates-stamped
16               Lampo 0107

17   Exhibit 10   (Collective) W-2s issued to         314
               Mr. Amos
18
     Exhibit 11   3/18/2020 Text Message between      326
19               Brad Amos and David DiCicco

20   Exhibit 12   4/14/2020 Email from Ms. Johnson to 343
               Mr. Amos
21
     Exhibit 13   COVID-19 Practices & Policies,      345
22               Bates-stamped Lampo 0122

23   Exhibit 14   9/18/2020 "Proceed with caution..." 345

24   Exhibit 15   12/14/2020 "It's just too much now" 347

25   Exhibit 16   "Stay at Home Save Lives" Facebook  348

1                        THE VIDEOGRAPHER:  My name is Cheryl

2    Erwin.  I'm a videographer.  My business address is

3    1013 River Ridge Terrace, Nashville, Tennessee, 37221.

4                        I'm here today to take the video

5    deposition of Mr. Brad Amos at 1720 West End Avenue,

6    Suite 402, Nashville, Tennessee.

7                        This deposition is being taken pursuant

8    to the Federal Rules of Civil Procedure in Civil Action

9    No. 3:21-cv-0923 in the United States District Court,

10   Middle District of Tennessee, Nashville Division.  This

11   deposition is being taken on behalf of the defendant.

12   The case is styled Brad Amos versus The Lampo Group,

13   LLC, et al.

14                        Today is Monday, September 26, 2022,

15   and the time is now 10:06.

16                        The court reporter is Jennifer Carollo

17   with Nashville Court Reporters.

18                        Will the attorneys, please, introduce

19   yourselves at this time, please.

20                        MS. SANDERS:  Leslie Sanders for

21   defendants.

22                        MR. CORTEZ:  Daniel Cortez for

23   defendants.

24                        MR. STREET:  Jonathan Street for the

25   plaintiff.

1                    MS. IRWIN:  Lauren Irwin for the

2    plaintiff.

3                    THE VIDEOGRAPHER:  Mr. Amos, would you,

4    please, raise your right hand so the court reporter can

5    swear you in, please.

6                         BRAD AMOS,

7    called as a witness, having been duly sworn, was

8    examined and testified as follows:

9                         EXAMINATION

10   BY MS. SANDERS:

11   Q.          Would you state your name for the record,

12   please.

13   A.          Brad Amos.

14   Q.          And, Mr. Amos, as you heard the court

15   reporter, my name is -- or the videographer, my name is

16   Leslie Sanders.

17   A.          How do you do?

18   Q.          I'm attorney for both defendants in this

19   case, both The Lampo Group and Dave Ramsey.  With me is

20   Daniel Cortez, who is the general counsel for The Lampo

21   Group.  Have you met Mr. Cortez before today?

22   A.          I actually think I have, actually.  I

23   might -- I believe actually you were introduced at

24   Ramsey Solutions once at an all employee meeting

25   actually.  So . . .

1          But physically, no, I've never actually had

2    words and shared a beer or anything like that.

3    So . . .

4    Q.          Got it.  Okay.  I thought if you had, it

5    was, obviously, not memorable.

6    A.          No.

7    Q.          So --

8    A.          Yeah, I saw your face.  Who?

9    Q.          Yeah.  Yeah.

10   A.          I don't know you.  I don't know you from

11   Adam or Scott.  I understand.

12   Q.          Okay.  So is your full name Brad Amos?  Do

13   you go by any other names?

14   A.          If -- on my driver's license, it would say

15   "Bradley Scott Amos."

16   Q.          Okay.

17   A.          But everybody calls me "Brad."

18   Q.          Okay.  All right.  And what's your address,

19   Mr. Amos?

20   A.          It is 26500 Township Street, Santa Clarita,

21   California.

22              And do you know the ZIP code too?

23   Q.          Yes.

24   A.          91350.

25   Q.          How long have you lived at that address?

```
 1   A.          Ooh.  Not very long.  We moved there two
 2   months ago.
 3   Q.          Okay.  Do you own it or rent it?
 4   A.          I own it.
 5   Q.          Okay.
 6   A.          The bank owns it, but, I mean, you know.
 7   Q.          I understand.
 8   A.          Maybe somebody I'll own it.
 9   Q.          I understand.  Where did you live just
10   before that?  What was your address just before Santa
11   Clarita?
12   A.          2 -- I'm sorry.  I may not know this
13   actually.  It's 21961 -- I could be wrong -- Garnet
14   Canyon Drive -- Avenue?  I'm not sure.  It's also in
15   Santa Clarita, California.  ZIP Code:  91390.  But if
16   you would like, I could find out that information.
17   That was the address we were renting at for a year when
18   we moved out of Tennessee in summer of last year.
19   Q.          Okay.  So those are the only two addresses
20   you have had since you left Tennessee?
21   A.          Since I have left Tennessee?
22   Q.          Right.
23   A.          Yes; that's correct.  Uh-huh.
24   Q.          All right.  So, Mr. Amos, we're here today
25   to take your deposition in the lawsuit that you filed
```

1   against The Lampo Group and Dave Ramsey individually.

2   Just a few ground rules for depositions.  I'm sure your

3   attorney has talked to you about this, but for the

4   court reporter's sake, it's helpful if we don't talk

5   over each other.

6   A.          Sure.

7   Q.          Particularly with masks on sometimes, you

8   can't see when -- I always look at people and

9   anticipate when they're going to talk.  I will probably

10  be the biggest offender of that rule, but I am going to

11  do my best --

12  A.          No problem.

13  Q.          -- to slow down and wait for a response from

14  you.

15          Also for the court reporter, it's helpful if

16  we say "yes" or "no" instead of "unh-unh" or "uh-huh,"

17  you know.  She can't really get those as well.

18          And then you understand that everything that

19  you are testifying today is under oath --

20  A.          Uh-huh.

21  Q.          -- correct?

22          Are you taking any medication or anything

23  that might affect your ability to tell the truth today?

24  A.          No.

25  Q.          Okay.  Have you ever given a deposition

```
1   before?
2   A.          No.
3   Q.          Okay.  Also just as a housekeeping rule
4   because there are two defendants in this case, if I am
5   referring to the company, I will probably say "Ramsey"
6   or "Lampo."
7   A.          Okay.
8   Q.          If I am referring to Dave Ramsey, I will
9   either say "Dave" or "Mr. Ramsey."
10  A.          Okay.
11  Q.          Does that work for you?
12  A.          Yeah; that sounds great.
13  Q.          Okay.  Because it can be a little confusing
14  saying "Ramsey."
15  A.          Yes, ma'am.
16  Q.          Okay.
17  A.          Uh-huh.
18  Q.          So "Ramsey" will be the company.
19              So with those rules in place, let's go ahead
20  and get started.
21              Where are you currently employed?
22  A.          I am employed at a place called "Mocean."
23  It's M-O-C-E-A-N.  So Mocean.
24  Q.          Okay.
25  A.          It's a film advertisement company.
```

1  Q.        How long have you been at Mocean?

2  A.        I started as a freelancer in August of last

3  year, and they most recently hired me on, a full-time

4  employee.

5  Q.        When was that?

6  A.        Ooh.  Not terribly long ago.  Just a few

7  months ago.  I can't give you the exact dates but just

8  a month or two ago.

9  Q.        But now you're a full-time employee?

10 A.        Yeah.  A full-time employee.  I've been a

11 union member of the IATSE.

12 Q.        Okay.

13 A.        The Local 700 since I started working with

14 them and then, you know, accrued enough hours as a

15 freelancer with them, and then now they, you know, so

16 the work performance is good enough, and they were,

17 like, would you go on full time, and we worked it out.

18 So that's where we're at.

19 Q.        So when you say "freelancer," you mean an

20 independent contractor?

21 A.        Sure.  Yeah.

22 Q.        And another -- I guess another way to say

23 that, when you got your tax form for 2021 from Mocean,

24 did you get a 1099?

25 A.        No.

1   Q.          It may have come through the union?  Did it
2   come through the union?
3   A.          No.  Neither.  It's -- again, freelancing
4   and -- is a little -- a little different out in Los
5   Angeles because they -- some things you're W-2
6   employees even though you're actually still freelance.
7   You're -- but other times, it's a 1099.  It varies from
8   company to company.
9               And post-COVID, you know, there's -- there's
10  a lot of different -- different ways people are hired
11  and stuff now.  So -- but as far as freelancing, you
12  know, contract is probably right, but there's no
13  contract.
14  Q.          Okay.
15  A.          I don't know.
16  Q.          But you did not get a 1099?
17  A.          I don't believe so.
18  Q.          Okay.  Where did you work immediately before
19  Mocean?  What was your employer before Mocean?
20  A.          Before Mocean?  What was the Dave Ramsey
21  company?  Ramsey Solutions.
22  Q.          Okay.
23  A.          The Lampo Group.
24  Q.          So no employer in between Mocean and Ramsey?
25  A.          No.  After they fired me, I was unemployed

1    for -- I guess, up until August of 2020.  That's how

2    long it took to find a job.

3    Q.        Okay.  Let's back up just a minute because I

4    thought you said you started at Mocean in August of

5    2021.  Was it 2020?

6    A.        Did I say 2021?  I apologize.  No.  Yes,

7    you're right.  It was -- yeah -- no, because I was

8    fired in 2020.

9    Q.        Right.

10   A.        Okay.  Yes.  So I started in August '21.

11   Yeah.  So . . .

12   Q.        So there was a year?

13   A.        Yes.

14   Q.        Got it.  Okay.  All right.

15   A.        Yeah.  Because I was -- it was July -- yeah,

16   July 31, 2020, and I started at Mocean, I believe

17   August 9, 2021.

18   Q.        Okay.  So in that one year that you were

19   unemployed, give or take a few days, in the year that

20   you were unemployed, did you receive unemployment

21   compensation?

22   A.        Not at first, ma'am.  I -- it's interesting

23   because of -- The Lampo Group apparently said that I

24   had received a severance, which I did not.  And so when

25   I applied for unemployment with the EDD, they had said

1  that I was unable to get it because I had already
2  had -- received a severance, $15,000 from them which I
3  had not.  So I finally -- basically, I had no -- no
4  means of income until 2021, I think it finally -- it
5  was resolved with the EDD, and finally they actually
6  pushed it through.  So sometime in -- actually, wait.
7  I think it was actually this year.  It wasn't 2021.  It
8  was this year actually.  It was in the spring that they
9  finally resolved some of the employment issues, and
10 that they kind of did a backpay on some of the
11 unemployment, I guess.  But that was the only real
12 source of income that I have had.
13          I did a small job for a company called "Mark
14 Woollen and Associates" in February of last year.  But
15 it was only a two-week gig.  So it was like they hired
16 me on as a freelancer to do a job just briefly and
17 then, you know, back to unemployment.
18 Q.      Any other -- any other small projects like
19 that or any other work that you did for compensation in
20 that one-year period?
21 A.      No.  They had -- yeah, it was the -- yeah.
22 As far as a full-time hire or working a forty-hour work
23 week of any kind, you know, it's -- Mocean was the
24 first time -- from Ramsey to them was the first time.
25 It was just that one job that I did with Mark Woollen

1    and Associates and that was only for, like, a week or

2    two.

3    Q.          And you didn't do any other jobs like that

4    one --

5    A.          No.

6    Q.          -- that were, like, two-week projects?

7    A.          No, ma'am.  No.

8    Q.          All right.  Now, back to the unemployment.

9    Where did you apply for unemployment?  In Tennessee or

10   California.

11   A.          Originally in Tennessee because that's where

12   the -- it happened.  The -- eventually, I had to get it

13   settled via California's EDD program, but -- but it was

14   a -- you know, a long -- yearlong affair trying to --

15   it was difficult too because they were closed for

16   COVID.  Their offices weren't open.  It was very

17   difficult to get people on the phone.  But,

18   eventually -- I didn't even find out that Lampo had

19   said that I had received an income -- that I received a

20   severance until it was revealed -- I think it might

21   have been six to eight months.  I finally was able to

22   get an employee on the phone who worked for the EDD,

23   and said, well, the reason is because they say you

24   received money from them, but I did not.

25   Q.          And they told you that Lampo said that you

1   received a severance of 15,000?

2   A.          That's --

3   Q.          Is that right?

4   A.          That's what they said.  They said that

5   according to the documents when they fired you, they

6   gave you a severance.

7   Q.          Okay.  I want to show you a document that

8   you produced or actually that I produced in this

9   lawsuit.

10  A.          Uh-huh.

11  Q.          Mr. Amos, if you would take a look at that

12  document, and there's actually a second page that

13  shouldn't be stapled to it, but that's okay.

14  A.          Sure.

15  Q.          We'll get to that one in a minute.

16  A.          Okay.

17                  MS. SANDERS:  I'll correct it.  Just

18  keep that --

19                  THE WITNESS:  You bet.

20                  MS. SANDERS:  -- John, because we'll

21  get to that one later.

22                  MR. STREET:  Sure.

23  BY MS. SANDERS:

24  Q.          So on this particular document, it says that

25  there was a mail date of March 16, 2021.  It says on

1  here the last day worked was 7/31/2021, but then it

2  says the effective date of claim was March 7, 2021.  Do

3  you see that in the middle of the page where it --

4  A.      Uh-huh.  Yeah, I sure do.

5  Q.      So do you think March 2021, does that

6  coincide with when you moved back to California?

7  A.      No.

8  Q.      Okay.  Had you moved before that date?

9  A.      Yes.

10  Q.      Okay.  When did you move to California?

11  A.      I moved to California in -- let's see.  When

12  did we move?  It was -- I'll have to remember.  Sorry.

13  The house sales, and I think of that.  It was last

14  year.  So it would have been 2021.  Yeah, it would have

15  been 2021.  It would have been August.  July?  August?

16  June?  The summer of 2021.  Summer of last year is when

17  we moved.  Yeah.

18  Q.      So do you --

19  A.      So this would have been filed actually in

20  Tennessee, but the original EDD filing was done almost

21  immediately after I was dismissed.  That was in 2020.

22  It had to be refiled because -- we had to -- after -- I

23  think it was in March when we -- this was around the

24  time when they revealed that I had gotten a severance.

25  They had to refile the whole thing all over again and

1  start over, which was fun.

2  Q.        So do you -- and, again, this document I'm

3  showing to you for identification, you've likely never

4  seen this.

5  A.        Probably not.

6  Q.        So I'm not -- this is just for your use.

7  A.        Sure.

8  Q.        So I'm not asking you to substantiate the

9  document.

10  A.        Sure.

11  Q.        But do you have any idea why the claim

12  transferred to California in March 7, 2021?

13  A.        I don't.  They -- I don't actually.

14  Q.        You don't know?

15  A.        I don't know.  They did say -- you know,

16  because obviously I was, like, well, I -- oh, you know,

17  what.  I think I do actually.  Because they -- okay.

18  Because they say that there was an overlap.  There's

19  actually a -- I'm guessing a period of time -- I'm not

20  an employment expert.  I'm not sure.  But I guess

21  there's a period of time where my unemployment was paid

22  out of my prior employer, which was in California, and

23  so that, I believe, because -- there were so many

24  problems with Lampo and what not, they said, well, we

25  should probably move this out to California because

1    part of your unemployment was paid in from your prior

2    employer.  So we might be able to actually use that,

3    and I think that was the issue and the -- one of the

4    issues that they did to probably -- that might be why

5    it was refiled in March.  I'm guessing.  I was only

6    able to talk to a human once.  So . . .

7    Q.          So did anybody that you spoke with in

8    California tell you that that's why it was transferred

9    to California, or is that just your speculation?

10   A.          I think it's speculation.  There was

11   somebody in Tennessee that said it was going to be

12   refiled.

13   Q.          Okay.

14   A.          They did say -- and it sounds like about the

15   same time --

16   Q.          I got you.

17   A.          -- it would have been refiled.  Yeah.

18   Q.          Okay.  So somebody at the Tennessee

19   unemployment office told you it was going to be refiled

20   in California?

21   A.          Yes, I believe so.  And I believe -- I'm not

22   sure if I had to do anything with it much at all, but,

23   yeah.

24   Q.          And did they tell you -- did the person in

25   Tennessee tell you why it was moving to California?

1   A.        I don't believe so.

2   Q.        Okay.

3   A.        I don't -- I don't recall a conversation

4   like that.

5   Q.        Okay.  Got it.

6   A.        Maybe they did, I don't -- but I don't think

7   so.

8                MS. SANDERS:  Okay.  If you'll hand me

9   that document, I'm going to take the back page off and

10  give this to the court reporter to mark as the first

11  exhibit to your deposition.

12              And she's just going to put the

13  exhibits in front of you.  Oh, I'm sorry.  I'll wait

14  until you're done.

15              (Marked Exhibit 1.)

16  BY MS. SANDERS:

17  Q.        Okay.  I am going to ask the court reporter

18  just to leave the exhibits here in case we refer back

19  to them.

20  A.        Sure.

21  Q.        And then they will be there for you.

22  A.        Sure.

23  Q.        Okay.  So now going back to your job at

24  Mocean, what are your job duties?  Let's start with

25  what's your title?

1    A.          An editor.

2    Q.          Editor?  Okay.  And what are your job duties

3    there?

4    A.          I, basically, cut motion picture trailers

5    for television spots, social media ads.  I do

6    marketing.  I do measure producing on my own as well

7    for major -- all of the major studios whether it be

8    anybody from, I guess, Warner Brothers to Netflix to

9    Disney.  So I create marketing content for them to

10   advertise their movies and television shows.

11   Q.          And what do you -- what's your pay?

12   A.          Currently, I receive -- I'm a hundred

13   dollars an hour.  So about 200,000 a year plus overtime

14   plus benefits now that I'm a full-time employee.

15   Some --

16   Q.          And you --

17   A.          Some through the union and some through

18   Mocean themselves and stuff.  So . . .

19   Q.          So you're still paid by the hour because of

20   the union?

21   A.          That's how it's registered.  You know, I'm a

22   salaried employee, but, you know, I think that they do

23   hourly accruals.  So they understand how -- again, I'm

24   not an employment expert.  So I'm not 100 percent sure.

25   I just know that the numbers all seem to -- to jive.

1  Q.         Let me ask you this, do you get paid the

2  same thing every paycheck?

3  A.         No, I do not.

4  Q.         So it fluctuates?

5  A.         Yes, because of overtime.

6  Q.         Got you.

7  A.         Some -- overtime, double time, triple time.

8  So you -- yeah, there's -- there's very specific rules

9  and partly -- but there were specific rules even before

10 I was in the union about what they can pay and how they

11 pay and, you know, the timeliness of it.

12 Q.         What's the name of the union?

13 A.         IATSE.

14 Q.         Right.  Can you spell that?

15 A.         I think it's -- I may need to look it up.

16 It's I-A-T-S-A-E [sic], I guess.  IATSE Local 700.

17 Q.         Yeah, I think that's right.

18 A.         Yeah.

19 Q.         Okay.  Local 700?

20 A.         I believe that's the local part of it, yeah.

21 IATSE is I-T-S-A-E.

22 Q.         When you --

23 A.         Yeah, I don't know.

24 Q.         When you get paid, do you get a check both

25 from IATSE and Mocean, or does it all come through

1  Mocean?

2  A.       Everything is online nowadays, so -- but I

3  believe it comes from Paycor, I guess, is the payment

4  company, and I'm pretty sure it comes through -- from

5  Mocean's, probably, bank account.

6  Q.       When you received your tax documentation in

7  2021, did you get one from the union or just Mocean?

8  A.       Probably just Mocean.  I haven't filed 2021

9  taxes.  I'm still trying to deal with a lot of the

10  wreckage from that year with unemployment.

11  Q.       Okay.  We'll talk about that some more

12  later, but -- oh, sorry.  We'll talk about that some

13  more later.

14         Okay.  Now, in between your work at Ramsey

15  and Mocean, tell me about your -- your efforts to find

16  a job.  Did you apply for other positions?

17  A.       Yeah.

18  Q.       Okay.  Where did you apply?

19  A.       Many jobs.  I think we turned this over in

20  discovery.  There was a good smattering of them.  But,

21  I mean, there was hundreds of companies.  I mean,

22  everything from, gosh, the Conservation Society of

23  Williamsburg to The Walt Disney Company, Amazon, 20th

24  Century Fox.  I think -- I think there was a company

25  called "Bentkey" out here.  We tried -- which Ben

1    Shapiro just founded.  There was dozens and dozens and

2    dozens and dozens and dozens and dozens and dozens and

3    dozens of places, you know, we tried to get the jobs

4    with.  But during the pandemic, you know, it was very

5    difficult.  Nobody is hiring.  And, you know, my skill

6    set is very specialized as well so -- in being an

7    editor.

8              The country music industry apparently

9    doesn't do a lot of -- as much things here as they used

10   to.  So a lot of those editing positions are not

11   available.

12             And the entire movie industry was closed.

13   You know, I don't know if you can remember how many

14   movies you watched during the pandemic, but it probably

15   wasn't many because it was -- most everything was

16   brought to streaming and stuff, and they weren't using

17   marketing because they didn't know if they would be in

18   existence.

19             But all of the contacts in every single

20   company I think I had back in -- in Los Angeles were

21   all shuddered.  They were closed completely.  They

22   either had people working from home or they were just

23   gone completely.  So some -- some went out of business.

24   There was actually quite a few that went out of

25   business.  And others, they just were not hiring.  And

1  they were idling, and they had no work.  So -- so even

2  the massive companies like Disney and Apple and those.

3  So -- so a lot of applications but not a lot of bites.

4  Q.          Okay.  Let me ask you this.  Let's break it

5  down into Tennessee and California.

6  A.          Uh-huh.

7  Q.          Okay.  And then we'll add on any other

8  states where you might have applied.

9  A.          Uh-huh.

10  Q.          So in Tennessee do you know how many

11  companies you applied to?  You mentioned one.

12  A.          Sure, yeah.  There's -- there's some

13  healthcare companies.  There's some -- there aren't

14  many.  I mean, it was difficult because there were not

15  many that -- I mean, we're talking about trying to

16  find -- you know, if I -- I mean, you couldn't even

17  find a job at Starbucks.  I mean, you know, that's --

18  after the pandemics, I mean, most of those jobs just

19  weren't available.  So there wasn't many that were

20  available in Middle Tennessee and even fewer for motion

21  picture editors.

22  Q.          Let me ask you this.  At the healthcare

23  companies what need do they have for a motion picture

24  editor?

25  A.          They just needed people to cut sizzle reels

1  and things like that.  But you --

2  Q.          I'm sorry.  What?

3  A.          Sizzle reels.  Basically, it's just a

4  promotional document.  It's just for internal use, but,

5  again, most of those jobs weren't available.  So I

6  would apply and wouldn't hear anything.

7  Q.          Were there any healthcare companies

8  advertising during that time for an editor, a video

9  editor?

10 A.          I think there was -- there was one or two,

11 but there weren't many.

12 Q.          Okay.

13 A.          They were very, very rare.  There's not very

14 many jobs period.  So . . .

15 Q.          Do you --

16 A.          But I applied.  I -- hundreds of docs.  You

17 know, because, again, it's -- you know, it's not cheap

18 to live here.  It's not as cheap as I think it was made

19 out to be.  So . . .

20 Q.          Did you apply for the couple of healthcare

21 companies that were advertising specifically for a

22 video editor?

23 A.          If there was a job to -- if there was an

24 editing job to apply to, I applied to it.

25 Q.          Do you remember which healthcare companies

1   were advertising?

2   A.          I don't remember.

3   Q.          Did you get an offer from either one of

4   them?

5   A.          No.

6   Q.          Okay.  All right.  You mentioned a Ben

7   Shapiro company.  What was name of that?

8   A.          I think they're called "Bentkey."

9   Q.          Was Bentkey -- had Ben Shapiro moved to

10  Nashville by then, or was he still in California?

11  A.          He was moving to California -- moving to

12  Tennessee, I think.

13  Q.          So when you applied, was it Tennessee or was

14  it in California?

15  A.          It was Tennessee.  Yeah, uh-huh.

16  Q.          Okay.

17  A.          Yeah.  All of these jobs I applied for were

18  in Tennessee.  In fact, it wasn't -- we ended up having

19  to move to find -- because the difficult thing is a lot

20  of times too when people were going to hire you

21  remotely, you're 2,000 miles away.  So even if there

22  was a job opportunity, you know, they hear you're

23  living in Tennessee, and it's, like, well, that's not

24  going to work for us because, you know, we -- while

25  we're still having people work from home, we want --

1    there's a difficult thing -- you know, when you have a

2    motion picture or a feature, you have a lot of -- lot

3    of media, and it's difficult to move.  So you -- they

4    want to have -- if you have a physical drive or you

5    have a closed system for security purposes, they need

6    to have it nearby.  They can't, you know, taxi stuff

7    2,000 miles over the Internet and stuff.  There's very

8    few companies that are set up to do that.  They are

9    now, but at the time they weren't.  So that

10   necessitated us -- at the end of the day, we could not

11   find any work, you know.  And no companies in

12   California worked with us because we were in Tennessee.

13           I couldn't find any Tennessee companies that

14   would, you know, allow us to do that.  So that's why

15   last year, we ended up moving.  Was it last year?

16   Yeah, because I think it's 2021 is when we moved.

17   Q.        So I just want to make sure I'm following

18   the timeline.  So in 2020 when you were terminated --

19   A.        Uh-huh.

20   Q.        -- by Ramsey?

21   A.        Yes.

22   Q.        You applied for positions in Tennessee that

23   were video editor positions; correct?

24   A.        Yes, ma'am.

25   Q.        Okay.  You mentioned --

1    A.        And also ones in Virginia. I applied to

2    ones in California. And there -- lots of positions

3    applied for.

4    Q.        So originally when you were applying for

5    positions in Tennessee, Virginia, and California, were

6    you looking for remote work?

7    A.        I was looking for any work.

8    Q.        Okay.

9    A.        You know.

10    Q.        All right.

11    A.        I could work -- remote would have been great

12    if they could do it. If they would keep a facility

13    that was, you know, compliant and that would keep

14    people safe, but there weren't a lot of places that --

15    you know, whether that -- that was not a -- a deciding

16    factor, you know, because most of the places just --

17    they weren't even hiring. Just -- a lot of them had

18    shuddered, and they didn't have a lot of, you know,

19    opportunity or potential. So . . .

20    Q.        So did anyone in California offer you a job

21    in 2020, but it was conditioned on you moving to

22    California?

23    A.        No.

24    Q.        Okay.

25    A.        The -- when -- in 2021, I was speaking --

1   began -- the industry was starting to reopen, and so

2   contacts I had with headhunters and people and agents

3   that I worked with previously said, well, things are

4   starting to get a little warmer; things are starting to

5   move; you know, but you living in another state is a

6   problem because, you know, if they do, you know, hire

7   you if it's on site or even it's remote -- because a

8   lot of the editors are all working from home.  I work

9   from home now, you know.  A lot of them work from home,

10  but, you know, again, you have to have, you know, the

11  actual technology with you.  You -- and, I mean, if you

12  have an Internet connection, you can do your job

13  remotely.  It's not a problem.  It's just making sure

14  that -- for security purposes for the footage that they

15  have because a lot of these movies are top secret, and

16  they don't want to, you know, have them leaked, and

17  they want to be able to keep track of the stuff.

18          Though saying that, postpandemic, the MPAA,

19  Motion Picture Association of America, has loosened a

20  lot of security restrictions and stuff understanding

21  that the new way to work is from home, and that almost

22  all -- that entire industry is pretty much remote now.

23  But, again, at the time, it wasn't, and then, you know,

24  again, I couldn't really find a job until I kind of got

25  back.  But once I got back, within two weeks, I found a

1    job.

2    Q.          Okay.

3    A.          So . . .

4    Q.          So there were --

5    A.          And that was -- that was -- actually, I

6    found a job, and -- yeah, I found a job, and then

7    that -- yeah, I found a job, and then Mocean actually

8    hired me away from that job.  You know, so -- and then

9    we applied -- I applied to other places and, you

10   know -- and, yeah.

11   Q.          So Mocean wasn't the first job you got?  You

12   got another job.  You just didn't take it; is that

13   right?

14   A.          They hired me away from it.  Yeah.  Because

15   there was a job called "Rogue Planet."  They wanted to

16   use me as an -- as an editor.  They had seen my resume,

17   and said, I think it would be a good fit, especially if

18   you're in California.  We can bring you in.  You know,

19   we have -- you know, we have kind of like these silent

20   days where they -- they have things set up, and they

21   have a -- they have no crew that work at the facility

22   except for an assistant to kind of run things.  So they

23   bring you in.  You work there.  And you can kind of

24   then send things out to all of your producers and

25   stuff.  So we're going to bring you in and do that.

1          And then Mocean offered a better -- was also

2    another place I had an application to.  And, again, I

3    use the word "application" loosely because it's mostly

4    an agent, you know, moving my reel and my work around.

5    And they had -- they had actually -- they had gotten

6    my -- my material and looked at it and said, you know,

7    we'll hire you for more.

8          And then halfway through even I think a

9    month after that, I had another company that, you know,

10    came and said, hey, we would love to hire you called

11    "Trailer Park."  And they were, like, can we hire you?

12    And they offered full-time work, and even more.  And I

13    didn't leave Mocean.  Mocean decided they would match

14    it and eventually that led to a full-time position so

15    with them matching salaries and things.

16    Q.          So are you saying "Road Planet" or "Rogue"?

17    A.          Rogue Planet.

18    Q.          Like R-O-A-D?

19    A.          No, Rogue.

20    Q.          R-O -- okay.  Got ya.  All right.  Sorry.  I

21    couldn't -- I couldn't understand.

22    A.          Yeah, I understand.  No problem.

23    Q.          So Rogue Planet was the first full-time

24    offer?

25    A.          No.  It wasn't a full-time offer.  These are

1    just freelance positions.

2    Q.          Freelance?  Okay.

3    A.          Yeah.  The way the industry works is usually

4    they will do people on a trial period.  It's, like, you

5    know, they'll bring you in for a few weeks, you know,

6    per project, and then usually hire you for a few weeks,

7    and then at the end of the week, they'll say, great.

8    It was good knowing you, you know.

9    Q.          All right.

10   A.          We'll cross again.  Or it's, like, hey,

11   could you work another four weeks; could you work

12   another four weeks, and they keep extending you until

13   they -- they switch you to a full-time position or not.

14   And so I was -- you know, because I had other companies

15   that were wanting to hire full time, they raced in and

16   said, hey, we'll make you full time.

17   Q.          So did you do work for Rogue Planet?

18   A.          No.

19   Q.          Okay.  You never did that work?  All right.

20               And Rogue Planet, you had to be in

21   California to do that work?

22   A.          Well, we were moving at that point.  When I

23   moved, I did not have a job.  I did not even have a --

24   I did not have any -- yeah, there was no -- there was

25   no job offers or anything yet.  There was just, you

1  know, oh, let's get here.  Let's put you in contact

2  with people, and maybe you can meet with them online,

3  do some Zoom calls, and, you know -- and then see if

4  you're a good fit.  So that -- so when I moved, I think

5  I was still doing Zoom calls, you know, on my phone.  I

6  was -- I remember -- yeah, we were -- we were in the

7  process of moving across country, and I'm still trying

8  to find a job and take calls, but the opportunities

9  were a lot better there.  We noticed already we were

10  starting to get a lot more pings from people that would

11  actually call you back and entertain your -- use your

12  resume and stuff like that.

13  Q.        Can you think of any companies in California

14  by name that told you that you either weren't eligible

15  or couldn't get the job because you lived in Tennessee?

16  A.        Sure.  Probably The Walt Disney Company.

17  Amazon.  Let's see.  Maybe 20th Century Fox.

18            I mean, it's interesting because there's

19  quite a few -- they won't tell you -- they won't tell

20  you that out and out.  You know, they'll just say, oh

21  thanks; thanks for your application.

22  Q.        Sure.

23  A.        We're considering other options.

24            So but, you know, usually the -- the

25  Tennessee address is a -- you know, would -- would end

1    the conversation.  But, I mean, I'm not sure if that's

2    the reason why specifically.  I know agents would say,

3    you know, headhunters say it's a lot easier to work

4    with you if you're nearby; you know, stuff -- just in

5    case they want you to come in house or -- because the

6    way the model -- the business model originally was, you

7    know, everybody came into work, edited, did their work.

8    And you had editors, producers, copywriters, everybody

9    was all working the facility in the same place.  But

10   when COVID happened, the entire industry changed to

11   where now everything is remote or isolated or separate.

12          So what they had now is they would hire --

13   oddly enough, their staffs would all be working from

14   home, and they would have freelancers come into bays

15   that they -- because they have these, you know, dormant

16   bays that were sitting empty, and they would bring

17   somebody in.  And you would be the only person working

18   in the building, and, you know, you'd be there doing

19   what you needed to do and then -- and then sending

20   stuff out to all of producers who are working from

21   home.  And your clients are all working from home, and

22   you would be sending your stuff to them.  So you never

23   really actually have any physical interaction even as a

24   freelancer.  So . . .

25   Q.        Okay.  Now --

1    A.          But because of security purposes, that ends

2    up being the big thing.  It's media -- these movies are

3    just -- they don't want to --

4                        (Interruption for clarification by the

5                         court reporter.)

6                        THE WITNESS:  Have them out and about.

7    In other words, if they're out -- you just don't want

8    risks of it, you know, being leaked online, and things

9    like that.  And they're very concerned about shipping a

10   feature.  You know, the new Chris Malian movie or

11   something, you know, 2,000 miles across the Internet

12   and stuff like that.  You know, so when they can do it

13   on closed systems or local systems is a lot -- you

14   know, it's a lot easier to do it.  But they do -- they

15   do -- they do it.  I mean, you know, they will do it

16   if -- if you're talented enough, and it's important

17   enough because clearly they have editors who are

18   working in Los Angeles and production teams are in

19   Australia, and they're communicating all of the time.

20   BY MS. SANDERS:

21   Q.          Uh-huh.

22   A.          They're sending footage and things like that

23   across.  So, you know, they -- it is entirely different

24   than it was two or three years ago.

25   Q.          Sure.  I understand that.  And so now -- I

1  think you testified earlier that the security

2  restrictions on the motion picture -- what you just

3  were describing -- has relaxed, but it was -- in '20

4  and '21, it was still in flux, I guess; like,

5  everything else?

6  A.         Yeah.  Everything is, yeah, pretty in flux.

7  It's -- but in 2021 was, oh, I can actually get a job

8  and stuff.  So . . .

9  Q.         Right.

10  A.         But between 2020 -- you know, basically that

11  year from summer to summer -- from 2020 -- but I had

12  even looked, you know, in 20 -- early 2020, once COVID

13  started, you know, I'd have friends from Hollywood who

14  would tell me what was going on, and it was bad out

15  there and everybody -- people were getting laid off in

16  droves, and there was no work to be had.

17          So, you know, it was just difficult because

18  it left me stranded.  You know, we had just, you know,

19  sold our house and bought a new one, and we were stuck,

20  you know.  So we couldn't get out.  Even if I had

21  wanted to, you know, go to someplace else, you couldn't

22  go to someplace else.  There was no place to go to.

23  Q.         Do you --

24  A.         In fact, even CMT here in Nashville had

25  closed.  They -- you know, they dropped their marketing

1   division completely.  You know, totally gone.  So . . .

2   Q.        So you did not apply at CMT?

3   A.        I did.

4   Q.        You did apply?

5   A.        Uh-huh.

6   Q.        Okay.  But they -- did they have any open

7   positions?

8   A.        No.  No.  Their marketing team was gone.  I

9   applied with them years prior, you know, and stuff,

10  like -- when we were considering moving to Nashville.

11  So -- and that was -- you know, I had contacts over

12  there.  So we -- things that we would try to keep in

13  the loop to try to, you know, see different jobs.  Hey,

14  this might be better, better benefits; things like

15  that, but we applied to them.  And, you know, after

16  they let me go, I was, like, hey, do you have a job?

17  There was nothing.

18  Q.        Did CMT have any open positions that you're

19  aware of for a video editor in 2020?

20  A.        No.  The -- in 2020, they had gone out of

21  business.  They were gone.

22  Q.        Okay.  And you don't remember the name of

23  the healthcare companies?  You mentioned a couple of

24  them.  You don't remember --

25  A.        They probably are in that stack probably.

1  Q.         Okay.  Of the documents you sent with the

2  letters that you --

3  A.         Yes.

4  Q.         Okay.

5  A.         Yeah.  They probably are.  They probably --

6  some of them may be in there.  I mean . . .

7  Q.         Okay.  I am going to show you the next

8  document that we're going to mark in this case as an

9  exhibit.  This appears to be your resume.

10 A.         Uh-huh.

11 Q.         You can take a minute to look at it if you

12 like.  And the first question I'm going to ask you is

13 if you prepared this?

14 A.         Yes.

15 Q.         Okay.  Do you know when you prepared it?

16 A.         Oh, I don't know.  And if you would like to

17 know what I do in my current job, you can just take a

18 look at the first line.

19 Q.         Yeah.

20 A.         That's probably pretty close.  Well, I would

21 imagine this is probably anywhere prior to 2021 because

22 it has me down at BLT Communications as my -- my last

23 job.  So, you know, it would likely -- yeah, it could

24 have been -- it could have been recent applications.

25 It could have been up until -- any time up until the

1    summer of last year, it could have been done.  It could
2    have been done before that.  This is pretty much the
3    standard, close to my -- my resume, yeah.
4    Q.        So is BLT where you worked right before you
5    came to Ramsey?
6    A.        Yes.  That was the company I was working
7    at --
8    Q.        Okay.
9    A.        -- when I was contacted by Ramsey Solutions.
10   Q.        Okay.  And we'll -- we'll get into all of
11   that.  So Ramsey Solutions is not listed on this
12   resume?
13   A.        No.
14   Q.        So do you list them on your current resume,
15   or is --
16   A.        Absolutely not.
17   Q.        Okay.  So then it is possible this resume
18   was done -- you think it was done after Ramsey
19   Solutions?
20   A.        I couldn't tell you.  It could be.  But
21   probably.  Maybe not.  I'm not sure.  Let's see.  I'm
22   reading it just to see.  (Witness reviews document.)
23             You know, my experience hadn't changed much
24   between deleting Ramsey between 2019 to 2021.  There's
25   no real jobs in between.  It's possible this is one

1  that actually might have been prior or older because of

2  the -- you know, I would have probably mentioned Mark

3  Woollen and Associates.  Even if I only worked for them

4  for a week or two, I probably would have mentioned them

5  in -- in a newer one.  So I would imagine this is

6  probably an older one.

7  Q.        Okay.

8  A.        I'm guessing.  But the formatting is

9  similar.  I bet it's probably older.  I imagine the

10  fontwise -- I would have to look.

11              MS. SANDERS:  Okay.  Let's give that to

12  the court reporter to mark that as the next exhibit

13  which will be Exhibit 2.

14              (Marked Exhibit 2.)

15  BY MS. SANDERS:

16  Q.        Okay.  Mr. Amos, now, you -- when I asked

17  you if you listed Ramsey on your resume that you

18  provided to either your agent or other potential

19  employers after Ramsey, you said "absolutely not."  Why

20  is that?

21  A.        Well, I -- they -- I think they're not the

22  kind of place you would really want to put on a resume

23  honestly.  They're a little bit of an embarrassment.

24  And especially when you see them out and about in

25  the -- you know, the news media today with all of the

1    lawsuits and the bad press.  I -- they're not --

2    they're not a plus when you -- you know, you want to

3    put your best foot forward when you have a resume, and

4    that's probably not the best foot forward --

5    Q.          Uh-huh.

6    A.          -- and stuff.

7               I also notice on my LinkedIn, I get -- there

8    were a lot of Ramsey employees who look at it a lot.

9    And so it is -- there's a little fear factor listing it

10   as well.  So, you know, it's just one of those things I

11   don't, you know, like fanning about too much because it

12   creates a lot of, you know, attention that's, you know,

13   maybe not necessarily the most positive.  And,

14   obviously, it was not a very positive experience.  So

15   it's not -- yeah, it's not something you want to put on

16   your resume and stuff like that.

17              I don't know if Mark Vicente puts he worked

18   for --

19                   (Interruption for clarification by the

20                    court reporter.)

21                   THE WITNESS:  Mark Vicente.  I don't

22   think he puts the NXIVM on his resume and things like

23   that.

24              So it's just one of those things; I

25   don't think you want to put, you know -- yeah.  I don't

1    think it's something that you want to tout.

2    BY MS. SANDERS:

3    Q.          What's the fear factor?

4    A.          Well, it's -- there is -- I mean, I know

5    when I was working there, there was a lot of -- at it's

6    all employee meetings, there was a lot of fear and

7    intimidation.  There was a lot of things where -- were

8    said about former employees there.  A lot of derogatory

9    things said by Dave himself, some slanderous kind of

10   accusations, and, you know, and you realize, you know,

11   that's probably what you're going to go to; you know,

12   you don't want to bring that much attention to -- you

13   know, I don't think it's something you want to talk too

14   much about and stuff like that.

15             So -- and there's -- there's -- you wonder

16   if the people who are looking -- you know, are they

17   casing you?  Are they trying to find out where you work

18   now?  I know he, you know, has a history of, you know,

19   even sending people to people's places of employ, you

20   know, even if they've left.  It's, like, you know,

21   so -- it's just things you've heard; whether they're

22   true; whether they're not.  But they're -- they're

23   things you don't want to take too much of a chance

24   with.  So . . .

25   Q.          When -- well, when did you hear Dave Ramsey

1  or did you hear Dave Ramsey say bad things about former

2  employees?

3  A.          In all employee meetings mostly, you know.

4  I think -- I mean, it probably got the most abusive, I

5  think, after COVID started, after March, between the

6  dates of March 2020 to my time of leaving in July of

7  2020.  It's where, I think, he would address people

8  like Caitlin O'Connor or the Fowlkes or some -- there's

9  other people he hadn't mentioned.  You know, he didn't

10  mention by name, and he would talk about disloyal and

11  that they would sleep around and spread disease.  That

12  they were, you know, not good people.

13  Q.          And you said he would say this at employee

14  meetings?

15  A.          Yeah.  Our all employee meetings.  Every

16  Monday, Dave requires everybody to be in attendance for

17  an all employee meeting where they talk -- supposedly

18  talk about company business.

19              Usually it's a platform for Dave to kind of

20  talk about whatever he's feeling.  Like, if he wants to

21  test out the material for a radio program, or if he has

22  musings that he wants to kind of tell people about.

23  Sometimes you get updates as far as what is going on at

24  the company, how things are going, but they're every

25  Monday.

1          And then they have the devotionals where
2     they require everybody to attend.  It's kind of a, you
3     know, religious speaking meeting that they do where
4     they bring in speakers and that's every Wednesday.  And
5     sometimes those become all employee meetings because
6     Dave has everybody in one place.  So he takes
7     advantage, and -- and if something is -- like, an
8     article has been dropped or somebody has said
9     something, he rushes in pretty quick to -- to talk
10    about it, and, you know . . .

11          And there was a -- a large series of
12    things -- he was in the news a lot, I think.  Whether
13    it's -- it's talking about, you know, saying bad things
14    about tornado victims or whether he would -- somebody
15    had sued him.  I know he was having problems with the
16    Marriott because of their antimask policy.

17          I know he was just very animated and
18    engaged, you know, during that period of time because
19    of COVID.  And so he would have very long-winded rants
20    and screams that he would do.  So -- and inevitably
21    some of these peoples would come up, ex-employees and
22    things like that.  And if they had said anything that
23    wasn't casting the company in the best of light.
24    Sometimes, actually, I don't think even that.  It
25    just -- I don't really know what their problem was with

1   them, but they would say very defamatory things to

2   them -- about them.

3           It was just that kind of, like, culture

4   that -- it didn't feel like that's how it was in the

5   beginning, but, you know, towards the end before I

6   left, that's definitely where it was.  It was kind of a

7   culture of fear and intimidation.

8   Q.          And you thought by listing Ramsey on your

9   resume, they would talk about you; is that what you're

10  saying?

11  A.          Not necessarily.  It's just -- it's -- if

12  any -- you know, you -- you -- like I say, when you

13  have people pinging you, you don't -- strangers pinging

14  you, you don't know, and they're -- you look at their

15  LinkedIn, and they're all Ramsey Solutions employees.

16  You're, like, why are they looking at me?  Why are they

17  looking?

18          So, you know, it's just -- it's a chapter in

19  my life I don't want to -- you know, honestly potential

20  employers or, you know, people I would like to work

21  with, you know, it's kind of first light.  You don't

22  want to -- I don't think they need to hear the burden

23  and war stories and stuff like that from working for a

24  place like that.

25          And like he says, there's a lot of bad press

1   about him right now with all of the different lawsuits.

2   Firing -- you know, he's fired multiple pregnant women,

3   and he's -- you know, he has issues with -- I guess, he

4   fired somebody who came out as gay, and there are

5   lawsuits with those.  And that's garnered a lot of bad

6   press.  And, you know, I don't know if that's the thing

7   that you want to put on your resume.  It's, like, hey,

8   I worked for that guy.  You know, it's first thing you

9   want to say, would you like to hire me?  You know, I

10  worked for this guy.

11          So they, I think, brings up the, does

12  your -- do all your mantras and the things you think

13  about, does it all align with Dave?  It must be because

14  you worked there; right?  So, you know, that's when --

15  that's a concern.  So that's probably not why you'd

16  want to put that on there.

17  Q.      You said something about Dave Ramsey shows

18  up at people's places of employment?

19  A.      Yeah.

20  Q.      Tell me about that.  What does that mean?

21  A.      Well, I -- I mean, I'd have to -- you know,

22  I don't know much about it, but it's online apparently

23  that they had a developer at one time who he was fired,

24  and -- or left the company.  Actually, I don't think he

25  was fired.  I think -- I mean, I don't know much about

1  the story itself, but I have heard that he had left

2  Ramsey Solutions and people showed up at his new place

3  of employment and said that the person was very bad.

4  And I -- I'm not sure if that was -- I would have to

5  look online.  It's -- to find the name.  I think that

6  person did work there at the time.  And there was an

7  all employee meeting.

8         Again, it's hard to tell who he was talking

9  about, but he would say people were disloyal and left,

10  and -- and, you know, Dave would talk about them.

11  Q.         So was it Dave Ramsey that showed up at the

12  developers new place of employment or just people that

13  worked at Ramsey Solutions?

14  A.         Some people that worked at Ramsey Solutions,

15  yeah.

16  Q.         And it's a story that you read?

17  A.         Uh-huh.  Yeah.  Well --

18  Q.         Okay.

19  A.         -- I think that's actually from the people

20  who are ex-employees, you know, that they have their

21  Twitter accounts and stuff that they make public, and

22  they'll talk about, you know, hey, you know, this

23  happened to me.  My husband left, or I used to be an

24  employee there, and, you know, had -- I left there

25  under good terms, and then suddenly, I had people show

1  up at my office and talk badly about me.

2  Q.          What's the name of that Twitter account?  Is

3  it one or is it multiple ones?

4  A.          No, I don't -- I think it's just one.  I

5  don't know off hand really which one it is.  I would

6  have to go look it up and stuff.

7  Q.          Do you follow it?

8  A.          No.  I don't follow any Twitter.  I'm not on

9  Twitter very much, but these things are just things

10  that are found on the Internet.  So . . .

11          And the interesting thing, again, it's one

12  of those -- those things where -- you know, where --

13  I'm sorry.  What were you saying?

14                  MS. SANDERS:  Well, hold on one second.

15  We're going to take a slight break.  Not really a

16  break.  I just want to ask the court reporter

17  something.

18                  (Off the record.)

19  BY MS. SANDERS:

20  Q.          Okay.  So, Mr. Amos, she's having a hard

21  time hearing you.

22  A.          Sure.

23  Q.          So can you speak up a little?

24  A.          Sure.

25  Q.          Okay.  That would be great.  Sorry.  I just

1 noticed her kind of leaning in, so I just want to make

2 sure she gets everything you say.

3 A.          Sure.

4 Q.          So the story about the developer, do you

5 remember his name?

6 A.          No.  I could look it up, though.  It's out

7 there.

8 Q.          Okay.  So it's on a public Twitter account?

9 A.          I believe so.  Well, these are -- you know,

10 a lot of these aren't necessarily -- it was also -- I

11 mean, they are people -- ex-employees and support

12 groups and things like that.  People who have left, you

13 know, Ramsey, and, you know, they post things online

14 about their job experiences; just kind of as a resource

15 to, you know -- you know, deal with not being there

16 anymore and stuff.  And so people will say, hey, these

17 are my personnel stories and experiences.

18          Some people go under COVID is a real issue.

19 I think this person did not.  And so we -- we could

20 find out the name, and we can get it to you, I guess.

21 Q.          Okay.  Yeah.  That would be great.  But

22 sitting here today, you don't know the name of that

23 Twitter account?

24 A.          I can't tell you right off the top of my

25 head, no.

1   Q.          Okay.  And you don't know the name of the
2   developer?
3   A.          No.  Not off the top of my head.  But
4   they -- yeah.
5   Q.          Okay.
6              MR. STREET:  And, Leslie, as he said,
7   we'll -- we'll get that information to you if you
8   really want it.
9              MS. SANDERS:  Okay.  Yeah.  That would
10  be great.
11  BY MS. SANDERS:
12  Q.          Okay.  So now, going back just a minute to
13  the -- you said that -- from -- particularly, from
14  March until -- until July of 2020.
15  A.          Uh-huh.
16  Q.          That's when you noticed most of the
17  commentary or the commentary got worse about former
18  employees; is that right?
19  A.          Uh-huh.  Well, lots of things.  It was a --
20  a lot of topics are covered, but that's definitely
21  the -- yeah, the company was different.
22  Q.          So and you said that you heard those things
23  during the all employee meetings that were once a week?
24  A.          Uh-huh.
25  Q.          Okay.

1    A.         Yeah.  Sometimes.  Sometimes.  And other

2    times, these things would be in our standups or

3    meetings.  They would be brought up by, you know, Luke

4    LeFevre or Lara Johnson.

5              I mean, by that point, I was engaged in

6    these one-on-one meetings, and so I was specifically

7    asked by Lara -- Lara Johnson to engage, you know,

8    find -- Dave would go on rants.  He would talk about

9    things.  I have no idea what about.  And she would say,

10   "What's your opinion about that?"

11             Like, "I have no opinion.  I have no idea

12   what you're talking about."

13             And she would explain.  She would kind of

14   set the table of what event had gone on.  Or this

15   person had gotten fired, and we had paid this person

16   off, and they had posted something negative on a

17   private Facebook account.  And so, you know, we turned

18   around and sued them, or we had turned around, and we

19   had taken away their -- you know, the severance we had

20   given.  We had asked for it back.  Things like that.

21             There was -- it was basically, Dave would

22   say stuff on Monday, and then the -- and when I would

23   have my meetings with Lara, they would basically be

24   reinterpreted, you know, for me.  She would basically

25   say, "Hey, this is what's going on.  Let me tell you

1   what's going on, and this is kind of the spin on that

2   thing."

3          So that was how I got mostly acquainted with

4   the stuff because it's like -- you know, you're -- they

5   implore you not to look online and not to look at

6   anything negative about the company.  Don't go online.

7   Don't find anything else about us.  Don't go looking up

8   random facts online and stuff like that.  That's just

9   all, you know, hack jobs and stuff like that.  And

10   that's how I think -- you know, how "The Daily Beast"

11   article they had about Dave, you know, pulling out a

12   pistol, a loaded weapon, and a -- and the gun was first

13   sold -- you know, it was, like, don't look at that

14   stuff.  If you need -- have questions about it, come to

15   us.  We'll talk you through and figure out what that

16   means and what it's all about.

17          So they're -- you know, a lot of times, I

18   didn't even know about what was going on at this

19   company.  In fact, most of the time I didn't.  And then

20   Lara would tell me what it was about, and then I would

21   have to go look it up and say, "Okay, well, what are

22   you talking about?  What is this lawsuit?  What is this

23   employee?  I don't know -- who are we talking about

24   even?"

25          I mean, I was just trying to do my job.  I

1  was just -- I came there to do a job and -- every day.

2  And I was constantly being asked to weigh in and to --

3  you know, find out, you know, how -- how do I feel

4  about this?  What's my opinion?  And worse, asked, you

5  know, what is my wife's opinion about these things.

6  And, you know, my wife was not even an employee.  So --

7  but that -- her opinion was apparently very important

8  to them.

9  Q.         So was this every Monday in that March to

10 June time frame or July time frame?

11 A.         For the meetings with Lara --

12 Q.         The --

13 A.         -- or are you talking about the all employee

14 meetings?

15 Q.         No.  I'm talking about the all employee

16 meetings that happened every Monday from March to July,

17 in every one of those.  So every week was there

18 commentary about former employees?

19 A.         Not every week.

20 Q.         Okay.  How often?

21 A.         It was -- yeah, it was sporadic.  But it was

22 more frequent.  At least every month, you would -- it

23 seemed like there was -- he was always commenting on

24 somebody they had an issue with; that there was a

25 problem.

1              Suzanne Simms actually -- one of the board
2  members held a rally I think a week or so before I left
3  where they talked about people who are Dave-ish.  They
4  are people that -- you know, they're fans of Dave, but
5  they don't kind of -- they're not all in on his
6  doctrine.  And they're not all in on the way he does
7  things and the fervor of kind of his belief system.
8  They don't quite -- they're like we like Dave.  I like
9  listening to his show.  I like what he has to say, but
10  I don't necessarily agree with a lot of his religious
11  beliefs, his COVID stances; things like that.  So they
12  called these people "Dave-ish."

13              And there was a rally to try to find people
14  who are, you know, Dave-ish and root them out and --
15  that they would be disloyal, and they should be found
16  and basically pilloried, and that was -- received
17  standing ovations and things like that.

18              I mean, there was -- that kind of stuff was
19  more frequent than not.  That's a -- just a very
20  specific example of, you know, kind of the fear and
21  intimidation kind of thing where -- where they're
22  calling out people.  And I'm not sure if they were
23  speaking to direct, specific employees; was that
24  examples.  Were they talking about me?  Were they
25  talking about -- I didn't know who they were talking

1    about.  But there were lots of -- you know, after COVID

2    started in March, you know, I think the -- kind of the

3    corrosiveness of a lot of those speeches had

4    intensified a lot in which I didn't have a lot of

5    understanding of why or what -- what the problem was.

6    But it seemed like it was, and, of course, by this

7    point, I was doing these one-on-ones with Lara, and

8    then she would ask me to -- to weigh in on that.  You

9    know, it was, like, what do you think?  And I'm, like,

10   I don't know.  I don't -- it's not really my business.

11   Q.        Okay.  So let's -- let take one thing at a

12   time in what you just told me about.  So you said

13   Suzanne Simms had a rally?

14   A.        It was an all employee meeting, and she was

15   kind of -- she got to -- now, some of these may not

16   have been all employee meetings.  There was, like --

17   they're mixed in with Devos.

18            I said -- I mentioned earlier, like, any --

19   sometimes Devos started with a religious speaker.  They

20   would usually have an evangelical local priest who

21   would come in.  You know -- well, not priest.  I guess,

22   it would be just a pastor.  They never had priests

23   and -- or rabbis or, you know, anybody from any other

24   religions, you know, in there.  But they did have

25   usually local pastors who are evangelical would come in

1    and speak.  But sometimes Dave would take over, and,

2    you know, he would add on.  Or if that person had not

3    maybe elocuted their point about the Bible or about

4    whatever point he was trying to make, Dave sometimes

5    would clean it up for them.  And say, oh, we're talking

6    about this, and this is how it applies to what's going

7    on at the company right now or about whatever you may

8    have heard.  Especially if there had been an article

9    then -- you know, posted online or whatever.  You know,

10    I -- again, I didn't really go online, you know, very

11    much as far as reading things and looking for things,

12    but they would call attention to these things like the

13    Marriott lawsuit or the Caitlin O'Connor case, and some

14    of these things.  And they would get out in front of --

15    The Nashville Scene had dropped an article or somebody

16    had said something, you know -- you know, on -- gosh

17    what is it?  Like religious news service.  Or I don't

18    know -- some of these -- whatever these were, because I

19    wouldn't even know about them until Dave would mention

20    them in the meetings.

21    Q.        Uh-huh.

22    A.        And draw attention to them, and then they

23    would define what all is being talked about, and then

24    they go from there.  So sometimes that was it.

25              The Suzanne Simms thing that was -- it could

1   have been a Devo, but it was probably an all employee

2   meeting that turned into a rally.

3   Q.          Okay.  So that's what I want to understand.

4   So it was at a weekly scheduled meeting, either a Devo

5   or an employee --

6   A.          Yes.

7   Q.          -- meeting; correct?

8   A.          Right.  Yes, ma'am.

9   Q.          So you said it turned into a rally because

10  there was, like, a standing ovation, and it was to find

11  people that were not -- that were Dave-ish; is that

12  correct?

13  A.          Yes.  That's right.

14  Q.          Okay.

15  A.          Uh-huh.

16  Q.          Did she identify any people in particular?

17  A.          No.

18  Q.          Okay.

19  A.          No.  I think that was -- the effort was

20  like -- the effort was if you know of people who are

21  Dave-ish, report them to your leaders.  If you find out

22  people who are not, you know, on board with what we're

23  talking about here.  If you're one of those people,

24  leave.  There was -- there was a constant refrain all

25  through the COVID era, "If you're not with us, just get

1    the hell out.  We don't want you."  And that was a very

2    big mantra.  You know, "If you don't like it, there's

3    the door.  I can fire you if -- because I don't like

4    your eye color, but I would rather you fire yourself.

5    So get the hell out.  We don't want you here."

6              There was a lot of that kind of stuff from

7    Dave specifically in the all employee meetings, but,

8    you know, the one with Suzanne Simms that -- I think

9    that was -- that was, like, find -- because, you know,

10   I thought they were talking about their fans.  I

11   thought they were talking about people who are doing

12   their debt-free degrees and were trying to get out of

13   debt and maybe they're -- they're not -- were only a

14   half foot in the program, or they want to do -- they

15   want to get out of debt, but they're not totally

16   committed to FP or maybe their not paying their dues or

17   taking the classes or maybe they listen to the radio

18   show, but they're not on board with his book.

19             I had thought maybe that was what they were

20   talking about in the beginning, but I realized later,

21   no, it -- as it went on, they were talking about

22   employees and loyalty and people being, you know,

23   100 percent, you know, behind what they do.

24   Q.        And I realize that happened one week before

25   you left, but are you aware of anyone who was

1  identified as a result of what you called a "rally"?

2  A.          I don't know.

3  Q.          Okay.

4  A.          The day I was fired, they -- we have these

5  creative standups where -- I mean, they just do

6  meetings -- it's a very -- it's kind of -- it's -- I

7  haven't worked in a system like this before that was

8  very corporate where they just do these meetings all of

9  the time.  They have standups and -- and they -- they

10  would do meeting of small individual teams; department

11  meetings of 30 people; standup meetings on every Friday

12  of 200 or so people; and then the all employee

13  meetings.  So constantly, we were always in meetings.

14          And I was -- I think I even said, I was

15  having a hard time getting work done on the documentary

16  because we were in meetings all of the time.

17          And even, you know, one-one-one meetings

18  with Lara and J.B. Waggoner, I would do, like, at least

19  twice a week.

20          But the standups -- I think there was a

21  standup the day I was fired on the 31st, and they had

22  talked about that there were people who were leaving

23  today because of COVID-related reasons.  They weren't

24  ID -- ID'd, but there's -- part of a creative team

25  where they have copywriters and video team members

1    together, and the person who ran -- and I don't know

2    who that was -- I mean, Ramsey has hundreds of people

3    there.  I don't know who that leader was, but that

4    person had said that they were sad because a few people

5    had chosen to leave.

6              So some people were fired.  Some people

7    could have been pressured.  Again, I don't know.  But I

8    do know those people were leaving.  I don't know -- I

9    couldn't tell you if that was a direct result of the

10   meeting.  It -- Lara would tell me in these that it

11   always seems like when they had those kind of meetings,

12   there was an uptick in people leaving.  So they might

13   have been effective, you know, because Dave would say,

14   "Hey, get the hell out."

15             And Lara would say that, you know, we do

16   have an uptick in people leaving.

17             And I do know, like, the -- it did seem like

18   the employee -- all employee meetings were getting

19   smaller as COVID continued and throughout the year

20   because I think we started the year at like a thousand

21   employees, and I think at the time I was fired -- you

22   know, HR would know what the exact numbers are.  But it

23   seemed like the -- there were less people there.  They

24   may have just voluntarily quit or been pressured.  I'm

25   not really sure.

1  Q.        Okay.  The standup on July 1st --

2  A.        Uh-huh.

3  Q.        -- you don't know who the leader was that

4  conducted the standup?

5  A.        Well, Luke LeFevre conducted the standup.

6  He always leads it.  And then -- but I believe the --

7  the person who was talking about people who had left,

8  that was -- she was the -- it was a young lady, and she

9  would be the head of, I guess, the copywriters; you

10  know, that production team.  Because there's two teams

11  together.  They call -- I think they call it creative.

12  We don't have a lot of interaction except for that one

13  day.  Because we're all under the creative umbrella,

14  they would have that other group there and put them

15  together.

16  Q.        Okay.  So it was the lady who was the head

17  of copyright that said a few people have chosen to

18  leave today because of COVID?

19  A.        I don't even know if that's the correct --

20  the word she had said.  That we -- there are people

21  leaving today.

22  Q.        Okay.  And she was sad?

23  A.        That's what she had said, yeah, uh-huh.

24  That's right.

25  Q.        Okay.  Now, back to the -- you made a

1    comment that -- I just want to make sure I get this

2    right.  Were you told not to look up random facts or to

3    look on the Internet about Dave Ramsey or Ramsey

4    Solutions?

5    A.          Yes.

6    Q.          Okay.

7    A.          That is correct.

8    Q.          And when was that?

9    A.          Oh, every -- every other week.  I was told

10   that even before -- before I was hired.  I think they

11   had -- they had said -- I think Kimberly Rudolph had

12   mentioned that.  I believe David DiCicco had mentioned

13   that.  Larry Anderson had mentioned that.  Lara Johnson

14   had mentioned that.  Luke LeFevre had mentioned that.

15   Margaret Kloess had mentioned that in my onboarding.

16   Dave mentioned -- once I was hired, David mentioned

17   that repeatedly; like, all of the time.

18               So it was -- it was kind of a thing:  You

19   don't listen to -- they have a very strict no gossip

20   policy.  Their -- it's one of their commandments that

21   they paint on the walls.  And so the idea was -- is to

22   keep -- I -- when you're first introduced to the

23   company, we -- they made it sound like it's about

24   employees gossiping about each other is the way they

25   made it sound.  You know, much, much later, it became

1   very clear that they mean no, no gossip about the

2   company; don't talk to other people outside of the

3   company and stuff.

4           And Margaret Kloess I think even in our

5   onboarding said, "You're going to lose friends.

6   Friends -- friends and family after this job won't talk

7   to you because we're weird."

8           And I thought that was an odd statement to

9   say, but I think -- I thought it meant because it's

10  like, oh, because we pay for things in cash, and that

11  we're trying to get people out of debt.  And we don't

12  like credit cards.  You know, and that -- that, you

13  know, was very appealing, but I think there may have

14  been something else to that.  I'm not really sure.  But

15  they -- we were told, yeah, that you're going to hear

16  rumors and things like that and they're not true.  So

17  don't listen to them.  You know, if you have questions

18  talk to us.  Lara would talk that all of the time.  And

19  I just think that -- in the meeting, it was always talk

20  to me first before you -- just don't take anything on

21  the Internet at face value.  And, you know, I didn't --

22  again, I -- I don't follow these -- I didn't follow any

23  Twitter feeds.  I didn't follow any particular news

24  services.  I don't subscribe to newspapers or anything

25  like that.  I just kind of just did my job; nose to the

1    grindstone and things like that.

2    Q.          So how did you see these things?  You just

3    saw them after you heard about them in the meeting?

4    A.          Sure.  They were told -- yeah.

5    Q.          Got it.

6    A.          Lara would mention these things, and I have

7    would have to go look them up.  Or sometimes she would

8    have them, and she would show them to me --

9    Q.          All right.

10   A.          -- in the meetings and stuff.

11              And Dave would -- Dave, I think, even

12   sometimes would actually in his all employee meetings

13   have PowerPoint presentations and show the articles and

14   stuff.  So he can kind of dissect and digest and

15   interpret them for you and stuff.

16   Q.          Okay.

17   A.          I -- again, it was interesting because at my

18   hire -- you know, because I had done some research on

19   them just trying to find out about Ramsey Solutions

20   themselves because I -- you know, I heard Dave on the

21   radio growing up.  I was, like, okay, I have heard him

22   on the radio, and I know a little bit about him.  I

23   don't know much about the company.  Are they working

24   out of a doublewide in a parking lot?  I'm not really

25   sure much about the company.

1          So that's when I started looking up stuff

2    online, and it's -- you know, it's a lot of really,

3    really positive things.  You can't find very many

4    negative things at all about the company which is

5    great.

6          I did find one article -- it was a very old

7    article by "The Daily Beast" that -- it was a very

8    bizarre story about, I guess, some Ramsey employees had

9    a private Facebook group and -- where they could kind

10   of talk about, you know, Ramsey Solutions, things at

11   Ramsey Solutions or whatever, if there were problems or

12   whatever.  And -- and, I guess, for some reason, this

13   is -- it made Dave very frustrated.  He didn't know who

14   these people were, and he had offered bounties to --

15   for anybody who could name who these people were.  And

16   for some reason, he decided as a -- to prove his point

17   about disloyalty or whatever, as a prop, he -- he

18   apparently brandished a loaded weapon in the meeting.

19          And, you know, it just sounded preposterous.

20   It was an old article.  And I was like -- that was the

21   only thing I could find that was anywhere negative.

22   And it sounded so -- and "Daily Beast," it's like, oh,

23   I don't know anything about this website.  To me it

24   sounds very fringe.  Probably not true.

25          So I had asked about, you know, that in my

1  interview and stuff.  And that -- people just shook
2  their heads, and said, oh, you'll hear lots of things,
3  but, you know, it's a great place to work.  There's --
4  we have no drama like -- anything like that whatsoever.
5          So, you know, you don't find -- I didn't
6  find lots of -- that was like the one time I think I
7  really was looking specifically for things about the
8  company, and I found that one article.
9  Q.      Do you --
10 A.          And then a week before I left, I had brought
11 up -- you know, because, again, Lara Johnson was very
12 engaged and animated about getting me to -- to
13 understand the culture and say, hey, this is -- this is
14 what we're about.  If you hear bad press, this is --
15 this is what it really means.  This is what it's really
16 about.  This our side.  This is what it's all about.
17         And I had inquired about that article.  And,
18 you know, because you -- I said -- I think I had said,
19 "You hear preposterous things, you know, like 'The
20 Daily Beast' article."
21         And she said, "Oh, yeah, that's a hundred
22 percent true."
23         And I was, like, that's -- I was surprised.
24 And I said, "What do you mean that's true?"
25         And she said, "That's 100 percent true.  In

1    fact, actually, when Dave brandished the weapon,

2    apparently an employee who was in the front row had

3    PTSD and had a fit, and it resulted in a lawsuit."

4            Which I didn't -- didn't read in the

5    article.  This was all her just telling me that.  It

6    sounded horrific.  But -- and then she followed up

7    with, "How does that make you feel?"  And that was a

8    lot of our meetings was:  "Dave has an article that's

9    negative.  Or Dave -- how does that make you feel?

10   What do you think about that?  What does your wife

11   think about that?"

12           And I didn't know why it was important to

13   them, but it was very, very important to know how I

14   felt about these things and to understand these

15   articles correctly.  And so that was one case, you

16   know, that apparently the stuff I had read, and they

17   told me -- you know, I had inquired about it at my

18   interview.  I think specifically I inquired to Larry

19   Anderson and David DiCicco at a dinner meeting at my

20   interview about "The Daily Beast" article, and, you

21   know, "You hear things."  You know, "Is it -- well,

22   that's not true, is it?"  And they shook their heads

23   and said, "No, it wasn't."  Which is difficult because

24   David DiCicco was -- he would have been an employee at

25   that time.  So he would have been there when that

1  happened.  So . . .

2  Q.       Were you ever disciplined for looking up

3  articles about Dave Ramsey or disgruntled employees at

4  Ramsey?

5  A.       Hmm.  That's hard to say.

6  Q.       Did anybody ever say to you, "You're being

7  disciplined because you looked up an article"?

8  A.       Again, that's hard to say.

9  Q.       Well, it's not really.  Listen to my

10  question.

11                 MR. STREET:  Let him answer, please.

12                 MS. SANDERS:  Well, I need an answer to

13  my question.

14                 MR. STREET:  Well, he's going to, if

15  you'll give him a chance here.

16                 THE WITNESS:  Yeah.  It -- I believe I

17  was actually.  Did anybody specifically say, hey --

18  because the difficult thing is I never -- when --

19  during my tenure there, I never was -- I was never

20  written up.  I was never actually -- I never was given

21  any poor performance marks.  I was also told -- because

22  I was inquiring, "Well, hey, how is my job doing?  Is

23  everything okay?"

24                 My KRA, my ninety-day review:  You're

25  killing it.  You're amazing.  Your skills are through

1    the roof.  You're doing a great job.

2              Producers apparently were fighting over

3    me for -- according to Lara Johnson, who is the

4    supervisor of the AV group there.  That you're doing a

5    great job.  You're killing it.  Amazing work.

6              I got rave reviews from Shane Emerson,

7    Leo Gonzalez.  All of the producers who worked with me

8    had done -- had you know, really, really positive

9    things to say.  I never had any really negative

10   thingies.

11             In fact, you know, I think even, you

12   know, like the week I was fired, Lara had said, "You're

13   doing a good job."

14             So I never had anything -- I'm sorry.

15             MS. SANDERS:  You're fine.  Go on.

16             THE WITNESS:  Oh, no; I'll wait until

17   you finish.

18   BY MS. SANDERS:

19   Q.        Nope.  Go on.

20   A.        Okay.

21   Q.        I'm looking at the time.

22   A.        Oh, no problem.

23             The -- but, no, I don't -- there was never

24   any disciplinary, you know, kind of action ever taken

25   or anything like that.

1          At the same time, after March, I guess,

2    16th, the dynamic had changed very differently, and I

3    was now doing these meetings with Lara where I was

4    being inquired about my wife and asked -- and they felt

5    very -- it felt punitive.  But, you know, so what --

6    what it felt like -- like you were in timeout or

7    something like that almost.  But it was -- it did feel

8    disciplinary, but it was never said it was

9    disciplinary.

10         They said they were apparently just -- they

11   had said I wasn't -- I wasn't onboarded correctly, and

12   that I needed to attend these meetings with her weekly

13   and sometimes biweekly, and they continued all the way

14   until the time I left.

15         And so I don't know specifically if that's a

16   form of punishment or not because they were very

17   unpleasant meetings, but, you know -- so specifically,

18   you know, hey, did you -- did you -- you know, you

19   looked up an article.  You're a bad person.  You know,

20   we're going to punish you, no.  But the articles were

21   covered quite extensively, and there was always --

22   there was a heavy inquiry.  Like, "Have you read these

23   articles?"  "Do you know anything about these things?"

24   "What do you know?"  "How do you feel?"  "What is this

25   about?"

1                And, you know, there were times where they

2    said, "Well, I don't believe you.  I don't think that

3    you have the right outlook on these things."  That was

4    said several times.

5                So, again, was I being punished?  I don't

6    know.  Maybe I was.  It's hard to say.

7    Q.           Okay.  But it's your testimony you did not

8    read the articles unless Ramsey brought them up --

9    A.           Yes.

10   Q.           -- is that correct?

11   A.           Uh-huh.

12   Q.           Okay.

13   A.           Except -- except for when I was doing my job

14   hunt.

15   Q.           Sure.  For "The Daily Beast"?

16   A.           Yeah.  I was trying to figure out what -- is

17   this place -- is it what they say?  And all I ever

18   found was "Best Place to Work in Nashville."  "Ten

19   years running."  I think they put it on letterhead.  I

20   think I had heard it -- Dave announced it on his radio

21   show.  He had said that it's the best place to work in

22   Nashville.  We keep -- I think he said, "Oh, we always

23   win this stinking award."  "Every year we win this

24   stinking award"; I think is one of the things he said

25   once.  Because, I mean, it's what you see.  You see

```
1    just basically it's a great place to work, you know,
2    everybody loves it here.
3    Q.          So who said to you "I don't believe you"?
4    A.          Lara Johnson.
5    Q.          Okay.  Anyone else?
6    A.          Lara Johnson was the one who was having
7    these -- are you talking about in -- in terms of the --
8    in terms of the articles?
9    Q.          You said --
10   A.          Specifically to articles?
11   Q.          Well, we can -- we can have her read it back
12   exactly, but you said that you would be asked your
13   opinion how do you feel on an article, and you would
14   say it, and they would say "I don't believe you."
15   A.          Uh-huh.
16   Q.          So I'm asking you who would say "I don't
17   believe you"?
18   A.          Specifically Lara Johnson.
19   Q.          Okay.  Anyone other than Lara?
20   A.          I'm trying to think if Luke LeFevre ever
21   said something like that.
22   Q.          Do you remember specific --
23   A.          Because it does seem, you know, triggering a
24   little bit.  You know, it seems -- it's like a --
25   there's a memory there or something like that, but I --
```

1    I am going to say specifically Lara because she was the

2    one I was in these one-on-one meetings with.

3    Q.        Do you remember specifically what they said

4    they didn't believe?

5    A.        Well, it was a variety of things.  But, you

6    know, are you asking about the articles or what she

7    didn't believe?

8    Q.        I'm asking you, you -- when she said "I

9    don't believe you," what was she talking about?

10    A.        Oh, well, she specifically -- there are

11    multiple times where -- you're forced to do these kind

12    of every week you have to talk to -- you have to put in

13    reports about how things are going in your job or your

14    day and your life.  How do you feel?  How are things

15    going?  And you're required to do these reports every

16    week.

17            And, you know -- and when things are fine, I

18    would say they're fine.  When things are not great, I

19    would put they're not great.  Because if they were --

20    you know, I was -- they were told to me that they're

21    private, and apparently they were being actually shared

22    with upper members of the company being -- you know,

23    they were being shared with your immediate supervisor.

24    Their supervisors, their super -- you know, their

25    heads.  It was being shared with board members and

1  higher -- and all the way up to the top of the company.

2         So you know, there were times that, you know

3  I put everything is -- I think things are going well.

4  I'm doing well with the documentary.  I think things

5  are going well with my job.  I think things are great.

6         And, you know, when I was on these

7  reonboarding meetings with Lara between March and July,

8  there were times where she would say, "Well, I don't

9  believe you.  I don't think that's accurate."  "And,

10  well, how do you -- do you have an opinion about these

11  articles?"

12         Like, "No, I don't have an opinion.  I

13  don't -- I haven't even read it."

14         It was like, "Well, I don't believe you."

15         I was like, "Well . . ."

16         And then I think also -- you know, "I don't

17  think you're" -- some of the most bizarre ones would be

18  about my wife.  They would ask, you know, "How is your

19  marriage?"

20         "I think things are great.  Things are doing

21  fine.  Not much of your business, but, you know, it's

22  fine."

23         And they were like, we -- "I don't believe

24  you."

25  Q.      Okay.

1    A.          As of -- I think, you know, and -- and, of
2    course, when -- when I was fired -- when I was fired
3    with Luke LeFevre, you know, he seemed to disagree and
4    mischaracterize most of everything I said.  So I guess
5    that would be a form of "I don't believe you."  But
6    that one -- I don't know if that -- those words were
7    specifically used.
8    Q.          So the:  You don't have an opinion on an
9    article; your marriage is fine.  Anything else where
10   their response was "I don't believe you"?
11   A.          The specific words "I don't believe you,"
12   I'm going to say just those.
13   Q.          Okay.
14   A.          But, I mean, in terms of suspicion and
15   oddness and gaslighting, there's a lot.
16   Q.          Okay.  So in addition to Luke LeFevre at the
17   termination meeting, what are the other examples of --
18   what are the other times when maybe they didn't say "I
19   don't believe you," but they indicated some suspicion?
20   A.          Suspicion?  I -- I guess I'm trying to find
21   out what you're actually asking.
22   Q.          Yeah.  I'm trying to find out what you're
23   actually saying.  So I guess we're both kind of
24   dancing.
25               All right.  So you said that the response

1    from Lara Johnson would be "I don't believe you" in

2    response to when you'd say you don't have an opinion

3    about an article and that your marriage was fine.

4    A.          Uh-huh.

5    Q.          You also mentioned that Luke LeFevre

6    disagreed with you in the termination meeting.

7    A.          Sure.

8    Q.          Were there other times when you felt like a

9    leader at Ramsey did not believe you?

10   A.          Not usually.  I usually took them at -- when

11   they said -- if they said, "Hey, you're doing a great

12   job"; I tend to believe them.

13              If they said, "Hey, you know, you work

14   really hard.  You do all of these things" -- you know,

15   and sitting there across from Dave or -- Dave Ramsey or

16   David DiCicco, and they say, if you do something for

17   us, and -- if you go out there, kill something, and

18   drag it back, make us some money, we'll share it with

19   you.  You know, and we'll work -- these -- you know,

20   we'll give you raises.

21              I had meetings in November and in October

22   with Lara and Luke and others about, you know, raises

23   and promotions and things like that, and you take them

24   at face value when they say, "Hey, these things are

25   coming.  It's not a problem.  We love what you're doing

1    here.  We like everything that you do."

2              And it's -- it's kind of gushing positivity.

3    And all throughout, you know, 2019 everything is

4    positive; to even 2020, everything is still super

5    positive.  And Lara would be positive in these

6    meetings, but there were times when they would not be

7    positive.  And it was always questions about -- you

8    know, usually my marriage or my feelings about things.

9    And then there were times when they would ask me

10   questions, and they would try to -- try to kind of put

11   words in my mouth.  You know, I wouldn't say things

12   like that, and Lara would say, "Well, I think you

13   actually mean this.  Is that what you mean?"

14             And I was, like, "Is that what you want me

15   to say, or is that what you're looking to say"?

16             The meetings were very odd.  The on -- these

17   reonboarding meetings that we had.  They would usually

18   go into if -- usually go into Dave's opinions about

19   things, the Ramsey way, and how I, you know,

20   interpreted things, and whether or not I was on board

21   with it or not, I guess.

22   Q.        Take a look at what's been marked as

23   Exhibit 2.

24   A.        Uh-huh.

25   Q.        You said to me if I wanted to know what you

1    did at Mocean to read the first line.

2    A.          I -- basically, the first section here is

3    the producer/senior editor for -- yeah, this is

4    kind of, like, what I do day-to-day kind of.

5    Q.          Okay.  And so when I asked you what you do

6    at Mocean, you said you're an editor.  You cut motion

7    picture trailers.

8    A.          Uh-huh.

9    Q.          And you do producing for studios.  That's

10   what you did at BLT?

11   A.          Yes.  Yes.

12   Q.          Okay.

13   A.          And so it's -- these are very similar.  So

14   if you read the -- my job description for my BLT

15   experience, it's very similar to what I did at Mocean.

16   Q.          Okay.

17   A.          Or do at Mocean.

18   Q.          Okay.  Now, let me ask you about BLT.

19   A.          Uh-huh.

20   Q.          You were employed there just before Ramsey.

21   And it looks like you were there for --

22   A.          Almost.

23   Q.          -- 13 years?

24   A.          Yeah, almost 14 years.

25   Q.          Okay.

```
 1   A.          It was 13 and change.

 2   Q.          Okay.  Why did you leave BLT?

 3   A.          Basically, I had become convinced, you know,

 4   through, I think, the meetings that I had had with

 5   David and Kimberly and Larry and -- and Lara Johnson

 6   and Luke LeFevre that there was a really great

 7   opportunity out here to -- they were looking to make --

 8   they told me they were trying to open a new film

 9   division.  They had a documentary they wanted and a big

10   Hollywood editor on.  They wanted somebody who -- that

11   had a lot of -- they were trying -- they had a

12   production team, and they were trying to move it kind

13   of into the 21st century.  They had a lot of

14   inexperienced editors.  They wanted people who could

15   come in and bring a value set and a skill set and help

16   improve the way of doing things there.  And they were

17   kind of on the ground floor.  They were building out.

18   It was -- it was -- the beginning -- the documentary

19   was going to be the first of a series of documentaries.

20   They were going to do -- have a whole film division

21   they were going to open up and start that -- and so it

22   sounded like something very exciting.  Because to -- to

23   move from trailers into features, that's kind of a step

24   up in the career.  And it would be mentoring a lot of

25   people, getting them up to speed, helping -- kind of
```

1    being on the ground level of trying to develop this

2    film department, you know, back in a place where I grew

3    up because I'm from Franklin, Tennessee.

4            So there's -- there's an appeal there as

5    well.  They -- they kind of pushed on how great it is

6    living here.  How much cheaper it is living here.  So

7    there would be basically -- it was also a different

8    work style as well.  They were a very family-friendly

9    environment, you know, that I -- in Los Angeles, the

10   hours are really, really long.  You know, you commute

11   two hours -- at the time when people still commuted and

12   were not working from home, you'd commute two hours;

13   you know, work anywhere from 40 to 60 hours a week and

14   then -- you know, and not see your family so much.

15           And they said, well, we don't have commutes,

16   and we don't have that kind of lifestyle.  We're very

17   family forward and very, you know, good about what we

18   do.  We're family first I think is what they said.  So

19   that had a lot of appeal.

20           And they also had -- they said kind of

21   the -- our value system seems to line up with yours,

22   you know, as far as your -- your feelings about things.

23           So -- so there was a lot of appeal to do

24   that.  And I submit, you know, resumes, you know,

25   somewhat regularly trying to find -- you know -- you

 1    know, find the best place, you know, to work and what's

 2    going to be the best fit for my family.  And it sounded

 3    like it would, you know, be a very, very good thing for

 4    my family because it would be more time to spend with

 5    the family.  It's time to spend with the kids.

 6             And while there would be -- you know, the

 7    salary would be a little reduced, they made it sound

 8    like that's only for the short-term.  Very quickly

 9    we'll get you in a leadership position.  You take

10    EntreLeadership and do these classes.  We'll move you

11    into a larger position, and you'll probably be making

12    kind of close to where you were before.  I mean, but

13    then again, Tennessee is a lot cheaper.  So you won't

14    have to worry about making so much.

15             So there was definitely an appeal to do

16    that.  So with that -- based off of that information

17    that I had, I then thought it might be a good fit even

18    though I had been there for so long.  I was fully

19    vested, and I was making a quarter of a million dollars

20    a year, and I had, you know, it was -- I think at the

21    time, you know, I had done -- I had just finished doing

22    a stint as creative directing there.  So a pretty high

23    end part of the company.  So and that's kind of, you

24    know, the lure and the allure of working, getting out

25    of -- leaving BLT and moving to do something else

1  different, and I had been there a very long time too.

2                      MS. SANDERS:  Okay.  This is a good

3  spot to take a break.  The videographer needs to switch

4  tapes, so five minutes.  Does that work?  Okay.  A

5  five-minute break.

6                      THE VIDEOGRAPHER:  Going -- going off

7  the record.  The time is now 11:28.

8                      (Recess taken from 11:28 to 11:38 A.M.)

9                      THE VIDEOGRAPHER:  We're back on the

10  record.  The time is now 11:38.

11  BY MS. SANDERS:

12  Q.          Okay.  Mr. Amos, we just took a short break,

13  and we're back on the record.  Just as a reminder,

14  you're still oath.

15          Before you went -- before we left for the

16  break, we began discussing your departure from your

17  last place of employment, which was BLT Communications.

18  A.          Yes.

19  Q.          Okay.  Now, when did you first apply for

20  employment at Ramsey Solutions?

21  A.          Probably 2017 --

22  Q.          Okay.

23  A.          -- is a guess.  They probably don't have the

24  records.  It's probably in the discovery or whatnot.

25  But, I believe, 2017.  I think they were looking --

```
 1   it's a part of -- you know, I think as I mentioned, I
 2   do applications occasionally just to see, you know,
 3   hey, what's out there; look around; things like that.
 4   And the -- I think they were looking for a creative
 5   director.  So I had thrown -- I think that's what it
 6   was.  I can't remember honestly.  And it -- that's what
 7   I threw my hat in the ring for, but I think when I put
 8   down that my salary -- which I just put the salary I
 9   was making then at the time was 200,000 as a -- as a
10   creative director, which is commensurate of what you'd
11   make as a creative director, and that kind of said,
12   hey, this doesn't work, and shut it down right there.
13   And that was, I think, on their website, I think.
14              And then there was another application in
15   20 -- it must have been 2019.  Either 2019 or the end
16   of 2018.  Probably 2019 where I was -- I applied -- and
17   I honestly don't remember what the -- if it was for a
18   producer or an editor.  I'm not really sure which, but
19   there was a job posting.  And I might have -- I don't
20   know if I applied for both or which or maybe just one.
21   I'm honestly not -- I don't remember.  The -- but that
22   was a -- you know, again, it's you can go look; poke
23   your head out.  I think I applied to Belmont
24   University, MTSU.  I applied to Bohan, Redpepper, a lot
25   of ad agencies and some stuff over in Virginia; looking
```

1    at the Colonial Williamsburg, you know.  I had also

2    applied to several places in Los Angeles as well,

3    different companies there.  I had applied to Trailer

4    Park and some others just to kind of see what's out

5    there, and you know, see who's competitive.

6             And -- and I got -- in the case of -- you

7    know, my mom had also been diagnosed with cancer as

8    well.  So it was helpful to, you know, just like, hey,

9    maybe we have to make a move.  Let's see what's, you

10   know, going on in Nashville.  Everybody says it's a

11   great place to work; great place to live.  That's where

12   I'm from, so let's take a look, you know.  And then so

13   we looked, and sent stuff out.  Didn't hear anything

14   back; didn't think anything of it.

15            I think Allison Bible, who was one of their

16   recruiters or whatever, had reached out, and said, hey,

17   we have got -- it was a while after I had applied too.

18   Reached out, and said, hey, we got this application.

19   We think you'd be great for --

20            Is the audio a little better?  Is that --

21   I'm trying to project.  If I sound angry, I'm not

22   angry.  I'm just trying to be louder.

23            She had said that I would -- hey, we got a

24   resume a couple of months ago; you know, I don't think

25   you'd be good for this position, but there's another

1   one we would like to forward you on to.  We think you
2   would be great for.  You know, would you mind -- I
3   don't know if she asked me to reapply or to change the
4   application for something else.  But it was reentered
5   and then that's when -- I was reached out -- Kimberly
6   Rudolph reached out to me, and said, "Hey, we're real
7   excited to get your resume.  You're exactly what we're
8   looking for."  You know, "Would you be interested?"
9           And it was, like, well, I would be happy to
10  talk with you, and that's kind of how it was in the
11  beginning.  It was very -- it's just very
12  conversational because at the beginning, you just get
13  somebody out of the blue that calls you, which isn't
14  usually done.  Usually it's -- for some of the -- in
15  Lara Johnson, you get jobs mostly through, you know,
16  personal contacts and things like that.  So, you know,
17  a lot of times if somebody is interested in you,
18  they'll take you to lunch or anything.  This is weird
19  because it's so much farther away.  And I didn't quite
20  recognize any of the names in the beginning.  Who is
21  Bible?  Because it shows her phone as Bible.  But --
22  but, yeah, then they referred it, and then it got to --
23  they started moving through the whole processes of
24  application and me feeling them out and them feeling me
25  out, and they liked what they saw and kind of did a

1  sales pitch.

2  Q.        So during your employment at BLT, how often

3  would you apply for other jobs to see what was out

4  there?

5  A.        It depends.  That company.  They had gone

6  through a lot of changes.  And it's -- it's one of the

7  things -- it's kind of how -- they had a lot of

8  turnover in my department, and that's how I had become

9  a creative director there because the previous creative

10  director had left.  And so it was doing a lot of work,

11  you know, where you're, you know, in charge of getting

12  work, working with clients, dealing with the employees,

13  all of the issues that you have there as -- as far as

14  managing and working with people who are younger than

15  you, very diverse skill sets, and trying to get

16  products and things created on time, time schedules,

17  budgets, the whole nine yards.  So I've been doing that

18  for a while.  And usually when there's, you know, a

19  turnover like that, you know, that's usually when

20  you -- you look around and say, hey, what else is going

21  on out there.  Because you know, there's -- is this

22  company going to be around?  Because sometimes they

23  fold very quickly.  You don't see the end coming.

24            So you always need to be taking lunches, and

25  you always need to be talking to people and finding

1    out, hey, what else is out there?  Am I maximizing

2    what's best for me and my family?

3             You know, my son has Coat's disease.  And

4    it -- Coat's disease is a disease that causes -- could

5    cause enucleation of the eye.  Enucleation.  I'll jut

6    pronounce it.  So the -- and it could cause blindness.

7    It's very serious and requires, you know, a lifetime of

8    expensive check-ups to Children's Hospital in

9    Los Angeles and also surgeries.

10            So when you -- you want stability, and you

11   want what's best for your family, and you want to make

12   sure that you're going to have -- you know, obviously

13   the material things that you need for them as far as

14   salary.  But you also want to make sure that you have

15   what's best; you know, as far as me being present, you

16   know, drama-free, as I think I keep saying but, you

17   know, living in -- living in an environment that where,

18   you know, work doesn't come home with you.  The

19   stresses don't come home with you.

20            And so you're always saying, hey, is this --

21   would this company be a better fit?  Would it allow me

22   more -- less -- a shorter commute?  Would this be a

23   higher salary?  Would this be a better location?  So

24   that is something that was done quite often.

25   Q.       Okay.  So we know that you applied for other

1   employment in 2017.  Do you think you applied for other

2   employment before then while you were at BLT?

3   A.          I don't think so.  The -- I'm not sure.

4   Q.          Okay.

5   A.          I won't be able to tell you one way or the

6   other.  I'm -- that does not sound familiar.

7   Q.          Okay.

8   A.          It sounds -- it sounds like there were

9   two -- two times that there was application made and

10  there was another time where they -- an application was

11  made.  I think it was 2017, 2019.  And 2019 was split

12  apart into a lot of different things because I think --

13  I don't know.  It probably looks like I applied, like,

14  17 times or something like that.  But I think it was

15  they -- because I know that we were asked -- I think it

16  was like -- you weren't just applying for one job.  You

17  were applying for two.

18  Q.          Right.

19  A.          So it was, like, split up, and then it --

20  and then they asked me could you apply -- send it over

21  again.  And then I think they had sent over their stuff

22  over internally too.  I don't quite know.

23  Q.          Okay.

24  A.          Their processes was very different because,

25  I mean, it's, like, a ninety-day review period where

1  you have to submit, you know, budgets and then spousal

2  interviews, and you know, and Zoom meetings with your

3  wife and lots of different things that are very

4  unusual.  So I obviously don't quite --

5  Q.        Okay.  Let me -- let me clarify the question

6  because it -- I think you misunderstood me.

7  A.        Oh.

8  Q.        And I probably didn't say it --

9  A.        Well, it's okay.

10  Q.        -- clearly.

11  A.        I apologize.

12  Q.        So I'm not just talking about applications

13  to Ramsey.  What I mean is at BLT?

14  A.        Sure.

15  Q.        When did you start -- I know that you

16  applied in 2017, but did you apply before that to other

17  places?  Not just Ramsey, but anywhere.

18  A.        Oh, yeah.

19  Q.        Okay.

20  A.        Yeah.

21  Q.        And do you know when that -- when you first

22  applied for something new?

23  A.        Oh, God, I don't -- probably every other

24  year.

25  Q.        Okay.  Got ya.  That's what I -- that's what

1    I was asking.

2    A.          Yeah, all of the time.

3    Q.          Yeah.  Got ya.

4    A.          It's -- you know, and let me be clear how --

5    what that means.  Applying to another company in the

6    entertainment industry is not a traditional, hey, let

7    me write-up a resume.

8    Q.          Right.  I understand.

9    A.          Send it to you.  Basically, it was, like,

10   you -- somebody said -- would call you up, and say,

11   hey, I'm meeting with somebody -- I'm having lunch

12   here.  Do you want to get together?

13   Q.          Yeah.

14   A.          That was an interview.  And interviews

15   typically -- you know, they don't discuss salaries.

16   They just discuss what projects you have worked on

17   prior and what clients you have had prior or actually

18   who you know.  And that allows you -- them to set you

19   in tiers of, like, oh, you're an A lister, B lister, C

20   lister.  And it's really -- the lunches are there just

21   to get to know you.  It's, like, hey, are you a cool

22   person I could work with because, you know, if they

23   know you've worked on projects, they know the skill set

24   is there.

25                    So, typically, that's where a lot of the

1  applications were, so to speak.  Occasionally there was

2  one where it was, like, oh, you would apply, and you

3  would apply to -- you know, in -- with a resume and the

4  whole -- usually to a studio position.  They would need

5  that for a studio.

6          But as far as, you know, I think from the

7  time -- I think with BLT I was a freelancer for the

8  first -- they had forgotten I was a freelancer and had

9  forgotten to hire me full time.  So it was several

10  years in the beginning when I was just freelancing, and

11  so you never knew if you're -- are you going to keep

12  working.  So I probably put out a lot of resumes and

13  applications then.  When I went from Intralink Film to

14  BLT, but, you know, they liked me, what I was doing so

15  much.  I mean, you know, we had a good relationship.

16  So . . .

17  Q.      Do you think you applied or networked with

18  anyone in Nashville before 2017?

19  A.      Some.

20  Q.      Okay.

21  A.      Yeah.  I would have.

22  Q.      And do you remember when that was?

23  A.      Oh, just -- I don't.  I know with -- I

24  had -- I had a friend who worked -- an associate who

25  worked at CMT.  And -- you know, and so I had talked to

1    them.

2            I have, you know, friends and family who
3    live here.  So I had talked to them about certain
4    things just because it's, like -- you know, your
5    network is -- is who you know.  So you ask them, hey,
6    what's -- what's going on with you and stuff.  But,
7    yeah.

8            And I -- but I don't think any formal
9    applications so much.  Occasionally.  But I don't
10   think -- I don't think it was quite as much as when I
11   was living in Los Angeles because Los Angeles that's
12   kind of where I was -- I was -- the feet were set.
13   Things were doing well.  And, you know, I was fully
14   vested in the company.  And so if you get shifty feet
15   to try to move someplace else, it's usually you're
16   going from one sure thing to another sure thing.  So
17   when -- you know, it makes it sound like, oh, you apply
18   all of the time; you're just being flighty.  Oh, I'll
19   take whatever.  It doesn't matter.  A job is a job.
20   But, no, usually these jobs are very long-term
21   positions.  You know, they get you in and you --
22   your -- your feet get set, reset.  And so, you know,
23   it's a pretty big deal.

24   Q.        You -- you mentioned that your mother was
25   diagnosed with cancer?

1  A.        Breast cancer.

2  Q.        And I'm -- she still lives in Tennessee?

3  A.        She does.

4  Q.        Okay.  And so was that when you started

5  looking at things in Tennessee?

6  A.        No.  But it -- like I said, I think I might

7  have -- probably more specifically, yeah, geared to

8  Tennessee.  Is Tennessee even an option if -- if you

9  wanted to leave BLT, and you wanted to go to someplace

10 else, would you go someplace else or would you stay?

11         And I think we had even determined probably

12 even despite my wife's -- my mom's diagnosis -- she was

13 doing pretty well.  And we were, like, well, maybe

14 we'll just stick it out here in California.  It was

15 important -- because the thing is that -- I'm trying to

16 recall the conversations that we had, but -- because we

17 applied to other places, kind of look around and see

18 how -- but I think at the end of the process, you know,

19 I think when she first especially got diagnosed, we

20 had -- hadn't gotten any nibbles or any bites or

21 anything, and it didn't sound like all of the jobs were

22 great.

23         And we know on the flip side, you know, we

24 have these, you know, appointments that we have to do

25 with Children's Hospital with my son.  And the idea is

1   would you be able to do these same appointments in

2   Tennessee?  The medical system is not as robust for

3   dealing with Coat's disease as it is in California.  So

4   would you be able to still do that?  So I think we --

5   you know, that might have been one of the factors.

6   Like, well, you know, if we're here, we're here.  You

7   know, we've got 401(k).  You've been vested.  You --

8   things are going well.  It would be nice for a

9   different change of scenery, but unless it's, you know,

10  a sure thing, you know, let's stick where you are.  And

11  then, you know, we got contacted by Allison and, you

12  know, and it sounded -- kind of said everything I

13  needed to hear, and it was almost too good to be true.

14  Q.        Okay.  You -- you keep referring to "we

15  applied."  Who are you talking about?  I know you but

16  who is the other --

17  A.        Well, you know, if you're going to drag your

18  family, you know.

19  Q.        Okay.  I just wanted to make sure I was

20  clear.  So you're talking about your wife?

21  A.        Sure.  Yeah.

22  Q.        Okay.

23  A.        Yeah.  You don't do -- yeah.

24  Q.        All right.  So -- so do you remember when

25  your mother was diagnosed with cancer?

```
 1   A.        I don't.  She -- she's a survivor.  So I try
 2   to think of where she was at in her -- she, I think,
 3   had been diagnosed several years prior -- well a year
 4   or two prior.  It was -- the -- the treatments were
 5   long.  So I think -- I think at that time we would have
 6   been in the back part of chemo maybe.  So -- the out of
 7   the woods, but where it could be -- it could come back
 8   at any time kind of thing.
 9   Q.        So you mentioned Belmont, MTSU.  I think you
10   said "Bowam"?
11   A.        Bohan.  Redpepper.
12   Q.        Oh, Bohan?
13   A.        Yeah.
14   Q.        I'm sorry.  I misunderstood you.
15   A.        Yeah.
16   Q.        And Redpepper.  Were those all in Tennessee?
17   A.        Yeah.  These are all Tennessee places.
18   Q.        Okay.  And when did you apply there?
19   A.        Yeah, CMT.
20             Oh, the same thing as the Ramsey thing
21   probably would have happened.
22   Q.        2017?
23   A.        No.  These are, I think -- no, this would
24   have been '19.  It would have been '19.  So it must
25   have been -- yeah, '19.
```

1  Q.        So --

2  A.        I think -- yeah.

3  Q.        -- was 2019 -- it seems that you made a more

4  concerted effort in Tennessee.  Was there any reason

5  for that?

6  A.              No.  Well, I had mentioned the L.A. ones.

7  It was actually pretty concerted efforts in

8  Los Angeles, and there's also -- there were some --

9  some ones in Williamsburg as well.  I think my wife

10  likes Colonial Williamsburg.  We have done lots of

11  vacations there.  They -- you just have the video teams

12  and editing things, we had applied there.

13              In Los Angeles, you know, I applied for

14  positions at Amazon.  They were a client, and Prime

15  Video.  I had done several applications, I think, at

16  Trailer Park.  Other competitors with us that could

17  offer the same amount of, you know, stability and --

18  you know, as far as their benefits and packages.  They

19  would be very similar to what I had.  So there were

20  quite a bit of, you know, L.A. back and forth as well.

21  So . . .

22  Q.        So any geographic locations other than L.A.,

23  Tennessee, and Williamsburg?

24  A.              No.  Those are the ones we were most

25  familiar with.

1  Q.        Okay.  Were there any others that you

2  applied to?  Do you remember?

3  A.        I don't know.  I don't think so.

4  Q.        Okay.

5  A.        Maybe.  I mean, are you talking about jobs

6  or just in different areas of the country?

7  Q.        Different locations in the country.

8  A.        No.  I don't think so.  The things that --

9  the things we had familiarity with.  You know, kind of

10  like, oh, just put your hat in the ring and see what

11  happens with this stuff.  And, you know, and then I

12  think at that point, we were pretty content with

13  sticking where we were.

14  Q.        So was it normal for you to apply to that

15  many places all at once?  I mean, was that a frequent

16  thing that you would do out of state?

17  A.        It depends.  Not out of state.  No.

18  Sometimes.  It -- you know, again, Tennessee and I'm --

19  you never know.  This could have been I watched an

20  article about -- you know, had a friend -- talked with

21  a friend that said, oh, man, things are popping in

22  Nashville and things are great, and -- or maybe, you

23  know, visiting friends or family and hearing how things

24  are going there.  It's always -- you know, Nashville is

25  always on the list of places to live.  People seem to

1    like it.  So it may have been something that would have

2    been, you know, mooted at the time.  Maybe that's why

3    it was added to the list of places to investigate, and

4    think, oh, hey, maybe this is -- this is what you want

5    to do.  So, yeah.  So maybe.

6    Q.        Was there anything going on at BLT in 2018

7    or 2019 that made you look for other work?

8    A.        Well, except for what I said.  They had a

9    turnover.

10   Q.        Right.

11   A.        The prior boss had left, and I had -- was --

12   I had to step up from being a producer/editor to a

13   creative director.

14   Q.        Okay.

15   A.        So . . .

16   Q.        And that was in that time frame:  The

17   2018 --

18   A.        Probably, yeah.  I imagine so.

19   Q.        Okay.

20   A.        I think -- I think in 2019 -- 2018?  Yeah,

21   2018, I was creative director, I think, until they

22   brought in somebody who had, like, a larger book of

23   business that could take over.

24   Q.        Mr. Amos, do you have any -- any

25   applications of employment or letters or communication

1   that you had with potential employers in 2018, 2019

2   area?

3   A.          Maybe.  I'm not sure.

4   Q.          Okay.  Have you looked for those?

5   A.          No.

6   Q.          Okay.

7   A.          I could probably find them if I wanted to go

8   look.

9   Q.          Sure.

10  A.          But I haven't -- haven't had -- it wasn't

11  necessary.

12  Q.          You have a -- an address, an email address

13  brad@amosfilm.com.  Is that still active?

14  A.          It is.

15  Q.          Do you still have that?  Okay.

16              When you would apply for other positions

17  while you were at BLT, is that the email you would use?

18  A.          Yes.

19  Q.          Okay.  And you still have that?

20  A.          Yes.

21  Q.          And do you still have access to emails on

22  brad@amosfilm.com?

23                  MR. STREET:  Objection.  That's --

24  these emails have nothing -- those were emails before

25  he worked at Ramsey.  There's -- we're not going to get

1  into his emails about what he had sent before he went

2  to go work for Dave Ramsey or Lampo.

3            MS. SANDERS:  Okay.  Your objection is

4  noted.  I'm going to ask him the questions.

5  BY MS. SANDERS:

6  Q.        So do you still have brad@amosfilm.com?

7  A.        Yeah.

8  Q.        Okay.  And so do you have access to all of

9  the emails on brad@amosfilm.com?

10 A.        Maybe.

11 Q.        Okay.  Do you know how far back they go?

12 A.        I don't.

13 Q.        Okay.  All right.  Now, when you applied at

14 positions in Tennessee, and you've listed a few, and I

15 want to make sure I've got a complete list of that.

16 You said Bohan, Redpepper, MTSU, Belmont, and Ramsey

17 Solutions.  Any others in Tennessee that you can

18 recall?

19 A.        Probably.  No.

20 Q.        But you can't recall today?

21 A.        Yes.

22 Q.        Right.  But you think there are some others?

23 A.        There might be, yeah.

24 Q.        Sure.

25 A.        I'm not sure.  I mean, again, this is not,

1    like, a -- yeah.

2    Q.         Did you get any offers from any of those?

3    A.         No.

4    Q.         Okay.  Is Ramsey Solutions the only offer

5    you got in Tennessee?

6    A.         Uh-huh.  That's right.

7    Q.         Is that a yes?

8    A.         Yeah.  They were the ones that reached out.

9    Uh-huh.

10   Q.         Okay.  And let's talk about that.  You said

11   they reached out.  When did they reach out to you

12   first?

13   A.         I don't know.  Allison Bible.  Sometime in

14   the spring of 2019, they reached out.  I know Kimberly

15   Rudolph was involved, and they were -- most of the

16   communications with her was all in May.

17   Q.         Did anybody from Ramsey Solutions reach out

18   to you in 2017?

19   A.         Maybe it might have been a bot.  I'm not

20   sure.

21   Q.         Maybe.  Did you apply for a position in

22   2017?

23   A.         I think we did.  I'm not sure.  I think it

24   was a while ago.  And I think that might have been the

25   one that I said about the creative director bit.

1  Q.        Okay.

2  A.        That might have been it, if I can -- if I'm

3  remembering clear.  I'm not sure if it is.  And that

4  was just, you know, kind of on a lark, and I think they

5  said that, hey, your -- your salary demands are way too

6  high.  Forget it.  But I don't know, again, if that was

7  a bot or a person.  That was a long time ago.

8  Q.        Did anybody at Ramsey Solutions ask you to

9  apply in 2017?

10  A.        I don't recall.  I don't think so.  Maybe.

11  I don't know.

12  Q.        Do you think Ramsey Solutions approached

13  you, or did you approach Ramsey Solutions first in

14  2017?

15  A.        In 2017?

16  Q.        Yes.

17  A.        I don't recall.  I don't know.

18  Q.        So you mentioned that Allison Bible reached

19  out to you.  Is that the first person you remember

20  reaching out to you from Ramsey Solutions?

21  A.        As far as I can think, yeah.

22  Q.        Okay.  In 2017 when you applied for what you

23  think might be the creative director position -- and

24  that's a position you saw online; is that correct?

25  A.        Yeah.  Right.  Yeah.

1    Q.          Okay.

2    A.          It's a -- and it's -- you'll find it on

3    their job -- their job boards or whatever and stuff

4    like that.  And I think they -- I think they even get

5    mailed -- emailed to me.  If you get -- if you're on a

6    job service or things like that, a lot of times, they

7    will just pop up in your email; you know, they will --

8    they will be sent to you.

9    Q.          Is that what happened?

10   A.          So you -- I don't think -- perhaps.  I don't

11   know how, you know, it came across my desk.  It's

12   possible.  I don't know if it's like me looking or if

13   it's, again, one of these automated things where they

14   keep sending out.  You know, they're very active in

15   recruitment.  So -- as I've learned.  So -- because,

16   you know, it's also possible I was just getting these;

17   you know, not like spam, but you get them so many times

18   on a job thing, and you're, like, oh, I'll click that

19   one.  That sounds interesting.  Let's do that.

20   Q.          So when you say they are active in

21   recruiting, are you talking about Ramsey Solutions?

22   A.          Yes.

23   Q.          So you think it's possible Ramsey Solutions

24   was automatically sending things to you?

25   A.          Or maybe -- or -- or it was the job service

1  that were -- they were a part of.  I think they're on

2  Glassdoor, Indeed, Monster.  They might be -- you know,

3  their automated services might be doing it.

4  Q.        Okay.

5  A.         That they put themselves in.  I mean,

6  they've -- you know, they have lots of different

7  things, and they link -- that links back to their

8  website, you know.

9  Q.        So do you think that Ramsey Solutions used

10  those automated services to target you?

11  A.         I have no idea.  I couldn't speak to what

12  their -- what they were planning or what their ideas

13  were.

14  Q.        Okay.  Do you believe that Ramsey Solutions

15  was specifically asking you to apply for a job in

16  20,017 --

17                MR. STREET:  Objection.

18  BY MS. SANDERS:

19  Q.        -- 2017?

20                MR. STREET:  He said he didn't know

21  what Ramsey was doing.  He has no way of knowing what

22  Ramsey was doing.

23                MS. SANDERS:  What's your objection?

24                MR. STREET:  That he's asked and

25  answered and told you, and you're asking him things

1  that he would have no knowledge of.  You're asking what

2  Ramsey would -- was doing.

3            MS. SANDERS:  Uh-huh.  Well, actually,

4  I was going --

5            MR. STREET:  You can ask your client

6  that.  Not my client.

7            MS. SANDERS:  Well, I actually asked

8  him what he believed.  So I'm going to ask that again.

9            MR. STREET:  Well, again, I believe --

10 BY MS. SANDERS:

11 Q.        If -- do you believe --

12           MR. STREET:  Objection.  Asked and

13 answered.  This question calls for speculation.

14           MS. SANDERS:  I haven't even asked the

15 question.

16           MR. STREET:  Well, if it's a repeat of

17 the last question --

18 BY MS. SANDERS:

19 Q.        In 2017 --

20           MR. STREET:  -- it's going to call for

21 speculation.

22           MS. SANDERS:  I would just ask that you

23 keep your objections to the objections that are

24 permitted under the civil rules of procedure.

25 ///

1  BY MS. SANDERS:

2  Q.        In 2017, did any person from Ramsey

3  Solutions reach out to you directly?

4  A.        I have no idea.

5  Q.        You do not know?

6  A.        I do not.

7  Q.        Okay.  In 2017, did you get any automated

8  messages from Ramsey Solutions?

9  A.        I'm not sure.

10  Q.        Okay.  In 2017 did you get any messages from

11  a recruiter that was working for Ramsey Solutions to

12  your knowledge?

13  A.        I don't know.

14  Q.        Okay.  Were you using a recruiter in 2017?

15  A.        Did I have an agent, like a headhunter?

16  Q.        Yes.

17  A.        Yes.

18  Q.        Okay.

19  A.        But they wouldn't have been doing anything

20  in Tennessee.  They would have been doing stuff in

21  Los Angeles.

22  Q.        Okay.  Did you have any headhunter or

23  recruiter or agent that was representing you in

24  Tennessee at any point?

25  A.        No.

```
1   Q.          Okay.
2   A.          They're -- I mean, the one that I had is
3   national, but, you know, as far as I know, no.
4   Q.          Okay.  So that one didn't bring any
5   Tennessee jobs to your attention?
6   A.          Not that I know of.
7   Q.          Okay.  Well, do you remember?
8   A.          I don't.
9   Q.          Okay.
10  A.          It was a long time ago.
11  Q.          Sometimes a "not that I remember" or "not
12  that I know of," sometimes I don't know exactly what
13  that means.  So I was asking if you remember, and it
14  sounds like --
15  A.          Sure.
16  Q.          -- you don't; is that correct?
17  A.          Correct.
18  Q.          Okay.  All right.  Now, let's move to 2018.
19  Did anybody at Ramsey Solutions reach out to you in
20  2018 and ask you to apply for a job?
21  A.          I -- it's almost as old as the '17.  So I'm
22  not sure.
23  Q.          Okay.
24  A.          The answers would be the same.
25  Q.          Okay.  I got you.  So I'm going to -- if I
```

1   asked you all of those questions for 2018, the answers

2   are the same?

3   A.         It's pretty -- yeah.

4   Q.         Okay.

5   A.         That's pretty good.

6   Q.         Is it fair to say the first person you

7   remember or can identify was Allison Bible?

8   A.         As far as I know, yeah.  And that even is

9   fuzzy because I think I've mentioned Kimberly Rudolph

10  often.  She was the one I had the most contact with.

11  Q.         Okay.

12  A.         But I think Bible was the one who reached

13  out.

14  Q.         Do you remember with Kimberly Rudolph -- do

15  you remember if you spoke with her before 2019?

16  A.         I don't think so.  I don't recall.

17  Q.         Okay.  All right.  And now -- I get it.

18  Dates are sometimes -- it's harder to remember things

19  by dates.  So I'm going to shift just a minute and talk

20  about -- because you reference that there were three

21  different positions, and then there were actually

22  several other positions that came up at Ramsey

23  Solutions; is that correct?

24  A.         Well, I'm sorry.  I blanked for a second.

25  What did you just say?

1   Q.          Okay.  So the first position you applied

2   for, you think was a creative director position in

3   2017?

4   A.          Possibly.  Yeah, I think so.

5   Q.          Okay.  And then what did you apply for -- I

6   think you said it was either the end of 2018 or 2019?

7   The one that Allison reached out and said, hey, that's

8   not available but --

9   A.          Sure.  And I don't -- either -- it was

10  either producing or -- eventually there was a video

11  editor position --

12  Q.          Okay.

13  A.          -- I applied to eventually.  I don't know,

14  again, if it was her saying, hey, you would be better

15  suited for this.  Can we get you to apply for that, and

16  I'll forward it on?  Or if that was -- if -- I seem to

17  vaguely remember it was like a producer and video

18  position.  I think -- I don't know if they were side by

19  side.  I'm not 100 percent sure.

20  Q.          Okay.  Okay.  I am going to show you another

21  document, and you may have never seen this document

22  before today.

23  A.          Uh-huh.

24  Q.          So I am just going to show it to you because

25  it has a date on it.

1    A.          Uh-huh.

2    Q.          That's dated Wednesday, July -- or June 19,

3    2019.  And at the top, it says, "Brad Amos Senior Video

4    Editor."  This looks like a document with some

5    interviews and schedule -- scheduled discussions with

6    various people at Ramsey.  Does this -- do you remember

7    this day?  June 19, 2019, when you apparently

8    interviewed with these Fowlkes that are on this list?

9    A.          Yes.

10   Q.          Okay.  So does that help you at all in -- in

11   the position that you actually applied for in 2009?

12   A.          Well, the position that -- well, the

13   position that I got or that I applied for?

14   Q.          (Counsel moves head up and down.)

15   A.          I think it was slight -- they might be

16   slightly different.

17   Q.          Okay.

18   A.          Because this has senior video editor.

19   Q.          Okay.

20   A.          And it may have been reclassed as far as I

21   know it -- I know they were very interested in

22   attracting me and getting me to work with them.  So

23   they may have moved it to a senior video position

24   because that pays more.

25   Q.          Okay.

```
 1   A.            I know they had actually increased the
 2   salaries in an effort to kind of entice me to get to
 3   work with them.  And, yeah.  Yeah.  This -- I mean,
 4   it's -- this is they -- because they wanted to fly me,
 5   and I remember it well because they wanted to fly me
 6   and specifically my wife which meant we had to bring
 7   our entire family to Franklin because there's no
 8   childcare out there for us so -- we have no family that
 9   lives near us in California.  So we had to bring the
10   entire family to Franklin just to do this -- at the
11   expense of -- because we had to pick up the expenses to
12   move everybody here to pay for it.  So I remember this
13   well.  And it's -- and it has -- yeah, it has dinner at
14   The Rutledge at the bottom with David DiCicco and Larry
15   Anderson.  Lara Johnson didn't show up.  And it was
16   Larry's spouse.  And it was -- from what other
17   employees told me, it was uncommon for them to do a
18   dinner there.  It was kind of reserved for higher end
19   interviewees.  Everybody else got Applebee's they --
20   they joked and that stuff so . . .
21   Q.            Okay.  Okay.  So, Mr. Amos, when you -- when
22   you -- how many times did you come to Tennessee to
23   interview with Ramsey?
24   A.            In person once.
25   Q.            In person once.  Okay.
```

1   A.          But now, as you can see, like, just from a

2   schedule like this, they had me -- many, many meetings.

3   And then I think that even while we were still in town,

4   they called even another meeting to this.  Yeah, this

5   is -- yeah, this is all of the meetings we had with

6   head of HR, you know, Rick Perry, who told me that

7   we're drama-free, and we have only one policy:  Don't

8   have affairs.  And that -- that's a fireable offense.

9            And then we had the David, Larry, Lara,

10  Luke.  This is the first time in person, meeting every

11  single one of these in person.  All of them I had

12  done -- with the exception of Rick Perry, I had done

13  video interviews.  It was a very long, extensive

14  process where -- you know, in the beginning it seems

15  quite simple, and then they keep moving the goal post.

16  I remember, it was a very long, like ninety -- sixty to

17  ninety days.  Actually, I -- yeah, I think it was like

18  sixty-plus days.

19            MS. SANDERS:  Okay.  Okay.  Let's go

20  ahead and mark that the next exhibit, Exhibit 3.

21            (Marked Exhibit 3.)

22            MR. STREET:  Was this produced in

23  discovery?  I'm just curious.

24            MS. SANDERS:  Yes.

25            MR. STREET:  Okay.  I'm just --

1          MS. SANDERS:  You'll see the

2   Bates-stamped number at the bottom.

3          MR. STREET:  I do.  I just didn't see

4   that, but that's fine.

5   BY MS. SANDERS:

6   Q.          Okay.  Mr. Amos, I am going to show you

7   another document that is dated January 6, 2019, and

8   this was produced from Lampo.

9   A.          Uh-huh.

10  Q.          So that was obviously in Lampo's possession.

11  Do you recognize that -- that document?  Did you

12  prepare that document?

13  A.          Yes.

14  Q.          Okay.  And tell me why you -- what was this

15  document about?

16  A.          I believe they required -- to apply you have

17  to put a -- you have to put a -- like a cover letter to

18  it.  Now, you have, like, an online doc they do, and

19  then they do a cover letter.  Again, because it's -- it

20  was unusual because I don't usually have to do cover

21  letters in what we do in Los Angeles.  And the other

22  thing too is -- some of the other things I had applied

23  to at the beginning of the year, but it was basically,

24  like, online interest.  Things like you had to do an

25  online application, and then they -- then they will

1  contact you from there.  And if it goes from there,

2  then you'll do cover letters, and, you know, other

3  things.  So this is, I think, one of the few that had

4  a -- had a cover letter.

5  Q.          Okay.  So I would like for you to just look

6  for a moment at that second paragraph.

7  A.          Uh-huh.

8  Q.          At the beginning where you say, "I grew up

9  listening to Dave on the radio as my father shuttled me

10 to basketball practice at Grassland Middle."

11 A.          Yes.

12 Q.          I'm assuming Grassland Middle is local?

13 A.          Yeah, Franklin, Tennessee.

14 Q.          Okay.  And so here you say that you listened

15 to Dave Ramsey as a child.  Did you continue to listen

16 to Dave Ramsey as an adult?

17 A.          I've heard his show, yeah --

18 Q.          Okay.

19 A.          -- a few times in Los Angeles.

20 Q.          Okay.

21 A.          I think I've even heard -- I think I -- I

22 think I've heard him say "best place to work" a few

23 times on the radio, and then he had said -- that's

24 where you get the idea, oh, it's not just him in his

25 house with a radio studio.  There's actually a company.

1  Q.        Okay.

2  A.        And stuff like that.  So . . .

3  Q.        And so you heard that before you went to

4  work there; that was just as a -- as a listener, I

5  guess, if you will?

6  A.        Yeah, sure.  You find it as a company, and

7  then -- and then when you see their stuff online, it's

8  like, oh, okay, there's something that -- there's

9  actually a physical place to apply to and the need for

10 video editors -- or I guess in this case creative

11 directors and things like that.

12 Q.        All right.  And then in the first paragraph

13 of that letter, it said, "I'm excited to see Ramsey

14 Solutions' current listing for a creative director.

15 Excited both because I'm in the process of moving to

16 Franklin to be closer to family, but also because

17 Ramsey Solutions has had a personal impact upon my own

18 life."

19 A.        Uh-huh.

20 Q.        So the first part in that "because I'm in

21 the process of moving to Franklin," by January 6th of

22 2019, had you already made that decision to move closer

23 to Franklin?

24 A.        It was a possibility we were mooting

25 about -- again, there's the thing of finding out your

1    mom had cancer.  It's, like, is this something that we

2    want to go ahead and move?  Do we not?

3              You know, when you apply -- you know, this

4    is kind of a standard, you know, intro you'll see on

5    every cover letter.  I'm excited that you've had an

6    opening, and, you know, let me apply.  So it's the kind

7    of thing you write in almost all of them kind of

8    letters.  But the thing is -- and then you put the

9    personal part in and, you know, about how, you know, I

10   listened to him.  And I did have a personal

11   relationship.  I did actually hear it.  I knew who he

12   was.  He's, you know, somebody who, you know, did a

13   radio show in Middle Tennessee, and I did hear it.  And

14   I remember -- you know, remember he's been on the air.

15   I remember doing basketball practice and hearing him

16   talk about -- I think he was doing -- I don't know what

17   the name of the show was at the time, but I do remember

18   hearing his voice.

19   Q.        Sure.

20   A.        But the -- the price -- it was definitely an

21   option that we had as possibly moving as a -- as a --

22   especially with my mom having cancer.  It was like hey,

23   let's do this consideration.  There's a concern when

24   you -- I think I have this on almost all of the cover

25   letters that I ended up sending out in Franklin because

1  I think there's more than one.  There's this and there

2  might have been another one or two that may have needed

3  a cover letter as well.  There are not many that did.

4  But the ones that did, I usually let them know it's a

5  possibility of moving because when you see the

6  addresses, it's oh, hey, I live -- you know, I live all

7  2,000 miles away in California.  And it's unlikely

8  anybody would consider you as an application -- an

9  applicant, if you're, you know, living that far way.

10  So it's, like, well, how do I -- how do you work for us

11  if you're in another state, you know.  This was before

12  the work from home and remote work and stuff.  So -- so

13  usually, you know, we would say, it's -- we're planning

14  on moving, and it was definitely something we were

15  considering doing.

16  Q.        Okay.

17  A.        Especially with my mom.

18  Q.        Okay.  So --

19  A.        I think -- I know towards the end of --

20  before -- actually, I think we had almost given up, I

21  think, by April, May.  I think we had kind of said,

22  okay, I guess, we're going to stay here in L.A. and,

23  you know, do the best.  Let's see if we can find maybe

24  another job; you know, with just the same kind of

25  benefits and do the L.A. thing.  And then Bible had

```
 1    reached out and stuff like that.
 2                    MS. SANDERS:  Okay.  Let's go ahead and
 3    mark that as the next exhibit, Jennifer.
 4                    (Marked Exhibit 4.)
 5                    MR. STREET:  Is that going to be 3 or
 6    4?
 7                    MS. SANDERS:  4.
 8    BY MS. SANDERS:
 9    Q.        Okay.  Mr. Amos, I am going to show you
10    another document.  And, again, you can see at the
11    bottom this was --
12    A.        Uh-huh.
13    Q.        -- produced by Ramsey, so it was in their
14    possession.
15    A.        Uh-huh.
16    Q.        And this appears to be another cover letter
17    from you to Ramsey on May 18, 2019 --
18    A.        Uh-huh.
19    Q.        -- is that right?  Did you write that
20    letter?
21    A.        Probably.  Yes.
22    Q.        Okay.  All right.  And in -- in that --
23                    MR. STREET:  I'm so sorry.  Did you
24    mean to say May 8, 2019?
25                    MS. SANDERS:  What did I say?  I'm
```

1    sorry.

2                      MR. STREET:  May 18th.

3                      MS. SANDERS:  I'm sorry.  May 8, 2019.

4    Sorry about that.

5                      THE WITNESS:  All right.

6    BY MS. SANDERS:

7    Q.          All right.  So on this particular letter,

8    it's similar to the last one.

9    A.          Yeah, it looks like it.

10   Q.          And you say there, you are in the process of

11   moving to Franklin, Tennessee, to be closer to family?

12   A.          Yes.

13   Q.          And then you also talk about the same -- so

14   at that point, again, was Tennessee an option or

15   something you were thinking about, or were you actually

16   in the process of moving?

17   A.          Oh, are you saying have I sold my house and

18   was I moving --

19   Q.          No.  I wasn't saying have you sold your

20   house.

21   A.          Oh, so in the physical process of moving,

22   absolutely not.  Is it still a consideration, yes.  And

23   it -- it would depend on, you know, the right job and

24   whether everything lined up.  Yes.  This looks -- yeah.

25   Q.          Okay.

1    A.          It's almost the same letter.  It says --
2    yeah, because at the top it says, I am writing at the
3    recommendation of Allison Bible.  So she must have
4    called and talked to me about a different position, and
5    they said, could you reapply?  So it must have been,
6    you know, applying for creative director, and then she
7    said, hey, I've got something for you, but it's not --
8    it's a different job.  Could you reapply and do this?
9    Because it says I was writing at the recommendation of
10   her, so that must be where it comes from.
11   Q.          Okay.  So that -- does that help you with
12   the time frame of when you maybe spoke to Allison
13   Bible?
14   A.          It would probably have been -- I mean, it
15   would have been before May, I would think.  It
16   sounds -- you know, so maybe anywhere between January
17   to May.
18   Q.          Okay.
19   A.          Sometime -- sometime in the spring --
20   Q.          All right.
21   A.          -- of 2019, like I said earlier.
22             MS. SANDERS:  Let's go ahead and mark
23   that as the next exhibit to the deposition which I
24   believe is 5.
25             (Marked Exhibit 5.)

1  BY MS. SANDERS:

2  Q.          Okay.  Now, earlier I asked you this,

3  Mr. Amos -- or I started asking this, and we started

4  talking about another topic.  I asked you about who the

5  "we" was, and I think you -- you said that was your

6  wife and your family.  You would say "we applied," and,

7  I guess, you were referencing your family.  Is that

8  correct when you say "we"?

9  A.          Yeah.  Well, they don't apply, I mean,

10  obviously, you know --

11  Q.          Right.

12  A.          They -- they're not trying to get a

13  position, but I say "we."  You know, you do things; you

14  do things together.

15  Q.          Right.  Exactly.

16          So did your wife also want to come to

17  Tennessee?

18  A.          Yeah.  Actually -- well, if -- if we were

19  thinking about physically moving, it was a joint

20  decision.  So she doesn't have family here, but I do.

21  We've been here plenty of times visiting.  Things like

22  that.  It's always nice.  We always have a great time

23  when we do.

24  Q.          Uh-huh.

25  A.          So, yeah, I think she probably -- yeah.

1          So I'm thinking.  There's other places we
2     had talked about moving to.  Williamsburg I know is one
3     because I had web applications I put out there as well.
4          But, you know, with my mom's diag -- cancer
5     diagnosis, it was, like, well, if we ever had to move.
6     If things went south, you know, we had to do full-time
7     care, is that a possibility?  And I think the answer
8     was sure, yeah, that's fine.  You know, it's good
9     weather; you know, things are pretty decent out there.
10    And we like -- like the people and everything.
11    So . . .
12    Q.        Had -- excuse me.
13             At the time that you were applying for this
14    job at Ramsey Solutions in 2019, did you have any
15    offers from anyone else out in L.A.?
16    A.        As far as offers?
17    Q.        Yes.
18    A.        I don't remember.  As far as -- nothing -- I
19    mean, nothing, again, like a -- the way things work out
20    there, nobody hands you a contract and says, hey,
21    there's a sack of cash underneath here.  Let's -- come
22    work for us.  It's a lot of, you know, handshakes and
23    things like that.  But there was -- there was some
24    interest from Trailer Park.  So it was a possibility.
25    And also, BLT was interested in retaining me.  They had

1    actually just increased -- you know, done a small
2    salary increase for the work that I had done as a
3    creative director.  And so, you know, there was --
4    there was an enticement there to try, you know, to
5    stick around and not go to another competitor or
6    anything like that.
7    Q.        So what had they offered you to stay?
8    A.        It's just basically -- it would be -- I
9    think I was moved -- positionally, I was moved in like
10   a larger bay.  I think I ended up getting an
11   increase -- a salary increase somewhat.  I think there
12   was a bonus check that was included for all of the work
13   that I had done as a creative director for them just as
14   a thank you.  And just generally trying to take some of
15   the workloads off of me because they had just brought
16   in a new creative director to take the job I had kept
17   that seat warm for.  And in an effort to -- so I would
18   go more -- back to producing and working with clients
19   and dealing more client forward rather than having to
20   run the entire department and stuff.  So that, you
21   know, is good because it's a whole lot of stress you're
22   not having to deal with.  You're just having to now do
23   great -- I'm editing.  I'm producing.  I'm working
24   directly with my clients as I normally do as opposed to
25   having to kind of juggle all of these balls in the air.

```
1    Q.        So did they know you were planning to leave?
2    A.        No.
3    Q.        Okay.
4    A.        No, no.  I mean, they -- at the time we
5    weren't planning on leaving.  You know, it was mooted
6    as a possibility that we had talked about, especially
7    if things went -- went sideways with my mom.  But it
8    was still very much in the -- you know, this is an
9    option.  Maybe we'll move.  Maybe, not.  It just kind
10   of depends.  You know, it would take the right job to
11   do so.  Because things were, you know, doing well, and
12   they were offering more money.  There were other
13   opportunities with Trailer Park and some of these other
14   competitors and even you find one or two things out in,
15   you know, Virginia and other things.
16             But so, no, moving was not a done deal.
17   Even if I say "we're in the process of moving."  It's
18   like -- you know, it's the kind of thing you to make
19   sure that people don't say, oh, if you're not going to
20   move -- I mean, we're not going to hire a guy in
21   California.  That's -- no way.  That's not ever going
22   to happen.  If you put out a cover letter, nobody will
23   hire you.  You know, we're to stay here, but we want to
24   get a job.
25   Q.        So what was BLT offering you at the time you
```

1   left?

2   A.          As far as offering, it wasn't a -- it was

3   not a -- well, the 3 percent yearly increases, that's

4   usually a typical kind of cost of living.  It wasn't a

5   guarantee, but a yearly bonus.  You know, I was already

6   fully vested in the 401(k) and everything there.  I was

7   on their health plan which was very generous.

8                So again, the offer -- I think I just said

9   it actually.  The offer was less work, more time with

10  your clients, you know, slight -- slight increase in

11  salary.

12  Q.          So that's what --

13  A.          And a bonus check.

14  Q.          Yes.  So what I meant was what was the

15  salary they were offering you?

16  A.          Oh, salary?  It would have just been the 3

17  per -- well, I -- I would have to figure it out.

18  Whatever I was making -- I think I was making on the

19  books probably 190ish, and then plus overtime which

20  is -- you get overtime every year.  So that ends up

21  increasing it 50,000.  So I was making close to a

22  quarter of a million a year every year anyway.

23  Q.          Okay.

24  A.          And so then it would have been 3 percent on

25  top of that.

1  Q.          Okay.

2  A.          So 3 percent from the base salary of 190,

3  and, of course, that would increase all of the overtime

4  rates as well.

5  Q.          And so did you have an offer from Trailer

6  Park at the same time?

7  A.          We were in discussions.

8  Q.          Okay.

9  A.          So if I brought my business and my clients

10 and myself over there, you know, is that an option?

11 And it would basically be -- it -- you -- you kind of

12 say -- again, these are early days.  So they just know,

13 hey, we like you.  We like what you're doing.  You

14 know, why don't you come talk to us.  Have more --

15 let's have more dinners and luncheons.

16              Typically, if they were a company, they're

17 only going to bring you away -- they're going to offer

18 you exactly the same and then some.  So yeah.

19 Q.          So you think at Trailer Park, it would have

20 been around 250?

21 A.          Perhaps.

22 Q.          Okay.

23 A.          The -- it's likely that it would have, you

24 know . . .

25 Q.          In your position --

1   A.          It would have -- and it would have --

2   Q.          Oh, excuse me.

3   A.          Oh, no, actually, you're probably about to

4   ask that.  I was going to say that it's probably doing

5   pretty much the same thing.

6   Q.          That's what I was going to ask.

7   A.          Yeah.

8   Q.          That's right.  Okay.  So at BLT when you

9   left, you were a senior editor?

10  A.          Yes.

11  Q.          Okay.  You've mentioned creative director?

12  A.          Yes.

13  Q.          Is senior editor, do you consider that a

14  promotion over creative director?

15  A.          There is -- in the hierarchy -- and, again,

16  everything at Hollywood is very informal.  It's not

17  like Ramsey with very specific titles.  You say, like,

18  senior editor, junior editor, and stuff like that.

19  They have specific titles.

20              In Hollywood, you know, it's usually -- you

21  know, have assistant editor.  People use "senior

22  editor" kind of as a vanity title.  It just means that

23  you're -- you've been doing this for 20 years.  You're

24  old.  So it's -- it usually comes with a little

25  prestige, not necessarily salary.

1          Creative director is usually a step up.  You
2   are usually one-on-one interface with the clients
3   kind of stuff.
4          Producer is kind of a different category all
5   together.  Alongside -- basically, there are producers
6   who are kind of the supervisors of the editors, but at
7   the same time, you can be a predator.  It's a terrible
8   title, but that's what they call it where you actually
9   are an editor and a producer at the same.
10  Q.        Oh.
11  A.        You deal with the clients hands on, take the
12  notes, and you actually do the notes, and you can send
13  them back.  And so my skill set allowed me to kind of
14  do that, and I did lots of stuff with Amazon Prime
15  and -- and Netflix, and I think those were my big --
16  two big clients, and then I worked with FX and lots of
17  other places as well.
18  Q.        So at what point in your career were you a
19  creative director?
20  A.        Well, creative director, I was there -- I
21  don't know -- 2018, '19ish.  I can't tell you exactly
22  without having -- do I have it -- do I have it on one
23  of my resumes here?  I'm not sure.
24  Q.        Well, the resume --
25  A.        Because -- yeah, I don't see it on this one.

1  But the creative director, they -- again, the person

2  who was the creative director of the department had

3  left and gone to another company.  And being the senior

4  man on deck, you know, they kind of did an informal

5  promotion to that.  It came with no extra salary, but a

6  lot more work because then you're -- you're kind of

7  moving and helping everybody, you know.

8            So in an effort, BLT was offering, hey, you

9  can -- how would you like -- like everything we're

10  doing -- you know, paying you now, but you don't have

11  to get -- you know, you're not having to orchestrate,

12  go sit in on all of the seminars we have to do for

13  training, and, you know, helping -- in other words,

14  being the guy running things.  You can go back to kind

15  of being, you know, an editor, producer, working with

16  the clients.  It's a lot less work, long -- shorter

17  hours, though, the pay is the same.  So . . .

18  Q.        So is that why your resume, that's

19  Exhibit 2, it says "senior editor"?  Because you didn't

20  have a formal promotion; is that why you didn't put

21  creative director on that?

22  A.        Umm --

23  Q.        It's right below that.  It's Exhibit 2.

24  A.        Yeah.  I don't know actually because it's

25  very likely, I would think, if -- if there was an

1   associate creative director job opening, and I had sent

2   them a resume, it likely would have said creative

3   director on it as well and stuff.  It would not have

4   just said just producer/senior editor.  So this

5   producer/senior editor one here, Exhibit 2, might have

6   been from an earlier -- an earlier --

7   Q.          Okay.

8   A.          -- time.  And then a later one might have

9   been sent, if I was playing the creative director, I

10  likely would have -- you know, I would have probably

11  had the bigger title on there and stuff because that's

12  what I -- what I was doing for a while.

13  Q.          Okay.  Now, when you moved here, you still

14  owned a home in California; is that correct?

15  A.          Yes, I did.

16  Q.          Okay.  And then when did you sell that home?

17  A.          Oh, that home -- it was finally under

18  contract on December 8th of 2020.  No, 2019.  Sorry.

19  And then I think it was sold January the 8th, 30-day

20  escrow.  So January 2020.

21  Q.          Okay.

22  A.          So . . .

23  Q.          Did you have any trouble selling your home?

24  A.          Yes.

25  Q.          Okay.  And did -- did Ramsey help you find a

1    Realtor to sell that home?

2    A.          They were very insistent that I use one of

3    their ELPs to sell the home.  They're -- they --

4                I'm sorry.  I'm playing with the -- I can

5    see your face in the background grimacing.  I

6    apologize.

7                Am I going slow enough?  Am I slower, or am

8    I still too fast?

9                      THE COURT REPORTER:  It's spurts.

10                     THE WITNESS:  Spurts?  I will be

11   slower.  I apologize.

12                     Okay.  They had -- let's see here.  Oh,

13   yes, they -- they -- when they hired me, I still had a

14   home in California, and I said, guys, it's great and

15   all that we're doing the hire.  I do -- I am going to

16   need time to sell because, obviously, we're re -- it's

17   a major deal.  You know, it was, like, you know, we're

18   excited to work for you.  Excited, you know, all of

19   these things that you have talked about and promised.

20   I think it's going to be a great deal; can't wait to

21   get started.  At the same time, we do have to sell this

22   house first and stuff.

23                     So I -- I actually got them to do --

24   move the start date later.  They wanted to -- they

25   wanted me in August.  They wanted me as -- they said it

1   was imperative we get you there as quick as possible to

2   start working on the documentary that they wanted to

3   hire me for.  That was odd because I really didn't

4   start getting a massive amount of work started on that

5   until almost January because they were still shooting

6   footage.  There was lots of other projects they put me

7   in front.  So I don't know if I needed really to get

8   there in August, but the idea was -- is that I would

9   start in August, and my wife would -- and my family

10  would stay in California, and we would work to try to

11  sell the home, and when it sold, they would join me.

12              And the house didn't sell as -- very

13  quickly.  We were having very few showings, and so

14  there was some frustration there that it wasn't moving

15  very fast.  And I was receiving a lot of pressure from

16  everybody really, every day.  Hey, where's your family?

17  Have they shown up yet?  Where's your wife?  How is

18  everything going?  What are you doing?

19              And at one point, I know even Luke

20  LeFevre had -- had stepped in and said, that, you know,

21  hey, we need to get you out here -- get your family out

22  here.  They need to be here.  Let me hook you up with

23  an ELP, and I think he had talked to their ELP group,

24  and they had actually gotten a real estate person they

25  wanted us to work with to sell our house.

1          They were -- they had gotten a bunch of

2    numbers and a bunch of people.  It became a little bit

3    of a nightmare at that point.  So we ended up not using

4    their ELP but the -- but the end -- but they were big

5    on me getting the house sold and getting moved out to

6    Tennessee ASAP.

7    BY MS. SANDERS:

8    Q.          So you did not use the ELP?

9    A.          In the end, we did not.

10   Q.          Okay.

11   A.          The ELP we ended up seeing -- it was

12   difficult, we had already -- we actually removed our

13   one real estate agent to try for a different one so we

14   could get the house sold and move.  Because we were

15   still interested in getting things -- we had, I think,

16   a house that we had a deposit on that was pending for

17   September 10th or whatever -- I forget what it was.

18   But they -- the idea was -- is that, you know, we were

19   going to move to California -- to Brentwood here in

20   Middle Tennessee, and we had a house lined up, and the

21   whole nine yards, but we just had to sell our house

22   first and get everybody moved over.  And he was having

23   trouble selling it, so we opted for a different real

24   estate agent.

25          And Luke said that he wanted us to -- you

1   know, it was, like, hey, we've got this ELP.  You

2   should -- you should use our ELP.  They'll sell your

3   house in a heartbeat.

4           I mean, the scenario around that is

5   interesting too because he volunteered that by I guess

6   he had -- I didn't know -- and this is, I think, the

7   first evidence that I had that the reports weren't

8   private that they were forcing us kind of to write.  We

9   had to write reports, and we had one-on-ones with the

10  supervisor where, again, it's funny because they're,

11  like, water cooler talk.  You just sit there just

12  shooting the breeze, but they ask a lot about family

13  and they always ask about personal stuff and your

14  viewpoints on things.  And it seems like it's a very

15  private, you know, one-on-one as they say, one-on-one.

16          But this material ended up being shared with

17  Luke.  Luke calls me into his office and says, "Hey,

18  what's going on?"  I was, like, "Oh, nothing."

19          He said, "Well, I see your report here.  You

20  look a little bummed."

21          "Oh, you see that?  I didn't know you read

22  that."

23          And it's, like, "oh, yeah."

24          So the -- that report -- and based off of

25  that, he was, like, "Well, let's help you sell your

1    home.  We've got to get your family here.  We really

2    need you here.  And we really need" -- because he had

3    voiced that there was some concern.

4              You know, it was, like, "Well are you going

5    to move back if you don't sell your house?"

6              I'm, like, "Well, that's a possibility.  If

7    this is -- you know, I like you guys.  You guys -- it

8    seems the job is doing well, but if I don't sell the

9    house, we're not going anywhere."

10             And he was, like, "Well, we need you here.

11   You're killing it.  You're doing a great job.  We

12   definitely need your family here."  And so he had

13   offered an ELP, and, yeah . . .

14   Q.        Were you bummed that your family wasn't

15   here?

16   A.        Of course.  Well, being -- I mean, being

17   separated from family is a -- is a big deal, yeah.

18   Q.        Uh-huh.

19   A.        Yeah.

20   Q.        So who was the ELP; do you remember?

21   A.        Kate Christiansen was the one -- they

22   recommended several.  It was bizarre because they had

23   one ELP they recommended that didn't even speak

24   English.  They had another one who supposedly works in

25   Los Angeles, but, like, was 30 miles away.  It wasn't

1    even a district they would actually even work.  They

2    didn't know the neighborhood.

3              And Kate Christiansen was actually familiar

4    with Santa Clarita.  So that was the person who -- who

5    had done -- that they ended up sending over.  And a

6    courtesy, we ended up talking with -- we already kind

7    of had selected a top tier agent in that area that we

8    were going to work with.

9    Q.        Uh-huh.

10   A.        But, you know, we felt pressured to use an

11   ELP, and when a board member says, hey, you need to use

12   our program.

13             "You know, these guys pay us money to be

14   part of the Rolodex and to be kind of -- you know, to

15   sell these properties, we got some money.  You know,

16   Ramsey gets some money back from, you know, the sale of

17   the house, the whole nine yards, everybody wins.  And

18   our ELPs are knock dead.  They're great.  They're

19   great."

20             So we interviewed her.  Brought her in our

21   home.  Let her see everything.  And talked comps and

22   things like that.  And in the end, we ended up not

23   using her and going with a different -- a different

24   agent.

25   Q.        And who did you use?

1   A.          I think it was -- I can't remember her name.
2   Jenn, but Neil Weichel was her boss, and he is one of
3   the real estate agents in that area.
4   Q.          Okay.
5   A.          That we ended up working with.
6   Q.          Okay.  Did you have any -- did you -- did
7   anybody -- did Luke or anyone else at -- at Ramsey tell
8   you they were disappointed that you did not use the
9   ELP?  Or did they know?
10  A.          Hmm.  No, I had told them.  I know I ended
11  up telling -- you know, contacting the -- the ELP guys,
12  the ELP department called repeatedly to say how was the
13  experience?  Rate your -- they would call trying to
14  find out feedback on it and stuff.
15  Q.          Did you answer that?
16  A.          Not -- not until -- not -- we were so busy.
17  Not until 2020 I think.  Yeah.  Not -- not immediately.
18  I think -- yeah, I think I did -- I think I might have
19  told Luke, Lara, and DiCicco that I appreciated it, but
20  we are going to -- move in another direction with it.
21  Q.          So when did the house sell?
22  A.          I think, as I stated before, it was
23  December 8th.
24  Q.          Oh, that's right.  You did say that.  Sorry
25  about that.

1  A.        2019.

2  Q.        You did.  Okay.  Now --

3  A.        That's when it sold.  It closed in 2020.

4  Q.        In 2020, yeah.

5            So then did you buy a house in Tennessee?

6  A.        Eventually.

7  Q.        Okay.

8  A.        We bought a house in -- because of all of

9  the delays and stuff, the house -- the first house fell

10 through, and we spent a lot of time -- we spent time in

11 an apartment.  I mean, I -- again, my family didn't

12 come out until November.

13 Q.        Okay.

14 A.        So we moved them out in November, and then

15 eventually we found a house in College Grove that was

16 only 15 minutes away from Ramsey.  So it was pretty

17 close, and we got that going and closed, I think, the

18 last week of February.

19 Q.        Okay.

20 A.        Something like that, yeah.

21 Q.        Do you --

22 A.        It was -- yeah, that's, like, when -- yeah,

23 that's, I think, when the -- yeah, it was about the

24 last week -- that was when we moved.  So I would say

25 about the last week of February.

```
1  Q.        Do you still own that house?
2  A.        No.
3  Q.        Okay.  You sold it?
4  A.        Yes.
5  Q.        Okay.  When did you sell that house?
6  A.        That would have been -- this year is 2022.
7  So last year 2021.  Probably in the summer.
8  Q.        Okay.
9  A.        I'm not sure when it was exactly, the exact
10 dates, but sometime the summer of 2019.
11                (Interruption in proceedings.)
12                MS. SANDERS:  Oh.  We'll take a break.
13                MR. STREET:  Yes.
14                THE VIDEOGRAPHER:  Going off the
15 record.  The time is 12:37.
16                (Recess taken from 12:37 to 12:38 P.M.)
17                THE VIDEOGRAPHER:  We're back on the
18 record.  The time is now 12:38.
19 BY MS. SANDERS:
20 Q.        Okay.  Mr. Amos, in an effort to shorten
21 this process.  I have just -- I am giving you a
22 collective set of documents.
23 A.        Uh-huh.
24 Q.        I believe these are all documents authored
25 by you.  If you could just take a look at that and let
```

1    me know that, then I'll ask you just a few questions
2    about these documents.
3    A.        Uh-huh.
4    Q.        Okay.  Have you had a chance just to thumb
5    through them?
6    A.        Uh-huh.
7    Q.        All right.  So these appear to be cover
8    letters with applications for employment.  These were
9    produced --
10   A.        Yes.
11   Q.        -- by you, by the way.  So these were all in
12   your possession?
13   A.        Yes.
14   Q.        And they look like they're in 2020 and 2021;
15   is that correct?
16   A.        That's correct.  Uh-huh.
17   Q.        Okay.  So is it safe to characterize these
18   as documents that were applications for employment or
19   at least coincided with applications of employment made
20   by you?
21   A.        That sounds fair.
22   Q.        Okay.
23   A.        Yeah.
24   Q.        All right.  So as I'm looking through these
25   documents, it doesn't always say -- well, most of the

1  time, it says at the top who they're to.

2  A.          Uh-huh.

3  Q.          So I am going to read these off, who I

4  believe they're to.  You can follow along.  We'll go in

5  order starting with No. 10 --

6  A.          Sure.

7  Q.          -- there at top.  The first one is Disney+;

8  is that correct?

9  A.          Uh-huh.

10  Q.          The next one is Cashmere --

11  A.          Uh-huh.

12  Q.          -- in L.A.?

13  A.          Oh --

14              MS. IRWIN:  Verbalize.

15              THE WITNESS:  Is that the one you have?

16  BY MS. SANDERS:

17  Q.          Oh, did I get out of order?

18  A.          No, no, no you got it.  You're good.

19  Q.          The next one, I think, is No. 12 at the

20  bottom.  You can see, like, at the bottom, there's some

21  tiny numbers.

22  A.          Okay.

23  Q.          Okay.  So let's look at those and that way

24  we'll know we're on the same --

25  A.          Sure.

1  Q.          Number 12 was for CBS also in L.A.

2  A.          Uh-huh.

3  Q.          Number 13, Apple TV+ on -- also in L.A.; is

4  that correct?

5  A.          Uh-huh.

6               MS. SANDERS:  Okay.  There's another.

7               THE COURT REPORTER:  You need to say

8  "yes" or "no," please.

9               THE WITNESS:  Oh, I apologize.  I'm

10 sorry.  The answer is yes.

11 BY MS. SANDERS:

12 Q.          Now, that -- that one, No. 13 is in December

13 and then the next one, No. 14, is also Apple TV+, but

14 that's in April of 2021.  It looks like you maybe

15 applied there twice?

16 A.          Yeah.  A lot of these places -- and I -- you

17 probably don't even have all of them.  But the -- you

18 know, when you're employed, you apply as many times as

19 you possibly can.  You know, and the -- they would be

20 places that, yeah, I would have applied to --

21 Q.          Okay.

22 A.          -- multiple times depending on the jobs that

23 they had.

24 Q.          Okay.

25 A.          And, again, you know, being unemployed for

1    that long and then running out of savings, not being

2    able to find anything, any time in -- you know, with

3    the pandemic, if you saw a job opening that you think

4    you could -- your skill set could fit or even be

5    lateral, it's an attempt to get in there, but a lot of

6    again, you know, in the end of 2020, 2021, the

7    beginning of it, there just aren't that many jobs.  And

8    the jobs that are there, you know, I'm probably one of

9    thousands that are probably applying because the -- I

10   mean, I don't know what the -- I'm not an expert and

11   I'm not a news man, but I know reports of, you know,

12   like one and ten, one and five Americans out of a job

13   kind of thing.

14   Q.        Uh-huh.

15   A.        So the -- especially in an industry where

16   they entirely had closed down, you know.

17   Q.        Right.  Okay.  The one -- there's one on the

18   0015, which is dated December 4.

19   A.        Uh-huh.

20   Q.        This looks like a position to Colonial

21   Williamsburg, and you say you're writing in regard to

22   the digital content producer.

23   A.        Uh-huh.

24   Q.        In this particular letter, if you go down

25   about three paragraphs, it says, "as an actor,

1   director, editor, and producer."  So in addition --

2   A.          Uh-huh.

3   Q.          -- to editing and producing, you have also

4   acted and directed; is that correct?

5   A.          I am a member of SAG-AFTRA.

6   Q.          Okay.  All right.

7   A.          As well so . . .

8   Q.          And what about directing?

9   A.          Yeah, I direct.  I have directed.  I mean,

10  the -- my degrees are -- I -- I hold a bachelor of fine

11  arts in theater.

12  Q.          Okay.

13  A.          I did acting.  I do voice-over.  Lots of

14  different things.  I did theater direction writing and

15  then, you know, I end up doing master's work at Loyola

16  Marymount for film.  So in creative fields, you wear

17  lots of hats.

18  Q.          Sure.

19  A.          And you have lots of skill sets, you know,

20  as your discipline allows you to cover lots of

21  different fields and things.

22  Q.          Okay.

23  A.          Just like, you know, at Ramsey, I was

24  qualified just to -- not to do just editing but also

25  produce and I -- they had me -- in the beginning

1    because they -- they -- I ended up -- because of my

2    experience as a creative director or as a producer, I

3    reordered their work flow.  Changed bottlenecks.

4    Showed them how to do more efficiency things with

5    billing.  I actually ended up building their bay for

6    them.  The first edit bay they ever had before.  I

7    ended up creating that myself.

8              So you have these skill sets and these

9    disciplines that you're kind of trained in because, you

10   know, they're all -- you know, lateral.  They all sit

11   next to it, and they all interrelate with each other.

12   Q.        Uh-huh.

13   A.        So in this case, you know -- you know, at

14   that point, you know, you've been out of work for so

15   long.  You know, you're not getting unemployment.

16   It -- there are no jobs; you're kind of like anything.

17   It's, like, well, I can do acting.  I do directing.

18   What do you need?

19   Q.        Sure.

20   A.        What do you need?  I'll -- I can do it

21   because I've got to feed a family here.  So . . .

22   Q.        All right.  Going on through the list, 16 is

23   Searchlight --

24   A.        And Williamsburg -- I think they might have

25   been somebody I applied to maybe in prior years.  And

1  maybe that's why --

2  Q.          Right.  You mentioned that earlier.

3  A.          Yeah.  That's probably why I have them down

4  as one -- one of many places.

5  Q.          Yes.

6  A.          But do we -- do we need to go through all of

7  these?

8  Q.          Well, I'm just going to -- I'm going through

9  them to make -- because what I am going to ask you is

10 if you have any others other than these.  So if you

11 know that this --

12 A.          Maybe --

13 Q.          -- is all you have, we don't have to go

14 through them all.

15 A.          Yeah.  These are all -- these are all that I

16 have in my possession.

17 Q.          Right.

18 A.          That -- I mean, because -- I mean, you guys

19 asked for, hey, give us some cover letters or anything

20 that shows.  But a lot of this, again, is the thing I

21 was saying before.  Not all of them need cover letters.

22 A lot of times you --

23 Q.          Uh-huh.

24 A.          You apply for a position.  It's online.

25 It's, like, click -- click these series of buttons and

1    stuff, and we'll put you into the database with the

2    other several thousands and see if you get hits.

3              But, again, it wasn't until, you know, I was

4    actually -- I mean, one of the biggest things of moving

5    out of Tennessee to California was so you could get the

6    face time with people.  So you can actually, you know,

7    do interviews with people.  Even if they're on Zoom,

8    the -- just the way of actually -- you know, the

9    proximity effect was in full effect there for getting

10   people to actually acknowledge what you're doing.

11   Q.        So do you have anywhere in your possession a

12   I list of all of the places that you either formally

13   applied to or spoke to about a job in 2020 and 2021?

14   A.        That -- no.

15   Q.        Okay.

16   A.        I mean, the EDD would have -- you know,

17   because even though they weren't paying me, I was

18   still, you know, weekly filling out the reports and

19   giving, you know -- I mean, you know, putting as much

20   information as I could.  It would -- usually they just

21   asked for, hey, we need three, and then we'll splinter

22   out.  So there were probably more --

23   Q.        Okay.

24   A.        -- out there as well.

25   Q.        But these documents and then your testimony

1    today, that's the best you can recall about the places

2    you applied in 2020 and 2021 and whatever the EDD might

3    have?

4    A.          Yeah, probably.  I mean, there's probably --

5    I mean, there's -- there's plenty.  You know, either --

6    and, again, these are places that were done by phone

7    call, cold call, places that were done through their

8    online -- you know, their website.  There wasn't -- you

9    know, I -- there's probably more than this.  But that I

10   actually have, like, oh, a cover letter for?

11   Q.          Uh-huh.

12   A.          You know, or an application, yeah, because

13   this -- if you have one resume, you have them all

14   because you kind of keep sending them out.

15   Q.          So most applications these days are all done

16   online.  Did you keep any of those copies of the things

17   you submitted online?

18   A.          No.  That I can think of.  I mean, I don't

19   know how I could.  Are you talking, like, did I --

20   Q.          Yeah.

21   A.          -- did I go through and screenshot --

22   Q.          Yes.

23   A.          -- after I applied?  No.  Nothing like that.

24   Q.          Okay.

25   A.          No.

1    Q.          Do you have any written offer letters that
2    you received in 2020 or 2021?
3    A.          No.
4    Q.          Okay.
5    A.          No.  And, you know, even when I did finally
6    land a job at Rogue Planet and that ended up turning
7    into a job at Mocean, they don't do offer letters.
8    Q.          Okay.
9    A.          It's just, like, hey -- it's usually -- it's
10   all one-on-one through a -- the Zoom.  You know, start
11   here, and we'll follow-up with the details later.
12                    MS. SANDERS:  Okay.  This is a good
13   place to stop and take a lunch break.
14                    THE VIDEOGRAPHER:  Going off the
15   record.  The time is now 12:47.
16                    (Recess taken from 12:47 to 2:01 P.M.)
17                    THE WITNESS:  We're back on the record.
18   The time is now 2:01.
19   BY MS. SANDERS:
20   Q.          Okay.  Mr. Amos, we have just had a break
21   for lunch.  Just as a reminder you are still under
22   oath.  We're going to continue with your deposition,
23   and there's -- do you have any travel arrangements,
24   Mr. Amos?  Like, do you have to be gone by a certain
25   time?  What's your -- what's --

1    A.         Well, I'll be gone sometime in the morning.

2    Q.         Okay.  I just --

3    A.         It's probably like 5:30 in the morning.

4    Q.         Okay.  I just wanted to make sure.  I knew

5    you came from out of town.  So I just wanted to

6    check --

7    A.         Yeah.

8    Q.         -- on your flight schedule.

9    A.         No, no.  We're free for today.

10   Q.         I don't think we'll be too terribly long,

11   but I just wanted to make sure you didn't have a flight

12   scheduled.

13   A.         Sure.

14   Q.         Okay.  So let's talk about your employment

15   at Ramsey Solutions.  You've told us about the

16   interview process and when you -- when you started, and

17   I believe your date of hire was in August; right?

18   2019?

19   A.         Yes.  I mean, I think I received a letter

20   several months prior, but I think the actual start date

21   was August, early August.

22   Q.         Okay.  I am going to show you what I think

23   might be that letter that you're referring to.

24   A.         Uh-huh.

25   Q.         Is that the letter you're referring to?

1   A.        Yes.

2   Q.        Okay.  And that's your signature or at least

3   your DocuSign at the bottom; is that correct?

4   A.        Uh-huh.

5   Q.        Okay.

6   A.        Yes; that's right.

7   Q.        And this letter says that we look forward to

8   seeing you on August 12, 2019, and identifies that as

9   the start date; does that sound right to you?

10  A.        It does, yeah, uh-huh.

11            MS. SANDERS:  Okay.  Let's go ahead and

12  make that the next exhibit which, I believe, is Exhibit

13  7.

14            THE WITNESS:  Uh-huh.

15            THE COURT REPORTER:  I don't think I

16  marked that one.

17            MS. SANDERS:  For the record, I don't

18  think I handed you that one to mark.  So just before

19  the break, we did a collection of letters starting with

20  Bates-stamped No. 00 -- Amos 0010 through Amos 0031.

21  We're going to go ahead and mark that Collective

22  Exhibit 6.  Is that right?

23            THE COURT REPORTER:  Yes.

24            MS. SANDERS:  Sorry about that.  That

25  was on me.

Case 3:21-cv-00923  Document 65-1  Filed 01/19/23  Page 153 of 389 PageID #: 1863

1                    (Marked Exhibit 6 and Exhibit 7.)

2    BY MS. SANDERS:

3    Q.         Okay.  Mr. Amos, earlier you talked about an

4    employee at Ramsey Solutions that you spoke with named

5    Kelly Randolph; is that right?

6    A.         Uh-huh.

7    Q.         Who was Kelly Randolph?

8    A.         She was some part of the recruitment team, I

9    guess is what they call it.  I'm not sure if it's her

10   title.  I don't know her title specifically.

11   Q.         Okay.

12   A.         But she was the one who reached out and --

13   about the video team and introduced -- did kind of the

14   initial evaluation of, you know, whether I would be a

15   good fit.  Answered any particular kind of questions I

16   had with it and kind of walked through the initial

17   processes.

18              And also she was the one -- we kind of just

19   talked about, you know, what Ramsey is; what they're

20   about; and, you know, that kind of thing.  Kind of --

21   you know, we're a family-first company that helps

22   people get out of financial debt.  Pretty low key.  You

23   know, and that they need stuff for their video

24   division, and she had a -- she did have -- I mean, it

25   was a long period.  It wasn't just a single interview.

1    It was several interviews.  And then the interviews
2    turned -- then they -- each time they kind of add
3    something more they needed, like, now we need to --
4            Can you hear me okay?  Slow enough or --
5    sorry.  And am I okay?
6            They would ask to try to get -- you know, we
7    now -- we'll do a different interview.  We need to
8    now -- you to take a personality exam.  Personality
9    test.  We need you to submit a budget, and they said it
10   was because they were a financial company.  I think she
11   organized the assessment and the budget and getting.  I
12   know they were under a lot of pressure to get the
13   budget for that.
14           And then they say, great.  Now we're going
15   to do some interviews, and we will need to interview
16   your wife which was odd.  I think there was at least --
17   at least one Zoom with my wife on.  There might have
18   been two, because I think one of them I don't think
19   worked out.
20           And then after Kimberly.  Then we segued to
21   Larry, and David DiCicco and Larry Anderson and other
22   members of the Ramsey team.
23   Q.      Okay.  And thank you.  You just corrected me
24   because I called her "Kelly Randolph."  It's Kimberly
25   Randolph.

1  A.        Kimberly; that's right.

2  Q.        Right.  That's right.

3  A.        Sure.

4  Q.        Sorry about that.

5           All right.  Now, so do you -- do you know

6  when you -- it sounds like you spoke to Kimberly

7  Randolph before you began employment?

8  A.        Yes.

9  Q.        Okay.

10 A.        Yes.  She was -- she was kind of the

11 interviewer.  The interview hiree.  She was the one who

12 told me, "Hey, we're looking for this position.  We

13 have a documentary.  We're opening up a new video

14 division.  We think you would be perfect for it.  You

15 know, you sound -- seem like you would be a fit for our

16 company."

17          So there was a lot of discussion at the

18 front kind of -- you know, kind of who -- who I am

19 and -- and gathering of material to see if this is a

20 job that would be -- would be worthwhile to do.  And --

21 and, again, the -- you know, there were -- there were a

22 lot of things that I think they -- again, it was -- it

23 was okay.  We didn't talk money at all.  So I didn't

24 know at the time how much they would be offering or

25 anything like that financially.  It was more about,

1   how -- how much of a low-key culture, family first; you
2   know, family friendly.
3           They were very missional too in the sense
4   of, there -- religion was kind of down played.
5   Actually, it was down played quite bit by Kimberly.
6   But they -- when I say "missional," about helping
7   people get out of debt, restart their lives, and move
8   forward.  And this had an appeal to me as well as a
9   change of venue and scenery.  Yes.
10  Q.          Did you tell Kimberly that you were planning
11  to move back to Tennessee?
12  A.          I don't remember.  I imagine it was
13  something that was asked.  If it was in my -- you know,
14  I don't know if we talked about that or not.  I would
15  imagine if it was in a cover letter, it probably would
16  have been mentioned, but it may not have been.  But,
17  you know, it's definitely something that was a
18  consideration, and it's, like, yeah, I think -- where I
19  would have -- just told her what we were considering,
20  it's, like, you know, it's -- it's a possibility that
21  we might move.  I don't know if it's a done deal.  We
22  don't own a house.  We still have a house here.  You
23  know, there's lots of moving parts, but, you know, if,
24  you know, this works, you know, it will be great.  But
25  it's not, again, something I was -- it was a lot of

1   work. So it wasn't something I was, like, yeah,

2   absolutely, we're moving. But if the offer was right,

3   then it might be -- we would consider it. You know, i

4   talk about --

5   Q.        Do you remember telling Kimberly Rudolph

6   that you heard about an opening at Ramsey from -- I

7   think it's doctor.com or dr.com?

8   A.        Do you know who dr.com is?

9   Q.        I do not.

10   A.        That would be daveramsey.com.

11   Q.        Oh, okay.

12   A.        So, yeah, that would be probably what

13   that --

14   Q.        Oh, I got you. I thought it was doctor dot

15   com?

16   A.        No, no, no. It's --

17   Q.        Okay. Got ya.

18   A.        So if they -- I think they probably -- I

19   imagine probably asked in the interview --

20   Q.        Okay.

21   A.        -- how did you hear about us? You know,

22   where did you hear it from? And -- and ten to one, I

23   may have gotten something in my -- my email box. You

24   know, like I see here on the -- on the -- on Exhibit 7,

25   they said, "Hey, we're one of the best places to work."

1  Oh, it says eleven times.  I think I had gotten

2  something that said ten times in a row.  But I think I

3  probably had gotten something in my inbox.  And it

4  might have been, again, like from an employment agency,

5  like Monster and Indeed and stuff and clicked that.

6  And usually if I had something like that, I would go to

7  see probably their website and say is that legit

8  because, you know, a lot of times these things go out

9  of date.  So . . .

10  Q.        And then you did not have any conversation

11  with Kimberly Rudolph about salary?

12  A.        No.  I don't believe any specifics.  I -- I

13  was looking at my notes the other day, and it seems

14  like the salary specifics came much later.  They -- I'm

15  not sure if they had, you know, expected salaries and

16  things like that.

17        They may have had -- on the initial

18  application, they may have said, you know, what are

19  you -- what's your desired salary range?  Because I

20  think they have something that's automated and it,

21  like, caps out.  So you have to put kind of a lower

22  number as a conversation starter because it doesn't

23  allow -- I remember it not allowing you to put

24  negotiable; you know, to leave that open ended to have

25  a conversation about it.  But the very extreme brass

1  tacks about the salary did not come until after the

2  interview in Tennessee where they offered $90,000 plus

3  a $10,000 bonus to move.  That offer specifically came

4  after while I was still in Tennessee for their

5  interview -- in-person interviews.

6  Q.          Okay.  So earlier you made some reference

7  that you had to -- it was your own expense, but I --

8  and I thought you were talking about moving but maybe

9  you were talking about the trip?

10  A.          I was talking about interviewing, yes.

11  Q.          Okay.  So you paid to come here to

12  interview?

13  A.          Yeah.  They paid for -- they required that

14  the -- my wife be interviewed.  And which is, again,

15  very difficult.  It put a lot of strain on us because,

16  you know, we have the two young kids at home, and

17  there -- we don't have family.  So they would have to

18  come with us as well.

19          So they -- you know, there -- there was a

20  question about how were we going to make this work.  Is

21  it necessary for my wife to come?  And they intimated,

22  well, you can't continue with the interview process

23  unless we speak to her.

24          So -- so what we ended up doing and what

25  they would do is, I think, they said we do -- we put

1    you up at a hotel, and we would get you a rental car

2    and -- and would pay for a flight for two people, and

3    so they would do -- they would do that.  And so they --

4    let me think here how it actually went down.

5    Because -- yes, if I remember correctly, they offered

6    to pay for that so we could do the interviews in

7    person.  And I think we shuffled it somewhat where

8    instead of paying for me, I think they just ended up

9    paying for -- I had them -- because I saw in the --

10   because I saw just recently in the documents that were

11   provided by Ramsey Solutions my minor children's names

12   unredacted as well as their ages so -- and it was

13   linked to a plane ticket.  So I'm under the impression

14   that the way it worked for us, we ended up buying --

15   oh, because children cannot be unaccompanied minors on

16   a flight.  So we ended up getting a separate ticket for

17   myself and my son, and my wife was -- a ticket made for

18   her and son.  So I think Ramsey ended up picking up

19   those two.  I did our own, and then we ended up

20   staying, I think, at their hotel for the allotted time

21   to interview, and then we ended up paying for an extra

22   day or two.  So we could begin looking at housing

23   because if this was a thing that was going to happen,

24   was it even feasible to move, and what are the houses

25   like and things like that.  So we stayed an extra day

1    or two to go see those as well.  So -- and so -- yeah,
2    and so that -- in that case, then we paid for the extra
3    rooms and whatnot.
4    Q.        So --
5    A.        I think.  I can't remember 100 percent.
6    It's been a long time.
7    Q.        So they -- the salary they offered you was
8    90,000 plus 10,000 to move; correct?
9    A.        Yeah.  Originally it was 80,000 but they
10   were very, very keen to get me to come.  So in the end
11   they ended up offering an extra -- because I think
12   there was an issue when they saw my budget that, you
13   know, typically, you know, I earn a lot more.  So they
14   ended up moving up the salary, you know, from 80 to 90
15   in an effort to kind of -- say hey, would this entice
16   you more to come?  Would this be better for you?  You
17   know, which was better.
18             It was still a lot less, but, you know,
19   they -- I mean, again, the appeal is -- is, you know,
20   somewhat less the salary.  It was more the appeal of
21   being in a family-friendly environment that was only
22   going to -- they were very specific about it.  We only
23   work 40 hours a week.  We don't do overtime.  We don't
24   have crazy deadlines.
25             And I was, like, well -- because I think

1    that even came up at the dinner meeting.  How do you

2    guys even meet deadlines because you guys end up

3    doing -- if you don't do overtime because some of those

4    projects are quite vast, how do you do it?  And I know

5    Dave -- Larry and David kind of looked at each other,

6    chuckled, and said, well, we miss a lot of deadlines,

7    but that's part of the game.  We're not a company

8    that's about pushing people, making people work over

9    the weekends, coming in early, leaving late.  You know,

10   we're not a bunch of screamers like they are in

11   Hollywood.  That was David's quote to me at that dinner

12   that my wife and I attended.

13            And, you know, the appeal again is -- you

14   know, it's a very low-key environment that you would

15   get more time with your family.  There's no drama.

16   There's no craziness, you know, about it; that you

17   experience sometimes in a very high-pressure

18   environment when you're editing.

19            So -- and, you know, we were under the

20   impression from what they said, well, Nashville is a

21   very -- much more cost-, you know, friendly place to

22   move to.  So it should be easier for you to be able to

23   live on this reduced salary.  And -- and that was, we

24   realized it would probably be a bit of a trick, but

25   we'll see if we can try and make it.  They -- I mean,

1    when we moved we found out that Nashville is at lot

2    more expensive even when you live on the fringes like

3    in College Grove and stuff.  It's still pretty

4    expensive.  Not L.A., but it's still not as cheap, I

5    think, as people make it out to be.

6              And then when you're earning so much less,

7    you know; it's that kind of thing of, like, things are

8    30 percent cheaper, but you're making 60 percent less.

9    There's still -- things are a little tighter, but

10   that's just what it is.  But, again, the appeal was

11   just the culture and the environment.

12   Q.         Did anybody at Ramsey tell you that 90,000

13   in Tennessee was the same thing as 250,000 in L.A.?

14   A.         They said effectively it would be in the

15   sense that -- in the -- because what it -- because the

16   idea was you would be paying so much less.  That

17   their -- they would constantly say, "We don't have an

18   income tax."  They do have the highest sales tax in the

19   country.  It's pretty high.  It's up there.  But

20   they -- the tax was a big selling point.  Property tax

21   is much lower.  Utilities are going to be lower.  So

22   even though you're not making as much, you're not

23   spending as much.  So it balances out.  I remember

24   people saying it balances out.  Oh, you're going to

25   find it's a lot easier to make ends meet here.  It all

1  balances out.

2  Q.          And who told you that?

3  A.          Oh, gosh, you know, specifically in the

4  interview process, David DiCicco at that -- especially

5  at that dinner.  Larry Anderson -- these are the guys

6  that I did on the Zoom calls.  I think even Kimberly

7  mentioned that the cost of living in Tennessee is much

8  cheaper as kind of a sell point.  You know, and the --

9  and I think the -- and once I got there, like, I --

10  literally, every other person would say, oh, you moved

11  from L.A.?  Oh, it's a lot cheaper here, right; you

12  know, it was a con -- constant mantra of, like, hey, it

13  must be a lot cheaper being here than it is anywhere

14  else?

15          But, again, the appeal was less the money.

16  You know, it was a lot more that they -- the culture

17  was apparently so -- you know -- it was a lot more --

18  you know, it was a lot more pleasant.  And, I mean --

19  and the thing is that I had been hearing it on the

20  radio and, you know, from the cover letters, and even I

21  think correspondence that Kimberly had sent, you know,

22  that it was voted "Best Place to Work" in Nashville by

23  its own employees.

24          And so when I would do my research, and I

25  would find, you know -- I had only found the one

1  article from "The Daily Beast" about the gun incident

2  where Dave, you know, pulled a weapon, a loaded weapon,

3  apparently, on his employees, you know, that just

4  sounds like crank because there's no way it could be

5  voted "Best Place to Work" ten times or for eleven as

6  Armando Lopez says here.  It just doesn't sound

7  possible.  That's -- there's really -- it's impossible.

8              So, I mean, that played into another part of

9  the decision too.  It's like working at a place that,

10 you know, seems regionally known to be one of the best

11 places to be, but by their own employees, which is

12 great.  So -- because I don't -- can't remember ever

13 working at a place where everybody was, like, oh, this

14 is the best place to work.  I've got to get there.

15 Q.          So where was it -- where was the "Best Place

16 to Work" designation?

17 A.          I heard it on the radio show.  What do you

18 mean designation?  By --

19 Q.          Who designated them "Best Place to Work"?

20 A.          Who -- it sounds -- well, that's the funny

21 thing, is that like -- like, for example here in this

22 letter by Armando Lopez, my acceptance letter, he just

23 says, "Yes, we have been voted one of the 'Best Places

24 to Work' in Nashville eleven times."  And now you're

25 proud to be one of the ever-growing lives changed

1    through the message and products that we have.  You'd
2    be part of that.
3            I believe it's the Nashville Business
4    Journal.  The one that I was a part of, was for
5    Inc Management.  They were -- they had been voted "Best
6    Place to Work," and they were attempting to get that
7    again in -- I think early part of the year 2000.
8            But I think Nashville Business Journal --
9    I'm not sure of what some of these other places were
10   but -- you know, because, it -- again, it had like --
11   you know, basically, it was a big banner that you'd
12   have at the bottom of a lot of their correspondence,
13   and it was a big deal because I know Dave was very big
14   on having people do that and giving very good notices,
15   as he said himself, in an all employee meeting, it's,
16   like -- it's a recruiting tool we use.  And so there
17   was a lot of pressure to do these things and to be part
18   of them and to make sure that you participate.
19   Q.      So did you ever learn that Nashville
20   Business Journal -- we'll start with them -- did not
21   designate Ramsey Solutions as a "Best Place to Work" in
22   Nashville?
23   A.      Yeah.  I don't know.
24   Q.      Okay.
25   A.      Yeah.  I don't know.  All I know is that

1    that's what they touted in all of their things; that

2    they're the best place to work.

3    Q.        Okay.

4    A.        I don't know who deigned them.  I know when

5    I was working with them, it was Inc. Management.

6    Q.        Okay.

7    A.        So I don't know where I would have gotten

8    the Nashville Business Journal, but somebody said they

9    did, unless they made it up.  You know, I don't know.

10   Q.        Did you ever come to find out while you were

11   employed at Ramsey Solutions that Inc. Management had

12   not designated Ramsey Solutions as a "Best Place to

13   Work"?

14   A.        Inc. Management wasn't even discussed until

15   we were trying to get -- to become "Best Place to

16   Work."  The -- apparently these awards are something

17   that they seem to periodic -- from what other employees

18   have told me is that this -- these sorts of awards are

19   ones that periodically we do.  And there's a lot of

20   pressure to vote for us as the best place.  And if not

21   there are reprisals.

22            And there are people who have some issues

23   with the way it's handled, and I remember very --

24   watching Luke LeFevre threaten a congregation of us at

25   a standup about it being the best place to work, and if

1    you disagree and you don't think so, then I need to
2    talk to you, and we need to have a conversation.  I
3    know that was -- that was at one point.

4            But as far as Inc. Management, you know,
5    that was the first one that I was aware of.  All I know
6    is that this moniker was bandied about, "Best Place to
7    Work" in Nashville ten times in a row.  And that was --
8    again, one of the things -- and I think we even saw it
9    as social media post.  We saw it on their website
10   because, again, when we were looking -- doing the
11   research, is this someplace we would like to do because
12   they had made -- they made it sound very appealing.  I
13   mean, you know, we were pretty content with what we
14   were doing; the salary I was making; the doctors; our
15   friends; our whole life.  They made it sound very
16   appealing.

17           It was, like, listen, you know, we have this
18   culture.  We have a -- we have a very nonstressed
19   environment.  It's a 40-hour work week.  And the other
20   thing too is they say, it's only 90,000; don't sweat
21   it.  Nashville is cheaper.  But we're going to -- most
22   people get raises really quickly here.  And look at
23   Larry, and they pointed to Larry.  He had been there
24   less than a year, and he actually had apparently moved
25   up very quickly.  And apparently his salary had

1    increased as well.

2              And they said these salary raises are pretty

3    common, and especially for a guy like you, they said

4    who have great skills and -- it shouldn't be such an

5    issue to do.

6              So again, even if you weren't making a lot,

7    it sounds like you would be able to make ends meet

8    until the time that they actually give you a raise and

9    move you up.  And they even talked about a system of

10   getting me into a leadership program called

11   "EntreLeadership," so I could train to get more skills

12   to even move higher up and even get more rewards.  So

13   it sounds like that was -- that was kind of a thing to

14   help base decisions on.  And plus when you're talking

15   about, again, "Best Place to Work," it helped negate

16   when you saw this one rogue article -- it was the only

17   article I could find.  Now, I can find articles --

18   tons of articles but -- you know, if you look, but at

19   the time we did the research, this was the only thing

20   we could find, and it sounded so far-fetched.  I mean,

21   so far-fetched.

22   Q.        Is Larry Anderson -- is that who you're

23   talking about, Larry?  You said Larry --

24   A.        That was -- yeah, they --

25   Q.        -- doubled his salary?

1    A.           Yeah, because -- well, no, I didn't say

2    doubled his salary.  They -- he -- his salary

3    increased.

4    Q.           Increased?

5    A.           Yeah.  And he -- but he was on the Zoom

6    calls with --

7    Q.           Okay.

8    A.           -- with David and, you know, because when

9    they finally did start talking and we're -- because

10   there was a point I know David had said, "I don't know

11   if, you know, we could ever pay you what you earned,

12   you know, out there."

13              And I -- and I said, "I understand that.

14   It's a different region.  So things are going to be

15   different."

16              He was, like, "I think it's going to be a

17   lot less."

18              And I'm, like, "Well, that could be a deal

19   breaker."

20              He was, like, "But I wouldn't sweet it."

21              And then they pointed about how Larry has --

22   has not been there that very long, but he has moved up

23   very quickly.  And this -- you know, you put your nose

24   to the grindstone, and it won't be hard to get -- you

25   know, get added in and get those rewards moving

```
 1   quickly.  And it's usually by the end of the first year
 2   they said, you're already going to be making, you know,
 3   benefits, you know, 401(k), and beyond that, you know,
 4   usually the raises -- I mean, they had said that -- you
 5   know, they quoted Dave with his EntreLeadership.  He
 6   even says that, you know, he doesn't believe in yearly
 7   reviews if a person is excelling, he's, like, we'll
 8   give you multiple raises in the course of a year.
 9   So . . .
10   Q.        Did you ever hear anyone other than Luke
11   LeFevre or anybody in management other than Luke
12   LeFevre talk about voting for the "Best Place to Work"?
13   A.        Yes.
14   Q.        Who?
15   A.        It was said on stage in an all employee
16   meeting.  I honestly don't remember his name.  I don't
17   know if it was Daniel Tardy.  I don't know if it was
18   another member of leadership.  If it was Jack Galloway.
19   It was somebody higher up in one of the all employee
20   meetings.  I mean, if we get those recordings, you
21   know -- everything was recorded there for the all
22   employee meetings.  I used to -- I used to cut with
23   those for the Christmas reels because they saved them
24   for all of their sound bites.  So there should be --
25   all of the all employee meetings are recorded.  So I
```

1    could find out exactly who it is.

2              But I remember having -- in those all

3    employee meetings they had people say, hey these are

4    really important.  We use these as a recruiting tool.

5    We need everybody to do this and make sure that you

6    vote, and you make sure you vote it's the best place to

7    work because it's really important to us.  I believe

8    even in these all employee meetings Dave Ramsey himself

9    actually implored us to do that.  And say, hey you

10   know, this is really important.  You guys need to --

11   you know, you-all know it's the best place to work.

12   So, you know, vote with them.  If you don't think it's

13   the best place to work, there's the door.

14             So but, I mean, that was not as -- honestly,

15   that was not an overt threat like we received from

16   Luke.  This was we were under just pressure, pressure,

17   pressure from CEO, other members of leadership, board

18   members, and also internally when you're in your own

19   department itself of Lara, and Larry, and some of the

20   others, hey, guys, remember the deadline is coming up.

21   You need to make sure, and you've -- constantly will

22   get email reminders.  You know, have you done this?

23   Have you submitted?

24             And it was -- it was weird too because you

25   didn't know if -- because the way you submit, I don't

1   know how it was an email.  It's odd because you don't

2   know if -- who are you sending it to?  Are you sending

3   it to Inc. Management directly?  Does it pass through

4   Dave?  Because it's through our servers.  Do people see

5   it, and do they read it?  You know, so I think there

6   was a concern that maybe these are being read.  I don't

7   know.  But, I mean, I had reason to believe that just

8   because I know that my supposedly private, you know,

9   weekly reports were being read by people other than who

10  they said they were being read.  They were being read

11  by people upstairs.  So there was the idea that maybe

12  if you -- you do these -- if you didn't do it, it would

13  be noted and if, which, yeah, they probably did because

14  I mean, again, I don't know exactly what they did.

15          I do know when people left for COVID, they

16  kept lists of who -- who was out.  And then there was a

17  listing of not just that they were out, but why they

18  were out, and, specifically, what their concerns were.

19  Q.      Okay.  We'll get -- get to that.

20  A.      Sure, but obviously --

21  Q.      But back to --

22  A.      To answer your question about they -- the

23  pressure, I do believe, you know, they were very

24  habitual list takers in keeping records of who -- who

25  said what, who did this, and making sure that there was

1  kind of this big stack, you know, list of, hey, reports
2  and messages and paper trails all of the time of who
3  did what and who said what.  It was a common refrain.
4  So I -- they probably were shared with upper
5  management; I would imagine.
6  Q.        So did you ever see a list of people who did
7  or did not vote in Inc. Maga -- or Inc. Management's
8  pole?
9  A.        No.  As far as the people who voted?
10 Q.        Or did not vote?  Either.  Any list
11 associated --
12 A.        No.  Well, I know --
13           I touched it I'm so sorry.  I saw you wince.
14 I am so sorry.  I apologize.
15           The -- I know that it was touted, and, I
16 believe, it was an all employee meeting where they --
17 it was -- it was exciting that they had had such a high
18 turn out.  And it was almost like -- apparently, it was
19 a hundred percent.  Or it was in the 90s percent of the
20 people.  So if anybody didn't vote, it was literally
21 like a dozen or two.  It was not -- very few people did
22 not vote.  And I think the -- it was the very -- I
23 think one of the meetings that we had, they joked it
24 was like an Iraqi election.  It was an off-color joke
25 that somebody had made back in the day when the Gulf

1    War and Saddam Hussein would -- you know, as a dictator

2    would run for election, and he would get 100 percent of

3    the vote.  And -- or I think they would say 98 percent

4    of the vote.  And they were, like, well, who was the

5    2 percent that wouldn't vote for him.  There was an old

6    joke about that.  But that was a joke that was mooted

7    after the results came out.  And that was in, I think,

8    a departmental standup meeting that we did --

9    Q.        Are you --

10   A.        -- at AVT.

11   Q.        Are you aware of anyone who was disciplined

12   or terminated for either not voting or voting that it

13   wasn't the best place to work?

14   A.        I'm not aware, and it was difficult because

15   it was something that people didn't talk a lot about.

16   Because it was -- I know when Luke had said, listen,

17   it's very important you do this thing, and that you

18   vote.  It's very important, and if you don't -- well,

19   if you -- because if you don't think this is the best

20   place to work, I need to have a conversation with you.

21   We need to talk.  And when he said it, a hush fell over

22   the room and everybody got very quiet, and it was a

23   very pointed moment.  And it was a situation where you

24   definitely afterwards -- you felt like it's definitely

25   not something you want to talk about.  And we have a

1    non -- a no gossip policy too.  And it's very weird

2    because the gossip policy -- I think I've talked about

3    it before -- has a -- a lot of weird applications.

4    Where, in other words, if it -- is it supposedly, okay,

5    we can't gossip about -- and whatever gossip is just

6    means having open-air discussions about Dave Ramsey or

7    a policy?  Or is it can we not talk about the

8    Inc. Management thing and the pressure?

9              I mean, I learned that they have had several

10   of these votes before, you know, throughout the years

11   because, and, again, as they said in all employee

12   meetings, they got up there and said, this is a massive

13   HR -- and, you know, I think it was -- I don't know if

14   it was an HR person or who, but they had said that this

15   is a massive recruiting tool for us, and you need to do

16   this.  It is very, very important that you do it for us

17   because this is how we get our employees and, you know,

18   and that's, you know, tied into the way we do our tax

19   status here, and the way that we do things.  So it's

20   important that you guys do these things and that you

21   vote -- you know, vote a certain way.

22   Q.         Okay.  So you just mentioned maybe somebody

23   from HR.  Before you indicated Daniel Tardy?

24   A.         Possibly, yes.

25   Q.         Possibly?

1    A.          Uh-huh.

2    Q.          Possibly Jack Galloway?

3    A.          Yes.

4    Q.          Possibly Dave Ramsey?

5    A.          Very likely Dave Ramsey.  I think I do

6    remember Dave because Dave when he said that -- he

7    might have actually have been -- somebody had said it

8    and at the end he -- because he would have a habit if

9    somebody had said something on stage, and he wanted to

10   add an addendum, he may have ringed in right behind

11   them, you know.

12              And then the CEO comes in behind them, "Oh,

13   by the way, just so you know, you know, if you don't

14   think this is the best place to work, you know, there's

15   the door."

16              I do remember -- I do remember he said that

17   many times, but that's -- you know, and I don't know if

18   it's specifically joined to the person who made those

19   statements, but I think it was -- as we were getting

20   closer to the Inc. Management deadline, it was referred

21   to several times.

22   Q.          And who do you think the HR person was?

23   A.          I don't know who was in HR.  I'm -- you

24   know, I don't know if it's a -- I see Armando Lopez's

25   name, and I know Rick Perry because I did interviews

1    with him, and I know it was Oksana.  But I don't know a

2    ton of people in HR.  So, again, because it's a

3    corporation with about a thousand faces at the time,

4    you know, it's like there are constantly new faces

5    coming up all of the time.  And if they have the

6    microphone, they're up in front, and you're kind of

7    like, oh, it's a team leader, you know.  Which is weird

8    because I think they had like -- I think the ratio of

9    leaders in the company is almost a -- like -- like,

10   it's a one-to-three ratio.  So like 30 to 40 percent of

11   the company is leaders.  So everybody gets off as

12   probably somebody you should listen to; it always seems

13   like.

14   Q.         Okay.  So you said that it was related to

15   the tax status.  What are you talking about?

16   A.         Well, I don't know.

17   Q.         Okay.

18   A.         That -- that was something that they said

19   that they get -- there's a -- they get tax credits for

20   who they hire, and it's important that they -- they're

21   constantly hiring.

22   Q.         And you don't know who said that?

23   A.         I don't know who said that.  I don't know

24   what that relates to.  Again, I'm not a tax expert and

25   nor do I know, you know -- and people in here probably

1    know because you're employment guys, but I don't -- I'm
2    not sure what that was in referral -- reference to.
3    Q.        Yeah, I don't either.
4              All right.  So then the other question I was
5    going to ask you about that, do you remember anyone
6    else other than possibly somebody in HR, Luke LeFevre,
7    maybe Daniel Tardy, maybe Jack Galloway, almost
8    certainly Dave Ramsey?  Anybody else you can think of
9    that made a comment about voting for the "Best Place to
10   Work"?
11   A.        Oh, well, Lara would have done it.  I mean,
12   Maria Katz would have done it.  I mean, I'm not
13   creating a hit list for anybody, is it?
14   Q.        I'm asking you questions, and you can answer
15   them.
16   A.        Sure, that's no problem.
17             These are all of the people I can remember
18   because, it was -- again, it was a lot of people who
19   were saying, hey, guys, the deadline is coming up.  You
20   need to do -- we were also getting emails, and I --
21   like, you would get daily emails about, hey, this is --
22   the deadline is coming up.  Make sure you vote.
23             Who was sending them?  I don't -- honestly,
24   I don't remember.  I don't have access to my emails, so
25   I don't know who they were.  But, you know, if they --

1    if we could get them back, I'm sure we could find out
2    who was sending them out at the time.
3    Q.          And did you edit video footage about a
4    meeting -- of a meeting where these things were said?
5    Have you seen a video where these things --
6    A.          Have I seen a video?
7    Q.          Well, let me finish my question.
8                Have you seen --
9    A.          Yeah.  Sure.
10   Q.          -- a video where things were said about
11   voting for the "Best Place to Work" poll?
12   A.          Have I seen a video?  No.  These are --
13   these are all in person.
14   Q.          Okay.
15   A.          As far as like I did.  Now, again the
16   standups on Friday -- especially the one that Luke made
17   the comment, I mean, they're usually recorded, and I
18   believe there -- because part of our department is
19   editors, and we also have cinematographers.  And
20   there's always a scramble every time there's a standup
21   or a -- which is an inner departmental meeting and the
22   all employee meeting which is everybody.  And usually
23   there's always a demand for cinematographers to get
24   cameras and film these things.  And so they're usually
25   recorded because they like to, use them, when you --

1   you know, like I said, for Christmas videos, internal

2   promos, for sizzle stuff, you know.  They never -- the

3   work booth, we never know what Dave said -- is going to

4   say, and we want to use his -- his messaging and what

5   he says, and we want to make sure that it gets out into

6   the world as much as possible.

7            So Dave says lots of things, and we need to

8   make sure we have it on tape.  So almost everything is

9   recorded.

10            And I believe -- I know the one with Luke it

11   was prerecorded -- it was recorded.  All of the

12   employee meetings where this was stated were recorded.

13   I'm not 100 percent sure.

14            Now, as far as the -- like the internals and

15   departmentwise, it's all just one on one.  But this is

16   all stuff that I, you know, was witness to and -- in

17   the room.  I never watched a video of what was

18   recorded.

19   Q.        Okay.  Now, what was your position at Ramsey

20   Solutions?

21   A.        I forget what the exhibit number is, but it

22   says -- I think Exhibit 3 has me listed as a senior

23   video editor.

24   Q.        Is that what your position was?

25   A.        I believe that is what he -- I don't know if

1    it's on Exhibit 7 either.  That just talks about the

2    pay.  But as far as -- as far as I know, that's what I

3    was hired as.

4    Q.          Okay.

5    A.          A senior video editor.

6    Q.          Did you --

7    A.          Which I don't think is what I applied for

8    actually, but I think that they -- I think we talked

9    about earlier it might have been amped up from video

10   editor to senior editor.

11   Q.          Was there any other position that you held

12   while you were at Ramsey Solutions that you know of?

13   A.          As far as a titled position, no; that's the

14   only titled position I had.  I mean, there was a lot of

15   dog spotty things that I did there.

16                I would do cinematography unpaid.  I would

17   do mentoring.  I was a mentor for -- you know, junior

18   editors who were having difficulty.  I -- you know,

19   also kind of served as an IT expert.  So building their

20   own bay.

21                I did -- when -- I believe it was -- not

22   Neil Gonzalez.  I believe it was Jeff Gideon.  He was a

23   producer on a budgeting series that I was working -- I

24   was editing for.  And I know, he had his -- he had a

25   child that was born premature.  It was a preemie baby,

1   and it was a big emergency.  He had to leave.  And so I

2   stepped into the role of the producer, and so I

3   produced and edited the project.  Again, because my

4   skill set allows me to wear lots of different hats.  So

5   I was able to step in and help out with that, and, you

6   know, I was able to get on budget, on time because they

7   had a big -- it was a big deal for them losing him just

8   at the last minute and stuff.  So . . .

9   Q.          When was that?

10  A.          Oh, that was 20 -- that was -- I was no

11  longer on the documentary, so that would have been

12  sometime after April -- between April 2020 to July

13  2020.  Yeah.

14  Q.          Okay.

15  A.          Because, yeah.  That's -- and so there's a

16  lot of unofficial, you know, jobs that we kind of --

17  again, it was a weird thing because you get hired for

18  one thing and you're going to work 40 hours a week, and

19  you end up working an extra 20 or 30 hours every --

20  well, not that many per week, but you'd end up slamming

21  in a lot of hours doing things that maybe you weren't

22  hired for, but -- you know, the thing is they really

23  wanted to get that -- you know, they made it sound like

24  at the beginning it's, like, listen if you -- you know,

25  we can -- we are promising you that you can get extra

1  rewards.  That you can have a higher salary.  We'll

2  move you into a leadership position.  Just take the

3  reins.

4          I think Dave said to me, personally on the

5  first week I was hired, he was, like, Listen, you --

6  you know, your -- your raise will be effective when you

7  are.  And if you go out there and kill something.  Drag

8  it home, and I'll share the meat with you."  That's --

9  that was his big mantra he had said to me.

10          And he said, "You get in there.  You

11  volunteer.  You do the extra time.  You do what you

12  have to do, and we'll make sure -- we'll make it worth

13  your while."

14          And so any chance I could to help people,

15  you know, I was really big on making sure that the --

16  you know, they -- I mean, when we did the interview,

17  they had said they were looking for a leader who

18  could -- I think they have it.  I think -- I'm not sure

19  if it's in the documents.  They have a KRA where they

20  have all of the expectations of what they -- they

21  believed my role should be.  I'm sure we can pull it

22  because it -- it's a very long, almost two and -- you

23  know, a page and a half document with all of their

24  expectations for you as a senior video editor.  But

25  beyond that, they were looking for somebody who could

1    come in and help, you know, mold the department into

2    something that's more 21st century.  When I came in,

3    they weren't even using slates or 2-Pops and things

4    that are common to allow sound departments to sync the

5    audio to the -- to graphics and to the picture.  And so

6    I helped them develop kind of standards and practices

7    guides that allowed them to do the videos more

8    smoothly.  More succinctly.

9              They were having a lot of time -- problems.

10   They were -- the AV department, according to Lara

11   Johnson was not very profitable.  She would -- she and

12   David and Larry would talk.  They had a big problem

13   with people doing time sheets.  And that -- the billing

14   was very difficult.  They were in the red all of the

15   time.  And so I helped them organize a way of getting

16   the -- of getting people to do their time sheets and

17   also just kind of get it to where it could be a little

18   more of a profitable model as far as the way jobs were

19   assigned, and how they were handled.  I know it was

20   something that was -- that was -- I took it upon myself

21   on my shoulders.  There were a few others as far as,

22   like, building editing bays.  Helping other people.  I

23   organized, like, even movie days because I'm -- I'm a

24   SAG-AFTRA member.  So I get screeners.  So we would,

25   like -- we would actually do movie days and stuff.  It

1    was kind of team-building exercises.  I actually
2    implemented a system where junior editors and female
3    editors who don't usually get a fair shake at getting
4    on bigger projects were able to showcase material they
5    had worked every week.
6              So, again, the idea was -- is they wanted me
7    to come in and help, you know, do some of the things
8    that I had done as a creative director and as a
9    producer at BLT and at other companies I had been at
10   and to bring it there and do that.  And so I did that
11   quite a bit in the fall and as much as I was allowed to
12   in the spring as well.
13   Q.         So let me ask you about the time sheets.
14   Did the editors keep time sheets at Ramsey Solutions?
15   A.         They -- I don't remember honestly.  They
16   have --
17   Q.         Did you --
18   A.         I honestly don't remember.  They have a
19   system called "Jira"; that is taken from -- they kind
20   of-- they stole it from Toyota, I guess.  It's, like, a
21   car company thing that they -- allows them to organize,
22   and I don't know if that's a scheduling program for
23   scheduling stuff or if that is actually like a program
24   where you bill your hours to something.
25   Q.         Did you keep your hours?

1   A.          I imagine -- you know, this sounds really

2   familiar.   There must have been hours kept because

3   that's something I think Maria Katz was on too a lot,

4   but she's the scheduler there.   I don't know.   I can't

5   honestly remember what their -- their procedures were

6   as far as that.

7   Q.          That's fine.

8   A.          It was interesting because, again, it's --

9   it's one of those things.   You know, it was, like --

10  you know, we just work the 40 hours.   We just do our

11  thing.   It was real low key.   You know, I know it

12  wasn't when you got there, but there -- I don't

13  honestly remember.

14  Q.          How many hours a week did you work on

15  average?

16  A.          It depends.   It was more than 40.

17  Q.          Every week?

18  A.          It -- it -- especially in the -- especially

19  in the year 2000 -- excuse me -- 2020 quite a bit.   In

20  the beginning, you know, you're wanting to do a good

21  job, so you put in the extra hours.   And it's all

22  unpaid.

23          And there are things that they did not

24  disclose to me when -- at hire.   Like you were supposed

25  to take FPU classes.   They never disclosed that you're

1  supposed to be doing that.  They -- you have to do

2  volunteer work at churches.  They didn't disclose that

3  either.  There are some things that are required

4  outside of work that was not disclosed at the initial

5  time of hire, among other things.

6          That -- I mean, they didn't talk about all

7  of the praying and the Bible journaling, and they

8  didn't talk about any of those odd culture things that

9  they -- all of the required reading of Dave's books and

10  the quotations and -- and they didn't -- they didn't

11  say any of that stuff.

12          So it's not a surprise, but what -- as far

13  as what I would do weekly, usually, I would put in some

14  extra hours.  Stay late talking to Larry or David in

15  trying to figure out, you know, best ways to move the

16  country -- company forward and move that department

17  more in the 21st century.

18          I know when there's a major project, like

19  the Christmas video, I can remember waking up at 4 in

20  the morning and stuff, going in, and doing -- shooting

21  videos and things like that.

22          I remember the EntreLeadership was an

23  unpaid.  That was one of the things they said if you

24  want to become a leader in the company, if you want to

25  get these commensurate raises, there was a -- they said

1    the first you need to do is get EntreLeadership.  And
2    you need to attend these classes.  We have them -- I
3    think it was every Wednesday.  I'm not sure.
4    Sometimes -- it might have been a Thursday.  I'm not
5    sure specifically the day, but I do know the time was
6    7 A.M.  And so I would wake up at 4 in the morning, 5
7    in the morning, fight the traffic from Spring Hill.  At
8    the time, I was living with my mom while my family was
9    in California.  And come in and attend these classes
10   out of Dave's book to try to, you know, become a leader
11   and find out the Ramsey way of doing things so I could
12   be, you know, a more effective leader and also say,
13   hey, great, let's get this guy -- he's done -- done
14   what he needs to do to get a raise.  And I know it was
15   mentioned at my ninety-day review.  So I would do that.
16            And I know when finally we were allowed to
17   start working on the documentary in January -- we kind
18   of forgot that moving -- there was a lot of time and
19   effort and energy put into that; that was unpaid and
20   off the clock a lot of times mostly to move things
21   around and stuff.  So . . .
22   Q.        Okay.  So did you get paid the same
23   amount --
24                  MR. STREET:  Let's let --
25                  THE WITNESS:  And I think there --

```
 1   BY MS. SANDERS:
 2   Q.          -- every paycheck?
 3   A.          Well, yeah --
 4               MR. STREET:  Let's let him finish his
 5   answer.
 6               MS. SANDERS:  Well, the question is
 7   long gone.  So --
 8               MR. STREET:  That's okay --
 9               THE WITNESS:  Well, the question --
10               MS. SANDERS:  No, we need to keep
11   moving because we're going to run out of time.
12               MR. STREET:  And that --
13   BY MS. SANDERS:
14   Q.          We're going to start over.  We're going to
15   start over.
16               My question is very simple.  Did you get
17   paid the same amount every paycheck or did it vary?
18   A.          Oh, no, it was -- it was the exact same.
19   Q.          Okay.
20   A.          Yeah, yeah.
21   Q.          All right.  Now, did you -- you said that
22   you worked -- you did quite a bit time over 40.  That's
23   where we started with this.  So --
24   A.          Sure.  Yeah.  Yeah.
25   Q.          -- how many -- like, how often do you think
```

1    you worked over 40 hours?

2    A.          I would say, especially after the

3    confrontation with Luke LeFevre on March 16th, it

4    increased considerably.  There was a dead period where

5    they kind of ignored me totally.  And then when --

6    after April 13th, it was like -- you felt like you

7    needed to give it all you can because I was doing these

8    extracurricular meetings with Lara Johnson, these

9    reonboarding sessions as they were called.

10   Q.          Okay.

11   A.          And so you felt like you needed to do all

12   you could even beyond what I was even doing before.

13   And so you put in the extra time and all you could to

14   make sure these projects really sung and -- and, you

15   know, did well.

16               I also was -- and that was when they gave me

17   mentoring work to help people -- I helped Sarah Mack

18   with -- and stuff and I think that was a thing.

19   Q.          When you say "extracurricular meetings with

20   Lara Johnson," were those after work hours or during --

21   A.          No.  They were during work hours.

22   Q.          Okay.

23   A.          But extracurricular in the sense that they

24   don't -- they had nothing to do with work.

25   Q.          Did you attend the EntreLeadership classes?

1  Did you complete those classes?

2  A.         They were ongoing.

3  Q.         Okay.

4  A.         They did not have a finish date.  They were

5  constantly, constantly being done.

6  Q.         How often -- how many of those did you

7  attend?

8  A.         Many.  As many -- I mean, in 2000 -- until

9  COVID -- they were very regular up until COVID.

10  Q.         Okay.

11  A.         Once COVID happened, they were -- they were

12  very erratic in when they were done, but they were

13  weekly before that.

14  Q.         Okay.

15  A.         So I would say every single week, you know,

16  prior to.

17  Q.         And you went weekly?

18  A.         Yes.

19  Q.         Okay.  Did you attend Financial Peace

20  University?

21  A.         No.

22  Q.         Okay.  Did you do any volunteer work --

23  A.         It was -- you know, on the Financial Peace

24  scale were -- according to their baby steps -- we never

25  took it -- were -- we would have finished and completed

1   their entire out-of-debt sequencing, the full seven
2   steps to where we were at the end.  And they -- I
3   remember they said that in the hire that that was one
4   of the things that they said appealed to me is I was a
5   living example of somebody who lived debt free.  Even
6   though I never took the program ever, I was -- I was
7   out of debt and didn't have any, you know, debts of any
8   kind.
9   Q.          You said there was required volunteer work
10  at churches.  What volunteer work at church did you do
11  that was required?
12  A.          In November they were -- no, I didn't do it
13  actually because -- but it was required, which, again,
14  was something like the Bible journaling was not
15  disclosed at the time of hire but required.
16            In the month of November, Dave said that
17  this is our month of giving.  And so, you know, his
18  daughter Denise was going to call you up and was going
19  to give work to everybody, and you need to do it on the
20  weekends.  We'll pay you for your time; don't sweat it,
21  but you do need to do this stuff.  It's mandatory.  And
22  they're going to be at churches.  They'll be at food
23  pantries.  And most of them were churches, but they --
24  there was, you know -- and from what people said
25  they're equivalent from, you know, painting fences,

1    cleaning up yards, doing lots of kind of dog spotty

2    work for these churches.  And --

3    Q.        Did you do it?

4    A.        I did not because I was -- I had asked if I

5    needed to do it, and they said they needed to -- at the

6    time it was they needed me on the Christmas video they

7    were trying to assemble.  And they -- it was a very

8    busy time.  And they said, "Listen, let's get you on

9    that; let's not do this -- do this for you."

10            I remember Lara Johnson saying, you know,

11   "I'll talk to Denise, and we'll not get you on that."

12   So . . .

13   Q.        All right.  How about the mandatory Bible

14   journaling?  Did you do that?

15   A.        Yes.

16   Q.        When did you do that?

17   A.        Oh, I think it was, like, every Wednesday

18   Lara Johnson brought everybody into a room.  When I was

19   hired on it's -- you know, it's a little like

20   Scientology.  You jump in and then they -- you know,

21   you have Dianetics and the huge stack of reading you

22   have to do.

23            I had -- when you first get to your desk

24   they have, like, ten books mostly authored by Dave and

25   by some of their personalities.  And they're required

1   reading.  They're great -- read all of this.  Know it

2   by heart by the end of the week.  And one of them is a

3   Bible journal, and that Bible journal was brought up

4   every Wednesday, and it was required that you were

5   supposed to kind of write in it, have thoughts about

6   it, go pray by yourself and do collective kind of

7   journaling with the group.

8           That was, I think, another thing that was

9   not told about how much, you know, public prayer there

10  would be.  How much sharing there would be.  It's a

11  very -- you know, his -- his -- you know, it's a very

12  public process; their praying and praise and prayer

13  circles and everybody sharing and then every meeting

14  closing it out with prayer, laying hands, and raising

15  it up in a salute with your head bowed and your hands

16  up, every time somebody was hired.  There was a lot of

17  that and I -- and it was not disclosed.  I mean,

18  literally every meeting.  And as you can tell from my

19  testimony, there's a lot of meetings, and they did a

20  prayer -- they closed it out -- with every single one,

21  there was a prayer.

22          Again, for me, you know, it's more

23  Protestant, and it's very -- it's a very personal thing

24  between, you know, me, and God, and it's not really

25  there to be shared, but they would create forums where

1  it was almost a requirement and a lot of pressure that

2  you go out and you told whatever personal things was

3  going on in your life, whether you had somebody die;

4  somebody is sick; somebody is going through a divorce.

5  And not -- not even all of the time was it -- did it

6  need to be you.  It was, like, do you know somebody who

7  has a divorce?  Do you know somebody who is sick?  Do

8  you know somebody who has got kids who have -- have an

9  illness because we need to pray for them, and we need

10 to -- to talk about it.

11        So it was basically making it a very,

12 uncomfortable kind of public thing and that was kind of

13 the Bible journaling in what we were supposed to do.

14 Q.        What was the name of the Bible journal?

15 A.        Oh, something about a "Perfect Circle," I

16 think.

17 Q.        Okay.

18 A.        I think it's in our testimony and stuff.

19 Q.        In your testimony?  I'm sorry.

20 A.        Or in -- yeah, in the -- not the testimony;

21 I'm sorry.  The statement of complaints.

22 Q.        Okay.  So the "Perfect Circle," was that

23 authored by a Ramsey personality?

24 A.        No.  It was somebody -- somebody else.

25 Q.        Okay.

1   A.          It was a -- kind of a -- yeah, I'm not sure

2   quite what the religion was.  It was -- I don't know if

3   it was evangelical or if it was just a regular

4   Protestant.  I just -- I'm not sure.

5   Q.          Was it one of the ten books you said you

6   were required to read in a week?

7   A.          Well, I wouldn't say ten books, but, oh,

8   yeah.  Yeah, it was -- yeah, it was one of the ones --

9   well, it's not a book that you read because there's a

10  lot of blank pages in it.  What would happen is Lara

11  would bring everybody in once a week, and she would --

12  it was, like, story time.  You'd sit down, and

13  everybody would be in a circle, and then she would read

14  out of the book.  She would read a chapter.

15  Q.          Okay.

16  A.          And then based off of what she had read, you

17  were asked to go away and then journal your thoughts

18  about what had been talked about and how it relates to

19  your work at Ramsey.  How you deal with things at

20  Ramsey.  Things that maybe you heard Dave saying at an

21  all employee meeting.  Maybe our Devo guest that we had

22  done this week what they have to say and how does that

23  influence your life and how can that bring you closer

24  to what you do here?  You know, with a -- with the way

25  we do things -- I wouldn't say the way we -- the Ramsey

1    way, I guess, you know.

2    Q.        So who attended those meetings that you just

3    spoke about with Lara?

4    A.        These -- these meetings were specifically

5    our department, our audiovisual department, including

6    all of our cinematographers and editors.

7    Q.        Who were some of those people at the

8    meetings?  I mean, you and who else?

9    A.        Yeah.  I mean, they have a -- I think in one

10   of your disclosures, you have a list of everybody's

11   salaries and everything, and it has the department

12   right there, and every single one of those people were

13   required to be there.  The only time they weren't there

14   was if they were out of town.  Like, David DiCicco I

15   don't think was there a lot because he was always out

16   of town filming stuff on the -- on the documentary.

17   Q.        Who are some of the people you remember

18   being there?

19   A.        I would -- well, Lara was always there

20   running things.  You would have Lindsey, Lindsey

21   Heatherly.  You would have, you know, all of the guys,

22   the cinematographers.  I mean, I get -- a lot of these

23   names I don't remember specifically because my

24   interaction with them was -- you know, they were

25   coworkers.  You know, and Sarah would be there.  You

1  know, Benji would be there.  Fulton would be there.

2  Dennis would be there.  Everybody would be there.  So

3  if you find an employee list, they were all there.

4  Q.        Okay.

5  A.        And Luke -- Larry -- Larry was there.  And

6  the only time somebody would be not there is if they

7  had, like, a very pressing work thing that took them

8  off campus or whatever.

9  Q.        And did those happen throughout the entire

10 course of your employment?

11 A.        Uh-huh.

12 Q.        Okay.

13 A.        Yeah.  Yeah.

14 Q.        From the beginning until the end?

15 A.        From the beginning until the end.

16 Q.        Okay.

17 A.        Uh-huh.

18 Q.        Yeah.  All right.  And let's talk a minute

19 about your supervisors at Ramsey Solutions.  Who was

20 your direct supervisor?

21 A.        My direct supervisor was a guy who sat next

22 to me, J.B. Waggoner.

23 Q.        Okay.  And who -- did you have any other

24 supervisors or any other managers that you would report

25 to?

1    A.          Yeah.  I mean, J.B. -- it was required that

2    I would have every meeting with him.  That I would

3    basically just tell how I'm doing at the company, and,

4    again, it was mooted as water cooler talk.  Oh, we're

5    just talking here.  How's the family?  How's the kids?

6    How's the this?  How's the everything?  But it --

7                And, yeah, we would talk about work.  I

8    would ask, you know, that was usually when I would make

9    my recommendations about ways to improve in the company

10   or how to move the work flow or this is maybe what we

11   had done in Hollywood because they -- they constantly

12   asked me, "Hey, what did we -- what did you do in L.A.?

13   What did you do here?  Could you, please, tell us

14   because we want to know."  And so constantly, "Oh, tell

15   me a story about this movie or tell me a story

16   about" -- you know, so there was a lot of interaction

17   there.

18                And then I guess a lot of that material then

19   would get passed up to next in line who you would find

20   David DiCicco, who I'd report to for the documentary,

21   is right above, who I believe was the head of

22   postproduction.  Or no -- yes.

23                And then there's Larry.  I did not report

24   to.  He was a head of production.

25                And above -- above David was the -- was Lara

1    Johnson who was kind of the head of AV and the head of
2    all of the cinematographers and the editors.  And she
3    was the one I ended up, eventually, reporting most to.
4              Above her would have been Luke LeFevre, who
5    was the CCO.  It was an odd title, but I guess the
6    creative of -- head of everything at Ramsey.  One of
7    the board members, second in line to Dave.
8              So the -- so that was kind of the chain of
9    command.  Lara was the one I probably ended up having
10   the most interaction with.
11   Q.        Okay.
12   A.        And so . . .
13   Q.        All right.  Now, you mentioned earlier
14   something about junior -- giving junior editors and
15   female editors opportunities.
16   A.        Yes.
17   Q.        And I think you indicated that they were
18   underserved or had less opportunity.  Are you talking
19   about at Ramsey, or are you talking about in general?
20   A.        In general, but specifically at Ramsey.
21   There was -- and it was something I talked about in
22   several of the meetings and brought up with them.  It
23   was, like, listen, you seem to only be putting female
24   editors on female shows.  You seem to only be giving --
25   they had one or two female editors, and they would be

1    put on "The Rachel Cruze Show," or they would be put on
2    "The Christy Wright Show."  And, you know, they rarely
3    were put on other projects and allowed to kind of
4    stretch their legs and do bigger and better things.
5    And I know I pushed to try to get -- I know I pushed to
6    try to get, you know, them involved with the Christmas
7    video which -- which ended up doing -- that's a -- kind
8    of a different editorial style.  It's more, you know,
9    sizzle.  It's more presentational.  It's a lot of
10   flashy editing, working with music, very different than
11   kind of episodic cutting which is -- which is the way
12   they would do -- basically just editing is swapping
13   between a three camera setup where you just do edit,
14   edit, edit, which is very rote and your skills don't
15   increase.
16           And my big thing was, like, you know, trying
17   to give people who are junior editors, younger editors,
18   female editors who weren't being given tasks that they
19   could get in there and they could improve their skill
20   sets and move further and move up.  There's no way --
21   you're not going to have that next generation of
22   editors that's coming behind that you can kind of move
23   up to these bigger projects.  Especially because,
24   again, they said, "We want you to come in, and we want
25   you to help build this film department because we are

1    going to -- this is the first documentary of several
2    we're going to do.  We're going to have a whole film
3    thing, and, you know, we're going to need to have
4    people polished up."
5            And part of the thing David asked me to do
6    is to kind of get editors bigger and better, more
7    robust and there --
8    Q.        Who asked you to do that?  I'm sorry.
9    A.        David DiCicco.
10   Q.        Okay.
11   A.        And -- and Larry -- well, and -- Larry
12   doesn't ever say -- didn't say -- does not say very
13   much in these meetings because I think he -- he's more
14   of production versus post.
15           So but in the early initial interviews it
16   was, hey -- you know, it was David DiCicco who asked me
17   to -- you know, "We really need your help.  We need to
18   move into the 21st century.  We have a lot of young,
19   inexperienced editors, and we need you to come in and
20   show them how it's done."
21           I had a code name apparently, according to
22   J.B. Waggoner, "the big fish."  I don't know what that
23   means.  But that's what -- what my code name was.  When
24   they hired me, I know apparently, David ran around
25   saying, "We landed the big fish.  We landed the big

1   fish."  So . . .

2   Q.          Who told you that?

3   A.          That was J.B. Waggoner --

4   Q.          Okay.

5   A.          -- in his -- in one of his -- one of the

6   one-on-ones we had.

7           So the idea was to help train people and get

8   them opportunities and to grow their skill set.

9           And even after -- you know, even after I --

10  you know, you had this -- this weird thing where they

11  had changed their -- where basically they ended up

12  treating -- you know, Luke and Lara had started being

13  very aggressive and punishing towards me and doing a

14  lot of these -- these reonboarding sessions and things,

15  they still were utilizing my skill set in some of these

16  really higher profile projects like the Summit reel or

17  FPU or budgeting materials.

18          And they still were having me even mentor

19  some of the -- because the -- again, they just kept

20  saying, "Oh, you're doing a great job.  You're doing

21  fantastic."

22          They would have me mentor like Sarah Bonner

23  Mack.  She was somebody they said was having trouble.

24  So I actually showed her how to cut trailers.  How to

25  move her skill into something that would be more

1   marketable, but also could be more helpful if she has a

2   job ever beyond Ramsey Solutions but also while she's

3   at Ramsey Solution how to cut bigger, better, faster,

4   stronger.  You know, more dynamic kind of promo spots.

5   Q.      Who did you talk to about the female editors

6   only working on female shows?

7   A.      Everybody.  I talked to -- specifically, I

8   would talk to Lara on one-on-ones, when I was in these

9   meetings -- these kind of reeducation or reorientation

10   meetings.

11         I mean, I don't -- they call it

12   reorientation.  There was no reorientation.  There was

13   no policy that was ever gone over in those meetings at

14   all.  It was all questions about my wife and what I

15   thought about Dave and the Ramsey way.

16         But specifically her, but also I remember

17   saying this -- we would have editor meetings.  We would

18   have editor meetings and department meetings, and I

19   would get together -- you know, and they would say,

20   "how are things going?"  And they would talk about, you

21   know, how are things going.

22         And I -- so everybody had heard me say, I

23   think we're underserving a lot of the female editors

24   here.  It would be great if we could get them on the

25   Christmas video, and it would be great if we could find

1    more diversified things for people to do.

2              And the reaction was a little bit more like,

3    "Well, no, stay in our -- stay in your lane.  You

4    should probably only do what you're told."

5              And I was, like, "Well, guys, this is how

6    people grow and how we get better."

7              And they did put -- I think Maddie was on

8    the Christmas video.  Sarah -- I know they let her cut

9    a battle of the bands, and do things that were a little

10   more outside of their normal rote skill set.

11             So -- so I -- hopefully they were listening,

12   and, I guess, it was a thing that was -- happened.

13   Q.        Did you -- were you ever an editor for one

14   of the shows?

15   A.        Yes.  I edited the new open for their

16   biggest show, "The Dave Ramsey Show," the radio show, I

17   ended up recutting their open for them that would be

18   used for all of their online stuff.  Because they --

19   the radio show goes out on air on the radio, but

20   there's also a video component, and I created the open

21   for that.

22             So they had asked me -- again, it's stuff

23   they asked me to do.  It's not like, oh, hey, let me

24   open -- you guys need a new open.  Let me cut it for

25   you.  It was -- they had asked me to do that.  So I

1    actually did work on that show.

2    Q.        Okay.  You mentioned earlier that Dave said

3    to you to -- like -- something about kill the meat and

4    drag it home; you'll get paid more?  Did he say that to

5    you personally?  Was that a one-on-one conversation?

6    A.        It was.  It was in our orientation meeting

7    in the first week.  They had a variety of -- of -- the

8    first -- when you do these orientation meetings, you

9    end up being -- you don't really talk about company or

10   policy or anything you do at a normal corporation where

11   you -- well, I never worked at a corporation beyond

12   this one, but when I -- at the companies I have worked

13   for, they -- you would go over policies, sexual

14   harassment policies; all of things that you normally do

15   at a company.

16            This was more about, hey, we're going to go

17   to -- we have a museum of Dave's life upstairs.  We're

18   going to go tour that, and we're going to do kind of

19   a -- we're going to have a game, and we're going to try

20   to figure out who can figure out the most trivia about

21   Dave's life.  Or we're going to take a tour of the

22   building, and we're going to look at where they buried

23   the Bible, and we're going to do lots of interactions

24   and things.

25            And one of the -- one of the things that

1    they did is they would have something, you know,

2    spontaneous guest appearances from the personalities.

3    They had Anthony O'Neal, who he -- he hasn't gone to

4    college or hasn't finished college, but he was their

5    debt free degree guy.  He was a guy, I'd end up working

6    with a little bit on their -- on the documentary

7    because the documentary was a student loan thing.  And

8    so he would be the one weighing in on it.

9            So he showed up to the presentation, and

10   then eventually Dave shows up, and they did questions

11   about -- you know, people would say -- he would sit in,

12   and say, "Ask me anything."  And, you know, people

13   would ask his -- you know, things they had on the radio

14   show.  It was a very fan kind of moment.  Like, you

15   know, hey, he's come down from high and you too can

16   hang out and have a quick Q. & A. with the -- with

17   Dave, the CEO.

18           And my question pertained to, you know,

19   "What does it take to be successful here because I'm

20   relocating?"

21           "Oh, that's great."

22           "All the way from California."

23           "Wow.  Sorry, Buddy, you know."

24           And then actually, like, "What does it take

25   to be successful because, obviously, there's a lot

1    riding on this being successful because if I don't get

2    paid or if we don't end up -- the experience isn't as

3    good because you're leaving your home and your family

4    and your career.  Everything is kind of being -- you

5    know, all of the stuff that you've built up for such a

6    long time is being left behind in California.  So you

7    want to make sure this will work, so it's a positive

8    experience.  Dave, what does it take to be successful

9    here?"

10                And that's where he responded to the quote

11   that I said earlier about -- about -- he told the story

12   about people who have all of the skills in the world,

13   and all of the degrees and asked for raises, but

14   they're not effective.  So I don't give them to them.

15   The raise is in effect when you are.  So what you need

16   to do is you need to volunteer, do what you have to

17   do -- you know, that was the drag -- go out there, kill

18   something, drag it home; I'll share the meat with you.

19                And he told me that, you know, we don't

20   believe in just yearly reviews.  We can give multiple

21   raises if you do a great job.  You know, we'll move you

22   up.  And I don't know if he's talking specifically

23   sales department stuff, but he had said that to me as

24   far as the way to actually move up in the company.

25                And then that was reaffirmed by David

1   DiCicco when I did a meeting with him in November.  You

2   know, we were starting to look at budgets and realizing

3   how -- how tight money was.  Seeing, hey, when is

4   this -- when are these raises happening, and obviously,

5   it was a big conversation with Lara, who is the head of

6   the department; people who would authorize these raises

7   and stuff.

8   Q.          So how many people were in the room when you

9   asked Dave that question and he responded?

10  A.          Oh, probably a dozen or so.

11  Q.          Okay.

12  A.          And they were probably -- and, you know, I

13  know you had Maria -- or not Maria.  I'm sorry.

14  Margaret Kloess, who was our orientation specialist or

15  whatever.  I think she's -- they call her "the welcome

16  wagon."  I don't know what her official job title is,

17  and then one or two other employees, but Dave himself,

18  and then the people that I was onboarded with, you

19  know, that week.  It was kind of every week, they move

20  in a -- every two weeks they move in a group of new

21  employees.  There's kind of a constant cycle of people

22  moving in constantly.

23  Q.          And you think that was about a dozen?

24  A.          Probably.

25  Q.          Okay.

1  A.        Probably.  It was --

2  Q.        All right.

3  A.        It was -- it was -- yeah, probably.  I mean,

4  some of them -- I don't know their names.  I don't

5  remember their stories because they were all asked to

6  tell their "Dave story," and everybody had to sit and

7  kind of talk about the moment they found Dave.  It was

8  kind of like their come to Dave Jesus moment.

9        And some -- some guy was on drugs and had

10  suddenly -- you know, had heard Dave on the radio

11  decided, you know, enough was enough.

12        Another person was in debt.  Another one

13  her, you know, husband was addicted to porn.

14        There was all of these stories that they

15  had.  It was a very intense outpouring of emotion and

16  stories that were kind of -- we were asked to tell.

17  And they were, like, hey, what's your moment?  What's

18  your story?  What's something personal about you?

19  What's some collateral that we can have out here; that

20  we can hear in a public setting.  And so . . .

21  Q.        What was your story?

22  A.        I just told the story about listening to

23  Dave on the radio when I was, you know, with my dad,

24  and, you know, going to basketball.  It was not as

25  inspiring, I guess, or as traumatic as some of the

1    others.  So . . .

2    Q.          Okay.  The -- you've mentioned several times

3    the documentary.  How many documentaries did you work

4    on when you were at Ramsey Solutions?

5    A.          It was only.

6    Q.          Okay.

7    A.          There is -- that's not fully true actually.

8    There is a -- when I got there, they were really

9    pushing.  It was, like, "Man, we've got to get you out

10   here.  I know you haven't sold your house, but can you,

11   please, get out here ASAP so you can start working on a

12   documentary."

13          So great.  No problem.  I'll leave the

14   family behind.  I get all the way out there in August,

15   and they still were shooting footage.  And they were,

16   like, "Well, we want to take what little footage we

17   have, and some of the sound bites, and we're doing a

18   new podcast based off of what will be the documentary."

19   It was kind of, like, a test platform.  It was called

20   "Borrowed Future."  It's a podcast that you know, I

21   ended up cutting a trailer for and that was the big

22   lift that they had right on the front.  So it wasn't a

23   documentary, but it had all of the documentary

24   material.  The documentary then was one thing.  Oh,

25   this is a documentary student loan that they hired me

1    on for and wanted me to work on, and that, you know,

2    was ongoing for the length of the time that I was

3    there, and, I believe, the year after, and, I think,

4    they finally released it in 2021.  I haven't kept

5    really good track of it.  I do know it went far beyond

6    what they thought it would take.

7    Q.        What did you -- when did you start working

8    on that documentary?

9    A.        It was something that I was supposed to --

10   they told me I would be working on it almost day one.

11   It didn't -- that didn't happen.  I would be able to

12   breakdown some footage every now and then.  But really

13   the actual heavy lifting on the project didn't start

14   until almost January.  We had -- we had in the

15   beginning, they wanted me to do the "Borrowed Future"

16   podcast, and then they had -- Dave Ramsey's show needed

17   a new open they wanted me to do.

18             They had -- I'll slow down I'm sorry.

19             They wanted me to do, the Christmas video

20   for them, which was -- that was a two-month thing, and

21   it was like anywhere from 30 to 50,000-dollar budget

22   for the Christmas video that they present at the

23   Opryland Hotel every year.  The Christmas -- and that

24   was, I think, December 7th was when it was due.  So we

25   would have started that in October.

1         So it was a lot of things that came before
2    the documentary because David was still shooting
3    footage for it.  Email the footage, as it comes in,
4    break it down as you can, if you can.  There was a
5    lot -- a big scramble on the Christmas video and
6    everything.  And then they -- and then finally I had to
7    build because they -- I had to build the bay because
8    David was very insistent we have an edit bay that we
9    put the documentary in and have all the footage and do
10   presentations.  And so I helped -- I actually
11   physically assembled it.  Put it together.  Got the
12   speakers and all the wiring and everything all -- all
13   set up in there.  It took some time.
14        And then at some point, they decided that
15   they thought it would be better if they would work on
16   PCs, and so they actually did a switchover from
17   Macintosh computers to PCs, and then that wasn't
18   working.  It wasn't any faster.  So they ended up
19   switching back to Macintosh.  So there was a lot of
20   delays.  And then eventually, finally in earnest, we
21   kind of got into it in January.  There was some stuff
22   done ahead -- breakdowns and some stuff that was put
23   together.  Some assemblies I had done for the "Borrowed
24   Future," the podcast, that was going to be hopefully
25   used for the documentary.  So . . .

1   Q.          Did you miss any deadlines on the
2   documentary?
3   A.          It's interesting because, again, day one in
4   my initial interview with David, I asked about
5   overtime.  And he said, well, we don't even have
6   deadlines.  And it's not something we really, really
7   get all bent out of shape about.
8           They had a schedule of -- for the
9   documentary that was kind of like a wish list he had
10  said.  It was like, this is where we target.  So we
11  kind of can prep people.  Like, we'll -- by this point,
12  we'll have the picture; by this point, we'll do
13  graphics; by this point, we'll do sound; and then we'll
14  do finishing.  And he needed -- he needed me to help
15  me -- help -- he needed me to help him develop that
16  schedule because they had never done a feature.  And I
17  had done many feature assemblies in Hollywood when I --
18  even though I did promo.  When I started, I ended up
19  doing a ton of -- of massively long features for big
20  movies, and so I was accustomed to doing it.  So they
21  had me pull the schedules together.
22          These initial schedules are really
23  ambitious.  And I was, like, there's no way.  I mean,
24  documentaries take two, three years to do.  And I think
25  this one in the end almost took them two years.  If

1    I -- I think when they finished, it was 2021. The idea

2    of doing the entire thing and having it done and ready

3    to go in six months was not likely. And so we had

4    several times we revised the schedule and pushed it

5    back.

6              And so he wanted an initial screening. And

7    he set it up -- I think that first screening was set up

8    behind -- I was moving -- because we moved into a new

9    house in February. He set up the initial screening

10   right after that. And I -- I let him know I think it's

11   going to be tight; that could be tough. But you know

12   what, I can move my move-in date.

13             And the difficult thing with Dave -- David;

14   he's not a really good communicator. And he has a

15   really hard time saying, hey, this is exactly what we

16   need. This is really important. And all of the time,

17   it was always a constant, "Oh, no, no, man; family

18   comes first. Don't worry about it. It's not a big

19   deal. You know, don't move your move-in date; that's

20   important. You know, family first. Family first." He

21   kept saying family first all of the time.

22             And the -- and then when that -- so I ended

23   up spending, I think -- I think the 27th or so -- I

24   forget what the dates were. I think it was the 227th,

25   28th, or 29th. I was out two days for PTO to do our

1  move-in which was approved.  And then I even had people

2  who helped us move in.

3           And then we had just, like, a short week to

4  get all of the rest of it together.  And so we got to

5  the end of it, and, you know, the idea was just to have

6  the first half of it assembled.  And, you know, we got

7  down to it, and he was, like, "Can you do it?"

8           I put the overtime is.  I was, like, "Sure;

9  I'm going to try."  We got to it, and we -- it wasn't a

10  hundred percent done.  I said, "That's okay.  I

11  think -- you know, put in a little weekend work.  Don't

12  worry; I'll do it.  We'll be good by the beginning of

13  next week."

14           And he was like, "No, no, I need it today."

15           A little miffed, but not really a big deal.

16  He said he wanted to do a screening.  And I'm not sure

17  who the screening was with.  So that was what he wanted

18  to do and -- and so we didn't do it, but the next week

19  we had it.

20           And this is the thing is that we did it.  I

21  screened it for them.  Showed him.  No big deal.  It

22  wasn't even really mentioned.  And then weeks and weeks

23  went by where they still had me working on the

24  documentary.  I was still doing that.  COVID happened.

25           They -- I think COVID -- Dave sent out an

1    email on the 15th of March about how COVID, you know,

2    it was a big -- COVID -- they had detected a case.

3    Amanda Rogers had gotten sick and -- and ended up being

4    hospitalized.  It was actually a very severe case, and

5    she works 15 feet away from the bay, documentary that's

6    being done.

7              And so they -- everybody -- it was a big

8    call to arms, which I can talk about, to the big all

9    employee meeting on Monday, and it was decided that

10   they would not close, and they -- although, we might

11   have to work without salaries and everything.

12   Q.        Who said that?

13   A.        That was Dave Ramsey.

14   Q.        That you would work without salaries?

15   A.        Yes.

16   Q.        Okay.

17   A.        And he said, "Don't worry, the board is

18   already not drawing a salary.  So we might have to ask

19   you to work without being paid, but we're not quite

20   there yet."

21             The big thing was -- is that he says we --

22   you know, "We're not at the point where we have to

23   start firing people."

24             But that was the first thing he had said

25   actually.  "I just want to ensure you, we're not going

1    to fire people yet."

2              And so that was that meeting talking about

3    it, and the general consensus was, like, I think this

4    is -- yes, we have a case.  Some people are sick.  But

5    we're not going to close down.  We're perfectly fine.

6    I know some people in government.  I won't say who, but

7    this -- this -- I think everybody needs to take a

8    breath.  Step back.  And we're -- we're going to be

9    okay.  So let's all pray and move forward.

10             And they opened the floor for some

11   questions, and the questions -- they had, like, a

12   couple of people come up and ask questions.  But they

13   weren't really questions.  They were mostly, you know,

14   I believe in this place, and it was very rah, rah kind

15   of stuff.  They weren't real good questions.

16             Afterwards, Luke LeFevre had brought

17   everybody into -- in our department because that was

18   where the first case was located.  Amanda Rogers works

19   in our audiovisual department.  And that's where she,

20   you know, works.  Her desk is right close to ours.

21             Luke brought everybody in, and said, "How

22   are you feeling?  You know, everybody good?  Are you

23   good?  Everybody cool?"  And everybody kind of nods,

24   and he said, "Okay.  Great.  Well, let's get back to

25   work."

1          And I piped up.  I said, "I actually do have

2    some questions because I think the attitude is we're

3    being a little cavalier about this.  We need to

4    probably-- we don't know anything about this.

5    Remember, this is very early days.  Everybody is

6    panicking.  You see stuff on the radio, and you see

7    stuff on the news, and there's very little information

8    out there."

9          And I said, "I think we probably need to

10   take a breath and take a look at what's going on here.

11   I think just to dismiss it out of hand that somebody

12   who got very, very sick is sitting in this department.

13   What does that mean for us?  Do we all need to be

14   tested?  Do we need to go home?  Do we all need to

15   quarantine?  Where do we even test?  What do we do?"

16   These are the kind of questions I had for Luke.

17         He seemed very taken aback that there was

18   somebody who actually had concerns, and he said, "Well,

19   okay, well you know what.  I think we just -- everybody

20   take a breath and let's pray."

21         And then at the end of the meeting, he then

22   pulls me aside and says, "Hey, man, what's up?"

23         I'm like, "What do you mean what's up?"

24         He was like -- he was like, "Yeah, what's

25   the problem?"

1    I'm like, "Well, I mean, somebody got really
2    deathly sick next to us.  We don't know anything about
3    the disease, and it seems like it's killing people.
4    What do we need to be doing here?  I mean, it seems
5    like there's a lot of questions, and I'm not hearing a
6    lot of answers.  I'm not saying we need to shut down,
7    but do we all need to be tested?  What are we doing?
8    What's the plan?"
9    And he's like, "Don't worry.  Don't worry.
10   We've got this.  We're watching.  It's not a big deal."
11   I'm like, okay.  And after that moment,
12   everything got very different with the way that Luke
13   treated me, and then this original question started
14   with a question about a missed deadline.  Because,
15   again, this deadline had not been talked about.
16   Q.         Okay.  So let me ask you that.
17   A.         Let me finish.  This document --
18   Q.         Hang on --
19   A.         The -- they had not talked about the
20   deadline really being missed.  David was a little
21   miffed.  He talked about it a little bit right there
22   when it happened.  He didn't mention it again.  It was
23   not mentioned again until -- because we ended up all
24   working from home.  We ended up all leaving.
25   The deadline being missed was not brought up

1    again until, I think, it was almost four weeks later,

2    or, no, I think it was almost six weeks later.  It was

3    in April.  April 9th when suddenly I got a call from

4    David DiCicco, and the first thing he says, "You missed

5    a deadline."

6                    I was like, "What deadline are you talking

7    about?"

8                    I was surprised and a little confused

9    because at that point, I had been removed from the

10   documentary because he had asked -- everybody was

11   supposed to work from home, and he -- and so we were

12   all starting to go home, and then he -- he had actually

13   asked if I would prefer working at home.  And actually

14   because he knew that I had somebody who was high risk

15   at home.  And he was like, "Hey, do you want to work

16   from home?"

17                   And that was the day after the confrontation

18   with Luke.  I won't even say confrontational.  I just

19   brought up my concerns.

20                   But he -- David then comes in and says,

21   "Hey, would you like to work from home?"

22                   And I was like, "Is that an option?"

23                   And he said, "Yeah, sure.  Sure.  It won't

24   be a problem."

25                   And I said, "Well, as long as it doesn't

1  jeopardize my job; I mean, I think it would be a good

2  idea until -- and we can take the week, figure out

3  what's going on, and then we can pick it up next week."

4           He was like, "Yeah.  Sounds great."

5           And so it ended up by the end of the week a

6  general order happened; everybody was sent home.

7           And then I called David to say, "How are we

8  going to do the documentary?  Do I need to pick up my

9  computer and my drives?  We can work from home.  I

10  think it will work."

11           He was like, "No, no, no.  We found a loop

12  hole we're going to get you to come in.  We need you to

13  work in house."

14           And I'm like, "Well, is that necessary?"

15           He was like, "Yeah, I want to work side by

16  side."

17           And there was concerns because this -- David

18  was still flying all over the place and shooting things

19  for the documentary, and he had actually been on planes

20  to New York I think the prior week.  And there was a

21  bit of uncomfort -- something being very uncomfortable

22  sitting in close proximity in a closed bay with

23  somebody who may or -- I mean, I don't know what his

24  habits are or what not.  But the one thing that people

25  were saying is just stay away from other people.  I

1 don't think they were even on the whole mask thing yet.

2 They were really just -- the only thing, social

3 distance as much as you can.

4 And they were shutting down the entire

5 company down based on it because they were -- more

6 people were starting to get sick in the company itself.

7 So David -- David -- I offered an

8 alternative solution. I said, "Well, listen, if you

9 want, I can come in and work. I'll just sleep in my

10 basement." I said, "We have a new house. We have an

11 unfinished basement. I'll sleep down there and be

12 separated from somebody else."

13 "No. I don't want you to do that."

14 And he kind of almost wouldn't take no for

15 an answer. And wanted me to come in, be present, and

16 be with him. And he said, you know what, don't even

17 worry about it. I'll put Dennis -- I'll take our

18 assistant editor who is on the project, I'll put him in

19 your role, and we'll swap.

20 And that felt odd, but I said that's fine if

21 that's what -- it will be easier. They next week gave

22 me my computer and -- because they had me come in.

23 They had me -- gave me my computer. They gave me a

24 hard drive and everything. They were having a party in

25 my bay with, like, five or six people in the bay itself

1   and kind of having food and alcohol while they were

2   editing with the new editor.  And then they gave me my

3   system and sent me home.

4              And I expected to hear, hey, let's start

5   editing where we can start putting stuff together.  You

6   know, let's start -- you know -- you know, because I

7   think originally they had talked about Dennis doing the

8   front half, and I would do the back half and we would

9   meet in the middle.  And -- and I just kept waiting for

10  notes, and I never got a call.

11             And then suddenly finally on the 9th, I got

12  a call from David who kind of ghosted me through these

13  weeks, and I -- and the first thing he says is, "You

14  missed a deadline.  You missed a deadline."

15             "Well, what are you talking about?"

16             I thought he was talking about, you know,

17  that they were behind on the documentary.  I hadn't

18  worked on the documentary for weeks.  So I didn't know

19  what they were doing.  If they were behind.  I thought

20  by this point, they were -- you know, I had caught them

21  up before -- you know, a day or two after we missed a

22  deadline.  That next week we were caught up.  I figured

23  we were good.  Maybe they had fallen.  They needed me

24  to pick up -- so I was confused, but he was referring

25  back that prior month, and it was very odd because, you

1    know, he hadn't mention it as being that big of a deal

2    at all.  And, again, to go back to the hire, you know,

3    "deadlines don't matter.  We don't have this cut

4    throat, everything is a deadline.  We didn't have a

5    release date for the documentary."  The documentary

6    hadn't been sold to anybody.

7    Q.        Okay.  So, Mr. Amos, I'm going to ask some

8    questions about -- I want to stick to the documentary

9    and the deadline.

10   A.        Sure.

11   Q.        Frankly, you're answering the questions and

12   talking about other topics.  I've actually learned a

13   lot.

14   A.        Uh-huh.

15   Q.        So no objection to that.  Okay.

16             But we're going to move things along, and I

17   need you to stick to the question.  Okay?

18   A.        Sure.

19   Q.        Here's the question.  When is the first time

20   that you were told that you missed a deadline?  Was it

21   April the 9th?

22   A.        Yeah.

23   Q.        Okay.  So nobody had ever talked to you

24   about missing a deadline before April the 9th?

25   A.        When David DiCicco came in is -- I don't

1    know what day.  It might have been the first week of

2    March time.  He had said -- you know, he had said, "Oh,

3    yeah, we're going to have a screening," and estimated

4    when he wanted to do it.

5                    And I said, "Great.  We'll see if we can do

6    that."

7                    And we tried and, you know, I was like, "Oh,

8    it's not going to happen today."

9                    And he was like, "Oh, I really wanted to

10   have it today.  I really wanted to have a screening.

11   You know, let me make some calls, and I'll deal with

12   it."

13   Q.         Is that what you described as him being

14   miffed?

15   A.         Yeah.  Yeah.  He was like --

16   Q.         Got it.  Okay.

17   A.         He was like, "Let me make some -- I really

18   wanted to have a screening today."

19                   I think he had some -- he had snacks in his

20   hands and everything like that.

21                   And he was like, "I really wanted to do this

22   today, but let me make some calls, and I'll deal."

23                   I was like, okay.  And I talked to him

24   later, and then he was like -- I was like, "Is

25   everything okay?"

1          He was like, "Yeah, it's fine."

2    Q.          Okay.

3    A.          So that was it.  And then we fast forward to

4    the 9th and that's when -- you know, that's when it's

5    mentioned in repetition.  You know, that was most of

6    the call.  It was, I missed the deadline.  I missed the

7    deadline.

8    Q.          In the schedule that you said that you

9    helped them make.

10   A.          Uh-huh.

11   Q.          Was there any deadlines in that schedule?

12   A.          No.  I mean, they were -- they were target

13   dates.

14   Q.          Okay.

15   A.          They were not deadlines like this is hard

16   and fast.  Like, if we don't reach this, the whole

17   thing falls apart.  It was this is the target date that

18   we're aiming to shoot for.

19   Q.          What was --

20   A.          Let's see if we can get to that, and then we

21   can have a screening by this, and then we can show

22   people this time and then we can -- you know, there's

23   lot of phases when you go through it.

24   Q.          What was the first target date on the

25   schedule?

1  A.       I'm guessing at that point -- well, we had

2  other target dates where we had -- like, that already

3  come and gone, and we had already done where it was,

4  like, let's get all of the footage broken down and

5  let's -- we'll get new footage.  We'll break it down

6  and we'll start an assembly.  And then those would

7  constantly be revised because then David would shoot

8  more footage and bring in new footage as -- as people

9  came up, and they found new people to work on the

10  documentary, and new people they wanted to add.  I

11  think the latest was one from New York.  They would go

12  in and shoot, and then you would have a whole new set

13  of dailies that you had to breakdown, organize, and get

14  done.  Dennis was even brought in -- he was supposed to

15  break this stuff down and get it done, but he ended up

16  doing editing instead of breaking that stuff down.

17  Q.       Okay.

18  A.       Which is fine.

19            MS. SANDERS:  We're going to take a

20  quick break for the videographer.

21            THE VIDEOGRAPHER:  Going off the

22  record.  The time is now 3:28.

23            (Recess taken from 3:28 to 3:35 P.M.)

24            THE VIDEOGRAPHER:  We're back on the

25  record.  The time is now 3:35.

Case 3:21-cv-00923  Document 65-1  Filed 01/19/23  Page 230 of 389 PageID #: 1940

1                    MS. SANDERS:  Thank you.

2    BY MS. SANDERS:

3    Q.          All right.  We have taken a short break,

4    Mr. Amos.  So we're going to get back to the

5    documentary.  Okay?  So we're going to talk just about

6    the documentary.  We'll talk all about COVID later, but

7    right now I just want to focus on the documentary.

8              You said that you made a schedule or you

9    helped assist with the schedule.

10   A.          Uh-huh.

11   Q.          There weren't any hard, fast deadlines, but

12   there were target dates?

13   A.          Uh-huh.

14   Q.          You knew in March that David DiCicco was

15   miffed, as you described it, but it wasn't until

16   April 9th that you learned that you had missed an

17   actual deadline; is that correct?

18   A.          That is true.  So I mean, like I said, did I

19   know a target date was missed?  Yes.  But as far as,

20   like, the gravity of what he made it sound like, the

21   way he talked about it on the phone call was as if --

22   you know, because I had been sent home.  I was not

23   working at the company, and everybody was working at

24   home so everything was done through texts.  I hadn't

25   heard anything.

1            The first I heard this was a problem in the
2    gravity of, like -- it made it sound like literally it
3    had put the entire project behind, just -- in the
4    course of really a handful of days.  I mean, these are
5    not weeks we're talking about or months.  This is a
6    handful of days, but he made it sound like it -- the
7    whole thing had fallen apart.
8            And I didn't really find out about it
9    that -- because even at the end of it, I said, "Well,
10   how do we -- what do you need from me because I've been
11   sitting here waiting?  If we're behind, I've been
12   waiting for weeks to get footage from you and to get
13   some notes so I could start putting stuff together."
14           I even -- while I was, you know, kind of
15   being ignored for a couple of weeks, I had even cut
16   together massive scenes for them to use that I thought
17   that might be from where we left off.
18           So I would say, "Well, if we're behind tell
19   me what we need to do to get back on track.  I've been
20   just sitting here doing nothing.  I have the footage.
21   I have a computer.  I have the edit system.  I can go
22   ahead and start putting stuff together now.  I could
23   have been putting stuff together the last three or four
24   weeks if you -- if this really was that big of a deal."
25           "No, no, no.  It's not a big deal.  That's

1    not the point.  That's not the point.  It's not a big
2    deal."
3              I'm like, "Well, okay.  Cool well, what do
4    we need to do moving forward?  Totally cool.  No
5    problem."
6              And he was like, "Okay.  We'll do a sync up
7    meeting next week."
8              And then when I got on that call, it was --
9    so it was put on my calendar, my Outlook that, you
10   know, David wanted to have a meeting, and it was
11   supposedly about the -- it was called "documentary sync
12   up."  It was a very -- like a cool -- I figured it
13   would be Dennis who was the guy who was editing now on
14   it, and I figured it would be David.  And it actually
15   was a board member, Luke LeFevre, and it was head Lara
16   Johnson, the head of the department.
17             And Luke immediately said, "Why is the
18   documentary so far behind?"
19             And I was surprised.  I was like, again, "I
20   just talked to David about this.  I didn't know you
21   guys had become so far behind, you know, since Dennis
22   took over.  Has" --
23             And they were like, "Well, no, no.  It's
24   because you missed a deadline."
25             I was like, "Oh, was it?  Because it's the

1    first I'm really hearing about this on -- you know, I

2    think was Thursday or whenever we talked."

3            And then Luke said, "Well, that -- what --

4    that's enough with that.  That's not -- that's not

5    really why we're here."

6            I'm like, "Okay.  Well, what are we doing

7    here?"  Because I'm surprised I'm talking to a board

8    member and Luke.

9            And I apologize.  I know we're talking about

10   the deadlines and the importance.  He steered the

11   conversation immediately into COVID.  And he

12   immediately asked, so -- he wanted to know about my

13   wife, about how my wife felt about COVID.  How I felt

14   about COVID.  Do I even want to start working?  Did I

15   want to continue working here?  He -- we weren't

16   talking about the documentary at all.  He was talking

17   about my attitude and my problems.  And it was a very

18   bizarre conversation.  You know, I -- I didn't really

19   know what to say, and what I needed to be doing.  But

20   then they removed me off of the documentary.

21           He was like, "We don't want you working on

22   the documentary at all."

23           And it's interesting too because I know from

24   some of the documents you guys have turned over,

25   apparently, Luke said some rather derogatory things

1    about my wife in, you know, personal emails.  Which may

2    not be too surprising that I have seen a lot of stuff

3    about crazy spouses.  I've talked about that before.

4    But the thing is that they said some derogatory thing

5    about this and were very concerned about -- and this

6    was the day after I had a conversation with Luke about

7    COVID.  He began to -- he apparently was worried about

8    my access to things and did I have passwords and was I

9    able to get through things.  That was the day after I

10   talked to him, and it was interesting because now --

11   this is now a full month or so later and on the 13th of

12   April, and I was ambushed by him and Lara talking about

13   do I want to be working here.  You know, do I believe

14   in Ramsey, and, of course, I did.

15            I mean, I -- I, basically, said, "Listen, I

16   left a quarter of a million dollar job.  I gave up all

17   of my friends, and I gave up my career.  And my wife

18   gave up her friends and her career.  My kids lost their

19   doctors.  They lost their friends, and we moved all the

20   way over the country to come work for you guys to work

21   on this thing which got me very excited.  You've got a

22   stress-free environment, no drama, less -- you know,

23   less hours.  You know, eventually we're going to get

24   more pay apparently.  It's going to end up being a

25   very, very pleasant experience.  That was what was

1    promised, and that's what I'm working for.  And that's
2    why I was trying to get here."
3                And I was very, very taken aback that they
4    were kind of questioning my commitment.
5                I'm like, "I sold everything.  I lost my
6    house, my career, the whole nine yards.  I came out
7    here to work with you guys, and now I'm being told I'm
8    not that committed."
9                So he backed off.  Said, "Oh, it's totally
10   fine and stuff, but we're not going to have you working
11   on that documentary anymore.  That's done.  Don't
12   worry.  There will be other documentaries.  We're
13   moving on."
14               Okay.  So I basically had been fired from
15   it.  I'm not quite sure 100 percent at that time why.
16   And then I was like, "What will I be working on?  I do
17   have, you know, obviously, a good skill set.  I know
18   what I need to -- I can be a great asset to you guys."
19               And he checked me.  And said, "Whoa, whoa.
20   You need to check your humility, Buddy."
21               And then, again, he got very angry at me.
22   And then asked if I even wanted to work here.  And it
23   was, like, "If you had another job, would you take it?"
24               And I reply, "No."
25               So that -- it was a very bizarre,

1    bewildering conversation, and at the end of it, that's

2    where they started -- Lara then reached out and said,

3    "We need to get you in reorientation meetings, and we

4    need to -- weekly we're going to start these

5    reorientation meetings."

6    Q.          So up until this conversation with Luke and

7    Lara, you had only had two conversations with David

8    DiCicco about the documentary and the -- and the

9    progress?

10   A.          Technically even just one because there was

11   the day that we had missed it before -- yeah -- well,

12   no, that's not true.  That's not true.

13              As far as that deadline, one conversation

14   that was on the 9th.  After, you know, because we

15   had -- the screening was done -- I think, he wanted it

16   the -- that first Friday in March.  I think it might

17   have been the 3rd.  I'm guessing at the date.  It was

18   the last -- it was like the first Friday in March.  It

19   was one week after I had moved out of my -- moved my

20   house.

21              And, again, I had said, "I can move this

22   date."

23              He told me, "Don't move the date.  Don't

24   move anything."

25              And then the next -- the following week, we

1   had -- we were working or working through -- we were

2   working together side by side on this stuff and then

3   COVID happened.  And then we had the emails that David

4   transmitted to everybody.  Then it kind of threw

5   everything in disarray.

6            And I had, you know, spoken to Luke about my

7   concerns, about the -- "We don't really know very much.

8   Maybe we need to take a step back, and we need to

9   reconsider and talk about what this really means for

10  the department.  We had had somebody so gravely ill

11  next to us."

12           The very next day, DiCicco said, "Would you

13  like to work from home?"

14           And I -- I -- I said, "As long as it doesn't

15  jeopardize my job, it would probably be great.  But we

16  can only do it for a week and see where things land."

17           And then by the end of the week, everybody

18  was out the door and stuff.

19           And so -- but it -- during that time, we

20  were still talking quite congenially about the

21  documentary, and about, "Oh, let's move this here.

22  Let's do this here.  How do you think this is edited?"

23           Because I think even that conversation

24  "would you like to work from home", you know, actually

25  came up after we had done yet another screening of the

1   documentary, and we were sitting there for hours on end

2   watching it.

3   Q.       So is it your testimony today that you did

4   not miss any target dates?

5   A.       No. I don't think so. I mean, it --

6   according to David DiCicco, I missed a deadline or a

7   target date on the first week of March according to

8   David.

9   Q.       Okay. How about according to you?

10   A.       Again -- as far as I would say, no. The --

11   you're talking about a project that had no deadlines;

12   that has no, you know, date -- no date where it's

13   actually -- there's no distribution date. There --

14   and, again, I mean, maybe this is on Luke's -- on

15   David's shoulders by not communicating sincerely enough

16   the importance of this date and how much it meant to

17   the project and how it would apparently throw

18   everything into disarray by not being -- making that

19   singular date.

20       I mean, in feature work, deadlines get

21   missed a lot because of the amount of footage they have

22   to work with in movies. So there's always a rolling

23   schedule they call it.

24       But, again -- and when it happened, it does

25   not -- it was very much downplayed. So, you know, him

1  making it out that it was a very, very big critical

2  thing that was done and missed and was very

3  detrimental, no.

4  Q.        Did you ever say to David DiCicco that

5  things were on target and that they were progressing

6  like they should?

7  A.        Yeah.  I -- I think I had said -- well, no,

8  I think I said the target.  I said, you know -- I think

9  I said, "You know, listen, I think that we're being too

10  ambitious about these target dates, and we should

11  probably revise the schedule and push things back."

12        But in the case of the -- this first one

13  that was missed I said, "You know, if it's a problem,

14  don't worry, I'll stay a weekend, and we can catch back

15  up.  Within a couple of days here, we'll be right as

16  rain.  We'll be exactly right where we wanted to be."

17        So -- and that's what we did.

18  Q.        Okay.  Now, you raised some issues earlier

19  about -- you called it "Bible journaling."  I believe

20  the book was called "A Perfect Circle"?

21  A.        Yeah.

22  Q.        Did you ever --

23  A.        Something circle, yeah.

24  Q.        Did you ever tell Lara or anyone else at

25  Ramsey that you did not want to do the Bible journaling

1    as you called it?

2    A.          The -- it's -- yes.

3    Q.          Okay.

4    A.          But after we got into the -- these -- the

5    re-education, the reorientation, you know --

6    Q.          Okay.

7    A.          -- meetings.

8    Q.          Do you remember when?

9    A.          I don't know when.  They -- these

10   meetings -- I think if you saw the documents, you guys

11   dumped, you saw -- there's at least 200 pages of blank

12   meeting dates, and it shows you how many meetings we

13   had.  I mean, it may not be 200.  That's an

14   exaggeration.  I apologize, but there is a lot of -- a

15   significant amount of papers that are just -- all just

16   meetings from her.  So as far as which days, I'm not

17   100 percent sure.

18          I do know that beforehand -- again, when I

19   first got there, the stuff is there.  It's not quite as

20   they said.  It's like -- it's a little like, man, you

21   have to do -- everybody is praying all of the time.

22   They're doing these Bible journals.

23          They said, "Oh, we have these devotionals we

24   hold every Wednesday.  Those are where we get

25   motivational speakers to come in."  And turns out

1    they're just all evangelical priests from local

2    churches.

3              There's all of the things that they didn't

4    disclose at the front end, but you're there, and you

5    want to make it work.  And they're really nice people,

6    and the mission is great.  You're helping people get

7    out of debt.  So it -- again, it's a lot like being

8    at -- being in Japan and being invited into a home.

9    You take your shoes off as a sign of respect, and you

10   don't kick up a fuss.  And you don't say, you know,

11   this is a problem.  I hate everybody here.  It's like

12   you know, it's fine.  I can do this.  It's not a big

13   deal.  It's not infringing on my rights as -- so to

14   speak at this point.  But it became more and more and

15   more aggressive the -- more and more and more,

16   especially when COVID happened because there you have a

17   direct instance where now somebody's beliefs about

18   something and the adherence to the fact of not

19   questioning things of -- you know, which is not kind of

20   what I believe.  I believe that there's -- you know --

21   you know, prayer is a very private thing.  You don't

22   need, like, a pope or your don't need a radio or, like,

23   somebody to translate your message between you and God.

24   It's a very personal thing that you can do.  That's

25   what kind of being a Protestant is all about.

1    Otherwise, we would all be Catholic.  You want to have

2    a situation where, you know, you can have that private

3    relationship.

4                They like to put it in a very public

5    setting.  That's not a problem.  I didn't mind.  It's

6    only when then in the next year the actions and the

7    belief systems then start jeopardizing not just your

8    family, but also your friends.  I mean, that's one of

9    the reasons I didn't pull Luke aside privately and say,

10   "Hey, this is a problem, Luke.  We need to have

11   conversations about it."

12               I did it in a public setting because of the

13   rest of my department, which is, you know, put possibly

14   in jeopardy because of Amanda getting very, very sick

15   and hospitalized.  That's not her fault.  That's not

16   Ramsey's fault.  But they did get sick there, and the

17   reaction, though, was one of, well, trust me; it's

18   okay.  Let's pray it away.  We'll be fine.  Somebody

19   else is driving the car and got their hand on the

20   wheel.

21               And in my life and in my belief system,

22   there's a lot more free will and a lot less predest --

23   predetermination about things.  And the way that people

24   do things is very impactful, and the lack of doing

25   things and my adhering to these beliefs could have put

1   everybody at a lot of risk.

2          And so that's when it started becoming

3   very -- I voiced my concerns and they had a big issue

4   with that.  And then from that point forward, it was a

5   systematic -- and I say "systematic" because this stuff

6   is scheduled.  These meetings were not just on the fly.

7   It was scheduled meetings of bringing you in and asking

8   then, we want to talk about your faith.  We really want

9   to talk about your marriage a lot, which is very

10  bizarre.  We want to talk about your spouse.  We want

11  to talk about your children.  And we want to talk about

12  you, your dedication, your belief system, and then

13  really being made to feel guilty about it.  And then

14  being gaslit and told that what I believe is not what I

15  really mean and should be saying and doing.  And that

16  was scheduled and that was with Lara all the way until

17  the end of my employment.

18          But I mean --

19  Q.      So --

20  A.          -- I did it and my performance -- I'm

21  sorry -- my performance didn't suffer.  And they seemed

22  to use me on all of the projects, and they even put me

23  on their biggest projects, their Summit reel and

24  everything.  It seemed like everything was doing pretty

25  well.

1   Q.         So -- so you objected sometime after April

2   to the Bible journaling.  Did you also object to the

3   public prayer?

4   A.         I said that there was probably way too many

5   meetings.  I tried to do a -- listen, I mean, you know,

6   in the beginning, they -- when I was hired on in the

7   beginning, they knew very well and good about my

8   position.  You know, I'm an Eagle Scout.  I think do

9   unto others; all of this stuff.  And they told -- those

10   things are great.

11            I think they -- they said, you know -- they

12   quoted Colossians and said do unto -- do your work unto

13   the Lord.  And they said this guy fits in perfectly.

14   This is exactly it.  But maybe their interpretation is

15   different.  I'm not sure, but I told them exactly what

16   I was about.  And it's not necessarily have anything to

17   do with a lot of public prayers and prayer groups and a

18   lot of -- you know, every single meeting.

19            So, you know, again, I'm not a person who

20   wants to try to make people feel bad about their belief

21   system.  I don't want people -- you know, I'm not here

22   to criticize whatever they believe.  Whether they're

23   Hindu, Muslim, Protestant, or Catholic, but there was a

24   very specific kind of Christianity that was

25   fundamentalist in its belief that Dave kind of adhered

1    to, and that's what you had to kind of stick with.

2              And if you had a problem with that, I think

3    that's what he referred to when he was saying, "Then

4    there's the door.  If you don't like what we're doing,

5    get the hell out."

6    Q.         So when you said you told them exactly what

7    you were about, and you mentioned Eagle Scouts --

8    A.         Yeah.  They brought that up even.  They -- I

9    think I -- I don't know if I put it on my resume.  But

10   it came up because I'm from Troop 130 here in Franklin.

11   And that was -- I think they were surprised that I

12   was -- they called me a "unicorn" because I was

13   actually from Tennessee.  Most of their employees they

14   get from out of state and bring in.  But originally I

15   am from Franklin, and so I said, "Oh, yeah, Troop 130.

16   I was an Eagle Scout."

17             And they go, "Really," you know.

18             And so they talked about that and the value

19   system that Boy Scouts put on -- on the Scout Law, the

20   oath that we do and everything.  And I said that's kind

21   of my by line, and we got into, you know, belief

22   systems from there.

23   Q.         Okay.  So you told them exactly what you

24   were about.  Was that in a hiring meeting or an

25   interview?

1    A.          That was in -- that was in the dinner --

2    Q.          Okay.

3    A.          -- with Luke, Larry, and my wife.  It also

4    came up before in these Zoom meetings with David

5    DiCicco, sometimes Larry.

6    Q.          Okay.  And --

7    A.          And I got -- also this is the other thing

8    too.  Also when I met with Luke Perry -- Luke.  Not --

9    sorry.

10   Q.          No, Rick.

11   A.          Not Luke Perry.  Rick Perry.  Thank you.

12   I'm so sorry.  Rick Perry because they talked about,

13   you know, the moral center of -- of -- of Ramsey

14   because they -- when I was brought in for full time

15   interviews, they kind of, "Oh, what church do you go

16   to?  What is your -- you know, what do you believe in

17   man," and stuff, and you're kind of "What is your" --

18   which I discussed, you know, the do unto others and

19   don't think -- take things at face value.  And don't be

20   somebody who is -- is just literally a belief -- will

21   take everything and adhere to a belief system blindly.

22   You know, doubt is, you know, faith in itself.  That's

23   kind of -- it's about having doubt.  It's not just one

24   single thing.  We're, you know, the driving car.  You

25   know, we have free will to do these things in life,

1    and -- and I discussed that at length with them.

2              And there was a lot of nodding, and a lot

3    of, "Yeah, man, this is great.  Totally.  This is

4    great.  Totally."

5              So that stuff was discussed, you know, in

6    person in these meetings up in the top of the -- and

7    you know, Luke Perry -- I mean, Rick Perry because, you

8    know, I expected they would say, "This is what we would

9    do.  This is what we do."

10             He always said, "We just have one rule, and

11   just don't ever -- don't ever cheat on your wife."

12             Which, again, talking about wives; I don't

13   know what was his deal . . .

14             After I left, I found out that they were

15   dealing with the -- Chris Hogan, one of their

16   personalities was having affairs and that was actually

17   being covered up in the company.  So that, I think, may

18   have been why, you know, they would -- we can't have

19   anybody else having affairs because it's very

20   detrimental, and it -- and while -- it was -- it's hard

21   finding that out now because at the time, he was, like,

22   "Yeah, if we find out that, you're fired."  And they

23   never fired Chris.

24             So that -- you know, again, it didn't come

25   up in work, the bigger -- there were other issues, but

1    I think the -- it would have become an issue had I

2    known that.  I would have never taken the job had I

3    known that they say one thing and do another.

4    Q.        Okay.  So at the dinner with Luke, Larry,

5    you, and your wife --

6    A.        Yes.

7    Q.        -- you told them exactly what you were

8    about.  Did you tell them that you don't think -- you

9    don't take things at face value; that doubt in and of

10   itself is a type of faith, and about your free-will

11   views?

12   A.        The free-will views definitely.

13   Q.        Okay.

14   A.        I'm -- I'm trying to think of, like, the --

15   some of doubt because that was on -- ongoing

16   conversations we had after I was hired or whatnot.

17   Q.        Okay.

18   A.        Because those were things I know were mused

19   with David -- David and other people.  David and Lara.

20   Lara especially when we were in the re-education

21   meetings or the reonboarding meetings they called them.

22   Q.        Okay.

23   A.        The -- I think -- yeah, the dinner, I do

24   remember that because it was -- it was a thing because,

25   you know, we were really committed.  You know, once we

1    decided okay, we're going to do this thing, I remember

2    my wife -- because we had to take -- I missed -- we had

3    missed the flight.  Security lines had bogged us down.

4    And we had missed the flight.  And we actually found

5    ways of getting on a flight and getting around so I

6    could actually get there and make the meetings because

7    they had all of these meetings.  I didn't want to

8    inconvenience them and put them out because they seemed

9    like they had gone to a lot of trouble to get it

10   together.

11            And my wife actually came separately so

12   she -- she could do the interview.  I don't know why;

13   again, she wasn't applying.  She's not an employee, but

14   she had to do an interview.  So she raced, and she

15   literally had gotten off a plane 30 minutes before she

16   walked in the meeting to the dinner.  And I remember us

17   talking about the free-will thing about, you know,

18   free-will determination.

19   Q.       Okay.

20   A.       And, you know, and it was like -- if you

21   just leave it -- let it to the wind, you know, people

22   driving the wheel, you're going to -- you're not going

23   to get where you want to on time.  So, you know, she

24   made it happen because she was committed to -- to our

25   life in Tennessee, and, you know, if this was going to

1  be the next stage in our -- you know, our life, you

2  know, let's make it work.  So . . .

3  Q.       Okay.  So -- so, again, going back to what

4  you said when you told them exactly what you were

5  about.  So you talked about at the dinner -- I'm just

6  talking about the dinner right now.

7  A.       Uh-huh.

8  Q.       You talked about the free will, your

9  free-will views.  Any -- anything else you can remember

10 about that -- just focus on that conversation?

11 A.       That particular conversation, that --

12 nothing else I can remember.

13 Q.       Okay.

14 A.       Because a lot of the -- again, the

15 conversation was dominated by -- they had even

16 mentioned, "You know, I think we know everything we

17 need to know about you, man.  You know, we really --

18 we're just kind of here to just relax and stuff.  What

19 do you -- what questions do you have about us?"

20          And that's where, as I told you earlier, I

21 had asked about, you know, are you -- you know, "The

22 Daily Beast" articles; how the workflow works; you

23 know, the culture; the Ramsey way; all of the stuff

24 that they kind of touted.  And I was -- it was like,

25 you know, this sounds a little too good to be true.

1  How does it work with deadlines; how does it work with
2  this?
3          You know I had even said -- you know, I had
4  even asked them point blank, are you guys a cult?  And
5  they said no.  So you know, because it just sounds too
6  good to be true, and local -- local rumor and lore
7  says, oh, those guys are so dedicated.  And when you
8  hear that, I'm like, you guys don't handle snakes?  Of
9  course, you don't handle snakes and shave your head
10  and -- maybe they're just talking about the cult of
11  people who -- the cult of people who are debt free and
12  only pay in cash.  I mean --
13  Q.         So --
14  A.         But it's something else completely really.
15  Q.         Did you have a conversation at the dinner
16  about the Ramsey way?
17  A.         Yeah.
18  Q.         Is that what you mentioned?
19  A.         Yeah.
20  Q.         And what did they tell you was the Ramsey
21  way?
22  A.         Well, I mean, it's interesting because I
23  didn't know until I got there how much there was, like,
24  a very specific adherence to what Dave does because
25  Dave is the one who sets the tone.  His DNA is etched

1    through the entire building.  And everything --

2              In EntreLeadership we do these meetings, and

3    he would talk at length about how he -- in the times of

4    the Israelites, they would take the king, and they

5    would put oil on his -- at the top of his head, and it

6    would leak down to his beard, and then drip onto the

7    rest of the body.  And that the -- that, you know,

8    being the king, being the owner of the company, being

9    the boss, you know, kind of what he says all filters

10   down into the lower levels.  And that he works very

11   hard.  He pours hundreds and hundreds of hours

12   apparently into his -- into his board members.  So that

13   when you hear from them, it's not hearing -- you're,

14   like, literally hearing from Dave.  They're almost like

15   Dave clones.  He wants them to be able to speak for him

16   as if he would with his own voice.

17             And so when you -- so what happens is, like,

18   whatever Dave kind of says, it trickles down through

19   the beard or it trickles down into everybody else.  So

20   you kind of learn the way Dave does things, what his

21   belief system is, and then it gets sent down to a lower

22   level and keeps dropping down, so it permeates all

23   levels of the company.  And that's kind of in the sense

24   of, like, how -- and, again, that was not discussed at

25   the meeting; that was kind of what I learned.  At the

1    time of the meeting, it was more about the -- they

2    defined the Ramsey way as like, oh, we're family

3    friendly, family first, you know.  Less hours, no

4    drama; none of that Hollywood crap, dude.  It's all

5    going to be, you know, kind of smooth sailing.  And

6    that you would -- you know, you're really going to

7    enjoy your time here and stuff.  And just imagine not

8    having a commute.  Just imagine, you know, not being

9    able to see your kids at night and, you know, hanging

10   out with them, and imagine, you know, living and having

11   not huge taxes and things over your head.  That was the

12   kind of the sell point, and when they're talking about

13   the culture.

14              I learned later that it had very little to

15   do with that.  It was more about Dave's will and the

16   adherence to that will.

17   Q.          Did you ever hear anybody talk about Dave's

18   clones or Dave's words trickling down, or was that your

19   conclusion?

20   A.          No.  That was quoting from Dave and his book

21   EntreLeadership.

22   Q.          Okay.

23   A.          Which was, again, one of the ten Dianetics

24   books that I had on my desk, you know, when I first got

25   there.  Where it was like that's required reading.  You

1    had to read.  So I had to know that thing, and that was

2    like -- it's in the first chapter, I think.

3              And then I had to take these EntreLeadership

4    courses that I was taking in the morning if I wanted to

5    advance and be a leader kind of -- because, again, the

6    promise was, like, hey, we'll give you a raise.  Just

7    do these programs, just volunteer your time, just do as

8    much as you can, and we'll get you where you want to be

9    financially.  Just you've got to meet us halfway.

10             And so I was doing these courses, and that

11   was one of the ones about how the oil -- how the boss

12   is the king and that his -- the oil drips down from the

13   forehead down to the beard and -- and permeates the

14   rest of the culture, and so he sets the tone for --

15   Q.        And those are Dave's words in --

16   A.        These are --

17   Q.        -- EntreLeadership?

18   A.        These are Dave's words --

19   Q.        Okay.

20   A.        -- in his book.

21   Q.        Got you.

22   A.        His best selling book and also the classes I

23   was -- I had to attend.

24   Q.        Got it.

25   A.        And those classes were run by board members

1    who themselves -- and Dave even says in the video --

2    because it -- sometimes Dave is there, but a lot of

3    times it's a video of him from their EntreLeadership

4    presentations that they sell for -- sell across the

5    nation.  And Dave says in -- he had worked very, very

6    hard to make sure that he -- to minimize the amount of

7    work he would have to do, he would try to make people

8    who could basically do him so he could do it for him.

9    And it was that whole -- you know, he says "pierce the

10   corporate veil."  You know, and the idea of making him

11   accountable and unaccountable at the same time were

12   basically he could have the final word on everything

13   and everybody will do what he says without him actually

14   having to have as much of an active day-to-day

15   business.

16           But it's weird, because he was extremely

17   involved in every single thing that we did.  I had to,

18   you know, get approval on every single project I

19   worked.  It would not go to finish unless Dave saw it

20   and gave the rubber stamp to it, every single thing

21   that we did.

22   Q.        Did you personally get that approval?

23   A.        Yes.

24   Q.        You spoke with Dave to get the approval?

25   A.        To get the -- oh, did I ask him?  No.  David

1    DiCicco, my supervisor.  The way they structure it, is
2    I edit the projects to give to Dave -- David DiCicco,
3    and David DiCicco then shows it to -- shows it to Lara,
4    and Lara shows it to --
5    Q.          Luke?
6    A.          -- and then Luke shows it to Dave.  But Dave
7    is always involved in the process, and several times,
8    Dave would actually sit in the bay with me and give his
9    approval and disapproval, and he actually even comments
10   on, like, you know, I know on the "Borrowed" podcast
11   feature -- or the trailer, he was really, really
12   impressed by.  The same thing with -- with their
13   Christmas video.  And in each case, he introduced
14   those, and the Summit reel was a big deal for him as
15   well, and there was comments on that as well.
16   Q.          So Dave Ramsey would sit in the edit bay
17   with you?
18   A.          They -- we would have a screen bay set up
19   too because, you know, we don't want him to -- the bay
20   was specifically built -- that I built for the
21   documentary.  The -- and the -- and we would actually
22   have a screening room where we would air trailers and
23   specific things that he needed to look at.  If it was a
24   really long piece, he would watch it at home at his
25   house.  If it was, you know -- and I know some of the

1    things we had, he would actually take home and watch

2    there.  He had his own screening room at his house, and

3    then people would say, "Oh, you made Dave's screening

4    room."  So it was kind of a sign that you -- you're

5    doing good kid.

6              But he would -- he would be the final say on

7    everything, and, everything had to go through him.  I

8    mean, everything, not just my videos, you know, which

9    were pretty high profile, but every -- the way they

10   approved shots, the way they approved certain takes,

11   book covers, everything.  You know.

12   Q.        When you say he would sit with you and

13   screen, was it just the two of you?

14   A.        It was him.  It was him.  It was David

15   DiCicco, and Luke usually.

16   Q.        Okay.  So four of you?

17   A.        Yeah, sometimes.  And sometimes less.

18   Sometimes there was an extra person or not.  I'm not --

19   of whom I'm not sure if they were trailing behind Dave

20   to check messages or whatever.

21             Sometimes they could -- yeah, sometimes I

22   think -- I think we did have one where it was just me,

23   Luke, and Dave, actually.  I think for the "Borrowed

24   Future" podcast.  But I mean, these weren't frequent,

25   you know, but they did happen.

1  Q.        How often do you think they happened?
2  A.        Oh, I don't know.  I mean, at least -- I
3  would say at least three times at least.  I --
4  specifically, "Borrowed Future."  I remember that one.
5         I do know there was a time I was working
6  on -- I don't even know what it was for.  It was some
7  kind of -- it was some COVID response video that he was
8  doing to introduce something, and he actually came to
9  my desk, and I was showing him specific editing tricks
10  I had done because he -- there was an edit they wanted
11  to put in.  And there was a problem because of Dave's
12  hand position, and so, you know, I mitigated the
13  problem and fixed it for them, and he came to check and
14  see if that would work or not.
15         Dave didn't like talking to people who were
16  kind of below the line much.  He would occasionally,
17  but he was not really big on having, you know,
18  chit-chat with -- with people who are not in
19  leadership, but he did come to the desk.  I know that
20  was another incidence where he would talk, and, you
21  know, we showed him how and fixed the problems for him
22  and stuff, and he was, you know, very congratulatory
23  and positive about it.
24  Q.        So was that something different than the
25  time that he said that you did a good job on something?

1  A.          Yes.  That's a different time.

2  Q.          Okay.  So let's -- each of those.  When was

3  the good job?  What was that about?

4  A.          Well, that was for the "Borrowed Future"

5  podcast.  That was the -- I think I have detailed it in

6  the complaint about the trailer that we had cut.  Or I

7  had cut.

8  Q.          Okay.

9  A.          I say "we" a lot.  But, I mean, my -- I had

10  cut.

11  Q.          Okay.

12  A.          I mean, I've got to check my humility, so I

13  say "we," all of the time.  But the -- I think it had

14  more to do with the borrow -- the "Borrowed Future"

15  podcast.  It was a very big deal because it was the

16  first launch point for the documentary and the idea

17  that they wanted to do a -- they wanted to do the

18  documentary, and they wanted to do something about

19  student loan debt.  And it was very important to them.

20  And so I created -- they wanted to do something that

21  was very Hollywood.

22          Dave is a very big fan of Hollywood.  He

23  loves Marvel movies, and he's -- he kind of gets stars

24  in the eyes.  He's been trying to do a television show

25  for a very long time and stuff, and he loves his

1    appearances on Fox and things -- well, I say love.  I'm
2    not going to speak for him, but I do know he touts them
3    a lot every time he appears; in his all employee
4    meetings, he talks.  But the -- so we had done some of
5    these -- I had done some of these very Hollywood
6    trailers that was very big and opulent, and we mixed it
7    on the sound stage and presented it.  And it did really
8    well, and it got thousands of likes.  And it's, like,
9    my YouTube at the time had a 99 percent approval.  They
10   still have it on there.  They still link to it and tout
11   it.  So it was a big deal for them.
12   Q.        So this was one of those screenings?
13   A.        Yes.
14   Q.        Okay.
15   A.        Uh-huh.  Or I think it was the first time he
16   had seen it.
17   Q.        Okay.
18   A.        And he was blown away.  He was -- he was
19   like, "This is so good.  This is how we should be doing
20   things."
21   Q.        Okay.  And he told you that?
22   A.        He told -- yes, he did while looking at
23   Luke.
24   Q.        Okay.
25   A.        So, again, it's -- it's an interesting thing

1   because he kind of passes the compliments through

2   people but --

3   Q.       Okay.

4   A.       But, yeah -- but he -- it was said to me.

5   "Congratulations.  Good job."

6   Q.       Okay.

7   A.       His eyes, at least -- at least rested on me

8   for two seconds and then moved away.

9   Q.       Okay.

10   A.       Very quickly.

11   Q.       And this was at one of the three -- maybe

12   three screenings that you did with Dave Ramsey?

13   A.       Sure.  Yes.  Specifically.

14   Q.       Got ya.

15   A.       I mean, we've had -- we've had several

16   interactions in the company, as I think I've denoted,

17   you know, when we met at the -- you know, my onboarding

18   session.  And, you know, I was introduced to him.

19   Everybody in the room was introduced.  I was introduced

20   to him.  I had asked him --

21   Q.       Was that the Q. & A.?

22   A.       -- how to be successful.

23   Q.       That was the Q. & A.?

24   A.       Yeah.  This is the initial thing.

25   Q.       Yeah.  Got ya.

1    A.          On the first onboarding week.  It was kind
2    of like where we -- we'd sit around, go to the Dave
3    museum, watch a documentary about Dave.  We'd play Dave
4    games, and, you know, we'd watch the radio show and
5    everything.  So kind of the week of Dave.
6              And then we would have other points where we
7    would have interactions.  Obviously, the "Borrowed
8    Future" podcast was another one.
9    Q.          Uh-huh.
10   A.          I had -- I had an interaction with him in
11   a -- the kitchen when his -- his granddaughter was
12   born.  Rachel was pregnant and she had had, I think,
13   her third child.  It might have been second.  I'm not
14   100 percent sure, but he was a proud -- proud
15   grandpoppie.  And, you know, he was showing pictures,
16   and I asked if -- well, actually, he wasn't showing
17   pictures at the time.  I congratulated him.  He said,
18   "Do you want" -- he pulled out his cell phone and said,
19   "Do you want to see pictures?"
20             And for a bit we talked about grandkids and
21   having kids, and he had asked me if I had kids of my
22   own and stuff.
23             And then at my ninety-day review, they --
24   you know, he gave speeches and showed his original copy
25   of Financial Peace University.

1        We also -- what else did we do there?  Oh,
2   but there -- we were reintroduced again to him, again.
3   You know, he and I conversed.  And he asked what --
4   what's your -- you've now been here ninety days, what
5   is your -- your takeaway?  Do you have a moment that,
6   you know, is of real big deal.
7        And he -- he said -- I know he called out
8   the fact that I was using -- funny enough, he actually
9   called out the fact that we -- I was using the word
10  "we" versus "I."  And he said, "That's good.  You're on
11  a good start already; you know, using 'we' because
12  that's what we are.  It's a we.  It's not I anymore."
13       But I had actually mentioned -- it was
14  interesting then -- the first ninety days, I had
15  actually jump started five cars there.  They had had
16  people -- five different employees who had had auto
17  trouble.  Their cars would not start because they were
18  driving -- they're part of the baby-step program, and
19  they were driving, you know, beater cars that -- with
20  the cold weather were not starting and functioning very
21  well.  And I would see them, and I would try to --
22       I'm so sorry -- there you go.
23       I would see them, and I would -- you know, I
24  had jumper cables in my car, and I would help them
25  start their cars and stuff.  And they all said, oh,

1    yeah, we can't afford a new car, or, you know, we're on

2    the -- we're on the baby step, and we could buy a car,

3    but we're trying not to buy a car because we want to --

4    we're trying to get out of debt or we're trying to save

5    up for a house or, you know, we're part of the plan.

6    It always ended up being we're part of the plan and

7    stuff.  And they said, we're only on step one, or we're

8    only on step three or whatever.  But -- so where I

9    could, I would jump it.

10              And so I said -- I said -- I joked.  "I was

11   like, oh, it shows people are really dedicated.  They,

12   like, endanger their lives by not having cars that they

13   can reliably get to work on."  And Dave didn't find

14   that very funny.

15              And I said, again, "It's proof of how

16   dedicated people are to the way we do things here."

17   Q.         That was at the ninety-day review?

18   A.         That was at the ninety-day review.

19   Q.         And was -- was that with you a group, or was

20   that just you and Dave?

21   A.         It was me and Dave in a group setting.

22   Q.         Okay.  Got it.  So how many people were in

23   the group?

24   A.         Oh, it was a lot because we -- I had been

25   onboarded with like a dozen or so people and because we

1   were so busy -- oh.  Oh, I remember.  Because there was

2   so much pressure to move my family out to -- they

3   wanted me to have my family here.  Even though we still

4   didn't have a house, I had to put them up in an

5   apartment and get them from California here.  They

6   had -- I had to go back.  They actually had me go back,

7   pick them up, and drive them across country to get

8   here.

9           And so I missed my ninety-day actual

10  meeting, my dinner I guess.  It was a dinner, a formal

11  dinner with Dave that they have for their ninety-day

12  review.  As part of -- kind of like a -- you get your

13  review from David DiCicco; your supervisor, J.B.

14  Waggoner.  I had that; it was a glowing review.

15  "You're killing it.  You're a ten out of ten.  You're

16  doing great."

17          And then we'd have a dinner with Dave.  I

18  missed mine.  I had to be -- do it a week or so later.

19  And that was slotted in with -- I think it might have

20  been thirty other people.

21  Q.      Okay.

22  A.      It seemed like it was a pretty packed house.

23  Q.      The dinner?  The dinner --

24  A.      Yeah.

25  Q.      -- was with thirty people?

1  A.          Yeah.  Yeah.

2  Q.          Okay.

3  A.          I think it was quite a few.  And it was

4  after hours, I think.

5  Q.          Okay.

6  A.          If I remember right.

7  Q.          All right.  And any other -- then you did

8  mention that Dave came to your desk --

9  A.          Yes.

10 Q.          -- once?

11 A.          There was -- there was a time -- it was -- I

12 think it was before the Summit reel.  I know he had

13 watched -- I cannot remember honestly if we had a

14 Summit screening for him in person, and he had watched

15 it, or if he ended up watching it at his house.  That

16 was a very high prestige trailer that they asked me --

17 and even though, you know, they put me into these kind

18 of punitive, you know, reorientation -- or

19 reorientation meetings -- reonboarding meetings, the --

20 they still kept putting me on these major projects.

21          And Summit was a big one and because they --

22 because of COVID, their numbers were so down.  They had

23 very low attendance for that.  And so they had asked me

24 to cut a trailer, a very big Hollywood kind of trailer

25 that would get everybody amped up and get ticket sales,

1   you know, moving up.  And so I had -- you know, a good

2   sport and all of that, cut a really solid one, I think.

3   And apparently from -- according to Shane Emer -- Shane

4   Emerson, that it got a standing ovation, and the people

5   were lining up to buy tickets.  And it doubled the

6   sales and the whole nine yards.  And Dave had watched

7   that as well.

8           And, honestly, I cannot remember if there

9   was a meeting.  I think it was screened for him, which

10  I don't think I was a part of.  I think they had me

11  busy on something else that kept me away from Dave,

12  and -- I was able to do it, but he did see that as

13  well.  And I know there was another -- the interaction

14  where he came to the desk and I fixed the shots of him

15  and everything like that with the hand, that happened,

16  I think, a few weeks prior, and stuff.

17  Q.      Okay.  And that was part of the Summit reel

18  when he came to your desk?

19  A.      No.  You know what, there was actually --

20  there was a -- I'm trying to remember actually what it

21  was that I cut because it was a -- it was happening

22  around the time of Black Lives Matter because Dave

23  wanted to use a clip from Martin Luther King.  And it

24  was part a thing where he did this walk up, and they

25  were doing a tracking shot following, and I fixed that.

1   And -- and that was what it was.  And it was

2   interesting too because I remember the -- I don't know

3   what it was for, but they had -- I think it was Summit.

4   It had something to do with Summit.  It must have

5   because they ended up using this clip they didn't

6   license because they couldn't -- they hadn't bothered

7   to call the King family or anything.  And so they ended

8   up using a clip, I guess illegally, I guess, but, you

9   know, Dave really wanted it, but they never got

10  clearance for it, and they ended up using it.  Even

11  though I warned them.  Don't use it; you can get sued

12  for millions.  And they -- you know, in Hollywood

13  everything is always cleared; you can't use music or

14  people's likenesses or speeches and stuff.  And they

15  didn't really care.  They did it any way.

16            That was -- and so that was him introducing

17  that clip through the walk in.  So I think it was for

18  Summit.  It was either -- I think it was either an

19  introduction for Summit or an after dinner hours dinner

20  thing that was for special members who had paid to do

21  like a dinner, like an evening with Dave kind of thing.

22  Q.        So that was what he came to your desk about?

23  A.        Yes.  Because he had -- not the use --

24  utilizing the Martin Luther King thing.  That was stuff

25  that was discussed between Lara and -- and J.B.

 1  Waggoner and several other people in the department.

 2  Not Dave.

 3            Dave was specifically -- he had done a --

 4  like, a tracking shot.  They did a tracking shot --

 5  it's where the camera will follow you all of the way,

 6  and he was doing kind of a big run up.  He was walking

 7  through the building, talking about COVID, and how bad

 8  things were, and, you know -- and introducing this

 9  Martin Luther -- Martin Luther King clip.  And they had

10  to do an edit in the middle of it because Dave had --

11  had -- he couldn't do all of the lines right.  Dave

12  needed -- needed to do multiple takes.  And so instead

13  of one continuos -- but he still wanted it to look like

14  it was a continuous take.

15            So my job was to do the edit and make it

16  seamless.  So there's some editing tricks I did to do

17  it.  And so -- but Dave, again -- he needed his

18  approval and because they were on short notice, you

19  know, he came to the desk personally and was, like,

20  checking it out.  I showed him how it was done, and he

21  approved it and thought it was great.  He thought it

22  was a good solve.

23  Q.        Was there anybody else there or was it just

24  you and Dave?

25  A.        Yeah.  It was Dave, Lara, probably J.B., and

1    there might have been a few other people, you know,

2    hanging -- anything -- anytime Dave is on the floor,

3    it's -- it's a big deal.

4    Q.        Uh-huh.

5    A.        You know, because he is the CEO of the

6    company.

7    Q.        So when was the standing ovation?

8    A.        That was at the Summit.

9    Q.        Okay.

10   A.        That was at Summit.  They had decided --

11   there was a big blow out with the Marriott because the

12   Marriott was in Orange County in Florida, and they had

13   scheduled Summit there originally.  And they -- their

14   ordinance there required everybody to wear masks, and

15   he didn't want the staff who worked at the hotel, their

16   employees, to be wearing masks.  And so he -- they --

17   they were required by law, and so he wanted out of it.

18   And they were, like, well, we have a contract and there

19   was a lawsuit, and it was, I think, reported in -- it

20   was reported in the news.  And it was a big deal and

21   Dave had lots of all employee meetings and emails and

22   stuff, and lots of statements flying around from people

23   talking about -- and that's where you kind of really

24   knew how Dave felt, you know, how passionate he was

25   about, you know, this whole thing needs to be solved

1    with, you know, spiritual, you know, adherence, rather

2    than actual wearing masks and things.  So he was upset

3    about that.

4              And so they -- they ended up creating yet

5    another loop where they kind of -- they moved the

6    entire thing instead of leaving it there and having

7    people wear masks.  They took the whole thing, lifted

8    it up, and moved it to Franklin, which was -- was --

9    created a bit of a stir because I think at the time

10   COVID rates were going up dramatically.  And they had a

11   big issue where you were bringing a lot of people from

12   out of state into one area, and people were worried

13   about these people staying in hotels and being around

14   the Franklin area.  And so I know that was something

15   that people were talking a lot about.

16             So that was -- that was the area -- they

17   had -- they didn't have as many people.  They usually

18   have thousands of people.  They had several hundred.

19   They were all packed into Summit.  And I wasn't in

20   attendance for that.  Lara Johnson recommended I stay

21   home for that because there would be all of these

22   people there not wearing masks.

23             And so they -- she said, "Hey you should

24   probably stay home.  Let's get you -- do you want to do

25   that?"

1       And I was like, "Well, if you want me to; as
2   long as it doesn't jeopardize my job.  No problem."
3       So, you know, it was -- they sent me home.
4   They fired me the next week, but the -- up until that
5   point, though, the Summit -- they had the trailer and
6   that was where the whole audience apparently, according
7   to Shane Emerson, he was there in person, said, "It got
8   a standing ovation.  It did really well.  Big shout out
9   to Brad.  He killed it.  I -- people were apparently
10  running up to buy tickets for next year's thing.  Great
11  job, Brad."
12      And that was what a lot of -- even despite
13  all of this -- you know, having it -- being in these
14  meetings and for whatever -- whatever I had said that
15  had got me into trouble with Luke and put me in this
16  kind of timeout with Lara, these weird gaslighting
17  meetings, they're apparently still using me on those
18  projects, and they're still doing pretty well and
19  getting pretty big reviews from other employees and
20  clients.
21  Q.      Were there any other editors that worked on
22  the Summit reel?
23  A.      Summit -- no.  What I did specifically, no.
24  It was specifically just me.  Now, this is not a -- I
25  said reel.  It's a trailer.  They called it the "Summit

1    reel."  It's technically -- basically, a tailer that

2    hypes next year's Summit.

3    Q.        Okay.

4    A.        So it reveals what city they're going to do

5    it in.  The special guests that they're going to have,

6    and it's a big kind of unveiling thing.

7    Q.        Okay.

8    A.        And so I set it to really some, you know,

9    hyperintense music.  We -- big cutting styles and lots

10   of Hollywood kind of things and made it very big and

11   eventy.  That specifically was just me.  I was the only

12   editor on that.  We did have a graphics person help

13   with graphics but, you know, a brown wrap -- I mean,

14   rate, but it's just me as far as the editing.

15   Q.        So --

16   A.        But the Summit conference, they had -- like,

17   the entire department works on Summit because it's --

18   Q.        Lots of editors on the whole thing?

19   A.        On the whole.

20   Q.        Right.  I understand that.

21   A.        Yeah, the whole week?

22   Q.        Yeah.

23   A.        Because it's a week of presentations and

24   everything.  And I think that's -- I said to Lara.  I

25   was like, "This is the busiest time, and you want to

1    send me home?  I would be -- if you want, I mean, I'm
2    happy to -- you know, I don't have to be on the floor.
3    I could work.  I don't want to let anybody down.  If
4    you want -- I can work from home, or if you don't want
5    to do that, I'll be happy to, you know, work in a bay
6    or something like that?"
7                 And it was, like, "No.  We've got it."
8    So . . .
9    Q.         So other than the time when Dave came to
10   your desk, did he talk to you at any other time about
11   the Summit trailer?
12   A.         About the Summit trailer?
13   Q.         Yes.
14   A.         No.
15   Q.         Okay.  The Summit --
16   A.         Not.
17   Q.         -- reel?
18   A.         Not that I know.  Not to my knowledge.
19   Q.         Okay.  All right.
20   A.         I mean, he may have talked to others about
21   it, and -- and how it went.
22   Q.         No.  I mean, directly to you?
23   A.         Not that I know of.
24   Q.         Okay.  All right.  So then we have the
25   three -- roughly three screenings.  You think it was

1    about three.  We have the time he came to your desk

2    about Summit.  We have the onboarding Q. and A. where

3    you asked the question and he answered.

4    A.          Uh-huh.

5    Q.          The interaction in the kitchen, and then at

6    the ninety-day review dinner.

7    A.          Uh-huh.

8    Q.          And then the "Borrowed Future" podcast.

9    A.          Yes.

10   Q.          Can you think of any other conversations you

11   had --

12   A.          Well, I think this is -- that's pretty much

13   all of them as far as I know.

14   Q.          Okay.

15   A.          And, again, in the case of several of these,

16   I was, you know, introduced and, you know, handshaking

17   and stuff like that.  That's not -- you know -- and you

18   know, his eyes would light up when someone would say,

19   "Oh, remember Brad.  He's the one who cut for this."

20               And he would say, "Oh, yeah, that's right."

21   You know, he was like -- his eyes light up, and, you

22   know, "Good job on that, Buddy," you know, and big

23   handshake.  "And so tell me about your ninety days, and

24   how does -- how does this feel to you," and stuff.

25   So . . .

1   Q.       Okay.  All right.  Now, I want to go back to

2   something you said earlier.  You said that in your

3   meeting with Rick Perry.

4   A.       Uh-huh.

5   Q.       Rick Perry said, "Don't cheat on your wife";

6   right?

7   A.       Yes.

8   Q.       Okay.  And did he ask you what church you go

9   to?

10   A.       I don't remember.  I -- if he did, it's --

11   it's -- he may have.

12   Q.       Okay.

13   A.       I mean, it's a hard thing.  Like working at

14   Ramsey, it's -- it's every time you meet somebody, the

15   first thing you ask is what's your name?  The second

16   thing they ask is what church do you go to?

17   Q.       Okay.  So --

18   A.       It's kind of a way of -- of introduction.

19   Q.       Did they ask you that during the interview

20   process?

21   A.       Yeah, they did.

22   Q.       Who asked you?

23   A.       Oh, God.  It came up with -- I think with

24   David DiCicco, I think, in the initial interviews.

25   I -- Kimberly might have asked.  I know Lara asked

1  definitely during the reorientation meetings.  The

2  reonboarding meetings.  Because that was all --

3  everything there was personal.  Everything was, like,

4  tell me about your wife.  Tell me about your

5  relationship.  Tell me about your marriage.

6          I believe Luke LeFevre may have even asked

7  me, and I forget when, if it was in January or

8  November.  It probably was January.

9  Q.        Okay.

10  A.        And he -- because he had again read -- I

11  don't know what he -- why he had a bone to pick with my

12  wife or what it is, but he had brought me into his

13  office again because he brought me in originally in

14  October to talk about -- in October he had brought me

15  in to talk about my house because I -- he had read my

16  reviews and said, "Hey, man, what's going on?  Are you

17  doing okay?"

18          I was like, "Well, you know, it's -- I'm

19  missing my family.  You know, we're apart."

20          "Oh, well, we've got to get you guys

21  together.  We've got to get everything together."

22          And I think there were fires and stuff out

23  in California.  And that's really difficult being on

24  the -- 2,000 miles away, and when all of the

25  interstates are cut off and there are fires surrounding

1    where your family is.  And that was a very frustrating
2    time.  So I just couldn't -- it was stressful.  He had
3    called me into his office to talk about that, which I
4    think that is when I had found out he was reading all
5    of the memos that were supposedly private.
6              He called me again in -- in January, I
7    think, and -- to ask about how I was doing and how my
8    wife is, and which again -- again, weird.  And I
9    believe at that point he had inquired, like, "Do you
10   guys have a church yet?  Do you have a church?"
11             And I -- you know, my wife is Catholic.  I'm
12   sorry; you don't know.  Sorry.  I shouldn't say "you
13   know," that's improper grammar.  But my wife is
14   Catholic.  I'm Protestant.  We don't typically do a
15   denominational church that we specifically go to,
16   especially in Tennessee because at that time -- you
17   know, there was a lot of pressure from a lot of Ramsey,
18   oh, come to my church; come to my church; come here;
19   come here; you know, and they were all evangelical, and
20   that's not really our -- my scene at all.  And because
21   with the home move, we had not gotten a house yet.  We
22   had been up in the air.  Everything was topsyturvy.  We
23   hadn't found a place for worship or anything like that.
24             So he'd inquire, you know, "What's your
25   church?  Where are you guys going?  What are you doing

1    for that?"

2            And he had recommended -- that's when he

3    recommended that I should take -- that Ramsey Solutions

4    offers religious based counseling from a church of

5    their choosing and choice.  They choose the counselor

6    and stuff and recommended I get some counseling with my

7    wife.  Again, odd.

8            It is interesting, though, because, you

9    know, in life, you have allegiances and your -- you

10   know, obviously your family is one of your large

11   allegiances.  And Dave is very, very -- he's -- he

12   has -- he would have lots of rants and screams on --

13   on -- in the all employee meetings about wives.  And,

14   again, Luke speaks with Dave's voice and has the same

15   similar mind-set, and he would talk ad nauseam about

16   wives and how, you know -- how spouses can really screw

17   things up.  And they -- he calls it "crazy spouses."

18           So I don't know if this an affect of that,

19   or if it's just, like, hey, there's something competing

20   for an employee's allegiance.  It needs to be with me;

21   you know, not with your wife.  So if we're asking you

22   to choose, we need you to choose -- and that's kind of

23   what I was told by Lara in these reonboarding meetings.

24   You've got to either choose us, or you need to choose

25   your wife.  And I said, she's my wife.  I like her a

1    lot better than I like you guys.

2    Q.        Is that what Lara said to you?

3    A.        Yes.

4    Q.        You need to choose your wife or us?

5    A.        You know, it -- you need to get on board.

6    She needs to get on board.  You need to get on board.

7    And I said if you're asking me to choose between my

8    wife and you, I'll be honest with you, I like my wife a

9    lot better than I like you.  So . . .

10   Q.        Did she tell you, you needed to choose

11   Ramsey over your wife?

12   A.        No.  She backed -- it's all these constant

13   backtracks with all of these people.  It was, like,

14   "No.  It's all family first.  It's always about family.

15   This is all about family.  We're a very family-friendly

16   place and stuff, but we do need your wife to get on

17   board."

18             And I'm like, "Well, what does that even

19   mean?"

20             Again, these meetings -- and maybe we'll

21   talk about it, but they were so bizarre because they

22   were constantly about reonboarding.  And I kept asking

23   them, guys, are these meetings -- so what policy did I

24   miss?  Because if I remember, onboarding was basically

25   taking tours of Dave's greatest hits.  You know, we'd

1    go around to the museum.  We'd play games.  We'd watch

2    documentaries about Dave.  It was all about praising

3    Dave.

4            What in the world did I miss?  Was there

5    policy and procedure and things I missed?  You know,

6    what is this -- this corporate vibe that, you know, you

7    think I don't have or I need to do?  What do I have to

8    be fixed on?  And they could never answer.  They just

9    said, well, we don't think you're -- you know, we don't

10   think you were onboarded correctly.  So we need to have

11   conversations about that, and we're going to keep doing

12   it until it -- until we feel satisfied.  And that was a

13   very, very, very -- I mean, they kept -- they said, oh,

14   we're only going to do it for two weeks, and then it

15   was a month, and then it was -- they set it for

16   December of the end of the year.  And that was -- we

17   hadn't even gotten to the summer yet, and she had set

18   it all the way for the rest of the year doing these

19   one-on-one meetings.  So . . .

20   Q.        I've just handed you another document,

21   Mr. Amos.

22   A.        Yes.

23   Q.        And it says at the bottom, "Electronically

24   signed by Brad Amos."  I just want to make sure that

25   really is your electronic signature?

```
1   A.          Yes.

2   Q.          Okay.

3   A.          Uh-huh.

4   Q.          Do you remember receiving this document?

5   A.          It was emailed.

6   Q.          Okay.

7   A.          This was never gone over in the -- in

8   orientation.  We never had a sitdown.  We never pulled

9   it out; like, hey, guys, we're an Equal Opportunity

10  Employer.  Here's our sexual harassment policy.  I

11  think this is one that includes something about the

12  kitchen, about -- maybe this isn't the one where it

13  basically says -- oh, yeah, breakroom etiquette.  You

14  know, it's odd because it's -- basic -- it's a very

15  quick overview of something that, you know, usually

16  most companies take -- you know, I remember at BLT, we

17  had entire -- our sexual harassment training was -- I

18  think we had it for, like, you know, two days at one

19  time.  So I was surprised that this was just kind of

20  sent in an email and that's what it was.  And you were

21  supposed to electronically -- nobody watches you do it.

22  They just assume that, hey, you're going to sign it.

23  You get it, and you kind of move on.

24              MS. SANDERS:  For the record, this is a

25  document entitled "The Lampo Group, LLC, Employment
```

1    Policies & Procedures."  We're going to mark that as

2    the next exhibit which I believe is Exhibit 8.

3                    (Marked Exhibit 8.)

4    BY MS. SANDERS:

5    Q.        Mr. Amos, did you ever have a conversation

6    with anyone at Ramsey Solutions, an employee at Ramsey

7    Solutions about Chris Hogan?

8    A.        Yes and no.  I will refer to the Rick Perry

9    conversation that we had -- that I had when I was first

10   hired and brought in.  I was told if you have an

11   affair, you'll get fired.  I do not know -- and you'd

12   have to ask Rick Perry if that was because they had

13   just had somebody who had an affair and that we need

14   to -- and, obviously, they were covering that up

15   because their policy is if you have an affair, if

16   you're dishonest, you know, if I -- I think he even

17   says in EntreLeadership, if I can't trust -- if

18   somebody, you know, can't be trusted with his wife, how

19   can I trust them?  So you're out the door.  Automatic

20   firing.  Automatic dismissal.  That's what Rick Perry

21   had said.

22             I do not know if he was saying that -- if

23   I -- I think he says it to everybody.  I don't know

24   what their policy is.  If they say it to everybody or

25   only specifically at that time because they were

1   apparently dealing with the Chris Hogan stuff at the

2   time.

3   Q.          Did Rick Perry mention Chris Hogan?

4   A.          Yes.  But not in the terms of like, you

5   know, because we just -- you know -- you know, I know

6   we have a no gossip policy.  Leans across the table and

7   says Chris Hogan is having affairs with employees, and

8   I think his sister -- and whatever salacious stuff

9   people did.  I don't know, but he did not do anything

10  like that.

11              He would talk about the personalities that

12  we have here.  And they're a great bunch of guys at

13  lunch.  And Chris Hogan, he used to play football.  So

14  did he talk about Chris Hogan?  Yeah, but not --

15  Q.          But not in the context?

16  A.          Not in the context of what he eventually he

17  ended up leaving Ramsey Solutions after my tenure.

18  Q.          Okay.  Did any -- anybody else that was

19  employed by Ramsey Solutions talk to you about Chris

20  Hogan?

21  A.          Not that I know of.

22  Q.          Okay.

23  A.          Again, and -- it's not something that I have

24  sat and thought long and hard about.  Did people --

25  were they saying something or crying for help or were

1    they mentioning this stuff and not -- and doing it in

2    code, maybe.  I don't know.  And maybe I wasn't picking

3    up on it.  Again, when I was there, I was there to

4    work.

5    Q.          Right.

6    A.          Nose to the grindstone, and I didn't

7    really -- and, again, the gossip policy was very

8    pervasive, and it was, like, you are not supposed to

9    talk specifically about leadership and not about the

10   company.  And you can't talk to them about your -- to

11   your spouses; you can't talk to them to anybody else.

12   So it was kind of a universal gag order.

13   Q.          Did -- okay.  You mentioned memos.  The

14   memos that you would do.  What -- what were the memos

15   that you are referring --

16   A.          Okay.  So in EntreLeadership, Dave has --

17   and this was not disclosed to me at the time of hire

18   that I would be doing these things, but, basically,

19   they're a check-in where you have a -- you have an

20   electronic form you have to fill out every Mon --

21   Friday before you go home.  They have to be filled out

22   and that talk about your personal and professional

23   victories and defeats, and you have to list what's

24   going on in your life personally, and what's going on

25   in your life professionally.  You even have, like, a

1    weird rating chart where it has, like, a red icon, a

2    yellow icon, a green icon, and you learn really quickly

3    to put all greens because if you put anything that's

4    either red or yellow -- maybe it's orange -- I'm not

5    sure -- you're going to get a call and you're getting

6    brought in because, again -- I didn't know at the time,

7    these are being read by people real high up the chain.

8    I was told that they were kept confidential.

9    Q.          Who told you that?

10   A.          Lara Johnson told me that and that she

11   was -- apparently she was the one who was sharing it

12   with Luke.  And -- and I called her out on that when we

13   were in the reorientation meetings.

14           I was, like, you know -- it's, like, I --

15   that's -- because she would consistently ask about my

16   wife, and, you know, that was being used and

17   weaponized, you know, apparently against me.  And I had

18   a -- I said, "I'm not going to talk about that

19   anymore."

20           Because I mean, clearly I had talked --

21   anything I say gets shared up the chain to probably who

22   knows; Dave even.  I mean, I know Maria Katz had even

23   said at one point there was a time where she was in the

24   lunchroom, and she had written something -- and this is

25   after I found out they were being shared, that she --

1    Dave had talked to her about something, and Jack
2    Galloway had said something to her that she had put in
3    her -- her weekly report, and it was shared.  And
4    somebody in the lunch line had said -- you know, Dave
5    had said -- it was Dave or Jack Galloway.  I mean,
6    I'm -- now I'm fuzzy on it.  I apologize, but one of
7    the two had said -- you know, had made a comment on
8    what she had commented about on it.  And, again,
9    that's -- I found out that right before I was fired.
10   But these reports had to be filled in weekly.  You
11   could not leave them blank, and they required you to
12   disclose personal information.
13            There are also the one-on-ones that were
14   supported with -- that were weekly.  That had to be
15   done with your supervisor where, again, it was promoted
16   as water cooler talk in an effort to get you to talk
17   and disclose about any medical problems you might be
18   having, financial problems.  They talked to you, how
19   are you with debts?  Cards?  Are you paying your bills
20   on time?  They would ask financial questions, medical
21   questions, spiritual questions, questions about family,
22   especially questions about your spouse.  And -- and I
23   found out those were being passed up too.  And in my
24   case, it passed up from J.B. to Lara, from Lara to
25   Luke, maybe to Dave, but you know, I don't know.

1              Those were the reports that we had to --
2    they were required.  And it -- and it's interesting
3    because even when I would do them, I would then be in
4    these reorientation meetings with Lara and I -- because
5    I had stopped doing them because every time I'd do
6    them, she would sit in there, and then we would just
7    talk about them the whole time.
8              She was like, "I want to talk about what you
9    said about this and what you said about this, and how
10   are you -- what are you thinking about this?"
11             I learned -- I just -- I'm not going to do
12   them anymore.  And then after three weeks, I got my
13   knuckles wrapped, and I said -- she said, "You have to
14   do these.  They are mandatory.  You cannot get
15   around" --
16             J.B. had told me that they're mandatory.  I
17   don't know if he was doing it under Lara or not.  And
18   then Lara later when I said, "I guess, I have to do
19   these."
20             She said, "Yeah, they're mandatory.  We need
21   you -- like, there's compulsory -- as compulsive --
22   compulsive attendance and -- it's like a Devo
23   attendance.  You have to do Devo.  They're mandatory to
24   sit through, and it's the same thing with the reports;
25   you have to do the reports."

1  Q.          Is that what she told you?  These are as

2  mandatory and Devos?

3  A.          She said these are as -- not -- no, no,

4  actually, that's me saying that they're as mandatory as

5  Devos.

6  Q.          Okay.

7  A.          Dave -- Dave Ramsey said the Devos are

8  mandatory.  And Luke LeFevre said Devos are mandatory.

9  I think I -- there was somebody, Conner Adams had

10 worked through -- and especially in our department, had

11 worked through it one time, and he had -- you know, he

12 laid into somebody who was late one time, and said it

13 was -- you know, these -- you have to show up to these

14 things.  They're not.  The same thing with the all

15 employee meetings.  These are mandatory.  These are not

16 optional.  You've got to be here.  You've got to be

17 present, and you've got to be on time, and you've got

18 to be these -- at these.

19           And then when Conner Adams had worked

20 through it because he was on a deadline with the --

21 with the show he was working on for AO, Luke LeFevre

22 had come down and said these are mandatory.  These are

23 not an option.  You have to be there to these things.

24 Q.          Did you hear Luke say?

25 A.          Yes.

1  Q.        Okay.

2  A.        Yeah, because he brought our whole

3  department in and -- and basically dressed us down.

4  Q.        Okay.

5  A.        Because he was like, I don't want to name

6  any names, but I caught somebody working.  And these

7  are -- just so you know these are mandatory.

8  Q.        Okay.

9  A.        You have to be in attendance to these

10 religious speakers.

11 Q.        And did you hear Dave Ramsey say Devos are

12 mandatory?

13 A.        Yes.

14 Q.        When did he say that?

15 A.        He said it in one of the Devos, I think.  I

16 could not tell you which one.

17 Q.        Okay.

18 A.        If we get the audio recordings, we'll --

19 they're recorded, so we could probably find -- find

20 them.

21           Randy Clark was an employee who was a

22 freelancer who was hired on -- by Ramsey specifically

23 to organize all of their media, and so all of their

24 quotes, footage, everything that's ever been recorded

25 by them for 25 years got -- they spent an entire year

1   reorganizing it because we had -- the video department

2   worked with all of those clips and all of those sound

3   bites.  So we have all of those recordings that are

4   there and vaulted and then double vaulted because they

5   kept spending all of this money on storage.  Because

6   that was one of the points in trying to help them save

7   money was, like, hey guys, you're -- there's formats.

8   You guys are digitizing everything in full resolution.

9   You could do a lower resolution.  Save space and not

10  have to be buying.  Because every time they had to buy

11  they -- it was -- it was many hundreds of thousands of

12  dollars in space.

13  Q.        Who did you say:  Randy?

14  A.        Randy Clark.

15  Q.        Randy Clark?

16  A.        And he was brought in -- so if you guys

17  need -- there's stuff you guys need to find, he can

18  probably help you find that stuff because he was

19  specifically hired just to make sure that we could --

20  because it's like in keywords.  You just do so many

21  keywords and strokes and dates and things, and they can

22  bring up all of the -- all of the Devos and all of the

23  things that were recorded.

24  Q.        Did --

25  A.        All employee meetings.

1   Q.        Did you ever record any Devos?

2   A.        Yes, I did.  I recorded -- I recorded all

3   employee meetings.  I was doing some stuff for the

4   Christmas video, and they wanted to get reactions from

5   people.  And so I did, you know, as one of my roles,

6   they needed footage, so they had me get a camera, and I

7   shot stuff.  I think there was some other because they

8   know how to operate camera, they had me step in at one

9   time to record something.  So I do believe I did record

10  at least one being asked to.  And also the Christmas

11  video to record footage for it, and I was asked to do

12  that as well.  So I think --

13  Q.        Do you have these recordings?

14  A.        No, no, no.  There -- these are Ramsey

15  cameras and Ramsey --

16  Q.        Okay.

17  A.        This is not me waving a cell phone around.

18  Q.        Right.

19  A.        This is on their XL cameras.

20  Q.        Right.

21  A.        Their high-end, high-def cameras and doing

22  full tripod recordings and stuff.

23  Q.        When did you hear Dave Ramsey say that he

24  thought COVID needed to be solved with prayer?

25  A.        Well, the first initially -- the first one

1  was initially his -- when he -- I believe that would be

2  March.  He sent us -- he emailed us all at home,

3  telling us about Amanda Rogers on the 15th of March.

4  The next day, the 16th -- I think it's the 16th?  Yeah,

5  16th is when he despite -- there was governance orders

6  and everything.  There was a lot of orders and

7  ordinances where they said, hey, we're -- don't have

8  gatherings over 10 people.  We really highly recommend

9  not, and he had all 900 of us all packed in like

10 sardines into the main building.  And he gave a

11 presentation.  That was where he said, "we're not going

12 to fire anybody yet.  You know, the board is not

13 drawing salaries, but, you know, we -- but don't worry.

14 I know some people, and, you know, they assure me it's

15 a-okay."

16          He didn't say who these people were or what

17 their credentials were or anything.

18          "It will be fine."  And the idea was that we

19 all just need to take a breath, chill out because

20 everybody is losing their freaking minds I think is

21 what he said, and then, you know -- and what we just

22 need to do is pray.  And with prayer we will -- I don't

23 know the exact quote, but he did mention prayer.  And

24 then we all prayed after he did, you know, "Questions?

25 Anything?  All right.  Let's everybody pray."

1           And then that was reenforced by Luke when he
2   came in later and said, "You know, don't worry, guys.
3   I think we all just need to take a breath and let's
4   pray.  And I think that's -- we could call use a good
5   prayer, and I think that's going to see us through."
6   So that was brought up there too.
7   Q.          So this was --
8   A.          But there were other times I believe Dave
9   makes the hope versus fear and the -- says with a power
10  prayer we're going to, you know, beat this thing and
11  stuff.  And, again, it's weird too because I -- you
12  know, prayer is a very private thing, you know, and
13  stuff, and this is supposed to be very public, and it
14  has to be, you know, the way Dave, you know, wants it
15  done kind of in his fundamental evangelicalism.
16  Q.          And this was at -- this was at a meeting
17  with the whole group you think around March 16th?
18  A.          Which one?
19  Q.          The one where he said he knows people; we
20  aren't going to fire anyone yet?
21  A.          Oh, yeah, that --
22  Q.          The board is not taking salaries?
23  A.          Yeah, that's March 16th.
24  Q.          And we should all pray.
25  A.          Yeah.  And I don't know if the audio is out

1   there.  It's -- it -- they I don't know if the -- I

2   know the email got leaked to the press and -- because

3   we had more employee meetings because -- and it was

4   very -- it was really difficult because, again, I was

5   promised a drama-free environment, and all it was was

6   distractions, distractions, distractions; people

7   leaking emails.  And Dave hustling everybody into all

8   employee meetings and then making -- yelling at people

9   and making a big deal about, you know, disloyal --

10  disloyalty, and if you hate this place so much -- I

11  know one time, somebody -- because they were having

12  these really big meetings and somebody had reported

13  them to S -- the C -- like I don't -- Centers for

14  Disease Control, and said, hey, they're in violation of

15  these orders.  And he got up there and mocked this

16  anonymous employee and said that they're not going to

17  do a damn thing.  I know that for a fact.  And, you

18  know, it just derided anybody having any concerns at

19  all about it.

20  Q.         So the March --

21  A.         I remember it -- towards the end, I would

22  wear masks because the -- we were all -- all of these

23  meetings were mandatory.  You had to attend them.  And

24  they were all packed in like sardines and nobody was

25  masking because -- and anybody who did mask -- because

1  I didn't mask at my desk, but I -- this is after, like,

2  masks became, like, the big recommendation and stuff.

3  And I just remember he would stare people down.  If you

4  were wearing a mask in a group, he would just stare at

5  you.  You know, super intensely.  Straight into you the

6  whole time, and he would lock eyes with you, and he

7  wouldn't move his eyes away until -- until you looked

8  away or did something else.  But I know that was the

9  Dave staring game, which was --

10  Q.        Did he stare at you?

11  A.        Yes.

12  Q.        When did that happen?

13  A.        Oh, God.  As it was, a couple of times, I

14  guess.  All employee meetings.  The Devos were so

15  important to him that we did -- when we were working

16  from home, he had them Zoomed, and it was mandatory

17  attendance that you attended the Zoom.  And then once

18  we got back, there was a two-week period where he still

19  allowed it to be streamed, and so people would watch

20  from their desk, which was great, but then they stopped

21  that and required everybody to be packed into the main

22  building, the main room again.

23          That and that time only I wore a mask.  A

24  couple of other people wore masks too.  They said, you

25  know, "If you -- if you feel comfortable, if you need

1    to wear a mask, you feel you need to, you're okay to do
2    it."
3              But, again, that was what they said on the
4    notice they posted on the door.  In practicality, there
5    was a lot of shaming and a lot of staring, and a lot
6    snickering.  There was a lot of derision put to anybody
7    who kind of wore a mask.  And, again, the CEO of the
8    company, I mean, just staring, you know, just straight
9    to you the whole time.
10   Q.       Who else would stare and shame?
11   A.       Oh, specifically Dave Ramsey who did the
12   stare-a-thons.
13   Q.       I said who else?
14   A.       But as far as who else, I mean, nobody else
15   would do the stare, but as far as other people, I can
16   remember they -- they had an impromptu game of hangman
17   that David DiCicco decided he was going to do as a
18   team-building exercise.
19             And I would stand -- and this was not a
20   masking, this is actually just me social distancing.  I
21   would distance in meetings by standing, you know, a
22   good 6 feet.  And that apparently irked people because
23   they -- some people were, like, "Why is he standing
24   apart?"
25             It was a new employee.  I don't know her

1  name who had asked, and Maria Katz was, "Oh, he's

2  social distancing."

3           And they were like "Why?"

4           And it's, like, because I have people at

5  home who could die if they get COVID.  You know, my son

6  has got, you know, a rare disease, and my wife, you

7  know, has pneu -- pneumonia.

8           So it's, like, listen, nobody here is -- and

9  they -- at the time, they had not invented a

10  vaccination.  So it was all just kind of trying to

11  avoid people and dodge.  But they hadn't done any --

12  like, push the desks apart.  They hadn't done really

13  any precaution.

14          They came back, and they said, "Oh, we

15  cleaned.  The CDC cleaned," but they didn't do any of

16  the other recommendations like, you know, partitions.

17  And I get partitions in the whole place would be

18  ridiculous.  But people were not separated.  They

19  weren't working from home.  There was not -- there was

20  very little mitigation efforts.

21          In fact, they even opened the kitchen -- the

22  dining room area very shortly afterwards including

23  the -- it was closed for a little while -- the buffet.

24  But they even opened the salad bar again.  So . . .

25  Q.       So how long did -- did the entire office

1    work at home?

2    A.          Five weeks.

3    Q.          Okay.

4    A.          I believe it was five weeks, and then there

5    was a big -- as soon as they were legally able to do

6    so, they rushed everybody back.  In the beginning, they

7    kind of did like a one-week transition period.  It was

8    like, hey, if you want to come back, great.  But you're

9    required to be in the office next week.

10              And, again, no problem.  I have never said,

11   "I have to work at home."  You know, that was their

12   recommendations.  You know, remember that was David

13   DiCicco saying, "Hey, would you like to work from

14   home?"  It was him who said that.

15              It was Lara Johnson who said, "Hey, we're

16   doing Summit.  Maybe you would like to work from home."

17              And then, of course, the federal mandate.  I

18   have no problem working from -- oh, I can distance.  I

19   was there.  I was there.  I masked in the big meetings.

20   I social distanced myself, and I stayed away from

21   people and just -- and did my work.  And never let, you

22   know, whatever my feelings are personally about my own

23   religious, you know, objections to not having any

24   objections to COVID interfere with anything I was doing

25   at the office.

1   Q.          I am going to show you another document.
2   This is the one I handed to y'all --
3   A.          Sure.
4   Q.          -- at the beginning.  It's Lampo 0107.
5   Yeah, that's it.  (Indicating.)
6               And when you take a look at this document,
7   Mr. Amos, is this when David DiCicco offered you the
8   opportunity to work at home?
9   A.          No.
10  Q.          Okay.
11  A.          It was not done in an email.  I think it was
12  done with a phone call.
13  Q.          Do you remember receiving this email?
14  A.          Yes, actually, I do.  Yes.  Because, again,
15  it was like, "that being said talk it over with
16  Melissa."  Like every single thing, "talk it over with
17  your wife."
18              I'm, like, my wife is not an employer here.
19  You know, it's amazing every single thing.  Because I
20  think I even saw a thing when I was out for that one
21  week, they said -- I think it said, "Wife is
22  uncomfortable with COVID."
23              And I'm like, how did you come to that
24  determination?  Who said that?  You know, I don't think
25  my wife ever had any conversations with David DiCicco

1    where they talked about COVID.

2    Q.          Had you ever indicated that your wife was at

3    risk?

4    A.          I did indicate that she was at risk, but

5    it's not -- her opinions were not the central -- it had

6    nothing to do with what's going on up there.

7    Q.          Let's hand that --

8    A.          She was very supportive of me and my job and

9    everything I do.

10                    MS. SANDERS:  Let's hand that to the

11   court reporter to mark that as the next exhibit which

12   will Exhibit 9.

13                    THE WITNESS:  Yeah.

14                    But, yes, David did offer -- and I

15   think --

16                    MS. SANDERS:  Wait a minute.  She can't

17   type and --

18                    THE WITNESS:  Oh, she can't type.  I

19   apologize.

20                    MR. STREET:  Go ahead and finish your

21   answer, though.

22                    THE WITNESS:  I will.

23                    (Marked Exhibit 9.)

24                    THE WITNESS:  But David DiCicco did

25   on -- did ask if I would be more comfortable working at

1    home and was like -- and offered it as an option.  And
2    that was the day after I had talked to Luke LeFevre
3    about having -- I had concerns that they had no
4    concerns, and he was concerned I had concerns.
5    BY MS. SANDERS:
6    Q.         And when was that?
7    A.         That was -- I think, as I've said before,
8    that was on the 16th of March.  David's email was the
9    15th.
10   Q.         Okay.
11   A.         As I said before, this is the 16th, and then
12   the 17th is when David offered this -- he actually
13   offered to work from home.  Yes.  Actually, so let's
14   change this.  This is inaccurate because what we -- he
15   offered to work from home on the 17th, and -- which was
16   surprising.  It was a very sudden kind of thing out of
17   the blue.
18          And I remember saying, "As long as it
19   doesn't jeopardize my job.  I mean, I don't want to
20   jeopardize the project.  I don't want us to get
21   behind."
22          And, he was, "Don't worry about.  It should
23   be cool."
24          And I said, "Well, maybe what we'll do is
25   we'll take off until the week and let" -- you know,

1  because the concern was, like, oh, maybe there is

2  active viruses.  We don't know anything about this.

3  Amanda was sick.  Maybe we just need to let it get

4  cleaned, let the area settle down, and, you know, we'll

5  come back in next week.  No problem.  So it was going

6  to take -- the plan was just to take the week.

7            This email here is from -- dated the 20th,

8  the Friday.  And this email here, he talks about --

9  this is where he -- he says, he wants me to -- he

10  wants -- he's saying we got approval to be in the

11  office as a skeleton crew, so I want you to come into

12  the office.  And then he says talk -- talk to Melissa.

13           He says there's zero -- he says, "There is

14  zero pressure or expectation to be in the facility.  I

15  just wanted you to have all the information up to this

16  point with the facility and cleaning," and stuff like

17  that.

18           So, you know, he's -- he -- I think that's

19  when we first start talking about, hey, I would like

20  for you to come in.  And that's when he -- we -- by

21  phone, I think we had talked about -- it was by phone

22  or by text that, you know, hey, we found a loop hole

23  because essential workers like medical personnel and

24  things like that, they can actually stay in -- in

25  office.  And so we're going to get the -- we're going

1    to get the radio classed as essential business.  And

2    we're going to find a way to get the student

3    documentary classed as an essential -- essential

4    business.  So we can all work in -- in house.

5            Which, again, I don't understand why

6    suddenly that became a big thing to him working in

7    house.  I was -- maybe because he knew that I had

8    objections to COVID.  I don't know what the mind-set

9    was there.  I know there was -- he was getting pressure

10   from Luke LeFevre not about the documentary about

11   something else about -- whether it be my wife or

12   because I spoke up about COVID especially when -- after

13   reading some of the documents that you guys dumped,

14   there was definitely, it seems like, a back and forth

15   there that seemed like there was a very premeditated

16   something going on in the background.  And maybe they

17   can illuminate more about what they were planning with

18   me.

19           But in this case here, this is kind of the

20   first of saying, hey, I might not have you work there.

21   And I'm kind of glad I didn't because when I did come

22   in on the 24th to pick up my -- you know, the QNAP

23   drive.  They called it "QNAP," which had all of the

24   footage on it, which basically allowed me to work

25   remotely.  I could work anywhere.  I had all of the

1  documentary footage.  I had, you know, the -- the

2  computer to edit it on.  That bay which -- the bay is

3  half the size of this room and, you know, you could

4  feel how tight and heavy the air is just with, you

5  know, the few people that we have in here.  And there

6  they had a room that's half the size with the edit bay,

7  and they jammed five people, most of them who weren't

8  even working on the documentary.

9          So it wasn't just a case of me and David.

10  It would have ended up being multiple people because

11  he -- he had whiskey out, and he had snacks, and the

12  idea was -- it was, like, a party to him.  I guess,

13  that's maybe why he wanted -- or maybe that wasn't.  I

14  don't know what the plan was there, but it definitely

15  would not have been -- there were very few people that

16  were in the building apparently would all be zeroed in

17  on that one room.

18  Q.      Okay.  So let me ask you this.  You have

19  said in the lawsuit that Ramsey violated COVID laws and

20  regulations.  What -- what specifically -- first of

21  all, what laws are you talking about?

22              MR. STREET:  Objection.  He's not a

23  lawyer.

24              THE WITNESS:  That's --

25              MS. SANDERS:  I'm asking him what he

1    said in his complaint.  He said --

2                     MR. STREET:  Which were filed by his

3    lawyers.

4                     MS. SANDERS:  Well, he has to answer

5    what he thinks Ramsey violated --

6                     MR. STREET:  He can --

7                     MS. SANDERS:  -- that's the basis of

8    his claim.

9                     MR. STREET:  He can talk about the

10   facts, but not in a specific statute, code section.

11                    MS. SANDERS:  That's an improper

12   object.

13   BY MS. SANDERS:

14   Q.        Tell me what you think Ramsey violated.

15                    MR. STREET:  If you can, you're not a

16   lawyer.  We understand.

17                    THE WITNESS:  If I -- I'm a video

18   editor, honestly, and I don't know.  I don't know

19   what -- all of the merits of the law and this, that,

20   and the other.

21                    MS. SANDERS:  That's good.

22                    THE WITNESS:  So, honestly, I'm a video

23   editor.  I just refer to what's in the complaint that

24   we've drafted up.  It does seem like there was

25   violations, but, you know, the specifics, I'll leave to

1  the legal people.

2  BY MS. SANDERS:

3  Q.          And that's what I'm asking you.  What do you

4  think Ramsey violated?

5                    MR. STREET:  Same objection.

6                    THE WITNESS:  Again, that's -- I have

7  no idea.

8  BY MS. SANDERS:

9  Q.          How do you think Ramsey violated it?  Let's

10  try that way.  What's your belief?

11  A.          How do I think?

12  Q.          Yes.  What's your belief in what Ramsey --

13  A.          Of what --

14  Q.          -- did to violate COVID laws or rules?

15                    MR. STREET:  Same objection.

16                    THE WITNESS:  Right.  Yeah, I don't --

17  it doesn't sound like --

18  BY MS. SANDERS:

19  Q.          Do you -- do you have a belief that Ramsey

20  violated laws?

21  A.          Do I have --

22                    MR. STREET:  What?

23                    THE WITNESS:  What?

24  BY MS. SANDERS:

25  Q.          Do you believe --

1  A.          Now, I am confused.  Sorry.

2  Q.          Do you believe that Ramsey violated any

3  COVID rules, regulations, ordinances, recommendations,

4  or laws?

5  A.          I don't know.

6  Q.          Okay.  All right.  Now --

7  A.          I mean, I do know -- I will say this -- I

8  will speak to the demeanor of --

9  Q.          That's not my question.  My question was do

10 you know, and you answered.

11 A.          Yeah.  I'll say -- yeah.  I'll leave that up

12 to the law to decide.

13                    (Interruption by the court reporter

14                     with a reminder to speak one at a

15                     time.)

16                    THE WITNESS:  Sure.  Oh, I'm sorry.

17 She was stepping on me.  So . . .

18                    We had a dance and stepped a lot.  So .

19 . .

20                    MS. SANDERS:  I think this is a good

21 time for a break.  The videographer needs to take a

22 break.

23                    THE VIDEOGRAPHER:  Going off the

24 record.  The time is now 4:56.

25                    (Recess taken from 4:56 to 5:01 P.M.)

1           THE VIDEOGRAPHER:  We're back on the

2    record.  The time is now 5:01.

3    BY MS. SANDERS:

4    Q.          Mr. Amos, throughout your deposition, you

5    have -- you have talked about documents that Ramsey has

6    produced and documents that you have produced.  So I

7    think one thing we can do to shorten this is to -- I am

8    going to ask you this question.  If you don't know the

9    answer, that's fine.

10   A.          Sure.

11   Q.          But your attorney has provided 101 pages of

12   documents.  I believe those were all provided by you.

13   Are you aware of that?  Are you aware that 101 pages of

14   documents were produced to us?

15   A.          I don't know the exact number.

16   Q.          Okay.  All right.  Well, it won't be short

17   then.  All right.  So let's start with these.  This is

18   the first set of documents that I want to show you.  If

19   you can take a look at these documents.  These appear

20   to be your tax documents from a variety of years.

21   A.          Uh-huh.

22   Q.          Is that -- do you recognize these?  Are

23   these --

24   A.          Yes.

25   Q.          -- accurate copies of W-2s?

```
 1    A.          I would have to look through all of them.
 2    Q.          Sure.
 3    A.          But from what years are these?  These are
 4    2 --
 5    Q.          There's several.  These are all of the tax
 6    records that your attorney has produced.
 7    A.          Okay.  Well, some of these are cut off, so
 8    I'm not 100 percent sure.  But this stuff looks like
 9    some of it is from 2019.  Some of it is from 2020.
10    2021.  Uh-huh.
11    Q.          I think --
12    A.          Most of them, I think -- there may be more.
13    I don't think there are.  I think this is everything.
14    Q.          Okay.  And these are all accurate copies of
15    your tax records?
16    A.          I can't tell with the redaction and stuff
17    being cut out, so I won't -- I can't -- I will not say
18    that they're 100 percent accurate, but they're probably
19    copies of the same.
20    Q.          Uh-huh.  Let me -- on this particular set of
21    documents, if you would look at the back, the very last
22    one.
23    A.          All right.  The last page?
24    Q.          Yes.  Uh-huh.  The Bates-stamped number is
25    at the very top, I believe.
```

1    A.          Uh-huh.

2    Q.          It says, BAMO 0002.

3    A.          Uh-huh.

4    Q.          I'm not sure if it was the second document.

5    I don't think it was.  But, anyway, that's the only

6    number I've got.  So do you see that one at the top?

7    It says "0S026."

8    A.          Yes.

9    Q.          Okay.  All right.  So this says -- this is a

10   W-2 from CMP Film & Design West, LLC.

11   A.          Yes.

12   Q.          Who is that?

13   A.          That is Mocean.

14   Q.          Okay.  So --

15   A.          Like the Ramsey Solutions is called "The

16   Lampo Group."

17   Q.          Uh-huh.

18   A.          C -- CMP is Mocean.

19   Q.          Got ya.  Okay.  And so it looks like in

20   2021, you received a W-2 from Mocean?

21   A.          Uh-huh.

22   Q.          Okay.  And then if you'll look at the one

23   that's the one next to that, the one right before that.

24   A.          Uh-huh.

25   Q.          There's one that appears to be from Mark

1    Woollen and Associates; is that correct?

2    A.          That is correct.

3    Q.          Okay.

4    A.          I think we talked about this earlier.

5    Q.          Yes.

6    A.          You had asked about my job history, and so

7    they -- Mocean is the job that I started in August.

8    Q.          Okay.

9    A.          And that I'm still currently with, and then

10   the prior one is Mark Woollen and Associates.  That's

11   how I said -- you were like, oh, it's freelance, W --

12   you get a 1099?

13               I'm, like, no.  It's a W-2.

14   Q.          Right.

15   A.          Again, things are weird.  This is the very

16   brief gig that I did at the early part of that year.

17   Q.          Got ya.

18                    MS. SANDERS:  Okay.  Let's hand that to

19   the court reporter.

20                    THE WITNESS:  Uh-huh.

21                    MS. SANDERS:  And make that the next

22   exhibit which is Exhibit 10.  You can make it a

23   collective exhibit, Jennifer.

24                    THE WITNESS:  And it's close to being

25   in order.  I don't know that it 100 percent is.

1                    (Marked Exhibit 10.)

2    BY MS. SANDERS:

3    Q.         Mr. Amos, was your position at BLT

4    eliminated while you were there?

5    A.         Eliminated while I was there?  No.

6    Q.         Okay.

7    A.         No, I don't think so.  Are you talking about

8    like, did I -- do they no longer have editors there?

9    Q.         Right.  Was your position terminated

10   involuntarily at BLT?

11   A.         Oh, are you -- are you asking was I fired

12   from BLT?

13   Q.         Yes.

14   A.         The answer is absolutely not.

15   Q.         Okay.

16   A.         They -- I -- because when you ask a question

17   like is that position still there, I couldn't tell you

18   post-COVID because they did eliminate a lot of

19   positions in hiring.

20   Q.         Sure.

21   A.         And things like that.

22   Q.         I meant while you were there.

23   A.         But you say did I ever get fired from there,

24   the answer is no.

25   Q.         Was the position eliminated while you were

1  there?

2  A.          Not while I was there.

3  Q.          Okay.

4  A.          I mean, I was still an editor.  I guess,

5  senior editor, I guess.  I don't know if they had that

6  vanity credit, you know, in their records or if it was

7  just editor.

8  Q.          Were -- were you concerned?  Did you have

9  any concerns that your position was going to be

10  terminated or that you were going to be terminated?

11  A.          From BLT?

12  Q.          Yes.

13  A.          No.

14  Q.          Okay.  Was that a no?

15  A.          That was a no.  Yes, sorry.

16  Q.          Okay.  All right.  You've told us about the

17  concerns that you raised with Luke LeFevre about the

18  company's attitude related to COVID.  Did you raise any

19  other concerns about Ramsey's approach to COVID or

20  response to COVID to anyone else?  I think you also

21  mentioned to Lara Johnson?

22  A.          Uh-huh.

23  Q.          Was there anyone else?

24  A.          This came -- this came much later.  All I

25  said at that time is, like, I have concerns that we

1  don't have concerns; that, basically, we are saying --

2  you know, we are being very cavalier about this.  We

3  don't know anything about the disease.  And we -- to

4  get all of my statement.  We don't know anything about

5  the disease.  We don't know much about it.  The person

6  who got sick was 15 feet away from where I work and

7  where everybody else works.  Do we all need to be

8  tested?  Where do we go for that?  Do we all need to

9  quarantine?  What do we need to do?  Moving forward,

10  what do we need to do?

11          And, again, Luke was less concerned about my

12  concerns.  He was more concerned that I had concerns.

13          He told me, "Don't worry about it, man.

14  We've got this.  You know, let's just -- you know, we

15  got this.  Don't worry; leadership is watching."

16          Now, were they watching me?  Or were they

17  watching out for everybody with COVID?  But, again, it

18  was -- there was not a very, hey, we have an active

19  appropriate response and this is what we're planning on

20  doing.  And I get it in its early days, but at the same

21  time, that was just my concerns; that there is not a

22  plan here in place.  And not that -- hey, I was -- I

23  was not -- I did not say, hey, we should all be working

24  from home.  And I demand everybody wear masks.  We

25  didn't even know masks were a thing then.  You know, I

1  demand you invent an inoculation.  It was nothing like

2  that.  It was just, I'm a little surprised we don't

3  have anything because I -- I don't know what to do when

4  I go home tonight.  Do I need to stay away from my

5  family?  Do I need to quarantine?  I have people who

6  might be high risk.  What is high risk?  We don't know

7  anything.

8           So this -- I think, you know, because he

9  kind of had come in here and said, "Hey, everybody,

10  good?  Y'all take a breath.  Are you good?  Okay.

11  Great.  Cool.  Let's pray."

12           That literally was what it was, and when he

13  said no response, I said, "Actually, I do have a

14  response."

15  Q.          Okay.  So you did have a response then.  Did

16  you raise concerns at any point after that with anyone

17  at Ramsey or anywhere else about your concerns with

18  Ramsey's approach to COVID?

19  A.          Lara Johnson.  I mean, that was in these

20  reorientation meetings.

21  Q.          Uh-huh.

22  A.          You know, where specifically, you know, it

23  was, you know -- and, again, it's weird because it's

24  that whole gaslighting thing where a lot of things get

25  put in my mouth.  I think she might have even been the

1    one to suggest I should start wearing masks in

2    meetings.  You know, because I did not want to rock the

3    boat.  I was not here to prevent anybody from doing

4    their job.  I wasn't there to prevent myself from doing

5    a job.  They would keep making recommendations.

6              David DiCicco:  "Hey, maybe you would feel

7    better if you work from home."

8              Hey maybe -- you know, Lara Johnson:  "Maybe

9    you should work from home."

10             You know, I think they might have -- she

11   might have even asked, "Why don't you wear a mask in

12   the meetings?  It will make you feel better."

13             I'm like, "Well, if that's what you expect

14   me to do, I'm fine.  I will do that."

15             But I never said, "Hey, I need to take time

16   off.  I don't like what you guys are doing.  I'm -- I

17   only want to work from home."

18             You know, it -- the -- when David DiCicco

19   says, "Hey, I would like us to work in office

20   together"; I was like, "Is that really necessary?"

21             Because we hadn't -- up to that point never

22   worked side by side even when we worked on the

23   "Borrowed" podcast trailer together because he --

24   because he was the producer.  He was out of town a lot.

25   We never did side-by-side stuff.  And he was traveling

 1   all over the place.  So it seemed unnecessary.

 2            I was like, "Why don't we -- if you want,

 3   I'll come in.  I'm happy to come in.  I'll just

 4   quarantine myself at home."

 5            And he got very upset that I would -- had an

 6   end run around that, and it was that of a different --

 7   different solution.  And I think that was -- I'm always

 8   like, hey, this is like -- there's a lot of different

 9   ways to skin a cat, but there's other solutions.

10            It seemed Dave had a very particular view

11   point of -- of COVID and how it should be handled, and

12   it had to be kind of his way.  And employees who had

13   disagreement with that or thought maybe we should

14   broaden our minds a little bit about other alternative

15   solutions to the problems that we're facing -- and they

16   are big problems.  I mean, he had to cancel his cruise.

17   He got into a major fight with the Marriott.  He ended

18   up having to move Summit.  And these are all very large

19   expenses.

20            And I remember when we were in the meetings

21   with Lara, these were not meetings where I'm shaking my

22   first, and saying, you know, these are -- you know, you

23   guys are bad people, and, you know, you're -- you --

24   you're trying to kill everybody.  It was basically

25   these are very, very expensive, and I'm worried we're

1    going to turn into a situation where we have such

2    massive losses.

3              Then you turn around and Dave has already

4    said, "I'm not firing anybody yet."

5              But before you know it, we could all be out

6    on the streets.  And I was very concerned because I had

7    already talked to people in Hollywood.  And everybody

8    is out of a job.  Entire industries are closed.  I had

9    friends who owned restaurants and they went out of

10   business.  And people are -- people are taking PPP

11   loans just to make ends meet.  It's a really big

12   critical time, and there isn't a lot -- I mean, I know.

13   You know, there's not a lot of demand for editing in

14   Nash -- in Nashville, and I've sold my house.  The

15   boats -- the boats are burned.  I don't have anyplace

16   to go back.  There's no career to go back to.  So I was

17   stuck, and I kept saying, "Let's make this work."

18             They didn't seem like they were interested

19   in making it work.

20   Q.        So anyone else other than Luke and Lara that

21   you spoke to about --

22   A.        About COVID concerns?

23   Q.        Right.  About Ramsey's response.

24   A.        About the response?  Those are

25   specifically -- yeah, those are specifically the people

1    I talked with.

2              I mean, Luke is a board member, and has

3    Dave's ear.  And then Lara, you know, is the head of

4    our department.  You know, it's -- it's not really --

5    I'm not there to politic, and, you know, make everybody

6    else's day unpleasant.  And say, all right.  I blame

7    you for doing this.  You know, people knew my positions

8    about, you know, religion.  They knew where I stood on

9    things.

10             You know, it -- I didn't have to keep

11   beating the table about, you know, the COVID response.

12   You know, I had said in public with that thing with

13   Luke, I said it publicly in an effort to get people to

14   be more aware about this.  But also to say, hey, guys

15   we should probably -- this is a big deal.  We should

16   think about it.

17             Interestingly enough, it's interesting,

18   after that meeting, several people did, you know, go

19   home.  They ended up working from home that week.

20   And -- and I have no idea if that had anything to do

21   with me, but afterwards it did feel like a lot people

22   did start separating a little bit, just until the work

23   from home order was put in place, until we knew more,

24   and that was -- it was just -- maybe just

25   precautionary, the -- but it -- I think the biggest

1    thing is because we know nothing, the idea is let's

2    work out of an abundance of caution because we don't

3    know anything.

4              And his response was basically, "Hey, Jesus

5    has got the wheel.  We don't need to do that because

6    it's taken care of.  So just calm down.  Business as

7    usual.  Take a breath.  Get back to work."

8    Q.       And when you say "they knew my position on

9    religion," what are you talking about?

10   A.       Well, I -- like I said, I had talked -- and

11   in the beginning, I had talked about when they hired

12   me -- and we talked about this earlier.

13   Q.       Right.  Okay.

14   A.       I mean, they hired me.  They had vetted me.

15   Kicked the tires.  They -- they do their whole

16   Colossians, do your work unto the Lord thing, and they

17   were, like, man, this guy -- he's our guy, you know.

18   Q.       I got ya.

19   A.       Kick those tires and he seems to be right.

20   Now, again their interpretation of Christianity may be

21   vastly different and apparently it is when I see some

22   of Dave's views versus mine.  I mean, his is a much

23   more collectivist view.  It's more -- it seems almost

24   Chinese in the way it's fitted rather than actually

25   anything else I believe in, but it's fine.

1  Q.        Okay.  I just wanted to make sure we were on

2  the same page when you said --

3  A.        Yes, ma'am.

4  Q.        -- they knew my religious --

5  A.        Yeah.

6  Q.        -- but we've discussed that?

7  A.        We have.

8  Q.        What you talked about in the hiring process?

9  A.        Yes.

10  Q.        Okay.

11  A.        Yes, ma'am.

12  Q.        Got ya.  I just wanted to make sure I

13  understood.

14  A.        Sure.

15  Q.        Okay.  So let me ask you this.  When the --

16  when the work force went to work at home at Ramsey

17  Solutions, you told me that was five weeks.  But how

18  long did you work at home?

19  A.        If you would like to add in -- if you add in

20  the week prior, like maybe five and a half; it might be

21  six weeks.

22  Q.        Okay.

23  A.        They had -- I believe -- I believe, my first

24  day back -- there was a day when it was voluntary.

25  Everybody was voluntarily supposed to show up, and then

1    it was mandatory that everybody show up, I think, the

2    following week.  I think that's when I came in.

3              So they were gone -- if -- and I don't know

4    if they were gone for four weeks or five weeks, but if

5    they were gone for whatever that time was, add one week

6    and that was me.  So -- and I think it was because Dave

7    had recommended -- David DiCicco, not Dave Ramsey, had

8    recommended I work from home.  And then that was while

9    I was home, everybody got sent home.

10   Q.        Okay.

11   A.        So if you want to have a total of time.

12   Q.        I got you.

13   A.        Yeah.

14   Q.        I am going to show you a document that was

15   produced by your attorneys.  And the document number at

16   the bottom is kind of hard to see.  So I'm going to

17   identify it.  It's a screenshot of a text message dated

18   March 18, 2020.  And the Bates number -- I have no idea

19   what it is.  So we'll just mark this as the next

20   exhibit --

21   A.        Uh-huh.

22   Q.        -- once he's reviewed it.

23             Is this an email from you to David DiCicco?

24   A.        Oh, this would be a text message.

25   Q.        I'm sorry.  I meant text message.

1  A.        Oh, sure.  No problem.  Yeah.

2  Q.        Okay.

3  A.        Yeah, this -- because this is -- remember

4  the day prior, you know, on the 16th, I had my

5  discussion with Luke in public.  The very next day

6  after a screening, Dave had recommended I work from

7  home.  And -- and, "Would I feel better if I was

8  working from home?"

9           Again, odd.  It was out of the blue.  And I

10  had not asked for it or intimated.  And then he gave me

11  that option.  And then he -- and he said, I think I

12  just saw the other thing -- "hey, go talk -- talk with

13  your wife."

14           I'm like okay.  I talk with her most of the

15  night, and, you know, we decided it would be okay if

16  we -- we stay here a few days because David and I had

17  already talked in person.

18           He's like, "Why don't you take the week.  Do

19  you want to take the week, and then maybe we'll come

20  back on Monday, the following week?"

21           You know, I'm like, "That sounds like a

22  great idea because that way we know that whatever the

23  germs or -- you know, settle down or whatever, you

24  know, and we can kind of, you know -- you know, get

25  back to work right after that."

1              But by Friday -- you know, by -- I think by

2    the 20th, which I think was Friday, they had decided

3    that, you know, the -- we had a work-from-home order

4    that was going to be issued, and so Dave preemptively

5    pushed every -- sent everybody home.

6                    MS. SANDERS:  Okay.  Let's mark that as

7    the next exhibit which I believe is 11.

8                    THE WITNESS:  Uh-huh.  And I think I

9    even said I'll call --

10                    MS. SANDERS:  Wait just a --

11                    THE WITNESS:  -- later and check in.

12    Oh, sorry.

13                    (Marked Exhibit 11.)

14   BY MS. SANDERS:

15   Q.          All right.  Now, did anyone at Ramsey

16   Solutions ever talk to you about performance

17   expectations, using a grid or a -- you can call it

18   whatever you want -- but using the characteristics of

19   humble, hungry, smart, skill fit, and team fit?

20   A.          Did anybody ever give me a grid?

21   Q.          Or speak to you.  Not -- not necessarily

22   hand it to you.  But did anybody ever talk to you about

23   your performance in those terms:  Humble, hungry,

24   smart, skill fit, team fit?

25   A.          When -- yes, actually.  Well, there's one

1  when Luke fired me and said I wasn't humble.

2  Q.        Okay.

3  A.        And -- and he -- he basically talked and we

4  have no problems with your work performance.  You're

5  great.  You're amazingly skilled and stuff like that,

6  but you're not humble.

7  Q.        Okay.

8  A.        And I said, well, I do believe you're

9  confusing, you know, confidence -- and I think I talked

10 to Lara about this before is -- is people confuse, you

11 know, humility and confidence, you know.

12         And Dave's, you know, idea is that you kind

13 of need to abase yourself, and you need to be -- you

14 know, grovel that -- and the idea is not groveling.

15 It's about if you are confident in your skills and your

16 position in life, you don't have to sit around and

17 prevaricate.  There's -- there's a difference in being

18 confident and there's a difference in being humble.

19 There's that.

20         There's two points -- and I don't think

21 these were served up with grids or talked about.  I

22 vaguely remember something about Kimberly in the hiring

23 phase talking about humble -- hungry, humble, and

24 smart, and they said that I fit all of three categories

25 really, really well.

1          And then team fit and all of that other

2     stuff.  They said that that was through the roof.  And

3     then I think that stuff was said again.  It sounds very

4     familiar when my KRA -- I'm not sure if you have that

5     or not.  If not, we can provide it.

6          Oh, you know what?  No, I don't think --

7     that's just a job description.  Don't worry about that.

8     They -- there is -- there was my ninety-day review.  I

9     sat with David DiCicco and J.B. Waggoner, and, again,

10    they covered all three of those points plus team fit

11    and all of these other about hungry, humble, smart.

12    And they're, like, you're hungry.  You're humble.

13    You're smart.  You're amazing.  You help out this

14    company.  You're the guy who gets in here.  You're

15    helping us reform the way that we do things.  Bring us

16    into the 21st century.  You know, you're really smart.

17    You know how to do these mixing things.  It was

18    interesting because, again, it was a glowing ten out of

19    ten.  They are like you're our guy.

20         And it was only at the weird ambush meeting

21    with Luke on April 13 where suddenly, I was -- yeah,

22    April 13, where suddenly he said you are not -- you

23    know, I needed to check my humility.

24    Q.        Okay.

25    A.        And that was because I had asked what my new

1    role would be; if I wouldn't be working on the

2    documentary, what would I be doing?

3             And he said, "You need to check your

4    humility," which was a weird statement.  But . . .

5    Q.       Did J.B. Waggoner ever give you any

6    performance feedback using those categories?

7    A.       No.  Unless the ninety-day review he was

8    involved in.  I remember people talking about that I,

9    you know, was through the roof on -- on everything.

10   And that -- this again, nothing was shared with me

11   physically.

12   Q.       Okay.

13   A.       No paperwork.  No anything.

14   Q.       Got it.

15   A.       All it was, was all verbal, and the verbal

16   was you -- you know, you're doing a really good job

17   because -- and that was a really important.  That

18   ninety-day review because I had not yet moved my family

19   from California.

20            They were -- Luke was banging the drum

21   saying, "You've got to get your family here.  You've

22   got to get them here."

23            I'm like, well, I'm just going to -- right

24   now they're in a nice home.  You want me to bring them

25   all the way out here and put them in an apartment until

1    the house sells, and, you know, so we were kind of

2    dragging our feet on that, but it was important because

3    if I had not gotten a good review on my ninety-day

4    review; you know, then I hadn't sold my house yet.  I

5    mean, we could still pivot and turn back.  It was

6    saying, hey, could I get my old career back and still

7    things there.  If this isn't going to work out, thank

8    you for letting me know now, so we can turn around.

9    But it was so glowing.

10              It was like, you know -- you know, talk

11   to -- "Hey, how did your ninety-day review" -- I talked

12   to my wife.  "How did your ninety-day review go?"

13              "It sounded like it was amazing, and it went

14   really well."

15              So, you know, that was a -- that as a big

16   confidence boost as far as the security.  Because,

17   again, we would not have taken the job at the beginning

18   had we known that there is no job security.  When

19   you -- when you move 2,000 miles away, sell your house.

20   If you think that you're going to be out in the street

21   you know, within a year, there's no way we would have

22   done it.

23              But, again, things changed after Luke and I

24   had that conversation where I just -- all I said -- it

25   was just asking questions.

1  Q.        Let's talk for just a minute about the
2  termination meeting.  You -- you referenced it just now
3  with Luke --
4  A.        Uh-huh.  Yeah.
5  Q.        -- and he had said that you weren't humble.
6  What else --
7  A.        Yeah.
8  Q.        -- was said in that meeting that you
9  remember?  Tell me what you remember about it.
10 A.        It was a meeting.  It was, again, one of
11 these weird ambush meetings where Lara -- it was
12 post-Summit.  Lara had said -- that prior week we had
13 talked about "The Daily Beast" article, and she
14 verified that it was 100 percent true.
15           She had also said -- said -- made weird
16 comments that "We pay people not to work here."  She
17 had said that several times in these meetings.
18           And I was like -- "Well, okay, well, I don't
19 even know what that means."
20           It was like, "Oh, we -- we pay people so
21 they don't work here.  Is that something you would be
22 interested in?"
23           I'm like, "Why would I not want to work
24 here?"
25           And she had said -- so what are -- and at a

1    later meeting that particular, "What if we gave you

2    $15,000, and we just say, whoops; we made a mistake?"

3              I think that was her words.  "Whoops; we

4    made a mistake."

5              And I'm like, who made a mistake?  You

6    guys -- you know, when you hired me, you had my budget.

7    You had a psychological assessment called a "DiSC" that

8    you had run on me.  You had my budget.  You had a lot

9    of personal information about me.  You'd interviewed my

10   wife and my spouse.  And apparently we're the best

11   thing since slice bread, and you hired me on.  In fact,

12   you even paid me more than you would normally pay

13   somebody for that position.  I -- you know, come to

14   find out later, I was one of the highest paid persons

15   in that entire department.  You know, I don't quite

16   understand, you know, suddenly why -- you know, I think

17   that would -- I don't want to do that.

18             And -- and the other thing is that, you

19   know, because I -- I was perfectly fine.  I thought we

20   were -- the job was improving and then -- that, you

21   know, I was doing really great work.  People

22   apparently -- she had said that producers were fighting

23   to work with me on their projects and stuff.  You know,

24   they felt pleasant.  My wife was doing something in

25   business.  Everything is -- is doing pretty well, and

1  so it was a bit of a blindside to be told, you know,

2  "Hey, would you like to say, whoops; we made a

3  mistake?"

4          Which is a little insulting because, you

5  know, when you give up a -- a quarter of a million

6  dollar career and just to -- and be told, whoops; we

7  made a mistake.  I'm like, you knew everything about

8  me.  You knew what you were getting into, and -- and I

9  still want to work for you, and I still like the

10 mission.  I don't know why we're doing these meetings,

11 and why you guys are speaking so punitive about things

12 with this gaslighting because literally every week, I

13 had no idea if I was doing a good job.  It was being

14 told you're doing this.  You're not doing this.  I

15 think you're lying.  I -- tell me more about your wife.

16 Why are you not answering what we want you to answer?

17 It was the weirdest psychological dress down ever.

18          So we do these -- this meeting with Lara

19 where she wants -- says, hey, let's just, you know, let

20 you go, and you can take 15 grand, which that won't

21 even pay for the -- the moving costs to get back.

22 Q.        Was this the termination meeting?

23 A.        This was right before the termination

24 meeting.

25 Q.        Okay.

1    A.         This led up to the termination meeting
2    because I -- she said, well, again, talk to your wife.
3    Run it by Melissa and come back to me with an answer on
4    Monday.
5              And I talked with her, and we said, I -- no,
6    and there's no -- what do we do?  It's the middle of
7    the pandemic.  If I quit, 15 grand is only going to get
8    us so far.  There are no jobs out there.  And even in
9    the middle of summer, there's nothing.  There's no
10   jobs.  There's no career.  There's nothing for us to go
11   back to.  We don't have a house in California.  We were
12   here.  What do we do?  You know . . .
13             So I -- we came back on Monday, and we said,
14   no, I -- we're perfectly fine here.  We -- we'll make
15   it work.
16             She was -- seemed surprised.  And I was,
17   like, great; that sounds fantastic.  And so I worked
18   the rest of the week.
19             And we did our usual meeting on Friday, and
20   then I was surprised to see Luke in there.  And, again,
21   it was -- and it was supposed to be just me and Lara.
22   You go in and, you know, he -- he -- I don't remember
23   the exact words, but, you know, he -- he didn't -- he
24   tells me to sit down.
25             I said, "I'm okay standing."

1            You know, because a lot of these times we do
2    these meetings, I'll either stand or be separate, and
3    Luke is not a big fan of personal space.  And, you
4    know, again, I was still social distancing from people.
5            So I said, "You know, what's going on?"
6            And he's -- he's like, you know -- I forget
7    the exact words.  I don't know how he said, we're
8    letting you go.  But he says -- I remember the words,
9    you know, that -- "You know, Brad, I think it's time.
10   You're not a good fit here."
11           And I was like, "What?"
12           He was like, "Come on, man."  You know, he
13   starts to rationalize.  "Come on, man; you know.
14   You -- between you and me, you're not a good fit here."
15           "But I don't understand what you're talking
16   about."
17           "What does it mean not a good fit because
18   I've -- you know, I was just talking with Lara, and
19   Lara said, hey, you're doing amazing at the job.
20   You're doing really good.  You know, the Summit reel
21   went over really well."
22           "That was really the prior week, and the
23   Summit reel went over really well.  That -- we ended up
24   having all of these things where they said, 'hey, you
25   look great.  You're doing fantastic.  We have got -- we

1  have producers fighting over you.'  I don't know quite

2  what the problem is."

3          And he was like -- and he admitted it.  He

4  said, "Yeah, you're right.  You are great.  You're

5  really good."

6          But -- and then I said, "So I don't quite

7  understand what the problem is because I get the

8  feeling that by the time we finish this meeting I'm not

9  going to have a job."

10          And he said, "You're right."

11          And -- and so he -- I said, "Well, I don't

12  understand what the problem is."

13          He said, "Well, okay.  Let's go through it.

14  You're very smart."

15          I think that's how he said it too because he

16  leans in, "Smart."  Like, I'm mad to admit you're

17  smart.  But he says, "You're very smart, and you're

18  very hungry.  But you're not humble."

19          And I was like, "I -- I beg to differ."

20          And that's what, I think, we -- we had just

21  talked about just a moment ago, the big difference

22  between confidence and the difference between humility,

23  you know, and I think people mistake that one for the

24  other.

25          And he was like, "No, no, no, you don't."

 1             And I was like -- I said, "Well, again this
 2   is coming from -- you know, you guys knew what you got
 3   into when you -- you got -- I'm a high D."
 4             Because they have this DiSC assessment, and
 5   they say, you know, people -- they look for people who
 6   are high Ds.  These are go-getter personalities.
 7   That's the exact same personality type Dave is
 8   apparently, and that's what they look for.  They don't
 9   have enough of them.  Apparently I was everything they
10   wanted.
11             So I was -- I was like, "I disagree.  I
12   think this is kind of exactly what you guys wanted.
13   You knew who I was.  I disagree."
14             And, you know, he said, "No, I think" -- I
15   forget what exchange happened there.
16             But the -- I know we -- we said -- "I mean,
17   as far as humility, I mean, look at -- you know, Dave
18   is a high D.  You know -- you know, as far as humility
19   goes, you know, Dave is -- you know, has -- you know, I
20   mean, Dave is extremely confident.  Is he not humble?"
21             "I mean, look at you, Luke.  You -- you do
22   every week, you do all of these massive" --
23             And he said, "We're not talking -- we're not
24   talking about me."
25             I'm like, "Okay.  That's fine.  And, well,

1  what is the problem?"

2          And he's like, "Well, you always stand off

3  to the side."

4          I'm like, "Well, because I'm trying to

5  quarantine."

6          I asked him, "Is this about COVID?"  Because

7  I've gotten the idea that things had changed after we

8  had that exchange.

9          And he said, "No, it's not about COVID.  But

10 you always stand off to the side."

11         And I'm like, "Well, I'm social distancing

12 because I don't want to catch it.  I've dodged it for

13 now."

14         And at that point, we had, I think, 30 -- I

15 don't know how many employees we had -- but by the end

16 of the year they had -- Armando Lopez had said that

17 20 percent of the company had caught COVID or one point

18 or another.  And that was some article they released in

19 the newspaper talking about hosting the Christmas

20 party.

21         But while I was there, I know Lara kept a

22 running tab.  She kept coming to me and telling me how

23 many people had gotten COVID.  And she -- I think there

24 was 30-something there at the time.

25         So I said, "No, I'm social distancing."

1          And he was like, "You keep talking over me."

2          And I'm like, "I'm just defending myself.

3    I'm just telling you what I'm telling you" --

4          He was like, "Okay."

5          I'm like, "Well, go on."

6          And he was like, "No.  We're done here."

7          "Okay.  So what do we do now?"

8          He was like, "Let's just go."

9    Q.      Okay.  Let's --

10   A.      So that's a pretty accurate representation

11   of kind of the back and forth that, you know, kind of

12   went on.

13          MS. SANDERS:  We're going to take about

14   a 30-second break so I can ask the court reporter --

15          THE VIDEOGRAPHER:  Going off the

16   record.  The time is now 5:31.

17          (Off the record.)

18          THE VIDEOGRAPHER:  We're back on the

19   record.  The time is now 5:31.

20          THE WITNESS:  But it was a very

21   uncomfortable, very aggressive -- Luke got -- I think

22   he -- I don't know if he thought I was going to thank

23   him for firing me or what.  And it was -- it had been a

24   very long time where they were being very, very -- had

25   been very aggressive to me.  They had been very nasty

1   in these meetings, these weird kind of one-on-ones that

2   Lara had been conducting for months, you know, where

3   you're kind of up in the air all of the time.

4               So I don't know if they thought it

5   would be a relief or whatever.  And they were -- I

6   think he seemed surprised that I wasn't thanking him

7   for firing me.

8               But -- but, you know, I didn't raise my

9   voice.  He did a lot of times.  He got very shouty and

10   very flustered.  And I'm not quite sure why.  I think

11   it was because I disagreed with his inaccurate

12   portrayal of me and my job skills and my role there.

13   And I said -- you know, because I had said I had given

14   up -- I do remember -- actually, I know what that blank

15   was where I was like I don't remember what happened

16   next.  But I had said -- you know, because he said,

17   "You're not humble."

18               And I had said, "I don't know what

19   classes as humble when you -- you drop a career that

20   you've had for almost 14 years, and you abandon all of

21   your kids' friends, and you move halfway across the

22   country to go work for them, and I find it very

23   upsetting when you start talking about how you're not

24   humble.  I'm like I gave up everything for you guys

25   based on the promises and assurances that you had.  And

1   you" --

2                And he just kept yelling at me.  So

3   it's -- that's -- that's -- that's -- that's -- that's

4   how I got fired.  That's what happened when he fired

5   me.

6   BY MS. SANDERS:

7   Q.        And the only people in there were you, Lara

8   Johnson, and Luke LeFevre?

9   A.        Yes.

10   Q.        Okay.

11   A.        Just us three.

12   Q.        All right.  I just handed you another

13   document, Mr. Amos.  This is an email dated April 14,

14   2020.  Once you've reviewed the contents of this email,

15   does that appear to be when these meetings that you've

16   referenced several times as reorientation meetings, is

17   that when they began?

18   A.        Yes.

19   Q.        Okay.

20   A.        They -- the -- that April 13th where I got

21   ambushed by Luke, and he said I needed to check my

22   humility there.  Where he didn't talk about -- they

23   mentioned the missed deadline right at the beginning

24   and then veer off into talking about my wife and how I

25   need to get my wife on board.  Afterwards -- this is

1    the day after.

2              And then "I've set up a meeting with me

3    [sic] to check in to see how projects are going."

4              Great.  No problem.

5              And "bridge the gap in workflow

6    communication that was an obvious problem."

7              Because -- and I'm not sure if that means,

8    yeah, this is it.  And I don't know what the workflow

9    in communication was because it just basically was me

10   being told to get my wife on board, and -- and then

11   asking -- I guess because I was surprised -- and, I

12   mean, we talked about what that meeting was earlier.

13   So I don't know again what it was.  It's a very strange

14   thing.

15             And "I wanted to give you a heads-up before

16   a meeting popped up on your schedule."

17             And then like, ". . . if you have any

18   questions."

19             And then I went in, and I asked my

20   questions, like, what are we -- and that's where we

21   asked --

22   Q.        Uh-huh.

23   A.        -- what's the policy that I missed or what

24   did I not get onboarded correctly with because I

25   figured -- it was scheduled just for one day.  I

1    thought, oh, we're going to have a meeting or maybe a

2    couple of meetings, and then it will be fine.  But they

3    ended up dragging on for the entire duration of my stay

4    there.

5                    MS. SANDERS:  All right.  Let's go

6    ahead and mark that as the next exhibit which I believe

7    is Exhibit 12.

8                    (Marked Exhibit 12.)

9    BY MS. SANDERS:

10   Q.        Okay.  Mr. Amos, I'm going to show you

11   another document, and I have just a simple yes-or-no

12   question for you.  Did you ever receive that -- have

13   you ever seen that document before?

14   A.        No.

15   Q.        Okay.

16   A.        No, I haven't.

17                   MS. SANDERS:  Let's mark that as the

18   next exhibit which is Exhibit 13.

19                   THE WITNESS:  I have seen something

20   similar.  There is, like, a hand -- typed-up thing that

21   they had put up I think after we had come back, I

22   think.  I don't know when it was.  But that was what

23   they had was basically -- because it was -- I'm sorry.

24                   Yeah.  Because the one that they posted

25   on the door said wash your hands and there's hand

1    sanitizer here if you need it.

2    BY MS. SANDERS:

3    Q.          Okay.

4    A.          And that was pretty much it.

5    Q.          So it was not -- the content wasn't the same

6    as what's in that document?

7    A.          No, it was different.  It was a lot less --

8    Q.          Okay.

9    A.          -- than that.  And -- and -- I mean, it was

10   still similar in the sense of don't -- you know,

11   don't -- it didn't have anything like, oh, hey, let's

12   separate desks or, hey, don't attend meetings, or let's

13   see if we can do our meetings online.  Because not

14   even, like, can we work from home?  Can we do these

15   massive meetings?  Can we do online?  There was none of

16   that kind of stuff.  It's all pretty much, like, you

17   know, the stuff -- it's just -- and maybe it doesn't

18   even -- it's like, hey, we wiped down the desks and

19   sanitized our hands.  And I think even by that point,

20   we'd known COVID really didn't care about hand washing.

21   Q.          Okay.

22   A.          It was more airborne and stuff.

23              MS. SANDERS:  Okay.  We're going to

24   mark that as the next exhibit which I believe is 13 or

25   14?

```
 1                  THE COURT REPORTER:  13.

 2                  MS. SANDERS:  Okay.

 3                  (Marked Exhibit 13.)

 4   BY MS. SANDERS:

 5   Q.        Okay.  Similar.  Mr. Amos, this is a

 6   document you produced.  I don't believe you wrote this

 7   because it says at the top it was by a software

 8   developer in Franklin, Tennessee.  So, again, just yes

 9   or no.  Did you write this?

10   A.        (Witness reviews document.)  Oh, no.  No not

11   at all.

12   Q.        Okay.

13   A.        I have never heard of this --

14   Q.        Okay.

15   A.        -- before.

16                  MS. SANDERS:  All right.  Let's make

17   that the next --

18                  THE WITNESS:  This would be the first

19   time I have ever seen something like this.

20                  MS. SANDERS:  Okay.  Let's make that

21   the next exhibit which is Exhibit 14.

22                  THE WITNESS:  And I -- just so we

23   know -- sorry.  I'll let you mark it.

24                  (Marked Exhibit 14.)

25                  THE WITNESS:  After seven hours, you'd
```

 1   think I'd stop talking.  Sorry.

 2                    I just -- this is lengthy, but I

 3   haven't actually read the full document, but just

 4   Looking -- scanning the first couple of lines that is

 5   absolutely not me.

 6   BY MS. SANDERS:

 7   Q.        Okay.

 8   A.        And I have no idea where that comes from.

 9   Q.        All right.  Here's one more document I'm

10   going to show you.  Same question; just a yes or no.

11   Did --

12                    MS. IRWIN:  Are these from Glassdoor?

13                    MS. SANDERS:  I don't know.  Y'all

14   produced them.

15                    MS. IRWIN:  Oh, okay.

16                    MS. SANDERS:  So I don't know.

17                    MS. IRWIN:  Okay.

18   BY MS. SANDERS:

19   Q.        Did you write this document, Mr. Amos?

20   A.        No.  No, no, no.

21   Q.        Okay.

22   A.        No.  I never posted anything online at all.

23   Q.        Okay.

24   A.        I -- that would have been construed as

25   gossip and that was against policy, and, you know, and

1   honestly, you know -- oh, this is the December -- oh, I

2   wasn't even working there at the time.

3   Q.          Okay.  All right.

4   A.          And this is -- this is September 2020.  This

5   is December 2020.

6                    MS. SANDERS:  Let's mark that the next

7   exhibit, Jennifer.

8                    (Marked Exhibit 15.)

9   BY MS. SANDERS:

10  Q.          All right.  Same drill.  I'm not sure what

11  this -- this was produced by your attorneys.  So I'm

12  just asking if you have ever seen this, and if you can

13  identify where it came from?

14  A.          This is a banner that my wife had on her

15  private -- or her Facebook page.

16  Q.          Okay.

17  A.          And now her Facebook page was linked -- they

18  required -- they were -- she was heavily pressured when

19  we moved here for her to join The Lampo Ladies' Group,

20  which is run by Armando's wife.  He's the head of HR.

21  And they are supposed to be kind of a support group for

22  wives.  I'm not quite sure what wives are there, but my

23  wife was linked to it.  And this is something that she

24  had.  It's the bottom banner on her Facebook, which I

25  guess people would have seen.

1           MS. SANDERS:  Okay.  All right.  Let's

2    mark that as the next exhibit.

3                (Marked Exhibit 16.)

4           MS. SANDERS:  Okay.  Mr. Amos, at this

5    time, we are going to -- we are going to stop your

6    deposition.  Your attorney and I have talked about some

7    outstanding discovery.  So I am going to reserve the

8    last hour of this deposition just in case there's

9    any --

10          MR. STREET:  He's not coming back to

11   Tennessee.

12          MS. SANDERS:  Would you let me finish?

13          MR. STREET:  I will but he --

14          MS. SANDERS:  I was about to tell him

15   the last hour, if we need it, will be remote.

16          MR. STREET:  All right.  Good enough.

17          MS. SANDERS:  So, Mr. Amos, just so you

18   understand.  This will conclude for now.

19          THE WITNESS:  Sure.

20          MS. SANDERS:  We may continue this

21   deposition depending on the remaining of the -- the

22   remainder of the discovery.  Okay?

23          THE WITNESS:  I have to ask.  Could

24   the -- what we have done up to now have been remote?

25          MS. SANDERS:  No.  It could not have.

1                    MR. STREET:  It could have.

2                    MS. SANDERS:  It couldn't have because

3     in this you're the -- you're the plaintiff in this

4     lawsuit that's been filed --

5                    THE WITNESS:  Sure.

6                    MS. SANDERS:  -- in the Middle District

7     of Tennessee.

8                    THE WITNESS:  Okay.

9                    MS. SANDERS:  And so as an attorney,

10    who may or may not be going to trial, it's my

11    opportunity to see you in person as a witness.

12                    THE WITNESS:  No problem.

13                    THE VIDEOGRAPHER:  Going off the

14    record.  The time is --

15                    MS. SANDERS:  Well, I guess we should

16    see -- do you have any -- do y'all have any questions,

17    or do you want to save it?

18                    MR. STREET:  No questions.

19                    MS. SANDERS:  Okay.

20                    THE VIDEOGRAPHER:  Going off the

21    record.  The time is now 5:41.

22                    MS. SANDERS:  Thank you.

23                    (Proceedings adjourned at 5:41 P.M.)

24

25

1                         ERRATA PAGE

2              I, BRAD AMOS, the witness herein, have
   read the transcript of my testimony and the same is
3  true and correct, to the best of my knowledge, with
   the exception of the following changes noted below,
4  if any:

5  Page/Line  Change                    Reason

6  _____  _____

7  _____  _____

8  _____  _____

9  _____  _____

10 _____  _____

11 _____  _____

12 _____  _____

13 _____  _____

14 _____  _____

15 _____  _____

16 _____  _____

17 _____  _____

18 _____  _____

19

20              _____
                BRAD AMOS

21

22              Sworn to and subscribed before me, this
   the _____ day of _____, 2022.

23

24              _____
                Notary Public

25              My Commission Expires:

1                    REPORTER'S CERTIFICATE

2              I, Jennifer B. Carollo, Licensed Court

3    Reporter, Registered Professional Reporter, Certified

4    Court Reporter, and Notary Public for the State of

5    Tennessee, hereby certify that I reported the foregoing

6    proceedings at the time and place set forth in the

7    caption thereof; that the proceedings were

8    stenographically reported by me; and that the foregoing

9    proceedings constitute a true and correct transcript of

10   said proceedings to the best of my ability.

11             I FURTHER CERTIFY that I am not related to

12   any of the parties named herein, nor their counsel, and

13   have no interest, financial or otherwise, in the

14   outcome or events of this action.

15             IN WITNESS WHEREOF, I have hereunto affixed

16   my official signature and seal of office this 24th day

17   of October, 2022.

18

19

20

21

22             JENNIFER B. CAROLLO, LCR, RPR, CCR
               AND NOTARY PUBLIC FOR THE STATE
23             OF TENNESSEE

24             LCR No. 432, Expires 6/30/2024

25             Notary Commission Expires 6/26/2024

**$**

**$10,000 (1)**
159:3
**$15,000 (2)**
14:2;331:2
**$90,000 (1)**
159:2

**/**

**/// (1)**
106:25

**[**

**[sic] (2)**
22:16;341:3

**A**

**aback (2)**
220:17;235:3
**abandon (1)**
339:20
**abase (1)**
326:13
**ability (1)**
9:23
**able (19)**
15:21;19:2,6;30:17;
89:5;95:1,4;144:2;
162:22;169:7;183:5,
6;186:4;213:11;
234:9;252:15;253:9;
267:12;299:5
**above (4)**
200:21,25,25;201:4
**Absolutely (6)**
40:16;41:19;
120:22;157:2;313:14;
345:5
**abundance (1)**
321:2
**abusive (1)**
44:4
**acceptance (1)**
165:22
**access (4)**
100:21;101:8;
179:24;234:8
**according (10)**
16:5;70:3;185:10;
192:24;203:21;238:6,
7,9;267:3;272:6
**account (5)**
23:5;49:2;50:8,23;
52:17
**accountable (1)**
255:11
**accounts (1)**
48:21

**accruals (1)**
21:23
**accrued (1)**
11:14
**accurate (5)**
75:9;309:25;
310:14,18;338:10
**accusations (1)**
43:10
**accustomed (1)**
215:20
**acknowledge (1)**
148:10
**acquainted (1)**
53:3
**across (9)**
34:7;36:11,23;
77:15;104:11;255:4;
265:7;284:6;339:21
**acted (1)**
145:4
**acting (2)**
145:13;146:17
**Action (2)**
5:8;70:24
**actions (1)**
242:6
**active (6)**
100:13;104:14,20;
255:14;303:2;315:18
**actor (1)**
144:25
**actual (6)**
30:11;151:20;
213:13;230:17;265:9;
271:2
**actually (128)**
6:22,22,23,25;7:1;
8:13;12:6;14:5,6,7,8;
16:8,12;17:19;18:13,
17,19;19:2;24:24;
31:5,7;32:5;34:11;
35:23;37:7;41:1;
45:24;47:24;48:19;
55:1;65:12;68:1;
69:17,20;74:21;
76:21,23;78:13;
91:17;97:7;106:3,7;
109:21;111:11;112:1;
113:17;115:25;116:9;
117:11;118:20;
120:15;122:18;124:1;
126:9;128:3;129:8,
12;130:24;132:23;
133:24;134:12;137:1,
3;146:5;148:4,6,8,10;
149:10;156:5;160:4;
168:24;169:8;172:9;
177:7;182:8;185:25;
186:1,23;193:13;
204:24;207:1;208:24;
209:24;212:7;214:10,
16;218:4,25;220:1,

18;222:12,13;223:19;
226:12;232:14;
237:24;238:13;
245:13;247:16;249:4,
6,11;255:13;256:8,9,
21;257:1,23;258:8;
262:16;263:8,13,15;
265:6;267:19,20;
289:4;297:20;300:14;
302:12,13;303:24;
316:13;321:24;
325:25;339:14;345:3
**ad (2)**
84:25;279:15
**Adam (1)**
7:11
**Adams (2)**
289:9,19
**add (8)**
25:7;57:2;154:2;
177:10;229:10;
322:19,19;323:5
**added (2)**
99:3;170:25
**addendum (1)**
177:10
**addicted (1)**
211:13
**addition (2)**
76:16;145:1
**address (9)**
5:2;7:18,25;8:10,
17;34:25;44:7;
100:12,12
**addresses (2)**
8:19;118:6
**adhere (1)**
246:21
**adhered (1)**
244:25
**adherence (4)**
241:18;251:24;
253:16;271:1
**adhering (1)**
242:25
**adjourned (1)**
348:23
**admit (1)**
335:16
**admitted (1)**
335:3
**ads (1)**
21:5
**adult (1)**
115:16
**advance (1)**
254:5
**advantage (1)**
45:7
**advertise (1)**
21:10
**advertisement (1)**
10:25

**advertising (3)**
26:8,21;27:1
**affair (4)**
15:14;283:11,13,15
**affairs (4)**
113:8;247:16,19;
284:7
**affect (2)**
9:23;279:18
**afford (1)**
264:1
**afterwards (5)**
175:24;219:16;
298:22;320:21;
340:25
**again (148)**
12:3;17:25;18:2;
21:23;26:5,17;30:10,
23,24;32:2;33:10;
48:8;49:11;57:10;
61:7;64:22;65:17;
67:11;69:8;72:5;
82:13;84:22;89:21;
98:18;101:25;103:6;
104:13;106:8,9;
110:14;114:19;
116:25;119:10;
120:14;123:19;126:8;
127:12;128:15;130:1;
135:10;139:11;
143:25;144:6;147:20;
148:3;149:6;155:21,
22;156:25;158:4;
159:14;161:19;
162:13;163:10;
164:15;166:7,10;
168:8,10;169:6,15;
173:14;176:11;178:2,
24;179:18;180:15;
183:3,17;186:6;
187:8;193:13;195:22;
200:4;202:24;204:19;
206:22;215:3;221:15,
22,23;222:1;226:2;
232:19;235:21;
236:21;238:10,14,24;
240:18;241:7;244:19;
247:12,24;249:13;
250:3,14;252:24;
253:23;254:5;263:2,
2;264:15;269:17;
275:15;277:10,13;
278:6,8,8;279:7,14;
280:20;284:23;285:3,
7;286:6;287:8,15;
294:11;295:4;296:22;
297:3,7;298:24;
299:10;300:14;304:5;
307:6;312:15;315:11,
17;316:23;321:20;
324:9;327:3,9,18;
328:10;329:17,23;
330:10;333:2,20;

334:4;336:1;341:13;
344:8
**against (3)**
9:1;286:17;345:25
**agencies (1)**
84:25
**agency (1)**
158:4
**agent (8)**
32:4;41:18;107:15,
23;134:13,24;137:7,
24
**agents (3)**
30:2;35:2;138:3
**ages (1)**
160:12
**aggressive (4)**
204:13;241:15;
338:21,25
**ago (10)**
8:2;11:6,7,8;36:24;
85:24;102:24;103:7;
108:10;335:21
**agree (1)**
55:10
**ahead (11)**
10:19;113:20;
117:2;119:2;121:22;
152:11,21;214:22;
231:22;301:20;342:6
**aiming (1)**
228:18
**air (7)**
117:14;124:25;
206:19;256:22;
278:22;305:4;339:3
**airborne (1)**
343:22
**al (1)**
5:13
**alcohol (1)**
225:1
**align (1)**
47:13
**allegiance (1)**
279:20
**allegiances (2)**
279:9,11
**Allison (8)**
85:15;95:11;
102:13;103:18;109:7;
110:7;121:3,12
**allotted (1)**
160:20
**allow (3)**
28:14;88:21;
158:23;185:4
**allowed (7)**
129:13;185:7;
186:11;189:16;202:3;
296:19;304:24
**allowing (1)**
158:23

**allows (4)**
91:18;145:20;
183:4;186:21
**allure (1)**
82:24
**almost (27)**
17:20;30:21;71:7;
79:22,24;95:13;
108:21;117:7,24;
118:20;121:1;133:5;
174:18;178:9;179:7;
181:8;184:22;196:1;
213:10,14;215:25;
222:1,2;224:14;
252:14;321:23;
339:20
**along (2)**
142:4;226:16
**Alongside (1)**
129:5
**alternative (2)**
224:8;318:14
**although (1)**
218:10
**always (33)**
9:8;54:23;60:13;
61:11;62:6;64:19;
71:21;72:22;78:7;
87:24,25;88:20;
98:24,25;122:22,22;
135:13;141:25;
178:12;180:20,23;
198:15,19;216:17;
238:22;247:10;256:7;
264:6;268:13;280:14;
318:7;337:2,10
**Amanda (5)**
218:3;219:18;
242:14;293:3;303:3
**amazing (6)**
69:25;70:5;300:19;
327:13;329:13;
334:19
**amazingly (1)**
326:5
**Amazon (4)**
23:23;34:17;97:14;
129:14
**ambitious (2)**
215:23;239:10
**ambush (2)**
327:20;330:11
**ambushed (2)**
234:12;340:21
**America (1)**
30:19
**Americans (1)**
144:12
**among (1)**
188:5
**Amos (40)**
5:5,12;6:3,6,13,14;
7:12,15,19;8:24;

16:11;41:16;49:20;
83:12;99:24;111:3;
112:21;114:6;119:9;
122:3;140:20;150:20,
24;152:20,20;153:3;
226:7;230:4;281:21,
24;283:5;300:7;
309:4;313:3;340:13;
342:10;344:5;345:19;
347:4,17
**amount (7)**
97:17;133:4;
189:23;190:17;
238:21;240:15;255:6
**amped (2)**
182:9;266:25
**Anderson (6)**
63:13;68:19;
112:15;154:21;164:5;
169:22
**Angeles (14)**
12:5;24:20;36:18;
81:9;85:2;88:9;93:11,
11;97:8,13;107:21;
114:21;115:19;
136:25
**angry (3)**
85:21,22;235:21
**animated (2)**
45:17;67:12
**announced (1)**
72:20
**anonymous (1)**
295:16
**answered (5)**
105:25;106:13;
153:15;275:3;308:10
**Anthony (1)**
208:3
**anticipate (1)**
9:9
**antimask (1)**
45:16
**anymore (5)**
50:16;235:11;
263:12;286:19;
288:12
**anyplace (1)**
319:15
**AO (1)**
289:21
**a-okay (1)**
293:15
**apart (6)**
89:12;228:17;
231:7;277:19;297:24;
298:12
**apartment (3)**
139:11;265:5;
328:25
**apologize (10)**
13:6;90:11;132:6,
11;143:9;174:14;

233:9;240:14;287:6;
301:19
**apparently (38)**
13:23;24:8;47:22;
54:7;66:18;68:2,16;
70:2;71:10;74:21;
111:7;164:17;165:3;
167:16;168:24,25;
174:18;203:21,24;
233:25;234:7,24;
238:17;252:12;267:3;
272:6,9,17;284:1;
286:11,17;297:22;
305:16;321:21;
331:10,22;336:8,9
**appeal (10)**
81:4,19,23;82:15;
156:8;161:19,20;
162:13;163:10;
164:15
**appealed (1)**
193:4
**appealing (3)**
64:13;168:12,16
**appear (3)**
141:7;309:19;
340:15
**appearances (1)**
208:2
**appears (3)**
39:9;119:16;311:25
**Apple (3)**
25:2;143:3,13
**Applebee's (1)**
112:19
**applicant (1)**
118:9
**application (13)**
32:2,3;34:21;84:14;
85:18;86:4,24;89:9,
10;114:25;118:8;
149:12;158:18
**applications (15)**
25:3;39:24;84:2;
90:12;92:1,13;93:9;
97:15;99:25;123:3;
141:8,18,19;149:15;
176:3
**applied (47)**
13:25;25:8,11;
26:16,24;27:13,17;
28:22;29:1,3;31:9,9;
38:9,15;84:16,20,23,
24;85:2,3,17;88:25;
89:1,13;90:16,22;
92:17;94:17;95:15;
97:12,13;98:2;
101:13;103:22;110:1,
13;111:11,13;114:22;
122:6;143:15,20;
146:25;148:13;149:2,
23;182:7
**applies (1)**

57:6
**apply (31)**
15:9;23:16,18;26:6,
20,24;38:2,4;83:19;
87:3;89:20;90:16;
92:2,3;93:17;96:18;
98:14;100:16;102:21;
103:9;105:15;108:20;
110:5,15;114:16;
116:9;117:3,6;122:9;
143:18;147:24
**applying (8)**
29:4;89:16,17;91:5;
121:6;123:13;144:9;
249:13
**appointments (2)**
94:24;95:1
**appreciated (1)**
138:19
**approach (3)**
103:13;314:19;
316:18
**approached (1)**
103:12
**appropriate (1)**
315:19
**approval (6)**
255:18,22,24;
256:9;269:18;303:10
**approved (4)**
217:1;257:10,10;
269:21
**April (16)**
118:21;143:14;
183:12,12;191:6;
222:3,3;226:21,24;
230:16;234:12;244:1;
327:21,22;340:13,20
**area (8)**
100:2;137:7;138:3;
271:12,14,16;298:22;
303:4
**areas (1)**
98:6
**Armando (4)**
165:6,22;177:24;
337:16
**Armando's (1)**
346:20
**arms (1)**
218:8
**around (27)**
17:23;32:4;44:11;
52:18,18;84:3;87:20,
22;94:17;124:5;
127:20;135:4;189:21;
203:24;249:5;262:2;
267:22;270:22;
271:13;281:1;288:15;
292:17;294:17;318:6;
319:3;326:16;329:8
**arrangements (1)**
150:23

**article (24)**
45:8;53:11;57:8,15;
66:6,7,20;67:8,17,20;
68:5,8,20;69:7;71:19;
73:13;76:9;77:3;
98:20;165:1;169:16,
17;330:13;337:18
**articles (13)**
65:13;68:15;69:3;
71:20,23;72:8;73:8,
10;74:6;75:11;
169:17,18;250:22
**arts (1)**
145:11
**ASAP (2)**
134:6;212:11
**aside (2)**
220:22;242:9
**assemble (1)**
194:7
**assembled (2)**
214:11;217:6
**assemblies (2)**
214:23;215:17
**assembly (1)**
229:6
**assessment (3)**
154:11;331:7;336:4
**asset (1)**
235:18
**assigned (1)**
185:19
**assist (1)**
230:9
**assistant (3)**
31:22;128:21;
224:18
**associate (2)**
92:24;131:1
**associated (1)**
174:11
**Associates (5)**
14:14;15:1;41:3;
312:1,10
**Association (1)**
30:19
**assume (1)**
282:22
**assuming (1)**
115:12
**assurances (1)**
339:25
**assure (1)**
293:14
**attempt (1)**
144:5
**attempting (1)**
166:6
**attend (10)**
45:2;71:12;189:2,9;
191:25;192:7,19;
254:23;295:23;
343:12

**attendance (7)**
44:16;266:23;
271:20;288:22,23;
290:9;296:17
**attended (3)**
162:12;198:2;
296:17
**attention (5)**
42:12;43:12;57:12,
22;108:5
**attitude (3)**
220:2;233:17;
314:18
**attorney (6)**
6:18;9:3;309:11;
310:6;347:6;348:9
**attorneys (3)**
5:18;323:15;346:11
**attracting (1)**
111:22
**audience (1)**
272:6
**audio (4)**
85:20;185:5;
290:18;294:25
**audiovisual (2)**
198:5;219:19
**August (16)**
11:2;13:1,4,10,17;
17:15,15;132:25;
133:8,9;151:17,21,21;
152:8;212:14;312:7
**Australia (1)**
36:19
**authored (3)**
140:24;194:24;
196:23
**authorize (1)**
210:6
**auto (1)**
263:16
**automated (5)**
104:13;105:3,10;
107:7;158:20
**Automatic (2)**
283:19,20
**automatically (1)**
104:24
**AV (3)**
70:4;185:10;201:1
**available (5)**
24:11;25:19,20;
26:5;110:8
**Avenue (2)**
5:5;8:14
**average (1)**
187:15
**avoid (1)**
298:11
**AVT (1)**
175:10
**award (2)**
72:23,24

**awards (2)**
167:16,18
**aware (8)**
38:19;59:25;168:5;
175:11,14;309:13,13;
320:14
**away (22)**
27:21;31:8,14;
52:19;86:19;118:7;
127:17;136:25;
139:16;197:17;218:5;
223:25;242:18;261:8;
267:11;277:24;296:7,
8;299:20;315:6;
316:4;329:19

**B**

**baby (3)**
182:25;192:24;
264:2
**baby-step (1)**
263:18
**bachelor (1)**
145:10
**back (77)**
13:3;14:17;15:8;
17:6;20:9,18,23;
24:20;30:25,25;
34:11;51:12;52:20;
62:25;73:11;77:18;
81:2;83:9,13;85:14;
96:6,7;97:20;101:11;
105:7;124:18;129:13;
130:14;136:5;137:16;
140:17;150:17;
156:11;173:21;
174:25;180:1;214:19;
216:5;219:8,24;
225:8,25;226:2;
229:24;230:4;231:19;
237:8;239:11,14;
250:3;265:6,6;276:1;
296:18;298:14;299:6,
8;303:5;304:14;
309:1;310:21;319:16,
16;321:7;322:24;
324:20,25;329:5,6;
332:21;333:3,11,13;
338:11,18;342:21;
347:10
**backed (2)**
235:9;280:12
**background (2)**
132:5;304:16
**backpay (1)**
14:10
**backtracks (1)**
280:13
**bad (12)**
37:14;42:1;44:1;
45:13;46:25;47:5;
48:3;67:14;71:19;

244:20;269:7;318:23
**badly (1)**
49:1
**balances (3)**
163:23,24;164:1
**balls (1)**
124:25
**BAMO (1)**
311:2
**bandied (1)**
168:6
**bands (1)**
206:9
**banging (1)**
328:20
**bank (2)**
8:6;23:5
**banner (3)**
166:11;346:14,24
**bar (1)**
298:24
**base (2)**
127:2;169:14
**based (7)**
82:16;135:24;
197:16;212:18;224:5;
279:4;339:25
**basement (2)**
224:10,11
**basic (1)**
282:14
**basically (38)**
14:3;21:4;26:3;
37:10;52:21,23,24;
55:16;73:1;79:2;80:3;
81:7;91:9;114:23;
124:8;127:11;129:5;
166:11;196:11;200:3;
202:12;204:11;
234:15;235:14;255:8,
12;273:1;280:24;
282:13;285:18;290:3;
304:24;315:1;318:24;
321:4;326:3;341:9;
342:23
**basis (1)**
306:7
**basketball (3)**
115:10;117:15;
211:24
**Bates (1)**
323:18
**Bates-stamped (3)**
114:2;152:20;
310:24
**battle (1)**
206:9
**bay (18)**
124:10;146:5,6;
182:20;214:7,8;
218:5;223:22;224:25,
25;256:8,16,18,19;
274:5;305:2,2,6

**bays (3)**
35:14,16;185:22
**beard (3)**
252:6,19;254:13
**Beast (8)**
53:10;66:7,22;
68:20;72:15;165:1;
250:22;330:13
**Beast' (1)**
67:20
**beat (1)**
294:10
**beater (1)**
263:19
**beating (1)**
320:11
**became (5)**
63:25;134:2;
241:14;296:2;304:6
**become (8)**
45:5;80:3;87:8;
167:15;188:24;
189:10;232:21;248:1
**becoming (1)**
243:2
**beer (1)**
7:2
**beforehand (1)**
240:18
**beg (1)**
335:19
**began (5)**
30:1;83:16;155:7;
234:7;340:17
**begin (1)**
160:22
**beginning (25)**
46:5;59:20;80:18;
86:11,12,20;92:10;
113:14;114:23;115:8;
144:7;145:25;183:24;
187:20;199:14,15;
213:15;217:12;244:6,
7;299:6;300:4;
321:11;329:17;
340:23
**behalf (1)**
5:11
**behind (16)**
59:23;177:10,12;
202:22;209:6;212:14;
216:8;225:17,19;
231:3,11,18;232:18,
21;257:19;302:21
**belief (13)**
55:7;242:7,21;
243:12;244:20,25;
245:21;246:20,21;
252:21;307:10,12,19
**beliefs (3)**
55:11;241:17;
242:25
**Belmont (3)**

84:23;96:9;101:16
**below (2)**
130:23;258:16
**Ben (3)**
23:25;27:6,9
**benefits (5)**
21:14;38:14;97:18;
118:25;171:3
**Benji (1)**
199:1
**bent (1)**
215:7
**Bentkey (3)**
23:25;27:8,9
**best (43)**
9:11;42:3,4;45:23;
72:18,21;82:1,2;88:2,
11,15;115:22;118:23;
149:1;157:25;164:22;
165:5,10,14,15,19,23;
166:5,21;167:2,12,15,
20,25;168:6;169:15;
171:12;172:6,11,13;
175:13,19;177:14;
179:9;180:11;188:15;
254:22;331:10
**bet (2)**
16:19;41:9
**better (20)**
32:1;34:9;38:14,14;
85:20;88:21,23;
110:14;161:16,17;
202:4;203:6;205:3;
206:6;214:15;280:1,
9;317:7,12;324:7
**bewildering (1)**
236:1
**beyond (6)**
171:3;184:25;
191:12;205:2;207:11;
213:5
**Bible (23)**
57:3;85:15;86:21,
21;102:13;103:18;
109:7,12;118:25;
121:3,13;188:7;
193:14;194:13;195:3,
3;196:13,14;207:23;
239:19,25;240:22;
244:2
**big (72)**
36:2;59:2;80:9;
93:23;129:15,16;
134:4;136:17;163:20;
166:11,13,13;174:1;
183:1,7,7;184:9,15;
185:12;202:16;
203:22,25,25;210:5;
212:21;214:5;215:19;
216:18;217:15,21;
218:2,7,8,21;221:10;
226:1;231:24,25;
232:1;239:1;241:12;

Case 3:21-cv-00923    Document 65-1    Filed 01/19/23    Page 354 of 389 PageID #: 2064

243:3;256:14;258:17;
259:15,22;263:6;
266:21,24;269:6;
270:3,11,20;271:11;
272:8,19;273:6,9,10;
275:22;295:9,12;
296:2;299:5,19;
304:6;318:16;319:11;
320:15;329:15;334:3;
335:21
**bigger (7)**
131:11;186:4;
202:4,23;203:6;
205:3;247:25
**biggest (5)**
9:10;148:4;206:16;
243:23;320:25
**bill (1)**
186:24
**billing (2)**
146:5;185:13
**bills (1)**
287:19
**bit (20)**
41:23;65:22;73:24;
97:20;102:25;134:2;
156:5;162:24;186:11;
187:19;190:22;206:2;
208:6;221:21;223:21;
262:20;271:9;318:14;
320:22;332:1
**bites (5)**
25:3;94:20;171:24;
212:17;291:3
**biweekly (1)**
71:13
**bizarre (7)**
66:8;75:17;136:22;
233:18;235:25;
243:10;280:21
**Black (1)**
267:22
**blame (1)**
320:6
**blank (5)**
197:10;240:11;
251:4;287:11;339:14
**blanked (1)**
109:24
**blindly (1)**
246:21
**blindness (1)**
88:6
**blindside (1)**
332:1
**blow (1)**
270:11
**BLT (26)**
39:22;40:4;79:10,
14,18;80:2;82:25;
83:17;87:2;89:2;
90:13;92:7,14;94:9;
99:6;100:17;123:25;

125:25;128:8;130:8;
186:9;282:16;313:3,
10,12;314:11
**blue (3)**
86:13;302:17;324:9
**board (22)**
55:1;58:22;59:18;
74:25;78:20;137:11;
172:17;201:7;218:17;
232:15;233:7;252:12;
254:25;280:5,6,6,17;
293:12;294:22;320:2;
340:25;341:10
**boards (1)**
104:3
**boat (1)**
317:3
**boats (2)**
319:15,15
**body (1)**
252:7
**bogged (1)**
249:3
**Bohan (4)**
84:24;96:11,12;
101:16
**bone (1)**
277:11
**Bonner (1)**
204:22
**bonus (4)**
124:12;126:5,13;
159:3
**book (1)**
59:18;99:22;
189:10;197:9,14;
239:20;253:20;
254:20,22;257:11
**books (6)**
126:19;188:9;
194:24;197:5,7;
253:24
**boost (1)**
329:16
**booth (1)**
181:3
**born (2)**
182:25;262:12
**borrow (1)**
259:14
**Borrowed (11)**
212:20;213:15;
214:23;256:10;
257:23;258:4;259:4,
14;262:7;275:8;
317:23
**boss (4)**
99:11;138:2;252:9;
254:11
**bot (2)**
102:19;103:7
**both (6)**
6:18,19;22:24;

76:23;84:20;116:15
**bothered (1)**
268:6
**bottlenecks (1)**
146:3
**bottom (10)**
112:14;114:2;
119:11;142:20,20;
152:3;166:12;281:23;
323:16;346:24
**bought (2)**
37:19;139:8
**bounties (1)**
66:14
**Bowam (1)**
96:10
**bowed (1)**
195:15
**box (1)**
157:23
**Boy (1)**
245:19
**Brad (12)**
5:5,12;6:6,13;7:12,
17;111:3;272:9,11;
275:19;281:24;334:9
**brad@amosfilmcom (4)**
100:13,22;101:6,9
**Bradley (1)**
7:15
**brandished (2)**
66:18;68:1
**brass (1)**
158:25
**bread (1)**
331:11
**break (19)**
25:4;49:15,16;83:3,
5,12,16;140:12;
150:13,20;152:19;
214:4;229:5,15,20;
230:3;308:21,22;
338:14
**breakdown (2)**
213:12;229:13
**breakdowns (1)**
214:22
**breaker (1)**
170:19
**breaking (1)**
229:16
**breakroom (1)**
282:13
**Breast (1)**
94:1
**breath (7)**
219:8;220:10,20;
293:19;294:3;316:10;
321:7
**breeze (1)**
135:12
**Brentwood (1)**
134:19

**bridge (1)**
341:5
**brief (1)**
312:16
**briefly (1)**
14:16
**bring (20)**
31:18,23,25;33:5;
35:16;43:12;45:4;
80:15;108:4;112:6,9;
127:17;186:10;
197:11,23;229:8;
245:14;291:22;
327:15;328:24
**bringing (2)**
243:7;271:11
**brings (1)**
47:11
**broaden (1)**
318:14
**broken (1)**
229:4
**Brothers (1)**
21:8
**brought (26)**
24:16;52:3;67:10;
72:8;99:22;124:15;
127:9;137:20;194:18;
195:3;201:22;219:16,
21;221:25;222:19;
229:14;245:8;246:14;
277:12,13,14;283:10;
286:6;290:2;291:16;
294:6
**brown (1)**
273:13
**Buddy (3)**
208:23;235:20;
275:22
**budget (8)**
154:9,11,13;
161:12;183:6;213:21;
331:6,8
**budgeting (2)**
182:23;204:17
**budgets (3)**
87:17;90:1;210:2
**buffet (1)**
298:23
**build (3)**
202:25;214:7,7
**building (11)**
35:18;80:17;146:5;
182:19;185:22;
207:22;252:1;269:7;
293:10;296:22;
305:16
**built (3)**
209:5;256:20,20
**bummed (2)**
135:20;136:14
**bunch (4)**
134:1,2;162:10;

284:12
**burden (1)**
46:22
**buried (1)**
207:22
**burned (1)**
319:15
**busiest (1)**
273:25
**business (20)**
5:2;24:23,25;35:6;
38:21;44:18;56:10;
75:21;99:23;127:9;
166:3,8,20;167:8;
255:15;304:1,4;
319:10;321:6;331:25
**busy (4)**
138:16;194:8;
265:1;267:11
**buttons (1)**
147:25
**buy (6)**
139:5;264:2,3;
267:5;272:10;291:10
**buying (2)**
160:14;291:10

**C**

**cables (1)**
263:24
**Caitlin (2)**
44:8;57:13
**calendar (1)**
232:9
**California (42)**
7:21;8:15;15:10;
17:6,10,11;18:12,22,
25;19:8,9,20,25;25:5;
27:10,11,14;28:12;
29:2,5,20,22;31:18;
33:21;34:13;94:14;
95:3;112:9;118:7;
125:21;131:14;
132:14;133:10;
134:19;148:5;189:9;
208:22;209:6;265:5;
277:23;328:19;
333:11
**California's (1)**
15:13
**call (28)**
34:11;57:12;62:11,
11;91:10;106:20;
129:8;138:13;149:7,
7;153:9;193:18;
205:11;210:15;218:8;
222:3;225:10,12;
228:6;230:21;232:8;
238:23;268:7;286:5;
294:4;300:12;325:9,
17
**called (33)**

Case 3:21-cv-00923   Document 65-1   Filed 01/19/23   Page 355 of 389 PageID #: 2065

6:7;10:22;14:13;
23:25;27:8;31:15;
32:10;55:12;60:1;
113:4;121:4;138:12;
154:24;169:10;
186:19;191:9;212:19;
223:7;232:11;239:19,
20;240:1;245:12;
248:21;263:7,9;
272:25;278:3,6;
286:12;304:23;
311:15;331:7
**calling (1)**
55:22
**calls (12)**
7:17;34:3,5,8;
86:13;106:13;135:17;
164:6;170:6;227:11,
22;279:17
**calm (1)**
321:6
**came (39)**
32:10;35:7;40:5;
47:4;54:1;104:11;
109:22;130:5;151:5;
158:14;159:3;162:1;
175:7;185:2;214:1;
226:25;229:9;235:6;
237:25;245:10;246:4;
249:11;258:8,13;
266:8;267:14,18;
268:22;269:19;274:9;
275:1;276:23;294:2;
298:14;314:24,24;
323:2;333:13;346:13
**camera (4)**
202:13;269:5;
292:6,8
**cameras (4)**
180:24;292:15,19,
21
**campus (1)**
199:8
**can (125)**
6:4;10:13;22:10,14;
24:13;30:12;31:18,
23;32:11;34:2,13;
36:12;37:7;39:11,17;
49:23;50:20;59:3;
65:14;73:11,11;
84:22;101:17;103:2,
21;106:5;109:7;
110:15;113:1;118:23;
119:10;129:7,12;
130:9,14;132:4;
142:4,20;143:19;
146:17,20;148:6;
149:1,18;154:4;
162:25;169:17;176:7;
179:8,14,17;183:25,
25;184:1,21;188:19;
191:7;195:18;197:23;
202:22;207:20;

208:15;209:20;
211:19,20;212:10,11;
214:4,4;215:11;
216:12;217:7;218:8;
223:2,3,9;224:3,9;
225:5;227:5;228:20,
21,21,22;231:21;
235:18;236:21;
237:16;239:14;
241:12,24;242:2;
250:9,12;54:8;
264:13;268:11;274:4;
275:10;279:16;
283:19;291:17,21;
297:15;299:18;
303:24;304:4,17;
306:6,9,15;309:7,19;
312:22;324:24;
325:17;327:5;329:8;
332:20;338:14;
343:13,14,14,15;
346:12
**cancel (1)**
318:16
**cancer (7)**
85:7;93:25;94:1;
95:25;117:1,22;123:4
**Canyon (1)**
8:14
**caps (1)**
158:21
**car (8)**
160:1;186:21;
242:19;246:24;
263:24;264:1,2,3
**cards (2)**
64:12;287:19
**care (4)**
123:7;268:15;
321:6;343:20
**career (11)**
80:24;129:18;
209:4;234:17,18;
235:6;319:16;329:6;
332:6;333:10;339:19
**Carollo (1)**
5:16
**cars (5)**
263:15,17,19,25;
264:12
**case (23)**
5:12;6:19;10:4;
20:18;35:5;39:8;
57:13;68:15;85:6;
116:10;146:13;161:2;
218:2,4;219:4,18;
239:12;256:13;
275:15;287:24;
304:19;305:9;347:8
**cash (3)**
64:10;123:21;
251:12
**Cashmere (1)**

142:10
**casing (1)**
43:17
**casting (1)**
45:23
**cat (1)**
318:9
**catch (2)**
239:14;337:12
**categories (2)**
326:24;328:6
**category (1)**
129:4
**Catholic (4)**
242:1;244:23;
278:11,14
**caught (4)**
225:20,22;290:6;
337:17
**cause (2)**
88:5,6
**causes (1)**
88:4
**caution (1)**
321:2
**cavalier (2)**
220:3;315:2
**CBS (1)**
143:1
**CCO (1)**
201:5
**CDC (1)**
298:15
**cell (2)**
262:18;292:17
**center (1)**
246:13
**Centers (1)**
295:13
**central (1)**
301:5
**Century (7)**
23:24;34:17;80:13;
185:2;188:17;203:18;
327:16
**CEO (5)**
172:17;177:12;
208:17;270:5;297:7
**certain (4)**
93:3;150:24;
176:21;257:10
**certainly (1)**
179:8
**chain (3)**
201:8;286:7,21
**chance (4)**
43:23;69:15;141:4;
184:14
**change (5)**
80:1;86:3;95:9;
156:9;302:14
**changed (8)**
35:10;40:23;71:2;

146:3;165:25;204:11;
329:23;337:7
**changes (1)**
87:6
**chapter (3)**
46:18;197:14;254:2
**characteristics (1)**
325:18
**characterize (1)**
141:17
**charge (1)**
87:11
**chart (1)**
286:1
**cheap (3)**
26:17,18;163:4
**cheaper (7)**
81:6;82:13;163:8;
164:8,11,13;168:21
**cheat (2)**
247:11;276:5
**check (13)**
22:24;124:12;
126:13;151:6;235:20;
257:20;258:13;
259:12;325:11;
327:23;328:3;340:21;
341:3
**checked (1)**
235:19
**check-in (1)**
285:19
**checking (1)**
269:20
**check-ups (1)**
88:8
**chemo (1)**
96:6
**Cheryl (1)**
5:1
**child (3)**
115:15;182:25;
262:13
**childcare (1)**
112:8
**children (2)**
160:15;243:11
**Children's (3)**
88:8;94:25;160:11
**chill (1)**
293:19
**Chinese (1)**
321:24
**chit-chat (1)**
258:18
**choice (1)**
279:5
**choose (8)**
279:5,22,22,24,24;
280:4,7,10
**choosing (1)**
279:5
**chosen (2)**

61:5;62:17
**Chris (10)**
36:10;247:15,23;
283:7;284:1,3,7,13,
14,19
**Christianity (2)**
244:24;321:20
**Christiansen (2)**
136:21;137:3
**Christmas (15)**
171:23;181:1;
188:19;194:6;202:6;
205:25;206:8;213:19,
22,23;214:5;256:13;
292:4,10;337:19
**Christy (1)**
202:2
**chuckled (1)**
162:6
**church (11)**
193:10;246:15;
276:8,16;278:10,10,
15,18,18,25;279:4
**churches (6)**
188:2;193:10,22,
23;194:2;241:2
**cinematographers (5)**
180:19,23;198:6,
22;201:2
**cinematography (1)**
182:16
**Circle (5)**
196:15,22;197:13;
239:20,23
**circles (1)**
195:13
**city (1)**
273:4
**Civil (3)**
5:8,8;106:24
**claim (3)**
17:2;18:11;306:8
**clarification (2)**
36:4;42:19
**clarify (1)**
90:5
**Clarita (4)**
7:20;8:11,15;137:4
**Clark (3)**
290:21;291:14,15
**classed (2)**
304:1,3
**classes (10)**
59:17;82:10;
187:25;189:2,9;
191:25;192:1;254:22,
25;339:19
**clean (1)**
57:5
**cleaned (3)**
298:15,15;303:4
**cleaning (2)**
194:1;303:16

**clear (4)**
64:1;91:4;95:20;
103:3
**clearance (1)**
268:10
**cleared (1)**
268:13
**clearly (3)**
36:17;90:10;286:20
**click (3)**
104:18;147:25,25
**clicked (1)**
158:5
**client (4)**
97:14;106:5,6;
124:19
**clients (12)**
35:21;87:12;91:17;
124:18,24;126:10;
127:9;129:2,11,16;
130:16;272:20
**clip (5)**
267:23;268:5,8,17;
269:9
**clips (1)**
291:2
**clock (1)**
189:20
**clones (2)**
252:15;253:18
**close (10)**
39:20;40:3;82:12;
126:21;139:17;
218:10;219:5,20;
223:22;312:24
**closed (13)**
15:15;24:12,21;
28:5;36:13;37:25;
139:3,17;144:16;
195:20;223:22;
298:23;319:8
**closer (5)**
116:16,22;120:11;
177:20;197:23
**closing (1)**
195:14
**CMP (2)**
311:10,18
**CMT (5)**
37:24;38:2,18;
92:25;96:19
**Coat's (3)**
88:3,4;95:3
**code (6)**
7:22;8:15;203:21,
23;285:2;306:10
**coincide (1)**
17:6
**coincided (1)**
141:19
**cold (2)**
149:7;263:20
**collateral (1)**

211:19
**collection (1)**
152:19
**collective (4)**
140:22;152:21;
195:6;312:23
**collectivist (1)**
321:23
**College (4)**
139:15;163:3;
208:4,4
**Colonial (3)**
85:1;97:10;144:20
**color (1)**
59:4
**Colossians (2)**
244:12;321:16
**com (1)**
157:15
**comfortable (2)**
296:25;301:25
**coming (11)**
77:25;87:23;162:9;
172:20;178:5;179:19,
22;202:22;336:2;
337:22;347:10
**command (1)**
201:9
**commandments (1)**
63:20
**commensurate (2)**
84:10;188:25
**comment (4)**
63:1;179:9;180:17;
287:7
**commentary (3)**
51:17,17;54:18
**commented (1)**
287:8
**commenting (1)**
54:23
**comments (3)**
256:9,15;330:16
**commitment (1)**
235:4
**committed (4)**
59:16;235:8;
248:25;249:24
**common (3)**
169:3;174:3;185:4
**communicating (2)**
36:19;238:15
**communication (3)**
99:25;341:6,9
**Communications (3)**
39:22;83:17;102:16
**communicator (1)**
216:14
**commute (4)**
81:10,12;88:22;
253:8
**commuted (1)**
81:11

**commutes (1)**
81:15
**companies (18)**
23:21;25:2,11,13,
23;26:7,21,25;28:8,
11,13;33:14;34:13;
38:23;85:3;186:9;
207:12;282:16
**company (68)**
10:5,18,25;12:8,8,
21;14:13;23:4,23,24;
24:20;27:7;32:9;
34:16;40:6;44:18,24;
45:23;47:24;51:21;
53:6,19;57:7;63:23;
64:2,3;65:23,25;66:4;
67:8;74:22;75:1;
82:23;87:5,22;88:21;
91:5;93:14;115:25;
116:6;127:16;130:3;
153:21;154:10;
155:16;162:7;178:9,
11;186:21;188:16,24;
200:3,9;207:9,15;
209:24;224:5,6;
230:23;247:17;252:8,
23;261:16;270:6;
285:10;297:8;327:14;
337:17
**company's (1)**
314:18
**compensation (2)**
13:21;14:19
**competing (1)**
279:19
**competitive (1)**
85:5
**competitor (1)**
124:5
**competitors (2)**
97:16;125:14
**complaint (3)**
259:6;306:1,23
**complaints (1)**
196:21
**complete (2)**
101:15;192:1
**completed (1)**
192:25
**completely (4)**
24:21,23;38:1;
251:14
**compliant (1)**
29:13
**compliments (1)**
261:1
**component (1)**
206:20
**comps (1)**
137:21
**compulsive (2)**
288:21,22
**compulsory (1)**

288:21
**computer (5)**
223:9;224:22,23;
231:21;305:2
**computers (1)**
214:17
**con (1)**
164:12
**concern (5)**
47:15;117:23;
136:3;173:6;303:1
**concerned (7)**
36:9;234:5;302:4;
314:8;315:11,12;
319:6
**concerns (21)**
173:18;220:18;
222:19;223:17;237:7;
243:3;295:18;302:3,
4,4;314:9,17,19,25;
315:1,12,12,21;
316:16,17;319:22
**concerted (2)**
97:4,7
**conclude (1)**
347:18
**conclusion (1)**
253:19
**conditioned (1)**
29:21
**conducted (2)**
62:4,5
**conducting (1)**
339:2
**conference (1)**
273:16
**confidence (4)**
326:9,11;329:16;
335:22
**confident (3)**
326:15,18;336:20
**confidential (1)**
286:8
**confrontation (2)**
191:3;222:17
**confrontational (1)**
222:18
**confuse (1)**
326:10
**confused (3)**
222:8;225:24;308:1
**confusing (2)**
10:13;326:9
**congenially (1)**
237:20
**congratulated (1)**
262:17
**Congratulations (1)**
261:5
**congratulatory (1)**
258:22
**congregation (1)**
167:24

**connection (1)**
30:12
**Conner (2)**
289:9,19
**consensus (1)**
219:3
**Conservation (1)**
23:22
**consider (3)**
118:8;128:13;157:3
**considerably (1)**
191:4
**consideration (3)**
117:23;120:22;
156:18
**considering (4)**
34:23;38:10;
118:15;156:19
**consistently (1)**
286:15
**constant (5)**
58:24;164:12;
210:21;216:17;
280:12
**constantly (13)**
54:2;60:13;163:17;
172:21;178:4,21;
192:5,5;200:11,14;
210:22;229:7;280:22
**construed (1)**
345:24
**contact (3)**
34:1;109:10;115:1
**contacted (2)**
40:9;95:11
**contacting (1)**
138:11
**contacts (4)**
24:19;30:2;38:11;
86:16
**content (5)**
21:9;98:12;144:22;
168:13;343:5
**contents (1)**
340:14
**context (2)**
284:15,16
**continue (5)**
115:15;150:22;
159:22;233:15;
347:20
**continued (2)**
61:19;71:13
**continuos (1)**
269:13
**continuous (1)**
269:14
**contract (5)**
12:12,13;123:20;
131:18;270:18
**contractor (1)**
11:20
**Control (1)**

295:14
**conversation (23)**
20:3;35:1;158:10,
22,25;168:2;175:20;
207:5;210:5;233:11,
18;234:6;236:1,6,13;
237:23;250:10,11,15;
251:15;283:5,9;
329:24
**conversational (1)**
86:12
**conversations (7)**
94:16;236:7;
242:11;248:16;
275:10;281:11;
300:25
**conversed (1)**
263:3
**convinced (1)**
80:3
**cool (7)**
91:21;219:23;
232:3,4,12;302:23;
316:11
**cooler (3)**
135:11;200:4;
287:16
**copies (4)**
149:16;309:25;
310:14,19
**copy (1)**
262:24
**copyright (1)**
62:17
**copywriters (3)**
35:8;60:25;62:9
**corporate (3)**
60:8;255:10;281:6
**corporation (3)**
178:3;207:10,11
**corrected (1)**
154:23
**correctly (5)**
68:15;71:11;160:5;
281:10;341:24
**correspondence (2)**
164:21;166:12
**corrosiveness (1)**
56:3
**Cortez (4)**
5:22,22;6:20,21
**cost (2)**
126:4;164:7
**cost- (1)**
162:21
**costs (1)**
332:21
**counsel (2)**
6:20;111:14
**counseling (2)**
279:4,6
**counselor (1)**
279:5

**country (9)**
24:8;34:7;98:6,7;
163:19;188:16;
234:20;265:7;339:22
**County (1)**
270:12
**couple (10)**
26:20;38:23;85:24;
219:12;231:15;
239:15;296:13,24;
342:2;345:4
**course (10)**
56:6;76:2;127:3;
136:16;171:8;199:10;
231:4;234:14;251:9;
299:17
**courses (2)**
254:4,10
**Court (22)**
5:9,16,17;6:4,14;
9:4,15;20:10,17;36:5;
41:12;42:20;49:16;
132:9;143:7;152:15,
23;301:11;308:13;
312:19;338:14;344:1
**courtesy (1)**
137:6
**cover (17)**
114:17,19,20;
115:2,4;117:5,24;
118:3;119:16;125:22;
141:7;145:20;147:19,
21;149:10;156:15;
164:20
**covered (4)**
51:20;71:21;
247:17;327:10
**covering (1)**
283:14
**covers (1)**
257:11
**COVID (53)**
15:16;35:10;37:12;
44:5;45:19;50:18;
55:11;56:1;58:25;
61:19;62:18;173:15;
192:9,9,11;217:24,25;
218:1,2;230:6;
233:11,13,14;234:7;
237:3;241:16;258:7;
266:22;269:7;271:10;
292:24;298:5;299:24;
300:22;301:1;304:8,
12;305:19;307:14;
308:3;314:18,19,20;
315:17;316:18;
318:11;319:22;
320:11;337:6,9,17,23;
343:20
**COVID-related (1)**
60:23
**coworkers (1)**
198:25

**crank (1)**
165:4
**crap (1)**
253:4
**craziness (1)**
162:16
**crazy (3)**
161:24;234:3;
279:17
**create (2)**
21:9;195:25
**created (4)**
87:16;206:20;
259:20;271:9
**creates (1)**
42:12
**creating (3)**
146:7;179:13;271:4
**creative (36)**
60:5,24;62:11,13;
82:22;84:4,10,11;
87:9,9;99:13,21;
102:25;103:23;110:2;
116:10,14;121:6;
124:3,13,16;128:11,
14;129:1,19,20;130:1,
2,21;131:1,2,9;
145:16;146:2;186:8;
201:6
**credentials (1)**
293:17
**credit (2)**
64:12;314:6
**credits (1)**
178:19
**crew (2)**
31:21;303:11
**critical (2)**
239:1;319:12
**criticize (1)**
244:22
**cross (1)**
33:10
**cruise (1)**
318:16
**Cruze (1)**
202:1
**crying (1)**
284:25
**cult (3)**
251:4,10,11
**culture (11)**
46:3,7;67:13;156:1;
163:11;164:16;
168:18;188:8;250:23;
253:13;254:14
**curious (1)**
113:23
**current (3)**
39:17;40:14;116:14
**currently (3)**
10:21;21:12;312:9
**cut (20)**

21:4;24:25;79:6;
171:22;204:24;205:3;
206:8,24;226:3;
231:15;259:6,7,10;
266:24;267:2,21;
275:19;277:25;310:7,
17
**cutting (3)**
202:11;212:21;
273:9
**cycle (1)**
210:21

**D**

**dad (1)**
211:23
**dailies (1)**
229:13
**Daily (10)**
53:10;66:7,22;
67:20;68:20;72:15;
165:1;179:21;250:22;
330:13
**damn (1)**
295:17
**dance (1)**
308:18
**dancing (1)**
76:24
**Daniel (5)**
5:22;6:20;171:17;
176:23;179:7
**database (1)**
148:1
**date (25)**
16:25;17:2,8;
110:25;132:24;
151:17,20;152:9;
158:9;192:4;216:12,
19;226:5;228:17,24;
230:19;236:17,22,23;
238:7,12,12,13,16,19
**dated (6)**
111:2;114:7;
144:18;303:7;323:17;
340:13
**dates (13)**
11:7;44:6;109:18,
19;140:10;216:24;
228:13;229:2;230:12;
238:4;239:10;240:12;
291:21
**daughter (1)**
193:18
**Dave (155)**
6:19;9:1;10:8,9;
12:20;43:9,25;44:1,
16,19;45:6;47:13,17;
48:10,11;52:8,21;
53:11;55:4,8;57:1,4,
19;59:7;61:13;63:3,
16;65:11,11,20;

66:13;68:1,8,9;69:3;
72:20;77:15,15;
101:2;115:9,15,16;
162:5;165:2;166:13;
171:5;172:8;173:4;
176:6;177:4,5,6,6;
179:8;181:3,7;184:4;
193:16;194:24;
197:20;201:7;205:15;
206:16;207:2;208:10,
17;209:8;210:9,17;
211:6,7,8,10,23;
213:16;216:13;
217:25;218:13;
244:25;251:24,25;
252:14,15,18,20;
253:20;255:1,2,5,19,
24;256:2,6,6,8,16;
257:19,23;258:15;
259:22;261:12;262:2,
3,3,5;264:13,20,21;
265:11,17;266:8;
267:6,11,22;268:9,21;
269:2,3,10,11,17,24,
25;270:2,21,24;
274:9;279:11;281:2,
3;285:16;286:22;
287:1,4,5,25;289:7,7;
290:11;292:23;294:8,
14;295:7;296:9;
297:11;318:10;319:3;
323:6,7;324:6;325:4;
336:7,17,19,20
**Dave-ish (5)**
55:3,12,14;58:11,
21
**daveramseycom (1)**
157:10
**Dave's (17)**
78:18;188:9;
189:10;207:17,21;
253:15,17,18;254:15,
18;257:3;258:11;
279:14;280:25;320:3;
321:22;326:12
**David (70)**
63:12,16;68:19,24;
77:16;80:5;112:14;
113:9;154:21;162:5;
164:4;170:8,10;
185:12;188:14;
198:14;200:20,25;
203:5,9,16,24;209:25;
214:2,8;215:4;
216:13;221:20;222:4,
20;223:7,17;224:7,7;
225:12;226:25;229:7;
230:14;232:10,14,20;
236:7;237:3;238:6,8;
239:4;246:4;248:19,
19,19;255:25;256:2,
3;257:14;265:13;
276:24;297:17;

299:12;300:7,25;
301:14,24;302:12;
305:9;317:6,18;
323:7,23;324:16;
327:9
**David's (3)**
162:11;238:15;
302:8
**day (32)**
17:1;28:10;54:1;
60:4,21;62:13;74:14;
111:7;133:16;158:13;
160:22,25;174:25;
189:5;213:10;215:3;
222:17;225:21;227:1;
234:6,9;236:11;
237:12;293:4;302:2;
320:6;322:24,24;
324:4,5;341:1,25
**days (20)**
13:19;31:20;
113:17,18;127:12;
149:15;185:23,25;
216:25;220:5;231:4,
6;239:15;240:16;
263:4,14;275:23;
282:18;315:20;
324:16
**day-to-day (2)**
79:4;255:14
**dead (2)**
137:18;191:4
**deadline (25)**
172:20;177:20;
179:19,22;221:14,15,
20,25;222:5,6;225:14,
14,22;226:4,9,20,24;
228:6,7;230:17;
232:24;236:13;238:6;
289:20;340:23
**deadlines (13)**
161:24;162:2,6;
215:1,6;226:3;
228:11,15;230:11;
233:10;238:11,20;
251:1
**deal (33)**
23:9;50:15;93:23;
124:22;125:16;
129:11;132:17,20;
136:17;156:21;
166:13;170:18;183:7;
197:19;216:19;
217:15,21;221:10;
226:1;227:11,22;
231:24,25;232:2;
241:13;247:13;
256:14;259:15;263:6;
270:3,20;295:9;
320:15
**dealing (5)**
87:12;95:3;124:19;
247:15;284:1

**deathly (1)**
221:2
**debt (13)**
59:13,15;64:11;
153:22;156:7;193:5,
7;208:5;211:12;
241:7;251:11;259:19;
264:4
**debt-free (1)**
59:12
**debts (2)**
193:7;287:19
**December (8)**
131:18;138:23;
143:12;144:18;
213:24;281:16;346:1,
5
**decent (1)**
123:9
**decide (1)**
308:12
**decided (10)**
32:13;66:16;
211:11;214:14;218:9;
249:1;270:10;297:17;
324:15;325:2
**deciding (1)**
29:15
**decision (3)**
116:22;122:20;
165:9
**decisions (1)**
169:14
**deck (1)**
130:4
**dedicated (3)**
251:7;264:11,16
**dedication (1)**
243:12
**defamatory (1)**
46:1
**defeats (1)**
285:23
**defendant (1)**
5:11
**defendants (4)**
5:21,23;6:18;10:4
**defending (1)**
338:2
**define (1)**
57:23
**defined (1)**
253:2
**definitely (13)**
46:6;51:20;82:15;
117:20;118:14;
136:12;156:17;
175:24,24;248:12;
277:1;304:14;305:14
**degree (1)**
208:5
**degrees (3)**
59:12;145:10;

209:13
**deigned (1)**
167:4
**delays (2)**
139:9;214:20
**deleting (1)**
40:24
**demand (4)**
180:23;315:24;
316:1;319:13
**demands (1)**
103:5
**demeanor (1)**
308:8
**Denise (2)**
193:18;194:11
**Dennis (6)**
199:2;224:17;
225:7;229:14;232:13,
21
**denominational (1)**
278:15
**denoted (1)**
261:16
**department (31)**
60:10;81:2;87:8;
124:20;130:2;138:12;
172:19;180:18;185:1,
10;188:16;198:5,5,
11;202:25;205:18;
209:23;210:6;219:17,
19;220:12;232:16;
237:10;242:13;269:1;
273:17;289:10;290:3;
291:1;320:4;331:15
**departmental (2)**
175:8;180:21
**departments (1)**
185:4
**departmentwise (1)**
181:15
**departure (1)**
83:16
**depend (1)**
120:23
**depending (2)**
143:22;347:21
**depends (4)**
87:5;98:17;125:10;
187:16
**deposit (1)**
134:16
**deposition (12)**
5:5,7,11,8:25;9:25;
20:11;121:23;150:22;
309:4;347:6,8,21
**depositions (1)**
9:2
**derided (1)**
295:18
**derision (1)**
297:6
**derogatory (3)**

43:8;233:25;234:4
**described (2)**
227:13;230:15
**describing (1)**
37:3
**description (2)**
79:14;327:7
**Design (1)**
311:10
**designate (1)**
166:21
**designated (2)**
165:19;167:12
**designation (2)**
165:16,18
**desired (1)**
158:19
**desk (15)**
104:11;194:23;
219:20;253:24;258:9,
19;266:8;267:14,18;
268:22;269:19;
274:10;275:1;296:1,
20
**desks (3)**
298:12;343:12,18
**despite (3)**
94:12;272:12;293:5
**detailed (1)**
259:5
**details (1)**
150:11
**detected (1)**
218:2
**determination (2)**
249:18;300:24
**determined (1)**
94:11
**detrimental (2)**
239:3;247:20
**develop (3)**
81:1;185:6;215:15
**developer (4)**
47:23;50:4;51:2;
344:8
**developers (1)**
48:12
**Devo (5)**
58:1,4;197:21;
288:22,23
**Devos (11)**
56:17,19;289:2,5,7,
8;290:11,15;291:22;
292:1;296:14
**devotionals (2)**
45:1;240:23
**diag (1)**
123:4
**diagnosed (5)**
85:7;93:25;94:19;
95:25;96:3
**diagnosis (2)**
94:12;123:5

**Dianetics (2)**
194:21;253:23
**DiCicco (37)**
63:12;68:19,24;
77:16;112:14;138:19;
154:21;164:4;198:14;
200:20;203:9,16;
210:1;222:4;225:25;
230:14;236:8;237:12;
238:6;239:4;246:5;
256:1,2,3;257:15;
265:13;276:24;
297:17;299:13;300:7,
25;301:24;317:6,18;
323:7,23;327:9
**dictator (1)**
175:1
**die (2)**
196:3;298:5
**differ (1)**
335:19
**difference (4)**
326:17,18;335:21,
22
**different (44)**
12:4,10,10;36:23;
38:13;47:1;51:21;
81:7;83:1;85:3;89:12,
24;90:3;95:9;98:6,7;
105:6;109:21;111:16;
121:4,8;129:4;
134:13,23;137:23,23;
145:14,21;154:7;
170:14,15;183:4;
202:8,10;221:12;
244:15;258:24;259:1;
263:16;318:6,7,8;
321:21;343:7
**differently (1)**
71:2
**difficult (17)**
15:15,17;24:5;
25:14;27:19;28:1,3;
37:17;68:23;69:18;
134:12;159:15;
175:14;185:14;
216:13;277:23;295:4
**difficulty (1)**
182:18
**digest (1)**
65:14
**digital (1)**
144:22
**digitizing (1)**
291:8
**dining (1)**
298:22
**dinner (23)**
68:19;112:13,18;
162:1,11;164:5;
246:1;248:4,23;
249:16;250:5,6;
251:15;265:10,10,11,

17,23,23;268:19,19,
21;275:6
**dinners (1)**
127:15
**direct (6)**
55:23;61:9;145:9;
199:20,21;241:17
**directed (2)**
145:4,9
**directing (3)**
82:22;145:8;146:17
**direction (2)**
138:20;145:14
**directly (4)**
107:3;124:24;
173:3;274:22
**director (29)**
84:5,10,11;87:9,10;
99:13,21;102:25;
103:23;110:2;116:14;
121:6;124:3,13,16;
128:11,14;129:1,19,
20;130:1,2,21;131:1,
3,9;145:1;146:2;
186:8
**directors (1)**
116:11
**disagree (4)**
76:3;168:1;336:11,
13
**disagreed (2)**
77:6;339:11
**disagreement (1)**
318:13
**disappointed (1)**
138:8
**disapproval (1)**
256:9
**disarray (2)**
237:5;238:18
**DiSC (2)**
331:7;336:4
**disciplinary (3)**
70:24;71:8,9
**discipline (1)**
145:20
**disciplined (3)**
69:2,7;175:11
**disciplines (1)**
146:9
**disclose (5)**
187:24;188:2;
241:4;287:12,17
**disclosed (5)**
187:25;188:4;
193:15;195:17;
285:17
**disclosures (1)**
198:10
**discovery (5)**
23:20;83:24;
113:23;347:7,22
**discuss (2)**

91:15,16
**discussed (7)**
167:14;246:18;
247:1,5;252:24;
268:25;322:6
**discussing (1)**
83:16
**discussion (2)**
155:17;324:5
**discussions (3)**
111:5;127:7;176:6
**disease (10)**
44:11;88:3,4,4;
95:3;221:3;295:14;
298:6;315:3,5
**disgruntled (1)**
69:3
**dishonest (1)**
283:16
**disloyal (4)**
44:10;48:9;55:15;
295:9
**disloyalty (2)**
66:17;295:10
**dismiss (1)**
220:11
**dismissal (1)**
283:20
**dismissed (1)**
17:21
**Disney (4)**
21:9;23:23;25:2;
34:16
**Disney+ (1)**
142:7
**dissect (1)**
65:14
**distance (3)**
224:3;297:21;
299:18
**distanced (1)**
299:20
**distancing (5)**
297:20;298:2;
334:4;337:11,25
**distractions (3)**
295:6,6,6
**distribution (1)**
238:13
**District (4)**
5:9,10;137:1;348:6
**diverse (1)**
87:15
**diversified (1)**
206:1
**Division (6)**
5:10;38:1;80:9,20;
153:24;155:14
**divorce (2)**
196:4,7
**DNA (1)**
251:25
**doc (1)**

114:18
**docs (1)**
26:16
**doctor (1)**
157:14
**doctorcom (1)**
157:7
**doctors (2)**
168:14;234:19
**doctrine (1)**
55:6
**document (36)**
16:7,12,24;18:2,9;
20:9;26:4;39:8;40:22;
110:21,21;111:4;
114:7,11,12,15;
119:10;184:23;
221:17;281:20;282:4,
25;300:1,6;311:4;
323:14,15;340:13;
342:11,13;343:6;
344:6,10;345:3,9,19
**documentaries (5)**
80:19;212:3;
215:24;235:12;281:2
**documentary (58)**
60:15;75:4;80:9,18;
133:2;155:13;183:11;
189:17;198:16;
200:20;203:1;208:6,
7;212:3,12,18,23,23,
24,25;213:8;214:2,9,
25;215:2,9;217:24;
218:5;222:10;223:8,
19;225:17,18;226:5,5,
8;229:10;230:5,6,7;
232:11,18;233:16,20,
22;235:11;236:8;
237:21;238:1;256:21;
259:16,18;262:3;
304:3,10;305:1,8;
328:2
**documentation (1)**
23:6
**documents (21)**
16:5;39:1;140:22,
24;141:2,18,25;
148:25;160:10;
184:19;233:24;
240:10;304:13;309:5,
6,12,14,18,19,20;
310:21
**DocuSign (1)**
152:3
**dodge (1)**
298:11
**dodged (1)**
337:12
**dog (2)**
182:15;194:1
**dollar (2)**
234:16;332:6
**dollars (3)**

21:13;82:19;291:12
**dominated (1)**
250:15
**done (63)**
17:20;20:14;40:1,2,
18,18;60:15;65:18;
70:8;82:21;86:14;
88:24;97:10,15;
113:12,12;124:1,2,13;
125:16;137:5;149:6,
7,15;156:21;172:22;
179:11,12;186:8;
189:13,13;192:5,12;
197:22;200:11;
203:20;214:22,23;
215:16,17;216:2;
217:10;218:6;229:3,
14,15;230:24;235:11;
236:15;237:25;239:2;
258:10;269:3,20;
287:15;294:15;
298:11,12;300:11,12;
329:22;338:6;347:24
**door (8)**
59:3;172:13;
177:15;237:18;245:4;
283:19;297:4;342:25
**dormant (1)**
35:15
**dot (1)**
157:14
**double (2)**
22:7;291:4
**doubled (3)**
169:25;170:2;267:5
**doublewide (1)**
65:24
**doubt (4)**
246:22,23;248:9,15
**down (47)**
9:13;25:5;39:22;
84:8,12;111:14;
144:16,24;147:3;
156:4,5;160:4;
197:12;208:15;
213:18;214:4;217:7;
219:5;221:6;224:4,5,
11;229:4,5,15,16;
249:3;252:6,10,18,19,
21,22;253:18;254:12,
13;266:22;274:3;
289:22;290:3;296:3;
303:4;321:6;324:23;
332:17;333:24;
343:18
**downplayed (1)**
238:25
**dozen (4)**
174:21;210:10,23;
264:25
**dozens (8)**
24:1,1,2,2,2,2,2,3
**drafted (1)**

306:24
**drag (6)**
77:18;95:17;184:7;
207:4;209:17,18
**dragging (2)**
329:2;342:3
**drama (4)**
67:4;162:15;
234:22;253:4
**drama-free (3)**
88:16;113:7;295:5
**dramatically (1)**
271:10
**draw (1)**
57:22
**drawing (2)**
218:18;293:13
**drcom (2)**
157:7,8
**dress (1)**
332:17
**dressed (1)**
290:3
**drill (1)**
346:10
**drip (1)**
252:6
**drips (1)**
254:12
**Drive (5)**
8:14;28:4;224:24;
265:7;304:23
**driver's (1)**
7:14
**drives (1)**
223:9
**driving (5)**
242:19;246:24;
249:22;263:18,19
**drop (1)**
339:19
**dropped (3)**
37:25;45:8;57:15
**dropping (1)**
252:22
**droves (1)**
37:16
**drugs (1)**
211:9
**drum (1)**
328:20
**Ds (1)**
336:6
**dude (1)**
253:4
**due (1)**
213:24
**dues (1)**
59:16
**duly (1)**
6:7
**dumped (2)**
240:11;304:13

Case 3:21-cv-00923   Document 65-1   Filed 01/19/23   Page 360 of 389 PageID #: 2070

**duration (1)**
  342:3
**during (12)**
  24:4,14;26:8;45:18;
  51:23;69:19;87:2;
  191:20,21;237:19;
  276:19;277:1
**duties (2)**
  20:24;21:2
**dynamic (2)**
  71:2;205:4

**E**

**Eagle (3)**
  244:8;245:7,16
**ear (1)**
  320:3
**earlier (19)**
  37:1;56:18;121:21;
  122:2;131:6,6;147:2;
  153:3;159:6;182:9;
  201:13;207:2;209:11;
  239:18;250:20;276:2;
  312:4;321:12;341:12
**early (9)**
  37:12;127:12;
  151:21;162:9;166:7;
  203:15;220:5;312:16;
  315:20
**earn (1)**
  161:13
**earned (1)**
  170:11
**earnest (1)**
  214:20
**earning (1)**
  163:6
**easier (5)**
  35:3;36:14;162:22;
  163:25;224:21
**EDD (7)**
  13:25;14:5;15:13,
  22;17:20;148:16;
  149:2
**edit (14)**
  146:6;180:3;
  202:13,14,14;214:8;
  231:21;256:2,16;
  258:10;269:10,15;
  305:2,6
**edited (4)**
  35:7;183:3;206:15;
  237:22
**editing (19)**
  24:10;26:24;97:12;
  124:23;145:3,24;
  162:18;182:24;
  185:22;202:10,12;
  225:2,5;229:16;
  232:13;258:9;269:16;
  273:14;319:13
**editor (45)**

21:1,2;24:7;25:24;
26:8,9,22;28:23;
31:16;38:19;79:3,6;
80:10;84:18;110:11;
111:4,18;128:9,13,18,
18,21,22;129:9;
130:15,19;131:4,5;
145:1;181:23;182:5,
10,10;184:24;205:17,
18;206:13;224:18;
225:2;273:12;306:18,
23;314:4,5,7
**editorial (1)**
  202:8
**editors (29)**
  25:21;30:8;35:8;
  36:17;80:14;116:10;
  129:6;180:19;182:18;
  186:2,3,14;198:6;
  201:2,14,15,24,25;
  202:17,17,18,22;
  203:6,19;205:5,23;
  272:21;273:18;313:8
**effect (3)**
  148:9,9;209:15
**effective (5)**
  17:2;61:13;184:6;
  189:12;209:14
**effectively (1)**
  163:14
**efficiency (1)**
  146:4
**effort (11)**
  58:19,20;97:4;
  112:2;124:17;130:8;
  140:20;161:15;
  189:19;287:16;
  320:13
**efforts (3)**
  23:15;97:7;298:20
**eight (1)**
  15:21
**either (22)**
  10:9;24:22;27:3;
  34:14;41:18;58:4;
  84:15;110:6,9,10;
  148:12;149:5;174:10;
  175:12;179:3;182:1;
  188:3;268:18,18;
  279:24;286:4;334:2
**election (2)**
  174:24;175:2
**electronic (2)**
  281:25;285:20
**Electronically (2)**
  281:23;282:21
**eleven (3)**
  158:1;165:5,24
**eligible (1)**
  34:14
**eliminate (1)**
  313:18
**eliminated (3)**

313:4,5,25
**elocuted (1)**
  57:3
**ELP (14)**
  133:23,23;134:4,8,
  11;135:1,2;136:13,20,
  23;137:11;138:9,11,
  12
**ELPs (2)**
  132:3;137:18
**else (48)**
  37:5,21,22;53:7;
  64:14;73:5;76:9;
  82:25;86:4;87:20;
  88:1;93:15;94:10,10;
  112:19;123:15;138:7;
  164:14;179:6,8;
  196:24;198:8;224:12;
  239:24;242:19;
  247:19;250:9,12;
  251:14;252:19;263:1;
  267:11;269:23;
  284:18;285:11;296:8;
  297:10,13,14,14;
  304:11;314:20,23;
  315:7;316:17;319:20;
  321:25;330:6
**else's (1)**
  320:6
**email (18)**
  100:12,17;104:7;
  157:23;172:22;173:1;
  214:3;218:1;282:20;
  295:2;300:11,13;
  302:8;303:7,8;
  323:23;340:13,14
**emailed (3)**
  104:5;282:5;293:2
**emails (12)**
  100:21,24,24;
  101:1,9;179:20,21,24;
  234:1;237:3;270:21;
  295:7
**embarrassment (1)**
  41:23
**Emer (1)**
  267:3
**emergency (1)**
  183:1
**Emerson (3)**
  70:6;267:4;272:7
**emotion (1)**
  211:15
**employ (1)**
  43:19
**employed (6)**
  10:21,22;79:20;
  143:18;167:11;
  284:19
**employee (59)**
  6:24;11:4,9,10;
  15:22;21:14,22;43:6;
  44:3,13,15,17;45:5;

48:7,24;51:23;53:23;
54:6,13,15;56:14,16;
58:1,5;59:7;60:12;
61:18,18;65:12;68:2,
24;153:4;166:15;
171:15,19,22,25;
172:3,8;174:16;
176:11;180:22;
181:12;197:21;199:3;
218:9;249:13;270:21;
279:13;283:6;289:15;
290:21;291:25;292:3;
295:3,8,16;296:14;
297:25
**employees (29)**
  12:6;42:8;43:8;
  44:2;46:15;51:18;
  54:18;55:23;59:22;
  61:21;63:24;66:8;
  69:3;87:12;112:17;
  164:23;165:3,11;
  167:17;176:17;
  210:17,21;245:13;
  263:16;270:16;
  272:19;284:7;318:12;
  337:15
**employee's (1)**
  279:20
**employer (6)**
  12:19,24;18:22;
  19:2;282:10;300:18
**employers (3)**
  41:19;46:20;100:1
**employment (22)**
  14:9;18:20;21:24;
  47:18;48:3,12;83:17,
  20;87:2;89:1,2;99:25;
  141:8,18,19;151:14;
  155:7;158:4;179:1;
  199:10;243:17;
  282:25
**empty (1)**
  35:16
**End (45)**
  5:5;28:10;33:7;
  34:25;46:5;82:23;
  84:15;87:23;94:18;
  110:6;112:18;118:19;
  134:4,9;137:22;
  144:6;145:15;161:10;
  162:2;171:1;177:8;
  183:19,20;193:2;
  195:2;199:14,15;
  207:9;208:5;209:2;
  215:25;217:5;220:21;
  223:5;231:9;234:24;
  236:1;237:17;238:1;
  241:4;243:17;281:16;
  295:21;318:6;337:15
**endanger (1)**
  264:12
**ended (52)**
  27:18;28:15;

117:25;124:10;134:3,
11;135:16;137:5,6,
22;138:5,10;146:1,5,
7;150:6;158:24;
159:24;160:8,14,16,
18,19,21;161:11,14;
201:3,9;202:7;
204:11;206:17;
212:21;214:18;
215:18;216:22;218:3;
221:23,24;223:5;
229:15;264:6;266:15;
268:5,7,10;271:4;
284:17;305:10;
318:17;320:19;
334:23;342:3
**ends (5)**
  36:1;126:20;
  163:25;169:7;319:11
**energy (1)**
  189:19
**engage (1)**
  52:7
**engaged (3)**
  45:18;52:5;67:12
**English (1)**
  136:24
**enjoy (1)**
  253:7
**enough (15)**
  11:14,16;35:13;
  36:16,17;132:7;
  154:4;211:11,11;
  233:4;238:15;263:8;
  320:17;336:9;347:16
**ensure (1)**
  218:25
**entertain (1)**
  34:11
**entertainment (1)**
  91:6
**entice (2)**
  112:2;161:15
**enticement (1)**
  124:4
**entire (20)**
  24:12;30:22;35:10;
  112:7,10;124:20;
  193:1;199:9;216:2;
  224:4;231:3;252:1;
  271:6;273:17;282:17;
  290:25;298:25;319:8;
  331:15;342:3
**entirely (2)**
  36:23;144:16
**entitled (1)**
  282:25
**EntreLeadership (13)**
  82:10;169:11;
  171:5;188:22;189:1;
  191:25;222:2;253:21;
  254:3,17;255:3;
  283:17;285:16

**Enucleation (2)**
88:5,5
**environment (9)**
81:9;88:17;161:21;
162:14,18;163:11;
168:19;234:22;295:5
**episodic (1)**
202:11
**Equal (1)**
282:9
**equivalent (1)**
193:25
**era (1)**
58:25
**erratic (1)**
192:12
**Erwin (1)**
5:2
**escrow (1)**
131:20
**especially (21)**
31:17;41:24;57:8;
94:19;117:22;118:17;
125:6;144:15;164:4;
169:3;180:16;187:18,
18;191:2;202:23;
241:16;248:20;
278:16;287:22;
289:10;304:12
**essential (4)**
303:23;304:1,3,3
**estate (4)**
133:24;134:13,24;
138:3
**estimated (1)**
227:3
**et (1)**
5:13
**etched (1)**
251:25
**etiquette (1)**
282:13
**evaluation (1)**
153:14
**evangelical (5)**
56:20,25;197:3;
241:1;278:19
**evangelicalism (1)**
294:15
**even (131)**
12:6;15:18;22:9;
25:1,16,20;27:21;
29:17;30:7;32:8,12;
33:23;35:23;37:12,
20,24;41:3;43:19,20;
45:24;53:18,24;54:6;
57:19;60:14,17;
62:19;63:10;64:4;
65:11;70:11;75:13;
78:4;82:17;94:8,11,
12;104:4;106:14;
109:8;113:3,4;
115:21;125:14,17;

133:19;136:23;137:1,
1;143:17;144:4;
148:7,17;150:5;
160:24;162:1,2;
163:2,22;164:6,20;
167:14;168:8;169:6,
9,12,12;171:6;172:8;
185:3,23;191:12,12;
193:5;196:5;204:9,9,
18;215:5,18;217:1,
22;220:15;222:18;
224:1,16;229:14;
231:9,14,15;233:14;
235:22;236:10;
237:23;243:22;245:8;
250:15;251:3,4;
255:1;256:9;258:6;
265:3;266:17;268:10;
272:12;277:6;280:18;
281:17;283:16;
285:25;286:22,22;
288:3;298:21,24;
300:20;305:8;315:25;
316:25;317:11,22;
325:9;330:19;331:12;
332:21;333:8;343:14,
18,19;346:2
**evening (1)**
268:21
**event (1)**
52:14
**eventually (12)**
15:12,18;32:14;
110:10,13;139:6,15;
201:3;208:10;214:20;
234:23;284:16
**eventy (1)**
273:11
**ever-growing (1)**
165:25
**everybody (69)**
7:17;35:7,8;37:15;
44:16;45:2,6;73:2;
85:10;112:12,19;
130:7;133:16;134:22;
137:17;165:13;172:5;
175:22;178:11;
180:22;193:19;
194:18;195:13;
197:11,13;199:2;
205:7,22;211:6;
218:7;219:7,17,21,22,
23,23;220:5,19;
222:10;223:6;230:23;
237:4,17;240:21;
241:11;243:1;252:19;
255:13;261:19;
266:25;270:14;
283:23,24;293:20,25;
295:7;296:21;299:6;
315:7,17,24;316:9;
318:24;319:7;320:5;
322:25;323:1,9;325:5

**everybody's (1)**
198:10
**evidence (1)**
135:7
**exact (9)**
11:7;61:22;140:9;
190:18;293:23;
309:15;333:23;334:7;
336:7
**exactly (18)**
73:12;86:7;108:12;
122:15;127:18;
129:21;140:9;172:1;
173:14;216:15;
239:16;244:14,15;
245:6,23;248:7;
250:4;336:12
**exaggeration (1)**
240:14
**exam (1)**
154:8
**EXAMINATION (1)**
6:9
**examined (1)**
6:8
**example (3)**
55:20;165:21;193:5
**examples (2)**
55:24;76:17
**excelling (1)**
171:7
**except (5)**
31:22;62:12;72:13,
13;99:8
**exception (1)**
113:12
**exchange (2)**
336:15;337:8
**excited (7)**
86:7;116:13,15;
117:5;132:18,18;
234:21
**exciting (2)**
80:22;174:17
**excuse (3)**
123:12;128:2;
187:19
**ex-employees (3)**
45:21;48:20;50:11
**exercise (1)**
297:18
**exercises (1)**
186:1
**exhibit (53)**
20:11,15;39:9;
41:12,13,14;78:3;
113:20,20,21;119:3,4;
121:23,25;130:19,23;
131:5;152:12,12,22;
153:1,1;157:24;
181:21,22;182:1;
283:2,2,3;301:11,12,
23;312:22,22,23;

313:1;323:20;325:7,
13;342:6,7,8,18,18;
343:24;344:3,21,21,
24;346:7,8;347:2,3
**exhibits (2)**
20:13,18
**existence (1)**
24:18
**expect (1)**
317:13
**expectation (1)**
303:14
**expectations (3)**
184:20,24;325:17
**expected (3)**
158:15;225:4;247:8
**expense (2)**
112:11;159:7
**expenses (2)**
112:11;318:19
**expensive (4)**
88:8;163:2,4;
318:25
**experience (9)**
40:23;42:14;79:15;
138:13;146:2;162:17;
209:2,8;234:25
**experiences (2)**
50:14,17
**expert (5)**
18:20;21:24;
144:10;178:24;
182:19
**explain (1)**
52:13
**extending (1)**
33:12
**extensive (1)**
113:13
**extensively (1)**
71:21
**extra (12)**
130:5;160:21,25;
161:2,11;183:19,25;
184:11;187:21;
188:14;191:13;
257:18
**extracurricular (3)**
191:8,19,23
**extreme (1)**
158:25
**extremely (2)**
255:16;336:20
**eye (2)**
59:4;88:5
**eyes (6)**
259:24;261:7;
275:18,21;296:6,7

**F**

**face (7)**
7:8;64:21;77:24;

132:5;148:6;246:19;
248:9
**Facebook (5)**
52:17;66:9;346:15,
17,24
**faces (2)**
178:3,4
**facility (5)**
29:12;31:21;35:9;
303:14,16
**facing (1)**
318:15
**fact (11)**
27:18;37:24;53:19;
68:1;70:11;241:18;
263:8,9;295:17;
298:21;331:11
**factor (3)**
29:16;42:9;43:3
**factors (1)**
95:5
**facts (3)**
53:8;63:2;306:10
**fair (3)**
109:6;141:21;186:3
**faith (3)**
243:8;246:22;
248:10
**fall (1)**
186:11
**fallen (2)**
225:23;231:7
**falls (1)**
228:17
**familiar (5)**
89:6;97:25;137:3;
187:2;327:4
**familiarity (1)**
98:9
**family (58)**
64:6;81:14,17,18;
82:2,4,5;88:2,11;
93:2;95:18;98:23;
112:7,8,10;116:16;
120:11;122:6,7,20;
133:9,16,21;135:12;
136:1,12,14,17;
139:11;146:21;156:1,
2;159:17;162:15;
189:8;200:5;209:3;
212:14;216:17,20,20,
21;242:8;253:2,3;
265:2,3;268:7;
277:19;278:1;279:10;
280:14,14,15;287:21;
316:5;328:18,21
**family-first (1)**
153:21
**family-friendly (3)**
81:8;161:21;280:15
**fan (3)**
208:14;259:22;
334:3

**fanning (1)**
42:11
**fans (2)**
55:4;59:10
**fantastic (3)**
204:21;333:17;
334:25
**far (46)**
12:11;14:22;44:23;
57:11;81:22;87:13;
88:13,15;92:6;97:18;
101:11;103:21;108:3;
109:8;111:20;118:9;
123:16,18;126:2;
168:4;174:9;180:15;
181:14;182:2,2,13;
185:18,21;187:6;
188:12;209:24;213:5;
230:19;232:18,21;
236:13;238:10;
240:16;273:14;
275:13;297:14,15;
329:16;333:8;336:17,
18
**far-fetched (2)**
169:20,21
**farther (1)**
86:19
**fast (5)**
132:8;133:15;
228:3,16;230:11
**faster (2)**
205:3;214:18
**father (1)**
115:9
**fault (2)**
242:15,16
**fear (6)**
42:9;43:3,6;46:7;
55:20;294:9
**feasible (1)**
160:24
**feature (6)**
28:2;36:10;215:16,
17;238:20;256:11
**features (2)**
80:23;215:19
**February (4)**
14:14;139:18,25;
216:9
**Federal (2)**
5:8;299:17
**feed (1)**
146:21
**feedback (2)**
138:14;328:6
**feeds (1)**
64:23
**feel (19)**
46:4;54:3;68:7,9;
71:7,24;73:13;74:14;
243:13;244:20;
275:24;281:12;
296:25;297:1;305:4;
317:6,12;320:21;
324:7
**feeling (5)**
44:20;86:24,24;
219:22;335:8
**feelings (3)**
78:8;81:22;299:22
**feet (7)**
93:12,14,22;218:5;
297:22;315:6;329:2
**fell (2)**
139:9;175:21
**felt (14)**
68:14;71:4,5,6;
77:8;137:10;175:24;
191:6,11;224:20;
233:13,13;270:24;
331:24
**female (9)**
186:2;201:15,23,
24,25;202:18;205:5,6,
23
**fences (1)**
193:25
**fervor (1)**
55:7
**few (24)**
9:2;11:6;13:19;
24:24;28:8;33:5,6;
34:19;61:4;62:17;
101:14;115:3,19,22;
133:13;141:1;174:21;
185:21;266:3;267:16;
270:1;305:5,15;
324:16
**fewer (1)**
25:20
**fields (2)**
145:16,21
**fight (2)**
189:7;318:17
**fighting (3)**
70:2;331:22;335:1
**figure (7)**
53:15;72:16;
126:17;188:15;
207:20,20;223:2
**figured (4)**
225:22;232:12,14;
341:25
**filed (5)**
8:25;17:19;23:8;
306:2;348:4
**filing (1)**
17:20
**fill (1)**
285:20
**filled (2)**
285:21;287:10
**filling (1)**
148:18
**film (10)**
10:25;80:8,20;81:2;
92:13;145:16;180:24;
202:25;203:2;311:10
**filming (1)**
198:16
**filters (1)**
252:9
**final (2)**
255:12;257:6
**finally (13)**
14:3,4,5,9;15:21;
131:17;150:5;170:9;
189:16;213:4;214:6,
20;225:11
**financial (7)**
153:22;154:10;
192:19,23;262:25;
287:18,20
**financially (2)**
155:25;254:9
**find (61)**
8:16;13:2;15:18;
23:15;25:16,17;
27:19;28:11,13;
30:24;34:8;43:17;
48:5;50:20;52:8;53:7;
54:3;55:13;58:10,21;
59:9;65:19;66:3,6,21;
67:5,6;76:20,22;
81:25;82:1;100:7;
104:2;116:6;118:23;
125:14;131:25;
138:14;144:2;163:25;
164:25;167:10;
169:17,17,20;172:1;
180:1;189:11;199:3;
200:19;205:25;231:8;
247:22;264:13;
290:19,19;291:17,18;
304:2;331:14;339:22
**finding (3)**
87:25;116:25;
247:21
**fine (26)**
70:15;74:17,18;
75:21,22;76:9;77:3;
114:4;123:8;145:10;
187:7;219:5;224:20;
228:1;229:18;235:10;
241:12;242:18;
293:18;309:9;317:14;
321:25;331:19;
333:14;336:25;342:2
**finish (9)**
70:17;180:7;190:4;
192:4;221:17;255:19;
301:20;335:8;347:12
**finished (4)**
82:21;192:25;
208:4;216:1
**finishing (1)**
215:14
**fire (5)**
59:3,4;219:1;
293:12;294:20
**fireable (1)**
113:8
**fired (26)**
12:25;13:8;16:5;
47:2,4,23,25;52:15;
60:4,21;61:6,21;
70:12;76:2,2;235:14;
247:22,23;272:4;
283:11;287:9;313:11,
23;326:1;340:4,4
**fires (2)**
277:22,25
**Firing (6)**
47:2;218:23;
283:20;319:4;338:23;
339:7
**first (83)**
13:22;14:24,24;
20:10;31:11;32:23;
39:12,18;46:21;47:8;
53:12;63:22;64:20;
79:1,2;80:19;81:18;
83:19;90:21;92:8;
94:19;102:12;103:13,
19;109:6;110:1;
113:10;116:12,20;
132:22;134:22;135:7;
139:9;142:7;146:6;
156:1;168:5;171:1;
184:5;189:1;194:23;
203:1;207:7,8;216:7,
18,20,20,21;217:6;
218:24;219:18;222:4;
225:13;226:19;227:1;
228:24;231:1;233:1;
236:16,18;238:7;
239:12;240:19;253:3,
24;254:2;259:16;
262:1;263:14;276:15;
280:14;283:9;292:25,
25;303:19;304:20;
305:20;309:18;
318:22;322:23;
344:18;345:4
**fish (3)**
203:22,25;204:1
**fit (19)**
31:17;34:4;68:3;
82:2,17;88:21;144:4;
153:15;155:15;
325:19,19,24,24;
326:24;327:1,10;
334:10,14,17
**fits (1)**
244:13
**fitted (1)**
321:24
**five (11)**
83:4;144:12;
224:25;263:15,16;
299:2,4;305:7;
322:17,20;323:4
**five-minute (1)**
83:5
**fixed (5)**
258:13,21;267:14,
25;281:8
**flashy (1)**
202:10
**flight (7)**
151:8,11;160:2,16;
249:3,4,5
**flighty (1)**
93:18
**flip (1)**
94:23
**floor (4)**
80:17;219:10;
270:2;274:2
**Florida (1)**
270:12
**flow (2)**
146:3;200:10
**fluctuates (1)**
22:4
**flustered (1)**
339:10
**flux (2)**
37:4,6
**fly (3)**
112:4,5;243:6
**flying (2)**
223:18;270:22
**focus (2)**
230:7;250:10
**fold (1)**
87:23
**follow (7)**
49:7,8;64:22,22,23;
142:4;269:5
**followed (1)**
68:6
**following (5)**
28:17;236:25;
267:25;323:2;324:20
**follows (1)**
6:8
**follow-up (1)**
150:11
**fontwise (1)**
41:10
**food (2)**
193:22;225:1
**foot (3)**
42:3,4;59:14
**footage (22)**
30:14;36:22;133:6;
180:3;212:15,16;
213:12;214:3,3,9;
229:4,5,8,8;231:12,
20;238:21;290:24;
292:6,11;304:24;
305:1
**football (1)**

284:13
**force (1)**
322:16
**forced (1)**
74:11
**forcing (1)**
135:8
**forehead (1)**
254:13
**Forget (7)**
103:6;134:17;
181:21;216:24;277:7;
334:6;336:15
**forgot (1)**
189:18
**forgotten (2)**
92:8,9
**form (4)**
11:23;71:16;76:5;
285:20
**formal (3)**
93:8;130:20;265:10
**formally (1)**
148:12
**formats (1)**
291:7
**formatting (1)**
41:8
**former (4)**
43:8;44:1;51:17;
54:18
**forth (3)**
97:20;304:14;
338:11
**forty-hour (1)**
14:22
**forums (1)**
195:25
**forward (14)**
42:3,4;81:17;86:1;
110:16;124:19;152:7;
156:8;188:16;219:9;
228:3;232:4;243:4;
315:9
**found (22)**
30:25;31:6,6,7;
49:10;55:15;67:8;
72:18;139:15;163:1;
164:25;211:7;223:11;
229:9;247:14;249:4;
278:4,23;286:25;
287:9,23;303:22
**founded (1)**
24:1
**four (6)**
33:11,12;222:1;
231:23;257:16;323:4
**Fowlkes (2)**
44:8;111:8
**Fox (2)**
23:24;34:17
**FP (1)**
59:16

**FPU (2)**
187:25;204:17
**frame (4)**
54:10,10;99:16;
121:12
**Franklin (14)**
81:3;112:7,10;
115:13;116:16,21,23;
117:25;120:11;
245:10,15;271:8,14;
344:8
**Frankly (1)**
226:11
**freaking (1)**
293:20
**free (5)**
151:9;193:5;208:5;
242:22;246:25;250:8;
251:11
**freelance (4)**
12:6;33:1,2;312:11
**freelancer (8)**
11:2,15,19;14:16;
35:24;92:7,8;290:22
**freelancers (1)**
35:14
**freelancing (3)**
12:3,11;92:10
**free-will (5)**
248:10,12;249:17,
18;250:9
**frequent (4)**
54:22;55:19;98:15;
257:24
**Friday (9)**
60:11;180:16;
236:16,18;285:21;
303:8;325:1,2;333:19
**friend (3)**
92:24;98:20,21
**friendly (3)**
156:2;162:21;253:3
**friends (13)**
37:13;64:5,6,6;
93:2;98:23;168:15;
234:17,18,19;242:8;
319:9;339:21
**fringe (1)**
66:24
**fringes (1)**
163:2
**front (9)**
20:13;57:14;68:2;
133:7;155:18;178:6;
212:22;225:8;241:4
**frustrated (1)**
66:13
**frustrating (1)**
278:1
**frustration (1)**
133:14
**full (12)**
7:12;11:17;33:15,

16;92:9;148:9;193:1;
234:11;246:14;291:8;
292:22;345:3
**full-time (11)**
11:3,9,10;14:22;
21:14;32:12,14,23,25;
33:13;123:6
**fully (4)**
82:18;93:13;126:6;
212:7
**Fulton (1)**
199:1
**fun (1)**
18:1
**functioning (1)**
263:20
**fundamental (1)**
294:15
**fundamentalist (1)**
244:25
**funny (4)**
135:10;165:20;
263:8;264:14
**further (1)**
202:20
**fuss (1)**
241:10
**Future (5)**
212:20;213:15;
214:24;257:24;258:4;
259:4,14;262:8;275:8
**fuzzy (2)**
109:9;287:6
**FX (1)**
129:16

**G**

**gag (1)**
285:12
**Galloway (5)**
171:18;177:2;
179:7;287:2,5
**game (4)**
162:7;207:19;
296:9;297:16
**games (2)**
262:4;281:1
**gap (1)**
341:5
**garnered (1)**
47:5
**Garnet (1)**
8:13
**gaslighting (4)**
76:15;272:16;
316:24;332:12
**gaslit (1)**
243:14
**gathering (1)**
155:19
**gatherings (1)**
293:8

**gave (15)**
16:6;191:16;
224:21,23,23;225:2;
234:16,17,18;255:20;
262:24;293:10;
324:10;331:1;339:24
**gay (1)**
47:4
**geared (1)**
94:7
**general (5)**
6:20;201:19,20;
219:3;223:6
**generally (1)**
124:14
**generation (1)**
202:21
**generous (1)**
126:7
**geographic (1)**
97:22
**germs (1)**
324:23
**gets (8)**
50:2;137:16;
178:11;181:5;252:21;
259:23;286:21;
327:14
**ghosted (1)**
225:12
**Gideon (1)**
182:22
**gig (2)**
14:15;312:16
**given (6)**
9:25;52:20;69:20;
118:20;202:18;
339:13
**giving (6)**
140:21;148:19;
166:14;193:17;
201:14,24
**glad (1)**
304:21
**Glassdoor (2)**
105:2;345:12
**glowing (3)**
265:14;327:18;
329:9
**goal (1)**
113:15
**God (5)**
90:23;195:24;
241:23;276:23;
296:13
**goes (3)**
115:1;206:19;
336:19
**go-getter (1)**
336:6
**Gonzalez (2)**
70:7;182:22
**good (60)**

11:16;23:20;31:17;
33:8;34:4;44:12;
48:25;70:13;81:17;
82:3,17;83:2;85:25;
92:15;95:13;109:5;
123:8;124:21;142:18;
150:12;153:15;
166:14;187:20;203:3;
213:5;216:14;217:12;
219:15,22,23;223:1;
225:23;235:17;244:7;
250:25;256:6;257:5;
258:25;259:3;261:5;
263:10,11;267:1;
269:22;275:22;294:4;
297:22;306:21;
308:20;316:10,10;
328:16;329:3;332:13;
334:10,14,17,20;
335:5;347:16
**gosh (3)**
23:22;57:16;164:3
**gossip (9)**
63:19;64:1;176:1,2,
5,5;284:6;285:7;
345:25
**gossipping (1)**
63:24
**governance (1)**
293:5
**government (1)**
219:6
**grammar (1)**
278:13
**grand (2)**
332:20;333:7
**granddaughter (1)**
262:11
**grandkids (1)**
262:20
**grandpoppie (1)**
262:15
**graphics (4)**
185:5;215:13;
273:12,13
**Grassland (2)**
115:10,12
**gravely (1)**
237:10
**gravity (2)**
230:20;231:2
**great (66)**
10:12;29:11;33:7;
49:25;50:21;51:10;
66:5;67:3;70:1,5;
73:1;74:18,19;75:5,
20;77:11;80:6;81:5;
85:11,11,19;86:2;
94:22;98:22;122:22;
124:23;132:14,20;
136:11;137:18,19;
154:14;156:24;
165:12;169:4;189:13;

195:1;204:20;205:24,
25;208:21;209:21;
212:13;219:24;223:4;
227:5;235:18;237:15;
241:6;244:10;247:3,
4;265:16;269:21;
272:10;284:12;
296:20;299:8;316:11;
324:22;326:5;331:21;
333:17;334:25;335:4;
341:4

**greatest (1)**
280:25
**green (1)**
286:2
**greens (1)**
286:3
**grew (2)**
81:2;115:8
**grid (2)**
325:17,20
**grids (1)**
326:21
**grimacing (1)**
132:5
**grindstone (3)**
65:1;170:24;285:6
**ground (3)**
9:2;80:17;81:1
**Group (21)**
5:12;6:19,21;9:1;
12:23;13:23;62:14;
66:9;70:4;133:23;
195:7;210:20;264:19,
21,23;282:25;294:17;
296:4;311:16;346:19,
21
**groups (2)**
50:12;244:17
**Grove (2)**
139:15;163:3
**grovel (1)**
326:14
**groveling (1)**
326:14
**grow (2)**
204:8;206:6
**growing (1)**
65:21
**guarantee (1)**
126:5
**guess (43)**
11:22;13:1;14:11;
18:20;21:8;22:16;
23:3;37:4;47:3;50:20;
56:21;62:9;66:8,12;
71:1;76:4,20,23;
78:21;83:23;116:5,
10;118:22;122:7;
135:5;153:9;186:20;
198:1;200:18;201:5;
206:12;211:25;
265:10;268:8,8;

288:18;296:14;
305:12;314:4,5;
341:11;346:25;
348:15
**guessing (5)**
18:19;19:5;41:8;
229:1;236:17
**guest (2)**
197:21;208:2
**guests (1)**
273:5
**guides (1)**
185:7
**guilty (1)**
243:13
**Gulf (1)**
174:25
**gun (2)**
53:12;165:1
**gushing (1)**
78:2
**guy (16)**
47:8,10;125:20;
130:14;169:3;189:13;
199:21;208:5,5;
211:9;232:13;244:13;
321:17,17;327:14,19
**guys (47)**
132:14;136:7,7;
137:13;138:11;
147:18;162:2,2;
164:5;172:10,20;
176:20;179:1,19;
198:21;206:5,24;
232:21;233:24;
234:20;235:7,18;
240:10;251:4,7,8;
277:20;278:10,25;
280:1,23;282:9;
284:12;291:7,8,16,17;
294:2;304:13;317:16;
318:23;320:14;331:6;
332:11;336:2,12;
339:24

## H

**habit (1)**
177:8
**habits (1)**
223:24
**habitual (1)**
173:24
**hack (1)**
53:9
**half (8)**
59:14;184:23;
217:6;225:8,8;305:3,
6;322:20
**halfway (3)**
32:8;254:9;339:21
**hand (14)**
6:4;20:8;49:5;

220:11;242:19;
258:12;267:15;301:7,
10;312:18;325:22;
342:20,25;343:20
**handed (4)**
152:18;281:20;
300:2;340:12
**handful (2)**
231:4,6
**handle (2)**
251:8,9
**handled (3)**
167:23;185:19;
318:11
**hands (7)**
123:20;129:11;
195:14,15;227:20;
342:25;343:19
**handshake (1)**
275:23
**handshakes (1)**
123:22
**handshaking (1)**
275:16
**hang (2)**
208:16;221:18
**hanging (2)**
253:9;270:2
**hangman (1)**
297:16
**happen (9)**
125:22;160:23;
197:10;199:9;213:11;
227:8;249:24;257:25;
296:12
**happened (21)**
15:12;35:10;48:23;
54:16;59:24;69:1;
96:21;104:9;192:11;
206:12;217:24;
221:22;223:6;237:3;
238:24;241:16;258:1;
267:15;336:15;
339:15;340:4
**happening (2)**
210:4;267:21
**happens (2)**
98:11;252:17
**happy (4)**
86:9;274:2,5;318:3
**harassment (3)**
207:14;282:10,17
**hard (18)**
48:8;49:20;60:15;
69:5,8;72:6;77:14;
170:24;216:15;
224:24;228:15;
230:11;247:20;
252:11;255:6;276:13;
284:24;323:16
**harder (1)**
109:18
**hat (2)**

84:7;98:10
**hate (2)**
241:11;295:10
**hats (2)**
145:17;183:4
**head (21)**
50:25;51:3;62:9,16;
84:23;111:14;113:6;
195:15;200:21,24;
201:1,1,6;210:5;
232:15,16;251:9;
252:5;253:11;320:3;
346:20
**headhunter (2)**
107:15,22
**headhunters (2)**
30:2;35:3
**heads (3)**
67:2;68:22;74:25
**heads-up (1)**
341:15
**health (1)**
126:7
**healthcare (6)**
25:13,22;26:7,20,
25;38:23
**hear (26)**
26:6;27:22;43:25;
44:1;46:22;64:15;
67:2,14,19;68:21;
85:13;95:13;117:11,
13;154:4;157:21,22;
171:10;211:20;225:4;
251:8;252:13;253:17;
289:24;290:11;
292:23
**heard (21)**
6:14;43:21;48:1;
51:22;57:8;65:3,20,
21;72:20;115:17,21,
22;116:3;157:6;
165:17;197:20;
205:22;211:10;
230:25;231:1;344:13
**hearing (9)**
49:21;98:23;
117:15,18;164:19;
221:5;233:1;252:13,
14
**heart (1)**
195:2
**heartbeat (1)**
135:3
**Heatherly (1)**
198:21
**heavily (1)**
346:18
**heavy (3)**
71:22;213:13;305:4
**held (2)**
55:2;182:11
**hell (4)**
59:1,5;61:14;245:5

**help (23)**
80:15;111:10;
121:11;131:25;
135:25;169:14;183:5;
184:14;185:1;186:7;
191:17;202:25;
203:17;204:7;215:14,
15,15;263:24;273:12;
284:25;291:6,18;
327:13
**helped (8)**
169:15;185:6,15;
191:17;214:10;217:2;
228:9;230:9
**helpful (4)**
9:4,15;85:8;205:1
**helping (7)**
80:25;130:7,13;
156:6;185:22;241:6;
327:15
**helps (1)**
153:21
**Here's (3)**
226:19;282:10;
345:9
**hey (109)**
32:10;33:10,16;
38:13,16;47:7;48:22;
50:16;52:25;61:14;
67:13;69:17,22;
71:18;77:11,13,24;
84:3,12;85:8,16,18,
23;86:6;87:20;88:1,
20;91:6,11,21;93:5;
99:4;103:5;110:7,14;
117:22;118:6;121:7;
123:20;127:13;130:8;
133:16,21;135:1,17;
137:11;147:19;
148:21;150:9;155:12;
157:25;161:15;
164:12;172:3,9,20;
174:1;179:19,21;
189:13;200:12;
203:16;206:23;
207:16;208:15;210:3;
211:17;216:15;
220:22;222:15,21;
225:4;242:10;254:6;
271:23;277:16;
279:19;282:9,22;
291:7;293:7;295:14;
299:8,13,15;303:19,
22;304:20;315:18,22,
23;316:9;317:6,8,15,
19;318:8;320:14;
321:4;324:12;329:6,
11;332:2,19;334:19,
24;343:11,12,18
**hierarchy (1)**
128:15
**high (14)**
82:22;103:6;

163:19;174:17;
208:15;222:14;257:9;
266:16;286:7;316:6,
6;336:3,6,18
**high-def (1)**
292:21
**high-end (1)**
292:21
**higher (7)**
75:1;88:23;112:18;
169:12;171:19;184:1;
204:16
**highest (2)**
163:18;331:14
**highly (1)**
293:8
**high-pressure (1)**
162:17
**Hill (1)**
189:7
**himself (4)**
43:9;166:15;172:8;
210:17
**Hindu (1)**
244:23
**hire (24)**
14:22;27:20;30:6;
32:7,10,11;33:6,15;
35:12;47:9;65:18;
92:9;125:20,23;
132:15;133:3;151:17;
178:20;187:24;188:5;
193:3,15;226:2;
285:17
**hired (25)**
11:3;12:10;14:15;
31:8,14;63:10,16;
132:13;182:3;183:17,
22;184:5;194:19;
195:16;203:24;
212:25;244:6;248:16;
283:10;290:22;
291:19;321:11,14;
331:6,11
**hiree (1)**
155:11
**hiring (8)**
24:5,25;29:17;
178:21;245:24;
313:19;322:8;326:22
**history (2)**
43:18;312:6
**hit (1)**
179:13
**hits (2)**
148:2;280:25
**Hmm (2)**
69:5;138:10
**Hogan (8)**
247:15;283:7;
284:1,3,7,13,14,20
**hold (3)**
49:14;145:10;

240:24
**hole (2)**
223:12;303:22
**Hollywood (14)**
37:13;80:10;
128:16,20;162:11;
200:11;215:17;253:4;
259:21,22;266:24;
268:12;273:10;319:7
**home (84)**
24:22;27:25;30:8,9,
9,21;35:14,21,21;
81:12;88:18,19;
118:12;131:14,16,17,
23;132:1,3,14;
133:11;136:1;137:21;
159:16;184:8;207:4;
209:3,18;220:14;
221:24;222:11,12,13,
15,16,21;223:6,9;
225:3;230:22,24;
237:13,24;241:8;
256:24;257:1;271:21,
24;272:3;274:1,4;
278:21;285:21;293:2;
296:16;298:5,19;
299:1,11,14,16;300:8;
302:1,13,15;315:24;
316:4;317:7,9,17;
318:4;320:19,19,23;
322:16,18;323:8,9,9;
324:7,8;325:5;
328:24;343:14
**honest (1)**
280:8
**honestly (17)**
41:23;46:19;84:6,
17,21;171:16;172:14;
179:23;186:15,18;
187:5,13;266:13;
267:8;306:18,22;
346:1
**hook (1)**
133:22
**hope (1)**
294:9
**hopefully (2)**
206:11;214:24
**horrific (1)**
68:6
**Hospital (2)**
88:8;94:25
**hospitalized (2)**
218:4;242:15
**hosting (1)**
337:19
**hotel (4)**
160:1,20;213:23;
270:15
**hotels (1)**
271:13
**hour (4)**
21:13,19;347:8,15

hourly (1)
21:23
**hours (27)**
11:14;81:10,11,12,
13;130:17;161:23;
183:18,19,21;186:24,
25;187:2,10,14,21;
188:14;191:1,20,21;
234:23;238:1;252:11;
253:3;266:4;268:19;
344:25
**house (49)**
17:13;35:5;37:19;
115:25;120:17,20;
132:22;133:12,25;
134:5,14,16,20,21;
135:3;136:5,9;
137:17;138:21;139:5,
8,9,9,15;140:1,5;
156:22,22;212:10;
216:9;223:13;224:10;
235:6;236:20;256:25;
257:2;264:5;265:4,
22;266:15;277:15;
278:21;304:4,7;
319:14;329:1,4,19;
333:11
**housekeeping (1)**
10:3
**houses (1)**
160:24
**housing (1)**
160:22
**How's (4)**
200:5,5,6,6
**HR (10)**
61:22;113:6;
176:13,14,23;177:22,
23;178:2;179:6;
346:20
**huge (2)**
194:21;253:11
**human (1)**
19:6
**humble (15)**
325:19,23;326:1,6,
18,23,23;327:11,12;
330:5;335:18;336:20;
339:17,19,24
**humility (9)**
235:20;259:12;
326:11;327:23;328:4;
335:22;336:17,18;
340:22
**hundred (5)**
21:12;67:21;
174:19;217:10;
271:18
**hundreds (6)**
23:21;26:16;61:2;
252:11,11;291:11
**hungry (6)**
325:19,23;326:23;

327:11,12;335:18
**hunt (1)**
72:14
**husband (2)**
48:23;211:13
**hush (1)**
175:21
**Hussein (1)**
175:1
**hustling (1)**
295:7
**hyperintense (1)**
273:9
**hypes (1)**
273:2

# I

**I-A-T-S-A-E (1)**
22:16
**IATSE (5)**
11:11;22:13,16,21,
25
**icon (3)**
286:1,2,2
**ID (1)**
60:24
**ID'd (1)**
60:24
**idea (31)**
18:11;52:9,11;
63:21;94:25;105:11;
107:4;115:24;133:8;
134:18;163:16;
173:11;186:6;204:7;
216:1;217:5;223:2;
255:10;259:16;
293:18;305:12;307:7;
320:20;321:1;323:18;
324:22;326:12,14;
332:13;337:7;345:8
**ideas (1)**
105:12
**identification (1)**
18:3
**identified (1)**
60:1
**identifies (1)**
152:8
**identify (4)**
58:16;109:7;
323:17;346:13
**idling (1)**
25:1
**ignored (2)**
191:5;231:15
**ill (1)**
237:10
**illegally (1)**
268:8
**illness (1)**
196:9
**illuminate (1)**

304:17
**imagine (12)**
39:21;41:5,9;99:18;
156:12,15;157:19;
174:5;187:1;253:7,8,
10
**immediate (1)**
74:23
**immediately (6)**
12:18;17:21;
138:17;232:17;
233:11,12
**impact (1)**
116:17
**impactful (1)**
242:24
**imperative (1)**
133:1
**implemented (1)**
186:2
**implore (1)**
53:5
**implored (1)**
172:9
**importance (2)**
233:10;238:16
**important (19)**
36:16;54:7;68:12,
13;94:15;172:4,7,10;
175:17,18;176:16,20;
178:20;216:16,20;
259:19;296:15;
328:17;329:2
**impossible (1)**
165:7
**impressed (1)**
256:12
**impression (2)**
160:13;162:20
**impromptu (1)**
297:16
**improper (2)**
278:13;306:11
**improve (3)**
80:16;200:9;202:19
**improving (1)**
331:20
**inaccurate (2)**
302:14;339:11
**inbox (1)**
158:3
**Inc (10)**
166:5;167:5,11,14;
168:4;173:3;174:7,7;
176:8;177:20
**incidence (1)**
258:20
**incident (1)**
165:1
**included (1)**
124:12
**includes (1)**
282:11

including (2)
198:5;298:22
income (4)
14:4,12;15:19;
163:18
inconvenience (1)
249:8
increase (6)
124:2,11,11;
126:10;127:3;202:15
increased (6)
112:1;124:1;169:1;
170:3,4;191:4
increases (1)
126:3
increasing (1)
126:21
Indeed (2)
105:2;158:5
independent (1)
11:20
indicate (1)
301:4
indicated (4)
76:19;176:23;
201:17;301:2
Indicating (1)
300:5
individual (1)
60:10
individually (1)
9:1
industries (1)
319:8
industry (8)
24:8,12;30:1,22;
33:3;35:10;91:6;
144:15
inevitably (1)
45:20
inexperienced (2)
80:14;203:19
influence (1)
197:23
informal (2)
128:16;130:4
information (8)
8:16;51:7;82:16;
148:20;220:7;287:12;
303:15;331:9
infringing (1)
241:13
initial (11)
153:14,16;158:17;
188:4;203:15;215:4,
22;216:6,9;261:24;
276:24
initially (2)
292:25;293:1
inner (1)
180:21
inoculation (1)
316:1

in-person (1)
159:5
inquire (1)
278:24
inquired (5)
67:17;68:17,18;
71:4;278:9
inquiring (1)
69:22
inquiry (1)
71:22
insistent (2)
132:2;214:8
inspiring (1)
211:25
instance (1)
241:17
instead (5)
9:16;160:8;229:16;
269:12;271:6
insulting (1)
332:4
intense (1)
211:15
intensely (1)
296:5
intensified (1)
56:4
interaction (8)
35:23;62:12;
198:24;200:16;
201:10;262:10;
267:13;275:5
interactions (3)
207:23;261:16;
262:7
interest (2)
114:24;123:24
interested (7)
86:8;17;111:21;
123:25;134:15;
319:18;330:22
interesting (17)
13:22;34:18;49:11;
65:17;104:19;135:5;
187:8;215:3;233:23;
234:10;251:22;
263:14;268:2;279:8;
288:2;320:17;327:18
Interestingly (1)
320:17
interface (1)
129:2
interfere (1)
299:24
internal (2)
26:4;181:1
internally (2)
89:22;172:18
internals (1)
181:14
Internet (6)
28:7;30:12;36:11;

49:10;63:3;64:21
interpret (1)
65:15
interpretation (2)
244:14;321:20
interpreted (1)
78:20
interrelate (1)
146:11
Interruption (4)
36:4;42:19;140:11;
308:13
interstates (1)
277:25
interview (23)
67:1;68:18,20;
91:14;112:23;151:16;
153:25;154:7,15;
155:11;157:19;159:2,
5,12,22;160:21;
164:4;184:16;215:4;
245:25;249:12,14;
276:19
interviewed (4)
111:8;137:20;
159:14;331:9
interviewees (1)
112:19
interviewer (1)
155:11
interviewing (1)
159:10
interviews (14)
90:2;91:14;111:5;
113:13;148:7;154:1,
1,15;159:5;160:6;
177:25;203:15;
246:15;276:24
intimated (2)
159:21;324:10
intimidation (3)
43:7;46:7;55:21
into (57)
25:5;35:7,14;40:10;
58:2,9;78:18,18;
80:13,23;82:11;
89:12;101:1;135:17;
148:1;150:7;165:8;
169:10;176:18;181:5;
183:2;184:2;185:1;
189:19;194:18;
203:18;204:25;
214:21;216:8;219:17;
233:11;238:18;240:4;
241:8;245:21;252:10,
12,12,19;266:17;
271:12,19;272:15;
277:12;278:3;289:12;
293:10;295:7;296:5,
21;303:11;318:17;
319:1;327:16;332:8;
336:3;340:24
Intralink (1)

92:13
intro (1)
117:4
introduce (2)
5:18;258:8
introduced (8)
6:23;63:22;153:13;
256:13;261:18,19,19;
275:16
introducing (2)
268:16;269:8
introduction (2)
268:19;276:18
invent (1)
316:1
invented (1)
298:9
investigate (1)
99:3
invited (2)
241:8
involuntarily (1)
313:10
involved (5)
102:15;202:6;
255:17;256:7;328:8
Iraqi (1)
174:24
irked (1)
297:22
Irwin (6)
6:1,1;142:14;
345:12,15,17
isolated (1)
35:11
Israelites (1)
252:4
issue (8)
19:3;50:18;54:24;
161:12;169:5;243:3;
248:1;271:11
issued (1)
325:4
issues (7)
14:9;19:4;47:3;
87:13;167:22;239:18;
247:25
I-T-S-A-E (1)
22:21

J

Jack (5)
171:18;177:2;
179:7;287:1,5
jammed (1)
305:7
January (12)
114:7;116:21;
121:16;131:19,20;
133:5;189:17;213:14;
214:21;277:7,8;278:6
Japan (1)

241:8
JB (12)
60:18;199:22;
200:1;203:22;204:3;
265:13;268:25;
269:25;287:24;
288:16;327:9;328:5
Jeff (1)
182:22
Jenn (1)
138:2
Jennifer (4)
5:16;119:3;312:23;
346:7
jeopardize (5)
223:1;237:15;
272:2;302:19,20
jeopardizing (1)
242:7
jeopardy (1)
242:14
Jesus (2)
211:8;321:4
Jira (1)
186:19
jive (1)
21:25
job (105)
13:2;14:13,16,25;
20:23,24;21:2;23:16;
25:17;26:23,24;
27:22;29:20;30:12,
24;31:1,6,6,7,8,11,12,
15;33:23,25;34:8,15;
37:7;38:16;39:17,23;
50:14;53:25;54:1;
64:6,25;69:22;70:1,5,
13;72:13;74:13;75:5;
77:12;79:14;84:19;
89:16;93:19,19;
104:3,3,6,18,25;
105:15;108:20;
118:24;120:23;121:8;
123:14;124:16;
125:10,24;131:1;
136:8,11;144:3,12;
148:13;150:6,7;
155:20;187:21;
204:20;205:2;209:21;
210:16;223:1;234:16;
235:23;237:15;248:2;
258:25;259:3;261:5;
269:15;272:2,11;
275:22;301:8;302:19;
312:6,7;317:4,5;
319:8;327:7;328:16;
329:17,18;331:20;
332:13;334:19;335:9;
339:12
jobs (24)
15:3;23:19;24:3;
25:18;26:5,14;27:17;
38:13;40:25;53:9;

86:15;87:3;93:20;
94:21;98:5;108:5;
143:22;144:7,8;
146:16;183:16;
185:18;333:8,10
**John (1)**
16:20
**Johnson (26)**
52:4,7;63:13;67:11;
70:3;73:4,6,18;77:1;
80:5;86:15;112:15;
185:11;191:8,20;
194:10,18;201:1;
232:16;271:20;
286:10;299:15;
314:21;316:19;317:8;
340:8
**join (2)**
133:11;346:19
**joined (1)**
177:18
**joint (1)**
122:19
**joke (3)**
174:24;175:6,6
**joked (3)**
112:20;174:23;
264:10
**Jonathan (1)**
5:24
**Journal (8)**
166:4,8,20;167:8;
195:3,3;196:14;
197:17
**journaling (8)**
188:7;193:14;
194:14;195:7;196:13;
239:19,25;244:2
**journals (1)**
240:22
**juggle (1)**
124:25
**July (11)**
13:15,16;17:15;
44:6;51:14;54:10,16;
62:1;75:7;111:2;
183:12
**jump (3)**
194:20;263:15;
264:9
**jumper (1)**
263:24
**June (4)**
17:16;54:10;111:2,
7
**junior (6)**
128:18;182:17;
186:2;201:14,14;
202:17
**jut (1)**
88:5

## K

**Kate (2)**
136:21;137:3
**Katz (4)**
179:12;187:3;
286:22;298:1
**keen (1)**
161:10
**keep (23)**
16:18;29:12,13;
30:17;33:12;38:12;
63:22;72:22;88:16;
92:11;95:14;104:14;
106:23;113:15;
149:14,16;186:14,25;
190:10;281:11;317:5;
320:10;338:1
**keeping (1)**
173:24
**keeps (1)**
252:22
**Kelly (3)**
153:5,7;154:24
**kept (17)**
124:16;173:16;
187:2;204:19;213:4;
216:21;225:9;266:20;
267:11;280:22;
281:13;286:8;291:5;
319:17;337:21,22;
340:2
**key (2)**
153:22;187:11
**keywords (2)**
291:20,21
**kick (2)**
241:10;321:19
**Kicked (1)**
321:15
**kid (1)**
257:5
**kids (8)**
82:5;159:16;196:8;
200:5;234:18;253:9;
262:21,21
**kids' (1)**
339:21
**kill (5)**
77:17;184:7;207:3;
209:17;318:24
**killed (1)**
272:9
**killing (5)**
69:25;70:5;136:11;
221:3;265:15
**Kimberly (18)**
63:11;80:5;86:5;
102:14;109:9,14;
154:20,24;155:1,6;
156:5,10;157:5;
158:11;164:6,21;

276:25;326:22
**kind (211)**
14:10,23;30:24;
31:19,22,23;41:22;
43:9;44:19,22;45:2;
46:3,6,21;50:1,14;
52:13;53:1;55:5,7,18,
20,21;56:2,15;59:6;
60:6;61:11;63:18;
64:25;65:14;66:9;
70:24;74:11;76:23;
78:2,10;79:4,4;80:12,
17,23,25;81:5,16,20;
82:12,23;84:11;85:4;
86:10,25;87:7;93:12;
94:17;95:12;96:8;
98:9;103:4;112:2,18;
117:4,6,7;118:21,24;
124:25;125:9,18;
126:4;127:11;128:22;
129:3,4,6,13;130:4,6,
14;135:8;137:6,14;
144:13;146:9,16;
149:14;153:13,15,16,
18,20,20;154:2;
155:10,18,18;156:4;
158:21;161:15;162:5;
163:7;164:8;169:13;
174:1;178:6;182:19;
183:16;185:6,17;
186:1,19;189:17;
191:5;193:8;194:1;
195:5,6;196:12,12;
197:1;201:1,8;202:3,
7,11,22;203:6;205:4,
9;207:18;208:14;
209:4;210:19,21;
211:7,8,16;212:19;
214:21;215:9,11;
219:14,23;220:16;
224:14;225:1,12;
231:14;235:4;237:4;
241:19,25;244:24,25;
245:1,20;246:15,17,
23;250:18,24;252:9,
18,20,23,25;253:5,12;
254:5;257:4;258:7,
16;259:23;261:1;
262:1,5;265:12;
266:17,24;268:21;
269:6;270:23;271:5;
272:16;273:6,10;
276:18;279:22;
282:19,23;285:12;
294:15;297:7;298:10;
299:7;302:16;304:19,
21;316:9;318:12;
323:16;324:24;
326:12;329:1;336:12;
338:11,11;339:1,3;
343:16;346:21
**king (7)**
252:4,8;254:12;

267:23;268:7,24;
269:9
**kitchen (4)**
262:11;275:5;
282:12;298:21
**Kloess (3)**
63:15;64:4;210:14
**knew (7)**
92:11;117:11;
151:4;222:14;230:14;
244:7;270:24;304:7;
320:7,8,23;321:8;
322:4;332:7,8;336:2,
13
**knock (1)**
137:18
**knowing (2)**
33:8;105:21
**knowledge (3)**
106:1;107:12;
274:18
**known (5)**
165:10;248:2,3;
329:18;343:20
**knows (2)**
286:22;294:19
**knuckles (1)**
288:13
**KRA (3)**
69:24;184:19;327:4

## L

**LA (13)**
97:6,20,22;118:22,
25;123:15;142:12;
143:1,3;163:4,13;
164:11;200:12
**lack (1)**
242:24
**Ladies' (1)**
346:19
**lady (2)**
62:8,16
**laid (2)**
37:15;289:12
**Lampo (16)**
5:12;6:19,20;9:1;
10:6;12:23;13:23;
15:18,25;18:24;
101:2;114:8;282:25;
300:4;311:16;346:19
**Lampo's (1)**
114:10
**land (2)**
150:6;237:16
**landed (2)**
203:25,25
**lane (1)**
206:3
**Lara (88)**
52:4,7,7,23;53:20;
54:11;56:7;60:18;

61:10,15;63:13;
64:18;65:6;67:11;
70:3,12;71:3;73:4,6,
18,19;74:1;75:7;77:1,
22;78:5,12;80:5;
86:15;112:15;113:9;
138:19;172:19;
179:11;185:10;191:8,
20;194:10,18;197:10;
198:3,19;200:25;
201:9;204:12;205:8;
210:5;232:15;234:12;
236:2,7;239:24;
243:16;248:19,20;
256:3,4;268:25;
269:25;271:20;
272:16;273:24;
276:25;279:23;280:2;
286:10;287:24,24;
288:4,17,18;299:15;
314:21;316:19;317:8;
318:21;319:20;320:3;
326:10;330:11,12;
332:18;333:21;
334:18,19;337:21;
339:2;340:7
**large (3)**
45:11;279:10;
318:18
**larger (3)**
82:1;99:22;124:10
**lark (1)**
103:4
**Larry (26)**
63:13;68:18;80:5;
112:14;113:9;154:21,
21;162:5;164:5;
168:23,23;169:22,23,
23;170:21;172:19;
185:12;188:14;199:5,
5;200:23;203:11,11;
246:3,5;248:4
**Larry's (1)**
112:16
**last (24)**
8:18;11:2;14:14;
17:1,13,16;28:15,15;
39:22;40:1;83:17;
106:17;120:8;139:18,
24,25;140:7;183:8;
231:23;236:18;
310:21,23;347:8,15
**late (3)**
162:9;188:14;
289:12
**later (22)**
16:21;23:12,13;
59:20;63:25;131:8;
132:24;150:11;
158:14;222:1,2;
227:24;230:6;234:11;
253:14;265:18;
288:18;294:2;314:24;

325:11;331:1,14
**lateral (2)**
  144:5;146:10
**latest (1)**
  229:11
**launch (1)**
  259:16
**Lauren (1)**
  6:1
**Law (4)**
  245:19;270:17;
  306:19;308:12
**laws (5)**
  305:19,21;307:14,
  20;308:4
**lawsuit (8)**
  8:25;16:9;53:22;
  57:13;68:3;270:19;
  305:19;348:4
**lawsuits (3)**
  42:1;47:1,5
**lawyer (2)**
  305:23;306:16
**lawyers (1)**
  306:3
**laying (1)**
  195:14
**leader (9)**
  61:3;62:3;77:9;
  178:7;184:17;188:24;
  189:10,12;254:5
**leaders (3)**
  58:21;178:9,11
**leadership (8)**
  82:9;169:10;
  171:18;172:17;184:2;
  258:19;285:9;315:15
**leads (1)**
  62:6
**leak (1)**
  252:6
**leaked (3)**
  30:16;36:8;295:2
**leaking (1)**
  295:7
**leaning (1)**
  50:1
**Leans (2)**
  284:6;335:16
**learn (3)**
  166:19;252:20;
  286:2
**learned (7)**
  104:15;176:9;
  226:12;230:16;
  252:25;253:14;
  288:11
**least (13)**
  54:22;60:18;
  141:19;152:2;154:16,
  17;240:11;258:2,3,3;
  261:7,7;292:10
**leave (15)**

20:18;32:13;58:24;
61:5;62:18;80:2;94:9;
125:1;158:24;183:1;
212:13;249:21;
287:11;306:25;
308:11
**leaving (13)**
  44:6;60:22;61:8,12,
  16;62:21;82:25;
  125:5;162:9;209:3;
  221:24;271:6;284:17
**led (2)**
  32:14;333:1
**LeFevre (24)**
  52:4;62:5;63:14;
  73:20;76:3,16;77:5;
  80:6;133:20;167:24;
  171:11,12;179:6;
  191:3;201:4;219:16;
  232:15;277:6;289:8,
  21;302:2;304:10;
  314:17;340:8
**left (27)**
  8:20,21;37:18;
  43:20;46:6;47:24;
  48:1,9,23,24;50:12;
  55:2;59:25;62:7;
  67:10;71:14;83:15;
  87:10;99:11;126:1;
  128:9;130:3;173:15;
  209:6;231:17;234:16;
  247:14
**legal (1)**
  307:1
**legally (1)**
  299:5
**legit (1)**
  158:7
**legs (1)**
  202:4
**length (3)**
  213:2;247:1;252:3
**lengthy (1)**
  345:2
**Leo (1)**
  70:7
**Leslie (3)**
  5:20;6:16;51:6
**less (20)**
  61:23;88:22;126:9;
  130:16;161:18,20;
  163:6,8,16;164:15;
  168:24;170:17;
  201:18;234:22,23;
  242:22;253:3;257:17;
  315:11;343:7
**letter (20)**
  114:17,19;115:4;
  116:13;117:5;118:3;
  119:16,20;120:7;
  121:1;125:22;144:24;
  149:10;151:19,23,25;
  152:7;156:15;165:22,

22
**letterhead (1)**
  72:19
**letters (13)**
  39:2;99:25;114:21;
  115:2;117:8,25;
  141:8;147:19,21;
  150:1,7;152:19;
  164:20
**letting (2)**
  329:8;334:8
**level (2)**
  81:1;252:22
**levels (2)**
  252:10,23
**license (2)**
  7:14;268:6
**life (16)**
  46:19;74:14;
  116:18;168:15;196:3;
  197:23;207:17,21;
  242:21;246:25;
  249:25;250:1;279:9;
  285:24,25;326:16
**lifestyle (1)**
  81:16
**lifetime (1)**
  88:7
**lift (1)**
  212:22
**lifted (1)**
  271:7
**lifting (1)**
  213:13
**light (4)**
  45:23;46:21;
  275:18,21
**liked (2)**
  86:25;92:14
**likely (8)**
  18:3;39:23;127:23;
  130:25;131:2,10;
  177:5;216:3
**likenesses (1)**
  268:14
**likes (1)**
  97:10
**Lindsey (2)**
  198:20,20
**line (8)**
  39:18;79:1;81:21;
  200:19;201:7;245:21;
  258:16;287:4
**lined (2)**
  120:24;134:20
**lines (3)**
  249:3;269:11;345:4
**lining (1)**
  267:5
**link (1)**
  105:7
**linked (3)**
  160:13;346:17,23

**LinkedIn (2)**
  42:7;46:15
**links (1)**
  105:7
**list (16)**
  40:14;98:25;99:3;
  101:15;111:8;146:22;
  148:12;173:24;174:1,
  6,10;179:13;198:10;
  199:3;215:9;285:23
**listed (4)**
  40:11;41:17;
  101:14;181:22
**listen (17)**
  59:17;63:19;64:17;
  69:9;115:15;168:17;
  175:16;178:12;
  183:24;184:5;194:8;
  201:23;224:8;234:15;
  239:9;244:5;298:8
**listened (2)**
  115:14;117:10
**listener (1)**
  116:4
**listening (4)**
  55:9;115:9;206:11;
  211:22
**lister (3)**
  91:19,19,20
**listing (4)**
  42:9;46:8;116:14;
  173:17
**lists (1)**
  173:16
**literally (9)**
  164:10;174:20;
  195:18;231:2;246:20;
  249:15;252:14;
  316:12;332:12
**little (37)**
  10:13;12:4,4;30:4;
  41:23;42:9;49:23;
  65:22;73:24;82:7;
  85:20;128:24;134:2;
  135:20;163:9;185:17;
  194:19;206:2,9;
  208:6;212:16;217:11,
  15;220:3,7;221:20,
  21;222:8;240:20;
  250:25;253:14;
  298:20,23;316:2;
  318:14;320:22;332:4
**live (9)**
  8:9;26:18;85:11;
  93:3;98:25;118:6,6;
  162:23;163:2
**lived (3)**
  7:25;34:15;193:5
**lives (6)**
  94:2;112:9;156:7;
  165:25;264:12;
  267:22
**living (13)**

27:23;30:5;81:6,6;
88:17,17;93:11;
118:9;126:4;164:7;
189:8;193:5;253:10
**LLC (3)**
  5:13;282:25;311:10
**loaded (3)**
  53:12;66:18;165:2
**loan (2)**
  208:7;212:25;
  259:19
**loans (1)**
  319:11
**Local (11)**
  11:13;22:16,19,20;
  36:13;56:20,25;
  115:12;241:1;251:6,6
**located (1)**
  219:18
**location (1)**
  88:23
**locations (2)**
  97:22;98:7
**lock (1)**
  296:6
**long (35)**
  7:25;8:1;11:1,6;
  13:2;15:14;81:10;
  82:18;83:1;96:5;
  103:7;108:10;113:13,
  16;130:16;144:1;
  146:15;151:10;
  153:25;161:6;170:22;
  184:22;190:7;209:6;
  215:19;222:25;
  237:14;256:24;
  259:25;272:2;284:24;
  298:25;302:18;
  322:18;338:24
**longer (2)**
  183:11;313:8
**long-term (1)**
  93:20
**long-winded (1)**
  45:19
**look (49)**
  9:8;16:11;22:15;
  39:11,18;41:10;42:8;
  46:14;48:5;49:6;50:6;
  53:5,5,13,21;63:2,3;
  65:7;78:22;84:3,22;
  85:12;87:20;94:17;
  99:7;100:8;115:5;
  135:20;140:25;
  141:14;142:23;152:7;
  168:22;169:18;
  207:22;210:2;220:10;
  256:23;269:13;300:6;
  309:19;310:1,21;
  311:22;334:25;336:5,
  8,17,21
**looked (8)**
  32:6;37:12;69:7;

71:19;85:13;100:4;
162:5;296:7
**looking (27)**
29:6,7;43:16;46:16,
17;53:7;57:11;66:1;
67:7;69:2;70:21;
78:15;80:7;83:25;
84:4,25;86:8;94:5;
104:12;141:24;
155:12;158:13;
160:22;168:10;
184:17,25;345:4
**looks (9)**
79:21;89:13;111:4;
120:9,24;143:14;
144:20;310:8;311:19
**loop (4)**
38:13;223:11;
271:5;303:22
**loosely (1)**
32:3
**loosened (1)**
30:19
**Lopez (3)**
165:6,22;337:16
**Lopez's (1)**
177:24
**Lord (2)**
244:13;321:16
**lore (1)**
251:6
**Los (14)**
12:4;24:20;36:18;
81:9;85:2;88:9;93:11,
11;97:8,13;107:21;
114:21;115:19;
136:25
**lose (1)**
64:5
**losing (2)**
183:7;293:20
**losses (1)**
319:2
**lost (3)**
234:18,19;235:5
**lot (162)**
12:10;23:9;24:9,10;
25:3,3;27:19;28:2,2;
29:14,17,18;30:8,9,
15,20;34:9,10;35:3;
36:13,14;42:8,8,12;
43:5,6,7,8;45:12;
46:25;47:5;50:10;
51:20;53:17;55:10;
56:3,4,4;59:6;62:12;
65:24;66:2;68:8;
76:15;80:11,13,24;
81:19,23;82:13;
84:24;86:17;87:6,7,
10;89:12;91:25;
92:12;104:6;123:22;
124:21;130:6,16;
133:15;135:12;

139:10;143:16;144:5;
147:20,22;154:12;
155:17,22;156:25;
158:8;159:15;161:13,
18;162:6;163:1,25;
164:11,13,16,17,18;
166:12,17;167:19;
169:6;170:17;175:15;
176:3;179:18;182:14;
183:16,21;185:9;
187:3;189:18,20;
195:16,19;196:1;
197:10;198:15,22;
200:16,18;202:9;
203:18;204:14;
205:23;208:25;214:1,
5,19;221:5,6;226:13;
228:23;234:2;238:21;
240:14;241:7;242:22,
22;243:1,9;244:17,
18;247:2,2;249:9;
250:14;255:2;259:9;
264:24;271:11,15;
272:12;278:17,17;
280:1,9;293:6;297:5,
5,5,6;308:18;313:18;
316:24;317:24;318:8;
319:12,13;320:21;
331:8;334:1;339:9;
343:7
**lots (25)**
29:2;51:19;56:1;
67:2,6;90:3;97:10;
105:6;129:14,16;
133:6;145:13,17,19,
20;156:23;181:7;
183:4;194:1;207:23;
270:21,22;273:9,18;
279:12
**louder (1)**
85:22
**love (2)**
32:10;77:25
**loves (3)**
73:2;259:23,25
**low (3)**
153:22;187:11;
266:23
**lower (6)**
158:21;163:21,21;
252:10,21;291:9
**low-key (2)**
156:1;162:14
**loyalty (1)**
59:22
**Loyola (1)**
145:15
**Luke (81)**
52:3;62:5;63:14;
73:20;76:3,16;77:5,
22;80:6;113:10;
133:19;134:25;
135:17,17;138:7,19;

167:24;171:10,11;
172:16;175:16;179:6;
180:16;181:10;191:3;
199:5;201:4;204:12;
219:16,21;220:16;
221:12;222:18;
232:15,17;233:3,8,25;
234:6;236:6;237:6;
242:9,10;246:3,8,8,
11;247:7;248:4;
256:5,6;257:15,23;
272:15;277:6;279:14;
286:12;287:25;289:8,
21,24;294:1;302:2;
304:10;314:17;
315:11;319:20;320:2,
13;324:5;326:1;
327:21;328:20;
329:23;330:3;333:20;
334:3;336:21;338:21;
340:8,21
**Luke's (1)**
238:14
**lunch (6)**
86:18;91:11;
150:13,21;284:13;
287:4
**luncheons (1)**
127:15
**lunches (2)**
87:24;91:20
**lunchroom (1)**
286:24
**lure (1)**
82:24
**Luther (4)**
267:23;268:24;
269:9,9
**lying (1)**
332:15

# M

**ma'am (7)**
10:15;13:22;15:7;
28:24;58:8;322:3,11
**Macintosh (2)**
214:17,19
**Mack (2)**
191:17;204:23
**mad (1)**
335:16
**Maddie (1)**
206:7
**Maga (1)**
174:7
**mail (1)**
16:25
**mailed (1)**
104:5
**main (3)**
293:10;296:21,22
**major (6)**

21:7,7;132:17;
188:18;266:20;
318:17
**makes (2)**
93:17;294:9
**making (24)**
30:13;82:11,14,19;
84:9;126:18,18,21;
162:8;163:8,22;
168:14;169:6;171:2;
173:25;184:15;
196:11;238:18;239:1;
255:10;295:8,9;
317:5;319:19
**Malian (1)**
36:10
**man (15)**
98:21;130:4;
144:11;212:9;216:17;
220:22;240:20;
246:17;247:3;250:17;
277:16;315:13;
321:17;334:12,13
**Management (10)**
166:5;167:5,11,14;
168:4;171:11;173:3;
174:5;176:8;177:20
**Management's (1)**
174:7
**managers (1)**
199:24
**managing (1)**
87:14
**mandate (1)**
299:17
**mandatory (17)**
193:21;194:13;
288:14,16,20,23;
289:2,4,8,8,15,22;
290:7,12;295:23;
296:16;323:1
**mantra (3)**
59:2;164:12;184:9
**mantras (1)**
47:12
**many (38)**
18:23;23:19;24:13,
15;25:10,14,15,19;
26:11,14;66:3;98:15;
104:17;112:22;113:2,
2;118:3;143:18;
144:7;147:4;177:17;
183:20;187:14;
190:25;192:6,8,8;
210:8;212:3;215:17;
240:12;244:4;264:22;
271:17;291:11,20;
337:15,23
**March (28)**
16:25;17:2,5,23;
18:12;19:5;44:5,6;
51:14;54:9,16;56:2;
71:1;75:7;191:3;

218:1;227:2;230:14;
236:16,18;238:7;
293:2,3;294:17,23;
295:20;302:8;323:18
**Margaret (3)**
63:15;64:4;210:14
**Maria (6)**
179:12;187:3;
210:13,13;286:22;
298:1
**Mark (25)**
14:13,25;20:10;
39:8;41:2,12;42:17,
21;113:20;119:3;
121:22;152:18,21;
283:1;301:11;311:25;
312:10;323:19;325:6;
342:6,17;343:24;
344:23;346:6;347:2
**Marked (17)**
20:15;41:14;78:22;
113:21;119:4;121:25;
152:16;153:1;283:3;
301:23;313:1;325:13;
342:8;344:3,24;
346:8;347:3
**marketable (1)**
205:1
**marketing (5)**
21:6,9;24:17;37:25;
38:8
**marks (1)**
69:21
**marriage (6)**
75:19;76:9;77:3;
78:8;243:9;277:5
**Marriott (5)**
45:16;57:13;
270:11,12;318:17
**Martin (4)**
267:23;268:24;
269:9,9
**Marvel (1)**
259:23
**Marymount (1)**
145:16
**mask (8)**
224:1;295:25;
296:1,4,23;297:1,7;
317:11
**masked (1)**
299:19
**masking (2)**
295:25;297:20
**masks (12)**
9:7;270:14,16;
271:2,7,22;295:22;
296:2,24;315:24,25;
317:1
**massive (8)**
25:2;133:4;176:12,
15;231:16;319:2;
336:22;343:15

**massively (1)**
215:19
**master's (1)**
145:15
**match (1)**
32:13
**matching (1)**
32:15
**material (8)**
32:6;44:21;88:13;
135:16;155:19;186:4;
200:18;212:24
**materials (1)**
204:17
**matter (3)**
93:19;226:3;267:22
**maximizing (1)**
88:1
**may (38)**
8:12;12:1;22:15;
39:6;56:15;57:7;
61:24;64:13;99:1;
102:16;110:21;
111:20,23;118:2,21;
119:17,24;120:2,3;
121:15,17;156:16;
157:23;158:17,18;
177:10;223:23;234:1;
240:13;247:17;
274:20;276:11;277:6;
310:12;321:20;
347:20;348:10,10
**Maybe (76)**
8:8;20:6;34:2,17;
40:21;42:13;57:3;
59:13,16,17,19;72:6;
76:18;84:20;85:9;
94:13;96:6;98:5,22;
99:2,4,5;100:3;
101:10;102:19,21;
103:10;104:25;
118:23;121:12,16;
125:9,9;143:14;
146:25;147:1,12;
159:8;173:6,11;
176:22;179:7,7;
183:21;197:20,21;
200:10;225:23;237:8;
238:14;244:14;
251:10;261:11;
280:20;282:12;285:2,
2;286:4;287:25;
299:16;302:24;303:1,
3;304:7,16;305:13,
13;317:6,8,8;318:13;
320:24;322:20;
324:19;342:1;343:17
**mean (146)**
8:6;11:19;23:21,21;
25:14,15,16,17,18;
30:11;34:18;35:1;
36:15;39:6;43:4;44:4;
47:20,21,25;50:11;

52:5;53:25;55:18;
60:5;61:2;64:1;67:24;
72:25;76:14;78:13,
13;82:12;89:25;
90:13;92:15;98:5,15;
101:25;105:5;108:2;
112:3;119:24;121:14;
122:9;123:19;125:4,
20;135:4;136:16;
139:11;144:10;145:9;
147:18,18;148:4,16,
19;149:4,5,18;
151:19;153:24;
161:19;162:25;
164:18;165:8,18;
168:13;169:20;171:4,
20;172:14;173:7,14;
176:9;179:11,12;
180:17;182:14;
184:16;188:6;192:8;
195:17;198:8,9,22;
200:1;205:11;211:3;
215:23;220:13,23;
221:1,4;223:1,23;
228:12;230:18;231:4;
234:15;238:5,14,20;
240:13;242:8;243:15,
18;244:5;247:7;
251:12,22;257:8,24;
258:2;259:9,12;
261:15;273:13;274:1,
20,22;276:13;280:19;
281:13;286:20,22;
287:5;297:8,14;
302:19;308:7;314:4;
316:19;318:16;
319:12;320:2;321:14,
22;329:5;334:17;
336:16,17,20,21;
341:12;343:9
**means (11)**
14:4;53:16;67:15;
91:5;108:13;128:22;
176:6;203:23;237:9;
330:19;341:7
**meant (6)**
64:9;112:6;126:14;
238:16;313:22;
323:25
**measure (1)**
21:6
**meat (3)**
184:8;207:3;209:18
**media (6)**
21:5;28:3;36:2;
41:25;168:9;290:23
**medical (4)**
95:2;287:17,20;
303:23
**medication (1)**
9:22
**meet (8)**
34:2;162:2;163:25;

169:7;225:9;254:9;
276:14;319:11
**meeting (65)**
6:24;44:17;45:3;
48:7;56:14;58:2,4,7;
60:10;61:10;64:19;
65:3;66:18;68:19;
76:17;77:6;91:11;
113:4,10;162:1;
166:15;171:16;
174:16;175:8;180:4,
4,21,22;195:13,18;
197:21;200:2;207:6;
210:1;218:9;219:2;
220:21;232:7,10;
240:12;244:18;
245:24;249:16;
252:25;253:1;265:10;
267:9;276:3;294:16;
320:18;327:20;330:2,
8,10;331:1;332:18,22,
24;333:1,19;335:8;
341:2,12,16;342:1
**meetings (120)**
43:6;44:3,14,15;
45:5;51:23;52:3,6,23;
54:11,14,16;56:16;
57:20;59:7;60:6,8,11,
11,13,13,16,17;61:11,
18;65:10,12;68:8;
71:3,12,17;74:2;75:7;
77:21;78:6,16,17;
80:4;90:2;113:2,5;
171:20,22,25;172:3,8;
174:23;176:12;
181:12;191:8,19;
195:19;198:2,4,8;
201:22;203:13;205:9,
10,13,17,18,18;207:8;
236:3,5;240:7,10,12,
16;243:6,7;244:5;
246:4;247:6;248:21,
21;249:6,7;252:2;
266:19,19;270:21;
272:14,17;277:1,2;
279:13,23;280:20,23;
281:19;286:13;288:4;
289:15;291:25;292:3;
295:3,8,12,23;296:14;
297:21;299:19;
316:20;317:2,12;
318:20,21;330:11,17;
332:10;334:2;339:1;
340:15,16;342:2;
343:12,13,15
**Melissa (3)**
300:16;303:12;
333:3
**member (8)**
11:11;137:11;
145:5;171:18;185:24;
232:15;233:8;320:2
**members (11)**

55:2;60:25;74:22,
25;154:22;172:17,18;
201:7;252:12;254:25;
268:20
**memorable (1)**
7:5
**memory (1)**
73:25
**memos (4)**
278:5;285:13,14,14
**mention (8)**
44:10;57:19;65:6;
221:22;226:1;266:8;
284:3;293:23
**mentioned (42)**
25:11;27:6;28:25;
38:23;41:2,4;44:9;
56:18;63:12,12,13,14,
14,15,16,16;77:5;
84:1;93:24;96:9;97:6;
103:18;109:9;128:11;
147:2;156:16;164:7;
176:22;189:15;
201:13;207:2;212:2;
217:22;221:23;228:5;
245:7;250:16;251:18;
263:13;285:13;
314:21;340:23
**mentioning (1)**
285:1
**mentor (3)**
182:17;204:18,22
**mentoring (3)**
80:24;182:17;
191:17
**merits (1)**
306:19
**message (5)**
166:1;241:23;
323:17,24,25
**messages (4)**
107:8,10;174:2;
257:20
**messaging (1)**
181:4
**met (3)**
6:21;246:8;261:17
**microphone (1)**
178:6
**Middle (12)**
5:10;17:3;25:20;
115:10,12;117:13;
134:20;225:9;269:10;
333:6,9;348:6
**miffed (4)**
217:15;221:21;
227:14;230:15
**might (51)**
6:23;9:23;15:20;
19:2,4;25:8;38:14;
41:1;61:12;82:17;
84:19;94:6;95:5;
101:23;102:19,24;

103:2,23;105:2,3;
111:15;118:2;131:5,
8;138:18;146:24;
149:2;151:23;154:17;
156:21;157:3;158:4;
177:7;182:9;189:4;
218:10,18;227:1;
231:17;236:16;
262:13;265:19;270:1;
276:25;287:17;
304:20;316:6,25;
317:10,11;322:20
**miles (3)**
27:21;28:7;36:11;
118:7;136:25;277:24;
329:19
**million (4)**
82:19;126:22;
234:16;332:5
**millions (1)**
268:12
**mind (2)**
86:2;242:5
**minds (2)**
293:20;318:14
**mind-set (2)**
279:15;304:8
**mine (2)**
265:18;321:22
**minimize (1)**
255:6
**minor (1)**
160:11
**minors (1)**
160:15
**minute (9)**
13:3;16:15;39:11;
51:12;109:19;183:8;
199:18;301:16;330:1
**minutes (3)**
83:4;139:16;249:15
**mischaracterize (1)**
76:4
**miss (5)**
162:6;215:1;238:4;
280:24;281:4
**missed (26)**
221:14,20,25;
222:4;225:14,14,21;
226:20;228:6,6;
230:16,19;232:24;
236:11;238:6,21;
239:2,13;249:2,3,4;
265:9,18;281:5;
340:23;341:23
**missing (2)**
226:24;277:19
**mission (2)**
241:6;332:10
**missional (2)**
156:3,6
**mistake (6)**
331:2,4,5;332:3,7;

Case 3:21-cv-00923   Document 65-1   Filed 01/19/23   Page 371 of 389 PageID #: 2081

335:23
**misunderstood (2)**
90:6;96:14
**mitigated (1)**
258:12
**mitigation (1)**
298:20
**mixed (1)**
56:17
**mixing (1)**
327:17
**Mocean (32)**
10:22,23;11:1,23;
12:19,19,20,24;13:4,
16;14:23;20:24;
21:18;22:25;23:1,7,8,
15;31:7,11;32:1,13,
13;79:1,6,15,17;
150:7;311:13,18,20;
312:7
**M-O-C-E-A-N (1)**
10:23
**Mocean's (1)**
23:5
**mocked (1)**
295:15
**model (3)**
35:6,6;185:18
**mold (1)**
185:1
**mom (6)**
85:7;117:1,22;
118:17;125:7;189:8
**moment (9)**
115:6;175:23;
208:14;211:7,8,17;
221:11;263:5;335:21
**mom's (2)**
94:12;123:4
**Mon (1)**
285:20
**Monday (10)**
5:14;44:16,25;
52:22;54:9,16;218:9;
324:20;333:4,13
**money (11)**
15:24;77:18;
125:12;137:13,15,16;
155:23;164:15;210:3;
291:5,7
**moniker (1)**
168:6
**Monster (2)**
105:2;158:5
**month (8)**
11:8;32:9;54:22;
193:16,17;225:25;
234:11;281:15
**months (8)**
8:2;11:7;15:21;
85:24;151:20;216:3;
231:5;339:2
**mooted (4)**

99:2;125:5;175:6;
200:4
**mooting (1)**
116:24
**moral (1)**
246:13
**more (82)**
23:11,13;32:7,12;
34:10;54:22;55:19;
82:4;88:22;94:7;97:3;
111:24;118:1;124:18,
19;125:12;126:9;
127:14,15;130:6;
146:4;148:22;149:9;
154:3;155:25;161:13,
16,20;162:15,21;
163:2;164:16,17,18;
169:11,12;185:2,7,8,
18;187:16;188:17;
189:12;195:22;202:8,
9;203:6,13;204:25;
205:1,4;206:1,2,10;
207:4,16;224:5;
229:8;234:24;241:14,
14,15,15,15,15;
242:22;253:1,15;
259:14;295:3;301:25;
304:17;310:12;
315:12;320:14,23;
321:23,23;331:12;
332:15;343:22;345:9
**morning (6)**
151:1,3;188:20;
189:6,7;254:4
**most (27)**
11:3;24:15;25:18;
26:5;29:16;42:13;
44:4;51:16;53:19;
75:17;76:4;97:24;
102:15;109:10;
141:25;149:15;
168:21;193:23;201:3,
10;207:20;228:5;
245:13;282:16;305:7;
310:12;324:14
**mostly (7)**
32:3;44:3;53:3;
86:15;189:20;194:24;
219:13
**mother (2)**
93:24;95:25
**motion (7)**
21:4;25:20,23;28:2;
30:19;37:2;79:6
**motivational (1)**
240:25
**mouth (2)**
78:11;316:25
**move (62)**
17:10,12;18:25;
27:19;28:3;30:5;
80:12,23;82:10;85:9;
93:15;108:18;112:12;

116:22;117:2;123:5;
125:9,20;132:24;
134:14,19;136:5;
138:20;156:7,11,21;
159:3;160:24;161:8;
162:22;169:9,12;
184:2;188:15,16;
189:20;200:10;
202:20,20,22;203:18;
204:25;209:21,24;
210:19,20;216:12,19;
217:2;219:9;226:16;
236:21,23,24;237:21;
265:2;278:21;282:23;
296:7;318:18;329:19;
339:21
**moved (31)**
8:1,18;17:6,8,11,
17;27:9;28:16;33:23;
34:4;111:23;124:9,9;
131:13;134:5,22;
139:14,24;163:1;
164:10;168:24;
170:22;216:8;234:19;
236:19,19;261:8;
271:5,8;328:18;
346:19
**move-in (3)**
216:12,19;217:1
**moves (1)**
111:14
**movie (5)**
24:12;36:10;
185:23,25;200:15
**movies (7)**
21:10;24:14;30:15;
36:2;215:20;238:22;
259:23
**moving (42)**
19:25;27:11,11;
28:15;29:21;32:4;
33:22;34:7;38:10;
82:25;86:23;113:15;
116:15,21;117:21;
118:5,14;120:11,16,
18,21;122:19;123:2;
125:16,17;130:7;
133:14;148:4;156:23;
157:2;159:8;161:14;
170:25;189:18;
190:11;210:22;216:8;
232:4;235:13;267:1;
315:9;332:21
**MPAA (1)**
30:18
**MTSU (3)**
84:24;96:9;101:16
**much (59)**
19:22;24:9;30:22;
40:2,23;42:11;43:12,
14,23;47:22,25;49:9;
57:11;63:25,25;
65:23,25;75:21;81:6,

14;82:14;86:19;
92:15;93:9,10;125:8;
128:5;148:19;155:24;
156:1;158:14;162:21;
163:6,16,21,22,23;
164:7;181:6;186:11;
195:9,10;203:13;
224:3;237:7;238:16,
25;251:23;254:8;
255:14;258:16;265:2;
275:12;295:10;
314:24;315:5;321:22;
343:4,16
**multiple (8)**
47:2;49:3;74:11;
143:22;171:8;209:20;
269:12;305:10
**mused (1)**
248:18
**museum (3)**
207:17;262:3;281:1
**music (4)**
24:8;202:10;
268:13;273:9
**musings (1)**
44:22
**Muslim (1)**
244:23
**must (9)**
47:13;84:15;96:24;
121:3,5,10;164:13;
187:2;268:4
**myself (8)**
127:10;146:7;
160:17;185:20;
299:20;317:4;318:4;
338:2

**N**

**name (27)**
5:1;6:11,15,15;
7:12;22:12;27:7;
34:14;38:22;44:10;
48:5;49:2;50:5,20,22;
51:1;66:15;117:17;
138:1;171:16;177:25;
196:14;203:21,23;
276:15;290:5;298:1
**named (1)**
153:4
**names (6)**
7:13;86:20;160:11;
198:23;211:4;290:6
**Nash (1)**
319:14
**Nashville (26)**
5:3,6,10,17;27:10;
37:24;38:10;57:15;
72:18,22;85:10;
92:18;98:22,24;
162:20;163:1;164:22;
165:24;166:3,8,19,22;

14;82:14;86:19;
92:15;93:9,10;125:8;
167:8;168:7,21;
319:14
**nasty (1)**
338:25
**nation (1)**
255:5
**national (1)**
108:3
**nauseam (1)**
279:15
**near (1)**
112:9
**nearby (1)**
28:6;35:4
**necessarily (7)**
42:13;46:11;50:10;
55:10;128:25;244:16;
325:21
**necessary (4)**
100:11;159:21;
223:14;317:20
**necessitated (1)**
28:10
**need (113)**
22:15;25:23;28:5;
46:22;53:14;69:12;
87:24,25;88:13;92:4;
116:9;132:16;133:21,
22;136:2,2,10,12;
137:11;143:7;146:18,
20;147:6,21;148:21;
153:23;154:3,7,9,15;
168:1,2;172:5,10,21;
175:20,21;176:15;
179:20;181:7;189:1,
2;190:10;193:19,21;
196:6,9,9;203:3,17,
17,19;206:24;209:15,
16;216:16;217:14;
220:3,9,13,14,14;
221:4,6,7;223:8,12;
226:17;231:10,19;
232:4;235:18,20;
236:3,4;237:8,8;
241:22,22;242:10;
250:17;279:22,24;
280:4,5,6,16;281:7,
10;283:13;288:20;
291:17,17;293:19,22;
294:3;296:25;297:1;
303:3;315:7,8,9,10;
316:4,5;317:15;
321:5;326:13,13;
328:3;340:25;343:1;
347:15
**needed (27)**
25:25;35:19;71:12;
95:13;118:2;133:7;
154:3;191:7,11;
194:5,5,6;213:16;
215:14,14,15;225:23;
233:19;256:23;
269:12,12,17;280:10;

292:6,24;327:23;
340:21
**needs (7)**
83:3;189:14;219:7;
270:25;279:20;280:6;
308:21
**negate (1)**
169:15
**negative (6)**
52:16;53:6;66:4,21;
68:9;70:9
**negotiable (1)**
158:24
**neighborhood (1)**
137:2
**Neil (2)**
138:2;182:22
**Neither (1)**
12:3
**Netflix (2)**
21:8;129:15
**network (1)**
93:5
**networked (1)**
92:17
**new (28)**
30:21;36:10;37:19;
48:2,12;80:8;90:22;
124:16;155:13;178:4;
206:15,24;210:20;
212:18;213:17;216:8;
223:20;224:10;225:2;
229:5,8,9,10,11,12;
264:1;297:25;327:25
**newer (1)**
41:5
**news (7)**
41:25;45:12;57:17;
64:23;144:11;220:7;
270:20
**newspaper (1)**
337:19
**newspapers (1)**
64:24
**next (46)**
39:7;41:12;113:20;
119:3;121:23;142:10,
19;143:13;146:11;
152:12;199:21;
200:19;202:21;
217:13,18;221:2;
223:3;224:21;225:22;
232:7;236:25;237:11,
12;242:6;250:1;
272:4,10;273:2;
283:2;293:4;299:9;
301:11;303:5;311:23;
312:21;323:19;324:5;
325:7;339:16;342:6,
18;343:24;344:17,21;
346:6;347:2
**nibbles (1)**
94:20

**nice (4)**
95:8;122:22;241:5;
328:24
**night (2)**
253:9;324:15
**nightmare (1)**
134:3
**nine (5)**
87:17;134:21;
137:17;235:6;267:6
**ninety (5)**
113:16,17;263:4,
14;275:23
**ninety-day (15)**
69:24;89:25;
189:15;262:23;
264:17,18;265:9,11;
275:6;327:8;328:7,
18;329:3,11,12
**Nobody (8)**
24:5;123:20;
125:22;226:23;
282:21;295:24;
297:14;298:8
**nodding (1)**
247:2
**nods (1)**
219:23
**non (1)**
176:1
**none (2)**
253:4;343:15
**nonstressed (1)**
168:18
**Nope (1)**
70:19
**nor (1)**
178:25
**normal (3)**
98:14;206:10;
207:10
**normally (3)**
124:24;207:14;
331:12
**nose (3)**
64:25;170:23;285:6
**noted (2)**
101:4;173:13
**notes (5)**
129:12,12;158:13;
225:10;231:13
**notice (3)**
42:7;269:18;297:4
**noticed (3)**
34:9;50:1;51:16
**notices (1)**
166:14
**November (7)**
77:21;139:12,14;
193:12,16;210:1;
277:8
**nowadays (1)**
23:2

**number (10)**
114:2;143:1,3;
158:22;181:21;
309:15;310:24;311:6;
323:15,18
**numbers (5)**
21:25;61:22;134:2;
142:21;266:22
**NXIVM (1)**
42:22

**O**

**oath (4)**
9:19;83:14;150:22;
245:20
**object (2)**
244:2;306:12
**objected (1)**
244:1
**Objection (9)**
100:23;101:3;
105:17,23;106:12;
226:15;305:22;307:5,
15
**objections (5)**
106:23,23;299:23,
24;304:8
**obvious (1)**
341:6
**obviously (15)**
7:5;18:16;42:14;
88:12;90:4;114:10;
122:10;132:16;
173:20;208:25;210:4;
235:17;262:7;279:10;
283:14
**occasionally (4)**
84:2;92:1;93:9;
258:16
**O'Connor (2)**
44:8;57:13
**October (4)**
77:21;213:25;
277:14,14
**odd (12)**
64:8;78:16;133:3;
154:16;173:1;188:8;
201:5;224:20;225:25;
279:7;282:14;324:9
**oddly (1)**
35:13
**oddness (1)**
76:15
**of- (1)**
186:20
**off (37)**
20:9;37:15;49:5,18;
50:24;51:3;52:16;
82:16;83:6;124:15;
135:24;140:14;142:3;
150:14;178:11;
189:20;197:16;199:8;

212:18;229:21;
231:17;233:20;235:9;
241:9;249:15;277:25;
302:25;308:23;310:7;
317:16;337:2,10;
338:15,17;340:24;
348:13,20
**off-color (1)**
174:24
**offender (1)**
9:10
**offense (1)**
113:8
**offer (15)**
27:3;29:20;32:24,
25;97:17;102:4;
126:8,9;127:5,17;
150:1,7;157:2;159:3;
301:14
**offered (14)**
32:1,12;66:14;
124:7;136:13;159:2;
160:5;161:7;224:7;
300:7;302:1,12,13,15
**offering (7)**
125:12,25;126:2,
15;130:8;155:24;
161:11
**offers (5)**
33:25;102:2;
123:15,16;279:4
**office (12)**
19:19;49:1;135:17;
277:13;278:3;298:25;
299:9,25;303:11,12,
25;317:19
**offices (1)**
15:16
**official (1)**
210:16
**often (7)**
54:20;87:2;88:24;
109:10;190:25;192:6;
258:1
**oil (3)**
252:5;254:11,12
**Oksana (1)**
178:1
**old (6)**
66:6,20;108:21;
128:24;175:5;329:6
**older (3)**
41:1,6,9
**onboarded (5)**
71:11;210:18;
264:25;281:10;
341:24
**onboarding (6)**
63:15;64:5;261:17;
262:1;275:2;280:24
**once (18)**
6:24;19:6;30:25;
37:12;51:23;63:16;

72:25;98:15;112:24,
25;164:9;192:11;
197:11;248:25;
266:10;296:17;
323:22;340:14
**one (208)**
13:18;14:25;15:4;
16:15,21;19:3;23:7;
25:11;26:10;27:3;
37:19;40:25;41:5,6;
42:10,24;45:6;47:23;
49:3,4,5,11,14;54:17;
55:1;56:11;58:23;
59:8,24;62:12;63:20;
66:6;67:6,8;68:15;
72:24;73:6;74:2;76:6;
84:20;85:15;86:1;
87:6;89:5,16;92:2;
93:16;95:5;102:25;
104:13,19;108:2,4;
109:10,12;110:7;
113:7,11;115:3;
118:1,2;120:8;123:2;
125:14;129:22,25;
131:5,8;132:2;
133:19;134:13,13;
136:21,23,24;138:2;
142:7,10,15,19;
143:12,13;144:8,12,
12,17,17;147:4,4;
148:4;149:13;152:16,
18;153:12,18;154:17,
18;155:11;157:22,25;
164:25;165:10,23,25;
166:4;168:3,5,8;
169:16;171:19;
174:23;180:16;
181:10,15,15;183:18;
187:9;188:23;193:3;
195:2,20;197:5,8;
198:9,12;201:3,6,9,
25;204:5,5;206:13;
207:12,25,25;208:8;
210:17;211:12;
212:24;213:10;215:3,
25;223:24;229:11;
236:10,13,19;239:12;
242:8,17;246:23;
247:10,15;248:3;
251:25;253:23;
254:11;257:22;258:4;
261:11;262:8;264:7;
266:21;267:2;269:13;
271:12;275:19;
279:10;282:11,12,18;
286:11,23;287:6;
289:11,12;290:15,16;
291:6;292:5,8,10,25;
294:18,19;295:11;
300:2,20;305:17;
308:14;309:7;310:22;
311:6,22,23,23,25;
312:10;317:1;323:5;

325:25;330:10;
331:14;335:23;
337:17;341:25;
342:24;345:9
**O'Neal (1)**
208:3
**one-one-one (1)**
60:17
**one-on-one (8)**
52:6;74:2;129:2;
135:15,15;150:10;
207:5;281:19
**one-on-ones (6)**
56:7;135:9;204:6;
205:8;287:13;339:1
**ones (12)**
29:1,2;49:3;75:17;
97:6,9,24;102:8;
118:4;167:19;197:8;
254:11
**one-to-three (1)**
178:10
**one-week (1)**
299:7
**one-year (1)**
14:20
**ongoing (3)**
192:2;213:2;248:15
**online (25)**
23:2;34:2;36:8;
47:22;48:5;50:13;
53:5,6,8;57:9,10;
66:2;103:24;114:18,
24,25;116:7;147:24;
149:8,16,17;206:18;
343:13,15;345:22
**only (44)**
8:19;14:11,15;15:1;
19:5;35:17;41:3;
59:13;66:21;82:8;
102:4;113:7;127:17;
139:16;161:21,22;
164:25;168:20;
169:16,19;182:14;
198:13;199:6;201:23,
24;205:6;206:4;
212:5;224:2;236:7;
237:16;242:6;251:12;
264:7,8;273:11;
281:14;283:25;
296:23;311:5;317:17;
327:20;333:7;340:7
**onto (1)**
252:6
**Ooh (2)**
8:1;11:6
**open (12)**
15:16;38:6,18;80:8,
21;158:24;206:15,17,
20,24,24;213:17
**open-air (1)**
176:6
**opened (3)**

219:10;298:21,24
**opening (5)**
117:6;131:1;144:3;
155:13;157:6
**operate (1)**
292:8
**opinion (10)**
52:10,11;54:4,5,7;
73:13;75:10,12;76:8;
77:2
**opinions (2)**
78:18;301:5
**opportunities (4)**
34:8;125:13;
201:15;204:8
**opportunity (7)**
27:22;29:19;80:7;
201:18;282:9;300:8;
348:11
**opposed (1)**
124:24
**Opryland (1)**
213:23
**opted (1)**
134:23
**option (9)**
94:8;117:21;
120:14;125:9;127:10;
222:22;289:23;302:1;
324:11
**optional (1)**
289:16
**options (1)**
34:23
**Orange (2)**
270:12;286:4
**orchestrate (1)**
130:11
**order (7)**
142:5,17;223:6;
285:12;312:25;
320:23;325:3
**orders (3)**
293:5,6;295:15
**ordinance (1)**
270:14
**ordinances (2)**
293:7;308:3
**organize (4)**
185:15;186:21;
229:13;290:23
**organized (2)**
154:11;185:23
**orientation (4)**
207:6,8;210:14;
282:8
**original (3)**
17:20;221:13;
262:24
**Originally (8)**
15:11;19:4;35:6;
161:9;225:7;245:14;
270:13;277:13

**others (13)**
24:25;77:22;85:4;
98:1;101:17,22;
147:10;172:20;
185:21;212:1;244:9;
246:18;274:20
**Otherwise (1)**
242:1
**ours (1)**
219:20
**out (213)**
8:16,18;11:17;12:4;
15:18;18:22,25;
23:25;24:23,24;
26:19;31:24;34:20,
20;35:20;36:6,7;
37:14,20;38:20;
41:24;43:17;44:21;
47:4;50:6,20;53:11,
15;54:3;55:14,22;
57:14;58:21;59:1,5,
12,15;61:14;64:11;
65:19,24;72:16;
76:21,22;77:17;80:7,
17;82:24;84:3,23;
85:4,13,16,18;86:5,6,
13,24,25;87:3,21;
88:1,1;92:12;94:14;
96:6;98:16,17;102:8,
11,11,14,17;103:19,
20;104:14;107:3;
108:19;109:13;110:7;
112:8;116:25;117:25;
119:1;123:3,9,15,19;
125:14,22;126:17;
133:21,21;134:5;
138:14;139:12,14;
142:17;144:1,12;
146:14;148:5,18,22,
24;149:14;151:5;
153:12,22;154:19;
156:7;158:8,21;
163:1,5,23,24;164:1;
167:10;170:12;172:1;
173:16,17,18;174:18;
175:7;180:1,2;181:5;
183:5;184:7;188:15;
189:10,11;190:11;
193:7;195:14,20;
196:2;197:14;198:14,
15;206:19;207:20,20;
208:16;209:17;
211:19;212:9,11,14;
215:7;216:25;217:25;
220:8,11;223:2;
231:8;235:6;236:2,
19;237:18;239:1;
240:25;241:7;245:5,
14;247:14,21,22;
249:8;253:10;262:18;
263:7,9;264:4;265:2,
15;269:20;270:11,17;
271:12;272:8;277:22;

278:4;282:9;283:19;
285:20,21;286:12,25;
287:9,23;293:19;
294:25;300:20;
302:16;305:11;
310:17;315:17;
317:24;319:5,8,9;
321:2;324:9;327:13,
18;328:25;329:7,20;
331:14;333:8
**outlook (2)**
72:3;232:9
**out-of-debt (1)**
193:1
**outpouring (1)**
211:15
**outside (3)**
64:2;188:4;206:10
**outstanding (1)**
347:7
**ovation (4)**
58:10;267:4;270:7;
272:8
**ovations (1)**
55:17
**over (40)**
9:5;17:25;18:1;
23:19;28:7;38:11;
57:1;70:2;84:25;
89:20,21,22;99:23;
127:10;128:14;
134:22;137:5;162:8;
175:21;190:14,15,22;
191:1;205:13;207:13;
223:18;232:22;
233:24;234:20;
253:11;280:11;282:7;
293:8;300:15,16;
318:1;334:21,23;
335:1;338:1
**overlap (1)**
18:18
**overt (1)**
172:15
**overtime (10)**
21:13;22:5,7;
126:19,20;127:3;
161:23;162:3;215:5;
217:8
**overview (1)**
282:15
**own (17)**
8:3,4,8;21:6;
116:17;140:1;156:22;
159:7;160:19;164:23;
165:11;172:18;
182:20;252:16;257:2;
262:22;299:22
**owned (2)**
131:14;319:9
**owner (1)**
252:8
**owns (1)**

8:6

## P

**packages (1)**
97:18
**packed (5)**
265:22;271:19;
293:9;295:24;296:21
**page (8)**
16:12;17:3;20:9;
184:23;310:23;322:2;
346:15,17
**pages (4)**
197:10;240:11;
309:11,13
**paid (17)**
18:21;19:1;21:19;
22:1,24;52:15;
159:11,13;161:2;
189:22;190:17;207:4;
209:2;218:19;268:20;
331:12,14
**paint (1)**
63:21
**painting (1)**
193:25
**pandemic (4)**
24:4,14;144:3;
333:7
**pandemics (1)**
25:18
**panicking (1)**
220:6
**pantries (1)**
193:23
**paper (1)**
174:2
**papers (1)**
240:15
**paperwork (1)**
328:13
**paragraph (2)**
115:6;116:12
**paragraphs (1)**
144:25
**Park (7)**
32:11;85:4;97:16;
123:24;125:13;127:6,
19
**parking (1)**
65:24
**part (27)**
19:1;22:20;60:24;
82:23;84:1;96:6;
105:1;116:20;117:9;
137:14;153:8;162:7;
165:8;166:2,4,7,17;
180:18;203:5;263:18;
264:5,6;265:12;
267:10,17,24;312:16
**participate (1)**
166:18

particular (10)
16:24;58:16;64:23;
120:7;144:24;153:15;
250:11;310:20;
318:10;331:1
Particularly (2)
9:7;51:13
partitions (2)
298:16,17
partly (1)
22:9
parts (1)
156:23
party (3)
224:24;305:12;
337:20
pass (1)
173:3
passed (3)
200:19;287:23,24
passes (1)
261:1
passionate (1)
270:24
passwords (1)
234:8
pastor (1)
56:22
pastors (1)
56:25
pay (18)
21:11;22:10,11;
64:10;112:12;130:17;
137:13;160:2,6;
170:11;182:2;193:20;
234:24;251:12;
330:16,20;331:12;
332:21
paycheck (3)
22:2;190:2,17
Paycor (1)
23:3
paying (8)
59:16;130:10;
148:17;160:8,9,21;
163:16;287:19
payment (1)
23:3
pays (1)
111:24
PCs (2)
214:16,17
Peace (3)
192:19,23;262:25
pending (1)
134:16
people (219)
9:8;12:10;15:17;
24:22;25:25;27:20,
25;29:14;30:2;33:4;
34:2,10;37:15;43:16,
19;44:7,9,12,22;
46:13,20;48:2,9,12,

14,19,25;50:11,12,16,
18;55:3,4,12,13,22;
58:11,16,20,22,23;
59:11,22;60:11,12,22;
61:2,4,6,6,8,12,16,23;
62:7,17,20;64:2,11;
66:14,15;67:1;80:14,
25;81:11;87:14,25;
98:25;111:6;123:10;
125:19;128:21;134:2;
148:6,7,10;153:22;
156:7;160:2;162:8,8;
163:5,24;166:14;
167:22;168:22;172:3;
173:4,9,11,15;174:6,
9,20,21;175:15;178:2,
25;179:17,18;184:14;
185:13,16,22;191:17;
193:24;198:7,12,17;
202:17;203:4;204:7;
206:1,6;208:11,12;
209:12;210:6,8,18,21;
215:11;217:1;218:23;
219:1,4,6,12;221:3;
223:24,25;224:6,25;
228:22;229:8,9,10;
241:5,6;242:23;
244:20,21;248:19;
249:21;251:11,11;
255:7;257:3;258:15,
18;261:2;263:16;
264:11,16,22,25;
265:20,25;267:4;
269:1;270:1,22;
271:7,11,12,13,15,17,
18,22;272:9;280:13;
284:9,24;286:7;
292:5;293:8,14,16;
294:19;295:6,6,8;
296:3,19,24;297:15,
22,23;298:4,11,18;
299:21;305:5,7,10,15;
307:1;316:5;318:23;
319:7,10,10,25;320:7,
13,18,21;326:10;
328:8;330:16,20;
331:21;334:4;335:23;
336:5,5;337:23;
340:7;346:25
peoples (1)
45:21
people's (3)
43:19;47:18;268:14
per (3)
33:6;126:17;183:20
percent (27)
21:24;59:23;67:22,
25;110:19;126:3,24;
127:2;161:5;163:8,8;
174:19,19;175:2,3,5;
178:10;181:13;
217:10;235:15;
240:17;262:14;310:8,

18;312:25;330:14;
337:17
perfect (4)
155:14;196:15,22;
239:20
perfectly (4)
219:5;244:13;
331:19;333:14
performance (8)
11:16;69:21;
243:20,21;325:16,23;
326:4;328:6
perhaps (2)
104:10;127:21
period (11)
14:20;18:19,21;
26:14;33:4;45:18;
89:25;153:25;191:4;
296:18;299:7
periodic (1)
167:17
periodically (1)
167:19
permeates (2)
252:22;254:13
permitted (1)
106:24
Perry (15)
113:6,12;177:25;
246:8,11,11,12;247:7,
7;276:3,5;283:8,12,
20;284:3
person (41)
19:24;35:17;48:3,6;
50:19;52:15,15;57:2;
61:1,4;62:7;71:19;
91:22;103:7,19;
107:2;109:6;112:24,
25;113:10,11;130:1;
133:24;137:4;160:7;
164:10;171:7;176:14;
177:18,22;180:13;
211:12;244:19;247:6;
257:18;266:14;272:7;
273:12;315:5;324:17;
348:11
personal (15)
86:16;116:17;
117:9,10;135:13;
195:23;196:2;211:18;
234:1;241:24;277:3;
285:22;287:12;331:9;
334:3
personalities (5)
194:25;208:2;
247:16;284:11;336:6
Personality (4)
154:8,8;196:23;
336:7
personally (6)
184:4;207:5;
255:22;269:19;
285:24;299:22

personnel (2)
50:17;303:23
persons (1)
331:14
pertained (1)
208:18
pervasive (1)
285:8
phase (1)
326:23
phases (1)
228:23
phone (11)
15:17,22;34:5;
86:21;149:6;230:21;
262:18;292:17;
300:12;303:21,21
physical (4)
28:4;35:23;116:9;
120:21
physically (4)
7:1;122:19;214:11;
328:11
pick (7)
112:11;223:3,8;
225:24;265:7;277:11;
304:22
picking (2)
160:18;285:2
picture (9)
21:4;25:21,23;28:2;
30:19;37:2;79:7;
185:5;215:12
pictures (3)
262:15,17,19
piece (1)
256:24
pierce (1)
255:9
pilloried (1)
55:16
pinging (2)
46:13,13
pings (1)
34:10
piped (1)
220:1
pistol (1)
53:12
pitch (1)
87:1
pivot (1)
329:5
place (58)
10:19,22;32:2;35:9;
37:22;41:22;45:6;
46:24;48:2,12;67:3;
72:17,18,21;73:1;
81:2;82:1;83:17;
85:11,11;115:22;
116:9;150:13;162:21;
164:22;165:5,9,13,14,
15,19;166:6,21;167:2,

12,15,20,25;168:6;
169:15;171:12;172:6,
11,13;175:13,20;
177:14;179:9;180:11;
219:14;223:18;
278:23;280:16;
295:10;298:17;
315:22;318:1;320:23
places (26)
24:3;29:14,16;31:9;
43:19;47:18;85:2;
90:17;94:17;96:17;
98:15,25;99:3;123:1;
129:17;143:16,20;
147:4;148:12;149:1,
6,7;157:25;165:11,
23;166:9
plaintiff (3)
5:25;6:2;348:3
plan (7)
126:7;221:8;264:5,
6;303:6;305:14;
315:22
plane (2)
160:13;249:15
planes (1)
223:19
Planet (7)
31:15;32:16,17,23;
33:17,20;150:6
planning (7)
105:12;118:13;
125:1,5;156:10;
304:17;315:19
platform (2)
44:19;212:19
play (3)
262:3;281:1;284:13
played (3)
156:4,5;165:8
playing (2)
131:9;132:4
pleasant (3)
164:18;234:25;
331:24
please (9)
5:18,19;6:4,5,12;
69:11;143:8;200:13;
212:11
plenty (2)
122:21;149:5
plus (8)
21:13,14;42:2;
126:19;159:2;161:8;
169:14;327:10
PM (5)
140:16;150:16;
229:23;308:25;
348:23
pneu (1)
298:7
pneumonia (1)
298:7

12,15,20,25;168:6;
169:15;171:12;172:6,
11,13;175:13,20;
177:14;179:9;180:11;
219:14;223:18;
278:23;280:16;
295:10;298:17;
315:22;318:1;320:23
places (26)
24:3;29:14,16;31:9;
43:19;47:18;85:2;
90:17;94:17;96:17;
98:15,25;99:3;123:1;
129:17;143:16,20;
147:4;148:12;149:1,
6,7;157:25;165:11,
23;166:9
plaintiff (3)
5:25;6:2;348:3
plan (7)
126:7;221:8;264:5,
6;303:6;305:14;
315:22
plane (2)
160:13;249:15
planes (1)
223:19
Planet (7)
31:15;32:16,17,23;
33:17,20;150:6
planning (7)
105:12;118:13;
125:1,5;156:10;
304:17;315:19
platform (2)
44:19;212:19
play (3)
262:3;281:1;284:13
played (3)
156:4,5;165:8
playing (2)
131:9;132:4
pleasant (3)
164:18;234:25;
331:24
please (9)
5:18,19;6:4,5,12;
69:11;143:8;200:13;
212:11
plenty (2)
122:21;149:5
plus (8)
21:13,14;42:2;
126:19;159:2;161:8;
169:14;327:10
PM (5)
140:16;150:16;
229:23;308:25;
348:23
pneu (1)
298:7
pneumonia (1)
298:7

**podcast (11)**
212:18,20;213:16;
214:24;256:10;
257:24;259:5,15;
262:8;275:8;317:23
**point (42)**
33:22;52:5;56:7;
57:3,4;66:16;98:12;
107:24;120:14;
129:18;133:19;134:3;
146:14;163:20;164:8;
168:3;170:10;214:14;
215:11,12,13;218:22;
222:9;225:20;229:1;
232:1,1;241:14;
243:4;251:4;253:12;
259:16;272:5;278:9;
286:23;303:16;
316:16;317:21;
318:11;337:14,17;
343:19
**pointed (3)**
168:23;170:21;
175:23
**points (4)**
262:6;291:6;
326:20;327:10
**poke (1)**
84:22
**pole (1)**
174:8
**policies (3)**
207:13,14;283:1
**policy (17)**
45:16;63:20;113:7;
176:1,2,7;205:13;
207:10;280:23;281:5;
282:10;283:15,24;
284:6;285:7;341:23;
345:25
**polished (1)**
203:4
**politic (1)**
320:5
**poll (1)**
180:11
**poor (1)**
69:21
**pop (1)**
104:7
**pope (1)**
241:22
**popped (1)**
341:16
**popping (1)**
98:21
**porn (1)**
211:13
**portrayal (1)**
339:12
**position (39)**
32:14;33:13;82:9,
11;85:25;92:4;

102:21;103:23,24;
110:1,2,11,18;111:11,
12,13,23;121:4;
122:13;127:25;
144:20;147:24;
155:12;181:19,24;
182:11,13,14;184:2;
244:8;258:12;313:3,
9,17,25;314:9;321:8;
326:16;331:13
**positionally (1)**
124:9
**positions (17)**
23:16;24:10;28:22,
23;29:2,5;33:1;38:7,
18;93:21;97:14;
100:16;101:14;
109:21,22;313:19;
320:7
**positive (10)**
42:13,14;66:3;70:8;
78:4,5,5,7;209:7;
258:23
**positivity (1)**
78:2
**possession (5)**
114:10;119:14;
141:12;147:16;
148:11
**possibility (7)**
116:24;118:5;
123:7,24;125:6;
136:6;156:20
**possible (8)**
40:17,25;104:12,
16,23;133:1;165:7;
181:6
**Possibly (9)**
110:4;117:21;
143:19;176:24,25;
177:2,4;179:6;242:13
**post (4)**
50:13;113:15;
168:9;203:14
**post-COVID (2)**
12:9;313:18
**posted (5)**
52:16;57:9;297:4;
342:24;345:22
**posting (1)**
84:19
**postpandemic (1)**
30:18
**postproduction (1)**
200:22
**post-Summit (1)**
330:12
**potential (4)**
29:19;41:18;46:19;
100:1
**pours (1)**
252:11
**power (1)**

294:9
**PowerPoint (1)**
65:13
**PPP (1)**
319:10
**practicality (1)**
297:4
**practice (2)**
115:10;117:15
**practices (1)**
185:6
**praise (1)**
195:12
**praising (1)**
281:2
**pray (10)**
195:6;196:9;219:9;
220:20;242:18;
293:22,25;294:4,24;
316:11
**prayed (1)**
293:24
**prayer (14)**
195:9,12,14,20,21;
241:21;244:3,17;
292:24;293:22,23;
294:5,10,12
**prayers (1)**
244:17
**praying (3)**
188:7;195:12;
240:21
**precaution (1)**
298:13
**precautionary (1)**
320:25
**predator (1)**
129:7
**predest (1)**
242:22
**predetermination (1)**
242:23
**preemie (1)**
182:25
**preemptively (1)**
325:4
**prefer (1)**
222:13
**pregnant (2)**
47:2;262:12
**premature (1)**
182:25
**premeditated (1)**
304:15
**prep (1)**
215:11
**prepare (1)**
114:12
**prepared (2)**
39:13,15
**preposterous (2)**
66:19;67:19
**prerecorded (1)**

181:11
**present (4)**
88:15;213:22;
224:15;289:17
**presentation (2)**
208:9;293:11
**presentational (1)**
202:9
**presentations (4)**
65:13;214:10;
255:4;273:23
**press (5)**
42:1;46:25;47:6;
67:14;295:2
**pressing (1)**
199:7
**pressure (14)**
133:15;154:12;
166:17;167:20;
172:16,16,17;173:23;
176:8;196:1;265:2;
278:17;303:14;304:9
**pressured (4)**
61:7,24;137:10;
346:18
**prestige (2)**
128:25;266:16
**pretty (31)**
23:4;30:22;37:6;
39:20;40:2;45:9;
82:22;93:23;94:13;
97:7;98:12;109:3,5;
123:9;128:5;139:16;
153:22;163:3,19;
168:13;169:2;243:24;
257:9;265:22;272:18,
19;275:12;331:25;
338:10;343:4,16
**prevaricate (1)**
326:17
**prevent (2)**
317:3,4
**previous (1)**
87:9
**previously (1)**
30:3
**price (1)**
117:20
**priest (2)**
56:20,21
**priests (2)**
56:22;241:1
**Prime (2)**
97:14;129:14
**prior (21)**
18:22;19:1;38:9;
39:21;41:1;91:17,17;
96:3,4;99:11;146:25;
151:20;192:16;
223:20;225:25;
267:16;312:10;
322:20;324:4;330:12;
334:22

**private (11)**
52:17;66:9;74:21;
135:8,15;173:8;
241:21;242:2;278:5;
294:12;346:15
**privately (1)**
242:9
**probably (89)**
9:9;10:5;12:12;
18:5,25;19:4;23:5,8;
24:14;34:16;38:25,
25;39:5,5,20,21;
40:21;41:2,4,6,9;
42:4;43:11;44:4;
47:15;58:1;66:24;
82:11;83:21,23,24;
84:16;89:13;90:8,23;
92:12;94:7,11;96:21;
99:18;100:7;101:19;
119:21;121:14;
122:25;126:19;128:3,
4;131:10;140:7;
143:17;144:8,9;
147:3;148:22;149:4,
4,9;151:3;156:15;
157:12,18,19;158:3,7;
162:24;173:13;174:4;
178:12,25;201:9;
206:4;210:10,12,24;
211:1,3;220:9;
237:15;239:11;244:4;
269:25;271:24;277:8;
286:21;290:19;
291:18;310:18;
320:15
**probably- (1)**
220:4
**problem (35)**
9:12;30:6,13;32:22;
45:25;54:25;56:5;
70:22;77:25;179:16;
185:12;212:13;
220:25;222:24;231:1;
232:5;239:13;241:11;
242:5,10;245:2;
258:11,13;272:2;
299:10,18;303:5;
324:1;335:2,7,12;
337:1;341:4,6;348:12
**problems (11)**
18:24;45:15;66:11;
185:9;233:17;258:21;
287:17,18;318:15,16;
326:4
**Procedure (3)**
5:8;106:24;281:5
**procedures (2)**
187:5;283:1
**proceedings (2)**
140:11;348:23
**process (17)**
34:7;94:18;113:14;
116:15,21;120:10,16,

Case 3:21-cv-00923   Document 651   Filed 04/19/23   Page 376 of 389 PageID #: 2086

21;125:17;140:21;
151:16;159:22;164:4;
195:12;256:7;276:20;
322:8
**processes (3)**
86:23;89:24;153:17
**produce (1)**
145:25
**produced (15)**
16:8,8;113:22;
114:8;119:13;141:9;
183:3;309:6,6,14;
310:6;323:15;344:6;
345:14;346:11
**producer (12)**
84:18;110:17;
129:4,9;130:15;
144:22;145:1;146:2;
182:23;183:2;186:9;
317:24
**producer/editor (1)**
99:12
**producer/senior (3)**
79:3;131:4,5
**producers (8)**
31:24;35:8,20;70:2,
7;129:5;331:22;335:1
**producing (6)**
21:6;79:9;110:10;
124:18,23;145:3
**production (5)**
36:18;62:10;80:12;
200:24;203:14
**products (2)**
87:16;166:1
**professional (1)**
285:22
**professionally (1)**
285:25
**profile (2)**
204:16;257:9
**profitable (2)**
185:11,18
**program (9)**
15:13;44:21;59:14;
137:12;169:10;
186:22,23;193:6;
263:18
**programs (1)**
254:7
**progress (1)**
236:9
**progressing (1)**
239:5
**project (11)**
33:6;85:21;183:3;
188:18;213:13;
224:18;231:3;238:11,
17;255:18;302:20
**projects (18)**
14:18;15:6;91:16,
23;133:6;162:4;
186:4;191:14;202:3,

23;204:16;243:22,23;
256:2;266:20;272:18;
331:23;341:3
**promise (1)**
254:6
**promised (3)**
132:19;235:1;295:5
**promises (1)**
339:25
**promising (1)**
183:25
**promo (2)**
205:4;215:18
**promos (1)**
181:2
**promoted (1)**
287:15
**promotion (3)**
128:14;130:5,20
**promotional (1)**
26:4
**promotions (1)**
77:23
**pronounce (1)**
88:6
**proof (1)**
264:15
**prop (1)**
66:17
**properties (1)**
137:15
**Property (1)**
163:20
**Protestant (5)**
195:23;197:4;
241:25;244:23;
278:14
**proud (3)**
165:25;262:14,14
**prove (1)**
66:16
**provide (1)**
327:5
**provided (4)**
41:18;160:11;
309:11,12
**proximity (1)**
148:9;223:22
**psychological (2)**
331:7;332:17
**PTO (1)**
216:25
**PTSD (1)**
68:3
**public (13)**
48:21;50:8;195:9,
12;196:12;211:20;
242:4,12;244:3,17;
294:13;320:12;324:5
**publicly (1)**
320:13
**pull (3)**
184:21;215:21;

242:9
**pulled (3)**
165:2;262:18;282:8
**pulling (1)**
53:11
**pulls (1)**
220:22
**punish (1)**
71:20
**punished (1)**
72:5
**punishing (1)**
204:13
**punishment (1)**
71:16
**punitive (3)**
71:5;266:18;332:11
**purposes (3)**
28:5;30:14;36:1
**pursuant (1)**
5:7
**push (2)**
239:11;298:12
**pushed (6)**
14:6;81:5;202:5,5;
216:4;325:5
**pushing (2)**
162:8;212:9
**put (69)**
20:12;34:1;41:22;
42:3,15,25;47:7,16;
62:14;72:19;74:12,
19;75:3;78:10;84:7,8;
92:12;98:10;105:5;
114:17,17;117:8;
123:3;125:22;130:20;
133:6;148:1;158:21,
23;159:15,25;170:23;
187:21;188:13;
189:19;191:13;202:1,
1,3;206:7;214:9,11,
22;217:8,11;224:17,
18;231:3;232:9;
242:4,13,25;243:22;
245:9,19;249:8;
252:5;258:11;265:4;
266:17;272:15;286:3,
3;287:2;297:6;
316:25;320:23;
328:25;342:21
**puts (2)**
42:17,22
**putting (7)**
148:19;201:23;
225:5;231:13,22,23;
266:20

**Q**

**QNAP (2)**
304:22,23
**qualified (1)**
145:24

**quarantine (5)**
220:15;315:9;
316:5;318:4;337:5
**quarter (4)**
82:19;126:22;
234:16;332:5
**quick (5)**
45:9;133:1;208:16;
229:20;282:15
**quickly (9)**
82:8;87:23;133:13;
168:22,25;170:23;
171:1;261:10;286:2
**quiet (1)**
175:22
**quit (2)**
61:24;333:7
**quite (27)**
24:24;34:19;55:8;
71:21;86:19;88:24;
89:22;90:4;93:10;
97:20;113:15;156:5;
162:4;186:11;187:19;
190:22;197:2;218:19;
235:15;237:20;
240:19;266:3;331:15;
335:1,6;339:10;
346:22
**quotations (1)**
188:10
**quote (3)**
162:11;209:10;
293:23
**quoted (2)**
171:5;244:12
**quotes (1)**
290:24
**quoting (1)**
253:20

**R**

**rabbis (1)**
56:23
**raced (2)**
33:15;249:14
**Rachel (2)**
202:1;262:12
**radio (21)**
44:21;59:17;65:21,
22;72:20;115:9,23,
25;117:13;164:20;
165:17;206:16,19,19;
208:13;211:10,23;
220:6;241:22;262:4;
304:1
**rah (2)**
219:14,14
**rain (1)**
239:16
**raise (9)**
6:4;169:8;184:6;
189:14;209:15;254:6;

314:18;316:16;339:8
**raised (2)**
239:18;314:17
**raises (11)**
77:20,22;168:22;
169:2;171:4,8;
188:25;209:13,21;
210:4,6
**raising (1)**
195:14
**rally (6)**
55:2,13;56:13;58:2,
9;60:1
**Ramsey (158)**
6:19,24;9:1;10:5,8,
9,14,18;12:20,21,24;
14:24;23:14;28:20;
40:5,9,11,18,24;
41:17,19;42:8;43:25;
44:1;46:8,15;47:17;
48:2,11,13,14;50:13;
61:2;63:3,3;65:19;
66:8,10,11;69:3,4;
72:8;77:9,15;78:19;
79:20;83:20;90:13,
17;96:20;100:25;
101:2,16;102:4,17;
103:8,12,13,20;
104:21,23;105:9,14,
21,22;106:2;107:2,8,
11;108:19;109:22;
111:6;112:23;115:15,
16;116:13,17;119:13,
17;123:14;128:17;
131:25;137:16;138:7;
139:16;145:23;
151:15;153:4,19;
154:22;157:6;160:11,
18;163:12;166:21;
167:11,12;172:8;
176:6;177:4,5;179:8;
181:19;182:12;
186:14;189:11;
196:23;197:19,20,25;
199:19;201:6,19,20;
205:2,3,15;206:16;
212:4;218:13;234:14;
239:25;246:13;
250:23;251:16,20;
253:2;256:16;261:12;
276:14;278:17;279:3;
280:11;283:6,6;
284:17,19;289:7;
290:11,22;292:14,15,
23;297:11;305:19;
306:5,14;307:4,9,12,
19;308:2;309:5;
311:15;316:17;
322:16;323:7;325:15
**Ramsey's (5)**
213:16;242:16;
314:19;316:18;
319:23

Case 3:21-cv-00923   Document 65-1   Filed 01/19/23   Page 377 of 389 PageID #: 2087

ran (2)
61:1;203:24
Randolph (5)
153:5,7;154:24,25;
155:7
random (2)
53:8;63:2
Randy (4)
290:21;291:13,14,
15
range (1)
158:19
rants (3)
45:19;52:8;279:12
rare (2)
26:13;298:6
rarely (1)
202:2
Rate (2)
138:13;273:14
rates (2)
127:4;271:10
rather (5)
59:4;124:19;
233:25;271:1;321:24
rating (1)
286:1
ratio (2)
178:8,10
rationalize (1)
334:13
rave (1)
70:6
re (1)
132:16
reach (5)
102:11,17;107:3;
108:19;228:16
reached (13)
85:16,18;86:5,6;
102:8,11,14;103:18;
109:12;110:7;119:1;
153:12;236:2
reaching (1)
103:20
reaction (2)
206:2;242:17
reactions (1)
292:4
read (27)
48:16;68:4,16;
71:22;72:8;73:11;
75:13;79:1,14;
135:21;142:3;173:5,
6,9,10,10;195:1;
197:6,9,13,14,16;
254:1;277:10,15;
286:7;345:3
reading (8)
40:22;57:11;188:9;
194:21;195:1;253:25;
278:4;304:13
ready (1)

216:2
reaffirmed (1)
209:25
real (12)
14:11;40:25;50:18;
86:6;133:24;134:13,
23;138:3;187:11;
219:15;263:6;286:7
realize (2)
43:10;59:24
realized (2)
59:20;162:24
realizing (1)
210:2
really (119)
9:17;30:24;35:23;
41:22;45:25;49:5,15;
51:8;56:10;57:10;
61:25;64:14;65:24;
66:2,3;67:7,15,15;
69:9;70:8,8,9;77:14;
80:6;81:10,10;84:18;
91:20;133:3,7,16;
136:1,2;165:7;
168:22;172:4,7,10;
183:22;184:15;187:1;
191:14;195:24;
203:17;204:16;207:9;
212:8;213:5,12;
215:6,6,22;216:14,15,
16;217:15,22;219:13;
221:1,20;224:2;
227:9,10,17,21;231:4,
8,24;233:1,5,18;
237:7,9;241:5;243:8,
13,15;245:17;248:25;
250:17;251:14;253:6;
256:11,11,24;258:17;
264:11;267:2;268:9,
15;270:23;272:8;
273:8;277:23;278:20;
279:16;281:25;285:7;
286:2;293:8;295:4,
12;298:12;317:20;
319:11;320:4;326:25,
25;327:16;328:16,17;
329:14;331:21;
334:20,21,22,23;
335:5;343:20
Realtor (1)
132:1
reapply (3)
86:3;121:5,8
reason (6)
15:23;35:2;66:12,
16;97:4;173:7
reasons (2)
60:23;242:9
recall (8)
20:3;94:16;101:18,
20;103:10,17;109:16;
149:1
receive (3)

13:20;21:12;342:12
received (12)
13:24;14:2;15:19,
19,24;16:1;23:6;
55:16;150:2;151:19;
172:15;311:20
receiving (3)
133:15;282:4;
300:13
recent (1)
39:24
recently (2)
11:3;160:10
Recess (5)
83:8;140:16;
150:16;229:23;
308:25
reclassed (1)
111:20
recognize (3)
86:20;114:11;
309:22
recommend (1)
293:8
recommendation (3)
121:3,9;296:2
recommendations (5)
200:9;298:16;
299:12;308:3;317:5
recommended (9)
136:22,23;271:20;
279:2,3,6;323:7,8;
324:6
reconsider (1)
237:9
record (24)
6:11;49:18;83:7,10,
13;140:15,18;150:15,
17;152:17;229:22,25;
282:24;292:1,9,9,11;
308:24;309:2;338:16,
17,19;348:14,21
recorded (13)
171:21,25;180:17,
25;181:9,11,12,18;
290:19,24;291:23;
292:2,2
recordings (5)
171:20;290:18;
291:3;292:13,22
records (5)
83:24;173:24;
310:6,15;314:6
recruiter (3)
107:11,14,23
recruiters (1)
85:16
recruiting (4)
104:21;166:16;
172:4;176:15
recruitment (2)
104:15;153:8
recutting (1)

206:17
red (3)
185:14;286:1,4
redaction (1)
310:16
Redpepper (4)
84:24;96:11,16;
101:16
reduced (2)
82:7;162:23
reeducation (1)
205:9
re-education (2)
240:5;248:20
reel (12)
32:4;204:16;
243:23;256:14;
266:12;267:17;
272:22,25;273:1;
274:17;334:20,23
reels (3)
25:25;26:3;171:23
reenforced (1)
294:1
reentered (1)
86:4
refer (3)
20:18;283:8;306:23
reference (3)
109:20;159:6;179:2
referenced (2)
330:2;340:16
referencing (1)
122:7
referral (1)
179:2
referred (3)
86:22;177:20;245:3
referring (7)
10:5,8;95:14;
151:23,25;225:24;
285:15
refile (1)
17:25
refiled (5)
17:22;19:5,12,17,
19
reform (1)
327:15
refrain (2)
58:24;174:3
regard (1)
144:21
region (1)
170:14
regionally (1)
165:10
registered (1)
21:21
regular (2)
192:9;197:3
regularly (1)
81:25

regulations (2)
305:20;308:3
reins (1)
184:3
reinterpreted (1)
52:24
reintroduced (1)
263:2
related (2)
178:14;314:18
relates (2)
178:24;197:18
relationship (4)
92:15;117:11;
242:3;277:5
relax (1)
250:18
relaxed (1)
37:3
release (1)
226:5
released (2)
213:4;337:18
reliably (1)
264:13
relief (1)
339:5
religion (4)
156:4;197:2;320:8;
321:9
religions (1)
56:24
religious (8)
45:3;55:10;56:19;
57:17;279:4;290:10;
299:23;322:4
relocating (1)
208:20
remainder (1)
347:22
remaining (1)
347:21
remember (100)
17:12;24:13;26:25;
27:2;34:6;38:22,24;
50:5;73:22;74:3;84:6,
17,21;92:22;95:24;
98:2;103:19;108:7,
11,13;109:7,14,15,18;
110:17;111:6;112:5,
12;113:16;117:14,14,
15,17;123:18;136:20;
138:1;156:12;157:5;
158:23;160:5;161:5;
163:23;165:12;
167:23;171:16;172:2,
20;177:6,16,16;179:5,
17,24;186:15,18;
187:5,13;188:19,22;
193:3;194:10;198:17,
23;205:16;211:5;
220:5;240:8;248:24;
249:1,16;250:9,12;

258:4;265:1;266:6,
13;267:8,20;268:2;
275:19;276:10;
280:24;282:4,16;
295:21;296:3;297:16;
299:12;300:13;
302:18;318:20;324:3;
326:22;328:8;330:9,
9;333:22;334:8;
339:14,15
**remembering (1)**
103:3
**reminder (3)**
83:13;150:21;
308:14
**reminders (1)**
172:22
**remote (8)**
29:6,11;30:7,22;
35:11;118:12;347:15,
24
**remotely (3)**
27:21;30:13;304:25
**removed (1)**
134:12;222:9;
233:20
**rent (1)**
8:3
**rental (1)**
160:1
**renting (1)**
8:17
**reonboarding (9)**
75:7;78:17;191:9;
204:14;248:21;
266:19;277:2;279:23;
280:22
**reopen (1)**
30:1
**reordered (1)**
146:3
**reorganizing (1)**
291:1
**reorientation (13)**
205:9,12,12;236:3,
5;240:5;266:18,19;
277:1;286:13;288:4;
316:20;340:16
**repeat (1)**
106:16
**repeatedly (2)**
63:17;138:12
**repetition (1)**
228:5
**reply (1)**
235:24
**report (7)**
58:21;135:19,24;
199:24;200:20,23;
287:3
**reported (3)**
270:19,20;295:12
**reporter (19)**

5:16;6:4,15;9:15;
20:10,17;36:5;41:12;
42:20;49:16;132:9;
143:7;152:15,23;
301:11;308:13;
312:19;338:14;344:1
**Reporters (1)**
5:17
**reporter's (1)**
9:4
**reporting (1)**
201:3
**reports (12)**
74:13,15;135:7,9;
144:11;148:18;173:9;
174:1;287:10;288:1,
24,25
**representation (1)**
338:10
**representing (1)**
107:23
**reprisals (1)**
167:21
**require (1)**
45:2
**required (22)**
74:15;114:16;
159:13;188:3,9;
193:9,11,13,15;
194:25;195:4;197:6;
198:13;200:1;253:25;
270:14,17;287:11;
288:2;296:21;299:9;
346:18
**requirement (1)**
196:1
**requires (2)**
44:16;88:7
**research (4)**
65:18;164:24;
168:11;169:19
**reserve (1)**
347:7
**reserved (1)**
112:18
**reset (1)**
93:22
**resolution (2)**
291:8,9
**resolved (2)**
14:5,9
**resource (1)**
50:14
**respect (1)**
241:9
**responded (2)**
209:10;210:9
**response (14)**
9:13;76:10,25;77:2;
258:7;314:20;315:19;
316:13,14,15;319:23,
24;320:11;321:4
**rest (6)**

217:4;242:13;
252:7;254:14;281:18;
333:18
**restart (1)**
156:7
**restaurants (1)**
319:9
**rested (1)**
261:7
**restrictions (2)**
30:20;37:2
**result (2)**
60:1;61:9
**resulted (1)**
68:3
**results (1)**
175:7
**resume (23)**
31:16;34:12;39:9;
40:3,12,14,17;41:17,
22;42:3,16,22;46:9;
47:7;85:24;86:7;91:7;
92:3;129:24;130:18;
131:2;149:13;245:9
**resumes (3)**
81:24;92:12;129:23
**retaining (1)**
123:25
**revealed (2)**
15:20;17:24
**reveals (1)**
273:4
**review (17)**
69:24;89:25;
189:15;262:23;
264:17,18;265:12,13,
14;275:6;327:8;
328:7,18;329:3,4,11,
12
**reviewed (2)**
323:22;340:14
**reviews (7)**
40:22;70:6;171:7;
209:20;272:19;
277:16;344:10
**revise (1)**
239:11
**revised (2)**
216:4;229:7
**rewards (3)**
169:12;170:25;
184:1
**Rick (13)**
113:6,12;177:25;
246:10,11,12;247:7;
276:3,5;283:8,12,20;
284:3
**Ridge (1)**
5:3
**ridiculous (1)**
298:18
**riding (1)**
209:1

**right (135)**
6:4;7:18;8:22,24;
12:12;13:7,9,14;15:8;
16:3;22:14,17;27:6;
29:10;31:13;32:20;
33:9,19;37:9;40:4;
47:1,14;50:24;51:18;
57:7;58:8,13;62:24;
63:2;65:9;72:3;76:25;
84:12;89:18;91:8;
95:24;99:10;101:13,
22;102:6;103:25;
108:18;109:17;
116:12;119:19,22;
120:5,7,23;121:20;
122:11,15;125:10;
128:8;130:23;138:24;
141:7,24;144:17;
145:6;146:22;147:2,
17;151:17;152:6,9,
22;153:5;155:1,2,2,5;
157:2;164:11;177:10;
179:4;190:21;194:13;
198:12;199:18;
200:21;201:13;211:2;
212:22;216:10;
219:20;221:21;230:3,
7;239:15,16;250:6;
266:6,7;269:11;
273:20;274:19,24;
275:20;276:1,6;
285:5;287:9;292:18,
20;293:25;307:16;
308:6;309:16,17;
310:23;311:9,23;
312:14;313:9;314:16;
319:23;320:6;321:13,
19;324:25;325:15;
328:23;332:23;335:4,
10;340:12,23;342:5;
344:16;345:9;346:3,
10;347:1,16
**rights (1)**
241:13
**ring (2)**
84:7;98:10
**ringed (1)**
177:10
**risk (6)**
222:14;243:1;
301:3,4;316:6,6
**risks (1)**
36:8
**River (1)**
5:3
**R-O (1)**
32:20
**Road (1)**
32:16
**R-O-A-D (1)**
32:18
**robust (2)**
95:2;203:7

**rock (1)**
317:2
**Rogers (3)**
218:3;219:18;293:3
**Rogue (9)**
31:15;32:16,17,19,
23;33:17,20;150:6;
169:16
**role (5)**
183:2;184:21;
224:19;328:1;339:12
**roles (1)**
292:5
**rolling (1)**
238:22
**Rolodex (1)**
137:14
**roof (3)**
70:1;327:2;328:9
**room (13)**
175:22;181:17;
194:18;210:8;256:22;
257:2,4;261:19;
296:22;298:22;305:3,
6,17
**rooms (1)**
161:3
**root (1)**
55:14
**rote (2)**
202:14;206:10
**roughly (1)**
274:25
**row (3)**
68:2;158:2;168:7
**rubber (1)**
255:20
**Rudolph (7)**
63:11;86:6;102:15;
109:9,14;157:5;
158:11
**rule (3)**
9:10;10:3;247:10
**Rules (8)**
5:8;9:2;10:19;22:8,
9;106:24;307:14;
308:3
**rumor (1)**
251:6
**rumors (1)**
64:16
**run (10)**
31:22;124:20;
175:2;190:11;254:25;
269:6;318:6;331:8;
333:3;346:20
**running (6)**
72:19;130:14;
144:1;198:20;272:10;
337:22
**rushed (1)**
299:6
**rushes (1)**

45:9
**Rutledge (1)**
112:14

## S

**sack (1)**
123:21
**sad (2)**
61:4;62:22
**Saddam (1)**
175:1
**safe (1)**
29:14;141:17
**SAG-AFTRA (2)**
145:5;185:24
**sailing (1)**
253:5
**sake (1)**
9:4
**salacious (1)**
284:8
**salad (1)**
298:24
**salaried (1)**
21:22
**salaries (9)**
32:15;91:15;112:2;
158:15;198:11;
218:11,14;293:13;
294:22
**salary (30)**
82:7;84:8,8;88:14,
23;103:5;124:2,11;
126:11,15,16;127:2;
128:25;130:5;158:11,
14,19;159:1;161:7,14,
20;162:23;168:14,25;
169:2,25;170:2,2;
184:1;218:18
**sale (1)**
137:16
**sales (6)**
17:13;87:1;163:18;
209:23;266:25;267:6
**salute (1)**
195:15
**same (38)**
19:15;22:2;35:9;
71:1;95:1;96:20;
97:17;108:24;109:2;
118:24;120:13;121:1;
127:6,18;128:5;
129:7,9;130:17;
132:21;142:24;
163:13;189:22;
190:17,18;255:11;
256:12;279:14;
288:24;289:14;307:5,
15;310:19;315:20;
322:2;336:7;343:5;
345:10;346:10
**Sanders (117)**

5:20,20;6:10,16;
16:17,20,23;20:8,16;
36:20;41:11,15;43:2;
49:14,19;51:9,11;
69:12;70:15,18;83:2,
11;101:3,5;105:18,
23;106:3,7,10,14,18,
22;107:1;113:19,24;
114:1,5;119:2,7,8,25;
120:3,6;121:22;
122:1;134:7;140:12,
19;142:16;143:6,11;
150:12,19;152:11,17,
24;153:2;190:1,6,10,
13;229:19;230:1,2;
282:24;283:4;301:10,
16;302:5;305:25;
306:4,7,11,13,21;
307:2,8,18,24;308:20;
309:3;312:18,21;
313:2;325:6,10,14;
338:13;340:6;342:5,
9,17;343:2,23;344:2,
4,16,20;345:6,13,16,
18;346:6,9;347:1,4,
12,14,17,20,25;348:2,
6,9,15,19,22
**sanitized (1)**
343:19
**sanitizer (1)**
343:1
**Santa (4)**
7:20;8:10,15;137:4
**Sarah (4)**
191:17;198:25;
204:22;206:8
**sardines (2)**
293:10;295:24
**sat (3)**
199:21;284:24;
327:9
**satisfied (1)**
281:12
**save (4)**
264:4;291:6,9;
348:17
**saved (1)**
171:23
**savings (1)**
144:1
**saw (17)**
7:8;65:3;86:25;
103:24;144:3;160:9,
10;161:12;168:8,9;
169:16;174:13;
240:10,11;255:19;
300:20;324:12
**saying (38)**
10:14;30:18;32:16;
45:13;46:10;49:13;
76:23;88:16,20;
110:14;120:17,19;
147:21;163:24;

179:19;194:10;
197:20;203:25;
204:20;205:17;
216:15,21;221:6;
223:25;243:15;245:3;
283:22;284:25;289:4;
299:13;302:18;
303:10;304:20;315:1;
318:22;319:17;
328:21;329:6
**scale (1)**
192:24
**scanning (1)**
345:4
**scenario (1)**
135:4
**Scene (2)**
57:15;278:20
**scenery (2)**
95:9;156:9
**scenes (1)**
231:16
**schedule (14)**
111:5;113:2;151:8;
215:8,16;216:4;
228:8,11,25;230:8,9;
238:23;239:11;
341:16
**scheduled (8)**
58:4;111:5;151:12;
243:6,7,16;270:13;
341:25
**scheduler (1)**
187:4
**schedules (3)**
87:16;215:21,22
**scheduling (1)**
186:22,23
**Scientology (1)**
194:20
**Scott (2)**
7:11,15
**Scout (3)**
244:8;245:16,19
**Scouts (2)**
245:7,19
**scramble (2)**
180:20;214:5
**screamers (1)**
162:10
**screams (2)**
45:20;279:12
**screen (2)**
256:18;257:13
**screened (2)**
217:21;267:9
**screeners (1)**
185:24
**screening (16)**
216:6,7,9;217:16,
17;227:3,10,18;
228:21;236:15;
237:25;256:22;257:2,

3;266:14;324:6
**screenings (2)**
261:12;274:25
**screenshot (2)**
149:21;323:17
**screw (1)**
279:16
**seamless (1)**
269:16
**Searchlight (1)**
146:23
**seat (1)**
124:17
**second (8)**
16:12;49:14;
109:24;115:6;201:7;
262:13;276:15;311:4
**seconds (1)**
261:8
**secret (1)**
30:15
**section (2)**
79:2;306:10
**security (8)**
28:5;30:14,20;36:1;
37:1;249:3;329:16,18
**seeing (3)**
134:11;152:8;210:3
**seem (11)**
21:25;61:17;73:23;
98:25;110:16;155:15;
167:17;201:23,24;
306:24;319:18
**seemed (14)**
54:23;56:6;61:23;
76:3;220:17;243:21,
24;249:8;265:22;
304:15;318:1,10;
333:16;339:6
**seems (15)**
61:11;73:24;81:21;
97:3;113:14;135:14;
136:8;158:13;165:10;
178:12;221:3,4;
304:14;321:19,23
**segued (1)**
154:20
**selected (1)**
137:7
**sell (21)**
131:16;132:1,3,16,
21;133:11,12,25;
134:21;135:2,25;
136:5,8;137:15;
138:21;140:5;164:8;
253:12;255:4,4;
329:19
**selling (4)**
131:23;134:23;
163:20;254:22
**sells (1)**
329:1
**seminars (1)**

3;266:14;324:6
**screenings (2)**
261:12;274:25

130:12
**send (5)**
31:24;89:20;91:9;
129:12;274:1
**sending (13)**
35:19,22;36:22;
43:19;104:14,24;
117:25;137:5;149:14;
173:2,2;179:23;180:2
**Senior (14)**
111:3,18,23;128:9,
13,18,21;130:3,19;
181:22;182:5,10;
184:24;314:5
**sense (5)**
156:3;163:15;
191:23;252:23;
343:10
**sent (18)**
39:1;85:13;89:21;
101:1;104:8;131:1,9;
164:21;217:25;223:6;
225:3;230:22;252:21;
272:3;282:20;293:2;
323:9;325:5
**separate (4)**
35:11;160:16;
334:2;343:12
**separated (3)**
136:17;224:12;
298:18
**separately (1)**
249:11
**separating (1)**
320:22
**September (3)**
5:14;134:17;346:4
**sequencing (1)**
193:1
**series (4)**
45:11;80:19;
147:25;182:23
**serious (1)**
88:7
**served (2)**
182:19;326:21
**servers (1)**
173:4
**service (3)**
57:17;104:6,25
**services (3)**
64:24;105:3,10
**session (1)**
261:18
**sessions (2)**
191:9;204:14
**set (30)**
24:6;28:8;31:20;
52:14;80:15,15;
91:18,23;93:12,22;
129:13;140:22;144:4;
183:4;204:8,15;
206:10;214:13;216:7,

7,9;229:12;235:17;
256:18;273:8;281:15,
17;309:18;310:20;
341:2
**sets (6)**
87:15;145:19;
146:8;202:20;251:25;
254:14
**setting (4)**
211:20;242:5,12;
264:21
**settle (2)**
303:4;324:23
**settled (1)**
15:13
**setup (1)**
202:13
**seven (2)**
193:1;344:25
**several (25)**
72:4;85:2;92:9;
96:3;97:15;109:22;
136:22;148:2;151:20;
154:1;176:9;177:21;
201:22;203:1;212:2;
216:4;256:7;261:15;
269:1;271:18;275:15;
310:5;320:18;330:17;
340:16
**severance (7)**
13:24;14:2;15:20;
16:1,6;17:24;52:19
**severe (1)**
218:4
**sexual (3)**
207:13;282:10,17
**shake (1)**
186:3
**shaking (1)**
318:21
**shame (1)**
297:10
**shaming (1)**
297:5
**Shane (4)**
70:6;267:3,3;272:7
**shape (1)**
215:7
**Shapiro (3)**
24:1;27:7,9
**share (3)**
77:18;184:8;209:18
**shared (11)**
7:2;74:21,23,25;
135:16;174:4;195:25;
286:21,25;287:3;
328:10
**sharing (3)**
195:10,13;286:11
**shave (1)**
251:9
**sheets (4)**
185:13,16;186:13,

14
**shift (1)**
109:19
**shifty (1)**
93:14
**shipping (1)**
36:9
**shoes (1)**
241:9
**shook (2)**
67:1;68:22
**shoot (3)**
228:18;229:7,12
**shooting (6)**
133:5;135:12;
188:20;212:15;214:2;
223:18
**short (5)**
83:12;217:3;230:3;
269:18;309:16
**shorten (2)**
140:20;309:7
**shorter (2)**
88:22;130:16
**shortly (1)**
298:22
**short-term (1)**
82:8
**shot (4)**
267:25;269:4,4;
292:7
**shots (2)**
257:10;267:14
**shoulders (2)**
185:21;238:15
**shout (1)**
272:8
**shouty (1)**
339:9
**show (40)**
16:7;39:7;48:25;
55:9;59:18;65:8,13;
72:21;110:20,24;
112:15;114:6;115:17;
117:13,17;119:9;
151:22;165:17;202:1,
2;203:20;206:16,16,
16,19;207:1;208:14;
213:16;228:21;
259:24;262:4;289:13,
21;300:1;309:18;
322:25;323:1,14;
342:10;345:10
**showcase (1)**
186:4
**showed (9)**
48:2,11;146:4;
204:24;208:9;217:21;
258:21;262:24;
269:20
**showing (4)**
18:3;258:9;262:15,
16

**showings (1)**
133:13
**shown (1)**
133:17
**shows (14)**
21:10;47:17;86:21;
147:20;201:24;205:6;
206:14;208:10;
240:12;256:3,3,4,6;
264:11
**shuddered (2)**
24:21;29:18
**shuffled (1)**
160:7
**shut (2)**
84:12;221:6
**shutting (1)**
224:4
**shuttled (1)**
115:9
**sick (11)**
196:4,7;218:3;
219:4;220:12;221:2;
224:6;242:14,16;
303:3;315:6
**side (12)**
67:16;94:23;
110:18,19;223:15,16;
237:2,2;317:22,22;
337:3,10
**side-by-side (1)**
317:25
**sideways (1)**
125:7
**sign (3)**
241:9;257:4;282:22
**signature (2)**
152:2;281:25
**signed (1)**
281:24
**significant (1)**
240:15
**silent (1)**
31:19
**similar (9)**
41:9;79:13,15;
97:19;120:8;279:15;
342:20;343:10;344:5
**Simms (4)**
55:1;56:13;57:25;
59:8
**simple (3)**
113:15;190:16;
342:11
**sincerely (1)**
238:15
**single (13)**
24:19;113:11;
153:25;192:15;
195:20;198:12;
244:18;246:24;
255:17,18,20;300:16,
19

**singular (1)**
238:19
**sister (1)**
284:8
**sit (14)**
130:12;135:11;
146:10;197:12;
208:11;216:6;256:8,
16;257:12;262:2;
288:6,24;326:16;
333:24
**sitdown (1)**
282:8
**site (1)**
30:7
**sitting (8)**
35:16;50:22;77:15;
220:12;223:22;
231:11,20;238:1
**situation (3)**
175:23;242:2;319:1
**six (5)**
15:21;216:3;222:2;
224:25;322:21
**sixty (1)**
113:16
**sixty-plus (1)**
113:18
**size (2)**
305:3,6
**sizzle (4)**
25:25;26:3;181:2;
202:9
**skeleton (1)**
303:11
**skill (17)**
24:5;80:15;87:15;
91:23;129:13;144:4;
145:19;146:8;183:4;
202:19;204:8,15,25;
206:10;235:17;
325:19,24
**skilled (1)**
326:5
**skills (7)**
69:25;169:4,11;
202:14;209:12;
326:15;339:12
**skin (1)**
318:9
**slamming (1)**
183:20
**slanderous (1)**
43:9
**slates (1)**
185:3
**sleep (3)**
44:11;224:9,11
**slice (1)**
331:11
**slight (4)**
49:15;111:15;
126:10,10

**slightly (1)**
111:16
**slotted (1)**
265:19
**slow (4)**
9:13;132:7;154:4;
213:18
**slower (2)**
132:7,11
**small (4)**
14:13,18;60:10;
124:1
**smaller (1)**
61:19
**smart (10)**
325:19,24;326:24;
327:11,13,16;335:14,
16,17,17
**smattering (1)**
23:20
**smooth (1)**
253:5
**smoothly (1)**
185:8
**snacks (2)**
227:19;305:11
**snakes (2)**
251:8,9
**snickering (1)**
297:6
**social (9)**
21:5;168:9;224:2;
297:20;298:2;299:20;
334:4;337:11,25
**Society (1)**
23:22
**software (1)**
344:7
**sold (15)**
37:19;53:13;
120:17,19;131:19;
133:11;134:5,14;
139:3;140:3;212:10;
226:6;235:5;319:14;
329:4
**solid (1)**
267:2
**Solution (3)**
205:3;224:8;318:7
**Solutions (54)**
6:24;12:21;40:9,11,
19;46:15;48:2,13,14;
63:4;65:19;66:10,11;
83:20;101:17;102:4,
17;103:8,12,13,20;
104:21,23;105:9,14;
107:3,8,11;108:19;
109:23;116:17;
123:14;151:15;153:4;
160:11;166:21;
167:11,12;181:20;
182:12;186:14;
199:19;205:2;212:4;

279:3;283:6,7;
284:17,19;311:15;
318:9,15;322:17;
325:16
**Solutions' (1)**
116:14
**solve (1)**
269:22
**solved (2)**
270:25;292:24
**somebody (58)**
8:8;19:11,18;35:17;
45:8,14;47:4;54:24;
57:15;80:10;86:13,
17;91:10,11;99:22;
117:12;146:25;167:8;
171:19;174:25;
176:22;177:7,9;
178:12;179:6;184:25;
193:5;195:16;196:3,
4,4,6,7,8,24,24;199:6;
204:23;220:11,18;
221:1;222:14;223:23;
224:12;237:10;
241:23;242:18;
246:20;276:14;
283:13,18;287:4;
289:9,12;290:6;
295:11,12;331:13
**somebody's (1)**
241:17
**someone (1)**
275:18
**someplace (6)**
37:21,22;93:15;
94:9,10;168:11
**sometime (8)**
14:6;102:13;
121:19,19;140:10;
151:1;183:12;244:1
**sometimes (27)**
9:7;44:23;45:5,24;
52:1,1;56:19;57:1,4,
24;65:7,12;71:13;
87:22;98:18;108:11,
12;109:18;162:17;
189:4;246:5;255:2;
257:17,17,18,21,21
**somewhat (4)**
81:25;124:11;
160:7;161:20
**son (5)**
88:3;94:25;160:17,
18;298:5
**soon (1)**
299:5
**sorry (44)**
8:12;17:12;20:13;
23:12;26:2;32:20;
49:13,25;70:14;
96:14;109:24;119:23;
120:1,3,4;131:18;
132:4;138:24;143:10;

152:24;154:5;155:4;
174:13,14;196:19,21;
203:8;208:23;210:13;
213:18;243:21;246:9,
12;263:22;278:12,12;
308:1,16;314:15;
323:25;325:12;
342:23;344:23;345:1
**sorts (1)**
167:18
**sound (22)**
63:23,25;82:7;
85:21;89:6;93:17;
94:21;152:9;155:15;
165:6;168:12,15;
171:24;183:23;185:4;
212:17;215:13;
230:20;231:2,6;
291:2;307:17
**sounded (8)**
66:19,22;68:6;
80:22;82:2;95:12;
169:20;329:13
**sounds (21)**
10:12;19:14;66:24;
89:8,8;104:19;
108:14;121:16;
141:21;155:6;165:4,
20;169:7,13;187:1;
223:4;250:25;251:5;
324:21;327:3;333:17
**source (1)**
14:12
**south (1)**
123:6
**space (3)**
291:9,12;334:3
**spam (1)**
104:17
**speak (11)**
49:23;57:1;92:1;
105:11;136:23;
159:23;241:14;
252:15;308:8,14;
325:21
**speaker (1)**
56:19
**speakers (4)**
45:4;214:12;
240:25;290:10
**speaking (4)**
29:25;45:3;55:23;
332:11
**speaks (1)**
279:14
**special (2)**
268:20;273:5
**specialist (1)**
210:14
**specialized (1)**
24:6
**specific (14)**
22:8,9;55:20,23;

73:22;76:11;128:17,
19;161:22;244:24;
251:24;256:23;258:9;
306:10
**specifically (47)**
26:21;35:2;52:6;
59:7;67:7;68:18;
69:17;71:15,17;
73:10,18;74:1,3,10;
76:7;94:7;105:15;
112:6;153:10;159:3;
164:3;173:18;177:18;
189:5;198:4,23;
201:20;205:7,16;
209:22;256:20;258:4;
261:13;269:3;272:23,
24;273:11;278:15;
283:25;285:9;290:22;
291:19;297:11;
305:20;316:22;
319:25,25
**specifics (3)**
158:12,14;306:25
**speculation (2)**
19:9,10;106:13,21
**speeches (3)**
56:3;262:24;268:14
**speed (1)**
80:25
**spell (1)**
22:14
**spend (2)**
82:4,5
**spending (3)**
163:23;216:23;
291:5
**spent (3)**
139:10,10;290:25
**spin (1)**
53:1
**spiritual (2)**
271:1;287:21
**splinter (1)**
148:21
**split (2)**
89:11,19
**spoke (10)**
19:7;109:15;
121:12;148:13;153:4;
155:6;198:3;255:24;
304:12;319:21
**spoken (1)**
237:6
**spontaneous (1)**
208:2
**sporadic (1)**
54:21
**sport (1)**
267:2
**spot (1)**
83:3
**spots (2)**
21:5;205:4

**spotty (2)**
182:15;194:1
**spousal (1)**
90:1
**spouse (4)**
112:16;243:10;
287:22;331:10
**spouses (4)**
234:3;279:16,17;
285:11
**spread (1)**
44:11
**spring (5)**
14:8;102:14;
121:19;186:12;189:7
**spurts (2)**
132:9,10
**stability (2)**
88:10;97:17
**stack (3)**
38:25;174:1;194:21
**staff (1)**
270:15
**staffs (1)**
35:13
**stage (3)**
171:15;177:9;250:1
**stamp (1)**
255:20
**stances (1)**
55:11
**stand (4)**
297:19;334:2;
337:2,10
**standard (2)**
40:3;117:4
**standards (1)**
185:6
**standing (8)**
55:17;58:10;267:4;
270:7;272:8;297:21,
23;333:25
**standup (8)**
60:11,21;62:1,4,5;
167:25;175:8;180:20
**standups (5)**
52:2;60:5,9,20;
180:16
**stapled (1)**
16:13
**Starbucks (1)**
25:17
**stare (5)**
296:3,4,10;297:10,
15
**stare-a-thons (1)**
297:12
**staring (3)**
296:9;297:5,8
**stars (1)**
259:23
**start (37)**
18:1;20:24;80:21;

90:15;132:24;133:2,
4,9;150:10;151:20;
152:9;166:20;170:9;
189:17;190:14,15;
212:11;213:7,13;
218:23;225:4,5,6;
229:6;231:13,22;
233:14;236:4;242:7;
263:11,17,25;303:19;
309:17;317:1;320:22;
339:23
**started (28)**
10:20;11:2,13;13:4,
10,16;37:13;44:5;
56:2,19;61:20;66:1;
86:23;94:4;122:3,3;
132:21;133:4;151:16;
190:23;204:12;
213:25;215:18;
221:13;236:2;243:2;
263:15;312:7
**starter (1)**
158:22
**starting (10)**
30:1,4,4;34:10;
142:5;152:19;210:2;
222:12;224:6;263:20
**starts (1)**
334:13
**state (7)**
6:11;30:5;98:16,17;
118:11;245:14;
271:12
**stated (2)**
138:22;181:12
**statement (4)**
64:8;196:21;315:4;
328:4
**statements (2)**
177:19;270:22
**States (2)**
5:9;25:8
**status (2)**
176:19;178:15
**statute (1)**
306:10
**stay (16)**
94:10;118:22;
124:7;125:23;133:10;
188:14;206:3,3;
223:25;239:14;
271:20,24;303:24;
316:4;324:16;342:3
**stayed (2)**
160:25;299:20
**staying (2)**
160:20;271:13
**steered (1)**
233:10
**step (10)**
80:23;99:12;129:1;
183:5;219:8;237:8;
264:2,7,8;292:8

Case 3:21-cv-00923    Document 65-1    Filed 01/13/23    Page 382 of 389 PageID #: 2092

**stepped (3)**
133:20;183:2;
308:18
**stepping (1)**
308:17
**steps (2)**
192:24;193:2
**stick (6)**
94:14;95:10;124:5;
226:8,17;245:1
**sticking (1)**
98:13
**still (58)**
12:6;21:19;23:9;
27:10,25;34:5,7;37:4;
78:4;81:11;83:14;
94:2;95:4;100:13,15,
19,21;101:6;113:3;
120:22;125:8;131:13;
132:8,13;133:5;
134:15;140:1;148:18;
150:21;156:22;159:4;
161:18;163:3,4,9;
204:15,18;212:15;
214:2;217:23,24;
223:18;237:20;265:3;
266:20;269:13;
272:17,18;296:18;
312:9;313:17;314:4;
329:5,6;332:9,9;
334:4;343:10
**stinking (2)**
72:23,24
**stint (1)**
82:22
**stir (1)**
271:9
**stole (1)**
186:20
**stood (1)**
320:8
**stop (3)**
150:13;345:1;347:5
**stopped (2)**
288:5;296:20
**storage (1)**
291:5
**stories (5)**
46:23;50:17;211:5,
14,16
**story (12)**
48:1,16;50:4;66:8;
197:12;200:15,15;
209:11;211:6,18,21,
22
**Straight (2)**
296:5;297:8
**strain (1)**
159:15
**stranded (1)**
37:18
**strange (1)**
341:13

**strangers (1)**
46:13
**streamed (1)**
296:19
**streaming (1)**
24:16
**Street (42)**
5:24,24;7:20;16:22;
51:6;69:11,14;
100:23;105:17,20,24;
106:5,9,12,16,20;
113:22,25;114:3;
119:5,23;120:2;
140:13;189:24;190:4,
8,12;301:20;305:22;
306:2,6,9,15;307:5,
15,22;329:20;347:10,
13,16;348:1,18
**streets (1)**
319:6
**stress (1)**
124:21
**stresses (1)**
88:19
**stress-free (1)**
234:22
**stressful (1)**
278:2
**stretch (1)**
202:4
**strict (1)**
63:19
**strokes (1)**
291:21
**stronger (1)**
205:4
**structure (1)**
256:1
**stuck (2)**
37:19;319:17
**student (4)**
208:7;212:25;
259:19;304:2
**studio (3)**
92:4,5;115:25
**studios (2)**
21:7;79:9
**stuff (138)**
12:11;21:18;24:16;
28:6,7;30:17,20;
31:25;34:12;35:4,20,
22;36:12;37:8;38:9;
42:6,16;43:14;46:23;
48:21;49:6;50:16;
52:22;53:4,8,9,14;
55:18;59:6;64:3;
65:10,14,15;66:1;
67:1;68:16;84:25;
85:13;89:21;93:6;
98:11;104:3;107:20;
112:20;116:2,7;
118:12;119:1;124:20;
128:18;129:3,14;

131:3,11;132:22;
135:13;138:14;139:9;
148:1;153:23;158:5;
163:3;181:2,16;
183:8;185:25;186:23;
188:11,20;189:21;
191:18;193:21;
196:18;198:16;
206:18,22;209:5,23;
210:7;214:21,22;
219:15;220:6,7;
225:5;229:15,16;
231:13,22,23;234:2;
235:10;237:2,18;
240:19;243:5;244:9;
246:17;247:5;250:18,
23;253:7;258:22;
259:25;262:22;
263:25;264:7;267:16;
268:14,24;270:22;
275:17,24;277:22;
279:6;280:16;284:1,
8;285:1;291:17,18;
292:3,7,22;294:11,13;
296:2;303:16;310:8,
16;317:25;326:5;
327:2,3;331:23;
343:16,17,22
**style (2)**
81:8;202:8
**styled (1)**
5:12
**styles (1)**
273:9
**submit (4)**
81:24;90:1;154:9;
172:25
**submitted (2)**
149:17;172:23
**subscribe (1)**
64:24
**substantiate (1)**
18:8
**successful (5)**
208:19,25;209:1,8;
261:22
**succinctly (1)**
185:8
**sudden (1)**
302:16
**suddenly (8)**
48:25;211:10;
222:3;225:11;304:6;
327:21,22;331:16
**sued (3)**
45:15;52:18;268:11
**suffer (1)**
243:21
**suggest (1)**
317:1
**Suite (1)**
5:6
**suited (1)**

110:15
**summer (10)**
8:18;17:16,16;
37:11,11;40:1;140:7,
10;281:17;333:9
**Summit (30)**
204:16;243:23;
256:14;266:12,14,21;
267:17;268:3,4,18,19;
270:8,10,13;271:19;
272:5,22,23,25;273:2,
16,17;274:11,12,15;
275:2;299:16;318:18;
334:20,23
**sung (1)**
191:14
**super (3)**
74:24;78:4;296:5
**supervisor (8)**
70:4;74:23;135:10;
199:20,21;256:1;
265:13;287:15
**supervisors (4)**
74:24;129:6;
199:19,24
**support (2)**
50:11;346:21
**supported (1)**
287:14
**supportive (1)**
301:8
**supposed (13)**
187:24;188:1;
195:5;196:13;213:9;
222:11;229:14;
282:21;285:8;294:13;
322:25;333:21;
346:21
**supposedly (6)**
44:17;136:24;
173:8;176:4;232:11;
278:5
**sure (135)**
8:14;9:2,6;11:21;
16:14,22;17:4;18:7,
10,20;19:22;20:20,
22;21:24;23:4;25:12;
28:17;30:13;34:16,
22;35:1;36:25;40:21;
48:4;49:22,24;50:2,3;
55:22;61:25;63:1;
64:14;65:4,25;72:15;
77:7;84:18;88:12,14;
89:3;90:14;93:16,16;
95:10,19,21;100:3,9;
101:15,24,25;102:20,
23;103:3;107:9;
108:15,22;110:9,19;
116:6;117:19;123:8;
125:19;129:23;140:9;
142:6,25;145:18;
146:19;151:4,11,13;
153:9;155:3;158:15;

166:9,18;172:5,6,21;
173:20,25;179:2,16,
22;180:1,9;181:5,8,
13;184:12,15,18,21;
189:3,5;190:24;
191:14;197:1,4;
209:7;217:8,16;
222:23,23;226:10,18;
235:15;240:17;
244:15;255:6;257:19;
261:13;262:14;
281:24;286:5;291:19;
300:3;308:16;309:10;
310:2,8;311:4;
313:20;322:1,12,14;
324:1;327:4;339:10;
341:7;346:10,22;
347:19;348:5
**surgeries (1)**
88:9
**surprise (1)**
188:12
**surprised (11)**
67:23;222:8;
232:19;233:7;245:11;
282:19;316:2;333:16,
20;339:6;341:11
**surprising (2)**
234:2;302:16
**surrounding (1)**
277:25
**survivor (1)**
96:1
**suspicion (3)**
76:14,19,20
**Suzanne (4)**
55:1;56:13;57:25;
59:8
**swap (1)**
224:19
**swapping (1)**
202:12
**swear (1)**
6:5
**sweat (2)**
168:20;193:20
**sweet (1)**
170:20
**switch (2)**
33:13;83:3
**switching (1)**
214:19
**switchover (1)**
214:16
**sworn (1)**
6:7
**sync (3)**
185:4;232:6,11
**system (16)**
28:5;55:7;60:7;
81:21;95:2;169:9;
186:2,19;225:3;
231:21;242:21;

243:12;244:21;
245:19;246:21;
252:21
**systematic (2)**
  243:5,5
**systems (4)**
  36:13,13;242:7;
  245:22

### T

**tab (1)**
  337:22
**table (3)**
  52:14;284:6;320:11
**tacks (1)**
  159:1
**tailer (1)**
  273:1
**takeaway (1)**
  263:5
**takers (1)**
  173:24
**talented (1)**
  36:16
**talk (97)**
  9:4;9:19;6:23:11,
  12;43:13;44:10,17,18,
  20;45:9;46:9;48:10,
  22;49:1;52:8;53:15;
  64:2,6,18,18,19;
  66:10;74:12;86:10;
  102:10;109:19;
  117:16;120:13;
  127:14;135:11;
  151:14;155:23;157:4;
  168:2;171:12;175:15,
  21,25;176:7;185:12;
  188:6,8;194:11;
  196:10;199:18;200:4,
  7;205:5,8,20;207:9;
  211:7;218:8;230:5,6;
  237:9;243:8,9,10,11,
  11;252:3;253:17;
  258:20;274:10;
  277:14,15;278:3;
  279:15;280:21;
  284:11,14,19;285:9,
  10,11,22;286:18;
  287:16,16;288:7,8;
  300:15,16;303:12,12;
  306:9;324:12,12,14;
  325:16,22;329:10;
  330:1;333:2;340:22
**talked (63)**
  9:3;55:3;57:23;
  60:22;92:25;93:3;
  98:20;121:4;123:2;
  125:6;132:19;133:23;
  137:21;153:3,19;
  156:14;169:9;176:2;
  182:8;197:18;201:21;
  205:7;221:15,19,21;

225:7;226:23;227:23;
230:21;232:20;233:2;
234:3,10;245:18;
246:12;250:5,8;
262:20;274:20;
286:20;287:1,18;
301:1;302:2;303:21;
309:5;312:4;319:7;
320:1;321:10,11,12;
322:8;324:17;326:3,
9,21;329:11;330:13;
333:5;335:21;341:12;
347:6
**talking (78)**
  25:15;45:13;48:8;
  52:12;53:22,23;
  54:13,15;55:24,25,25;
  57:5;58:23;59:10,11,
  20,21;62:7;73:7;74:9;
  87:25;90:12;95:15,
  20;98:5;104:21;
  122:4;137:6;149:19;
  159:8,9,10;169:14,23;
  170:9;178:15;188:14;
  200:5;201:18,19;
  209:22;219:2;222:6;
  225:15,16;226:12;
  231:5;233:7,9,16,16;
  234:12;237:20;
  238:11;247:12;
  249:17;250:6;251:10;
  253:12;258:15;269:7;
  270:23;271:15;
  303:19;305:21;313:7;
  321:9;326:23;328:8;
  334:15,18;336:23,24;
  337:19;338:1;339:23;
  340:24;345:1
**talks (2)**
  182:1;303:8
**tape (1)**
  181:8
**tapes (1)**
  83:4
**Tardy (3)**
  171:17;176:23;
  179:7
**target (13)**
  105:10;215:10;
  228:12,17,24;229:2;
  230:12,19;238:4,7;
  239:5,8,10
**tasks (1)**
  202:18
**tax (13)**
  11:23;23:6;163:18,
  18,20,20;176:18;
  178:15,19,24;309:20;
  310:5,15
**taxes (2)**
  23:9;253:11
**taxi (1)**
  28:6

**team (13)**
  38:8;60:24,25;
  62:10;80:12;153:8,
  13;154:22;178:7;
  325:19,24;327:1,10
**team-building (2)**
  186:1;297:18
**teams (4)**
  36:18;60:10;62:10;
  97:11
**Technically (2)**
  236:10;273:1
**technology (1)**
  30:11
**television (3)**
  21:5,10;259:24
**telling (7)**
  68:5;138:11;157:5;
  293:3;337:22;338:3,3
**tells (1)**
  333:24
**Ten (14)**
  72:18;144:12;
  157:22;158:2;165:5;
  168:7;194:24;197:5,
  7;253:23;265:15,15;
  327:18,19
**tend (1)**
  77:12
**Tennessee (65)**
  5:3,6,10;8:18,20,
  21;15:9,11;17:20;
  19:11,18,25;25:5,10,
  20;27:12,13,15,18,23;
  28:12,13,22;29:5;
  34:15,25;81:3;82:13;
  94:2,5,8,8;95:2;96:16,
  17;97:4,23;98:18;
  101:14,17;102:5;
  107:20,24;108:5;
  112:22;115:13;
  117:13;120:11,14;
  122:17;134:6,20;
  139:5;148:5;156:11;
  159:2,4;163:13;
  164:7;245:13;249:25;
  278:16;344:8;347:11;
  348:7
**tenure (2)**
  69:19;284:17
**terminated (5)**
  28:18;175:12;
  313:9;314:10,10
**termination (6)**
  76:17;77:6;330:2;
  332:22,23;333:1
**terms (6)**
  48:25;73:7,8;76:14;
  284:4;325:23
**Terrace (1)**
  5:3
**terrible (1)**
  129:7

**terribly (2)**
  11:6;151:10
**test (4)**
  44:21;154:9;
  212:19;220:15
**tested (3)**
  220:14;221:7;315:8
**testified (2)**
  6:8;37:1
**testifying (1)**
  9:19
**testimony (7)**
  72:7;148:25;
  195:19;196:18,19,20;
  238:3
**texts (1)**
  230:24
**thanking (1)**
  339:6
**thanks (2)**
  34:21,21
**theater (2)**
  145:11,14
**thingies (1)**
  70:10
**thinking (4)**
  120:15;122:19;
  123:1;288:10
**third (1)**
  262:13
**thirty (2)**
  265:20,25
**though (16)**
  12:6;30:18;50:6;
  82:18;130:17;148:17;
  163:22;193:6;215:18;
  242:17;265:3;266:17;
  268:11;272:5;279:8;
  301:21
**thought (26)**
  7:4;13:4;46:8;
  59:10,11,19;64:8,9;
  82:17;157:14;159:8;
  205:15;213:6;214:15;
  225:16,19;231:16;
  269:21,21;284:24;
  292:24;318:13;
  331:19;338:22;339:4;
  342:1
**thoughts (2)**
  195:5;197:17
**thousand (2)**
  61:20;178:3
**thousands (4)**
  144:9;148:2;
  271:18;291:11
**threat (1)**
  172:15
**threaten (1)**
  167:24
**three (18)**
  36:24;109:20;
  144:25;148:21;

202:13;215:24;
231:23;258:3;261:11,
12;264:8;274:25,25;
275:1;288:12;326:24;
327:10;340:11
**threw (2)**
  84:7;237:4
**throat (1)**
  226:4
**throughout (5)**
  61:19;78:3;176:10;
  199:9;309:4
**throw (1)**
  238:17
**thrown (1)**
  84:5
**thumb (1)**
  141:4
**Thursday (2)**
  189:4;233:2
**ticket (4)**
  160:13,16,17;
  266:25
**tickets (2)**
  267:5;272:10
**tied (1)**
  176:18
**tier (1)**
  137:7
**tiers (1)**
  91:19
**tight (3)**
  210:3;216:11;305:4
**tighter (1)**
  163:9
**timeline (1)**
  28:18
**timeliness (1)**
  22:11
**timeout (2)**
  71:6;272:16
**times (46)**
  12:7;27:20;52:2;
  53:17;72:1,4;74:11;
  75:2,8;76:18;77:8;
  78:6,9;86:17;89:9,14;
  104:6,17;112:22;
  115:19,23;122:21;
  143:18,22;147:22;
  158:1,2,8;165:5,24;
  168:7;177:17,21;
  189:20;212:2;216:4;
  252:3;255:3;256:7;
  258:3;294:8;296:13;
  330:17;334:1;339:9;
  340:16
**tiny (1)**
  142:21
**tires (2)**
  321:15,19
**title (8)**
  20:25;128:22;
  129:8;131:11;153:10,

10;201:5;210:16
**titled (2)**
182:13,14
**titles (2)**
128:17,19
**today (21)**
5:4,14;6:21;8:24;
9:19,23;41:25;50:22;
60:23;62:18,21;
101:20;110:22;149:1;
151:9;217:14;227:8,
10,18,22;238:3
**together (22)**
61:1;62:11,15;
91:12;122:14;129:5;
205:19;214:11,23;
215:21;217:4;225:5;
231:13,16,22,23;
237:2;249:10;277:21,
21;317:20,23
**told (55)**
15:25;19:19;34:14;
56:12;63:2,9;64:15;
65:4;68:17;69:21;
74:20;80:8;105:25;
112:17;113:6;138:10,
19;151:15;155:12;
156:19;164:2;167:18;
195:9;196:2;204:2;
206:4;209:11,19;
211:22;213:10;
226:20;235:7;236:23;
243:14;244:9,15;
245:6,23;248:7;
250:4,20;279:23;
283:10;286:8,9,10;
288:16;289:1;314:16;
315:13;322:17;332:1,
6,14;341:10
**ton (2)**
178:2;215:19
**tone (2)**
251:25;254:14
**tonight (1)**
316:4
**tons (1)**
169:18
**took (11)**
13:2;77:10;83:12;
185:20;192:25;193:6;
199:7;214:13;215:25;
232:22;271:7
**tool (3)**
166:16;172:4;
176:15
**top (15)**
30:15;50:24;51:3;
75:1;111:3;121:2;
126:25;137:7;142:1,
7;247:6;252:5;
310:25;311:6;344:7
**topic (1)**
122:4

**topics (2)**
51:20;226:12
**topsyturvy (1)**
278:22
**tornado (1)**
45:14
**total (1)**
323:11
**totally (7)**
38:1;59:15;191:5;
232:4;235:9;247:3,4
**touched (1)**
174:13
**tough (1)**
216:11
**tour (2)**
207:18,21
**tours (1)**
280:25
**tout (1)**
43:1
**touted (3)**
167:1;174:15;
250:24
**towards (4)**
46:5;118:19;
204:13;295:21
**town (5)**
113:3;151:5;
198:14,16;317:24
**Township (1)**
7:20
**Toyota (1)**
186:20
**track (3)**
30:17;213:5;231:19
**tracking (3)**
267:25;269:4,4
**traditional (1)**
91:6
**traffic (1)**
189:7
**Trailer (18)**
32:11;85:3;97:16;
123:24;125:13;127:5,
19;212:21;256:11;
259:6;266:16,24,24;
272:5,25;274:11,12;
317:23
**trailers (5)**
21:4;79:7;80:23;
204:24;256:22
**trailing (1)**
257:19
**trails (1)**
174:2
**train (2)**
169:11;204:7
**trained (1)**
146:9
**training (2)**
130:13;282:17
**transferred (2)**

18:12;19:8
**transition (1)**
299:7
**translate (1)**
241:23
**transmitted (1)**
237:4
**traumatic (1)**
211:25
**travel (1)**
150:23
**traveling (1)**
317:25
**treated (1)**
221:13
**treating (1)**
204:12
**treatments (1)**
96:4
**trial (2)**
33:4;348:10
**trick (1)**
162:24
**trickles (2)**
252:18,19
**trickling (1)**
253:18
**tricks (2)**
258:9;269:16
**tried (4)**
23:25;24:3;227:7;
244:5
**triggering (1)**
73:23
**trip (1)**
159:9
**triple (1)**
22:7
**tripod (1)**
292:22
**trivia (1)**
207:20
**Troop (2)**
245:10,15
**trouble (6)**
131:23;134:23;
204:23;249:9;263:17;
272:15
**true (15)**
43:22;64:16;66:24;
67:22,24,25;68:22;
95:13;212:7;230:18;
236:12,12;250:25;
251:6;330:14
**trust (3)**
242:17;283:17,19
**trusted (1)**
283:18
**truth (1)**
9:23
**try (21)**
38:12,13;55:13;
78:10,10;93:15;96:1;

124:4;133:10;134:13;
154:6;162:25;189:10;
202:5,6;207:19;
217:9;244:20;255:7;
263:21;307:10
**trying (41)**
15:14;23:9;25:15;
34:7;43:17;53:25;
57:4;59:12;64:11;
65:19;72:16;73:20;
76:20,22;80:8,11,12;
81:1,25;85:21,22;
87:15;94:15;122:12;
124:14;138:13;
167:15;188:15;194:7;
202:16;235:2;248:14;
259:24;264:3,4,4;
267:20;291:6;298:10;
318:24;337:4
**turn (5)**
174:18;319:1,3;
329:5,8
**turned (7)**
23:19;52:17,18;
58:2,9;154:2;233:24
**turning (1)**
150:6
**turnover (3)**
87:8,19;99:9
**turns (1)**
240:25
**TV+ (2)**
143:3,13
**twice (2)**
60:19;143:15
**Twitter (7)**
48:21;49:2,8,9;
50:8,23;64:23
**two (41)**
8:1,19;10:4;11:8;
15:2;26:10;30:25;
36:24;41:4;62:10;
81:11,12;89:9,9,17;
96:4;118:2;125:14;
129:16;154:18;
159:16;160:2,19,22;
161:1;174:21;184:22;
201:25;210:17,20;
215:24,25;216:25;
225:21;236:7;257:13;
261:8;281:14;282:18;
287:7;326:20
**two-month (1)**
213:20
**two-week (3)**
14:15;15:6;296:18
**type (4)**
248:10;301:17,18;
336:7
**typed-up (1)**
342:20
**typical (1)**
126:4

**typically (5)**
91:15,25;127:16;
161:13;278:14

**U**

**umbrella (1)**
62:13
**Umm (1)**
130:22
**unable (1)**
14:1
**unaccompanied (1)**
160:15
**unaccountable (1)**
255:11
**uncomfort (1)**
223:21
**uncomfortable (4)**
196:12;223:21;
300:22;338:21
**uncommon (1)**
112:17
**under (12)**
9:19;48:25;50:18;
62:13;106:24;131:17;
150:21;154:12;
160:13;162:19;
172:16;288:17
**underneath (1)**
123:21
**underserved (1)**
201:18
**underserving (1)**
205:23
**understood (1)**
322:13
**unemployed (4)**
12:25;13:19,20;
143:25
**unemployment (11)**
13:20,25;14:11,17;
15:8,9;18:21;19:1,19;
23:10;146:15
**unfinished (1)**
224:11
**unh-unh (1)**
9:16
**unicorn (1)**
245:12
**union (8)**
11:11;12:1,2;21:17,
20;22:10,12;23:7
**United (1)**
5:9
**universal (1)**
285:12
**University (3)**
84:24;192:20;
262:25
**unless (6)**
72:8;95:9;159:23;
167:9;255:19;328:7

**unlikely (1)**
118:7
**unnecessary (1)**
318:1
**unofficial (1)**
183:16
**unpaid (4)**
182:16;187:22;
188:23;189:19
**unpleasant (2)**
71:17;320:6
**unredacted (1)**
160:12
**unto (5)**
244:9,12,12;
246:18;321:16
**unusual (2)**
90:4;114:20
**unveiling (1)**
273:6
**up (228)**
13:1,3;22:15;27:18;
28:8,15;31:20;36:2;
39:25,25;45:21;
47:11,18;48:2,11;
49:1,6,23;50:6;52:3;
53:7,21;57:5;63:2;
65:7,21;66:1;67:11;
68:6;69:2,7,20;71:19;
72:8;75:1;80:21,24,
25;81:3,21;89:19;
91:10;99:12;104:7;
109:22;111:14;
112:11,15;115:8;
117:25;118:20;
120:24;124:10;
126:20;129:1;133:17,
22;134:3,11,20;
135:16;137:5,6,22;
138:5,11;145:15;
146:1,5,7;150:6;
155:13;159:24;160:1,
8,14,16,18,18,19,21;
161:11,14,14;162:1,2;
163:19;167:9;168:25;
169:9,12;170:22;
171:19;172:20;
176:12;178:5,6;
179:19,22;182:9;
183:19,20;188:19;
189:6;192:9;193:18;
194:1;195:3,15,16;
200:19;201:3,9,22;
202:7,20,23;203:4;
204:11;206:17;207:9;
208:5,9,10;209:2,5,
22,24;212:21;214:13,
18;215:18;216:7,7,9,
23;218:3;219:12;
220:1,22,23;221:23,
24,25;222:19;223:3,5,
8;225:21,22,24;229:9,
15;232:6,12;234:16,

17,18,24;236:6;
237:25;239:15;
241:10;245:8,10;
246:4;247:6,17,25;
256:18;264:5,6;
265:4,7;266:15,25;
267:1,5,24;268:5,8,
10;269:6;271:4,8,10;
272:4,10;275:18,21;
276:23;278:22;
279:17;283:14;
284:17;285:3;286:7,
21;287:23,24;289:13;
291:22;294:6;295:15;
301:6;303:15;304:12,
22;305:10;306:24;
308:11;317:21;
318:18;320:19;
322:25;323:1;326:21;
332:5;333:1;334:23;
339:3,14,24;341:2,16;
342:3,21;347:24
**updates (1)**
44:23
**upon (2)**
116:17;185:20
**upper (2)**
74:22;174:4
**upset (2)**
271:2;318:5
**upsetting (1)**
339:23
**upstairs (2)**
173:11;207:17
**uptick (2)**
61:12,16
**use (26)**
18:6;19:2;26:4;
31:16;32:3;34:11;
100:17;128:21;132:2;
134:8;135:2;137:10,
11,25;138:8;166:16;
172:4;180:25;181:4;
231:16;243:22;
267:23;268:11,13,23;
294:4
**used (10)**
24:9;48:23;76:7;
105:9;171:22,22;
206:18;214:25;
284:13;286:16
**using (15)**
24:16;107:14;
134:3;137:23;185:3;
263:8,9,11;268:5,8,
10;272:17;325:17,18;
328:6
**usual (2)**
321:7;333:19
**usually (40)**
33:3,6;34:24;44:19;
56:20,25;77:10,10;
78:8,17,18;86:14,14;

87:18,19;92:4;93:15,
20;114:20;118:4,13;
126:4;128:20,24;
129:1,2;148:20;
150:9;158:6;171:1,4;
180:17,22,24;186:3;
188:13;200:8;257:15;
271:17;282:15
**Utilities (1)**
163:21
**utilizing (2)**
204:15;268:24

**V**

**vacations (1)**
97:11
**vaccination (1)**
298:10
**vaguely (2)**
110:17;326:22
**value (7)**
64:21;77:24;80:15;
81:21;245:18;246:19;
248:9
**vanity (2)**
128:22;314:6
**varies (1)**
12:7
**variety (3)**
74:5;207:7;309:20
**various (1)**
111:6
**vary (1)**
190:17
**vast (1)**
162:4
**vastly (1)**
321:21
**vaulted (2)**
291:4,4
**veer (1)**
340:24
**veil (1)**
255:10
**venue (1)**
156:9
**verbal (2)**
328:15,15
**Verbalize (1)**
142:14
**verified (1)**
330:14
**versus (5)**
5:12;203:14;
263:10;294:9;321:22
**vested (4)**
82:19;93:14;95:7;
126:6
**vetted (1)**
321:14
**via (1)**
15:13

**vibe (1)**
281:6
**Vicente (2)**
42:17,21
**victims (1)**
45:14
**victories (1)**
285:23
**video (46)**
5:4;26:8,22;28:23;
38:19;60:25;97:11,
15;110:10,17;111:3,
18,23;113:13;116:10;
153:13,23;155:13;
180:3,5,6,10,12;
181:17,23;182:5,9;
184:24;188:19;194:6;
202:7;205:25;206:8,
20;213:19,22;214:5;
255:1,3;256:13;
258:7;291:1;292:4,
11;306:17,22
**VIDEOGRAPHER (20)**
5:1,2;6:3,15;83:3,6,
9;140:14,17;150:14;
229:20,21,24;308:21,
23;309:1;338:15,18;
348:13,20
**videos (4)**
181:1;185:7;
188:21;257:8
**view (2)**
318:10;321:23
**viewpoints (1)**
135:14
**views (4)**
248:11,12;250:9;
321:22
**violate (1)**
307:14
**violated (7)**
305:19;306:5,14;
307:4,9,20;308:2
**violation (1)**
295:14
**violations (1)**
306:25
**Virginia (4)**
29:1,5;84:25;
125:15
**viruses (1)**
303:2
**visiting (2)**
98:23;122:21
**voice (4)**
117:18;252:16;
279:14;339:9
**voiced (2)**
136:3;243:3
**voice-over (1)**
145:13
**voluntarily (2)**
61:24;322:25

**voluntary (1)**
322:24
**volunteer (7)**
184:11;188:2;
192:22;193:9,10;
209:16;254:7
**volunteered (1)**
135:5
**vote (15)**
167:20;172:6,6,12;
174:7,10,20,22;175:3,
4,5,18;176:21,21;
179:22
**voted (5)**
164:22;165:5,23;
166:5;174:9
**votes (1)**
176:10
**voting (5)**
171:12;175:12,12;
179:9;180:11

**W**

**W-2 (4)**
12:5;311:10,20;
312:13
**W-2s (1)**
309:25
**Waggoner (8)**
60:18;199:22;
203:22;204:3;265:14;
269:1;327:9;328:5
**wagon (1)**
210:16
**wait (5)**
9:13;14:6;20:13;
70:16;132:20;301:16;
325:10
**waiting (3)**
225:9;231:11,12
**wake (1)**
189:6
**waking (1)**
188:19
**walk (2)**
267:24;268:17
**walked (2)**
153:16;249:16
**walking (1)**
269:6
**walls (1)**
63:21
**Walt (2)**
23:23;34:16
**wants (8)**
44:20,22;244:20;
252:15;294:14;303:9,
10;332:19
**war (2)**
46:23;175:1
**warm (1)**
124:17

**warmer (1)**
30:4
**warned (1)**
268:11
**Warner (1)**
21:8
**wash (1)**
342:25
**washing (1)**
343:20
**watch (6)**
256:24;257:1;
262:3,4;281:1;296:19
**watched (6)**
24:14;98:19;
181:17;266:13,14;
267:6
**watches (1)**
282:21
**watching (7)**
167:24;221:10;
238:2;266:15;315:15,
16,17
**water (3)**
135:11;200:4;
287:16
**waving (1)**
292:17
**way (68)**
11:22;30:21;33:3;
35:6;55:6;63:24;
71:13;75:1;78:19;
80:16;89:5;103:5;
105:21;118:9;123:19;
125:21;141:11;
142:23;148:8;160:14;
165:4;167:23;172:25;
176:18,19,21;177:13;
185:15,18;189:11;
197:24,25;198:1;
202:11,20;205:15;
208:22;209:24;
212:14;215:23;
221:12;230:21;
234:20;242:23;
243:16;244:4;250:23;
251:16,21;252:20;
253:2;256:1;257:9,
10;264:16;268:15;
269:5;276:18;281:18;
294:14;304:2;307:10;
318:12;321:24;
324:22;327:15;
328:25;329:21
**ways (5)**
12:10;188:15;
200:9;249:5;318:9
**we' (1)**
263:11
**weapon (5)**
53:12;66:18;68:1;
165:2,2
**weaponized (1)**

**wear (8)**
145:16;183:4;
270:14;271:7;295:22;
297:1;315:24;317:11
**wearing (5)**
270:16;271:2,22;
296:4;317:1
**weather (2)**
123:9;263:20
**web (1)**
123:3
**website (6)**
66:23;84:13;105:8;
149:8;158:7;168:9
**Wednesday (1)**
45:4;111:2;189:3;
194:17;195:4;240:24
**week (74)**
14:23;15:1;33:7;
41:4;51:23;54:17,19;
55:2;59:24;60:19;
63:9;67:10;70:12;
74:12,16;81:13;
139:18,24,25;161:23;
168:19;183:18,20;
184:5;186:5;187:14,
17;192:15;195:2;
197:6,11,22;207:7;
210:19,19;217:3,13,
18;223:2,3,5,20;
224:21;225:22;227:1;
232:7;236:19,25;
237:16,17;238:7;
262:1,5;265:18;
272:4;273:21,23;
299:9;300:21;302:25;
303:5,6;320:19;
322:20;323:2,5;
324:18,19,20;330:12;
332:12;333:18;
334:22;336:22
**weekend (2)**
217:11;239:14
**weekends (2)**
162:9;193:20
**weekly (11)**
58:4;71:12;148:18;
173:9;188:13;192:13,
17;236:4;287:3,10,14
**weeks (25)**
30:25;33:5,6,11,12;
210:20;217:22,22;
222:1,2;225:13,18;
231:5,12,15,24;
267:16;281:14;
288:12;299:2,4;
322:17,21;323:4,4
**Weichel (1)**
138:2
**weigh (2)**
54:2;56:8
**weighing (1)**

208:8
**weird (20)**
64:7;86:18;172:24;
176:1,3;178:7;
183:17;204:10;
255:16;272:16;278:8;
286:1;294:11;312:15;
316:23;327:20;328:4;
330:11,15;339:1
**weirdest (1)**
332:17
**welcome (1)**
210:15
**weren't (27)**
15:16;24:16;25:19;
26:5,11;28:9;29:14,
17;34:14;60:23;
89:16;125:5;135:7;
148:17;169:6;183:21;
185:3;198:13;202:18;
219:13,15;230:11;
233:15;257:24;
298:19;305:7;330:5
**West (2)**
5:5;311:10
**whatnot (3)**
83:24;161:3;248:16
**what's (49)**
7:18;20:25;21:11;
22:12;43:3;49:2;
52:10,25;53:1;54:4;
57:6;78:22;82:1;84:3;
85:4,9;88:2,11,15;
93:6,6;105:23;
135:18;150:25,25;
158:19;211:17,17,18,
19;220:10,22,23,24;
221:8;223:3;263:4;
276:15;277:16;
278:24;285:23,24;
301:6;306:23;307:10,
12;334:5;341:23;
343:6
**whatsoever (1)**
67:4
**wheel (3)**
242:20;249:22;
321:5
**whenever (1)**
233:2
**where's (2)**
133:16,17
**whiskey (1)**
305:11
**whoa (2)**
235:19,19
**whole (31)**
17:25;80:20;86:23;
87:17;92:4;124:21;
134:21;137:17;
168:15;203:2;224:1;
228:16;229:12;231:7;
235:6;255:9;267:6;

270:25;271:7;272:6;
273:18,19,21;288:7;
290:2;294:17;296:6;
297:9;298:17;316:24;
321:15
**whoops (4)**
331:2,3;332:2,6
**who's (1)**
85:5
**wife (64)**
54:6;68:10;71:4;
75:18;90:3;95:20;
97:9;112:6;122:6,16;
133:9,17;154:16,17;
159:14,21;160:17;
162:12;205:14;
233:13,13;234:1,17;
246:3;247:11;248:5;
249:2,11;276:5;
277:4,12;278:8,11,13;
279:7,21,25,25;280:4,
8,8,11,16;283:18;
286:16;298:6;300:17,
18,21,25;301:2;
304:11;324:13;
329:12;331:10,24;
332:15;333:2;340:24,
25;341:10;346:14,20,
23
**wife's (2)**
54:5;94:12
**Williamsburg (8)**
23:23;85:1;97:9,10,
23;123:2;144:21;
146:24
**win (2)**
72:23,23
**wince (1)**
174:13
**wind (1)**
249:21
**wins (1)**
137:17
**wiped (1)**
343:18
**wiring (1)**
214:12
**wish (1)**
215:9
**within (3)**
30:25;239:15;
329:21
**without (5)**
129:22;218:11,14,
19;255:13
**witness (43)**
6:7;16:19;36:6;
40:22;42:21;69:16;
70:16;120:5;132:10;
142:15;143:9;150:17;
152:14;181:16;
189:25;190:9;301:13,
18,22,24;305:24;

306:17,22;307:6,16,
23;308:16;312:20,24;
325:8,11;338:20;
342:19;344:10,18,22,
25;347:19,23;348:5,8,
11,12
**wives (5)**
247:1;279:13,16;
346:22,22
**women (1)**
47:2
**wonder (1)**
43:15
**woods (1)**
96:7
**Woollen (5)**
14:14,25;41:3;
312:1,10
**word (4)**
32:3;62:20;255:12;
263:9
**words (14)**
7:2;36:7;76:6,11;
78:11;130:13;176:4;
253:18;254:15,18;
331:3;333:23;334:7,8
**wore (3)**
296:23,24;297:7
**work (202)**
10:11;11:16;12:18;
14:19,22;23:14;25:1;
27:24,25;28:11;29:6,
7,11;30:8,9,21;31:21,
23;32:4,12;33:11,11,
17,19,21;35:3,7,7;
37:16;43:17;46:20;
48:6;60:15;67:3;70:5;
72:18,21;73:1;77:13,
19;81:8,13;82:1;83:4;
84:12;85:11;87:10,
12;88:18;91:22;99:7;
101:2;111:22;112:3;
115:22;116:4;118:10,
12,12;123:19,22;
124:2,12;126:9;
130:6,16;132:18;
133:4,10,25;137:1,8;
145:15;146:3,14;
157:1,25;159:20;
161:23;162:8;164:22;
165:5,14,16,19;166:6,
21;167:2,13,16,25;
168:7,19;169:15;
171:12;172:7,11,13;
175:13,20;177:14;
179:10;180:11;181:3;
183:18;187:10,14;
188:2,4;191:17,20,21,
24;192:22;193:9,10,
19;194:2;197:19;
199:7;200:7,10;
207:1;209:7;212:3;
213:1;214:15;217:11;

218:11,14,19;219:25;
222:11,15,21;223:9,
10,13,15;224:9;
229:9;234:20,20;
235:7,22;237:13,24;
238:20,22;241:5;
244:12;247:25;250:2;
251:1,1;255:7;
258:14;264:13;274:3,
4,5;285:4;299:1,11,
13,16,21;300:8;
302:13,15;304:4,20,
24,25;315:6;317:7,9,
17,19;319:17,19;
320:22;321:2,7,16;
322:16,16,18;323:8;
324:6,25;326:4;
329:7;330:16,21,23;
331:21,23;332:9;
333:15;339:22;
343:14
**Work' (1)**
165:24
**worked (40)**
11:17;15:22;17:1;
28:12;30:3;40:4;41:3;
42:17;47:8,10,14;
48:13,14;60:7;70:7;
91:16,23;92:24,25;
100:25;129:16;
154:19;160:14;186:5;
190:22;191:1;207:11,
12;225:18;255:5,19;
270:15;272:21;
289:10,11,19;291:2;
317:22,22;333:17
**workers (1)**
303:23
**workflow (3)**
250:22;341:5,8
**work-from-home (1)**
325:3
**working (68)**
11:13;14:22;24:22;
30:8;35:9,13,17,20,
21;36:18;40:6;43:5;
46:23;65:23;81:12;
82:24;87:12,14;
92:12;107:11;124:18,
23;130:15;133:2;
138:5;165:9,13;
167:5;182:23;183:19;
189:17;202:10;205:6;
208:5;212:11;213:7,
10;214:18;217:23;
221:24;222:13;
230:23,23;233:14,15,
21;234:13;235:1,10,
16;237:1,1,2;258:5;
276:13;289:21;290:6;
296:15;298:19;
299:18;301:25;304:6;
305:8;315:23;320:19;

324:8;328:1;346:2
**workloads (1)**
124:15
**works (10)**
33:3;136:24;
156:24;218:5;219:18,
20;250:22;252:10;
273:17;315:7
**world (3)**
181:6;209:12;281:4
**worried (3)**
234:7;271:12;
318:25
**worry (15)**
82:14;216:18;
217:12;218:17;221:9,
9;224:17;235:12;
239:14;293:13;294:2;
302:22;315:13,15;
327:7
**worse (2)**
51:17;54:4
**worship (1)**
278:23
**worth (1)**
184:12
**worthwhile (1)**
155:20
**Wow (1)**
208:23
**wrap (1)**
273:13
**wrapped (1)**
288:13
**wreckage (1)**
23:10
**Wright (1)**
202:2
**write (7)**
117:7;119:19;
135:8,9;195:5;344:9;
345:19
**write-up (1)**
91:7
**writing (4)**
121:2,9;144:21;
145:14
**written (3)**
69:20;150:1;286:24
**wrong (1)**
8:13
**wrote (1)**
344:6

**X**

**XL (1)**
292:19

**Y**

**ya (10)**
32:20;90:25;91:3;

157:17;261:14,25;
311:19;312:17;
321:18;322:12
**y'all (4)**
300:2;316:10;
345:13;348:16
**yards (6)**
87:17;134:21;
137:17;194:1;235:6;
267:6
**year (43)**
8:17,18;11:3;13:12,
18,19;14:7,8,14;
17:14,16;21:13;
23:10;28:15,15;
37:11;40:1;61:19,20;
72:23;82:20;90:24;
96:3;114:23;126:20,
22,22;140:6,7;166:7;
168:24;171:1,8;
187:19;213:3,23;
242:6;281:16,18;
290:25;312:16;
329:21;337:16
**yearlong (1)**
15:14
**yearly (4)**
126:3,5;171:6;
209:20
**years (16)**
36:24;38:9;72:19;
79:23,24;92:10;96:3;
128:23;146:25;
176:10;215:24,25;
290:25;309:20;310:3;
339:20
**year's (2)**
272:10;273:2
**yelling (1)**
295:8;340:2
**yellow (2)**
286:2,4
**yes-or-no (1)**
342:11
**York (2)**
223:20;229:11
**you' (1)**
335:1
**you-all (1)**
172:11
**young (3)**
62:8;159:16;203:18
**younger (2)**
87:14;202:17

**Z**

**zero (2)**
303:13,14
**zeroed (1)**
305:16
**ZIP (2)**
7:22;8:15

**Zoom (10)**
34:3,5;90:2;148:7;
150:10;154:17;164:6;
170:5;246:4;296:17
**Zoomed (1)**
296:16

**0**

**00 (1)**
152:20
**0002 (1)**
311:2
**0010 (1)**
152:20
**0015 (1)**
144:18
**0031 (1)**
152:20
**0107 (1)**
300:4
**0S026 (1)**
311:7

**1**

**1 (1)**
20:15
**10 (4)**
142:5;293:8;
322:22;313:1
**10,000 (1)**
161:8
**10:06 (1)**
5:15
**100 (14)**
21:24;59:23;67:25;
110:19;161:5;175:2;
181:13;235:15;
240:17;262:14;310:8,
18;312:25;330:14
**101 (2)**
309:11,13
**1013 (1)**
5:3
**1099 (4)**
11:24;12:7,16;
312:12
**10th (1)**
134:17
**11 (2)**
325:7,13
**11:28 (2)**
83:7,8
**11:38 (2)**
83:8,10
**12 (5)**
142:19;143:1;
152:8;342:7,8
**12:37 (2)**
140:15,16
**12:38 (2)**
140:16,18

**12:47 (2)**
150:15,16
**13 (10)**
79:23;80:1;143:3,
12;327:21,22;342:18;
343:24;344:1,3
**130 (2)**
245:10,15
**13th (3)**
191:6;234:11;
340:20
**14 (7)**
79:24;143:13;
339:20;340:13;
343:25;344:21,24
**15 (6)**
139:16;218:5;
315:6;332:20;333:7;
346:8
**15,000 (1)**
16:1
**15th (3)**
218:1;293:3;302:9
**16 (3)**
16:25;146:22;347:3
**16th (10)**
71:2;191:3;293:4,4,
5;294:17,23;302:8,
11;324:4
**17 (2)**
89:14;108:21
**1720 (1)**
5:5
**17th (2)**
302:12,15
**18 (2)**
119:17;323:18
**18th (1)**
120:2
**19 (5)**
96:24,24,25;111:2,
7
**190 (1)**
127:2
**190ish (1)**
126:19
**19ish (1)**
129:21
**1st (1)**
62:1

**2**

**2 (9)**
8:12;41:13,14;
78:23;130:19,23;
131:5;175:5;310:4
**2,000 (6)**
27:21;28:7;36:11;
118:7;277:24;329:19
**2:01 (2)**
150:16,18
**20 (7)**

37:3,12;84:15;
128:23;183:10,19;
337:17
**20,017 (1)**
105:16
**200 (3)**
60:12;240:11,13
**200,000 (2)**
21:13;84:9
**2000 (3)**
166:7;187:19;192:8
**2009 (1)**
111:11
**2017 (20)**
83:21,25;89:1,11;
90:16;92:18;96:22;
102:18,22;103:9,14,
15,22;105:19;106:19;
107:2,7,10,14;110:3
**2018 (11)**
84:16;99:6,17,20,
21;100:1;108:18,20;
109:1;110:6;129:21
**2019 (29)**
40:24;78:3;84:15,
15,16;89:11,11;97:3;
99:7,20;100:1;
102:14;109:15;110:6;
111:3,7;114:7;
116:22;119:17,24;
120:3;121:21;123:14;
131:18;139:1;140:10;
151:18;152:8;310:9
**2020 (34)**
13:1,5,8,16;17:21;
28:18;29:21;37:10,
11,12;38:19,20;44:6,
7;51:14;78:4;131:18,
20;138:17;139:3,4;
141:14;144:6;148:13;
149:2;150:2;183:12,
13;187:19;310:9;
323:18;340:14;346:4,
5
**2021 (31)**
11:23;13:5,6,17;
14:4,7;16:25;17:2,5,
14,15,16;18:12;23:7,
8;28:16;29:25;37:7;
39:21;40:24;140:7;
141:14;143:14;144:6;
148:13;149:2;150:2;
213:4;216:1;310:10;
311:20
**2022 (2)**
5:14;140:6
**20th (4)**
23:23;34:17;303:7;
325:2
**21 (2)**
13:10;37:4
**21961 (1)**
8:13

**21st (5)**
80:13;185:2;
188:17;203:18;
327:16
**227th (1)**
216:24
**24th (1)**
304:22
**25 (1)**
290:25
**250 (1)**
127:20
**250,000 (1)**
163:13
**26 (1)**
5:14
**26500 (1)**
7:20
**27th (1)**
216:23
**28th (1)**
216:25
**29th (1)**
216:25
**2-Pops (1)**
185:3

**3**

**3 (8)**
113:20,21;119:5;
126:3,16,24;127:2;
181:22
**3:21-cv-0923 (1)**
5:9
**3:28 (2)**
229:22,23
**3:35 (2)**
229:23,25
**30 (8)**
60:11;136:25;
163:8;178:10;183:19;
213:21;249:15;
337:14
**30-day (1)**
131:19
**30-second (1)**
338:14
**30-something (1)**
337:24
**31 (1)**
13:16
**31st (1)**
60:21
**37221 (1)**
5:3
**3rd (1)**
236:17

**4**

**4 (6)**
119:4,6,7;144:18;

188:19;189:6
**4:56 (2)**
308:24,25
**40 (8)**
81:13;161:23;
178:10;183:18;
187:10,16;190:22;
191:1
**401k (3)**
95:7;126:6;171:3
**402 (1)**
5:6
**40-hour (1)**
168:19

**5**

**5 (3)**
121:24,25;189:6
**5:01 (2)**
308:25;309:2
**5:30 (1)**
151:3
**5:31 (2)**
338:16,19
**5:41 (2)**
348:21,23
**50,000 (1)**
126:21
**50,000-dollar (1)**
213:21

**6**

**6 (4)**
114:7;152:22;
153:1;297:22
**60 (2)**
81:13;163:8
**6th (1)**
116:21

**7**

**7 (7)**
17:2;18:12;152:13;
153:1;157:24;182:1;
189:6
**7/31/2021 (1)**
17:1
**700 (3)**
11:13;22:16,19
**7th (1)**
213:24

**8**

**8 (4)**
119:24;120:3;
283:2,3
**80 (1)**
161:14
**80,000 (1)**

161:9
**8th (3)**
131:18,19;138:23

**9**

**9 (3)**
13:17;301:12,23
**90 (1)**
161:14
**90,000 (3)**
161:8;163:12;
168:20
**900 (1)**
293:9
**90s (1)**
174:19
**91350 (1)**
7:24
**91390 (1)**
8:15
**98 (1)**
175:3
**9th (7)**
222:3;225:11;
226:21,24;228:4;
230:16;236:14