# In The Matter Of:

*Melissa Jane Hogan vs.*
*Christopher Michael Laine Hogan*

---

*Hearing*
*October 3, 2019*

---



**nashvillecourtreporters**

*"Quality: Your work demands it . . . Our work reflects it."*

P.O. Box 290903 Nashville, TN 37229-0903

Phone: 615-885-5798
800-552-DEPO (3376)
Fax: 615-885-2621
info@ncrdepo.com

*Online Scheduling:* www.ncrdepo.com

*Original File 2019-10-03 Hogan v Hogan.txt*
*Min-U-Script® with Word Index*

IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE
AT FRANKLIN


MELISSA JANE HOGAN,                    )
                                       )
            Plaintiff/Wife             )
                                       )
vs.                                    )   DOCKET NO. 48072W
                                       )
CHRISTOPHER MICHAEL LAINE HOGAN,       )
                                       )
            Defendant/Husband          )


---------------------------------------------------------


TRANSCRIPT OF PROCEEDINGS

Before:  The Honorable Joseph A. Woodruff

Thursday, October 3, 2019

1:33 p.m.


---------------------------------------------------------

Virginia Dodge, RDR, CRR, LCR
NASHVILLE COURT REPORTERS
(615) 885-5798
Fax (615) 885-2621
www.ncrdepo.com

APPEARANCES:


Heard Before The Honorable Joseph A. Woodruff


For the Plaintiff/Wife

                        Siew-Ling Shea, Esq.
                        Rogers, Kamm & Shea
                        2205 State Street
                        Nashville, TN 37203
                        (615) 320-0600
                        shea@thewindinthewillowslaw.com


For The Lampo Group, LLC/Ramsey Solutions

                        Todd Presnell, Esq.
                        Bradley
                        Roundabout Plaza
                        1600 Division Street
                        Suite 700
                        Nashville, TN 37203
                        (615) 252-2355
                        tpresnell@bradley.com

1          The above-styled cause came on for hearing on

2    Thursday, October 3, 2019, beginning at 1:33 p.m.,

3    Chancery Court of Williamson County, Tennessee, before

4    The Honorable Joseph A. Woodruff, when the following

5    proceedings were had, to wit:

6                    P R O C E E D I N G S

7                         *  *  *

8                    THE COURT:  Good afternoon, everyone.

9                    MS. SHEA:  Good afternoon.

10                   MR. PRESNELL:  Good afternoon, Judge.

11                   THE COURT:  Welcome to the afternoon

12   session of the contested domestic motion docket.  We

13   have one case left on our docket to hear.  And that is

14   number 14 on the docket, Hogan vs. Hogan, motion to

15   compel subpoenaed documents.

16                   So where do we stand, and what's the --

17   first of all, have you-all been able to narrow any of

18   the issues?

19                   MS. SHEA:  Yes, we have.  So we were

20   here on September the 19th, and, Your Honor, you

21   entered an order on September the 24th, but you told us

22   we had to meet and confer in person, and you gave us

23   some specific dates to get the meet-and-confer done.

24                   So Mr. Todd Presnell, who represents

25   The Lampo Group/Ramsey Solutions, and I met on

1    September the 25th, 2019, and we discussed the subpoena
2    that we had issued and served upon Lampo Group/Ramsey
3    Solutions on July -- I think it's 30th, 2019.
4                     And so as a result of that meet-and-
5    confer, Mr. Presnell was going to check with his client
6    and get me some responses by October the 1st, 2019.
7                     And, Your Honor, do you need a copy of
8    all the items subpoenaed?
9                     THE COURT:  Only if there's a dispute
10   about the sufficiency of the production.  Y'all met.
11                    MS. SHEA:  Yes.
12                    THE COURT:  I assume at that meeting,
13   you narrowed the scope.  Mr. Presnell went back to his
14   client.
15                    Did Lampo Group produce in accordance
16   with the agreed-upon --
17                    MS. SHEA:  So there are some things
18   still missing, and I have not received any records yet
19   because we need a protective order that was sent to me
20   yesterday, and I just gave Mr. Presnell a copy of my
21   proposed counter.
22                    THE COURT:  So what do I need to do
23   today?
24                    MS. SHEA:  So this is the response that
25   Lampo Group provided to me at 4:51 last evening.

1          THE COURT:  Is this on the issue of the
2  protective order?
3          MS. SHEA:  No.  This is on the issue of
4  what they will be able to produce in response to my --
5          THE COURT:  Make that Exhibit 1.
6          (Proposed protective order marked
7           Exhibit 1.)
8          THE COURT:  Did this come from
9  Mr. Presnell's office?
10          MS. SHEA:  It did come from
11  Mr. Presnell's office.  And I have reviewed it, and we
12  have some things that we had talked about at our meet-
13  and-confer that he was going to check with his client.
14  And his client is saying that they do not have -- one
15  thing that his client said is that they do not have his
16  compensation calculations.
17          And, Your Honor, that is not possible
18  because if you look at husband's paycheck stubs -- and
19  let me hand you a set of them.
20          THE COURT:  What is it you mean when
21  you say "compensation computation"?  What is it you're
22  asking for?
23          MS. SHEA:  So Lampo Group is able to
24  give us his contract terms and the commissions that he
25  gets from each source of income for him.  He has

1    sources of income from speaking.  Mr. Hogan has sources

2    of income from radio, TV sponsorships, leads --

3                    THE COURT:  Does that flow through

4    Lampo Group?

5                    MS. SHEA:  It flows all through Lampo

6    Group, and it is all reflected in his paystubs.

7                    And, Your Honor, if you look at

8    Mr. Hogan's paystubs, his commissions fluctuate every

9    pay period.

10                    THE COURT:  Well, that's not

11   surprising.  Commissions that did not fluctuate from

12   pay period to pay period would be something that would

13   be curious, but commissions that are different every

14   pay period is not surprising at all.

15                    MS. SHEA:  That's correct.

16                    So he had a huge commission payment of

17   125,000, and since the pendente lite order has been

18   ordered, he is claiming he doesn't make enough money

19   anymore because he doesn't get to travel anymore.

20                    So we have no way of determining how is

21   it that all of a sudden, his commissions have all dried

22   up?  And that he's not making sufficient funds to

23   deposit moneys into --

24                    THE COURT:  If he's not traveling any

25   longer or as much as he did, then he's undertaking the

1  revenue-generating activity that he otherwise would

2  have been undertaking.

3         MS. SHEA:  That's correct.

4         THE COURT:  And he doesn't get a

5  commission if he doesn't generate revenue.

6         MS. SHEA:  That's correct.

7         THE COURT:  So why isn't that --

8         MS. SHEA:  Well, what we want to know

9  when he says he doesn't travel anymore, what is the

10  impact on his income?  Or if he says, "I am going to be

11  publishing a book," what is the impact on his income?

12  Surely when they pay him every pay period, there is a

13  way for them to calculate the amount that they're

14  paying him.  And the amount that they pay him --

15         THE COURT:  Isn't that shown on the

16  remittance advice that he receives?

17         MS. SHEA:  No, it doesn't.  It's a one-

18  lump-sum payment.  And we have no way of figuring out.

19  So if he gets a commission of 60,000, 50,000, 40,000,

20  125,000, what is it attributable to?  We have no way of

21  knowing.

22         And he has multiple sources of income

23  because he writes publication -- he has two books.  He

24  gets royalties from those books while he's employed

25  with Lampo.  He gets speaking engagement fees.  He gets

1    sponsorships by radios, TVs, podcasts.  He gets leads

2    payments.

3                    He has counseling, I believe.  We came

4    across a contract of compensation breakdown at one

5    point that he had some type of counseling or

6    consultation fees.

7                    We have no way of knowing how all these

8    things are calculated.

9                    And in Mr. Hogan's discovery, he gave

10   us some general things, general categories, and I can

11   forward it on to you.  This is some general categories

12   that he has given us through May, but it doesn't cover

13   everything.  So it's through May of 2019.

14                   He's saying that internal speaking in

15   2019 was 34,494.  His external speaking is 8,400.  His

16   product is $299,024.94.  His leads are 52,507.46.  And

17   adds up to a total of 394,426.97.

18                   He somehow was able to give us some of

19   this information in his responses to interrogatories,

20   but then his employer for some reason cannot give us

21   how they calculated his paystub.

22                   THE COURT:  What's the question that

23   was asked in the subpoena?

24                   MS. SHEA:  The subpoena asks for

25   "provide a breakdown of Mr. Hogan's compensation and

1    the percentages attributable to the various activities

2    that comprise his income at Ramsey Solutions and how

3    Mr. Hogan's income is calculated."  And that is

4    subpoena item number 4.

5                    THE COURT:  Look, look.  That's a duces

6    tecum, correct?

7                    MS. SHEA:  Yes.

8                    THE COURT:  The duces tecum asked for

9    documents that fit in a particular description.  If the

10   recipient of the subpoena has such a document that fits

11   that description, they produce it.

12                   If they don't have a document that fits

13   that description, they don't have the document that

14   fits that description.

15                   It seems to me that what you have set

16   out in your duces tecum would be more appropriate to

17   ask by way of an interrogatory.

18                   Now, you can't serve interrogatories on

19   a nonparty, but you can take a nonparty's deposition.

20   And when you've got an entity like Lampo Group, you can

21   take an entity deposition and Lampo Group can designate

22   a representative who has knowledge of these facts and

23   can testify to it.

24                   Because you've asked for a breakdown

25   and showing this, showing that, you're asking them to

1  create something that may not exist in the business

2  records of Lampo Group.  You're asking Lampo Group to

3  engage in a process, the results of which would be a

4  document responsive to that description.

5                    At least that's how it appears to me.

6                    MS. SHEA:  Well, they somehow have a

7  method for calculating how much they're paying him.

8  And if they're doing it by method, surely they have a

9  record of how much they're paying him --

10                    THE COURT:  But that's not what you

11  asked for.  You asked them to --

12                    Make the subpoena an exhibit.  I want

13  to see it.  I want to see a copy of that because you

14  read it to me.  I tried to listen carefully.  Let me

15  see what the words are in the duces tecum.

16                    This will be Exhibit 4.

17                    (Subpoena marked Exhibit 4.)

18                    THE COURT:  Are there any objections to

19  the first three exhibits I've received?

20                    MR. PRESNELL:  No, Your Honor.

21                    THE COURT:  Very well.  They're

22  received.

23                    Okay.  Which number is it?

24                    MS. SHEA:  That was number 4.

25                    THE COURT:  Let's take these one at a

1   time.  How many of the categories in your duces tecum
2   am I going to have to decide today?
3                   MS. SHEA:  We have the compensation.
4                   THE COURT:  We've got item number 4.
5   What else?
6                   MS. SHEA:  And then we have his
7   receipts of expenses.
8                   THE COURT:  What number is that?
9                   MS. SHEA:  Number 12.  Copies of
10  expense reimbursement forms.
11                  THE COURT:  Okay.  12.  What else?
12                  MS. SHEA:  And also 13, which is also
13  related to his expenses, which is the copies of the
14  bank statements that reflect check, debit or credit
15  transactions.
16                  THE COURT:  What else?  What other
17  categories?
18                  MS. SHEA:  Then we have his telephone
19  records.  They have indicated that they --
20                  THE COURT:  What category?
21                  MS. SHEA:  Number 17.
22                  Lampo has indicated that they can
23  produce one year.  I understand that Mr. Hogan has
24  actually a new phone on top of it, so -- recently.  So
25  we also want the records from the new phone.

