# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| BRAD AMOS, | ) |
| Plaintiff, | ) Case No. 3:21-cv-00923 |
| | ) |
| | ) District Judge Richardson |
| v. | ) |
| | ) Magistrate Judge Holmes |
| THE LAMPO GROUP, LLC, | ) |
| | ) Jury Demand |
| Defendant. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, The Lampo Group, LLC, ("Lampo") by and through the undersigned counsel and pursuant to Local Rule 7.01, files this memorandum of law in support of its Motion for Summary Judgment (Doc. #113).

## I.    INTRODUCTION

This is a single-plaintiff employment case. Plaintiff, Brad Amos, ("Amos") is an aggrieved former employee of Lampo, whom the company fired on July 31, 2020, for displaying insubordination and disrespect towards a senior manager.

Amos originally sued Lampo in the Chancery Court for Williamson County, Tennessee on April 15, 2021. After Lampo responded with the first of many motions to dismiss, Amos voluntarily dismissed his case and refiled it four months later here.

The operative complaint in this case—Plaintiff's First Amended Complaint (Doc. #21)—is Amos' fourth attempt to assert claims against Lampo and second in this Court. Lampo has consistently moved to dismiss Amos' claims because they are legally deficient and factually untrue. Lampo's Second Motion to Dismiss (Doc. #30) remains pending and should be granted. Lampo's Motion for Summary Judgment is intended to supplement, not supersede, it.

This has been a case of claims in search of facts. Though Amos knew or should have known that his claims against Lampo were meritless when originally filed, he has doggedly pursued this case more in hopes of stumbling upon some evidence of wrongdoing (whether related to him or not) than the truth. He has exploited the Court's preference that discovery continue during the pendency of dispositive motions, forcing Lampo and the Court to expend tremendous resources for no discernable benefit to anyone.[1] This case has reached summary judgment only because Lampo refuses to settle a frivolous, malicious lawsuit and has the resources to stand on that principle. We earnestly ask the Court to put an end to it by granting Lampo's Second Motion to Dismiss and/or Motion for Summary Judgment.

## II.      STATEMENT OF FACTS[2]

Amos applied for employment at Lampo several times from 2017 to 2019 while living in California and making approximately $200,000 to $250,000 per year. (Plaintiff Dep. 83:1-13; 84:1-21; 126:16-22)[3]. He also applied for other positions in the Nashville area during this

---

[1] Implicit in the Court's preference is the expectation that parties will police themselves in accordance with applicable regulations, including, without limitation, 28 U.S.C. §1927, Rule 11 of the Federal Rules of Civil Procedure, Local Rule 83.01(c)(6), and Rule 3.1 of the Tennessee Rules of Professional Conduct. That has not occurred in this case. Amos has mindlessly pursued this case despite being placed on express notice of its legal deficiencies by Lampo's multiple motions to dismiss and the lack of any record evidence to support it. Discovery in this single-plaintiff employment case ballooned into multiple rounds of written discovery, 11 depositions, and production of nearly 52,000 pages of documents and review of multiples more. All because Amos responded to the absence of evidence with requests for more information rather than taking honest stock of his claims.

[2] Lampo relies on Amos' version of the facts for summary judgment purposes only. Even when viewed in a light most favorable to him, Amos' version of the facts is riddled with inconsistencies and contradictions and fails to substantiate his convoluted claims.

[3] Amos filed his deposition transcript on January 19, 2023 (Doc. #65-1). However, Lampo cannot access the exhibits to the deposition transcript as filed with the Court. Out of an abundance of caution and to ensure that the Court can access the exhibits referenced by Lampo

2

timeframe, including at Belmont University, MTSU, Bohan, and Redpepper. (Plaintiff Dep. 84:21-24). Amos was interested in moving back to Nashville with his family for several reasons, including to be near his ailing mother. (Plaintiff Dep. 85:6-14). In fact, Amos represented to Lampo that he was "in the process of moving to Franklin, TN to be closer to family" when he applied for positions in January and May of 2019. (Plaintiff Dep. Ex. 4-5). Amos expressed interest in employment with Lampo specifically because of its mission to help people get out of debt, his desire for a change of "venue and scenery" from California to Tennessee, and the personal impact Lampo has had on his life. (Plaintiff Dep. 156:3-9, Ex. 4-5).

After applying for several positions at Lampo without receiving an offer of employment, a recruiter at Lampo suggested that Amos apply for an open video editor position. (Plaintiff Dep. 85:15-86:11, 110:5-11, 111:10-24). Amos applied for the position and participated in several interviews with Lampo employees. (Plaintiff Dep. 90:1-4, 111:2-9). He was eventually offered a job at Lampo with an annual salary of $90,000. (Plaintiff Dep. 161:7-19).

