# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **BRAD AMOS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:21-cv-00923** |
| **vs.** | ) | |
| | ) | **Judge Richardson** |
| **THE LAMPO GROUP, LLC,** | ) | |
| | ) | **Magistrate Judge Holmes** |
| **Defendant.** | ) | |
| | ) | **JURY DEMAND** |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Brad Amos ("Mr. Amos") files this Response and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment. Defendant's motion contains several factual and legal inaccuracies and omissions and must be denied.

## I.    STATEMENT OF RELEVANT FACTS

This lawsuit was brought on behalf of the Plaintiff for claims under Tennessee Public Protection Act, Title VII of the Civil Rights Act, Fraud, Promissory Estoppel, and T.C.A. § 50-1-102.[1]

---

[1] Based on previous filings with the court it needs to be made clear; despite Defendant's constant attempts to play the victim, this lawsuit was brought because of its actions and no other improper reasons. Further, Defendant in this matter was so obstinate in the discovery process this case required much more work on the part of all the attorneys involved. Defendant behaves as if the Rules and orders of this court simply do not apply to them.   led to the filing of multiple discovery disputes and even a motion for sanctions for failure - all which the Defendant lost.

### a. Background

Prior to working at Lampo, Mr. Amos lived in California where he spent the majority of his career establishing himself in the entertainment industry. (Plaintiff's Statement of Additional Material Facts). In California, Mr. Amos made approximately $200,000 to $250,000 per year as a Creative Director. (*Id*, at 84:8-12; 87:9-10). Despite his professional success, Mr. Amos' family remained his priority. (Dep. of Amos at 88:14-21). In line with industry standards, every other year or so, Mr. Amos would informally apply to various positions to see if there would be a better fit for his family. (Plaintiff's Statement of Additional Material Facts). Mr. Amos first applied for a position at Defendant in 2017 and then applied once more in 2019. (Dep. of Amos at 83:19-21; 89:8-11). A few months after submitting his second application, one of Defendant's recruiters reached out to Mr. Amos about a different position they thought he'd be a good fit for. (Plaintiff's Statement of Additional Material Facts). Mr. Amos was interested in the position and re-sent his application materials to Defendant. (Dep. of Amos at 86:2-11). At the time, Mr. Amos remained in California and was not in the physical process of moving. (Dep. of Amos at 120:21-22). However, Mr. Amos was willing to relocate his family given "the right job" and if "everything lined up." (Plaintiff's Statement of Additional Material Facts).

### b. Interview Process

Defendant utilizes a lengthy interview process for applicants consisting of a ninety-day review period and includes multiple Zoom and in person interviews, spousal interviews, and requires applicants submit personal finance and budget information. (Plaintiff's Statement of

---

Defendant's attempt to bully their way through this lawsuit was a demonstration of why the general public often has such low views of attorneys.

Additional Material Facts). Towards the end of this process, Defendant requires a "Final On-Site Interview and Spousal." (Plaintiff's Statement of Additional Material Facts). This consists of evaluations from a set of interviews at Defendant's facility and dinner with the applicant's spouse. (Dep. of Johnson at 33:25-34:5). The interview process included interviews with both Mr. Amos and his wife and took nearly two (2) months to complete. (Ex. A). Defendant paid for Mr. Amos and his wife to travel to Tennessee with their young children for these interviews. (Dep. of Amos at159:13-18). When Mr. Amos questioned whether his wife and children needed to be in attendance, Defendant told him he could not continue with the interview process until they spoke with his wife. (Dep. of Amos at 159:19-23). During Mr. Amos spousal dinner, he was questioned about his religion and faith. Mr. Amos made it clear that his belief system does not include taking things at face value nor adhering to a belief system blindly. (Dep. of Amos at 246:15-21). Instead, Mr. Amos' belief is that "we're driving the car" and should act with free will. (Dep. of Amos at 246:22-25). Mr. Amos' evaluation notes that he was "an extremely talented candidate that will need to be fast track re: contributing." (Plaintiff's Statement of Additional Material Facts). Defendant officially extended an offer and hired Mr. Amos in August of 2019 as a Senior Editor. (Dep. of Johnson 29:14-16; 38:18-20).

### c. Employment at Lampo

As a condition of employment with Defendant, employees must adhere to specific religious beliefs. Defendant's CEO, Dave Ramsey, believes "Focused intensity over time, multiplied by God, creates unstoppable momentum," and part of his employment practice is "the idea that if you focus intensely over time and God blesses it, you create unstoppable momentum." (Dep. of Ramsey at 30:11-15). Despite Defendant having an operating board, if Mr. Ramsey does not agree to their decisions those decisions will not go into effect. (Dep. of Ramsey at 51:8-11). Defendant's

policies include employees doing "their work unto the lord" and "in a way that makes God proud." (Dep. of Ramsey at 26:25; 27:15-16). Prayer was required at every "coffee house" meeting, all-employee meetings, "devotional" meetings, "standup" meetings, outside events, and meals. (Ex. A). Employees were also expected to attend various religious affiliated activities, like weekly devotionals. (Plaintiff's Statement of Additional Material Facts). Generally, devotionals consisted of different religious speakers. (Dep. of Amos at 45:2-3; Dep. of A. Lopez 10/25/22 at 166:20-167:4; Dep. of Johnson at 62:1-11). All religious speakers were evangelical, Defendant never had priests, rabbis, or anybody from any other religions speak during devotionals. (Plaintiff's Statement of Additional Material Facts). However, topics often strayed and would include other general company information because mandatory attendance resulted in the convenience of all employees being gathered. (Dep. of Amos at 45:1-10; Dep. of Johnson at 63:20-23).

Other religious affiliated extracurriculars were expected of employees like volunteer work at churches and bible journaling. (Plaintiff's Statement of Additional Material Facts). Mr. Amos was required to write down his prayers, concerns, and feelings as it relates to his relationship with God. He was encouraged to share his religious feelings publicly. Mr. Amos never shared these and this caused friction with his employers. (Ex. A).

Another employment requirement was attendance at weekly staff meetings. (Plaintiff's Statement of Additional Material Facts). During this meeting, information would be shared regarding company business. (Dep. of Amos at 44:15-18). However, the topics covered would extend far past company business and would become a platform for Mr. Ramsey to talk about whatever he was currently feeling and test out new radio material. (Dep. of Amos at 44:15-22). Staff meetings would always end with a closing prayer. (Plaintiff's Statement of Additional Material Facts).

4

Additionally, employees were required to complete weekly reports about their job and personal life. (Plaintiff's Statement of Additional Material Facts). Weekly reports were a general form and employees would fill in their highs and lows for the week, stressors they were experiencing, comments on their workload, and anything else they'd like to share. (Plaintiff's Statement of Additional Material Facts). In these reports, employees were encouraged to share "what was going on with their lives" so that their supervisor could be aware, like family drama, a lost pet, or current divorce. (Dep. of A. Lopez 10/25/22 at 95:6-20; 95:24-96:3). Mr. Ramsey has commented that it can be "very difficult to bring your best self to work when you're dealing with problems at home." (Dep. of Ramsey at 41:9-11). Employees submitted these reports to their immediate supervisor. (Plaintiff's Statement of Additional Material Facts). While employees submit weekly reports to their direct supervisor, all supervisors continuing up the chain of command would have access to these reports as well. (Dep. of A. Lopez 10/25/22 at 97:20-98:12). Despite sharing his honest thoughts on work and life going well, Lara Johnson would frequently inquire about Plaintiff's report asking things like, "How is your marriage?" (Dep. of Amos at 75:16-24). At one time Mr. Luke LeFevre, Chief Creative Officer, recommended Mr. Amos attend Ramsey Solutions (Lampo) religious based marriage counseling services. Mr. Amos did not feel this was necessary and did not take these religious based classes. (Ex. A).

