IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BRAD AMOS,                          )
                                    )
    Plaintiff,                      )          NO. 3:21-cv-00923
                                    )
v.                                  )          JUDGE RICHARDSON
                                    )
THE LAMPO GROUP, LLC,               )
                                    )
    Defendant.                      )

## **MEMORANDUM OPINION AND ORDER**

Pending before the Court is the motion (Doc. No. 30, "Motion") of The Lampo Group, LLC ("Lampo") to dismiss the claims against it set forth in Plaintiff's Amended Complaint (Doc. No. 21). Lampo filed a memorandum in support (Doc. No. 31). Plaintiff filed a response in opposition (Doc. No. 37, "Response"), and Lampo filed a reply (Doc. No. 39).

For the reasons discussed herein, the Court will grant Lampo's Motion.

## FACTUAL ALLEGATIONS

This is an action brought by Plaintiff against Lampo, his former employer, and Dave Ramsey, Lampo's alleged "President."[1] By Order of this Court entered on July 11, 2023 (Doc. No.

---

[1] In his response to the motion to dismiss that was filed by Ramsey (though not in the Amended Complaint), Plaintiff refers to Ramsey as Lampo's "Chief Executive Officer." (Doc. No. 35 at 8).

  Generally, a limited liability company does not necessarily have a "president" or a "chief executive officer," but it can have one, *see, e.g.*, Tenn. Code Ann. § 48-249-402(c) & (d), and it is certainly possible that this particular one (Lampo) did based on the management titles it created for leadership positions.

110), the claims against Ramsey have been dismissed,[2] and Ramsey has been terminated as a party. The claims against Lampo remain pending and are the subject of the instant Motion.

The action seeks damages based on Plaintiff having been successfully recruited, but then terminated, as an employee of Lampo Group under allegedly tortious circumstances. Notably, the termination allegedly occurred on July 31, 2020, while the COVID-19 pandemic was occurring, (Doc. No. 21 at ¶¶ 318-19). And the termination, according to the Amended Complaint, resulted from Plaintiff's refusal to follow Lamp Group's views "that prayer was the exclusive way to prevent COVID infections" and "that taking precautions other than prayer against COVID infection would make a person fall out of God's favor," and from Plaintiff "maintain[ing] his own religious beliefs in his efforts to avoid infection in addition to prayer" and "refus[ing] to adhere to Lampo's particular religious views and abandon his own on COVID[.]" (Doc. No. 21 at ¶¶ 342-45). And although paragraph 332 of the Amended Complaint contains typographical errors that obscure its meaning somewhat, it appears to allege that the "sole factor in Lampo's decision to terminate Plaintiff" was that "Plaintiff refused to participate in and/or refused to remain silent about Lampo's requiring non-essential workers to be present in their office against state-mandated COVID-19 "stay at home", mask, and social distancing precautions[.]" (Doc. No. 21 at ¶ 332).[3]

[2] Herein, the Court refers to Lampo and Ramsey collectively as "Defendants" even though Ramsey is no longer a Defendant, having previously been dismissed by the Court.

[3] The Court endeavors to construe the Amended Complaint in Plaintiff's favor by construing its allegations to make sense and be consistent vis-à-vis one another (especially since Plaintiff does not appear to plead anything in the alternative). So doing, the Court takes the Amended Complaint to allege that there was what can properly be characterized as a single reason for Plaintiff's termination, but that such reason in turn can properly be expressed in slightly different manners in an attempt support a claim under the Tennessee Public Protection Act (which is what paragraph 332 of the Amended Complaint is intended to support) as well as a claim of religious discrimination and failure to accommodate under Title VII (which is what paragraphs 342-45 are intended to support) and the Tennessee Human Rights Act.

In the complaint filed in this action, which came subsequent to Plaintiff's voluntary dismissal of a suit he filed against Lampo and Ramsey in state court, Plaintiff asserted claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*. and the Tennessee Public Protection Act, T.C.A. § 50-1-304, *et seq*. (Doc. No. 21 at ¶ 1). Plaintiff thereafter filed an Amended Complaint (Doc. No. 21), which remains the operative complaint in this action.

In a manner arguably inconsistent with Rule 8(a)'s dictate that a complaint be a "short and plain statement of the claim," the Amended Complaint contains 380 paragraphs. It contains six counts, all of which are asserted against Lampo. Specifically Plaintiff asserts a claim: in Count I for retaliatory discharge in violation of the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304 *et seq.*; in Count II for religious discrimination in violation of Title VII; in Count III for (the same alleged) religious discrimination in violation of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq*; in Count IV for fraud under Tennessee law based on a number of alleged false statements; in Count V based on promissory estoppel; and in Count VI based on deceptive representations and promises in violation of Tenn. Code Ann. § 50-1-102.

More specifically, regarding the alleged false statements underlying Count IV, Plaintiff alleges as follows:

> Defendant Lampo knowingly made false statements about Plaintiff's employment with Defendants including:
>
> a) Plaintiff would edit features and help create their new film department;
>
> b) Defendant Lampo was not "cult like" in the way they operated;
>
> c) Defendant Lampo operated a "drama free" workplace;
>
> d) Defendant Ramsey stated Lampo had been voted "best place to work" for over 10 years in a row by their [sic] own employees without interference from management; Defendant Lampo reassured Plaintiff this statement was true during the interview process [; and]

e) Defendant Lampo was family friendly and would allow Plaintiff to spend time with his family without interference from Defendants.

(Doc. No. 21 at ¶ 357).

Construed liberally in favor of Plaintiff as required, Count IV additionally alleges a sixth false statement (one that Plaintiff implies was made on multiple occasions, or by multiple agents of Lampo, or both): that Plaintiff had the ability to work from home absent adverse employment action. (Doc. No. 21 at ¶ 360).[4] (Below, these six alleged false statements will be referred to collectively as the "six statements").

Plainly, the Amended Complaint attributes all of the six statements to Lampo, but as a legal entity Lampo can be held responsible for a statement only if the statement is made by an agent[5]

---

[4] Paragraph 360 alleges, "Further, Defendant Lampo knowingly made false *statements about* Plaintiff's ability to work from home without adverse employment action." (Doc. No. 21 at ¶ 360) (emphasis added). Were the Court to construe the allegation of paragraph 360 *against* Plaintiff, it would construe paragraph 360 as failing to allege *any* statement (true or false); that is, the Court would construe this paragraph as identifying not any particular (allegedly false) *statement*, but rather only the *topic* of a statement, i.e., a topic ("Plaintiff's ability to work from home without adverse employment action") about which *unidentified* statements were made. But construing this allegation in Plaintiff's favor so as to treat it as having alleged the substance (rather than the mere topic) of a misrepresentation, as required to support a claim based on a misrepresentation, the Court will treat it as an allegation that Lampo falsely stated that Plaintiff would have the ability to work from home without adverse employment action.

Relevant to the discussion below regarding Count VI, paragraphs 375 and 376 of the Amended Complaint identify only the topic of alleged misrepresentation without any way for the Court to even guess *what* representations were made about those topics. Unlike paragraph 360, those two paragraphs do not phrase the topic of alleged misrepresentations in a manner than enables the Court to reasonably infer the substance of any misrepresentations made on the topic so identified. Therefore, as explained in that discussion below, the Court cannot treat paragraphs 375 and 376 of the Amended Complaint as alleging the substance of any misrepresentation.

