# EXHIBIT 1

# SELECTED FACTS RELATED TO RELIGIOUS NONCONFORMITY CLAIM IN PLAINTIFF'S AMENDED COMPLAINT

15. Plaintiff was raised in a Christian home and continues to practice his Christian beliefs.

16. Plaintiff's Christian beliefs included caring for family and doing unto others as you would have them do unto you.

34. Plaintiff has personal Christian religious beliefs which he regularly practices and values.

35. Among those values, Plaintiff possesses a religious devotion to maintaining the health, safety, and wellbeing of his children and wife.

36. Additionally, Plaintiff's religious beliefs reflect a respectful treatment for the safety of others and his community.

37. Plaintiff has continuously held and actively practiced these values throughout his life.

41. After sharing his religious beliefs with Mr. DiCicco and Mr. Anderson, Plaintiff inquired to the validity of these rumors as sharing these values was an important part of his employment.

57. The onboarding process was nothing more than an indoctrination process; a process of teaching a person to accept a set of beliefs uncritically.

58. The "onboarding" consisted of 3 days of indoctrinating employees to constantly praise Mr. Ramsey and/or "The Ramsey Way".

59. The "Ramsey Way" encourages expressing deeply personal connection with Mr. Ramsey and the Ramsey brand.

60. The "Ramsey Way" encourages expressing praise for Mr. Ramsey constantly.

61. The onboarding process included group discussions where people shared their "Dave Story,"

62. "Dave Stories" were deeply personal moments where Mr. Ramsey or his program significantly changed a person's life.

63. During the onboarding process, Plaintiff was introduced to Defendants' "14-Point Philosophy," which was a document outlining the company's culture and values, also known as Defendants' "Core Values."

64. One point of this 14-Point Philosophy, titled "No Gossip," specifically outlines the Defendants' value against "backstabbing."

65. However, the part of the onboarding process dealing with "gossip" only focused on the prohibition against any negative comments about Mr. Ramsey or his management decisions.

95. Lampo also required all its employees to participate in weekly "one-on-one" meetings.

96. The meetings were designed in part to ensure Plaintiff adhere to Mr. Ramsey's personal religious beliefs both at the office and in his home life as directed by Mr. Ramsey.

123. Plaintiff's wife and son were considered "high-risk" individuals.

124. Plaintiff had a deep religious devotion to protect the health and safety of his family.

125. As such, Plaintiff exercised extreme caution and made personal measures not to potentially infect his family with this virus.

126. Plaintiff had a deep religious devotion to respect and care for the health and safety of others in his community, to follow the "golden rule" to do no harm to others.

127. As such, Plaintiff exercised additional caution not to potentially spread the virus to his coworkers and friends outside of work.

137. Specifically in this 900 person meeting, Mr. Ramsey stated that fear of working in the office because of COVID demonstrated **"weakness of spirit".**

138. Mr. Ramsey believed taking preventative measures were against the will of God.

139. Mr. Ramsey aided, abetted, compelled, commanded, and/or directed Lampo to impose his beliefs by terminating or demoting employees who did not agree with his spiritual beliefs or held religious beliefs in contravention of his own.

145. Plaintiff did not share Defendants' beliefs that taking actions to protect his family demonstrated "weakness of spirit".

146. Mr. Ramsey's stated beliefs regarding COVID were amplified on his radio show numerous times.

147. Troubled by this news because of his Christian commitment to protecting the health of his family, Plaintiff confronted Mr. LeFevre that afternoon in front of the entire team about his concerns with Defendants' response to this virus.

148. In this confrontation, Plaintiff mentioned other alternatives for safe working conditions during COVID, including working from home, that were aligned with his own religious beliefs.

149. Plaintiff told Mr. LeFevre he was concerned that Lampo's confirmed COVID-19 case was a mere fifteen (15) feet from his working area.

150. Plaintiff expressed concern that Lampo had not taken any effort to implement any precautions against COVID-19 despite the proximity to an infected employee.

151. Plaintiff reiterated his worries concerning his child with Coat's disease and his high-risk wife with a predisposition for pneumonia.

152. As Mr. LeFevre and Defendants were aware, Plaintiff's religious beliefs require him to protect his family's health and safety.

153. Mr. LeFevre dismissed Plaintiff's concerns, informing him that Lampo's current response was sufficient, and that Plaintiff needed to simply "pray and keep moving forward."

154. Lampo expected its employees to adopt the religious view of Mr. Ramsey that taking COVID-19 precautions demonstrated "weakness of spirit" and prayer was the proper way to avoid COVID-19 infection.

155. In contrast, Plaintiff's religious beliefs required him to heed the advice of science to protect his family from a deadly disease.

