# In The Matter Of:

*Brad Amos v.*
*The Lampo Group, LLC, et al*

---

*Charles L. Baum, Ph.D.*
*January 18, 2023*

---

**nashvillecourtreporters**

Online Scheduling: **ncrdepo.com**  |  **615.885.5798**

*Original File 2023-01-18 Charles Baum PhD ZOOMVideo.txt*
*Min-U-Script® with Word Index*

1

```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF TENNESSEE
                         NASHVILLE DIVISION


BRAD AMOS,                      )
                                ) Case No. 3:21-cv-00923
        Plaintiff,              )
                                ) District Judge Richardson
v.                              )
                                ) Magistrate Judge Holmes
THE LAMPO GROUP, LLC,           )
et al.,                         ) Jury Demand
                                )
        Defendants.             )
```

-------------------------------------------------------

WEB CONFERENCE VIDEO DEPOSITION OF

CHARLES L. BAUM, PH.D.

Wednesday, January 18, 2023

-------------------------------------------------------

APPEARANCES:

For the Plaintiff:        Ms. Lauren Irwin
                          Mr. Jonathan A. Street
                          The Employment & Consumer Law
                            Group
                          1720 West End Avenue
                          Suite 402
                          Nashville, TN  37203
                          615-850-0632
                          lauren@eclaw.com
                          street@eclaw.com

For the Defendants:       Mr. Daniel Crowell
                          Mr. Stephen C. Stovall
                          Barton PLLC
                          611 Commerce Street
                          Suite 2603
                          Nashville, TN  37203
                          615-340-6790
                          dcrowell@bartonesq.com
                          sstovall@bartonesq.com

The Videographer:         Mr. Frank Erwin
                          Erwin Video
                          1013 River Ridge Terrace
                          Nashville, TN  37221
                          615-646-1615
                          ferwinvideo@comcast.net

Reported By:
Patricia W. Smith, LCR, RPR, CCR

1          The web conference (Zoom) deposition of

2     Charles L. Baum, Ph.D., was taken by counsel for the

3     Defendants.  The witness appeared via Zoom on

4     Wednesday, January 18, 2023, beginning at 10:08 A.M.,

5     for all purposes allowed under the Federal Rules of

6     Civil Procedure.

7          It is agreed that Patricia W. Smith, Licensed

8     Court Reporter, Registered Professional Reporter, and

9     Certified Court Reporter may swear the witness, take

10    the deposition, and afterwards reduce same to

11    typewritten form, and that the reading and signing of

12    the completed deposition by the witness was not

13    discussed.

14         All formalities as to caption, certificate,

15    transmission, filing, etc., are waived.  All objections

16    except as to the form of the questions are reserved to

17    on or before the hearing.

18    ---------------------------------------------------------

19

20

21

22

23

24

25

4

1                              INDEX

2    CHARLES L. BAUM, PH.D.:                              PAGE

3          Examination by Mr. Crowell                       6

4          Examination by Ms. Irwin                        43

5

6

7                            EXHIBITS

8    NUMBER                  DESCRIPTION                  PAGE

9    1          Expert Report of Charles L. Baum, Ph.D.,   7
10                October 31, 2022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE VIDEOGRAPHER:  We are on the

2     record.

3                    This is the Zoom video deposition of

4     Charles L. Baum, Ph.D.  Today is Wednesday, January 18,

5     2023, and the time is now 10:08.

6                    And will counsel please identify

7     yourselves, state whom you represent, and then

8     stipulate on the record that there is no objection to

9     the court reporter administering a binding oath to the

10    witness today via Zoom.

11                    And let's start with the defendants'

12    attorney, please.

13                    MR. CROWELL:  My name is Daniel

14    Crowell.  I am with Barton, attorney for defendants.

15    Along with me, I have Stephen Stovall.  And no

16    objections to the oath.

17                    MS. IRWIN:  Lauren Irwin, attorney for

18    the plaintiff, Brad Amos, with The Employment and

19    Consumer Law Group, along with Jon Street, and no

20    objection.

21                    THE COURT REPORTER:  If we are ready, I

22    will swear Dr. Baum in.

23                    THE VIDEOGRAPHER:  Yes, go right ahead.

24                    THE COURT REPORTER:  Doctor, if you

25    will raise your right hand.

1                    CHARLES L. BAUM, PH.D.,

2    called as a witness, having been duly sworn, was

3    examined and testified as follows:

4                        EXAMINATION

5    BY MR. CROWELL:

6    Q.        Good morning, Dr. Baum.

7    A.        Good morning.

8    Q.        Am I pronouncing your last name correctly?

9    A.        Yes.

10   Q.        All right.  Good.  I have learned not to

11   just assume that anymore.

12             I appreciate you being available this

13   morning, and I appreciate the way your report is

14   organized.  I -- I think -- I mean, I know these are

15   famous last words, but I think it will get us out of

16   here pretty quickly today.

17             Before the deposition started, we were

18   discussing your report, a 36-page document with the

19   case caption on the front, entitled "Expert Report of

20   Charles L. Baum, Ph.D.," ending on page 36 with some

21   reference citations numbered 35 through 43.

22             Do you have a copy of that report in front

23   of you, Dr. Baum?

24   A.        I do, yes.

25   Q.        Okay.  Is that the expert report that you

1    have submitted in this case on behalf of the plaintiff,

2    Brad Amos?

3    A.         Yes.

4              MR. CROWELL:  Okay.  Let's go ahead and

5    admit that as the first exhibit to this deposition.

6              THE COURT REPORTER:  Exhibit 1.

7              (Marked Exhibit 1.)

8    BY MR. CROWELL:

9    Q.         All right.  Dr. Baum, this report, is it

10   complete?  In other words, does it have all the

11   attachments and everything?  Is it -- is it in the form

12   in which you prepared and submitted it?

13   A.         Yes.

14   Q.         Okay.  Do you need to update or correct

15   anything in the report that you know of today?

16   A.         No.

17   Q.         Okay.  And are there medical or any other

18   reasons why you can't testify truthfully and completely

19   today?

20   A.         No.

21   Q.         Okay.  This report, Dr. Baum, who prepared

22   it?

23   A.         I did.

24   Q.         Did you have any assistance in preparing it?

25   A.         No.

1    Q.          Okay.  So you're the sole author of this
2    report?
3    A.          Correct.
4    Q.          Okay.  The scope of the report -- Dr. Baum,
5    if you'll look on the first page, under number 2,
6    paragraph number 2, you write:  In this report, I
7    provide an analysis of the economic losses from lost
8    earnings and lost employment benefits for Brad Amos --
9    Mr. Amos -- due to Mr. Amos's employment termination by
10   the Lampo Group, or Ramsey Solutions or Dave Ramsey --
11   hereafter, the Lampo Group -- on or around July 31,
12   2020.
13             Is the scope of your expert opinion in this
14   report, Dr. Baum, limited to this description in
15   paragraph 2?
16   A.          Let me answer your question this way:  I
17   don't plan to provide an opinion about liability.
18   There are a couple of supplemental damage loss elements
19   that I summarize at the end of the report.  They're not
20   really damage loss elements that require complicated
21   calculations with growth rates and present value
22   discounting.  But my understanding is those are
23   elements of damage that are being claimed in this case,
24   and I do provide sort of an arithmetic calculation of
25   what those damage elements are.

1  Q.        Okay.  Thank you.  So let's do this, then.

2  I want to get a comprehensive overview of the scope of

3  your actual expert testimony.

4         So in this paragraph 2 you list economic

5  losses from lost earnings and lost employment benefits.

6  So that's -- that's two buckets.

7         What else in this report are you providing

8  expert testimony about?

9  A.        I am providing a comment on the difference

10  in house prices for Mr. Amos, the price that he paid

11  for his house initially and -- and -- I'm sorry -- the

12  price that he sold his house for and the price that he

13  would have had to pay to repurchase it.

14         An additional damage element is lost

15  earnings that his wife might have had during this

16  period of time.

17         I also summarize some therapy costs for

18  Mr. Amos's son.

19         And then I comment on the fact that Mr. and

20  Ms. Amos may seek therapy themselves, but I don't

21  attach a dollar value to that amount.

22         Now, the house -- housing element also

23  includes a calculation of transaction costs that were

24  incurred to sell the home.

25  Q.        Okay.  So we've got economic losses from

1  lost earnings and lost employment benefits, difference
2  in the house prices plus transaction costs, Mr. Amos's
3  wife's lost earnings, therapy costs for their children,
4  and potential therapy for Mr. and Ms. Amos.
5              Is that the full gamut of your expert
6  testimony?
7  A.          If you -- yes, if you said therapy for the
8  son.
9  Q.          Son.  Sorry.  Not kids.  Son.  Thank you.
10  Okay.  Perfect.  Thank you.
11              All right.  So in the report, Dr. Baum, we
12  go -- if we can go to -- look at paragraph -- beginning
13  with paragraph number 5, that begins a series of
14  paragraphs that all start with "it is my
15  understanding."  Every paragraph begins that way, from
16  5 all the way down to 19.
17              When you say it is your understanding, where
18  did the information in these paragraphs come from, 5
19  through 19?  And if we need to go one by one, we can.
20  But let's start globally.
21  A.          This would be information that was provided
22  to me either by Mr. Amos or his attorney or information
23  that I obtained from the case-specific documents that I
24  list in Exhibit B.
25  Q.          Okay.  And -- and we'll -- let's try this at

1   a high level and see where we go.

2            So with respect to information gleaned from

3   case-specific documents that you identify in Exhibit B,

4   did -- did that require any analysis or -- let me put

5   it differently.  Did that require any expert analysis

6   of those documents?  Or were you simply just reading

7   the documents and gleaning information that way?

8   A.       Well, I guess I would say I was -- I don't

9   know exactly how to answer that question.  I certainly

10  examined the documents and got some information from

11  them on amounts of earnings, for example.  I suppose

12  that could require some expert analysis for someone to

13  know exactly which number on W-2 forms, for example,

14  would be the relevant one.

15           But some of the information is just

16  information that was given to me that I am assuming is

17  true, either in the form of a telephone conversation

18  between me and Mr. Amos or information I got from the

19  complaint, which has some of the allegations in the

20  case.

21  Q.       With respect to information that you

22  obtained from documents, did you have to engage in any

23  arithmetic beyond simple addition, subtraction,

24  multiplication, and division?

25  A.       Um --

1  Q.         For these paragraphs 5 through 19.

2  A.         No, I don't think so.  I was just either

3  citing assumptions that I am making based on

4  information that was provided to me; or in some cases I

5  have reviewed W-2 forms, and I am providing information

6  on what those W-2 forms say.

7  Q.         Okay.  For these -- the information in these

8  paragraphs 5 through 19, did you independently verify

9  any of this information that you received from

10 Mr. Amos, his attorneys, or the documents?

11 A.         Yes, in some cases I did attempt to verify

12 this information.  Now, some of this is information

13 that is just an assumption I am making.

14          For example, in paragraph 5 I didn't

15 independently investigate when Mr. Amos was born.

16          I obtained information about his education

17 level from his resumé.  I assume the resumé is correct,

18 but I haven't independently investigated that.

19          In paragraph 6, for example, I do have an

20 earnings statement that provides some information on

21 what Mr. Amos was earning from BLT Communications.  He

22 told me that he was earning approximately $240,000, and

23 I put that information in this paragraph.  Later, I

24 referenced the earnings statement that shows what he

25 actually was earning from BLT Communications.

```
 1              Maybe as another example, in paragraph 7 I
 2    say that it's my understanding that Mr. Amos did
 3    some -- some side work for various companies.  I listed
 4    those company names.  I didn't investigate directly
 5    whether he did work for those companies or not, but I
 6    do have earnings statements and W-2 forms from them.
 7    And so if those statements are correct, then it looks
 8    like he did do some work for those companies as side
 9    jobs.
10    Q.          So to the extent you independently verified
11    this information in paragraphs 5 through 19, was it
12    using documents provided to you by Mr. Amos or his
13    lawyers?
14    A.          Yes.  It -- any investigation I would have
15    done would have come exclusively from the items that I
16    list in Exhibit B.
17    Q.          Okay.  If any of this information in
18    paragraphs 5 through 19 is incorrect, could that change
19    your ultimate conclusions, your expert conclusions in
20    this report?
21    A.          It's possible it would, but it's possible it
22    would not.  It would just depend on what the
23    information is that is -- that is changing.  Some
24    information is key information, like the amount
25    Mr. Amos was earning from the Lampo Group.
```

1          Other information, like his precise date of

2     birth, probably isn't that important in my analysis.

