# In The Matter Of:
*Brad Amos v.*
*The Lampo Group, LLC, et al*

*Video Deposition of Brad Amos*
*September 26, 2022*

**nashvillecourtreporters**

Online Scheduling: ncrdepo.com | 615.885.5798

*Original File 2022-09-26 Brad Amos.txt*
*Min-U-Script® with Word Index*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BRAD AMOS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 3:21-cv-00923 |
| v. | ) |
| | ) District Judge Richardson |
| THE LAMPO GROUP, LLC, et al, | ) |
| | ) Magistrate Judge Holmes |
| | ) |
| Defendants. | ) |

-----------------------------------------------------------

VIDEO DEPOSITION OF

BRAD AMOS

Monday, September 26, 2022

-----------------------------------------------------------

```
APPEARANCES:

For the Plaintiff:      Mr. Jonathan A. Street
                        Ms. Lauren Irwin
                        The Employment & Consumer Law
                          Group
                        1720 West End Avenue
                        Suite 402
                        Nashville, TN  37203
                        615-850-0632
                        street@eclaw.com
                        lauren@eclaw.com

For the Defendants:     Ms. Leslie Goff Sanders
                        Jackson Lewis, P.C.
                        611 Commerce Street, Suite 3102
                        Nashville, TN 37203
                        615-565-1661
                        leslie.sanders@jacksonlewis.com

                        Mr. Daniel Cortez
                        General Counsel at Ramsey
                          Solutions
                        1011 Reams Fleming Boulevard
                        Franklin, TN  37064

The Videographer:       Ms. Cheryl Erwin
                        Erwin Video
                        1013 River Ridge Terrace
                        Nashville, TN  37221
                        615-646-1615
                        cerwinvideo@comcast.net




Reported By:
Jennifer B. Carollo, LCR, RPR, CCR
```

1  about.  But there were lots of -- you know, after COVID
2  started in March, you know, I think the -- kind of the
3  corrosiveness of a lot of those speeches had
4  intensified a lot in which I didn't have a lot of
5  understanding of why or what -- what the problem was.
6  But it seemed like it was, and, of course, by this
7  point, I was doing these one-on-ones with Lara, and
8  then she would ask me to -- to weigh in on that.  You
9  know, it was, like, what do you think?  And I'm, like,
10 I don't know.  I don't -- it's not really my business.
11 Q.         Okay.  So let's -- let take one thing at a
12 time in what you just told me about.  So you said
13 Suzanne Simms had a rally?
14 A.         It was an all employee meeting, and she was
15 kind of -- she got to -- now, some of these may not
16 have been all employee meetings.  There was, like --
17 they're mixed in with Devos.
18            I said -- I mentioned earlier, like, any --
19 sometimes Devos started with a religious speaker.  They
20 would usually have an evangelical local priest who
21 would come in.  You know -- well, not priest.  I guess,
22 it would be just a pastor.  They never had priests
23 and -- or rabbis or, you know, anybody from any other
24 religions, you know, in there.  But they did have
25 usually local pastors who are evangelical would come in

1  identified as a result of what you called a "rally"?
2  A.          I don't know.
3  Q.          Okay.
4  A.          The day I was fired, they -- we have these
5  creative standups where -- I mean, they just do
6  meetings -- it's a very -- it's kind of -- it's -- I
7  haven't worked in a system like this before that was
8  very corporate where they just do these meetings all of
9  the time.  They have standups and -- and they -- they
10 would do meeting of small individual teams; department
11 meetings of 30 people; standup meetings on every Friday
12 of 200 or so people; and then the all employee
13 meetings.  So constantly, we were always in meetings.
14              And I was -- I think I even said, I was
15 having a hard time getting work done on the documentary
16 because we were in meetings all of the time.
17              And even, you know, one-one-one meetings
18 with Lara and J.B. Waggoner, I would do, like, at least
19 twice a week.
20              But the standups -- I think there was a
21 standup the day I was fired on the 31st, and they had
22 talked about that there were people who were leaving
23 today because of COVID-related reasons.  They weren't
24 ID -- ID'd, but there's -- part of a creative team
25 where they have copywriters and video team members

        I'm like, "Well, I mean, somebody got really deathly sick next to us. We don't know anything about the disease, and it seems like it's killing people. What do we need to be doing here? I mean, it seems like there's a lot of questions, and I'm not hearing a lot of answers. I'm not saying we need to shut down, but do we all need to be tested? What are we doing? What's the plan?"

