Q.     Have you had any specific training or background, education, in Title VII or the discrimination laws?

A.     Some, yes.

Q.     Tell me about it.

A.     We have trained our entire leadership team on Title VII.

Q.     How often?

A.     I don't remember and can't speak to exactly how often, but we have done training on that.

Q.     Did you do it before June of 2020?

A.     Yes, I do believe so.  I cannot remember a specific date.

Q.     Were you provided any training materials?

A.     I cannot remember any specific materials.

Q.     Did you do a sign-in sheet of any kind when that occurred?

A.     I don't remember.

Q.     Who did the training?  Who conducted the training?

A.     I do not remember all of the people involved, but we did utilize Armando Lopez and some other leaders.

Q.     What do you mean by other leaders?

A.     I do remember we had a group of leaders that

Case 3:20-cv-00628  Document 93-1  Filed 05/13/26  Page 16 of 30  PageID #:46297

did some training for us. I just don't remember who all was involved in that. I do remember Armando Lopez.

Q. Okay. The other leaders that you're referring to, you don't remember specifically who any of those people were?

A. No.

Q. Were they Ramsey Solutions employees?

A. For sure, yes.

Q. Were there any outside people that came in and trained the management team, third party?

A. Not that I remember.

Q. Okay. So other than these training sessions that you can't remember when they took place or who conducted them other than Armando Lopez, is there any other documentation or evidence that you would have that these trainings took place with respect to Title VII?

A. You would have to talk to Human Resources. I personally don't -- cannot speak to that.

Q. What was your understanding of Title VII based on these trainings?

A. I don't remember all the details.

Q. Are you aware that Title VII prohibits discrimination on the basis of pregnancy?

Case 3:21-cv-00923 Document 393-51 Filed 08/31/26 Page 2 of 30 PageID #: 48398

A.    Yes.

Q.    Okay.  Are you aware that Title VII prohibits discrimination on the basis of religion?

A.    Yes.

Q.    And that includes an employer imposing its religious beliefs on its employees?

MS. SANDERS:  Object to the form.  She can answer it.

THE WITNESS:  Can you restate the question?

BY MS. COLLINS:

Q.    Well, is it part of your understanding that Title VII prohibits an employer from imposing its religious beliefs on its employees?

A.    That's not my exact understanding.  My understanding is they cannot be terminated as a result of religious beliefs.

Q.    As a result of the employer's religious beliefs?

A.    Any religious beliefs.

Q.    So wouldn't terminating an employee based on a biblically-based core value be terminating them because of the employer's religious beliefs?

MS. SANDERS:  Objection.  She can answer.  Object to the form.

Case 3:20-cv-00628  Document 33-1  Filed 03/11/26  Page 3 of 30  PageID #:4699

THE WITNESS: That is not my understanding of Title VII.

BY MS. COLLINS:

Q. Okay. What is your understanding based on?

A. My understanding is based on the training that I have had.

Q. So you think it's okay to terminate an employee premised on a biblically-based core value?

A. My understanding is we are within our rights to have core values for our organization.

Q. Even if it's opposing --

A. That we -- I'm sorry.

Q. Go ahead.

A. That we ask our employees to abide by.

Q. And that's even if it's imposing an employer's view of their own religious beliefs on its employees?

MS. SANDERS: Object to the form. She can answer.

THE WITNESS: My understanding is yes.

BY MS. COLLINS:

Q. And other than the trainings that you've received from Armando Lopez and other leaders, is your understanding based on anything else, that that premise we just discussed was okay?

Case 3:20-cv-00628  Document 393-51  Filed 08/11/22  Page 4 of 30 PageID #: 8350

A.    Not that I know of.

Q.    Is it possible that that understanding is incorrect, an incorrect interpretation of Title VII?

A.    Anything is possible.

Q.    As a member of the HRC, do you think it's important to understand the ins and outs of Title VII?

A.    Yes.

Q.    As a member of the HRC, decisions you make can result in the loss of an employee's career; you understand that?

A.    No.

Q.    No?  Well, you terminate employees, so they can lose their job, right?

A.    You said career.  Yes, they can lose their job.

Q.    Okay.  And many of your employees that work there consider their jobs their career, right?

          MS. SANDERS:  Object to the form.

          THE WITNESS:  I don't agree with that statement.