1          Then we have also number 16, which is

2   the audio and video recordings, transcripts and/or

3   notes.  I understand that there may be an April 10

4   recording that can be supplemented to us.

5          But of course, I haven't received any

6   documents so far.

7          THE COURT:  Are those the items?

8          MS. SHEA:  And Mr. Presnell was going

9   to check with all the attendees at the December 2018

10  meetings to see if they had notes with respect to

11  those.

12         THE COURT:  Well, that was a generous

13  thing for him to do.

14         So that's it.  4, 12, 13, 16 and 17,

15  right?

16         MS. SHEA:  That I dispute?  Yes.

17         THE COURT:  Yes, ma'am.

18         Let me hear from Lampo Group.

19         On number 4, what sort of work papers

20  exist that reflect the commission computation?  What

21  sort of business records exist on that?  Work papers?

22         MR. PRESNELL:  Good afternoon, Judge.

23  Todd Presnell from Lampo Group.

24         THE COURT:  Nice to have you here.

25         MR. PRESNELL:  Good to be here.  Thank

1  you.

2         In response to question number 1, we

3  are producing what was titled an employment addendum.

4         THE COURT:  She didn't identify

5  number 1 as being an issue.

6         MR. PRESNELL:  No, but I'm leading --

7  my answer to that answers number 4 because I'm also

8  producing two separate compensation schedules.  And

9  those compensation schedules break down how he is paid,

10  meaning he gets X percentage for book royalties, for

11  example, after so many books are sold.  He gets X

12  percentage for speaking engagements.  So we have those

13  schedules broken down.  And given the period they've

14  asked for, we have two different ones covering two

15  different periods.

16         So my response is that those

17  compensation schedules responds to number 4.

18         THE COURT:  Let me find out what it is

19  that wife's getting at.

20         Ms. Shea, on number 4, are you looking

21  for evidence of what the commission rate is by

22  category?  Or are you looking for the individual work

23  papers that break down each individual month's

24  remittance?  Which of the two do you want?

25         MS. SHEA:  Both.

1          THE COURT:  I'm not going to give you

2    each individual month's.  I'm going to order it's

3    reasonable for the company to produce the commission

4    rate schedules that are in effect for the period of

5    time.  If it's the company's position that these are

6    the rates for X period of time, so if there's a pay

7    remittance that fits within that date range, these are

8    the percentages that will apply.

9          And you can back into what the gross

10   number was if you know what the rate is.

11          MS. SHEA:  Well, the unfortunate thing

12   is he's not going to provide me with totals.  So

13   there's no way of backing into --

14          THE COURT:  Of course you can.  If you

15   know what the remittance was and you know that that

16   represents a percentage, a commission percentage of

17   whatever that percentage was --

18          In other words, if you know that the

19   percentage is 10 percent, and you know he got a

20   commission of $200, then you know the gross was 2,000.

21   It's arithmetic.

22          MS. SHEA:  Let me kind of show you

23   something that was produced by Jeremy Breland to

24   Mr. Hogan.

25          THE COURT:  Who's Jeremy Breland?

1          MS. SHEA:  From Lampo Group to
2    Mr. Hogan.  And also what Ms. Hogan received as a copy
3    of the breakdown of the projected commission sources, I
4    guess in 2013.
5          So such records do actually exist.
6          THE COURT:  Let me see what this is.
7    Next exhibit.
8          (Email marked Exhibit 5.)
9          THE COURT:  So this is an email from
10   January of 2013 to Melissa Hogan from Chris Hogan.  And
11   it says, "Here is that revised comp plan we talked
12   about."
13          And then there's this --
14          MS. SHEA:  It's small.
15          But it breaks down all the different
16   categories and sources of income that he gets.
17          Now, even though it might say he gets
18   30 percent of the fees from outside speaking, if we
19   look at his paycheck, we don't know how much of his
20   paycheck comprised of that 30 percent, if they did not
21   give us year-to-date is up to 150,000 or something like
22   that.
23          And these documents exist because
24   Jeremy Breland, who is an executive vice president at
25   Lampo Group/Ramsey Solutions, forwarded this

1　information to Mr. Hogan, and then Mr. Hogan gave it to

2　Ms. Hogan.  And this is how they've been tracking all

3　his payments.

4　　　　　　　　THE COURT:  Well, this might very well

5　be -- this is not tracking any payment.  This is a --

6　　　　　　　　MS. SHEA:  Projected income.

7　　　　　　　　THE COURT:  This is projected income.

8　It doesn't mean that he actually earned this income.

9　He may earn more.

10　　　　　　　　MS. SHEA:  He may have.  And that's

11　what we want.  We want to know what he's earned to date

12　under each category.

13　　　　　　　　THE COURT:  You've got his pay

14　remittance.

15　　　　　　　　What's the relevance of each individual

16　category?

17　　　　　　　　MS. SHEA:  Because what happens is

18　if -- say Mr. Hogan says, "Well, I cannot track my --

19　my employer has taken me out and cancelled my speaking

20　engagements," we know it's --

21　　　　　　　　He gets a 30 percent commission on

22　speaking engagements, but without a total that he has

23　earned this year, we don't know how much it comprises

24　of his income.

25　　　　　　　　THE COURT:  Mr. Presnell, Lampo Group,

1  your client, uses an outside payroll service evidently

2  because these remittance advices are generated on a

3  form that has "Paycor" on it.

4              Is that an outside third-party payroll

5  provider, like ADP?

6              MR. PRESNELL:  I think it is.  I think

7  it is.  I'm not sure.

8              THE COURT:  So tell me how Lampo Group

9  determines in a given pay period how much an employee

10  like Mr. Hogan is due to receive by way of commissions.

11             MR. PRESNELL:  Judge, my understanding

12  is that -- and I've checked with them a couple of times

13  in a couple different ways.

14             There is no document that breaks down

15  what he receives in each check or what composes each

16  one of his checks.  I specifically asked about this

17  kind of document.  Wouldn't it be on a paystub-type

18  document?

19             The answer is no.  The way they handle

20  it is he receives revenue through various business

21  channels, whether it's publishing or outside

22  entertainment --

23             THE COURT:  Does he receive the

24  revenue, or is the revenue received by Lampo Group?

25             MR. PRESNELL:  Well, the revenue is

1   received by Lampo.  His commissions based on the

2   company's revenue run through various business units.

3                   THE COURT:  Sure.

4                   MR. PRESNELL:  Before every pay period,

5   which is once a month, each unit sends the internal

6   payroll department what the payments are for that

7   month.  So if he sold 10 books over his threshold

8   limit, then he gets royalties on 10 books, and that's

9   what's reported, and that goes into the check.

10                  But we don't have a document each time

11  that we give Mr. Hogan that says, "Well, you received a

12  thousand dollars from book royalties," or anything --

13                  THE COURT:  You may not give it to

14  Mr. Hogan, but somebody in the payroll department

15  calculates how much money he is due to receive.  And it

16  clearly is on a lagging basis.  He might not get paid

17  on revenue generated in February until the end of

18  March, maybe even April.

19                  But at some point, revenue attributed

20  to him has the commission percentage applied to it, and

21  the resulting amount is paid to him through the

22  services of Paycor.

23                  How is that done?

24                  MR. PRESNELL:  I asked that question

25  almost verbatim, Judge.  And the answer is payroll does

1  not have a breakdown of his monthly payment.  They

2  don't.  The payroll receives gross figures from various

3  business units, and they put it on the check, label it

4  apparently as divided between salary and commission,

5  and that's it.

6              THE COURT:  Who is it that determines

7  the commission?  Is it determined by the business, or

8  is it determined by the centralized payroll desk in

9  the -- I guess the controller's office?

10              MR. PRESNELL:  My understanding is it's

11  by the business unit.

12              THE COURT:  Each line of business

13  separately determines the amount of commission that's

14  due to be paid.  Is that what you're telling me?

15              MR. PRESNELL:  Yes.

16              THE COURT:  Well, then each line of

17  business has to have some working papers to back that

18  up, don't they?

19              MR. PRESNELL:  Each -- they may.  They

20  may.

21              THE COURT:  If they don't, then I would

22  expect that the company's auditors would criticize the

23  company for lack of internal control.

24              MR. PRESNELL:  Right.

25              THE COURT:  I mean surely you can't

1   just have compensation decisions being made by an

2   autonomous business unit without some kind of paper

3   trail that checks its accuracy.

4                MR. PRESNELL:  To be fair, I think my

5   understanding is they do depend on the employee to know

6   what the sales are, what the percentages are and to

7   verify what he or she receives.

8                But at some point, is there some

9   calculation, a determination of the number of books

10  sold and they calculate the percentage and they report

11  that to payroll?  Yes.

12               Is there a centralized breakdown of his

13  payment, his commissions for every single paycheck?

14  No, there is not.

15               I thought -- candidly, I thought there

16  might be.  I thought it might be on a payment stub.

17  I've asked this question.  And there is nothing that is

18  readily available that we can go find and produce.

19               So what we have produced are the W-2s,

20  and we're willing to produce those comp schedules.

21               And we submit at this point why should

22  there be any additional burden on Lampo to go back and

23  search through old emails for an extended period of

24  time to try to find this breakdown when we're giving

25  how things were broken down?

1          And you're right.  If he's not on the
2    road speaking, then his royalties from speaking
3    engagements will decrease.
4          So we want to give under the protective
5    order how Mr. Hogan's paid, what he's paid.  We're
6    giving a calendar of his events that we extracted from
7    his network space that shows these speaking
8    engagements, for example.
9          We believe we satisfied, more than
10   satisfied, our burden on this compensation issue.
11         Judge, I'll end this issue, we're not
12   here saying we don't want to produce it.  If I had it
13   in a producible format, I would turn it over under the
14   protective order.  There's no real mystery here about
15   it.  But we just don't have anything in the way they
16   want it that's readily available.
17              THE COURT:  Is Lampo Group producing
18   one or more documents that set out the commission
19   percentages attributable to the various activities that
20   are revenue-generating activities by Mr. Hogan?
21              MR. PRESNELL:  Yes.
22              THE COURT:  And that's a document that
23   will contain some or all of the information that's set
24   out in Exhibit 5?
25              MR. PRESNELL:  Yes.  This is the first

1  time I've seen this, but a quick glance, it appears to

2  be very close to, if not the same as, one of the comp

3  schedules that I intend to produce.

4                    THE COURT:  I'm not going to order any

5  additional documents be produced in response to

6  number 4.

7                    Let's go to number 12, expense

8  reimbursement forms for Mr. Hogan from January 1, 2018

9  to the present.  What sort of documents does Lampo

10  maintain, and what did the meet-and-confer resolve with

11  respect to number 12?

12                    MR. PRESNELL:  Yes, Your Honor.  12 and

13  13 can really be read together or they go together.

14                    Mr. Hogan is one of a few employees who

15  has a company debit card.  So when he is traveling and

16  charging expenses, he uses his debit card, which goes

17  directly to a Lampo bank account.  So he does not

18  complete nor do we have any expense reimbursement

19  forms.  And I told counsel --

20                    THE COURT:  Is he the only person that

21  has the debit card that he uses?