Amos claims that he relied on five (5) representations by Lampo when deciding to accept a position with the company:

1. He would edit features and help create Lampo's new film department;

2. Lampo was not "cult like" in the way it operated;

3. Lampo operated a "drama free" workplace;

4. Dave Ramsey stated that Lampo had been voted "best place to work" for over 10 years in a row by their own employees without interference from management, and

---

in this memorandum, we have attached Exhibits 4, 5, 9, 11, and 12 to Amos' deposition transcript to this memorandum.

Lampo employees assured Amos that this statement was true during his interview process; and

5. Lampo was family friendly and would allow Amos to spend time with his family without interference.

(Doc. # 21 ¶357).

At deposition, Amos testified that Lampo told him they were starting a video department to do a series of documentaries. (Plaintiff Dep. 80:3-25). Amos acknowledges that he worked on a documentary for Lampo during his employment. (Plaintiff Dep. 75:2-5, 200:20-21, 208:5-7, 212:2-5, 213:12-14). He also asked during the interview process if Lampo was a "cult" because it sounded too good to be true (Plaintiff Dep. 251:3-12). Amos claims that he was promised a drama-free environment during his interview process, but he perceived Lampo's mandatory employee meetings and employees' e-mail leaks to press to be "distractions." (Plaintiff Dep. 295:1-10). As for Lampo's designation as a "best place to work," Amos claims that he heard Mr. Ramsey announce the recognition on his radio show, that he saw it on Lampo letterhead, and that he verified it independently on the internet. (Plaintiff Dep. 72:16-73:2). Finally, during the interview process, Amos claims he was told that Lampo was family friendly as compared to Los Angeles, particularly because the reduced commute in Tennessee allows more time with family. (Plaintiff Dep. 81:8-19).

The COVID-19 pandemic blindsided Lampo and the entire country during Amos' employment. Around March 16, 2020, Amos attended a meeting at Lampo in which CEO Dave Ramsey addressed the company. (Plaintiff Dep. 218:7-13). Amos claims that Mr. Ramsey told employees that the company did not plan to close. (Plaintiff Dep. 218:9-10). Mr. Ramsey also said that the Operating Board members had stopped taking salaries and that Lampo was not at the point

4

of having to lay off people. (Plaintiff Dep. 218:17-23). Amos claims that Mr. Ramsey then told everyone to "pray and move forward." (Plaintiff Dep. 219:8-9).

After the company-wide meeting, Chief Creative Officer and Operating Board Member Luke LeFevre met with all of the employees in Amos' department. (Plaintiff Dep. 219:16-18). Mr. LeFevre asked the employees how everyone was feeling about work during the pandemic. (Plaintiff Dep. 219:21-23). Amos claims that he said the following during the meeting:

> I actually do have some questions because I think the attitude is we're being a little cavalier about this. We need to probably – we don't know anything about this. Remember, this is very early days. Everybody is panicking. You see stuff on the radio and you see stuff on the news, and there's very little information out there.
>
> I think we probably need to take a breath and take a look at what's going on here. I think just to dismiss it out of hand that somebody who got very, very sick is sitting in this department. What does that mean for us? Do we all need to be tested? Do we need to go home?  Do we all need to quarantine? Where do we even test? What do we do?

(Plaintiff Dep. 220:1-15).  Amos testified that Mr. LeFevre responded by saying that everyone needed to "take a breath" and pray. (Plaintiff Dep. 220:18-20). According to Amos, Mr. LeFevre spoke to him one-on-one after the meeting and asked him what was going on. (Plaintiff Dep. 220:21-22). At deposition, Amos testified that he responded:

> Well, I mean, somebody got really deathly sick next to us. We don't know anything about the disease, and it seems like it's killing people. What do we need to be doing here? I mean, it seems like there's a lot of questions, and I'm not hearing a lot of answers. I'm not saying we need to shut down but do we all need to be tested? What are we doing? What's the plan?

(Plaintiff Dep. 221:1-8). According to Amos, Mr. LeFevre told him not to worry and that the company was watching what was going on. (Plaintiff Dep. 221:9-10, 315:13-15).

Amos admits that he never asked to work at home due to COVID-19. (Plaintiff's Dep. 317:15-17). According to Amos, both Lara Johnson (the head of his department) and David DiCicco (his direct supervisor) suggested that he work from home after the March 16, 2020, meeting where he expressed concerns. (Plaintiff Dep. 317:6-9). Ms. Johnson also suggested to Amos that he wear a mask in meetings if it would make him feel more comfortable. (Plaintiff Dep. 317:10-12). On March 18, 2020, Amos decided to stay at home and informed Mr. DiCicco of his decision. (Plaintiff Dep. Ex. 11). Mr. DiCicco approved of Amos' decision and said he completely understood. (Id).