All of these additional work commitments influenced the company culture at Defendant. Near the time of Mr. Amos' termination, the company culture had increasingly become one of fear and intimidation. (Dep. of Amos at 46:3-7). Employees were told not to look things up on the internet about Mr. Ramsey. (Dep. of Amos at 63:2-17). All required meetings became a forum where Mr. Ramsey would speak quite abusively about former employees. (Dep. of Amos at 44:3-11). Frequently, Mr. Ramsey brought a PowerPoint presentation to these meetings with negative

articles on the internet where he would dissect them and interpret them for the staff. (Plaintiff's Statement of Additional Material Facts). Especially from March 2020, after Covid-19 started, Mr. Ramsey would address former employees who brought complaints against him, like O'Connor and Fowlkes[2], and say disparaging things like they would sleep around and spread disease. (Dep. of Amos at 44:3-11). Furthering this fear culture, employees were aware that Mr. Ramsey previously terminated multiple pregnant women and an employee who had come out as gay. (Dep. of Amos at 47:2-6). Mr. Ramsey has even gone as far to fire someone for something their spouse had posted on Facebook. (Dep. of Ramsey at 69:2-16). It was common for Mr. Ramsey to call former employees "disloyal" during these large employee meetings. (Dep. of Amos at 48:1-7).

Part of this fear culture was getting employees to completely embrace Mr. Ramsey's chosen ideas and messages, or face termination. On one occasion, Suzanne Sims, a board member for Defendant, spoke during an employee meeting with the goal of finding people who were "Dave-ish". (Plaintiff's Statement of Additional Material Facts). "Dave-ish" people were individuals who liked Mr. Ramsey, but did not buy into his belief system completely. Defendant held a rally to root out these "Dave-ish" people for termination; this statement received a standing ovation at the rally. (Plaintiff's Statement of Additional Material Facts). Leaders often encouraged employees to find people who were "Dave-ish" and report them to their supervisors. (Dep. of Amos at 58:19-25). Employees were fully expected to buy-in to all Ramsey beliefs. Mr. Amos' supervisor told his department that "if [they] don't think this is the best place to work, I need to have a conversation with you. We need to talk." (Dep. of Amos at 175:14-25).

### d. Plaintiff's Employment

---

[2] O'Connor and Fowlkes were employees who have also brought lawsuits against Defendant

Before Covid-19 began to spread across the nation in early 2020, Mr. Amos' supervisors often met with him to express their satisfaction with his work performance and to discuss potential raises and promotions. (Dep. of Amos at 77:21-78:1). Plaintiff never received a write up during his time at Lampo and received rave reviews from his employers. (Plaintiff's Statement of Additional Material Facts). On one occasion, his supervisor, Luke LeFevre, told Mr. Amos he was "killing it" and doing "a great job". (Plaintiff's Statement of Additional Material Facts ). In fact, Defendant's code name for Mr. Amos was the "big fish." (Plaintiff's Statement of Additional Material Facts). The first promotional video he made for the aforementioned project received a standing ovation from those in attendance. (Ex. A).

Then in spring of 2020, Mr. Amos grew concerned with the potential health risks Covid-19 posed and Defendant's failure to implement and follow state orders. (Dep. of Amos at 298:1-20). Defendant further demonstrated their intention to avoid legal mandates through public statements made by their Chief Executive Officer, Dave Ramsey, on his public radio and YouTube show. (Ex. E).  One state mandate released in mid-March cautioned residents from attending any gathering with more than 10 people. (Dep. of Amos at 293:4-9; Ex. D). Despite this mandate, Defendant gathered Mr. Amos and approximately 900 other employees for a presentation about Covid-19. (Dep. of Amos at 293:8-25). During this meeting employees were encouraged to "take a breath" and "chill out because everybody [was] losing their freaking minds" and to pray. (Dep. of Amos at 293:18-25). Following this presentation, Mr. Amos' supervisor reinforced this message with his team stating, "We could all use a good prayer, and I think that's going to see us through." (Plaintiff's Statement of Additional Material Facts).  At another staff meeting around this time, Mr. Ramsey yelled about disloyalty after an anonymous employee reported Defendant to the Center for Disease Control. (Dep. of Amos at 295:7-15). After mocking this employee, Mr.

Ramsey told staff that the CDC would "not do a damn thing." (Dep. of Amos at 295:15-19). Despite employees becoming sick with Covid-19 at their facility, Defendant maintained the attitude that employees should "pray it away" and "somebody else is driving the car and got their hand on the wheel." (Dep. of Amos at 242:15-20).

There was a very specific kind of Christianity that was fundamentalist in its belief that Mr. Ramsey adhered to and he expected his employees to do the same. If they did not adhere to this standard, Mr. Ramsey stated "Then there is the door. If you don't like what we are doing, get the hell out". (Dep. Of Amos at 244:19 to 255:5).

In response to Defendant's illegal activities, Mr. Amos both voiced his concerns to his leaders and refused to work in an environment that did not comply with government orders. (Dep. of B. Amos at 220:9-221:10; 316:15-20; 320:10-16). Mr. Amos noticed other coworkers and members of management comment about or stare at him for implementing Covid precautions like wearing a mask or social distancing. (Dep. of Amos at 295:21-297:2). Specifically, Mr. Amos expressed his concerns to his leaders during one-on-one meetings. (Dep. of B. Amos at 297:19-298:13). Following a conversation where Mr. Amos' supervisor asked the department, "How are you feeling?...Everybody good?" Mr. Amos raised concerns about the handling of Covid. (Dep. of Amos at 219:21-25; 220:1-8). Specifically, Mr. Amos said, "I actually do have some questions because I think the attitude is we're being a little cavalier about this." (Dep. of Amos at 220:1-8). Mr. Amos emphasized his belief that they "probably need[ed] to take a breath and take a look at what's going on [t]here." (Dep. of Amos at 220:9-16). After asking if people should get tested and where this would occur, Mr. LeFevre responded, "Well, okay, well you know what. I think we just—everybody take a breath and let's pray." (Dep. of Amos at 220:17-20).

Following this conversation on March 16, 2020, Mr. Amos noticed a stark change in the dynamic between himself and his supervisors. (Dep. of Amos at 71:1-2). Mr. Amos, having a high-risk child living at home, was uncomfortable with Lampo's religious response to his COVID inquiry and suggested he could work from home. Mr. Amos was demoted for making this suggestion. (Ex. A). Mr. Amos was then permanently removed from the project he was working on because he chose to raise concerns with the company's inaction and subsequent religious contentment after a case had been confirmed a mere fifteen (15) feet away from him. (Ex. A). On April 9, 2020, Mr. Amos was told, for the first time, he missed a deadline from months prior. (Dep. of Amos at 222:2-7). Additionally, Mr. Amos was told he had been on-boarded incorrectly when hired and needed to begin "re-onboarding sessions." (Plaintiff's Statement of Additional Material Facts). Despite Mr. Ramsey's opinion that employees working from home were not completing their work, he could not identify a single measurable item indicating work from home was actually affecting business. (Dep. of Ramsey at 114:12-16).

Despite being told the "re-onboarding meetings" were not disciplinary in nature, they were implemented that way. (Plaintiff's Statement of Additional Material Facts). During the "re-onboarding meetings" Ms. Johnson would ask Mr. Amos his thoughts on Mr. Ramsey's rants, specifically the rants about employees who had sued the company for disagreeing with Mr. Ramsey's policies. (Dep. of Amos at 52:1-20). Mr. LeFevre also had meetings with Mr. Amos and would immediately steer the conversation to Covid. (Dep. of Amos at 233:9-10). Mr. Amos' wife would also be a topic of conversation during these meetings. (Dep. of Amos at 71:3-4). Ms. Johnson would inquire about Plaintiff's wife's opinion on the company and Mr. Ramsey. (Dep. of Amos at 54:1-8).