[5] The Court takes judicial notice that Lampo is a manager-managed LLC organized under Tennessee law. https://tnbear.tn.gov/Ecommerce/FilingDetail.aspx?CN=1792250621781741321011530952090780811 83 120028233. The kinds of persons whose acts can (under appropriate circumstances) be attributed to a Tennessee member-managed LLC include the LLC's manager(s) and president (if it has one). *See* Tenn. Code Ann. § 48-249-402(b)(1) & (d). And because such agents' powers can be delegated by the LLC to employees (even if not a mangers or the president), Tenn. Code Ann. § 48-249-402, it is clear that employees under certain circumstances can be agents of the LLC. It is also clear that the acts of an agent of the LLC are attributable to the LLC if done "for carrying on in the ordinary course the LLC's business." (Herein, the Court will refer to an act done in this manner as an act done "within the scope of" the agency).

(or agents) in the course of their agency with Lampo. The Amended Complaint attributes only one of the alleged false statements to Ramsey personally: the statement that Lampo "had been voted 'best place to work' for over 10 years in a row by their own employees without interference from management" ("best-workplace statement").[6] By unqualifiedly alleging that *both* Defendants made the best-workplace statement, the Amended Complaint (construed in Plaintiff's favor as required) effectively alleges that Lampo is responsible for making this statement based at least on the acts of its president, Ramsey, acting within the scope of his agency. Lampo does not take issue with the fact that the Amended Complaint otherwise does not indicate which agent(s) of Lampo made the respective six statements, and so the Court likewise will not take issue with that. Instead, the Court accepts as true the allegation that Defendant (through one or more agents) made each of the six statements to Plaintiff.

Notably, contrary to an implication made in Plaintiff's Response, (Doc. No. 37 at 13), the Amended Complaint does *not* allege that Defendants—either of them—told Plaintiff that "Defendant Lampo would be one of the best places to work as decided by employees independent

_____

Tenn. Code Ann. § 48-249-402(b)(1) & (2). The Court keeps in mind that the act of any LLC agent can be the act of the LLC, but also that an LLC needs to act, if at all, only through agent carrying on in the ordinary course of the LLC's business. The Court notes that the Amended Complaint alleges that "Lampo is so completely controlled by Mr. Ramsey it is indistinguishable as Ramsey is the *sole decision maker* for Lampo." (Doc. No. 21 at ¶ 141) (emphasis added). This is not tantamount to saying that Ramsey is the sole *agent* for Defendant, but it would have behooved Plaintiff to make clear his view (if in fact it is his view, as seems likely) that Ramsey was not the sole agent of Lampo. It also would have behooved Plaintiff to identify particular agents of Lampo besides Ramsey to the extent that Plaintiff was able to do so, but the Court disregards Plaintiff's failure to do so because Lampo does not make an issue out of this.

[6] The Amended Complaint attributes the best-workplace statement to Ramsey not only in paragraphs 357, 325 and 49, but also in paragraph 47, which adds the detail that (allegedly) Ramsey had personally stated this "on many occasions on his radio show and in other media outlets." (Doc. No. 21 at ¶ 47). Paragraph 50 alleges that Plaintiff was told the same thing, but by Defendant Lampo Group's "leadership" (and not necessarily Ramsey personally). (*Id.* at ¶ 50). So there are several places in which the best-workplace statement is attributed to Ramsey, but at most there is only one place (paragraph 325) where Ramsey is alleged to have made the statement *directly to* Plaintiff.

of managerial interference." What it actually alleges is that Plaintiff was told personally by "Defendants" (meaning Ramsey himself, and perhaps some other agent(s) of Lampo) that Lampo was "voted*"* one of the best places to work. The distinction is not merely semantic. It is one thing to make a representation about *the results of certain voting*, which is a factual representation that is either true or false; it is quite another to make a representation about *how good a place would be to work*, a subjective representation that ultimately is a matter of opinion (or even mere puffery) that can neither be shown to be true nor shown to be false. And so that Court keeps that distinction in mind.

As noted above, the claims against Ramsey (Counts III and IV) have since been dismissed, and Lampo filed the instant Motion, seeking dismissal of all counts.[7]

## LEGAL STANDARD

For purposes of a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must take all the factual allegations in the complaint as true, as it has done above. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 679. A legal conclusion, including one couched as a factual allegation, need not be

---

[7] Only (at most) two of the Counts (Counts III and IV) were asserted against Ramsey, and as noted above those counts have been dismissed.

accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), cited in *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish plausibility of entitlement to relief even if it supports the possibility of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir. 2008). To put it only slightly differently, "[a] Rule 12(b)(6) movant 'has the burden to show that the plaintiff failed to state a claim for relief.'" *Willman v. Att'y Gen. of United States*, 972 F.3d 819, 822 (6th Cir. 2020) (quoting *Coley v. Lucas Cnty.*, 799 F.3d 530, 537 (6th Cir. 2015)). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

<u>DISCUSSION</u>

I.      <u>Count I: TPPA Claim</u>

In Count I, as noted above, Plaintiff claims that his termination was in violation of TPPA because it was (according to Plaintiff) due to his "refus[al] to participate in and/or refus[al] to remain silent about Lampo's requiring nonessential workers to be present in their office against state-mandated COVID-19 'stay at home', mask, and social distancing precautions." (Doc. No. 21 at ⁋⁋ 332). The TPPA provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." T.C.A. §50-1-304(b).

As the statute suggests, termination for refusal to participate and termination for refusal to remain silent are separate bases for violation of the TPPA. As Lampo notes, the Amended Complaint suggested that Plaintiff was asserting both bases, but if so, Plaintiff has abandoned the

"refusal to remain silent basis" and is now proceeding only under the "refusal to participate" basis. (Doc. No. 39 at 1). But in any event, under either basis, a TPPA claim requires the refusal to relate to the employer's "illegal activities." Perhaps out of an abundance of caution, Lampo is content to concede that "illegal activities" include not only activities that actually were illegal, but also activities the plaintiff reasonably believed to be illegal (even if they were not illegal). (*See* Doc. No. 31 at 3-4 (citing *Richmond v. Vanguard Healthcare Servs.*, LLC, 2016 Tenn. App. LEXIS 66 at *16-27 (Tenn. Ct. App. Jan. 29, 2016))). The Court is not so sure; the statute itself does not suggest that protection extends to resistance to activities that are not actually illegal. The standard recitation of elements for a TPPA claim likewise does not suggest this possibility. *See, e.g., Parker v. ABC Techs., Inc.*, No. M202000675COAR3CV, 2021 WL 694912, at *4 (Tenn. Ct. App. Feb. 23, 2021) ("To state a claim for relief under the Act, a plaintiff must allege that (1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in or remain silent about illegal activity; (3) the defendant employer terminated the plaintiff's employment; and (4) the sole reason for termination was plaintiff's refusal to participate in or remain silent about the illegal activity."). And the Court does not take intermediate appellate decisions as necessarily conclusive as to what state law is.[8] Moreover, contrary to Plaintiff's assertion, (Doc. No. 37 at 4), it has *not* cited a case wherein the Sixth Circuit construed the term "illegal activities" to include activities

---

[8] As the Sixth Circuit has explained:

> In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court. *See Prestige Cas. Co.,* 99 F.3d at 1348 (applying Michigan law). If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. *See id.* "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995).

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001).

that were merely reasonably believed by the plaintiff to be illegal.[9] Nevertheless, the Court will accept Lampo's invitation to construe illegal activities arguendo to include any activities at least reasonably believed by Plaintiff to be illegal.