158. Despite the CDC's COVID-19 precautions, the in person weekly meetings and devotionals at Lampo continued to take place.

159. Defendants declined to implement any of Governor Lee's or the Center for Disease Control's recommended COVID-19 precautions including limited gathering sizes, temperature checks, or social distancing.

162. Plaintiff asked if that was an option and expressed his concerns about COVID since his son, wife, and mother were all considered "high risk."

163. Mr. DiCicco assured Plaintiff that his job would not be jeopardized by working from home and "family comes first."

164. Plaintiff decided that working from home would be safest for his family.

165. Plaintiff decided working from home was consistent with his religious beliefs considering Defendants' refusal to comply with COVID-19 precautions.

170. Mr. DiCicco told Plaintiff that the documentary team, which included Plaintiff, would continue working in the office in contradiction to what he told Plaintiff previously.

174. Plaintiff could perform all aspects of his job with a computer and Internet access.

176. Mr. DiCicco and the Defendants were well aware Plaintiff had high-risk household members which made coming into the office very dangerous to Plaintiff's family.

179. Mr. Ramsey continued to promote his religious beliefs by saying any COVID-19 precautions showed "weakness of the spirit" and encouraged employees to refrain from taking COVID-19 precautions but instead "pray and keep moving forward."

180. Mr. DiCicco then told Plaintiff he could work from home but demoted him to Assistant Editor on the project because of Plaintiff's religious beliefs.

181. Mr. DiCicco also stated that when Plaintiff was able to return to the office he would again be considered a "Senior Video Editor."

183. On March 22, 2020 Plaintiff's wife shared a post criticizing the Tennessee government's weak response to COVID-19, presumably seen by Lampo employees.

208. The meeting quickly devolved into a discussion about COVID-19 quarantine and Plaintiff's relationship with his wife.

209. Plaintiff had discussed in what he thought were private "one on ones" that his wife was having some problems adjusting to life in Tennessee as she had moved 2000 miles away from her friends of over 20 years and had to leave her job. He also mentioned the pandemic was not helping with the situation at all.

212. Mr. LeFevre commented that Plaintiff needed to "talk with his wife to get her on the same page" referring to his wife's comments regarding shortcomings of Governor Lee in handling the coronavirus.

215. Plaintiff's family issues were his own issues, not Defendants'; yet Defendants

continually sought to exert control over every aspect of employees' lives.

216. Plaintiff's ability to keep his family decisions out of the hands of his employer

aligned with Plaintiff's deeply held religious beliefs.

219. Plaintiff was removed from the project.

220. Plaintiff inquired what his next project would be since he was demoted and no longer working on his sole project, the student debt documentary.

221. Mr. LeFevre responded only by saying Plaintiff needed to "check his humility."

222. Mr. LeFevre clearly meant Plaintiff should give up his personal beliefs in exchange for the beliefs of the company leader; specifically the way he chose to handle personal family issues and choosing to not put his family in danger because Ramsey believed taking COVID precautions demonstrated "weakness of spirit."

223. Mr. LeFevre demonstrated the policy of Lampo and Ramsey to disallow any views, including religious, that were not in line with Dave Ramsey's personal beliefs.

225. After this meeting, Plaintiff was mandated to attend a second, additional weekly

one-on-one meeting with Lara Johnson.

226. Plaintiff was informed that he had not been "onboarded" (indoctrinated) correctly and therefore he would need to go through an additional one on one with Ms. Johnson. Lampo said Plaintiff needed to be "re-onboarded" regarding the "Ramsey Way."

227. These meetings were meant to monitor, "reeducate", punish, and/or find cause to dismiss Plaintiff.

228. These meetings were designed to indoctrinate Plaintiff to the personal religious views of Dave Ramsey as a spiritual leader.

229. Plaintiff attempted to focus these meetings on business-related topics.

230. Ms. Johnson made the meetings about Plaintiff's relationship with his wife and any issues they may be having in their marriage.

231. The meetings were designed to make Plaintiff uncomfortable and to make sure he and his wife could not spend time together without the interference of Defendants.

232. In at least one of these meetings, Ms. Johnson actually stated discussing business related matters in these meetings was "getting off topic."

233. Ms. Johnson consistently redirected these conversations to focus on Plaintiff's wife, marriage, family, and his spirituality.

236. Ms. Johnson repeatedly insisted that Plaintiff talk with his wife about their commitment to Lampo.

244. When Plaintiff inquired about the quality of his performance during these meetings, Ms. Johnson consistently noted that she had nothing but compliments about his performance and that he was a superior worker.

245. Plaintiff was forced to attend these meetings of a "spiritual and personal nature" to force Plaintiff to completely submit to Defendants as an employer and also as a spiritual and religious leader.