3     If he were actually born a year later or I got the

4     month wrong, then that -- that wouldn't change the

5     calculations.

6     Q.          Okay.  So let's drill on that -- drill down

7     on that just a bit more.

8          So if any of the dollar figures, for

9     example, are incorrect in paragraphs 5 through 19,

10    would that impact your ultimate expert conclusions in

11    this report?

12    A.          It's possible.  My answer is going to be

13    kind of the same way it was before.  Some of the dollar

14    figures are important; and if they were to change, then

15    that would affect my calculations.  Some of the dollar

16    figures are really not important.

17         For example, I reference how much Mr. Amos

18    earned from side work from some of these third-party

19    employers back in 2019 when Mr. Amos was in California,

20    before he became employed for the Lampo Group.  That

21    information doesn't really play a role in my

22    calculations.  And so if earnings from side jobs back

23    in 2018 were a little bit higher or a little bit lower

24    than I have listed, that wouldn't affect my

25    calculations.

1    Q.          Okay.  In paragraph 12 you write:  It is my

2    understanding Mr. Amos was demoted by the Lampo Group

3    on April 9, 2020, to associate editor and was assigned

4    demeaning work.

5              Was that information provided to you by

6    Mr. Amos or his lawyers?

7    A.          Yes.

8    Q.          And were you able to independently verify

9    whether that was true?

10   A.          I did not attempt to.  No, I did not.

11   Q.          Same question with 13:  It is my

12   understanding Mr. Amos's employment was terminated by

13   the Lampo Group effective July 31, 2020, and Mr. Amos

14   believes this employment termination is discriminatory,

15   retaliatory, and wrongful and is in violation of Title

16   VII of the Civil Rights Act, the Tennessee Public

17   Protection Act, and the Tennessee Human Rights Act.

18             Was that information provided to you by

19   Mr. Amos or his lawyers?

20   A.          It was provided to me by them, and I do have

21   some documentation from some severance notices on the

22   date on which Mr. Amos's employment was terminated.

23   From those documents, I have concluded that his

24   employment was terminated.  I have the date for that

25   employment termination.  I don't plan on giving a legal

1  analysis as to whether that is a violation of these

2  various statutes or not, though.

3  Q.          Okay.  So you're not providing any expert

4  testimony regarding the characterization of his

5  termination as illegal?

6  A.          I think that's correct.  I'm not -- I don't

7  plan to provide an opinion on liability.

8  Q.          And I'm sure the last sentence of this

9  paragraph, the reference to Lampo Group being guilty of

10  fraud, promissory estoppel, deceptive practices, and

11  false pretenses, the same answer?  No expert testimony

12  regarding those issues?

13  A.          That's correct.  That's information I -- I

14  obtained from the complaint.

15  Q.          Okay.  All right.  Paragraph 15, you write:

16  It is my understanding Mr. Amos diligently sought

17  replacement employment in good faith.

18              Is that information provided -- was that

19  information provided to you by Mr. Amos or his

20  attorneys?

21  A.          Yes.  And in this case I do have some

22  information on jobs that Mr. Amos applied for.  I have

23  some cover letters that Mr. Amos sent to employers of

24  open positions.  And then, of course, I also have

25  information on Mr. Amos actually finding subsequent

1  work and who he became employed for and his salary at

2  that next employer.

3  Q.         Are you providing -- or are you intending to

4  provide an expert opinion on whether Mr. Amos was

5  diligent in seeking replacement employment?

6  A.         I would provide an opinion on that if I were

7  asked, yes.

8  Q.         Okay.  Is that opinion -- well, have you --

9  well, strike that.

10         Does this report contain an opinion from

11  you, an expert opinion as to whether Mr. Amos was

12  diligent in seeking replacement employment?

13  A.         I think I -- I think I would answer your

14  question by saying I would provide an opinion that he

15  was diligent, based on the fact that he did find

16  replacement employment earning more than he had been

17  earning from the Lampo Group about a year after his

18  employment termination from the Lampo Group.

19  Q.         Okay.  A similar question with respect to

20  good faith.  Are you providing today an expert opinion

21  that Mr. Amos acted in good faith in seeking

22  replacement employment?

23  A.         It would be my opinion that he did, yes.

24  Q.         Okay.  All right.  We'll come back to that.

25         (Feedback over Zoom connection.)

1          Sorry.  I was getting some feedback there.

2     I don't know if that was me.

3          Okay.  All right.  Let's move on down to,

4     now, paragraphs number 20 through 32.  Each of those

5     paragraphs begin with "according to documents I have

6     reviewed."  Just to be clear, the documents referenced,

7     Dr. Baum, in paragraphs 20 through 32, are all of those

8     documents listed on Exhibit B, pages 32 through 33 of

9     your report?

10    A.          Yes, and these are all either W-2 statements

11    or earnings statements or pay stubs.

12    Q.          Okay.  And are these all documents that were

13    provided to you by Mr. Amos or his attorneys?

14    A.          Yes.

15    Q.          Okay.  Dr. Baum, on page 33 of the report,

16    number 31, you reference a phone call with Brad Amos on

17    October 21, 2022.  Do you see that?

18    A.          Yes.

19    Q.          What did you discuss with Mr. Amos on that

20    phone call?

21    A.          I didn't take notes from the phone call that

22    are handwritten, but I did take the information and

23    include it in the first paragraphs of this report that

24    we have been discussing, where I start the paragraph by

25    saying "it's my understanding."  I spoke with Mr. Amos

1    about these case-specific details, things like who he

2    had been employed for, the dates of those -- of that --

3    of those stints of employment, his earnings, and his

4    benefits, and information about some of the other

5    damage elements, like his son going to therapy.  We

6    discussed things like that.

7                Any information that would have been

8    pertinent for my calculations I included in the first

9    part of this report as -- as my assumptions.

10   Q.        Okay.  Thank you.

11               All right.  Let's move on to paragraphs 33

12   and 34, a couple more paragraphs that begin with "it is

13   my understanding," similar to before, Dr. Baum.

14               Let's start with 33.  Where did the

15   information in paragraph 33 come from?

16   A.        This would have been -- been information

17   that I would have discussed with Mr. Amos in our phone

18   call.  And I did have some receipts that Mr. Amos

19   provided me about the cost of this therapy, and that

20   should be listed in Exhibit B.

21   Q.        Okay.  Same question for number 34.  Where

22   did the information in number 34 come from?

23   A.        This would have been from Mr. Amos and from

24   our phone call.

25   Q.        Okay.

1  A.        And there is no documentation that would --
2  would go with this paragraph.
3  Q.        Okay.  Got it.
4            To your knowledge, had Mr. Amos or his wife
5  sought therapy related to his employment termination?
6  A.        My understanding is they have not yet, as of
7  the writing of this report.
8  Q.        Okay.  And so that -- number 34 does not
9  factor into any of your ultimate conclusions in this
10 report; correct?
11 A.        That's right.
12 Q.        Okay.  And so on to number 35, similar to a
13 question I asked earlier but a little more
14 comprehensive.  In 35 you write:  In this analysis,
15 based on the assumption that paragraphs 5 through 34
16 are true, I calculate the economic losses to Mr. Amos
17 from lost earnings and lost employment benefits due to
18 his employment termination from the Lampo Group on
19 July 31, 2020.
20            If any of your assumptions in paragraphs 5
21 through 34 are not true, would that impact your
22 ultimate conclusions?
23 A.        It's possible it would, but it's also
24 possible it would not.  This is sort of a similar
25 answer that I have given before.  Some of this

1  information, if it were to change, would affect the

2  calculations directly.  And some of it really wouldn't

3  affect the calculations.  It's information that I

4  provide that is background; it provides context; it's

5  information I have considered.  Some of this

6  information, though, does not directly affect the

7  calculations.

8  Q.        Okay.  If -- looking at the paragraphs

9  related to documents.  So this is paragraphs 20 through

10  32.  If any of the dollar values in those documents, or

11  that you gleaned from those documents, are incorrect,

12  would that ultimately change your expert conclusions in

13  this report?

14  A.        It's possible it would, but it's possible it

15  would not.  Let me give an example of each.

16        In paragraph 22 I say -- I reference how

17  much Mr. Amos earned from a side employer, DG

18  Entertainment Media.  It's $2,219.80.  That really

19  doesn't affect my calculations if that number is

20  incorrect.

21        On the other hand, information in paragraph

22  25, for what Mr. Amos earned from Mark Woollen and

23  Associates after his employment termination, that

24  amount does matter because I deduct that as mitigation

25  or as an offset.  And it -- and the economic losses are

1   reduced by that amount.

2   Q.          Okay.

3   A.          So the answer to your question is some of

4   the numbers matter, and some of them really don't.

5   Q.          Is the line of demarcation whether the

6   numbers are pre-termination versus post-termination?

7   A.          To some extent I think that's true.  I don't

8   really use the side jobs pre-termination in my

9   calculations.

10          But I do, in one of my scenarios, project

11  what Mr. Amos would have earned from the Lampo Group if

12  he hadn't been terminated and if the Lampo Group had

13  raised his salary to the level he had been earning

14  prior to being hired there, from back when he was

15  employed for BLT Communications.  So that would be a

16  pre-termination salary that would matter.

17  Q.          Okay.  Gotcha.  All right.

18          All right.  Dr. Baum, that's -- I wanted to

19  get those things out of the way up front.  I want to go

20  back just a bit, and then we're going to just continue

21  in this sort of way of moving through these paragraphs,

22  paragraph by paragraph.

23          Back to paragraph 33, where you write it's

24  your understanding that Mr. Amos has incurred therapy

25  costs of $180 per week for his son due to his

1  employment termination.

2           Were you able to independently verify

3  that -- well, strike that.

4           Where did you get the information that

5  Mr. Amos's son's therapy is related to his employment

6  termination?

7  A.        I would have gotten the information -- that

8  information from Mr. Amos.  I have not attempted to

9  independently verify whether the therapy was due to the

10  employment termination.

11          Now, I do have therapy receipts; so I do

12  know that the therapy cost $180 per session and it

13  appears to have been received about once a week.

14  Q.        Okay.  Similar question for 34 -- strike --

15  strike that.

16          Okay.  Let's look at number 39.  In

17  paragraph 39 you reference -- you discuss, generally

18  speaking, the scope of recoverable damages, or at least

19  some of the recoverable damages, and you cite case law.

20          In the middle of that paragraph, you note

21  that in some circuits, including the Sixth Circuit, if

22  a terminated worker lost an employer-provided benefit,

23  such as health -- health insurance coverage but did not

24  replace that benefit after the discrimination and

25  incurred no monetary loss for not having that benefit,

1  then the injured party is not -- I think there's a typo

2  there -- is not be eligible to receive compensation for

3  that benefit.

4          After Mr. Amos's employment was terminated,

5  were there any -- to your knowledge, were there any

6  benefits that he received at Lampo that he did not

7  replace?

8  A.          Well, my understanding is that he did

9  replace his health insurance benefits from his

10  employment with -- with the -- with CMT Communications

11  Group.

12  Q.          Okay.

13  A.          And so it's not that he didn't replace those

14  benefits.  It's that the replacement cost was -- the

15  cost of the benefit was lower than the cost he had been

16  paying from the Lampo Group.

17  Q.          Okay.  Let me ask a similar question but a

18  bit differently.

19          In paragraph 37 you state that the economic

20  losses from lost earnings and lost employment benefits

21  to Mr. Amos, you calculate them to range from $52,537

22  to 237 -- $237,513.  Do those -- does that -- do those

23  calculations include any benefits that Mr. Amos had at

24  Lampo and replaced after he was terminated?

25  A.          Those totals do not include insurance costs,

1    and they do not include insurance that Mr. Amos

2    replaced.  They do include some employment benefits.