        And he's like, "Don't worry. Don't worry. We've got this. We're watching. It's not a big deal."

        I'm like, okay. And after that moment, everything got very different with the way that Luke treated me, and then this original question started with a question about a missed deadline. Because, again, this deadline had not been talked about.

Q.     Okay. So let me ask you that.

A.     Let me finish. This document --

Q.     Hang on --

A.     The -- they had not talked about the deadline really being missed. David was a little miffed. He talked about it a little bit right there when it happened. He didn't mention it again. It was not mentioned again until -- because we ended up all working from home. We ended up all leaving.

        The deadline being missed was not brought up

jeopardize my job; I mean, I think it would be a good idea until -- and we can take the week, figure out what's going on, and then we can pick it up next week."

He was like, "Yeah. Sounds great."

And so it ended up by the end of the week a general order happened; everybody was sent home.

And then I called David to say, "How are we going to do the documentary? Do I need to pick up my computer and my drives? We can work from home. I think it will work."

He was like, "No, no, no. We found a loop hole we're going to get you to come in. We need you to work in house."

And I'm like, "Well, is that necessary?"

He was like, "Yeah, I want to work side by side."

And there was concerns because this -- David was still flying all over the place and shooting things for the documentary, and he had actually been on planes to New York I think the prior week. And there was a bit of uncomfort -- something being very uncomfortable sitting in close proximity in a closed bay with somebody who may or -- I mean, I don't know what his habits are or what not. But the one thing that people were saying is just stay away from other people. I

don't think they were even on the whole mask thing yet. They were really just -- the only thing, social distance as much as you can.

And they were shutting down the entire company down based on it because they were -- more people were starting to get sick in the company itself.

So David -- David -- I offered an alternative solution. I said, "Well, listen, if you want, I can come in and work. I'll just sleep in my basement." I said, "We have a new house. We have an unfinished basement. I'll sleep down there and be separated from somebody else."

"No. I don't want you to do that."

And he kind of almost wouldn't take no for an answer. And wanted me to come in, be present, and be with him. And he said, you know what, don't even worry about it. I'll put Dennis -- I'll take our assistant editor who is on the project, I'll put him in your role, and we'll swap.

And that felt odd, but I said that's fine if that's what -- it will be easier. They next week gave me my computer and -- because they had me come in. They had me -- gave me my computer. They gave me a hard drive and everything. They were having a party in my bay with, like, five or six people in the bay itself

1  they're just all evangelical priests from local
2  churches.
3           There's all of the things that they didn't
4  disclose at the front end, but you're there, and you
5  want to make it work.  And they're really nice people,
6  and the mission is great.  You're helping people get
7  out of debt.  So it -- again, it's a lot like being
8  at -- being in Japan and being invited into a home.
9  You take your shoes off as a sign of respect, and you
10 don't kick up a fuss.  And you don't say, you know,
11 this is a problem.  I hate everybody here.  It's like
12 you know, it's fine.  I can do this.  It's not a big
13 deal.  It's not infringing on my rights as -- so to
14 speak at this point.  But it became more and more and
15 more aggressive the -- more and more and more,
16 especially when COVID happened because there you have a
17 direct instance where now somebody's beliefs about
18 something and the adherence to the fact of not
19 questioning things of -- you know, which is not kind of
20 what I believe.  I believe that there's -- you know --
21 you know, prayer is a very private thing.  You don't
22 need, like, a pope or your don't need a radio or, like,
23 somebody to translate your message between you and God.
24 It's a very personal thing that you can do.  That's
25 what kind of being a Protestant is all about.