BY MS. COLLINS:

Q.    Do you consider your job at Ramsey Solutions your career?

A.    It is part of my career.

Case 3:21-cv-00923 Document 337-1 Filed 08/13/26 Page 5 of 30 PageID #: 4861

Q. Okay. What is the distinction in your mind between a job and a career?

A. My career would be over my lifetime. This is one job.

Q. Have you ever hired anyone who is visibly pregnant?

A. I don't recall.

Q. Would you agree that it's probably harder for a pregnant person to get a job when they're visibly pregnant?

A. I do not. I do not agree with that.

Q. But you've never personally hired someone who is visibly pregnant, right?

A. Not that I remember.

Q. What is your understanding as to what discrimination is under Title VII?

A. My understanding is refusing to hire someone or terminating someone.

Q. On the basis of what?

A. The various elements of that title which I do not remember all of them.

Q. I think we already discussed that includes religion and sex or pregnancy, right?

A. Not sex. Pregnancy, yes. Religion, yes. I'm sorry, sex as in their gender? I don't

Case 3:20-cv-00628  Document 93-51  Filed 08/11/22  Page 6 of 30 PageID #: 4702

understand what you're asking.

Q.    Do you have any understanding as to whether or not Title VII covers discrimination on the basis of sex?

A.    As far as gender, yes.

Q.    Do you understand discrimination to mean to treat differently, basically?

A.    I don't remember specifically.

Q.    Have you ever hired someone who was not Christian?

A.    Possibly.  I don't know for sure.

Q.    Have you been a part of employee interviews before they get hired?

A.    Yes.

Q.    What about spousal interviews?

A.    Yes.

Q.    As part of either the employee interview or the spousal interview, are they typically asked where they go to church?

A.    Not typically.

Q.    What do you mean by not typically?  Are they asked that sometimes?

A.    That is not -- that is not part of our questions that we ask prior to hiring someone.

Q.    Is there any discussion as to what their

Case 3:20-cv-00092628  Document 393-51  Filed 05/13/26 Page 22 of 30 PageID #:4873803

faith practices are?

A.    No.

Q.    So you've never been a part of a spousal interview that included discussions of an employee, where they go to church, or their faith practices?

A.    Only if they bring it up and desire to discuss it.

Q.    When you have participated in one of those spousal interviews, do you create any sort of documentation after the interview?

A.    Are you asking if I personally do?

Q.    Yeah.

A.    Personally after an interview, I will usually send an email with my thoughts on the -- on the interview.

Q.    Who would you typically send that to?

A.    It depends on the situation.

Q.    What do you mean by that?

A.    Depends on who the hiring manager is.

Q.    Would you send it to someone else besides the hiring manager?

A.    Possibly the recruiter.

      MS. SANDERS:  I'm sorry, Heather.  Did you just say someone else?  There was a little bit of an interruption.  Is that what you said?

Case 3:20-cv-00628  Document 93-51  Filed 05/13/26  Page 8 of 30 PageID #:48390

MS. COLLINS:   (Nods head.)

MS. SANDERS:   Okay.   Just making sure.

BY MS. COLLINS:

Q.     Are the recruiters for Ramsey Solutions in-house?

A.     Yes.

Q.     Has it been your experience that other people send out interview summaries like that after they've interviewed a candidate or had a spousal interview?

A.     I can't speak to how other people do it.

Q.     Have you received a summary like that from any other hiring managers?

A.     Yes.

Q.     Who?

A.     I cannot remember any off the top of my head.

Q.     Now, with respect to Title VII, would you agree with me that it's a violation of Title VII to treat an employee differently because they tell you they are pregnant?

MS. SANDERS:   Object to the form.   She can answer.

THE WITNESS:   Can you rephrase the question?

BY MS. COLLINS:

Q.     Well, do you agree that it would be a

Case 3:20-cv-00628   Document 337-1   Filed 05/13/22   Page 4 of 63 PageID #: 4405

violation of Title VII to treat an employee differently because they inform you they are pregnant?

A.    If by informing us they are pregnant, yes, that would be a violation to treat them differently.

Q.    It would also be a violation of Title VII to treat an employee differently because their religious beliefs are different than those of Ramsey Solutions?

MS. SANDERS:  I object to the form.  She can answer.