22                    MR. PRESNELL:  No.  And that goes to

23  number 13.  We do not have -- there are multiple

24  employees that have a debit card that goes to the same

25  account.  And so when we get a bank statement, we do

1   not have a way to segregate Mr. Hogan's expenses from

2   any other employee's expenses.  And that's what I

3   explained to counsel.

4                    So we don't have any documents like

5   that.

6                    THE COURT:  Well, how does the company

7   determine that the expenses that were incurred on the

8   debit card were legitimate business expenses?

9                    MR. PRESNELL:  My understanding, Your

10  Honor, is that some period of time -- I don't know;

11  month to month, something to that effect -- when the

12  bank statements come in, they have accounting staff who

13  reconcile them, I think against expense receipts.

14                    THE COURT:  So let's say you've got two

15  employees using the same debit card or they each have

16  their own individual piece of plastic, but it's

17  basically a debit card that goes to the same account.

18                    MR. PRESNELL:  Correct.

19                    THE COURT:  You're telling me that's

20  how it's structured, right?

21                    MR. PRESNELL:  Correct.  There are

22  about 40, as I understand.

23                    THE COURT:  Okay.  For purposes of my

24  question, let's just say it's two.

25                    So the internal control procedure is

1   the employee collects a receipt at the point of

2   purchase and then turns that receipt in to accounting

3   when they get off the road and are back at the mother

4   ship; is that right?

5                    MR. PRESNELL:  That's my understanding.

6   Yes.

7                    THE COURT:  Well, wouldn't there then

8   be a separate file for each employee who is accessing

9   the account so that you know whether a particular

10  receipt was an expense incurred by Mr. Hogan as opposed

11  to an expense incurred by Mr. Jones?

12                   MR. PRESNELL:  At the time of

13  reconciliation, yes.  I think so.

14                   THE COURT:  Okay.  It seems like there

15  would have to be.

16                   MR. PRESNELL:  Right.

17                   THE COURT:  So somewhere there is a

18  reconciliation file that is unique to Mr. Hogan.  Is

19  that right?

20                   MR. PRESNELL:  I don't know

21  specifically.  What I know is because when we talked

22  about this issue on the 25th, I explained our process.

23                   And then counsel asked me, "What about

24  the actual expense receipts?"

25                   And I said, "Well, I'm certain we have

1  to have them at some point to do the reconciliation, so

2  I will check on that."

3            That was not, as I understand it,

4  specifically requested in the documents, but I told

5  them I would.  And I responded yesterday that we don't

6  have an efficient method to extract old expense

7  receipts.

8            I wish I had asked this question.  I

9  didn't.  I don't know how long they keep those expense

10 receipts after reconciliation.  But we don't have a --

11 I don't know that there is a Mr. Hogan file that

12 itemizes his receipts.

13            THE COURT:  I think that it would be

14 customary for a company to keep files of that sort at

15 least so long as it would need to in order to make them

16 available to its auditors.

17            MR. PRESNELL:  Correct.

18            THE COURT:  And what I don't know is

19 whether Lampo Group undertakes an audit examination,

20 and if so, whether it does every year or through some

21 other period of time.

22            Do you happen to know the answer to

23 that?

24            MR. PRESNELL:  I don't know how long

25 they keep it for audit purposes.  And specifically I

1  don't think they keep it, but I'm happy to go reask is

2  whether they keep it segregated by employee as opposed

3  to a global expense file, for lack of better phrase.

4  THE COURT: If all you had was one

5  basket into which all receipts from all 40 employees

6  were put and they were not separated by individual

7  employee, then it seems to me it would be a serious

8  question from internal controls because if you had 39

9  faithful employees and one unfaithful employee, you

10  wouldn't be able to sort out who that unfaithful

11  employee was.

12  So it would seem to me that it makes

13  sense that in the reconciliation process, the

14  reconciliations would be done in a manner that

15  identifies each employee whose accounts are being

16  reconciled.

17  Doesn't that make sense?

18  MR. PRESNELL: It does. And my

19  understanding is that happens at the time of

20  reconciliation. What I don't know is what they do with

21  those receipts post reconciliation.

22  THE COURT: Find out.

23  MR. PRESNELL: I will.

24  THE COURT: Find out because if that

25  file is kept, then suspend any routine retirement or

1  destruction of those files as they relate to Mr. Hogan.

2             It would also make sense that some sort

3  of working paper would be generated in the

4  reconciliation process.  And it's conceivable that the

5  auditors might be satisfied if all they were given were

6  the working papers for the reconciliation.  They might

7  want to test the accuracy of the reconciliation by

8  actually looking at the raw data, the raw receipts.

9  But I don't know that that's in fact the case with

10 Lampo and its auditors.

11            But do check and find out if the

12 reconciliation process identifies by employee at some

13 stage and what working papers, if any, are generated

14 and then how long those working papers are retained.

15 And producing those working papers that are

16 identifiable just to Mr. Hogan with no other employee

17 would be responsive to numbers 12 and 13.  So I'm going

18 to order --

19            MR. PRESNELL:  Very well, Your Honor.

20            THE COURT:  I'm going to order you to

21 look into that.  If the company's got it, then produce

22 whatever you've got as it relates to Mr. Hogan.

23            MR. PRESNELL:  Yes, Your Honor.

24            THE COURT:  Let me make a note.

25            MS. SHEA:  Your Honor, I was wondering

1   as we go forward, can Lampo Group make sure they

2   segregate Mr. Hogan's expenses?

3                   And the reason I ask that is because

4   under the child support guidelines, fringe benefits

5   that offset living expenses are considered income, and

6   so -- and this is -- and I have this --

7                   THE COURT:  Isn't Mr. Hogan already

8   maxed out with the income that he has?

9                   MS. SHEA:  I'm not sure.  I guess it

10  would be.  It would seem like it.  But there's also

11  extra expenses because of Case, the youngest one that

12  is going to need child support forever because of his

13  Hunter syndrome disability.

14                  And also with Tyson being now in an

15  inpatient facility still, and it's $9,000 a month on

16  his inpatient facility treatment.  And he's going to be

17  there for at least a year.

18                  And then there's other expenses as

19  well.  So all his income is going to be important, even

20  if he maxes out on child support, all his income is

21  going to be important in determining how to address

22  some of these needs of the children.

23                  THE COURT:  Ms. Shea, I think I've

24  already made it clear that if the company already has

25  in place a process that does segregate expense

1  reconciliations by employee, then they are to suspend

2  any existing routine document retention or destruction

3  policy so that the records with respect to Mr. Hogan

4  are preserved.

5                I am not going to order the company to

6  start doing something that it doesn't already do.  But

7  if it already does it, I'm going to order that it be

8  exempt from any document retention policy that would

9  otherwise have allowed the company in a matter of just

10 routine document maintenance to destroy records after a

11 certain period of time.

12               Follow me?

13               MS. SHEA:  Yes.

14               THE COURT:  So, Mr. Presnell, you

15 understand what I've ordered with respect to 12 and 13?

16               MR. PRESNELL:  Yes, Your Honor.

17               THE COURT:  Let me make a note.

18               Number 16.  What's the company's

19 position with respect to 16?

20               MR. PRESNELL:  Our initial position is

21 audio recordings of staff meetings or devotionals have

22 nothing to do with income, and we should not be forced

23 to produce anything.

24               With that said, I checked to see

25 exactly what we have.  I don't object to something we

1    don't have.

2                We audio-record devotional meetings

3    which occur on Wednesdays as opposed to staff meetings

4    where we don't audio-record or video-record.

5                The only video recording we do at

6    devotionals is when an outside speaker is there.  So

7    that's the only video that might be there.  We do not

8    video-record the entire devotional meeting.  We may

9    audio-record the entire devotional meeting.

10                So I checked, and the only date

11   identified in 16 that would fall within that category

12   is April 10, 2019.  So I've asked the question if they

13   still have the audio recording of that devotional.  I

14   have not heard back yet, but I will let them know as

15   soon as I do whether we have it or do not have it.

16                But again, it's a devotional.  And I

17   submit it has nothing to do with Mr. Hogan's income.

18                THE COURT:  Well, the request does not

19   stop there.  It goes on to say that also requesting

20   recordings or notes regarding meetings between

21   Mr. Hogan and Mr. Ramsey relevant to the Hogans or

22   their marriage at Mr. Ramsey's home or office from

23   January 1, 2018 to present.

24                Do such documents exist?

25                MR. PRESNELL:  No, Your Honor.  There

1 are no notes, transcripts, anything of any of these

2 meetings except for potential audio recording on

3 April 10.

4             THE COURT:  And that was a recording of

5 an outside devotional speaker or presentation by an

6 outside speaker?

7             MR. PRESNELL:  No.  I don't know if

8 there was an outside speaker that day or not.  If there

9 would have been, there would have been an additional

10 video of the speaker.

11             THE COURT:  Oh, there would only be a

12 video of that --

13             MR. PRESNELL:  Correct.  But there is

14 an audio of the entire devotional for that day.  And

15 what I just don't know, if they still have it, but I've

16 asked.

17             THE COURT:  Ms. Shea, what's the

18 relevance of number 16?

19             MS. SHEA:  So Mr. Hogan has identified

20 several people, coworkers of his, as well as his boss,

21 that has information about the marriage of Ms. Hogan,

22 about his complaints about their marriage.

23             And Ms. Hogan and Mr. Hogan were

24 present at some of these meetings where there were

25 notes being taken because Ms. Hogan --

1                   THE COURT:  Well, were they notes being
2       taken about the Hogans' marriage?
3                   MS. SHEA:  Yes, because there was some
4       intervention that was happening.  There was personal
5       involvement of Dave Ramsey in the parties' marriage and
6       trying to do some things.
7                   He's also made some statements publicly
8       to all the staff, 800 of them, in a meeting all about
9       the Hogans' marriage, about Ms. Hogan, about Mr. Hogan.
10                  And Mr. Hogan has actually had three of
11      his coworkers sit outside the courtroom when we were
12      here on a pendente lite parenting time here.
13                  I do not know what is in -- if they're
14      going to be -- I have the right to inquire to find out
15      what is the information they have, what are they going
16      to be testifying about, what records they have of all
17      this.
18                  And Ms. Hogan was present at some of
19      these meetings.  And she has seen notes being taken
20      while the intervention was going on.
21                  She has also known about -- she's
22      familiar that the company routinely posts all the
23      public meetings that they have with all their employees
24      at Lampo Group.  And it's posted on their internal
25      website or I don't know whatever they call it, where

1    you can actually go and listen because you missed out

2    on some kind of a speech being made by David Ramsey,

3    and so we believe that there are such records that

4    exist.

5                    THE COURT:  They may exist, but do they

6    have anything to do with the marriage?

7                    MS. SHEA:  They have to do with

8    statements that Mr. Hogan has made, statements that

9    other people --

10                   THE COURT:  How do you know that?

11                   MS. SHEA:  Because it's been public.

12   It was made publicly to all the employees.

13                   And it was also statements made during

14   meetings that Ms. Hogan was present.

15                   THE COURT:  If there were statements

16   made at meetings where she was present, she knows what

17   was said.  So why does she need discovery when things

18   occurred in her presence?