Shortly after Lampo approved Amos' decision to stay at home, Lampo decided to close its facility and send all employees home. (Plaintiff Dep. 322:15-323:9). Amos believes that Mr. Ramsey preemptively sent everybody home because he knew that the state was going to issue a work-from-home order. (Plaintiff Dep. 325:1-5). On March 20, 2020, Mr. DiCicco told Amos that they had approval to be part of a skeleton crew, that there was deep cleaning occurring in the facility, and that there was "ZERO pressure or expectation" that Amos would be in the facility while closed. (Plaintiff Dep. Ex. 9). Amos decided to stay at home rather than come back to the facility to be a part of the skeleton crew. (Plaintiff Dep. 304:19-25). Lampo provided Amos with a computer and hard drive so that he could work from home (Plaintiff Dep. 224:21-24; 304:21-25).

Lampo's employees worked from home for five (5) weeks. (Plaintiff Dep. 299:4-6). Amos believes that Lampo brought everyone back into the office only after the state of Tennessee sait it was legal to return to work (Id.). Lampo gave everyone a one-week transition period before requiring employees to return to work. (Plaintiff Dep. 299:7-9). Amos had no problem with Lampo's decision to return everyone to work. (Plaintiff Dep. 299:10-14). He came back to work,

6

socially distanced, and wore a mask at times. (Plaintiff Dep. 299:17-21). Amos admits that he does not know whether Lampo violated any COVID-19 rules, regulations, ordinance, recommendations, or laws. (Plaintiff Dep. 308:2-5).

According to Amos, Mr. LeFevre and Ms. Johnson met with him during the work-from-home period on or about April 13, 2020. (Plaintiff Dep. 327:20-23). Mr. LeFevre began the meeting by discussing a deadline related to the documentary to which Amos was assigned that he believed Amos had missed. (Plaintiff Dep. 232:14 – 232:8). Amos claims that Mr. LeFevre then asked him how he and his wife felt about COVID-19. (Plaintiff Dep. 233:9-14). Amos also claims that Mr. LeFevre talked about his attitude and told him that he needed to check his humility. (Plaintiff Dep. 233:14-22; 327:20-25; 328:1-4; 340:20-23; Ex. 12).

Following the April 13, 2020, meeting, Amos had weekly meetings with Lara Johnson. (Plaintiff Dep. 105:14-15). Amos described the meetings as personal in nature. (Id.). He would answer questions about his wife, his marriage, and what he thought about Mr. Ramsey and the "Ramsey way." (Plaintiff Dep. 105:14-15; 277:1-5). Ms. Johnson also asked Amos if he wanted to continue working at Lampo. (Plaintiff Dep. 330:15-24). According to Amos, Ms. Johnson told him that Lampo made a mistake in hiring him and that they would pay him $15,000 if he wanted to leave. (Plaintiff Dep. 330:25-331:1-2). Amos responded that he still wanted to work for Lampo and that he still liked the mission. (Plaintiff Dep. 332:8-9). Amos was concerned that, if he quit, he would not find another job. (Plaintiff Dep. 333:5-10). Amos told Ms. Johnson that he and his wife were perfectly fine in Tennessee and that they would make it work at Lampo. (Plaintiff Dep. 333:13-15).

On July 31, 2020, Mr. LeFevre terminated Amos' employment at Lampo. (Plaintiff Dep. 326:1, 12:24-13:17; 60:20-21; 340:2-5). Amos claims that Mr. LeFevre told him that he was not a

good fit for the job. (Plaintiff Dep. 334:9-10). Amos said that he did not understand because Ms. Johnson had complimented his work. (Plaintiff Dep. 334:17-25). He stated, "so I don't quite understand what the problem is because I get the feeling that by the time we finish this meeting I'm not going to have a job." (Plaintiff Dep. 333:6-9). According to Amos, Mr. LeFevre then went through a rubric for evaluating employment, including the characteristics of humble, hungry, smart, skill fit, and team fit. (Plaintiff Dep. 325:15-326:1). Mr. LeFevre told Plaintiff that he was not humble. (Plaintiff Dep. 326:1). Amos disagreed and told Mr. LeFevre that he was confusing confidence with a lack of humility. (Plaintiff Dep. 326:8-19). Amos then told Mr. LeFevre that he was a high "D" on the DISC personality assessment and that Lampo looks for people who are high Ds because Mr. Ramsey is one. (Plaintiff Dep. 336:1-13). According to Amos, he was "everything they wanted" when he was hired by Lampo. (Plaintiff Dep. 336:8-10). Amos then told Mr. LeFevre that he was not humble, and neither was Mr. Ramsey. (Plaintiff Dep. 336:18-22). Mr. LeFevre ended the meeting and terminated Plaintiff's employment. (Plaintiff Dep. 338:4-8; 340:2-5).