9

Defendant claims Mr. Amos was ultimately fired on the spot for insubordination during a meeting with one of his supervisors. (Dep. of LeFevre at 168:2-8; 170:14-16; 174:3-4). However, during this meeting, it is no coincidence that his supervisor specifically indicated they have been "trying to get [him] to change" since March. (Dep. of LeFevre at 185:15-21). The alleged insubordination consisted of Defendant accusing Mr. Amos of having a humility problem and Mr. Amos suggesting his confidence was being confused with ego. (Dep. of LeFevre 185:7-14). Notably, this same supervisor already cleared a severance amount for Mr. Amos with Defendant's Human Resources Committee. (Dep. of LeFevre at 173:17-20; Ex. B).

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Sixth Circuit has urged caution in granting summary judgment for an employer once a Claimant establishes a prima facie case because "an employer's true motivations are particularly difficult to ascertain" and are "elusive." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.8, 101 S. Ct. 1089, 1094 n.8 (1981)).

Summary judgment should not be imposed to deny a party an opportunity to present a meritorious claim or defense on his/her "day in court." *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). *See Harris v. JB Robinson Jewelers*, 627 F. 3d 235, 239 (6th Cir. 2010) (testimony alone can be sufficient to create a jury question regarding an issue of material fact); *Walker v. Davis*, 649 F. 3d 502, 505 (6th Cir. 2011) ("At the summary judgment stage, the relevant facts are the

Claimant's version of the facts…"). In this case, genuine issues of material facts exist making summary judgment inappropriate.

## III. ARGUMENT

### a. Tennessee Public Protection Act ("TPPA")

To succeed under a TPPA claim, the plaintiff must show four elements:

(1) the plaintiff was an employee of the defendant;
(2) the plaintiff refused to participate in or remain silent about illegal activity;
(3) the defendant employer discharged or terminated the plaintiff's employment; and
(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Williams v. City of Burns*, 465 S.W.3d 96, 111 (Tenn. 2015) (internal citations omitted). Further, a plaintiff asserting a claim under the TPPA must also show that he "engaged in conduct protected by the TPPA, that the protected conduct was known to the defendant, that the defendant thereafter discharged [him], and that there was the requisite causal connection between the protected conduct and the discharge. (*Id.* At 113–14). It is undisputed that Mr. Amos was an employee of Defendant and that Defendant terminated his employment.

### i. Plaintiff refused to remain silent or participate in an illegal activity.

Under the TPPA, evidence is sufficient to establish an "illegal activity" when an employee has "reasonable cause to believe a law, regulation, or rule has been violated or will be violated, and in good faith report[s] it. *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). In order to meet this reasonable belief burden, the Plaintiff must "identify the law and policy that []he contends was contravened and must be able to substantiate these allegations to some degree." *Richmond v. Vanguard Healthcare Servs., LLC*, No. M201402461COAR3CV, 2016 WL 373279, at *7 (Tenn. Ct. App. Jan. 29, 2016) (internal citations and quotations omitted). It is not necessary to conclusively prove a violation of a statute or regulation; the issue is whether the employee had

reasonable cause to believe a statute or regulation had been violated. *King v. Delfasco, LLC*, 646 S.W.3d 456, 470 (Tenn. Ct. App. 2021), appeal denied (Mar. 23, 2022).

TPPA protections are also triggered when an individual's refusal to participate is based on "a public purpose [that] should be protected. So long as the employee's actions … seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged." *Guy. v. Mut. of Omaha Ins.* Co., 79 S.W.3d 528, 537 n. 4 (Tenn. 2002). The protections of the TPPA against retaliation are not limited only to reports of illegal activities, but also to the individual who refuses to participate in the activity. *Knisley v. CEC Ent., Inc.,* No. 3:19-CV-00495, 2019 WL 10949409, at *4 (M.D. Tenn. Oct. 23, 2019).

Mr. Amos's claim is based on his adherence to state and federal mandates that businesses and individuals take certain precautions to avoid the spread of Covid-19. (Dep. of B. Amos at 295:21-296:11; 298:3-20). Despite multiple state orders directing business to keep employees home from work, Defendant required employees to be in the office and attend meetings and conferences with hundreds of attendees. (Dep. of A. Lopez 10/25/22 at 164:13-165:6; Dep. of Amos at 293:8-25; Ex. C; Ex. D). Defendant further demonstrated their intention to avoid legal mandates through public statements made by their Chief Executive Officer, Dave Ramsey, on his public radio and YouTube show. (Ex. E).  In response to Defendant's illegal activities, Mr. Amos both voiced his concerns to his leaders and refused to work in an environment that did not comply with government orders. (Dep. of B. Amos at 220:9-221:10; 316:15-20; 320:10-16). Mr. Amos told his leaders in one-on-one meetings that he was worried about his family and Covid, specifically having to go to an office that did not adhere to the law. (Dep. of B. Amos at 297:19-298:13). Mr. Amos's wife also made her family's position clear that people should remain home

on Facebook.[3] (Ex. F). It remains no coincidence that Defendant repeatedly referred to Mrs. Amos as "crazy" following her public support of government orders decreeing employees work from home. (Ex. G). The facts are clear that Defendant engaged in an illegal activity and that Mr. Amos vocally opposed them as well as refused to participate in them.

### ii. Defendant terminated Plaintiff solely because he refused to remain silent or participate in an illegal activity.

When establishing causation under the TPPA, the plaintiff may rely on circumstantial evidence that is pertinent and probative. *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 29–30 (Tenn. 2011). Circumstantial evidence that is pertinent and probative on the issue of causation includes:

(1) temporal proximity of the adverse action to the complaint;
(2) a pattern of workplace antagonism following a complaint;
(3) an employer's failure to adhere to established company policy in dealing with the employee;
(4) discriminatory treatment when compared to similarly situated employees;
(5) evidence of a good work history and high or solid performance evaluations of the employee;
(6) sudden and marked changes in an employee's performance evaluations after the exercise of the employee's protected rights; and
(7) evidence tending to show that the [employer's] stated reason for discharge was false.

*Sykes v. Chattanooga Hous. Auth.,* 343 S.W.3d 18, 29–30 (Tenn. 2011) (internal citations and quotations omitted).

To determine if a causal connection exists between the protected activity and discharge, courts may consider temporal proximity combined with other circumstantial evidence. *Boyd v. Youth Opportunity Invs., LLC*, No. 3:20-CV-321-TAV-DCP, 2022 WL 3205013, at *9 (E.D. Tenn. Aug. 8, 2022). However, when an adverse employment action occurs so closely in time to the protected activity, temporal proximity can be significant enough to establish causation for the

---

[3] Defendant indicated that an employee's spouse's social media posts and comments can be imputed to the employee when the employee does not repudiate their spouse's statements. (Dep. of A. Lopez 6/15/23 at 60:7-13).

purposes of a *prima facie* case of retaliation. *Hayes v. Metro. 'ov't of Nashville & Davidson Cnty., Tennessee*, No. 3:20-CV-01023, 2022 WL 17490492, at *38 (M.D. Tenn. Dec. 7, 2022).

Temporal proximity plays a large role in establishing the causation here. Mr. Amos had been employed by Defendant since August 2019 and had not been disciplined or had his work product criticized until April 2020. (Dep. of A. Lopez 10/25/23 at 170:23-171:8). However, when the Covid-19 pandemic began to affect Defendant in March 2020, and Mr. Amos made his objections to Defendant's response clear through his words and actions, Defendant began fabricating problems with his performance to warrant a termination. Defendant has cited issues that, if true, should have conceivably been rasied many months prior to March 2020, such as missed deadlines and communication deficiencies, but did not begin to take any action on them until April 2020. (Dep. of Johnson at 45:12-16; Exhibit- April 8 email; Dep. of Amos at 71:1-9). Had it not been for Mr. Amos's vocal opposition and refusal to participate in Defendant's defiance of government orders, Defendant would not have begun looking for reasons to terminate him.