Lampo notes that Plaintiff has not plausibly alleged a refusal to participate in any such activities, let alone any activities that were *actually* illegal. Specifically, it notes that everything with which, according to the Amended Complaint, Lampo did not comply was a mere guideline, exhortation, or recommendation—not a legal requirement. (Doc. No. 31 at 4). Lampo also notes that as for any legal requirements mentioned in the Amended Complaint, none were alleged by Plaintiff to have been violated. (*Id.* at 4-5).

In response, Plaintiff does not point to a single legal requirement allegedly violated by Lampo, and so he does not show any actual illegal activities in which he refused to participate. Instead, Plaintiff asserts essentially that he has adequately alleged facts that support an inference that he *reasonably believed* that Lampo was engaged in illegal activity (in which he refused to participate). As for what particular alleged facts support that inference, Plaintiff identifies Lampo's "blatant disregard for the CDC guidelines, coupled with its exploitation and direct violation of Governor Lee's Executive Orders." (Doc. No. 37 at 4). But even viewing Plaintiff's allegations in the light most favorable to him, the Court simply cannot find it reasonable to believe that non-compliance with CDC (Centers for Disease Control and Prevention) *guidelines* was illegal. Indeed, based on the gist of the entire Amended Complaint—which is that Plaintiff was a passionate, fervent follower of public-health authorities' (including the CDC's) guidance regarding COVID-19 countermeasures—it is not inferable from the Amended Complaint that Plaintiff even had such

---

[9] The case cited here, *Hall v. Wal-Mart Stores, Inc.*, No. 3:16-CV-2818, 2017 WL 2131649, at *3 (M.D. Tenn. May 16, 2017), manifestly is not a Sixth Circuit case but rather a district court case.

a belief; instead, what is inferable is only that he would have been very informed about the *non-mandatory* nature of such guidelines.

Additionally, although Plaintiff refers in his Response to Lampo allegedly committing direct violations of Governor Lee's Executive Orders—Nos. 17 and 22 in particular—any such "violations" would have been of recommendations rather than legal requirements, and thus would not constitute illegal activities. The Amended Complaint claims that Executive Order No. 17 "direct[ed] Tennesseans to work from home whenever feasible" and that that Executive Order No. 22 "require[ed] nonessential employees to stay at home and only allow[ed] essential businesses to operate," and it implies that these provisions are the ones that were violated (Doc. No. 21 at ¶¶ 182, 193). The Complaint did not attach copies of these executive orders, but Lampo has since filed them, and because they are plainly relevant and indeed integral to Plaintiff's TPPA claim, the Court may consider them.[10] The contents of No. 17 (Doc. No. 39-2) reflect that its only alleged provision on which Plaintiff relies in fact does not exist. No. 17 does not "direct" Tennesseans to work from home whenever feasible. Instead, it states that employees "should" work from home whenever feasible; this language is recommendary only—fortunately so, because it certainly would have been difficult for the state to enforce such a provision if it were mandatory, given that so doing would have required public-sector employees to make case-by-case determinations as to whether it was "feasible" for a particular private-sector employee to work from home. As for No. 22, it did not provide that only essential businesses could operate; instead it stated that "[b]usinesses or organizations [like Lampo] that do not perform Essential Services shall not be

---

[10] "Documents integral to the complaint may be relied upon, even if they are not attached or incorporated by reference, [provided that it is] clear that there exist no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecomm., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (internal citations, quotation marks, and alterations omitted).

*open for access or use by the public or its members*," a much narrower restriction and one that, as far as the Amended Complaint indicates, was not violated by Lampo. (Doc. No. 39-3 at 3) (emphasis added).

In short, Plaintiff does not allege any factual matter plausibly suggesting that Lampo engaged in anything that amounted to "illegal activity" by virtue of violating an executive order of the Governor—or by virtue of violating any other legally-mandatory requirement or prohibition. Thus, Plaintiff has failed to state a claim under the TPPA, and Count I must be dismissed.

II.    Count II: Title VII Claim

As Lampo notes, (Doc. No. 31 at 6), a claim of religious discrimination in violation of Title VII and the THRA can encompass a claim of general religious discrimination (*i.e.*, that the defendant-employer took an adverse employment action based on the plaintiff's membership in a protected class, *i.e.*, plaintiff being someone with a particular religious belief that came into conflict with a requirement of the defendant-employer), a claim of failure to accommodate religious beliefs, or both. Like Lampo, the Court will assume that Plaintiff asserts both kinds of claims in Counts III and IV, based on his termination for his refusal to go along with Lampo's insistence that he forego particular COVID countermeasures. As this Court has noted, both kinds of claims require (among other things) that (1) the plaintiff holds a sincere religious belief that conflicts with an employment requirement and (2) the plaintiff informed the employer about the conflict. *EEOC v. Publix Super Mrkts., Inc.*, 481 F. Supp. 3d 684, 692-93 (M.D. Tenn. 2020).

Importantly, consistent with the language of requirement (1), it is not enough that a plaintiff's sincerely held religious beliefs do not align with *the religious beliefs that underlie* the

employment policy (requirement) that the plaintiff was terminated for non-complying with.[11] Instead, the plaintiff needs to have alleged *a religious belief* that conflicts with an *employment requirement. O'Connor v. Lampo Grp., LLC*, No. 3:20-CV-00628, 2021 WL 4480482, at *6 (M.D. Tenn. Sept. 29, 2021), *reconsideration denied*, No. 3:20-CV-00628, 2021 WL 4942869 (M.D. Tenn. Oct. 22, 2021) (initial emphasis added). So here, it is not enough (or even relevant) that Plaintiff alleges a religious belief that conflicts with Lampo's corporate religious beliefs (for example, that prayer is the only appropriate COVID countermeasure) that underlay Lampo's alleged requirement that Plaintiff forego the COVID countermeasures Plaintiff wanted to follow. Instead, what Plaintiff needs to plausibly allege is (1) a sincerely held belief; (2) that is "religious"; (3) that conflicts with Lampo's requirement that Plaintiff forego his desired COVID countermeasures.

Lampo correctly notes that "Title VII prohibits discrimination because of religious belief, not [discrimination because of] mere conduct." (Doc. No. 31 at 7). More specifically, Title VII prohibits adverse employment actions based on a conflict between an employer's requirements and an employee's *religious beliefs*; it does not prohibit adverse employment actions based on a conflict between an employer's requirements and an employee's *conduct* (even if the employee chooses such conduct based on a religious belief). So it is not enough that Plaintiff allege a conflict between Lampo's requirement and *the conduct that Plaintiff believes is required* based on a general application of his religious beliefs; again, actionable conflicts are limited to those between the defendant-employer's requirement and the plaintiff's *religious beliefs*. This not only follows

---

[11] It is likewise not enough that the plaintiff was terminated for not complying with an employment requirement that happens to be grounded on the employer's religious beliefs. The conflict causing the non-compliance must stem from the plaintiff's *own* religious beliefs; a plaintiff's rejection of the employer's religious-based requirement could be based on something other than religious beliefs of the plaintiff (such as a disdain for the requirement itself that is untethered to the religious basis for it).

from the language of requirement (1), but also is necessary to avoid turning a huge swath of ordinary employer-employee conflicts over how employees should conduct themselves into a matter of alleged religious discrimination; in other words, absent this limitation, any employee that could claim a religious-based grounding for his or her chosen course of action could claim religious discrimination based on the employer's insistence on different conduct.