246. Frequently, Plaintiff was questioned about his perception of Mr. Ramsey's comments during staff meetings regarding the company and also religious matters.

248. During several of these meetings occurring during and after March 2020, Plaintiff expressed to Defendant Lampo that Defendant Lampo's current COVID-19 policies were at odds with his religious beliefs and created strife in his family life.

249. To Plaintiff's understanding, Lampo employed a strict "No Gossip" policy regarding Mr. Ramsey that, if violated, would lead to termination.

253. Plaintiff returned to the office as all employees were required to do starting May 4, 2020.

254. Lampo took adverse employment actions against all employees who requested to work from home.

255. Following Plaintiff' return to the office, employee desks remained in contact with one another without any partitioning or additional protection.

256. Zoom meetings were suspended and in person meetings were required.

257. Religious and staff mass gatherings were mandatory.

259. Specifically, the CDC urged the use of masks and social distancing as primary deterrents for the spread of COVID-19 infection.

260. Lampo implemented none of these policies.

261. Defendants felt the proper attitude was to simply "pray away the disease".

262. During conference meetings, the use of masks and social distancing was frowned upon.

263. Employees who wore masks to meetings were mocked and derided.

264. Lampo continued to host meetings with more than 900 attendees, encouraging employees to attend in person despite being streamed.

265. Masks and social distancing were not required at these meetings with 900 attendees.

266. Within two weeks, these meetings were no longer streamed and employees were required to attend in person with no opportunity to social distance.

267. Later in May 2020, an anonymous Lampo employee reported violations under OSHA and/or CDC guidelines.

268. Mr. Ramsey addressed this report and specifically described the anonymous employee as "cowardly" and "disloyal," stating that the employee should "do the right thing and quit."

269. Mr. Ramsey openly mocked this employee's attempt to report a violation, stating that it would be useless due to Mr. Ramsey's "connections."

270. Ms. Johnson personally asked Mr. Amos if he had any concerns about Mr. Ramsey's comments regarding this employee.

271. Out of fear of retaliation, Plaintiff responded that he did not.

283. Ms. Johnson was aware that wearing a mask was a precautionary measure that

Plaintiff took at work.

287. Ms. Johnson urged Plaintiff to take off during the Summit.

288. Ms. Johnson made her suggestion with knowledge that Plaintiff wore masks at work and that Summit would be a mask-free event.

289. Persuaded by Ms. Johnson's warning of conflict at Summit, Plaintiff took time off as suggested.

290. Plaintiff's supervisors assured him that not attending the event would not adversely affect his employment.

299. Defendants consistently provided a dramatic workplace atmosphere where staff would consistently spread internal rumors, monitor and report irregularities and disloyalty in the social media accounts of fellow employees, and punish any employee who shared "gossip" outside of the workplace.

300 Ms. Johnson asked Plaintiff if these statements had changed the way that he felt about working for Defendants.

301. Ms. Johnson inquired if Plaintiff would like it better if Defendants provided him $15,000.00 and said "whoops I made a mistake."

313. At the time of Plaintiff's hiring, Lampo specifically told Plaintiff that Defendants were not "cult-like" in the way they operated.

314. Defendants required complete and total submission to Mr. Ramsey and his views of the world in order to maintain employment.

315. Even following laws and government mandates which are not in line with Defendants' view of the world is reason for termination.

316. Defendants maintained a cult-like attitude regarding Mr. Ramsey the entire time of

Plaintiff's employment. Lampo, at Ramsey's direction, would regularly and aggressively promote their own religious beliefs against COVID-19 precautions while also demeaning Plaintiff's religious beliefs supporting these measures to care for the wellbeing and safety of his family.

317. Defendant Lampo, at Ramsey's direction, also criticized Plaintiff's exercise of his religious beliefs such as social distancing and wearing a mask.

318. On July 31, 2020, Plaintiff had another one-on-one with Ms. Johnson and Mr. LeFevre.

319. In this meeting, Mr. LeFevre terminated Plaintiff stating Plaintiff "was not a good fit" and was perceived to have a "lack of humility."

320. Additionally, Mr. LeFevre further explained the reasoning for this decision by demeaning Plaintiff's attempts to take preventative measures, stating that Plaintiff was not a good fit because he "would stand off to the side all of the time."

321. The only reasons Plaintiff stood off to the side was due to Defendants' refusal to follow COVID-19 mask and social distancing guidelines.   322. Upon Plaintiff's information and belief, he was also terminated for his "lack of humility" as a result of his failure to submit to Defendant's religious beliefs throughout his employment and his one-on-one meetings.