3              They include the projected value of lost

4    retirement contributions by the Lampo Group and the

5    value of lost contributions by the Lampo Group to the

6    Social Security Administration on Mr. Amos's behalf.

7    So those two totals don't include any economic losses

8    from lost health insurance.  They do include economic

9    losses from lost Social Security retirement

10   contributions and employer retirement contributions to

11   a 401(k) plan.

12   Q.        Okay.  Do they include any other benefits

13   beyond those you just described?

14   A.        Not beyond those two, no.

15   Q.        Okay.  Paragraph 43, you write that

16   Mr. Amos's earnings are assumed to have grown over time

17   with price inflation and productivity.  You then cite

18   three sources:  Becker, Ben-Porath, and Gilbert.

19             What is Becker?

20   A.        These are general works in economics --

21   they're not specific to this case -- that would provide

22   the economic theory or the economic principles behind

23   why a worker's earnings would go up over time.

24   Q.        Okay.

25   A.        It's sort of theoretical justification for

1   raising wages or earnings over time.

2   Q.          Were you provided or did you independently

3   obtain any information regarding Mr. Amos's

4   productivity at Lampo Group?

5   A.          No.

6   Q.          Okay.  Paragraph 44, you write:  I project

7   Mr. Amos's earnings at the Lampo Group would have

8   increased 5 percent on August 12, 2020, upon Mr. Amos's

9   one-year anniversary with the Lampo Group.

10              Why do you project that his earnings would

11  have increased 5 percent on August 12, 2020?

12  A.          In this first scenario -- I've got two

13  scenarios.  In this first scenario, I assume that

14  Mr. Amos's wage base is still $90,000, but I project

15  the $90,000 to go up with general wage inflation.  The

16  sources that I use for that reflect general wage

17  inflation in the economy for the 2001 period.  It shows

18  that, on average, the typical worker received a pay

19  increase of about 5 percent.

20  Q.          Do you have any information or knowledge

21  regarding Lampo Group's wage increases in 2020, actual

22  wage increases?

23  A.          I don't have information on that for other

24  employees.  I do have information on -- on -- from

25  Mr. Amos on a pledge by the Lampo Group to raise

1   Mr. Amos's earnings upon his one-year anniversary and

2   for him to begin benefiting from profit sharing and

3   bonuses.  And so I've got information specific to

4   Mr. Amos but not for other employees.

5   Q.          Okay.  So beyond general wage growth in the

6   economy and information you received from Mr. Amos, do

7   you have any other information to support your

8   projection that his wages would have increased

9   5 percent on August 12, 2020?

10  A.          Not from other Lampo employees, no.

11  Q.          You mentioned his eligibility for profit

12  sharing.  Did profit sharing factor into your ultimate

13  conclusions in this report?

14  A.          Indirectly, I think they did.  In one of my

15  scenarios, my second scenario, I assumed that upon

16  Mr. Amos's one-year anniversary with Lampo he would

17  have received a significant pay increase.  This is

18  based on Mr. Amos conveying to me that Lampo Group

19  indicated to him that he would earn an amount

20  comparable to what he had been earning from BLT

21  Communications prior to his employment with the Lampo

22  Group.

23          Now, whether this salary increase in the

24  second scenario would have come in the form of base

25  salary increases or profit sharing or bonuses, that I

1    don't specify.  But I do increase his level of cash

2    compensation to a level comparable to what he had been

3    earning prior to his employment with the Lampo Group

4    from BLT Communications.

5    Q.          Okay.  Do you know whether Lampo Group has a

6    profit sharing plan?

7    A.          My -- my understanding is -- is that they

8    do.

9    Q.          And where did you obtain -- where did that

10   understanding come from?

11   A.          I certainly would have discussed this with

12   Mr. Amos, and it could be information that was also in

13   the complaint.

14   Q.          Okay.  Do you know -- just assume for a

15   second that Lampo Group had a profit sharing plan.  Do

16   you know how it worked?

17   A.          Not specifically, no.  I have no -- no

18   profit sharing plan description, no.

19   Q.          And this goes without saying, but I'm going

20   to ask it anyway.  Do you know whether Lampo provided

21   profit sharing to any employees in or for 2020?

22   A.          My understanding is that they did.  But I --

23   I don't have information on other employees at Lampo

24   from their payroll documents.

25   Q.          Okay.  Paragraph 45, you note that you

1  assume that absent Mr. Amos's employment termination he

2  would have begun receiving retirement benefits from the

3  Lampo Group equal to 4 percent of earnings beginning on

4  August 12, 2020.  What is that assumption based on?

5  A.        This would have been -- I would have

6  obtained this information from conversations I had with

7  Mr. Amos, where he conveyed to me that at the time he

8  was employed by the Lampo Group he did not receive

9  employer contributions to his 401(k) account; but that

10 he had been told if he remained employed for the Lampo

11 Group, that upon his one-year anniversary, that's when

12 those employer contributions would have begun and that

13 they would have been an amount equal to 4 percent of

14 his earnings.

15 Q.        Okay.  Paragraph 56, you have mentioned this

16 a few times already.  You reference in the middle of

17 that paragraph a pledge:  Mr. Amos believes that an

18 amount was pledged to him equal to his earnings from

19 BLT Communications.

20        And you have already testified -- but just

21 to make sure I understand -- your understanding is

22 that -- based on information provided by Mr. Amos -- is

23 that Lampo pledged to match his pay from BLT

24 Communications after one year; is that correct?

25 A.        That's the information that was -- that was

1    provided to me, yes.

2    Q.          And apart from information that you received

3    from Mr. Amos -- strike that.

4                Were you able to independently verify

5    whether that was true or false?

6    A.          No, I did not attempt to independently

7    verify that.

8                Now, I think I probably should add that I --

9    that I do list in Exhibit B a letter from Ramsey

10   Solutions to Mr. Amos, that they sent him I guess upon

11   his hire, where they provide information in a Ramsey

12   document on what his salary would be, and they also

13   reference sharing the profits and that employees will

14   become eligible for profit sharing -- I guess I

15   infer -- upon their one-year anniversary.  The letter

16   says that, specifically, Mr. Amos will become eligible

17   for profit sharing on August the 12th, 2020, and that

18   would be his one-year anniversary.

19               So I do have that information in addition to

20   what I discussed with Mr. Amos.

21   Q.          Okay.  And so for purposes of this report,

22   did you assume that his eligibility for profit sharing

23   and matching his pay from BLT Communications were one

24   and the same?

25   A.          Let me answer the question this way.  I

1    provide two scenarios.

2            In my first scenario, I -- I do not

3    assume -- in my first scenario, I assume that

4    Mr. Amos's salary from the Lampo Group would not have

5    been raised to his -- his prior level with BLT

6    Communications.  In this first scenario, I assume that

7    90,000 remains his wage base.  It goes up a little bit

8    upon his one-year anniversary for general wage

9    inflation but nothing more than that.

10           In the second scenario, I do provide a

11   calculation where upon Mr. Amos's one-year anniversary

12   with the Lampo Group his salary is raised to the level

13   that it had been from his prior employment with the BLT

14   Communications Group.

15           Now, in that second scenario I don't specify

16   whether that raise would have been due to a raise in

17   base pay or whether it would have been due to profit

18   sharing.  It would have come from one of those sources.

19   But specifically whether that would have been profit

20   sharing or whether the profit sharing would have been

21   something in addition, on top of that, that I don't

22   specify.

23   Q.        So going back to paragraph 37 again, where

24   you provided the range of values of economic loss

25   involved -- 52,537 to 237,513 -- is the difference in

1  those two values essentially whether he would have --

2  whether Lampo would have matched his BLT Communications

3  pay after one year?

4  A.          That's correct.  That's correct.

5  Q.          Okay.

6  A.          The lower figure is based on $90,000.  There

7  really is no profit sharing in that scenario.  His

8  wages go up 5 percent with general price inflation, but

9  I don't know that I would refer to that as a -- as

10  profit sharing.

11          In the second scenario, his wages do go up

12  significantly.  Perhaps that comes in the form of

13  profit sharing, but it might have come through some

14  other mechanism.  My understanding is that the Lampo

15  Group had pledged to match his prior earnings.  Whether

16  that would have been done through bonuses or profit

17  sharing or just an increase in base pay, that I don't

18  know and I don't make an assumption about.

19  Q.          Okay.  Paragraph 57, you write:  The

20  economic losses calculated in this analysis may need to

21  be adjusted for four factors.

22          First, you reference lost home equity equal

23  to $695,000 and $48,860 in realtor fees and

24  commissions.  How did you reach those figures?

25  A.          The first figure is a comparison of the sale

1    price of Mr. Amos's home, the price he sold the home

2    for when he moved from California to Tennessee; it's a

3    difference in that price and the price that that same

4    house listed for sale several years later, upon

5    Mr. Amos's return to California after his employment

6    termination with the Lampo Group.

7              The transaction costs are from a -- I guess

8    you would call it a mortgage statement -- a statement

9    from a mortgage broker on what -- on what Mr. Amos

10   incurred in order to sell his house for his move to

11   Tennessee.

12   Q.        Okay.

13   A.        And my understanding is this is a damage

14   element that Mr. Amos is claiming.  He is claiming that

15   absent the actions of the Lampo Group, he wouldn't have

16   left California and wouldn't have sold his home.

17   Q.        Okay.  Let's break it down.

18             So the home equity, you said you compared

19   the price that he sold the home for when he left

20   California to what it was listed for sale when?

21   A.        I have a statement on the house being for

22   sale and an amount that the house was for sale for, and

23   it's -- it's information that's in a -- I guess you

24   would say it's an advertisement or a listing by a

25   broker for the house.  And I'm sure there is a date on

1    the brokerage form.  Off the top of my head, I don't
2    remember what that date is.  But it would have been the
3    price Mr. Amos would have had to have paid to re-obtain
4    that house.
5    Q.        Okay.  So that's -- that's what it was
6    listed for.  But do you know whether the house actually
7    sold or not?
8    A.        I do not, no.
9    Q.        Okay.  And so, naturally, then, you don't
10   know the amount it may have sold for.
11   A.        That's correct.
12   Q.        Okay.  Beyond subtracting the listing
13   price -- rather, the sale price from the listing price,
14   did you do any other analysis to reach $695,000?
15   A.        No.
16   Q.        Do you have any information about Mr. Amos's
17   efforts to sell his home when he moved to Tennessee?
18   A.        I have some information from him.
19   Q.        Okay.
20   A.        My understanding is he needed to sell his
21   home.  My understanding is that the Lampo Group
22   suggested that they use a -- suggested he use a
23   realtor -- a realtor that was a vendor recommended by
24   them, an endorsed vendor.  My understanding is he used
25   that vendor.

1          And I do have information on the -- I've
2   been calling them transaction costs.  I think they
3   could also be called the closing costs for that house
4   sale.  Certain realtor's fees were incurred and other
5   transaction costs.
6   Q.          Okay.  In this report are you providing any
7   expert testimony regarding the housing market where
8   Mr. Amos's home in California was located when he sold
9   it?
10  A.          No.
11  Q.          Same question, but when he could have bought
12  it back.  Are you providing any expert testimony
13  regarding the housing market in that location at the
14  time the house was relisted?
15  A.          At this time I have not been asked to, no.
16  Q.          Okay.  The transaction costs, the 48,860,
17  other than reviewing the -- I don't know if it was the
18  HUD statement, or whatever it was -- did you do any
19  other analysis to reach that figure?
20  A.          I did.  I did make some adjustments to those
21  closing costs.  For example, I did not include
22  principal and interest and tax payments that are
23  included on that statement but that Mr. Amos would have
24  incurred whether he had sold the house or had kept the
25  house.  So I did make some adjustments or modifications

Case 3:21-cv-00923   Document 222-1   Filed 06/23/25   Page 36 of 58 PageID #: 5360

1   to that statement.

2   Q.          Anything else beyond those?

3   A.          No.  My intent was to only capture those

4   costs that would have been avoided if Mr. Amos had not

5   sold the home.

6   Q.          In this report are you providing any expert

7   testimony regarding Mr. Amos's decision to leave

8   California to take a position with Lampo in Tennessee?

9   A.          Well, I think the expert opinion I might

10  provide would be that he was attempting to mitigate his

11  damages and he did so successfully.