1  Otherwise, we would all be Catholic.  You want to have
2  a situation where, you know, you can have that private
3  relationship.
4           They like to put it in a very public
5  setting.  That's not a problem.  I didn't mind.  It's
6  only when then in the next year the actions and the
7  belief systems then start jeopardizing not just your
8  family, but also your friends.  I mean, that's one of
9  the reasons I didn't pull Luke aside privately and say,
10 "Hey, this is a problem, Luke.  We need to have
11 conversations about it."
12          I did it in a public setting because of the
13 rest of my department, which is, you know, put possibly
14 in jeopardy because of Amanda getting very, very sick
15 and hospitalized.  That's not her fault.  That's not
16 Ramsey's fault.  But they did get sick there, and the
17 reaction, though, was one of, well, trust me; it's
18 okay.  Let's pray it away.  We'll be fine.  Somebody
19 else is driving the car and got their hand on the
20 wheel.
21          And in my life and in my belief system,
22 there's a lot more free will and a lot less predest --
23 predetermination about things.  And the way that people
24 do things is very impactful, and the lack of doing
25 things and my adhering to these beliefs could have put

1  work at home?
2  A.         Five weeks.
3  Q.         Okay.
4  A.         I believe it was five weeks, and then there
5  was a big -- as soon as they were legally able to do
6  so, they rushed everybody back.  In the beginning, they
7  kind of did like a one-week transition period.  It was
8  like, hey, if you want to come back, great.  But you're
9  required to be in the office next week.
10             And, again, no problem.  I have never said,
11 "I have to work at home."  You know, that was their
12 recommendations.  You know, remember that was David
13 DiCicco saying, "Hey, would you like to work from
14 home?"  It was him who said that.
15             It was Lara Johnson who said, "Hey, we're
16 doing Summit.  Maybe you would like to work from home."
17             And then, of course, the federal mandate.  I
18 have no problem working from -- oh, I can distance.  I
19 was there.  I was there.  I masked in the big meetings.
20 I social distanced myself, and I stayed away from
21 people and just -- and did my work.  And never let, you
22 know, whatever my feelings are personally about my own
23 religious, you know, objections to not having any
24 objections to COVID interfere with anything I was doing
25 at the office.

demand you invent an inoculation. It was nothing like that. It was just, I'm a little surprised we don't have anything because I -- I don't know what to do when I go home tonight. Do I need to stay away from my family? Do I need to quarantine? I have people who might be high risk. What is high risk? We don't know anything.

So this -- I think, you know, because he kind of had come in here and said, "Hey, everybody, good? Y'all take a breath. Are you good? Okay. Great. Cool. Let's pray."

That literally was what it was, and when he said no response, I said, "Actually, I do have a response."

Q. Okay. So you did have a response then. Did you raise concerns at any point after that with anyone at Ramsey or anywhere else about your concerns with Ramsey's approach to COVID?

A. Lara Johnson. I mean, that was in these reorientation meetings.

Q. Uh-huh.

A. You know, where specifically, you know, it was, you know -- and, again, it's weird because it's that whole gaslighting thing where a lot of things get put in my mouth. I think she might have even been the

1  I talked with.
2           I mean, Luke is a board member, and has
3  Dave's ear.  And then Lara, you know, is the head of
4  our department.  You know, it's -- it's not really --
5  I'm not there to politic, and, you know, make everybody
6  else's day unpleasant.  And say, all right.  I blame
7  you for doing this.  You know, people knew my positions
8  about, you know, religion.  They knew where I stood on
9  things.
10          You know, it -- I didn't have to keep
11 beating the table about, you know, the COVID response.
12 You know, I had said in public with that thing with
13 Luke, I said it publicly in an effort to get people to
14 be more aware about this.  But also to say, hey, guys
15 we should probably -- this is a big deal.  We should
16 think about it.
17          Interestingly enough, it's interesting,
18 after that meeting, several people did, you know, go
19 home.  They ended up working from home that week.
20 And -- and I have no idea if that had anything to do
21 with me, but afterwards it did feel like a lot people
22 did start separating a little bit, just until the work
23 from home order was put in place, until we knew more,
24 and that was -- it was just -- maybe just
25 precautionary, the -- but it -- I think the biggest

what is the problem?"