THE WITNESS:  My understanding of Title VII is we cannot discriminate or treat someone differently based on their religious views.

BY MS. COLLINS:

Q.    And would you agree with me that not all employees have the same religious view that premarital sex is prohibited by the Bible?

A.    That is possible.

Q.    Would those employees still be terminated, if they disagreed with the religious view held by Ramsey Solutions?

A.    I have never terminated someone for having that view.

Q.    But you have terminated employees who engaged

Case 3:21-cv-00923 Document 93-5  Filed 08/31/26 Page 25 of 763 PageID #: 484006

see if you did?

A.    I have turned over all text messages, anything that was asked of me, to my attorneys.  I don't recall any specifics.

Q.    Okay.  How many text messages did you turn over?

A.    I don't remember.

Q.    But you did turn over text messages that had to do with Caitlin O'Connor?

A.    This one for sure I did.  I don't recall if there were any others.

Q.    Did you know that it was illegal to terminate a qualifying employee when they notify you that they need FMLA?

          MS. SANDERS:  Object to the form.  You can answer it.

          THE WITNESS:  Yes.  And that is not why we terminated Caitlin O'Connor.

BY MS. COLLINS:

Q.    Okay.  But part of the reason why she notified Ramsey Solutions of her pregnancy was in the context of requesting FMLA, correct?

A.    She did request to speak about FMLA in her initial email to Human Resources.

Q.    Do you know if she was provided a notice of

Case 3:23-cv-00828 Document 93-5    Filed 05/13/26 Page 61 of 763 PageID #: 4807

her rights under the FMLA?

A. I do not know for sure.

Q. As a member of the HRC Committee, did you ask as to whether or not she was provided a notice of her rights?

A. No. That would be our Human Resources Department obligation.

Q. Do you know what I mean by notice of rights?

A. Not exactly.

MS. COLLINS: Okay. Let's take a quick break. Off the record.

(Short break.)

BY MS. COLLINS:

Q. Ms. Simms, would you agree with me that the prohibition against premarital and extramarital sex is not written down anywhere at Ramsey Solutions?

A. To my knowledge -- I can't speak for certain, but to my knowledge it's not formally written down.

Q. And what is your understanding as to how it's communicated?

A. We communicate in multiple ways with our team that we do not want them engaging in sex outside of marriage, from the interview process, to the on-boarding, to regular communication from our staff meeting with our entire team.

Case 3:21-cv-00028 Document 93-5 Filed 08/31/22 Page 71 of 763 PageID #: 8008

Q.    Is all of that verbal?

A.    Yes.

Q.    Okay.  Would you agree with me that most important things should be reduced to writing?

A.    I do not agree with that.

Q.    Okay.  Why not?  What do you disagree about that?

A.    I feel we are very clear and very effective in our communication of all our core values.

Q.    But y'all just don't put some of them down in writing, correct?

A.    We did not put in formal writing the specifics around the sex outside of marriage.

Q.    Has that ever been considered?

A.    I don't know for sure.

Q.    Have you been a part of any conversations where that's been considered?

A.    Not that I recall.

Q.    Do you know of an employee named ███████████████?

A.    I am aware of ███████████.

Q.    Why was ██████ terminated?

A.    ██████ was not terminated.

Q.    Did ██████ quit?

A.    If I am remembering the correct person, ████████

Case 3:20-cv-00828 Document 93-5   Filed 08/31/26 Page 13 of 30 PageID #: 86409

resigned from our organization.

Q. Do you know why?

A. My memory is that she resigned because she very respectfully told us she disagreed with some of our core values.

Q. Which core values?

A. I don't remember specifically which ones.

Q. Was Caitlin O'Connor's situation brought up?

A. I'm sorry, can you repeat the question? It faded out.

Q. Sure. Was Caitlin O'Connor's situation brought up?

A. I don't recall if it was in that conversation.

Q. Did she sign an NDA or severance agreement?

A. I don't recall.

Q. Was she asked to resign?

A. No.

Q. Did she work in your department?

A. At the time she resigned, I do believe she worked in a department that reported up to me.

Q. Do you recall who her immediate supervisor was?

A. No, I don't recall exactly who it was.

Q. What did you do to prepare for your

Case 2:23-cv-00828 Document 93-5   Filed 05/17/26 Page 14 of 30 PageID #: 8610

Q. in premarital sex, right?

A. Yes.

Q. Wouldn't that imply that they disagree with any sort of religious premise that premarital sex is prohibited by the Bible?