19                   MS. SHEA:  And then David Ramsey took

20   Mr. Hogan off the speaking engagements because of his

21   infidelity and --

22                   THE COURT:  So?

23                   MS. SHEA:  So Mr. Hogan is accusing

24   wife of his -- I guess he's trying to shift blame and

25   say that wife is the reason he's having problems.  But

1    really he was the one that was having problems at work.

2    And so we're just trying to figure out what are those

3    problems that he's having at work.

4                    THE COURT:  Mr. Presnell, have you

5    asked Lampo Group whether it has any records, notes,

6    documents or anything relevant to whether Mr. Hogan is

7    having, to use Ms. Shea's phrase, problems at work?

8                    MR. PRESNELL:  I asked Lampo about

9    everything in number 16.  Notes from meetings, audio

10   tapes, videotapes.

11                   And they have none of that, regardless

12   of whether it pertains to his work issues allegedly or

13   otherwise, other than that potential audio recording of

14   the devotional April 10.

15                   THE COURT:  Well, this is a pretty

16   specific request insofar as it asks about meetings at

17   Ramsey Solutions on December 20, 21 and 22 of 2018, and

18   meetings between Mr. Hogan and Mr. Ramsey.  And the

19   request does include a request for the notes.

20                   So I want Lampo to make a search to

21   determine whether it or its employees have any notes

22   where the subject matter is problems with Mr. Hogan or

23   matters involving the parties' marriage.

24                   MR. PRESNELL:  I'm happy to do that,

25   Judge.  I've done it.  I've specifically asked about

1   these dates.

2                   THE COURT:  I understand.

3                   MR. PRESNELL:  I'm happy to do it.

4                   THE COURT:  I narrowed down the focus.

5   It's not going to be a fishing expedition, but if the

6   parties' marriage became the topic of discussion in

7   business settings, people made notes of it, then that's

8   discoverable.

9                   MR. PRESNELL:  Fair enough.  Thank you.

10                  THE COURT:  That's my ruling with

11  respect to 16.

12                  All right.  Number 17.

13                  MR. PRESNELL:  Your Honor, number 17

14  asks for cell phone records.  I inquired into this one

15  as well.  Mr. Hogan, much like the debit card issue, is

16  one of a handful of employees that has a business cell

17  phone.  It all goes to one cell phone bill, one

18  company.

19                  I asked them if they could segregate

20  Mr. Hogan's cell phone records out of that.  The answer

21  is yes, they can.  And so they have.  What they can

22  access online through the phone company goes back

23  through September of 2018.

24                  So I have a spreadsheet showing those

25  calls.

1          MS. SHEA:  Your Honor, the only problem

2    with that is that's the new phone.  Evidently there is

3    an older phone, and we want it from January of 2018.

4          THE COURT:  Do such records exist for

5    the earlier phone?

6          MR. PRESNELL:  Not that we have

7    possession of.

8          MS. SHEA:  Lampo should have records, I

9    would imagine, for their employees.  I mean it's their

10   phone records.

11         THE COURT:  No.  It's the cell phone

12   provider's records.  The cell phone provider sends a

13   bill, which Lampo pays.  But as far as the data usage

14   and all that kind of stuff, that's the cell phone

15   provider's records.

16         MS. SHEA:  I guess I wasn't clear.

17   What I was trying to say is Lampo Group is the

18   customer, so because they are the customer, I cannot

19   subpoena their records from the cell phone company.

20         Now, on the other hand, Lampo Group can

21   ask the cell phone company, please produce that.

22         THE COURT:  Well, what is it that you

23   want?

24         MS. SHEA:  From January 1, 2018 --

25         THE COURT:  No, no.  What is it that

Case 3:21-cv-00923   Document 80-7   Filed 03/09/23   Page 37 of 52 PageID #: 2342

1  you want?  Do you want --

2            MS. SHEA:  The breakdown on the phone

3  records, the detailed phone records.

4            THE COURT:  I'm not going to require

5  Lampo to produce anything related to cell phone bills

6  that is any greater detail than what the cell phone

7  provider gives to Lampo, furnishes to Lampo.

8            And depending on who the cell phone

9  provider is, it may be more detailed than other

10  providers would send or less.  I don't know.  I don't

11  even know who their cell phone provider contract is

12  with.

13            But I'm not going to require Lampo to

14  hunt up, generate something that it does not receive in

15  the ordinary course of its business.  So whatever that

16  may be.

17            Mr. Presnell, do you have any

18  explanation for why the company doesn't have anything

19  earlier than September of 2018?

20            MR. PRESNELL:  I was just told they

21  went online, as I understand it, and looked at their --

22  it only goes back one year.  We're able to segregate it

23  from the other employees, so that's the printout I

24  have.

25            THE COURT:  That's what you're going to

1  get.

2              MR. PRESNELL:  Thank you, Your Honor.

3              THE COURT:  Okay.  That looks like

4  that's it.  Is there any other --

5              MS. SHEA:  There is one other issue.

6  Lampo Group has asked for a protective order, and we

7  generally do not have a problem with a protective order

8  except that the one that they have proposed to me is

9  overbroad.  It goes into sealing records, and it goes

10  into sealing depositions.  We don't even have

11  depositions in this case.

12              And it's going way beyond what is

13  allowed because usually for a protective order, Lampo

14  has a duty to show that there is good cause under --

15  Ballard vs. Herzke is the Tennessee Supreme Court case.

16  And they have to show specific harm, which we can

17  understand for the records which -- they're only

18  producing Mr. Hogan's income information, and they're

19  producing his calendar and some of his phone records.

20              We don't have a problem having a

21  protective order on those, but I don't want one that's

22  so broad, that covers everything that they stamp

23  "confidential" because they're saying that anything

24  that they stamp "confidential."  That goes way too --

25  that's way too broad.

1            And the other part is they are looking

2   to seal it.  And there are cases out there that says

3   that you have to say that there is a compelling reason

4   as well, and it has to be narrowly tailored.  And

5   that's the Shane Group case, I think it's out of

6   Michigan, Sixth Circuit case, and it cites In Re

7   Knoxville News-Sentinel, which says it has to be

8   narrowly tailored.

9            So I suggested back a protective order.

10  And I can show Your Honor what we have proposed back,

11  if you'd like to take a look at that.  And if that is

12  okay --

13            MR. PRESNELL:  I just received it.  I'd

14  like to have an opportunity to read it.  I don't know

15  why we can't work this out --

16            THE COURT:  That's fair enough.  Let me

17  see if this was noticed for today.

18            The only thing that's on the motion is

19  motion to compel.  Motion with respect to protective

20  order is not on the docket for today.  So you-all

21  continue to work on this.

22            Mr. Presnell, I would observe that the

23  appellate courts have gotten pretty tight on what can

24  be sealed.  And they're policing that with a lot more

25  energy than they had in the past.

1              MR. PRESNELL:  I understand.

2              THE COURT:  But bear in mind, just

3    because something is produced in discovery does not

4    mean it is going to be filed.  In fact, discovery

5    responses are not required to be filed.  They're not

6    supposed to be filed.

7              MR. PRESNELL:  My client's only concern

8    in that regard would be if the comp schedules are used

9    in a public setting.  I think we would like to be heard

10   on whether those two schedules should be under seal.

11   Those are highly proprietary.  They deal with how we

12   pay high-level talent at this company.  It's a private

13   company.  We don't want that proprietary information in

14   the public domain.  We work hard to protect it.

15             Other than those two comp schedules, I

16   don't know what else would rise to the level of being

17   under seal.

18             THE COURT:  You-all continue to work on

19   the protective order.  If you can't come to an

20   agreement on the terms, then somebody needs to file a

21   motion.  But that's not on the docket today.

22             MS. SHEA:  And then, Your Honor, can

23   you please put a deadline for the production?  Because

24   we have mediation coming up on the 22nd and 23rd of

25   this month.  So if we're going to have to put off

1  mediation --

2              THE COURT:  I think Mr. Presnell is

3  going to not let the grass grow under his feet.  I want

4  this order to be implemented without any unreasonable

5  delay.  And my order is effective today, even though a

6  written order will not be entered until one is

7  submitted and I've signed it.

8              But, Mr. Presnell, I'll allow you to

9  prepare the order from today.  And it will be effective

10 today, so don't let the grass grow under your feet in

11 tracking down the additional documents that I've

12 ordered be produced.

13             MR. PRESNELL:  Understood.  The

14 documents I'm ready to produce, I already have.  Just

15 waiting to work out this protective order, and then I

16 can turn those over.  The others, I just need to ask

17 questions, and I'll do that.

18             THE COURT:  Well, I can order from the

19 bench that the compensation schedules be treated as

20 confidential subject to the terms of a protective order

21 to be subsequently entered by The Court.

22             But my directive that the parties treat

23 it as confidential doesn't get into the issue about

24 sealing it and whatnot, but that can all be dealt with

25 in the protective order.

1                In your order from today's proceeding,

2    you can certainly recite the fact that The Court is

3    ordering that the production of the compensation data

4    schedules will be treated as confidential by wife's

5    counsel.

6                MS. SHEA:  Some of them, we already

7    have --

8                THE COURT:  Treated confidential by the

9    parties.  Lampo's a third party.  So apply to husband's

10   counsel as well.

11               MS. SHEA:  Some of the information on

12   the compensation schedule, my client already has from

13   the past.  You're referring to the stuff that they're

14   producing -- that Lampo Group is producing that's --

15               THE COURT:  Right.

16               MS. SHEA:  Thank you, Your Honor.

17               THE COURT:  You're welcome.

18               MR. PRESNELL:  Thank you, Judge.

19               (Concluded at 2:43 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Virginia Dodge, Registered Diplomate

4    Reporter and Tennessee Licensed Court Reporter and

5    Notary Public, do hereby certify that I recorded to the

6    best of my skill and ability by machine shorthand the

7    proceedings contained herein, that same was reduced to

8    computer transcription by myself, and that the

9    foregoing is a true, accurate and complete transcript

10   of the proceedings heard in this cause.

11          I further certify that I am not an attorney

12   or counsel of any of the parties, nor a relative or

13   employee of any attorney or counsel connected with the

14   action, nor financially interested in the action.