## III.    LEGAL STANDARD

The Court recently restated the summary judgment standard in *Andrews v. Tri Star Sports & Ent. Grp., Inc.*:

> Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue  of material fact." *Anderson  v.  Liberty  Lobby,  Inc.*, 477  U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

> A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp.  Co.*, 446 F.3d 637, 640 (citing *Anderson*, 477 U.S. at 248)*, abrogated on*

8

*other grounds by Young v. Utd. Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628. Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex*, 477 U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed—*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively—can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather,

9

there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

2023 WL 4378100, at *2 (M.D. Tenn. July 6, 2023).

## IV. ARGUMENT

Lampo is entitled to summary judgment with respect to all of Amos' claims. We address each below, in turn.

### A. Count I – Tennessee Public Protection Act

Lampo is entitled to summary judgment with respect to Amos' Tennessee Public Protection Act ("TPPA") claim because he cannot establish a prima facie case of retaliatory discharge or pretext.[4]

#### 1. Prima Facie Case

To withstand summary judgment, Amos must establish a prima facie case of retaliatory discharge. *See, e.g., Foster* at *2. The four prima facie elements are (1) employment with Lampo, (2) refusal to participate in, or remain silent about, illegal activity, and (3) termination of employment (4) solely for refusing to participate in, or remain silent about, illegal activity. *See, e.g., Grizzard v. Nashville Hospitality Capital, LLC*, 2021 WL 3269955 at *26 (M.D. Tenn. July 30, 2021).

Amos cannot establish the second or fourth prima facie elements, which Tennessee courts have consistently described as a "formidable burden." *See, e.g., Id.*

_____

[4] The Tennessee General Assembly has essentially codified the *McDonnell Douglas* framework into the TPPA. *See, e.g., Foster v. MasTec North America*, 2023 WL 3513685 at *1-2 (M.D. Tenn. May 17, 2023); T.C.A. §50-1-304(f).

10

### i.    No Illegal Activity

The second prima facie element requires TPPA protected activity to be related to "illegal activities", defined as any violation of a state or federal statute or regulation that implicates important public policy concerns. *See, e.g., Id.* at *27.

Amos' TPPA claim concerns Lampo's response to COVID-19. However, he has neither alleged, nor adduced any evidence to support, that Lampo's COVID-19 response violated any laws. To the contrary, at deposition, Amos conceded that he did not know whether Lampo's COVID-19 response violated any laws. He also testified that he believed Lampo was following the law when it sent employees home and brought them back to work five weeks later.

### ii.    No Reporting

Moreover, since Amos' TPPA claim proceeds on an opposition theory (i.e., that he objected to Lampo's COVID-19 response), the second prima facie element also requires evidence that he properly reported his concerns about illegal activity to someone other and higher than the person responsible for it. *See, e.g., Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 40-41 (Tenn. 2015).

However, there is no evidence in the record that Amos reported his concerns about Lampo's COVID-19 response to anyone higher than Mr. Lefevre, and he has consistently claimed that Lampo's most senior executive—Dave Ramsey—was ultimately responsible for the company's COVID-19 response. *See, e.g.,* First Amended Complaint ¶¶ 132-142.

In this scenario, the TPPA required Amos to report to someone outside Lampo, particularly given his insistence that Mr. Ramsey controlled all aspects of the company. *See, e.g., Haynes* at 40-41. There is no evidence in the record that Amos reported to anyone outside of Lampo, nor certainly that Lampo was aware of any such report.

11

### iii. No Causal Link

The fourth prima facie element requires evidence of a causal connection between Amos' TPPA protected activity and termination of employment. There is no evidence in the record to support causation, other than perhaps the temporal proximity between Amos expressing concerns about Lampo's COVID-19 response in April 2020 and the termination of his employment on July 31, 2020. However, Tennessee courts are clear that temporal proximity is not sufficient to establish the fourth prima facie element of a TPPA claim. *See, e.g., Boyd v. Youth Opportunity Investments, LLC*, 2022 WL 3205013 at *9 (E.D. Tenn. Aug. 8, 2022); *Smith v. C.R. Bard, Inc.*, 730 F.Supp.2d 783, 800 (M.D. Tenn. 2010).