Defendant ultimately cites "insubordination" as the reason for Mr. Amos's termination. (Dep. of LeFevre at 168:2-8; 170:14-16; 174:3-4). However, the alleged insubordination took place in a meeting with Mr. LeFevre, in which Mr. LeFevre had all but determined that Mr. Amos would be terminated. Mr. LeFevre had already cleared a severance amount with Defendant's Human Resources Committee and had recruited a witness, Ms. Johnson, to observe the termination. (Dep. of LeFevre at 120:10-20; 117:20-118:20). After it became clear to Defendant that Mr. Amos would not participate in Defendant's illegal activities or remain silent about them, Defendant coordinated a meeting to terminate his employment.

        ii.      <u>Pretext.</u>

Once the employer has established a legitimate, non-retaliatory reason for their adverse employment action, the burden then shifts to plaintiff to show that the employer's reason was pretextual. *See George v. Youngstown State Univ.*, 966 F.3d 446, 462–63 (6th Cir. 2020). To meet this burden, the plaintiff must show "(1) that the proffered reason had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (internal citations omitted)). *See also*, *Hawthorne v. Univ. of Tennessee Health Sci. Ctr.*, 203 F. Supp. 3d 886, 894 (E.D. Tenn. 2016) (defendant's shifting stories coupled with plaintiff's other evidence undermined defendant's proffered justification for adverse action sufficient to create genuine issue of material fact). Because the TPPA requires the plaintiff to establish that retaliation was the sole reason for his termination, he must show that every proffered reason is pretextual. *Boyd v. Youth Opportunity Invs., LLC*, No. 3:20-CV-321-TAV-DCP, 2022 WL 3205013, at *12 (E.D. Tenn. Aug. 8, 2022)

The Defendants claim that temporal proximity cannot be used to show pretext; however, the fact that Mr. Amos made the Defendant aware of his religious accommodations years prior to the violation is not the proper time to use when looking at temporal proximity. The temporal proximity would be between Defendant's failure to accommodate Plaintiff and his termination; not when they were put on notice of his request for accommodation.

      a. Defendant's alleged reasons for terminating Plaintiff did not actually motivate their action.

Defendant alleges that they terminated Mr. Amos for "insubordination" in a meeting with Mr. LeFevre. (Dep. of A. Lopez 10/25/22 109:10-11, Dep. of LeFevre at 168:2-8). However, Defendant had already determined Mr. Amos would be terminated prior to this meeting. Prior to

this meeting, Mr. LeFevre emailed Defendant's Human Resources Committee looking for approval for severance funds to offer Mr. Amos. (Ex. B). Mr. LeFevre also expressed concern that Mr. Amos would want to make his employment work. (*Id.*). Had Defendant actually not intended to terminate Mr. Amos in this meeting, a severance package would not have been prepared in advance. Most importantly, at the time the severance was requested, the alleged insubordination hadn't even occurred yet.

> b. Defendant's alleged reasons for terminating Plaintiff were insufficient to motivate their action.

Mr. Amos's alleged insubordination could not be sufficient to motivate termination. Defendant does not have a handbook that indicates merely vocalizing disagreement is independent grounds for termination. Mr. Amos's insubordination did not amount to more than Mr. Amos disagreeing with Mr. LeFevre's criticisms. (Dep. of LeFevre at 169:19-170:13; Dep. of Amos at 326:3-11). Despite Defendant's attempt to assert so, Mr. Amos did not act violently or inappropriately. (Dep. of Johnson at 117:3-19; Dep. of B. Amos at 339:8-12) Defendant then shifted to allege that two missed deadlines predicated his termination. (Dep. of A. Lopez 10/25/22 at 87:7-12, Dep. of Johnson at 45:5-24). However, the deadlines Defendant refers to were also the responsibility of Lara Johnson and David DiCicco. (Dep. of Johnson at 20:12-21:6; 35:4-7). Despite this shared responsibility, none of the others responsible were disciplined or terminated. (Dep. of Johnson at 20:9-11; Dep. of DiCicco at 119:22-120:1). Further, Mr. Amos's supervisors testified that the deadlines were largely arbitrary and could be moved. (Dep. of Johnson at 22:14-19). Despite Defendant's assertions, it is clear that the reasons alleged for Mr. Amos's termination in no way actually motivated their decision, nor were they sufficient to terminate him.

> iii.   <u>Plaintiff sufficiently reported the illegal activity.</u>

Defendant alleges that Mr. Amos's claim must fail under the TPPA because he did not make **_external_** reports of Defendant's illegal activities. This is the wrong standard to apply to claims brought under the TPPA. To satisfy the refusal to remain silent prong, a plaintiff must allege that he either reported the illegal conduct externally **_or internally_** "to someone other than the person responsible for the activity." *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 38 (Tenn. 2015). *Danes v. Associated Wholesale Grocers, Inc.*, No. 17-CV-182, 2017 WL 3674852, at *3 (M.D. Tenn. Aug. 25, 2017) (emphasis added).

Under the TPPA, an employee can sufficiently "blow the whistle" by making an internal report of the illegal actions. Employees asserting whistleblower claims **_may report illegal activity internally_** but must report to someone other than the person responsible for the activity. *Haynes at* 38. Internal reporting to superiors of illegal actions by other employees can constitute protected activity. *Id.* at 40. An employee may satisfy the TPPA's reporting requirement by making a report internally to "company management." *Foster v. MasTec N. Am.,* No. 3:21-CV-00737, 2023 WL 3513685, at *6 (M.D. Tenn. May 17, 2023). *Foster* explicitly established that reporting internally can be sufficient to trigger protections of the TPPA when the individual reported to is not involved in the illegal activity and has the power to respond to Plaintiff's reports. *Id.*

Mr. Amos, having read Governor Lee's orders, realized Defendant's activities were contrary to both the law and public policy. (Dep. of B. Amos at 293:2-10). As a result, Mr. Amos began utilizing a mask and sought socially distanced work conditions. (Dep. of B. Amos at 295:21-296:2; 299:19-21). Mr. Amos also communicated to his supervisors that because of the seriousness of his wife and his concerns, he would not be able to be around his immediate family if required to work in the office because of the great health risks exposure the virus presented. (Dep. of B.

Amos at 298:1-7; 318:2-4). Defendant has maintained that the Board of Directors made decisions related to Defendant's Covid-19 response. (Dep. of A. Lopez 6/15/23 at 25:18-23).

Defendant encourages employees to make any grievance reports to their direct leader. (Dep. of A. Lopez 6.15.23 at 42:4-8). If the employee is not satisfied with the response from their direct leader, Defendant's policy is to report to the next in the chain of command. (Dep. of A. Lopez 6.15.23 at 42:4-10.) Mr. Amos's direct leader was David DiCicco. (Dep. of Amos at 255:25-256:1). Mr. Amos made Mr. DiCicco aware that he was not comfortable with Defendant's response and vocalized his belief that it was not in accordance with the law. (Dep. of B. Amos at 220:9-221:10; 316:15-20; 320:10-16). When Mr. DiCicco did not offer any solutions, Mr. Amos elevated his complaints to Lara Johnson, who advised him to take Paid Time Off if he wished to avoid large gatherings. (Dep. of B. Amos at 271:20-22).

Defendant has maintained throughout discovery that the Board of Director's coordinated Defendant's Covid-19 response. (Dep. of Ramsey at 51:1-7). Neither Mr. DiCicco nor Ms. Johnson are on Defendant's Board of Directors (Dep. of A. Lopez 10/25/2022 at 54:4-23). However, Defendant indicated that they would be able to elevate any employee complaints to the appropriate people. Both Mr. DiCicco and Ms. Johnson had the power to respond to Mr. Amos's complaints, though they did not. As such, Mr. Amos's vocal objections and clear resistance to Defendant's illegal activities to Mr. DiCicco and Ms. Johnson were sufficient to trigger the TPPA.