Absent such limitation, for example, if an employee is an adherent of a religion that (like most religions, evidently) generally promotes caring, decency, etc., and the employee believes that caring and decency requires a particular course of conduct in connection with the employee's employment, a religious-discrimination claim would lie whenever the employer requires a different course of conduct. The potential applications of this are innumerable. To take just one example, imagine a salesperson of widgets whose religion (like many) insists on care for the poor. Imagine further that the salesperson concludes that application of this principle requires a major price discount for purchasers the salesperson perceives to be "poor," whereas the employer insists that everyone (rich, poor, or otherwise) pay the same sales price for the widgets. Absent the limitation the Court has recognized above, the salesperson could claim religious discrimination upon termination for refusing to charge perceived poor persons the employer's full mandated sales price. In the view of the undersigned, this would be entirely untenable and does a disservice to the spirit of laws (like Title VII and the THRA) that serve to prohibit and combat real religious discrimination.

In its brief in support of the Motion, Lampo argued (among other things) that the Amended Complaint failed to adequately allege that Plaintiff held a sincere religious belief that conflicted with a requirement of Lampo. (Doc. No. 31 at 9). In this regard, Lampo argued more specifically that that the Amended Complaint did not allege that Plaintiff conveyed to Lampo, as grounds for

his expressed opposition to Lampo's requirements related to COVID, anything actually amounting to a religious belief. (*Id.* at 8-9).

To that, Plaintiff responded by pointing to various paragraphs of the Amended Complaint that allege that his beliefs (favoring particular COVID countermeasures) conflicted with Lampo's alleged requirement that he forego those countermeasures. (Doc. No. 37 at 7). The Amended Complaint indeed has a great deal to say about that (much of which, alas, is redundant). Specifically, the Amended Complaint alleges, "During several of these meetings occurring during and after March 2020, Plaintiff expressed to Defendant Lampo that Defendant Lampo's current COVID-19 policies were at odds with his religious beliefs and created strife in his family life." (Doc. No. 21 at ¶ 248). The Amended Complaint also alleges that "Lampo, at Ramsey's direction, would regularly and aggressively promote their own religious beliefs against COVID-19 precautions while also demeaning Plaintiff's religious beliefs supporting these measures to care for the wellbeing and safety of his family." (*Id.* at ¶ 316). The Amended Complaint also alleges that "Defendant Lampo, at Ramsey's direction, also criticized Plaintiff's exercise of his religious beliefs such as social distancing and wearing a mask." (*Id.* at ¶ 317). It likewise asserts that "Lampo terminated Plaintiff for taking scientifically prescribed precautions, as required by his sincerely held religious beliefs, in the COVID pandemic rather than relying on prayer alone to protect himself." (*Id.* at ¶ 340). It refers to Plaintiff's "religious devotion to maintaining the health, safety, and wellbeing of his children and wife" and to "protect[ing] the health and safety of his family." (*Id.* at ¶¶ 35, 124). It also alleges that Plaintiff had a deep religious devotion to respect and care for the health and safety of others in his community, to follow the "golden rule" to do no harm to others. (*Id.* at ¶ 126). It further alleges that "Plaintiff's religious beliefs require him to protect his family's health and safety" and "to heed the advice of science to protect his family from a deadly

disease." (*Id.* at ¶¶ 152, 155). The Amended Complaint also refers to Lampo terminating Plaintiff for refusing to "abandon his own [particular religious views] on COVID." (*Id.* at ¶ 345). It also complains of Lampo's "refusing to respect and/or accommodate Plaintiff's strongly held religious belief that 'God helps those that help themselves.'"). (*Id.* at ¶ 338).

Plaintiff's claim fails outright because, despite any efforts by him to finesse this, he is actually alleging a conflict between Lampo's required course of conduct and Plaintiff's *desired course of conduct*. The conflict alleged is not of the required kind—*i.e.*, a conflict between Lampo's required course of conduct and some *religious belief* of Plaintiff—and this is true even if Plaintiff's religious beliefs are what inclined him towards the course of conduct that was in conflict with Lampo's requirement. This alone is fatal to any claim of religious discrimination.

The claim would still fail even if one assumed arguendo that Plaintiff were to be treated as alleging a conflict between Lampo's requirements and Plaintiff's COVID-countermeasure beliefs themselves (as distinguished from Plaintiff's conduct as motivated by his beliefs). The reason is that although Plaintiff claimed that such beliefs are "religious" in nature, the claim is merely conclusory, not inherently plausible, and unsupported by any factual matter in the Amended Complaint.

To understand why this is the case, it is helpful to first note that Plaintiff claims that his belief that "the precautions suggested by the CDC, State of Tennessee, Medical Doctors and others were the proper way to avoid COVID" is specifically a "Christian" belief and thus "religious" in nature. (Doc. No. 32 at ¶ 341). It is certainly plausible that Plaintiff's beliefs are *consistent* with the Christian religion (however one conceives of it, and different Christians certainly conceive of it in different ways). But the Court must say that it is not inherently plausible that the rather specific belief on which Plaintiff relies—a belief very specifically in the propriety of particular

"precautions" suggested by particular government actors and physicians in response to a particular pandemic that indisputably arose only millennia after the birth of Jesus Christ and the completion of the last book in the New Testament—is a Christian belief. It is likewise not inherently plausible that this belief is "religious" in any sense whatsoever (even if it is not a Christian belief). The Supreme Court has stated (albeit outside the context of Title VII) that a belief is "religious" if it is "[a] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by . . . God." *United States v. Seeger,* 380 U.S. 163, 176 (1965). And as discussed below, the Third Circuit has noted that whether a belief is religious turns in large part on whether it addresses fundamental and ultimate questions having to do with deep and imponderable matters and is comprehensive. Under these standards, Plaintiff's rather clinical and technocratic belief in the propriety of particular authorities' COVID-countermeasure recommendations appears far from religious.

In *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d 487 (3d Cir. 2017), the plaintiff refused a flu vaccine based on the beliefs that "one should not harm their [sic] own body and . . . that the flu vaccine may do more harm than good," claiming that "he would violate his conscience as to what is right and what is wrong" were he to yield to coercion from his employer (the lead defendant) to take the flu vaccine. *Id.* at 492. The Third Circuit upheld the district court's dismissal of the plaintiff's claim of religious discrimination in violation of Title VII, holding that the plaintiff's anti-vaccine beliefs were not religious in nature. *Id*. Although the court's discussion largely concerned a distinction between a "religion" and belief systems other than a "religion"—a distinction not implicated here inasmuch as Plaintiff's Christianity is undeniably a "religion"—it was also concerned with a distinction between "religious" beliefs and non-religious beliefs. The Court explained:

In conducting our review, we bear in mind the history of the judicial definitions of religion. In *United States v. Seeger*, while interpreting a conscientious objector statute that exempted from conscription those whose religious training and belief made them opposed to war in any form, the Supreme Court put forward a standard for determining whether a belief is religious: "[D]oes the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption?" With this standard, the Court differentiated between those whose views were religious in nature and those whose views were "essentially political, sociological, or philosophical ...."[12] The Court stated then, and has continued to reiterate ever since, that no court should inquire into the validity or plausibility of the beliefs; instead, the task of a court is "to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in [the believer's] own scheme of things, religious."[13] Applying the same test later in *Welsh v. United States*, the Court made clear that belief in God or divine beings was not necessary; nontheistic beliefs could also be religious within the meaning of the statute as long as they "occupy in the life of that individual 'a place parallel to that filled by . . . God' in traditionally religious persons."