12  Q.          Well, so I'm -- I'm going to get to that.

13  But I'm talking about moving from California to

14  Tennessee.  That decision.  Are you providing any

15  expert testimony about that decision, to leave

16  California to come to Lampo?

17  A.          Oh, I'm sorry.  I thought you were talking

18  about going from Tennessee back to California.

19  Q.          I'll get -- I'll get to that one, yeah.

20              But, yeah, so California to Tennessee, are

21  you providing any expert testimony on that decision?

22  A.          If I understand your question correctly, I

23  believe that -- that move was necessitated by him

24  accepting the job with the Lampo Group.

25  Q.          Okay.  And what do you base that conclusion

1  on?

2  A.          I guess I haven't done any independent

3  investigating.  But it was my understanding that in

4  order to take the job with the Lampo Group, Mr. Amos

5  had to move; that it was -- that he didn't have the

6  option of working for the Lampo Group in California.

7  Q.          Okay.  And is -- is that conclusion based on

8  information provided by Mr. Amos?

9  A.          You know, I really haven't discussed that

10  with Mr. Amos.  I assumed that the move was necessary.

11  I don't know that I asked him whether it was necessary

12  or not.

13  Q.          Okay.  Now, the move back to California, you

14  sort of already answered the question.  So -- but I'll

15  ask it again.

16              Are you providing any expert testimony

17  regarding his decision to move from Tennessee back to

18  California?

19  A.          My testimony on that would be that was

20  Mr. Amos's attempt to mitigate his damages, and he was

21  successful.  His new job with CMP in California more

22  than replaced his earnings with the Lampo Group.

23  Q.          When did Mr. Amos begin working at CMP?

24  A.          In about July of 2021.

25  Q.          And so that would have been roughly almost a

1  year after he was terminated from Lampo; correct?

2  A.        Yes.

3  Q.        What information have you been provided or

4  obtained about Mr. Amos's efforts to find new

5  employment after he was terminated by Lampo, during

6  that, let's say, 11-month period?

7  A.        I have -- I have information from Mr. Amos

8  on different jobs he had applied for, seeking

9  replacement employment.  I've got information on who

10  some of those employers were and cover letters that he

11  sent to them.

12  Q.        Okay.  Has all the information that you

13  have -- strike that.

14            All the information that you have regarding

15  his efforts to seek replacement employment, has all

16  that information come directly from Mr. Amos or his

17  lawyers?

18  A.        Yes.

19  Q.        Okay.  In connection with this report, did

20  you do any kind of analysis of the job market, the

21  relevant job market, in the Nashville area from the

22  time he was terminated by Lampo to the time that he

23  took the position with CMP?

24  A.        I didn't do any separate analysis

25  specifically for this case.  But as a labor economist,

1    I study and examine labor markets essentially

2    continuously.  And so I am aware of what the labor

3    market would have been like during this period of time,

4    what various unemployment rates would have -- would

5    have been like.

6              I am also aware, from the economics

7    literature, how long it typically takes people --

8    workers -- to replace earnings after an employment

9    interruption based on information from academic

10   studies.

11   Q.         From the date that Mr. Amos was terminated

12   until he accepted or started the position with CMP,

13   were there any positions in the Nashville area similar

14   to the position he held at Lampo?

15   A.         I have some information on positions that

16   Mr. Amos applied for.  I haven't -- I guess they're

17   similar in some regards.  That's somewhat subjective.

18   Certainly they were positions that he believed he was

19   qualified for.  They wouldn't have been alike in all

20   aspects as his employment was for the Lampo Group.

21   Q.         But have you -- have you done any kind of

22   independent analysis, beyond what Mr. Amos has told

23   you, of the positions that were available that were

24   comparable to his position at Lampo during that period,

25   that 11-month period?

1    A.          No.

2    Q.          Do you believe that Mr. Amos had to move

3    back to California to mitigate his damages in this

4    case?

5    A.          I don't believe that he necessarily had to

6    move back to California to mitigate his damages.  But

7    since he did mitigate his damages, from a standpoint of

8    calculating economic losses, from an economist's

9    standpoint, it really doesn't matter whether he

10   mitigates damages by staying in Tennessee or moving to

11   California.  The fact that he did mitigate those

12   damages about a year after he left the Lampo Group

13   is -- in my opinion is quick time.

14   Q.          And what's that opinion based on?

15   A.          There are a number of economic studies that

16   suggest that it takes individuals a substantial period

17   of time to find replacement employment.  And even when

18   they do find their next job, there is often a gap in

19   wages.  There is often a difference in what they had

20   been earning.  And that wage differential or that

21   earnings gap can persist for many years.

22          In this case, Mr. Amos found a job that more

23   than replaced his earnings from the Lampo Group, and

24   that's -- I said a moment ago -- it was -- it was quick

25   time.

1        Most economic studies show that for the vast

2   majority of workers, they continue to experience a gap

3   or a reduction in earnings for years into the future.

4   Q.        Sitting here today, do you know whether

5   Mr. Amos could have mitigated his damages by remaining

6   in Tennessee, in the Nashville area specifically?

7   A.        I didn't specifically examine that.  It's

8   possible that he could have, or it's possible that he

9   might not have.  But the fact that he did completely

10  mitigate his damages to some extent makes where he

11  mitigated his damages, from my calculations,

12  unimportant.

13             MR. CROWELL:  If it's okay with you

14  guys, let's take a ten-minute break.  We may be done.

15             THE VIDEOGRAPHER:  We're going off the

16  record.  The time is now 11:04.

17             (Recess taken from 11:04 A.M. to

18              11:18 A.M.)

19             THE VIDEOGRAPHER:  We're back on the

20  record, and the time is 11:18.

21  BY MR. CROWELL:

22  Q.        All right, Dr. Baum.  Famous last question,

23  which usually means at least five more.  But we're near

24  the end here.

25             In paragraph 57 -- again, we're back to

1    these adjustments for -- possibly for four factors.

2              The second possible adjustment you

3    reference, there in the middle of paragraph 57:

4    Ms. Amos had earned an average of $11,720 per year as a

5    copywriter over the 2015 to 2019 period while in

6    California, but Ms. Amos did not have employment or

7    earnings from the labor force while Mr. Amos worked for

8    the Lampo Group or since Mr. Amos's employment

9    termination from the Lampo Group, which is $26,394 in

10   earnings from July 31, 2020, to the writing of this

11   report.

12             Do you know whether -- strike that.

13             Do you know why Ms. Amos was unemployed

14   while Mr. Amos worked for Lampo?

15   A.        I don't know.  My understanding is that she

16   stayed behind in California for a brief period of time

17   but eventually moved to Tennessee.

18             But I should add that the loss period for

19   this damage element does not run when Mr. Amos was

20   employed for the Lampo Group.

21   Q.        Okay.  When does it run?

22   A.        It runs from the date of his termination in

23   2020 until the writing of this -- until the writing of

24   the report.

25   Q.        I just read that.  Yeah, sorry about that.

1          So do you know whether she has sought

2    employment since July 31, 2020?

3    A.          My understanding is that she has sought

4    employment but has not been able to find subsequent

5    work like she had before her move to Tennessee.

6    Q.          Do you know specifically whether she has

7    applied for comparable positions?

8    A.          No.

9    Q.          Okay.  Do you know -- have you done any

10   analysis of the job openings, copywriter job -- or

11   comparable job openings since July 31, 2020, in

12   Tennessee or California?

13   A.          No.

14               MR. CROWELL:  Okay.  All right.  We are

15   done.  Thank you so much.

16               Well, I'm done.

17               MS. IRWIN:  Yeah, I've got a few

18   follow-ups here which shouldn't take too long.

19                    EXAMINATION

20   BY MS. IRWIN:

21   Q.          Dr. Baum, could you give me a brief summary

22   of your educational background.

23   A.          Yes.  I went to college at Wake Forest

24   University.  I got a Bachelor's Degree in economics and

25   one in political science in 1995.  I went to graduate

1    school at the University of North Carolina in Chapel

2    Hill and earned a Ph.D. in economics in May of 1999.

3    Q.          Do you do any kind of continuing education?

4    A.          In academics, our continuing education comes

5    in the form and is evidenced by our publications in

6    academic journals and peer-reviewed journals.  These

7    are articles that an economist like me would publish

8    that involve economic research.

9               And so rather than us necessarily going back

10   to school, our task in academics is to continue to read

11   and research and learn and investigate.  And the

12   results of those efforts should take the form of a

13   peer-reviewed publication.

14   Q.          And have you continued to be published since

15   obtaining your Ph.D.?

16   A.          Yes.  And my resumé, which is included in

17   the report, includes my publications over the last 15

18   or 20 years.

19   Q.          Okay.  Can you give me a summary of your

20   experience since obtaining your Ph.D. in the area of

21   economics?

22   A.          I graduated with my Ph.D. in economics from

23   UNC in May of 1999.  A few months before that, Middle

24   Tennessee State University had interviewed me and

25   offered me a job to begin teaching at MTSU at the

1    beginning of the fall 1999 semester.  I accepted that
2    job, and I have been teaching full time as an economics
3    professor at MTSU since the fall of 1999.  I was
4    initially hired as an assistant professor, then
5    promoted to associate professor, and then full
6    professor.
7    Q.          Okay.  As we went through this report, we
8    talked about a number of calculations that you did.
9    Can you explain to me what economic theories you
10   applied to these calculations beyond just simple
11   multiplication and subtraction?
12   A.          Some of the economic theories that we use --
13   or that I used -- include information from economic
14   theory on wage growth rates, whether wages go up over
15   time.  I used information from economics on mitigation
16   and the job search process.
17              There is an economic literature that I am
18   familiar with and that I review regularly that studies
19   how long it typically takes someone to find a job.
20   This literature also examines how long it takes someone
21   to find a job after losing a job and whether a wage gap
22   typically remains.
23              If there are future lost earnings, then an
24   economist will -- will use formulas from finance to
25   discount values to present value.  I considered this in

1  that -- I considered that in this analysis.  But since

2  Mr. Amos completely mitigated his losses by the end of

3  2021, I did not include in my calculations lost future

4  earnings.  And so I didn't have future losses to

5  discount to present value.

6  Q.          Okay.  How are the calculations that you did

7  in this report different than the calculations a

8  non-economist might do?

9  A.          I evaluate factors like wage growth rates,

10  efforts to mitigate, whether mitigation occurs, whether

11  it occurs over a reasonable period of time.  I also use

12  some formulas from finance to include interest.  This

13  requires me to identify the appropriate interest rate

14  and to apply interest calculations using formulas from

15  finance.

16          Of course, in this analysis I also looked at

17  a number of employment documents in the form of

18  earnings statements, pay stubs, W-2 forms, in order to

19  identify what the appropriate levels of earnings were,

20  what employment benefits should or should not be

21  included.

22          I also used some information on

23  government-mandated benefits to appropriately value

24  employer contributions to the Social Security

25  Administration on Mr. Amos's behalf by his employers.

1  Q.          And these are all things you have come to be

2  familiar with through your education and experience?

3  A.          Yes.

4                    MS. IRWIN:  Okay.  That's all I have.

5                    MR. CROWELL:  Nothing from me.

6                    THE VIDEOGRAPHER:  This concludes the

7  video deposition.  The time is 11:26.

8                    (Proceedings concluded at 11:26 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          E R R A T A   P A G E

2          I, Charles L. Baum, Ph.D., the witness
herein, have read the transcript of my testimony and
3     the same is true and correct, to the best of my
knowledge, with the exception of the changes noted
4     below, if any:

5     Page/Line   Change                    Reason

6     _____   _____

7     _____   _____

8     _____   _____

9     _____   _____

10    _____   _____

11    _____   _____

12    _____   _____

13    _____   _____

14    _____   _____

15    _____   _____

16    _____   _____

17    _____   _____

18    _____   _____

19    _____   _____

20                 _____

21                 CHARLES L. BAUM, PH.D.

22          Sworn to and subscribed before me, this the
_____ day of _____, 2023.
23

24                 _____

25    My Commission Expires:  Notary Public
                         _____

1                      REPORTER'S CERTIFICATE

2              I, Patricia W. Smith, Licensed Court

3    Reporter, Registered Professional Reporter, and

4    Certified Court Reporter, hereby certify that I

5    reported the foregoing proceedings at the time and

6    place set forth in the caption thereof; that the

7    proceedings were stenographically reported by me; and

8    that the foregoing proceedings constitute a true and

9    correct transcript of said proceedings to the best of

10   my ability.