And he's like, "Well, you always stand off to the side."

I'm like, "Well, because I'm trying to quarantine."

I asked him, "Is this about COVID?" Because I've gotten the idea that things had changed after we had that exchange.

And he said, "No, it's not about COVID. But you always stand off to the side."

And I'm like, "Well, I'm social distancing because I don't want to catch it. I've dodged it for now."

And at that point, we had, I think, 30 -- I don't know how many employees we had -- but by the end of the year they had -- Armando Lopez had said that 20 percent of the company had caught COVID or one point or another. And that was some article they released in the newspaper talking about hosting the Christmas party.

But while I was there, I know Lara kept a running tab. She kept coming to me and telling me how many people had gotten COVID. And she -- I think there was 30-something there at the time.

So I said, "No, I'm social distancing."

1    And he was like, "You keep talking over me."
2    And I'm like, "I'm just defending myself.
3    I'm just telling you what I'm telling you" --
4    He was like, "Okay."
5    I'm like, "Well, go on."
6    And he was like, "No. We're done here."
7    "Okay. So what do we do now?"
8    He was like, "Let's just go."
9    Q.    Okay. Let's --
10   A.    So that's a pretty accurate representation
11   of kind of the back and forth that, you know, kind of
12   went on.
13            MS. SANDERS: We're going to take about
14   a 30-second break so I can ask the court reporter --
15            THE VIDEOGRAPHER: Going off the
16   record. The time is now 5:31.
17            (Off the record.)
18            THE VIDEOGRAPHER: We're back on the
19   record. The time is now 5:31.
20            THE WITNESS: But it was a very
21   uncomfortable, very aggressive -- Luke got -- I think
22   he -- I don't know if he thought I was going to thank
23   him for firing me or what. And it was -- it had been a
24   very long time where they were being very, very -- had
25   been very aggressive to me. They had been very nasty

1            ERRATA PAGE

2        I, BRAD AMOS, the witness herein, have
read the transcript of my testimony and the same is
3 true and correct, to the best of my knowledge, with
the exception of the following changes noted below,
4 if any:

5   Page/Line   Change                     Reason

6   _____   _____

7   _____   _____

8   _____   _____

9   _____   _____

10  _____   _____

11  _____   _____

12  _____   _____

13  _____   _____

14  _____   _____

15  _____   _____

16  _____   _____

17  _____   _____

18  _____   _____

19
                  _____
20                BRAD AMOS

21
          Sworn to and subscribed before me, this
22   the _____ day of _____, 2022.

23
                  _____
24
                  Notary Public
25                My Commission Expires:

REPORTER'S CERTIFICATE

I, Jennifer B. Carollo, Licensed Court Reporter, Registered Professional Reporter, Certified Court Reporter, and Notary Public for the State of Tennessee, hereby certify that I reported the foregoing proceedings at the time and place set forth in the caption thereof; that the proceedings were stenographically reported by me; and that the foregoing proceedings constitute a true and correct transcript of said proceedings to the best of my ability.

I FURTHER CERTIFY that I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome or events of this action.

IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal of office this 24th day of October, 2022.

_____
JENNIFER B. CAROLLO, LCR, RPR, CCR
AND NOTARY PUBLIC FOR THE STATE
OF TENNESSEE

LCR No. 432, Expires 6/30/2024

Notary Commission Expires 6/26/2024