A. Having a view and engaging in are two different things.

Q. Okay. Well, if an employee makes a decision to engage in premarital sex, wouldn't that indicate that they disagree that it's prohibited by the Bible?

A. Not necessarily.

Q. What do you mean by that?

A. I don't believe that everyone who has premarital sex believes that it's okay to do that based on what the Bible says.

Q. Isn't it true that the Bible is actually silent as to that premise?

A. As to which premise?

Q. That premarital sex is prohibited?

A. I believe the Bible says that it is wrong to have sex outside of marriage. That's what I personally believe.

Q. But you just don't know any sort of Bible verse that supports that belief, right?

Case 3:23-cv-00828 Document 93-5  Filed 05/31/26 Page 15 of 30 PageID #: 4011

A. I don't have any scripture references memorized.

Q. Were you aware that Title VII prohibits retaliation in the workplace?

A. I am not familiar. I don't remember specifically on that.

Q. Okay. Why is it a private corporation's business under what circumstances an employee can get pregnant?

A. We are private. That pretty much answers the question. We have decided we want a certain culture here, one in which people are not sleeping around.

Q. Okay.

A. And that is within our rights as a private organization.

Q. Okay. And it's your belief that as a private corporation they can ask employees when they have sex or if they're married or not, if they're engaging in sex outside of marriage?

A. I believe it is our right. We do not conduct that. We have never asked our employees those questions.

Q. Would an employee be terminated if they refuse to answer those questions as to whether or not they are having sex outside of marriage?

Case 3:20-cv-00828 Document 93-5 Filed 08/31/26 Page 27 of 763 PageID #: 484012

A.    I don't know how to answer that.  That's not part of our -- that's not part of the way we conduct ourselves in leading this organization.

Q.    Well, Caitlin O'Connor was terminated because she notified the company she was pregnant outside of marriage, right?

A.    No.  That is not why she was terminated.

Q.    Okay.  What is your belief as to why she was terminated?

A.    Because she had sex outside of marriage, which is in violation of our core values.

Q.    And the company only knew about that because she notified it that she was pregnant, correct?

A.    That is how we became aware, yes.

Q.    And Caitlin O'Connor was not a personality with the company, was she?

A.    No.

Q.    She wasn't the face of the company?

A.    She was not a public face of the company, no.

Q.    She was an administrative assistant, correct?

A.    Yes.

Q.    Was she an administrative assistant in one of the departments that you oversee?

A.    No.

Q.    Sitting here today, can you think of any

Case 3:23-cv-00828 Document 93-5   Filed 05/17/26 Page 28 of 76 PageID #: 4013

Q. non-Christians that work at Ramsey Solutions?

A. We have a thousand team members, and I do not know the large majority of them so no, I cannot list any names.

Q. Well, do you know of any employees there are Muslim and do Noonday Prayers?

A. I personally do not.

Q. Have you seen any or do you know if there are any Jewish employees?

A. I personally do not.

Q. Now, did there come a point in time when with respect to the righteous living core value that it was determined that premarital intercourse was prohibited but not premarital oral sex?

A. As far as the core value itself, I don't remember a specific conversation where we made that blanket statement.

Q. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX XXXXXXXXXXXXXXXXXXXXXXXXXX

XX XXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXX

Case 3:21-cv-00923 Document 89-5   Filed 08/13/26 Page 29 of 763 PageID #: 48414

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXX   XXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXX

XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXX

CaSeS2e3t2Ov-0O90oB28 DDoocument897-5  FFiled0857317/226 Paaega301o5 763PaogeuI2#D 484015

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXX

XX       XXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXX

XX       XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXX

XX      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

Q.      And as far as you know, you're not aware of any situation where a female employee like Caitlin O'Connor would have notified the company of a pregnancy outside of wedlock where any sort of restoration plan would have been offered?

A.      Can you say the question one more time?

MS. COLLINS:  Sure.  Deb, can you just repeat what I said?  I'll see it if makes sense.

(Question was read.)

THE WITNESS:  I am not aware of any situation where that has happened.