15          This 4th day of October, 2019.

16

17

18   _____

19   Virginia Dodge
     My Commission Expires:  9/25/2022
     Tennessee LCR No. 734, Exp: 6/30/20
20   RDR/CRR #835835

21

22

23

24

25

Melissa Jane Hogan vs.
Christopher Michael Laine Hogan

Hearing
October 3, 2019

**$**

**$200 (1)**
14:20
**$299,024.94 (1)**
8:16
**$9,000 (1)**
28:15

**A**

**able (6)**
3:17;5:4,23;8:18;
26:10;37:22
**above-styled (1)**
3:1
**access (1)**
35:22
**accessing (1)**
24:8
**accordance (1)**
4:15
**account (4)**
22:17,25;23:17;
24:9
**accounting (2)**
23:12;24:2
**accounts (1)**
26:15
**accuracy (2)**
20:3;27:7
**accusing (1)**
33:23
**across (1)**
8:4
**activities (3)**
9:1;21:19,20
**activity (1)**
7:1
**actual (1)**
24:24
**actually (6)**
11:24;15:5;16:8;
27:8;32:10;33:1
**addendum (1)**
13:3
**additional (4)**
20:22;22:5;31:9;
41:11
**address (1)**
28:21
**adds (1)**
8:17
**ADP (1)**
17:5
**advice (1)**
7:16
**advices (1)**
17:2
**afternoon (5)**
3:8,9,10,11;12:22
**again (1)**
30:16
**against (1)**
23:13
**agreed-upon (1)**
4:16
**agreement (1)**
40:20
**allegedly (1)**
34:12
**allow (1)**
41:8
**allowed (2)**
29:9;38:13
**almost (1)**
18:25
**amount (4)**
7:13,14;18:21;
19:13
**and/or (1)**
12:2
**and-confer (1)**
5:13
**anymore (3)**
6:19,19;7:9
**apparently (1)**
19:4
**appears (2)**
10:5;22:1
**appellate (1)**
39:23
**applied (1)**
18:20
**apply (2)**
14:8;42:9
**appropriate (1)**
9:16
**April (5)**
12:3;18:18;30:12;
31:3;34:14
**arithmetic (1)**
14:21
**assume (1)**
4:12
**attendees (1)**
12:9
**attributable (3)**
7:20;9:1;21:19
**attributed (1)**
18:19
**audio (7)**
12:2;29:21;30:13;
31:2,14;34:9,13
**audio-record (3)**
30:2,4,9
**audit (2)**
25:19,25
**auditors (4)**
19:22;25:16;27:5,
10
**autonomous (1)**
20:2
**available (3)**
20:18;21:16;25:16

**B**

**back (10)**
4:13;14:9;19:17;
20:22;24:3;30:14;
35:22;37:22;39:9,10
**backing (1)**
14:13
**Ballard (1)**
38:15
**bank (4)**
11:14;22:17,25;
23:12
**based (1)**
18:1
**basically (1)**
23:17
**basis (1)**
18:16
**basket (1)**
26:5
**bear (1)**
40:2
**became (1)**
35:6
**beginning (1)**
3:2
**bench (1)**
41:19
**benefits (1)**
28:4
**better (1)**
26:3
**beyond (1)**
38:12
**bill (2)**
35:17;36:13
**bills (1)**
37:5
**blame (1)**
33:24
**book (3)**
7:11;13:10;18:12
**books (6)**
7:23,24;13:11;18:7,
8;20:9
**boss (1)**
31:20
**Both (1)**
13:25
**break (2)**
13:9,23
**breakdown (8)**
8:4,25;9:24;15:3;
19:1;20:12,24;37:2
**breaks (2)**
15:15;17:14
**Breland (3)**
14:23,25;15:24
**broad (2)**
38:22,25
**broken (2)**

13:13;20:25
**burden (2)**
20:22;21:10
**business (14)**
10:1;12:21;17:20;
18:2;19:3,7,11,12,17;
20:2;23:8;35:7,16;
37:15

**C**

**calculate (2)**
7:13;20:10
**calculated (3)**
8:8,21;9:3
**calculates (1)**
18:15
**calculating (1)**
10:7
**calculation (1)**
20:9
**calculations (1)**
5:16
**calendar (2)**
21:6;38:19
**call (1)**
32:25
**calls (1)**
35:25
**came (2)**
3:1;8:3
**can (24)**
8:10;9:19,20,21,23;
11:22;12:4;14:9,14;
20:18;22:13;28:1;
33:1;35:21,21;36:20;
38:16;39:10,23;
40:22;41:16,18,24;
42:2
**cancelled (1)**
16:19
**candidly (1)**
20:15
**card (8)**
22:15,16,21,24;
23:8,15,17;35:15
**carefully (1)**
10:14
**case (7)**
3:13;27:9;28:11;
38:11,15;39:5,6
**cases (1)**
39:2
**categories (5)**
8:10,11;11:1,17;
15:16
**category (5)**
11:20;13:22;16:12,
16;30:11
**cause (2)**
3:1;38:14
**cell (13)**
35:14,16,17,20;

36:11,12,14,19,21;
37:5,6,8,11
**centralized (2)**
19:8;20:12
**certain (2)**
24:25;29:11
**certainly (1)**
42:2
**Chancery (1)**
3:3
**channels (1)**
17:21
**charging (1)**
22:16
**check (9)**
4:5;5:13;11:14;
12:9;17:15;18:9;19:3;
25:2;27:11
**checked (3)**
17:12;29:24;30:10
**checks (2)**
17:16;20:3
**child (3)**
28:4,12,20
**children (1)**
28:22
**Chris (1)**
15:10
**Circuit (1)**
39:6
**cites (1)**
39:6
**claiming (1)**
6:18
**clear (2)**
28:24;36:16
**clearly (1)**
18:16
**client (7)**
4:5;14:5;13,14,15;
17:1;42:12
**client's (1)**
40:7
**close (1)**
22:2
**collects (1)**
24:1
**coming (1)**
40:24
**commission (15)**
6:16;7:5,19;12:20;
13:21;14:3,16,20;
15:3;16:21;18:20;
19:4,7,13;21:18
**commissions (8)**
5:24;6:8,11,13,21;
17:10;18:1;20:13
**comp (5)**
15:11;20:20;22:2;
40:8,15
**company (16)**
14:3;19:23;22:15;
23:6;25:14;28:24;

Case 3:21-cv-00923   Document 80-7   Filed 03/09/23   Page 45 of 52 PageID #: 2350

Melissa Jane Hogan vs.
Christopher Michael Laine Hogan

**Hearing**
October 3, 2019

29:5,9;32:22;35:18,
22;36:19,21;37:18;
40:12,13
**company's (5)**
14:5;18:2;19:22;
27:21;29:18
**compel (2)**
3:15;39:19
**compelling (1)**
39:3
**compensation (13)**
5:16,21;8:4,25;
11:3;13:8,9,17;20:1;
21:10;41:19;42:3,12
**complaints (1)**
31:22
**complete (1)**
22:18
**composes (1)**
17:15
**comprise (1)**
9:2
**comprised (1)**
15:20
**comprises (1)**
16:23
**computation (2)**
5:21;12:20
**conceivable (1)**
27:4
**concern (1)**
40:7
**Concluded (1)**
42:19
**confer (2)**
3:22;4:5
**confidential (6)**
38:23,24;41:20,23;
42:4,8
**considered (1)**
28:5
**consultation (1)**
8:6
**contain (1)**
21:23
**contested (1)**
3:12
**continue (2)**
39:21;40:18
**contract (3)**
5:24;8:4;37:11
**control (2)**
19:23;23:25
**controller's (1)**
19:9
**controls (1)**
26:8
**Copies (2)**
11:9,13
**copy (4)**
4:7,20;10:13;15:2
**counsel (5)**
22:19;23:3;24:23;

**42:5,10**
**counseling (2)**
8:3,5
**counter (1)**
4:21
**County (1)**
3:3
**couple (2)**
17:12,13
**course (3)**
12:5;14:14;37:15
**Court (106)**
3:3,8,11;4:9,12,22;
5:1,5,8,20;6:3,10,24;
7:4,7,15;8:22;9:5,8;
10:10,18,21,25;11:4,
8,11,16,20;12:7,12,
17,24;13:4,18;14:1,
14,25;15:6,9;16:4,7,
13,25;17:8,23;18:3,
13;19:6,12,16,21,25;
21:17,22;22:4,20;
23:6,14,19,23;24:7,
14,17;25:13,18;26:4,
22,24;27:20,24;28:7,
23;29:14,17;30:18;
31:4,11,17;32:1;33:5,
10,15,22;34:4,15;
35:2,4,10;36:4,11,22,
25;37:4,25;38:3,15;
39:16;40:2,18;41:2,
18,21;42:2,8,15,17
**courtroom (1)**
32:11
**courts (1)**
39:23
**cover (1)**
8:12
**covering (1)**
13:14
**covers (1)**
38:22
**coworkers (2)**
31:20;32:11
**create (1)**
10:1
**credit (1)**
11:14
**criticize (1)**
19:22
**curious (1)**
6:13
**customary (1)**
25:14
**customer (2)**
36:18,18

**D**

**data (3)**
27:8;36:13;42:3
**date (3)**
14:7;16:11;30:10

**dates (2)**
3:23;35:1
**Dave (1)**
32:5
**David (2)**
33:2,19
**day (2)**
31:8,14
**deadline (1)**
40:23
**deal (1)**
40:11
**dealt (1)**
41:24
**debit (9)**
11:14;22:15,16,21,
24;23:8,15,17;35:15
**December (2)**
12:9;34:17
**decide (1)**
11:2
**decisions (1)**
20:1
**decrease (1)**
21:3
**delay (1)**
41:5
**department (2)**
18:6,14
**depend (1)**
20:5
**depending (1)**
37:8
**deposit (1)**
6:23
**deposition (2)**
9:19,21
**depositions (2)**
38:10,11
**description (5)**
9:9,11,13,14;10:4
**designate (1)**
9:21
**desk (1)**
19:8
**destroy (1)**
29:10
**destruction (2)**
27:1;29:2
**detail (1)**
37:6
**detailed (2)**
37:3,9
**determination (1)**
20:9
**determine (2)**
23:7;34:21
**determined (2)**
19:7,8
**determines (3)**
17:9;19:6,13
**determining (2)**
6:20;28:21

**devotional (8)**
30:2,8,9,13,16;31:5,
14;34:14
**devotionals (2)**
29:21;30:6
**different (5)**
6:13;13:14,15;
15:15;17:13
**directive (1)**
41:22
**directly (1)**
22:17
**disability (1)**
28:13
**discoverable (1)**
35:8
**discovery (4)**
8:9;33:17;40:3,4
**discussed (1)**
4:1
**discussion (1)**
35:6
**dispute (2)**
4:9;12:16
**divided (1)**
19:4
**docket (5)**
3:12,13,14;39:20;
40:21
**document (12)**
9:10,12,13;10:4;
17:14,17,18;18:10;
21:22;29:2,8,10
**documents (13)**
3:15;9:9;12:6;
15:23;21:18;22:5,9;
23:4;25:4;30:24;34:6;
41:11,14
**dollars (1)**
18:12
**domain (1)**
40:14
**domestic (1)**
3:12
**done (4)**
3:23;18:23;26:14;
34:25
**down (8)**
13:9,13,23;15:15;
17:14;20:25;35:4;
41:11
**dried (1)**
6:21
**duces (5)**
9:5,8,16;10:15;11:1
**due (3)**
17:10;18:15;19:14
**during (1)**
33:13
**duty (1)**
38:14

**E**

**earlier (2)**
36:5;37:19
**earn (1)**
16:9
**earned (3)**
16:8,11,23
**effect (2)**
14:4;23:11
**effective (2)**
41:5,9
**efficient (1)**
25:6
**else (4)**
11:5,11,16;40:16
**Email (2)**
15:8,9
**emails (1)**
20:23
**employed (1)**
7:24
**employee (12)**
17:9;20:5;24:1,8;
26:2,7,9,11,15;27:12,
16;29:1
**employees (11)**
22:14,24;23:15;
26:5,9;32:23;33:12;
34:21;35:16;36:9;
37:23
**employee's (1)**
23:2
**employer (2)**
8:20;16:19
**employment (1)**
13:3
**end (2)**
18:17;21:11
**energy (1)**
39:25
**engage (1)**
10:3
**engagement (1)**
7:25
**engagements (6)**
13:12;16:20,22;
21:3,8;33:20
**enough (3)**
6:18;35:9;39:16
**entered (3)**
3:21;41:6,21
**entertainment (1)**
17:22
**entire (3)**
30:8,9;31:14
**entity (2)**
9:20,21
**even (6)**
15:17;18:18;28:19;
37:11;38:10;41:5
**evening (1)**