### 2. *Pretext*

Even if Amos could establish a prima facie case of retaliatory discharge under the TPPA, Lampo is entitled to summary judgment because he cannot prove pretext.

Lampo has produced a legitimate, non-retaliatory reason for terminating Amos' employment—his reaction to Mr. Lefevre during their meeting on July 31, 2020. Under the TPPA's exacting "sole reason" standard, Amos must demonstrate that his conduct on July 31, 2020 played no role in Lampo's termination decision. *See, e.g., Boyd* at *7.

Amos may establish pretext by showing that (i) Lampo's reason for terminating his employment has no basis in fact, (ii) Lampo's reason for his termination did not actually motivate it, or (iii) Lampo's reason for his termination was insufficient to motivate it. *Id.* at *11-12.

The first approach to pretext is fairly straightforward—Amos must show that Lampo terminated his employment based on facts that are not true *Id.* at *12. However, Amos' account of his meeting with Mr. Lefevre on July 31, 2020, closely mirrors Lampo's account and, in any event,

his own subjective view of his behavior that day is not sufficient to establish pretext. *See, e.g.,*
*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992).

The second approach to pretext requires Amos to show that the termination of his employment was more likely motivated by retaliation or that Lampo's reason for terminating his employment was not credible. *Boyd* at *12. Again, Amos' account of his meeting with Mr. Lefevre on July 31, 2020, closely mirrors Lampo's account and his own subjective view of his behavior is not sufficient to establish pretext.

The third approach to pretext requires Amos to produce evidence that other employees engaged in substantially identical conduct and were not terminated. *Id.* at *12. There is no record evidence of this at all.

## B. Counts II & III – Title VII & THRA[5]

Lampo is entitled to summary judgment with respect to Amos's religious discrimination claims under Title VII and the THRA because he cannot establish a prima facie case or pretext.

### 1. *Prima Facie Case*

To withstand summary judgment, Amos must establish a prima facie case of religious discrimination. Amos' Title VII and THRA claims proceed on a general religious discrimination theory (as opposed to religious accommodation) so the four prima facie elements are (1) Amos was a member of a protected class, (2) he experienced an adverse employment action, (3) he was

---

[5] Lampo has consolidated these claims because they are analyzed under the same *McDonnell Douglas* framework. *See, e.g., Cox v. Little Clinic of Tennessee, LLC*, 2020 WL 6685517 at *3 (M.D. Tenn. Nov. 12, 2020).

qualified for his position, and (4) he was treated differently than similarly situated employees.[6] *See, e.g., Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007).

We do not believe that Amos has established the first prima facie element—membership in a protected class (that Lampo knew about). Although courts do not generally question the validity of employees' religious beliefs and only carefully question their sincerity, Amos seems to be shoehorning his personal opinions and preferences regarding COVID-19 into a religious belief. At deposition, Amos testified about the issues separately—his religious beliefs and his approach to COVID-19. He testified about sharing his religious beliefs with Lampo during the hiring process in 2019, before COVID-19 had surfaced. He then testified about sharing his personal approach to COVID-19 with Lampo in April 2020 after the pandemic began and explained that his personal approach (e.g., masking, social distancing) was motivated by his wife and son's medical conditions. (Plaintiff Dep. 298:4-7). There is no record evidence that Amos ever made a clear connection for Lampo between his religious beliefs and personal approach to COVID-19.

But even if Amos can establish membership in a protected class, he cannot establish the fourth prima facie element—that he was treated differently than similarly situated employees outside that protected class. Indeed, the record contains no comparator evidence at all.

---

[6] Lampo initially interpreted Amos' religious discrimination claims as proceeding under an accommodation theory. However, at deposition, Amos testified that he never wanted or requested an accommodation from Lampo. (Plaintiff Dep. 298:25-299:25; 316:15-317:17). Moreover, the thrust of Amos' religious discrimination claim appears to be that Lampo treated him differently (i.e., terminated his employment) because of his religious beliefs. Not that his employment with Lampo was terminated because he refused to comply with a company directive (i.e., Lampo's approach to COVID-19) due to religious convictions. It is a subtle difference, perhaps with little meaningful distinction here.

14

### 2. *Pretext*

Amos cannot establish that Lampo's explanation for his termination was pretext for religious discrimination for the same reasons as his TPPA claim. *See* Section IV(A)(2) *supra*. However, temporal proximity is inherently less relevant to Amos' religious discrimination claim than his TPPA claim, particularly given Amos' testimony that he shared his religious beliefs with Lampo during hiring interviews in 2019.