## IV. Religious Discrimination under the THRA and Title VII of the Civil Rights Act

Plaintiff in this matter filed his complaint claiming violations of Title VII and the Tennessee Human Rights Act in this matter for (1) "Reverse" Religious Discrimination (Doc. 21, Par 337, 351) [4], (2) traditional Religious Discrimination (Doc. 21, Par. 338, 349), (3) unlawful

---

[4] Plaintiff could not have been more explicit in his claim for "reverse religious discrimination" in his Amended Complaint. "Lampo violated Title VII of the Civil Rights Act of 1964, 52 U.S.C. § 2000e, et. seq. by wrongfully

retaliation (Doc. 21, Par 335, 349), and (4) failure to accommodate (Doc. 21, Par. 338). Defendant does not address Plaintiff's claims for "reverse" religious discrimination or retaliation in either their Motion to Dismiss or Motion for Summary Judgment. Defendant only addresses Plaintiff's claim for failure to accommodate in a footnote in their Motion for Summary Judgment. As such, at a minimum, Plaintiff's claims for "reverse" religious discrimination and retaliation should be allowed to move forward.

Plaintiff, however, out of an abundance of caution will address all of these claims; should the court agree with Plaintiff that Defendant has failed to ask for summary judgment or dismissal of either of these claims- this section of this memorandum should be ignored. _Plaintiff in no way concedes Defendant has asked for dismissal or summary judgment for any claims not specifically addressed by Defendant in those previously filed Motions._

Any reply brief filed by Defendant should only supplement issues raised in its original Motion and not argue against Plaintiff's claims they failed to address in their previously filed Motions. Case law indicates that a movant cannot raise a new issue in the Reply brief, and such issues will be considered waived due to concerns about fairness to the non-movant, who does not get to reply. *Lofgren v. Polaris Indus. Inc.*, No. 3:16-CV-02811, 2021 WL 2580047, at *12 (M.D. Tenn. June 23, 2021).

      i. **Reverse Religious Discrimination**

           1. <u>Prima Facie Case for Reverse Religious Discrimination</u>

---

terminating Plaintiff **for his nonadherence to several of Lampo's particular religious convictions**." (Doc. 21, Par. 337). (emphasis added). Defendant Lampo violated the Tennessee Human Rights Act, T.C.A. § 4-21-101, et seq. by wrongfully **terminating Plaintiff for his nonadherence to Lampo's religious convictions**. (Doc. 21, Par 351) Plaintiff also made a claim for "traditional" Religious Discrimination as well. "Alternatively, Lampo violated Title VII of the Civil Rights Act of 1964, 52 U.S.C.§ 2000e, et. seq. by refusing to respect and/or accommodate Plaintiff's strongly held religious belief that "God helps those that help themselves" Doc. 21, Par. 338.

Title VII prohibits employers from discriminating "on the basis of . . . . religion." 42 U.S.C. § 2000e–2(a)(1). Aside from protecting employees from discrimination on the basis of their religion, Title VII also protects employees from discrimination because they do not share their employer's religious beliefs. A religious discrimination claim premised on an employer's preference for a particular religious group is often referred to as a "reverse religious discrimination" claim. *Equal Opportunity Emp. Comm'n v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 392 (E.D.N.Y. 2016) (internal citations omitted).

For a reverse religious discrimination claim, the "protected class" element is not comparable because [the plaintiff] does not claim he was part of a protected class (i.e., that he adheres to a particular religion). As a result, courts have held that a "modified version" of the prima facie inquiry is appropriate: a plaintiff must demonstrate that "(1) []he was qualified for the position ...; (2) [his] employer subjected [him] to an adverse employment action; and (3) some additional evidence supports the inference that the adverse action was taken because of a discriminatory motive based on the employee's failure to adopt or follow the employer's religious beliefs." *United Health* at 406, *Owens v. City of New York Dep't of Educ.*, 2021 WL 3862974, at *9 (S.D.N.Y. Aug. 30, 2021)[5] (internal citations omitted); *See also Finn v. City of Boulder City*, 2018 WL 473001, at *4 (D. Nev. Jan. 17, 2018), aff'd,756 F. App'x 756 (9th Cir. 2019).

In *Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033 (10th Cir.1993), the court reasoned that the "protected class" showing required in a traditional race or sex discrimination claim does not apply to this type of non-adherence or reverse religious discrimination claim because "it is the religious beliefs of the employer, and the fact that [the employee] does not share them, that constitute the basis of the [religious discrimination] claim." *Id*. at 1038. It is appropriate

---

[5] Attached hereto as Exhibit J

to tailor the elements of a prima facie showing according to the particular circumstances of each case. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L.Ed.2d 957 (1978) (recognizing that *McDonnell Douglas's* suggested method for setting out a prima facie case "was never intended to be rigid, mechanized, or ritualistic."). *Noyes v. Kelly Servs*., 488 F.3d 1163, 1168–69 (9th Cir. 2007). *Finn* at *4.

Mr. Amos, as set out previously was qualified for his position, he was terminated (adverse employment action), and additional evidence exists to support the inference that he was terminated because of a discriminatory motive based on the employee's failure to adopt and or follow the employer's religious beliefs. Defendant does not dispute the first two elements but appear to dispute the third.

Plaintiffs would refer the court to the above section regarding pretext in their argument regarding claims under the Tennessee Public Protection Act. as well as their statement of facts in this brief. Plaintiff would further highlight the additional facts set out above:

During Mr. Amos spousal dinner, he was questioned about his religion and faith. Mr. Amos made it clear that his belief system does not include taking things at face value nor adhering to a belief system blindly. Instead, Mr. Amos' belief is that "we're driving the car" and should act with free will.

However, as a condition of employment with Defendant, employees must adhere to specific religious beliefs. Defendant's CEO, Dave Ramsey, stated Lampo's policies include "Focused intensity over time, multiplied by God, creates unstoppable momentum,." and part of his employment practice is "the idea that if you focus intensely over time and God blesses it, you create unstoppable momentum." Defendant's policies include employees doing "their work unto the lord" and "in a way that makes God proud."

In classes taken by Plaintiff required for his employment; he was told a story regarding how in the times of the Israelites they would anoint the king by putting oil on his head, letting it drip through his beard, and onto his body. Defendant's representatives told Plaintiff this is the way the company was run with Dave being "the king" everything should trickle down to the employees from Ramsey including his belief system. (Amos depo p. 252, 254 1. 10-14) Plaintiff realized soon after starting his employment, continued employment was based on adherence to Mr. Ramsey's will above all. (Amos depo p. 253, l. 14-16).

The company's requirement that employees submit completely to the religious views of Lampo/ Dave Ramsey had intensified by the end of his employment there. The company culture had increasingly become one of fear and intimidation. Employees were told not to look things up on the internet about Mr. Ramsey and required meetings became a forum where Mr. Ramsey would speak quite abusively about former employees who challenged the policies of Defendant.

Frequently, Mr. Ramsey would bring a PowerPoint presentation to these meetings with negative articles on the internet where he would dissect them and interpret them for the staff. Especially after Covid-19 started in March 2020, Mr. Ramsey would address former employees who brought complaints against him, like O'Connor and Fowlkes, and say disparaging things like they would sleep around and spread disease. Employees were made aware that Mr. Ramsey previously terminated multiple pregnant unmarried women and an employee who had come out as gay. Mr. Ramsey has even gone as far to fire someone for something their spouse had posted on Facebook. It was common for Mr. Ramsey to call former employees "disloyal" during these large employee meetings. In other words, if a former employee did not adhere to, or comply with, "The Ramsey Way," he or she would be shunned among the flock.

Part of this fear culture, was getting employees to completely embrace Mr. Ramsey's chosen beliefs or face termination. An employee meeting was held with the goal of finding people who were "Dave-ish"; meaning people who liked Mr. Ramsey, but did not buy into his belief system completely. Defendant held a rally to root out these "Dave-ish" people for termination; this statement received a standing ovation at the rally. Leaders often encouraged employees to find people who were "Dave-ish" and report them to their supervisors. Employees were fully expected to buy-in to all Ramsey beliefs. Mr. Amos' supervisor told his department that "if [they] don't think this is the best place to work, I need to have a conversation with you. We need to talk." (Dep. Of Amos at 175:14-25).