This Court has specifically considered how a belief may occupy a place parallel to that filled by God in traditionally religious persons. In *Malnak v. Yogi*, confronted with this question, Judge Adams in a concurrence investigated definitions of religion from the time of the Framing of the Constitution. These definitions tended to revolve around belief in God. Finding them inadequate, Judge Adams proposed a modern definition of religion. We later adopted this definition in *Africa v. Commonwealth of Pennsylvania*[, 662. F.2d 1025, 3d Cir. 1981)], describing it as follows:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

This definition has met with considerable agreement.

*Id.* at 490-91 (footnotes omitted) (quoting *Africa*, 662 F.2d at 1032). The court concluded:

> We note that we are not the only court to come to the conclusion that certain anti-vaccination beliefs are not religious. This is not to say that anti-vaccination beliefs cannot be part of a broader religious faith; in some circumstances, they can, and in those circumstances, they are protected.[26] However, Fallon has not presented such circumstances here.

*Id.* at 492-93 (footnotes omitted).

*Africa* spoke in terms of what constituted a religion, but in the aftermath of *Africa* and *Fallon*, the Third Circuit explained that "[i]n assessing *whether beliefs are religious*, we consider whether they address fundamental and ultimate questions having to do with deep and imponderable matters, are comprehensive in nature, and are accompanied by certain formal and external signs." *Brown v. Children's Hosp. of Philadelphia*, 794 F. App'x 226, 227 (3d Cir. 2020) (emphasis added) (internal quotation marks omitted*)*.

The Sixth Circuit apparently has not weighed in on the Third Circuit's approach, but very recently a district court in the Sixth Circuit cited *Fallon* approvingly regarding the proper approach to take. *See Lawhead v. Brookwood Mgmt. Co., LLC*, No. 5:22-CV-00886-JRA, 2023 WL 2691718, at *4 (N.D. Ohio Mar. 29, 2023). And for its part, *Lawhead* has been cited approvingly in another case from the same district court, which helpfully explained:

> Th[e Supreme Court's] definition of religion is capacious, but it does not expand to include every belief, opinion, or ideology one might embrace. Those that amount to "essentially political, sociological, or philosophical views" are not protected by either Title VII or Ohio Rev. Code § 4112.02 [prohibiting discrimination on the basis of religion]. *Lawhead v. Brookwood Mgmt. Co., LLC*, No. 5:22-cv-00886, 2023 WL 2691718, at *4 (N.D. Ohio Mar. 29, 2023) (quoting *Fallon v. Mercy Cath. Med. Ctr. Of Se. Pa.*, 877 F.3d 487, 490 (3d Cir. 2017)). Courts are well advised to use a "light touch" when evaluating the sincerity of a religious belief. *See Davis v. Fort Bend Cnty.*, 765 F.3d 480, 486 (5th Cir. 2014). But courts in the Sixth Circuit have dismissed claims brought by plaintiffs seeking accommodations by cloaking their secular beliefs in the language and protections of Title VII. *See Pedreira* [v. Ky. Baptist Homes for Children, Inc., 579 F.3d 722, 728 (6th Cir. 2009)]; *Lawhead*, 2023 WL 2691718, at *3; *Robertson v. McKesson Corp.*, No. 2:23-cv-2334, 2023 WL 5177406, at *6 (S.D. Ohio Aug. 11, 2023).

*Prida v. Option Care Enterprises, Inc.*, No. 5:23-CV-00905, 2023 WL 7003402, at *4 (N.D. Ohio Oct. 24, 2023).

Returning to what the Third Circuit said about anti-vaccination beliefs, the Court concludes that it applies equally to Plaintiff's belief set regarding COVID counter-measures (which allegedly is pro-vaccination, pro social-distancing, etc.): depending on their specific substance, some such

beliefs *conceivably could* be part of a broader religious faith, in which case they are protected. But Plaintiff had asserted in only the most conclusory manner that his beliefs regarding COVID countermeasures are religious in nature. And "Plaintiff must do something more than simply assert a conclusory statement that she was terminated based on her religious beliefs." *Lawhead*, 2023 WL 2691718, at *3. Without more, the Court is constrained to say that it is not objectively plausible that a belief in the propriety of particular government and doctor-suggested precautions regarding COVID is religious rather than entirely secular—*i.e.*, political, scientific, medical, social, sociological, philosophical, pragmatic, ethical, secular-moral, etc.—in nature.

In this regard, this case is like *Lawhead*, in which the Court dismissed the plaintiff's claim of religious discrimination in violation of Title VII, which was based on the plaintiff's termination by her employer (the lead defendant) for refusing to administer COVID vaccinations. The court explained in pertinent part:

> Courts have "differentiated between those whose views were religious in nature and those whose views were 'essentially political, sociological, or philosophical,' stating, 'no court should inquire into the validity or plausibility of the beliefs; instead, the task of a court is "to decide whether the beliefs professed by a registrant are sincerely held and whether they are in [the believer's] own scheme of things, religious." ' " *Fallon v. Mercy Catholic Med. Ctr.*, 877 F.3d 487, 490-91 (3d Cir. 2017) See also, *Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51 (2d Cir. 1988) (upholding as not clearly erroneous a district court finding that certain parents' opposition to vaccination was "based, not on religious grounds, but on scientific and secular theories"); *Hanzel v. Arter*, 625 F. Supp. 1259, 1260, 1265 (S.D. Ohio 1985) (describing a professed belief in "chiropractic ethics"—"a body of thought which teaches that injection of foreign substances into the body is of no benefit and can only be harmful"—as philosophical rather than religious); *McCartney v. Austin*, 31 A.D.2d 370, 298 N.Y.S.2d 26, 27 (N.Y. App. Div. 1969) ("[A]ppellants' opposition [to vaccination]—whether or not predicated upon their personal moral scruples or upon medical concern—is not upon religious grounds . . . .").

*Lawhead*, 2023 WL 2691718, at *4 (N.D. Ohio Mar. 29, 2023). The Court is of the view that *Lawhead*'s approach, and reference to the cited cases, is persuasive. "At issue here is whether

Plaintiff alleged sufficient facts to allow the Court to reasonably infer that she is a member of a protected class [meaning, here, someone against whom action was taken based on his having particular religious beliefs], as required to survive a motion to dismiss." *Id.* at 3. Plaintiff does make a conclusory allegation to this effect, but the conclusory allegation is something that is not itself objectively plausible on its face. More to the point, Plaintiff does not *allege facts* (as opposed to making mere conclusory statements) sufficient to push his Title VII claim across the line into plausibility.

To be clear, the undersigned herein is not purporting to be the final arbiter on "religion," on what beliefs can be "religious," or on what beliefs are "Christian." And he is not purporting to say that Plaintiff's belief in the propriety of particular "precautions" suggested by particular government actors and physicians is per se not a "religious" belief. What the Court is saying is that Plaintiff's claim is conclusory and devoid of factual matter supporting the claim that this belief set is "religious." This is particularly problematic where, as here, the claimed religious nature of the beliefs at issue is far from inherently plausible.

The Court concludes that because, as far as the factual matter of the Amended Complaint plausibly suggests, "[Plaintiff's] beliefs are not religious, terminating him for acting on his beliefs did not constitute religious discrimination." *Fallon*, 877 F.3d at 493 n. 27. And for the same reason, failure to accommodate those beliefs did not constitute a failure to provide religious accommodation. Accordingly, Count II must be dismissed in its entirety.