11             I FURTHER CERTIFY that I am not related to

12   any of the parties named herein, nor their counsel, and

13   have no interest, financial or otherwise, in the

14   outcome or events of this action.

15             IN WITNESS WHEREOF, I have hereunto affixed

16   my signature on this 1st day of February, 2023.

17

18

19

20   _____

21   PATRICIA W. SMITH, LCR, RPR, CCR

22   LCR No. 164, Expires 6/30/2024

23

24

25

## $

**$11,720 (1)**
42:4
**$180 (2)**
22:25;23:12
**$2,219.80 (1)**
21:18
**$237,513 (1)**
24:22
**$240,000 (1)**
12:22
**$26,394 (1)**
42:9
**$48,860 (1)**
32:23
**$52,537 (1)**
24:21
**$695,000 (2)**
32:23;34:14
**$90,000 (3)**
26:14,15;32:6

## A

**able (4)**
15:8;23:2;30:4;
43:4
**absent (2)**
29:1;33:15
**academic (2)**
39:9;44:6
**academics (2)**
44:4,10
**accepted (2)**
39:12;45:1
**accepting (1)**
36:24
**according (1)**
18:5
**account (1)**
29:9
**Act (3)**
15:16,17,17
**acted (1)**
17:21
**actions (1)**
33:15
**actual (2)**
9:3;26:21
**actually (4)**
12:25;14:3;16:25;
34:6
**add (2)**
30:8;42:18
**addition (3)**
11:23;30:19;31:21
**additional (1)**
9:14
**adjusted (1)**
32:21
**adjustment (1)**

**42:2**
**adjustments (3)**
35:20,25;42:1
**administering (1)**
5:9
**Administration (2)**
25:6;46:25
**admit (1)**
7:5
**advertisement (1)**
33:24
**affect (6)**
14:15,24;21:1,3,6,
19
**again (3)**
31:23;37:15;41:25
**ago (1)**
40:24
**ahead (2)**
5:23;7:4
**alike (1)**
39:19
**allegations (1)**
11:19
**almost (1)**
37:25
**Along (2)**
5:15,19
**Amos (82)**
5:18;7:2;8:8,9;
9:10,20;10:4,22;
11:18;12:10,15,21;
13:2,12,25;14:17,19;
15:2,6,13,19;16:16,
19,22,23,25;17:4,11,
21;18:13,16,19,25;
19:17,18,23;20:4,16;
21:17,22;22:11,24;
23:8;24:21,23;25:1;
26:25;27:4,6,18;
28:12;29:7,17,22;
30:3,10,16,20;33:9,
14;34:3;35:23;36:4;
37:4,8,10,23;38:7,16;
39:11,16,22;40:2,22;
41:5;42:4,6,7,13,14,
19;46:2
**Amos's (27)**
8:9;9:18;10:2;
15:12,22;23:5;24:4;
25:6,16;26:3,7,8,14;
27:1,16;29:1;31:4,
11;33:1,5;34:16;
35:8;36:7;37:20;
38:4;42:8;46:25
**amount (9)**
9:21;13:24;21:24;
22:1;27:19;29:13,18;
33:22;34:10
**amounts (1)**
11:11
**analysis (16)**
8:7;11:4,5,12;14:2;

**16:1;20:14;32:20;**
**34:14;35:19;38:20,**
**24;39:22;43:10;46:1,**
**16**
**anniversary (8)**
26:9;27:1,16;
29:11;30:15,18;31:8,
11
**answered (1)**
37:14
**anymore (1)**
6:11
**apart (1)**
30:2
**appears (1)**
23:13
**applied (5)**
16:22;38:8;39:16;
43:7;45:10
**apply (1)**
46:14
**appreciate (2)**
6:12,13
**appropriate (2)**
46:13,19
**appropriately (1)**
46:23
**approximately (1)**
12:22
**April (1)**
15:3
**area (4)**
38:21;39:13;41:6;
44:20
**arithmetic (2)**
8:24;11:23
**around (1)**
8:11
**articles (1)**
44:7
**aspects (1)**
39:20
**assigned (1)**
15:3
**assistance (1)**
7:24
**assistant (1)**
45:4
**associate (2)**
15:3;45:5
**Associates (1)**
21:23
**assume (9)**
6:11;12:17;26:13;
28:14;29:1;30:22;
31:3,3,6
**assumed (3)**
25:16;27:15;37:10
**assuming (1)**
11:16
**assumption (4)**
12:13;20:15;29:4;
32:18

**assumptions (3)**
12:3;19:9;20:20
**attach (1)**
9:21
**attachments (1)**
7:11
**attempt (4)**
12:11;15:10;30:6;
37:20
**attempted (1)**
23:8
**attempting (1)**
36:10
**attorney (4)**
5:12,14,17;10:22
**attorneys (3)**
12:10;16:20;18:13
**August (5)**
26:8,11;27:9;29:4;
30:17
**author (1)**
8:1
**available (2)**
6:12;39:23
**average (2)**
26:18;42:4
**avoided (1)**
36:4
**aware (2)**
39:2,6

## B

**Bachelor's (1)**
43:24
**back (16)**
14:19,22;17:24;
22:14,20,23;31:23;
35:12;36:18;37:13,
17;40:3,6;41:19,25;
44:9
**background (2)**
21:4;43:22
**Barton (1)**
5:14
**base (6)**
26:14;27:24;31:7,
17;32:17;36:25
**based (10)**
12:3;17:15;20:15;
27:18;29:4,22;32:6;
37:7;39:9;40:14
**Baum (17)**
5:4,22;6:1,6,20,23;
7:9,21;8:4,14;10:11;
18:7,15;19:13;22:18;
41:22;43:21
**became (2)**
14:20;17:1
**Becker (2)**
25:18,19
**become (2)**
30:14,16

**begin (5)**
18:5;19:12;27:2;
37:23;44:25
**beginning (3)**
10:12;29:3;45:1
**begins (2)**
10:13,15
**begun (2)**
29:2,12
**behalf (3)**
7:1;25:6;46:25
**behind (2)**
25:22;42:16
**believes (2)**
15:14;29:17
**benefit (5)**
23:22,24,25;24:3,
15
**benefiting (1)**
27:2
**benefits (15)**
8:8;9:5;10:1;19:4;
20:17;24:6,9,14,20,
23;25:2,12;29:2;
46:20,23
**Ben-Porath (1)**
25:18
**beyond (8)**
11:23;25:13,14;
27:5;34:12;36:2;
39:22;45:10
**binding (1)**
5:9
**birth (1)**
14:2
**bit (7)**
14:7,23,23;22:20;
24:18;31:7
**BLT (11)**
12:21,25;22:15;
27:20;28:4;29:19,23;
30:23;31:5,13;32:2
**bonuses (3)**
27:3,25;32:16
**born (2)**
12:15;14:3
**bought (1)**
35:11
**Brad (4)**
5:18;7:2;8:8;18:16
**break (2)**
33:17;41:14
**brief (2)**
42:16;43:21
**broker (2)**
33:9,25
**brokerage (1)**
34:1
**buckets (1)**
9:6

## C

**calculate (2)**
    20:16;24:21
**calculated (1)**
    32:20
**calculating (1)**
    40:8
**calculation (3)**
    8:24;9:23;31:11
**calculations (19)**
    8:21;14:5,15,22,
    25;19:8;21:2,3,7,19;
    22:9;24:23;41:11;
    45:8,10;46:3,6,7,14
**California (21)**
    14:19;33:2,5,16,
    20;35:8;36:8,13,16,
    18,20;37:6,13,18,21;
    40:3,6,11;42:6,16;
    43:12
**call (6)**
    18:16,20,21;19:18,
    24;33:8
**called (2)**
    6:2;35:3
**calling (1)**
    35:2
**can (5)**
    10:12,19;40:21;
    44:19;45:9
**caption (1)**
    6:19
**capture (1)**
    36:3
**Carolina (1)**
    44:1
**case (10)**
    6:19;7:1;8:23;
    11:20;16:21;23:19;
    25:21;38:25;40:4,22
**cases (2)**
    12:4,11
**case-specific (3)**
    10:23;11:3;19:1
**cash (1)**
    28:1
**Certain (1)**
    35:4
**certainly (3)**
    11:9;28:11;39:18
**change (5)**
    13:18;14:4,14;
    21:1,12
**changing (1)**
    13:23
**Chapel (1)**
    44:1
**characterization (1)**
    16:4
**Charles (3)**
    5:4;6:1,20
**children (1)**
    10:3
**Circuit (1)**

23:21
**circuits (1)**
    23:21
**citations (1)**
    6:21
**cite (2)**
    23:19;25:17
**citing (1)**
    12:3
**Civil (1)**
    15:16
**claimed (1)**
    8:23
**claiming (2)**
    33:14,14
**clear (1)**
    18:6
**closing (2)**
    35:3,21
**CMP (4)**
    37:21,23;38:23;
    39:12
**CMT (1)**
    24:10
**college (1)**
    43:23
**comment (2)**
    9:9,19
**commissions (1)**
    32:24
**Communications (12)**
    12:21,25;22:15;
    24:10;27:21;28:4;
    29:19,24;30:23;31:6,
    14;32:2
**companies (3)**
    13:3,5,8
**company (1)**
    13:4
**comparable (5)**
    27:20;28:2;39:24;
    43:7,11
**compared (1)**
    33:18
**comparison (1)**
    32:25
**compensation (2)**
    24:2;28:2
**complaint (3)**
    11:19;16:14;28:13
**complete (1)**
    7:10
**completely (3)**
    7:18;41:9;46:2
**complicated (1)**
    8:20
**comprehensive (2)**
    9:2;20:14
**concluded (2)**
    15:23;47:8
**concludes (1)**
    47:6
**conclusion (2)**

36:25;37:7
**conclusions (7)**
    13:19,19;14:10;
    20:9,22;21:12;27:13
**connection (2)**
    17:25;38:19
**considered (3)**
    21:5;45:25;46:1
**Consumer (1)**
    5:19
**contain (1)**
    17:10
**context (1)**
    21:4
**continue (3)**
    22:20;41:2;44:10
**continued (1)**
    44:14
**continuing (2)**
    44:3,4
**continuously (1)**
    39:2
**contributions (7)**
    25:4,5,10,10;29:9,
    12;46:24
**conversation (1)**
    11:17
**conversations (1)**
    29:6
**conveyed (1)**
    29:7
**conveying (1)**
    27:18
**copy (1)**
    6:22
**copywriter (2)**
    42:5;43:10
**correctly (2)**
    6:8;36:22
**cost (5)**
    19:19;23:12;24:14,
    15,15
**costs (13)**
    9:17,23;10:2,3;
    22:25;24:25;33:7;
    35:2,3,5,16,21;36:4
**counsel (1)**
    5:6
**couple (2)**
    8:18;19:12
**course (2)**
    16:24;46:16
**court (4)**
    5:9,21,24;7:6
**cover (2)**
    16:23;38:10
**coverage (1)**
    23:23
**CROWELL (9)**
    5:13,14;6:5;7:4,8;
    41:13,21;43:14;47:5

**D**

**damage (8)**
    8:18,20,23,25;
    9:14;19:5;33:13;
    42:19
**damages (12)**
    23:18,19;36:11;
    37:20;40:3,6,7,10,12;
    41:5,10,11
**Daniel (1)**
    5:13
**date (7)**
    14:1;15:22,24;
    33:25;34:2;39:11;
    42:22
**dates (1)**
    19:2
**Dave (1)**
    8:10
**deceptive (1)**
    16:10
**decision (5)**
    36:7,14,15,21;
    37:17
**deduct (1)**
    21:24
**defendants (1)**
    5:14
**defendants' (1)**
    5:11
**Degree (1)**
    43:24
**demarcation (1)**
    22:5
**demeaning (1)**
    15:4
**demoted (1)**
    15:2
**depend (1)**
    13:22
**deposition (4)**
    5:3;6:17;7:5;47:7
**described (1)**
    25:13
**description (2)**
    8:14;28:18
**details (1)**
    19:1
**DG (1)**
    21:17
**difference (5)**
    9:9;10:1;31:25;
    33:3;40:19
**different (2)**
    38:8;46:7
**differential (1)**
    40:20
**differently (2)**
    11:5;24:18
**diligent (3)**
    17:5,12,15