BY MS. COLLINS:

Q.      Okay.  When did you first find out about Caitlin O'Connor notifying the company that she was pregnant?

A.      I don't remember the exact date.  I believe I was notified by an email from Armando Lopez.

Q.      Okay.  When you received the email, did you discuss it with anyone?

Case 3:23-cv-00828 Document 93-5   Filed 05/13/26 Page 22 of 63 PageID #: 4817

A.    Not that particular -- not in that particular moment.

Q.    Okay.  When you received the email, were you aware that she was not married?

A.    Yes.  I believe she stated that in her email. But I was aware she was not married.

Q.    So was it a foregone conclusion that she would be terminated because she was not married?

A.    In being consistent with our core values, the fact that she had sex outside of marriage meant that we would terminate her.

Q.    If she would have gotten married, would she have been given a restoration plan or a second chance?

A.    That's a hypothetical.  I cannot answer that question.

Q.    Was that discussed or considered?

A.    We never had a discussion because she never brought up the idea that she would get married.

Q.    Did you have any discussion with her or ask her if she had plans to get married?

A.    No.  And the core value had already been violated because she had sex outside of marriage.

Q.    So there was no way, there was no path that she could have taken to redeem herself at that point

Case 3:20-cv-00828 Document 89-5   Filed 05/17/26 Page 32 of 63 PageID #: 4918

to keep her job?

A.    In being consistent with core values, we did not have a choice but to terminate her.

Q.    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXX

                   XXXXXXXXXXXXXXXXXXXXXXXX

             XXXXXXXXXXX  XXXXXXXXXXXXXXXXXXX

             XXXXXXXXXXX  XXXXX

             XXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXX

XXXXXXXXXXXXXXX

XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XX        XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

Q.    If Ms. O'Connor would have notified the company closer to her due date that she had engaged in, you know -- that she was pregnant and unmarried, would she have still been terminated?

A.    She would have been terminated for having sex outside of marriage.

Q.    Did you know that she had had other children outside of wedlock?

Case 3:20-cv-00828 Document 93-5   Filed 05/17/26 Page 24 of 63 PageID #: 85019

A.    I knew she had other children.  I don't remember the circumstances.

Q.    Now, when you received the email, did you have any -- or after you received the email from Armando Lopez that Caitlin O'Connor had sent to him, did you have any conversation with Ms. O'Connor?

A.    I did.

Q.    Okay.  Tell me what you recall.

A.    I recall having a phone conversation with her, and I recall having a meeting in person with her.

Q.    Which came first, the phone conversation or the meeting?

A.    The phone conversation.

Q.    Right.  Did you have that on your cell phone or your company phone or just your landline?

A.    Cell phone.

Q.    Okay.  Did you record the phone conversation?

A.    No.

Q.    Is your cell phone a company-provided cell phone?

A.    Yes.

Q.    Okay.  When did you speak with her?

A.    I don't remember.

Q.    Okay.  What do you recall about the phone

Case 3:20-cv-00828 Document 93-5   Filed 08/31/26 Page 24 of 30 PageID #: 8020

conversation?

A.    I really don't recall anything from the conversation specifically.

Q.    What do you recall generally about the phone conversation?

A.    The only thing generally I remember is feeling very much the intention of wanting to make sure Caitlin was okay.

Q.    Do you recall her telling you anything in specific?

A.    I don't.

Q.    Do you recall any specific questions that you asked her?

A.    No, I don't.

Q.    Did you take any notes?

A.    No.

Q.    Was anyone else present when you had that phone conversation with her?

A.    No.

Q.    Then you mentioned -- well, about how long did the phone conversation last, if you recall?

A.    I don't remember.  I do feel like it was fairly brief.

Q.    Okay.  So tell me about the meeting that you had with her in person.

Case 3:20-cv-00828 Document 93-5   Filed 05/17/26 Page 25 of 30 PageID #: 4521

A.     Jen Sievertsen and I met with her not long after us receiving the email.

Q.     Okay.  What do you recall about that meeting?

A.     I do not recall details.  I simply recall that we simply wanted to see how Caitlin was doing and if she was going to be doing okay.

Q.     What do you mean if she was going to be doing okay?

A.     Just if she was okay.  We didn't know.  We had no reason to assume that she was feeling great about her situation or not.  So we simply wanted to sit down with her and see how she was doing.

Q.     What do you mean feeling great about her situation?  About the fact that she was pregnant or the fact that she was going to lose her job?