Case 3:21-cv-00923   Document 80-7   Filed 03/09/23   Page 46 of 52 PageID #: 2351

Melissa Jane Hogan vs.
Christopher Michael Laine Hogan

Hearing
October 3, 2019

4:25
**events (1)**
21:6
**everyone (1)**
3:8
**evidence (1)**
13:21
**evidently (2)**
17:1;36:2
**exactly (1)**
29:25
**examination (1)**
25:19
**example (2)**
13:11;21:8
**except (2)**
31:2;38:8
**executive (1)**
15:24
**exempt (1)**
29:8
**Exhibit (8)**
5:5;7;10:12,16,17;
15:7,8;21:24
**exhibits (1)**
10:19
**exist (9)**
10:1;12:20,21;15:5,
23;30:24;33:4,5;36:4
**existing (1)**
29:2
**expect (1)**
19:22
**expedition (1)**
35:5
**expense (11)**
11:10;22:7,18;
23:13;24:10,11,24;
25:6,9;26:3;28:25
**expenses (11)**
11:7,13;22:16;23:1,
2,7,8;28:2,5,11,18
**explained (2)**
23:3;24:22
**explanation (1)**
37:18
**extended (1)**
20:23
**external (1)**
8:15
**extra (1)**
28:11
**extract (1)**
25:6
**extracted (1)**
21:6

**F**

**facility (2)**
28:15,16
**fact (3)**
27:9;40:4;42:2

**facts (1)**
9:22
**fair (1)**
20:4;35:9;39:16
**faithful (1)**
26:9
**fall (1)**
30:11
**familiar (1)**
32:22
**far (2)**
12:6;36:13
**February (1)**
18:17
**fees (3)**
7:25;8:6;15:18
**feet (2)**
41:3,10
**few (1)**
22:14
**figure (1)**
34:2
**figures (1)**
19:2
**figuring (1)**
7:18
**file (6)**
24:8,18;25:11;26:3,
25;40:20
**filed (3)**
40:4,5,6
**files (2)**
25:14;27:1
**find (7)**
13:18;20:18,24;
26:22,24;27:11;32:14
**first (3)**
3:17;10:19;21:25
**fishing (1)**
35:5
**fit (1)**
9:9
**fits (4)**
9:10,12,14;14:7
**flow (1)**
6:3
**flows (1)**
6:5
**fluctuate (2)**
6:8,11
**focus (1)**
35:4
**Follow (1)**
29:12
**following (1)**
3:4
**forced (1)**
29:22
**forever (1)**
28:12
**form (1)**
17:3
**format (1)**

21:13
**forms (3)**
11:10;22:8,19
**forward (2)**
8:11;28:1
**forwarded (1)**
15:25
**fringe (1)**
28:4
**funds (1)**
6:22
**furnishes (1)**
37:7

**G**

**gave (4)**
3:22;4:20;8:9;16:1
**general (3)**
8:10,10,11
**generally (1)**
38:7
**generate (2)**
7:5;37:14
**generated (4)**
17:2;18:17;27:3,13
**generous (1)**
12:12
**gets (12)**
5:25;7:19,24,25,25;
8:1;13:10,11;15:16,
17;16:21;18:8
**given (4)**
8:12;13:13;17:9;
27:5
**gives (1)**
37:7
**giving (2)**
20:24;21:6
**glance (1)**
22:1
**global (1)**
26:3
**goes (12)**
18:9;22:16,22,24;
23:17;30:19;35:17,
22;37:22;38:9,9,24
**Good (6)**
3:8,9,10;12:22,25;
38:14
**grass (2)**
41:3,10
**greater (1)**
37:6
**gross (3)**
14:9,20;19:2
**Group (25)**
4:15,25;5:23;6:4,6;
9:20,21;10:2,2;12:18,
23;15:1;16:25;17:8,
24;21:17;25:19;28:1;
32:24;34:5;36:17,20;
38:6;39:5;42:14

**Group/Ramsey (3)**
3:25;4:2;15:25
**grow (2)**
41:3,10
**guess (5)**
15:4;19:9;28:9;
33:24;36:16
**guidelines (1)**
28:4

**H**

**hand (2)**
5:19;36:20
**handful (1)**
35:16
**handle (1)**
17:19
**happen (1)**
25:22
**happening (1)**
32:4
**happens (2)**
16:17;26:19
**happy (3)**
26:1;34:24;35:3
**hard (1)**
40:14
**harm (1)**
38:16
**hear (2)**
3:13;12:18
**heard (2)**
30:14;40:9
**hearing (1)**
3:1
**Herzke (1)**
38:15
**high-level (1)**
40:12
**highly (1)**
40:11
**Hogan (45)**
3:14,14;6:1;11:23;
14:24;15:2,2,10,10;
16:1,1,2,18;17:10;
18:11,14;21:20;22:8,
14;24:10,18;25:11;
27:1,16,22;28:7;29:3;
30:21;31:19,21,23,23,
25;32:9,9,10,18;33:8,
14,20,23;34:6,18,22;
35:15
**Hogans (1)**
30:21
**Hogans' (2)**
32:2,9
**Hogan's (10)**
6:8;8:9,25;9:3;
21:5;23:1;28:2;30:17;
35:20;38:18
**home (1)**
30:22

**Honor (18)**
3:20;4:7;5:17;6:7;
10:20;22:12;23:10;
27:19,23,25;29:16;
30:25;35:13;36:1;
38:2;39:10;40:22;
42:16
**Honorable (1)**
3:4
**huge (1)**
6:16
**hunt (1)**
37:14
**Hunter (1)**
28:13
**husband's (1)**
5:18;42:9

**I**

**identifiable (1)**
27:16
**identified (2)**
30:11;31:19
**identifies (2)**
26:15;27:12
**identify (1)**
13:4
**imagine (1)**
36:9
**impact (2)**
7:10,11
**implemented (1)**
41:4
**important (2)**
28:19,21
**include (1)**
34:19
**income (20)**
5:25;6:1,2;7:10,11,
22;9:2,3;15:16;16:6,
7,8,24;28:5,8,19,20;
29:22;30:17;38:18
**incurred (2)**
23:7;24:10,11
**indicated (2)**
11:19,22
**individual (6)**
13:22,23;14:2;
16:15;23:16;26:6
**infidelity (1)**
33:21
**information (8)**
8:19;16:1;21:23;
31:21;32:15;38:18;
40:13;42:11
**initial (1)**
29:20
**inpatient (2)**
28:15,16
**inquire (1)**
32:14
**inquired (1)**

Case 3:21-cv-00923   Document 80-7   Filed 03/09/23   Page 47 of 52 PageID #: 2352

Melissa Jane Hogan vs.
Christopher Michael Laine Hogan

Hearing
October 3, 2019

35:14
**insofar (1)**
34:16
**intend (1)**
22:3
**internal (6)**
8:14;18:5;19:23;
23:25;26:8;32:24
**interrogatories (2)**
8:19;9:18
**interrogatory (1)**
9:17
**intervention (2)**
32:4,20
**into (10)**
6:23;14:9,13;18:9;
26:5;27:21;35:14;
38:9,10;41:23
**involvement (1)**
32:5
**involving (1)**
34:23
**issue (9)**
5:1,3;13:5;21:10,
11;24:22;35:15;38:5;
41:23
**issued (1)**
4:2
**issues (2)**
3:18;34:12
**item (2)**
9:4;11:4
**itemizes (1)**
25:12
**items (2)**
4:8;12:7

**J**

**January (5)**
15:10;22:8;30:23;
36:3,24
**Jeremy (3)**
14:23,25;15:24
**Jones (1)**
24:11
**Joseph (1)**
3:4
**Judge (7)**
3:10;12:22;17:11;
18:25;21:11;34:25;
42:18
**July (1)**
4:3

**K**

**keep (5)**
25:9,14,25;26:1,2
**kept (1)**
26:25
**kind (5)**
14:22;17:17;20:2;

33:2;36:14
**knowing (2)**
7:21;8:7
**knowledge (1)**
9:22
**known (1)**
32:21
**knows (1)**
33:16
**Knoxville (1)**
39:7

**L**

**label (1)**
19:3
**lack (2)**
19:23;26:3
**lagging (1)**
18:16
**Lampo (43)**
3:25;4:2,15,25;
5:23;6:4,5;7:25;9:20,
21;10:2,2;11:22;
12:18,23;15:1,25;
16:25;17:8,24;18:1;
20:22;21:17;22:9,17;
25:19;27:10;28:1;
32:24;34:5,8,20;36:8,
13,17,20;37:5,7,7,13;
38:6,13;42:14
**Lampo's (1)**
42:9
**last (1)**
4:25
**leading (1)**
13:6
**leads (3)**
6:2;8:1,16
**least (3)**
10:5;25:15;28:17
**left (1)**
3:13
**legitimate (1)**
23:8
**less (1)**
37:10
**level (1)**
40:16
**limit (1)**
18:8
**line (2)**
19:12,16
**listen (2)**
10:14;33:1
**lite (2)**
6:17;32:12
**living (1)**
28:5
**long (4)**
25:9,15,24;27:14
**longer (1)**
6:25

**look (7)**
5:18;6:7;9:5,5;
15:19;27:21;39:11
**looked (1)**
37:21
**looking (4)**
13:20,22;27:8;39:1
**looks (1)**
38:3
**lot (1)**
39:24
**lump-sum (1)**
7:18

**M**

**ma'am (1)**
12:17
**maintain (1)**
22:10
**maintenance (1)**
29:10
**makes (1)**
26:12
**making (1)**
6:22
**manner (1)**
26:14
**many (2)**
11:1;13:11
**March (1)**
18:18
**marked (3)**
5:6;10:17;15:8
**marriage (9)**
30:22;31:21,22;
32:2,5,9;33:6;34:23;
35:6
**matter (2)**
29:9;34:22
**matters (1)**
34:23
**maxed (1)**
28:8
**maxes (1)**
28:20
**May (13)**
8:12,13;10:1;12:3;
16:9,10;18:13;19:19,
20;30:8;33:5;37:9,16
**maybe (1)**
18:18
**mean (5)**
5:20;16:8;19:25;
36:9;40:4
**meaning (1)**
13:10
**mediation (2)**
40:24;41:1
**meet (1)**
3:22
**meet- (1)**
5:12

**meet-and- (1)**
4:4
**meet-and-confer (2)**
3:23;22:10
**meeting (4)**
4:12;30:8,9;32:8
**meetings (14)**
12:10;29:21;30:2,3,
20;31:2,24;32:19,23;
33:14,16;34:9,16,18
**Melissa (1)**
15:10
**met (2)**
3:25;4:10
**method (3)**
10:7,8;25:6
**Michigan (1)**
39:6
**might (8)**
15:17;16:4;18:16;
20:16,16;27:5,6;30:7
**mind (1)**
40:2
**missed (1)**
33:1
**missing (1)**
4:18
**money (2)**
6:18;18:15
**moneys (1)**
6:23
**month (6)**
18:5,7;23:11,11;
28:15;40:25
**monthly (1)**
19:1
**month's (2)**
13:23;14:2
**more (6)**
9:16;16:9;21:9,18;
37:9;39:24
**mother (1)**
24:3
**motion (6)**
3:12,14;39:18,19,
19;40:21
**much (8)**
6:25;10:7,9;15:19;
16:23;17:9;18:15;
35:15
**multiple (2)**
7:22;22:23
**mystery (1)**
21:14