### C.  Count IV – Fraud

Lampo is entitled to summary judgment with respect to Amos' fraud claim. In Lampo's Second Motion to Dismiss, we have asked the Court to dismiss Amos' fraud claim on several grounds. Extensive discovery in this case has not aided Amos' efforts, as he has not uncovered any evidence of fraud. Rather than rehash Lampo's Second Motion to Dismiss, we address Amos' fraud claim here simply to reiterate and supplement those arguments.[7]

Fraud is synonymous with intentional or fraudulent representation, *see, e.g., Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 FN1 (Tenn. 1999), and consists of the following six elements:

1.  A representation made of an existing or present fact;

2.  The representation was false when made;

3.  The representation was in regard to a material fact;

4.  The false representation was made knowingly or recklessly without regard for its truth;

---

[7] A significant argument raised in Lampo's Second Motion to Dismiss, but not discussed here, concerns the statute of limitations. As outlined in Lampo's Second Motion to Dismiss, Amos' fraud claim against Lampo is time-barred. He has not uncovered any evidence that alters the relevant timeline presented in his First Amended Complaint.

15

5. The plaintiff reasonably relied upon the misrepresented material fact; and

6. The plaintiff suffered damage as a result of the misrepresentation.

*See, e.g., PNC Multifamily Capital Institutional Fund XXVI LP v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 548 (Tenn. Ct. App. 2012).

Amos claims that Lampo made the following fraudulent misrepresentations:

- Statement No. 1: "Plaintiff would edit features and help create their new film department."

- Statement No. 2: "[Lampo] was [sic] not 'cult like' in the way they operated."

- Statement No. 3: "[Lampo] operated a 'drama free' workplace."

- Statement No. 4: "Lampo had been voted 'best place to work' for over 10 years in a row by their own employees without interference from management."[8]

- Statement No. 5: "[Lampo] was family friendly and would allow Plaintiff to spend time with his family without interference from Defendants."[9]

(First Amended Complaint ¶¶ 357, 360).

We briefly address a few of the fraud elements below, in turn.

---

[8] Amos attributes this statement to both Mr. Ramsey and Lampo. Amos alleges that Mr. Ramsey made this statement "on many occasions on his radio show and in other media outlets." (First Amended Complaint at ¶47). Apparently, Mr. Ramsey made these statements *before* Amos' employment with Lampo because he claims to have "inquired about [them] during the interview process." (Id. at ¶48).

[9] In Lampo's Second Motion to Dismiss, we have raised a sixth statement that might have formed the basis for Amos' fraud claim. In the First Amended Complaint, Amos seemed to allege that Lampo made false statements about his ability to work from home without adverse employment action. (Doc. #21 ¶¶ 160-163). Amos has apparently abandoned this because he testified that he never asked for an accommodation to work from home. Furthermore, he was allowed to work from home (like everyone else at Lampo during the 5-week closure of the office) and he returned to work.

16

### 1. *Existing or Present Fact*

In order to meet the first element of a fraud claim, Amos must assert actual facts and not opinion or conjecture about future events. *Woosley v. Bailey,* 1992 WL 187639, *5 (Aug.7, 1992, Tenn. Ct. App.); *Van Eman v. Keuffel & Esser of New Jersey, Inc.,* 1988 WL 60493, *5 (Sept. 26, 1988, Tenn. Ct. App.). "It is a well-settled rule of law that in order to constitute actionable fraud and deceit, a false representation or statement must relate to a subject of fact which is susceptible of knowledge and that fraud and deceit cannot be predicated upon the mere expression of opinion or judgment, which is understood to be only such or cannot be reasonably understood to be anything else." *Georgia Marble Co. v. Standard Tile Co.,* 86 S.W. 2d 429 (Tenn. Ct. App. 1935) (citing *Ropeke v. Palmer,* 6 Tenn.App. 348 (1927)).

Statement Nos. 2, 3 and 5 are clearly opinions and not based in fact. Statement No. 1 is conjecture about future events. These statements, even if made, cannot satisfy the first element of a fraud claim and should be eliminated from consideration.

### 2. *Representation Was False When Made*

Statement Nos. 2, 3 and 5 cannot be considered false as they are opinions. Even if the opinions expressed could satisfy the first element of a fraud claim, it is impossible to characterize them as "false." What is "family-friendly" to one person, may not be family-friendly to another. One person's interpretation of a "cult" or "drama" is not necessarily the same as another person's interpretation. Statements No. 2, 3 and 5 are subjective opinions that cannot be considered false.

Amos admits that Statement No. 1 was not false. He admits that he worked as an editor on the documentary feature film.