There was a very specific kind of Christianity that was fundamentalist in its belief that Mr. Ramsey adhered to and he expected his employees to do the same. If they did not adhere to this standard, Mr. Ramsey stated "Then there is the door. If you don't like what we are doing, get the hell out".

As set out in this brief; when Plaintiff challenged Defendant's policy of relying on prayer and faith to deal with COVID 19, he was treated very differently.. He was ultimately demoted and terminated for challenging these beliefs.

### i. Traditional Religious Discrimination

To establish a prima facie claim of religious discrimination under Title VII based on circumstantial ("indirect") evidence, Plaintiff must demonstrate that: (1) they were a member of a protected class, (2) they were subjected to an adverse employment action, (3) they were qualified for the position, and (4) they were replaced by a person outside of the protected class or were treated differently than similarly situated employees. *Bolden v. Lowes Home Ctrs*., LLC, 783 F.

App'x 589, 594-97 (6th Cir. 2019), *Grooms v. Walden Sec.*, No. 3:21-CV-00363, 2021 WL 2292305, at *2 (M.D. Tenn. June 3, 2021).[6]

Defendant in this matter challenges whether Plaintiff can meet the first and fourth element of this claim for purposes of their summary judgment motion. (Doc 114, p. 13)

Defendant alleges Plaintiff cannot meet the first element in that he is not a member of a protected class. Summary judgment is seldom appropriate in subjective inquiries and, in religious accommodation cases such as this, should be granted only where on the record before the Court, the only conclusion a reasonable jury could make is that the employee's religious assertion was not bona fide. The finding on this issue generally will depend on the factfinder's assessment of the employee's credibility. Credibility issues such as the sincerity of an employee's religious belief are "quintessential fact questions." As such, they ordinarily should be reserved for the factfinder at trial, not for the court at summary judgment. *Equal Emp. Opportunity Comm'n v. Publix Super Markets, Inc.*, 481 F. Supp. 3d 684, 699–700 (M.D. Tenn. 2020) (internal citations omitted).

"In most cases whether or not a practice or belief is religious is not at issue. However, in those cases in which the issue does exist, the Commission will define religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views. This standard was developed in *United States v. Seeger*, 380 U.S. 163 (1965) and *Welsh v. United States*, 398 U.S. 333 (1970). The Commission has consistently applied this standard in its decisions. The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee. The

---

[6] Attached hereto as Exhibit H

phrase "religious practice" as used in these Guidelines includes both religious observances and practices, as stated in section 701(j), 42 U.S.C. 2000e(j)." 29 CFR 1605.1.

Plaintiff informed Defendant of his religious beliefs at a dinner meeting during the interview process with several Lampo executives. (Amos 246-247). At this meeting the executives asked Plaintiff things like "What church do you go to? What do you believe in?" Mr. Amos stated he believed it was wrong to adhere to any belief system blindly, stating that doubt is faith itself. Plaintiff stated his belief that all persons have free will in life and are not pre-destined. Defendant's executives acknowledged they heard and understood Plaintiff's beliefs (Amos 246, l. 15-25, 247, l. 1-4) Plaintiff clearly stated his religious belief to Defendant and they acknowledged they understood. However Plaintiff was demoted and ultimately terminated for not accepting Lampo's COVID policy which was based on relying solely on prayer and faith to respond to the epidemic.

For the fourth element, also challenged by the Defendant; Plaintiff would refer to the above section of his brief regarding pretext in their argument regarding claims under the Tennessee Public Protection Act.

### ii. **Religious Discrimination- Retaliation**

To establish a prima facie case of religious discrimination retaliation, the plaintiff must show (1) that he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflict; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Reed v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 569 F.3d 576, 580 (6th Cir. 2009) (internal citations omitted). Once the plaintiff has established a prima facie case, it is the Defendant's burden to show that accommodating the employee would cause undue hardship. *Id*. (internal citations omitted).

Plaintiff informed Defendant of his sincere religious belief in the interview process as stated above. In his March 16, 2020 meeting he also informed Luke LeFevre of his unhappiness with Lampo's attitude toward COVID of using prayer and faith to fight the disease rather than following the guidance of the CDC and other organizations recommendations. After Mr. Amos informed Defendant of his position, his relationship with Defendant deteriorated quickly despite no change in the quality or quantity of his work as set out above. He was ultimately demoted and terminated thereafter, for pretextual reasons.

### iii. **Religious Discrimination- Failure to Accommodate**

In reviewing a Title VII religious accommodation claim, this Court employs a two-step, burden-shifting framework. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007). First, an aggrieved party must establish a prima facie case of religious discrimination by showing he (1) holds a sincere religious belief that conflicts with an employment requirement; (2) has informed the employer about said conflict; and (3) suffered an adverse employment outcome for failing to comply with the conflicting employment requirement. *Id*. Second, once a prima facie case is made out, the employer must demonstrate that it could not "reasonably accommodate" the employee's religious beliefs without incurring an undue hardship or burden on its business. *Id.*; 42 U.S.C. § 2000e(j). *Truskey v. Vilsack*, No. 21-5821, 2022 WL 3572980, at *2 (6th Cir. Aug. 19, 2022)[7], cert. denied, 143 S. Ct. 2659 (2023). Defendant, in a footnote in their brief, claims that Plaintiff abandoned this claim, however, this is not true.

Mr. Amos' deposition testimony indicates that Defendant knew he had a high-risk family member and told him it was ok if he worked from home. (Dep. of Amos at 222:8-24). Following that conversation, Defendant revoked this offer and told Mr. Amos they needed him to work "in

house." (Dep. of Amos at 223:11-13). In response, Mr. Amos began suggesting possible accommodation which included sleeping in his basement to avoid pitting his family's health at risk. (Dep. of Amos at 224:7-12). Defendant denied this suggestion and proposed switching Mr. Amos' role instead. (Dep. of Amos at 224:13-19). On another occasion, Mr. Amos offered to use vacation days to avoid attending a large gathering held by Defendant. (Dep. of Johnson at 103:8-9). Defendant praised him for this suggestion and encouraged him to do so. (Dep. of Johnson at 103:3-5). At the same time however, after requesting this accommodation, Defendant changed in their attitude toward Plaintiff which led to his demotion and eventual termination.

### a. Fraud

Defendant's motion for summary judgment with respect to Mr. Amos' fraud claim should be denied. To sustain a claim of fraud under Tennessee law, the Plaintiff must prove:

1. [the existence of] a false statement concerning a fact material to the transaction;
2. knowledge of the statem'nt's falsity or utter disregard for its truth;
3. intent to induce reliance on the statement;
4. reliance under circumstances manifesting a reasonable right to rely on the statement;
5. An injury resulting from the reliance.

*Bridgestone 'm.'s, Inc. v. 'nt'l Bus. Machines Corp*., 172 F. Supp. 3d 1007, 1013 (M.D. Tenn. 2016) (citing *Blackburn & McCune, PLLC v. Pre–Paid Legal Servs., Inc.,* 398 S.W.3d 630, 644 (Tenn.Ct.App.2010) (quoting *Lamb v. MegaFlight, Inc.,* 26 S.W.3d 627, 630 (Tenn.Ct.App.2000))).

In his Amended Complaint, Mr. Amos asserts Defendant made the following fraudulent misrepresentations about his employment:

- Statement No. 1: "Plaintiff would edit features and help create their new film department;"

- Statement No. 2: "Defendant Lampo was not "cult like" in the way they operated;"

- Statement No. 3: "Defendant Lampo operated a "drama free" workplace;"

- Statement No. 4: "…Lampo had been voted "best place to work" for over 10 years in a row by their own employees without interference from management; Defendant Lampo reassured Plaintiff this statement was true during the interview process;"

- Statement No. 5: "Defendant Lampo was family friendly and would allow Plaintiff to spend time with his family without interference from Defendants;"

- Statement No. 6: "Defendant Lampo knowingly made false statements about Plaintiff's ability to work from home without adverse employment action."