III.    Count III: THRA Claim

Both parties lump their arguments as to Count II together with their argument as to Count III. Clearly, they perceive that the outcome on Count II must be the outcome on Count III, and vice versa. The parties are correct in this regard because, subject to very limited exceptions not

applicable here, the analysis for a Title VII claim is the same as the analysis for a claim under the THRA alleging the same kind of discrimination as the Title VII claim. *See, e.g.*, *Jordan v. Mathews Nissan, Inc.*, 539 F. Supp. 3d 848, 862 (M.D. Tenn. 2021). Accordingly, for the same reasons that Count II must be dismissed in its entirety, Count III likewise must be dismissed in its entirety.

IV.    <u>Count IV: Fraud Claim</u>

As Plaintiff correctly notes:

> Under Tennessee law, the terms intentional misrepresentation, fraudulent misrepresentation, and fraud are synonymous, and the claim has the following elements: (1) defendant made a representation of an existing or past fact; (2) representation was false when made; (3) representation was in regard to a material fact; (4) false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of [the] misrepresentation.

(Doc. No. 37 at 8-9).

On Count IV, Lampo directs its argument at, among other things, the fifth element. Lampo argues that "Plaintiff's fraud claims should be dismissed because none of the six statements could have possibly induced reasonable reliance." (Doc. No. 31 at 15). In making this argument, Lampo relies primarily on the assertion that "Tennessee's strong presumption in favor of at-will employment [discussed by the Court below] and the inherently changeable nature of at-will employment make it extremely difficult for employees to maintain materiality and reasonable reliance-based claims like fraudulent misrepresentation and promissory estoppel." (*Id.*). Lampo also argues somewhat more broadly (and relatedly) that "[a] reasonable person would not have relied upon those six statements to make the weighty decision to relocate his entire family from California to Tennessee for an at-will position that paid $150,000 less than his job in California." (*Id.* at 15). Lampo thus has fairly raised the issue of whether the Complaint adequately alleges the element of reasonable reliance.

The element of reasonable reliance is subject to the pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure.[12] The Sixth Circuit has explained why that is so and also what this standard entails:

> Rule 9(b) . . . requires a plaintiff to state with particularity the circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a plaintiff's complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 524–25 (6th Cir. 2023) (internal citations and quotation marks omitted). And, although not made crystal clear by the language just quoted, when Fed. R. Civ. P. 9(b) applies to a claim, "that rule requires that she plead the circumstances of her fraud and misrepresentations with particularity." *Evans v. Pearson Enterprises, Inc.*, 434 F.3d 839, 852 (6th Cir. 2006). This means that "[c]onclusory statements of reliance are not sufficient to explain with particularity how she detrimentally relied on the alleged fraud [.]" *See id.* at 852-53 (citing *Smith v. Mitlof,* 198 F.Supp.2d 492, 504–05 (S.D.N.Y. 2002) (holding that the complaint's allegation that the plaintiffs reasonably relied on the fraudulent representations was insufficient to meet the heightened pleading requirements of Rule 9(b)).

The Amended Complaint alleges, or at least implies, Plaintiff's reasonable reliance in the following (and only the following) paragraphs: 52, 359, 366, 370, 371, 372, and 379. But in every instance, the reliance is alleged only in very cursory, conclusory fashion. The closest the Amended Complaint comes to asserting facts that would establish Plaintiff's reliance is in two places when it indicates that reliance was placed on the six statements "in accepting the job" and "in accepting

---

[12] Defendant does allude to Rule 9(b) being applicable to claims of fraud (and, for that matter, fraudulent inducement and, as discussed below, claims under Tenn. Code Ann. § 50-1-102), albeit only when addressing Count VI and only via a passing reference to "Rule 9" and "heightened pleading standard." (Doc. No. 31 at 17).

the position," respectively. (Doc. No. 21 at ¶¶ 52, 359). There otherwise is no factual matter explaining the fact or nature of the reliance. As *Evans* noted, conclusory allegations of reliance are insufficient. In the Court's view, the Amended Complaint's entirely conclusory allegations of reliance simply do not suffice to plead reliance (reasonable or otherwise) with particularity. Likewise, as for any reliance being reasonable, the Amended Complaint alleges this only in four places, namely paragraphs 359, 362, 372, 379. And in each place, the reasonableness is alleged only in the most cursory, conclusory fashion. There is simply no alleged factual matter explaining for any reliance was reasonable. In the Court's view, this simply does not suffice to plead the reasonableness of any reliance with particularity. Accordingly, Count IV will be dismissed.[13]

In response to the Motion, Plaintiff does nothing to explain how the Amended Complaint identifies, with particularity, the fact or nature of the reliance. He does not, for example, explain what it was about any statement that made a difference in any decision he made (such as accepting employment with Lampo), and how it made a difference. Instead, he focuses on arguing that the Amended Complaint contains allegations showing that his reliance was reasonable. To do so, he cites paragraphs 49-50, and 325 for one proposition, paragraph 375 for another proposition, and paragraph 18 for yet another proposition. Unless the undersigned's eyes are deceiving him, the cited paragraphs fail so badly to support the respective propositions for which they are cited that the Court must invite (though not require) counsel for Plaintiff to file a notice explaining why he thought it was acceptable to cite such paragraphs for such propositions. The Court rejects the unsupported propositions on which Plaintiff relies here and correspondingly rejects the notion that

---

[13] The Court declines to consider Defendant's alternative arguments in support of the dismissal of Count IV, and likewise declines to raise other potential grounds for dismissal *sua sponte*, such as that the Amended Complaint does not allege other required aspects of a fraud claim with the particularity required for those aspects by Rule 9(b).

these paragraphs support at all (let alone support with particularity) that any reliance by Plaintiff was reasonable.

Plaintiff cites one more paragraph of the Amended Complaint, namely, paragraph 41. He cites it for the propositions that, with respect to "Ramsey's statements about the working conditions at Defendant Lampo," (i) "Plaintiff took efforts to either confirm or refute what he believed to be true and intended to rely on"; and (ii) "[d]uring such efforts, Plaintiff inquired to employees of Defendant Lampo to confirm the statements, which they did, and further encouraged Plaintiff to rely on the statements." (Doc. No. 37 at 13). Paragraph 41 alleges that "[a]fter sharing his religious beliefs with Mr. DiCicco and Larry Anderson [Lampo's Head of Production and Head of Post Production], Plaintiff inquired to the validity of these rumors as sharing these values was an important part of his employment." (Doc. No. 21). To provide context for paragraph 41, the Court notes that paragraph 40 alleges that "Plaintiff through his own interview research had also found certain reviews and local commentary indicating that Lampo was more 'cult-like' than Christian." (*Id.*).

And paragraph 42, which the Court treats (to Plaintiff's benefit) as if it was also cited here, alleges that "[i]n response, Mr. DiCicco and Mr. Anderson specifically stated on behalf of Lampo and Ramsey the working environment at Lampo and with Mr. Ramsey was not 'cult-like.'" (*Id.*). The allegations of these two paragraphs suggest at most that Plaintiff made efforts to determine whether Lampo was "cult-like," and not efforts to vet allegedly false statements regarding anything else. And the Court concludes that these allegations fail to plausibly suggest the reasonability of any reliance by Plaintiff on Lampo's employees' assertions that Lampo was not "cult like." The Amended Complaint is quite clear: Plaintiff was aware that some people were of the opinion that Lampo "cult-like." It was not reasonable to rely on contrary opinions from members of the

leadership at Lampo—both because these are obviously only *opinions* about which people might disagree with one another, and because it is an objective reality that little stock can be placed in a company leadership's denial of unflattering characterizations of the company.[14] In summary, Plaintiff's assertions completely fail to dissuade the Court from concluding that the Amended Complaint does not allege with particularity as required that he relied, and relied reasonably, on any of the six statements.