**diligently (1)**
    16:16
**directly (4)**
    13:4;21:2,6;38:16
**discount (2)**
    45:25;46:5
**discounting (1)**
    8:22
**discrimination (1)**
    23:24
**discriminatory (1)**
    15:14
**discuss (2)**
    18:19;23:17
**discussed (5)**
    19:6,17;28:11;
    30:20;37:9
**discussing (2)**
    6:18;18:24
**division (1)**
    11:24
**Doctor (1)**
    5:24
**document (2)**
    6:18;30:12
**documentation (2)**
    15:21;20:1
**documents (18)**
    10:23;11:3,6,7,10,
    22;12:10;13:12;
    15:23;18:5,6,8,12;
    21:9,10,11;28:24;
    46:17
**dollar (5)**
    9:21;14:8,13,15;
    21:10
**done (8)**
    13:15;32:16;37:2;
    39:21;41:14;43:9,15,
    16
**down (4)**
    10:16;14:6;18:3;
    33:17
**Dr (14)**
    5:22;6:6,23;7:9,21;
    8:4,14;10:11;18:7,
    15;19:13;22:18;
    41:22;43:21
**drill (2)**
    14:6,6
**due (6)**
    8:9;20:17;22:25;
    23:9;31:16,17
**duly (1)**
    6:2
**during (2)**
    9:15;38:5;39:3,24

**E**

**earlier (1)**
    20:13
**earn (1)**

Case 3:21-cv-00923    Document 222-1    Filed 06/23/25    Page 52 of 58 PageID #: 5376

27:19
**earned (6)**
14:18;21:17,22;
22:11;42:4;44:2
**earning (10)**
12:21,22,25;13:25;
17:16,17;22:13;
27:20;28:3;40:20
**earnings (35)**
8:8;9:5,15;10:1,3;
11:11;12:20,24;13:6;
14:22;18:11;19:3;
20:17;24:20;25:16,
23;26:1,7,10;27:1;
29:3,14,18;32:15;
37:22;39:8;40:21,23;
41:3;42:7,10;45:23;
46:4,18,19
**economic (20)**
8:7;9:4,25;20:16;
21:25;24:19;25:7,8,
22,22;31:24;32:20;
40:8,15;41:1;44:8;
45:9,12,13,17
**economics (8)**
25:20;39:6;43:24;
44:2,21,22;45:2,15
**economist (3)**
38:25;44:7;45:24
**economist's (1)**
40:8
**economy (2)**
26:17;27:6
**editor (1)**
15:3
**education (4)**
12:16;44:3,4;47:2
**educational (1)**
43:22
**effective (1)**
15:13
**efforts (5)**
34:17;38:4,15;
44:12;46:10
**either (4)**
10:22;11:17;12:2;
18:10
**element (4)**
9:14,22;33:14;
42:19
**elements (5)**
8:18,20,23,25;19:5
**eligibility (2)**
27:11;30:22
**eligible (3)**
24:2;30:14,16
**else (2)**
9:7;36:2
**employed (7)**
14:20;17:1;19:2;
22:15;29:8,10;42:20
**employees (6)**
26:24;27:4,10;

28:21,23;30:13
**employer (6)**
17:2;21:17;25:10;
29:9,12;46:24
**employer-provided (1)**
23:22
**employers (4)**
14:19;16:23;38:10;
46:25
**Employment (45)**
5:18;8:8,9;9:5;
10:1;15:12,14,22,24,
25;16:17;17:5,12,16,
18,22;19:3;20:5,17,
18;21:23;23:1,5,10;
24:4,10,20;25:2;
27:21;28:3;29:1;
31:13;33:5;38:5,9,
15;39:8,20;40:17;
42:6,8;43:2,4;46:17,
20
**end (3)**
8:19;41:24;46:2
**ending (1)**
6:20
**endorsed (1)**
34:24
**engage (1)**
11:22
**Entertainment (1)**
21:18
**entitled (1)**
6:19
**equal (4)**
29:3,13,18;32:22
**equity (2)**
32:22;33:18
**essentially (2)**
32:1;39:1
**estoppel (1)**
16:10
**evaluate (1)**
46:9
**even (1)**
40:17
**eventually (1)**
42:17
**evidenced (1)**
44:5
**exactly (2)**
11:9,13
**EXAMINATION (2)**
6:4;43:19
**examine (2)**
39:1;41:7
**examined (2)**
6:3;11:10
**examines (1)**
45:20
**example (9)**
11:11,13;12:14,19;
13:1;14:9,17;21:15;
35:21

**exclusively (1)**
13:15
**exhibit (9)**
7:5,6,7;10:24;11:3;
13:16;18:8;19:20;
30:9
**experience (3)**
41:2;44:20;47:2
**Expert (23)**
6:19,25;8:13;9:3,8;
10:5;11:5,12;13:19;
14:10;16:3,11;17:4,
11,20;21:12;35:7,12;
36:6,9,15,21;37:16
**explain (1)**
45:9
**extent (3)**
13:10;22:7;41:10

**F**

**fact (4)**
9:19;17:15;40:11;
41:9
**factor (2)**
20:9;27:12
**factors (3)**
32:21;42:1;46:9
**faith (3)**
16:17;17:20,21
**fall (2)**
45:1,3
**false (2)**
16:11;30:5
**familiar (2)**
45:18;47:2
**famous (2)**
6:15;41:22
**Feedback (2)**
17:25;18:1
**fees (2)**
32:23;35:4
**few (3)**
29:16;43:17;44:23
**figure (3)**
32:6,25;35:19
**figures (4)**
14:8,14,16;32:24
**finance (3)**
45:24;46:12,15
**find (7)**
17:15;38:4;40:17,
18;43:4;45:19,21
**finding (1)**
16:25
**first (11)**
7:5;8:5;18:23;
19:8;26:12,13;31:2,3,
6;32:22,25
**five (1)**
41:23
**follows (1)**
6:3

**follow-ups (1)**
43:18
**force (1)**
42:7
**Forest (1)**
43:23
**form (8)**
7:11;11:17;27:24;
32:12;34:1;44:5,12;
46:17
**forms (5)**
11:13;12:5,6;13:6;
46:18
**formulas (3)**
45:24;46:12,14
**found (1)**
40:22
**four (2)**
32:21;42:1
**fraud (1)**
16:10
**front (3)**
6:19,22;22:19
**full (3)**
10:5;45:2,5
**future (4)**
41:3;45:23;46:3,4

**G**

**gamut (1)**
10:5
**gap (4)**
40:18,21;41:2;
45:21
**general (6)**
25:20;26:15,16;
27:5;31:8;32:8
**generally (1)**
23:17
**Gilbert (1)**
25:18
**given (2)**
11:16;20:25
**giving (1)**
15:25
**gleaned (2)**
11:2;21:11
**gleaning (1)**
11:7
**globally (1)**
10:20
**goes (2)**
28:19;31:7
**Good (6)**
6:6,7,10;16:17;
17:20,21
**Gotcha (1)**
22:17
**government-mandated (1)**
46:23
**graduate (1)**
43:25

**graduated (1)**
44:22
**Group (46)**
5:19;8:10,11;
13:25;14:20;15:2,13;
16:9;17:17,18;20:18;
22:11,12;24:11,16;
25:4,5;26:4,7,9,25;
27:18,22;28:3,5,15;
29:3,8,11;31:4,12,14;
32:15;33:6,15;34:21;
36:24;37:4,6,22;
39:20;40:12,23;42:8,
9,20
**Group's (1)**
26:21
**grown (1)**
25:16
**growth (2)**
8:21;27:5;45:14;
46:9
**guess (7)**
11:8;30:10,14;
33:7,23;37:2;39:16
**guilty (1)**
16:9
**guys (1)**
41:14

**H**

**hand (2)**
5:25;21:21
**handwritten (1)**
18:22
**head (1)**
34:1
**health (4)**
23:23,23;24:9;25:8
**held (1)**
39:14
**hereafter (1)**
8:11
**high (1)**
11:1
**higher (1)**
14:23
**Hill (1)**
44:2
**hire (1)**
30:11
**hired (1)**
22:14;45:4
**home (11)**
9:24;32:22;33:1,1,
16,18,19;34:17,21;
35:8;36:5
**house (16)**
9:10,11,12,22;
10:2;33:4,10,21,22,
25;34:4,6;35:3,14,24,
25
**housing (3)**

9:22;35:7,13
**HUD (1)**
35:18
**Human (1)**
15:17

## I

**identify (4)**
5:6;11:3;46:13,19
**illegal (1)**
16:5
**impact (2)**
14:10;20:21
**important (3)**
14:2,14,16
**include (13)**
18:23;24:23,25;
25:1,2,3,7,8,12;
35:21;45:13;46:3,12
**included (4)**
19:8;35:23;44:16;
46:21
**includes (2)**
9:23;44:17
**including (1)**
23:21
**incorrect (4)**
13:18;14:9;21:11,
20
**increase (5)**
26:19;27:17,23;
28:1;32:17
**increased (3)**
26:8,11;27:8
**increases (3)**
26:21,22;27:25
**incurred (6)**
9:24;22:24;23:25;
33:10;35:4,24
**independent (2)**
37:2;39:22
**independently (10)**
12:8,15,18;13:10;
15:8;23:2,9;26:2;
30:4,6
**indicated (1)**
27:19
**Indirectly (1)**
27:14
**individuals (1)**
40:16
**infer (1)**
30:15
**inflation (5)**
25:17;26:15,17;
31:9;32:8
**information (78)**
10:18,21,22;11:2,7,
10,15,16,18,21;12:4,
5,7,9,12,12,16,20,23;
13:11,17,23,24,24;
14:1,21;15:5,18;

16:13,18,19,22,25;
18:22;19:4,7,15,16,
22;21:1,3,5,6,21;
23:4,7,8;26:3,20,23,
24;27:3,6,7;28:12,23;
29:6,22,25;30:2,11,
19;33:23;34:16,18;
35:1;37:8;38:3,7,9,
12,14,16;39:9,15;
45:13,15;46:22
**initially (2)**
9:11;45:4
**injured (1)**
24:1
**insurance (5)**
23:23;24:9,25;
25:1,8
**intending (1)**
17:3
**intent (1)**
36:3
**interest (4)**
35:22;46:12,13,14
**interruption (1)**
39:9
**interviewed (1)**
44:24
**into (3)**
20:9;27:12;41:3
**investigate (3)**
12:15;13:4;44:11
**investigated (1)**
12:18
**investigating (1)**
37:3
**investigation (1)**
13:14
**involve (1)**
44:8
**involved (1)**
31:25
**Irwin (5)**
5:17,17;43:17,20;
47:4
**issues (1)**
16:12
**items (1)**
13:15

## J

**January (1)**
5:4
**job (16)**
36:24;37:4,21;
38:20,21;40:18,22;
43:10,10,11;44:25;
45:2,16,19,21,21
**jobs (5)**
13:9;14:22;16:22;
22:8;38:8
**Jon (1)**
5:19

**journals (2)**
44:6,6
**July (7)**
8:11;15:13;20:19;
37:24;42:10;43:2,11
**justification (1)**
25:25

## K

**kept (1)**
35:24
**key (1)**
13:24
**kids (1)**
10:9
**kind (4)**
14:13;38:20;39:21;
46:21
**knowledge (3)**
20:4;24:5;26:20