A.     Based on her email to Armando, we wanted to make sure she was okay.

Q.     What do you mean by okay?

A.     We wanted to make sure that she was doing okay, as one person to another would ask if they were doing okay.

Q.     Well, I need you to explain that.  Do you mean emotionally?  What do you mean?

A.     That was part of it.  She referenced in her email she knew that there was a conflict of our core

Case 3:20-cv-00828 Document 93-5   Filed 05/13/26 Page 27 of 63 PageID #: 4822

values.  We knew she might be nervous.  We knew -- we didn't want to assume anything.  So we simply wanted to see how she was doing.

Q.    Okay.  Did you take any notes?

A.    I don't recall.

Q.    Did you send a summary of the meeting to anyone?

A.    I don't recall.

Q.    Have you checked to see if you had any notes or an email summary of the meeting?

A.    I personally have not unless -- not -- not that I recall.

Q.    Sitting here today, you don't know if you created any notes from that meeting that you had with Caitlin O'Connor?

A.    I do not know for sure if I personally did.

Q.    Okay.  And you haven't checked?

A.    No.

Q.    All right.  So you had the meeting with Caitlin O'Connor and Jen Sievertsen to see if she was okay.  Do you recall anything else about the meeting?

A.    No.  It was very brief.

Q.    How did Ms. O'Connor seem during the meeting?

A.    I don't remember specifics.  I do feel like

Case 3:23-cv-00828 Document 93-5   Filed 08/31/26 Page 27 of 30 PageID #: 8023

she expressed to us that she was happy, and her boyfriend was very happy about the situation. And I don't remember much else about that conversation.

Q.    Where did the meeting take place?

A.    In my office.

Q.    Was the door open or shut?

A.    Closed.

Q.    Do you recall if anyone else took notes, if you observed anyone else taking notes during the meeting?

A.    I don't recall.

Q.    Okay. If you could pull up Exhibit Number 6 for me, please.

        MS. SANDERS:  I just handed the witness an exhibit marked Number 6 from Mr. Lopez's deposition.

        WHEREUPON, a document was presented, previously marked as Exhibit Number 6.

BY MS. COLLINS:

Q.    Okay. All right. Ms. Simms, have you seen this email thread before?

A.    Yes.

Q.    Now, it looks like you were provided Ms. O'Connor's phone number on Friday, June 19th. Do you think that was the day that you called her?

Case 2:20-cv-00828 Document 93-5   Filed 08/31/26 Page 29 of 63 PageID #: 8524

A.    I don't remember exactly.  It is possible.

Q.    Before you met with Ms. O'Connor did you have any conversations with Jen Sievertsen as far as what you expected to get from the meeting with Ms. O'Connor?

A.    Actually, I don't remember if we had any conversations prior to the meeting.

Q.    Okay.  And on Exhibit Number 6, it looks like Dave Ramsey sent the HR Committee, which you're a part of, an email at 5:10 a.m. on June 19th.

      Did you have any conversations with him about Ms. O'Connor after he sent this email?

A.    No.  No.

Q.    So at any point in time did you have any conversations with Mr. Ramsey about this email that he sent on June 19th?

A.    No.

Q.    Did you have any conversations with him about Caitlin O'Connor?

A.    Like during this time frame?  During which time frame?

Q.    During the time frame around her termination?

A.    No.

Q.    In Mr. Ramsey's email, he states:  Then next week we will follow the steps we did before.  What

Case 3:20-cv-00828 Document 93-5   Filed 05/17/26 Page 29 of 30 PageID #: 4875

was your understanding as to what that meant?

A.    My understanding was that we would have to terminate her as we had had to do previously due to the conflict with our core values.  It also included making sure that we would financially take very good care of her.

Q.    And that was in the form of severance agreement?

A.    In this case it was not just severance.  We offered a full year of health insurance for she and the baby as well.

Q.    And she would have also been required to sign a nondisclosure agreement as part of that severance agreement, correct?

A.    Yes.  As part of any severance agreement, yes.

Q.    Which meant she couldn't talk about the reasons why she was terminated, correct?

A.    That's correct.

Q.    And it also prohibited her from pursuing her legal rights with respect to any discrimination she felt she experienced as a result of her termination, correct?

MS. SANDERS:  Object to the form.  You can answer.