**N**

**narrow (1)**
3:17
**narrowed (2)**
4:13;35:4
**narrowly (2)**
39:4,8

**need (7)**
4:7,19,22;25:15;
28:12;33:17;41:16
**needs (2)**
28:22;40:20
**network (1)**
21:7
**new (3)**
11:24,25;36:2
**News-Sentinel (1)**
39:7
**Next (1)**
15:7
**Nice (1)**
12:24
**none (1)**
34:11
**nonparty (1)**
9:19
**nonparty's (1)**
9:19
**nor (1)**
22:18
**note (2)**
27:24;29:17
**notes (12)**
12:3,10;30:20;31:1,
25;32:1,19;34:5,9,19,
21;35:7
**noticed (1)**
39:17
**number (26)**
3:14;9:4;10:23,24;
11:4,8,9,21;12:1,19;
13:2,5,7,17,20;14:10;
20:9;22:6,7,11,23;
29:18;31:18;34:9;
35:12,13
**numbers (1)**
27:17

**O**

**object (1)**
29:25
**objections (1)**
10:18
**observe (1)**
39:22
**occur (1)**
30:3
**occurred (1)**
33:18
**October (2)**
3:2;4:6
**off (3)**
24:3;33:20;40:25
**office (4)**
5:9,11;19:9;30:22
**offset (1)**
28:5
**old (2)**
20:23;25:6

Case 3:21-cv-00923   Document 80-7   Filed 03/09/23   Page 48 of 52 PageID #: 2353

older (1)
36:3
once (1)
18:5
one (22)
3:13;5:14;8:4;
10:25;11:23;17:16;
21:18;22:2,14;26:4,9;
28:11;34:1;35:14,16,
17,17;37:22;38:5,8,
21;41:6
one- (1)
7:17
ones (1)
13:14
online (2)
35:22;37:21
Only (11)
4:9;22:20;30:5,7,
10;31:11;36:1;37:22;
38:17;39:18;40:7
opportunity (1)
39:14
opposed (3)
24:10;26:2;30:3
order (30)
3:21;4:19;5:2,6;
6:17;14:2;21:5,14;
22:4;25:15;27:18,20;
29:5,7;38:6,7,13,21;
39:9,20;40:19;41:4,5,
6,9,15,18,20,25;42:1
ordered (3)
6:18;29:15;41:12
ordering (1)
42:3
ordinary (1)
37:15
others (1)
41:16
otherwise (3)
7:1;29:9;34:13
out (20)
7:18;9:16;13:18;
16:19;21:18,24;
26:10,22,24;27:11;
28:8,20;32:14;33:1;
34:2;35:20;39:2,5,15;
41:15
outside (9)
15:18;17:1,4,21;
30:6;31:5,6,8;32:11
over (3)
18:7;21:13;41:16
overbroad (1)
38:9
own (1)
23:16

**P**

paid (6)
13:9;18:16,21;

paper (2)
20:2;27:3
papers (8)
12:19,21;13:23;
19:17;27:6,13,14,15
parenting (1)
32:12
part (1)
39:1
particular (2)
9:9;24:9
parties (2)
41:22;42:9
parties' (3)
32:5;34:23;35:6
party (1)
42:9
past (2)
39:25;42:13
pay (12)
6:9,12,12,14;7:12,
12,14;14:6;16:13;
17:9;18:4;40:12
paycheck (4)
5:18;15:19,20;
20:13
Paycor (2)
17:3;18:22
paying (3)
7:14;10:7,9
payment (6)
6:16;7:18;16:5;
19:1;20:13,16
payments (3)
8:2;16:3;18:6
payroll (8)
17:1,4;18:6,14,25;
19:2,8;20:11
pays (1)
36:13
paystub (1)
8:21
paystubs (2)
6:6,8
paystub-type (1)
17:17
pendente (2)
6:17;32:12
people (3)
31:20;33:9;35:7
percent (4)
14:19;15:18,20;
16:21
percentage (8)
13:10,12;14:16,16,
17,19;18:20;20:10
percentages (4)
9:1;14:8;20:6;
21:19
period (14)
6:9,12,12,14;7:12;
13:13;14:4,6;17:9;

18:4;20:23;23:10;
25:21;29:11
periods (1)
13:15
person (2)
3:22;22:20
personal (1)
32:4
pertains (1)
34:12
phone (23)
11:24,25;35:14,17,
17,20,22;36:2,3,5,10,
11,12,14,19,21;37:2,
3,5,6,8,11;38:19
phrase (2)
26:3;34:7
piece (1)
23:16
place (1)
28:25
plan (1)
15:11
plastic (1)
23:16
please (2)
36:21;40:23
pm (2)
3:2;42:19
podcasts (1)
8:1
point (6)
8:5;18:19;20:8,21;
24:1;25:1
policing (1)
39:24
policy (2)
29:3,8
position (3)
14:5;29:19,20
possession (1)
36:7
possible (1)
5:17
post (1)
26:21
posted (1)
32:24
posts (1)
32:22
potential (2)
31:2;34:13
prepare (1)
41:9
presence (1)
33:18
present (6)
22:9;30:23;31:24;
32:18;33:14,16
presentation (1)
31:5
preserved (1)
29:4

president (1)
15:24
PRESNELL (63)
3:10,24;4:5,13,20;
10:20;12:8,22,23,25;
13:6;16:25;17:6,11,
25;18:4,24;19:10,15,
19,24;20:4;21:21,25;
22:12,22;23:9,18,21;
24:5,12,16,20;25:17,
24;26:18,23;27:19,
23;29:14,16,20;
30:25;31:7,13;34:4,8,
24;35:3,9,13;36:6;
37:17,20;38:2;39:13,
22;40:1,7;41:2,8,13;
42:18
Presnell's (2)
5:9,11
pretty (2)
34:15;39:23
printout (1)
37:23
private (1)
40:12
problem (3)
36:1;38:7,20
problems (5)
33:25;34:1,3,7,22
procedure (1)
23:25
proceeding (1)
42:1
proceedings (1)
3:5
process (6)
10:3;24:22;26:13;
27:4,12;28:25
produce (14)
4:15;5:4;9:11;
11:23;14:3;20:18,20;
21:12;22:3;27:21;
29:23;36:21;37:5;
41:14
produced (5)
14:23;20:19;22:5;
40:3;41:12
producible (1)
21:13
producing (8)
13:3,8;21:17;27:15;
38:18,19;42:14,14
product (1)
8:16
production (3)
4:10;40:23;42:3
projected (3)
15:3;16:6,7
proposed (4)
4:21;5:6;38:8;
39:10
proprietary (2)
40:11,13

protect (1)
40:14
protective (15)
4:19;5:2,6;21:4,14;
38:6,7,13,21;39:9,19;
40:19;41:15,20,25
provide (2)
8:25;14:12
provided (1)
4:25
provider (5)
17:5;36:12;37:7,9,
11
providers (1)
37:10
provider's (2)
36:12,15
public (4)
32:23;33:11;40:9,
14
publication (1)
7:23
publicly (2)
32:7;33:12
publishing (2)
7:11;17:21
purchase (1)
24:2
purposes (2)
23:23;25:25
put (4)
19:3;26:6;40:23,25

**Q**

quick (1)
22:1

**R**

radio (1)
6:2
radios (1)
8:1
Ramsey (7)
9:2;30:21;32:5;
33:2,19;34:17,18
Ramsey's (1)
30:22
range (1)
14:7
rate (3)
13:21;14:4,10
rates (1)
14:6
raw (2)
27:8,8
Re (1)
39:6
read (3)
10:14;22:13;39:14
readily (2)
20:18;21:16

Case 3:21-cv-00923   Document 80-7   Filed 03/09/23   Page 49 of 52 PageID #: 2354

**ready (1)**
41:14
**real (1)**
21:14
**really (2)**
22:13;34:1
**reask (1)**
26:1
**reason (4)**
8:20;28:3;33:25;
39:3
**reasonable (1)**
14:3
**receipt (3)**
24:1,2,10
**receipts (9)**
11:7;23:13;24:24;
25:7,10,12;26:5,21;
27:8
**receive (4)**
17:10,23;18:15;
37:14
**received (9)**
4:18;10:19,22;12:5;
15:2;17:24;18:1,11;
39:13
**receives (5)**
7:16;17:15,20;19:2;
20:7
**recently (1)**
11:24
**recipient (1)**
9:10
**recite (1)**
42:2
**reconcile (1)**
23:13
**reconciled (1)**
26:16
**reconciliation (11)**
24:13,18;25:1,10;
26:13,20,21;27:4,6,7,
12
**reconciliations (2)**
26:14;29:1
**record (1)**
10:9
**recording (6)**
12:4;30:5,13;31:2,
4;34:13
**recordings (3)**
12:2;29:21;30:20
**records (24)**
4:18;10:2;11:19,25;
12:21;15:5;29:3,10;
32:16;33:3;34:5;
35:14,20;36:4,8,10,
12,15,19;37:3,3;38:9,
17,19
**referring (1)**
42:13
**reflect (2)**
11:14;12:20

**reflected (1)**
6:6
**regard (1)**
40:8
**regarding (1)**
30:20
**regardless (1)**
34:11
**reimbursement (3)**
11:10;22:8,18
**relate (1)**
27:1
**related (2)**
11:13;37:5
**relates (1)**
27:22
**relevance (2)**
16:15;31:18
**relevant (2)**
30:21;34:6
**remittance (6)**
7:16;13:24;14:7,15;
16:14;17:2
**report (1)**
20:10
**reported (1)**
18:9
**representative (1)**
9:22
**represents (2)**
3:24;14:16
**request (4)**
30:18;34:16,19,19
**requested (1)**
25:4
**requesting (1)**
30:19
**require (2)**
37:4,13
**required (1)**
40:5
**resolve (1)**
22:10
**respect (7)**
12:10;22:11;29:3,
15,19;35:11;39:19
**responded (1)**
25:5
**responds (1)**
13:17
**response (5)**
4:24;5:4;13:2,16;
22:5
**responses (3)**
4:6;8:19;40:5
**responsive (2)**
10:4;27:17
**result (1)**
4:4
**resulting (1)**
18:21
**results (1)**
10:3

**retained (1)**
27:14
**retention (2)**
29:2,8
**retirement (1)**
26:25
**revenue (8)**
7:5;17:20,24,24,25;
18:2,17,19
**revenue-generating (2)**
7:1;21:20
**reviewed (1)**
5:11
**revised (1)**
15:11
**right (10)**
12:15;19:24;21:1;
23:20;24:4,16,19;
32:14;35:12;42:15
**rise (1)**
40:16
**road (2)**
21:2;24:3
**routine (3)**
26:25;29:2,10
**routinely (1)**
32:22
**royalties (5)**
7:24;13:10;18:8,12;
21:2
**ruling (1)**
35:10
**run (1)**
18:2