17

As for Statement No. 4, Amos neither alleges nor can point to any facts to indicate that this statement is false. There is no dispute that Lampo was actually named a "Best Place to Work" by the Nashville Business Journal when Amos was applying for employment. Because it is clearly true that Lampo was voted a Best Place to Work, Amos adds "without interference from management" in an attempt to create something "false." However, Amos has not even alleged facts that support this after-thought tagline. Amos claims that *while he was employed*, company leaders told employees to fill out Inc. Magazine Best Place to Work surveys and not disparage Lampo. The problem with this assertion is that, even if true, this alleged management interference relates to a *later* Best Place to Work designation, not the one that Amos allegedly relied on when deciding to come work for Lampo. There is no evidence or even an allegation that management interfered with any Best Place to Work designations in 2017 through 2019 when Amos was applying for employment at Lampo.

### 3. Materiality

Plaintiff's fraud claim should also be dismissed because none of the five statements were sufficiently material to be actionable. To be material, a misrepresentation must have been so significant that it determined the conduct of the party seeking relief. *See, e.g., Grissim v. Powell Constr. Co.,* 1999 Tenn. App. LEXIS 413 at *8-9 (Tenn. Ct. App. June 25, 1999); *Dozier v. Hawthorne Dev. Co.*, 262 S.W.2d 705, 709-10 (Tenn. Ct. App. 1953). The materiality of a misrepresentation is a question of law for the Court. *Grissim* at *8-9.

All of the statements identified by Amos were vague, subjective, and/or collateral to the primary terms and conditions of his employment with Lampo. Nor were any of the statements a guarantee of future circumstances. As an at-will employee of Lampo, Amos' employment was subject to termination by Lampo at any time for any or no reason. *See, e.g., Stein v. Davidson*

18

*Hotel Co.,* 945 S.W.2d 714, 716 (Tenn. 1997). So, it is simply not plausible for Amos to argue that those statements were sufficiently material to be outcome determinative.

### 4. *Reasonable Reliance*

Amos' fraud claim should also be dismissed because none of the statements could have possibly induced reasonable reliance. Tennessee's strong presumption in favor of at-will employment and the inherently changeable nature of at-will employment make it extremely difficult for employees to maintain materiality and reasonable reliance-based claims like fraudulent misrepresentation and promissory estoppel. *See, e.g., Koch v. Lightning Transp., LLC*, 2015 U.S. Dist. LEXIS 707 at *22-23 (M.D. Tenn. Jan. 6, 2015); *Wright v. Wacker-Chemie AG*, 2014 U.S. Dist. LEXIS 105337 at *43-45 (E.D. Tenn. Aug. 1, 2014); *Chapman v. Southern Natural Gas Co.,* 2011 U.S. Dist. LEXIS 25129 at *13-15 (E.D. Tenn. Mar. 11, 2011). Again, most of the statements are opinions, not fact. Reliance on an opinion is not justified or reasonable unless it is the opinion of a disinterested person and if the fact that such person holds the opinion is material. *Davis v. McGuigan*, 325 S.W.3d 149, 155 (Tenn. 2010). Obviously, devoted employees of Lampo are not disinterested parties.  A reasonable person would not have relied upon their statements to make the weighty decision to relocate his entire family from California to Tennessee for an at-will position that paid $150,000 less.

### D.  Count V – Promissory Estoppel

Lampo is entitled to summary judgment with respect to Amos' promissory estoppel claim, which alleges that "Lampo made promises to [him] regarding the conditions of his future employment including limited interference with [his] family time and a strict 40-hour work week." (First Amended Complaint ⁋354).

To succeed on his promissory estoppel claim, Amos must show "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that [he] reasonably relied upon the promise to [his] detriment." *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007).

Amos' claim that Lampo promised "limited interference with family time" and a "strict 40-hour work week" are too ambiguous, vague, and nonspecific to establish promissory estoppel. *See Id*. These "promises" are more accurately described as general characteristics of employment with Lampo. Amos testified that he was told Lampo was family friendly compared to Los Angeles. (Plaintiff Dep. 81:8-19). He does not characterize any discussion of family time as a "promise." Even if this discussion could be an inferred promise, the subjective characterizations of "family friendly" and "family time" are too ambiguous and vague to be actionable. Additionally, there is no way to determine with certainty what constitutes "limited interference."

Further, Amos claims that in one of his interviews it was said that "[w]e only work 40 hours a week." (Plaintiff Dep. 161:22-23). Again, this statement is not a promise but a general characterization of the working hours at Lampo. Similarly, courts have found that statements such as "overtime would be plentiful" and "there was years of work to be done," were not "promises." *See Chavez*, 245 S.W.3d at 405.