(First Amended Complaint ¶¶ 357, 360).

First, Mr. Amos reiterates his claims are not time-barred by the statute of limitations. In Defendant's Second Motion to Dismiss, they relied on T.C.A. 28-3-104 to argue Mr. Amos' claims were barred by the statute of limitations. While Defendant's motion for summary judgment fails to discuss this point, a footnote indicates their intention to maintain that defense. As such, Mr. Amos briefly overviews his prior argument as well.

Mr. Amos believes the proper statute of limitations would be contained in T.C.A. 28-3-105 as it is not a personal injury claim and should be a 3-year statute of limitations. Courts have treated economic loss by fraud or misrepresentation as an injury to personal property and therefore subject to a three-year statute of limitations under Tenn. Code Ann. § 28–3–105. *See Evans v. Walgreen Co.,* 813 F.Supp.2d 897, 934–935 (W.D. Tenn. 2011). However, Mr. Amos' claims would still not be time-barred if the Court applied the statute of limitations Defendant suggests. Mr. Amos' claims

did not actually accrue until Mr. Amos actually suffered damages.[8] Mr. Amos' claims therefore did not accrue until he was terminated on July 31, 2020.

iv.   Existing or Present Fact

Under Tennessee law, "[s]tatements of future intention, opinion, or sales talk are generally not actionable because they do not involve representations of material or present fact." *Power & Tel. Supply*, 447 F.3d at 931 (emphasis added) (citing *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982)). Defendant's analysis states this general rule, then fails to acknowledge that Tennessee recognizes an exception in cases "where justice demands." *City of Morristown v. AT&T Corp*., 206 F. Supp. 3d 1321, 2016 WL 4530499 (E.D. Tenn. 2016)[9]. Thus, Mr. Amos believes the alleged statements do show existing or present facts; but even if the court disagrees, this alone should not eliminate his claims from consideration.

Defendant's lengthy interview process contradicts their argument Statement No. 1 is a conjecture about future events. The new film department Defendant told Mr. Amos he would "help create" was not a mere idea or abstract goal, but present reality further supported by the fact that Defendant was actively interviewing employees. In fact, the new department resulted from a merger that occurred between April and June of 2019—prior to Mr. Amos' employment. (Dep. Of DiCicco at 68:11-15).

In Statement No. 4, Mr. Amos claims Defendant told him Lampo had been voted "best place to work" by their own employees without interference from management. Defendant maintains this to be true and an outcome of employee survey responses. Thus, Statement No. 4 should be considered a present fact as it results from compiled employee responses and may be

---

[8] "Except as provided in subdivision (a)(2), the following actions shall be commenced within one (1) year after the cause of action **accrued**:" T.C.A. 28-3-104 (emphasis added)."

29

considered empirical research. In light of Statement No. 4, Mr. Amos could reasonably believe Statement No.'s. 2, 3, and 5 to be reflective of present facts determined from these survey responses. Additionally, contradicting this representation, Defendant's 30(b)(6) deponent stated that despite claiming to have won "best places to work," Ink Magazine rescinded the award twice and returned their application fee. (Dep. Of Lopez 6.15.23 at 32:11-33;10). Further casting doubt on whether or not it was truthful that Defendant won without managements interference, Mr. Ramsey said, "Oh, by the way, just so you know, if you don't think this is the best place to work...there's the door." (Dep. of Amos at 177:13-16).

Lastly, Defendant falsely presumes Mr. Amos abandoned his sixth false statement that Defendant made regarding his ability to work from home without adverse employment action. Mr. Amos' deposition testimony indicates that Defendant knew he had a high-risk family member and told him it was ok if he worked from home. (Dep. of Amos at 222:8-24). Following that conversation, Defendant revoked this offer and told Mr. Amos they needed him to work "in house." (Dep. of Amos at 223:11-13). In response, Mr. Amos began suggesting possible accommodations which included sleeping in his basement to avoid pitting his family's health at risk. (Dep. of Amos at 224:7-12). Defendant denied this suggestion and proposed switching Mr. Amos' role instead. (Dep. of Amos at 224:13-19). On another occasion, Mr. Amos offered to use vacation days to avoid attending a large gathering held by Defendant. (Dep. of Johnson at 103:8-9). Defendant praised him for this suggestion and encouraged him to do so. (Dep. of Johnson at 103:3-5).

### v.  Defendant's representations were false when made

Mr. Amos disagrees with Defendant's argument that it is impossible to characterize a subjective statement as false. Instead, Mr. Amos argues it would be most proper to allow a jury to determine the truthfulness of the alleged statements. Supporting this contention, Mr. Amos raises

several facts which cast doubt on the truthfulness of the representations made by Defendant. First, during Mr. DiCicco's deposition he confirmed that employees have been asked to work after five if they were trying to hit a deadline. (Dep. of DiCicco at 60:25-61:4). This is particularly relevant here, given the representations made about the hours Mr. Amos would be required to work and the fact that he was later reprimanded for missing a deadline.

### iii. <u>Defendant's representations were material.</u>

In his Amended Complaint, Mr. Amos alleges that each statement was material when accepting the position with Defendant. The fact Mr. Amos took a job that paid $150,000 less than the job he had in California is further evidence of the materiality of those statements. A fact is material if: (a) a reasonable [person] would attach importance to its existence or nonexistence in determining his [or her] choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his [or her] choice of action, although a reasonable [person] would not so regard it. *Patel v. Bayliff,* 121 S.W.3d 347, 353 (Tenn. Ct. App. 2003) (quoting *Lowe v. Gulf Coast Dev., Inc.,* No. 01–A–019010CH00374, 1991 WL 220576, at *8 (Tenn.Ct.App.1991)).

Here, both (a) and (b) apply. Mr. Amos acted as a reasonable person in using statements made by the Chief Executive Officer of his prospective employer to make a determination about whether or not he would move across the country for a job. (Plaintiff's First Amended Complaint at ¶ 43-50). The law does not require that the material fact which Plaintiff relied on be the only material fact relied on, such is the case here. In accordance with other material considerations, Mr. Amos reasonably relied on Defendant's statements and assurances about the working conditions

at Lampo as a crucial decision-making point in accepting employment with Defendant. (*Id.* at ¶ 52).

A reasonable person would attach importance to their salary and the decision to accept a significant salary decrease. Defendant furthers this point as its actions clearly show it attempted to validate the salary offered to Mr. Amos on multiple occasions. Defendant told Mr. Amos the salary reduction would only be for the short-term. (Dep. of Amos at 82:7-8). Additionally, Defendant indicated that if Mr. Amos took Defendant's sponsored leadership classes, it would transfer him into a leadership position and his salary would be increased close to what it was in California. (Dep. of Amos at 82:9-13). Finally, Defendant maintained the salary decrease would be less impactful on Plaintiff's standard of living than it may appear because the cost of living in Tennessee was less than in California. (Dep. of Amos at 82:13-14).

Additionally, Defendant knew that the recipient of the statements would be likely to regard the matter as important in decision-making, whether or not that person is reasonable. Defendant knew that Mr. Amos was considering moving to Tennessee from California, and Mr. Amos would rely on Defendant's statements and assurances in making his decision to accept employment with Lampo. (Dep. of Amos at 86:8-11; 122:18-23; 161:18-24). During the interview process, Mr. Amos told Defendant his family's best interest was a significant factor in selecting a new position. (Dep. of DiCicco at 41:7-42:1). In a later interview, Defendant told Mr. Amos it's their "value systems seemed to line-up." (Dep. of Amos at 81:20-22). This is just one example of many, where Defendant seeks to represent things material in Mr. Amos' decision.