The Amended Complaint could hardly have done less to attempt to satisfy these pleading standards with respect to Ramsey. In fact, the Amended Complaint is so lacking in this regard that it must be said, in fairness to Plaintiff, that perhaps he actually was not even purporting in the Amended Complaint to state a fraud claim against Ramsey (even if he did go along with the suggestion later made by Lampo via the instant Motion that the Amended Complaint purported to do so). So Count IV must be dismissed as insufficient under Rule 9(b).

V.      Count V: Promissory Estoppel Claim

Relevant to Plaintiff's Count V claim of promissory estoppel, the Tennessee Court of Appeals has noted:

> Under the doctrine of promissory estoppel, also known as detrimental reliance, a promise made by a promisor that reasonably may be expected to induce action or forbearance on the part of the promisee, and which does induce such action or forbearance, is binding if injustice can be avoided only by enforcement of the promise. *Calabro v. Calabro,* 15 S.W.3d 873, 878 (Tenn. Ct. App.1999) (citations omitted). The action or inaction of the promisee is a substitution for consideration under the doctrine. *Id.* at 879. The remedy granted for breach of such a promise, however, may be limited as justice requires. *Id.* at 878.

> In order to assert the doctrine of promissory estoppel, the party must show that a promise was made and that he reasonably relied on the promise to his detriment. *Id.* at 879. Although the existence of an expressed contract is not

---

[14] The Court must ask: even assuming that reasonable minds might characterize Lampo as "cult-like," did Plaintiff believe that there were any circumstances under which company leaders would say, "Yes, we agree with those opinions; Lampo is cult-like"?

required in a claim of promissory estoppel, the promise on which the promisee relied must have been unambiguous and not unenforceably vague. *Id.*

*Wilson v. Price*, 195 S.W.3d 661, 669–70 (Tenn. Ct. App. 2005).[15] The elements of a claim of promissory estoppel reflect the requirement that the promise at issue be unambiguous and not vague. As Plaintiff notes, "[t]o succeed on a claim of promissory estoppel, the Plaintiff must show '(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that they reasonably relied upon the promise to their detriment.'" (Doc. No. 37 at 15-16 quoting *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404–05 (Tenn. Ct. App. 2007)). "A promissory estoppel claim in Tennessee sounds in fraud and is governed by the Rule 9(b) pleading standard." *In re AME Church Emp. Ret. Fund Litig.*, No. 122MD03035STAJAY, 2023 WL 2562784, at *38 (W.D. Tenn. Mar. 17, 2023) (citing *Alsbrook v. Concorde Career Colleges, Inc.*, 469 F.Supp.3d 805, 848–49 (W.D. Tenn. 2020) (collecting cases)).

Plaintiff provides the following summary of the alleged promises underlying his claim of promissory estoppel, each of which is based on one of the six statements, although for whatever reason Plaintiff invokes only four of the six statements.:

> Prior to accepting employment with Defendant Lampo, Defendant Lampo made several promises to Mr. Amos. These promises included that Mr. Amos would edit features and help create the new film department; Defendant Lampo was not "cult like"; Defendant Lampo operated a "drama free" workplace; and

---

[15] The Sixth Circuit has explained:

> In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. *See id.* "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995).

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citation omitted). Herein, when the Court cites a decision of the Tennessee Court of Appeals, it does so with confidence that the State Supreme Court today would not decide differently with respect to the cited proposition(s).

> Defendant Lampo was family friendly and would allow Plaintiff to spend time with his family without interference from Defendant.

(Doc. No. 37 at 16) (citing Doc. No. 21 at ¶ 356). It is readily apparent that all but the first of these alleged promises are too ambiguous and vague to be enforceable via claim of promissory estoppel. Statements about whether something (here, a working environment) is "not 'cult-like,'" "drama free," and "family friendly" are not promises (and thus not enforceable promises) at all, but rather statements of opinions. Alternatively, to the extent that any such statement could at least *potentially* be deemed a promise, they patently are highly subjective, ambiguous, and vague and thus are not enforceable promises.

Then there is the alleged two-part promise to "[i] allow Plaintiff to spend time with his family [ii] without interference from Defendant," which is comprised of two separate promises, each set off by the bracketed numerals added here by the Court for analytical purposes. As for the first, it is totally implausible that Lampo did not, via its demands of Plaintiff as an employee, leave Plaintiff at least *some* time with his family. So what Plaintiff must mean is that in making the promise, Lampo actually implied that he would be "allowed" more time with his family than he actually ended up being allowed. But the alleged promise itself is framed in terms only of "spend[ing] time," a notion that is entirely vague and ambiguous in terms of the key variable of the *amount* of time. And as for the second, the notion of an employer not "interfere[ing]" with an employee spending time with his or her family begs the question: what constitutes interference? Sending a work-related email to an employee when he or she is at home on a weekend playing chess with his or her child? Calling the employee, while he or she is watching TV at night with the entire family, and asking the employee to come into the office for what objectively could be a time-sensitive business crisis? Texting the employee while the employee is on a walk with his or her spouse in the early morning, to congratulate the employee for a job well done the prior day?

The potential examples are virtually limitless. The line between employer conduct constituting "interference" and employer conduct not constituting interference is entirely subjective and unclear, and so this alleged promise is too ambiguous and vague to be enforceable.[16]

Plaintiff asserts in wholly conclusory fashion that all promises on which he relies were "clear and unambiguous." (Doc. No. 37 at 16). The Court rejects that unsupported assertion with respect to all of the purported promises discussed above.

That leaves the alleged promise that Plaintiff "would edit features and help create the new film department." (Doc. No. 21 at ¶ 357). In connection with Plaintiff's claim of promissory estoppel, Lampo claims that Plaintiff was an at-will employee. Neither the Amended Complaint nor Plaintiff's brief in opposition to the Motion suggests otherwise, and so the Court accepts that

---

[16] It could be asserted that the Court has raised *sua sponte* this grounds for dismissal; Defendant made two arguments for dismissal, neither of which expressly is based on the notion that the alleged promises were too vague and ambiguous to be enforced. On the other hand, the Court does perceive Defendant alluded to this notion when it asserted, "Promises of limited interference with family time and a strict 40-hour work week are simply not cognizable under even the most basic formulation of promissory estoppel, much less the narrower version applicable to at-will employment." (Doc. No. 31 at 16).

But the Court concludes that in any event, it may invoke *sua sponte* grounds for dismissal that are different from the ones asserted in the pending Rule 12(b)(6) motion. And the Court does not see from the case law that it is required to afford a plaintiff a chance to oppose those grounds where, as here, the grounds arise directly and entirely from the words of the complaint and the Court perceives any contrary arguments would be futile given the unmistakable import of the words of the complaint itself, which could not be avoided even with the cleverest advocacy. *See, e.g., Bainum v. Sedgwick Cnty. Commissioners*, 27 F. App'x 965, 970 (10th Cir. 2001) ("[A] complaint may also be dismissed sua sponte under Fed. R. Civ. P. 12(b)(6) on grounds [not raised by the defendant]—if it is patently obvious that he could not prevail on the facts alleged and that allowing him an opportunity to amend would be futile." (citing *Whitney v. New Mexico*, 113 F.3d 1170, 1173 (10th Cir.1997))); *Omar v. Sea–Land Service, Inc.*, 813 F.2d 986, 991 (9th Cir. 1987) ("A trial court may dismiss a claim sua sponte under FED. R. CIV. P. 12(b)(6) . . . . Such dismissal may be made without notice where the claimant cannot possibly win relief" (citing *Wong v. Bell*, 642 F.2d 359, 361–62 (9th Cir. 1981)); *Avio, Inc. v. Alfoccino of Auburn Hills, Inc.*, No. 2:10-CV-10221, 2013 WL 12231775, at *2 (E.D. Mich. May 28, 2013) ("[D]istrict courts have the power to dismiss a claim, sua sponte, under Fed. R. Civ. P. 12(b)(6) when it is patently obvious that the plaintiff cannot prevail on the facts alleged and amendment would be futile." (citing e.g., *McKinney v. State of Okl., Dep't of Human Servs., Shawnee, OK*, 925 F.2d 363, 365 (10th Cir. 1991), and *Baker v. Director, United States Parole Comm'n*, 916 F.2d 725, 726 (D.C. Cir. 1990) (per curiam)); *Black Dog Outfitters, Inc. v. Idaho Outfitters and Guides Licensing Bd.*, 790 F.Supp.2d 1248, 1262 (D. Idaho 2011) (dismissing a claim sua sponte and without notice on preemption grounds).