## L

**labor (4)**
38:25;39:1,2;42:7
**Lampo (60)**
8:10,11;13:25;
14:20;15:2,13;16:9;
17:17,18;20:18;
22:11,12;24:6,16,24;
25:4,5;26:4,7,9,21,
25;27:10,16,18,21;
28:3,5,15,20,23;29:3,
8,10,23;31:4,12;32:2,
14;33:6,15;34:21;
36:8,16,24;37:4,6,22;
38:1,5,22;39:14,20,
24;40:12,23;42:8,9,
14,20
**last (5)**
6:8,15;16:8;41:22;
44:17
**Later (3)**
12:23;14:3;33:4
**Lauren (1)**
5:17
**Law (2)**
5:19;23:19
**lawyers (4)**
13:13;15:6,19;
38:17
**learn (1)**
44:11
**learned (1)**
6:10
**least (2)**
23:18;41:23
**leave (2)**
36:7,15
**left (3)**
33:16,19;40:12
**legal (1)**

15:25
**letter (2)**
30:9,15
**letters (2)**
16:23;38:10
**level (7)**
11:1;12:17;22:13;
28:1,2;31:5,12
**levels (1)**
46:19
**liability (2)**
8:17;16:7
**limited (1)**
8:14
**line (1)**
22:5
**list (4)**
9:4;10:24;13:16;
30:9
**listed (7)**
13:3;14:24;18:8;
19:20;33:4,20;34:6
**listing (3)**
33:24;34:12,13
**literature (3)**
39:7;45:17,20
**little (4)**
14:23,23;20:13;
31:7
**located (1)**
35:8
**location (1)**
35:13
**long (4)**
39:7;43:18;45:19,
20
**look (3)**
8:5;10:12;23:16
**looked (1)**
46:16
**looking (1)**
21:8
**looks (1)**
13:7
**losing (1)**
45:21
**loss (5)**
8:18,20;23:25;
31:24;42:18
**losses (12)**
8:7;9:5,25;20:16;
21:25;24:20;25:7,9;
32:20;40:8;46:2,4
**lost (20)**
8:7,8;9:5,5,14;
10:1,1,3;20:17,17;
23:22;24:20,20;25:3,
5,8,9;32:22;45:23;
46:3
**lower (3)**
14:23;24:15;32:6

15:25
**letter (2)** [duplicate removed?]

## M

**majority (1)**
41:2
**makes (1)**
41:10
**making (2)**
12:3,13
**many (1)**
40:21
**Mark (1)**
21:22
**Marked (1)**
7:7
**market (5)**
35:7,13;38:20,21;
39:3
**markets (1)**
39:1
**match (2)**
29:23;32:15
**matched (1)**
32:2
**matching (1)**
30:23
**matter (4)**
21:24;22:4,16;40:9
**may (6)**
9:20;32:20;34:10;
41:14;44:2,23
**Maybe (1)**
13:1
**mean (1)**
6:14
**means (1)**
41:23
**mechanism (1)**
32:14
**Media (1)**
21:18
**medical (1)**
7:17
**mentioned (2)**
27:11;29:15
**middle (4)**
23:20;29:16;42:3;
44:23
**might (4)**
9:15;32:13;36:9;
41:9;46:8
**mitigate (8)**
36:10;37:20;40:3,
6,7,11;41:10;46:10
**mitigated (3)**
41:5,11;46:2
**mitigates (1)**
40:10
**mitigation (3)**
21:24;45:15;46:10
**modifications (1)**
35:25
**moment (1)**

40:24
**monetary (1)**
23:25
**month (1)**
14:4
**months (1)**
44:23
**more (8)**
14:7;17:16;19:12;
20:13;31:9;37:21;
40:22;41:23
**morning (3)**
6:6,7,13
**mortgage (2)**
33:8,9
**Most (1)**
41:1
**move (11)**
18:3;19:11;33:10;
36:23;37:5,10,13,17;
40:2,6;43:5
**moved (3)**
33:2;34:17;42:17
**moving (3)**
22:21;36:13;40:10
**MTSU (2)**
44:25;45:3
**much (3)**
14:17;21:17;43:15
**multiplication (2)**
11:24;45:11

## N

**name (2)**
5:13;6:8
**names (1)**
13:4
**Nashville (3)**
38:21;39:13;41:6
**naturally (1)**
34:9
**near (1)**
41:23
**necessarily (2)**
40:5;44:9
**necessary (2)**
37:10,11
**necessitated (1)**
36:23
**need (3)**
7:14;10:19;32:20
**needed (1)**
34:20
**new (2)**
37:21;38:4
**next (2)**
17:2;40:18
**non-economist (1)**
46:8
**North (1)**
44:1
**note (2)**

23:20;28:25
**notes (1)**
18:21
**notices (1)**
15:21
**number (15)**
8:5,6;10:13;11:13;
18:4,16;19:21,22;
20:8,12;21:19;23:16;
40:15;45:8;46:17
**numbered (1)**
6:21
**numbers (2)**
22:4,6

## O

**oath (2)**
5:9,16
**objection (2)**
5:8,20
**objections (1)**
5:16
**obtain (2)**
26:3;28:9
**obtained (6)**
10:23;11:22;12:16;
16:14;29:6;38:4
**obtaining (1)**
44:15,20
**occurs (2)**
46:10,11
**October (1)**
18:17
**Off (2)**
34:1;41:15
**offered (1)**
44:25
**offset (1)**
21:25
**often (2)**
40:18,19
**once (1)**
23:13
**one (11)**
10:19,19;11:14;
22:10;27:14;29:24;
30:23;31:18;32:3;
36:19;43:25
**one-year (8)**
26:9;27:1,16;
29:11;30:15,18;31:8,
11
**only (1)**
36:3
**open (1)**
16:24
**openings (2)**
43:10,11
**opinion (14)**
8:13,17;16:7;17:4,
6,8,10,11,14,20,23;
36:9;40:13,14

**option (1)**
37:6
**order (3)**
33:10;37:4;46:18
**organized (1)**
6:14
**out (2)**
6:15;22:19
**over (8)**
17:25;25:16,23;
26:1;42:5;44:17;
45:14;46:11
**overview (1)**
9:2

## P

**page (3)**
6:20;8:5;18:15
**pages (1)**
18:8
**paid (2)**
9:10;34:3
**paragraph (33)**
8:6,15;9:4;10:12,
13,15;12:14,19,23;
13:1;15:1;16:9,15;
18:24;19:15;20:2;
21:16,21;22:22,22,
23;23:17,20;24:19;
25:15;26:6;28:25;
29:15,17;31:23;
32:19;41:25;42:3
**paragraphs (18)**
10:14,18;12:1,8;
13:11,18;14:9;18:4,5,
7,23;19:11,12;20:15,
20;21:8,9;22:21
**part (1)**
19:9
**party (1)**
24:1
**pay (10)**
9:13;18:11;26:18;
27:17;29:23;30:23;
31:17;32:3,17;46:18
**paying (1)**
24:16
**payments (1)**
35:22
**payroll (1)**
28:24
**peer-reviewed (2)**
44:6,13
**people (1)**
39:7
**per (3)**
22:25;23:12;42:4
**percent (7)**
26:8,11,19;27:9;
29:3,13;32:8
**Perfect (1)**
10:10

**Perhaps (1)**
32:12
**period (11)**
9:16;26:17;38:6;
39:3,24,25;40:16;
42:5,16,18;46:11
**persist (1)**
40:21
**pertinent (1)**
19:8
**PhD (7)**
5:4;6:1,20;44:2,15,
20,22
**phone (5)**
18:16,20,21;19:17,
24
**plaintiff (2)**
5:18;7:1
**plan (7)**
8:17;15:25;16:7;
25:11;28:6,15,18
**play (1)**
14:21
**please (2)**
5:6,12
**pledge (2)**
26:25;29:17
**pledged (3)**
29:18,23;32:15
**plus (1)**
10:2
**political (1)**
43:25
**position (5)**
36:8;38:23;39:12,
14,24
**positions (6)**
16:24;39:13,15,18,
23;43:7
**possible (10)**
13:21,21;14:12;
20:23,24;21:14,14;
41:8,8;42:2
**possibly (1)**
42:1
**post-termination (1)**
22:6
**potential (1)**
10:4
**practices (1)**
16:10
**precise (1)**
14:1
**prepared (2)**
7:12,21
**preparing (1)**
7:24
**present (3)**
8:21;45:25;46:5
**pretenses (1)**
16:11
**pre-termination (3)**
22:6,8,16

**pretty (1)**
6:16
**price (14)**
9:10,12,12;25:17;
32:8;33:1,1,3,3,19;
34:3,13,13,13
**prices (2)**
9:10;10:2
**principal (1)**
35:22
**principles (1)**
25:22
**prior (6)**
22:14;27:21;28:3;
31:5,13;32:15
**probably (2)**
14:2;30:8
**Proceedings (1)**
47:8
**process (1)**
45:16
**productivity (2)**
25:17;26:4
**professor (4)**
45:3,4,5,6
**profit (7)**
27:2,11,12,25;28:6,
15,18,21;30:14,17,
22;31:17,19,20;32:7,
10,13,16
**profits (1)**
30:13
**project (4)**
22:10;26:6,10,14
**projected (1)**
25:3
**projection (1)**
27:8
**promissory (1)**
16:10
**promoted (1)**
45:5
**pronouncing (1)**
6:8
**Protection (1)**
15:17
**provide (13)**
8:7,17,24;16:7;
17:4,6,14;21:4;
25:21;30:11;31:1,10;
36:10
**provided (17)**
10:21;12:4;13:12;
15:5,18,20;16:18,19;
18:13;19:19;26:2;
28:20;29:22;30:1;
31:24;37:8;38:3
**provides (2)**
12:20;21:4
**providing (12)**
9:7,9;12:5;16:3;
17:3,20;35:6,12;36:6,
14,21;37:16

**Public (1)**
15:16
**publication (1)**
44:13
**publications (2)**
44:5,17
**publish (1)**
44:7
**published (1)**
44:14
**purposes (1)**
30:21
**put (2)**
11:4;12:23

**Q**

**qualified (1)**
39:19
**quick (2)**
40:13,24
**quickly (1)**
6:16

**R**

**raise (4)**
5:25;26:25;31:16,
16
**raised (3)**
22:13;31:5,12
**raising (1)**
26:1
**Ramsey (4)**
8:10,10;30:9,11
**range (2)**
24:21;31:24
**rate (1)**
46:13
**rates (4)**
8:21;39:4;45:14;
46:9
**rather (2)**
34:13;44:9
**reach (3)**
32:24;34:14;35:19
**read (2)**
42:25;44:10
**reading (1)**
11:6
**ready (1)**
5:21
**really (10)**
8:20;14:16,21;
21:2,18;22:4,8;32:7;
37:9;40:9
**realtor (3)**
32:23;34:23,23
**realtor's (1)**
35:4
**reasonable (1)**
46:11
**reasons (1)**

7:18
**receipts (2)**
19:18;23:11
**receive (2)**
24:2;29:8
**received (7)**
12:9;23:13;24:6;
26:18;27:6,17;30:2
**receiving (1)**
29:2
**Recess (1)**
41:17
**recommended (1)**
34:23
**record (4)**
5:2,8;41:16,20
**recoverable (2)**
23:18,19
**reduced (1)**
22:1
**reduction (1)**
41:3
**refer (1)**
32:9
**reference (10)**
6:21;14:17;16:9;
18:16;21:16;23:17;
29:16;30:13;32:22;
42:3
**referenced (2)**
12:24;18:6
**reflect (1)**
26:16
**regarding (9)**
16:4,12;26:3,21;
35:7,13;36:7;37:17;
38:14
**regards (1)**
39:17
**regularly (1)**
45:18
**related (3)**
20:5;21:9;23:5
**relevant (2)**
11:14;38:21
**relisted (1)**
35:14
**remained (1)**
29:10
**remaining (1)**
41:5
**remains (2)**
31:7;45:22
**remember (1)**
34:2
**re-obtain (1)**
34:3
**replace (5)**
23:24;24:7,9,13;
39:8
**replaced (2)**
24:24;25:2;37:22;
40:23

**replacement (9)**
16:17;17:5,12,16,
22;24:14;38:9,15;
40:17
**report (35)**
6:13,18,19,22,25;
7:9,15,21;8:2,4,6,14,
19;9:7;10:11;13:20;
14:11;17:10;18:9,15,
23;19:9;20:7,10;
21:13;27:13;30:21;
35:6;36:6;38:19;
42:11,24;44:17;45:7;
46:7
**reporter (4)**
5:9,21,24;7:6
**represent (1)**
5:7
**repurchase (1)**
9:13
**require (4)**
8:20;11:4,5,12
**requires (1)**
46:13
**research (2)**
44:8,11
**respect (3)**
11:2,21;17:19
**results (1)**
44:12
**resumé (3)**
12:17,17;44:16
**retaliatory (1)**
15:15
**retirement (4)**
25:4,9,10;29:2
**return (1)**
33:5
**review (1)**
45:18
**reviewed (2)**
12:5;18:6
**reviewing (1)**
35:17
**right (14)**
5:23,25;6:10;7:9;
10:11;16:15;17:24;
18:3;19:11;20:11;
22:17,18;41:22;
43:14
**Rights (2)**
15:16,17
**role (1)**
14:21
**roughly (1)**
37:25
**run (2)**
42:19,21
**runs (1)**
42:22

**S**

**salary (8)**
17:1;22:13,16;
27:23,25;30:12;31:4,
12
**sale (7)**
32:25;33:4,20,22,
22;34:13;35:4
**same (7)**
14:13;15:11;16:11;
19:21;30:24;33:3;
35:11
**saying (3)**
17:14;18:25;28:19
**scenario (11)**
26:12,13;27:15,24;
31:2,3,6,10,15;32:7,
11
**scenarios (4)**
22:10;26:13;27:15;
31:1
**school (2)**
44:1,10
**science (1)**
43:25
**scope (4)**
8:4,13;9:2;23:18
**search (1)**
45:16
**second (7)**
27:15,24;28:15;
31:10,15;32:11;42:2
**Security (3)**
25:6,9;46:24
**seek (2)**
9:20;38:15
**seeking (4)**
17:5,12,21;38:8
**sell (4)**
9:24;33:10;34:17,
20
**semester (1)**
45:1
**sent (3)**
16:23;30:10;38:11
**sentence (1)**
16:8
**separate (1)**
38:24
**series (1)**
10:13
**session (1)**
23:12
**several (1)**
33:4
**severance (1)**
15:21
**sharing (19)**
27:2,12,12,25;28:6,
15,18,21;30:13,14,
17,22;31:18,20,20;
32:7,10,13,17
**show (1)**
41:1

**shows (2)**
12:24;26:17
**side (6)**
13:3,8;14:18,22;
21:17;22:8
**significant (1)**
27:17
**significantly (1)**
32:12
**similar (8)**
17:19;19:13;20:12,
24;23:14;24:17;
39:13,17
**simple (2)**
11:23;45:10
**simply (1)**
11:6
**Sitting (1)**
41:4
**Sixth (1)**
23:21
**Social (3)**
25:6,9;46:24
**sold (9)**
9:12;33:1,16,19;
34:7,10;35:8,24;36:5
**sole (1)**
8:1
**Solutions (2)**
8:10;30:10
**someone (3)**
11:12;45:19,20
**somewhat (1)**
39:17
**son (6)**
9:18;10:8,9,9;19:5;
22:25
**son's (1)**
23:5
**sorry (5)**
9:11;10:9;18:1;
36:17;42:25
**sort (5)**
8:24;20:24;22:21;
25:25;37:14
**sought (4)**
16:16;20:5;43:1,3
**sources (3)**
25:18;26:16;31:18
**speaking (1)**
23:18
**specific (2)**
25:21;27:3
**specifically (7)**
28:17;30:16;31:19;
38:25;41:6,7;43:6
**specify (1)**
28:1;31:15,22
**spoke (1)**
18:25
**standpoint (2)**
40:7,9
**start (5)**

5:11;10:14,20;
18:24;19:14
**started (2)**
6:17;39:12
**state (3)**
5:7;24:19;44:24
**statement (8)**
12:20,24;33:8,8,
21;35:18,23;36:1
**statements (5)**
13:6,7;18:10,11;
46:18
**statutes (1)**
16:2
**stayed (1)**
42:16
**staying (1)**
40:10
**Stephen (1)**
5:15
**still (1)**
26:14
**stints (1)**
19:3
**stipulate (1)**
5:8
**Stovall (1)**
5:15
**Street (1)**
5:19
**strike (7)**
17:9;23:3,14,15;
30:3;38:13;42:12
**stubs (2)**
18:11;46:18
**studies (4)**
39:10;40:15;41:1;
45:18
**study (1)**
39:1
**subjective (1)**
39:17
**submitted (2)**
7:1,12
**subsequent (2)**
16:25;43:4
**substantial (1)**
40:16
**subtracting (1)**
34:12
**subtraction (2)**
11:23;45:11
**successful (1)**
37:21
**successfully (1)**
36:11
**suggest (1)**
40:16
**suggested (2)**
34:22,22
**summarize (2)**
8:19;9:17
**summary (2)**

43:21;44:19
**supplemental (1)**
8:18
**support (1)**
27:7
**suppose (1)**
11:11
**sure (3)**
16:8;29:21;33:25
**swear (1)**
5:22
**sworn (1)**
6:2

**T**

**talked (1)**
45:8
**talking (2)**
36:13,17
**task (1)**
44:10
**tax (1)**
35:22
**teaching (2)**
44:25;45:2
**telephone (1)**
11:17
**ten-minute (1)**
41:14
**Tennessee (16)**
15:16,17;33:2,11;
34:17;36:8,14,18,20;
37:17;40:10;41:6;
42:17;43:5,12;44:24
**terminated (11)**
15:12,22,24;22:12;
23:22;24:4,24;38:1,5,
22;39:11
**termination (15)**
8:9;15:14,25;16:5;
17:18;20:5,18;21:23;
23:1,6,10;29:1;33:6;
42:9,22
**testified (2)**
6:3;29:20
**testify (1)**
7:18
**testimony (12)**
9:3,8;10:6;16:4,11;
35:7,12;36:7,15,21;
37:16,19
**theoretical (1)**
25:25
**theories (2)**
45:9,12
**theory (2)**
25:22;45:14
**therapy (13)**
9:17,20;10:3,4,7;
19:5,19;20:5;22:24;
23:5,9,11,12
**third-party (1)**

14:18
**though (2)**
16:2;21:6
**thought (1)**
36:17
**three (1)**
25:18
**times (2)**
29:16
**Title (1)**
15:15
**Today (7)**
5:4,10;6:16;7:15,
19;17:20;41:4
**told (3)**
12:22;29:10;39:22
**took (1)**
38:23
**top (2)**
31:21;34:1
**totals (2)**
24:25;25:7
**transaction (6)**
9:23;10:2;33:7;
35:2,5,16
**true (6)**
11:17;15:9;20:16,
21;22:7;30:5
**truthfully (1)**
7:18
**try (1)**
10:25
**two (6)**
9:6;25:7,14;26:12;
31:1;32:1
**typical (1)**
26:18
**typically (3)**
39:7;45:19,22
**typo (1)**
24:1

**U**

**ultimate (5)**
13:19;14:10;20:9,
22;27:12
**ultimately (1)**
21:12
**Um (1)**
11:25
**UNC (1)**
44:23
**under (1)**
8:5
**unemployed (1)**
42:13
**unemployment (1)**
39:4
**unimportant (1)**
41:12
**University (3)**
43:24;44:1,24

**up (7)**
22:19;25:23;26:15;
31:7;32:8,11;45:14
**update (1)**
7:14
**upon (9)**
26:8;27:1,15;
29:11;30:10,15;31:8,
11;33:4
**use (7)**
22:8;26:16;34:22,
22;45:12,24;46:11
**used (4)**
34:24;45:13,15;
46:22
**using (2)**
13:12;46:14
**usually (1)**
41:23

**V**

**value (7)**
8:21;9:21;25:3,5;
45:25;46:5,23
**values (4)**
21:10;31:24;32:1;
45:25
**various (3)**
13:3;16:2;39:4
**vast (1)**
41:1
**vendor (1)**
34:23,24,25
**verified (1)**
13:10
**verify (7)**
12:8,11;15:8;23:2,
9;30:4,7
**versus (1)**
22:6
**via (1)**
5:10
**video (2)**
5:3;47:7
**VIDEOGRAPHER (5)**
5:1,23;41:15,19;
47:6
**VII (1)**
15:16
**violation (2)**
15:15;16:1

**W**

**W-2 (6)**
11:13;12:5,6;13:6;
18:10;46:18
**wage (12)**
26:14,15,16,21,22;
27:5;31:7,8;40:20;
45:14,21;46:9
**wages (6)**

26:1;27:8;32:8,11;
40:19;45:14
**Wake (1)**
43:23
**way (9)**
6:13;8:16;10:15,
16;11:7;14:13;22:19,
21;30:25
**Wednesday (1)**
5:4
**week (2)**
22:25;23:13
**what's (1)**
40:14
**wife (2)**
9:15;20:4
**wife's (1)**
10:3
**without (1)**
28:19
**witness (2)**
5:10;6:2
**Woollen (1)**
21:22
**words (2)**
6:15;7:10
**work (7)**
13:3,5,8;14:18;
15:4;17:1;43:5
**worked (3)**
28:16;42:7,14
**worker (2)**
23:22;26:18
**workers (2)**
39:8;41:2
**worker's (1)**
25:23
**working (2)**
37:6,23
**works (1)**
25:20
**write (8)**
8:6;15:1;16:15;
20:14;22:23;25:15;
26:6;32:19
**writing (4)**
20:7;42:10,23,23
**wrong (1)**
14:4
**wrongful (1)**
15:15

**Y**

**year (7)**
14:3;17:17;29:24;
32:3;38:1;40:12;42:4
**years (4)**
33:4;40:21;41:3;
44:18

**Z**

**Zoom (3)**
5:3,10;17:25

**1**

**1 (2)**
7:6,7
**10:08 (1)**
5:5
**11:04 (2)**
41:16,17
**11:18 (2)**
41:18,20
**11:26 (2)**
47:7,8
**11-month (2)**
38:6;39:25
**12 (5)**
15:1;26:8,11;27:9;
29:4
**12th (1)**
30:17
**13 (1)**
15:11
**15 (2)**
16:15;44:17
**18 (1)**
5:4
**19 (7)**
10:16,19;12:1,8;
13:11,18;14:9
**1995 (1)**
43:25
**1999 (4)**
44:2,23;45:1,3

**2**

**2 (4)**
8:5,6,15;9:4
**20 (4)**
18:4,7;21:9;44:18
**2001 (1)**
26:17
**2015 (1)**
42:5
**2018 (1)**
14:23
**2019 (2)**
14:19;42:5
**2020 (15)**
8:12;15:3,13;
20:19;26:8,11,21;
27:9;28:21;29:4;
30:17;42:10,23;43:2,
11
**2021 (2)**
37:24;46:3
**2022 (1)**
18:17
**2023 (1)**
5:5
**21 (1)**

18:17
**22 (1)**
21:16
**237 (1)**
24:22
**237,513 (1)**
31:25
**25 (1)**
21:22

**3**

**31 (7)**
8:11;15:13;18:16;
20:19;42:10;43:2,11
**32 (4)**
18:4,7,8;21:10
**33 (6)**
18:8,15;19:11,14,
15;22:23
**34 (7)**
19:12,21,22;20:8,
15,21;23:14
**35 (3)**
6:21;20:12,14
**36 (1)**
6:20
**36-page (1)**
6:18
**37 (2)**
24:19;31:23
**39 (2)**
23:16,17

**4**

**4 (2)**
29:3,13
**401k (2)**
25:11;29:9
**43 (2)**
6:21;25:15
**44 (1)**
26:6
**45 (1)**
28:25
**48,860 (1)**
35:16

**5**

**5 (16)**
10:13,16,18;12:1,8,
14;13:11,18;14:9;
20:15,20;26:8,11,19;
27:9;32:8
**52,537 (1)**
31:25
**56 (1)**
29:15
**57 (3)**
32:19;41:25;42:3

**6**

**6 (1)**
12:19

**7**

**7 (1)**
13:1

**9**

**9 (1)**
15:3
**90,000 (1)**
31:7