**S**

**salary (1)**
19:4
**sales (1)**
20:6
**same (4)**
22:2,24;23:15,17
**satisfied (3)**
21:9,10;27:5
**saying (4)**
5:14;8:14;21:12;
38:23
**schedule (1)**
42:12
**schedules (12)**
13:8,9,13,17;14:4;
20:20;22:3;40:8,10,
15;41:19;42:4
**scope (1)**
4:13
**seal (3)**
39:2;40:10,17
**sealed (1)**
39:24
**sealing (3)**
38:9,10;41:24
**search (2)**

20:23;34:20
**seem (2)**
26:12;28:10
**seems (3)**
9:15;24:14;26:7
**segregate (5)**
23:1;28:2,25;35:19;
37:22
**segregated (1)**
26:2
**send (1)**
37:10
**sends (2)**
18:5;36:12
**sense (3)**
26:13,17;27:2
**sent (1)**
4:19
**separate (2)**
13:8;24:8
**separated (1)**
26:6
**separately (1)**
19:13
**September (5)**
3:20,21;4:1;35:23;
37:19
**serious (1)**
26:7
**serve (1)**
9:18
**served (1)**
4:2
**service (1)**
17:1
**services (1)**
18:22
**session (1)**
3:12
**set (4)**
5:19;9:15;21:18,23
**setting (1)**
40:9
**settings (1)**
35:7
**several (1)**
31:20
**Shane (1)**
39:5
**SHEA (56)**
3:9,19;4:11,17,24;
5:3,10,23;6:5,15;7:3,
6,8,17;8:24;9:7;10:6,
24;11:3,6,9,12,18,21;
12:8,16;13:20,25;
14:11,22;15:1,14;
16:6,10,17;27:25;
28:9,23;29:13;31:17,
19;32:3;33:7,11,19,
23;36:1,8,16,24;37:2;
38:5;40:22;42:6,11,
16
**Shea's (1)**

34:7
**shift (1)**
33:24
**ship (1)**
24:4
**show (4)**
14:22;38:14,16;
39:10
**showing (3)**
9:25,25;35:24
**shown (1)**
7:15
**shows (1)**
21:7
**signed (1)**
41:7
**single (1)**
20:13
**sit (1)**
32:11
**Sixth (1)**
39:6
**small (1)**
15:14
**sold (3)**
13:11;18:7;20:10
**Solutions (5)**
3:25;4:3;9:2;15:25;
34:17
**somebody (2)**
18:14;40:20
**somehow (2)**
8:18;10:6
**somewhere (1)**
24:17
**soon (1)**
30:15
**sort (6)**
12:19,21;22:9;
25:14;26:10;27:2
**source (1)**
5:25
**sources (5)**
6:1,1;7:22;15:3,16
**space (1)**
21:7
**speaker (5)**
30:6;31:5,6,8,10
**speaking (12)**
6:1;7:25;8:14,15;
13:12;15:18;16:19,
22;21:2,2,7;33:20
**specific (3)**
3:23;34:16;38:16
**specifically (5)**
17:16;24:21;25:4,
25;34:25
**speech (1)**
33:2
**sponsorships (2)**
6:2;8:1
**spreadsheet (1)**
35:24

Case 3:21-cv-00923   Document 80-7   Filed 03/09/23   Page 50 of 52 PageID #: 2355

**staff (4)**
23:12;29:21;30:3;
32:8
**stage (1)**
27:13
**stamp (2)**
38:22,24
**stand (1)**
3:16
**start (1)**
29:6
**statement (1)**
22:25
**statements (7)**
11:14;23:12;32:7;
33:8,8,13,15
**still (4)**
4:18;28:15;30:13;
31:15
**stop (1)**
30:19
**structured (1)**
23:20
**stub (1)**
20:16
**stubs (1)**
5:18
**stuff (2)**
36:14;42:13
**subject (2)**
34:22;41:20
**submit (2)**
20:21;30:17
**submitted (1)**
41:7
**subpoena (8)**
4:1;8:23,24;9:4,10;
10:12,17;36:19
**subpoenaed (2)**
3:15;4:8
**subsequently (1)**
41:21
**sudden (1)**
6:21
**sufficiency (1)**
4:10
**sufficient (1)**
6:22
**suggested (1)**
39:9
**supplemented (1)**
12:4
**support (3)**
28:4,12,20
**supposed (1)**
40:6
**Supreme (1)**
38:15
**sure (4)**
17:7;18:3;28:1,9
**Surely (3)**
7:12;10:8;19:25
**surprising (2)**

6:11,14
**suspend (2)**
26:25;29:1
**syndrome (1)**
28:13

**T**

**tailored (2)**
39:4,8
**talent (1)**
40:12
**talked (3)**
5:12;15:11;24:21
**tapes (1)**
34:10
**tecum (5)**
9:6,8,16;10:15;11:1
**telephone (1)**
11:18
**telling (2)**
19:14;23:19
**Tennessee (2)**
3:3;38:15
**terms (3)**
5:24;40:20;41:20
**test (1)**
27:7
**testify (1)**
9:23
**testifying (1)**
32:16
**third (1)**
42:9
**third-party (1)**
17:4
**though (2)**
15:17;41:5
**thought (3)**
20:15,15,16
**thousand (1)**
18:12
**three (2)**
10:19;32:10
**threshold (1)**
18:7
**Thursday (1)**
3:2
**tight (1)**
39:23
**times (1)**
17:12
**titled (1)**
13:3
**today (8)**
4:23;11:2;39:17,20;
40:21;41:5,9,10
**today's (1)**
42:1
**Todd (2)**
3:24;12:23
**together (2)**
22:13,13

**told (4)**
3:21;22:19;25:4;
37:20
**took (1)**
33:19
**top (1)**
11:24
**topic (1)**
35:6
**total (2)**
8:17;16:22
**totals (1)**
14:12
**track (1)**
16:18
**tracking (3)**
16:2,5;41:11
**trail (1)**
20:3
**transactions (1)**
11:15
**transcripts (2)**
12:2;31:1
**travel (2)**
6:19;7:9
**traveling (2)**
6:24;22:15
**treat (1)**
41:22
**treated (3)**
41:19;42:4,8
**treatment (1)**
28:16
**tried (1)**
10:14
**try (1)**
20:24
**trying (4)**
32:6;33:24;34:2;
36:17
**turn (2)**
21:13;41:16
**turns (1)**
24:2
**TV (1)**
6:2
**TVs (1)**
8:1
**two (9)**
7:23;13:8,14,14,24;
23:14,24;40:10,15
**type (1)**
8:5
**Tyson (1)**
28:14

**U**

**under (9)**
16:12;21:4,13;28:4;
38:14;40:10,17;41:3,
10
**Understood (1)**

41:13
**undertakes (1)**
25:19
**undertaking (2)**
6:25;7:2
**unfaithful (2)**
26:9,10
**unfortunate (1)**
14:11
**unique (1)**
24:18
**unit (3)**
18:5;19:11;20:2
**units (2)**
18:2;19:3
**unreasonable (1)**
41:4
**up (6)**
6:22;8:17;15:21;
19:18;37:14;40:24
**upon (1)**
4:2
**usage (1)**
36:13
**use (1)**
34:7
**used (1)**
40:8
**uses (3)**
17:1;22:16,21
**using (1)**
23:15
**usually (1)**
38:13

**V**

**various (5)**
9:1;17:20;18:2;
19:2;21:19
**verbatim (1)**
18:25
**verify (1)**
20:7
**vice (1)**
15:24
**video (5)**
12:2;30:5,7;31:10,
12
**video-record (2)**
30:4,8
**videotapes (1)**
34:10
**vs (2)**
3:14;38:15

**W**

**W-2s (1)**
20:19
**waiting (1)**
41:15
**way (14)**

6:20;7:13,18,20;
8:7;9:17;14:13;17:10,
19;21:15;23:1;38:12,
24,25
**ways (1)**
17:13
**website (1)**
32:25
**Wednesdays (1)**
30:3
**Welcome (2)**
3:11;42:17
**whatnot (1)**
41:24
**what's (6)**
3:16;8:22;16:15;
18:9;29:18;31:17
**Who's (1)**
14:25
**whose (1)**
26:15
**wife (2)**
33:24,25
**wife's (1)**
13:19;42:4
**Williamson (1)**
3:3
**willing (1)**
20:20
**wish (1)**
25:8
**wit (1)**
3:5
**within (2)**
14:7;30:11
**without (3)**
16:22;20:2;41:4
**wondering (1)**
27:25
**Woodruff (1)**
3:4
**words (2)**
10:15;14:18
**work (12)**
12:19,21;13:22;
34:1,3,7,12;39:15,21;
40:14,18;41:15
**working (6)**
19:17;27:3,6,13,14,
15
**writes (1)**
7:23
**written (1)**
41:6

**Y**

**Y'all (1)**
4:10
**year (5)**
11:23;16:23;25:20;
28:17;37:22
**year-to-date (1)**

Case 3:21-cv-00923   Document 80-7   Filed 03/09/23   Page 51 of 52 PageID #: 2356

15:21
**yesterday (2)**
4:20;25:5
**you-all (3)**
3:17;39:20;40:18
**youngest (1)**
28:11

---

## 1

**1 (7)**
5:5,7;13:2,5;22:8;
30:23;36:24
**1:33 (1)**
3:2
**10 (7)**
12:3;14:19;18:7,8;
30:12;31:3;34:14
**12 (8)**
11:9,11;12:14;22:7,
11,12;27:17;29:15
**125,000 (2)**
6:17;7:20
**13 (6)**
11:12;12:14;22:13,
23;27:17;29:15
**14 (1)**
3:14
**150,000 (1)**
15:21
**16 (8)**
12:1,14;29:18,19;
30:11;31:18;34:9;
35:11
**17 (4)**
11:21;12:14;35:12,
13
**19th (1)**
3:20
**1st (1)**
4:6

---

## 2

**2,000 (1)**
14:20
**2:43 (1)**
42:19
**20 (1)**
34:17
**2013 (2)**
15:4,10
**2018 (8)**
12:9;22:8;30:23;
34:17;35:23;36:3,24;
37:19
**2019 (7)**
3:2;4:1,3,6;8:13,15;
30:12
**21 (1)**
34:17
**22 (1)**
34:17

**22nd (1)**
40:24
**23rd (1)**
40:24
**24th (1)**
3:21
**25th (2)**
4:1;24:22

---

## 3

**3 (1)**
3:2
**30 (3)**
15:18,20;16:21
**30th (1)**
4:3
**34,494 (1)**
8:15
**39 (1)**
26:8
**394,426.97 (1)**
8:17

---

## 4

**4 (11)**
9:4;10:16,17,24;
11:4;12:14,19;13:7,
17,20;22:6
**4:51 (1)**
4:25
**40 (2)**
23:22;26:5
**40,000 (1)**
7:19

---

## 5

**5 (2)**
15:8;21:24
**50,000 (1)**
7:19
**52,507.46 (1)**
8:16

---

## 6

**60,000 (1)**
7:19

---

## 8

**8,400 (1)**
8:15
**800 (1)**
32:8

Case 3:21-cv-00923   Document 80-7   Filed 03/09/23   Page 52 of 52 PageID #: 2357