Finally, Amos' promissory estoppel claim is completely foreclosed by Tennessee's presumption of at-will employment. Tennessee courts disagree over whether an at-will employee can ever assert promissory estoppel given the need for reasonable reliance. *Wright* at *40-43. But even supportive courts acknowledge that promissory estoppel can only be applied to at-will employment relationships in exceptional circumstances, like where an enforceable promise has been made and failure to enforce that promise would effectively perpetuate a fraud upon the

employee and/or confer an unconscionable advantage upon the employer. *See, e.g., Id.*; *Chavez*, 245 S.W.3d at 404-408. "Promises" of limited interference with family time and a strict 40-hour work week are simply not cognizable under even the most basic formulation of promissory estoppel, much less the narrower version applicable to at-will employment.

### E. Count VI – T.C.A. §50-1-102

Lampo is entitled to summary judgment with respect to Amos' claim under T.C.A. §50-1-102. This relatively obscure statute makes it "unlawful for any person to induce, influence, persuade or engage workers to change from one place to another in this state, or to bring workers of any class or calling into this state to work in any type of labor in this state through or by means of false or deceptive representations, false advertising or false pretenses, concerning the kind and character of the work to be done, or the amount and character of compensation to be paid for the work, or the sanitary or other conditions of the employment, or as to the existence or nonexistence of a strike or other trouble pending between employer and employees, at the time of or prior to the engagement." T.C.A. §50-1-102(a)(1); *see also Gillinsky v. Marcus & Millichap Real Estate Inv. Servs. of Seattle,* 2021 U.S. Dist. LEXIS 128263 at *48-51 (M.D. Tenn. July 9, 2021).

The Tennessee Court of Appeals has characterized T.C.A. §50-1-102 as functionally equivalent to fraudulent inducement, *i.e.,* an employer fraudulently inducing an employee to quit his/her current job and come work for them. *Shipp v. Ditch Witch Equip. of Tenn., Inc.,* 2007 Tenn. App. LEXIS 123 at *6 (March 7, 2007). As statutory fraud, T.C.A. §50-1-102 claims are subject to the same heightened pleading standards, materiality standards, and statutes of limitations as common law fraud claims. *Block v. Meharry Med. College,* 2016 U.S. Dist. LEXIS 69485 at *3-4 (M.D. Tenn. May 26, 2016) (statute of limitations); *Grissim* at *9-11 (June 25, 1999) (materiality);

21

*see Metro. Prop. & Cas. Ins. Co. v. Bell,* 2005 U.S. App. LEXIS 17825 at*15-16 (6th Cir. Aug. 17, 2005) (applying Rule 9 to TCPA claims).

The language of the statute makes it clear that for a false or deceptive representation to be actionable under the statue, it must concern, in relevant part, "the *kind and character* of the work to be done." *Evans v. Nashville Film Inst., LLC*, 2022 WL 2500324, at *12 (M.D. Tenn. July 6, 2022) (emphasis added). Amos' First Amended Complaint alleges only deceptive representations related to the "character" and "quantity" of the work to be done. (Doc. #21 ¶¶ 375-76). Misrepresentations about the "quantity" of work are not actionable. To be actionable, a "misrepresentation must fall within one of the four categories" identified in the statute. *Evans*, 2022 WL 2500324, at *12.

Moreover, Amos fails to identify what Lampo said about the character of work at the company that, he contends, was false or deceptive. His specific allegations in Count VI of the First Amended Complaint merely recite the claim's basic elements. Considering the nature of this claim and entirety of Amos' First Amended Complaint, Count VI is—at best—a statutory rehash of his fraud claim in Count IV and fails for the same reasons.

Respectfully submitted,

/s/Daniel Crowell
Leslie Goff Sanders (TN #18973)
Daniel Crowell (TN #31485)
Stephen Stovall (TN #37002)
BARTON LLP
611 Commerce Street
Suite 2603
Nashville, TN 37203
Telephone: (615) 340-6790
lsanders@bartonesq.com
dcrowell@bartonesq.com
sstovall@bartonesq.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I certify that, on July 28, 2023, I filed the foregoing *Memorandum of Law in Support of*

*Defendant's Motion for Summary Judgment* via the Court's electronic filing system, which will

automatically notify and send a copy of the filing to:

Jonathan A. Street
Lauren J. Irwin
Brandon G. Hall
Cullen D. Hamelin
THE EMPLOYMENT AND CONSUMER LAW GROUP

*Attorneys for Plaintiff*

/s/Daniel Crowell
Daniel Crowell (TN #31485)
*Attorney for Defendant*