### vi.  Mr. Amos reasonably relied on Defendant's statements.

Mr. Amos's reliance on Defendant's fraudulent statements were reasonable. Whether a person's reliance on a representation is reasonable generally is a question of fact requiring the

consideration of a number of factors. *E.g., City State Bank v. Dean Witter Reynolds, Inc.,* 948 S.W.2d 729, 737 (Tenn. Ct. App. 1996). The factors include the plaintiff's sophistication and expertise in the subject matter of the representation, the type of relationship—fiduciary or otherwise—between the parties, the availability of relevant information about the representation, any concealment of the misrepresentation, any opportunity to discover the misrepresentation, which party initiated the transaction, and the specificity of the misrepresentation. *See, e.g., id.; accord Allied Sound, Inc. v. Neely,* 58 S.W.3d 119, 122–23 (Tenn.Ct.App.2001); *Davis v. McGuigan,* 325 S.W.3d 149, 158 (Tenn. 2010). Mr. Amos notes that the third, fifth, and seventh factors are particularly operative.

Mr. Amos' recruitment and interview process with Defendant was extensive, which allowed him to make a reasonable inquiry into the truth of statements that had been made about working for Defendant and received assurances. Mr. Amos' efforts included reading reports from Mr. Ramsey regarding the working conditions at Defendant and asking the individuals recruiting him about the truth of the Mr. Ramsey's fraudulent statements at issue in this lawsuit. (Plaintiff's First Amended Complaint at ¶ 49-50, ¶ 325). Despite these efforts, Mr. Amos had no reason to believe these statements were false and reasonably relied on them.

Additionally, due to the nature of the position, Mr. Amos had little ability to validate the claims made by Defendant. Multiple Defendant employees told Mr. Amos about the development of the new film division. (Dep. of Amos at 80:3-9). The position Mr. Amos was interviewing for would involve growing this department. (Dep. of Amos at 80:3-81:3). Thus, Mr. Amos had to rely on the claims made by Defendant about general and enforced workplace practices and protocols which would consequently shape his employment.

Finally, Defendant initiated the employment relationship with Mr. Amos and he relied on their fraudulent statements. (*Id.* at ¶ 18). Mr. Amos did not independently seek employment with Defendant and acted reasonably in relying on their repeated assurances that Lampo would be one of the "best places to work" as decided by employees independent of managerial interference. These statements and assurances by Defendant were intended to, and in fact did, induce Mr. Amos to quit his high paying job and move to Tennessee.

### b. Promissory Estoppel

To establish a claim of promissory estoppel, the plaintiff must show that the defendant made a promise upon with the plaintiff reasonably relied. *Philp* v. Se. Enterprises, LLC, No. M201602046COAR3CV, 2018 WL 801663, at *10 n.21 (Tenn. Ct. App. Feb. 9, 2018). To succeed on such a claim, the plaintiff must establish:

1. that a promise was made;
2. that the promise was unambiguous and not unenforceably vague; and
3. that [he] reasonably relied upon the promise to his detriment.

*Lansky v. Prot. One Alarm Monitoring, Inc.,* No. 2:17-CV-2883-SHM-DKV, 2018 WL 3077803, at *7 (W.D. Tenn. June 21, 2018) *(*citing *Chavez v. Broadway Elec. Serv. Corp.,* 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007)).

### 1. Defendant made a promise.

The key element, of course, is the promise. *Amacher v. Brown–Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991). "It is the key because the court must know what induced the plaintiff's action or forbearance[.]" *Id. Smith v. Hi-Speed, Inc.,* 536 S.W.3d 458, 483 (Tenn. Ct. App. 2016). Prior to accepting employment, Defendant made several promises to Mr. Amos. These promises included that Mr. Amos would edit features and help create the new film department; Defendant was not "cult like"; Defendant operated a "drama free" workplace; and Defendant was

family friendly and would allow Mr. Amos to spend time with his family without interference from Defendant. (Plaintiff's First Amended Complaint ¶ 356). These promises were clear and unambiguous, and induced Mr. Amos accepting employment and moving his family from California to Tennessee.

2. Defendant's promise was unambiguous and not unenforceably vague.

The promise at the heart of a promissory estoppel claim must be definite enough to be enforced. *Burgess v. Ford Motor Co.,* No. M2011-00654-COA-R3CV, 2012 WL 4503188 (Tenn. Ct. App. Sept. 28, 2012). Courts have held a promise to be sufficient and not unenforceably vague when it "was specific as to the action that would be taken and specific to its duration." (*Id.*). Defendant argues that promised "limited interference with family time" and a strict 40-hour work week" are too ambiguous, vague and nonspecific to establish promissory estoppel. However, promising a "strict 40-hour work week" is quite definite—it's duration can be measured and tracked, and adherence is possible.

3. Mr. Amos reasonably relied on Defendant's promise to his detriment.

The doctrine of promissory estoppel is also referred to as "detrimental reliance" because the plaintiff must show not only that a promise was made, but also that the plaintiff reasonably relied on the promise to his detriment. *Id.* (quoting *Engenius Entm't, Inc. v. Herenton,* 971 S.W.2d 12, 19–20 (Tenn. Ct. App. 1997)). *Jeffries v. U.S. Metal Powders, Inc.,* No. E2013-00521-COA-R3CV, 2014 WL 239179, at *7 (Tenn. Ct. App. Jan. 22, 2014). In other words, a plaintiff must show that he acted or refrained from acting in a "definite and substantial" manner based on reliance of a promise. *Burgess v. Ford Motor Co.,* No. M2011-00654-COA-R3CV, 2012 WL 4503188 (Tenn. Ct. App. Sept. 28, 2012). Here, the promises were clear and unambiguous, and Mr. Amos

relied on them to his detriment when Defendant terminated him in response to his complaints about the promises being false.

### c. T.C.A. § 50-1-102

T.C.A. § 50-1-102 provides, in relevant part "It is unlawful for any person to induce, influence, persuade or engage workers to change from one place to another in this state. . . through or by means of false or deceptive representations, false advertising or false pretenses, concerning the kind and character of the work to be done, or the amount and character of compensation to be paid for the work, or the sanitary or other conditions of the employment. . . . at the time of or prior to the engagement." This statue then allows for a damaged worker to bring a civil action to recover any and all damages sustained as a result of the false or deceptive representations, including attorney's fees and costs. *Evans v. Nashville Film Inst., LLC*, No. 3:21-CV-00255, 2022 WL 2500324, at *12 (M.D. Tenn. July 6, 2022).

Plaintiff reiterates the fraud analysis completed above. In his Amended Complaint, Mr. Amos asserted six fraudulent misrepresentations made by Defendant. Statement No. 1 clearly involves the kind of character of work to be done by Mr. Amos. Similarly, Statement Nos. 2, 3, 4, and 5 are all misrepresentations by Defendant about the character of the work Defendant was involved in and the working environment. Finally, Statement No. 6 shows a deceptive representation about the conditions of Mr. Amos's employment and what effect working from home would have on this employment.

## V. CONCLUSION

Defendant cannot meet its burden viewing the evidence in light most favorable to Mr. Amos, and he respectfully requests the Court deny Defendant's motion for summary judgment.

Respectfully submitted,

**THE EMPLOYMENT & CONSUMER LAW GROUP**

**/s/ *LAUREN IRWIN*_____**
**JONATHAN STREET, BPR No. 021712**
**LAUREN IRWIN, BPR No. 038433**
1720 West End Ave., Suite 402
Nashville, TN 37203
(615) 850-0632
street@eclaw.com
lauren@eclaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the above and foregoing was served via the Court's electronic filing system and via email on September 1, 2023 to the following:

Leslie Goff Sanders (TN #18973)
Daniel Crowell (TN #31485)
Stephen Stovall (TN #37002)
**BARTON PLLC**
611 Commerce Street, Suite 2603
Nashville, TN 37203
lsanders@bartonesq.com
dcrowell@bartonesq.com
sstovall@bartonesq.com

*Attorneys for Defendant*

*/s/ Lauren Irwin*