Plaintiff was an at-will employee, especially since "[e]mployment in Tennessee is presumed to be at-will unless an employment contract uses specific language defining a definite term of employment," *Parker v. Magna Seating of Am., Inc.*, No. 21-5567, 2022 WL 2116045, at *3 (6th Cir. Apr. 14, 2022), something that Plaintiff does not allege here.

And consistent with Lampo's argument here, this Court has noted:

> [A plaintiff's] status as an at-will employee makes it very difficult for her to establish a claim of promissory estoppel because it is hard to prove the third element of reasonable reliance. *Wright v. Wacker–Chemie AG*, 2014 WL 3810584 at *15 (E.D. Tenn. Aug.1, 2014) (citing *Chapman v. S. Natural Gas Co.*, 2011 WL 88918 at *5–6 (E.D. Tenn. March 11, 2011). Thus, courts have held that a Plaintiff who is an at-will employee may prevail on a promissory estoppel claim only under exceptional circumstances. *Id*. at * 16. . . .
>
> . . . .
>
> . . . Exceptional circumstances may include situations in which the defendant's misrepresentations are fraudulent or "intentionally false." *Id* at *16.

*Koch v. Lightning Transp., LLC*, No. CIV. 3:13-0225, 2015 WL 66971, at *9 (M.D. Tenn. Jan. 6, 2015). The Court will assume arguendo that Plaintiff has adequately alleged "exceptional circumstances," inasmuch as he has alleged (albeit not with the specificity required by Rule 9(b) as discussed below, a failing the Court will disregard for present purposes) that Lampo made this alleged promise "knowingly." (Doc. No. 21 at ¶ 357(a)). But Lampo's broader point here is that Plaintiff has not alleged facts plausibly satisfying the requirement of reasonable reliance. (*See* Doc. No. 31 at 16). And the Court agrees, for the reasons discussed when explaining that the Amended Complaint does not allege with particularity (as required by Rule 9(b), which applies here) reasonable reliance upon any of the six statements.

VI.     Count VI: Claim under Tenn. Code Ann. § 50-1-102

The statute invoked by Plaintiff in Count VI provides in pertinent that it is:

unlawful for any person to induce, influence, persuade or engage workers to change from one place to another in this state, or to bring workers of any class or calling into this state to work in any type of labor in this state through or by means of false or deceptive representations, false advertising or false pretenses, concerning the kind and character of the work to be done, or the amount and character of compensation to be paid for the work, or the sanitary or other conditions of the employment, or as to the existence or nonexistence of a strike or other trouble pending between employer and employees, at the time of or prior to the engagement.

Tenn. Code Ann. § 50-1-102(a)(1).

Lampo describes this statute as "relatively obscure" (Doc. No. 31 at 16), and not without reason inasmuch as the Court was unable to find much case law on this particular statute that is helpful to the present issues. And yet one thing about a claim under this statute is clear: it is subject to the pleading standards of Rule 9(b), just as Lampo claims. (Doc. No. 31 at 17). If a claim "sounds in fraud, [the plaintiff] must meet Rule 9(b)'s pleading requirements at the outset." *Smith v. Bank of Am. Corp.*, 485 F. App'x 749, 752 (6th Cir. 2012). One look at Tenn. Code Ann. § 50-1-102(a)(1) seems to indicate unmistakably that a claim thereunder is one that "sounds in fraud." But the Court can reach this conclusion another way. First, the Court notes that "[w]hether a state-law claim sounds in fraud, and so triggers Rule 9(b)'s heightened standard, is a matter of substantive state law, on which we must defer to the state courts." *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012). There is very little applicable state case law on point, but, as Lampo notes, the Tennessee Court of Appeals has called a violation of Tenn. Code. Ann. § 50-1-102—with good reason, given the statutory language—"fraudulent inducement." *Shipp v. Ditch Witch Equip. of Tennessee, Inc.*, No. M200502354COAR3CV, 2007 WL 700979, at *2 (Tenn. Ct. App. Mar. 7, 2007). And a claim of fraudulent inducement under Tennessee law is, unsurprisingly, subject to Rule 9(b). *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 751 (6th Cir. 2014) ("[The plaintiff] has asserted claims of fraud in the inducement, common-law fraud,

fraudulent misrepresentation, and negligent misrepresentation. Each of these is governed by Fed. R. Civ. P. 9(b).").

Under Tennessee law, to establish a claim of either fraudulent inducement or promissory estoppel, a plaintiff must show that it reasonably relied upon the allegedly false information. *See Lamb v. MegaFlight, Inc*., 26 S.W.3d 627, 630– 31 (Tenn. Ct. App. 2000) (noting that the elements of fraudulent inducement are: "(1) a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; [and] (5) an injury resulting from the reliance."). The Court is confident that the same is true of a claim under Tenn. Code. Ann. § 50-1-102, given that it is a claim in the nature of one for fraudulent inducement.

The claim here fails to satisfy Rule 9(b). To begin with, if the claim is based (in part) on the six statements—which, surprisingly, Count VI does not make clear is in fact the case—reasonable reliance has not been alleged with particularity, for the reasons discussed above; and certainly there is nothing specific in Count VI itself to indicate otherwise. And to the extent that Count VI purports to be based on statements other than the six statements, it fails because it does not actually identify any false statements, let alone allege them with particularity as required. In paragraphs 375 and 376 Count VI alleges that Lampo (separate and apart from making the six statements, apparently) "made deceptive representations *about*," respectively, "the character of the work to be done" and "the quantity of the work to be done." (Doc. No. 21 at ¶¶ 375, 376). But an allegation that a misrepresentation was *about a particular* topic is not an allegation *of a particular misrepresentation*; it is one thing to say what a misrepresentation was *about*, and it is quite another to say what a misrepresentation *was*; the first is a specification of a topic, while the second is a

specification of (the content of) a misrepresentation—and Rule 9(b) requires the latter. And so no misrepresentation has been alleged here with particularity as required by Rule 9(b)

Accordingly, the Court will dismiss Count VI.

CONCLUSION

This case is only at the motion-to-dismiss stage, as the Court well recognizes. But a Complaint has to meet certain standards under *Iqbal/Twombly* and/or Rule 9(b) to survive past that stage. For the reasons discussed herein, the Court finds that none of Plaintiff's claims accomplish that. Accordingly, the Motion (Doc. No. 30) will be GRANTED, and all counts against Lampo will be dismissed.

An appropriate corresponding order will be entered.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE